UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, and NICHOLAS MCGRANE,<br><br>Defendants. | Case No.: _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Plymouth County Retirement System ("Plaintiff") alleges the following upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC") made by Evolent Health, Inc. ("Evolent" or the "Company") and related parties; (b) review and analysis of press releases and other publications disseminated by Evolent and related parties; (c) review and analysis of shareholder communications, conference calls and postings on Evolent's website concerning the Company's public statements; (d) review of and analysis of news articles concerning Evolent and related parties; and (d) review of other publicly available information concerning Evolent, related parties, and/or the Individual Defendants (as defined below).

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons or entities that purchased or otherwise acquired Evolent common stock from March 3, 2017 through May 28, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange

Act of 1934 (the "Exchange Act").  Plaintiff alleges that Defendants violated the Exchange Act by

publishing false and misleading statements to artificially inflate the Company's stock price.

2.      Evolent provides health care delivery and payment services to a national network

of health systems across Medicare, Medicaid and commercial markets.  The Company's "end-to-

end" suite of management, administrative, and analytical services is designed to capitalize on the

transition to value-based health care.  To this end, Evolent's business model seeks to develop

financially "aligned partnerships" with healthcare providers and plans, which supposedly benefits

customers by enabling them to expand their market opportunity, control costs and improve the

quality of care.

3.      Evolent's business model has been described as having a "land and expand"

strategy, whereby the Company seeks to "land" new health plan customers and then "expand" the

scope of services provided to them to increase revenues.  Under the land and expand model,

Evolent attracted health plan partners, who were commonly in impaired financial condition, by

offering them loans, equity investments and other extensions of capital.  The investments often

provided Evolent with a means to exert influence over its customers, such as pushing additional

service offerings.  The strategy of landing new clients and then pushing through increasing services

was key for Evolent to book increasing revenues.

4.      By the end of 2018, Evolent had contractual relationships with over 35 operating

partners, many of which were either related parties or companies in which Evolent had significant

ownership or had provided financing at the onset of the relationship.  The largest of these partners

was University Health Care, Inc., d/b/a Passport Health Plan ("Passport"), which represented 20%

of the Company's revenues.  Evolent made it clear to investors, however, that the Company's

strategy was to service health plans and not own them, as that would increase its exposure to

fluctuating reimbursement rates and increasing costs of care, as well as other political and financial risks that health plans face.

5.     During the Class Period, Evolent materially misrepresented the nature of its customer "partnerships" and the sustainability of its partnership business model, particularly in regard to Passport. For example, Evolent stated in its SEC filings that the core elements of its platform included "long-term, embedded and aligned partnerships with health systems to enable us and our provider partners to grow together." Evolent also emphasized to investors that its "business model provides strong visibility and aligns our partners' incentives with our own" and that the Company was "in the early stages of capitalizing on these long-term aligned partnerships." In truth, however, Evolent's partnership model was not aligned with its partners and was in fact designed to extract ever increasing fees for the Company at the expense of its partners. This was particularly true for Passport, which Evolent used as a cash cow while draining the vast majority of its employees, functions, and money, leaving it a shell of its former self and on the verge of collapse.

6.     Ultimately, on May 29, 2019, Evolent shocked investors when it unexpectedly announced that it was buying a controlling interest in Passport, which was essentially a bailout of the financially distressed health plan. Evolent acquired Passport despite previously stating that it had no intention of buying any health plans for the foreseeable future and that acquiring health plans was not part of its strategic focus. In addition, in acquiring Passport, and contrary to the Company's positive statements during the Class Period, Evolent admitted that Passport was performing poorly and was not being run or managed properly, despite paying massive management fees to Evolent for what was previously understood by investors to be an aligned relationship. In reaction to these disclosures, Evolent's stock price plummeted nearly 30%, wiping

3

out $340 million in shareholder value in a single trading day. Evolent's stock price has continued to decline since the May 29 announcement and its stock price is currently trading under $7.00 per share, nearly 80% lower than its Class Period high of $28.75 per share.

7.      As a result of Defendants' false and misleading statements and omissions and the precipitous declines in the market value of the Company's common stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as Evolent is headquartered in this District.

## III.  CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Evolent common stock from March 3, 2017 through May 28, 2019, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Evolent and

4

the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

12.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Evolent's common stock was actively traded on the New York Stock Exchange ("NYSE") (an open and efficient market) under the symbol "EVH." Millions of Evolent shares were traded publicly during the Class Period on the NYSE. As of May 6, 2019, Evolent had approximately 82 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by Evolent and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

13.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

14.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)  whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)  whether Defendants participated in and pursued the common course of conduct complained of herein;

c)  whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Evolent;

d)  whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Evolent;

e)  whether the market price of Evolent common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)  the extent to which the members of the Class have sustained damages and the proper measure of damages.

16.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

IV.  **PARTIES**

17.  Plaintiff Plymouth County Retirement System purchased Evolent common stock during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and suffered damages as a result of the federal securities law violations alleged herein.

18.  Defendant Evolent is incorporated in Delaware, and the Company's principal executive offices are located in Arlington, Virginia.  Evolent common stock trades on the NYSE under the symbol "EVH."

19.     Defendant Frank Williams ("Williams") has served at all relevant times as the Company's Chief Executive Officer and Co-Founder.

20.     Defendant Nicholas McGrane ("McGrane") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

21.     Defendants Williams and McGrane are referred to as the "Individual Defendants."

22.     Evolent and the Individual Defendants are referred to as the "Defendants."

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Evolent, were privy to confidential, proprietary and material adverse non-public information concerning Evolent, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Evolent's business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations

to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Evolent's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Evolent's common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.    The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Evolent's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## V.    **SUBSTANTIVE ALLEGATIONS**

### A.    **Background**

28.    According to the Company's SEC filings, through its "end-to-end, built-for-purpose, technology enabled platform" Evolent aligns or partners up with health systems and

8

physicians organizations and provides "integrated, technology-enabled services" and third-party administration ("TPA") to partners "to transition their organization and business model to succeed in value-based payment models." Through its value-based care business model, Evolent allows its "provider partners to expand their market opportunity, diversify their revenue streams, grow market share and improve the quality of the care they provide." The Company considers "value-based care to be the necessary convergence of health care payment and delivery" and believes that value-based care will control "large portions of health care delivery costs." As of December 31, 2018, Evolent had contractual partnerships with over 35 operating partners.

29.     The core elements of Evolent's "value-based care services include: (1) Identifi®, our proprietary technology system that aggregates and analyzes data, manages care workflows and engages patients, (2) population health performance, which supports the delivery of patient-centric cost effective care, (3) delivery network alignment, comprising the development of high performance delivery networks and (4) integrated cost and revenue management solutions including PBM [pharmacy benefit management] and patient risk scoring."

30.     On February 1, 2016, Evolent entered into a strategic alliance with Passport, a nonprofit community-based and provider-sponsored health plan administering Kentucky Medicaid and federal Medicare Advantage benefits to approximately 300,000 Kentucky Medicaid and Medicare Advantage beneficiaries. The transaction included a 10-year arrangement under which Evolent provides various health plan management and managed care services to Passport. At the inception of the partnership, Evolent issued 1.1 million shares to Passport to acquire capabilities and assets from Passport to build out a Medicaid Center for Excellence in Louisville. Evolent then ramped up the services it provided to Passport, which quickly became a vital component in the

Company's ability to generate organic growth. A significant portion of Evolent's revenue comes from Passport, which comprised 17.5% of its consolidated revenue for 2018.

31.     After the inception of the Passport "partnership," Passport's financial health deteriorated dramatically while its administrative costs and fees to Evolent skyrocketed. Prior to the partnership, Passport, which was considered a well-established and mature health plan, had turned profits of $115 million in 2014 and $39 million in 2015. But in 2016, the first year of the partnership, Passport lost $58 million, then struggled to make $18 million in 2017, and once again lost over $122 million in 2018, as illustrated below.



32.     Passport's already poor financial condition became dire in September 2018 when Kentucky cut Passport's Medicaid payments and made the change retroactive to July 2018. These rate cuts, which were originally proposed in January 2018, hit Passport so hard that Passport issued a going-concern warning in January 2019. However, Passport's issues and poor financial condition began well prior to the Medicaid rate changes. As noted in a January 2019 article from

*Insider Louisville* titled, "Passport's finances being dragged down by $220M 'management fees' to Evolent Health," Passport's fiscal troubles "began even before the state changed the distribution of its Medicaid dollars last summer." As stated in the *Insider Louisville* article:

> In the last three years, Passport paid the publicly traded Evolent Health some $220 million in non-employee management fees, accounting for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead.

33.     The article noted how "Passport's money problems are a result of overspending," and that the company's non-profit expenses were rising much faster than its revenue. The main cause of these financial difficulties was that Passport was paying high fees to Evolent for outsourcing, with Evolent using Passport's former employees and overcharging for the same services. Notably, Passport's employees fell from 655 in 2015 to only 202 in 2017 – a decline of over two-thirds – the majority of whom were poached by Evolent. The article stated that "Passport essentially outsourced to Evolent the work those employees were doing and paid the company a management fee. From 2015 to 2017, salaries Passport paid fell to about $17 million, down $22 million, while non-employee management fees rose to $129 million, up $86 million." In other words, Evolent exerted control over Passport to extract funds, forcing Passport into financial distress.

34.     In March 2019, Passport revealed that it had lost a staggering $122 million in 2018. While Passport blamed the situation solely on the Medicaid cuts, Kentucky Governor Matt Bevin stated that Passport was actually "a very poorly run operation from a financial standpoint," and that it was "bleeding out" because of its own operational failures. In fact, Passport had been losing money in 2018 even before the cuts. Nonetheless, in April 2019, Kentucky rescinded the cuts to help Passport which allowed Evolent to give the appearance that Passport was back on the path to

solvency. However, unbeknownst to investors, Passport had begun trying to sell itself to, among others, Evolent.

**B.** **Defendants' Materially False and Misleading Statements**

35.     On March 3, 2017, the Company filed an annual report on Form 10-K for the year ended December 31, 2016.    The Form 10-K contained signed certifications by Defendants Williams and McGrane pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Evolent represented in the Form 10-K, "our business model provides strong visibility and aligns our partners' incentives with our own" and "[w]e expect to grow with current partners as they increase membership in their value-based programs, through expanding the number of services we provide to our existing partners and by adding new partners" as Evolent's business model is based on "[l]ong-term, embedded and aligned partnerships with health systems to enable us and our provider to grow together." Evolent further touted that it is "in the early stages of capitalizing on these aligned operating partnerships" as it continues to "leverage [its] purpose-built technology platform and centralized resources in conjunction with the growth of [its] partners' membership base." In addition, Evolent represented the following concerning its "Partner Relationships":

> Our business model is predicated on long-term strategic partnerships with leading providers that are attempting to evolve two of their most critical business functions: how they deliver care and how they are compensated for it. The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, long-term contractual relationships and a cycle of clinical and cost improvement with shared financial benefit.
>
> We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care.  By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective cost setting to payers, employers and consumers, which enable them to capture greater market share.  As providers have succeeded in lowering costs and growing market share, this enables them to increase their value-based offerings.  By virtue of our business model, we benefit from our partners' growth.

36. On May 9, 2017, the Company issued a press release reporting its financial results for its first quarter ended March 31, 2017, and conducted an investor conference call where Williams touted that the Company continues "to see strong demand for the Evolent platform" as providers "accelerate success in value-based care." As a result, Williams represented that Evolent's "current pipeline continues to be very strong in terms of breadth and depth with a number of later stage discussions moving with pace. One of the compelling aspects of a revenue model is that we have multiple sources of organic growth between expanding solutions and covered lives that our existing partners as well as adding new providers to the Evolent network."

37. As to Passport, Williams stated that Evolent was "able to leverage its experience and strong provider network in combination with the Evolent platform to drive greater efficiency and to improve quality of care across the large and diverse population." Williams also represented:

> As a result of our early success, the leadership team at Passport spent last several month's evaluation Evolent Health's capabilities and recently made the decision to move all TPA services to our platform later this year. The migration decision was driven of a belief in our vision of bringing together claims, clinical and financial information in an integrated platform to drive greater flexibility and clinical value in serving providers and patients.

38. On August 7, 2017, the Company issued a press release reporting its financial results for its second quarter ended June 30, 2017, and conducted an investor conference call where Williams represented that its business model seeks "situations where we can be aligned with our partners" and "structured fees in some sort of upfront investment and working with our clients that we are in a co-ownership position." Thus, Evolent's business model seeks health plans where Evolent is not only providing "clinical platform and infrastructure but also being aligned partner financially with skin in the game as these providers move towards risk." Similarly, Williams represented:

[P]roviders really prefer when we have some skin in the game and we feel truly aligned. I think it changes the nature of the relationship and frankly when we do that, we can be more directive about what we require of the partner to drive performance. And I think increasingly in our business we're looking for situations where we can participate as an aligned partner and drive very specific actions in terms of how there are ultimately operating their risk business, how they're thinking about a number of decisions relative to it.

Because we think in doing that one it changes the nature of the relationship it makes it feel longer-term in nature in some cases perpetual. And then enables us to drive performance because we're able to control many more levers than if we're just in a pure service relationship. And we do feel that's really important because as many of you know this is hard stuff and you've got to get all the decisions right how you price products, what the benefit design is, how you think about position compensation and network composition, how you think about side of service all of those issues and increasingly we believe if our customers are going to be successful, and we're going to be successful long-term, we want to be at the table participating in those decisions and structuring our relationships in a way that allows us to do that.

39. With respect to Passport, Williams claimed Evolent had a "very aligned relationship" and "a long-term arrangement" with an initial term of 10-years, adding that "they really look at us is some ways — while we are separate entities that they look at us as a co-owner." Further, Williams stated that "we really have joint governance and we're able to drive the decisions we think are important for performance." Indeed, Williams touted that for "one partner, we've been able to transition hundreds of thousands of Medicaid beneficiary lives on to our platform and customize our predictive models to support the unique needs of this population."

40. On September 27, 2017, the Company issued a press release announcing, in part, the acquisition of "selected assets of New Mexico Health Connections" where the "assets will be contributed to a new entity, True Health New Mexico, Inc." ("True Health"). Specifically, in the press release, the Company represented that it "has entered into a unique agreement to acquire assets related to the commercial business from New Mexico Health Connections (NMHC) for $10.25 million in cash" in order "to establish a new health plan managed services organization that

14

will leverage Evolent's operational, clinical and technology services to support a provider-centric, value-based model of care throughout the state of New Mexico. "

41.     On November 2, 2017, Evolent issued a press release announcing financial results for the third quarter ended September 30, 2017, and conducted an investor conference call.  During the call, Williams represented that "proven clinical performance and its resulting impact on our partners' financial success is helping to extend our reputation as the market leader and the partner of choice, as organizations leverage our infrastructure, clinical knowledge base and deep expertise to create a differentiated physician and patient experience and associated outcomes" "through improved engagement, cost and quality."  Williams further represented, "[t]his is a core reason that we continue to invest in the technology and services platform that power our partners' value businesses, including our health plan services platform and identity."

42.     In response to an analyst's question about Evolent's relationships to its partners, Williams represented:

> I'd say one thing you're seeing in the evolution of our strategy a bit is looking for ways to align with our partner network.  Some of that can be in the way that we contract and sort of show confidence in our performance, so a small portion of our fees in performance based arrangements.  Some of them can be in co-ownership arrangements and where we see the opportunity to build networks across a large geography we do feel that co-ownership is an excellent model to bring that alignment.  We're then viewed as a co-owner, as a long-term partner, the relationship has a perpetual feel.  It also allows us to have a seat at the table in terms of driving some of the key metrics that are going to be important for performance.

43.     With respect to "the planned migration of Passport Health Plan to [Evolent's] health plan services platform," Evolent and Passport made the decision "together" to "provide a differentiated and more efficient service" and for the "opportunity to expand the depth of our strategic alliance, leveraging best practices from both entities to create value for Passport

unmatched by a traditional vendor-client relationship." Further, Evolent stated that the Evolent

team had "been working full time on this data migration and operational integration."

44.     On January 10, 2018, at an industry conference, Williams represented that Evolent

has "an affirmative business model" and does not view itself "as a vendor, but really, long-term,

aligned with our partner base and then proven clinical and financial results, and we're increasingly

seeing that across the portfolio." McGrane represented that Evolent has "built a scalable platform

that we've really been able to leverage through the addition of life growth in recent years." In

regard to co-investing with partners, McGrane represented that Evolent has "a very clear criteria

of what we're looking for, attractive markets, high-performing partners. We do extensive due

diligence. We bring to bear full set of our capabilities." Importantly, McGrane represented that

by "investing alongside partners," "through the combination of our capabilities and capital,"

Evolent really has "a seat at the table to ensure that they key levers of success — that we're driving

the key levers of success."

45.     With respect to True Health, Williams represented that the acquisition was a "very

unique arrangement for us" and represented that Evolent was "not" "getting into the health plan

business" despite the acquisition. Indeed, according to Williams, Evolent "saw a unique

opportunity in New Mexico, really, to work with a network that is low cost, very highly regarded,

where we feel we can grow that, both on the commercial side and other product lines, and already

is off to a very good start." Similarly, McGrane represented that True Health was a "one-off"

acquisition where the Company "could capitalize significant geographies, and have a very

profitable stream of revenue on our service tech platform with limited risk on the health plan side.

It's not a new strategy for us."

46.     As to Passport, McGrane represented that "Passport is a great example" of "co-invest[ing] and to set up very attractive long-term relationships" because "Passport will be over $80 million years in revenue, that's a 10-year term relationship with a business where we acquired some assets upfront that have really enhanced our Medicaid business."

47.     On February 27, 2018, Evolent announced fourth quarter and full year financial results for 2017, and conducted an investor conference call where Williams represented that Evolent's "work starts with data integration, rules development, stratification and predictive algorithms, which help our partner organizations to focus their care management efforts on the most impactable patients." During the call, Williams represented, "[w]ith our partner base, we experienced strong and consistent operational performance and gained increased confidence in the effectiveness of our clinical programs in improving quality and reducing medical costs." Williams stated that with Evolent's recent expansion of the Passport partnership, the Company was well-positioned for top-line growth with "over 90% visibility into our revenue for the coming year, and strong bottom line growth given the inherent scalability of our business model." Also, in addressing the Company's partnership acquisition strategy going forward and in light of a recent acquisition of True Health, Williams represented that True Health was "a unique investment for us as we don't anticipate any additional health plan acquisitions for the foreseeable future."

48.     On March 1, 2018, the Company filed an annual report on Form 10-K for the year ended December 31, 2017. The Form 10-K contained signed certifications by Defendants Williams and McGrane pursuant to SOX. The Form 10-K represented that Evolent's "business model provides strong visibility and aligns our partners' incentives with our own" and "[w]e expect to grow with current partners as they increase membership in their existing value-based programs, through expanding the number of services we provide to our existing partners, by adding

new partners and by capturing value through upside risk-sharing arrangements." Evolent further

represented that it is "in the early stages of capitalizing on these aligned operating partnerships"

as it continues to "leverage [its] purpose-built technology platform and centralized resources in

conjunction with the growth of [its] partners' membership base." In addition, Evolent represented

the following concerning its "Partner Relationships":

> Our business model is predicated on long-term strategic partnerships with leading
> providers that are attempting to evolve two of their most critical business functions:
> how they deliver care and how they are compensated for it. The partnership model
> enables cultural alignment, integration into the provider care delivery and payment
> work flow, long-term contractual relationships and a cycle of clinical and cost
> improvement with shared financial benefit.
>
> We have sought to partner with leading providers in sizable markets, which we
> believe creates a growth cycle that benefits from the secular transition to value-
> based care.  By helping these systems lower clinical and administrative costs, we
> believe we are positioning them to offer a low cost, effective cost setting to payers,
> employers and consumers, which enable them to capture greater market share.  As
> providers have succeeded in lowering costs and growing market share, this enables
> them to increase their value-based offerings.  By virtue of our business model, we
> benefit from our partners' growth.

49.     On May 9, 2018, Evolent issued a press release announcing financial results for the

first quarter ended March 31, 2018, and conducted an investor conference call where Williams

touted that Evolent provides "a cost-effective infrastructure that integrates clinical and

administrative functions under one roof, and allows our provider partners to leverage the benefits

of integration in driving performance."  Also, McGrane represented that Evolent has "been driving

efficiency and operational scale within our Medicaid business."  As to Passport, Williams reported

"[e]xciting progress and heartening to see such a high return on the investment we initiated roughly

2 years ago with Passport."

50.     On May 11, 2018, the Company participated in an analyst meeting where Williams

represented that Evolent has "[e]mbedded and aligned relationships…, but we do not want to be a

18

vendor…. And from the very outset, we've tried to figure meaningful ways to build alignment that makes that a 10-, 20-, 30-year relationship." Williams further represented that Evolent "creates alignment from the very outset" by aligning itself "with our partners by putting in capital to be able to say we need you to do the following seven things if you're going to be successful in their value business to really get a long-term commitment from them in terms of the relationship." Williams touted, "I think we feel very good about the infrastructure we've built, and our ability to take on very large pieces of business and to do it rapidly and to meet the needs of our clients, and to do that in multiple product areas."

51.     With respect to its financial commitment to Passport, Williams represented that Evolent "put $10 million into a Passport relationship" "because we felt that [it] could be a very, very large client for us and a very attractive client from a long-term perspective." Likewise, Williams represented that the partnership with Passport "is a multiple-year investment that we've made. And if you think about the average provider system trying to do this on their own and incorporate all these insights. I think next to impossible surely is to do it at this standard." Moreover, Williams represented that "Passport is a good example" of a "great partnership" where Evolent "introduced our PBM, which really helped address this rate cut and allowed them to get a lot of savings on the pharmacy side. We introduced risk adjustment, which was a new service, which again was really important in terms of helping economics. And then they actually moved over to our TPA towards the end of last year. And so you can see the growth within that." Further, Williams represented that the Passport partnership has:

> [R]eally helped align us with that organization. It has turned into an incredible partnership. We've been able to expand our service offering there, so we're now doing our PBM, our TPA. We're doing risk adjustment here. We actually have some ambitions to leverage their brand and platform potentially, more broadly in the state and in contiguous states. And so if you look at that $10 million investment

and you say, "Well did you generate a return from that?"  This will be a very high-return relationship for us.  The 10-year relationship, over $80 million a year in revenue, and so you just think about that investment and alignment makes a lot of sense from lots of different perspectives.

52.     McGrane represented that Evolent has "been able to deliver strong and consistent growth both with existing partners as well as adding new partners."  Further, McGrane represented that Evolent has "a scalable platform with significantly high flow-through on incremental lives....  We've a strong track record of accretive capital deployment.  And then finally, the business model is a PMPM [Per Member Per Month] recurring model, and that gives us a high degree of revenue visibility."  McGrane further described Evolent's business model:

> On the capital strategy, a lot of questions on this in the last 12 months or so.  So it's a balanced strategy, but I think it's also a very strategic strategy.  I'll start with the co-investment with partner strategy.  And again, it's strategic because these are choices we are making.  We're looking at situations where we want to partner with motivated partners to catalyze market opportunities that may otherwise not be available to us.  So again, it's a very deliberate strategy on our behalf.  We believe we're deploying modest amounts of capital in the context of large multiyear agreements.

> So it's a thoughtful strategy.  It's strategic.  We believe it enhances alignment and retention, which is a key long-term objective.  And it gives us access to downstream – to capture downstream value in these arrangements....  So again, I think the co-investment strategy is strategic and an important part of our strategy.  But, again, it's in selective instances.

53.     On August 7, 2018, Evolent issued a press release announcing financial results for the second quarter ended June 30, 2018, and conducted an investor conference call.  During the call, Williams represented that Evolent is "well positioned to meet both market needs through our integrated platform."  Further, Williams represented that Evolent's approach is "conservative in how we're building infrastructure to make sure we're managing costs well" and "drive[s] some impressive consistent results for our partners" through Evolent's "care model and platform." Specifically, Williams represented that Evolent has a "differentiated platform, highly integrated"

as it has allowed Evolent "to standardize and reduce costs in many areas, and then it's enabling us to do incredible things from a clinical performance perspective." Similarly, Williams further represented that Evolent serves "a critical role in several regions deploying a provider-led managed care model alongside our provider partners to help lower medical costs and improve health care for at-need patient populations."

54.    On September 12, 2018, the Company conducted an investor conference call where Williams represented that Evolent's partnership with Passport "has been very valuable to us. So today, we're approaching almost 2 million lives in Medicaid as a result of that relationship. So I think a very good use of capital and a very valuable partnership for us." Later in the call, Williams represented that Evolent had "figured out a way where the relationship with Passport and that investment in the Medicaid Center of Excellence and then having the TPA capability radically increased our penetration into that market." Williams further represented that Evolent's platform model can integrate "both clinical and the back office claims platform, and that has some major benefits in the way you can ultimately manage patients and in the level of integration you can bring to the customer base."

55.    On November 6, 2018, Evolent issued a press release announcing financial results for the third quarter ended September 30, 2018, and conducted an investor conference call where Williams represented that there is "an overwhelming sense that the shift to value-based care is accelerating." Williams also represented that "we continue to deliver strong clinical and financial results across our network and see a number of our partners gaining confidence in their value-based care strategies" and "we're pleased to see our Medicaid strategy continuing to pay off over the course of this year as we added four new Medicaid partners and now have more than 1.5 million total Medicaid lives under management." During the call, Williams represented that its growth in

adjusted services revenue was "primarily driven by new partners that went live in the first and second quarters, as well as growth from existing markets, particularly with Passport."

56. On January 9, 2019, at an industry conference, Williams affirmed "our model is not for full-plan ownership." Specifically, Williams represented that Evolent has "an attractive business model" with "[s]calable technology in a large and growing market." Moreover, Williams represented the following concerning Evolent's business model:

> Where we see opportunity is, if we have real-partner commitment, so they're really committed to the value-based strategy, they're going to invest over the long haul with a relationship in a market can scale to several hundred thousand lives. That obviously drives our profitability, where we're able to do that. Where there's shared control and accountability, so it has not worked well where the partner can make a lot of decisions that influence the value business, and we're not able to have a say in those things. Because if you price the business wrong, if you don't manage network aggressively, you will not have a successful business. And ultimately, align financial models. So I would say, a lot of our business early on was free-for-service oriented. We ultimately have never wanted to be a vendor, we want to be a long-term partner. And the question is, how do we ultimately set up those relationships.

57. With respect to Evolent's approach with its partners, Williams represented that the partnership is "a perpetual relationship," but "not going to be 100% owner of health plans, but we do like the middle bar where we can have co-ownership, and again, an aligned model." Williams further represented that Evolent "invest[s] alongside our partners to set up profitable, aligned, long-term relationships. And again, this alignment is key, commitment and alignment are key." Further, Williams used Passport as a case study where the "alignment and share commitment have significantly expanded the relationship over the last several years" because Evolent has been "willing to put our money where our mouth is on the clinical and share in the savings and ultimately take lower upfront fees to do that. And if you look at where we've done that, so this evolution is really been happening across, at least, surely the last year, we've done it with Passport." As such,

Williams represented that the "investment with Passport has really paid off. Absolutely wonderful organization."

58.    On February 16, 2019, various media outlets reported that on the prior day, Passport had filed a lawsuit against Kentucky's Health and Family Services, claiming that recent Medicaid rate cuts imposed by the state could bankrupt the company and alleged that the state agency exhibited "knowing indifference to the likelihood that such lowered rates would drive Passport out of business in a foreshortened period of time."  Immediately, on February 19, 2019, an analyst at Piper Jaffray commented that if Evolent "loses Passport as a client," then this "would amount to a $3/share impact to valuation."  As a result of the lawsuit and the risk to Evolent, Evolent's stock price dropped $1.81 per share or nearly 11%, to close at $14.99 per share on February 19, 2019.

59.    On February 26, 2019, Evolent issued a press release announcing financial results for the fourth quarter and year ended December 31, 2018, and conducted an investor conference call.  During the call, Williams represented that Evolent does "not focus[] on outright majority ownership in health plans, we are interested in exploring creative, aligned co-ownership arrangements."  Williams represented that Evolent is "driving a leaner cost structure across our operations as well as reorienting our investment strategy towards what we see as higher growth opportunities."  Williams also represented the following concerning Evolent's business model:

> [W]e've actively [been] evolving our business model into more aligned
> relationships that we believe will drive fundamentally better performance, better
> economics and longevity with our partners.  This movement is a result of our
> experience across the last several years and a realization that greater control and
> ability to execute on all of the available performance levers is critical for success
> in value-based care.  When we have relationships with an aligned structure, we
> attract the leading provider organizations to our model, have the basis for a true
> partnership and are able to meaningfully access the upside created in well-
> constructed risk arrangements.

60.     As to Passport, Williams represented that Evolent has been "taking a more conservative perspective on Passport for the year" where "we plan to work closely with the Passport leadership team on a plan to drive strong operations, high-impact clinical programs and focused initiatives that drive both efficiency and high-quality patient care." Significantly, an analyst asked Williams if, "in light of the Passport risk that's happening now, has that had any impact or has it changed your philosophy towards co-investing strategy?" Williams responded that the dispute with the state:

> hasn't changed our strategy and if anything, we believe we can build a scalable, sustainable value business with great profitability and longevity. We're going to be very selective about how we do it and what our exposure is. So you'll see us being very careful about the way we invest and thinking throughout the cash flow, long-term cash flow of the relationships and returns that we have generated. And I think if you look at the average returns, that we have generated, they have been high, again, if you look holistically at the relationship.

61.     Significantly, in answering another question about any changes to the Company's co-investing strategy, Williams represented that "there's no big change in strategy based on what we see happening with Passport specifically." Then when asked if Evolent would consider buying Passport if the situation got worse, Williams represented:

> I don't think we've thought about acquiring a full Medicaid plan. It's just not in our strategic lens at this point. Again, in certain situations we've talked about co-ownership models where we might have a minority stake in something. But related to Passport, that's not something that is currently being evaluated. As I said, there's lots of moving pieces relative to their business. They have a long history, they have an existing group of very supportive shareholders and that's just not been something that we've spent time on. We're really focused on supporting strong operations, clinical performance improvement, financial performance and doing everything we can to maximize that in the coming months, which I think is the right place for us to be focused.

62.     On February 28, 2019, the Company filed an annual report on Form 10-K for the year ended December 31, 2018. The Form 10-K contained signed certifications by Defendants

Williams and McGrane pursuant to SOX. The Form 10-K represented that Evolent's "Services

business model provides strong visibility and aligns our partners' incentives with our own" and

"[w]e expect to grow with current partners as they increase membership in their existing value-

based programs, through expanding the number of services we provide to our existing partners, by

adding new partners and by capturing value through risk-sharing arrangements and co-ownership."

Evolent further represented that it is "in the early stages of capitalizing on these aligned operating

partnerships" as it continues to "leverage [its] purpose-built technology platform and centralized

resources in conjunction with the growth of [its] partners' membership base." In addition, Evolent

represented the following concerning its "Services Partner Relationships":

> Our Services business model is predicated on strategic partnerships with leading providers that are attempting to evolve two of their most critical business functions: how they deliver care and how they are compensated for it. The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, contractual relationships and a cycle of clinical and cost improvement with shared financial benefit.

> We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care. By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective cost setting to payers, employers and consumers, which enable them to capture greater market share. As providers have succeeded in lowering costs and growing market share, this enables them to increase their value-based offerings. We benefit from our partners' growth and, in certain cases, we participate alongside our partners through various risk-sharing arrangements, including loans, provisions of letters of credit, equity investments, reinsurance and capitation arrangements and other extensions of capital.

63.     On May 7, 2019, Evolent issued a press release announcing financial results for the

first quarter ended March 31, 2019, and conducted an investor conference call where Williams

represented "in terms of our overall organization, we continue to emphasize building a high-

performance organization and strengthening our position as a leading destination for talent."

Williams also touted Evolent's business model:

> First, we believe we're well positioned in the market, given our proven track record and ability to support both providers and payers across multiple lines of business. Second, on the Medicare front, we're encouraged to see continued interest from IPAs and other provider groups, exploring their next step in the value-based journey.... Increasingly, we're focused on aligned partnership models and careful market selection. The goal is to find the right partners and situations, where we can add a significant number of lives and leverage our clinical capabilities with a high-performance physician network to deliver improved clinical and financial results. One critical source of value we provide to our Medicare partners in this process is an in-depth economic programs. We're able to build solid three to five year business cases for our partners based on our health plan experience, actuarial expertise as well as market, membership and other key data....

> The combination of our proven value-based care approach and health plan services platform offers payers the flexibility they need to generate cost savings and deliver high-quality services at scale. In addition, we offer in-depth clinical programs, technology and other support for providers working under various delegated risk arrangements with payers.

64.   Williams also represented that "Passport is making solid progress towards improving its financial performance" and "we continue to partner with Passport to drive performance improvement in all aspects of operations in an effort to insulate the health plan as much as possible from potential rate volatility in the future." Williams further represented, "Currently, we're pursuing several major initiatives in close collaboration with the Passport leadership team" including the following:

> First, we're working with Passport to evaluate and take steps to streamline its administrative cost to gain efficiencies. Second, we've taken a close look at clinical program areas of opportunity where we can leverage analytics, clinical pathways and multiple engagement modalities to support cost and quality improvements. As a result, we're launching several new clinical initiatives to proactively manage patients with chronic conditions, streamline care transitions and address unnecessary variation and outcomes. Third, we're also looking at potential improvements in specialty care, which represents a significant portion of medical spend in this particular Medicaid population. Fourth, we're working to maximize performance across the provider network based on outcomes analytics, which, we

believe, has the potential to drive improvements in both cost and quality of care. Based on these initiatives and given the strength of its clinical model, we believe that Passport is making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members. Overall, we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market. Taking a step back and looking across our partner network, we continue to see strong clinical performance and examples of how our integrated platform is assisting our partners in managing multiple populations and complex reimbursement arrangements. All in all, we came into this year with a clear set of priorities and we feel good about our initial progress, the growth in our pipeline and the overall market. The leadership team is highly engaged in driving strong execution operationally and financially with a focus on setting up a strong second half '19 and beyond.

65.     The above statements in paragraphs 35-64 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) Evolent's partnership model was not aligned with its partners as it was designed to parasitically increase its own revenue by extracting enormous administrative and management fees at the expense of its partners such as Passport; (2) Passport was struggling financially, particularly after Kentucky cut its reimbursement rates, and the partnership between Evolent and Passport was becoming increasingly unsustainable; (3) Evolent was draining Passport of functions, employees and money, to such an extent that Passport was left on the verge of insolvency; (4) Passport was conducting a bidding process for several months to sell itself to a financial buyer to prevent liquidation; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

### C.     The Truth Emerges

66.     On May 29, 2019, Evolent issued a press release revealing that it had "entered into a definitive agreement to partner with the current owners of Passport Health Plan in continuing to

serve Kentucky Medicaid market" as they "have been seeking a partner to provide expanded management and operational support, as well as capital through joint ownership of the health plan, and have selected Evolent as [their] long-term financial and operating partner." Specifically, under the definitive agreement, "Evolent will contribute $70 million for a 70 percent ownership interest in Passport Health Plan and will also provide interim balance sheet support if necessary to meet near-term regulatory capital requirements" and "Evolent will expand its existing Management Services Agreement (MSA) with Passport, taking on additional responsibilities for day-to-day management of the health plan including administrative, clinical and financial operations and oversight." The amended MSA had a term of ten years.

67. Later in the day, the Company conducted an investor conference call where Williams disclosed that Passport's "owners ran a competitive process and selected Evolent Health as Passport's long-term operating and financial partner." In detailing Passport's bidding process, Williams disclosed that the situation had "unfolded across the last several months" where Passport's owners conducted a "competitive process to select a joint venture partner to optimize the future performance of the plan from a strategic, clinical and financial perspective." Significantly, Williams disclosed that Evolent was "able to get very deep with [Passport] across the last several months" during the bidding process. Besides paying $70 million for the controlling interest, Williams disclosed that Evolent "will provide a $20 million statutory note to Passport to enhance its risk-based capital." Moreover, Williams disclosed that "Evolent will take over leadership of the plan, and Scott Bowers, our current National Medicaid President, will become CEO" who has "been very involved with Passport, so he will become on the ground there on a day-to-day basis." Having taken a controlling interest and taken charge, Williams stated that Evolent would offer "full accountability" and a "full suite of ideas in terms of generating

improvements on both the admin and the clinical side and a pace and force that is literally day-to-day in terms of the progress."

68.     During the conference call, Williams called the Passport acquisition a "strong strategic fit" and "unique opportunity for us," but admitted that Passport "had deteriorating financial performance" after suffering "substantial losses and those losses carry for several months" due to Medicaid rate cuts.  The deteriorating financial conditions at Passport required an Evolent team to respond to the dire financial situation "at the end of December and early January and really started putting in place a broad set of initiatives."

69.     In response to Evolent's disclosure that it was acquiring Passport, the Company's share price dropped $4.14 per share or nearly 30%, to close at $10.01 per share on May 29, 2019.

70.     On May 30, 2019, Evolent conducted a second conference call where Williams disclosed that Evolent was not "the highest bidder."  Further, Williams admitted Passport "in some ways reacted a little bit slowly to the change" in the Medicaid rate cuts and that "it hasn't really been run well over this last period" which caused "financial pressure."  However, Williams revealed that Evolent was "in there, and we knew Passport deeply."  Williams said on the same call, "[w]e have a clear line of sight into what's going on [at Passport]" and "know this asset very, very well."

71.     On May 31, 2019, a Piper Jaffray report noted that in part, "[t]he market's visceral reaction occurred because management had promised it would not buy another health plan (the stock had a similar reaction after EVH acquired TrueHealth NM)."  Also, an Oppenheimer analyst report stated concerns that the deal "sets a precedent if similar scenarios arise with other Medicaid clients."  On June 13, 2019, SunTrust summarized that Defendants' admissions had raised "investor pessimism [to] an all-time high."

## VI.     UNDISCLOSED ADVERSE FACTS

72.     The market for Evolent common stock was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, Evolent common stock traded at artificially inflated prices during the Class Period.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein. Plaintiff and the other members of the Class purchased or otherwise acquired Evolent common stock relying upon the integrity of the market price of the Company's securities and market information relating to Evolent, and have been damaged thereby.

73.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.

## VII.    LOSS CAUSATION

74.     During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Evolent common stock and operated as a fraud or deceit on Class Period purchasers of Evolent common stock by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When the Defendants' misrepresentations and fraudulent conduct were disclosed, the price of Evolent common stock fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Evolent common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

75. By Defendants' failing to disclose the true state of the Company's business, investors were not aware of the true state of the Company's financial status. Therefore, the Defendants presented a misleading picture of Evolent's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Evolent to conceal the truth.

76. The declines in the price of Evolent's common stock after the truth came to light were a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Evolent's common stock price decline negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Evolent's common stock and the subsequent decline in the value of Evolent's common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. SCIENTER ALLEGATIONS

77. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

31

78.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Evolent, their control over, receipt and/or modification of Evolent's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Evolent, participated in the fraudulent scheme alleged herein.

IX.     **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

79.     At all relevant times, the market for Evolent's common stock was an efficient market for the following reasons, among others:

   a)   Evolent's common stock met the requirements for listing, and were listed and actively traded, on the NYSE, a highly efficient market;

   b)   As a regulated issuer, Evolent filed periodic public reports with the SEC and the NYSE;

   c)   Evolent's common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

   d)   Evolent regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

80.     As a result of the foregoing, the market for Evolent's common stock promptly digested current information regarding Evolent from all publicly available sources and reflected such information in Evolent's stock price. Under these circumstances, all purchasers of Evolent's common stock during the Class Period suffered similar injury through their purchase of Evolent's common stock at artificially inflated prices and a presumption of reliance applies.

81.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Evolent's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.    NO SAFE HARBOR

82.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

83.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Evolent who knew that the statement was false when made.

## XI.   CLAIMS AGAINST DEFENDANTS

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All the Defendants**

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

85.     During the Class Period, Evolent and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Evolent common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Evolent common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

86.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Evolent common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Evolent, as alleged herein.

87.     Evolent and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, business practices, performance, operations and future prospects of Evolent as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information; and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Evolent's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Evolent and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein; and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Evolent's common stock during the Class Period.

88.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

35

89.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Evolent's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

90.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Evolent common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Evolent shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Evolent common stock during the Class Period at artificially inflated prices and were damaged thereby.

91.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business

practices, future prospects and intrinsic value of Evolent, which were not disclosed by the Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Evolent common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

92.     By virtue of the foregoing, Evolent and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     The Individual Defendants were and acted as controlling persons of Evolent within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were

issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.     As set forth above, Evolent and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: August 8, 2019

Respectfully Submitted,

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 2005
Telephone: (202) 408-4600
Facsimile: (202)408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Plaintiff*

## CERTIFICATION AND AUTHORIZATION

I, David Sullivan, on behalf of the Plymouth County Retirement System ("Plymouth"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint in this matter and I am authorized in my capacity as Executive Director of Plymouth to initiate litigation and to execute this Certification on behalf of Plymouth.

2. Plymouth did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Plymouth is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Plymouth's transactions in Evolent Health, Inc. common stock during the Class Period are set forth below:

| Date | Transaction | Shares | Price |
|------|-------------|--------|-------|
| 10/12/18 | Purchase | 9,757 | $25.53 |
| 12/18/18 | Purchase | 5,502 | $18.54 |
| 04/04/19 | Purchase | 11,529 | $12.26 |
| 04/09/19 | Sale | 2,539 | $12.71 |
| 05/09/19 | Purchase | 11,330 | $14.36 |

5. Plymouth has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Hampton v. Aqua Metals, Inc.*, Case No. 4:17-cv-07142 (N.D. Cal.)

   *Plymouth County Ret. Sys. v. Patterson Companies, Inc.*, Case No. 0:18-cv-0871 (D. Minn.)

   *Schlimm v. Welbilt, Inc.*, Case No. 8:18-cv-3007 (M.D. Fla.)

   *Employees Ret. Sys. of the Puerto Rico Electric Power Authority v. Conduent, Inc.*, Case No. 2:19-cv-08237 (D.N.J.)

6. Plymouth has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

   *In re Envision Healthcare Corp. Sec. Litig.*, Case No. 3:17-cv-01112 (M.D. Tenn.)

1

*Plymouth County Ret. Ass'n v. Advisory Board Co.*, Case No. 1:17-cv-01940 (D.D.C.)

*St. Clair County Employees Ret. Sys. v. Acadia Healthcare Company, Inc.*, Case No. 3:18-cv-0988 (M.D. Tenn.)

*Plymouth County Ret. Sys. v. GTT Communications, Inc.*, Case No. 1:19-cv-0982 (E.D. Va.)

7.    Plymouth will not accept any payment for serving as a representative party on behalf of the Class beyond Plymouth's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of August, 2019.

*Plymouth County Retirement System*

David Sullivan, Executive Director