UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON, <br><br> Defendants. | Case No. 1:19-cv-01031-RDA-TCB |

**AMENDED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.      Nature of the Action ........................................................................................................... 1

II.     Introduction ......................................................................................................................... 2

III.    Parties ................................................................................................................................. 7

        A.      Lead Plaintiffs ......................................................................................................... 7

        B.      Defendants .............................................................................................................. 8

        C.      Relevant Nonparties ............................................................................................. 10

IV.     Jurisdiction ....................................................................................................................... 11

V.      Overview of the Fraud ..................................................................................................... 11

        A.      Evolent's Entire Business Model Was Predicated on Its Purported Ability To
                Reduce Its Clients' Costs ..................................................................................... 11

        B.      Evolent Becomes a "Co-Owner" of Passport, Which Immediately Becomes
                the Company's Most Important Client ................................................................. 13

        C.      Rather Than "Lower Clinical and Administrative Costs," Evolent Drives
                Passport to the Brink of Bankruptcy .................................................................... 16

                1.      Defendants "Rebadge" Hundreds of Passport Employees, Dramatically
                        Raising Passport's Costs for the Same Services Passport Once
                        Performed In-House ..................................................................................... 16

                2.      Evolent Saddles Passport With Its Faulty Claims Processing Platform,
                        Which Directly Leads to the Crippling 2018 Medicaid Rate Cuts .......... 19

                        a.      A Recipe For "Disaster": Evolent Transfers Passport Onto Its
                                Knowingly Defective Claims Processing Platform ...................... 20

                        b.      Former Passport and Evolent Employees Confirm That The
                                Valence Platform Was an Utter "Disaster" for Passport .............. 24

                        c.      Evolent's Defective Claims Administration Led Kentucky To
                                Assess Passport with Hundreds of Millions of Dollars in
                                Penalties For Improper and Untimely Data Submissions ............. 26

                        d.      Evolent's Failure to Properly Submit Encounter Data to
                                Kentucky Leads Kentucky to Cut Passport's Medicaid
                                Reimbursement Rates, Further Imperiling the Plan's Finances.... 29

3.     In Just Three Years, Evolent Pushes Passport to the Brink of Financial Ruin ........................................................................................... 31

D.     The Truth Begins to Emerge .............................................................. 34

1.     Evolent Falsely Pins the Blame for Passport's Financial Troubles on the 2018 Rate Cuts, Without Revealing That Its Own Practices Caused the Rate Cuts .............................................................. 34

2.     Passport Sues Kentucky Over the Rate Cuts, and Evolent Repeatedly and Emphatically Denies That It Would Need to Acquire Passport ........ 35

3.     Evolent Shocks the Market by Announcing That it Will Bail Out Passport by Acquiring a 70% Stake in the Plan ........................................ 38

E.     Subsequent Events Confirm Defendants' Fraud .................................... 40

VI.     Defendants' False and Misleading Statements ............................................... 42

A.     Evolent's 2016 Form 10-K ................................................................... 43

B.     Evolent's 1Q 2017 Investor Call and Form 10-Q .................................. 44

C.     Evolent's May 11, 2017 Investor and Analyst Day Conference ........................... 46

D.     Evolent's 2Q 2017 Form 10-Q ............................................................. 47

E.     Evolent's 3Q 2017 Investor Call and Form 10-Q .................................. 48

F.     Evolent's 4Q and Full Year 2017 Investor Call, and 2017 Form 10-K ............... 50

G.     Evolent's 1Q 2018 Investor Call and Form 10-Q .................................. 53

H.     Evolent's May 11, 2018 Investor and Analyst Day Conference ........................... 54

I.     Evolent's 2Q 2018 Investor Call and Form 10-Q .................................. 55

J.     The September 5, 2018 Wells Fargo Healthcare Conference and Evolent's 3Q 2018 Form 10-Q ........................................................................... 56

K.     The January 25, 2019 Insider Louisville Article .................................... 58

L.     Evolent's 4Q and Full Year 2018 Investor Call, and 2018 Form 10-K ............... 59

M.     Evolent's 1Q 2019 Investor Call ........................................................... 61

VII.     Additional Allegations of Defendants' Scienter ................................................ 62

     A.     The Individual Defendants Closely Monitored All Aspects of Passport's
           Performance, as Defendants Touted in Their Public Statements, and as
           CWs Confirmed .................................................................................... 63

     B.     Passport Was by Far Evolent's Most Important Client .......................... 64

     C.     Contemporaneous Witness Accounts Confirm that Evolent Management Knew
           of the Debilitating Problems With Evolent's Newly-Acquired Claims
           Processing Platform from the Outset ...................................................... 65

     D.     Once the "Writing Was on the Wall," in January 2019, Evolent Installed a
           "Shadow Management Team" at Passport, Giving Them Even More Direct
           Knowledge of Everything that Transpired at Passport .......................... 66

     E.     The Magnitude of Passport's Data Submission Violations, and the Resulting
           Massive Penalties Assessed by Kentucky, Which Were Set Forth in "Penalty
           Letters" Sent Each Month to Passport's Most Senior Officers, Establishes
           Defendants' Scienter .............................................................................. 67

VIII.    Loss Causation .................................................................................................. 68

IX.      Class Action Allegations .................................................................................. 70

X.       Applicability of Presumption of Reliance: Fraud on the Market Doctrine ...... 72

XI.      Inapplicability of the Statutory Safe Harbor and the Bespeaks Caution Doctrine ........... 73

XII.     Counts .............................................................................................................. 74

XIII.    Prayer for Relief ............................................................................................... 77

XIV.     Jury Trial Demand ............................................................................................ 78

## I.     NATURE OF THE ACTION

1.      Lead Plaintiffs Plymouth County Retirement System and Oklahoma Police Pension and Retirement System (collectively, "Lead Plaintiffs"), bring this securities class action seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et seq*. ("Exchange Act"), on behalf of themselves and all other persons and entities who purchased or otherwise acquired any of the publicly-traded common stock of Evolent Health, Inc. ("Evolent" or the "Company") from March 3, 2017 through May 28, 2019, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").  Evolent is a Virginia-based provider of technology-enabled clinical and administrative services to Medicaid and Medicare health plans.

2.      Lead Plaintiffs allege the following upon personal knowledge as to allegations specifically pertaining to Lead Plaintiffs and, as to all other matters, upon the investigation of Lead Counsel, which included: (a) analysis of public filings with the United States Securities and Exchange Commission ("SEC") made by Evolent and related parties; (b) documents that Lead Plaintiffs obtained through a Kentucky Open Records Act request; (c) interviews with former employees of Evolent and other relevant companies; (d) analysis of press releases and other publications disseminated by Evolent and related parties; (e) analysis of shareholder communications, conference calls and postings on Evolent's website concerning the Company's public statements; (f) analysis of news articles concerning Evolent and related parties; (g) analysis of other publicly available information concerning Evolent and the Individual Defendants (as defined below); and (h) other materials concerning Evolent, as identified herein. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## II.   <u>INTRODUCTION</u>

3.     Throughout the Class Period, Evolent repeatedly told investors that its entire business model was predicated on the Company's supposed ability to dramatically reduce its clients' healthcare and administrative costs.  Indeed, in virtually every one of its SEC filings, Evolent represented that its services would "<u>lower clinical and administrative costs</u>" for its clients, and "enable health systems to manage patient health <u>in a more cost-effective manner</u>."[1]  Fueled by these assurances, Evolent experienced explosive growth:  between 2016 and 2018, the Company's revenue increased by almost 150%, from $254 million to $627 million, and its stock price more than doubled from $11 in November 2017 to a high of $28.75 in September 2018, less than one year later.

4.     However, as was ultimately revealed, Evolent's statements about its ability to "lower costs" were materially false, and its growth was wholly illusory.  Indeed, rather than lowering its clients' costs, Evolent grossly overcharged its single most important client—a Kentucky-based Medicaid plan called Passport Health Plan ("Passport" or the "Plan") that was responsible for 20% of Evolent's annual revenue—<u>hundreds of millions of dollars</u> during the Class Period for basic healthcare management services.  Significantly, as numerous former high-ranking employees of Passport and Evolent confirmed, and as internal documents Lead Plaintiffs obtained through their independent investigation that have never before been publicly disclosed until now make clear, Evolent dramatically increased Passport's costs for the exact same administrative functions that Passport had previously been performing in-house.

5.     Indeed, immediately upon being retained by Passport in 2016, Evolent hired away 350 Passport employees (<u>more than 70% of Passport's workforce</u>), and then proceeded to bill Passport exorbitant fees for the exact same services those employees were already performing—

---

[1] Unless otherwise noted, all emphasis in quotations is added.

fees that were far in excess of what Passport had been paying.  As a result, between 2015 and 2016, Passport's administrative expenses increased almost <u>60%</u> in one year, rising from $107.5 million to $169.1 million, and by 2018 these expenses had spiked to $194 million per year. Tellingly, this dramatic increase in expenses could not be tied to a corresponding increase in Passport's business—to the contrary, Passport's costs grew at a rate more than 1,000% greater than its revenue.  As multiple former Passport and Evolent employees stated, Evolent "<u>said they could cut costs by providing services; they did the opposite</u>," and Passport was "<u>paying [Evolent] to do the stuff that we used to do, and paying them more</u>."

6.     Evolent was able to enact this scheme because its agreement with Passport effectively made it, as Evolent's own CEO repeatedly boasted, a "<u>co-owner</u>" of Passport.  In fact, former Evolent and Passport employees made clear that Evolent's most senior officers were intimately involved in all major aspects of Passport's business, including participating in weekly meetings with Passport's management team and even installing a "shadow management" team at Passport.   As  Defendant  Williams  proclaimed,  Evolent's  control  over  Passport  was absolute:  Evolent was always "at the table participating in [Passport's operational] decisions," the two companies had "joint governance," and Evolent was "<u>able to drive the decisions we think are important for performance</u>."

7.     As the Class Period continued, Evolent took full advantage of its relationship with Passport.  In the fall of 2017, Evolent took over claims administration from Passport's longtime third-party claims administrator despite the fact that Evolent had absolutely <u>no</u> experience in processing  complex  individual  medical  claims,  and  had  only  recently  acquired  a  claims administration platform that was built to process bundled dental claims, which were much less complicated.    Multiple  high-ranking  Evolent  and  Passport  employees  repeatedly  warned

Evolent's most senior management that the claims administration system was "<u>not advanced</u> <u>enough</u>" to process individual medical claims and was "not ready" to go live at Passport.

8.     As documents obtained by Lead Counsel during their investigation conclusively demonstrate, Evolent's claims administration was so utterly deficient that, unbeknownst to investors, Passport was rendered completely unable to comply with the most basic requirements of its Medicaid contract with Kentucky.  Specifically, beginning in October 2017 (when Evolent took over Passport's claims processing), Kentucky sent monthly penalty letters addressed directly to Passport's CEO and widely disseminated at Evolent and Passport.  These letters, whose subject line read "Consequences for Failure to Submit Encounters in Accordance with the Contract," meticulously catalogued Passport's myriad of late and improper submissions of medical claims "encounter" data—critical claim information that Kentucky relied upon in setting its Medicaid reimbursement rates.  These failures violated Passport's contract with Kentucky and resulted in <u>tens of millions of dollars</u> in monthly penalties.  For example, the penalty letter for February 2018 alone identified improper claims submissions that were an extraordinary 44 million days late in the aggregate, which resulted in a penalty of over $48 million.  Moreover, while Evolent publicly claimed throughout the Class Period that its claims administration services were going "incredibly well," the penalty letters directly contradict those claims, and show that Evolent's failures only increased over time:  in October 2018, the penalties imposed on Passport for its faulty claims administration rose to over <u>$55 million</u>.  All told, between October 2017 and April 2019, Kentucky imposed staggering penalties of nearly <u>half a billion dollars</u> on Passport precisely because Passport was unable to properly and timely submit encounter data.

9.     Moreover, as numerous former Passport and Evolent employees confirmed, Evolent's claims administration services were so defective that they not only massively increased

Passport's administrative costs, but also caused Kentucky to dramatically <u>reduce</u> Passport's Medicaid reimbursement rates—a crushing combination that brought Passport to the brink of insolvency.  As these former employees explained, "the Medicaid rate cuts were a result of <u>Passport's own failure to submit encounter data correctly</u>"—a failure entirely attributable to Evolent.

10.     The combination of Evolent's exorbitant fees and its disastrous claims administration failures eventually had a catastrophic impact on Passport.  As Evolent management would later admit, in January 2019 Evolent realized that the "writing was on the wall" that Passport's financial situation was so desperate it would likely need a bailout.  Yet Defendants disclosed none of this to its investors, and instead went out of their way to assure investors that Evolent had <u>no intention</u> of bailing out or purchasing the ailing health plan. Indeed, during Evolent's February 26, 2019 earnings call, Defendant Williams *expressly denied* that Evolent would even *consider* bailing out Passport, stating that such a bailout was "<u>just not in our strategic lens</u>" and not "currently being evaluated."  Even as late as May 7, 2019, during Evolent's earnings call for Q1 2019, Defendant Williams assured investors that "Passport is making solid progress towards improving its financial performance" and "we continue to partner with Passport to drive performance improvement in all aspects of operations . . ."

11.     As a result, the market was stunned when a mere <u>three weeks later</u>, on May 29, 2019, Evolent abruptly reversed course.  On that day, Evolent made the shocking announcement that, contrary to its prior assurances, Passport's financial condition was so dire that the Company had no choice but to acquire it in a last-ditch effort to save its most important client and revenue stream.  In response to the news of Evolent's massive and cash-draining emergency bailout of its largest customer, Evolent's stock price collapsed.  The stock lost nearly 30% of its value in a

single day, falling from $14.15 to $10.01 per share on May 29, 2019, on extraordinarily high volume—a decline of more than 65% from the price it traded at just eight months earlier.

12.    Analysts reacted angrily to the disclosure, noting that it directly contradicted Defendants' prior assurances regarding Passport's financial condition.  For example, SunTrust noted that the acquisition "signals that <u>Passport wasn't in a position to remain operationally sustainable as a standalone entity</u>," and that Evolent's "investment and balance sheet commitment is likely instrumental in supporting the business."  SunTrust further criticized Defendants' prior misleading denials that Evolent would have to bail out Passport, noting that "<u>[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call</u>," and that "management cited they had <u>'not contemplated acquiring a full Medicaid plan,'</u> <u>that it's 'not in our strategic lens at this point.'</u>"

13.    During an investor call the very next day, Defendant Williams <u>admitted that Evolent had no choice but to buy out Passport</u>, stating that "ideally, we'd love [] not to be [] investing alongside [] clients in this way in this particular situation."  Moreover, Evolent management admitted that it had known of the risk it would have to bail out Passport no later than January 2019, <u>even as it continued to assure investors in February 2019 that no such risk existed</u>.  Indeed, as the Company's COO and co-founder Thomas Peterson admitted, "<u>starting in January, once the writing kind of became on the wall</u> . . . there was [an] additional level of urgency that was placed on this. . . ."

14.    As a result of Defendants' fraudulent scheme, Evolent's stock price has never recovered and currently trades well below its Class Period high.  Moreover, in November 2019, the Commonwealth of Kentucky announced that it would not renew Passport's Medicaid contract, and disclosed information revealing that Passport was clearly the most poorly run

health plan of any applicant in Kentucky.  As a result of Defendants' violations of the federal securities laws, investors who purchased Evolent common stock at artificially inflated prices during the Class Period have suffered substantial losses.  This action seeks redress on behalf of these aggrieved shareholders.

### III.   PARTIES

#### A.    Lead Plaintiffs

15.    Lead Plaintiff Plymouth County Retirement System ("Plymouth") is a public pension system organized for the benefit of current and retired municipal and county employees of Plymouth County, Massachusetts.  It manages over $1 billion in assets and has over 11,000 participants. As set forth in its certification filed on October 7, 2019 (ECF No. 20-2) and incorporated herein, Plymouth purchased Evolent common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On November 12, 2019, the Court appointed Plymouth as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 29.

16.    Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police") is an administrator of a multi-employer, cost-sharing defined benefit pension plan that provides participants with retirement, death and disability benefits. Oklahoma Police covers substantially all police officers employed by the 141 municipalities and state agencies within the State of Oklahoma. It manages approximately $2.5 billion in assets and has over 5,000 participants.  As set forth in its certification filed on October 7, 2019 (ECF No. 20-2) and incorporated herein, Oklahoma Police purchased Evolent common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On November 12, 2019, the Court appointed Oklahoma Police as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 29.

17.     Plymouth and Oklahoma Police are collectively referred to herein as "Lead Plaintiffs" or "Plaintiffs."

**B.     Defendants**

18.     Defendant Evolent Health, Inc. is a Delaware corporation with its principal executive offices located in Arlington, Virginia.  Evolent was founded in 2011 by its then-managing members, healthcare consulting firm The Advisory Board Company ("ABCO") and nonprofit health enterprise University of Pittsburgh Medical Center ("UPMC").  Individual Defendants Williams and Blackley were each former ABCO executives, and have run Evolent since its inception.  Evolent held its initial public offering in June 2015, and its common stock trades on the NYSE under the symbol "EVH."

19.     Defendant Frank Williams ("Williams") was, at all relevant times, Chief Executive Officer ("CEO") of Evolent.  Williams also is a co-founder of Evolent and sits on the Company's Board of Directors ("Board").  Prior to founding Evolent, Williams served as CEO of ABCO from June 2001 to September 2008 and as its Chairman of the Board from September 2008 to August 2011.

20.     Defendant Nicholas McGrane ("McGrane") was, at all relevant times, Evolent's Chief Financial Officer ("CFO").

21.     Defendant Seth Blackley ("Blackley") is also a co-founder of the Company and a Board member and was, at all relevant times, President of Evolent's operating subsidiary, Evolent Health LLC.  Prior to founding Evolent, Blackley was the Executive Director of Corporate Development and Strategic Planning at ABCO from May 2004 to August 2011.

22.     Defendant Christie Spencer ("Spencer") was Evolent's National Chief Medicaid Operating Officer from 2016 to February 2018.  Prior to that, she was Vice President and Chief Operating Officer of Passport from May 2011 through January 2016.

23.    Defendant Steven Wigginton ("Wigginton") joined Evolent in 2012 and was, at all relevant times, CEO of Valence Health, Inc., a company Evolent acquired in October 2016.

24.    Defendants Williams, McGrane, Blackley, Spencer, and Wigginton are collectively referred to as the "Individual Defendants."

25.    Evolent and the Individual Defendants are collectively referred to as the "Defendants."

26.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Evolent, were privy to confidential, proprietary and material adverse non-public information concerning Evolent, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Evolent's business.

28.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and

presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

29.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Evolent's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Evolent's common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## C.     Relevant Nonparties

30.     During the Class Period, University Health Care, Inc. d/b/a Passport Health Plan ("Passport" or the "Plan"), operated as a non-profit, provider-sponsored managed care organization ("MCO") that administers Medicaid benefits to eligible residents of the Commonwealth of Kentucky.  Founded in 1997 as a pilot project to help Kentucky control Medicaid costs in the Louisville region, Passport was Kentucky's first MCO and has been administering Medicaid in Kentucky for over 20 years.  Passport was purchased by Evolent in a deal that was announced May 29, 2019, and that closed December 30, 2019.

31.     Mark Carter ("Carter") was Passport's CEO during the entirety of the Class Period.

## IV.     JURISDICTION

32.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

33.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District, as Evolent is headquartered in this District.

34.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## V.     OVERVIEW OF THE FRAUD

### A.     Evolent's Entire Business Model Was Predicated on Its Purported Ability To Reduce Its Clients' Costs

35.     Evolent provides healthcare delivery and payment services to provider-sponsored health systems across the Medicaid, Medicare, and commercial markets.  The Company boasts that its "end-to-end" suite of technology-based clinical, financial, administrative, and analytical services is designed to capitalize on the transition of the healthcare industry from a fee-for-

11

service payment model to a value-based care approach, precisely by reducing its client's clinical and administrative costs through integration onto Evolent's technological services platform.

36.     Beginning in January 2014, the value-based care approach was implemented by the Affordable Care Act ("ACA") as a way to reduce federal and state government spending on Medicaid and Medicare.  The ACA's move to a value-based care approach was seismic: under the traditional fee-for-service model, the government reimburses Medicaid and Medicare health plans for virtually all of the medical expenses their members incur.  By contrast, under a value-based care approach, the government provides health plans with fixed "per member per month" ("PMPM") payments based on the health of the populations served, and the health plans must then operate within this capitated budget.  Consequently, under the fee-for-service model health plans face little to no financial risk, whereas under the value-based care model health plans face significant risk because the government will not reimburse provider-sponsored health plans for medical expenses incurred that exceed the predetermined PMPM amount, thus making the health plans themselves financially responsible for any excess medical costs.

37.     Defendants repeatedly emphasized to investors that Evolent's entire business was predicated on the claim that its high-tech services dramatically "lower[ed] clinical and administrative costs" for health plans such as Passport operating under the value-based care model.  Defendant Williams stated during a January 11, 2017 investor conference that the "reason[] that we ultimately launched Evolent" was because health plans moving to a value-based care approach "need to get [] costs under control," and Evolent regularly told investors in its public filings with the SEC that its business model consisted of "one strategic option" which was to "reduce . . . total cost[s]" for its customers, including Passport.  Accordingly, Evolent

repeatedly promised that its services would create "a cycle of clinical and cost improvement" for Medicaid plans that partnered with the Company.

38.     Evolent further represented that the Company's technological platform, through which it implemented its cost-savings strategy, "empower[s] and support[s]" its value-based operations because Evolent's services were used to "capitalize on multiple types of value-based payment relationships" and to "create a connected clinical delivery ecosystem, stratify patient populations, standardize clinical work flows and enable high-quality, cost-effective care."

39.     Evolent integrated its clients into its purportedly cost-savings technological platform by entering into "partnerships" with Medicaid and Medicare plans.  The Company described these partnerships as "long-term" and "strategic" to help "leading providers that are attempting to [transition to value-based care]."  Evolent advertised these "long-term partnerships" as supposedly beneficial to its partners by enabling them to control costs and improve the quality of care.

B.     **Evolent Becomes a "Co-Owner" of Passport, Which Immediately Becomes the Company's Most Important Client**

40.     Evolent's focus on "clinical and cost improvement" that enabled "high-quality, cost-effective care" attracted a Kentucky-based non-profit, provider-sponsored managed care organization called Passport to retain Evolent.  Specifically, on February 1, 2016, Evolent announced that it had engaged Passport as a partner pursuant to a long-term master services agreement (the "Passport MSA").  Passport partnered with Evolent because, according to Passport's then-CEO Mark Carter, by the end of 2015 Passport's healthcare delivery platform was "in need of replacement and upgrade."  Thus, the Passport MSA included a 10-year arrangement under which Evolent was to provide services to Passport, thereby purportedly enabling Passport to cut costs and maintain profitability using the value-based care approach.

13

41.     From the beginning of their relationship through the end of the Class Period, Passport was by far Evolent's most significant client.  Indeed, in the Forms 10-K the Company filed with the SEC for the years ending 2016, 2017, and 2018, Evolent disclosed that Passport accounted for the following percentages of Evolent's overall revenue—far more than any other client for each of those years:

| Year | 2016 | 2017 | 2018 |
|------|------|------|------|
| **Evolent Total Revenue** | $254.2 million | $434.9 million | $627.1 million |
| **Evolent Revenue Attributable to Passport** | $49.8 million | $89.6 million | $109.7 million |
| **Passport Percent of Revenue** | 19.6% | 20.6% | 17.5% |

42.     In order to maintain this substantial and reoccurring revenue stream, Evolent structured its agreement with Passport so that Evolent would have control over all major aspects of Passport's business.  Indeed, throughout the Class Period, Evolent effectively ran Passport's daily operations, including managing Passport's clinical, financial and back-office services, contracting with Passport's network of healthcare providers, conducting risk adjustment and pharmaceutical benefit management services and processing Passport's medial claims.  Evolent's control over Passport was so profound that the two companies regularly publicly described Evolent as a "co-owner" of Passport.  For example, during an August 7, 2017 earnings call, Defendant Williams boasted that Passport "look[s] at us as a co-owner" and "we really have joint governance and we're able to drive the decisions we think are important for performance."

43.     Evolent explained that this "co-ownership" strategy was specifically designed to allow Evolent to exert increased levels of control over Passport.  In particular, Defendant Williams explained in an August 7, 2017 earnings call that this arrangement allowed the Company to "drive very specific actions in terms of how [Passport is] ultimately operating their risk business," and enabled Evolent to "be at the table participating in [Passport's operational]

decisions"; "be more directive about what we require of [Passport] to drive performance"; and ultimately to "control many more levers than if we're just in a pure service relationship."

44.     Former Passport employees confirmed that Evolent's executives were intimately involved in virtually all of Passport's operations and finances throughout the Class Period.[2] For example, CW 1—who was a senior member of Passport's Internal Audit team from December 2011 to March 2019 responsible for monitoring Passport's compliance with Kentucky-mandated internal controls designed to ensure Passport's financial statements were accurate and complete, and who reported directly to Passport's CFO—made clear that Evolent's senior officers were directly involved in Passport's business, including participating in weekly meetings with Passport's management team.  As CW 1 succinctly stated, Evolent's senior officers always "knew what was going on."  Indeed, CW 1 said that "[t]he [Passport] executive team met every Monday and [Defendant Spencer]"—who had previously worked for Passport before moving to Evolent—"was always in the room."  CW 1 further elaborated that, after Spencer left Evolent in 2018, Evolent's then National Medicaid President—Scott Bowers, who was later named Passport's CEO—replaced Defendant Spencer as the Evolent executive in attendance at Passport's weekly executive meetings.

45.     Moreover, Evolent had such control over Passport that Evolent would later admit that the Plan had allowed Defendants to install a shadow management team at Passport well before Evolent announced it was acquiring the Plan.  As a senior executive and co-founder of Evolent would later explain, "we brought in our own CMO, our own CEO, our own COO, a Chief Actuary, Head of Network Contracting, and we were shoulder to shoulder with Passport leadership."

---

[2] Former Evolent and Passport employees are referred to herein as Confidential Witness ("CW __") and are referenced in the feminine form to maintain their confidentiality.

46.     Accordingly, from the outset of Evolent's relationship with Passport, Evolent was deeply involved in virtually every single major aspect of Passport's operations.

## C.     Rather Than "Lower Clinical and Administrative Costs," Evolent Drives Passport to the Brink of Bankruptcy

### 1.     Defendants "Rebadge" Hundreds of Passport Employees, Dramatically Raising Passport's Costs for the Same Services Passport Once Performed In-House

47.     Over the course of the first year of the Passport partnership in 2016, Evolent not only provided Passport with its suite of healthcare management services, but Evolent also began to provide operational, back-office-type services to Passport as well.  However, as numerous former Passport and Evolent employees confirmed, Evolent did not possess the capabilities to provide many of these services to Passport, and instead merely hired away Passport's employees to perform this work.  Indeed, Defendants engaged in a scheme to convert over two-thirds of Passport's workforce (approximately 350 of Passport's 500 employees) and hire them as Evolent employees—in Evolent's vernacular, "rebadging" Passport employees to make them its own.

48.     According to CW 1, Evolent used the newly "rebadged" employees to take over various administrative functions that Passport had once performed itself and began providing these same services to Passport in exchange for fees.  Significantly, however, Evolent charged Passport far more than it had previously cost Passport to perform the same services in-house.  According to CW 1, Passport ended up paying Evolent "more than we had been paying for the salaries of the people that did the work Evolent was [now] doing. . . . The admin expense was more than we were paying for those salaries.  That's all Evolent."

49.     Making matters worse, CW 1 explained that the rebadged employees were not performing any additional duties, but rather were doing the exact same job at Evolent that they had done at Passport.  She explained that Passport was merely "paying [Evolent] to do that stuff

that we used to do, and we were paying [Evolent] more." She questioned what benefit Passport enjoyed from rebadging: "I didn't understand it. To me, it was like, what are we getting out of it?" Significantly, former "rebadged" employees confirmed that their roles at the two companies were virtually identical. For example, CW 2 began working at Passport in 2016 as a Contract Specialist, where she was responsible for drafting contracts between Passport and the Plan's healthcare providers. Once Passport became an Evolent partner, CW 2 was "rebadged" as a Contract Specialist employed by Evolent, where her day-to-day work responsibilities remained "exactly the same." CW 3, who worked in risk adjustment at Passport and was rebadged as Evolent's Associate Director of Risk Adjustment from August 2018 through July 2019, also confirmed the same.

50. Despite Evolent's repeated promises that it would help Medicaid plans such as Passport "lower . . . administrative costs," rebadging Passport employees to Evolent employees had the exact opposite effect by significantly driving up Passport's costs. From 2015 through 2017, Passport's salary costs fell $22 million, from $39 million to $17 million, primarily as a result of Passport employees being "rebadged" as Evolent employees and moving off Passport's payroll. However, these salary savings were *dwarfed* by the increased fees that Passport paid to Evolent. From 2016 through 2018, the total fees that Evolent reaped from Passport more than doubled: from $57.2 million in 2016, to $88.8 million in 2017, and finally to $109.7 million in 2018:



51.     Moreover, in the case of many services, Evolent was actually costing Passport far more than it was saving.  For example, Evolent began providing risk adjustment services to Passport around July 2016.  Risk adjustment involves compiling data on how sick Passport's patient population had been in a given period of time and the amount of medical expenses incurred, and then submitting that data to Kentucky.  If it turned out that Passport's members had been sicker and needed more medical care than the members of Kentucky's other Medicaid health plans, Passport could obtain a risk adjustment payment from Kentucky to compensate for the difference.  However, Evolent performed abysmally at this task and actually lost money for Passport.  According to CW 3, who worked in risk adjustment first at Passport and then at Evolent, Evolent charged Passport millions of dollars more for its risk adjustment services than the Plan obtained in additional payments from the state, ultimately costing Passport twice as much in fees as the services "saved"—which CW 3 described as a "one to two R[eturn] O[n] I[nvestment]."  CW 3 said that Evolent similarly cost Passport money in several other service areas, including recontracting with healthcare providers and healthcare quality initiatives.

52.     Former employees corroborated the practical realities of Evolent's scheme.  As CW 1 stated, Evolent "didn't do all the great things that [it] was supposed to do"; "[Evolent] said they could cut costs by providing services; they did the opposite."   Indeed, if Evolent ever saved Passport money in any area at all, according to CW 1, it was done merely by "cutting heads [i.e. personnel] and services [to plan members]," not through the Company's purported high-tech solutions that were supposed to use data analysis to make Passport's operations more cost-efficient.

53.     In sum, Evolent's "rebadging" strategy was a far cry from a cost-savings tool and was in reality nothing more than a scheme to fraudulently capitalize on its control over Passport. Indeed, between 2015 and 2016, Passport's administrative expenses increased almost 60% in one year, rising from $107.5 million to $169.1 million (a growth rate that was more than 1,000% greater than its revenue growth).   Moreover Passport had a net underwriting gain of $33.3 million in 2015—essentially, a true measure of operational cost efficiency derived by subtracting claims payments and general administrative expenses from Passport's total Medicaid revenue— but suffered a net underwriting loss of $80.4 million in 2016 after Evolent was brought onboard.

### 2.     Evolent Saddles Passport With Its Faulty Claims Processing Platform, Which Directly Leads to the Crippling 2018 Medicaid Rate Cuts

54.     In addition to the exorbitant fees that Evolent's "rebadging" tactic imposed on Passport, the Company compounded Passport's increasingly out of control costs by taking over Passport's vitally important claims processing management.  Significantly, Evolent implemented its claims processing system at Passport despite the fact that the Company had no experience with claims processing and planned to perform this crucial function using a recently-acquired claims administration platform that was built to process group dental claims, which were substantially different and less complex than processing Passport's individual medical claims.

Indeed, as set forth below, Evolent knew *at the outset* that its claims administration platform was severely defective and completely unequipped to handle claims administration for Passport.

55.     The result was an entirely predictable and avoidable "disaster" according to high-ranking former Passport and Evolent employees.  Evolent rendered Passport utterly incapable of properly, accurately, and timely processing and paying its claims.  As a result, underpayments, overpayments, and delayed payments skyrocketed, resulting in tens of millions of dollars in interest payments on late paid claims, reprocessing costs and unrecoverable provider overpayments—a debilitating additional cost burden on Passport's already-struggling finances.

56.     Making matters worse, Evolent's platform was wholly incapable of processing and submitting essential Medicaid claims data (known as "encounter data") to Kentucky—the very data that Kentucky used to set Passport's Medicaid reimbursement rates.  As set forth further below, Evolent's abysmal failure to perform this basic and essential function for Passport resulted in <u>hundreds of millions of dollars in penalties</u> imposed on Passport by the state, and further, ultimately caused Kentucky to cut Passport's Medicaid reimbursement rates, dramatically reducing Passport's revenue and accelerating the Plan's financial decline.

        **a.**        **A Recipe For "Disaster": Evolent Transfers Passport Onto Its Knowingly Defective Claims Processing Platform**

57.     In May 2017, Evolent announced that effective October 1, 2017, it would replace AmeriHealth, Passport's long-standing third-party claims processor, with Evolent's own medical claims processing platform, known as Valence.  Valence was not part of the "suite of services" Evolent had originally contracted with Passport to provide.  Rather, in late 2016, Evolent acquired two companies that provided claims processing services to health plans, Valence Health, Inc. ("Valence") and Aldera Holdings, Inc. ("Aldera"), Valence's primary software provider.  By acquiring Valence and Aldera and then integrating them with its other services,

Evolent claimed to have the capabilities needed to provide medical claims processing and administration services to its partners, which were critically important functions for Medicaid plans such as Passport for several reasons.

58.     First, as Passport's claims administrator, Evolent would be tasked with ensuring all of the medical claims submitted to Passport were processed and paid timely and correctly. Payment of these claims constituted the vast majority of Passport's total costs, and further, failure to timely or correctly pay claims could have major financial consequences, such as incurring interest penalties and reprocessing expenses.

59.     Second, Evolent would be required to collect data known as "encounter data" on each medical claim it processed.  This encounter data was essentially a description of what was wrong with the patient, how sick the patient was, and what care was needed.  Functionally, encounter data provided documentary evidence of Passport's members' medical expenses.  Thus, Evolent was required to regularly submit this data to Kentucky on behalf of Passport, which the Commonwealth would then use to set Medicaid reimbursement rates every six months—*i.e.*, to determine the amount of Medicaid payments Kentucky would make to health plans like Passport.

60.     Moreover, failure to properly submit encounter data could lead to substantial penalties from the state.  Encounter data was thus essential to Passport's ability to operate in a financially sound manner.  Indeed, during Evolent's annual Analyst and Investor Day conference on May 11, 2018, Evolent co-founder and long-time Chief Operating Officer, Tom Peterson, emphasized that accurately reporting and managing encounter data was "one of the most important things in Medicaid":

>       One of the most important things in Medicaid is encounter reporting, you're reporting your encounters to the state to make sure that you're accurately reflecting the claims volume since you're paying the claims and the actuaries are

going to set the rates so you need to get as high of an encounter experience as possible. <u>So how you actually manage encounters is really important</u>.

61.    Due to the critical importance of claims administration and processing to Passport, Defendants closely monitored Valence's progress and repeatedly touted the success of its integration during the Class Period. For instance, during an investor earnings call on May 9, 2017, Defendant Williams assured investors that the integration of Valence's claims processing technology into Evolent's other services "has gone incredibly well" and that, with regard to "bringing on Passport, that's going to be another 300,000 lives on the [Valence] platform, and our commitment was to <u>get that absolutely right in terms of serving clients at a high standard from the outset</u>."

62.    In reality, well before October 2017, Defendants knew that the Valence platform was utterly unequipped to handle processing claims for Passport. As CW 1 explained, Evolent had no prior experience with Medicaid claims processing—"all they were offering was a care management system. <u>[Evolent] didn't know Medicaid claims processing</u>." Indeed, as CW 1 elaborated, "to move from [Passport's prior claims processing vendor, AmeriHealth] that you've had for 15 years, to a company like Valence with comparatively no history didn't make sense" because "<u>claims processing is the biggest thing that insurance companies do</u>. Evolent said that they had a plan to make Valence work; <u>everyone at Passport was skeptical</u>."

63.    The problems with integrating Valence went far beyond Evolent's own lack of claims processing experience. As CW 1 further explained, the Valence platform lacked the capabilities needed to manage Medicaid medical claims because "<u>Valence initially was built to be a dental claims processing system</u>" and "dental and medical are two different things." Dental and individual medical—as opposed to group medical—are more different still, she explained, and consequently, using Valence to manage Passport's claims "<u>just doesn't work</u>." CW 3

corroborated the fact that the Valence platform was initially designed to manage group dental claims, and that Evolent attempted to "buil[d] it out" post-acquisition to support the processing of individual medical claims, which were managed completely differently.  For example, as CW 3 explained, one of the primary problems was that dental claims are usually "limited in scope" and "bundled"—meaning that if a dental claim for a crown was submitted, all the other procedures that accompanied the crown (such as root canal, cleaning, etc.) were bundled in with that one claim.  Medicaid medical claims, in contrast, were individualized, not bundled.

64.     Consequently, according to CW 3, a platform built to process bundled dental claims was "not advanced enough" to support processing Passport's individual medical claim data. CW 2, who was working on the Valence platform for Evolent at the time, aptly described the same integration problem, stating: "there were fundamental problems that we couldn't change, we were just applying band-aids and fixes to it to get it to work."

65.     Defendants knew that the Valence integration was encountering severe difficulties, that the platform was completely unfit for use to manage Passport's medical claims, and that these problems could not possibly be fixed by the October 1, 2017 go-live date.  For example, CW 2 said she made it known to Evolent management on "a number of occasions" that the Valence platform was not ready or adequate, and emphasized that "it wasn't just me" telling management of the problems.  In fact, CW 2 said, "[p]retty much everyone from Passport was telling them" the transition would not go smoothly.  Other former employees corroborated these accounts.  CW 4, a former Evolent Medicare/Medicaid Quality Analyst from 2016 to July 2019 specifically tasked with analyzing Passport's medical claims data, said it was clear at the outset that "the system wasn't ready."

**b.** **Former Passport and Evolent Employees Confirm That The Valence Platform Was an Utter "Disaster" for Passport**

66.     Despite these repeated and vociferous warnings, Evolent transitioned Passport to its Valence platform on October 1, 2017, reiterating the cost savings and efficiencies that would result from integrating Valence.   For example, during an investor conference, Defendant Williams boasted that "by bringing [the Valence platform] in-house," Evolent would "improve margins dramatically."   Indeed, Evolent told investors that bringing Passport onto the Valence platform alone would bring Evolent an additional $20 million in revenue per year.   One month later, during Evolent's November 2, 2017 earnings call, Williams celebrated the transition, stating:  "we've successfully launched Passport [. . .] onto our [Valence] services platform, which should contribute meaningfully to our revenue in 2018."   Williams further assured investors that Evolent's "teams continue to monitor operations closely and report a smooth transition."

67.     Defendants' claims could not have been further from the truth.  Indeed, according to CW 4, Passport's transition onto Evolent's Valence platform was a "disaster" from the very outset.  Evolent's defective Valence claims administration platform became yet another way in which Evolent dramatically increased Passport's costs, rather than "lowering" its costs as Defendants told investors Evolent's services would do.

68.     First, Valence's defects led to pervasive late payments of claims submitted by healthcare providers, and Passport was contractually obligated to pay interest when claims were paid late.  As CW 1 confirmed, "if you make a claims payment later than 30 days you have to pay interest [to the healthcare provider who submitted the claim], so that [expense] went up a lot."  As she put it, "claims processing did change when [Evolent] took over, but it was because they weren't paying them."

69.     Second, Evolent's pervasive failure to correctly process claims caused Passport to incur extensive reprocessing costs, as each incorrectly processed claim would have to be reprocessed.  As CW 3 explained, "when you have thousands and thousands [of incorrectly processed claims], that adds up."

70.     Third, as CW 1 confirmed, Evolent's defective claims processing platform caused Passport to make tens of millions of dollars in overpayments to healthcare providers, which the Plan was unable to recoup.   While Passport might normally be able to recoup these overpayments by applying them as credits to future claims by those providers, Evolent's Valence system was so defective that the Company could not determine how to correct these overpayments, making those tens of millions of dollars effectively uncollectable.  According to CW 1, Passport had never had meaningful amounts of claims overpayments prior to Evolent taking over, yet, under Evolent, Passport's overpayments "were so big and so old that [healthcare providers] could have a credit balance from 2018 and they weren't processing claims in 2019, so how do we get that back?"  Indeed, Passport's own financial statements later confirmed that, by the end of 2018, Passport had accrued a staggering $20.5 million in claims overpayment receivables—which, more than one year after taking over Passport's claims processing, Evolent still had not been able to recoup.  The problems were so systemic that, as CW 1 recounted, when she left Passport in March 2019 to pursue other career opportunities, Evolent and Passport "were still trying to figure [this] out."

71.     Fourth, CW 1 further recounted that, once Evolent took over claims processing, Passport's claims payments became incredibly difficult to forecast, making Passport's finances impossible to manage: "if you talk to the actuaries [at Passport] about their ability to do their job after Evolent started handling claims – their ability to predict patterns of claims went away.  If

you can't predict, or you are underpaying, there are problems."  Moreover, she said, Evolent's processing of claims was so inept and difficult to understand that even "I couldn't audit it." Evolent's claims administration failures were so rampant and costly that, according to CW 3, Evolent stood up a daily "war room" to try to address the mounting crisis.  According to CW 3, Evolent's Medicaid Market President was present at each war room meeting, and would then create presentations based on the meetings to share with Evolent's most senior executives to keep them updated on this pressing situation.

72.     In short, Evolent's implementation of its Valence platform to process Passport's medical claims was an utter failure and wreaked havoc on all aspects of this critical functioning, causing tens of millions of dollars in increased costs to the Plan.

c. **Evolent's Defective Claims Administration Led Kentucky To Assess Passport with Hundreds of Millions of Dollars in Penalties For Improper and Untimely Data Submissions**

73.     In addition to the tens of millions of dollars in increased costs that Evolent's claims administration failures imposed on Passport, Evolent's materially deficient claims processing led to an even greater problem: Evolent's services caused Passport to submit inaccurate and untimely encounter data to the Commonwealth of Kentucky, which carried significant contractual penalties.

74.     Specifically, Passport's Medicaid contract required Evolent to timely and accurately submit "encounter data"—data collected from each medical claim about how sick or healthy a patient was and what care was required—to Kentucky's Department for Medicaid Services ("DMS").  This data was essential to DMS, because DMS needed it to determine the appropriate Medicaid reimbursement rates to pay Medicaid plans such as Passport.  If the population was sicker and needed more care, rates would increase, and if the population was healthier and needed less care, rates would decrease.  Because encounter data was so essential to

DMS's ability to accurately set Medicaid reimbursement rates, its contracts with health plans like Passport imposed severe monetary penalties—which Kentucky would subtract from the Plan's capitation payments—if such data was not timely or properly submitted.

75.     Evolent's claims administration platform was so defective that it was essentially incapable of timely and accurately submitting encounter data, which resulted in millions of dollars in monthly fines immediately after Passport adopted Evolent's platform.   Indeed, documents obtained by Lead Plaintiffs from the Commonwealth of Kentucky—the contents of which had never been publicly disclosed until now—confirm just how severely deficient Evolent's Valence platform was at properly aggregating and submitting encounter data to the state.   Specifically, a series of monthly "penalty letters" that Kentucky's DMS sent directly to Passport's most senior officers—including Passport's CEO, CFO and Director of Claims & Reimbursement—show that, throughout the Class Period, Passport was regularly assessed hundreds of millions of dollars' worth of penalties due to Evolent's failure to timely and properly submit encounter data.

76.     The penalty letters sent each month by the Commonwealth of Kentucky make clear how pervasive and systemic the problems were with Passport's claims administration services—and also make clear that these issues were well known to Passport's and Evolent's most senior officers.   Indeed, each month during the Class Period, Kentucky's DMS sent Passport's most senior officers a detailed, multi-page letter whose subject line read "Consequences for Failure to Submit Encounters in Accordance with the Contract."   Those letters then set forth, in painstaking detail, the myriad ways that Passport failed to comply with its Kentucky Medicaid contract.   For example, pursuant to its agreement, if Passport failed to submit encounters within 30 days of the adjudication date (the date the claim was either accepted

or denied), Passport was subject to a fine of $1 per encounter per day.  According to the penalty letter for February 2018, which was sent to Passport on March 16, 2018, the encounter data Passport submitted in February alone were a remarkable <u>44,115,599 days late in the aggregate</u>, resulting in a penalty of $44,115,599.  Similarly, if Passport failed to resubmit error encounter files within 60 days from receiving notice of such error, Passport was subject to a "late fee" of $1 per encounter per day for each day over 60 days.  Again, the penalties that Passport was subjected to were staggering:  in February, "[b]ased upon the February data report, Passport Health Plan had <u>2,178,712 records over sixty (60) days [late]</u> for a penalty of $2,178,712."

77.    Significantly, the massive penalties that Passport was assessed during the Class Period stand in stark contrast to Passport's pre-Evolent claims processing, which resulted in *de minimis* penalties each month.  For example, during the nine-month period prior to Evolent taking over claims processing for Passport, Passport averaged penalties of just $33,000 per month.  By contrast, in October 2017—the first month Evolent handled claims processing—Passport's assessed penalties immediately skyrocketed to $619,625—an increase of roughly <u>1,800%</u>.  Moreover, even this stunning immediate increase paled in comparison to the astronomical penalties imposed on Passport in subsequent months as a result of Evolent's utterly deficient claims processing.  In fact, rather than Evolent remedying the pervasive problems, the systemic failures only worsened.  As set forth above, in February 2018 alone, Evolent caused Passport to be assessed with a staggering <u>$48 million in penalties</u> for untimely and improperly submitted encounter data.  In October 2018, Passport submitted encounter data that was more than <u>50 million days</u> late in the aggregate, and its corresponding penalty totaled <u>$56 million</u>.  And, for each of November and December 2018, Passport's encounter data penalties topped <u>$100 million</u> per month.  In all, from October 2017 through April 2019, Evolent caused Passport

to incur a staggering **_$489 million_** in penalties for deficient encounter data submissions in violation of its contract with Kentucky—an amount so large that it would have bankrupted the Plan.  Both CW 1 and CW 3 corroborated that these massive penalties were entirely the result of Evolent's abject failure to properly and timely submit encounter data.

78.     The only reason that these penalties did not drive Passport into immediate insolvency was that under its Medicaid contract with Kentucky, Passport's penalties were capped at 0.33% of their monthly capitation revenue.  However, even under these "capped" penalty rates, Passport was forced to pay more than $10 million to Kentucky between October 2017 and April 2019—an amount equivalent to <u>one-third</u> of Passport's entire net operating gain for 2015 (the year before Evolent took over at Passport).

79.     Accordingly, as set forth above, Evolent's utterly deficient claims administration—which caused Passport to breach its Medicaid contract with Kentucky—not only caused Passport to incur tens of millions of dollars in dramatically increased reprocessing costs, interest payments and penalties, but it also played a significant role in Kentucky's decision to reduce its Medicaid reimbursement rates to Passport and, ultimately, caused Passport to lose its contract entirely.

        **d.**    **Evolent's Failure to Properly Submit Encounter Data to Kentucky Leads Kentucky to Cut Passport's Medicaid Reimbursement Rates, Further Imperiling the Plan's Finances**

80.     Making matters even worse for Passport, Evolent's deficient claims administration led to Kentucky's decision to cut its Medicaid payments to Passport in the second half of 2018.  Specifically, on May 30, 2018 Passport learned that Kentucky planned to significantly cut its Medicaid rates for the geographic region covering the majority of Passport's members, for the six-month period July 1, 2018 through December 31, 2018 (the "2018 rate cuts").  The 2018 rate cuts did not actually go into effect until November 1, 2018, but were

retroactively applied to the period beginning July 1, 2018, resulting in Passport's Medicaid revenue being reduced by 3.2% during that time period.

81.     Unbeknownst to investors, however, Evolent's deficient claims processing services were directly and solely at fault for these rate cuts, and the resulting financial harm to Passport.   Indeed, while Passport publicly protested the 2018 rate cuts and blamed Kentucky for what it claimed was an unfair process, multiple CWs corroborated the penalty letters and confirmed that the 2018 rate cuts were directly caused by Evolent's failure to properly submit Passport's encounter data to the state.   As CW 3 bluntly stated, "the Medicaid rate cuts were a direct result of Passport's own failure to submit encounter data correctly," which was a "downstream effect" of Evolent's defective claims administration platform.   CW 3 had direct knowledge of the 2018 rate cuts because of his position in Evolent's risk adjustment department at this time, in which he was responsible for aggregating encounter data for Medicaid claims and analyzing it to estimate the likelihood a given patient population will get sick.

82.     According to CW 3, immediately after they learned of the 2018 rate cuts, high-level executives of Evolent, including Evolent co-founder and long-time COO, Tom Peterson, "were here on the ground for weeks on end trying to work to get things fixed."   CW 1 confirmed that Evolent knew of Passport's dire financial circumstances as soon as Passport's own management knew of the situation.   "Whenever Passport knew, Evolent knew," CW 1 said, adding "they sit at the table."

83.     The financial impact to Passport from these cuts was so severe that Passport would report a loss of $65.5 million by year-end 2018 and project an additional $75 million loss for the first half of 2019.   Indeed, both Evolent and Passport would publicly blame these rate cuts

for Passport's severe financial distress, but Defendants never disclosed that these rate cuts were, in fact, a direct result of Evolent's claims administration failures.

### 3.   In Just Three Years, Evolent Pushes Passport to the Brink of Financial Ruin

84.   Once a profitable and nationally-ranked health plan, Evolent's parasitic fees and faulty claims administration services rapidly turned Passport from the crown jewel of Kentucky Medicaid plans into a financially-insolvent shell of its former self.  As CW 1 explained, "before Evolent came in, Passport was seen as a plan that did things well."  Indeed, by 2011 Passport was nationally ranked as the 13th best Medicaid health plan in the United States, and by 2014, Passport served over 236,000 Kentucky Medicaid recipients.  The Plan enjoyed profits of $115 million in 2014 and $39 million in 2015, and ended each of those years with $214.9 million and $249.9 million in capital, respectively. Moreover, Passport renewed its long-standing contract with Kentucky in 2015, under which Passport would continue to administer Medicaid in Kentucky for the next five years.

85.   However, the story changed dramatically the moment that Evolent took over. Before retaining Evolent, Passport incurred total general administrative expenses of $107.5 million in 2015.  After engaging Evolent, Passport incurred general administrative expenses of $169.1 million in 2016, $182.7 million in 2017, and $194 million in 2018—increases of 57%, 70%, and 80%, respectively, over the expenses that had been incurred in 2015, the year immediately preceding the Evolent partnership.  These ever-increasing general administrative expenses were a direct outgrowth of Evolent's exorbitant fees, as shown in in the chart below:



86.     Significantly, these staggering increases in Passport's expenses cannot be tied to any corresponding growth in Passport's revenue.   Indeed, in the first year of Evolent's partnership with Passport, Passport's $62 million jump in total administrative expenses represented a staggering 57% increase over the prior year—while Passport's revenues increased by only about 5% for the same period.   Moreover, while Passport reported its expenses and fees to regulators, investors had no idea that it was Evolent causing these expense increases, while failing to actually reduce Passport's overall costs or otherwise help the Plan operate in a more cost-effective manner.   According to CW 4, by this point Passport was already "a mess," and Evolent was known throughout Passport to be its worst performing third-party service provider from a cost-efficiency perspective.

87.     As a result, during the Class Period, Passport's profits were transformed into massive losses, depleting Passport's capital by more than $150 million, from a high of $250 million in 2015 to $92 million in 2018.   Passport's annual "net underwriting gain (loss)" metric—essentially a true measure of operational cost efficiency derived by subtracting claims

payments and general administrative expenses from Passport's total Medicaid revenue—drastically swung from significant net underwriting gains pre-Evolent to devastating net underwriting losses post-Evolent.  As reflected in the chart below, while Passport had a net underwriting <u>gain</u> of $33.3 million in 2015, after retaining Evolent, Passport had a net underwriting <u>loss</u> of $80.4 million in 2016, a *de minimis* net underwriting gain of $4.3 million for 2017, and a $130.7 million net underwriting <u>loss</u> for 2018:



88.     In sum, Evolent financially crippled Passport, transforming it from one of Kentucky's most successful Medicaid providers into a hollowed-out shell teetering on the brink of insolvency.  Nearly overnight, Passport's fees skyrocketed as former employees confirmed that Passport was paying Evolent grossly excessive fees for rebadged former Passport employees to do the exact same jobs at Evolent.  Evolent not only cannibalized Passport's existing revenue, but also decimated Passport's ability to actually generate revenue through the faulty implementation of the Valance claims processing platform, leading to significant net

underwriting losses during the Class Period. Passport soon began spiraling out of control, unable to continue to pay Evolent's massive fees while unable to determine how much money it should receive from Kentucky.

**D. The Truth Begins to Emerge**

**1. Evolent Falsely Pins the Blame for Passport's Financial Troubles on the 2018 Rate Cuts, Without Revealing That Its Own Practices Caused the Rate Cuts**

89. In November 2018, Passport plunged into financial jeopardy when Kentucky reduced the Medicaid capitation payments that covered the majority of Passport's members by roughly 4.1%, meaning that Passport's revenue would decline by approximately 3.2%. Passport appealed these Medicaid rate cuts with the state, and, consequently, beginning in January 2019, while that appeal was pending, reports began to emerge in local Kentucky news outlets that Passport was in financial distress, ostensibly due solely to Kentucky's Medicaid rate cuts.

90. On January 25, 2019, *Insider Louisville* published an article titled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to Evolent Health," which reported on Passport's financial woes and discussed that—setting aside the 2018 rate cuts— Evolent's exorbitant fees were dramatically worsening Passport's financial situation. The *Insider Louisville* article explained that "declining reimbursement rates to Passport tell just part of the story," that "Passport's money problems also are a result of overspending," and that "[t]he big culprit that is pushing up expenses: non-employee management fees"—more specifically, Evolent's fees:

> In the last three years, Passport paid the publicly traded Evolent Health some $220 million in non-employee management fees, accounting for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead.

91.     The *Insider Louisville* article emphasized that, over the course of 2016 and 2017 (the first two years Evolent provided services to Passport), "expenses rose at a faster pace than revenue." Specifically, while Passport's revenue grew 9.4% per year, its non-employee management fees (which were mostly paid to Evolent) rose by <u>68% annually</u>. Significantly, however, Defendants flatly denied that their fees were excessive or improper. Instead, Defendants claimed that Evolent's high fees were solely the result of taking over services Passport once provided, falsely claiming that Evolent was providing services "at cost" and even "<u>at a lower per member cost than prior periods</u>." As the *Insider Louisville* article stated:

> Evolent told Insider via email that the 'majority of the fees Passport pays to Evolent are directly tied to local staff — <u>at cost</u> — as well as (insurance claims processing) and pharmacy benefit services at a <u>lower per member cost than prior periods</u>.' The company said it has 'hundreds of employees supporting Passport' and that 'the number of employees has increased in line with the increases in scope of our partnership with Passport' and that 'the number of our employees in Louisville exceeds our original projection.'

92.     In a further attempt to counter *Insider Louisville*'s claims, Evolent dispatched Passport's CEO, Mark Carter, to reassure investors that the article was incorrect, and that Passport had actually benefitted from its arrangement with Evolent. In a January 31, 2019 research note on Evolent titled, "Passport is a Happy Client, Despite Local Media Reports," Piper Jaffray reported that it had "caught up with Mark Carter, CEO of Passport Health," who assured the analyst that "[w]hile Passport is wrangling with regulators over capitation rates, the issue is not tied to the [Evolent] relationship."

### 2.     Passport Sues Kentucky Over the Rate Cuts, and Evolent Repeatedly and Emphatically Denies That It Would Need to Acquire Passport

93.     On February 15, 2019, Passport filed a lawsuit against Kentucky's Finance and Administration Cabinet and its Cabinet for Health and Family Services ("CHFS") (the "Passport Complaint"), challenging the Medicaid rate cuts that Passport learned of in May 2018. In that

lawsuit, Passport alleged that, if the rate cuts were not reversed, <u>Passport would be legally insolvent by March 1, 2019</u>.  Passport further alleged that it had recorded a loss of $65.5 million for year-end 2018 and projected an additional $75 million in losses for the first half of 2019 alone—ostensibly solely as a result of the Medicaid rate cuts.  As a result of these losses, Passport explained that it would fall below the statutory minimum capital needed to remain solvent by law as soon as March 1, 2019—a mere two weeks later—and risked losing its Medicaid contract with Kentucky, the basis of its entire business and existence.  On February 19, 2019, the first trading day following Passport's lawsuit, Evolent's stock price fell 10.8%, to close at $14.99 (from a closing price of $16.80 on the previous trading day) on unusually high volume.

94.     The revelations in the Passport Complaint raised significant concerns among investors and analysts about the impact of a potential Passport bankruptcy on Evolent's revenue stream—and whether Evolent would have to bail out Passport given that it constituted approximately 20% of Evolent's revenue.  Accordingly, during an investor conference call on February 26, 2019, analysts peppered Evolent's management with questions about Passport's dire financial condition and its potential effects on Evolent.   In particular, analysts were concerned that Evolent might have to bail out or purchase Passport, in what would obviously be a transaction that was detrimental to Evolent's financial condition.   Significantly, Evolent management outright dismissed these concerns.  Defendant Williams represented that Evolent does "<u>not focus[] on outright majority ownership in health plans</u>" and told analysts, "<u>there's no big change in strategy based on what we see happening with Passport specifically</u>."

95.     Analysts continued to push Williams on the insolvency risks that Passport posed to Evolent, again focusing on its importance to Evolent's bottom line.  A Citigroup analyst asked Williams outright: "On the Passport side, is there any balance sheet risk if they were to go

insolvent? Or put another way, have your joint investment efforts of Passport given you any exposure in a tail event"? Williams responded unequivocally that "<u>No.  No, we don't have any broader exposure</u>."  When analysts specifically asked if Evolent was even considering acquiring Passport, Defendant Williams emphatically rejected that possibility, stating that Evolent had not even "thought about" acquiring Passport, that such an acquisition was "not in our strategic lens at this point," and that a Passport bailout was "<u>not something that is currently being evaluated</u>."

96.     By Spring 2019, Passport's financial picture appeared to have improved.  First, in March 2019, Passport announced that it had undertaken cost-cutting measures to shore up its finances.  Second, on April 10, 2019, Kentucky announced that it was reversing its prior Medicaid cuts and thus increasing the reimbursement rate affecting Passport.  Analysts covering Evolent were buoyed by the news.  Cantor Fitzgerald, for example, opined that the newly increased rates "lift[ed] an overhang on EVH shares," and SunTrust wrote that "elevated payments to Passport decrease[] risk EVH loses its largest customer," and that "the elevated rates, in addition to Passport's cost cuts in March, give us confidence EVH's guidance for contribution from Passport should remain intact for this year."

97.     Indeed, as late as May 7, 2019, during its earnings call for the first quarter of 2019, Evolent management assured investors that "<u>Passport is making solid progress towards improving its financial performance.</u>" Again, the market was reassured.  JPMorgan maintained its $15 price target, commenting that Passport was "on more steady footing," that the "recent Kentucky rate increase [was] a step in the right direction for the stability of [Evolent's] partner Passport Health," and that Evolent "is partnering with [Passport] to drive improvement operations to insulate the plan from potential rate volatility in the future."

**3.**      **Evolent Shocks the Market by Announcing That it Will Bail Out Passport by Acquiring a 70% Stake in the Plan**

98.      Before the market opened on May 29, 2019, Evolent stunned investors by abruptly and suddenly reversing course.  On that day, the Company issued a press release announcing that, notwithstanding its prior assurances, it had agreed to acquire a majority stake in Passport, paying $70 million in exchange for its 70% interest, and further agreed to provide additional "interim balance sheet support"—that is, to pay in additional capital—if such support became necessary for Passport to meet its statutory capital requirements.  Evolent's announcement was an admission that—contrary to Defendants' recent assurances—Passport's financial condition was far worse than had been previously known, and that Passport could not have survived as an independent entity.  Moreover, the announcement was an admission that it was <u>not</u> the 2018 rate cuts—which had already been rescinded—that were the cause of Passport's downfall, but rather the catastrophic financial harm imposed on Passport by Evolent's excessive fees and deficient claims administration processes.

99.      Also prior to the market opening on May 29, Evolent held a special investor call to discuss its acquisition of a majority stake in Passport.  During the call, Defendant Williams initially attempted to downplay the idea that Evolent's stake amounted to an urgently needed bailout, painting the transaction as an "opportunity" for Evolent.  However, with analysts questioning why there was "still the need to make this investment to become basically a 70% owner," Williams was forced to admit that <u>Evolent had had no choice but to buy Passport to protect the 20% of Evolent's revenue stream that Passport contributed</u>:  "[w]hen you get a rate cut and you suffer substantial losses and those losses carry for several months, then you develop a sense of urgency that we need to respond with speed, we need to respond comprehensively…<u>given the financial situation, we need[ed] to respond immediately</u>."

100.   In response to the news of Evolent's massive and cash-draining emergency bailout of its largest and most important customer, Evolent's stock price fell a staggering 29.3%—or $4.14 per share—on May 29, 2019, to close at $10.01 (from the previous trading day's closing price of $14.15).

101.   Analysts excoriated Evolent management for their lack of candor about the likelihood of bailing out Passport.  SunTrust noted that "[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call: When asked whether EVH would acquire some, if not the whole, Passport business during the 4Q18 earnings call, <u>management cited they had 'not contemplated acquiring a full Medicaid plan,' that it's 'not in our strategic lens at this point</u>.'"  SunTrust further emphasized that "this transaction signals that Passport <u>wasn't in a position to remain operationally sustainable as a standalone entity</u>, which suggests to us that EVH's investment and balance sheet commitment is likely instrumental in supporting the business."  Citigroup worried that the deal raised "<u>concerns that EVH had to pay to maintain its customer base</u>."

102.   Analyst and investor reaction to Evolent's bailout of Passport was so severe that Evolent was forced to address the situation yet again during another investor call the very next day, on May 30, 2019.  During the call, Defendant Williams again admitted that Evolent was effectively forced to buy out Passport: "a lot of people say, 'Boy, I wish you weren't in this situation, because ideally, we'd love you not to be – have – be investing alongside your clients in this way in this particular situation' and we agree.  <u>But that's not the situation that was presented to us</u>."

103.   Strikingly, Evolent management also admitted that it had known of the risk it would have to bail out Passport no later than January 2019.  As the Company's COO and co-

founder Thomas Peterson stated, "despite having this really strong profound belief in the mission of Passport and the potential for Passport, the sponsors [of Passport] really felt as though they needed to take on a partner.  And so . . . starting in January, once the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be retroactive rate relief, there was [an] additional level of urgency that was placed on this . . . ."  Indeed, he admitted, the situation had become so severe that "in January what we did was we effectively created a shadow management team [at Passport].  So we had our own – we brought in our own CMO, our own CEO, our own COO, a Chief Actuary, Head of Network Contracting, and we were shoulder to shoulder with Passport leadership."

### E.    Subsequent Events Confirm Defendants' Fraud

104.    Evolent's forced acquisition of a 70% stake in Passport could not have come at a more inopportune time for Passport, as the Plans' contract with the Commonwealth to provide Medicaid services to Kentucky residents was set to end in July 2020.   Thus, Kentucky announced that in May 2019, the Commonwealth would be issuing a request for Medicaid proposals (the "RFP") to award Medicaid contracts.  Passport submitted its RFP proposal to Kentucky in July 2019.

105.    On November 26, 2019, Kentucky announced its decision on new Medicaid contracts awarded stemming from the RFP.  Five MCOs were awarded Medicaid contracts under the RFP, and Passport was not one of them, meaning that Passport had now lost its long-standing Medicaid contract, the basis of virtually its entire business.

106.    As the *Courier-Journal* reported on the morning of November 27, 2019, in an article titled "Bevin administration leaves out Passport in awarding $8B in Medicaid contracts":

> In a blow to Louisville's Passport Health Plan, Gov. Matt Bevin's administration has notified five other health insurance companies they have won contracts to

manage around $8 billion a year in Kentucky's Medicaid business — <u>cutting Passport out of the work it's had for more than 20 years</u>.

\* \* \*

The five-year contracts take effect July 1[, 2020].

\* \* \*

<u>The loss of the new contract could put Passport out of business</u> because its main revenue comes from managing health care for Kentucky Medicaid enrollees, a population it was founded to serve in 1997 as a nonprofit.

\* \* \*

Passport's loss of the Medicaid contract also is a blow to Evolent Health, a Virginia-based health management company that announced plans to buy Passport in May for $70 million, a transaction expected to close by the end of this year.

107.    On this news, Evolent's stock price fell 27%, from a close of $10.68 on November 26, 2019, to a close of $7.76 on November 27, 2019.

108.    Documents obtained from Kentucky that quantify all applicants' responses to the RFP confirm that Passport lost its Medicaid contract with Kentucky because it was unable to establish that it could provide Medicaid services "in a cost-effective manner"—the precise reason Evolent was supposedly hired.  Indeed, of the seven applicants, Passport <u>received by far the lowest numerical score</u>, both overall and in many of the individually scored categories, including areas in which Evolent had promised improvements.  To score the responses, Kentucky assembled a "Scorecard" with comments that listed and described the reasons why Passport's contract was not renewed.  For example, the Scorecard noted that Passport "took a substantial net loss of $125 million in 2018"—a loss which was directly attributable to Evolent's debilitating fees and deficient claims processing platform.  Moreover, despite the critical importance of encounter data, Passport failed to provide any "formal policy" regarding encounter data processing—the very area of data collection that Evolent had botched so badly at Passport as to

financially imperil the Plan.  But the most damning reason of all was Kentucky's conclusion that Passport "did not address in detail" how "whole-person integrated care, population health, and overall [healthcare] improvement outcomes" would be "<u>accomplished in a cost-effective manner</u>."

109.    Piper Jaffray issued an analyst report commenting on the RFP scoring, opining that it was "highly unlikely" Passport could successfully appeal the results, noting that "[Evolent] was repeatedly penalized for the rfp response not including enough detail on how they would address various initiatives, training, and incentives" and noting that Evolent "also scored lowest compared to peers on experience judged by breadth of [Medicaid] contracts held."

110.    On December 23, 2019, new Kentucky Governor Andy Beshear announced that there would be a rebidding process for providers to bid for contracts to provide Medicaid services in Kentucky.  He warned, however, that "[n]o one is guaranteed a contract," and did not give any specific indication that Passport was likely to win a new contract in the rebidding process.  As of the filing of this Complaint, Kentucky's Medicaid contract awards were still undecided.

## VI.    <u>DEFENDANTS' FALSE AND MISLEADING STATEMENTS</u>

111.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, Evolent's press releases, investor presentations, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's business and operational practices and its dealings with Passport.

112.    Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of Evolent's business, operational status, profitability, and future growth prospects, all of which artificially inflated the price of Evolent's common stock.

### A.    Evolent's 2016 Form 10-K

113.    On the first day of the Class Period, March 3, 2017, Evolent filed its Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K").  The 2016 Form 10-K explained that the Company was founded for the sole purpose of enabling its partners to cut "total cost[s]," a necessary requirement for these partners to maintain profitability while transitioning to value-based care.  Specifically, Evolent claimed: "The solution we offer our target market contemplates one strategic option – to pursue clinical and technological integration to reduce utilization and total cost[.]"

114.    In the 2016 Form 10-K, Evolent repeatedly emphasized that the Company's suite of services benefited health plan systems like Passport "[b]y helping these systems lower clinical and administrative costs" and "capture greater market share."  Specifically, Evolent represented:

> The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, long-term contractual relationships and a cycle of clinical and cost improvement with shared financial benefit.

> We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care.  By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective care setting to payers, employers and consumers, which enables them to capture greater market share.  As providers have succeeded in lowering costs and growing market share, this enables them to increase their value-based offerings. By virtue of our business model, we benefit from our partners' growth.

115.    The statements in paragraphs 113 and 114 were materially false and misleading. Evolent's services did not help what was by far its most significant partner, Passport, lower clinical and administrative costs; in fact, they did just the opposite.  Indeed, in 2016, Evolent

charged Passport $57.2 million in fees, accounting for nearly all of Passport's $62 million increase in administrative expenses from the prior year—a roughly 57% cost <u>increase</u> in a single year.  As CW 1—who was deeply involved in Passport's finances, as a high-ranking member of its audit department and direct report of Passport's CFO—put it, "<u>[Evolent] said they could cut costs by providing services; they did the opposite</u>."  Moreover, with respect to the rebadging of over two-thirds of Passport's employees, CW 1 confirmed that Passport ended up paying Evolent "more than we had been paying for the salaries of the people that did the work Evolent was [now] doing. . . . <u>The admin expense was more than we were paying for those salaries.  That's all Evolent</u>."  In other words, she said, Passport was merely "paying [Evolent] to do that stuff that we used to do, and we were paying them more."  Indeed, rather than reducing Passport's "total cost," during the first year Evolent provided services to Passport, Evolent's "solution" caused Passport to swing from a net underwriting gain of $33.3 million in 2015 to a net underwriting loss of $80.4 million in 2016.

### B.  Evolent's 1Q 2017 Investor Call and Form 10-Q

116.    On May 9, 2017, the Company conducted an investor conference call to discuss its financial results for the first quarter ended March 31, 2017.  The next day, May 10, 2017, Evolent filed its Form 10-Q reporting financial results for the quarter.

117.    During the call, Williams boasted that Evolent's services had "<u>drive[n] greater efficiency</u>" for Passport, stating:

> In terms of growth to our existing partners, I am also excited about our work across the last year at Passport Health Plan in Kentucky. Passport is a nationally recognized organization in Medicaid and we've been able to leverage its experience and strong provider network in combination with the Evolent platform <u>to drive greater efficiency and to improve quality of care across the [Plan's] large and diverse population.</u>

118.     Similarly, in the Form 10-Q, Evolent described its suite of tech-based services and claimed they enabled health plan partners like Passport to operate "in a more cost-effective manner."  Specifically, Evolent represented:

> The Company's services include providing our customers, who we refer to as partners, with a population management platform, integrated data and analytics capabilities, pharmacy benefit management ('PBM') services and comprehensive health plan administration services.  Together these services enable health systems to manage patient health in a more cost-effective manner.

119.     The statements in paragraphs 117 and 118 were materially false and misleading. Evolent's services did not help "drive greater efficiency" for Passport or help it operate "in a more cost-effective manner"; in fact, they did just the opposite.  In reality, as set forth above, Evolent repeatedly sought to increase the large and reoccurring revenue stream the Company generated from its partnership with Passport by charging Passport huge amounts for performing the same work Passport used to conduct in-house, and driving up administrative costs with no commensurate financial benefit for Passport.  Indeed, as CW 1 put it, "[Evolent] said they could cut costs by providing services; they did the opposite."

120.     During the May 9, 2017 investor call, Williams also insisted that Evolent's integration of its new Valence claims processing platform into its other services had "gone incredibly well," and that Evolent was "feeling greater stability in operations, like we have the ability to scale."  With regard to Passport, Williams boasted that "that's going to be another 300,000 lives on the platform, and our commitment was to get that absolutely right in terms of serving clients at a high standard from the outset."

121.     The statements in paragraph 120 were materially false and misleading.  In fact, Defendants knew well before the scheduled October 1, 2017 go-live date that the integration process was not going "incredibly well" and Valence was unable and unequipped to handle processing claims "at a high standard from the outset" for Passport.  For instance, Defendants

were well-aware that Valence had been designed to process group dental claims, not individual medical claims, which are managed completely differently.  As CW 3 explained, a platform built to process dental claims was "<u>not advanced enough</u>" to support processing Passport's individual medical claims data.  Moreover, CW 2 said she made it known to Evolent management on "a number of occasions" that the system was not ready or adequate to handle Passport's medical claims processing, and emphasized that "it wasn't just me" telling management of the problems.  In fact, she said, "<u>[p]retty much everyone from Passport was telling them</u>" the transition would not go smoothly.  Other CWs corroborated this account, with CW 4 explaining that it was clear at the outset that "<u>the system wasn't ready</u>."

### C.    Evolent's May 11, 2017 Investor and Analyst Day Conference

122.    On May 11, 2017, Evolent held its second annual Investor and Analyst Day.  During the conference, Defendants extensively discussed the Passport partnership, Evolent's acquisition of Valence and Aldera, and the plan to migrate Passport to Evolent's new Valence claims processing system on October 1, 2017.  For instance, Defendant Wigginton, an Evolent employee since 2012 who was appointed CEO of Valence after Valence was acquired by Evolent in October 2016, insisted that the "<u>integration process with the Valence health team has proceeded at or above our expectations</u>" and that Evolent was "<u>really creating a seamless, highly integrated infrastructure</u>" by combining Valence's services with the Company's other service offerings.

123.    During this conference, Evolent's then-National Medicaid COO, Defendant Spencer (who had been Passport's COO until she moved to Evolent in February 2016), also represented that Passport had done "a lot of due diligence" on Valence and had "<u>made sure that everything was working the way that we want it to</u>" before deciding to transition to Valence.

124.    The statements in paragraphs 122 and 123 were materially false and misleading. Defendants knew well before the scheduled October 1, 2017 go-live date that the integration of Valence and the Company's other service offerings would <u>not</u> create a "seamless, highly integrated infrastructure" and, consequently, that the integration was <u>not</u> "proceeding at or above expectations" with respect to Passport.  Defendants were well-aware that Valence had been designed to process group dental claims, not individual medical claims, which are managed completely differently.  As CW 3 explained, a platform built to process dental claims was "<u>not advanced enough</u>" to support processing Passport's individual medical claim data. Moreover, CW 2 said she made it known to Evolent management on "a number of occasions" that the system was not ready or adequate to handle Passport's medical claims processing, and emphasized that "it wasn't just me," telling management of the problems.  In fact, she said, "<u>[p]retty much everyone from Passport was telling them</u>" the transition would not go smoothly. Other CWs corroborated this account, with CW 4 explaining that it was clear at the outset that "the system wasn't ready."

**D.    Evolent's 2Q 2017 Form 10-Q**

125.    On August 7, 2017, Evolent filed its Form 10-Q reporting financial results for the second quarter ended June 30, 2017.

126.    In the Form 10-Q, Evolent described its suite of tech-based services and claimed they enabled health plan partners like Passport to operate "<u>in a more cost-effective manner</u>." Specifically, Evolent represented:

> The Company's services include providing our customers, who we refer to as partners, with a population management platform, integrated data and analytics capabilities, pharmacy benefit management ('PBM') services and comprehensive health plan administration services.  <u>Together these services enable health systems to manage patient health in a more cost-effective manner</u>.

127.    The statements in paragraph 126 were materially false and misleading.  In reality, Evolent repeatedly sought to increase the large and reoccurring revenue stream the Company generated from its partnership with Passport by charging Passport as much as possible for its services without providing any corresponding financial benefit to Passport.    Moreover, Evolent's services did <u>not</u> help its most significant partner, Passport, operate "in a more cost-effective manner"; in fact, they did just the opposite.  Indeed, in 2017, Evolent charged Passport <u>a whopping $88.8 million in fees</u>—a 55% increase over the already exorbitant $57.2 million in fees it had charged Passport in 2016—contributing to yet another large increase in Passport's overall expenses.  CW 1 explained, "<u>[Evolent] said they could cut costs by providing services; they did the opposite</u>."

**E.      Evolent's 3Q 2017 Investor Call and Form 10-Q**

128.    On November 2, 2017, Evolent conducted an investor conference call to discuss its financial results for the third quarter ended September 30, 2017.   One week later, on November 9, 2017, Evolent filed its Form 10-Q reporting financial results for the quarter.

129.    During the call, Williams again discussed Evolent's relationship with Passport, boasting that Evolent "<u>successfully launched</u> Passport . . . onto our [Valence] platform," and that Evolent "teams continue to monitor [Valence's] operations closely and <u>report a smooth transition</u>."  Moreover, Williams insisted transitioning to Valence would "provide a differentiated and <u>more efficient service</u>" for the Plan and "<u>create value for Passport unmatched by a traditional vendor client relationship</u>":

>  As a reminder, we made this decision [to process claims for Passport using Valence] together for several reasons. First, <u>we wanted to provide a higher level of service for Passport members and providers. By integrating our clinical and administrative platforms, we'll be able to provide a differentiated and more efficient service for our members.</u> Second, we recognize the opportunity to expand the depth of our strategic alliance, <u>leveraging best practices from both</u>

entities to create value for Passport unmatched by a traditional vendor client
relationship.

* * *

To ensure a seamless transition for providers and plan members, teams continue
to monitor operations closely and report a smooth transition. In the months since
go live, over 1.6 million enrolment transactions have been completed as we
onboard more than 300,000 Passport Health Plan members across the quarter.

130.   The statements in paragraph 129 were materially false and misleading.  Although

Passport had only begun using Valence to process claims one month before these statements

were made, Defendants already knew that Evolent employees had not "report[ed] a smooth

transition" and, consequently Valence would not "create value for Passport unmatched by a

traditional vendor client relationship"; in fact, it would do just the opposite.   As CW 4

confirmed, Evolent's transition of Passport to its new Valence claims platform was "a disaster!"

– not "successful[]" or "smooth."  Indeed, as CW 3 explained, because Valence was "not built

correctly" for processing individual medical claims, the system caused Passport's claims to be

incorrectly denied, delayed, and even under or overpaid.

131.   Moreover, once Passport transitioned to Valence on October 1, 2017, Evolent did

not "provide a higher level of service for Passport"; rather, Passport's claims administration and

processing capabilities deteriorated immediately.  Documents Lead Plaintiffs obtained from the

Commonwealth of Kentucky establish that Evolent's Valence services were fundamentally

flawed and consequently drove up costs for the Plan rather than decreasing them.  For example,

under Passport's previous claims administrator, Passport was assessed *de minimis* penalties

averaging just $33,000 per month.  By contrast, in October 2017—the first month that Evolent

handled Passport's claims processing—Passport was assessed penalties of $619,625, an increase

of roughly 1,800%.  These penalties continued to exponentially skyrocket as a result of Evolent's

utterly deficient claims processing, and, remarkably, over the subsequent year and a half,

Passport was assessed <u>nearly half a billion dollars in penalties</u>.  As CW 3 confirmed, Valence wreaked havoc at Passport for a period of "more than 15 months," becoming so systemic that Evolent was forced to standup a daily "war room" to address the issue.

132.    In the Form 10-Q, Evolent described its suite of tech-based services and claimed they enabled health plan partners like Passport to operate "<u>in a more cost-effective manner</u>." Specifically, Evolent represented:

> The Company's services include providing our customers, who we refer to as partners, with a population management platform, integrated data and analytics capabilities, pharmacy benefit management ('PBM') services and comprehensive health plan administration services.  <u>Together these services enable health systems to manage patient health in a more cost-effective manner</u>.

133.    The statements in paragraph 132 were materially false and misleading. Evolent's services did <u>not</u> help its most significant partner, Passport, "operate in a more cost-effective manner"; in fact, they did just the opposite.  As set forth above, Evolent repeatedly sought to increase the revenues it derived from Passport by charging Passport as much as possible for its services without providing any corresponding financial benefit to Passport, including for example, by "rebadging" employees and forcing Passport to use Evolent's grossly deficient claims processing service.  As CW 1 put it, "<u>[Evolent] said they could cut costs by providing services; they did the opposite</u>."

**F.    Evolent's 4Q and Full Year 2017 Investor Call, and 2017 Form 10-K**

134.    On February 27, 2018, Evolent held an investor conference call to discuss its financial results for the fourth quarter and year ended December 31, 2017.  Two days later, on March 1, 2018, Evolent filed its Form 10-K for the year ended December 31, 2017 ("2017 Form 10-K").

135.    During the call, Defendant Williams claimed that the integration of Evolent's Valence claims processing platform into Evolent's services for Passport was going "<u>incredibly</u>

well" and was enabling the Company's partners, including Passport, to "get to a higher level of performance":

> The past year was also important in terms of integrating Valence into our broader health plan services offering and successfully scaling the organization with several large clients [including Passport] coming in across the year. While we still have work to do in fulfilling our long-term vision, the integration is going incredibly well and the Valence platform has enhanced our differentiation significantly in the marketplace.

* * *

> Lastly, with the integration of Valence and Aldera into our health plan services platform, we're seeing strong success providing services to existing and larger scale provider-owned health plans. The integration of the back-office claims and network management system . . . is highly differentiated in the market, and these organizations get to a higher level of performance in a more demanding market.

136.  The statements in paragraph 135 were materially false and misleading. Defendants were well-aware by this time that the integration of Valence at Passport had not "go[ne] incredibly well."  In fact, nothing could be further from the truth.  As CW 4 confirmed, Evolent's transition of Passport to its Valence platform was, in fact, "a disaster!"  For example, as CW 3 explained, because Valence was "not built correctly" for processing individual medical claims, the system caused Passport's claims to be incorrectly denied, delayed, and even under or overpaid.  Indeed, documents that Lead Plaintiffs obtained from the Commonwealth of Kentucky establish that Evolent's Valence services were fundamentally flawed and consequently, Passport incurred significantly higher claims processing costs while using Valence than it had before.  For instance, under Passport's previous claims administrator, Passport was assessed penalties averaging just $33,000 per month.  By contrast, in October 2017—the first month that Evolent handled Passport's claims processing—Passport was assessed penalties of $619,625, an increase of roughly 1,800%.  These penalties continued to exponentially skyrocket as a result of Evolent's utterly deficient claims processing, and, remarkably, over the subsequent year and a half,

51

Passport was assessed <u>nearly half a billion dollars in penalties</u>.  As CW 3 confirmed, Valence wreaked havoc at Passport for a period of "more than 15 months," becoming so systemic that Evolent was forced to standup a daily "war room" to address these urgent issues.

137.    In its 2017 Form 10-K, Evolent explained that the Company was founded for the sole purpose of enabling its partners to cut "<u>total cost[s]</u>," a necessary requirement for these partners to maintain profitability while transitioning to value-based care.  Specifically, Evolent claimed:  "<u>The solution we offer our target market contemplates one strategic option – to pursue clinical and technological integration to reduce utilization and total cost</u>[.]"

138.    In the 2017 Form 10-K, Evolent also stated that the Company's suite of services benefited health plan systems like Passport "<u>[b]y helping these systems lower clinical and administrative costs</u>" and "<u>capture greater market share</u>."  Specifically, Evolent represented that:

> The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, <u>contractual relationships and a cycle of clinical and cost improvement with shared financial benefit</u>.

> We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care. <u>By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost</u>, effective care setting to payers, employers and consumers, which enables them to capture greater market share. <u>As providers have succeeded in lowering costs</u> and growing market share, this enables them to increase their value-based offerings. By virtue of our business model, we benefit from our partners' growth.

139.    The statements in paragraphs 137 and 138 were materially false and misleading. Evolent's services did <u>not</u> help its most significant partner, Passport, lower clinical and administrative costs; in fact, they did just the opposite.  Indeed, in 2017, Evolent charged Passport <u>a whopping $88.8 million in fees</u>—a 55% increase over the already exorbitant $57.2 million in fees it had charged Passport in 2016—contributing to yet another large increase in Passport's overall expenses.  CW 1 explained that "<u>[Evolent] said they could cut costs by</u>

providing services; they did the opposite." Finally, by this time, Evolent's Valence platform was already causing rampant problems with Passport's claims processing, including late payment of claims, underpayment of claims, overpayment of claims, incorrect processing of claims, and failure to properly submit encounter data to the state. Under Passport's previous claims administrator, Passport was assessed penalties averaging just $33,000 per month. By contrast, in October 2017—the first month that Evolent handled Passport's claims processing—Passport was assessed penalties of $619,625, an increase of roughly 1,800%. These penalties continued to exponentially skyrocket as a result of Evolent's utterly deficient claims processing, and, remarkably, over the subsequent year and a half, Passport was assessed nearly half a billion dollars in penalties.

### G. Evolent's 1Q 2018 Investor Call and Form 10-Q

140.  On May 9, 2018, Evolent conducted an investor conference call to discuss its financial results for the first quarter ended March 31, 2018. The next day, May 10, 2018, Evolent filed its Form 10-Q reporting financial results for the quarter.

141.  During the call, Williams touted that Evolent's services provide "a cost-effective infrastructure that integrates clinical and administrative functions under one roof, and allows our provider partners to leverage the benefits of integration in driving performance." And, Defendant Williams further represented that Evolent had "been driving efficiency and operational scale within our Medicaid business."

142.  Similarly, in the Form 10-Q, Evolent described its suite of tech-based services and claimed they enabled health plan partners like Passport to operate "in a more cost-effective manner." Specifically, Evolent represented:

> The Company's services segment ('services') provides our customers, who we
> refer to as partners, with a population management platform, integrated data and
> analytics capabilities, pharmacy benefit management ('PBM') services and

comprehensive health plan administration services.   <u>Together these services enable health systems to manage patient health in a more cost-effective manner</u>.

143.   The statements in paragraphs 141 and 142 were materially false and misleading. Evolent's services did <u>not</u> create "a cost-effective infrastructure" or "drive[] performance" for its most crucial partner, Passport, but rather, dramatically increased Passport's costs with no commensurate financial benefit to Passport.  Indeed, in 2018 Evolent reaped a shocking <u>$109.7 million in fees from Passport</u>, which caused Passport to incur a staggering $130.7 million net underwriting loss by the end of 2018.  Moreover, as Evolent took over more and more services from Passport, Passport's general administrative expenses increased at a rate dramatically outpacing its revenue growth.   Specifically, between 2015 and 2018, Passport's Medicaid revenue grew only 15%—from $1.65 billion to $1.94 billion—while its general administrative expenses increased by a staggering *80%*—from $107.5 million to $194 million.  Indeed, as CW 1 put it, "<u>[Evolent] said they could cut costs by providing services; they did the opposite</u>."

### H.   Evolent's May 11, 2018 Investor and Analyst Day Conference

144.   On May 11, 2018, Evolent held its third annual Investor and Analyst Day.  During the conference, Evolent executives discussed the Passport partnership at length yet again.  With respect to its financial commitment to Passport, Williams boasted that "<u>Passport is a good example</u>" of "<u>a great partnership</u>" purportedly because Evolent "<u>allowed them to get a lot of savings</u>" and "<u>was really important in terms of helping economics</u>."

145.   At this conference Defendant Blackley, the President of Evolent's operating subsidiary, also stated that Evolent's suite of services had purportedly caused "<u>about $75 million of improvement to Passport's bottom line</u>," claiming that:

> I think, you look at the results of the partnership, Evolent-Passport over the last few years under Tom [Peterson] and Steve [Houghland]'s leadership, about 5% improvement in MLR roughly, <u>so which is about $75 million of improvement to Passport's bottom line</u>. That is while, I think, taking care of patients in a way that

is better more coordinated, more integrated and better for the providers. So if you boil all what Steve just mentioned down to sort of the results, the $75 million improvement in the bottom line is a big deal, and it helps make, I think, the mission sustainable, and gives an opportunity for us to expand what we're doing in the state. And that's -- from an investor's standpoint, in taking away the net result [--] is critical. . . . But that was across the analytics and technology and platform, the compensation models, the clinical programming, and then also, the health plan services, Valence platform, which the Passport team adopted recently. So I think that gives you a full picture of the impact of all the work.

146.    These statements in paragraphs 144 and 145 were materially false and misleading. In reality, Evolent had not "allowed [Passport] to get a lot of savings," had not achieved "about $75 million of improvement to Passport's bottom line," and was not "really important in terms of helping [Passport's] economics."  Rather Evolent's suite of services had dramatically increased Passport's costs and depleted the Plan's capital. CW 1 said that she had no idea what Blackley was referring to when he claimed that Evolent had saved Passport $75 million.  Instead, she said "[Evolent] said they could cut costs by providing services; they did the opposite."  Indeed, during the first half of 2018 alone, months before the 2018 rate cuts went into effect, Passport had already incurred a net loss of $26 million caused by "increased costs."  By the end of 2018, Passport would incur a staggering $130.7 million net underwriting loss.

I.    **Evolent's 2Q 2018 Investor Call and Form 10-Q**

147.    On August 7, 2018, Evolent conducted an investor conference call to discuss its financial results for the second quarter ended June 30, 2018.  Two days later, on August 9, 2018, Evolent filed its Form 10-Q reporting financial results for the quarter.

148.    During the call, Williams claimed Evolent has a "differentiated platform, highly integrated" that has allowed Evolent "to standardize and reduce costs in many areas," and "drive some impressive consistent results for our partner[s]."  Meanwhile, Defendant McGrane described Evolent's approach as "conservative in how we're building infrastructure to make sure we're managing cost well."

149.     Similarly in the Form 10-Q, Evolent described its suite of tech-based services and claimed they enabled health plan partners like Passport to operate "in a more cost-effective manner."  Specifically, Evolent represented:

> The Company's services segment ('services') provides our customers, who we refer to as partners, with a population management platform, integrated data and analytics capabilities, claims processing services, including pharmacy benefit management and comprehensive health plan administration services. Together these services enable health systems to manage patient health in a more cost-effective manner.

150.     The statements in paragraphs 148 and 149 were materially false and misleading. Evolent's services did not help its most crucial partner, Passport "reduce costs in many areas," "drive some impressive consistent returns,"  or enable it to operate "in a more cost-effective manner," but rather, dramatically increased Passport's costs with no commensurate financial benefit to Passport.  Moreover, as Evolent took over more and more services from Passport, Passport's general administrative expenses increased at a rate dramatically outpacing its revenue growth.  Indeed, as CW 1 put it, "[Evolent] said they could cut costs by providing services; they did the opposite."  Additionally, by this time, Evolent's Valence platform was already causing rampant problems with Passport's claims processing, including late payment of claims, underpayment of claims, overpayment of claims, incorrect processing of claims, and failure to properly submit encounter data to the state.  These claims processing deficiencies wreaked havoc on Passport's financials, causing it to incur nearly half a billion dollars in penalties from the state, pay interest charges on late claims, and ultimately lose out on revenue from Kentucky that it could have received had it properly submitted its encounter data.

**J.      The September 5, 2018 Wells Fargo Healthcare Conference and Evolent's 3Q 2018 Form 10-Q**

151.     On September 5, 2018, Evolent presented at the 2018 Wells Fargo Healthcare Conference, again emphasizing the purported cost savings Evolent had generated for Passport.

Then about a month later on November 8, 2018, Evolent filed its Form 10-Q reporting financial results for the quarter.

152.    During the call, Defendant Williams expressly stated:  "<u>In [Passport's] own plan, we believe we've helped to generate over $100 million in savings</u>, which was highly valuable to that organization."

153.    Similarly, in the Form 10-Q, Evolent described its suite of tech-based services and claimed they enabled health plan partners like Passport to operate "<u>in a more cost-effective manner</u>."  Specifically, Evolent represented:

> The Company's services segment ('services') provides our customers, who we refer to as partners, with a population management platform, integrated data and analytics capabilities, claims processing services, including pharmacy benefit management, and comprehensive health plan administration services.  <u>Together these services enable health systems to manage patient health in a more cost-effective manner</u>.

154.    The statements in paragraphs 152 and 153 were materially false and misleading. Evolent's services did <u>not</u> help its most crucial partner, Passport operate "in a more cost-effective manner"; in fact, they did just the opposite.  As Evolent took over more and more services from Passport, Passport's general administrative expenses increased at a rate dramatically outpacing its revenue growth.  Indeed, as CW 1 put it, "<u>[Evolent] said they could cut costs by providing services; they did the opposite</u>."  Moreover, by this time, Evolent's Valence platform was already causing rampant problems with Passport's claims processing, including late payment of claims, underpayment of claims, overpayment of claims, incorrect processing of claims, and failure to properly submit encounter data to the state.  These claims processing deficiencies wreaked havoc on Passport's financials, causing it to incur nearly half a billion dollars in penalties from the state, pay interest charges on late claims, and ultimately lose out on revenue from Kentucky that it could have received had it properly submitted its encounter data.

### K.      The January 25, 2019 *Insider Louisville* Article

155.     On January 25, 2019, a Kentucky press outlet discussed Evolent's exorbitant fees and Passport's dramatically worsening financial situation.   In an article titled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to Evolent Health," *Insider Louisville* wrote that "declining reimbursement rates to Passport tell just part of the story," and that "Passport's money problems" were also a result of the fees it had paid to Evolent.

156.     *Insider Louisville* reported in the article that in response to its allegations, Defendants flatly denied that Evolent's fees were harming Passport, or that Evolent was overcharging the Plan in any way.  Evolent insisted that its fees were reflective of the "hundreds of [Evolent] employees supporting Passport" and the "increases in scope of our partnership with Passport."   Indeed, Evolent indicated that the fees it was charging Passport (and the resulting marked increase in Passport's expenses) were entirely appropriate and reasonable for the services performed for the Plan, falsely claiming that the services Evolent's rebadged employees were providing for Passport were being provided "at cost" and even "at a lower per member cost than prior periods."   Specifically, the *Insider Louisville* article reported:

> Evolent told Insider via email that the 'majority of the fees Passport pays to Evolent are directly tied to local staff—at cost—as well as (insurance claims processing) and pharmacy benefit services at a lower per member cost than prior periods.' The company said it has 'hundreds of employees supporting Passport' and that 'the number of employees has increased in line with the increases in scope of our partnership with Passport' and that 'the number of our employees in Louisville exceeds our original projection.' However, the company did not provide details.

157.     The statements in paragraph 156 were materially false and misleading.  Evolent failed to disclose that its services were not provided to Passport "at cost."   In fact, as former employees explained, Evolent charged far more for the services its rebadged employees provided to Passport than Passport had paid these employees in salaries.  For example, as CW 1 explained,

Passport ended up paying Evolent "more than we had been paying for the salaries of the people that did the work Evolent was [now] doing. . . . <u>The admin expense was more than we were paying for those salaries.  That's all Evolent</u>."  Evolent further failed to disclose that with respect to claims processing, Evolent's Valence services did <u>not</u> process Passport's claims "at lower per member cost" than Passport had paid pre-Valence for the same claims processing.  Instead, information obtained from Kentucky demonstrates the exact opposite; namely, that under Passport's previous claims administrator, Passport was assessed penalties averaging just $33,000 per month.  By contrast, in October 2017—the first month that Evolent handled Passport's claims processing—Passport was assessed penalties of $619,625, <u>an increase of roughly 1,800%</u>.  These penalties continued to exponentially skyrocket as a result of Evolent's utterly deficient claims processing, and, remarkably, over the subsequent year and a half, Passport was assessed <u>nearly half a billion dollars in penalties</u>.  As CW 3 confirmed, Valence wreaked havoc at Passport for a period of "more than 15 months," becoming so systemic that Evolent was forced to standup a daily "war room" to address the issue.

**L.     Evolent's 4Q and Full Year 2018 Investor Call, and 2018 Form 10-K**

158.     On February 26, 2019, Evolent conducted an investor conference call to discuss its financial results for the fourth quarter and year ended December 31, 2018.  Two days later, on February 28, 2019, Evolent filed its Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K").

159.     By this time, Passport had sued Kentucky and in light of Passport's lawsuit and ongoing media reports, analysts and investors remained concerned that Passport's financial troubles posed a risk to Evolent's most substantial revenue stream, and that Evolent might even have to acquire Passport.  In response, Defendant Williams emphatically dismissed these concerns, stating that even though such a deal would clearly be detrimental to Evolent, Evolent

was "not focused on outright majority ownership [of] health plans" and further assured that "there's no big change in strategy based on what we see happening with Passport specifically."

160.    Still concerned that Evolent would wind up having to bail out Passport, a Citigroup analyst asked Williams outright: "[o]n the Passport side, is there any balance sheet risk if they were to go insolvent? Or put another way, have your joint investment efforts of Passport given you any exposure in a tail event…?"   Williams again responded unequivocally: "No.  No, we don't have any broader exposure."   The Citigroup analyst sought specific assurances that Evolent was not planning to bail out Passport:  "[i]f there was a tail event for Passport, and given the importance of scale on your business, what would prevent you from potentially acquiring some of their assets, if not the whole business?"  Significantly, Williams again flatly dismissed the possibility that Evolent had any intention of acquiring or bailing out Passport, insisting instead that such a transaction was "not in our strategic lens at this point" and specifically that, "related to Passport that's not something that is currently being evaluated":

> Again, it's pretty hard to speculate on that. I don't think we've thought about acquiring a full Medicaid plan. It's just not in our strategic lens at this point. Again, in certain situations, we've talked about co-ownership models where we might have a minority stake in something, but related to Passport that's not something that is currently being evaluated.

161.    The statements in paragraphs 159 and 160 were materially false and misleading. As Evolent management would later admit, by no later than January 2019—a full month before the above statements were made—Defendants were well-aware that Passport's financial condition had deteriorated to the point where the "writing [was] on the wall" that Evolent inevitably would have to bail out Passport in order to preserve its most important source of business and its largest reoccurring revenue stream.  Moreover, the very fact that Evolent put a "shadow management team" into place at Passport in January 2019—the exact same time that Evolent executives would later admit that the "writing was on the wall" that Evolent would be

forced to bail out Passport—evidences that Evolent was already laying the groundwork for its bailout of Passport by that time.

162. In the 2018 Form 10-K, Evolent also stated that the Company's suite of services benefited health plan systems like Passport "[b]y helping these systems lower clinical and administrative costs" and "capture greater market share." Specifically, Evolent represented:

> The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, contractual relationships and a cycle of clinical and cost improvement with shared financial benefit.
>
> We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care. By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective care setting to payers, employers and consumers, which enables them to capture greater market share. As providers have succeeded in lowering costs and growing market share, this enables them to increase their value-based offerings. We benefit from our partners' growth[.]

163. The statements in paragraph 162 were false and misleading. Indeed, in 2018, Evolent not only failed to help Passport "lower clinical and administrative costs" and "capture greater market share," but, in fact, drove the Plan into financial ruin. Indeed, as CW 1 put it, "[Evolent] said they could cut costs by providing services; they did the opposite." Moreover, as of November 1, 2018, the financial ramifications of the 2018 rate cuts began to hit Passport and became so severe that Passport would report a loss of $65.5 million by year-end 2018 and project an additional $75 million loss for the first half of 2019. Significantly, multiple CWs confirmed that the 2018 rate cuts were directly caused by Evolent's claims processing deficiencies and its failure to ensure its Valence system accurately and timely processed Passport's medical claims.

## M.    Evolent's 1Q 2019 Investor Call

164. On May 7, 2019, Evolent conducted an investor conference call to discuss its financial results for the first quarter ended March 31, 2019.

165.    During the call, Williams again attempted to assuage Passport-related bailout concerns by assuring investors that "Passport is making solid progress towards improving its financial performance," stating:

> Currently, we're pursuing several major initiatives in close collaboration with the Passport leadership team[.]
>
> * * *
>
> Based on these initiatives and given the strength of its clinical model, we believe that Passport is making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members. Overall, we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market.

166.    The statements in paragraph 165 were materially false and misleading.  Indeed, by this time, not only was Passport not making "solid progress towards improving its financial performance," but Evolent was three weeks away from announcing that the Company was acquiring the Plan.  Even at this late date, however, Evolent failed to disclose to investors its intention and its need to buy Passport outright in order to save its largest revenue source and the lynchpin of its national Medicaid business strategy.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

167.    The facts set forth herein, viewed collectively, give rise to a strong inference that the Individual Defendants acted knowingly, or severely recklessly, when they concealed from the market the material negative information that, *inter alia*:  (1) Evolent's services did not, and could not, help its largest client, Passport, cut costs, but in fact did the exact opposite— increasing costs as evidenced by Evolent's near bankrupting of Passport; (2)  Evolent's Valence claims management platform was ineffective and unable to perform the functions it was supposed to perform, instead causing Passport's claims management to deteriorate to the point

that it paid fines and interest penalties and ultimately was subjected to reimbursement cuts; and (3) Defendants knew, once Passport's financial situation became dire, that Evolent would have no choice but to bail out Passport so as not to lose its largest and most significant client.

A.   **The Individual Defendants Closely Monitored All Aspects of Passport's Performance, as Defendants Touted in Their Public Statements, and as CWs Confirmed**

168.   Throughout the Class Period, Defendants emphasized their extensive role in the management of Passport, and their resulting insight into Passport's performance.   Indeed, Defendants repeatedly claimed that Evolent's relationship with Passport was so close and Evolent's control over the Plan's decision making was so unequivocal that Evolent's own CEO continuously boasted throughout the Class Period that Evolent was "a co-owner" of Passport.

169.   For example, during an August 7, 2017 earnings call, Defendant Williams stated, with respect to Passport, that "while we are separate entities that they look at us as a co-owner." Williams further added that through its agreement with Passport, Evolent was "able to sit down at the table," and "<u>we really have joint governance and we're able to drive the decisions we think are important for performance</u>."

170.   Former Passport and Evolent employees further confirmed that Evolent closely monitored Passport, including by sending high-level officers to attend weekly meetings with Passport management.   For example, CW 1 said that Defendant Christie Spencer—who was COO at Passport up until February 2016, when she went over to Evolent—always "knew what was going on" and that "even after she went to Evolent, she was still at the table.'   CW 1 said that "<u>[t]he [Passport] executive team met every Monday and [Defendant Spencer] was always in the room</u>."   CW 1 further stated that, after Spencer the Company in 2018, Evolent's National Medicaid President—Scott Bowers, who was later named Passport's CEO—was present at regular Passport executive meetings.

171.   Further, CW 3 explained that, once problems became apparent with Evolent's Valence claims management platform, Evolent's senior management was so concerned that they created a daily "war room" meeting, and that Scott Bowers was present at almost every war room meeting, and would in turn create presentations on the claims situation to share with Evolent's other senior management.

172.   CW 3 also explained that Evolent was intimately involved with Passport's dire financial troubles, such that, beginning in late 2018, "folks like [Evolent COO and co-founder] Tom Peterson were here on the ground [in Louisville] for weeks on end trying to work to get things fixed."  CW 1 corroborated that Evolent knew of Passport's dire financial circumstances as soon as Passport's own management knew of the situation.   "Whenever Passport knew, Evolent knew," CW 1 said. "They sit at the table."

173.   Evolent also had absolute insight into the operations and performance of Passport due to the "rebadging" of hundreds of Passport employees as Evolent employees, whereupon those employees continued to perform exactly the same role they had previously performed for Passport, but now reported to Evolent management.

174.   Evolent's admitted intensive involvement in the day-to-day management of Passport—corroborated and bolstered by high-level former Evolent and Passport employees— creates a strong inference of scienter, as the Individual Defendants knew virtually everything that Passport management knew about Passport's operations and financial condition, if not more.

**B.     Passport Was by Far Evolent's Most Important Client**

175.   Throughout the Class Period, Evolent management touted its relationship with Passport as its most significant by far.  For the years 2016, 2017, and 2018, respectively, Passport accounted for 19.6%, 20.6%, and 17.5% of Evolent's revenue, making Passport *by far* Evolent's largest partner by revenue in each of those years.   Evolent mentioned Passport dozens of times

in each of the Company's Form 10-K Annual Reports, including in the 10-K's "Risk Factors" section, which stated that the loss of Passport, specifically, as a client could negatively impact Evolent's financial results, and referred to Passport as "our strategic alliance partner."  No other client received similar treatment in the Company's SEC filings.

176.    The fact that Passport was essential to Evolent's financial success further supports a strong inference of scienter, as it is implausible that the Individual Defendants would not closely monitor the performance and condition of the Company's most important partner.

**C.    Contemporaneous Witness Accounts Confirm that Evolent Management Knew of the Debilitating Problems With Evolent's Newly-Acquired Claims Processing Platform from the Outset**

177.    Former Evolent and Passport employees confirmed that they made Valence's severe problems known to Evolent management at the outset of its use at Passport, and that these problems were widely known within Evolent.  For example, CW 2 said he personally made it known to Evolent management on "a number of occasions" that the system wasn't ready, "and it wasn't just me," telling management.  In fact, "[p]retty much everyone from Passport was telling them" the transition to Valence would not go smoothly for Passport.  Other CWs corroborated this.  For example, CW 4 called the switch to the Valence platform "a disaster" and said it was clear at the outset that "the system wasn't ready."  Indeed, CW 1 said it was "shocking," at the time, that Evolent, a company with no prior experience in claims processing, was now going to be processing claims for Passport, let alone with a system that was not designed for individual medical claims that Evolent "didn't know how to use."  Consequently, "everyone at Passport was skeptical" that Evolent could make it work.

178.    Defendants also knew of Valence's severe problems because they experienced similar problems with the claims management platform at other Medicaid plans that Evolent serviced.  For example, both CW 3 and CW 4 said that the Valence platform was creating similar

problems in 2018 at Evolent's three Florida Medicaid plan clients as it had been doing in Kentucky at Passport.

179.    These facts further bolster a strong inference of the Individual Defendants' scienter with respect to the problems with the Valence claims platform, making it implausible that the Individual Defendants were not aware, at the outset, of the severe problems with the Valence platform—problems that would, in turn, directly lead to Passport's downfall.

**D.    Once the "Writing Was on the Wall," in January 2019, Evolent Installed a "Shadow Management Team" at Passport, Giving Them Even More Direct Knowledge of Everything that Transpired at Passport**

180.    In January 2019, when it became apparent that Passport's financial condition was so dire that it would likely need a financial bailout and/or a buyout, Evolent installed a "shadow management team" to manage affairs at Passport.  As COO Tom Peterson explained in an investor call on May 30, 2019:

> [S]tarting in January, once the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be retroactive rate relief, there was additional level of urgency that was placed on this. . . .

> * * *

> [I[n January what we did was we effectively created a shadow management team [at Passport].  So we had our own – we brought in our own CMO, our own CEO, our own COO, a Chief Actuary, Head of Network Contracting, and we were shoulder to shoulder with Passport leadership.

181.    As outlined above, even before this "shadow management team" was in place, Evolent had a clear line of sight into the operations and finances of Passport at all times during the Class Period.  Once this shadow management team was installed, however, the inference that the Individual Defendants had scienter with respect to the problems at Passport and the need to bail out the Plan becomes incontrovertibly strong.

**E.    The Magnitude of Passport's Data Submission Violations, and the Resulting Massive Penalties Assessed by Kentucky, Which Were Set Forth in "Penalty Letters" Sent Each Month to Passport's Most Senior Officers, Establishes Defendants' Scienter**

182.    From the very first month that Evolent took over claims administration for Passport—October 2017—Passport *immediately* began incurring exponentially increased penalties for untimely and incorrectly submitted encounter data.  These penalties *dwarfed* the *de minimis* penalties imposed on Passport before Evolent took over its claims administration.  For example, in the 9-month period before Evolent took over Passport's claims administration, Passport had averaged just $33,000 in penalties assessed each month.   But this number skyrocketed to $619,625 in October 2017, an increase of roughly 1,800%.  Soon thereafter, these monthly penalties exponentially increased by massive amounts.  For example, Evolent caused Passport to incur $48 million in penalties for February 2018, $56 million for October 2018, and over $100 million for each of November and December 2018.  In all, from October 2017 through April 2019, Evolent's faulty claims administration resulted in a staggering ***$489 million*** in encounter data penalties—an amount so large that it would have bankrupted Passport had the penalty payments not been contractually capped at 0.33% of the Plan's monthly revenue.  Even then, Passport was forced to pay more than $10 million to Kentucky between October 2017 and April 2019—an amount equivalent to one-third of Passport's entire net underwriting gain for 2015 (the year before Evolent took over at Passport).

183.    These penalties were set forth in detailed letters tFhat Lead Plaintiffs obtained through their independent investigation and that Kentucky sent on a monthly basis directly to Mark Carter, the CEO of Passport, as well as numerous other senior Passport officers, including its CFO.  In light of the magnitude of these penalties, and the fact that Evolent itself admitted that it acted as a "co-owner" of Passport and would "drive the decisions (it) thought were

important for performance," it is inconceivable that Evolent was not aware of these letters and the penalties that Evolent's own services had caused.  These egregious and outsized penalties create a strong inference of scienter and demonstrate that the Individual Defendants knew from the outset that Evolent's claims administration services were dramatically increasing Passport's costs and causing the Plan severe financial harm, to the point that Passport was driven to the brink of bankruptcy.

## VIII.   **LOSS CAUSATION**

184.    During the Class Period, shares of Evolent's publicly traded common stock traded on the NYSE.  The market for shares of Evolent's common stock was open, well-developed, and efficient at all relevant times.

185.    Throughout the Class Period, the price of Evolent common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Evolent common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's stock at artificially inflated prices.

186.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Evolent common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Evolent

common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

187.    By issuing materially false and misleading statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Evolent's business.  Defendants' false and misleading statements had the intended effect and caused Evolent common stock to trade at artificially inflated levels throughout the Class Period.

188.    On February 15, 2019, Passport filed a lawsuit against Kentucky's Cabinet for Health and Family Services and Finance and Administration Cabinet regarding Medicaid reimbursement rates.  The complaint detailed that Passport's financial situation was far more dire than previously reported, explaining that Passport's statutory net worth had dropped $68.9 million during 2018 and that it had suffered losses of $65.5 million for the year.  In addition, Passport stated that it expected a staggering additional $75 million in losses for the first six months of 2019 alone.  As a result of these losses, Passport stated that it would fall below the statutory minimum capital needed to remain solvent by law as soon as March 1, 2019—a mere two weeks later, thus rendering Passport unable to operate as a Medicaid provider in Kentucky. As a direct result of the Passport lawsuit, on February 19, 2019 (the first trading day following the lawsuit filing), Evolent's common stock precipitously declined 10.8%, to close at $14.99 (from closing the previous trading day at $16.80), on unusually high volume.

189.    On May 29, 2019, before the market opened, Evolent announced that it would pay $70 million to take a 70% ownership stake in Passport, and would provide "interim balance sheet support" if such support became necessary for Passport to continue to meet its statutory capital requirements.  As a direct result of this news, Evolent's share price plummeted a staggering

29.3%—or $4.14, to close at $10.01 (from the previous trading day's closing price of $14.15), on unusually high volume.

190.    The drastic and continuing decline in Evolent's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.    CLASS ACTION ALLEGATIONS

191.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of Evolent between March 3, 2017 and May 28, 2019, inclusive (the "Class"), and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of Evolent at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

192.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Evolent shares were actively traded on the New York Stock Exchange.   As of August 9, 2019, there were over 83.8 million shares of Evolent common stock outstanding.   While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least tens-of-thousands of members of the proposed Class.   Class members who purchased shares of Evolent common stock may be identified from records

maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

193.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws, as complained of herein.

194.    Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

195.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    b.    whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

    c.    whether Defendants acted with scienter; and

    d.    the proper way to measure damages.

196.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

197.   At all relevant times, the market for Evolent's common stock was efficient for the following reasons, among others:

    a.    Evolent's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

    b.    As a regulated issuer, Evolent filed periodic reports with the SEC and the New York Stock Exchange;

    c.    Evolent regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.    Evolent was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

198.   As a result of the foregoing, the market for Evolent's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Evolent's common stock.  All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Evolent stock at artificially inflated prices, and a presumption of reliance applies.

199.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Evolent's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld

be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

200.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.   None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Evolent's present business and operations, its present financial condition, and its most significant client, Passport, among other things.

201.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Evolent's business and operational practices, among others.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Evolent were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

202.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was

authorized and approved by an executive officer of Evolent who knew that the statement was false when made.

## XII.    COUNTS

### Count I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

203.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

204.    This Count is asserted on behalf of all members of the Class against Evolent and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

205.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

206.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Evolent common stock during the Class Period.

207.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Evolent common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Evolent's business and operations; (b) artificially inflate and maintain the market price of Evolent common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

208.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

209.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Evolent common stock, were either known to Defendants, or were so obvious that Defendants should have been aware of them.

210.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Evolent common stock, which inflation was removed from its price when the true facts became known.

Lead Plaintiffs and the other members of the Class would not have purchased Evolent common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

211.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Evolent common stock during the Class Period.

## Count II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

212.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

213.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

214.    During their tenures as officers and/or directors of Evolent, each of the Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Evolent, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Evolent during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

215.    In their capacities as senior corporate officers and/or directors of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company.  The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Evolent during the Class Period. The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by Evolent during the Class Period.  As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Evolent within the meaning of Section 20(a) of the Exchange Act.

216.    As set forth above, Evolent violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

217.    By virtue of their positions as controlling persons of Evolent, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class, who purchased or otherwise acquired shares of Evolent common stock.  As detailed above, during the respective times these Individual Defendants served as officers and/or directors of Evolent, each of the Individual Defendants was culpable for the material misstatements and omissions made by the Company.

218.    As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Evolent common stock.

## XIII.   PRAYER FOR RELIEF

219.    Wherefore, Lead Plaintiffs pray for relief and judgment as follows:

a.  Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.  Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.  Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.  Such other and further relief as the Court may deem just and proper.

## XIV.   **JURY TRIAL DEMAND**

220.   Lead Plaintiffs hereby demand a trial by jury.

Dated: January 10, 2020

Respectfully submitted,

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
Megan Kinsella Kistler
mkistler@cohenmilstein.com
**COHEN MILSTEIN SELLERS**
**& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*

Joseph E. White, III (*pro hac vice* forthcoming)
jwhite@saxenawhite.com
Lester R. Hooker (*pro hac vice* forthcoming)
lhooker@saxenawhite.com
Brandon T. Grzandziel (*pro hac vice*)
brandon@saxenawhite.com
**SAXENA WHITE P.A.**

7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel: (561) 394-3399
Fax: (561) 394-3382

Steven B. Singer (*pro hac vice* forthcoming)
ssinger@saxenawhite.com
Sara DiLeo (*pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (*pro hac vice*)
jsaltzman@saxenawhite.com
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
Fax: (888)  631-3611

*Lead Counsel for Lead Plaintiffs*