**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § | Case No. 1:19-cv-01031-RDA-TCB |
| | § | |
| v. | § | |
| | § | CLASS ACTION |
| EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON | § § § § § | |
| Defendants. | § | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT</u>**

Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX  78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND FACTS................................................................................................................4

    A.  Relevant Parties ...........................................................................................................4

        1.  Evolent ...............................................................................................................4

        2.  Individual Defendants.........................................................................................6

        3.  Passport Health Plan .........................................................................................7

    B.  Evolent and Passport's Expanding, Productive Partnership. .......................................7

    C.  The 2018 Medicaid Rate Cut for Passport................................................................14

    D.  Evolent Purchases Passport and Turns Around Its Finances.....................................15

LEGAL STANDARD....................................................................................................................17

ARGUMENT.................................................................................................................................17

I.   Plaintiffs Have Failed to Adequately Allege Any False or Misleading Statements.................17

    A.  Optimistic statements and descriptions of the Company's aspirations are corporate puffery and not actionable. ......................................................................................18

    B.  Forward-looking statements are protected by the PSLRA. ...................................21

    C.  Plaintiffs do not plead specific facts showing that the challenged statements were false when made.......................................................................................................22

II.  Plaintiffs Fail to Plead Particularized Facts Supporting a Strong Inference of Scienter. ........26

    A.  Plaintiffs fail to plead facts establishing a motive to commit fraud. ................................26

    B.  The Confidential Witnesses' allegations do not support any inference of scienter...........27

    C.  Evolent's acquisition of Passport does not raise an inference of scienter. ........................31

III. Defendants Can Only be Held Responsible for Their Own Statements. ................................32

IV. Plaintiffs Fail to Adequately Plead Loss Causation................................................................33

V.  Plaintiffs Fail to Adequately Plead Control-Person Liability. ................................................37

CONCLUSION..............................................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acterna Corp. Sec. Litig.*,
   378 F. Supp. 2d 561 (D. Md. 2005)......................................................................................26

*In re Allaire Corp. Sec. Litig.*,
   224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................................18

*Arnlund v. Deloitte Touche, L.L.P.*,
   199 F. Supp. 2d 461 (E.D. Va. 2002) ..................................................................................31

*Ash v. PowerSecure Int'l, Inc.*,
   No. 4:14-cv-92, 2015 WL 5444741 (E.D.N.C. Sept. 15, 2015) ..........................................30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................................33, 38

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................38

*Brennan v. Deluxe Corp.*,
   361 F. Supp. 3d 494 (D. Md. 2019) ......................................................................................4

*In re Cable & Wireless, PLC Sec. Litig.*,
   321 F. Supp. 2d 749 (E.D. Va. 2004) ..................................................................................18

*Carlucci v. Han*,
   886 F. Supp. 2d 497 (E.D. Va. 2012) ......................................................................17, 18, 31

*In re CIENA Corp. Sec. Litig.*,
   99 F. Supp. 2d 650 (D. Md. 2000)........................................................................................21

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
   738 F. Supp. 2d 614 (D. Md. 2010)................................................................................38, 39

*In re Coventry Healthcare, Inc. Sec. Litig.*,
   No. 09-cv-2337, 2011 WL 1230998 (D. Md. Mar. 30, 2011) .........................................29, 31

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................................33

*In re Federal–Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001)................................................................................20

ii

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) ...............................................................................4

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
    42 F.3d 204 (4th Cir. 1994) ...............................................................20, 21, 23, 24

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) ..............................................................29

*In re Human Genome Scis. Inc. Securities Litig.*,
    933 F. Supp. 2d 751 (D. Md. 2013) ....................................................................4

*Jacobs v. Coopers & Lybrand, LLP*,
    No. 97CV3374 (RPP), 1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ......................38

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)..........................................................................1, 3, 32, 33

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ........................................................................34, 36

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ..................................................................37

*Local 295/Local 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third
    Bancorp.*,
    731 F. Supp. 2d 689 (S.D. Ohio 2010) .......................................................3, 27, 28

*Maguire Fin.L.P. v. PowerSource Int'l, Inc.*,
    876 F.3d 541 (4th Cir. 2017) ..............................................................................26

*Malone v. Microdyne Corp.*,
    26 F.3d 471 (4th Cir. 1994) ................................................................................21

*Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ..............................................................................26

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    629 F. Supp. 2d 1207 (W.D. Wash. 2009)...........................................................29

*In re Mutual Funds Inv. Litig.*,
    566 F.3d 111 (4th Cir. 2009) ..............................................................................34

*In re Neustar Sec. Litig.*,
    83 F. Supp. 3d 671 (E.D. Va. 2015) ...............................................................19, 20

*Nolte v. Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) .........................................................................17, 22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................................26

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
   838 F. Supp. 2d 1148 (D. Colo. 2012)..................................................................38

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
   353 F.3d 338 (4th Cir. 2003) ................................................................................26

*In re PEC Sols., Inc. Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) ..........................................................................17, 26

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
   No. 16 C 5198, 2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) .................................31

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) ................................................................................17

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ....................................................................................20

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
   935 F.3d 424 (5th Cir. 2019) ................................................................................26

*Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013)..............................................................27

*Smith v. Circuit City Stores, Inc.*,
   286 F. Supp. 2d 707 (E.D. Va. 2003) ....................................................................23

*Teachers' Ret. Sys. Of La. V. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ......................................................................27, 29, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................26

*In re Trex Co., Inc. Sec. Litig.*,
   454 F. Supp. 2d 560 (W.D. Va. 2006) ...............................................20, 22, 27, 31

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   57 F. Supp. 3d 950 (D. Minn. 2014)......................................................................18

*Witthohn v. Federal Ins. Co.*,
   164 Fed. App'x 395 (4th Cir. 2006) (unpublished) ..................................................4

*In re XM Satellite Radio Holdings Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007)..................................................................18, 20

*Yates v. Mun. Mortg. & Eq., LLC,*
    744 F.3d 874 (4th Cir. 2014) ................................................................................................28

**Statutes**

15 U.S.C. § 78u-5(i)(1) ..........................................................................................................21

Private Securities Litigation Reform Act................................................................. *passim*

Securities Exchange Act ........................................................................................... *passim*

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ........................................................................................................32

Federal Rule of Civil Procedure 8(a) ....................................................................................38

Federal Rule of Civil Procedure 9(b) ..........................................................................1, 17, 34

Federal Rule of Civil Procedure 10b-5 ..............................................................17, 32, 33

## INTRODUCTION

The Court should dismiss Plaintiffs' Amended Class Action Complaint ("AC") because Plaintiffs fail to meet the heightened pleading standards for alleging securities fraud under the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b).  Plaintiffs allege that Evolent Health, Inc. ("Evolent") made false and misleading statements concerning its ability to deliver cost savings to healthcare plan customers.  The crux of Plaintiffs' theory is that Evolent mismanaged its business relationship with Passport Health Plan ("Passport") by overcharging for services and failing to deliver projected cost savings, and then covering its tracks by acquiring a majority stake in Passport after stating that it didn't intend to acquire another health plan.

The problem with Plaintiffs' AC is that it lacks adequate factual allegations.  That failure is not any mere oversight; rather Plaintiffs' conclusory allegations are inconsistent with the public documents they claim to have analyzed as part of their pre-suit investigation.  As Passport's public Annual Statements in 2017–2018 show, Evolent drove over $75 million in savings through a reduction in Medical Loss Ratios after Evolent's systems were put in place.  Passport's Board and management selected Evolent time and again for additional services to drive further efficiencies in the health plan.  The public record is clear that Evolent did deliver value and cost savings to Passport.

Plaintiffs' case is legally flawed and fails to properly state a claim for securities fraud for multiple reasons.  *First*, Plaintiffs fail to identify an actionable misstatement or omission.  Most of the challenged statements are aspirational comments about the anticipated cost savings that Evolent customers could achieve using its suite of healthcare plan services.  They are classic corporate puffery—nonspecific comments about "driving greater efficiency," "helping" customers achieve cost savings, achieving "high standards," and the like that are immaterial as a matter of law.  In addition, many of the challenged statements are forward looking comments about what

1

Evolent planned or hoped to achieve for its customers. Because these statements were accompanied by detailed cautionary language about the myriad risks involved with Evolent's business, they are not actionable under the PSLRA's safe harbor.

*Second*, the Court should dismiss the AC because Plaintiffs fail to plead particularized facts raising a strong inference of scienter. The AC does not allege that Evolent's executives had a financial motive to engage in fraud. With no alleged motive, the law requires that Plaintiffs set forth especially compelling allegations to support a strong inference of actual intent or severe recklessness. Plaintiffs have not met that burden.

Plaintiffs identify a handful of confidential witnesses (CWs), multiple levels below executive management, who claim in vague terms that Evolent's executives knew that Passport was not achieving the cost savings that Evolent had promised. These claims are neither compelling nor adequately supported. Evolent did not guarantee that Passport, or any of its 35+ customers, would see immediate cost savings from Evolent's services. More importantly, these CWs do not identify any specific conversation they had with any specific defendant at a specific time showing that a defendant knew that a specific statement was false or misleading when made. The best that Plaintiffs offer is CW2's statement that she made it known to "Evolent management" that Evolent's newly acquired Valence payment platform was inadequate for Passport's needs. That is not nearly good enough. It is unclear if or when CW2 expressed her concerns to an individual defendant, and even if she had, it is not clear how this concern placed that defendant on notice that any particular statement to investors was false or misleading when made. Plaintiffs have no facts explaining why the leadership team at Passport would have, after extended due diligence, decided to change claims platforms to the Evolent platform if it were not for lower costs and higher quality than their previous system.

2

Likewise, Evolent's acquisition of a majority stake in Passport in May 2019 does not show that its prior statements about not planning to acquire another health plan were false, let alone that they were made with scienter. Circumstances and business strategies change. Evolent changed its plans and acquired Passport because Passport's Board solicited acquisition bids from multiple parties, which could have jeopardized Evolent's business with Passport. Plaintiffs' theory that Evolent acquired Passport to hide cost overruns is conclusory and not supported by meaningful factual allegations.

*Third*, under the Supreme Court's ruling in *Janus*, only the speaker of a challenged statement can be held liable for the statement under the federal securities laws. The Court should therefore dismiss the claims against the individual defendants that are based on statements they did not personally make.

*Finally*, the Court should dismiss the AC because Plaintiffs fail to plead loss causation adequately. Plaintiffs' core allegation is that Evolent misrepresented the cost savings it delivered to its healthcare plan clients because Evolent overcharged Passport for its services. As Plaintiffs allege in the AC, this information was made public in a January 25, 2019 *Insider Louisville* article. This Court can, and should, take judicial notice of the indisputable fact that Evolent's stock price barely moved in the days following this article. According to Plaintiffs, "the market for Evolent's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Evolent's common stock." AC ¶ 198. Because Evolent's stock price did not decline following the January 25, 2019 *Insider Louisville* article, Plaintiffs cannot plead loss causation for the alleged "cost savings" misstatements as a matter of law.

For these reasons, and others more fully explained below, the Court should dismiss the AC.

## BACKGROUND FACTS

**A.      Relevant Parties**

**1.          Evolent**

Evolent is an Arlington, Virginia-based company that assists health plans and physician groups to develop, manage, and administer health plans.  Ex. 2, 2018 10-K[1] at 70.  Evolent acts as a bridge between health care providers and insurers so that patients receive high quality care that is cost-effective, evidence-based, and seamless.    Ex. 3, J.P. Morgan Conference ("JPM Presentation") at 9.[2]    Evolent has particular expertise in value-based care models, which compensate healthcare providers with global payments for either an entire population or an episode of care, incentivizing better care at a lower cost. Ex. 2, 2018 10-K at 1.  This is in contrast to fee-for-service models, which reward providers for additional tests and procedures.  *Id.*  Evolent's business has significant opportunities to grow because the U.S. Centers for Medicare and Medicaid Services, CMS, continues to encourage—and mandate, in some cases—the value-based systems that Evolent provides.  *Id.* at 2.

Evolent has about 3,200 employees and works with more than 35 health care organizations in 40 states across the country.  Ex. 3, JPM Presentation at 10.  At the end of 2018, 3.7 million people received care on a platform managed by Evolent.  *Id.*

---

[1] All documents referred to in this motion are appended as exhibits to the accompanying Declaration of Ashley C. Parrish and referred to herein as "Ex. __."

[2] Courts may consider publicly available documents when reviewing a motion to dismiss.  *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004) (noting it was proper during Rule 12(b)(6) review to consider "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services").  In addition, "[d]istrict courts in this circuit routinely take judicial notice of newspaper articles, analysts' reports, and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint."  *In re Human Genome Scis. Inc. Securities Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013) (internal citations omitted).  Complaints from another case are proper for the court to consider on a motion to dismiss, *Witthohn v. Federal Ins. Co.*, 164 Fed. App'x 395, 396-97 (4th Cir. 2006) (unpublished), as are documents from a public agency, *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 502–03 (D. Md. 2019).  All documents cited herein are publicly available, and the location where each document may be found is included in the Parrish Declaration.

Evolent's goal is to improve health outcomes *and* to decrease health care costs. Evolent accomplishes this goal in part by providing technologies that identify patients who need specialized support and then using a suite of clinical and administrative services to deliver that support. Ex. 4, 2018 Investor Day at 42–43. An important way to improve health outcomes while lowering costs is to avoid hospitalizations. Ex. 5, 2019 Investor Day at 25. Hospital stays are expensive, and often lead to additional health issues. *Id.* Evolent uses its technology to determine who is likely to be admitted to a hospital and, more importantly, what type of intervention would work best for that particular patient to prevent hospitalization. *Id.* at 23–24. For example, if a patient has a significant wound, educating the patient on how to take care of the wound while it heals might be enough, but in some cases it might be more efficient to have a nurse provide care. A nurse's assistance is less costly than a hospitalization due to infection, promotes a quicker healing process, and allows the patient to remain at home. Ex. 5, 2019 Investor Day at 28.

The challenge for health care providers and health plans is to figure out *who* to help, *how* to help, and *when* to help. Ex. 5, 2019 Investor Day at 24. Evolent provides software systems that aggregate and analyze medical and demographic data to provide this information. *Id.* at 23–25. Moreover, Evolent uses the data and its expertise to change its practices if the interventions aren't working or aren't working as well as a different intervention might work. Ex. 4, 2018 Investor Day at 33. There are costs involved in Evolent's approach—the cost of the intervention as well as Evolent's fees—but ultimately it ensures that patients receive better care and it reduces costs over time. Ex. 5, 2019 Investor Day at 28.

These cost savings and improved health outcomes aren't just aspirational. Evolent continually tests its systems, and the savings and improved outcomes are documented by outside consultants. Ex. 5, 2019 Investor Day Presentation at 16. With its targeted interventions, Evolent

5

lowered total medical expense for Medicaid patients by 21%, reduced hospital admissions by 33%, and reduced visits to the ER by 36% among patients who received the intervention over the course of a couple of years. *Id.*

In addition to the population health, care management, and health plan administration services described above, Evolent's business also includes a New Mexico health plan, True Health, which it acquired in 2018, and a specialty-care management practice, New Century, which it acquired in 2018. Ex. 2, 2018 Form 10-K at 1. The specialty-care program brings Evolent's care management practices to oncology and cardiology care. Ex. 2, 2018 Form 10-K at 1.

### 2. Individual Defendants.

Plaintiffs have sued three current Evolent executives and two former employees (the "Individual Defendants"). Frank Williams is the Chief Executive Officer, director and co-founder of Evolent. Ex. 6, 2019 Proxy Statement at 11. Seth Blackley is the President, director and co-founder of Evolent. *Id.* at 7. Nicholas McGrane previously served as Evolent's Chief Financial Officer and now serves as Evolent's Executive Vice President, Corporate Performance. Ex. 7, May 7, 2019 8-K at 2.

Steven Wigginton and Christie Spencer no longer work for Evolent. Wigginton served as Valence's CEO after its acquisition by Evolent but left Evolent in early 2018 to join Sutter Health | Aetna as CEO. *See* Ex. 8, 2018 Proxy Statement at 21. For part of the Class Period, he was an Evolent named executive officer. *Id.* Spencer, who worked at Passport before joining Evolent as National Medicaid Chief Operating Officer, left Evolent in 2018 to become CEO of Lighthouse Health Plan. She was never an executive officer of Evolent. *See, e.g.,* Ex. 9, 2017 Proxy Statement at 16; Ex. 8, 2018 Proxy Statement at 21.

### 3.    Passport Health Plan

Founded by the University of Louisville in 1997, Passport Health is a non-profit that cares for some of Kentucky's poorest citizens with its Medicaid program in Louisville, Kentucky.  Ex. 10, May 29, 2019 Form 8-K at Exhibit 99.1.  There are about 300,000 members of Passport, mostly from Louisville.  Ex. 11, Rate Case at ¶¶ 12–14.  Passport has been recognized as one of the top Medicaid managed care organizations in the country by the National Committee for Quality Assurance, an accreditation group that evaluates the quality and efficacy of health insurance plans. *Id.* at ¶ 19.  Passport has provided high-quality care and good outcomes for lower costs, even to its population of high-risk patients.[3]

Passport has a long history of innovative value-based, managed care and population health work.  *Id.* at ¶ 10.  It operates on a 'per member per month' model, whereby the Commonwealth of Kentucky pays Passport a set amount per person that Passport covers, in contrast to paying Passport for the cost of each covered person's doctor's visit.  *Id.* at ¶ 16.  When Passport sought to improve its technology in 2015 Evolent was a good match.

### B.    Evolent and Passport's Expanding, Productive Partnership.

Evolent and Passport formed a strategic partnership in February 2016.  Ex. 12, Feb. 1, 2016 Form 8-K at 1.  Both parties viewed it as a long-term alliance that would allow them to grow into new markets and provide better care.  Ex. 4, 2018 Investors Day at 23.  The partnership included a commitment to build a Medicaid Center of Excellence (MCOE) in Louisville, which would offer strategic, clinical, technology, and other support to Medicaid organizations.  Ex. 4, 2018 Investor

---

[3] As Passport explained in its February 2019 challenge to Kentucky's rate adjustment, the area in which many of its members live "has historically experienced disproportionate socioeconomic challenges such as poverty, redlining, crime, unemployment, lack of access to care and food insecurity.  These adverse 'social determinants of health,' compounded by other multiple risk factors, result in higher instances of asthma, obesity, diabetes, certain cancers, addiction, sexually transmitted disease, and poorer health overall."  Ex. 11, Rate Case at ¶ 25.

Day at 22-23.  The MCOE, with Passport's experience and Evolent's services and technology, enhances Evolent's ability to expand into the growing market in provider-sponsored, community-based Medicaid health plans throughout the United States.  Ex. 14, 2016 10-K at 42.  As part of the 10-year services agreement, Evolent provided care management services (the type of care described above regarding clinical interventions) and utilization management services (helping patients receive the most effective type of services) to Passport.  Ex. 12, Feb. 1, 2016 Form 8-K at 1; Ex. 4, 2018 Investor Day at 22-23.  Evolent also provided analytics and reporting services, such as automatically delivering the many reports required by regulators.  *Id.*

To provide these services at the best price, Passport and Evolent decided that some Passport employees would be "rebadged," meaning they would become employees of Evolent and initially do the same work they did at Passport.  Ex. 4, 2018 Investors Day at 23.  The scope of the rebadged employees' jobs would eventually expand once Evolent opened the MCOE which would provide services to numerous Medicaid plans in addition to Passport.  *Id.* at 23.

Over time, Passport contracted with Evolent for additional services.  Ex. 4, 2018 Investor Day at 22–23.  It first added a new risk adjustment service, which allowed Passport to better increase its reimbursement rates from the Commonwealth if the 'risk' of its patients was higher (e.g., more diabetics joined Passport as members).  Ex. 4, 2018 Investor Day at 10; Ex. 11, Rate Case at ¶ 61.  In September 2016, Passport selected Evolent to run its pharmacy benefit management (PBM) program.  Ex. 15, Healthcare Financial Management article at 3.  Evolent's program had significantly better deals with pharmaceutical companies, so Passport's pharmacy costs were immediately lowered.  *Id.*  In fact, the PBM contract alone decreased medical expenditures by 3% in a year.  *Id.*  In 2017, the PBM accounted for a significant part of the

$75+ million in savings that Evolent helped Passport to achieve.  Ex. 4, 2018 Investor Day at 24; *see also infra* section I.C.

Passport then investigated switching its "third party administrator" ("TPA") services, which include medical claims management, processing and adjudication of claims, and billing.  In 2016, Evolent had acquired its own TPA platform when it bought Valence Health Inc., a 20-year old company that focused on providing health plan services including claims processing for numerous Medicaid health plans.  Ex. 16, July 12, 2016 8-K at Exhibit 99.1.  Shortly after, Evolent acquired Aldera, the software underlying Valence's program.  Ex. 17, 2017 Investor Day at 27.  At the time of acquisition, Valence had 10 large contracts, supported 600,000 people via health plans, and specialized in Medicaid plans.  Ex. 16, July 12, 2016 8-K at Exhibit 99.1.  Valence had a long history of providing TPA services for medical claims, including processing claims for many Medicaid plans in multiple states.  *Id.*  It was not a "dental claims processing system." AC ¶ 63.

Passport's decision to pick Valence to replace its current TPA was done after extensive diligence.  Ex. 17, 2017 Investor Day at 29.  Most important, though, Valence provided modernized technology that integrated with the clinical services and other software used by Passport. Ex. 17, 2017 Investor Day at 29.  The transition from Passport's older Amerihealth TPA to the new Valence TPA system occurred in October 2017.  AC ¶ 66.  Because this was a massive undertaking, Evolent and Passport worked on the transition for over six months.  Ex. 17, 2017 Investor Day at 28–29.  Evolent candidly disclosed in its risk factors to investors that the Valence "integration may be unpredictable, or subject to delays or changed circumstances, and … may not perform in accordance with our expectations."  Ex. 2, 2018 10-K at 18.

Passport, in partnership with Evolent, is a well-run Medicaid health plan based on publicly available standard metrics of Medicaid plan performance, including the plan's Medical Loss Ratio

("MLR"), Administrative Loss Ratio ("ALR"), and its compliance rates. It is also clear from public comments from the Kentucky Senate Medicaid Oversight and Advisory Committee, accolades received from the Commonwealth of Kentucky, and from ratings by its members. Kentucky State Senator Morgan McGarvey, who represents Louisville and is on the oversight committee, explained that Passport receives far fewer complaints than the other Medicaid plans in Kentucky. He continued, "[s]ince I've been in the legislature, Passport has always had a reputation as being one of the good providers."[4]

Passport's MLR and ALR are better than the national average and the same or better than Kentucky Medicaid plans. MLR is the portion of an organization's revenues spent on medical care (i.e., how much of the premiums are used to pay doctors, hospitals, and pharmacies).[5] CMS regulations require that about 90% of a plan's premiums be spent on medical care.[6] Passport routinely meets or exceeds that requirement. Ex. 18, Kentucky Hosp. Assoc. Report at 2.

Evolent's work and services drove real savings for Passport. In 2016, Passport's MLR was too high at 95.1%—which left little money for administrative costs or reserves.[7] But in 2017, the

---

[4] Yetter, Deborah, "Passport sues state over rate cuts it says could put it out of business," *Louisville Courier Journal* (Feb. 15, 2018), available at https://www.courier-journal.com/story/news/politics/elections/kentucky/2019/02/15/passport-health-plan-sues-kentucky-over-medicaid-rate-cuts/2883725002/.

[5] The standard MLR calculation is described in the annually-compiled Milliman Research Report, "Medicaid Managed Care Financial Results for 2018," Ex. 19 at 20, Milliman Report. Medical Loss Ratio = MLR = (Total Hospital and Medical Expenses + Increase in Reserves for A&H Contracts) / Revenue. The figures used in the calculation are taken from the identical page, line, and column number from the publicly available, standardized financial forms filed by all Medicaid organizations. "Total Hospital and Medical Expenses," which includes pharmacy costs, are found on page 7, line 17, column 8. Passport has no A&H Contracts so that number will not be used in the calculation, but it can be found on page 7, line 21, column 8. "Revenue" is found on page 7, line 7, column 8. With that equation and data from Passport's Annual Statements in 2016 and 2017, Ex. 13 and Ex. 20, the MLR can be calculated easily.

[6] CMS's calculation of MLR adjusts for quality improvement expenditures and removes taxes and regulatory fees from revenue before calculating MLR. This results in a several-point increase from the number calculated by others, which is (total spent on medical, hospital, and pharmacy care) / revenues. *See* Ex. 18, Kentucky Hospital Association Report at 2.

[7] Using the equation above and Passport's 2016 Annual Statement (Ex. 13), Passport's 2016 MLR = $1,644,681,907/ $1,730,097,322 = 95.1%

10

first full year that Evolent worked with Passport, the MLR improved to 89.9%, well within requirements for CMS, which allowed Passport sufficient funds for administrative expenses.[8]  In fact, as discussed below, that 5.2% MLR improvement contributed to the $90 + million in bottom-line cost savings to Passport in 2017.

Passport's ALR, the portion of revenue paid to administer the plan, has been near the national and state averages since 2016.  In 2018, the national average for ALR was 8.8% and Kentucky's average was 10.6%.  Ex. 19, Milliman's Medicaid Managed Care Financial Results for 2018 ("Milliman Report") at 3, 25.[9]  Passport's ALR in 2018 was 9.5%, as calculated using publicly-available financial information filed with the Kentucky Department of Insurance and the standard calculation method used in the industry.  Ex. 19, Milliman Report at 21; Ex. 21, 2018 Annual Statement at 7.[10]  More recently, Passport announced that its ALR had improved significantly, such that it was just about 8% in July 2019, again driven by Evolent's work and services.  Ex. 22, Letter to Kentucky Senate Medicaid Oversight and Advisory Committee ("MOAC Letter") at 3.

In addition, the public data demonstrates that Evolent significantly reduced Passport's long-term trend of escalating administrative expenses.  For example, in 2014, Passport's administrative expenses grew from $51M to $79M—a growth rate of 54%.  Ex. 20, Passport's

---

[8] Using the equation above and Passport's 2017 Annual Statement (Ex. 20), 2017 MLR = $1,705,056,248 / $1,897,000,830 = 89.9%

[9] Milliman Research has publicly released this report for more than a decade. Ex. 19, Milliman Report at 1.  It includes ALR and MLR calculations and averages by state and managed care organization characteristics (size, geographical location, multi-state).

[10] Milliman uses the equation: ALR = (Claim Adjustment Expenses + General Administrative Expenses) / Revenue, where the location of each number is taken from the publicly available, standardized financial forms filled out by all Medicaid organizations.  Claim Adjustment Expense are found on page 7, line 19, column 8 of the Annual Statement; General Administrative Expenses are found on page 7, line 20, column 8; and Revenue is found on page 7, line 7, column 8.  In Passport's case, the ALR is calculated as (-3,106,512 + 184,960,821) / 1,908,285,497 = 9.53%.

2017 Annual Statement at 29 (Five-Year Historical Data).  In 2015, Passport's administrative expenses grew from $79M to $107M—a growth rate of 35%.  *Id*.  In 2016, Passport's administrative expenses grew from $107M to $169M—a growth rate of 57%.  But in 2017, Passport's first full year with Evolent, Passport's administrative expenses grew just 8%, from $169M to $182M.[11]  *Id.*  And in 2017, Passport added 19,863 new members—more than the memberships added in 2016 (17,469).  *Id.*

Passport has high compliance rates as judged by the IPRO, an independent auditor selected by the Kentucky Department for Medicaid Services ("DMS") that analyzes health plan regulatory compliance as part of a state-mandated review.[12]  The audits assess areas including quality of care, care management, access to care, credentialing of providers, and technology systems.  Ex. 23, KY EQRO 2018 Annual Review.  The IPRO audits of all Medicaid managed care organizations are posted on the DMS website.[13]  Based on that extensive analysis, Passport had a 93% compliance rate.  *Id.*

Another performance metric relates to encounter data, which all Medicaid plans must submit to states and to CMS.  Encounter data includes the doctor's services, the patient's diagnosis, and the treatment plan, and allows the Medicaid agency to track services received by the program's members.[14]  Many states, including Kentucky, impose sanctions for late, inaccurate or incomplete

---

[11] And in 2018, Passport's administrative expenses grew a mere 6% from $182M to $193M.  Ex. 21, Passport's 2018 Annual Statement at 29.

[12] *See* information regarding IPRO (available at https://ipro.org/wp-content/uploads/2019/01/Program-Profile-IRO_3c.pdf) *and* information from the CMS website for Medicaid (https://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/managed-care/downloads/kentucky-mcp.pdf) (citing IPRO as the "External quality review organization)/

[13] Reports are available here: https://chfs.ky.gov/agencies/dms/dpqo/mco-qb/Pages/reports.aspx

[14] Helpful background is provided by CMS's Medicaid.gov website: https://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/downloads/medicaid-encounter-data-toolkit.pdf

encounter data.[15]  It is common for Medicaid plans to receive some penalties for issues related to encounter data.  Passport received penalty letters with its old TPA provider, Amerihealth, as well as with its new TPA provider, Valence.  *See* Ex. 24, Penalty Letter for July 2017 (with Amerihealth as TPA); Ex. 25, Penalty Letter for October 2017 (with Valence as TPA).   With the change to Valence, it is not surprising that there were delays in submitting encounter data.  But these penalties were relatively small.  Plaintiffs themselves admit that "the staggering $489 million in penalties for deficient encounter data" was actually "capped" at about $10 million.  AC ¶¶ 77, 78.  Indeed, the total penalties in 2018 were about $6.5 million, which is immaterial compared with Passport's total revenues of $1.95 billion.[16]  Ex. 21, Passport's 2018 Annual Statement at 4.

Plaintiffs allege that Passport's total administrative expenses increased by $62 million in 2016 and that "it was Evolent causing these expense increases."  AC ¶ 86.  But as previously discussed, this increase was consistent with a long-term trend of escalating administrative expenses at Passport, which Evolent reversed in 2017 and 2018.  Moreover, as Plaintiffs concede, Passport's revenues (i.e., Medicaid payments) increased by "about 5%" in 2016. AC ¶ 86.  In fact, in 2016 Passport's membership increased by 17,469 and its revenue increased by $94.68 million.[17]  Thus, it is no surprise that Passport's aggregate administrative costs also increased in 2016.

Passport has received praise as one of the nation's top Medicaid organizations.  Ex. 11, Rate Case at ¶ 19 (ranking Passport in the top 25 Medicaid managed care organizations for many

---

[15] *See, e.g.,* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/downloads/medicaid-encounter-data-toolkit.pdf at 12–14.

[16] In addition, Passport was not financially impacted by these penalties because Evolent had indemnified Passport for them as part of the Services Contract.  Evolent reimbursed Passport for the full amount due to the Commonwealth. *See* Ex. 26, 3Q 2019 10-Q at 35-26.  This, contrary to Plaintiffs' theory that Evolent took advantage of Passport, Evolent's commitment to reimburse Passport for penalties shows that Evolent was a good partner that put its money behind its services.

[17] Ex. 13, Passport's 2016 Annual Statement at 29 (lines 5 and 16).

13

years, and higher than any in the south or central US).  Kentucky's CHFS, the department that regulates Medicaid plans, selected Passport for CMS's on-site tour as its best exemplar of a Medicaid managed care organization.  Ex. 11, Rate Case at ¶ 19.  Passport's members are also pleased with the plan; based on surveys of members conducted by the Commonwealth in 2018, Passport was rated as "excellent" on the overall rating of its adult and child plans.  Ex. 27, 2019 Kentucky Guide to Choosing a Medicaid Managed Care Organization.

## C.    The 2018 Medicaid Rate Cut for Passport

Passport's finances were strong until November 1, 2018, when Kentucky instituted an arbitrary Medicaid rate adjustment, which retroactively applied to the period beginning July 1, 2018.  AC ¶ 80.  The adjustment decreased rates paid to the five Medicaid plans operating in the Louisville region—while raising rates across the rest of the state.   Ex. 11. Rate Case at ¶ 51. Passport was impacted most because it has the largest share of members in the Louisville area, and relatively few members in the regions with increased rates.[18]  Ex. 11. Rate Case at ¶ 51.  The adjustment resulted in a rate decrease to Passport of 3.9%, but an average increase of 2.2% for *every other* Medicaid plan in Kentucky.  Ex. 11, Rate Case at ¶ 26.  The rate cuts had a major adverse impact on Passport's finances, as its revenues under the new rates would not cover its costs to pay doctors and pharmacies, let alone cover any administrative costs.  Ex. 22, MOAC Letter at 2; AC ¶ 80; Ex. 2, 2018 Form 10-K at 16.

---

[18] The other four Medicaid plans with members in the Louisville area had many more members in the rest of Kentucky, where Medicaid rates increased.  This meant the other Medicaid plans had a net *increase* in rates, even with the Louisville-area decrease.

Many of Kentucky's elected officials and newspapers attributed the rate change to politics.[19]  The Kentucky Secretary of CHFS, the department overseeing Medicaid plans, said the rate cuts were mandated by CMS, the federal agency that oversees Medicaid programs.  Ex. 28, Bid Protest at 13–14.  But CMS said this was not true, and Kentucky had no real response.  *Id.*

No one in authority, or any media report, attributed the rate adjustment to Passport's encounter data submissions, as the AC attempts to do.  Kentucky itself said that the decrease was based on its actuarial's projections.  *Id.* at ¶ 50.  The CHFS Secretary cast some aspersions on Passport, but never said that the rate decrease was based on Passport's encounter data.  Much has been said about the rate changes,[20] but no one except CW3, a low-level Passport employee, has ever alleged that the encounter data issues led to the rate decrease.

**D.    Evolent Purchases Passport and Turns Around Its Finances**

Due to the uncertainty surrounding the rate cuts and its financial position, Passport began a competitive bidding process for a partner that could inject capital and share the risk inherent in a value-based health care company dependent on Medicaid and Medicare.  Ex. 29, May 29, 2019 Special Call at 4–5; Ex. 5, 2019 Investor Day at 13.   Evolent told the market that it did not intend to purchase another health plan after its purchase of True Health, a New Mexico provider-sponsored health plan in January 2018.[21]  Ex. 2, 2018 10-K at 1; *see* statements cited at AC ¶¶ 159,

---

[19] *E.g., see* Yetter, Deborah, "Louisville leaders call on Bevin to save Passport Health and its HQ," *Louisville Courier Journal* (Mar. 4, 2019) available at https://www.courier-journal.com/story/news/2019/03/04/louisville-leaders-discuss-passport-health-plans-future/3053130002/

[20] This was a major news story in Kentucky, particularly because there was a closely contested gubernatorial race. *See* Raman, Sandhya, "Health care issues pivotal in Kentucky governor's race," *Roll Call*, July 1, 2019, available at https://www.rollcall.com/news/congress/health-issues-pivotal-in-kentucky-governors-race; Brammer, Jack, "Beshear cancels and rebids $8B in Medicaid managed care contracts issued by Bevin," *Lexington Herald Leader*, Dec. 23, 2019, available at https://www.kentucky.com/latest-news/article238663378.html.

[21] Evolent acquired New Mexico-based health plan True Health in 2018.  Ex. 2, 2018 Form 10-K at 5.  As Evolent explained and as cited in the AC at ¶ 33, full ownership of a plan was not in Evolent's "strategic lens" in early 2019. But Evolent's strategy always included "creative, aligned," "co-ownership models" of various types of health plans when it made good financial sense.  Ex. 30, 4Q & Full Year Earnings Call at 24.

15

160, 165.  But when Evolent learned that Passport was about to be purchased by one of Evolent's competitors—which meant that Evolent would likely lose its most significant customer—it decided to further invest in Passport.  Ex. 5, 2019 Investor Day at 13.   Evolent and Passport had worked together as strategic partners for three years by this point, and during those years Passport saw the good work Evolent had done and the value it provided to the health plan.  *Id.* at 17.  Ultimately, even with another offer in hand, Passport chose to sell 70% of its equity interests to Evolent, while Passport's founders remained 30% owners.[22]  *Id.* at 13.

Passport's Board and owners were enthusiastic about the partnership in May 2019.  At the time of the purchase, the President of the University of Louisville, one of Passport's owners, said the university "helped create Passport Health Plan in 1997, paving the way for what has become a national model for managed care. … Now, we are proud to partner with Evolent Health to begin a new chapter that will continue to spark innovation in the delivery of care." Ex. 10, May 29, 2019 Form 8-K at Ex. 99.1.  Passport's founders continue to own 30% of Passport and work closely with Evolent because they believe in Evolent's ability to improve the way health care is delivered.

Together, Passport and Evolent have made significant progress in turning around Passport's financial situation.  Passport has experienced a 14-point improvement in operating margins in the first three quarters of 2019.  Ex. 31, Q3 2019 Earnings Call at 7.   Passport went from an operating margin of -13% to + 1.3% in those 3 quarters.  *Id.*  This improvement came from decreases in both medical expenses and administrative expenses.  Ex. 22, MOAC Letter at 3.  Medical costs were lowered with increased care management, and administrative costs were

---

[22] There are no facts sufficient to establish that Evolent had any undue influence or control over Passport before it acquired the company in mid-2019.  In 2016, Passport had twelve executive officers and seventeen members on its board of directors – none of whom were affiliated with Evolent – with annual revenues in excess of $1.74 billion. Ex. 13, Passport's 2016 Annual Statement at 1 and 7.  There is no support for Plaintiffs' baseless and conclusory allegation that Passport's officers and directors shirked their fiduciary obligations, mismanaged Passport, and drove it to the brink of insolvency.

lowered with Evolent's help and by increased efficiencies in in staffing.  *Id.*  Evolent expects that Passport's finances will continue to improve.  *Id.*; Ex. 31, Q3 2019 Earnings Call at 7.

**LEGAL STANDARD**

To state a claim under Section 10(b) and Rule 10b–5 of the Securities Exchange Act, a plaintiff must show "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages."  *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999).  A Section 10(b) claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled "with particularity" and the PSLRA's stricter requirements.  *Carlucci v. Han*, 886 F. Supp. 2d 497, 509 (E.D. Va. 2012).

The PSLRA requires the plaintiff to specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) (citing 15 U.S.C. § 78u–4(b)(1)).  The complaint must also allege facts giving rise to a strong inference that the defendant acted with scienter.  *Id.*  If a complaint does not meet these pleading requirements, then the district court must dismiss the complaint.  *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005).

**ARGUMENT**

I.      **Plaintiffs Have Failed to Adequately Allege Any False or Misleading Statements.**

Plaintiffs' AC should be dismissed because they have not adequately alleged any false or misleading statements that could provide a basis for imposing liability under the securities laws. The statements they do identify are not actionable, either because they qualify as corporate puffery

17

or because they are forward-looking statements that are protected under the PLSRA. In addition, Plaintiffs have not adequately pleaded that any of the challenged statements was false when made.

**A.      Optimistic statements and descriptions of the Company's aspirations are corporate puffery and not actionable.**

Optimistic, vague statements about a company's purpose, goals, and expectations are "non-actionable [because] they do not demonstrate falsity" and because the "kind of rosy affirmation commonly heard from corporate managers and familiar to the marketplace" are not material. *Carlucci*, 886 F. Supp. 2d at 522; *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 766 (E.D. Va. 2004). Such statements do not state a claim for securities fraud because they cannot be proved false *and* because "no reasonable investor could find them important to the total mix of information available." *In re Cable & Wireless, PLC Sec. Litig.,* 321 F. Supp. 2d at 766-67. Most of the alleged statements that Plaintiffs challenge are the type of optimistic and generalized statements that are insufficient to support a section 10(b) claim as a matter of law.

For example, Plaintiffs contend that the description regularly included in Evolent's Form 10-Qs in the first paragraph under the "Organization" section is false and misleading. *See* AC ¶¶ 118, 126, 132, 142, 149, 153.[23] Evolent states, "these services enable health systems to manage patient health in a more cost-effective manner." *Id.* Describing its services as "cost-effective" is exactly the type of 'loose,' 'vague' statement that courts routinely categorize as puffery. *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179–80 (D.D.C. 2007) (holding as immaterial puffery the statements in 10-Qs that the company's business plan was "cost effective," "smart," "sound" and "efficient").[24]

---

[23] See Ex. 1, Chart, listing reasons why each of the allegedly false or misleading statements cannot form the basis of a claim under Section 10(b).

[24] *See also W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 969 (D. Minn. 2014) (holding as immaterial puffery the phrase "work[s] to improve patient access through well-planned studies which show the safety, efficacy, and cost-effectiveness of our therapies"); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp.

Other alleged misstatements about cost effectiveness are also puffery, such as Evolent's CEO's comments that Evolent's "cost-effective infrastructure … allows our partners to leverage the benefits of integration in driving performance;" his later comment that Evolent has been able to "standardize and reduce costs in many areas;" and his opinion that Evolent's approach is "conservative in how we're building infrastructure to make sure we're managing cost well."[25] AC ¶¶ 141; 148.

Similarly, statements in Evolent's 10-Ks describing its "partnership model" are the type of vague, loose, and optimistic statements that cannot form the basis for a Section 10(b) claim. Plaintiffs object to Evolent's statement that its "partnership model enables cultural alignment…" and that the partnership allows Evolent to "help[] these systems lower clinical and administrative costs, [so] we believe we are positioning them to offer a low cost, effective care setting …."  AC ¶¶ 114, 138, and 162.  Of course, the use of "believe" also signifies that it is not a factual statement at all, but rather a non-actionable, forward-looking statement of opinion, *see infra* section I.B.  And Evolent's disclosures about "cultural alignment" that "helps systems lower … costs" are corporate puffery because no reasonable investor would believe that they add to the total mix of information available to the market.  *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015).

The AC also challenges certain risk disclosures as false or misleading, such as the comment that "[t]he solution we offer our target market contemplates one strategy option—to… reduce utilization and total cost."  AC ¶ 113.  The full statement warns investors that not all customers may choose to focus on lowering costs, so Evolent may lose business.  Ex. 14, 2016 10-K at 19.

---

2d 319, 333–34 (D. Mass. 2002) (holding as immaterial puffery the phrase "to enable companies to grow their online businesses faster and more cost effectively than ever before.")

[25] In the Complaint, Plaintiffs assert that this statement was made by Nicholas McGrane.  This is incorrect.  It was made by CEO Frank Williams.  Ex. 32, 2Q 2018 Investor Call at 15.

Additionally, the "strategic option" of cutting costs is corporate puffery and is not specific enough to constitute a fraud on the market. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289–90 (4th Cir. 1993) ("No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.").

Courts routinely hold that general statements about increasing efficiency and continuing to show positive results do not state a claim under section 10(b).[26]  Many statements alleged to be false or misleading fall into this category, such as Evolent has "been driving efficiency and operational scale within our Medicaid business" and Evolent has been able to "drive some impressive consistent results for our partners."  AC ¶¶ 117, 148.

Williams made several comments about Passport that are vague, optimistic statements upon which no reasonable investor would rely.  *See In re Neustar Sec.*, 83 F. Supp. 3d at 681.  He said that Passport is a "good example" of "a great partnership."  AC ¶ 144.  In addition, he stated that Evolent "allowed [Passport] to get a lot of savings" and "was really important in terms of helping economics."  AC ¶ 144.  These statements are much too vague to mislead a reasonable investor.  *In re Federal–Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (stating that statements like "the Company is on target to achieve projected 'synergies' and cost savings" are the sort of "vague statements predicting growth" that are puffery) (cited by *In re Neustar Sec.*, 83 F. Supp. 3d at 681).

Vague, optimistic statements about a company are not actionable as a matter of law, so statements such as those above cannot be used to state a claim under Section 10(b).

---

[26] *E.g., see In re XM Satellite Radio*, 479 F. Supp. 2d at 179–80 ("efficient" is corporate puffery); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213–14 (4th Cir. 1994) (statement that company is "on target" to meet goals is corporate puffery); *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 578 (W.D. Va. 2006) (describing finances as "on track" is corporate puffery).

**B.    Forward-looking statements are protected by the PSLRA.**

Many of the challenged statements are not actionably because they are covered by the PSLRA's safe harbor for forward-looking statements.    Statements about "future economic performance" and a company's "plans and objectives" are statutorily excluded from liability if (1) the statement includes meaningful cautionary language, *or* (2) the plaintiff cannot show that the statement was made with actual knowledge of its falsity.  15 U.S.C. § 78u-5(i)(1); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994).

Here, many of the alleged false statements are forward-looking projections that were properly prefaced with risk warnings. For example, towards the end of the class period, Williams discussed Passport's challenges given its rate cuts.  AC ¶ 165.  He said that "we believe that Passport is making solid progress towards improving its financial performance," and then "[o]verall, we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market."  AC ¶ 165.  These are forward-looking statements; he is predicting that the "combination" of a number of factors will "strengthen the balance sheet."  It is couched in conditional language and is not a "guarantee" that Passport will have a successful future. *Hillson Partners*, 42 F.3d at 212.  In addition, the earnings call in which Mr. Williams made the statement began with a warning that the "call contains forward-looking statements" and directing listeners to find full warnings in Evolent's SEC filings, on Evolent's investor relations page, and in the press release issued that day.  Incorporating such warnings satisfies the PSLRA safe harbor. *In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 661 (D. Md. 2000).

A number of the optimistic statements described above are also forward-looking and thus fail to state a claim on that independent ground.  AC ¶¶ 114, 138, 162.  Statements about Evolent's

21

strategy regarding purchasing health plans are also forward-looking and protected by the PSLRA safe harbor. AC ¶¶ 159, 160. They discuss future plans alongside appropriate warnings given in the SEC filings. *E.g.,* Ex. 2, 2018 Form 10-K at ii (warning about acquired businesses' financial performance). Defendants provide a chart of some of the specific cautionary language that Evolent provided in its quarterly and annual SEC filings during the class period. *See* Ex. 1, Chart. These risk factors were meaningful and prescient to some of the business setbacks that Evolent actually faced during the class period (i.e., rate cuts and integration issues).

**C.      Plaintiffs do not plead specific facts showing that the challenged statements were false when made.**

Under the PSLRA, a "complaint must be dismissed [if] it fails to plead falsity with requisite particularity." *Capital One Fin. Corp.*, 390 F.3d at 316. That is, the facts pled to support the falsity of a statement must show the statement was false when made, not merely that it is likely to be false. *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 579 (W.D. Va. 2006). The AC's major flaw is that Plaintiffs fail to plead contemporaneous facts showing the challenged statements were false when made. Evolent's statements to the *Lousiville Insider*'s journalist about the number of employees in Louisville and per-member-per-month rates for Evolent's services are alleged to be false, but there are no facts pled to support this assertion. AC ¶¶ 155–157. Most of the "facts" pled are conclusory statements: Evolent's "services were **not** provided 'at cost'" and Evolent's "services did **not** process claims 'at lower per member cost'." AC ¶ 157. The Plaintiffs rely on increased overall administrative costs—which rose, as described above, in part because of additional members, members with higher risk profiles, and additional services provided to Valence—and penalties for encounter data. These conclusory statements and unrelated facts do not plead with particularity that Evolent's statements about the number of employees it has nor its per-member-per-month fees were false.

The AC also fails to allege with the required particularity that statements about Evolent's claims administration system, Valence, were false.  The switchover from Passport's prior TPA (medical billing) vendor, Amerihealth, to the Evolent Valence platform, occurred in October 2017.  AC ¶ 57.  Positive statements made *five months before the transition* occurred are not rendered false merely because the transition itself encountered problems that had been warned about.  That is impermissible fraud-by-hindsight.  *Hillson Partners*, 42 F.3d at 209.  This kind of "Monday morning quarterbacking … is insufficient pleading under the Reform Act."  *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003).  On May 9 and May 11, 2017, on an investor call and at Investor Day, Williams and Wigginton described the transition process as of May 2017 as having "gone well" and "proceeded at or above our expectations."  AC ¶¶ 120, 122.  To try to show that these statements were false, Plaintiffs cite CW2's predictions as a low-level employee that the October 2017 transition would not go smoothly and CW4's opinion that "the system wasn't ready."  AC ¶¶ 121, 124.  These predictions about a transition *five months* away and a concern that the system wasn't ready *five months* before it was supposed to be ready do not show that the statements made in May 2017 were false when made.

The AC likewise relies on low-level employees' speculations that Valence was built for dental claims as evidence that the October 2017 transition would go poorly.  AC ¶¶ 121, 124. First, as shown in multiple SEC filings, this speculation is incorrect.  *See* Ex. 16, July 12, 2016 8-K at Exhibit 99.1; Ex. 33, Oct. 3, 2016 at 2.  Regardless, however, software can be used for different purposes and with five months to go, Wigginton's and Williams's May 2017 statements about the October 2017 transition are not shown to be false based on the purpose for which Valence was originally built.

Spencer's one allegedly false statement, made on May 11, 2017, is that Passport had done "a lot of due diligence" to make sure that "everything was working the way we want it to" before deciding to purchase the Valence system. AC ¶ 123. But to show falsity all Plaintiffs can point to are the low-level employees' opinions about the program itself. AC ¶ 124. That is inadequate. The CW's do not say they were on the diligence team investigating Valence, and they do not purport to have any idea what Passport had done to test Valence or what competing factors the executives had weighed to purchase and use Valence.

The AC also alleges that Williams's statements about the Valence transition on a November 2, 2017 earnings call were false because the CWs claim that the Valence program was a "disaster." AC ¶ 129. Williams never said the transition was perfect; he said only that Evolent "successfully launched" Valence and that Evolent was "continu[ing] to monitor it" but that it was a "smooth transition." *Id.* Williams's statement was true, even if some CWs did not think highly of the program. Plaintiffs also claim that the encounter data penalties incurred in October show that Williams's November 2 statement was false. AC ¶ 131. But Kentucky hadn't even sent the October penalty letter to Passport by the time of the earnings call—it takes some time to process; the letter was sent on November 17, 2017, two weeks after the statements were made. Ex. 25, Penalty Letter for October 2017 at 1. Neither Passport nor Williams knew at the time about the fines cited by Plaintiffs, so that later information cannot make Williams's Nov. 2 statements false when made. Again, fraud by hindsight is impermissible. *Hillson Partners*, 42 F.3d at 209.

Plaintiffs also allege that statements by Williams and Blackley in May and September 2018 that Evolent had saved Passport between $75 million and $100 million were false, but they again fail to show falsity. AC ¶¶ 145, 152. In September 2018, Williams stated he believed that Evolent "helped to generate over $100 million in savings." AC ¶ 152. In May 2018, Blackley stated that

24

Passport's improved MLR led to an improved bottom line for Passport: "about 5% improvement in MLR roughly, so which is about $75 million of improvement to Passport's bottom line."  Ex. 4, 2018 Investor Day at 26.  MLR is the percentage of revenues spent on medical care (including doctors, hospitals, and pharmacies); 5% of revenues not spent on medical care meant there were more resources to improve the administration of the health plan.[27]

Plaintiffs' failure to show falsity is especially notable in light of publicly available information establishing that Evolent helped Passport improve its MLR from 95.1% in 2016 to 89.9% in 2017— showing that it reduced the amount it paid to doctors, hospitals and pharmacies as a percentage of its revenue.  Ex. 13, 2016 Annual Statement at 7; Ex. 20, 2017 Annual Statement at 7.  The savings based on the lowered MLR are significant, as Blackley and Williams pointed out: 5% of Passport's revenues in 2017 would be about $95 million.[28]  This represents actual savings to Passport's bottom line.  Said differently, had Passport operated in 2017 with its 2016 MLR, then Passport would have spent an additional 5.2% of its 2017 revenue on medical expense, which is $98,644,043.  The improved MLR saved Passport $98 million.[29]  Williams's and Blackley's statements concerning cost savings were true.

---

[27] *See supra* n.5 for an explanation of MLR.  MLR is a standard calculation in the industry, and it uses data from the statutorily-required, standardized forms filed by all Medicaid and Medicare organizations.    See Ex. 19, Milliman Report at 20.  An MLR of 100% means that all revenues are being paid for medical costs; an MLR over 100% means that the revenues cannot even pay for medical costs.  A financially healthy Medicaid organization spends about 90% of its revenues on medical expenses and 8-10% on administrative costs.

[28] Passport's 2017 Revenue as reported in its Annual Statement is $1,897,000,830; 5% of that is about $95 million.  The actual MLR improvement was 5.2%, which yields a savings of $98.6 million.  Ex. 20, 2017 Annual Statement at 7.

[29] See *supra* n.5 for the full explanation and calculation of Passport's MLR.  The calculation is done using the industry-standard method using publicly-available, widely reported Annual Statements that each Medicaid organization must file.

## II.    Plaintiffs Fail to Plead Particularized Facts Supporting a Strong Inference of Scienter.

The Court should dismiss the AC for the independent reason that it lacks particularized facts supporting a "strong inference" of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). "To survive a motion to dismiss, the facts alleged must give rise to a strong inference that [Defendants] intentionally or recklessly deceived, manipulated, or defrauded investors." *Maguire Fin.L.P. v. PowerSource Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017). "[M]ere negligence" or corporate mismanagement is not enough. *PEC Solutions*, 418 F.3d at 387. Moreover, Plaintiffs must plead facts demonstrating scienter as to each Defendant and each challenged statement— Plaintiffs cannot plead scienter against Defendants as a group. *Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc., 576 F.3d 172, 182, 190 (4th Cir. 2009)*. The AC falls far short of these heightened standards.

### A.    Plaintiffs fail to plead facts establishing a motive to commit fraud.

Plaintiffs' failure to allege facts showing a motive to commit fraud "cuts against" any inference of scienter. *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 577 (D. Md. 2005). To establish a motive, "a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003); *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000) ("[P]laintiffs had to allege that defendants benefitted in some concrete and personal way from the purported fraud."). Here, there is no alleged motive.

Federal courts recognize that in the absence of a clear motive, Plaintiffs' factual allegations showing actual knowledge or severe recklessness must be even more precise and compelling. *See, e.g., Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019) ("Motive is a critical—though not essential—aspect of a successful claim for securities fraud . . .

26

. A failure to show motive means that the strength of the circumstantial evidence of scienter must be correspondingly greater.") (internal citations and quotations omitted). There are no compelling facts alleged in the AC.

**B.      The Confidential Witnesses' allegations do not support any inference of scienter.**

The information attributed to the four CWs (*see, e.g.*, AC ¶¶ 44, 48, 49, 64-65, 67 and 87) is insufficient to raise a strong inference of scienter. In the Fourth Circuit, "[w]hen the complaint chooses to rely on facts provided by confidential sources, it must describe the sources 'with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged' or in the alternative provide other evidence to support their allegations.'" *Teachers' Ret. Sys. Of La. V. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) (citation omitted). The source must have personal knowledge of the alleged facts; hearsay will not suffice. *In re Trex Co.*, 454 F. Supp. 2d at 573. Further, for scienter, plaintiffs must allege with specificity that confidential sources communicated information to the individual defendants or otherwise show how the sources know what the defendants knew or recklessly disregarded. *See Hunter*, 477 F.3d at 174, 181-82; *Local 295/Local 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 721 (S.D. Ohio 2010) (rejecting confidential witness testimony that could not "impute knowledge" of alleged fraudulent practices to any of the individual defendants).

The four CWs offer information concerning alleged problems with Evolent's business relationship with just one customer—Passport. Ex. 2, 2018 10-K at 1. There are no allegations that Evolent experienced similar issues with any of its other 35 clients. *Id.* Nor are there allegations establishing that the Individual Defendants knew that Evolent's statements concerning its ability to deliver cost savings to clients generally were false or misleading. *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) (rejecting

allegations from confidential witness in one branch office where complaint "[did] not allege that the practices identified . . . were anything other than a local, isolated practice, or how [s/he] would have personal knowledge of whether the alleged practices were widespread or a matter of corporate policy").

More importantly, the AC does not allege that any of the CWs told, or knew information had been conveyed to, the Individual Defendants about the various alleged problems with Passport. *See Local 295/Local 851 IBT Emp. Grp. Pension Tr.*, 731 F. Supp. 2d at 722 (rejecting confidential witness testimony, in part, where "all . . . information pre-date[d] the class period and, thus, [wa]s irrelevant" and could not "impute[] knowledge of [the company's] deficient lending practices to the [i]ndividual [d]efendants").

CW1's assertion that "Evolent's senior officers were directly involved in Passport's business, including participating in weekly meetings," does nothing to show that any Individual Defendant knew that any specific statement was false when made. AC ¶ 44. Every diligent executive attends meetings regularly—this unremarkable fact does not establish scienter. *See Yates v. Mun. Mortg. & Eq., LLC,* 744 F.3d 874, 889 (4th Cir. 2014) ("We view the frequency of accounting meetings as a sign of diligence rather than evidence of a nefarious purpose."). CW1 does not say that she communicated her concerns about employee rebadging, not delivering on promised cost-savings, Evolent's lack of prior experience with Medicaid, problems with the Valence platform, or Evolent's claims processing to any Individual Defendant at these meetings. AC ¶¶ 48, 52, 62, 63, 71. Plaintiffs must identify a specific communication to an Individual Defendant on a specific date to shed light on an Individual Defendant's state of mind when a statement was made. *See Yates*, 744 F.3d at 887 (allegations from confidential witnesses should be discounted where "the confidential witnesses do not expressly assert that the ... defendants

28

intentionally or recklessly [engaged in the fraud]" and their statements are "generally vague and conclusory as to the . . . defendants' state of mind").[30]

Likewise, CW2 does not say if or when she communicated her concerns about the rebadging of Passport employees to any Individual Defendant. AC ¶ 49. While CW2 claims that "she made it known to Evolent management on a number of occasions that the Valence platform was not ready or adequate," she doesn't say who she specifically spoke to or when. AC ¶ 65; *Hunter*, 477 F.3d at 181 (requiring plaintiffs to plead a "particular date"). Indeed, almost all of the anonymous CWs' allegations are devoid of temporal specificity. These "vague allegation[s] with respect to when the [Individual] Defendants should have known about [alleged] problems . . . precludes the Court from making a finding that Plaintiffs have adequately pled scienter." *In re Coventry Healthcare, Inc. Sec. Litig.*, No. 09-cv-2337, 2011 WL 1230998, at *11 (D. Md. Mar. 30, 2011). And even if such detail could be provided, it is difficult to see how this would be a "red flag" of fraud when Evolent specifically warned investors that the integration of new payment processing technologies, like Valence, is complex and difficult to accomplish without problems or setbacks. Ex. 14, 2016 10-K at ii. A more plausible inference, drawn from the indisputable fact that Evolent paid over $219.4 million to acquire Valence in October 2016, is that the Individual Defendants believed that the Valence platform provided substantial value and could be successfully implemented. Ex. 33, Oct. 3, 2016 8-K at Item 1.01.

Plaintiffs offer CW3 to establish that (1) Evolent overcharged Passport for services; (2) the Valence platform was initially designed for dental claims not Medicare claims; (3) Evolent

---

[30] *See also In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1217 (W.D. Wash. 2009) (confidential witnesses failed to establish scienter where they did not connect their knowledge of product defects to defendants); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1289 (S.D. Fla. 2008) (confidential witnesses did not establish scienter because they failed to connect executive's disregard of lending guidelines to the individual defendants).

29

incorrectly processed Passport's claims which resulted in large penalties; (4) Kentucky cut Passport's Medicare rates because of Evolent's defective claims administrative services; and (5) Evolent knew of Passport's dire financial circumstances as soon as Passport's own management knew of the situation. AC ¶¶ 51; 63; 71, 77; 81; 82. Not only is none of this true, importantly, CW3 does not connect any of this information directly to an Individual Defendant, much less with temporal specificity. CW3 says that information concerning "Evolent's claims administration failures" was conveyed in a daily "war room," and that "Evolent's Medicaid Market President was present at each war room meeting." AC ¶ 71. But there are no factual allegations that an Individual Defendant attended any such meeting—just the rank speculation that Evolent's Medicaid Market President shared this information with "Evolent's most senior executives." *Id*. When and who specifically received this information—Plaintiffs don't say. Similarly, CW3 claims that "high-level executives, including Evolent co-founder and long-time COO, Tom Peterson" were at Passport for weeks after the Medicare rate cuts in January 2019. AC ¶ 82. Peterson is not an Individual Defendant, and even if he were, CW3 does not say what he learned while visiting Passport that would suggest that any specific statement was false when made.

CW4 claims that (1) Passport's transition to the Valence platform was a disaster; (2) it was clear at the outset that Valence was not ready; and (3) Evolent was known throughout Passport to be its worst performing third-party service provider. AC ¶¶ 67; 121; 86. Again, there is no allegation that CW4 shared her concerns with an Individual Defendant. Without such facts, CW4's personal opinions do not say anything about the Individual Defendants' scienter for any challenged statement.

The CWs allege no contact with the Individual Defendants, and the statements attributed to them therefore cannot possibly demonstrate "what th[e] defendants actually knew." *Ash v.*

*PowerSecure Int'l, Inc.*, No. 4:14-cv-92, 2015 WL 5444741, at *13 (E.D.N.C. Sept. 15, 2015); *Coventry Healthcare*, 2011 WL 1230998, at *6 (anonymous witnesses lacking "direct contact with" defendants logically cannot know "what the Defendants knew or recklessly disregarded"); *Carlucci*, 886 F. Supp. 2d at 519-20 (same). The Court cannot assume that the CWs' concerns would have been passed further up the chain including to the Individual Defendants. *See Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at *14 (N.D. Ill. Dec. 6, 2017) (rejecting CW allegations absent "particularized factual allegations supporting an inference that [witness's concerns] rose so far up the corporate chain of command as to reach" defendants); *In re Trex Co.*, 454 F. Supp. 2d at 581 ("A confidential witness's testimony cannot be based on hearsay.").

## C.     Evolent's acquisition of Passport does not raise an inference of scienter.

Plaintiffs allege that Evolent's May 29, 2019 announcement that it would acquire a majority stake in Passport raises a strong inference that Williams knew that his earlier statement in February 2019 that acquiring Passport was "not in [Evolent's] strategic lens at this point" was false and misleading. AC ¶ 160. According to Plaintiffs, Evolent knew in January 2019 that it would be required to bail out Passport. AC ¶ 161. This ignores the changed circumstances that caused Evolent to alter its strategy and acquire a majority interest in Passport. As Williams explained to investors at the May 29, 2019 conference announcing the deal, the "owners of Passport… recently ran a competitive process to select a joint venture partner." Ex. 29, May 29, 2019 Special Call at 5. Because Passport solicited bids, Evolent changed its strategy—if it did not submit a winning bid, then its business relationship with Passport would be in jeopardy. At best, Plaintiffs argue that the four-month temporal proximity between Williams's two statements raises an inference of scienter. "However, pleading temporal proximity alone has not been viewed as adequately establishing scienter." *Arnlund v. Deloitte Touche, L.L.P.*, 199 F. Supp. 2d 461, 482

31

(E.D. Va. 2002). This is especially true here when changed circumstances (i.e., Passport's competitive bidding process) explains the change in strategy.

Plaintiffs also allege that Evolent knew that it would need to bail out Passport in January 2019 because non-defendant Tom Peterson stated during the May 29 conference call that the Medicaid cut in January placed "an additional level of urgency" on Passport. AC ¶ 103. This statement does not indicate that Evolent knew in January that it would need to "bail out" Passport. Peterson was simply stating the obvious—the retroactive Medicaid rate reductions were having an adverse impact on Passport, which is exactly what Evolent disclosed to its shareholders in its 2018 10-K filed on February 28, 2019: "Recent rate changes in Kentucky have negatively impacted Passport, our largest partner in terms of revenue for 2018, and could significantly harm our business, financial condition and results of operation." Ex. 2, 2018 10-K at 16. Indeed, Evolent told investors in February that "if the rates are not changed, [Passport] could be deemed insolvent by the end of March." *Id*.

## III.    Defendants Can Only be Held Responsible for Their Own Statements.

Under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), only the person or entity that "makes" the challenged statements can be held liable under Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b). "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by— the party to whom it is attributed." *Janus*, 564 U.S. at 142–43. The AC does not attribute any of the challenged statements to Spencer or Wigginton except for statements at a May 11, 2017 conference (1) by Wigginton that Evolent's "integration" of Valence "has proceeded at or above our expectations" AC ¶ 122, and (2) by Spencer that "Passport had done 'a lot of due diligence' on Valence." AC ¶ 123. These are the *only* statements attributed to Wigginton or Spencer. The fact that all other challenged statements are specifically attributed to parties other than Spencer or

32

Wigginton is "strong evidence" that they did not make those statements. *Janus*, 564 U.S. at 142–43; *see also id.* at 147–48 & n.11 (noting the significance of lack of attribution).

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142. Although Plaintiffs allege that the "Individual Defendants, because of their positions with the Company, controlled … the contents of its reports, press releases and presentations to [the] public," AC ¶ 28, such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to carry the AC past a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Absent particularized allegations explaining how Spencer or Wigginton had the requisite control over the challenged statements (except for the two statements alleged in AC ¶¶ 122–23), Spencer and Wigginton cannot be liable under Rule 10b-5 as makers of these challenged statements. *See Janus*, 564 U.S. at 142–43, 148 (holding that mutual fund investment adviser did not make false statements in prospectuses of its client mutual fund, despite having been "significantly involved in preparing" prospectuses and having "provide[d] the false or misleading information"). There are no allegations that Spencer or Wigginton provided any false information to Evolent or to the other Individual Defendants.

## IV.    Plaintiffs Fail to Adequately Plead Loss Causation.

Plaintiffs asserting claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 bear the burden of alleging the element of loss causation, that the truth of the alleged misstatement or omission was revealed to the market and caused the Plaintiffs' losses. As the Supreme Court has recognized, loss causation requires more than simply alleging that the plaintiff purchased defendant's stock at an artificially inflated purchase price and thereby sustained damages. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Plaintiffs must allege loss causation with "sufficient specificity," a standard that this Circuit has recognized as essentially equivalent to the particularity pleading requirement of Rule 9(b). *See In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 119–120 (4th Cir. 2009). The standard requires courts to examine whether "the necessary causal link exists" between the alleged misrepresentations or omissions and Plaintiffs' alleged damages; this is inherently fact-specific and differs based on the circumstances of the alleged corrective disclosures. *Hunter*, 477 F.3d at 186.

A necessary component of a properly pleaded loss causation element is a valid corrective disclosure. This Circuit holds that "any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation prompted the resulting decline in price." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011) (internal quotations and citations omitted.) The corrective disclosures themselves must "present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price." *Id*. at 473 (internal citations and quotations omitted).

The core of Plaintiffs' case is that Evolent misled investors by not disclosing the fact that it was "over-charging" Passport for its services. AC at ¶¶ 4, 48, 51, 115, 119, 127, 139. According to Plaintiffs, the truth about how much Evolent was charging—and the impact this had on Passport—was not revealed to the public until February 15, when Passport filed a lawsuit against the Commonwealth of Kentucky that included detailed information about Passport's dire financial situation. AC at ¶¶ 93-94, 188. Plaintiffs' entire loss causation argument is based on the allegation that this was the first time that investors knew the truth about the impact Evolent was having on

Passport, and that once the market learned this information the stock fell, damaging investors.  AC at ¶¶ 184-90.

Even if all of Plaintiffs' allegations were true, the AC fails as a matter of law to adequately plead the element of loss causation because the market was put on notice as early as January 25, 2019, about not only the supposedly excessive fees that Evolent charged Passport, but also of the fact that these charges might exacerbate the financial ruin of Passport.  Plaintiffs themselves cite an article from January 25, 2019 from the *Insider Louisville*[31] publication entitled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to Evolent Health."  AC at ¶¶ 90, 155-57.  This article provides very detailed information about how much Evolent charged Passport for its services.  For example, the article states that Passport's non-employee management fees had risen by $86 million following its partnership with Evolent.  AC at ¶ 91.  It also places this fact into perspective, stating that Passport had paid more than $220 million in management fees to Evolent, and that this was an extremely important relationship to both Passport and Evolent.  AC at ¶¶ 90, 155.

In addition to these statistics, the additional context provided by the article makes it clear that a reasonable investor was put on notice of the information that Plaintiffs allege was concealed from investors.  For example, the article states explicitly that Passport was projecting a $144 million loss for the year.  Ex. 34, *Insider Louisville* article.  It is also reported that Evolent and Passport's alliance was "under intense financial pressures" and that Passport's CEO had just "addressed the nonprofit's potential insolvency."  *Id*.  Moreover, the article specifically links these

---

[31] *Insider Louisville* was a blog and newsletter that ceased publication in August 2019.  Though not directly relevant to the legal argument here, Defendants note that one of the site's investors was David Jones Jr., Humana Board member and son of Humana founder David Jones Sr.  Humana is a direct competitor of Passport in the Kentucky Medicaid market.  *See* "Local news site Insider Louisville to stop publishing Aug. 7," WDRB, July 30, 2019, available at https://www.wdrb.com/news/business/local-news-site-insider-louisville-to-stop-publishing-aug/article_fc6723d0-b2d2-11e9-8f3a-97b9d9aed7a9.html.

problems to the recent reduction in the Medicare reimbursement rate instituted by the Commonwealth of Kentucky. *Id.*

Plaintiffs argue that the true magnitude of the impact on Passport was not revealed to investors until the next month, when Passport filed suit against the Commonwealth of Kentucky. AC at ¶¶ 93-94, 188. Similarly, Plaintiffs allege that Evolent's announced acquisition of Passport in May finally revealed to the public how dire Passport's financial position had become. *Id*. at ¶ 189. But these are not corrective disclosures. What matters is when the public became aware of the information that was allegedly withheld by Defendants. *See Katyle,* 637 F.3d at 478 (upholding dismissal because alleged corrective disclosures did not relate directly to the actual information allegedly concealed by defendants). The January 25, 2019 article disclosed all relevant facts necessary to place investors on notice concerning the same risks that were allegedly revealed by both the lawsuit and the acquisition.

If the January 25, 2019 article presented detailed and concerning information about the rising costs within Passport and its possible inability to remain solvent, then why is it not identified by Plaintiffs as a corrective disclosure? *See* AC ¶¶ 90-92, 155-57. Because the stock price of Evolent barely moved after the release of the January 25, 2019 article. *See* Ex. 35, Chart of Evolent Stock Price During Class period. This is further evidence that the market understood the risks involved with the relationship between Evolent and Passport. As of the date of that article, the market knew the stakes and risks—the author himself discloses that Passport is worried about its own solvency. Ex. 34, *Insider Louisville* article. Even though this risk would not be realized until months later, this was not new information, merely the materialization of a risk that investors were already warned of. AC at ¶¶ 90-91, 155-56.

Thus, the article—and the lack of a stock price drop—do not fit conveniently with Plaintiffs' narrative of this case. The market was not suddenly blindsided in February to learn that Passport had major financial problems. Nor did any new information enter the market then about the fees and costs charged by Evolent. Rather, the stock price decline beginning in February are simply the natural consequence of a previously understood risk materializing. Because Plaintiffs' only alleged corrective disclosures occur after the relevant facts were disclosed to investors in the January 25 *Insider Louisville* article, it is impossible as a matter of law for Plaintiffs to allege a valid corrective disclosure, and the AC should be dismissed for failure to plead loss causation.

## V.    Plaintiffs Fail to Adequately Plead Control-Person Liability.

To successfully plead a prima facie case of "control person liability" under § 20(a), Plaintiffs must allege: (1) the existence of a primary securities violation committed by the "controlled" person or actor (*i.e.*, underlying predicate securities violation); and (2) the defendant's "control" over the primary violator. *See Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 602 (E.D. Va. 2015) (citation omitted). As explained above, Plaintiffs have failed to plead a primary violation against Evolent and the Individual Defendants because the AC fails to identify any actionable misstatement or omission; does not plead detailed facts that raise a strong inference of scienter or fraudulent intent; and fails to adequately plead loss causation.

Plaintiffs' § 20(a) claims against Spencer also fail because the AC does not allege facts sufficient to establish that she controlled Evolent. To adequately plead "control," Plaintiffs must allege that Spencer had the power to control both the general affairs of Evolent, and the power to directly or indirectly control or influence the specific corporate policy that resulted in the predicate securities violation. *See Kiken*, 155 F. Supp. 3d at 602 (citation omitted). Plaintiffs have not pleaded any specific facts to establish that Spencer exercised such control. The AC is replete with conclusory allegations that Spencer was a "controlling person" by "reason of [her] status as senior

37

executive officers and/or directors" and "had the power and influence to cause the Company to engage in unlawful conduct" and "to control the contents of [Evolent's] reports, press releases and presentations … to the investing public." *See* AC ¶¶ 27–28, 214–15. Under Rule 8(a) and the standards announced in *Iqbal* and *Twombly*, however, the Court should not accept conclusory statements and legal conclusions as true.[32]

Stripped of their legal conclusions, Plaintiffs' only factual control-person allegation related to Spencer is that she "was Evolent's National Chief Medicaid Operating Officer from 2016 to February 2018." AC ¶ 22. But an individual's position alone does not establish control person liability. *See In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 639 (D. Md. 2010) (citing *In re Cryomedical Sci., Inc. Sec. Litig.*, 884 F. Supp. 1001, 1020 (D. Md. 1995) ("neither status nor position, in and of themselves, are sufficient for § 20(a) liability")).

Significantly, Spencer did not sign Evolent's SEC filings, nor was she listed in Evolent's SEC filings as an officer of the Company. *See In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1182 (D. Colo. 2012) ("Defendants' authority to sign or not sign the registration statements at issue is sufficient indicia of 'control' over the representations and disclosures that went out to potential investors to support 'control person' liability at the pleading stage of this litigation."); *Jacobs v. Coopers & Lybrand, LLP*, No. 97CV3374 (RPP), 1999 WL 101772, at * 18 (S.D.N.Y. Mar. 1, 1999) ("[T]hough his status as director who allegedly served on the audit committee alone would not raise the inference that Hirsch was a Section 20(a) controlling person, the allegation that he signed a fraudulent 10-K form does raise this inference."). Accordingly, the Court should dismiss Plaintiffs' § 20(a) claim against Spencer because the AC

---

[32] *See Iqbal*, 556 U.S. at 664 ("A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

"does not plead any facts from which it can be reasonably inferred [she was a] control person."

*See Constellation Energy*, 738 F. Supp. 2d at 639.

## CONCLUSION

For the reasons set forth above, the Amended Complaint should be dismissed in its entirety for failure to state a claim for securities fraud.


DATED: February 6, 2020

RESPECTFULLY SUBMITTED,

*/s/ Ashley C. Parrish*
Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, 2nd Floor
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX  78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

39

## **CERTIFICATE OF SERVICE**

I certify that on February 6, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System on all parties in this case.

*/s/ Ashley C. Parrish*
Ashley C. Parrish
