# Exhibit 11

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
CIVIL ACTION NO. _____
DIVISION _____

*ELECTRONICALLY FILED*

UNIVERSITY HEALTH CARE, INC. d/b/a PASSPORT
HEALTH PLAN                                                          PLAINTIFF

v.

COMMONWEALTH OF KENTUCKY, FINANCE AND
ADMINISTRATION CABINET and WILLIAM
LANDRUM, III, Not Individually But In His Official
Capacity As Secretary, Finance And Administration Cabinet           DEFENDANTS
SERVE:        ANDREW BESHEAR
              Office of the Attorney General
              Capitol Building, 700 Capital Avenue,
              Suite 118
              Frankfort, Kentucky 40601

SERVE:        WILLIAM LANDRUM, III, SECRETARY
              Commonwealth of Kentucky
              Finance and Administration Cabinet
              Office of the Secretary
              702 Capitol Annex, Room 383
              Frankfort, Kentucky 40601
AND

COMMONWEALTH OF KENTUCKY, CABINET FOR
HEALTH AND FAMILY SERVICES and ADAM MEIER,
Not Individually But In His Official Capacity As Secretary,
Cabinet For Health And Family Services

SERVE:        ADAM MEIER, SECRETARY
              Office of the Secretary
              Cabinet for Health and Family Services
              275 E. Main Street, 5W-A
              Frankfort, Kentucky 40601

SERVE:        ANDREW BESHEAR
              Office of Attorney General
              Capitol Building, 700 Capitol Avenue,
              Suite 118
              Frankfort, Kentucky 40601

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000001 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, University Health Care, Inc. d/b/a Passport Health Plan ("**Passport**"), is a nonprofit, provider-sponsored managed care health plan that provides services to Medicaid beneficiaries in Jefferson County, Kentucky and throughout the Commonwealth of Kentucky. Passport brings this Complaint against the Defendants seeking injunctive and declaratory relief. In the middle of the parties' contract term, Defendant Cabinet for Health and Family Services ("**CHFS**") abruptly and arbitrarily lowered the rates it pays Passport to operate a Medicaid managed care plan in the Louisville area, with knowing indifference to the likelihood that such lowered rates would drive Passport out of business in a foreshortened period of time with the consequent and near-immediate disruption to the lives and the health care of approximately 315,000 Medicaid beneficiaries. At the same time, CHFS increased the rates for all other regions in the state, benefiting each of Passport's competitors, and having the effect of singling out Passport as the only Medicaid managed care organization to suffer a composite rate reduction. Passport seeks immediate and long-term relief from CHFS's disparate and arbitrary treatment.

## THE PARTIES

1. Passport is a nonprofit, non-stock Kentucky corporation that provides managed health care services for Kentucky Medicaid beneficiaries. Passport is recognized by the IRS as a public charity under Section 501(c)(3) of the Internal Revenue Code of 1986. It began providing managed care services in 1997 in Jefferson County and several surrounding counties pursuant to a contract with the Commonwealth of Kentucky. For many years, Passport exclusively served what was previously designated as Kentucky's Medicaid managed care Region 3 (recently relabeled Region A), consisting of the following counties: Breckinridge, Bullitt, Carroll, Grayson, Hardin, Henry, Jefferson, Larue, Marion, Meade, Nelson, Oldham, Shelby, Spencer,

2

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000002 of 000045

Filed 19-CI-00160 12/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

Trimble, and Washington counties. This region includes the Louisville metropolitan area and its surrounding counties. In 2014, after the Commonwealth elected to outsource substantially all of its Medicaid program to managed care organizations ("**MCOs**"), Passport was allowed to expand into the other managed care regions of the state (i.e., Regions 1, 2, 4, 5, 6, 7, and 8) and other, newly-established Medicaid MCOs were allowed to compete in Region 3. Even so, the vast majority of Passport's beneficiaries reside in Region 3. Recently, however, without any articulated justification for the change, CHFS combined for rate setting purposes the other seven Medicaid regions into a single region, Region B, while Region 3 was simply renamed Region A. The regions outside of old Region 3 (the new Region B) were all grouped together and received a rate increase, while Region 3 (renamed Region A) was singled out for a rate decrease.

2. Defendant, the Commonwealth of Kentucky Finance and Administration Cabinet ("**FAC**") is the administrative agency of the Commonwealth of Kentucky that, among other things, administers the Commonwealth of Kentucky's purchasing process and enters into contracts on the Commonwealth's behalf. Pursuant to KRS Chapter 45A, it has supervisory authority over all purchases by other state agencies such as CHFS, including the contract at issue here.

3. Defendant, William Landrum, III, is the Secretary of the FAC and is named in his official capacity. Secretary Landrum has been joined specifically because he has the responsibility to administer FAC and because injunctive relief is sought herein, among other forms of relief. Unless the context requires otherwise, references to "FAC" include Secretary Landrum.

4. CHFS is the administrative agency of the Commonwealth of Kentucky assigned responsibility for administering the Kentucky Medical Assistance Program pursuant to KRS

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000003 of 000045

3

NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

205.510 to 205.630. These statutes provide for the implementation of the federal Medicaid program in Kentucky in accordance with the provisions of Title XIX of the Social Security Act and applicable federal regulations. CHFS administers the Kentucky Medical Assistance Program through its Department for Medicaid Services ("**DMS**") as provided in KRS 194A.030(2).

5. Defendant, Adam Meier, is the Secretary of CHFS and is named in his official capacity. Secretary Meier has been joined specifically because he has the responsibility to administer the Kentucky Medical Assistance Program consistent with applicable law and because injunctive relief is sought herein, among other forms of relief. Unless the context requires otherwise, references to "CHFS" include Secretary Meier.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to the Kentucky Model Procurement Code, KRS 45A.245 and KRS 418.040 because there is an actual and justiciable controversy between the parties as set forth herein; and because the amount in controversy is in excess of the jurisdictional minimum of this Court.

7. Venue is proper in this Court pursuant to KRS 45A.245, KRS 452.405, and KRS 452.480.

## FACTUAL BACKGROUND

**Passport And The Community It Serves.**

8. Passport was formed in 1997, at the invitation of the Commonwealth of Kentucky, by the University of Louisville Medical School Practice Association, University of Louisville Medical Center, Jewish Heritage Fund for Excellence (formerly, Jewish Hospital), Norton Healthcare Inc., and the Louisville/Jefferson County Primary Care Association for the purpose of operating as an MCO overseeing the health care of Medicaid beneficiaries in what until recently has been called Medicaid Region 3. Passport was founded to serve as a

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000004 of 000045

4

Filed 19-CI-00160 12/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

collaboration between the Commonwealth and health care providers to align and arrange for services under the Medicaid program. Prior efforts to provide Medicaid managed care services in Region 3, the Commonwealth's largest Medicaid population, had been unsuccessful.

9. Medicaid is the federal/state program that provides medical care for poor and disabled people in Kentucky. Approximately eighty percent (80%) of the costs of the Medicaid program are funded by the federal government, conditioned on the Commonwealth's compliance with federal statutes, regulations, and directives from the Centers for Medicare and Medicaid Services ("**CMS**").

10. Passport's organizational model was designed to keep earnings, jobs and expertise in Kentucky, to support making long-term investments in preventative services, to invest Medicaid dollars in the local health care delivery system, and to provide better service to Medicaid beneficiaries. Unlike some other MCOs, Passport has no history of managing cash flow by denying or delaying claim payments,[1] but focuses on getting members the care they

---

[1] *See, e.g., Appalachian Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424 (6th Cir. 2013); *Community United Methodist Hospital, Inc. v. WellCare Health Insurance Company of Kentucky*, No. 16-CI-1536 (Jeff. Cir. Ct. 2016); *Community United Methodist Hospital, Inc. v. Coventry Health & Life Ins. Co.*, No. 16-CI-1535 (Jeff. Cir. Ct. 2016); *Casey County Hospital, Inc. v. Coventry Health & Life Ins. Co.*, No. 16-CI-1542 (Jeff. Cir. Ct. 2016); *Wayne County Hospital, Inc. v. WellCare Health Insurance Company of Kentucky*, No. 16-CI-1550 (Jeff. Cir. Ct. 2016); *Jane Todd Crawford Memorial Hospital, Inc. v. Coventry Health and Life Ins. Co.*, No. 16-CI-001544 (Jeff. Cir. Ct. 2016); *Jane Todd Crawford Memorial Hospital, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.*, No. 16-CI-001545 (Jeff. Cir. Ct. 2016); *Wayne County Hospital, Inc. v. Coventry Health & Life Ins. Co.*, No. 16-CI-1550 (Jeff. Cir. Ct. 2016); *Marcum & Wallace Memorial Hospital, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.*, No. 16-CI-001583 (Jeff. Cir. Ct. 2016); *Mercy Health Partners – Lourdes, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.*, Case No. 16-CI-001584 (Jeff. Cir. Ct. 2016); *Trigg County Hospital, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.*, Case No. 16-CI-001547 (Jeff. Cir. Ct. 2016); and *Cumberland County Hospital Association, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.*, Case No. 16-CI-001546 (Jeff. Cir. Ct. 2016).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000005 of 000045

5

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

need, on quality of care and on member satisfaction. It has been the best and most innovative MCO in Kentucky.

11.     Passport is eligible to enter into a risk contract in accordance with Section 1903(m) of the Social Security Act of 1935, as amended, and 42 C.F.R. 438.6; is engaged in the business of providing prepaid comprehensive health care services as defined in 42 C.F.R. 438.2; and is an insurer under Subtitles 3 and 38 of the Kentucky Insurance Code (KRS Chapter 304) with a health line of authority from the Kentucky Department of Insurance (the "**DOI**").

12.     As of January 2019, Kentucky had approximately 1.26 million Medicaid beneficiaries. Passport serves approximately 209,000 Medicaid beneficiaries in the sixteen counties constituting Region 3. That is approximately sixty-five percent (65%) of the total number of Medicaid beneficiaries residing in the region, and approximately sixteen percent (16%) of the total number of Medicaid beneficiaries statewide.

13.     Most of Passport's members in Region 3 are located in Jefferson County, which includes Louisville, Kentucky's largest city. As of January 31, 2019, Passport had 125,709 members in Jefferson County. Of those, a little less than half – 59,755 – were under the age of 18.

14.     In addition to the 209,000 Medicaid beneficiaries served by Passport in Region 3, Passport serves approximately 106,000 beneficiaries in other regions of the Commonwealth. Thus, Passport serves approximately 24.9% of all Medicaid beneficiaries in the Commonwealth who are enrolled in managed care, and Region 3 accounts for sixty-five percent (65%) of Passport's total enrollment. In short, Region 3 is dependent on Passport, and Passport's business consists overwhelmingly of Medicaid beneficiaries in Region 3.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000006 of 000045

6

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

15. Passport is the only nonprofit Medicaid managed care company currently operating or contracted to operate in the Commonwealth of Kentucky. Passport is a Section 501(c)(3) organization, as approved by the IRS, driven by a charitable mission that pervades the organization, including its sponsors (all of which are charitable), its board of directors, its management team and its staff. The other Kentucky MCOs are all for-profit organizations, which have an inherent duty to maximize shareholder return.

16. As an MCO, Passport has a contract with the Commonwealth to align and arrange for healthcare services to Medicaid beneficiaries. In return, Passport receives a fixed or capitated "Per Member Per Month" rate, for each beneficiary (or "member") enrolled in its plan. Passport then contracts with health care professionals and organizations (such as hospitals and health clinics) and pays them to provide services to Medicaid patients for whom Passport has taken responsibility.

17. Passport differs from for-profit MCOs in that the organization itself is governed by healthcare providers and the community it serves. Passport is a membership organization under Kentucky's nonprofit corporation law, with its members consisting only of its Section 501(c)(3) sponsoring organizations. *See* ¶ 8. The phrase "sponsoring organization" has great significance in this context, for such organizations put Passport one step closer to its members, and bring critical input and expertise that has allowed the organization to achieve and maintain its reputation and long-term success. Passport is overseen by its board of directors, comprised of fifteen (15) voting members. Passport's sponsoring organizations appoint nine (9) directors. In addition, the Partnership Council, Inc., a Kentucky nonprofit corporation established to provide broad representation of health care consumers and providers (the "**Partnership Council**"), appoints three (3) additional directors to Passport's board. Finally, these board members (those

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000007 of 000045

7

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

appointed by the sponsoring organizations and by the Partnership Council) appoint three (3) additional directors to Passport's board from the community at-large. Accordingly, the fifteen (15) voting members of Passport's board of directors are drawn from its charitable sponsors and from the public. Passport's sole mission is to improve the health and quality of life of its members, i.e., the Medicaid beneficiaries it serves.

18. Passport has built strong relationships with both beneficiaries and healthcare providers. Its network of participating providers is robust; Passport currently has contracts with eighty-five percent (85%) of the health care providers in Region 3 that participate in Kentucky's Medicaid program. In Region 3 alone, Passport's network includes 22 hospitals, as well as approximately 3,000 primary care providers and 12,100 specialists. As with private insurance, a strong network is an important factor in Medicaid beneficiaries' choice of plans, and directly affects a plan's ability to meet its members' health needs. An extensive network of contracted providers means members have more ready access to medical care.

19. Passport has been recognized repeatedly as one of the top Medicaid managed care organizations in the country. It is accredited by the National Committee for Quality Assurance ("**NCQA**") which evaluates the quality and efficiency of health insurance plans. NCQA has ranked Passport first in Kentucky and in the top 25 nationally for many years, and has consistently ranked Passport higher than any other Medicaid MCO in the south or central United States. Passport has long been regarded by CHFS as the gold standard for a well-operated MCO. As one example of this, in September 2017, CHFS selected Passport as the model Kentucky MCO for an on-site tour by a CMS Readiness Team, for which Passport received accolades.

20. Passport has also been repeatedly recognized for its leadership in health care and community advocacy. For example, in 2017 alone, Passport's Refugee Care Coordination

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000008 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

Program was named the runner-up for Spalding University's Spirit of Social Work Agency Award; its CEO was presented with the Bingham Greenebaum Doll Leadership in Healthcare Award at the MediStar Awards (recognizing "a progressive and entrepreneurial individual who is not afraid to take risks and whose job performance is considered exemplary by providers, patients and peers"); and the Better Business Bureau recognized Passport for 10 years of A+ service. Additionally, over the last 15 years, Passport has received numerous awards for excellence in health care communications, demonstrating its commitment to educating its members and promoting positive health outcomes.

21. Throughout its existence, Passport has generated substantial cost savings for the Commonwealth of Kentucky. For example, a May 2012 study prepared by Washington, D.C.-based Special Needs Consulting Services estimated that Passport had saved Kentucky's Medicaid program approximately $180 million over the previous two calendar years, and found that Passport's administrative costs are well below industry norms.

22. Passport has generated these cost savings despite the fact that socioeconomic differences and other factors make it costlier to treat the Medicaid population in the Louisville region in comparison to other areas of the state.

23. Materials prepared by CHFS's agencies support Passport's assertions concerning the increased expense of providing care in the Louisville region. For example, according to the "2016 Annual Administrative Claims Data Report – Inpatient Hospitalizations," which was prepared by CHFS's Office of Health Data and Analytics, the average charge for inpatient hospital discharges in the seven-county area surrounding Louisville was markedly higher than the average charge for inpatient hospital discharges throughout the Commonwealth as a whole ($47,956.82 to $38,048.33, respectively).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000009 of 000045

9

Filed          19-CI-00160     02/15/2019          Amy Feldman, Franklin Circuit Clerk          NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

24.     Materials prepared by CMS likewise support Passport's assertions concerning the increased costs of providing care in the Louisville region. For example, CMS publishes wage index data every year to account for area wage differences in the development of Medicare rates, and Louisville consistently has one of the highest wage index ratings in Kentucky.

25.     Region 3 also has a higher percentage of racial minorities than the rest of the Commonwealth. According to the most current US Census data, African-Americans make up more than twenty-two percent (22%) of the Jefferson County population. A significant number of Passport's members reside in west Louisville, which is a majority African-American community. The West End of Louisville has historically experienced disproportionate socioeconomic challenges such as poverty, redlining, crime, unemployment, lack of access to care and food insecurity. These adverse "social determinants of health," compounded by other multiple risk factors, result in higher instances of asthma, obesity, diabetes, certain cancers, addiction, sexually transmitted disease, and poorer health overall. In Kentucky, African-American men have the shortest life expectancy of all demographic groups when stratified by race and gender. In Kentucky, African-American infants are twice as likely to die in the first year of life as compared to Caucasian infants. It follows that providing health care to this population will be costlier than providing care in other areas.

26.     Statistics related to drug abuse provide another snapshot of some of the population health challenges in Region 3:

- Region 3 accounted for one-third of all drug abuse discharges in Kentucky, although it contains less than fifteen percent (15%) of the Commonwealth's total population.

10

Filed          19-CI-00160     02/15/2019          Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000010 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

- Deaths from drug overdoses have continued to rise in Louisville. Rates have gone from 18.2 per 100,000 in 2011 to 43.0 per 100,000 in 2016.

- Long-term drug abuse is related to multiple negative health outcomes, including heart and lung disease, HIV/AIDS, Hepatitis, and death from overdose.

- Region 3 accounts for almost one-third of the psychoses discharges in the state.

- Region 3 accounts for almost forty percent (40%) of the incidence of alcohol/drug abuse or dependence without rehabilitation therapy in the state.

27.     Passport's dedication to short- and long-term improvements in the well-being of its members and the community in general includes its decision to locate its long-planned headquarters building in west Louisville and to partner with the YMCA and other nonprofit and social service organizations to place crucial resources directly in the area of most need. This was a strategic decision to increase direct contact with its residents, regardless of whether they are members; to improve the community's access to care; and to positively impact those adverse social determinants of health that cost lives, impede employment and contribute to the cycle of hopelessness that has long burdened Louisville's West End. Ultimately, the move will improve health outcomes and save the Commonwealth untold health care costs.

28.     Passport's grass-roots efforts to move the needle on population health include programs to overcome barriers that inhibit members' access to services. Passport has succeeded in achieving an unusually high level of member "engagement," which means it is effective in getting members to seek out and receive needed health care services. In this regard, Passport is unique among the Kentucky MCOs in that it consistently invests in the long-term health and well-being of its membership. Passport has done this not only in furtherance of its charitable

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000011 of 000045

11

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

mission and strong sense of responsibility to the community, but also because a healthier membership base will lead to significant savings to Medicaid in the long term.

**The Expansion Of Medicaid Managed Care In Kentucky.**

29.     In 2011, CHFS requested and received permission from CMS to implement a managed care program for all Kentucky Medicaid regions except for Region 3 (which was already well-served by Passport). CMS granted permission (a "waiver"), which became effective on November 1, 2011.  DMS divided the Commonwealth into eight managed care regions, and contracted with MCOs to serve Medicaid beneficiaries in all regions of the Commonwealth other than Region 3.  At the time, DMS did not permit Passport to bid on the right to provide services outside Region 3.

30.     In 2011, three for-profit MCOs, Coventry Health and Life Insurance Co. (**"Coventry"**), Kentucky Spirit Health Plan, Inc. (**"Kentucky Spirit"**), and WellCare Health Insurance of Illinois, Inc. (**"WellCare"**) were awarded managed care contracts.  With limited exceptions, all Medicaid beneficiaries outside of Region 3 were required to enroll with one of the three MCOs.

31.     The implementation of managed care outside of Region 3 resulted in serious problems in a number of areas, including confusion among Medicaid beneficiaries, breaks in continuity of patient care, inadequacy of MCO networks, and delayed and erroneous payment of claims.  In fact, Kentucky Spirit terminated its contract with the state effective July 2013 and withdrew from the Commonwealth.  Throughout this time, Passport continued to serve Region 3 successfully and without the problems plaguing the rest of the Commonwealth.

32.     Kentucky Spirit notified CHFS of its intent to terminate its contract in October, 2012. It alleged that the state misled the three MCOs concerning the costs of care for the state's

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000012 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

Medicaid population, resulting in financial losses to Kentucky Spirit (who was receiving lower rates than the other MCOs) that it claimed were unsustainable. Although CHFS disputed Kentucky Spirit's claims, shortly thereafter it awarded a nearly eight percent (8%) raise – in the middle of the contract term – to Coventry and WellCare, in exchange for a release of any claims relating to information provided by CHFS during the bidding process. The rate increases came too late to prevent Kentucky Spirit's exodus.

33. Despite well-documented difficulties in the rest of the Commonwealth, CHFS nonetheless decided to expand the for-profit Medicaid managed care model into Region 3.

34. In June 2012, FAC issued a request for proposal on behalf of CHFS seeking bids for the provision of managed care services in Region 3. In addition to Passport, three other entities – Coventry, WellCare, and Humana – were also successful bidders for Region 3 contracts.

35. At that time and without their consent, CHFS reassigned seventy-five percent of Passport's members in Region 3 away from Passport, and divided them between the other three MCOs. In contrast, CHFS did not take any of Coventry's or WellCare's membership from them in the other regions and redistribute them to Passport or Humana. Nonetheless, as a testament to the exceptional services Passport provides, a large number of members chose to return to Passport when given the choice. Passport's current 65 percent market share is a tangible result of its excellent service, member satisfaction and freedom of choice exercised by its members in selection of their MCO.

36. Effective January 2014, and as authorized by the Patient Protection and Affordable Care Act, CHFS expanded the Medicaid program in the Commonwealth to cover citizens who earned up to 138 percent (138%) of the federal poverty level. This resulted in an

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000013 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

increase of more than 400,000 eligible Medicaid beneficiaries statewide. Today Passport cares for approximately 113,000 Medicaid expansion members statewide.

37. Effective January 2014, Anthem was added as an MCO serving all Kentucky Medicaid regions. Beginning in July 2015, Coventry became Aetna Better Health of Kentucky.

38. As of December 31, 2018, WellCare had the largest share of Kentucky Medicaid beneficiaries among all MCOs and Passport had the second-largest share. As of December 31, 2018, WellCare served approximately 35.3% of the Medicaid MCO members statewide but only 9.8% in Region 3/Region A. As of December 31, 2018, Passport served approximately 24.9% of the Medicaid MCO members statewide but 65% in Region 3/Region A.

39. Before July 1, 2016, DMS adjusted the rates paid to Passport and other MCOs on an annual basis in accordance with contracts between CHFS and the MCOs. DMS historically issues a table of rates for each of the eight Managed Care regions, with specific per member/per month capitated rates for each of several categories of beneficiaries in each region (for example, categories include "Dual Eligible", "Families and Children – Infant" and "Foster Care"). Base rates for all MCOs within a given region and category are the same.

**The 2015 Master Agreement And The 2018 Contract Modification.**

40. In June 2015, Passport and CHFS entered into their most recent master contract for Medicaid Managed Care Services, effective for services beginning on July 1, 2015 (the "**Master Agreement**"). The Master Agreement provided for four (4) additional one-year periods upon the mutual agreement of the Parties, potentially extending its term through June 30, 2019. A copy of the Master Agreement is attached as **Exhibit A**, consisting of a 14-page overview of the parties' agreement.

14

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000014 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

41.    The Master Agreement has been renewed periodically by agreement of the parties.  **Exhibit B** to this Complaint is a document titled "Medicaid Managed Care Contract between the Commonwealth of Kentucky on Behalf of Department for Medicaid Services and Contractor," executed in late June 2018.  Exhibit B is hereafter referred to as the **"Contract Modification."**   Exhibits A and B are hereafter referred to collectively as simply **"the Contract."**

42.    The Master Agreement provides as follows:

The initial term of the Contract shall be effective July 1, 2015 and expires June 30, 2016.

This Contract may be renewed at the completion of the initial Contract period for four (4) additional one-year periods upon the mutual agreement of the Parties.  Such mutual agreement shall take the form of a Contract Modification as described in Section 40.8 of the RFP.

43.    The Master Agreement further provides:

**Basis of Price Revisions**

PRICE ADJUSTMENTS:  Unless otherwise specified, the capitation payment rates established by the Contract resulting from this Solicitation shall remain firm for the contract period subject to the following:

CMS Approval:  The capitation payment rates established by the Contract are subject to the approval of the Center for Medicare and Medicaid Services (CMS).  If CMS rejects any component of the rates, the capitation payment rates shall be adjusted as required.

Extended Contract Periods:  If the Contract provides for an option renewal period, a price adjustment may be granted at the time the Contract is renewed, subject to applicable Contract provisions.

44.    The Master Agreement also provides:

**Changes and Modifications to the Contract**

Pursuant to KRS 45A.210 (1) and 200 KAR 5:311, no modification or change of any provision in the Contract shall be made, or construed to have been made, unless such modification is mutually agreed to in writing by the Contractor and the Commonwealth, and incorporated as a written amendment to the Contract and processed through the Office of Procurement Services and approved by the Finance and Administration Cabinet prior to the effective date of such modification or change pursuant to KRS 45A.210(1) and 200 KAR 5:311. Memorandum of understanding, written clarification, and/or correspondence shall not be construed as amendments to the Contract.

Filed          19-CI-00160     02/15/2019          Amy Feldman, Franklin Circuit Clerk          NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

If the Contractor finds at any time that existing conditions make modification of the Contract necessary, it shall promptly report such matters to the Commonwealth Buyer for consideration and decision.

45.     Section 7.0 of the Contract Modification provides:

**7.0     Contract Term**

**7.1     Term**

The term of the Contract shall be for the period July 1, 2018 through June 30, 2019. This Contract may be renewed for one (1) additional six (6) month period upon the mutual agreement of the Parties. Such mutual agreement shall take the form of an addendum to the Contract under Section 41.3 "**Amendments**." Contractor shall give notice to the Commonwealth at least sixty (60) days before the end of any annual term if the Contractor does not intend to renew the Contract. The Department shall use its best efforts to provide rates for renewal terms at least ninety (90) days prior to the expiration of the current terms, unless the Department elects not to renew the Contract hereunder.

The Commonwealth reserves the right not to exercise any or all renewal options. The Commonwealth reserves the right to extend the Contract for a period less than the length of the above-referenced renewal period if such an extension is determined by FAC and the Department to be in the best interest of the Commonwealth and agreed to by the Contractor.

The Commonwealth reserves the right to renegotiate any terms and/or conditions as may be necessary to meet requirements for the renewal period. In the event proposed terms or conditions cannot be agreed upon, subject to the notices above, either party shall have the right to withdraw without prejudice from exercising the option for a renewal.

**7.2     Effective Date**

The Contract is not effective and binding until approved by the Commonwealth of Kentucky. Payment under this Contract is contingent upon approval by CMS or any Waiver Amendment, State Plan Amendment and this Contract.

46.     Section 11.0 of the Contract Modification Provides:

**11.1     Calculation of Rates**

The Capitation Rate has been established in accordance with 42 C.F.R. 438. The Capitation Rates are attached as Appendix A. "**Capitation Payment Rates**" and shall be [sic] deemed incorporated into this Contract and shall be binding to the Contractor and the Department, subject to CMS' approval. If CMS fails to approve a component of the rates, the capitation payment rates shall be adjusted to reflect that disapproval. [Attachment G, p. 36.]

**11.2     Rate Adjustments**

Prospective adjustments to the rates may be required if there are mandated changes in Medicaid services to the managed care population provided through this Contract as a result of legislative, executive, regulatory, or judicial action. Changes applicable to this Contract mandated by state or federal legislation, or executive, regulatory or judicial mandates, shall take effect on the dates specified in the legislation or mandate. In the

16

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000016 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

event of such changes, any rate adjustments shall be made through the Contract amendment process.

47.     Section 41.3 of the Contract Modification provides as follows:

### 41.3     Amendments

This Contract may be amended at any time by written mutual consent of the Contractor and FAC and the Department, and upon approval of CMS. In the event that changes in state or federal law require the Department [i.e., DMS] to amend its Contract with the Contractor, notice shall be made to the Contractor in writing and any such amendment shall be subject to the applicable payment rate revision provisions as described in Section 11.2 "**Rate Adjustments.**" The Department may, from time to time provide clarification of the Providers' and the Contractor's responsibilities, provided, however, such clarification shall not expand or amend the duties and objections under this Contract without an amendment.

## DMS Sets New Capitation Rates That Disproportionately Harm Passport.

48.     Since July 1, 2016, DMS has modified MCO capitation rates semi-annually.

49.     Effective January 1, 2018, DMS announced rates to be effective through the end of State Fiscal Year 2018, i.e., through June 30, 2018 (the "**SFY 2018 Rates**"). These rates were relatively unchanged from previous rates. Passport did not formally object to the SFY 2018 Rates, even though Passport had requested an increase in rates to reflect increasing costs. These rates caused Passport to incur losses of approximately $26 million from January to June 2018.

50.     On or about May 30, 2018, Passport learned that DMS's actuarial firm, Wakely Consulting Group, LLC ("**Wakely**"), had developed a schedule of significant rate changes to be effective July 1, 2018 as part of the implementation of Kentucky HEALTH, the new Medicaid waiver program proposed by Governor Bevin to add "community engagement" requirements for some beneficiaries.

51.     It was then that Passport learned that seven of the eight managed care regions of the Commonwealth (excluding former Region 3) would be combined into a single region for rate cutting purposes, Region B. DMS and Wakely proposed to *increase* rates paid in Region B by 2.5% overall. Region 3, where approximately sixty-five percent (65%) of Medicaid members are

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000017 of 000045

17

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

covered by Passport, would be re-designated as Region A. Passport learned that Region A's rates would be *reduced* by 4.9% overall (together with the May 2018 proposed Region B rates, the rates are referred to herein as the "**Waiver Rates**").

52.     Despite objections and questions about the rate development process from Passport and other MCOs, which were summarily dismissed by DMS and Wakely, the Waiver Rates were set to take effect July 1, 2018. However, on or about June 19, 2018, representatives of Wakely and DMS assured Passport that rate reductions applicable to Passport would be offset by other changes included in the Kentucky HEALTH waiver program and that Passport would be "made whole." This proved not to be true.

53.     On Friday, June 29, 2018, the United States District Court for the District of Columbia ruled that CHFS's plan to implement Kentucky HEALTH violated federal law, and the Court enjoined its implementation. That program had been planned for activation July 1, 2018.

54.     Immediately following this court decision, with little time to adjust the proposed July 1, 2018 Waiver Rates following the invalidation of Kentucky HEALTH, DMS chose instead to extend the SFY 2018 Rates into the 2019 State Fiscal Year beginning July 1, 2018.

55.     Passport continued to seek information from and dialogue with CHFS and Wakely about the various rates as calculated by Wakely, without success.

56.     Following the District of Columbia court decision, DMS directed Wakely to establish revised capitation rates that would apply retroactively to July 1, 2018. On or about September 21, 2018, DMS announced the new "bridge rates" to be effective until the Kentucky HEALTH waiver could be implemented on January 1, 2019 (the "**Bridge Rates**"). Similar to the Waiver Rates released in May that were never implemented, the Bridge Rates consolidated seven of the eight regions into Region B, increased rates paid in Region B by 2.2%, and decreased rates

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000018 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

paid in Passport's home, now called Region A, by 4.1%. As a result, Passport experienced a statewide reduction of 3.2% in rates overall, while all other MCOs received an increase.

57.    As had happened previously when the Waiver Rates were announced, all MCOs – not just Passport – asked approximately 40 questions about the Bridge Rates and DMS's rate setting approach. Without meaningful discussion, these concerns were brushed aside by Wakely and DMS, with no adjustments made.

58.    On or about November 1, 2018, CHFS began paying MCOs according to the Bridge Rates. Instead of applying the rates prospectively, CHFS began to recoup from Passport and other MCOs purported "overpayments" it made (i.e., the difference between the Bridge Rates and the SFY 2018 Rates) from July and August. On or about December 1, 2018, CHFS recouped from Passport and other MCOs "overpayments" it had made in September and October. The total amount of Passport's recoupment was $20,500,000, netting CHFS approximately $4 million (the remainder must be paid back to the federal government). These were funds that Passport had already earned for services provided to the Commonwealth. By means of this unprecedented retroactive application of the Bridge Rates, CHFS essentially reached into Passport's pocket and extracted millions of charitable dollars it had already earned.

59.    In December 2018, CHFS advised Passport that it would be extending the Bridge Rates for an additional calendar quarter, through March 2019, because of further delays in implementing Kentucky HEALTH. These delays were, of course, the result of questions about alleged defects in the CHFS-authored program pending in the federal court case, well beyond the control of Passport. In fact, Passport has consistently supported CHFS and DMS with the Kentucky HEALTH roll-out.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000019 of 000045

19

**DMS's Risk Adjustment Process.**

60.     An important component of Medicaid rate setting for MCOs is the risk adjustment process. This process exists to make equitable adjustments among MCOs to account for the health status of their enrolled members, to minimize incentives for selectively enrolling healthier members, and to provide adequate financing for MCOs whose members have more expensive health care needs. DMS's risk adjustment model is "zero-sum," meaning that no additional dollars are provided by the Commonwealth of Kentucky. Instead, if one MCO's rates are adjusted upward because of their more expensive population mix, then another MCO's rates are adjusted downward. Section 12.1 of the Contract Modification provides for the process to "help [ ] ensure payments to MCOs are more equitable and mitigate [ ] the impact of selection bias, thus protecting MCO solvency and reducing incentives for plans to avoid high-risk individuals."

61.     As part of the Contract's risk adjustment process, Passport typically receives additional payments from DMS because its members have higher-than-average health needs. The risk adjustment "bump" in rates for Passport has historically been around a three percent (3%) increase above DMS's base rates. This is because of the risk scores assigned to Passport's members. Thus, Passport receives a positive risk adjustment to its base rates because its members, on average, have higher risk scores than other MCOs' members. Put simply, less healthy individuals who access the health care system cost more than healthier individuals who do not access the health care system.

62.     Effective July 1, 2018, in addition to the changes described above, DMS also reduced the risk adjustment amount available to Passport. Under the Bridge Rates, while Passport still received an increase to the base rates, it accounts for only a two percent (2%)

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000020 of 000045

20

Filed        19-CI-00160        02/15/2019                Amy Feldman, Franklin Circuit Clerk        NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

increase as compared to the three percent (3%) increase Passport normally receives. This change alone has reduced payments to Passport by approximately $20 million per year.

63.    As with other changes, DMS has offered no explanation for the risk adjustment change, which has a disproportionately negative impact on Passport. Passport has a demonstrated record of serving patients with higher risk scores and more costly health care needs. Conversely, as with the Bridge Rates, the change has a positive impact on Passport's competitors who serve patients with lower risk scores and less costly health care needs.

64.    Ineffectual or reduced risk adjustments provide an incentive for profit-oriented managed care companies to market their services or curate their provider networks selectively, so that they enroll patients who will utilize fewer resources (or make it more difficult for patients to access care) while avoiding patients who are heavier utilizers, thereby enabling lower medical expenditures and higher profits. *See Appalachian Regional Healthcare v. Coventry Health and Life Insurance Co., 2012 WL 2359439, Med & Med GD (CCH) P 304, 062, Findings of Fact 64-67.* (This is the same concept as "selection bias," which is the term used in § 12.1 of the Contract Modification.)

65.    Passport does not manipulate its marketing efforts, member enrollment or provider contracting in order to maximize profits; it enrolls all eligible beneficiaries and contracts with providers without discrimination. In fact, Passport's members often enroll with Passport because they have sought care with one of Passport's provider-sponsors, rather than because they have responded to marketing communications directed at all Medicaid eligible citizens.

66.    Notably, when CHFS opened Region 3 to allow competition by other MCOs, Passport experienced a measurable increase in the average risk score of its members, as the other

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000021 of 000045

21

Filed        19-CI-00160        02/15/2019                Amy Feldman, Franklin Circuit Clerk

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

MCOs disproportionately enrolled healthier beneficiaries and left Passport with a disproportionately sicker enrollment base.

67.     If CHFS forces the collapse of Passport, it will disproportionately cause harm to the sickest individuals in Region A, who are well-served by Passport and its extensive network of providers.

68.     In numerous meetings and discussions, Passport has advised CHFS and DMS that the Bridge Rate decreases in Region A and risk adjustment changes are disproportionately harming Passport.

69.     Because of Passport's predominant market share – the result of its unique and longstanding relationship with members and providers in Region 3/Region A -- CHFS's current rate scheme, which  lowers rates in Region 3/Region A while raising them everywhere else, singles out Passport for harm.

70.     Federal law requires CHFS, in setting capitation rates for MCOs, to "use the most appropriate data." 42 CFR 438.5(c)(2).  On information and belief, in calculating the Bridge Rates, Wakely relied exclusively on "encounter data." 2 CFR 438.5(c)(2).  However, the United States General Accounting Office ("**GAO**") has raised questions about the reliability of states' Medicaid managed care encounter data. *See* United States Government Accountability Office, "Medicaid Managed Care: Additional CMS Actions Needed to Help Ensure Data Reliability" GAO-19-10 (October 2018), available online at https://www.gao.gov/assets/700/695069.pdf. The contract requires Passport to submit encounter data but, recognizing issues with such data's accuracy, allows a five percent error rate.  Contract Modification § 40.3 and Appendix F. Notwithstanding these known problems with encounter data it had collected in Kentucky, including data relating to Region 3 involving Passport. Wakely's calculation of the Bridge Rates

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000022 of 000045

22

NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

was done using encounter data exclusively, ignoring more reliable claims data. Wakely refused to consider other, more reliable sources of historical data are available (i.e., "claims data"), that would have balanced the encounter data's inaccuracies.

**DMS's Rates Threaten Passport's Existence and Ability To Serve Its Members.**

71.     Passport has operated as a financially stable MCO for over twenty years. As of December 31, 2016, Passport had a consolidated statutory net worth in the amount of $196.8 million. As of December 31, 2017, Passport had a consolidated statutory net worth in the amount of $217.4 million. As of June 30, 2018, Passport had a consolidated statutory net worth in the amount of $212.9 million. But by December 31, 2018, Passport's consolidated statutory net worth had dropped to $148.5 million. Largely because of the Bridge Rates, Passport recorded a loss of $65.5 million for calendar year 2018. These are charitable funds that CHFS has, in essence, clawed back with its rate manipulation.

72.     Pursuant to KRS Chapters 304.38 and 304.33, if Passport's "risk-based capital" falls below a statutorily required threshold, it could be subject to court-ordered liquidation or rehabilitation by the DOI and lose its right to operate as a health insurer. An insurer like Passport must report its financial information to the DOI on a quarterly basis.

73.     Passport calculates that the risk-based capital threshold it is required to meet to comply with DOI requirements is $130 million.

74.     Passport projects an additional $75 million in Medicaid losses for the first six months of 2019 if DMS's rates remain unchanged.

75.     Passport must report 2018 financial results to the DOI by March 1, 2018. Under DOI reporting rules, this report also includes projected losses through the end of the rate year with the state, which is June 30. Accordingly, on or before March 1, 2019, due to these losses

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000023 of 000045

23

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

Passport expects to report a financial status showing expected risk based capital will be significantly less than the statutory threshold for DOI action.

76.     An additional critical date is March 31, 2019, the end of the quarter.  Passport projects that its losses due to the Bridge Rates will actually decrease its risk-based capital below the statutory threshold as of that date.

77.     These actual and projected losses are a direct result of CHFS's unreasonable and arbitrary Bridge Rates.

78.     If, as expected, Passport must report on or before March 1, 2019, that its risk-based capital is projected to be less than $130 million, or if its risk-based capital actually drops below that threshold by March 31, then the DOI will have the legal right to file a verified petition in state circuit court for an order appointing the DOI Commissioner as rehabilitator of Passport under KRS 304.33-140.  Subtitle 33 of the Kentucky Insurance Code sets forth various grounds for filing such a petition, including "[t]hat the insurer is or is about to become insolvent."  For these purposes, "insolvency" means that the "insurer is unable to pay its debts or meet its obligations as they mature or that its assets do not exceed its liabilities plus the greater of: (a) Any capital and surplus required by law to be constantly maintained."  KRS 304.33-030(18). Further, without action by DMS to adjust the Bridge Rates, Passport's rehabilitation proceeding would most likely convert into a liquidation proceeding under KRS 304.33-180.

79.     Section 3.3 of the Contract Modification between CHFS and Passport requires Passport to maintain a license as an insurer or a health maintenance organization from the DOI. If CHFS's arbitrary rates force Passport to be in violation of DOI regulations, they could also in turn cause Passport to be in violation of Section 3.3 of the Contract Modification.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000024 of 000045

24

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

80. CHFS has knowingly and willfully placed Passport in the position where its reserves will be depleted, its compliance with insurance laws will be jeopardized, and its ability to comply with the terms of the Contract it has with CHFS will be undermined.

81. If Passport is financially unstable, forced into receivership or state operation or similarly hampered in its continued operation, the medical care of its 315,000-plus members will likely be disrupted. They will be forced to enroll with another MCO, which likely will not have as broad a provider network as Passport's and may in turn require members to find new providers, including primary care doctors. Physicians and many other providers are not required to treat Medicaid patients, and many choose not to because of low reimbursement. Member fear and confusion will surely occur, which may in turn reduce the members' access to timely care. Further, if forced to change MCOs as a result of CHFS's actions, these members will be denied their free choice of managed care organizations.

**DMS's Rates Are Arbitrary, Capricious, And Actuarially Unsound.**

82. Pursuant to 42 CFR § 438.4, DMS's capitation rates for Medicaid managed care must be "actuarially sound" and must be reviewed and approved by CMS.

83. Demonstrating actuarial soundness requires more than simply checking DMS's arithmetic. To be actuarially sound, capitated rates must be "based on valid rate development standards" and "generally accepted actuarial principles and practices;" must "be appropriate for the populations to be covered and the services to be furnished under the contract;" must be adequate to meet the legal requirements of 42 CFR Chapter 438; and must not cross-subsidize between rate cells (i.e., member categories), among other principles. Actuarial soundness is not an aggregate concept to be applied to all MCOs, but should have been determined with specific application to Passport.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000025 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

84.     Rates may be "actuarially sound" and still arbitrary and capricious if they are based on illogical assumptions or if they do not fairly compensate providers for performing services they are contracted to perform. The ultimate value of an actuarial analysis may be affected by a wide variety of assumptions that go beyond issues of statistical validity.

85.     Passport's long track record of successfully and economically providing services in Region 3/Region A provides a reliable benchmark for calculating the necessary and reasonable costs of serving its members.

86.     On information and belief, Wakely was either asked to make unreasonable assumptions, was allowed to draw its own assumptions without appropriate guidance from DMS, or some combination of the two. If the underlying assumptions are wrong, the results produced from them are necessarily deficient.

87.     DMS's Bridge Rates are not actuarially sound and are otherwise arbitrary, capricious and unreasonable, for at least the following reasons:

A.     They are inadequate to compensate Passport for serving the members it serves and providing the services required under the parties' contract;

B.     DMS's rate adjustments have produced wide swings in rates over multiple rate periods. Such rate volatility is arbitrary and actuarially unsound;

C.     In decreasing rates for Region A, the Bridge Rates have ignored mandatory program changes that increase Passport's costs;

D.     The rates were developed using a "baseline period" of historical claims actually incurred by Passport and other MCOs which was then trended forward using a "trend rate" to estimate what the actual claims experience would be for a future period. In calculating the Bridge Rates, Wakely used a baseline period of September 2016

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000026 of 000045

26

through August 2017 which was not a standard baseline period and actually produced anomalous results;

E.    The Bridge Rates were developed exclusively by relying on encounter data that DMS knows to be flawed;

F.    In trending the baseline data forward, Wakely utilized trend rates that were much lower than previous trend rates with no apparent justification for doing so;

G.    The Bridge Rates disregard Passport's actual claims experience, which has been consistently reported to DMS in accordance with the parties' Contract;

H.    The Bridge Rates disregard known increases in pharmacy costs Passport is required to incur but that are beyond Passport's control;

I.    The Bridge Rates disregard the particular health needs of Passport's members;

J.    The Bridge Rates were developed and implemented without transparency or adequate response to contractor input;

K.    The Bridge Rates appear to cross-subsidize between regions, disproportionately benefiting MCOs with significant membership in Region B while disproportionately harming Passport, with its predominant market share in Region A;

L.    DMS's reduction of the risk adjustment causes disproportionate harm to Passport, whose members have higher overall risk factors, and detrimentally encourages cherry-picking of the healthier members (a/k/a selection bias) by other MCOs;

M.    Extension of the Bridge Rates into calendar year 2019 was done without further analysis or adjustments, but solely out of administrative convenience;

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000027 of 000045

27

19-CI-00160    02/15/2019    Amy Feldman, Franklin Circuit Clerk    NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

N.    The Bridge Rates do not reimburse Passport for expensive third-party agreements which Passport must keep in place to support the ever-changing implementation date for Kentucky HEALTH.  For example, Passport has had to maintain a contractual relationship with Care Enroll, an Indiana-based premium billing partner that Passport cannot afford to terminate but is costing Passport at least $270,000 per month as long as Kentucky HEALTH's implementation is postponed; and

O.    Retroactive application of the Bridge Rates, which were unknown to Passport at the time it contracted to provide MCO services, followed by a massive recoupment to help pay for rate increases elsewhere, is unprecedented.

88.    On information and belief, CHFS's behavior in establishing and implementing the Bridge Rates and refusal to share data used to calculate them with Passport are the result of either an improper motive to harm or eliminate Passport; a motive to assist one or more of Passport's competitors in expansion of market share at the expense of Passport; or gross and deliberate indifference to the harm inflicted on Passport, its 315,000-plus members, its employees and the communities it serves generally.

89.    Passport has done immeasurable good work in the communities it serves for two decades.  But it appears to have been slated for immediate execution by individuals who have held their positions for less than a year. Secretary Meier was appointed to his position in May 2018.  Carol Steckel, DMS Commissioner, assumed her position in September 2018 after nearly five years of employment with WellCare in Tampa, Florida.

90.    CHFS has offered no plausible justification for the disparate and arbitrary treatment of Passport.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000028 of 000045

28

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

91. In meetings and correspondence, Passport has provided extensive information to CHFS, including analyses by two actuarial firms, to explain why the Bridge Rates are arbitrary and inadequate, but to date its efforts have yielded no meaningful reconsideration or action.

**Passport Asks The State For Relief From The Bridge Rates – To No Avail.**

92. Shortly after the Waiver Rates and Bridge Rates were shared, Passport's finance department computed that the rates would be catastrophic. Passport has sought numerous opportunities to engage with CHFS and DMS decision-makers to discuss its concerns, being rebuffed each time. Passport has offered many proposals to address the harm created by the rates. These outreach efforts started immediately after the Waiver Rates were announced in June 2018. Passport continued communicating with Wakely, DMS and CHFS in August 2018, November 2018, December 2018, January 2019, and February 2019.

93. On January 8, 2019, Passport formally notified Secretary Meier and Secretary Landrum of its dispute concerning the Bridge Rates. A copy of that appeal letter is attached as **Exhibit C**. Passport had provided a draft of its appeal letter on December 31, 2018.

94. Despite the obvious urgency, Secretary Meier and CHFS have failed even to acknowledge in writing Passport's appeal except indirectly in a letter dated January 22, 2019 from CHFS to legislative leaders (and in statements to the media). In the letter -- a copy of which was provided to Passport by a legislator and not by CHFS -- CHFS falsely asserted that Passport has not provided information to support its appeal. It has also stated this publicly on several occasions, but there are no outstanding requests to which Passport has not responded promptly.

95. Still without acknowledging Passport's appeal, on January 23, CHFS personnel notified all MCOs that the Bridge Rates being challenged by Passport had just been submitted to

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243) COM : 000029 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

CMS for certification. They had not previously been submitted to CMS for approval even though they had been made effective by DMS retroactive to July 1, 2018.

96.     On January 31, 2019, DMS announced, after working with the economists in the Office of the State Budget Director ("**OSDB**") to update the Medicaid budget projection due to significant declines in the number of Medicaid enrollees since June 2018, that the previously estimated $295 million state general fund shortfall in the Medicaid budget projected over the current biennium had been eliminated. In its press release, CHFS noted that through the last three quarters of calendar year 2018, there was a decline in overall Medicaid enrollment of 72,309. Further, the release notes that "[u]sing updated enrollment data and revenue projections, DMS and OSDB now estimate that, based upon current Medicaid enrollment levels and assuming continuing economic conditions, the enacted budget will be sufficient to cover expenses over the current biennium."

**CHFS and DMS Refuse to Budge**

97.     Passport has continued to engage DMS and CHFS through the date of filing this Complaint, making at least two proposals recently to resolve the matter. One such proposal, offered in person to Secretary Meier on February 4, 2019, called for the parties to engage an independent expert actuary to mediate their dispute. This proposal was rejected.

98.     In the parties' discussions, Commissioner Steckel advised that CHFS would entertain proposals from Passport only if they met narrow, arbitrary parameters. Notwithstanding this attitude of intractability, Passport offered proposals within those parameters. All were ultimately rejected.

99.     On February 6, representatives of Passport and its consulting actuaries met with representatives of DMS and Wakely to discuss resolving these issues. While the discussions

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000030 of 000045

30

lasted into the evening, Secretary Meier participated for only the last few minutes of the three-hour meeting.

100.    Also on February 6, the DOI issued letters to Passport notifying Passport that DOI examiners would be investigating Passport's affairs and conducting a targeted audit of Passport's financial statements.

101.    On February 11, representatives of Passport and DMS met again to discuss resolving the rate dispute, with each parties' consulting actuaries participating via conference telephone.  Secretary Meier did not attend.  At this meeting, Passport offered several proposals to resolve the dispute. These were rejected based on the assertion that the resolution would be a "change in policy" requiring Secretary Meier's approval.

102.    The specific "policy" in question is unknown, as it is not reflected in any federal or state statute or regulation, and therefore would violate KRS Chapter 13A. Thus, it could be more appropriately characterized as an undisclosed "agenda."

103.    On February 12, 2019, Passport submitted a letter to CHFS about the ongoing rate dispute, summarizing the issues identified by Passport's actuaries and, again, requesting relief. A copy of that letter is attached as **Exhibit D**.

104.    On the afternoon February 13, 2019, in response to Passport's requests and the February 12th letter, Secretary Meier, Secretary Brinkman and Commissioner Steckel phoned Passport to:  (1) advise that CHFS had no intention to provide anything more than nominal relief to Passport, if that, notwithstanding their understanding of Passport's imminent peril (stating that they did not care to "delay the inevitable"); (2) warn that rates for the second quarter of 2019 are unlikely to be better than the Bridge Rates; and (3) offer the option for that Passport withdraw its

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

31

COM : 000031 of 000045

Filed    19-CI-00160    02/15/2019    Amy Feldman, Franklin Circuit Clerk    NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

pending appeal letter by the end of the week, without explaining why that would be appropriate or necessary.

105.    Secretary Meier's warning that rates for the next rating period beginning April 1, 2019 would be similar to the Bridge Rates is inconsistent with his previous assertions that rate decisions are "data driven," as it does not yet appear new rates have been developed based on current data.

106.    On information and belief, CHFS defends its actions by alleging "deficiencies" in Passport's performance.    These references presumably are to technical administrative requirements applicable to MCO reporting.  For example, Passport was once assessed a $200,000 penalty by DMS because the recipient of a "zip" file had to click on it twice, rather than once, to open it.  These deficiencies do not affect the quality or cost-efficiency of Passport's contract performance, and do not justify or authorize CHFS in paying reduced rates under the Contract.

107.    CHFS and DMS have also alleged that Passport overpays its providers, without providing Passport with evidence to support the allegations, although Passport has requested such information from CHFS if it exists.  On information and belief, the allegation is false.  Even if CHFS and DMS could support the allegation, however, it would not be a basis to reduce Passport's rates and could be addressed through other means.

108.    Further, CHFS and DMS have in the past falsely alleged that Passport's administrative costs are high due, in part, to alleged overcompensation of its executives.  This is a red herring.  Passport has implemented a "state-of-the-art" compensation approval process designed to meet the "rebuttable presumption of reasonableness" safe harbor established by the IRS and the United States Department of the Treasury.  Passport has a conflict-free Executive Compensation Committee, the members of which work with an independent executive

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000032 of 000045

02/15/2019 05:22:07 PM
CourthouseNews-1

compensation consultant to review compensation data from similarly situated organizations and to compare, executive-by-executive, amounts paid to their functionally comparable executives at peers institutions. The Executive Compensation Committee has adopted a Charter and Compensation Philosophy which requires it to assure the reasonableness of compensation paid to Passport's executives. Passport executives are paid base salaries tied to the market median (i.e., 50th percentile) with an opportunity to receive an annual incentive bonus if they achieve performance objectives which are set in advance and which result in Passport's mission, financial and operational success. Moreover, Passport reports all compensation paid to its executives publicly through its annual tax filing. CHFS and DMS never raised these concerns until they slashed Passport's rates and they still have not raised the issue directly with Passport. Further, even if these were true deficiencies (they are not), they do not affect the quality or cost-efficiency of Passport's performance under the Contract. Finally, to Passport's knowledge, CHFS has never questioned (nor even analyzed) the compensation to the Chief Executive Officers of Humana, Wellcare, Anthem or Aetna.

109. On information and belief, CHFS may be purveying disinformation about Passport's relationship with Evolent, an experienced support services organization that works with provider-sponsored plans like Passport. Approximately 340 former Passport employees were outsourced to Evolent to create operational efficiencies and in anticipation of the development of a Medicaid Center of Excellence in Louisville. Passport's payments to Evolent, which are based on a percentage of Passport's revenues, are effectively its reimbursement to Evolent for staffing employee positions that Passport used to pay directly. This relationship – which is not at all unusual in the industry – is similar to but has advantages over Passport's original structure that was established with CHFS's blessing. Passport's cost structure and

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000033 of 000045

33

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

outsourced relationship with Evolent falls well within industry benchmarks in all of the major cost categories. Further, the relationship has allowed Passport to streamline operations, reduce administrative costs, increase membership and improve care coordination. Passport's relationship with Evolent promotes the purposes of the Medicaid program and does not help justify CHFS's actions.

110. Passport's relationship with Evolent is a strategic alliance intended to further multiple goals shared with the Bevin administration. In fact, the Cabinet for Economic Development granted Evolent $10 million in economic incentives to center its Medicaid operations in Kentucky and work with Passport to develop a Medicaid Center of Excellence. Further, Evolent, a publicly traded company, consented to be part of Passport's vision to locate its headquarters in west Louisville, to help catalyze economic growth, and promote education, employment, and safe neighborhoods in this depressed area. Evolent joining the commitment to this initiative is in perfect alignment with the administration's KentuckyHealth waiver, which has these outcomes as stated goals, and is particularly noteworthy for a publicly traded company. CHFS now turning on Passport relationship with Evolent is particularly ironic.

111. Contrary to statements by CHFS representatives to the media, the disparate treatment of Passport is not supported by "historical data." On information and belief, if such an analysis exists, it fails to adjust for specific needs of the members served by Passport or Passport's success in achieving Medicaid's goals of providing health care to members and delivering savings to the Commonwealth.

112. CHFS has yet to formally acknowledge Passport's appeal, other than to suggest that it be withdrawn.

34

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000034 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

**DMS's Commissioner – Who Has A Conflict Of Interest – Participates In The Rate-Setting Process.**

113.   In September 2018, CHFS appointed a new Commissioner of DMS, Ms. Carol Steckel. The Commissioner of DMS reports to Secretary Meier and has the direct responsibility of overseeing the Kentucky Medicaid program.

114.   Immediately prior to becoming Kentucky's Medicaid Commissioner, Ms. Steckel served for four years and nine months as a "senior executive" with WellCare, with responsibility for, among other functions, overseeing "alliance and business development activities."

115.   If Passport is unable to operate as a Kentucky Medicaid MCO, WellCare, as the largest Medicaid MCO in the Commonwealth, stands to benefit from the opportunity to enroll new members, particularly in Region 3/Region A, where WellCare currently has only a 9.7% market share.

116.   Even if WellCare does not increase its Region 3/Region A market share, as its total market share in the Commonwealth is already significantly higher elsewhere than in Region 3/Region A (35.3% overall), it benefits significantly from a rate scheme like the Bridge Rates that increased rates statewide except in Region 3/Region A.

117.   To Passport's knowledge, Ms. Steckel has made no effort to abstain from participation in setting the Bridge Rates, nor has she or CHFS sought an opinion whether her participation in such rate-setting would be consistent with Kentucky's Executive Branch Code of Ethics. Passport is not aware of any effort made to publicly address this patent conflict.

118.   Passport is aware, however, that at a Medicaid Oversight and Advisory Committee meeting, Ms. Steckel has remarked that "WellCare is a great company."

119.   If, as appears to be the case, Ms. Steckel has participated in DMS's decision to establish, implement or adhere to the Bridge Rates, she has participated in unfairly creating

35

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000035 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

potential business opportunities and increased profits for her former employer while potentially eliminating its primary competitor, Passport.

**Passport Serves Its Members Effectively And Economically.**

120.    Passport is an efficiently and economically operated health plan.  Over the past few years, the Kentucky Medicaid trends for medical expenses and capitation rates are moving in opposite directions.  Since July 2010, Passport's total rates paid for all members have been decreased by 0.86% while medical expenses have increased significantly.  The fact that Passport has been able to consistently deliver the care expected of it demonstrates its efficiency and economy.

121.    Another compelling indicator of Passport's economy and effectiveness in serving its members is its medical loss ratio ("**MLR**").  MLR is an industry term that describes the percentage of a health plan's revenues that it uses to pay for medical goods and services as opposed to paying for the plan's administrative costs.  Because it actually measures expenditures for the health care services the health plan is paid to provide, the use of the term "medical *loss* ratio" is a misnomer.  It means money spent on actual care provided to members, the raison d'être of the Medicaid program.  In other words, if an MLR is at ninety percent (90%), that means ninety out of every one hundred dollars paid to the MCO goes directly to treat patients, and only ten percent (10%) is used to cover the plan's administrative costs, build reserves or, in the case of a for-profit MCO, pay shareholder dividends.  (As a nonprofit corporation, Passport, pays no shareholder dividends and reinvests any margin in the community.)

122.    Pursuant to 42 § CFR 438.8, MCOs like Passport are required to report their MLRs to the Commonwealth.  Federal law specifies that, in order to be actuarially sound, a

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000036 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

state's managed care rates should be calculated to "reasonably achieve a medical loss ratio standard ... of at least 85 percent for the rate year." 42 CFR § 438.4.

123.    CHFS's rules go further, as permitted. It has adopted a minimum MLR of ninety percent (90%) for Kentucky's Medicaid managed care contractors. Section 11.4 of the Contract Modification provides that, if Passport's MLR is below ninety percent (90%), it must refund a "payment adjustment" to CHFS. This provision evidences CHFS's policy decision that a ninety percent (90%) MLR is desirable because it promotes use of MCO funds for actual provision of medical care rather than overhead and profits. This policy is also consistent with federal law.

124.    CHFS's Bridge Rates are not designed to reasonably achieve a medical loss ratio of eighty-five percent (85%) or ninety-percent (90%) for the rate year in Region A.

125.    Over Passport's 20-year history, its MLR has averaged ninety percent (90%) of its revenues while its administrative costs have averaged 9.5% of its revenues. By comparison, the average for-profit MCO in Kentucky spends only 86 cents per dollar of revenue on goods and services for members (i.e., an eighty-six percent (86%) MLR), leaving 14 cents of every dollar it receives from the state for administration and profit distribution.

126.    Under the Bridge Rates, Passport's MLR has ranged from 94.4% to an astonishing 105.8% per month since the month of October 2018. In all its years of existence, no prior rate setting has pushed Passport to these impossible-to-sustain confiscatory levels.

**The Bottom Line**

127.    As a result of CHFS's actions, Passport has suffered and will continue to suffer irreparable harm.

128.    CHFS's actions reflect complete indifference to the particular health care needs of Medicaid beneficiaries in Region A and are likely to result in reduced access to needed health

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000037 of 000045

37

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

care services for them. The direct effect of CHFS's actions can be distilled into a simple mathematical equation: Without relief, the rate cut to Passport for fiscal year 2019 will total approximately $144 million. Based on Passport's historical MLR, approximately 90% in funding for direct patient care will simply vanish. Yet the savings to the state amount to only about 20% of the $144 million (the rest being subsidized by the federal government). Thus, to save approximately $30 million in a year when CHFS has reported a large Medicaid surplus, it is effectively slashing direct care to the poor of approximately $130 million. CHFS's rate scheme ignores the real and immediate impact on Medicaid beneficiaries.

**COUNT ONE**
**(Breach of Contract/KRS Chapter 45A)**

129. Passport restates and incorporates by reference Paragraphs 1 to 128 of this Complaint.

130. The Contract does not permit DMS to implement rates unilaterally or retroactively.

131. DMS has unilaterally implemented the Bridge Rates, including the retroactive recoupments of alleged "overpayments," without Passport's consent and in violation of the parties' Contract.

132. Unilateral imposition of the Bridge Rates was not necessitated by any change in law or Medicaid services.

133. DMS was without authority to implement new rates retrospectively, without approval from CMS, or without Passport's consent. The Contract requires that modifications be "mutually agreed to in writing." Changes to the rates are modifications that specifically require "written mutual consent," with exceptions that do not apply here.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000038 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

134. Further, the Master Agreement requires DMS compliance with applicable federal law. Federal law requires that retroactive rate adjustments: "…must be supported by a rationale for the adjustment and the data, assumptions and methodologies used to develop the magnitude of the adjustment must be adequately described with enough detail to allow CMS or an actuary to determine the reasonableness of the adjustment. These retroactive adjustments must be certified by an actuary in a revised rate certification and submitted as a contract amendment to be approved by CMS…." 42 C.F.R § 438.7(c)(2). To Passport's knowledge, DMS met none of these requirements.

135. In addition, KRS 45A.030(9) defines "contract modification" to mean "any written alteration in the specifications, delivery point, rate of delivery, contract period, price, quantity or other contract provisions of any existing contract, whether accomplished by unilateral action in accordance with a contract provision or by mutual action of the parties to the contract. It includes bilateral actions, such as supplemental agreements, and unilateral actions, such as change orders, administrative changes, notices of termination and notices of the exercise of a contract option."

136. All contract modifications involving state agencies are subject to the provisions of 200 KAR 5:311, which requires the Finance and Administration Cabinet, or any state agency to whom purchasing authority has been delegated, to provide for modifications by appropriate clauses in its contract.

137. Pursuant 200 KAR 5:021, Section 1, "a state agency shall follow the procurement requirements in the Finance and Administration Cabinet Manual of Policies and Procedures." According to Finance and Administrative Cabinet policy (FAP 111-11-00):

A contract modification "shall state the reason and basis for the changes."

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000039 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT 02/15/2019 05:22:07 PM CourthouseNews-1

- "Should a situation requiring a contract Modification occur, the agency shall thoroughly document the need for the Modification. This documentation shall be communicated to [Office of Procurement Services ("OPS")] to explain the rationale for the Modification and its financial impact."

- Further, during the period of the contract, any Modification shall not be permitted in any of its conditions and specifications, unless the contractor receives electronic or written approval from OPS or the agency issuing the modification.

138. CHFS's unilateral and retroactive actions in implementing the Bridge Rates and revised risk adjustment process violate the Contract; KRS Chapter 45A; 200 KAR 5:311; FAP 111-11-00, and other provisions of law.

139. Pursuant to Section 41.12 of the Contract Modification, the Secretary of CHFS has authority to issue a decision in writing concerning a dispute arising under the Contract. However, the Contract does not provide a deadline within which the Secretary must respond to Passport's notice of dispute.

140. Although CHFS has not yet acted on Passport's appeal, CHFS's conduct, and in particular Secretary Meier's suggestion that Passport should simply withdraw its appeal rather than receive an adverse decision, indicates that denial of Passport's request for relief is a foregone conclusion.

141. If and when CHFS denies Passport's appeal, KRS Chapter 45A and the Contract Modification allow an appeal to be taken to FAC, which is required to issue a decision "promptly." However, pursuant to KRS 45A.235, a contractor may be required to wait up to 120 days after filing an appeal with FAC for a decision by that body.

142. If, as expected, Passport's risk-based capital is reduced below $130 million by March, its continued existence will be in jeopardy long before FAC will have taken final action in this matter.

40

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000040 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

143. Secretary Meier's comments in the February 13 phone call to Passport concerning likely rates for the next rate period evidence CHFS's determination to continue with arbitrary, unreasonable and actuarially unsound rates into the foreseeable future regardless of the legal merits of doing so.

144. Given the inevitable consequences of CHFS's imposition of the Bridge Rates, Passport is suffering and will continue to suffer irreparable harm by waiting for Defendants to fulfill their statutory duties in connection with Passport's appeals.

145. Under these circumstances, in which CHFS's breach of contract has placed Passport at imminent risk of irreparable harm, Passport is not required to exhaust administrative remedies before seeking the aid of this Court.

146. Passport is entitled to a declaration of rights that CHFS has breached the Contract, immediate injunctive relief against CHFS's use of the Bridge Rates, and permanent injunctive relief directing CHFS to comply with the Contract when setting Passport's rates and to cease unilaterally imposing rates without satisfying all contractual and legal prerequisites.

## COUNT TWO
### (Bad Faith)

147. Passport restates and incorporates by reference Paragraphs 1 to 146 of this Complaint.

148. Every contract imposes on each party a duty of good faith and fair dealing, which embraces the mutual duty not to do anything to injure or destroy the right of the other party to receive the benefits of the agreement.

149. KRS 45A.015 declares that every contract entered pursuant to KRS Chapter 45A imposes an obligation of good faith, including honesty in fact and the observance of reasonable commercial standards of fair dealing, in performance and enforcement of the contract.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000041 of 000045

Filed 19-CI-00160 02/15/2019 Amy Feldman, Franklin Circuit Clerk

Filed 02/15/2019 05:22:07 PM CourthouseNews-1

150.     Through its actions described above, CHFS has not acted in good faith and has violated the Contract and KRS 45A.015.

151.     Worse, CHFS has exacerbated Passport's damages with its perfidious behavior since June 2018, which has hampered Passport's ability to act to mitigate its damages and contributed to Passport's significant loss of market value.

152.     As a result of CHFS's actions, Passport has suffered and will continue to suffer irreparable injury and is entitled to relief.

## COUNT THREE
### (Violation of Section 2 of the Kentucky Constitution)

153.     Passport restates and incorporates by reference Paragraphs 1 to 152 of this Complaint.

154.     Section 2 of the Kentucky Constitution bars the Commonwealth from acting in an arbitrary or capricious manner.

155.     CHFS's conduct in setting Bridge Rates that are unreasonable, confiscatory, and actuarially unsound; in demonstrating, at best, utter indifference to the viability of Passport and its ability to perform the Contract is arbitrary and capricious and in violation of §2 of the Constitution.

156.     By imposing Bridge Rates that (a) are not actuarially sound; (b) were imposed retroactively; (c) were not approved by CMS, nor even submitted to CMS until six and one-half months after the effective date; and (d) CHFS knows will have catastrophic consequences for Passport and Region A, CHFS has violated other requirements of law.

157.     CHFS's arbitrary actions are forcing Passport to incur severe losses and expend its reserves in order to fulfill its contractual obligations to CHFS and to its members.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000042 of 000045

Filed        19-CI-00160        02/15/2019        Amy Feldman, Franklin Circuit Clerk

02/15/2019 05:22:07 PM
CourthouseNews-1

158.    CHFS has effectively confiscated the property of Passport and otherwise denied it due process in violation of §2 of the Kentucky Constitution. Under these circumstances, in which CHFS's violation of Passport's constitutional rights has placed Passport at imminent risk of irreparable harm, Passport is not required to exhaust administrative remedies before seeking the aid of this Court.

**WHEREFORE**, Passport respectfully requests as follows:

A.      That the Court declare that CHFS has violated the parties' Contract and other provisions of law by imposing the injurious, arbitrary and actuarially unsound Bridge Rates;

B.      That the Court exercise its equitable powers to order the following temporary relief: (i) prospective payment to Passport of the SFY 2018 Rates pending exhaustion of Passport's appeal of the Bridge Rates; and (ii) reconciliation of payments retroactive to July 1, 2018 based on the SFY 2018 Rates, including but not limited to refunding the moneys recouped as alleged "overpayments" by CHFS;

C.      That the Court enjoin, temporarily and permanently, CHFS's use of the Bridge Rates or any set of rates in violation of the Contract and the law; and

D.      That the Court enter judgment awarding Passport all further legal, equitable and other relief to which it may appear to be entitled.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000043 of 000045

Filed          19-CI-00160     02/15/2019          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

## VERIFICATION

I, Mark B. Carter, Chief Executive Officer of University Health Care, Inc. d/b/a Passport Health Plan, hereby verify under penalty for perjury that the factual allegations set forth herein are true and correct to the best of my knowledge, information and belief this 14th day of February, 2019.

_____
Mark B. Carter
Chief Executive Officer, University Health Care,
Inc. d/b/a Passport Health Plan

COMMONWEALTH OF KENTUCKY          )
                                  :
COUNTY OF JEFFERSON               )

Subscribed and sworn to before me by Mark B. Carter this 14th day of February, 2019.

My commission expires: _May 8, 2020_____.

_____
Notary Public

Respectfully submitted,

_____
Byron E. Leet
Stephen R. Price, Sr.
John W. Woodard, Jr.
WYATT, TARRANT & COMBS LLP
500 West Jefferson Street
Suite 2800
Louisville, Kentucky 40202
(502) 589.5235
*Counsel for Plaintiff, University Health
Care, Inc. d/b/a Passport Health Plan*

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000044 of 000045

NOT ORIGINAL DOCUMENT
02/15/2019 05:22:07 PM
CourthouseNews-1

## NOTICE OF TRANSMISSION OF COURTESY COPIES

Courtesy copies of this Complaint were transmitted to the following via electronic mail on February _15_ , 2019

Johann Herklotz, General Counsel
Cabinet for Health and Family Services
johann.kerklotz@ky.gov

John Lewis, General Counsel
Finance and Administration Cabinet
finance.cabinet@ky.gov

Andrew Beshear, Attorney General
Office of the Attorney General
attorneygeneral@ag.ky.gov

61804581.7