# Exhibit 28



**DICKINSON WRIGHT** PLLC

300 WEST VINE STREET, SUITE 1700
LEXINGTON, KY 40507-1621
TELEPHONE: 859-899-8700
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

ANDREW L. SPARKS
ASparks@dickinsonwright.com
859-899-8734

December 11, 2019

**VIA HAND DELIVERY**

Ms. Holly McCoy-Johnson, Secretary
Commonwealth of Kentucky
Finance and Administration Cabinet
New Capitol Annex
702 Capitol Ave., Rm. 383
Frankfort, KY 40601

Re:    University Health Care, Inc., d/b/a Passport Health Plan's Protest of MCO Contract Awards Under RFP Number 758 1900000093

Dear Secretary McCoy-Johnson:

This firm represents University Health Care, Inc., d/b/a Passport Health Plan ("Passport"). Pursuant to KRS 45A.285(2), this letter constitutes Passport's protest of the Finance and Administration Cabinet's (the "Cabinet's") award of contracts on November 27, 2019, in response to Request for Proposals # 758 1900000093 (the "RFP").[1] Passport disputes, among other deficiencies, errors that resulted in the award of contracts to Aetna Better Health of Kentucky ("Aetna"), Humana Health Plan, Inc., ("Humana"), Molina Healthcare of Kentucky ("Molina"), United Healthcare Plan of Kentucky ("United"), and WellCare Health Insurance of Kentucky ("WellCare"), and not to Passport. The grounds for Passport's protest are set forth below. Passport notes that it may gain knowledge giving rise to additional, or more specific, grounds for protest. Passport delivered an Open Records Request ("ORR") to the relevant agencies of the Commonwealth on December 2, 2019. The Commonwealth has provided only the bare minimum of records sought in the ORR even though the statutory time for doing so has passed. Passport reserves the right to supplement this protest as additional facts become known in accordance with Kentucky law.

---

[1] Passport is protesting the award of both the Medicaid Managed Care contract and the Kentucky SKY contract award pursuant to the specified RFP.

December 11, 2019
Page 2

## EXECUTIVE SUMMARY

Passport – a 20-plus-year veteran of the Kentucky's Medicaid Program – has been shut out of a managed care contract under the recent RFP award, thus (1) threatening the stability of Kentucky's safety net for hundreds of thousands of the Commonwealth's most vulnerable; (2) exposing the Cabinet for Health and Family Services ("CHFS"), and the Department for Medicaid Services ("DMS") to unstable and challenging implementations with new-to-Kentucky Medicaid managed care organizations ("MCOs"); (3) unnecessarily creating administrative, operational, and clinical obstacles for the provision of care under the Program; and (4) eliminating the only local, home-grown Medicaid health plan in the Commonwealth. These Bevin-Cabinet contract awards were biased – a clear demonstration of Governor Bevin's disdain for Passport – and not reflective of the expertise, experience, and long-standing, deeply-rooted commitment Passport has built, nurtured, and maintained for Kentucky over the past two decades.

Passport has been singled out as a particular target of Governor Bevin's ire. For more than a year, the Bevin administration's discriminatory rate increases, revision of the Medicaid Regions, derisive remarks, and unprovoked attacks[2] have harmed Passport's reputation and its bottom line. Just days before leaving office, Bevin's Cabinet found a further opportunity to deal a final blow against Passport in particular, and the Jefferson County region more generally:  denying Passport a managed care contract with the Commonwealth to continue administering its Medicaid Program, thus stripping Commonwealth and, directly Jefferson County Medicaid members of a local, stable, experienced incumbent MCO.

The Bevin Cabinet arrived at this RFP decision not through careful consideration of the competing proposals, but through a disregard of statutory and regulatory requirements of Kentucky law.  This protest will show that the Cabinet:

- demonstrated bias against Passport improperly tainting the process; this bias is shown through the administration arbitrarily revising the Medicaid regions (in a manner proven disadvantageous to Passport), imposing reduced reimbursement rates targeted at Region A, where Passport has nearly two-thirds of all Medicaid members, decreasing Passport's reimbursement rates while simultaneously raising rates in the rest of the Commonwealth, and regularly making its dislike of Passport well known in public statements to the media;

- failed to follow the law in its handling of the RFP, by failing to hold oral presentations, and by failing to disclose the basis of scoring for 77% of the points available for the total

---

[2] Governor Bevin continued his attacks on Passport even after his constituents voted him out of office.  Only a week ago, Bevin gave a radio interview to WDRB News wherein he again derided Passports perceived "leadership problems" and stated that "Passport just didn't meet the qualifications" of the RFP. (*See* Uncovered by WDRB News, http://uncoveredbywdrb.libsyn.com/bonus-pod-kentucky-gov-matt-bevin-explains-his-defeat, posted Dec. 4, 2019).

December 11, 2019
Page 3

DICKINSON WRIGHT PLLC

technical evaluation in the RFP, and by neglecting to permit the Government Contract Oversight Committee to review the contracts before they were executed;

- failed to follow the terms of its own RFP by failing to disclose page limits (which show only on the scoring sheets) and in changing the timing of award;

- sought to bind the Commonwealth to Governor Bevin's vision of Medicaid through the RFP process and the execution of contracts for a period of five years, including limiting foster care children to one MCO option, after Governor Beshear won the election and publicly stated that the Medicaid waiver would be rescinded.

For these reasons, the Cabinet's decision is not only unwise, but arbitrary and contrary to law – including the Kentucky Model Procurement Code ("KMPC") and the Constitution of the Commonwealth of Kentucky. Not only were the Cabinet's actions irrational and in violation of the KMPC, they were also prejudicial to Passport. But for the improper scoring, and the arbitrary and capricious disregard of the RFP's requirements and of the KMPC, Passport would have likely secured a contract with the Cabinet to continue providing the same high-quality care to low-income Kentuckians that it has for more than twenty years.

Upon receipt of this protest, the Secretary "shall not proceed further with the solicitation or award involved[.]" KRS 45A. 290. Accordingly, Passport respectfully requests that, consistent with Kentucky law, the Cabinet stay further implementation of the Medicaid Managed Care and Kentucky SKY award announced on November 27, 2019. The Cabinet, under the direction of Governor Beshear, should then consider whether to begin the competitive negotiation process anew, or to issue supplemental RFPs consistent with Kentucky law and the Beshear administration's Medicaid policy goals. If necessary, the existing contracts may be extended to avoid any interruption of care.

Passport has standing to protest the Cabinet's award as an aggrieved bidder under KRS 45A.285(2). Passport's protest is also timely, having been delivered to the Secretary within two weeks of the award announcement. *Id.*; 200 KAR 5:380; *see also* RFP at Sec. 10.8 ("Any actual or prospective offeror or contractor who is aggrieved in connection with . . . selection for award of a contract may file a protest . . . within two (2) calendar weeks after such aggrieved person knows or should have known of the facts giving rise thereto"). However, because Passport has submitted an ORR to the Cabinet that may reveal new grounds for protest, including further arbitrary and capricious deficiencies in the Cabinet's decision, Passport reserves the right to supplement this protest with any new or more specific grounds for relief that could not reasonably have been known prior to the receipt of the records requested. KRS 45A.285(2); 200 KAR 5:380.

December 11, 2019
Page 4

## INTRODUCTION

### I.    BACKGROUND

Medicaid is a cooperative federal-state scheme that aims to provide medical assistance to certain vulnerable populations. *See* 42 U.S.C. § 1396-1. The Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human Services (HHS), has primary responsibility for overseeing the Medicaid Program. To receive federal funding, states must submit their "plans for medical assistance" for CMS' approval. *Id.*

The Medicaid Act sets out minimum standards to which all state Medicaid plans must generally conform. 42 U.S.C. § 1396a. However, the Act also allows states to deviate from some of these requirements pursuant to a waiver from the Secretary of HHS. 42 U.S.C. § 1315. Section 1115 of the Social Security Act, accordingly, permits the Secretary to approve "experimental, pilot, or demonstration project[s]" in state plans that would otherwise fall outside the Medicaid Act's parameters. *Id.* States that take advantage of these Section 1115 waivers can develop flexible solutions and test new approaches to tackle their unique Medicaid needs – which is how the Passport plan came to be.

Passport was formed at the invitation of the Commonwealth of Kentucky in 1997 as part of a demonstration project to control historically high Medicaid costs in the Louisville Region (formerly called Region 3), by the University of Louisville Medical School Practice Association, University of Louisville Medical Center, Jewish Heritage Fund for Excellence (formerly Jewish Hospital HealthCare Services), Norton Healthcare Inc., and the Louisville/Jefferson County Primary Care Association. Passport, a nonprofit MCO, was tasked with overseeing the health care of Medicaid beneficiaries as a collaboration between the Commonwealth and healthcare providers to align and arrange for services under the Medicaid Program. Previous efforts to provide Medicaid managed care services in Region 3, the Commonwealth's largest Medicaid population, had been unsuccessful.

Since 1997, Passport has ensured access to quality health care for hundreds of thousands of low-income Kentuckians, improving patient care while offering value to Kentucky taxpayers.[3] Passport currently manages healthcare for more than 300,000 Kentucky residents, most of whom reside in the Louisville area. Unlike most bidders, it is Kentucky-born and Kentucky-based. In recognition of Passport's contribution to its members and the community, the Commonwealth has consistently awarded Passport contracts to manage its Medicaid Program since Passport's inception.

---

[3] See U of L Magazine, "Passport to Good Health," Summer 2006 issue, available at https://louisville.edu/ur/ucomm/mags/summer2006/passport.html, attached as Attachment 1.

December 11, 2019
Page 5

Passport's organizational model was designed to keep earnings, jobs and expertise in Kentucky, to support making long-term investments in preventative services, to invest Medicaid dollars in the local healthcare delivery system and to provide better service to Medicaid beneficiaries. Unlike some other MCOs, Passport has no history of managing cash flow by denying claim payments,[4] but focuses on getting members the care they need, on quality of care and on member satisfaction. It has been one of the highest performing and most innovative MCOs in Kentucky.

As of July 2019, Kentucky had approximately 1.25 million Medicaid beneficiaries. Passport serves more than 206,000 beneficiaries in the sixteen counties constituting Region 3. That is approximately 66% of the total number of Medicaid beneficiaries residing in the region and approximately 16.5% of the total number of Medicaid beneficiaries statewide. Most of Passport's members in Region 3 are located in Jefferson County, which includes Louisville, Kentucky's largest city. As of July 31, 2019, Passport had 130,523 members in Jefferson County. Of those, a little less than half – 62,620 – were under the age of 18.

Passport differs from its competitor MCOs in that the organization itself is provider founded and sponsored, with a long history of drawing from the community for expertise and governance. Passport's sole mission is to improve the health and quality of life of the Medicaid beneficiaries it serves. In 2018, Passport's community engagement team provided Kentucky Medicaid-specific information through 1,722 one-on-one meetings with assisters, advocates, providers and their staff, business, and pharmacies, with 119 formal presentations and 231 trainings to staff.

Passport has built strong relationships with beneficiaries, healthcare providers and necessary social service agencies. Its network of participating providers is robust; Passport currently has contracts with 85% of the health care providers in Region 3 that participate in Kentucky's Medicaid Program and with 62% of the health care providers state-wide that participate in Kentucky's Medicaid Program. In Region 3 alone, Passport's network includes 22

---

[4] *See, e.g., Appalachian Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.,* 714 F.3d 424 (6th Cir. 2013); *Community United Methodist Hospital, Inc. v. WellCare Health Insurance Company of Kentucky,* No. 16-CI-1536 (Jeff. Cir. Ct. 2016); *Community United Methodist Hospital, Inc. v. Coventry Health & Life Ins. Co.,* No. 16-CI-1535 (Jeff. Cir. Ct. 2016); *Casey County Hospital, Inc. v. Coventry Health & Life Ins. Co.,* No. 16-CI-1542 (Jeff. Cir. Ct. 2016); *Wayne County Hospital, Inc. v. WellCare Health Insurance Company of Kentucky,* No. 16-CI-1550 (Jeff. Cir. Ct. 2016); *Jane Todd Crawford Memorial Hospital, Inc. v. Coventry Health and Life Ins. Co.,* No. 16-CI-001544 (Jeff. Cir. Ct. 2016); *Jane Todd Crawford Memorial Hospital, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.,* No. 16-CI-001545 (Jeff. Cir. Ct. 2016); *Wayne County Hospital, Inc. v. Coventry Health & Life Ins. Co.,* No. 16-CI-1550 (Jeff. Cir. Ct. 2016); *Marcum & Wallace Memorial Hospital, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.,* No. 16-CI-001583 (Jeff. Cir. Ct. 2016); *Mercy Health Partners -Lourdes, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.,* Case No. 16-CI-001584 (Jeff. Cir. Ct. 2016); *Trigg County Hospital, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.,* Case No. 16-CI-001547 (Jeff. Cir. Ct. 2016); and *Cumberland County Hospital Association, Inc. v. WellCare Health Insurance Company of Kentucky, Inc.,* Case No. 16-CI- 001546 (Jeff. Cir. Ct. 2016).

December 11, 2019
Page 6

hospitals, as well as approximately 3,000 primary care providers and 12,100 specialists. As with private insurance, a strong network is an important factor in Medicaid beneficiaries' choice of plans, and directly affects a plan's ability to meet its members' health needs. An extensive network of contracted providers means members have more ready access to medical care.

Passport has been recognized repeatedly as one of the top Medicaid managed care organizations in the country. It is accredited by the National Committee for Quality Assurance ("NCQA") which evaluates the quality and efficiency of health insurance plans. NCQA has ranked Passport first in Kentucky and in the top 25 nationally for many years, and has consistently ranked Passport higher than any other Medicaid MCO in the south or central United States. For example, when NCQA partnered with U.S. News and World Report in 2014 on a national survey rating the top Medicaid programs in the country, Passport ranked #19 on the magazine's list of Medicaid health insurance plans in the United States.[5]  Similarly, when CMS announced the extension of Passport's federal waiver in October 2005, then CMS administrator Scott McClellan said Passport is "among the highest performing Medicaid managed-care demonstrations in the country."[6]

Passport has long been regarded by CHFS as the gold standard for a well-operated MCO. As one example of this, in September 2017, CHFS selected Passport as the model Kentucky MCO for an on-site tour by a CMS Readiness Team, for which Passport received accolades.

Passport has also been repeatedly recognized for its leadership in health care and community advocacy. For example, in 2017 alone, Passport's Refugee Care Coordination Program was named the runner-up for Spalding University's Spirit of Social Work Agency award; its CEO was presented with the Bingham Greenebaum Doll Leadership in Healthcare Award at the MediStar Awards (recognizing "a progressive and entrepreneurial individual who is not afraid to take risks and whose job performance is considered exemplary by providers, patients and peers"); and the Better Business Bureau recognized Passport for 10 years of A+ service. Additionally, over the last 15 years, Passport has received numerous awards for excellence in health care communications, demonstrating its commitment to educating its members and promoting positive health outcomes.

Passport's members – who are consistently loyal to Passport – agree. Until January 2013, Passport was the only MCO serving Region 3  with a 100% market share. When the state opened the region to other MCOs in the fall of 2012, it took 75% of Passport's members and assigned them to other MCOs. Despite healthy competition and vigorous marketing by the other MCOs, when given the opportunity, Medicaid beneficiaries switched back to Passport in droves, such that Passport now has a 66% market share in that region. Member satisfaction alone demonstrates

---

[5] *See* September 25, 2014 Press Release, available at: http://passporthealthplan.com/wp-content/uploads/2014/11/09-25-ncqa-ranking.pdf, attached as Attachment 2.

[6] *See* U of L Magazine, "Passport to Good Health," n.3.

December 11, 2019
Page 7

DICKINSON WRIGHT PLLC

Passport's success in arranging for the medical care of Medicaid beneficiaries. This is just one of the many reasons why the Cabinet's contract award makes no sense and is fraught with bias against Passport.

Passport's grass-roots efforts to move the needle on population health include programs to overcome barriers that inhibit members' access to services. Passport has succeeded in achieving an unusually high level of member "engagement," which means it is effective in getting members to seek out and receive needed health care services. In this regard, Passport is unique among the Kentucky MCOs in that it consistently invests in the long-term health and well-being of its membership. Passport has done this not only in furtherance of its charitable mission and strong sense of responsibility to the community, but also because a healthier membership base will lead to significant savings to Medicaid in the long run.

Throughout its existence, Passport has generated substantial cost savings for the Commonwealth of Kentucky. For example, a May 2012 study prepared by Washington, D.C.-based Special Needs Consulting Services estimated that Passport had saved Kentucky's Medicaid Program approximately $180 million over the previous two calendar years, and found that Passport's administrative costs are well below industry norms.

More to the point, Passport achieved this success despite serving a population of Members with additional and unique medical needs. Socioeconomic differences and other factors make it more expensive to treat the Medicaid population in the Louisville region compared to other areas of the state. According to the "2016 Annual Administrative Claims Data Report - Inpatient Hospitalizations," which was prepared by CHFS's Office of Health Data and Analytics, the average charge for inpatient hospital discharges in the seven-county area surrounding Louisville was markedly higher than the average charge for inpatient hospital discharges throughout the Commonwealth as a whole ($47,956.82 to $38,048.33, respectively).

Region 3 also has a higher percentage of racial minorities than the rest of the Commonwealth. According to the most current US Census data, African-Americans make up more than 22% of the Jefferson County population. A significant number of Passport's members reside in West Louisville, which is a majority African-American community. The West End of Louisville has historically experienced disproportionate socioeconomic challenges such as poverty, redlining, crime, unemployment, lack of access to care and food insecurity. These adverse "social determinants of health" compounded by other multiple risk factors, result in higher instances of asthma, obesity, diabetes, certain cancers, addiction, sexually transmitted diseases, premature birthrates and low birthweights, and poorer health overall. It follows, and has been proven statistically, that providing health care to this population is costlier than providing care in other areas.[7]

---

[7] In fact, an entire arm of CMS, the Office of Minority Health, is devoted to assisting local and federal partners in eliminating health disparities while improving the health of minority populations, including racial and ethnic

December 11, 2019
Page 8

DICKINSON WRIGHT PLLC

Passport's benefit to the region is not just felt by Members. The MCO is supported by a staff of more than 600 (most of whom are in Louisville) and is building a new West Louisville headquarters which is also intended to serve as a community health and well-being campus. The proposed Passport headquarters in West Louisville is more than bricks and mortar – it is symbolic of Passport's long-term commitment to delivering quality care to the underserved communities in Region 3. This is why, in developing its West Louisville headquarters, Passport held numerous community meetings and partnered with the YMCA and other nonprofit and social service organizations to place crucial resources directly in the area of most need. This was a strategic decision to increase direct contact with its residents, regardless of whether they are members; to improve the community's access to care; and to positively impact those adverse social determinants of health that cost lives, impede employment and contribute to the cycle of hopelessness that has long burdened Louisville's West End. Ultimately, the move will improve health outcomes and save the Commonwealth untold health care costs.

Disregarding Passport's commitment to the state and the West Louisville Community – not to mention the actual merits of Passport's proposal as compared to those of the other bidders – the Bevin administration has put all of the foregoing at risk by denying Passport a Medicaid managed care contract, all but ensuring the end of its existence. So when Governor Bevin only days ago claimed Passport "just didn't meet the qualifications" to be an MCO under the RFP, one has to wonder what record or facts he consulted.[8] As noted herein, few plans in the country can boast a record of accomplishments like Passport.

## II.  THE CABINET'S CONTRACT AWARD IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW

The award of a negotiated procurement is a discretionary act by the agency. *Lab. Corp. of Am. Holdings v. Rudolph*, 184 S.W.3d 68, 75 (Ky. Ct. App. 2005). However, there are limits to agency discretion. An agency's RFP award will be rejected where it is arbitrary and capricious or contrary to the law, including where the award is made in violation of the KMPC or Section 2 of the Kentucky Constitution. *Com. v. Yamaha Motor Mfg. Corp.*, 237 S.W.3d 203, 206 (Ky. 2007).

KMPC standards exist for a reason. "Specifically, with the enactment of the KMPC, the General Assembly elevated the standard of conduct for the Commonwealth's procuring entities, *inter alia*, 'to provide safeguards for the maintenance of a procurement system of quality and integrity,' and 'to insure fair and equitable treatment of all persons who deal with the procurement system.'" *Id.* at 205 (citation and footnotes omitted). Further, legal requirements are evaluated on

---

minorities. It offers a variety of research, data sets and statistics to increase awareness of systemic health disparities. (*See* https://www.cms.gov/About-CMS/Agency-Information/OMH/research-and-data/index, attached as Attachment 3).

[8] *See* Uncovered by WDRB News, n. 2.

December 11, 2019
Page 9

DICKINSON WRIGHT PLLC

a "contrary to law" basis – i.e., whether the award decision meets legal requirements both in law, and regulation. "This includes challenge on grounds that statutory procedures were disregarded for reasons of political patronage." *Pendleton Bros. Vending v. Com. Fin. & Admin. Cabinet*, 758 S.W.2d 24, 25 (Ky. 1988).

Although the Cabinet's decision enjoys a "a presumption of correctness" KRS 45A.280, "a 'presumption of correctness' is only presumptive and not conclusive." *Id.* at 30. Here, Passport has rebutted that presumption.

The Cabinet's award decision is contrary to the terms of the RFP, in violation of the KMPC, and impermissibly corrupted by the outgoing administration's bias. Passport has, moreover, suffered prejudice as a result of these errors. But for the Cabinet's failure to invite the required oral presentations *standing alone*, there is a reasonable likelihood that Passport would have been awarded a contract.

Accordingly, the Secretary must sustain Passport's protest, direct the Cabinet to rescind the contracts awarded and remand the matter to the Beshear administration Cabinet to determine whether: (1) to cancel the existing RFP and issue a new one; or (2) amend the contracts based on its own review of the proposals submitted under the RFP.

## ANALYSIS

## I.  THE AWARD DECISION HAS BEEN INCURABLY TAINTED BY THE BEVIN ADMINISTRATION'S BIAS AGAINST PASSPORT

It is clear that the RFP decision should be vacated given the certain and repeated attacks that the Bevin administration has leveled against Passport the past several years. Starting in November of 2017, the administration arbitrarily revised the Medicaid regions for rate setting, which would prove disadvantageous to Passport. The administration then unilaterally, and without contractual or statutory authority, retroactively slashed Passport's rates. The administration continued its campaign against Passport through the last year, repeatedly making public disparaging comments about Passport. Even with his departure from office quickly approaching, Bevin has continued this month with public comments defending his tenure and more specifically, the exclusion of Passport from the RFP award. There can be little doubt that this is a concerted and orchestrated campaign to drive Passport out of business, as yet another manifestation of the Governor's larger battle against Jefferson County.

Central to Kentucky's competitive negotiation process is the mandate that bidding parties, "must be treated equally." *See Matter of: Arthur Young & Company*, 85-1 CPD ¶ 598 (Comp. Gen. 1985) (stating that "[i]t is a fundamental principle of federal procurement that offerors must be treated equally and provided with a common basis for the preparation of their proposals"). To

December 11, 2019
Page 10

DICKINSON WRIGHT PLLC

ensure that bidding parties are treated equally such that bias or a conflict of interest will not taint the RFP process, the KMPC instructs that the underlying policies and purposes of the code "shall be," among other things:

> (d) To provide for **increased public confidence in the procedures** followed in public procurement;
>
> (e) To insure the **fair and equitable treatment of all persons** who deal with the procurement system of the Commonwealth;
>
> (f) To provide increased economy in state procurement activities by **fostering effective competition**; and
>
> (g) To provide **safeguards** for the maintenance of a procurement system of **quality and integrity**.[9]

Federal procurement standards governing state Medicaid agencies also prohibit both real and apparent conflicts of interest in the procurement process.[10] It follows, therefore, that decision maker bias is grounds for vacating or withdrawing contracts or RFPs.[11] Put differently, an impartial decision maker is critical in ensuring that a bidding party has been afforded due process of law.[12]

Because Passport was required to defend itself and the very members that the Kentucky Medicaid Program seeks to protect against the Cabinet's abrupt and arbitrary rate cuts earlier this year (while simultaneously increasing the rates of other MCOs), there is no question that the Cabinet was biased and could not provide Passport with a fair and impartial review throughout the RFP process. There also have been continued tensions between Governor Bevin and Passport as explained throughout this protest. The Cabinet's denial of Passport's RFP response is an act of

---

[9] KRS § 45A.010(d) - (g) (emphasis added); *see also RAM Eng'g & Const., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 586 (Ky. 2003).

[10] 42 C.F.R. § 75.327 (prohibiting an employee, officer, or agent from participating in the selection, award, or administration of a contract supported by a Federal award if he or she has a "real or apparent conflict of interest."); *see also Medco Behavioral Care Corp. of Iowa v. State, Dep't of Human Servs.*, 553 N.W.2d 556, 558, 566 (Iowa 1996) (holding that an original successful bidder should be disqualified from the procurement process because an organizational conflict of interest existed and analyzing that the appearance of impropriety is a sufficient basis on which to disqualify a bidder from the procurement process under the federal acquisition regulation (FAR) if the appearance of impropriety is based on facts and not mere innuendo).

[11] *See e.g., Pendleton Bros. Vending v. Com. Of Ky. Finance and Admin. Cabinet*, 758 S.W.2d 24 (Ky. 1988) (holding that unsuccessful bidder alleging that the bid process was not "free of political pressure and outside influence" could challenge the state's contract award even without allegations of specific acts of fraud, collusion, or dishonesty).

[12] *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).

December 11, 2019
Page 11

lingering animosity which calls into question the entire bidding process since it lacked an impartial review of all bidders, namely Passport.

Indeed, the Supreme Court has condemned state agencies for bias where a party appearing before the agency would not have a "fair and impartial" opportunity to be heard, as "the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators." *Gibson*, 411 U.S. at 579. In *Gibson*, the Alabama Optometric Association initiated proceedings against seeking to enjoin "optometrists in the State who were employed by business corporations such as Lee Optical," from practice, alleging that Alabama law prohibited optometrists from being employees of corporations. *Id.* While the lawsuit was pending the optometry board scheduled license revocations hearings against several optometrists employed by Lee Optical. The accused optometrists "sought an injunction against the scheduled hearings on the grounds that the statutory scheme regulating the practice of optometry in Alabama was unconstitutional" because "the Board was biased and could not provide the plaintiffs with a fair and impartial hearing in conformity with due process of law." *Id.* The district court concluded that success in the Board's efforts would possibly redound to the personal benefit of members of the Board because the Alabama Board of Optometry "was composed solely of optometrists in private practice for their own account." The district court held, therefore, that "the Board was constitutionally disqualified from hearing the charges filed against the appellees." *Id.* The Supreme Court upheld this determination and found a violation of due process because the agency had a personal interest in the outcome of the proceedings, and the tribunal was therefore acting as an "adjudicator" in a trial-like proceeding. *Id.*

Given the challenging political climate and friction between the parties, Governor Bevin's Cabinet was not a neutral evaluator of Passport's RFP as required by the KMPC; rather, the Cabinet acted as an adjudicator against Passport in order to advance the Governor's political aspirations and further penalize the organization for the rate cut dispute earlier this year, an illegal practice not supported in law. *See Gibson*, 411 U.S. at 579.

*Gibson* is not the only limitation on impermissible bias in procurement. Bias may also arise from a conflict of interest on the part of one or more evaluators. However, state and federal safeguards are intended to protect Passport against that risk.

KRS 45A.340(2) prohibits Commonwealth employees who "may be in any manner interested, either directly or indirectly, in his own name or in the name of any . . . corporation in any contract for the performance of any work" on which he "may be called upon to act or vote." Nor may an employee "knowingly receive or agree to receive, directly or indirectly, compensation for any services rendered or to be rendered, either by himself or another, in any cause, proceeding, application, or other matter which is before said agency or before the department of state government in which said agency functions." *Id.* at (6). These protections are expressly incorporated into the Cabinet's solicitation. *See* RFP at Sec. 40.27.

December 11, 2019
Page 12

KRS 45A.340 mirrors the federal regulations which also govern procurement standards in the managed care setting. *See* 45 C.F.R. §75.326 ("subrecipients of a state" receiving federal funds, also referred to as a "non-federal entity," must comply with §75.327 to §75.335). In some respects, the federal protections go even further than the Commonwealth does. For example, "[n]o employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a Federal award if he or she has a ***real or apparent conflict of interest***." 45 C.F.R. § 75.327(c)(1) (emphasis added). "Such ***a conflict of interest would arise when*** the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or ***is about to employ any of the parties indicated herein***, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract." *Id.* (emphasis added).

This regulation is aimed at organizational conflicts of interest. "*Organizational conflict of interest* means that because of other activities or relationships with other persons, a person is unable or potentially unable to render objective assistance or advice to the government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." *See Medco Behavioral Care Corp.*, 553 N.W.2d at 564 (citation omitted) (applying federal acquisition regulations in adjudicating a protest to the award of a state contract to provide managed mental health care under Iowa's Medicaid Program). Such conflicts may require disqualification of an applicant whether they are "real *or* apparent." 45 C.F.R. § 75.327(c)(1) (emphasis added). "An organizational conflict of interest may result when factors create an *actual or potential conflict of interest on an instant contract*, or when the nature of the work on the instant contract creates an *actual or potential conflict of interest on future acquisition*." *Medco Behavioral Care Corp.*, 553 N.W.2d at 564 (citation omitted). Bidders who gain an unfair competitive advantage in the procurement process through an actual or even a potential apparent conflict of interest maybe subject to disqualification. *Medco Behavioral Care Corp.*, 553 N.W.2d at 565 (citing *Compliance Corp. v. United States*, 22 Cl. Ct. 193, 200 (1990)).

Importantly, while the conflict of interest must be based on facts, rather than suspicion, the only facts "required . . . are those which establish the existence of the organizational conflict of interest, not the specific impact of the conflict." *Id.* (citation omitted). Once the facts demonstrate that a conflict exists, the agency must take reasonable steps to neutralize it, "without further need" for facts or other evidence showing the conflict's impact on the procurement. *Id.* (citation omitted). "[H]arm from that conflict, unless it is avoided or adequately mitigated, is presumed to occur." *Id.* (citation omitted). The same goes for prejudice. "Organizational conflicts of interest call into question the integrity of the competitive procurement process, and, as with other such circumstances, no specific prejudice need be shown to warrant corrective action." *Id.* at 565–66 (citation omitted); *see also e.g., NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376 (Fed. Cir. 1986).

Here, thanks to former Governor Bevin's Cabinet's outstanding failure to provide complete records in response to Passport's ORR, Passport is presently unaware of the full extent of the

December 11, 2019
Page 13

possible biases or conflicts of interest among the Bevin Administration employees who evaluated the bidders' proposals. *See* RFP at Sec. 10.5. Accordingly, in view of the bias already evidenced in the public record, Passport reserves the right to supplement its bias complaint on grounds of organizational or other conflicts of interest upon learning the full circumstances underlying the Cabinet's decision.

## A.        The Proposed, and Enacted, 2018 Rate Change

The Commonwealth's bias against Passport was evident as far back as May 2018, when Passport learned that DMS's actuarial firm, Wakely Consulting Group, LLC ("Wakely"), had developed a schedule of significant rate changes to be effective July 1, 2018 as part of Kentucky's proposed Section 1115 Medicaid Wavier Program known as Kentucky HEALTH. Kentucky HEALTH proposed to add "community engagement" requirements for some beneficiaries. This "community engagement program" – which two courts have since determined is illegal – mandated that beneficiaries spend at least 80 hours per month on qualifying activities (including employment, job-skills training, education, community service, and participation in drug treatment) or lose Medicaid coverage. *Stewart v. Azar* (*Stewart II*), 366 F. Supp. 3d 125, 132 (D. D.C. 2019); *see also Stewart v. Azar* (*Stewart I*), 313 F. Supp. 3d 237, 265 (D. D.C. 2018).

The Commonwealth planned to realign the state's Medicaid regions in order to calculate the new rates. As part of this realignment, the Bevin administration proposed that seven of the eight managed care regions of the Commonwealth (excluding former Region 3) be combined into a single region for rate setting purposes, known as Region B. Region 3, encompassing urban areas known for more costly care, where Passport covers approximately 65% of Medicaid members, would be re-designated as Region A. DMS and Wakely proposed to *increase rates* paid in Region B by 2.5% overall, while simultaneously *reducing* Region A's rates by 4.9% overall. This was despite Louisville's history of higher than average Medicaid costs – the very problem Passport had previously been successful in addressing.

Before these proposed rate reductions went into effect, a federal court determined the Kentucky HEALTH Program violated federal law, and enjoined the Commonwealth from implementation. *Stewart I*, 313 F. Supp. 3d at 273–74. In response, DMS directed Wakely to establish revised capitation rates. The Commonwealth maintained the realigned regions – Region A and Region B – as part of its revisions. The revised capitation rates ultimately adopted increased the rates paid in Region B by 2.2% and decreased rates paid in Passport's home, Region A, by 4.1% (the "2018 Rate Cuts"). As a result, Passport suffered a statewide reduction of 3.2% in rates overall, while all other MCOs enjoyed a rate increase.

When challenged on the rates, Secretary Adam Meier first claimed that CMS required the new regions and 2018 Rate Cuts. When CMS went on the record and stated that it had given no direction to the Commonwealth regarding the grouping of regions, the administration then claimed

December 11, 2019
Page 14

DICKINSON WRIGHT PLLC

that the grouping was necessary to develop better rates to meet CMS requirements, and continued to implement the new regions without change.

The Bevin administration sought to remake Kentucky Medicaid in a way that would reduce the number of members. When their efforts were thwarted by the court, the administration proceeded with their made up new regions for rate setting, made up the rates, and in doing so, created immense financial harm to Passport[13] and demonstrated their bias against Passport.

## B.    Administration's Public Statements Demonstrating Bias

Perhaps nowhere has Governor Bevin's bias against Passport been more prominently displayed than in his administration's drumbeat of incessant aspersions cast against the MCO. Such negative publicity and political overtones have no place in a state procurement and were no doubt damaging to Passport.[14]

- In connection with the 2018 Rate Cuts, Passport and the Cabinet entered into litigation which likely led to more bias against Passport by the administration. The 2018 Rate Cuts would prove detrimental to Passport's viability and to the livelihood of the nearly 315,000 Kentucky Medicaid beneficiaries that were entangled in the state's slash. Meanwhile, CHFS increased the rates for all other regions in the state, benefiting each of Passport's competitors and effectively singling out Passport as the only Medicaid MCO to suffer a composite rate reduction. Without success, Passport pleaded with relevant parties in order to resolve the irreparable harm it would suffer as a result of the 2018 Rate Cuts, including the real risk of potential insolvency.

- In response to the litigation, Adam Meier, secretary of the CHFS responded with various false premises and speculative criticisms, which he then immediately acknowledged as "irrelevant." He further cast random and speculative aspersions about "several business decisions that may be contributing" to Passport's financial distress, including its payments to "some of its network hospitals" and its relationship with Evolent. Notably, he offered no factual analysis, no comparison to other MCOs and no reason to suggest that any of the speculation, even if true, would warrant paying Passport unsound rates. The response was full of mudslinging rhetoric without supporting facts and without meaningful review of Passport's complaint regarding the

---

[13] Fortunately, Passport has made great strides financial in the last six months with a 14 point turnaround in operating margin and a positive 1.3% margin in the third quarter. See Evolent Health Inc. Q3 2019 Earnings Call Transcript from November 5, 2019 call at: https://www.fool.com/earnings/call-transcripts/2019/11/06/evolent-health-inc-evh-q3-2019-earnings-call-trans.aspx, attached as Attachment 4.

[14] See Forest City Land Grp. v. Ohio Dep't of Mental Health, No. 19709, 1999 WL 194515, at *3 (Ohio Ct. App. Mar. 31, 1999), noting where "alleged political overtones and an unannounced policy of favoring resident bidders existed, the absence of announced standards for a bidding process amount to an abuse of discretion."

December 11, 2019
Page 15

DICKINSON WRIGHT PLLC

rate reduction. Passport's lawsuit was jointly dismissed in June of 2019, in the midst of the RFP bidding process. There is no doubt, therefore, that the parties reviewing Passport's RFP response were biased as a result of the earlier suit, pointing out the state's egregious attacks and flawed rational in isolating Passport to fail and ultimately lose in the bidding process.

- Secretary Meier further accused Passport of being beholden to shareholders and used that as a reason for Passport's financial distress, rather than the State's failure to pay Passport an equitable rate. He implied that Passport increases payments to unnamed hospitals in its network "solely for the benefit of its shareholders." This statement is false and evidences CHFS's stunning failure to comprehend and appreciate the differences between Passport and the for-profit MCOs operating in Kentucky. As a nonprofit corporation, Passport pays no shareholder dividends and reinvests any margin it makes into the community.

- CHFS and DMS have continually and falsely alleged that Passport's administrative costs are high due, in part, to alleged overcompensation of its executives, which could not be further from the truth.

- On March 1, 2019, Adam Meier stated that Passport's withdrawal of its motion for a preliminary injunction "appears to be an admission that its financial plight never was as bleak as it claimed in the lawsuit filed against the Cabinet." Several days later, Mr. Meier then stated that Passport was paying some providers "rates that are in excess of what is market driven."

- When Louisville Mayor Greg Fischer and Congressman John Yarmuth publicly called for cooperation from Bevin's administration to help assuage Passport's past financial struggles, Governor Bevin accused them of "charades" and "political theater" rather than taking the two leaders at their word and committing to help the plan. Also in response to the requested help, Governor Bevin publicly opined that Passport is "a very poorly run operation from a financial standpoint, it would seem, based on their actual cash flow. That's a big problem. There is only so much you can do for an operation that cannot maintain itself financially." Despite Passport being a financially healthy organization until the reduced rates were implemented, Governor Bevin blithely stated that "it would seem from everything we've seen that they are bleeding out. Long before any changes were made to any reimbursement levels." This assertion is not grounded in any facts, and belied by the evidence.[15]

---

[15] See "In Radio Interview, Bevin Accuses Louisville Leaders of 'Political Theater' over Passport Health", Wave3 News, March 5, 2019. https://www.wave3.com/2019/03/05/radio-interview-bevin-accuses-louisville-leaders-political-theater-over-passport-health/, attached as Attachment 5.

December 11, 2019
Page 16

- Governor Bevin made clear that he believed Passport would soon be out of business, asserting that providing rate relief to Passport would be simply "dragging out the inevitable". This is in addition to other statements made, in February 2019, by Secretary Meier, Secretary Brinkman, and Commissioner Steckel, to advise Passport that CHF "had no intention to provide anything more than nominal relief to Passport, if that, notwithstanding their understanding of Passport's imminent peril (stating that they did not care to 'delay the inevitable')."[16]

- As recently as December 4, 2019, Governor Bevin has continued to take shots at Passport saying, "it's not a well-run company" and that it has "big financial and leadership problems."

Rather than engage in this public smear campaign, the administration should have directed any concerns specifically and directly to Passport. Undoubtedly, Governor Bevin and his administration's tactics tainted and disadvantaged Passport as it entered into the recent procurement.

### C.    The Bevin Cabinet's Suspiciously-Timed Decision to Delay the Award Announcement until After the Election

Evidence of bias can also be found in the Commonwealth's purposeful decision to move the award date until after the November election. One can surmise that Governor Bevin did not want to announce the removal of Louisville's home-grown health plan right before a very close election.

Upon issuance of the RFP, one of the questions put to the Cabinet from bidders was "what is the anticipated Contract Award Date"? The Commonwealth responded on June 14, 2019, that the Contract Award Date would be October 2019. October came and the administration held the decision. There was no additional information provided within the RFP process regarding the timing of the announcement; instead, the bidders and the public were left to learn this information through informal statements at meetings and conversations. In moving the announcement, the Cabinet again disregarded the specifications of the RFP and the RFP process.

### D.    DMS's Actions have Harmed Passport

Further evidence of bias can be found in the manner in which the Bevin administration, specifically DMS, campaigned against Passport. As a current MCO, Passport has an existing

---

[16] *See* <u>Verified Complaint for Injunctive and Declaratory Relief</u>, filed in 19-CI-00160, University Health Care, Inc. d/b/a Passport Health Plan v. Commonwealth of Kentucky, Finance and Administration Cabinet, and William Landrum III, et. al., February 14, 2019, ¶ 104, attached as Attachment 6.

December 11, 2019
Page 17

DICKINSON WRIGHT PLLC

contractual relationship with DMS that places certain obligations and requirements on each party. For example, numerous times over the last year, DMS has failed to timely respond to submittals by Passport, penalized Passport for the very issues that Passport is awaiting DMS response or approval for, and treated Passport differently than other MCOs. In some instances, DMS denial has directly harmed Passport financially, while benefiting DMS. DMS has approved the submittal by the other MCOs that were seeking permission to recover overpayments and educate the identified provider. However, DMS denied the same report submitted by Passport seeking the same actions – recovery of overpayment and provider education – and requested additional information be added to the report. As a result, Passport has been unable to recoup funds that it has identified should be returned, and has been unable to educate the provider to stop the erroneous billing from continuing. Similarly, there have been multiple instances where Passport has submitted a request to DMS for permission to take action on overpayments, and DMS has denied Passport's request, on the grounds that Optum, DMS's vendor, will be taking action on behalf of DMS instead. This also has a direct financial impact on Passport – Passport is unable to recover funds paid on fraud, waste and abuse claims, while DMS recovers and keeps those funds instead.

The hostility that the Bevin administration has repeatedly and publicly demonstrated against Passport appears to have influenced the day-to-day actions of DMS, to Passport's detriment. This bias has tainted the RFP process and violates the law. In the face of such bias the RFP results cannot stand.

E.    **Potential Conflicts of Interest**

DMS's use of certain vendors creates a conflict of interest in the procurement and administration of the Medicaid Program. In addition, Passport has reason to believe that certain individuals involved with the procurement process also should have been recused from such involvement given potential conflicts of interest, whether actual or perceived. Passport has asked for verification of this in our ORR and will be able to supplement this issue once it receives the requested materials.

Optum as a key administrative vendor for DMS, with access to, and privy to, information about current MCOs, creates a conflict of interest in the procurement and administration of the Medicaid Program. Optum is contracted with DMS to provide various administrative services for the Commonwealth's Medicaid Program, specifically related to program integrity and fraud, waste and abuse ("FWA"). This gives Optum visibility into the claims paid by all of the MCOs. At the same time, Optum's sister company, United, was bidding to become a new MCO in Kentucky. United was awarded an MCO contract by the Bevin administration. While the administration and DMS may have ensured all proper firewalls were in place and observed for Optum in its role as a key administrative vendor for the Commonwealth, without a complete production to our ORR, Passport has no ability to confirm. Any review of the procurement outcome should shed light on this potential conflict.

December 11, 2019
Page 18

DICKINSON WRIGHT PLLC

However, even if a robust firewall is in place and Optum has not benefited from its access to other MCOs information for its corporate sibling's RFP response, DMS has acted against the Passport's interest in delaying approval or denying Passport the opportunity to recover overpayments. Recovery of overpayments is governed by certain statutes and contractual requirements with DMS. First, such recoveries must be made within 24 months. Any delay by DMS in approving Passport's request can result in Passport losing the right to recover. On multiple occasions, DMS has failed to take action on Passport's requests for periods of time in excess of six months, directly precluding Passport from taking action to recover overpayments to providers unless and until DMS approves such recoveries.

## II.  UNDER THE BEVIN ADMINISTRATION, THE COMMONWEALTH DID NOT FOLLOW ITS OWN PROCEDURES

The Cabinet awarded the contracts at issue through the KMPC's "competitive negotiation" process. The "competitive negotiation" process uses Requests for Proposals or "RFPs." KRS 45A.085(2). Under a competitive negotiation scheme, the award "shall be made to the responsible and responsive offeror whose proposal is determined in writing to be the most advantageous to the Commonwealth, taking into consideration price and the evaluation factors set forth in the request for proposals[.]" KRS 45A.085(6).

A bidding party is "responsible" "if it has the capability in all respects to perform fully the contract requirements, and the integrity and reliability which will assure good faith performance." KRS 45A.070(6). The agency "shall" generally conduct "[w]ritten or oral discussions . . . with all responsible offerors who submit proposals determined in writing to be reasonably susceptible of being selected for award." KRS 45A.085(7).

Another element relevant here is the bidding party's "responsiveness." A bidding party is "responsive" if it submits a bid "which conforms in all material respects to the invitation for bids, so that all bidders may stand on equal footing with respect to the method and timeliness of submission and as to the substance of any resulting contract." KRS 45A.070(7). A bid generally has to be "responsive" in order to succeed in the competitive *sealed* bidding process.

In the competitive negotiation, by contrast, the agency has more flexibility in drafting the content of solicitations and in evaluating the resulting offers. *See, e.g., Matter of: A & C Building and Industrial Maintenance Corp.*, 88-1 CPD ¶451 (Comp. Gen. 1988). Accordingly, an RFP response is not initially evaluated for "responsiveness" because subsequent negotiations allow an offeror to revise its proposal to comply with RFP requirements. *See Matter of: EC Corp.*, 90-1 CPD ¶23 (Comp. Gen. 1990).

While competitive negotiation does not strictly utilize "responsiveness," an RFP proposal is subject to the similar, but more flexible concept of "RFP conformance." Unlike "responsiveness" which is assessed at the time of bid opening, "RFP conformance" is measured at

December 11, 2019
Page 19

DICKINSON WRIGHT PLLC

the time of the award. At that time, the proposal must conform with the mandatory requirements of the solicitation or it should not be accepted. *Mangi Environmental Group, Inc. v. United States*, 47 Fed. Cl. 10, 16 (2000); *Protest of Telos Field Engineering*, 92-1 BCA, ¶ 24,676 (GSBCA 1992).

## A.     The Bevin Cabinet Failed to Comply with the RFP

In previous protest resolutions, the Secretary has acknowledged the Cabinet's duty to comply with the terms of its own RFP. This is not just a technical requirement; but a matter of fairness among the proposing parties.

"It is a fundamental principle of federal procurement that offerors must be treated equally and provided with a common basis for the preparation of their proposals. In negotiated procurements such as this, **any proposal which ultimately fails to conform with the material terms of the solicitation should be considered unacceptable and should not form the basis of award**." *See Determination of Protest - Louisville Arena Authority: Hazardous Material Remediation and Building Demolition* RFP, No. 08-12 at 4 (quoting *Arthur Young & Co.*, 85-1 CPD ¶ 598 (Comp. Gen. 1985) (emphasis added)). Rather, "[i]f an agency wishes to accept such a proposal, it must place the other offerors on notice of the specific changes and provide an equal opportunity for all offerors to compete for the requirement." *Id.* (quoting *Arthur Young, supra*).

Thus, "it is axiomatic in protest law that the contract awarded must conform to the mandatory requirements of the solicitation. Otherwise, offerors would not be competing on the same basis, and full and open competition would not be obtained." *Louisville Arena Authority*, at 4 (quoting *Protest of Stellar Computer, Inc.*, 90-1 BCA ¶ 22,584 (GSBCA 1990)). Fostering effective competition is a fundamental policy underlying the Kentucky Model Procurement Code. KRS 45A.010(f).

## B.     The Bevin Cabinet Neglects the Oral Presentation Requirement

### 1.     In failing to hold Oral Presentations with the bidders, the Cabinet failed to comply with the terms of its own RFP

Because the Secretary agrees that the Cabinet must comply with the terms of its own RFP in rendering award decisions, the Secretary has previously sustained protests over contracts issued in response to proposals that did not comply with the RFP – meaning the awarding agency had departed from the RFP's terms in awarding the contract. *See, e.g., Louisville Arena Authority*, No. 08-12 at 4-5 (sustaining protest of construction award where the RFP prohibited demolition of a parking structure, but the winning proposal would demolish the structure). The Secretary endorses this approach even when the agency's deviation from the RFP is arguably minor. *See e.g., Determination of Protest – RFP 736 0800001079, (Lake Cumberland CCC Service Area)*, No. 08-

December 11, 2019
Page 20

DICKINSON WRIGHT PLLC

39 at 3-4 (protest sustained where awardee's failure to state whether it had the requisite years of experience, or whether its employees had the requisite years of experience, as required by RFP, rendered it ineligible for contract).

Permitting the agency to do otherwise, and award a contract on terms that depart from its own RFP "would violate the policy of competition which underlies the KMPC." *Louisville Arena Authority*, at 4. Contracts issued in those circumstances are "without a reasoned basis and . . . arbitrary and capricious." *Lake Cumberland CCC Service Area*, at 3. Nevertheless, that is what the Bevin Cabinet did here in awarding the managed care contracts without first inviting oral presentations pursuant to Section 70.3 of the RFP.

Section 70.3 provides that the "Commonwealth may require Oral Presentations/Demonstrations to verify or expand on the Technical Proposals." Oral presentations are significant, the RFP acknowledges, as an "opportunity for the vendor" to "answer questions or to clarify" its proposal's compliance with the RFP's requirements. RFP at Sec. 70.3. In fact, "[t]he Commonwealth reserves the right to reject any or all proposals in whole or in part based on the oral presentations," even though these presentations are worth only 200 points. *Id.* And perhaps in recognition of their value, the Cabinet "reserve[d] the right not to require oral presentations"[17] only "if they *do not affect the final rankings.*" *Id.* (emphasis added). In this case, the Cabinet exercised that claimed "reserve[d] right" presumably because it thought oral presentations could not "affect the final rankings." The Cabinet was wrong.

To the contrary, this is precisely the scenario wherein a 200-point oral presentation had every possibility of "affect[ing] the final rankings." The Cabinet's Determination and Finding shows that Passport's score was well within the range such that inviting oral presentations would have affected the final rankings. Further, the evaluators would have been hard-pressed to avoid giving Passport a high score on oral presentations, given Passport's wealth of experience and deep connection to the Kentucky Medicaid Program. Passport, no doubt, would have been able to speak to its successes and lessons learned, its strong provider network, and innovative programs, and commitments to beneficiaries. Perhaps the Cabinet did not want to see Passport succeed here. Perhaps they wanted to perpetuate Governor Bevin's vision of "the inevitable" and that is why Passport was not invited for oral presentations.

By depriving Passport of its opportunity for oral presentations, Passport was unable to address questions that arose during the evaluation, as demonstrated by the scoring sheets, such as "it is unclear what will happen after the transition and how the new board (not Kentucky based) will impact a potential award" (Section 60.7(A)) and "after reading the response, the reviewer has questions" (Section 60.7(C)). Rather than honor its RFP commitment to invite oral presentations,

---

[17] The Cabinet's mistaken belief that it had discretion to decline to invite bidders to oral presentations in the first instance its itself a violation of the KMPC that justifies setting aside this competitive negotiation as contrary to law. *See* section II.B.(2) *infra*.

December 11, 2019
Page 21

the agency opted to "violate the policy of competition which underlies the KMPC" and award contracts without observing the terms of the very solicitation it issued. *Louisville Arena Authority*, at 4. This decision was "without a reasoned basis and . . . arbitrary and capricious." *Lake Cumberland CCC Service Area*, at 3. Consequently, the contracts it awarded must be rescinded.

### 2.  The Cabinet's failure to hold Oral Presentations also violates the KMPC

Equally important, the Cabinet's obligation to hold oral presentations arises not only from the RFP, but from the KMPC. Namely, the statutory requirement that the Cabinet initiate discussions with "all responsible offerors who submit proposals determined in writing to be reasonably susceptible of being selected for award." KRS 45A.085(7).

While the Cabinet phrased its decision to conduct (or not conduct) oral presentations as discretionary, *see* RFP at 70.3 (stating the "Commonwealth *may* require" oral presentations) the agency has no discretion to craft an RFP contrary to Kentucky law. *See* RFP at Sec. 10.7 ("The procurement process will provide for evaluation of proposals and selection of the successful proposal in accordance with State law and regulations.").

An RFP that excuses the oral presentations and discussions at the Cabinet's discretion *is* contrary to Kentucky law because such discussions are expressly required under KRS 45A.085(7): "Written or oral discussions *shall* be conducted with all responsible offerors who submit proposals determined in writing to be reasonably susceptible of being selected for award." (emphasis added). "Shall" is mandatory; not discretionary.[18] *See, e.g., Alexander v. S & M Motors, Inc.*, 28 S.W.3d 303, 305 (Ky. 2000) ("Not only have Kentucky courts long construed 'may' to be a permissive word, rather than a mandatory word, but our legislature has given guidance in this regard. When considering the construction of statutes, KRS 446.010(20) provides that 'may' is permissive, and 'shall' is mandatory."). Even the Cabinet must agree on that point. *See* RFP at Sec. 10.4 ("Requirements that include the words 'Shall', 'Will', Must' indicate a mandatory requirement.").

Because the Commonwealth instructs that the Cabinet "shall" conduct "[w]ritten or oral discussions . . . with all responsible offerors . . . determined in writing to be reasonably susceptible of being selected for award," the Cabinet was required to do just that. Here, however, it did not. Presumably, the Bevin Cabinet believed it could forego the discussion requirement pursuant to 200 KAR 5:307(5) – a Cabinet-drafted regulation that, on its face, appears to empower the agency to independently "determine[]" whether "written or oral discussions should be had with the offerors[.]"[19] But here too, the Cabinet is mistaken.

---

[18] While there are statutory exceptions to this requirement, none of the permitted exceptions apply.

[19] 200 KAR 5:307(5) provides in full:

December 11, 2019
Page 22

The Cabinet has no authority to adopt a regulation granting itself broader discretion than that the Commonwealth affords it. "[I]t is axiomatic that the grant of the power to make regulations does not authorize an administrative agency to adopt regulations which are contrary to legislative policy as expressed in the statutes." *Kentucky Alcoholic Beverage Control Bd. v. Anheuser-Busch, Inc.,* Ky. App., 574 S.W.2d 344, 345 (1978).

Duly adopted administrative regulations "have the full effect of law." *Flying J Travel Plaza v. Commonwealth, Transportation Cabinet, Department of Highways,* 928 S.W.2d 344, 347 (Ky. 1996). Yet such regulations "are valid only as subordinate rules when found to be within the framework of the policy defined by the legislation" as an administrative agency's authority "is limited to a direct implementation of the functions assigned to the agency by the statute." *Id.; United Sign, Ltd. v. Commonwealth,* 44 S.W.3d 794, 798 (Ky. App. 2000). Where, as here, "the regulation contradicts [the statute], it is void and should *not* have been a consideration by the [agency]" in drafting its RFP. *Hughes v. Kentucky Horse Racing Auth.,* 2004 WL 1752414, at *3 (Ky. Ct. App. Aug. 6, 2004). Simply put, the Cabinet cannot excuse itself from a requirement the Commonwealth insists it "shall" undertake.

That the Commonwealth should make the oral or written discussion requirement necessary is unsurprising given that a similar, parallel requirement applies to federal agencies. Federal agencies conducting competitive negotiation generally must hold "meaningful discussions" with competitive range offerors. *See* 48 C.F.R. § 15.306(d) ("[d]iscussions . . . tailored to each offeror's proposal . . . must be conducted by the contracting officer with each offeror within the competitive range" in the case of "competitive acquisition"). "Meaningful discussion" as part of the procurement process is "basic to the concept of competitive negotiation." *Protest of Sys. Automation Corp.,* GSBCA No. 8204-P, 86-1 B.C.A. (CCH) ¶ 18654 (Dec. 17, 1985).

"In negotiated procurements, agencies are required to conduct meaningful discussions with offerors in the competitive range." *Banknote Corp. of Am. v. United States,* 56 Fed. Cl. 377, 384 (2003), *aff'd,* 365 F.3d 1345 (Fed. Cir. 2004). A meaningful discussion between agency and

---

The purchasing officer shall examine each written proposal received for general conformity with the terms of the procurement. If it has been provided in the solicitation that an award may be made without written or oral discussions, the purchasing officer may, upon the basis of the written proposals received, award the contract to the responsible offeror submitting the proposal determined in writing to be the most advantageous to the Commonwealth. If, after the proposals have been examined, it is determined that written or oral discussions should be had with the offerors, the purchasing officer shall determine in writing, based on an individual review, those proposals received that are eligible to be selected for award of a contract. Each responsible offeror that is eligible to be selected for award of a contract shall be contacted by the purchasing officer and a meeting scheduled for discussion of the offeror's proposals. The purchasing officer shall not be required to conduct discussions under the circumstances of or relative to the topics enumerated in KRS 45A.085(6)(a), (b) or (c).

December 11, 2019
Page 23

bidder allows the bidder to address the relative strengths and weaknesses of its proposals so that it has a fair opportunity to meet the RFP's requirements. *Orca Nw. Real Estate Servs. v. United States*, 65 Fed. Cl. 1, 9, *on reconsideration*, 65 Fed. Cl. 419 (2005) (citing *Prof'l Servs. Inc.*, 97-1 Comp. Gen. ¶ 54 (1996)). This is consistent with the concept of "responsiveness" because subsequent negotiations allow an offeror to revise its proposal to comply with RFP requirements. *Matter of: EC Corp.*, 90-1 CPD ¶23.

Importantly, the benefit of this exchange is not just for the bidder but for the government. Providing offerors the chance to "revise their proposals in response to agency-identified weaknesses" helps "ensure[] the government will obtain the 'best value' from a procurement." *Orca Nw. Real Estate*, 65 Fed. Cl. at 8; *see also Ohio River Conversions, Inc. v. City of Owensboro*, 663 S.W.2d 759, 760 (Ky. Ct. App. 1984) ("Although the procurement code provides in some four different sections most laudatory policies and purposes, it must be kept in mind that its primary function is to benefit the citizens, as is the real purpose of government itself and the laws pertinent thereto.").

The RFP here frames the purpose of the oral presentations in the same terms: "This is the opportunity for the vendor to present and demonstrate the solution and to answer questions or to clarify the understanding of the evaluation committee in accordance with the requirements of this RFP." RFP at Sec. 70. Even though oral presentations are worth a maximum of 200 points, around only 10% of the 1,850 total points available, "[t]he Commonwealth reserves the right to reject any or all proposals in whole or in part based on the oral presentations/demonstrations." RFP at Sec. 70.3. And it is no abuse of discretion for the agency to reject a proposal based exclusively on responses during oral discussions. *See S. C. Myers & Assocs., Inc.*, B-286297 (Comp. Gen.) (Dec. 20, 2000) (when protester revealed during oral presentation that the employee identified as the proposed project director would in fact be replaced "relatively early in performance" of the contract, and the protestor failed to identify a replacement in its proposal, this "bait and switch" justified the agency's rejection of the protestor's bid).

Given that the Cabinet failed to invite the oral presentations required under the RFP and under KRS 45A.085(7), or, at the very least, did not invite Passport to give such a presentation, there are two possibilities: (1) either the Cabinet did not invite these presentations at all, in which case it violated the KMPC in addition to its RFP's promise that presentations would be requested if they could "affect the final rankings"; or (2) the Cabinet did not invite Passport[20] *in particular*

---

[20] Passport would have been entitled to give a presentation if it were determined in writing to be a "responsible bidder." KRS 45A.085(7). Whether the Cabinet actually deemed Passport "responsible" is impossible to know on account of the Cabinet's still-incomplete ORR production. Still, at this stage, there is every reason to assume that Passport would have been deemed a responsible bidder; it is the only bidder to have managed and administered the Commonwealth's Medicaid program since 1997; was awarded a contract to do so as recently as 2015, and, again, was roughly only 120 points out of contention for being awarded a contract in this instance. Nor was the Bevin Cabinet free to "avoid its duty to conduct meaningful discussions" with Passport "by labeling informational inadequacies in a proposal as weaknesses rather than deficiencies," i.e., purposefully or arbitrarily under-scoring its bid so that Passport would not

December 11, 2019
Page 24

DICKINSON WRIGHT PLLC

to give such a presentation, in which case its decision betrays further evidence of the Bevin administration's bias.

The Commonwealth is making an $8 billion gamble and in doing so fails to fulfill its duty to the citizens of the Commonwealth. Through this award process, the Commonwealth has made the risky decision not to renew two current incumbent plans and instead replace them with two new plans (one of whose performance in other states makes their ability to perform in Kentucky highly questionable as detailed in Section VI of this protest).

This type of major decision, with so many dollars and health implications at stake, should be made only after full and careful consideration, including bringing each and every bidding plan in for oral presentations (especially proposed new plans to the program). *See Protest of Sys. Automation Corp.*, GSBCA No. 8204-P, 86-1 B.C.A. (CCH) ¶ 18654 (Dec. 17, 1985) ("**This failure to hold meaningful discussions is not a minimal or trivial violation of regulation but one which is basic to the concept of competitive negotiation**. The Board should grant the protest on this basis." (emphasis added)). It would make sense and be prudent to verify important statements and promises made in the written RFP response can in fact be fulfilled and operationalized and not just take a written statement for granted. After all, the "primary function" of fair, competitive procurement "is to benefit the citizens" – in this case Medicaid beneficiaries – who will feel the direct impact of the Cabinet's decisions and bear the consequences of its errors. *Ohio River Conversions*, 663 S.W.2d at 760. The stakes are simply to high not bring each bidder in for an extensive oral review. However, sadly and with great risk to Medicaid beneficiaries, the Commonwealth under Governor Bevin did not feel it important enough or necessary to conduct oral presentations.

Once the Bevin Cabinet got what it wanted, an outcome that would force Passport out of business, it declined to observe any further legal obligations it had to invite oral presentations. This is simply an abrogation of the evaluators' duty and responsibility and should be fatal to the contracts awarded through this flawed process. Passport has suffered prejudice as a result of these errors because it was denied the opportunity to give an oral presentation that had every possibility of "affect[ing] the final rankings."

## C.   The Bevin Cabinet Violated the Law by Failing to Meaningfully Disclose the Basis for Scoring

The Secretary's own "Procurement and Protest Resources" available on the Cabinet's website explain "it is a well-settled rule that the solicitation should inform all the offerors of the

---

be deemed a "responsible" bidder. *Protest of Sys. Automation Corp.*, GSBCA No. 8204-P, 86-1 B.C.A. (CCH) ¶ 18654 (Dec. 17, 1985).

December 11, 2019
Page 25

DICKINSON WRIGHT PLLC

basis for evaluation of proposals and the evaluation must, in fact, be based on the scheme set forth in the solicitation."[21] (citing *Human Resources Research Organization*, B-203302, 82-2 CPD P31 (Comp. Gen. July 8, 1982)). Kentucky codifies this rule in KRS 45A.085(5), requiring that RFPs "*shall* indicate the relative importance of price and other evaluation factors[.]" (emphasis added). Under the federal regulations applicable to MCO procurement (which also bind the state agency as a "subrecipient" of Medicaid funds, 45 C.F.R. §75.326) the duty to inform all offerors of the basis for evaluation is even more stringent; RFPs must "identify *all* evaluation factors and their relative importance." 45 C.F.R. § 75.329(d)(1) (emphasis added).

Despite this duty, the RFP disclosed only nine criteria for the evaluation of the Medicaid Managed Care Program:

**70.0 Technical Proposal Evaluation:**

| EVALUATION: Medicaid Managed Care Program Criteria | Maximum Points Possible |
|---|---|
| Executive Summary (60.7 A) | 25 |
| Company Background - 1. Corporate Experience (60.7 B) | 40 |
| Company Background - 2. Corporate Information (60.7 B) | 30 |
| Company Background - 3. Staffing (60.7 B) | 90 |
| Technical Approach (60.7 C) | 1270 |
| Use Cases (60.7 C.30) | 105 |
| Implementation Plan (60.7 D) | 30 |
| Emergency Response and Disaster Recovery Plan (60.7 E) | 35 |
| Turnover Plan (60.7 F) | 25 |
| **Maximum Points Possible** | **1,650** |

With this structure, 77% of the available points, or 1270 of 1650 points, were categorized as "Technical Approach", with no further delineation of factors for evaluation or points associated with the multitude of subcategories within each section. Importantly, the RFP **did not** identify the "relative importance" of "all evaluation factors under" the "Technical Approach" section of the RFP. *See* RFP at Sec. 60.7(C), and 70.2  Nothing in Section 60.7(C) of the RFP – nor in Attachment C to the RFP – specifies the amount of points available under each "factor" assessed as part of a bidder's "Technical Approach." In response to Passport's ORR, the Cabinet produced the "Technical Proposal Evaluation" forms. A cursory review of these scoring sheets plainly

---

[21] *See* "Protests To An Award: Competitive Sealed Bidding (KRS 45A.080), Competitive Negotiation (KRS 45A.085), And Personal Service Contracts (KRS 45A.695)," available at https://finance.ky.gov/services/legalsvcs/Documents/Proteststoan Award0711.pdf, included here as Attachment 7.

December 11, 2019
Page 26

DICKINSON WRIGHT PLLC

demonstrates that the Cabinet did, indeed, have a specific scoring scheme with individual point values for each separate factor.[22]

Within the "Technical Approach" section, there were 28 separate subsections, with the amount of points available for each subsection ranging from 5 to 175, with 222 different factors measured within those 28 subsections, with each of the 222 "factors" being weighted. As a result, some factors were worth a maximum of 5 points, while others were worth up to 20 points. At the time the bidders submitted their proposals, there was no way to identify the relative importance of the factors. In fact, during the RFP process when bidder enquired about the points to be assigned to each subsection, the Cabinet responded simply: "No. The breakouts provided are in line with the Section heading of Section 60.7."[23]

It is a mystery why the specific scoring scheme, point values, and relative weights were not disclosed to bidders as part of the RFP documents, or at any time during the procurement process. Rather, they were kept in a black box by the evaluators, or worse yet, determined *ad hoc* as the evaluators reviewed the RFP responses and developed in a manner to effectuate an outcome most desired by Governor Bevin – to "inevitably" exclude Passport.

The Cabinet's failure to comply with its obligation under KRS 45A.085(5), and under federal law to properly "identify all evaluation factors and their relative importance," 45 C.F.R. § 75.329(d)(1) results in a RFP that was contrary to law and potentially devised to eliminate Passport. Kept in the dark about the "relative importance" of the individual factors, Passport suffered prejudice because it was denied the opportunity to target its proposal on the factors with the highest point values. Accordingly, there is no question that the contracts awarded thereunder cannot stand and should be rescinded.

**D.    The Cabinet Awarded Contracts without the Government Contract Review Committee's Approval**

Passport is not alone in falling victim to the Bevin administration's illegal, last-ditch effort to bind the Commonwealth to its Medicaid policy agenda. In its haste to resolve MCO assignments while Governor Bevin was still in office, the Cabinet awarded and executed the contracts with the winning bidders without first seeking review and approval from the Government Contract Review Committee as the KMPC requires. *See* KRS 45A.705.

---

[22] Passport's protest to the Cabinet's failure to "indicate" the "relative importance of . . . evaluation factors" under KRS 45A.085(5) is timely because Passport could not have known that such an disclosed scoring scheme existed until it received the technical scores in response to its ORR, late on December 4, 2019, less than "two (2) calendar weeks" ago. KRS 45A.285(2); 200 KAR 5:380. These technical scores revealed that a certain amount of predetermined points were available, and allocated to specific factors considered as part of the "Technical Proposal Evaluation."

[23] *See* RFP, Addendum 1 at page 112.

December 11, 2019
Page 27

DICKINSON WRIGHT PLLC

Just this Monday, Kentucky's Government Contract Oversight Committee, which is authorized to review contracts issued pursuant to the KMPC that call for the expenditure of "public funds," *see e.g., Landrum v. Commonwealth ex rel. Beshear*, No. 2018-SC-000122-TG, __ S.W.3d __; 2019 WL 4072505, at *5–6 (Ky. Aug. 29, 2019), voted unanimously to disapprove and reject the awarded contracts, as the Bevin Cabinet failed to seek the Committee's approval of the contracts before they were executed.[24] Instead, "the administration sent the contracts to the [C]ommittee for approval . . . only after it had already awarded them to five private health insurance companies." *Id.* Committee members, including one within Governor's own party, determined this was "wrong." *Id.*

This is yet another instance of the Bevin administration acting contrary to the KMPC and further grounds for rescinding the contracts, either as a result of Passport's protest, or pursuant to the Secretary's authority under KRS 45A.705(6)(b). These Bevin-Cabinet contracts were awarded in violation of Kentucky law and cannot stand.

## III.  SCORING ISSUES

While Passport has submitted an ORR that requested documents related to the RFP submittals, including scoring information and identification of reviewers, the documents provided to date in response to the ORR have been the bare minimum: Technical Proposal Evaluation, i.e., the scoring sheets, the executed contracts, and limited other documents. Without the production of responsive documents, including the identity of the evaluators, Passport's knowledge of errors in the process is limited. Once additional documents are produced, Passport intends to supplement this protest accordingly. Nevertheless, an initial review of the Technical Proposal Evaluations and comments contained therein reveal many grounds for finding the evaluation to have been arbitrary and capricious.

First, as the two-decade long incumbent in the Commonwealth, it makes absolutely no sense that Passport would have received a score of 21.5 out of 30 for implementation. Passport is already implemented. There is little that Passport would have to do to "go-live" if awarded a contract. Evaluator comments stating that Passport lacked detail regarding the specified items such as: establishing an office location and call centers, provider recruitment activities, staff hiring and a training plan, developing all required materials, and establishing interfaces with subcontractors and the Department are baseless and simply nonsensical. Passport, as a currently operating plan, has met these requirements for the last 22 years. Passport has already established offices, has active call centers, staff, interfaces with subcontractors and the Department, and materials in place. As compared to a new Kentucky entrant, Molina, which only incorporated in

---

[24] *See* "Lawmakers rip last-minute, $8 billion Medicaid contract awarded by Bevin administration," Louisville Courier-Journal, Dec. 9, 2019: https://www.courier-journal.com/story/news/politics/ky-legislature/2019/12/09/lawmakers-rip-8-billion-last-minute-award-medicaid-contracts/2630616001/, attached as Attachment 8.

December 11, 2019
Page 28

the Commonwealth in March 2019, yet received 29 out of 30 points in the same section, Passport certainly is the more experienced and implemented plan, and ready to hit the ground running.

Second, Passport has a long-established and mature provider network, anchored by its health system founders and enhanced by thousands of providers in rural communities. In the provider network section (C.18), however, Passport scored less than 80% as compared to new entrant Molina's 92%. The absurdity of this scoring highlights the likely arbitrary and capricious approach taken by the evaluators, and ignores the fact that Passport's network adequacy has not been questioned or criticized by the CHFS. In addition, Passport, an established plan with approximately 30,000 contracted providers, was criticized for not mentioning behavioral health providers and stated to have a "weak" value-based performance ("VBP") program, despite describing a primary care VBP program that includes seven multi-site practices covering 37% of Passport's members across 2,100 contracted primary care providers (61% of total PCPs).

Third, there are multiple comments indicating that Passport did not include subsidiaries in its response; Passport has no subsidiaries responsive to the questions in the RFP and repeatedly stated this throughout its submission. Moreover, the first instance of such a comment: "it appears they did not include subsidiaries and Subcontractors" was in subsection 60.7(B)(f), which asked only for contracts held *by Vendor*. Despite this, the scoring sheet indicates that the RFP requested information for the parent company, subsidiaries and Subcontractors. Thus, Passport suffered a point reduction (2/5) based on inaccuracies about the RFP questions in the scoring sheet itself. This demonstrates that the scoring was tainted in multiple ways: the standards on the scoring sheets did not match the contents of the RFP and evaluator(s) interjected into the scoring what they believed they knew about Passport. Strangely, Molina, a subsidiary of Molina Healthcare, received 5/5 for the same question, with the comments indicating "no problems in other states". This comment is quickly demonstrated to be false; as detailed in Section VI below, Molina related entities have experienced the loss of Medicaid managed care contracts, or reduction of a service area, in at least four states.

Additional irregularities with scoring, and there are likely to be more, include the following:

- In the scoring pages received from the Cabinet, there are page limits identified for each section. However, page limits were indicated in the RFP *only* in the Use Cases Section. From some of the comments, it appears that reviewers may have stopped reading the submission after reaching the identified page limit.

- As detailed elsewhere in this protest, comments about Passport's submission clearly indicate that the evaluators were influenced by the hostility of the administration and the media campaign that Governor Bevin, Secretary Meier and others engaged in against Passport.

December 11, 2019
Page 29

- Similarly, Passport's scores were reduced for answering the question asked. In Section 60.7(C)(27)(d)(ii) when requested to "provide *a sample dashboard report*" (emphasis added to show that the request was for a single sample), Passport received a 3/5 and the comments indicated that "Dashboards are attached but *only one example provided* – would have like to have seen more." (emphasis added). If the intent was for multiple samples to be submitted, the RFP should have asked for that. Certainly, Passport would have obliged, and would have had much information to share, given its lengthy tenure in the Commonwealth.

- Passport likewise received scores of 3/5 for Section 60.7(C)(10)(b)(ii) with the comment noting that Passport "merely answered", and Section 60.7(C)(16)(b) where in response to a request to detail any limitations and/or issues with the Department's expectations or requirements, Passport "state[s] there are no issues." Passport's score for Section 60.7(C)(24)(a)(i) was reduced to 3.5/5 because "some of the proposed innovations are written in past tense which led the evaluation team to assume these are not new innovations, but have already been initiated."

- In contrast, other submitters were given 5/5 even where the evaluator found that the submittal was "unrealistic" (Molina, Section 60.7(B)(a)(i)), "confusing" (Humana, Section 60.7(A)(1)), "not sure how achievable it is" (WellCare, section 60.7(C)(9)(j)(ii)), or "why did they give FL examples instead of KY specific examples?" (Humana, Section 60.7(C)(10)(a)(ii). Submitters likewise received scores of 4/5 even where the comments would appear to indicate issues with the content, such as "good effort but content is inaccurate" (United, Section 60.7(C)(18)(c)(ii)), "weak" (United, Section 60.7(C)(21)(e)(ii)), and "not sure on the audience for which this section was intended for" (Molina, Section 60.7(A)(2)). The disconnects between quantitative scoring and qualitative assessments are sloppy at best, and certainly harmful to all bidders.

- Passport, an innovator in population health, including partnering with Evolent as an early adopter of NCQA's PHM Accreditation (with Evolent being the First entity in the country to earn NCQA's Population Health Program Accreditation in September 2019), was deemed to lack significant experience in implementation of population health with a score of 87/110 points.

- Finally, in multiple instances, the scoring sheets indicate that the reviewer had questions; each of these instances demonstrate that there were numerous outstanding questions that should have been addressed through oral presentations as addressed in Section II.B. above.

December 11, 2019
Page 30

DICKINSON WRIGHT PLLC

While the full scope of errors in scoring cannot be known until the documents responsive to Passport's ORR are fully produced, the initial production demonstrates numerous areas of concern that require further investigation.

## IV.  THE RFP WAS FOR A MEDICAID PROGRAM THAT WILL LOOK RADICALLY DIFFERENT UNDER THE NEW ADMINISTRATION

With two weeks left in office, Governor Bevin approved these new MCO contracts worth more than $8 billion, seeking to bind the Commonwealth for at least five years to his vision of Medicaid.  Such actions are not in the best interest of the Commonwealth.[25]  The RFP and the contracts awarded pursuant to the RFP are for a Medicaid Program under Governor Bevin's vision: a goal of reduced enrollment, a strong push of members off of Medicaid and onto commercial insurance, with copays and work requirements.  Kentucky itself estimated these reforms would push up to 95,0000 Kentuckians off the Medicaid roles. *Stewart II*, F. Supp.3d at 141. This vision was so at odds with the Medicaid Act's objectives, it has twice been deemed illegal. *Id.* at 155; *Stewart I*, 313 F. Supp. 3d at 265. In fact, Governor Bevin's Section 1115 Waiver "Kentucky HEALTH" Program "has yet to take effect" because the Secretary's approvals of the waiver Program have been vacated in federal court. *Stewart II*, F. Supp.3d at 155.

With the change in the administration, the goals of the Medicaid Program have changed as well.  Governor Bevin had threatened to terminate Medicaid expansion under the Affordable Care Act ("ACA") if CMS and the federal courts did not approve Kentucky HEALTH.  Such a termination of the ACA Medicaid expansion would eliminate Medicaid coverage for more than 450,000 Kentuckians.  In contrast, Governor Beshear has stated that gutting Kentucky's Medicaid Program and stripping coverage from those who need it most is "just plain immoral."  Governor Beshear supports Medicaid expansion under ACA and rescinding the Bevin Medicaid waiver, stating that the recension is a week one priority.  Rescinding the Bevin Medicaid waiver will eliminate the Kentucky HEALTH requirements that would mandate that some Medicaid recipients to pay for coverage and work, go to school or volunteer to keep their benefits.  Governor Bevin's plan directly targeted reducing Medicaid enrollment, while Governor Beshear's emphasis is on ensuring that all Kentuckians have access to insurance, stating that "health care is a basic human right."

---

[25] This is demonstrated by the concerns raised since the award was announced, from both Republican and Democrat leaders, *see* "Lawmakers want Gov.-elect Beshear to review Medicaid contracts Bevin awarded in final days", Louisville Courier-Journal, Dec. 7, 2019: https://www.courier-journal.com/story/news/politics/ky-legislature/2019/12/07/kentucky-lawmaker-wants-scrutiny-medicaid-awards-excluding-passport/4366112002/, attached as Attachment 9, and "Bevin administration leaves out Passport in awarding $8B in Medicaid contracts", Louisville Courier-Journal, Nov. 27, 2019 at https://www.courier-journal.com/story/news/politics/elections/kentucky/2019/11/27/kentucky-awards-contracts-manage-billions-medicaid-business-cuts-out-louisville-based-passport/4252132002/, attached as Attachment 10, as well as at the December 9, 2019, Medicaid Oversight and Advisory Committee Meeting, where, upon a vote, the newly awarded MCO contracts were disapproved. *See* "Lawmakers rip last-minute, $8 billion Medicaid contract awarded by Bevin administration," n.24.

December 11, 2019
Page 31

Governor Beshear understands that expanded Medicaid coverage provides necessary support to maintain rural health clinics and hospitals and supports the economic growth of the Commonwealth. Governor Beshear is also supportive of expanding programs that educate potential Medicaid recipients about their eligibility, such as the Senior Health Insurance Program and the Hart-Supported Living Program, recognizing that the needs of Kentuckians are varied. The Bevin administration used the RFP to overall Medicaid for members within foster care, eliminating MCO choice, and limiting the award to one bidder.

Finally, the Bevin administration has been very critical of pharmacy benefit managers ("PBMs"), including the recent report from the Cabinet which was sought to support Governor Bevin's push to eliminate PBMs from Medicaid by carving out prescription drugs from the scope of services provided by MCOs. Such a revision would be a significant change to the Medicaid Program under which the RFP was issued and the contracts awarded. In contrast, Governor Beshear has proposed that Kentucky leverage its purchasing power in the Medicaid systems and, via legislation, impose a drug spending cap for Medicaid, modeled off of legislation in New York.

In short, the RFP award and MCO contracts do not comport with the future of Medicaid in Kentucky and should not permitted to have been used by the Bevin administration to limit the goals and vision of Governor Beshear.

## V.  CONFIRMATION OF THE ARBITRARY, CAPRICIOUS AND ILLEGAL CONTRACTS HARMS BENEFICIARIES AND THE COMMUNITY

The Commonwealth's arbitrary and ill-advised decision to remove Passport from the Kentucky Medicaid Program after 22 years of high quality delivery of health care services to Medicaid beneficiaries will have profound impact on beneficiaries and to the community as well. Moreover, removing Passport from among the Medicaid MCOs offering plans in the Kentucky Medicaid Program coupled with the Cabinet's award of contracts to two companies that have never operated in Kentucky Medicaid Program before – Molina and United – puts the stability of the Program at risk and is likely to harm both Kentucky's beneficiaries and the community at large.

### A.    Harm to Medicaid Beneficiaries

By stripping Passport, a home-grown Kentucky health plan, of its contract to manage benefits for Kentucky's Medicaid Managed Care Program for more than 300,000 beneficiaries (200,000 of those in Jefferson and its surrounding counties alone), the Cabinet is placing the Commonwealth's beneficiaries at risk of lapses in health care, greater administrative burden, and confusion about benefits. As the incumbent for 22 years, Passport is distinctively capable of continuing provision of quality care to beneficiaries and giving steady partnership with the Cabinet. Some of the more than 300,000 Passport members have been with Passport for years; a sudden change in MCO will come as a surprise and a disruption to their stable receipt of health

December 11, 2019
Page 32

DICKINSON WRIGHT PLLC

care services. Transitioning over 300,000 individuals to new health plans will not come without great complexity. Accurate and efficient coordination of care and benefits, pharmacy transitions, handling of authorizations already in cue, network differences, other stakeholder relationships, and disruption of long-standing care/case management relationships are all at risk now that the Cabinet has decided to terminate Passport as a managed care plan in the Commonwealth.

Terminating Passport as an MCO also results in a loss of knowledge to the Commonwealth. Passport is uniquely positioned, given its long tenure in the Commonwealth and its deep local roots, to advise the Cabinet on policies and be at the forefront of important policy changes impacting beneficiaries and the Kentucky Medicaid Program. The Cabinet has often looked to Passport for its trailblazing efforts to impact beneficiary care, and improve the Medicaid Program overall, in areas such as the following:

- Passport employees sat on 200 appointed boards, participated in over 700 interagency meetings and held over 1,700 meetings with community agencies across the Commonwealth in 2018.

- Passport's clinical model has kept members with complex health conditions from being unnecessarily admitted and readmitted to the hospital at rates of 30% and 14% lower, respectively, than if those members had not engaged with Passport. This helps to get members the care and treatment they need to avoid adverse health events and therefore stay out of the hospital or emergency room ("ER"), leading overall to significant reductions in medical trend.

- Passport's technology capabilities are top-notch. Once Passport was fully operational on its new risk stratification methodology a few years ago, Passport found that 15% of its population was eligible for health-enhancing, cost-reducing care coordination services versus just 1% of members receiving support services in years prior.

- Passport was ahead of the policy changes regarding elective c-sections and inductions. When no other Kentucky Medicaid plan was addressing the high c-section rate in the Commonwealth, Passport was developing solutions to benefit pregnant women, and DMS agreed.

- Passport built supporting models around the Commonwealth's mandated EE LIP (navigator) initiative. Recognizing the high ER utilization rates in Kentucky, Passport felt this an important endeavor. Passport went above what was expected of it to focus on this work: over 1,300 Passport members participating as compared to 2 members managed by WellCare.

December 11, 2019
Page 33

- Passport was early to cover treatment of Hepatitis C for members; well before other Kentucky plans. Such decision was not advantageous to Passport, but Passport recognized that this treatment was vital to its members suffering from Hepatitis C. This deep desire to "do right by our members" is rooted in Passport's mission, its history, and its connection to the Commonwealth.

- In behavioral health services, Passport is often the health plan that identifies issues from DMS policy decisions that impact providers. Passport takes the initiative to meet with the providers, and then suggests solutions for DMS to implement. This has happened with SUD services, long term services for serious mental illness ("SMI"), and Applied Behavioral Analysis ("ABA") services during implementation. To Passport's knowledge, no other health plan brought up these issues, met with providers to better articulate the components, and then handed DMS a written proposal that they could work from to make adjustments.

- Passport is the only Medicaid health plan in Kentucky to have representatives on NCQA committees to determine how quality, in the behavioral health space, should be defined and measured in a more impactful way than the mutually agreed ineffective HEDIS metrics at this point in time. Passport implemented Screening, Brief Intervention, and Referral to Treatment ("SBIRT"), an evidence-based practice used to identify, reduce, and prevent problematic use, abuse, and dependence on alcohol and illicit drugs, and participated in national collaboratives to help health plans collectively around the country identify barriers and develop and implement solutions so people could be screened and providers paid for SUD screenings. Passport's commitment to seeing members as "whole persons" and building relationships in the community to create the opportunities for members to get their other social needs met so they can have the resources to combat the complexity of poverty and move off of Medicaid.

- Passport's relationship with Evolent Health buttresses its population health efforts, taking advantage of Evolent Health's NCQA accreditation as the first nationally recognized organization for the new Population Health Program accreditation. The level of expertise will be lost if Passport is no longer a Medicaid plan in Kentucky.

Having been founded and sponsored by providers, Passport benefits from strong relationships with its providers. Passport has continued to foster its relationship with providers and enjoys strong support from the provider community, as demonstrated by the letter of support for Passport that were included in Passport's RFP submission.[26] If Passport no longer operates in the Kentucky Medicaid Program, providers who have historically contracted with Passport and

---

[26] The letters of support were included in the Transmittal letter with Passport RFP submission and are included here as Attachment 11.

December 11, 2019
Page 34

who have a large share of their patients as Passport members will see a sharp decline in their otherwise steady revenue.

Passport's long-standing operations in the Commonwealth mean less implementation time, less issues with readiness, and less administrative hassle for the Cabinet, Members, and providers, all while supporting strong, deeply rooted beneficiary-centered services in partnership with the Commonwealth and other stakeholders.

Finally, it is critically important for members and providers to know that Passport is still here to serve them – at least through July 1, 2020 – and hopefully longer depending on the outcome of this protest. Members still have access to the same benefits, coordinated care and community services that they always have at Passport. They should not switch plans and disenroll from Passport now; this will only create more havoc and confusion; and CHFS should make that known to both members and providers.

**B.    Harm to the Community**

Passport has demonstrated its commitment to its members and to the larger community, locally and throughout the Commonwealth, with millions of dollars of investments. Most recently, Passport was taking the lead to help revitalize West Louisville, planning to locate its new company headquarters in this underserved neighborhood.  Passport has invested over $40 million to date to develop the West Louisville campus, with additional development planned.  In addition, to locating its own workforce at this site, Passport was in active negotiations with many other businesses to move to this new site.  Recognizing the links between social determinants and health outcomes, Passport looked to bring a Health and Well-being Campus to drive improved health, in addition to lifting the economics of the community.  The West Louisville project has the promise to be a transformative event for the city, however with the Commonwealth's recent action the future of the West Louisville site remains in doubt.  In addition, if the RFP decision is not reversed, Passport will be forced to shut down, forcing nearly 600 staff to lose their jobs, not only a massive impact for each and every Passport employee and their families, but also a revenue loss for the Commonwealth. In 2018, more than $3.3 million in payroll taxes were paid for this staff.

As discussed in the Introduction, the loss of Passport is not merely the loss of a health plan, it is the loss of a unique and innovative provider of health care, it is a loss of a health plan that understands and is uniquely positioned to offer preventative health care services especially to urban residents, it is the loss of a leading company who had worked tirelessly not only for its members but for its community as a whole, and it is the loss of a company that is so profoundly intertwined with the fabric of Jefferson County and its surrounding area.  In 2018, Passport operations paid $44 million in salaries in Kentucky and Southern Indiana, the vast majority going to employees in Jefferson and surrounding counties. Passport's employees provided almost $1 million dollars in local taxes and approximately $2 million in State taxes in 2018. Passport maintains close to $1.5 million in local real estate costs.  Passport gave nearly $750,000 in grants

December 11, 2019
Page 35

DICKINSON WRIGHT PLLC

and sponsorships to local community agencies in the area in 2018 and about $10 million since inception. No national MCO can boast such a commitment to this Commonwealth, or replace Passport's two decade long history of partnership; partnership with the Commonwealth, partnership with providers, and partnership with critical social services agencies. Passport is a Kentucky plan, through and through; by Kentuckians and for Kentuckians.

## VI.  CERTAIN BIDDERS SHOULD NOT HAVE BEEN AWARDED CONTRACTS FOR THE MEDICAID PROGRAM

The Commonwealth takes a significant gamble by awarding contracts to Molina and WellCare. Molina's past performance in other Medicaid managed care markets has proven to be unsuccessful. Moreover, WellCare – once its acquisition by Centene Corporation is final – will fall under the management of a company that has not only already terminated a Medicaid Managed Care Program contract with the Commonwealth, but also sued the Commonwealth (and was counter-sued by the Commonwealth) related to such contract. If the past is any indication, neither Molina nor WellCare (under the ownership of Centene) will be consistent, stable, and cooperative partners to the Commonwealth.

### A.    Molina

Molina's recent track record of losing state Medicaid procurements as the long-standing incumbent should give the Commonwealth much pause. How does the Cabinet have faith in a company that has been forced to exit markets far more complex and sizable than Kentucky? In Illinois, Florida, Texas, and New Mexico, in recent years, Molina has lost part or all of its business.

- In Illinois, in 2017, in advance of a re-procurement, the Illinois Department of Healthcare and Family Services disenrolled all 26,750 Molina members in the Springfield area and placed them into the state's fee-for-service Medicaid Program due to disruption in Molina's provider network. A state spokesperson reported that the decision to remove Molina from the 6-county region was due to Molina's network "not meeting department standards for beneficiary access."[27]

- The state of New Mexico awarded its Medicaid Managed Care Program contracts for a January 1, 2019 start date, ousting long-time incumbent Molina. Molina had been the largest Medicaid managed care plan in the state, serving 225,000 beneficiaries. Molina was not successful in its protest of the decision and was forced to exit the market.

---

[27] *See* "Molina's managed-care Medicaid patients to be placed in fee-for-service system", The State Journal-Register, April 7, 2017: https://www.sj-r.com/news/20170407/molinas-managed-care-medicaid-patients-to-be-placed-in-fee-for-service-system, attached as Attachment 12.

December 11, 2019
Page 36

- Florida's procurement of contractors for its Medicaid Program for a January 1, 2019 start date, the first since a 2013 procurement, awarded Molina only 2 of 11 regions; this after Molina filed a protest when the original award left Molina with no regions at all. The award represented a large reduction in Molina's Florida footprint as it operated previously in 8 of the 11 regions. The state's smaller award to Molina signals a loss of confidence in the company, and should be a warning sign to the Commonwealth that Molina's track record was not strong enough to continue throughout a larger part of the state.

- Just this fall, in Texas, Molina lost a $1 billion contract to serve nearly 90,000 of the state's Star+Plus members in 4 of 6 regions as of the end of 2019. STAR+PLUS is a Texas Medicaid Managed Care Program integrating the delivery of Acute Care services and Long-Term Services and Supports (LTSS) for people who are age 65 or older, blind, or disabled.

In addition, Molina's deficient performance in various markets subjected it to weighty fines and penalties for harm to members and providers. Among them:

- In May 2019, the Insurance Commissioner of the State of Washington fined Molina Healthcare $600,000 with $200,000 suspended, and a mandated compliance plan related to incorrect billing for mammograms and emergency visits, and denial of services related to Autism. See Consent Order with Fine issued by the Washington State Office of the Insurance Commissioner.

- In 2018, the Texas Department of Insurance ("TDI") fined Molina $500,000, in addition to nearly $8 million in penalties and interest to the TDI and to impacted health care providers for prompt pay deficiencies. This occurred after Molina corrected prompt pay reports from 2014 to 2017, paying in excess of $4 million in penalties and interest, and payments to providers who were underpaid in those years nearly $3.8 million.

- In late 2018, the state of California's Department of Managed Health Care ("DMHC") fined Molina over $200,000 in two separate penalties related to Molina's handling Medi-Cal managed care and commercial plan enrollee grievances in violation of California's Health and Safety Code. A year prior, DMHC fined Molina $100,000 for failing to assist an enrollee with an out of network emergency room claim. In 2015, Molina was fined $500,000 for additional grievance system violations.

Still despite all this, the Cabinet appeared to favor Molina over Kentucky-resident bidders who were rightfully entitled to a preference under Kentucky law. Resident offerors are entitled to a preference "against a nonresident bidder registered in any state that gives or requires a preference to bidders from that state. The preference shall be equal to the preference given or required by the

December 11, 2019
Page 37

state of the nonresident bidder." KRS 45A.494. *See also* KRS 45A.492 (preferring Kentucky residents in public contracts serves public policy).

An offeror qualifies as a resident bidder if it is authorized to transact business in the Commonwealth and it "[h]as *for one (1) year prior to and through the date of the advertisement,* filed Kentucky corporate income taxes, made payments to the Kentucky unemployment insurance fund established in KRS 341.490, and maintained a Kentucky workers' compensation policy in effect." KRS 45A.494(2)(b) (emphasis added). Yet, according to its corporate filings with the state, Molina has not filed income taxes, paid unemployment insurance, or maintained a workers compensation policy in the Commonwealth, "for one (1) year prior to and through the date of the advertisement."[28] To do so would have been impossible – Molina did not exist until March 6, 2019 – only two months "prior to and through the date of the advertisement," which in this case was the RFP posting date of May 16, 2019.

Although Molina did not qualify as a residential bidder, the Cabinet never bothered to assess whether other resident bidders would be entitled to a preference as against Molina, even though both KRS 45A.494 and the RFP required it to do so. *See* RFP at Sec. 40.1. *See also* FAC Manual at FAP 110-10-00, paragraph 25 ("All agencies shall consider and apply the Reciprocal Preference Laws, in accordance with KRS 45A.494 and 200 KAR 5:400, before the final award of all contracts."). The Secretary can be certain it did not, because the Cabinet said as much in its "Determination and Finding": "Kentucky Reciprocal Preference law did not have any bearing on the award."

For this additional reason, the Cabinet's award to Molina is not only a gamble on the quality of care available to low-income Kentuckians – it is contrary to law, and yet a further basis for vacating the awarded contracts.

**B.    Centene/WellCare**

WellCare – once its acquisition by Centene Corporation is final – will fall under the management of company that has not only already terminated a Medicaid Managed Care Program contract with the Commonwealth, but also sued the Commonwealth related to such contract. In March 2019, Centene announced plans to acquire WellCare for more than $15 million, increasing Centene's already sizable market share in the Medicare Advantage and Medicaid plan industries. Centene announced this fall that it expected the transaction to close earlier than initially anticipated with final approvals coming in early 2020. Various providers, and the American Hospital Association, implored the Justice Department and state regulatory agencies to take a closer look at the acquisition given the impact it will have on competition and delivery of care to vulnerable populations.

---

[28] *See* Molina Corporate filings attached hereto as Attachment 13.

December 11, 2019
Page 38

DICKINSON WRIGHT PLLC

     Under Centene's ownership, WellCare stands to risk its reputation and whatever rapport and good currency it had built with the Commonwealth to date. In 2011, the Commonwealth's Cabinet for Health and Family Services signed contracts with three Medicaid health plans to partner for the revamped Medicaid Program in 104 counties which went live in late 2012. Among the awardees were WellCare and Centene Corp., doing business as Kentucky Spirit. In less than one year from the Program's commencement, Kentucky Spirit pulled out of the Program, citing losses in excess of $120 million. The company then sued the Commonwealth for damages, blaming the Commonwealth for flawed data that lead the company to underestimate the actual costs and poor health of members. As a result, the Commonwealth counter-sued alleging breach of contract and sought to recover significant damages and enforce its rights under the $25 million performance bond required for each Medicaid MCO, not to mention the 125,000 members that had to be reassigned to the remaining health plans operating in the Medicaid Managed Care Program. The Commonwealth further contended that Kentucky Spirit's exit would lead to $28 million to $40 million in Commonwealth expenditures, and $92 million to $134 million in federal CMS expenditures.[29] Despite these outrageous financial implications, after nearly three years of litigation, after Governor Bevin took office in late 2015, the Commonwealth ultimately settled with Kentucky Spirit in 2016[30], paying Kentucky Spirit a cash amount, and both parties agreeing to drop all lawsuits made against each other.[31] Perhaps the Commonwealth has forgotten of this debacle and the upheaval and disruption that ensued. Rate issues are not uncommon in the Medicaid Program, but Kentucky Spirits' actions to terminate its state contract and bring suit against the Commonwealth because of those issues was shocking and indicative of Kentucky Spirit's/Centene's poor approach to a partnership with the Commonwealth. It is puzzling and disappointing that the Commonwealth would award another contract to WellCare, knowing full well that Centene Corp. has recently purchased WellCare. Centene Corp. already bailed on the Commonwealth once when it was not happy with its subsidiary's participation in the Program. It should be barred from further contract awards, directly or through a subsidiary (or pending subsidiary) given its past behavior and poor partnership.

     In addition, Centene has experienced its fair share of performance issues resulting in fines and disputes. It is curious that these were likely not disclosed in the recent RFP response submitted

---

[29] *See* Centene Corporation's Form 10-Q for the period ending September 30, 2016 at https://investors.centene.com/static-files/07f3df18-f558-493e-b124-e66f982b2a73, attached as Attachment 14.

[30] The timing of this settlement is curious, especially in light of the $1 million dollar donation that Centene made to the Republican Governor's Association in 2016 (and, again nearly that same amount two years later in 2018). *See* https://www.opensecrets.org/527s/527cmtedetail_contribs.php?cycle=2016&ein=113655877 and https://www.opensecrets.org/527s/527cmtedetail_contribs.php?cycle=2018&ein=113655877, attached as Attachment 15 and Attachment 16.

[31] Michael Neidorff, Centene's CEO, was quoted as saying "We commend Governor Bevin for taking the initiative to resolve this long-standing dispute." *See* "Centene reaches settlement with Kentucky", St. Louis Business Journal, Nov. 4, 2016. https://www.bizjournals.com/stlouis/news/2016/11/04/centene-reaches-settlement-with-kentucky.html, attached as Attachment 17.

December 11, 2019
Page 39

by WellCare, despite the fact that by the time the new contract goes live, Centene will more likely than not be the owner of the WellCare subsidiary in the Commonwealth. Examples of the performance issues and related sanctions and fines include:

- In 2017, the state of Nebraska's Medicaid Program sanctioned Centene's Nebraska subsidiary, Heritage Health, citing "ongoing and serious deficiencies" in its performance, specifically related to payments to behavioral health and home health care providers.

- In Arizona, Centene's behavioral health subsidiary, Arizona Complete Health (formerly Cenpatico Integrated Care) was sanctioned by the Arizona Health Care Cost Containment System (AHCCCS) with a $125,000 fine related to claims processing failures.

- Centene's Iowa subsidiary, Iowa Total Care, was awarded a contract in 2018 to manage part of the state's $4.8 billion Medicaid Program, despite scoring nearly 14 points lower than when it applied and was rejected in 2015, according to public records identified by reporters and referenced in a Des Moines Register news article.[32] The investigation uncovered over $23 million in penalties in more than 12 states resulting from Centene's and its subsidiaries' mismanagement of program operations (i.e., prompt claims payment, network inadequacies; and EPSDT compliance).

## VII.    REMEDIES TO THE BEVIN CABINET'S BIASED ASSESSMENT AND ILLEGAL CONTRACT AWARDS

### A.    The Commonwealth is Free to Terminate the Awarded Contracts for "Convenience"

The Secretary is empowered to terminate for convenience the contracts resulting from the RFP, even if she disagrees with Passport's protest. Section 40.22 of the RFP provides that any contract resulting from the Cabinet's solicitation "shall be subject to the termination provisions set forth in 200 KAR 5:312." Section 5:312(3) in turn states that the "Commonwealth may terminate a contract **for convenience** if the purchasing officer has determined that termination will be in the commonwealth's best interests." (emphasis added). The only limitation on the Commonwealth's right to do so is that it should provide the contractor "(30) calendar days written notice" of the termination, and even then, the "Finance and Administration Cabinet, or his designee," may make a written determination that "a shorter notice of termination for convenience is in the best interest

---

[32] *See*, "Exclusive: Iowa's new private Medicaid manager has paid millions of dollars in penalties in a dozen states", Des Moines Register, July 1, 2018. https://www.desmoinesregister.com/story/news/investigations/2018/07/01/iowa-new-private-medicaid-company-troubled-past-centene-millions-dollars-penalties/637740002/,    attached    as Attachment 18.

December 11, 2019
Page 40

DICKINSON WRIGHT PLLC

of the commonwealth." *Id.* All successful bidders agreed to the termination-for-convenience provision by virtue of having accepted and signed the Cabinet's offered contracts. *See* RFP at Sec. 40.22. Moreover, the contracts awarded under the RFP contain a termination for convenience provision at Section 39.15. Thus, the awarded bidders cannot be heard to complain if the Commonwealth exercises its rights under the terms of the contracts to which they agreed.

The Commonwealth is entitled to terminate contracts with bidding parties for convenience upon a change in circumstances. *RAM Eng'g & Const.*, 127 S.W.3d at 585–86. Here, circumstances have indisputably changed with the election of a new Governor. The Beshear administration's policy values and vision for Medicaid are markedly different from that of the Bevin administration. Why should the Beshear administration be limited and bound by a program that does not align to its own goals? Or a program engineered to implement an illegal, unapproved demonstration project certain to cause Kentucky's Medicaid beneficiaries "a great deal of harm"? *Stewart II*, 366 F. Supp. 3d at 155. Differing policy values – values that Kentucky voters have recently endorsed – are a wholly valid basis to reject a contract executed by a previous administration. *See e.g.*, *Landrum v. Commonwealth ex rel. Beshear*, *supra*, 2019 WL 4072505, at *11 (Ky. Aug. 29, 2019) (former Secretary Landrum did not act arbitrarily in canceling contracts entered into by then-Attorney General Beshear upon recommendation of a republican-led Government Contract Oversight Committee).

The path forward following a termination for convenience is also straightforward under 200 KAR 5:312: (1) The purchasing officer may either negotiate a settlement, or the Secretary shall issue a determination of the amount, if any, due the contractor; (2) the contract is bound to "[s]*top work immediately* on the terminated" contract, and take other steps necessary to minimize any further damages and waste; and (3) payment of the settlement sum is made to the terminated contractor.[33] Thereafter, the Beshear Cabinet may proceed with an RFP reflective of its goals for the Commonwealth's Medicaid Program.

To reiterate, this avenue is available *whether or not* the Secretary sustains the protest. All winning contractors have agreed the Cabinet may terminate the contract for its "convenience." No cause of action lies against the Commonwealth for exercising the very rights the successful bidders agreed it should have. And, due to the change in administration and critical policy differences between Governor Bevin and Governor Beshear, it is most certain in the "Commonwealth's best interest" to terminate the existing contracts for convenience.

---

[33] Any settlement sum to the awarded bidders here would be de minimus for several reasons: (1) the contracts do not take effect until July 1, 2020, (2) the contracts were awarded two weeks ago; and (3) within days of the announcement of the award concerns were raised about the award of the contracts, putting the bidders on notice of the potential for action regarding the contracts.

December 11, 2019
Page 41

**B.**    **The Commonwealth is Bound to Rescind Contracts Awarded in Violation of the KMPC and in an Arbitrary and Capricious Fashion**

Even if the Beshear Administration declines to terminate the awarded contracts for "convenience" as is its right, the Secretary here must nevertheless rescind the contracts awarded based on the arbitrary, capricious, and unlawful decision making detailed above.[34]

As explained, the Bevin Cabinet failed to comply with basic requirements of Kentucky law in awarding the contracts, disregarding its promise in the RFP to invite oral arguments where they may "affect the final rankings," disregarding the KMPC's requirement that it hold discussions with the bidders, declining to specify scoring values as required under both state and federal law, and permitting numerous scoring errors that are plain even from the limited records that have thus far been made available to Passport. Beyond all this is the longstanding pattern of the Bevin administration to deride Passport, and its bias has unavoidably infected its decision in this case.

For these reasons, Secretary must (1) sustain the protest; and (2) rescind the awarded contracts.

**C.**    **Next Steps Following Termination**

Regardless of the means by which the awarded contracts are terminated (or rescinded), the Cabinet's next step will be to determine whether: (1) to rescind the problematic RFP, in addition to rescinding the awarded contracts, and draft a new RFP from scratch, or (2) to keep the current RFP but amend it to conform both with the KMPC, and the Beshear Administration's Medicaid policy goals.

**D.**    **Curing the Bevin Administration's Errors will Not Interrupt Care to the Commonwealth's Medicaid Beneficiaries**

Termination of the awarded contracts, either for convenience, or as a result of Passport's protest, need not result in interruption of care to the Commonwealth's most vulnerable. Rather, the Cabinet and the Commonwealth have multiple avenues available to correct the Bevin Cabinet's errors without incident.

---

[34] An addition path of action that the Secretary may utilize was triggered on December 9, 2019, when the legislature's contract review committee voted 6-0 to "disapprove" the award under the RFP. While such a vote is not binding, it starts a process whereby the Secretary shall respond within ten days. *See* "Lawmakers rip last-minute, $8 billion Medicaid contract awarded by Bevin administration," n.24.

December 11, 2019
Page 42

DICKINSON WRIGHT PLLC

Specifically, the Commonwealth may either: further extend the current MCO contracts effective July 1, 2015 (hereinafter, the "current contracts"), by modification, or enter into new bridge contracts effective July 1, 2020 until the protest is resolved.

Under Section 40.8 of the former RFP, the current contracts permit the Commonwealth and the MCOs to mutually agree to a modification in writing and incorporate it as a written amendment pursuant to KRS 45A.210(1) and 200 KAR 5:311.[35] The Cabinet has also reserved the right under the current contracts "to renegotiate any terms and/or conditions as may be necessary to meet requirements for the extended period," which has not yet expired.

As with all Medicaid contracts, CMS will, of course, have to approve the modifications, *see* 42 C.F.R. §§ 438.6(a),(c), 438.806(c); *see also* 42 U.S.C. § 1396b(m). However, by extending the term of already-approved contracts, such review may be limited to only the capitation rates, *see* 42 C.F.R. §§ 438.4, 438.5 & 438.7 (standards for rate development and documentation requirements). Such review should be less onerous than the review CMS would have to undertake of the newly executed MCO contracts under the RFP – especially of newly-executed contracts with insurers who have never before facilitated care in the Commonwealth. Indeed, CMS's guidance on MCO contract amendment and capitation rates suggests that if the rates under the current contracts as modified or amended are not affected, the Commonwealth need not have them re-certified in order for CMS to approve the modification:

ix. Procedures for rate certifications for rate and contract amendments, include:

(a) CMS requires that the state submit a new rate certification when the rates change, except for changes permitted in 42 CFR §438.7(c)(3).

(b) **for contract amendments that do not affect the rates (except for changes permitted in 42 CFR §438.7(c)(3)), CMS does not require a new rate certification from the state.** However, if the contract amendment revises the covered populations, services furnished under the contract or other changes that could reasonably change the rate development and rates, the state and its actuary must provide supporting documentation indicating the rationale as to why the rates continue to be actuarially sound in accordance with 42 CFR §438.4.

---

[35] 200 KAR 5:311 generally requires "[a]ll changes to contracts for the purchase of commodities, supplies, equipment and construction services shall be effected by a modification to the contract." A "contract modification" under the KMPC means "any written alteration in the specifications, delivery point, rate of delivery, contract period, price, quantity, or other contract provisions of any existing contract, whether accomplished by unilateral action in accordance with a contract provision or by mutual action of the parties to the contract. It includes bilateral actions, such as supplemental agreements, and unilateral actions, such as change orders, administrative changes, notices of termination, and notices of the exercise of a contract option." KRS 45A.030(9).

December 11, 2019
Page 43

DICKINSON WRIGHT PLLC

(c) there are several circumstances when CMS would not require a new rate certification:

> (i) the state may increase or decrease capitation rate per rate cell up to 1.5 percent range, in accordance with 42 CFR §438.7(c)(3).

> (ii) a state applies risk scores to the capitation rates paid to the plans under a risk adjustment methodology described in the rate certification for that rating period and contract, in accordance with 42 CFR §438.7(b)(5)(iii).

(d) any time a rate changes for any reason other than application of an approved payment term (e.g., risk adjustment methodology), which was included in the initial managed care contract, the state must submit a contract amendment to CMS, even if the rate change does not need a new rate certification. (emphasis added).[36]

Alternatively, should Cabinet opt for bridge contracts, it has the authority to enter into such contracts if either the Governor declares an emergency, KRS 39A.100(2)(d), or the agency head declares an emergency, *see* KRS 45A.095.

When "emergency conditions exist," an agency can make a contract by noncompetitive negotiation. KRS 45A.095(2)(c). An "emergency condition" includes "a situation which creates a threat or *impending threat to public health* . . . The existence of the emergency condition creates an immediate and serious need for services, construction, or items of tangible personal property that cannot be met through normal procurement methods and the lack of which would seriously threaten the functioning of government, the preservation or protection of property, or the health or safety of any person." KRS 45A.095(1)(a) (emphasis added).

If an "emergency condition" does exist, "the chief procurement officer, head of the using agency, or a person authorized in writing as the designee of either officer may make or authorize others to make emergency procurements[.]" KRS 45A.095(5). Likewise, 200 KAR 5:309(10) provides that contracts may be awarded through noncompetitive negotiation in limited circumstances, including for "commodities, supplies, equipment, or construction services that would ordinarily be purchased on a competitive basis if an emergency has been declared in the manner described by KRS 45A.095(2) and (3)." "The Finance and Administration Cabinet may [also] negotiate directly for the purchase of contractual services, supplies, materials, or equipment in bona fide emergencies regardless of estimated costs." KRS 45.095(6). Pursuant to the Cabinet's

---

[36] *See* CMS's *2019-2020 Managed Care Rate Development Guide,* available at https://www.medicaid.gov/medicaid/managed-care/downloads/guidance/2019-2020-medicaid-rate-guide.pdf, attached as Attachment 19.

December 11, 2019
Page 44

DICKINSON WRIGHT PLLC

own Manual of Policies and Procedures, emergency purchases made in compliance with FAP 111-39-00 "*shall* be approved by the [S]ecretary of the FAC or [her] designee." (emphasis added).[37] The emergency conditions here would be the need to avoid interruption of care for Medicaid members while the state resolves resolve the instant protest.

And the Commonwealth would not be the first to follow this path – Louisiana recently cited emergency conditions as a basis for extending their MCO contracts in response to protest litigation.[38] Kansas has too. Moreover, Kansas was able to successfully secure CMS approval for its emergency contract extension for then-existing MCO contracts in October 2017, despite CMS' prior concerns regarding lax oversight of that state's MCOs.[39] Plainly, CMS shares the states' interest in ensuring that beneficiary care remains accessible and uninterrupted.

Pennsylvania likewise chose to extend its existing MCO contracts when insurer protestors challenged its contract awards in 2017. *See UnitedHealthcare of Pennsylvania, Inc. v. Dep't of Human Servs.*, 2018 WL 1722664, at *9 n.20 (Pa. Commw. Ct. Apr. 10, 2018) ("By Stipulation and Order approved by this Court on June 30, 2017, the Department agreed to stay all procurement activities with regard to the Reissued RFP, including negotiations of any kind or readiness review activities, until this Court's disposition of Aetna's petition for review. The Department also agreed that the existing HealthChoices agreements will remain in effect and will not be terminated."). Washington D.C. did the same in 2018.[40] Consistently then, CMS approval has not been an obstacle to the necessary extension of existing MCO agreements.

---

[37] *See* Finance and Administration Cabinet Manual of Policies and Procedures, Amended February 2016, available at https://finance.ky.gov/services/policies/Documents/FINAL 2015 FAP Manual corrections (Pg 80 revision + 111-43-00) 071516.pdf

[38] See Louisiana Department of Health Announcement, "Louisiana Secures Emergency Plan Contracts," available at http://ldh.la.gov/index.cfm/page/3719, attached as Attachment 20. Copies of the signed emergency contracts are also available through the state of Louisiana, *see* *e.g.*, http://ldh.la.gov/assets/docs/BayouHealth/Contract_Amendments/LHCC-E/LHCC-CF_1signed.pdf, attached as Attachment 21.

[39] *See* National Public Radio Publication of KCUR 98.3 *"As Deadline Nears, Kansas Still Waiting for Federal Approval of KanCare Extension,"* Jim McLean, Oct. 4, 2017, available at https://www.kcur.org/post/deadline-nears-kansas-still-waiting-federal-approval-kancare-extension - stream/0, attached as Attachment 22. CMS' October 17, 2017 letter of approval to Kansas is available at https://clpc.ucsf.edu/sites/clpc.ucsf.edu/files/KanCare 1115 12 Month Extension Approval Ltr 101317.pdf, attached as Attachment 23.

[40] *See* Washington D.C.'s Department of Health Care Finance Annual Fiscal Reports, 2017-2018 Report at 11-13, available at https://dhcf.dc.gov/sites/default/files/dc/sites/dhcf/release_content/attachments/DHCF%20Oversight%20Testimony%202-2018.pdf, attached as Attachment 24, and 2018-2019 Report at 45-46, noting that emergency contracts were executed, available at https://dccouncil.us/wp-content/uploads/2019/04/dhcf.pdf, excerpts attached as Attachment 25.

December 11, 2019
Page 45

DICKINSON WRIGHT PLLC

Given the stakes, and the Commonwealth's flexible options to avoid the disruption of care to hundreds of thousands of Kentuckians who depend on Passport's well-established provider network and community involvement, this is not an instance in which "continuation of the procurement is necessary to protect substantial interests of the Commonwealth." KRS 45A.290. If anything, the opposite is true – continuation of a procurement process marred by bias, rendered unlawful, arbitrary and capricious by the previous Administration's disregard for legal requirements, and which does not reflect the values of the newly-elected Administration in any event – weighs heavily against the Commonwealth's interest. Passport's beneficiaries should be permitted to rely on the care and the providers they trust pending the Commonwealth's resolution of its protest.

## CONCLUSION

As Governor Beshear and his team have indicated, an award of $8 billion in contracts with 11 days left in Governor Bevin's administration is concerning. Given the priority that Governor Beshear has placed on health care, and his statement that there will be a week one order to rescind the Kentucky HEALTH Medicaid waiver, terminating the newly awarded contracts under the termination for convenience clause is prudent. Such termination would be in the best interest of the hundreds of thousands of potentially impacted members to have clarity as to the future of the Program. Therefore, it would be advisable to begin processing an emergency extension immediately. If the protests continue forward, the new Secretary or her designee will issue a written determination of the grounds asserted in the protest and it will be considered to be final and conclusive for purposes of administrative remedies. If a protest is sustained, potential remedies may include: (1) cancellation of the solicitation; (2) cancellation of the award; (3) an order directing the agency to re-score the bids or offers; or (4) other remedies as may be appropriate.

Sincerely,

Andrew L. Sparks

ALS

Enclosures

BLOOMFIELD 90770-1 2739639v3