UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON,<br><br>      Defendants. | Case No. 1:19-cv-01031-RDA-TCB |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................iv

I.     Introduction.....................................................................................................................1

II.    Factual Background ........................................................................................................5

       A.     Evolent's Entire Business Model was Predicated on its Purported Ability to
              Reduce its Clients' Costs ................................................................................... 5

       B.     Evolent Becomes a "Co-Owner" of Passport, Which in Turn Becomes its
              Most Important Client ........................................................................................ 6

       C.     Rather than "Lower Clinical and Administrative Costs," Evolent
              Dramatically Increases Passport's Costs Throughout the Class Period .................... 7

       D.     Evolent's Faulty Claims Administration Platform Leads to Nearly Half a
              Billion Dollars in Undisclosed Penalties and a Crippling Medicaid
              Reimbursement Rate Cut.................................................................................... 8

       E.     Acquiring Passport is "Not in our Strategic Lens": The Truth Begins to
              Emerge While Defendants Continue to Misrepresent the Difficulties with
              Passport ........................................................................................................... 11

       F.     "The Writing Was on the Wall:" After Months of Internal Planning Evolent
              Publicly Reverses Course and Announces it Will Buy a 70% Stake in
              Passport ........................................................................................................... 13

III.   Argument ...................................................................................................................15

       A.     Plaintiffs Have Pled That Defendants Made False and Misleading
              Statements ....................................................................................................... 15

              1.    Defendants' Statements Were False and Misleading When Made.............. 15

                    a)    Defendants Made False and Misleading Statements About
                          the Ability of Evolent's Services to "Lower Clinical and
                          Administrative Costs"...................................................................... 15

                    b)    Defendants Made False and Misleading Statements About
                          Evolent's Valence Claims Administration Platform...................... 22

                    c)    Defendants Made False and Misleading Statements About
                          Their Bailout and Acquisition of Passport ..................................... 24

              2.    Defendants' False and Misleading Statements Were Material.................... 27

B.     The Complaint Raises a Strong Inference That Defendants Acted with Scienter ................................................................................................................ 30

C.     Plaintiffs Have Pled Loss Causation ....................................................................... 38

IV.    Conclusion ........................................................................................................................40

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004).................................................................................. 19, 20

*Arnlund v. Deloitte & Touche LLP*,
  199 F. Supp. 2d 461 (E.D. Va. 2002)............................................................................ 34

*Asher v. Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004)........................................................................................ 40

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........................................................................ 29

*Black v. Martek Biosciences Corp.*,
  2006 WL 8435572 n.13 (D. Md. June 14, 2006) ..................................................... 23, 24

*Brendon v. Allegiant Travel Co.*,
  412 F. Supp. 3d 1244 (D. Nev. 2019) .......................................................................... 30

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012)........................................................................... 31

*Curran v. Freshpet, Inc.*,
  2018 WL 394878 (D.N.J. Jan. 12, 2018) ...................................................................... 25

*Davison v. Loudoun Cty. Bd. of Supervisors*,
  2016 WL 4801617 (E.D. Va. Sept. 14, 2016)................................................................ 20

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................................... 38

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016)............................................................................... 28

*Hering v. Rite Aid Corp.*,
  331 F. Supp. 3d 412 (M.D. Pa. 2018) ........................................................................... 27

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994)......................................................................................... 29

*In re Akorn Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ........................................................................... 22

iv

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ............................................................. 18, 29

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ............................................................. 27

*In re Computer Sciences Corp. Sec. Litig.*,
890 F. Supp. 2d 650 (E.D. Va. 2012).................................................................... 32

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) .................................................... 18, 19

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015)............................................ 31, 32, 36, 37

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ..................................................................... 29

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ............................................................ 18, 26

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D.W.V. 2012).............................................................. 29, 40

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 3d 620 (E.D. Va. 2000)................................................................ 36, 37

*In re Trex Co., Inc. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) ..................................................................... 18

*In re XM Satellite Radio Holdings Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007) ...................................................................... 29

*Janus Cap. Grp. v. First Deriv. Traders*,
564 U.S. 135 (2011) ......................................................................................... 24, 25

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236 (D.S.C. July 25, 2016) ....................................................... 22, 33, 39

*Keippel v. Health Ins. Innovations, Inc.*,
2019 WL 5698329 (M.D. Fla. Nov. 4, 2019)........................................................ 29

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)............................................................................... 19

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015).......................................................... passim

*Local 295/Local 851 IBT Emp. Grp. Pension Tr. and Welfare Fund v. Fifth Third Bancorp.*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010)........................................................................... 38

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) ............................................................................. 34

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009)................................................................................. 26, 31

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
  674 F.3d 369 (4th Cir. 2012)........................................................................................ 22

*McIntyre v. Pedder*,
  2015 WL 5039431 (W.D.N.C. Aug. 26, 2015)............................................................ 19

*Mendoza v. Wells Fargo Bank, N.A.*,
  2014 WL 2624938 (S.D. Tex. June 12, 2014) ............................................................. 20

*Miss. Pub. Empl. Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008) .......................................................................................... 26

*Monroe Cty. Empl. Ret. Sys. v. S. Co.*,
  2018 WL 1558577 (N.D. Ga. Mar. 29, 2018).............................................................. 29

*Murphy v. Precision Castparts,*
  *Corp.*, 2017 WL 3084274 (D. Or. June 27, 2017) ...................................................... 28

*Nieman v. Duke Energy Corp.*,
  2013 WL 4004274 (W.D.N.C. July 26, 2013) ............................................................. 15

*Peace Officers' Ann. & Ben. Fund of Ga. v. DaVita Inc.*,
  372 F. Supp. 3d 1139 (D. Colo. 2019) ......................................................................... 27

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014)................................................................................... 34, 37

*Ret. Sys. v. Sterling Fin. Corp.*,
  963 F. Supp. 2d 1092 (E.D. Wash. 2013) .................................................................... 38

*SEC v. Agora, Inc.*,
  2007 WL 9725170 (D. Md. Aug. 3, 2007).................................................................... 28

*SEC v. Pirate Inv'r, LLC*,
  580 F.3d 233 (4th Cir. 2009)........................................................................................ 30

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010).......................................................................... 27

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018)................................................................. 28, 38, 39, 40

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014)................................................................. 28

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007)................................................................. 34, 35

*Tellabs, Inc. v. Major Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................. 31, 37

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)................................................................. 26

*Willis v. Big Lots, Inc.*,
  2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ................................................................. 28

*Yates v. Municipal Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014)................................................................. 37, 38

Rules

Fed R. Evid. 201 ................................................................. 20

Lead Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 48).[1]

## I.    INTRODUCTION

Throughout the Class Period, Evolent Health, Inc. ("Evolent" or the "Company") created an illusion of explosive growth predicated on a business model that was supposed to "lower clinical and administrative costs" for its health system clients, enable them to "drive greater efficiency," and allow them to "manage patient health in a more cost-effective manner." In particular, Evolent touted its partnership with a Kentucky-based Medicaid plan known as Passport Health Plan ("Passport") as the paragon of this cost-cutting strategy. Evolent boasted that its relationship with Passport was "creat[ing] value" for Passport and that it had yielded significant "improvement" to Passport's "bottom line." Given that Evolent appeared to be executing its winning cost-cutting formula on Passport—which was by far Evolent's largest and most important client—the Company's stock price soared, more than doubling in less than a year from $11 in November 2017 to a high of $28.75 in September 2018. Evolent's revenues also skyrocketed as a direct result of the Passport relationship: between 2016 and 2018, the Company's annual revenue increased by almost 150%, from $254 million to $627 million.

The truth, however, was that Evolent's highly touted cost-cutting platform was far from the success story that Defendants triumphantly portrayed—particularly at Passport. In reality, Evolent cannibalized Passport and drove it to the brink of bankruptcy. As multiple former senior employees of both Passport and Evolent confirmed, Evolent grossly overcharged Passport hundreds of millions of dollars during the Class Period without providing any corresponding

---

[1] All "¶__" references are to the Amended Class Action Complaint (ECF No. 38) (the "Complaint"); all defined terms have the meanings assigned in the Complaint; and all emphasis in quoted material is added unless otherwise noted.

benefits.  As CW 1, a senior member of Passport's Internal Audit team who reported directly to Passport's CFO, succinctly explained: "[Evolent] said they could cut costs by providing services; they did the opposite."  ¶52.  Indeed, upon minting the partnership, Evolent immediately hired away 350 Passport employees—more than 70% of Passport's workforce—and then billed Passport exorbitant fees that greatly exceeded what Passport had been paying for the exact same services.  As a result, between 2015 and 2016, Passport's administrative expenses increased almost 60% in one year, from $107.5 million to $169.1 million, and by 2018 those expenses had spiked to $194 million per year.  CW 1 explained that Passport was merely "paying [Evolent] to do that stuff that we used to do, and we were paying [Evolent] more."  ¶49.  Significantly, this dramatic increase in expenses could not be tied to a corresponding increase in Passport's business—to the contrary, Passport's costs grew at a rate more than 1,000% greater than its revenue.

Not only did Evolent gouge Passport for the same administrative services, but Evolent also extended its grasp into other crucial areas of Passport's operations with the same deleterious impact.  Specifically, in October 2017 Evolent implemented its newly acquired Valence claims processing platform at Passport, despite the fact that Evolent had no prior medical claims processing experience.  Medical claims administration was crucial for Passport, because Passport was required to report the claims data (also known as encounter data) to Kentucky, which then used the data to set the reimbursement rates for Passport.  These facts were well known to Evolent's most senior officers—indeed, numerous former employees stated that they told senior management that Valence was "not advanced enough" to process individual medical claims, that it was "not ready" to go live at Passport, and that Evolent was "just applying band-aids and fixes to it to get it to work."  ¶¶63-64.  Nevertheless, despite these warnings Evolent forced Passport onto Valence, and the results were predictably devastating.

2

From the minute that Valence went live, Kentucky began to assess Passport hundreds of millions of dollars in penalties for failing to timely and properly submit encounter data— staggering amounts which were undisclosed to investors.  These penalties, while hidden from investors, were documented in monthly letters addressed to Passport's senior executives, including its CEO and CFO, whose subject line read "Consequences for Failure to Submit Encounters in Accordance with the Contract."  The letters meticulously catalogued Passport's myriad of late and improper submissions of medical claims encounter data as a result of Valence.  All told, between October 2017 and April 2019, Passport submitted records that were collectively tens of millions of days late, which resulted in Kentucky imposed staggering penalties of nearly half a billion dollars on Passport precisely because Passport was unable to properly and timely submit encounter data as the direct result of the faulty Valence platform—the same platform former employees had warned management "just doesn't work."

Evolent's faulty Valence platform not only massively increased Passport's administrative costs, but it also led directly to Kentucky dramatically reducing Passport's reimbursement rates precisely because Passport was unable to timely submit accurate encounter data.  This crushing combination had a catastrophic financial impact on Passport and brought it to the brink of insolvency.  Evolent management would later admit that by January 2019, Evolent had realized that the "writing was on the wall" that Passport's financial situation was so desperate that it would likely need a bailout. Yet Defendants disclosed none of this to investors, instead repeatedly assuring investors that Evolent had no intention of bailing out or purchasing the ailing health plan. Indeed, during Evolent's February 26, 2019 earnings call, Defendant Williams expressly denied that Evolent would even consider bailing out Passport, stating that such a bailout was "just not in our strategic lens" and not "currently being evaluated."  ¶160.  Indeed, as late as May 7, 2019,

3

Defendants claimed that Passport's financial situation was improving, and Defendant Williams falsely assured investors that Passport was "making solid progress towards improving its financial performance." ¶165.

The market was stunned when a mere three weeks later, on May 29, 2019, Evolent abruptly reversed course. On that day, Evolent made the shocking announcement that Passport's financial condition was so dire that the Company had no choice but to acquire a 70% stake in the plan in a last-ditch effort to save its largest and most important customer. Analysts excoriated Evolent management for their lack of candor about Passport, noting that the deal meant that "Passport wasn't in a position to remain operationally sustainable as a standalone entity" and that "[m]anagement had previously talked down going after Passport as recently as 4Q18 earnings call." In response to the news of Evolent's emergency bailout of its largest customer, Evolent's stock price collapsed, losing nearly 30% of its value in a day.

Given the powerful facts detailed in the Complaint, bolstered by first-hand accounts from former employees, Defendants' motions to dismiss should be denied.[2]

First, scienter is more than adequately pled. By Defendants' own admissions, Evolent's control over Passport was absolute and unfettered: Defendants have expressly acknowledged that Evolent: (i) was "a co-owner" of Passport; (ii) had "joint governance" with Passport that allowed it to "drive the decisions we think are important for performance"; (iii) was "at the table participating in [Passport's operational] decisions"; (iv) controlled the "levers" at Passport; and (v) even installed a "shadow management team" at Passport. Defendants cannot now credibly

---

[2] Indeed, recognizing the futility of their arguments, Defendants have resorted to submitting a hodgepodge of 35 documents—including documents not referenced in the Complaint and self-serving documents written by Evolent's own executives—that are well beyond the scope of a preliminary motion to dismiss and inappropriate for judicial notice.

distance themselves from their status as an avowed "co-owner" of Passport, and their brief is silent as to these powerful admissions—because courts have uniformly held that such statements establish scienter.

Second, the Complaint details how and why Defendants' statements about Evolent's relationship with Passport and its entire cost-cutting business model were false and misleading. Rather than lowering costs, Evolent caused Passport's costs to dramatically increase. Defendants also failed to reveal that as a direct result of Evolent's faulty claims processing platform, Passport was unable to timely and properly submit critical encounter data to Kentucky as required by its contract with the Commonwealth, causing it to incur hundreds of millions of dollars in penalties. Nothing more is required to plead falsity.

Finally, there is no question that the Complaint adequately alleges loss causation. The Complaint clearly alleges that Defendants' fraud was revealed through two disclosures, on February 15, 2019 and May 29, 2019, that caused the Company's share price to plummet 10% and 29%, respectively. Defendants point to a January 25, 2019 *Insider Louisville* article that they purport revealed the true scope and impact of Evolent's fees on Passport prior to these disclosures—but neglect to mention that within the very article they cite, Defendants flatly denied that Evolent's fees were harming Passport, or that Evolent was overcharging the Plan in any way. ¶91. Plaintiffs more than meet the pleading requirements for establishing loss causation.

For all of these reasons, Defendants' motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.   Evolent's Entire Business Model was Predicated on its Purported Ability to Reduce its Clients' Costs

Evolent is a provider of healthcare delivery and payment services to Medicaid and Medicare health plans. ¶35. The Company's entire business model is predicated on its purported

ability to reduce its clients' healthcare and administrative costs. ¶¶37-39. Evolent repeatedly touted that its suite of high-tech services would help Medicaid and Medicare plans "lower clinical and administrative costs," that its business would "reduce . . . total cost[s]" for its customers, and that its services would create "a cycle of clinical and cost improvement." ¶37. Evolent claimed it could achieve these goals through long-term "partnerships" with health plans whereby it would provide an integrated "suite" of services that would help these plans reduce their costs. ¶39.

**B.** **Evolent Becomes a "Co-Owner" of Passport, Which in Turn Becomes its Most Important Client**

Until its acquisition by Evolent in late 2019, Passport was a non-profit Medicaid plan based in Louisville, Kentucky that had primarily served Louisville-area Medicaid recipients for nearly 20 years. ¶30. Passport's relationship with Evolent officially began on February 1, 2016, when Evolent announced it had entered into a 10-year agreement to provide services to Passport, purportedly in order to help the plan cut its clinical and administrative costs. ¶40. Passport soon became by far Evolent's most important client. ¶41. Fees that Passport paid to Evolent accounted for 19.6%, 20.6%, and 17.5% of Evolent's revenue in 2016, 2017, and 2018, respectively—far more than any other single client. ¶41.

Because Passport was so critical to Evolent's bottom line, Defendants made clear that Evolent was intimately involved in Passport's operations, and in fact controlled the Company's business. Defendants regularly described Evolent as a "co-owner" of Passport and boasted that "we really have joint governance [over Passport] and we're able to drive the decisions we think are important for performance." ¶42. This, according to Defendants, gave them immense visibility into and control over Passport's operations. For example, Defendant Williams told investors that the arrangement allowed the Company to "drive very specific actions in terms of how [Passport is] ultimately operating their risk business," to "be at the table participating in [Passport's operational]

6

decisions," and to ultimately "control many more levers than if we're just in a pure service relationship." ¶43. The extent of Evolent's involvement and control was so great that, as Defendants would later reveal, they installed a "shadow management team" several months in advance of Evolent ultimately acquiring Passport in 2019, bringing in "our own CMO, our own CEO, our own COO," with them standing "shoulder to shoulder with Passport leadership." ¶45.

### C.      Rather than "Lower Clinical and Administrative Costs," Evolent Dramatically Increases Passport's Costs Throughout the Class Period

While Evolent reassured investors throughout the Class Period that its services would "lower clinical and administrative costs" for clients like Passport, in reality the exact opposite was true. As a former senior member of Passport's Internal Audit team succinctly put it: "[Evolent] said they could cut costs by providing services; they did the opposite." ¶52.

Evolent began by "rebadging" hundreds of Passport employees—which meant that Evolent hired them away from Passport and then had them continue to perform the exact same functions they had been performing for Passport, but in exchange for substantial fees paid to Evolent that dwarfed what Passport had previously spent to perform the same functions in-house. ¶¶47-48. Significantly, as CW 1 confirmed, "the admin expense [resulting from Passport's fees] was more than we were paying for those [employees'] salaries. That's all Evolent." ¶48. In other words, Passport was merely "paying [Evolent] to do that stuff that we used to do, and we were paying [Evolent] more. ¶49. Consequently, from 2015 to 2016, Passport's total administrative expenses increased 60% in just one year, from $107.5 million to $169.1 million. Then, between 2016 and 2018, the fees Passport paid to Evolent nearly doubled, increasing from $57.2 million to $109.7 million. And these massive increases could not be explained away by high revenue or membership growth, as Passport's administrative expenses increased 1,000% faster than its revenue. ¶53.

In 2016, 2017, and 2018, Passport paid Evolent fees of $57.2 million, $88.8 million, and

7

$109.7 million, respectively—meaning that Evolent's already outsized 2016 fees nearly doubled in just two years. ¶50. Yet in exchange for these fees, Passport never saw the promised overall cost-savings. As CW 1 put it, Evolent "didn't do all the great things that [it] was supposed to do." For example, Evolent was supposed to obtain additional revenue for Passport through "risk adjustment" services which were supposed to analyze data on how sick Passport's members had been in a given period, which could then be submitted to the state to obtain additional reimbursement. ¶51. But according to CW 3, who worked in risk adjustment, Evolent charged Passport twice as much in fees as it ever saved Passport, causing Passport to lose millions of dollars on this service alone. *Id*.

Indeed, as a direct result of the massive fees imposed on it by Evolent, Passport's financial condition dramatically worsened throughout its partnership with Evolent. In 2015, the year prior to the beginning of the partnership, Passport had a healthy net underwriting gain (i.e. operating profit) of $33.3 million. Yet, in 2016, Evolent's first year of servicing Passport, Passport dramatically swung to a net operating loss of $80.4 million. ¶87. In 2018 matters got dramatically worse, as Passport suffered a staggering and solvency-threatening $130.7 million net underwriting loss. ¶88. In spite of these glaring facts, Defendants misleadingly claimed to have provided "about $75 million of improvement to Passport's bottom line" as of May 2018 and increased that claim to "over $100 million savings" for Passport by September 2018. ¶¶145, 152.

> **D.    Evolent's Faulty Claims Administration Platform Leads to Nearly Half a Billion Dollars in Undisclosed Penalties and a Crippling Medicaid Reimbursement Rate Cut**

In May 2017, Evolent announced that, effective October 1, 2017, it would replace Passport's longstanding third-party claims administrator with Valence, Evolent's newly acquired claims administration platform. ¶57. Effective claims administration was Passport's most critical function. As Passport's claims administrator, Evolent was required to collect critical data known as

8

"encounter data" on each medical claim, which was essentially a description of how sick each patient was, and the care needed as a result. ¶59. Properly recording and accurately reporting encounter data was vital; as Evolent's own COO, Tom Peterson explained, "[o]ne of the most important things in Medicaid is encounter reporting," because "you're reporting your encounters to the state to make sure that you're accurately reflecting the claims volume since you're paying the claims and the actuaries are going to set the rates so you need to get as high of an encounter experience as possible. So how you actually manage encounters is really important." ¶60.

As Defendants ramped up Valence's implementation, they repeatedly assured investors that the platform was successful. On November 2, 2017—a month after the launch—Williams boasted that "we've successfully launched Passport […] onto our [Valence] services platform," and that teams monitoring the platform "report a smooth transition." ¶66. And in February 2018—several months after the platform had been fully launched at Passport—Defendant Williams assured investors that "the integration [of Valence] is going incredibly well." ¶135.

In reality, however, the launch of Valence at Passport was a "disaster" from the outset and became yet another way in which Evolent dramatically increased Passport's costs. ¶67. As former Evolent and Passport employees confirmed, Evolent had no prior claims administration experience and "didn't know Medicaid claims processing." ¶62. Making matters worse, Valence was designed as a dental claims processing platform and was "not advanced enough" to process Medicaid medical claims, which were far more complex. ¶¶54, 63-64. Indeed, as Evolent was hastily rolling out its Valence platform, former Evolent and Passport employees explicitly warned Evolent management that the system would not work because it "wasn't ready." ¶¶62-65.

By far the most significant consequence of the botched Valence implementation was that it caused Passport to incur hundreds of millions of dollars in penalties from Kentucky for utterly

9

failing to timely and properly submit encounter data.  ¶75.  Prior to implementing Valence, Passport had incurred *de minimis* penalties averaging just $33,000 per month for untimely and incorrectly submitted encounter data.  ¶77.  By contrast, as soon as Evolent took Valence live in October 2017, Passport's monthly penalties skyrocketed: first to $619,625—an increase of approximately 1,800%—and then exponentially into the tens of millions of dollars per month.  ¶77.  For example, in February 2018—just as Defendant Williams was assuring investors that the integration of Valence was going "incredibly well" (¶135)—Evolent caused Passport to submit records that were an astounding 44 million days late in the aggregate, resulting in Passport incurring $48 million in penalties for untimely and improperly submitted encounter data.  ¶¶76-77.  These immense monthly penalties not only continued through the Class Period, but they actually dramatically increased, demonstrating that the problems with Valence were never resolved and in fact were pervasive.  By November 2018, the penalties imposed on Passport exceeded $100 million per month.  All told, by April 2019 Passport had incurred a total of $489 million in penalties.[3]  ¶77.  Moreover, the senior officers of both Passport and Evolent were well-aware of these issues.  The penalties were so significant that they were set forth in monthly letters that Kentucky sent directly to Passport's most senior officers—including its CEO and CFO, and aptly titled "Consequences for Failure to Submit Encounters in Accordance with the Contract."  ¶75.

Former Evolent employees confirmed Evolent's disastrous claims administration had a dramatic and deleterious impact on Passport, and directly led to Kentucky's decision to cut its Medicaid payments to Passport in the second half of 2018.  Specifically, on May 30, 2018, Passport learned that Kentucky planned to significantly cut its Medicaid rates for the geographic

---

[3] Passport was saved from paying the full amount of these penalties only because Kentucky capped penalty payments at a set percentage of its revenue; even still, Passport was forced to pay roughly $10 million in penalties when it was already cash-strapped due to Evolent's malfeasance.  ¶78.

region covering the majority of Passport's members, for the six-month period ending December 31, 2018, reducing Passport's Medicaid revenue by roughly 3.2% (the "2018 rate cuts").    ¶80. Unbeknownst to investors, these cuts were "a direct result of Passport's own failure to submit encounter data correctly," as CW 3 confirmed, which was a "downstream effect" of Valence's failures.    ¶81.    Evolent management not only knew this, but according to CW 1 the Company's COO, Tom Peterson, was "on the ground for weeks on end trying to work to get things fixed" at Passport.    ¶82.    These cuts devastated Passport, which would project a net loss of $75 million for the first half of 2019 alone.    ¶83.

In addition to these devastating rate cuts, Valence's defects led to pervasive late and inaccurate payments of medical claims.    Passport was contractually obligated to pay interest penalties on late claims, which according to CW 1 was an expense that "went up a lot" after Valence was implemented.    ¶68.    Moreover, the improperly processed claims resulted in tens of millions of dollars in overpayments to healthcare providers—which became nearly impossible to recoup because Valence was so defective that Passport could not figure out who to credit for overpayments against future claims payments.    ¶¶69-70.    Indeed, by the end of 2018, Passport had outstanding receivables for more than $20 million in overpayments.    ¶70.    Each improperly processed claim itself had to be reprocessed, further raising Passport's costs.    ¶71.    Finally, Valence's defects made Passport's finances impossible to manage, as CW 1 explained that its actuaries could no longer accurately predict its claims payments. ¶71.

**E.      Acquiring Passport is "Not in our Strategic Lens": The Truth Begins to Emerge While Defendants Continue to Misrepresent the Difficulties with Passport**

Beginning in January 2019 press reports emerged that Passport was in financial distress, ostensibly due solely to Kentucky's Medicaid rate cuts.    ¶89.    On January 25, 2019, *Insider Louisville* published an article claiming that "declining reimbursement rates to Passport tell just

11

part of the story," and explaining that Passport's financial troubles also appeared to stem from excessive "non-employee management fees" paid to Evolent—a total of $220 million in fees that "account[ed] for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead." ¶90. Significantly, however, in response to these allegations Evolent flatly denied that its fees were excessive or improper, and falsely claimed that Evolent was providing services "at cost" and even "at a lower per member cost than prior periods." ¶91.

On February 15, 2019, Passport filed a lawsuit against Kentucky (the "Passport Complaint"), challenging the Medicaid rate cuts. ¶93. The Passport Complaint revealed, for the first time, that insolvency was not only a future possibility for Passport, but an imminent threat—specifically, if the rate cuts were not reversed immediately, Passport would be legally insolvent within two weeks. ¶93. On February 19, 2019, the first trading day following Passport's lawsuit, Evolent's stock price fell 10.8%, to close at $14.99.

The revelations in the Passport Complaint raised concerns among analysts that Evolent might be forced to bail out Passport because it constituted approximately 20% of Evolent's revenue. For example, during Evolent's February 26, 2019 earnings call, analysts repeatedly pressed Defendants about whether there is "any balance sheet risk if [Passport] were to go insolvent" and whether "your joint investment efforts [with] Passport have given you any exposure in a tail event." ¶95. Williams unequivocally denied the possibility, stating "[n]o. No, we don't have any broader exposure." ¶95. And when further pressed, Williams repeated that Evolent had not even "thought about" acquiring Passport or its assets, and that this was "not in our strategic lens" and "not something that is currently being evaluated. ¶95.

Over the next two months, Defendants assured investors that Passport's finances were

12

ostensibly improved by purported "cost-cutting" measures, and a Medicaid rate increase announced in April 2019. ¶96. As such, analysts were encouraged that "elevated payments to Passport decrease[] risk EVH loses its largest customer." ¶96. Indeed, as late as May 7, 2019, Defendants sought to bolster this impression, telling investors that "Passport is making solid progress towards improving its financial performance," while omitting that Evolent was just three weeks away from providing Passport the bailout it needed to survive. ¶97.

**F.    "The Writing Was on the Wall": After Months of Internal Planning Evolent Publicly Reverses Course and Announces it Will Buy a 70% Stake in Passport**

On May 29, 2019, Evolent stunned the market by announcing that, contrary to its prior assurances just weeks before, it would have to pay $70 million (plus a promise of additional "interim balance sheet support") for a 70% stake in Passport. ¶98. The announcement was an admission that (i) Passport's finances were even worse than previously known, contrary to Defendants' assurances just three weeks prior, and (ii) the 2018 rate cuts were not the sole cause of Passport's financial troubles (as these had already been reversed in April 2019) but rather the grossly excessive costs imposed on Passport by Evolent. ¶98. Indeed, during a special investor call the same day, Defendant Williams was forced to admit that Evolent had no choice but to buy a stake in Passport to avoid losing its largest client, stating that we "wish [we] weren't in this situation" and "given the financial situation, we needed to respond immediately." ¶¶99, 102.

In direct reaction to the news, Evolent's stock price fell nearly 30%—$4.14 per share—on May 29, 2019, to close at $10.01. Analysts excoriated Evolent management for their lack of candor about the need for bailing out Passport. SunTrust noted that "[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call: When asked whether EVH would acquire some, if not the whole, Passport business during the 4Q18 earnings call, management cited they had 'not contemplated acquiring a full Medicaid plan,' that it's 'not in our

13

strategic lens at this point.'" SunTrust further emphasized that "this transaction signals that Passport wasn't in a position to remain operationally sustainable as a standalone entity, which suggests to us that EVH's investment and balance sheet commitment is likely instrumental in supporting the business." ¶101.

Strikingly, during the May 30, 2019 call, Defendants admitted that they knew of the risk they would have to bail out Passport by January 2019, and even installed what they called a "shadow management team" at Passport to pursue a potential acquisition. As the Company's COO and co-founder Thomas Peterson stated, "the sponsors [of Passport] really felt as though they needed to take on a partner. And so . . . starting in January, once the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be retroactive rate relief, there was [an] additional level of urgency that was placed on this . . . ." Indeed, he admitted that the situation had become so severe that "in January what we did was we effectively created a shadow management team [at Passport]. So we had our own—we brought in our own CMO, our own CEO, our own COO, a Chief Actuary, Head of Network Contracting, and we were shoulder to shoulder with Passport leadership." ¶103.

On November 26, 2019, Kentucky announced that Passport's Medicaid contract would not be renewed. ¶105. Documents obtained from Kentucky that quantified Passport's response to the RFP issued by the Commonwealth to provide Medicaid services revealed that Passport scored the lowest of all respondents. ¶108. By far the most damning reason for rejecting Passport's bid was Kentucky's conclusion that Passport "did not address in detail" how "overall [healthcare] improvement outcomes" would be "accomplished in a cost-effective manner." ¶108.

14

### III.   ARGUMENT

#### A.   Plaintiffs Have Pled That Defendants Made False and Misleading Statements

##### 1.   Defendants' Statements Were False and Misleading When Made

To allege falsity, Plaintiffs need only "plead sufficient facts to support a reasonable belief in the allegation that a defendant's statement was misleading." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015). As a general rule, "the trier of fact decides whether a public statement is misleading," and thus "it is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage." *Id.* Rather, a plaintiff is only required to "allege[] facts and circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible." *Nieman v. Duke Energy Corp.*, 2013 WL 4004274, at *8 (W.D.N.C. July 26, 2013).

##### a)   Defendants Made False and Misleading Statements About the Ability of Evolent's Services to "Lower Clinical and Administrative Costs"

Throughout the Class Period, Evolent repeatedly emphasized that its entire business model was predicated on its supposed ability to dramatically reduce its clients' healthcare and administrative costs. For example, Evolent told investors that "[t]he solution we offer . . . contemplates one strategic option—to pursue clinical and technological integration to reduce utilization and total cost[.]" ¶¶113, 137.[4] Evolent also repeatedly assured investors that its services enabled its partners to "lower clinical and administrative costs." ¶¶114, 138, 162. With respect to Passport, Evolent's most important client that accounted for 20% of its revenue, Evolent falsely

---

[4] Regarding this statement in particular, Defendants claim that "the full statement warns investors that not all customers may choose to focus on lowering costs, so Evolent may lose business." Def. Br. at 19. This is irrelevant; neither Plaintiffs allege nor Defendants argue that Evolent "lost [Passport's] business" because Passport did not "choose to focus on lowering costs."

boasted of its purported successes in cutting costs.  For example, Defendant Blackley claimed that Evolent's services had created "about $75 million of improvement to Passport's bottom line," while Defendant Williams claimed that Evolent's services had "helped to generate over $100 million in savings" for Passport, which was "highly valuable to that organization."  ¶¶145, 152.

These statements were materially false and misleading at the time they were made.  In fact, Evolent's services dramatically increased clinical, administrative, and total costs for Passport. Indeed, as CW 1, a former senior member of Passport's Internal Audit team—who reported directly to Passport's CFO and was intimately familiar with Passport's finances—confirmed, "[Evolent] said they could cut costs by providing services; they did the opposite."  ¶52.  Plaintiffs have pled an extensive array of facts corroborating CW 1's statement and demonstrating specific ways in which Evolent drove up, rather than lowered, Passport's clinical, administrative, and total costs.

First, in the first year that Evolent provided services to Passport, Passport's administrative expenses rose a staggering 60%.  ¶53.  Contrary to Defendants' arguments, this increase could not be explained away by revenue or membership growth, because administrative expenses grew at a rate more than 1,000% faster than revenue that year.[5]  ¶53.  Contrary to Evolent's claims, this dramatic increase was not the result of merely "rebadging" employees; while Passport's salary costs fell $22 million between 2015 and 2017, the fees Passport paid to Evolent for the same employees dwarfed the salaries Passport had paid.  ¶50.  Indeed, multiple CWs—including CW 1—specifically said that Evolent charged Passport far more for the same employees doing the same work than Passport had been paying.  In their own words, Passport was merely "paying

---

[5] Defendants refer to 2017 as "Passport's first full year with Evolent."  Def. Br. at 12. However, Evolent began providing services to Passport no later than February 2016, however, meaning that Evolent was servicing Passport for roughly 11 months of 2016.

[Evolent] to do that stuff that we used to do, and we were paying [Evolent] more." ¶49.

Second, the botched implementation of the flawed Valence platform caused Passport to submit medical records that were in the aggregate millions of days late in violation of Passport's contract with Kentucky (as reflected by the fact that Kentucky imposed nearly $500 million in penalties on Passport for its contract violations); incur interest charges on late claims payments; and pay out tens of millions in claims overpayments. ¶¶68-71. The encounter data penalties only exponentially increased from there. ¶¶75, 77. For example, in February 2018 alone, Kentucky assessed Passport with a staggering $48 million in penalties for untimely and improperly submitted encounter data; by October 2018, Passport was assessed penalties totaling $56 million; and, for November and December 2018, Passport's encounter data penalties topped $100 million per month.[6] ¶77.

Third, these claims administration failures ultimately caused the 2018 Medicaid reimbursement rate cut that Evolent publicly blamed for Passport's financial woes. ¶¶80-83. Defendants' attempt to refute this allegation is especially unavailing. Passport itself has claimed that Kentucky based its rate cuts on encounter data, alleging in its February 2019 lawsuit against

---

[6] Defendants assert that these massive penalties were not material because Passport's contract with Kentucky capped its payments. However, this argument misses the mark. The fact that Passport was incurring more than $100 million in penalties per month precisely because of Evolent's defective claims processing services establishes that Evolent rendered Passport wholly unable to comply with its contract with Kentucky, which is material given that Passport's entire business was providing healthcare to Kentucky Medicaid recipients. Such cold, hard facts—the hundreds of millions of dollars in assessed penalties—demonstrate that Defendants' public statements about Valence were false. Moreover, even the capped penalties were material to Passport. As a non-profit health plan, Passport paid out the overwhelming majority of its revenues in medical claims expenses, operated on extremely thin margins, and, indeed, had a net underwriting loss of $80.4 million in 2016, a *de minimis* net underwriting gain of $4.3 million in 2017, and a $130.7 million net underwriting loss for 2018. The $10 million in penalties were thus double Passport's net underwriting gain of $4.3 million in 2017, and were about 8% of Passport's net underwriting loss in 2018.

17

Kentucky that, in calculating the reimbursement rates, "Wakely [Kentucky's actuary] relied exclusively on 'encounter data.'" Passport Complaint at 22-23, 27 (Def. Ex. 11 (ECF No. 50-11)). Defendants' vague and unsupported alternative explanation—that "[m]any of Kentucky's elected officials and newspapers attributed the rate change to politics"—raises fact issues that cannot be resolved at this stage.[7]

Finally, after just three years of Evolent's stewardship, Passport—a once well-run and financially sound Medicaid plan—had been driven to the brink of insolvency, a fact that Defendants cannot avoid. In light of these facts, Plaintiffs have undeniably pled that Defendants' statements were objectively and materially false and misleading. *See, e.g., In re Flowers Foods, Inc. Sec. Litig.,* 2018 WL 1558558, at *9 (M.D. Ga. Mar. 23, 2018) (defendants made materially false and misleading statements where they "voluntarily touted the benefits of [their] model as . . . helping the Company to keep costs low.").

Defendants offer no real response to Plaintiffs' well-pled allegations, and instead are forced

---

[7] The cases cited by Defendants are easily distinguishable. Most notably, in *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319 (D. Mass. 2002) (Def. Br. at 18-19, n.24), the court upheld the vast majority of the plaintiffs' alleged false statements and denied the defendants' motion to dismiss.[7] The particular statement that Defendants quote (out of context) was found not to be actionable only because it "describe[d] the customers' needs 'to grow their online business faster and more cost effectively before,'" (without claiming that the company could meet those needs), and thus, the statement was not false because there was "no indication that these were not the customers' needs." *Id.* at 333-34. Meanwhile, the court upheld similar statements that averred that customers were "leveraging the Allaire Internet business platform to successfully bring their businesses online faster and more cost effectively than ever before," because these statements were objectively verifiable and false in light of the defendants' contemporaneous knowledge of severe problems impacting the performance of the product. *Id.* at 335. In *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 578 (W.D. Va. 2006) the court dismissed a statement that a company was "on track for a strong year"—a statement that is clearly non-specific and unverifiable because "strong year" does not have an objective or verifiable meaning. *Cf. In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1354 (N.D. Ga. 2018) (statements that the company supply chain's recovery from a disruption was "on track" false where plaintiffs pled particularized facts showing recovery was not meeting internal goals and was not resolving the company's supply chain problems.).

18

to resort to improperly submitting an assortment of documents that are cited nowhere in the Complaint in an attempt to improperly shoehorn summary judgment arguments into their motion to dismiss. This is a prime example of what the Ninth Circuit recently warned was a "concerning pattern in securities cases like this one," where Defendants "exploit[] [judicial notice] procedures to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Ninth Circuit explained that this improper practice leads to "harmful results" because it "risks premature dismissals of plausible claims that may turn out to be valid after discovery," and that the "risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id*.

The Court should not judicially notice these documents; alternatively, it should permit Plaintiffs to conduct discovery and convert Defendants' motion into a motion for summary judgment. Nearly half of Defendants' exhibits—16 of 35—are not referenced in the Complaint.[8] These documents fall far outside of the "narrow" circumstances in which a court may take notice of such materials because the documents are not "integral to" or "explicitly relied on" in the Complaint. *McIntyre v. Pedder*, 2015 WL 5039431, at **6-7 (W.D.N.C. Aug. 26, 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Moreover, many of Defendants' submitted documents are inappropriate for judicial notice because they are self-serving and highly unreliable. For example, Exhibit 15 (ECF No. 50-15), an article co-authored by Evolent's own National Medicaid President and Passport's own CEO, is submitted in support of Defendants' dubious assertion that Evolent lowered Passport's PBM

---

[8] Specifically, Exhibits 6, 7, 8, 9, 10, 15, 16, 18, 19, 22, 23, 26, 27, 28, 31, and 33 are not referenced in the Complaint.

costs. *Id.* at 5; Def. Br. at 8.  Similarly, Exhibit 22 (ECF No. 50-22) is a letter written by Passport's own CEO and President that Defendants claim proves Evolent lowered Passport's administrative and clinical costs—but that is dated September 2019, after Evolent announced it was acquiring a 70% stake in Passport.  *Id.*; Def. Br. at 11, 14, 16.[9]  These documents are not the types of "sources whose accuracy cannot reasonably be questioned" that are contemplated by Fed R. Evid. 201.  *Davison v. Loudoun Cty. Bd. of Supervisors*, 2016 WL 4801617, at \*\*3–4 (E.D. Va. Sept. 14, 2016); *see also Mendoza v. Wells Fargo Bank, N.A.*, 2014 WL 2624938, at \*2 (S.D. Tex. June 12, 2014) (ignoring, on a motion to dismiss, documents that were "not public records fit for judicial notice, and are just self-serving statements by [Defendant]").

Even if the Court were to take judicial notice of Defendants' highly unreliable documents and extraneous "facts," they are unavailing.  For example, relying largely on documents not cited in the Complaint, Defendants proffer their own calculations of Passport's "Medical Loss Ratio" ("MLR") and "Administrative Loss Ratio" ("ALR") as evidence that Evolent "drove real savings for Passport."  Def. Br. at 10-11, 25.  Yet as a more fulsome examination reveals, Defendants misleadingly cherry-pick this data.  Specifically, Defendants argue that while Passport's 2016 MLR was "too high at 95.1%," Evolent's services lowered Passport's MLR to 89.9% in 2017. *Id.*  But Defendants omit that Passport's "too high" 95.1% MLR in 2016 was the direct result of Evolent's management, and significantly, any "improvement" in 2017 was short-lived, as Passport's MLR shot back up to a "too high" 95.1% in 2018.[10]  Thus, even if the Court were to

---

[9] In addition to Exhibits 15 and 22, Exhibits 18, 19, 22, 23, 27, and 28 are self-serving and of dubious reliability.

[10] While Defendants claim that 2017 was "the first full year that Evolent worked with Passport," this, too, is misleading.  Evolent began servicing Passport no later than February 2016 (¶40), and thus was working with Passport for virtually the entire year.

20

accept at this preliminary stage Defendants' assertion that "[a] financially healthy Medicaid organization spends about 90% of its revenues on medical expenses and 8-10% on administrative costs" (meaning a healthy organization has a 90% MLR) (Def. Br. at 25, n.27), it would show that Passport was "financially healthy" before Evolent took over (when Passport had a 91% MLR) but became "financially unhealthy" by 2018, when its MLR was more than 95%. Moreover, according to Defendants' own formula, Passport's ALR (representing the portion of revenue spent on administrative expenses) skyrocketed the year Evolent took over—from 6.6% to 9.5%—and remained at similarly high levels at least through the end of the Class Period.[11]

Finally, while Defendants again cherry-pick a single year to argue that Passport's administrative expenses increased "just 8%" from 2016 to 2017 (Def. Br. at 12), this argument ignores the far more salient point that, under Evolent's control, Passport's administrative expenses increased 80% in three short years, dramatically outpacing revenue growth for the same time period. ¶85-86; Def. Ex. 21 at 29. In sum, Defendants' extraneous materials do not support their assertions.[12]

Moreover, Defendants assert—citing an article authored by Evolent's own National Medicaid President—that Evolent's PBM services lowered Passport's medical expenditures. Def. Br. at 8-9. The impartiality of the article aside, even if these PBM claims were true, they do not render Defendants' statements truthful. The Complaint alleges with particularity that Defendants made false and misleading statements about "lower[ing] clinical and administrative costs" "total

---

[11] Defendants' citation of supposed national and Kentucky "averages" for ALR is wholly irrelevant to Plaintiffs' claim that Evolent failed to lower Passport's clinical and administrative costs.

[12] Many of Defendants' other assertions, such as those about Passport's "high compliance rate" and its "ranking" and "reputation" among Medicaid plans are too poorly sourced, generic, or irrelevant even to respond to. *See, e.g.,* Def. Br. at 10, 12, 13-14.

costs," and creating "improvement to Passport's bottom line." Even if Evolent were to reduce Passport's PBM costs—which is a question of fact inappropriate for resolution on a motion to dismiss—this would not demonstrate that Defendants lowered "clinical and administrative costs," or "total costs," or created "bottom line improvement" for Passport.

In light of these damning facts, Defendants' statements that they "lower[ed] clinical and administrative costs," or provided as much as $100 million in "bottom-line savings" to Passport were false and misleading, and Defendants cannot plausibly claim otherwise.

### b) Defendants Made False and Misleading Statements About Evolent's Valence Claims Administration Platform

During 2017 and 2018, Defendants made materially false and misleading statements about Evolent's "integration" of its Valence claims administration platform at Passport.[13] For example, on November 2, 2017, Defendant Williams stated that Evolent had "successfully launched Passport . . . onto our [Valence] Platform," and that "teams continue to monitor [Valence]'s operations closely and report a smooth transition." ¶129. Indeed, on Evolent's February 27, 2018 earnings call, Williams claimed that the Valence integration was "going incredibly well" and helping Passport to "see[] strong success providing services" and "get to a higher level of performance." ¶135. Similar statements are regularly found to be actionable where, as here, they are contradicted by specific, non-public facts showing that the integration was not, in fact, "going incredibly well." *See, e.g., KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *8 (D.S.C. July 25, 2016) (upholding as false the statement "[t]he integration is going extremely well."); *In re Akorn Secs. Litig.*, 240 F. Supp. 3d 802, 816-18 (N.D. Ill. 2017) (statements that company was "on track" with

---

[13] Notably, Defendants do not even address their February 2018 false and misleading statements about Valence. For this reason, Defendants have waived any argument that their February 2018 statements regarding Valence were not materially false and misleading. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012).

plans to fully integrate the acquired business, and that "acquisitions are fully integrated," were materially false and misleading where company had "problems integrating" new accounting system and "fail[ed] to . . . accurately process and account for rebates and chargebacks.").

The penalty letters addressed directly to Passport's CEO, CFO, and other senior officers obtained from Kentucky alone demonstrate that Defendants' statements concerning Valence were false. These letters establish that Valence was so defective that it could not perform any of its mission-critical functions, such as timely submitting accurate encounter data to Kentucky. Indeed, in February 2018 alone, Valence caused Passport to incur more than $48 million in penalties, including penalties for over 2 million records that were over 60 days late by that time.[14] ¶77.

Moreover, former Evolent and Passport employees, each with direct knowledge of the relevant facts, independently corroborated that Valence was "not advanced enough" to handle Medicaid medical claims; that it was "not ready" when launched at Passport; and that its launch was a "disaster." *See, e.g., Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 n.13 (D. Md. June 14, 2006) ("the [confidential] witnesses' interlocking and corroborating accounts add support to the reliability of the statements."). Contrary to Defendants' arguments, the witnesses supporting these claims were not "low level employees." Rather, these former employees included CW 1—a former senior member of Passport's Internal Audit team who reported directly to Passport's CFO—and CW 3, a former Associate Director of Risk Adjustment for Evolent who had

---

[14] Defendants' contention that Passport's prior claims administrator also incurred some encounter data penalties is unavailing. Evolent's penalties were many orders of magnitude higher than the previously administrator's *de minimis* penalties. ¶77. Moreover, Defendants' assertion that Evolent indemnified Passport for the 2018 penalties is unsupported. The 3Q2019 Form 10-Q that Defendants cite in support states instead that (i) Evolent "has not accrued any liabilities related to such obligations. . . ."; and (ii) references an indemnity agreement that Evolent Passport entered into as jointly and severally liable indemnitors in 2Q2019—half a year after the penalties were assessed on Passport. Ex. 26 (ECF No. 50-26).

previously worked for Passport. ¶¶44, 49. Moreover, CW 3 was working on the Valence platform for Evolent at the time these problems occurred, and explained that "there were fundamental problems that we couldn't change, we were just applying band-aids and fixes to it to get it to work." *See Martek*, 2006 WL 8435572, at *5, n.13 ("Each witness statement is pled with the requisite particularity as each witness's position with the Company, location and duration of employment, as well as the basis for his or her knowledge were alleged.").

Finally, while Defendants contend that the CWs' "speculation" that Valence was built for dental claims was "incorrect," they provide no support for this claim. Indeed, the exhibits they cite are merely Forms 8-K that announce Evolent's acquisition of Valence, and nothing in these documents claims that Valence was not built for dental claims or that it was actually capable of processing Passport's Medicaid medical claims. In fact, not only did multiple CWs independently corroborate that the platform had been built for dental claims, but CW 3 explained in great detail how this fact made Valence ill-equipped to process Passport's claims. ¶¶63-64.[15]

      **c)**      **Defendants Made False and Misleading Statements About Their Bailout and Acquisition of Passport**

During Evolent's February 26, 2019 earnings call an analyst asked if there was "any balance sheet risk if [Passport] were to go insolvent? Or put another way, have your joint investment efforts of Passport given you any exposure in a tail event"? Defendant Williams unequivocally responded "[n]o. No, we don't have any broader exposure" (¶¶95, 160)—*i.e.* he denied that there was even a risk that Evolent would have to bail out Passport. Moreover, Defendant Williams denied that Evolent was even considering acquiring "some of [Passport's]

---

[15] Defendants argue that, under *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011), statements not made by Wigginton and Spencer cannot be attributed to them. However, Plaintiffs do not seek to hold Wigginton or Spencer liable for statements they did not make.

assets, assuring analysts such a transaction was "not in our strategic lens at this point," and that "related to Passport that's not something that is currently being evaluated."

Then, during Evolent's May 7, 2019 earnings call, Defendants assured investors—who were still concerned about Passport's financial health and the possibility that Evolent might be forced to bail out the health plan—that Passport's finances were improving.  Specifically, Williams stated that "Passport is making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members, and that "[o]verall, we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market." ¶165.

These statements were false at the time they were made, because Defendants themselves later admitted that, by January 2019, Evolent already knew that Passport's sponsors "really felt as though they needed to take on a partner" and that "an additional level of urgency . . . was placed" on this need.  ¶103.  Evolent management further admitted that by January, "the writing [was] on the wall" for Passport, and accordingly made Evolent's senior management stand "shoulder to shoulder with Passport leadership" through a "shadow management team."  *Id.*   Indeed, Defendants' May 29, 2019 disclosures made the falsity of their February 2019 statements so apparent that one analyst specifically expressed dismay at being misled, noting that "[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call," and that "management cited they had 'not contemplated acquiring a full Medicaid plan.'" ¶101.[16]

---

[16] Defendants' May 2019 statements are not "forward-looking" statements protected by the PSLRA safe harbor (Def. Br. at 21-22) because Plaintiffs allege Defendants "omitted present facts" needed to make them not misleading, *i.e.* that Passport's financial situation remained dire and that Evolent was only three weeks away from announcing its bailout.  *See*, *e.g., Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) (statements about expected

Additionally, these statements were made just weeks before Evolent announced its buyout of Passport—meaning it is extremely implausible that Evolent was not planning to bail out Passport at the time it made the statements. Yet even at this late date, Defendants did not disclose that Passport in fact still required a bailout and capital support, and that Evolent was on the verge of providing such a bailout. As such, the "the extremely short time period here is strong evidence" that the statements were materially false and misleading when made. *Miss. Pub. Empl. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008).

In light of these incontrovertible facts, Defendants have cobbled together a self-serving counternarrative in which, by late February 2019 they still had no idea that Passport might require a bailout and/or seek an acquirer or "partner." Instead, Defendants contend that they suddenly changed their minds about "further invest[ment] in Passport" only after they "learned that Passport was about to be purchased by one of Evolent's competitors"—a claim for which they do not

---

demand and sales growth for products were misleading and not protected by safe harbor where defendants omitted "present facts" about "placement and sales problems at major retailers."); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) ("[T]o the extent Plaintiffs [ ] challenge Defendants' alleged omission of present facts with respect to the challenged statements, the PSLRA's safe harbor does not apply."). Moreover, the "generic disclaimer[s]" cited by Defendants do not constitute the kind of "meaningful cautionary language" required to invoke the safe harbor; rather, sufficiently meaningful cautionary language must "warn about or fully disclose the potential specific risks allegedly omitted in the misrepresentations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009) (risk statements merely warned of a "limited, general, and vague risk to customer satisfaction" when defendants knew that specific and known problems "posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized."). Defendants do not point to any "cautionary language" that warns of the specific risk that Evolent was on the verge of bailing out Passport, and Defendants had assured investors only two months earlier that there was no chance they would do so. Indeed, Defendants' brief does not even identify what specific cautionary language Defendants believe insulates specific false statements, instead making generic references to their "chart" attached as Exhibit 1 and to "appropriate warnings given in the SEC filings." Def. Br. at 21-22. *See In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1359 (N.D. Ga. 2018) ("The Court will not use its scarce resources to scour 50 pages of filings in the hopes of finding which cautionary language Defendants intended.").

provide any support and which were directly contradicted by the statements at the time that Passport was making "solid progress."   ¶165.[17] Indeed, Defendants' alternative explanation requires the dubious assumption that, by the end of February 2019, Defendants were not even contemplating acquiring or bailing out Passport (even though the "writing was on the wall" and even though they knew Passport "needed a partner" no later than January 2019); yet, between May 8, 2019 when they said that Passport's financial situation was improving and May 29, 2019, Defendants (i) changed their mind entirely and (ii) went through the entire process of bidding, negotiating, and signing an agreement to acquire Passport.  In light of Defendants' far-fetched alternative explanation, it is "implausible to conclude that [Defendants]' statements were not false when made." *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *16 (C.D. Cal. Jan. 16, 2013); *Peace Officers' Ann. & Ben. Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154-55 (D. Colo. 2019) (resolving inferences in plaintiffs' favor where "[d]efendants [] present[ed] only a weak plausible alternative. . . .").[18]

### 2.      Defendants' False and Misleading Statements Were Material

A statement is material for purposes of Rule 10b-5 "[i]f a reasonable investor, exercising

---

[17] Even the May 30, 2019 Investor Day Transcript cited by Defendants (*see* Def. Br. at 16 and Ex. 5) does not claim that Evolent made its decision to purchase a 70% stake in Passport only after learning that Passport "was about to be purchased by one of Evolent's competitors."

[18] Defendants' statements also were not forward looking, because they concerned what was "in [Defendants'] strategic lens at this point," and what was "currently being evaluated" with respect to Passport, and thus related to the state of affairs at that time, rather than merely what might happen in the future. *See, e.g., Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412, 424 (M.D. Pa. 2018) ("Statements that Walgreens had committed to potentially divesting 1000 stores are not forward-looking because they relate to Walgreens's present commitment, not its eventual, possible actions.").  Moreover, Defendants' statements were statements of present fact—"Passport is making solid progress. . . ." *See, e.g., Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) ("[S]tatements in which [defendants] report being 'encouraged by' or 'pleased with' some aspect of the Joint Venture's progress are statements of [the defendants'] present views" and thus not protected by the PSLRA safe harbor.).

due care, would gather a false impression from a statement, which would influence an investment decision." *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 666 (D.S.C. 2016).  At this stage, a securities fraud complaint "may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018).  Indeed, it is difficult to imagine how Defendants' statements about Evolent's ability to lower costs for its most important client could not be material since the Company's entire business model was predicated on its supposed ability to reduce costs.

Contrary to Defendants' arguments, these statements were material to investors and not "puffery."  First, Defendants' statements were clearly "capable of objective verification," *SEC v. Agora, Inc.*, 2007 WL 9725170, at *5 (D. Md. Aug. 3, 2007)—either Evolent "lower[ed] clinical and administrative costs" for Passport, or it did not; either Evolent created "bottom-line savings" for Passport, or it did not.  *See also Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *11 (D. Or. June 27, 2017), *report and recommendation adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017) ("statements [that] are either true or false and can be objectively evaluated and verified" were "clearly material to investors, and not puffery.").  Indeed, as demonstrated above, Passport's financials directly contradict any claims that Evolent "lowered clinical and administrative costs" or created "bottom-line savings," but instead show that Evolent increased costs for Passport.

Second, Defendants' statements were material to investors because they concerned the singular purpose of Evolent's business—to lower clinical and administrative costs for health plans—and because they concerned its largest and most important client, Passport.  *See, e.g., Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *7 (S.D. Ohio Jan. 21, 2016) ("issues which could call into

28

question the viability of [defendants'] business model" clearly material to investors); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 595–96 (W.D. Tex. 2014) ("any reasonable, prudent investor would take into consideration information about . . . the single investment product that [defendant company] sold."). As such, Evolent's success in lowering costs "would be among the most important information looked to by investors." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (claims about underwriting quality material to investors in a mortgage banking company). Moreover, "the significance [of Evolent's purported lowering of its clients' costs] is illustrated by the frequency with which Defendants emphasized [it]" in public statements. *Atlas*, 556 F. Supp. 2d at 1155; *see also In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617–18 (S.D.W.V. 2012) ("[S]tatements professing that safety was [the defendants'] 'first priority every day'" material where "[d]efendants closely aligned their statements of commitment to safety to their productivity and success as a company, thereby lending credence to the materiality of their statements."); *Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *7–8 (M.D. Fla. Nov. 4, 2019) (statements not puffery "when key executives continually stress [their subject matter] as a key to company success.").[19]

---

[19] Defendants also take certain statements and phrases out of their larger context in arguing that these phrases constitute "puffery. Def. Br. at 19-20 ("partnership model enables cultural alignment. . . ."); ("a great partnership" "really important in terms of helping economics."). These excerpts are "selective phrases within larger statements that, when read in their entirety and in context, are not mere corporate puffery." *Monroe Cty. Empl. Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *21 (N.D. Ga. Mar. 29, 2018). *In re XM Satellite Radio Holdings Sec. Litig.* does not stand for the proposition that language such as "cost-effective" "smart" "sound" and "efficient" is corporate puffery *per se*. Def. Br. at 18 (citing 479 F. Supp. 2d 165, 179-80 (D.D.C. 2007). Rather, this language was puffery because it lacked context that would enable it to be "quantified []or specified in any way." *Id.* Indeed, in reversing a case that relied on *XM*, the D.C. Circuit reaffirmed that "the critical inquiry is whether [a] statement could have misled a reasonable investor . . . given the context in which it was made." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (emphasis added and internal quotation omitted). By contrast, Evolent stated that its services "enable health systems to manage patient health in a more cost-effective manner," which implies an objectively verifiable comparison to the same health systems' cost-effectiveness prior to

Indeed, Defendants themselves emphasized the materiality of their statements. For example, Defendant Blackley stated that Evolent's purported "$75 million improvement in [Passport's] bottom line is a big deal, and [] helps make…the mission sustainable, and gives an opportunity to expand what we're doing in the state. And that's—from an investor's standpoint, in taking away the net result—is critical."[20]  ¶145.  There can be no doubt that Defendants' statements were material.[21]

### B.    The Complaint Raises a Strong Inference That Defendants Acted with Scienter

A complaint pleads scienter by alleging "facts that constitute circumstantial evidence of either reckless or conscious behavior."  *Kiken*, 155 F. Supp. 3d at 601.  "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were

---

using Evolent's services (rather than a "loose" or "vague" claim).  *See, e.g. Allaire*, 224 F. Supp. 2d at 332-33 ("comparatory language" less likely to be puffery).  In *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213-14 (4th Cir. 1994)—a pre-PSLRA case—the court did not mention puffery in connection with dismissing a statement that the defendant company was "on target" to meet projections.

[20] Defendants' use of the word "believe" does not render the statement "[b]y helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective care setting to payers, employers and consumers, which enables them to capture greater market share" an inactionable opinion statement.  The relevant factual portion of the statement—which avers that Evolent's services "help[] these systems lower clinical and administrative costs"—is not modified by the word "believe." As such, even if part of the statement expresses an opinion, the statement is a classic example of an "opinion statement[] with an embedded fact." *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1259 (D. Nev. 2019).

[21] The Court should disregard Defendants' Exhibit 1 (ECF No. 50-1), which is a six-page chart that makes arguments in addition to those in their brief why Defendants believe their statements are not materially false.  Not only is this an end-run around their brief's page limitations, but Defendants' additional arguments are so vague as to be meaningless.  Defendants simply list any number of general reasons why they believe the statements to be inactionable—for example, as puffery or forward-looking statements—without explaining why those reasons are applicable to the selected statements.  In additional, Defendants point to purportedly cautionary language in Exhibit 1, without ever identifying the cautionary language to which they refer.  Def. Br. at 21.

materially inaccurate." *SEC v. Pirate Inv'r, LLC*, 580 F.3d 233, 243 (4th Cir. 2009).

At this stage, a plaintiff needs to raise only a "strong inference" of scienter; she need not prove her case. *Tellabs, Inc. v. Major Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). If an inference of scienter is "at least as compelling" as any plausible opposing inference, the complaint should be sustained. *Id.* at 324. In other words, "a tie favors the plaintiff." *Lormand*, 565 F.3d at 254. A scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Rather, in evaluating scienter, the court "must evaluate the totality of the circumstances alleged in the complaint, and afford 'the inferential weight warranted by context and common sense.'" *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 783 (E.D. Va. 2015) (quoting *Carlucci v. Han*, 907 F. Supp. 2d 709, 729 (E.D. Va. 2012)). The scienter inquiry "constantly assum[es] the plaintiff's allegations to be true" and asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23, 326-27 (emphasis in original).

The Complaint alleges ample facts raising a strong inference that Defendants knew or recklessly disregarded material facts undermining and disproving their statements to investors.

First, the Individual Defendants have admitted that they meticulously monitored all aspects of Passport's performance. Indeed, Defendant Williams boasted that Passport looked to Evolent "as a co-owner." ¶42. Strikingly, Williams further described the Evolent-Passport relationship in even more intimate terms, telling investors that "we really have joint governance," that "we're able to drive the decisions we think are important for performance," that Evolent was able to "control many more levers than if we're just in a pure service relationship," and that Evolent was "at the table participating in [Passport's operational] decisions." ¶¶42, 43, 169. These statements are

31

dispositive as to Defendants' scienter; Defendants never contest them and their silence is damning. Simply put, one cannot claim to be an "owner" of a business who "drives the decisions that we think are important"—as Defendant Williams said about Passport—and then turn and pretend to not be knowledgeable about Passport's operations.   Indeed, as numerous courts have held in similar circumstances, these admissions standing alone are sufficient to conclude that Defendants acted with scienter.   *Genworth*, 103 F. Supp. 3d at 785 ("Because of the Individual Defendants' self-proclaimed 'personal involvement in Genworth's complete review of all [LTC] components,' the Court may reasonably infer that Defendants possessed knowledge of the true state of affairs of the LTC business, and thus had knowledge that their representations were misleading'"); *In re Computer Sciences Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012) ("The NHS Contract was one of [the defendant company's] largest, one that [Defendant CEO/Chairman] said he 'watch[ed] most closely' and had his 'utmost attention.' This is an important fact supporting the scienter allegations."); *Kiken*, 155 F. Supp. 3d at 607 (defendants' repeated statements that they were "personally involved in Lumber Liquidators' Chinese operations" contributes to inference of scienter).

Given Evolent's seat "at the table," Defendants would also have had first-hand knowledge of the detailed monthly penalty letters addressed directly to Passport's CEO, CFO, and other senior executives, which documented first-hand that Kentucky was assessing Passport hundreds of millions of dollars in penalties for submitting improper and untimely encounter data as a direct result of the Valence implementation "disaster."  ¶¶67, 75.  These penalties skyrocketed roughly 1,800% the very first month that Evolent took over Passport's claims processing—and only exponentially increased from there. ¶¶75, 77.  For example, in February 2018 alone, Kentucky assessed Passport with a staggering $48 million in penalties for untimely and improperly submitted

encounter data; by October 2018, Passport was assessed penalties totaled $56 million; and, for each of November and December 2018, Passport's encounter data penalties topped $100 million per month.  ¶77.  In all, from October 2017 through April 2019, Evolent caused Passport to incur a staggering $489 million in penalties for deficient encounter data submissions in violation of its contract with Kentucky—an amount so large that it would have bankrupted the Plan, but for the fact that the penalties were capped by Passport's contract with Kentucky.  ¶78.  Despite these caps, the inaccurate encounter data reporting and resulting penalties had a devastating impact on Passport's finances, ultimately causing the 2018 rate cuts that Evolent publicly blamed for Passport's financial woes—and that set the stage for Passport's bailout.  ¶¶80-83.

Defendants have further admitted that they knew no later than January 2019 that Evolent faced the risk that it would have to bail out Passport.  At that time, Evolent already knew that Passport's sponsors "really felt as though they needed to take on a partner," and Evolent COO and co-founder Thomas Peterson said that "starting in January, once the writing kind of became on the wall around the real impact of the rates" and "there was [an] additional level of urgency" to act.  ¶103.  This urgency was so imminent, Peterson explained, that Evolent "effectively created a shadow management team [at Passport]," bringing in at least five individuals—including Defendant Williams, along with Evolent's Chief Medical Officer, and Chief Actuary—who stood "shoulder to shoulder with Passport leadership."  ¶103.[22]  Nevertheless, Defendants continued to deny that Evolent would have to bail out Passport until May, when Evolent suddenly announced that it was acquiring a 70% stake in the plan.  *KBC Asset Mgmt.*, 2016 WL 3981236, at *9

---

[22] Defendants' contention that Peterson was "simply stating the obvious" (Def. Br. at 32), belies the common-sense understanding of the meaning of the phrase "writing on the wall," as well as the fact that acquiring companies send executive shadow management teams to target companies during transition phases to ensure a smooth transition.

("repeated statements about core operations of 3D Systems, such as the acquisition strategy" adds to inference of scienter). Moreover, the temporal proximity of Defendants' denials to the admission "bolster[s] the inferences of scienter" here. *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) ("three to six months"); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 482-83 (E.D. Va. 2002) (two months proximity supported scienter).

Second, multiple former high-level employees—including a senior member of Passport's Internal Audit team (¶44)—have provided consistent and corroborating accounts that Defendants knew first-hand that Evolent caused Passport's rapidly ballooning costs, and forced the faulty implementation of the unfit Valence platform onto Passport.[23] For example:

- CW 1, who was a senior member of Passport's Internal Audit team who was responsible for monitoring Passport's compliance and who reported directly to Passport's CFO, confirmed that Evolent "didn't do all the great things that [it] was supposed to do"; "[Evolent] said they could cut costs by providing services; they did the opposite." ¶¶44, 52.

- CW 3, who worked in risk adjustment at Passport before being rebadged to Evolent, confirmed that Evolent cost Passport twice as much in risk adjustment fees as the services "saved." ¶51.

- CW 1 pointed to Evolent's practice of rebadging Passport employees as Evolent employees as one way in which Evolent increased costs, which she explained resulted in additional "admin expense" for Passport because it was "paying [Evolent] to do that stuff that we used to do, and we were paying [Evolent] more." ¶¶48-49. CW 2 and CW 3 corroborated CW 1's account, confirming that when they were rebadged as Evolent employees, their day-to-day responsibilities remained "exactly the same." ¶49.

---

[23] The CWs are identified by title, job responsibilities and tenure. ¶44 (CW 1); ¶49 (CW 2); ¶49 (CW 3); ¶65 (CW 4). These roles and responsibilities put them in a position to know the information they provided and the context to it, and thus satisfy the standards for reliable sources. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) (confidential witnesses must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations."); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 492 (D. Del. 2019) (finding this sufficient and rejecting arguments that CWs were "low-level employees.").

- CW 1 also explained how, despite Evolent having no prior claims processing experience, it forced the Valence system onto Passport, despite the fact that Valence was designed as a completely different dental claims system, which "just doesn't work" to handle Passport's Medicaid medical claims. ¶¶62-63.

- CW 3 corroborated CW 1's account that Valence was originally designed to handle dental claims, explaining that it was "not advanced enough" to handle Passport's medical claims data. ¶¶63, 64.

- CW 2 further corroborated the accounts of CW 1 and CW 3 of the botched Valence integration, explaining "there were fundamental problems that we couldn't change, we were just applying band-aids and fixes to it to get it to work." ¶64.

- CW 4 confirmed that the transition to Valence was a "disaster" from the outset because "the system wasn't ready." ¶¶65, 67.

- CW 2 informed Evolent management "on a number of occasions" that Valence was not ready or adequate, and emphasized "it wasn't just me" informing management of the problems. She explained that "pretty much everyone from Passport was telling them" the transition to Valence would not go smoothly. ¶65.[24]

- CW 1 confirmed that the defective Valence system caused Passport to make tens of millions of dollars in overpayments to healthcare providers—which it was unable to recoup—despite never having a meaningful number of claims overpayments prior to Evolent taking over. ¶70.[25] She also explained that after Valence was implemented, Passport's finances became impossible to manage and "their ability to predict patterns of claims went away." ¶71. She further explained that Valence was so inept and difficult to understand that "I couldn't audit it." *Id*.

---

[24] Defendants' assertions that the CW's accounts are devoid of "temporal specificity" are belied by the well-pled facts of the Complaint. CW 2 made clear that she many others repeatedly informed Evolent management that Valence was not ready or adequate to be implemented—which could only have occurred during the period that Valence was being implemented, between May and October 2017. ¶¶57, 65. Moreover, as the other CWs make clear, the reason that Valence was not ready was that it was not designed to handle Passport's medical claims—which remained unchanged throughout that five months period. In other words, the reason behind CW 2's warnings did not change between the first and last days. These facts here are unlike those in *Teacher' Ret. Sys. of La. v. Hunter*, 477 F.3d at 181, which concerned the date when a "well-known" sentiment concerning an acquisition began to take hold <u>after the acquisition had already closed</u>.

[25] The overpayment of tens of millions of unrecouped dollars to providers beginning in October 2017 due to Valence fatally undermines whatever beliefs Defendants may have had a year earlier concerning the value that Valence could provide to Evolent. Def. Br. at 29.

- CW 3 confirmed that Valence's failures were so rampant and costly that Evolent set up a daily "war room" to address the mounting crisis. Evolent's Medicaid Market President was present at each war room meeting and would then report back to Evolent's most senior executives on the status. ¶71.

- CW 1 and CW 3 confirmed that it was the faulty implementation of the Valence system and its inability to handle Passport's medical claims which resulted in the failure to properly and timely submit encounter data to Kentucky. ¶77.

- CW 3 further confirmed that "the [2018] Medicaid rate cuts were a direct result of Passport's own failure to submit encounter data correctly." ¶81.

- CW 3 explained that immediately after Evolent learned of the 2018 rate cuts, high-level executives, including Evolent COO and co-founder Tom Peterson "were here on the ground for weeks on end trying to work to get things fixed."[26] ¶82.

Notably, Defendants do not challenge the veracity or reliability of any of these accounts. Nor can they, and the failure to do so is fatal to their motion in light of Plaintiffs' allegations.

Third, Defendants' false and misleading statements concerned the strategy upon which Evolent's entire business was predicated—Evolent's ability to cut clinical and administrative costs for its long-term partners. ¶¶37-39. And Passport, the long-term partner that was driven to the brink of bankruptcy by Evolent's skyrocketing cost increases, was by far Evolent's most important customer, accounting for up to 20% of Evolent's revenue between 2016 and 2018. ¶41. Passport was critical to Evolent's financial performance—it was mentioned dozens of times in Evolent's

---

[26] To suggest, as Defendants do, that the Individual Defendants did not know anything about meetings attended by senior executives (including one of Evolent's co-founders) in the wake of the Valence integration "disaster" and the 2018 Medicaid rate cuts, is absurd—especially considering that Defendants spoke at length about both the supposed successes of the Valence implementation and the effects of the rate cuts. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 3d 620, 640-41 (E.D. Va. 2000) (Individual Defendant's statements "particularly probative" to scienter analysis because "they tend to show a particularized awareness of the importance [of the topic of the misrepresentations]"); *Genworth*, 103 F. Supp. 3d at 785 ("[T]hat Defendants made repeated misrepresentations over the course of a year also suggests a substantial degree of scienter."). Moreover, any assertions regarding the lack of supposed "temporal specificity" (Def. Br. 30), ring hollow in light of the fact that the war room could only have been set up after Valence went live, while the rate cut meetings could only have happened after the rate cuts. ¶¶71, 82.

36

Forms 10-K—and to suggest that the Individual Defendants were unaware of the ballooning cost increases or the disastrous Valence implementation strains credulity. *Genworth*, 103 F. Supp. 3d at 784 (core operations theory "certainly relevant to Court's holistic analysis" of scienter (citing *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014)); *Kiken*, 155 F. Supp. 3d at 606 (fraudulent conduct involving "core operations" of the business indicative of scienter); *Reese*, 747 F.3d at 569 (It is "reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies.").

Fourth, while the Supreme Court has explained that no need to plead a motive to commit securities fraud (*Tellabs*, 551 U.S. at 325), especially when the Complaint raises a strong inference that Defendants knew the undisclosed facts as here, Defendants undoubtedly had a motive to mislead investors concerning the true state of affairs at Passport. *MicroStrategy*, 115 F. Supp. at 643 ("[A] more particularized motive to commit fraud, one tied to specific circumstances . . . may provide the necessary added inferential weight to tilt the balance in favor of scienter."). At the beginning of the Class Period, Defendants were motivated to conceal the truth that Evolent's business model was actually raising costs, not lowering them, at Evolent's largest client. Later, when the writing appeared "on the wall" that Passport would need to be acquired, Defendants were motivated to downplay the severity of Passport's financial condition in hopes that Passport would be selected in the Kentucky Medicaid RFP Response, again to protect the 20% of its revenue stream that Passport represented. ¶103. *Genworth*, 103 F. Supp. 3d at 786 (motive to artificially preserve company's investment grade credit rating in advance of offering contributes to an inference of scienter).

In response to these particularized allegations, Defendants offer no real non-culpable inference for their conduct. Significantly, Defendants do not even assert that they were unaware of

37

Passport's skyrocketing cost increases or the faulty Valence implementation and resulting faulty encounter data. Instead, their primary argument against scienter is that the CWs should be disregarded because they purportedly had no interaction with any of the Individual Defendants (Def. Br. at 30-31).[27] This, however, ignores one of the central facts of this case that Defendants refused to address in their brief—that Defendant Williams repeatedly boasted that Passport looked to Evolent "as a co-owner," that Evolent and Passport "really have joint governance," that Evolent was "at the table participating in [Passport's operational] decisions" and that Evolent was "able to drive the decisions we think are important for performance." ¶¶42, 169.

### C.      Plaintiffs Have Pled Loss Causation

To plead loss causation, a complaint need provide only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). In this Circuit, pleading loss causation "may be accomplished by alleging facts establishing that the defendant's misrepresentation or omission was one substantial cause of the investment's decline in value." *Singer*, 883 F.3d at 445. The "disclosure or series of partial disclosures need not precisely identify the misrepresentation or omission about which the plaintiff

---

[27] The opinions that Defendants cite in support of this argument are inapposite. In *Yates*, the meetings concerned a "difficult and complex" accounting error that "was one percent or less" of the company's bottom line. *Yates*, 744 F.3d at 887-88. Here, the meetings involved the Evolent team specifically assigned to Passport (including Defendant Spencer), which was by far Evolent's largest and most important partner, and comprised nearly 20% of its revenue for each of the years 2016, 2017, and 2018. ¶41. Moreover, there is no requirement in *Yates*, as Defendants contend, that a CW must identify a specific communication on a specific date to a specific Defendant. Instead, the excerpt that Defendants selectively cite and edit actually holds that the *Yates* defendants knew that the company was not in compliance with certain GAAP provisions, but could not specifically state that they were not in compliance during the class period. 744 F.3d at 887. Moreover, as Defendants concede, the CW account in *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) related to a bank's branch office, not to senior executives as being in the room. ¶44. *Local 295/Local 851 IBT Emp. Grp. Pension Tr.*, 731 F. Supp. 2d 689 (S.D. Ohio 2010) is also inapplicable. As Defendants concede, the CW's information in that case predated the class period (Def. Br. at 27), which is not the case here.

38

complains"—the disclosures need only "relate back to the misrepresentation and not to some other negative information about the company." *Id.* at 446. So long as a "plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings," as loss causation is "usually determined by the trier of fact." *Kiken*, 155 F. Supp. 3d at 609. Here, the Complaint amply pleads loss causation.

Defendants make a single challenge to Plaintiffs' well-pled loss causation allegations: that the January 25, 2019 *Insider Louisville* article entitled "Passport's Finances Being Dragged Down by \$220M in 'Management Fees' to Evolent Health purportedly revealed the full truth of Defendants' fraud to the market. Def. Br. at 35. Defendants are wrong. While the article did assert that the fees Evolent extracted from Passport were contributing to Passport's deteriorating financial condition, the article also contained important information that Defendants have notably failed to discuss: namely, that Defendants flatly denied that Evolent's fees were harming Passport, or that Evolent was overcharging the Plan in any way. ¶91. Indeed, the article quoted Evolent as falsely claiming that it was providing services to Passport "at cost" and even "at a lower per member cost than prior periods." ¶91; Def. Ex. 34 at 9-10 (ECF No. 50-34). As the article stated:

> Evolent told *Insider* via email that the 'majority of the fees Passport pays to Evolent are directly tied to local staff — at cost — as well as (insurance claims processing) and pharmacy benefit services at a lower per member cost than prior periods.' The company said it has 'hundreds of employees supporting Passport' and that 'the number of employees has increased in line with the increases in scope of our partnership with Passport' and that 'the number of our employees in Louisville exceeds our original projection.'

Given Defendants' emphatic denial that Evolent was the true cause of Passport's financial woes, it is unsurprising that Evolent's share price did not move in response to the publication of the article. *KBC Asset Mgmt.*, 2016 WL 3981236, at *11 (truth not revealed to market when defendants continued to deny existence of financial problems). Indeed, the market credited Defendants' denials, including in a January 31, 2019 Piper Jaffray research note titled "Passport is

39

a Happy Client, Despite Local Media Reports." ¶92.

It is also unsurprising that, when Passport revealed in its February 15, 2019 lawsuit against Kentucky that it would be legally insolvent in two weeks if the 2018 Medicaid rate cuts were not reversed, Evolent's share price fell 10.8% in response, and then plummeted another 29% on May 29, 2019, when Evolent announced that it would be acquiring a 70% stake in Passport. ¶¶93, 100. Defendants' conjecture that a mere regurgitation of publicly known information would spark such sell-offs strains credulity and has been flatly rejected by this Circuit and others. *Singer*, 883 F.3d at 447 (allegation that share price declined 40% upon revelation of previously concealed fraudulent information "is wholly adequate to demonstrate that the exposure of the Company's fraud was at least one substantial cause of the investment's decline in value."); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (Easterbrook, J.) ("[I]t is hard to understand the sharp drop in the price of [the company's] stock [if] the full truth had reached the market.").[28]

## IV.   CONCLUSION

For all of these reasons, Defendants' motion should be denied in its entirety.

---

[28] "On a motion to dismiss, a Section 20(a) claim will . . . stand or fall based on the court's decision regarding the Section 10(b) claim." *Kiken*, 155 F. Supp. 3d at 609. Accordingly, "[b]ecause the Court has found that Plaintiffs have adequately pled that a primary violation exists under § 10(b), Plaintiffs' claim under § 20(a) stands as well." *Id*. Indeed, "as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss. . . ." *Massey*, 883 F. Supp. 2d at 627. Defendants only challenge Defendant Spencer's capacity as a control person. But there can be no doubt that Spencer controlled Evolent. She was part of the Passport Executive Team that met every Monday and was also entrusted to make public statements on behalf of Evolent, including at the May 11, 2017 Investor and Analyst Day, during which she falsely described the due diligence that she and the rest of the Individual Defendants performed on Valence. ¶¶44, 122-23.

40

Dated: February 27, 2020

Respectfully submitted,

/s/ Steven J. Toll
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
Megan Kinsella Kistler
mkistler@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*

Maya Saxena (*pro hac vice* forthcoming)
msaxena@saxenawhite.com
Joseph E. White, III (*pro hac vice* forthcoming)
jwhite@saxenawhite.com
Brandon T. Grzandziel (*pro hac vice*)
brandon@saxenawhite.com
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel: (561) 394-3399
Fax: (561) 394-3382

Steven B. Singer (*pro hac vice* forthcoming)
ssinger@saxenawhite.com
Sara DiLeo (*pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (*pro hac vice*)
jsaltzman@saxenawhite.com
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
Fax: (888) 631-3611

*Lead Counsel for Lead Plaintiffs*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2020, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

/s/ Steven J. Toll
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*