**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

PLYMOUTH COUNTY RETIREMENT §
SYSTEM, Individually and On Behalf of §
All Others Similarly Situated, §
     Plaintiff, §  Case No. 1:19-cv-01031-RDA-TCB
          §
     v. §
          §  CLASS ACTION
EVOLENT HEALTH, INC., FRANK §
WILLIAMS, NICHOLAS MCGRANE, §
SETH BLACKLEY, CHRISTIE §
SPENCER, and STEVEN WIGGINTON §
      Defendants. §

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 737-0500
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX  78701
Tel: (512) 457-2000
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Introduction..................................................................................................................1

Argument ....................................................................................................................4

I.   Plaintiffs Fail to Plead Sufficient Facts to Raise the Necessary Strong Inference of Scienter. .4

   A.  Plaintiffs allege no plausible motive for fraud.....................................................4

   B.  Plaintiffs allege no facts showing that any Defendant had actual knowledge of the alleged falsity of any statement.......................................................................5

      1.  The Confidential Witnesses never interacted with any Individual Defendant. .............5

      2.  The Confidential Witnesses have no knowledge of Evolent's work with other customers. ...............................................................................................9

      3.  Actual knowledge cannot be inferred based on the Individual Defendants' executive positions.....................................................................................9

      4.  None of the other facts pled in the AC evidence scienter...........................................11

II.  Plaintiffs Fail to Adequately Plead Falsity ...............................................................12

   A.  Alleged mismanagement is not sufficient to state a Section 10(b) claim. ........................13

   B.  Statements about Evolent's ability to lower costs are not actionable................................14

   C.  Statements about integrating Valence are not actionable. .................................................16

   D.  Statements about Evolent's business strategy are not actionable. .....................................17

III. Plaintiffs Fail to Adequately Plead Loss Causation...................................................19

Conclusion ...............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Cable & Wireless, PLC,*
321 F. Supp. 2d 749 (E.D. Va. 2004) ......................................................................13

*In re Computer Scis. Corp. Sec. Litig.,*
890 F. Supp. 2d 650 (E.D. Va. 2012) ......................................................................11

*Cozzarelli v. Inspire Pharmaceuticals,*
549 F.3d 618 (4th Cir. 2008) ...............................................................4, 5, 12, 13

*Friends of Lake View Sch. Dist. Incorporation No. 25 of Phillips Cty. v. Beebe,*
578 F.3d 753 (8th Cir. 2009) ..................................................................................12

*In re Genworth Fin. Inc. Sec. Litig.,*
103 F. Supp. 3d 759 (E.D. Va. 2015) ................................................................10, 11

*Glaser v. The9, Ltd.,*
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................6, 9

*Goldfarb v. Mayor & City Council of Baltimore,*
791 F.3d 500 (4th Cir. 2015) ..................................................................................12

*Hall v. Virginia,*
385 F.3d 421 (4th Cir. 2004) ..................................................................................12

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,*
432 F. Supp. 2d 571 (E.D. Va. 2006) ........................................................................9

*Katyle v. Penn Nat'l Gaming, Inc.,*
637 F.3d 462 (4th Cir. 2011) ..................................................................................19

*Khjoa v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) ..................................................................................12

*Kiken v. Lumber Liquidators Holdings, Inc.,*
155 F. Supp. 3d 593 (E.D. Va. 2015) ......................................................................11

*Local No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.,*
724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 Fed. App'x 63 (2d Cir. 2011) .......................5

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,*
576 F.3d 172 (4th Cir. 2009) .............................................................................5, 10, 15

*Papasan v. Allain*,
    478 U.S. 265 (1986)..................................................................................................12

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..................................................................................................13

*Sec'y of State for Defense v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ...................................................................................12

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...................................................................................20

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) .................................................................................7, 8

*In re Tibco Software, Inc.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006).........................................................16

*In re Trex Co., Inc. Sec. Litig.*,
    454 F. Supp. 2d 560 (W.D. Va. 2006) ....................................................................6, 7

*Weill v. Dominion Res., Inc.*,
    875 F. Supp. 331 (E.D. Va. 1994) ..........................................................................13

*Witthohn v. Fed. Ins. Co.*,
    164 Fed. App'x 395 (4th Cir. 2006) ........................................................................12

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ..........................................................................5, 9, 11

**Statutes**

Private Securities Litigation Reform Act.........................................................................9

**Other Authorities**

Federal Rule of Civil Procedure 9(b)..........................................................................9, 19

**INTRODUCTION**

Plaintiffs' Opposition urges the Court to accept the theory of fraud spun in their Amended Complaint ("AC") while ignoring the obvious fact that Passport's financial problems resulted from Kentucky's decision in 2018 to retroactively and dramatically cut Medicaid reimbursement rates in the Louisville area. There are no well-pled facts to support Plaintiffs' tenuous link between Kentucky's decision to reduce rates and alleged problems with the Valence system. The AC itself explains that Kentucky imposed the rate cut on all Medicaid plans in the "geographic region" of Louisville. All five of the Medicaid plans operating in Louisville suffered, so it could not be Passport's challenges with Valence that caused the Commonwealth to act. Moreover, even if it were somehow possible that the Valence implementation impacted Kentucky's Medicaid rates, there are simply no facts pled suggesting that Defendants knew or could have possibly known that the transition would lead to disastrous rate cuts. Four anonymous sources, one blog post, and some challenges implementing a complex business system about which Evolent warned investors do not combine to satisfy the PSLRA's strict pleading requirements. Plaintiffs' dubious theory of fraud, which amounts to nothing more than general allegations of mismanagement, should not open the courthouse doors to unsubstantiated claims for securities fraud.

First, the lack of a cogent and compelling inference of scienter is fatal to Plaintiffs' claims. The premise of their fraud theory is implausible: Evolent intentionally caused Passport financial harm by overcharging for unnecessary products and services so that Evolent could then spend $70 million of its own money to "bail it out." Plaintiffs do not plead and have not identified any rational explanation why Evolent would engage in that nonsensical scheme. They merely assert that Defendants "undoubtedly had a motive to mislead investors concerning the true state of affairs at Passport," but they never explain what the motive was. Because they lack any plausible motive,

Plaintiffs must plead specific facts showing that Defendants actually knew that the challenged statements were false when made.  They have not met that burden.

Plaintiffs instead rely heavily on four confidential witnesses ("CWs") to allege that Defendants supposedly knew that Evolent could not deliver promised cost savings to its health plan customers, and that its Valence medical claims platform was "not ready" to handle Passport's claims.  But the CWs never say that they communicated their concerns to any Individual Defendant.  Plaintiffs cannot establish actual knowledge by merely alleging that Passport was a large customer or that the Individual Defendants were closely involved with Passport's business. The law is clear: A strong inference of scienter cannot be presumed based on titles or positions. Plaintiffs must instead allege a specific document or communication that a Defendant saw, heard, or read showing a statement was false or misleading when made.  They have not done so.

Second, Plaintiffs fail to adequately identify any actionable false statements or omissions. Plaintiffs' allegations focus on Evolent's alleged problems with Passport, but most of the alleged misstatements are merely general statements about Evolent's business, products and services that have no connection to Passport.[1]  Although Passport was Evolent's largest customer, Evolent had more than 35 other healthcare plan customers and grew its customer base each quarter during the Class Period.  Plaintiffs cannot plead the falsity of any statements that do not concern Passport with allegations that Evolent mismanaged the Passport relationship, which is all that Plaintiffs offer.

---

[1] Plaintiffs identify approximately 36 alleged misstatements during the Class Period, *see* AC ¶¶ 113-165, but only 14 of the statements specifically refer to Passport and thus are possibly within the scope of CWs' knowledge.  *See* AC ¶¶ 117, 120, 123, 129, 144, 145, 152, 156, 159, 160, 165.  The remaining 22 statements are not false, and Plaintiffs fail to allege any facts that would suggest they were false when made.  At a minimum, the Court should strike the 22 non-Passport alleged misstatements and dismiss any claims based on them.

None of the challenged statements that do concern Passport is actionable either. Plaintiffs allege that Defendants falsely stated in 2018 that Evolent helped improve Passport's financials by $75 million to $100 million, but their own allegations demonstrate that in 2017, the first full year under its contract with Evolent, Passport increased its net income by $84.7 million. AC ¶ 87. Passport's publicly-filed financial statements also confirm these cost savings. The statements concerning the initial "smooth" integration of the Valence platform are immaterial puffery, particularly in light of the risk disclosures that Evolent provided concerning the potential problems associated with the integration. And the AC contains no facts showing that Evolent's February 2019 statements that it did not "currently" plan to acquire Passport were false when made. Evolent changed its strategy in May 2019 because circumstances changed. The cases are legion that 20/20 hindsight is not a sufficient basis to carry a plaintiff's burden to plead falsity.

Third, Plaintiffs have not pleaded loss causation because the core allegation that Evolent caused Passport's financial ruin by overcharging for unnecessary products and services was disclosed in the *Insider Louisville* blog article on January 24, 2019, which Plaintiffs do not link to a decline in Evolent's stock price. Plaintiffs' primary response is that the *Insider Louisville* article did not reveal that Evolent was charging Passport unreasonable fees. But Plaintiffs do not allege that it was ever revealed to the market that Evolent's fees were unreasonable—Plaintiffs' only subsequent corrective disclosures concern the impact that those fees were having on Passport's finances. Because the *Insider Louisville* article had already unambiguously disclosed this impact, Plaintiffs cannot point to a single valid corrective disclosure to meet Rule 9(b)'s heightened pleading requirements.

The AC should be dismissed because it does not raise a strong inference of scienter, does not allege that any statement was false was made, and does not even allege loss causation adequately.

**ARGUMENT**

**I.      Plaintiffs Fail to Plead Sufficient Facts to Raise the Necessary Strong Inference of Scienter.**

To survive dismissal, Plaintiffs must plead concrete factual allegations sufficient to create a strong inference of scienter.  Because they do not plead a plausible motive for fraud, they must plead facts sufficient to conclude that Defendants acted with severe recklessness or actual knowledge of falsity.  They have not met that pleading burden.

**A.      Plaintiffs allege no plausible motive for fraud.**

The AC essentially alleges that Evolent purposely drove Passport into financial ruin so that it could spend $70 million of its own money "bail it out."  Plaintiffs insist that the "motive to commit fraud" was to "conceal the truth that Evolent's business model was actually raising costs, not lowering them," and later to "downplay the severity of Passport's financial condition."  Opp'n 37.  But to what end?  Without suspicious stock sales by insiders or other financial gain, why would the Defendants engage in such a self-destructive scheme?  Plaintiffs never say.

The Fourth Circuit previously rejected this type of irrational motive theory.  In *Cozzarelli v. Inspire Pharmaceuticals*, plaintiffs alleged that defendants lied about their most important drug trial, saying it would succeed when the company knew it would fail.  The Fourth Circuit concluded that "[i]t is improbable that Inspire would stake its existence on a drug and a clinical trial that the company thought was doomed to failure."  549 F.3d 618, 627 (4th Cir. 2008).  The same logic applies here.  Plaintiffs ask the Court to infer that Evolent, a company predicated on providing services to health plans, would purposely perform those services so badly for its most important

4

customer that Evolent would be forced to spend $70 million to prevent the customer's bankruptcy. That is improbable, as is Plaintiffs' allegation that Defendants knew that Evolent's Valence platform was "not ready" and would not work. Why would Evolent spend $220 million to acquire the Valence platform in 2016 if Defendants knew that it would not work? Plaintiffs' theories of scienter make no sense. Like the allegations in *Inspire Pharmaceuticals*, their inference of fraud is "not even plausible, much less convincing." *Id.*

### B.    Plaintiffs allege no facts showing that any Defendant had actual knowledge of the alleged falsity of any statement.

The AC pleads no facts showing that any Defendant had actual knowledge that any challenged statement was false when made. Plaintiffs' allegations amount to nothing more than the type of "core operations" or "senior executives must have known" theories that the Fourth Circuit has rejected. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014); *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 184 (4th Cir. 2009). Even taking the CWs' statements as true, they do not support a strong inference of scienter because the CWs do not say that they communicated any of their concerns directly to any Defendant. This Circuit "only afford[s] [plaintiffs'] allegations the inferential weight warranted by context and common sense." *Matrix Capital*, 576 F.3d at 183. Context and common sense here show that Plaintiffs' allegations of actual knowledge are inadequate.

### 1.    The Confidential Witnesses never interacted with any Individual Defendant.

The CWs never assert that they spoke with, were in the same room with, or sent or received any email from any Individual Defendant. Nor do they assert any other reason why they would have knowledge of what any Individual Defendant knew about the alleged falsity of any challenged statement. Courts routinely dismiss securities cases under these circumstances. *E.g., Local No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460–61

(S.D.N.Y. 2010), *aff'd,*, 430 Fed. App'x 63 (2d Cir. 2011) (holding that employees' statements not sufficient to establish scienter when "employees had no contact with the Individual Defendants."). Evidence from a CW should be credited only if he or she has personal knowledge and is in a position to know relevant facts. *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006). "Common knowledge" at a company cannot support a finding of scienter. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590–91 (S.D.N.Y. 2011). But that is all that Plaintiffs offer. Their allegation that "pretty much everyone from Passport was telling" Evolent about problems with Valence is nowhere near particular enough to support an inference of scienter. AC ¶ 65.

Plaintiffs ask the Court to assume that some of the CWs passed along information that somehow flowed up the chain of command to an Individual Defendant. But those allegations are not sufficient to show that any CW told any Defendant anything, or that any CW had personal knowledge of what any Defendant knew. For example:

- CW1 reported to Passport's CFO—not Evolent's CFO. AC ¶ 44. CW1 knew that "the Passport executive team met every Monday" and that Defendant Spencer was in the room. *Id.* But CW1 does not say that she attended any of those meetings. She does not know what was discussed at those meetings generally or specifically. She did not speak to Spencer.[2] Even crediting CW1's statements concerning the general situation at Passport, the facts pled in the AC do not show that her opinion of the situation ever made its way to an Individual Defendant.

- CW2 stated that "on a number of occasions" she told Evolent management that the Valence platform was not ready or adequate. AC ¶ 65. CW2 does not say who "Evolent management" is—presumably, Plaintiffs would have said that CW2 had talked directly with an Individual Defendant if she had. CW2 does not say at what level of management the people she told were. She does not say when she told management or how. Without more specifics, it is impossible to infer that her statements about the adequacy of a software program ever made it to an Individual Defendant.

---

[2] The only allegedly false statement made by Spencer was about Passport's transition to Valence and was based on her involvement in the decision to use the Valence system. AC ¶ 123. The weekly meetings referenced appear to be general executive meetings, not Valence-transition meetings, and thus do not even relate to the subject of Spencer's one challenged statement.

- CW3 said there was a "daily war room" to address the "mounting crisis" regarding Valence, and that Spencer attended "each war room meeting," and then created presentations "to share with Evolent's most senior executives." AC ¶ 71. CW 3 does not say that she attended any meeting. CW3 does not say she helped prepare the purported presentation or even that she ever viewed one. She does not say how she knows a report was passed along to any Individual Defendant. This type of hearsay is exactly the type of evidence from confidential witnesses that courts rule as insufficient because it is not based on personal knowledge. *In re Trex*, 454 F. Supp. 2d at 573.

- CW4 does not say anything about meetings or communications with any management, much less with any Individual Defendant. *E.g.,* AC ¶¶ 65, 67, and 86.

There is, in short, nothing pled in the AC showing that any of the CWs interacted in any way with any Individual Defendant. CW1 was always a Passport employee, and the two other CWs who made assertions about communications or meetings started at Passport and then were rebadged as Evolent employees. AC ¶¶ 44, 49. That means that these CWs were based in Louisville, not in Evolent's Virginia headquarters where the Individual Defendants were located. Evolent had over 3,000 employees during the Class Period. Ex. 2, 2018 10-K at 17.[3] There is no factual basis to infer that the concerns of a few employees in Louisville made their way to an Individual Defendant in Virginia. The only "evidence" that any information from the CWs was conveyed to some level of "Evolent management" is based entirely on hearsay about what happened at meetings to which CWs were not privy (CW1), presentations that CWs never saw (CW3), and conversations that are not adequately described (CW2). Even assuming that everything the CWs say is true, there is no factual basis to infer that any Individual Defendant had actual knowledge of any false statement.

Two additional points about the CWs are noteworthy. First, courts disregard evidence provided by CWs when it is not based on personal knowledge, or if the CWs have a general lack of understanding of the subject matter. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 179

---

[3] "Ex." refers to the Exhibits appended to the Declaration of Ashley C. Parrish in support of Defendants' Motion to Dismiss.

(4th Cir. 2007). For example, in *Hunter,* the Fourth Circuit held that a CW's "evident lack of familiarity with the R & D contract," the main contract about which allegedly false statements were made, meant that the CW's other assertions about the contract were suspect. *Id.* Here, several CWs assert that Valence was a dental claims processing system inappropriate for handling medical claims. AC ¶¶ 7, 54, 63, 64, 121 and 124. But documents filed with the SEC, which Plaintiffs claim they reviewed before filing this litigation and do not challenge as false, show that Valence was already servicing more than 10 Medicaid and Medicare plans when Evolent acquired it. Ex. 16, July 12, 2016 8-K at Exhibit 99.1 (announcing the purchase of Valence and describing the companies); AC ¶ 2(a), (d). Dental claims are never referenced. The fact that the CWs have such an off-base understanding should compel viewing their statements with skepticism.

Second, the AC does not state when information was shared with "Evolent management." Courts require pleadings based on CWs to describe when the statement was made to an individual defendant, so it is clear that the defendant had actual knowledge. *Hunter*, 477 F.3d at 181. The AC appears to suggest that CW2 made statements to Evolent "management" before Passport's transition to Valence: "[p]retty much everyone from Passport was telling them 'the transition would not go smoothly.'" AC ¶ 121. In fact, the Opposition admits that it "could only have occurred during the period that Valence was being implemented, between May and October 2017"—a six-month span. Opp'n 35 n.24. That is not sufficiently specific. As Evolent disclosed in its risk factors, the integration of complex software systems, like Valence, can result in problems and delays. Ex. 2, 2018 10-K at 18. If CW2 made the statement about Valence's readiness in May, at the beginning of the process, then it would not have been surprising—it takes a lot of work to successfully transition to a new medical claims processing system. But we have no idea when

the statement was made because the AC does not plead this necessary detail and, in any event, CW2's statements shed no light on the actual knowledge possessed by any Individual Defendant.

### 2. The Confidential Witnesses have no knowledge of Evolent's work with other customers.

No CW is alleged to have worked with any of Evolent's clients besides Passport. CW1, the only CW with a modicum of seniority, did not even work for Evolent, the company being sued for securities fraud. AC ¶ 44. Courts have held that when CWs do not work for the company, any statements they make should be viewed with significant skepticism. *Glaser*, 772 F. Supp. 2d at 594–95 (disregarding statements from three of the CWs when they did not work for the company). Evolent was not a one-trick pony—it had over 35 other healthcare plan and provider organization customers across the country during the Class Period, which Plaintiffs admit generated about 80% of Evolent's revenue. AC ¶ 41. Moreover, 22 of 36 statements cited as false or misleading in the AC concern Evolent generally, not Passport or its finances. *See* n.1. The CWs' views concerning statements that were not about Passport should not be credited.

### 3. Actual knowledge cannot be inferred based on the Individual Defendants' executive positions.

Courts should not infer from a defendant's executive position that he "must have known" about any problems or alleged wrongdoing at the individual's company, much less at one of the company's many clients. *Yates*, 744 F.3d at 888–89; *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) (holding that Rule 9(b) and PSLRA standards for scienter were not met because "holding an executive position alone does not necessarily lead one to infer that Individual Defendants knew that the alleged omissions were false or misleading."). Plaintiffs contend that "one cannot claim to be an 'owner' of a business who 'drives the decisions that we think are important'—as Defendant Williams said about Passport— and then turn and pretend to not be knowledgeable about Passport's operations." Opp'n 32. But

9

that directly contradicts controlling precedent. As the Fourth Circuit has recognized, "owners" of a company cannot be found to have specific knowledge based on their ownership. *Matrix Capital,* 576 F.3d at 184 (declining to find a strong inference of scienter when "Plaintiffs ask us to infer from the breadth and gravity of OneGlobe problems that high level corporate agents (including [the CEO] and [the CFO]) must have been aware of the problems…."). Here, at the time the challenged statements were made, Evolent did not even own Passport. Passport was only one of its 35 clients. Moreover, Williams's understanding of Passport's operations and involvement in some strategic decisions does not mean that he knew that any of the statements were false when made. There are no allegations in the AC sufficient to reach a different conclusion.

The cases Plaintiffs cite are readily distinguished because they all involve admissions by individual executives that they were directly involved in the circumstances at issue in the case. Opp'n 32. For example, the defendant in *Genworth* said that his statement "was based on his *personal involvement* in Genworth's complete review of all components of the Company's long-term care business." *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) (emphasis in original). A "complete review" in which the executive was "personally involved" is very different than the facts alleged here. Williams said that "we really have joint governance," AC ¶ 42; he never said that he had personally participated in a full review of the Valence integration at Passport. Williams's additional statements speak of Evolent's relationship with Passport, including Evolent's participation in some of Passport's decision-making. *Id.* ¶¶ 43, 169. Just because Evolent was "able to drive the decisions we think are important for performance" hardly means that Williams himself knew about the falsity of any statement regarding Passport. Again, generalized accusations that an executive—even a CEO—"must have known" about problems at a partner's company (not even his own company) does not meet the

10

high bar to plead a strong inference of scienter. *Yates,* 744 F.3d at 888. Similarly, *Computer Sciences Corp.* and *Kiken* describe statements made by executives that show clear, personal involvement, in contrast to Williams's statements that *Evolent* was a partner with Passport. *In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012) (executive paid "the 'utmost attention' to the contract at issue in the case); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 607 (E.D. Va. 2015) (defendants said repeatedly that they were "personally involved"). The *Genworth* court noted that the "self-proclaimed personal involvement" of defendants is what supports an individual defendant's scienter. 103 F. Supp. 3d at 785. The circumstances in the cited cases are much different than the ones in this case.

### 4.    None of the other facts pled in the AC evidence scienter.

The Opposition argues that the large penalties Passport allegedly incurred for problems incorrectly reporting encounter data support a strong inference of scienter. Opp'n 32–33. But that is just the same 'executives must have known' argument discussed above. Plaintiffs ignore the reality that the penalties (1) were imposed only after Williams made the positive statement about the Valence transition; and (2) were capped at a small fraction of the meaningless numbers Plaintiffs cite. *Compare* Opp'n 17 n.6 (admitting that it was "$10 million in penalties") *with* Opp'n at 17 ("$500 million in penalties").

The presence of Thomas Peterson, Evolent's COO who is not a named defendant, along with a "shadow management team" at Passport headquarters in early 2019 does not suggest that Evolent intended to acquire Passport. It suggests that Evolent was trying to help its partner and that it knew that Passport was struggling financially—but Evolent shared that information with investors repeatedly, including in its 2018 10-K. Ex. 2 at 16. As described more fully below, Evolent explained that it changed its acquisition strategy based on new information. There are no facts to support Plaintiffs' supposition that Evolent intended in January 2019 to acquire Passport.

11

## II.     Plaintiffs Fail to Adequately Plead Falsity

Relying on out-of-circuit precedent, Plaintiffs try to salvage their narrative of fraud by arguing that Defendants have "attempted to improperly shoehorn summary judgment arguments into their motion to dismiss."  Opp'n 19 (citing *Khjoa v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018)).  That is incorrect.  Defendants merely ask that the Court take judicial notice of public records that provide context relevant to determining whether Plaintiffs have met their pleading burden.  The Fourth Circuit recognizes that courts "may properly take judicial notice of matters of public record." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (citing *Papasan v. Allain*, 478 U.S. 265, 269 n.1 (1986)).  A "court does not convert a motion to dismiss to a motion for summary judgment when it takes judicial notice of public records." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 506–07 (4th Cir. 2015) (citing *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004)).[4]

Moreover, because Plaintiffs allege in the AC that they conducted an investigation before commencing this litigation, the Court is entitled to review the context of the public information that forms the basis of their lawsuit.[5]  AC ¶ 2; Opp'n 18–19.  When "Plaintiffs' proposed inference

---

[4] The following types of documents have properly been considered at the motion to dismiss stage: (1) information on a state administrative agency's website, *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d at 506, such as Ex. 22, Passport's Audit for the Kentucky Dept. for Medicaid Services; (2) state court records, *Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x 395, 397 (4th Cir. 2006), such as Ex. 11, Passport's Rate Case (filed in Kentucky state court, against Kentucky's rate setting agency); (3) analyst reports and calls, *Cozzarelli*, 549 F.3d at 625, such as Ex. 5, Investor Day 2019 and Ex. 31, 3rd Quarter 2018 Earnings Call; and (4) records of administrative agencies, *Friends of Lake View Sch. Dist. Incorporation No. 25 of Phillips Cty. v. Beebe*, 578 F.3d 753, 762 (8th Cir. 2009), such as Exs. 13, 20, 21, Passport's annual financial statements for 2016, 2017, and 2018.

[5] Plaintiffs also complain that Exhibit 1, a chart with the challenged statements from the AC and a summary of arguments made about each in the MTD, was inappropriate.  The chart was provided for context and to help the Court boil down the dense, 70 pages of often-redundant allegations from the AC into a manageable list of the statements at issue.  The chart includes the full quote, not the cherry-picked section in the AC.  The full documents are included as Exhibits, but it is helpful to easily see the full paragraph from which allegedly misleading statements are taken.  Just the sentence before and after can show that there is, in fact, nothing misleading about the statement.  In addition, the

of scienter depends on stringing together a series of isolated allegations without considering the necessary context," the Fourth Circuit held that it "must examine the facts as a whole, including facts found in 'documents incorporated into the complaint by reference.'" *Inspire Pharm.*, 549 F.3d at 625. Because the exhibits attached to the Motion to Dismiss ("MTD") are all subject to judicial notice or incorporated into the AC, they are all appropriate for this Court to consider.

### A. Alleged mismanagement is not sufficient to state a Section 10(b) claim.

Plaintiffs claim that Evolent's positive statements about its products and services were false and misleading because Evolent allegedly mismanaged the delivery of those products and services to one customer, Passport. This alleged "mismanagement" and the concomitant financial challenges at Passport, the AC avers, must mean that *any* statement that is relatively positive about *Evolent's* business is, *ipso facto*, false. Logically, this does not follow, and legally, this fails to state a claim under Section 10(b). *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004); *see also* MTD at 9–14 (identifying publicly available facts establishing that the allegations regarding mismanagement are false).

Courts have repeatedly recognized that "mere mismanagement" by executives does not state a valid claim for securities fraud. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *In re Cable & Wireless*, 321 F. Supp. 2d at 770; *Weill v. Dominion Res., Inc.*, 875 F. Supp. 331, 336 (E.D. Va. 1994). "Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives." *In re Cable & Wireless*, 321 F. Supp. 2d at 770. "[P]oor management is a risk that every investor takes." *Id.* But that is exactly what Plaintiffs do here—

---

reasons that each statement cannot state a securities fraud claim are discussed in the text of the brief; the chart is just a summary of previously made arguments.

they attempt to convert mismanagement and breach-of-contract claims that belong to Passport as securities fraud claims by Evolent's investors.

### B.      Statements about Evolent's ability to lower costs are not actionable.

Evolent's aspirational statements about its general ability to deliver cost savings to its healthcare plan customers are not rendered false by allegations that Evolent "overcharged" one customer, Passport, for its products and services.  It is undisputed that Evolent had over 35 customers during the Class Period.  Ex. 3, JPM Presentation, at 10.[6]  Without facts that Evolent overbilled other clients or failed to deliver promised cost savings to other clients, Plaintiffs' allegations are insufficient to plead that the challenged statements, which do not specifically concern Passport, were false when made.  Plaintiffs' Opposition never articulates why the alleged problems with Passport demonstrate a systematic failure by Evolent to deliver cost-saving healthcare systems and services.

Plaintiffs' allegations are also insufficient to demonstrate the falsity of the few statements that directly concern Passport.  Plaintiffs' inflammatory allegation that "Evolent grossly overcharged Passport hundreds of millions of dollars during the Class Period without providing any corresponding benefits" does not render any challenged statement false or misleading. Opp'n 1.  There is no allegation that Evolent charged Passport more than the negotiated contract price.  The only allegation Plaintiffs rely on to support their "overbilling" claim is that Evolent hired (or rebadged) 350 Passport employees and charged Passport more in fees than Passport previously paid those employees in salary.  AC ¶¶ 48, 115, 157.  But Plaintiffs ignore the costs and benefits of the suite of additional healthcare systems and software that Evolent provided to

---

[6] Plaintiffs' investigation included "analysis of shareholder communications, conference calls and postings on Evolent's website," AC ¶ 2, of which this exhibit is one.

14

Passport during the Class Period, such as (1) the medical claims processing system (Valence), (2) the pharmacy benefit management ("PBM") program, and (3) Evolent's care management system. MTD 7–9.

The only challenged statements that address specific cost savings to Passport are (1) Blackley's May 11, 2018 statement that Evolent's suite of services had caused "about $75 million of improvement to Passport's bottom line," AC ¶ 145, and (2) Williams's September 5, 2018 comment that he "believ[ed]" that "we've helped to generate over $100 million in savings" in Passport's plan. AC ¶ 152. Defendants explain in detail how these numbers are verified by Passport's publicly filed financial statements, and Plaintiffs themselves use the Motion to Dismiss's explanation to calculate the MLR and ALR for several years. MTD 24–35; Opp'n 20.

Plaintiffs cite Passport's financial results extensively in the AC, but then ask this Court in their Opposition to disregard Passport's financial statements, which are publicly available records filed with the Commonwealth of Kentucky. *Id.* Plaintiffs argue that the "Court should not judicially notice these documents" because they "fall far outside of the 'narrow' circumstances in which a court may take notice of such materials." Opp'n 19. Nonsense. These publicly filed records are precisely the type of documents that federal courts routinely consider at the motion-to-dismiss stage in securities cases to test the adequacy of plaintiffs' allegations. *Matrix Capital*, 576 F.3d at 183 (4th Cir. 2009); *see also* n.4. And because the AC repeatedly cites Passport's financial results to support its allegations, Passport's financial statements are thus integral to the complaint and should be considered by the Court.[7]

---

[7] The Court need not examine Passport's financial statements to verify the accuracy of Defendants' statements— Plaintiffs own allegations show that Passport's net underwriting profits improved from "a net underwriting *loss* of $80.4 million in 2016" to a "net underwriting gain of $4.3 million for 2017." AC ¶ 87. This supports the veracity of the challenged statements made in 2018 that Evolent helped Passport to improve its bottom line finances between $75–100 million. AC ¶¶ 145, 152.

### C.    Statements about integrating Valence are not actionable.

The integration of a new business process software system is a complex endeavor that is fraught with the potential for setbacks and delays.  In this case, Evolent expressly warned investors that "[w]e may be unable to integrate the operations, products, technologies or personnel gained through the Valence Healthcare" acquisition "without a material adverse effect on our business, financial condition and results of operations."  Evolent's Form 10-Q for 2Q 2017 (Aug. 7, 2017) at 50.[8]  Despite these clear warnings, Plaintiffs argue that investors were materially misled by Defendant Williams's statements:

- In May 2017, five months before the "go-live date," that the early integration of Valence at Passport "has gone incredibly well."  AC ¶¶ 61, 65.

- On November 2, 2017, one month after the "go-live date," that "we've successfully launched" Valence at Passport and Evolent's "teams continue to monitor operations closely and report a smooth transition."  AC ¶ 66.

Plaintiffs' argument is without merit—no reasonable investor would consider a CEO's optimistic statement at the very early stages of the implementation of a complex business software system to be material, particularly here because Evolent provided specific warnings that the integration of Valence could cause significant problems.[9]  Ex. 2, 2018 10-K at ii, 18–19.

Moreover, Williams's positive statements at the beginning of the Valence integration at Passport are not rendered false because the Valence system allegedly caused Passport to submit defective medical claims that resulted in large penalties.  Not only is this the type of integration problem that Evolent warned could cause a "material adverse effect on [Evolent's] business, financial condition and results," it is based on the hindsight assessment of penalties imposed after

---

[8] *Available at* https://www.sec.gov/Archives/edgar/data/1628908/000162890817000044/evh06301710-q.htm.

[9] *See, e.g., In re Tibco Software, Inc.,* 2006 WL 1469654, at *23 (N.D. Cal. May 25, 2006) (granting motion to dismiss and finding that statements about integration of new software were not false because the company did not know there would be problems until after the integration was completed and because positive statements were accompanied by appropriate cautionary language).

the October 1, 2017 "go-live" date.  AC ¶ 65.  Plaintiffs do not contend that these penalties were known or knowable when Williams made the statements about the "smooth" and "successful" Valence integration at Passport on November 2—a mere 32 days after the October 1st "go-live" date.  In other words, the fact that Kentucky imposed penalties in late 2017 and 2018 does not render Williams's earlier statement about the transition false when made.

Plaintiffs also exaggerate the magnitude of the actual fines imposed on Passport by Kentucky.  They repeatedly assert that Kentucky imposed $500 million in fines on Passport, but the actual number is buried in footnotes in their Opposition—the fines were capped at just a fraction of that.  Opp'n 10 n.3, 17 n.6.  This $10 million in fines in 2018, or about "8% of Passport's net underwriting loss in 2018," was not a material contributing factor to Passport's $130.7 million in net underwriting losses in 2018, AC ¶ 146, and would not necessarily garner the attention of Evolent's senior management.

### D.    Statements about Evolent's business strategy are not actionable.

None of the statements regarding Evolent's business strategy, plans regarding purchasing Passport, or Passport's progress is false or misleading even when Plaintiffs' allegations are taken as true.

Plaintiffs do not adequately plead that Williams' statement in February 2019 that Evolent did not currently have plans to acquire Passport was false when made.  The facts they tout are conclusory: Evolent bought Passport three months after Williams said it was not in Evolent's "strategic lens," so Williams should be assumed to have been lying.  Plaintiffs rely on non-defendant Tom Peterson's comment that in January 2019, "the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be retroactive rate

17

relief….."  AC ¶ 103; Opp'n 14.[10]  But Peterson's comments merely echo what Evolent disclosed in its 2018 10-K filed in February: that Kentucky's rate cuts would have a material adverse impact on Passport and could result in its bankruptcy.  Ex. 2 at 16.

Based on the documents from which Plaintiffs themselves cite, there is a plausible explanation for Evolent's sudden purchase of Passport that does not make Williams's statements false when made.  *See* Ex. 5 at 16–17; 13–16 (Williams explaining Passport's decision to seek a purchaser) (not alleged to be false or misleading).  Evolent changed its strategy in May 2019 and considered acquiring Passport after it learned that a business competitor was poised to purchase Passport.  Ex. 5, 2019 Investor Day at 14–15 ("If we stepped away, imagine a national Medicaid MCO would've come in, they would've bought the asset and surely would've figured out a way for us to be much less engaged than we were engaged… [this was] outside of our strategy… but, boy, it seems like something we should look at.").  Though the Company had not planned on acquiring a new health plan after New Mexico's True Health, Evolent decided doing so made the most sense to keep Passport's business.  *Id.*

Moreover, Williams's positive statements on May 7, 2019 about Passport's prospects are clearly forward-looking statements with cautionary language.[11]  Williams said "we believe" that Passport is making progress.  AC ¶ 165.  He said that Evolent was "hopeful" that increased rates

---

[10] Based on a straight reading of the remarks Peterson made on May 30, 2019, it appears that he meant "the writing was on the wall" that the 2018 retroactive rate cut was not going to be rescinded.  Ex. 5, 2019 Investor Day Transcript at 16–17.  Plaintiffs assume his statement to mean that "the writing was on the wall" that Evolent would be forced to acquire Passport.  Opp'n 25.

[11] Cautionary language was included at the start of all analyst calls.  *See, e.g.,* Ex. 30, 4Q 2018 Call at 4; Ex. 32, 2Q 2018 Call at 4.  Risk factors are also included in Evolent's 10-Ks and 10-Qs, such as:
(1) Ex. 2, 2018 10-K (excerpt) at ii–iii and 16-19;
(2) 2018 10-K at 15–39, https://www.sec.gov/Archives/edgar/data/1628908/000162890818000015/evh12311710-k.htm;
(3) 2017 10-K at ii–iii and 15–35, https://www.sec.gov/Archives/edgar/data/1628908/000162890817000006/evh12311610-k.htm;
(4) 2016 10-K at 2–3 and 14–33, https://www.sec.gov/Archives/edgar/data/1628908/000162890816000030/evh12311510-k.htm;
(5) 10-Q for 2Q 2017 at 1–2 and 47–69, cited *supra* n.8; and
(6) 10-Q for 3Q 2018 at 1–2 and 56-59, https://www.sec.gov/Archives/edgar/data/1628908/000162890818000083/evh09301810-q.htm.

and administrative rates would "strengthen" the balance sheet. *Id.* When asked in February 2019 about a potential acquisition of Passport, he did not promise shareholders that Evolent would never purchase a health plan. He said purchasing Passport was "not something that is currently being evaluated." AC ¶ 160. There are no facts pled suggesting that it was being evaluated in February 2019, just baseless supposition that the *later* purchase *must* mean they were evaluating it then. This is impermissible fraud by hindsight.

## III. Plaintiffs Fail to Adequately Plead Loss Causation

To plead loss causation, this Circuit requires particularized pleading akin to the requirements of Rule 9(b). *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). As Defendants' Motion to Dismiss notes, the underlying information that Plaintiffs allege was concealed from the market was disclosed in the *Insider Louisville* news article that Plaintiffs prominently cite. MTD 35; AC ¶ 89-92.

Plaintiffs admit that the article disclosed information about the large costs that Evolent imposed on Passport, but contend that the article did not disclose that Evolent billed above-market fees to Passport. Opp'n 39. Plaintiffs also argue that if all relevant information was disclosed in the article, then Evolent's share price would not have declined following the filing of Passport's lawsuit against the State of Kentucky and the news that Evolent was acquiring an ownership interest in Passport. *Id.* at 40.

Even if it were true that Evolent billed Passport at above-market rates, Plaintiffs have not alleged any subsequent corrective disclosure revealing this fact to the market. Plaintiffs do not allege that revelations about the *propriety* of these costs were the cause of Plaintiffs' loss, but rather the *consequences* of these high costs on Passport. *Id.* at 5. Because the market was put on notice of the consequences in the February article, Plaintiffs cannot plead loss causation.

19

Plaintiffs also argue that its other alleged corrective disclosures must be valid because Evolent's stock price fell on those days. Opp'n 40. But not all bad news announced by a company is a corrective disclosure. Rather, corrective disclosures must "reveal to the market in some sense the fraudulent nature of" such misrepresentation or omission… and not to some other negative information about the company." *Singer v. Reali*, 883 F.3d 425, 446 (4th Cir. 2018) (internal quotations and citations omitted.)

## CONCLUSION

The securities laws are designed to protect against fraud, that is, demonstrably false or misleading statements of material fact made with an intent to deceive or defraud. They are not meant as insurance for aggrieved investors who suffered losses due to alleged mismanagement of the business – overcharging customers or failing to integrate a complex medical claims software system. Plaintiffs' case is a paradigm example of trying to shoehorn a classic mismanagement case into a securities fraud case. Congress strengthened the requirements to plead securities fraud to weed out cases like this one at the pleading stage. Plaintiffs have failed to satisfy the PSLRA's heightened pleading requirements for falsity, scienter, and loss causation—stripped of baseless supposition, spin, and conclusions, and applying the proper context and common sense, it is clear that the AC should be dismissed for failing to state a plausible claim for securities fraud.

20

DATED: March 5, 2020

RESPECTFULLY SUBMITTED,

*/s/ Ashley C. Parrish*
Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 737-0500
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX  78701
Tel: (512) 457-2000
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 5, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System on all parties in this case.

*/s/ Ashley C. Parrish*
Ashley C. Parrish

21