UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON,<br><br>     Defendants. | Case No. 1:19-cv-01031-RDA-TCB |

**LEAD PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION
FOR LEAVE TO AMEND THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.    Introduction.....................................................................................................................1

II.   Argument .......................................................................................................................3

    A.    Lead Plaintiffs' Motion is Not Prejudicial or Procedurally Improper ................... 3

    B.    Prohibiting Any Further Amendments at This Early Stage is Improper................. 6

    C.    Lead Plaintiffs' Motion is Not Futile Because the SAC Amply Establishes
        that Defendants Acted with Scienter in Defrauding Investors............................... 8

        1.    CW 5 Had a Front Row Seat to Witness "Evolent Run Passport to
            the Ground," "Cripple[] [Passport's] Business and then Charge[] us
            for Services that Weren't Rendered.".......................................................... 10

        2.    CW 5 Unquestionably Places Defendant Williams at the Center of
            Evolent's Fraud ...................................................................................... 13

        3.    The SAC Amply Establishes Scienter on the Part of the Other
            Individual Defendants.............................................................................. 18

III.   Conclusion ...................................................................................................................20

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Alliance Solutions, Inc. v. Quest Software, Inc.*,
2012 WL 692883 (D. Md. Mar. 1, 2012) ............................................................. 3, 9

*Beads v. Md. State Police*,
2013 WL 6490268 (D. Md. Dec. 9, 2013) ........................................................... 4, 6

*Black v. Martek Biosciences Corp.*,
2006 WL 8435572 (D. Md. June 14, 2006) ....................................................... 13, 14

*Collier v. ModusLink Global Solutions, Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ......................................................................... 15

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) ............................................................... 17

*Davis v. Piper Aircraft Corp.*,
615 F.2d 606 (4th Cir. 1980) ................................................................................... 4

*Foman v. Davis*,
371 U.S. 178 (1962) ............................................................................................. 2, 7

*Galustian v. Peter*,
591 F.3d 724 (4th Cir. 2010) ................................................................................... 6

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) ...................................................................................... 7

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
2011 WL 3211472 n.11 (S.D.N.Y. July 29, 2011) ................................................. 8

*In re Cendant Corp. Sec. Litig.*,
404 F.3d 173 (3d Cir. 2005) .................................................................................... 7

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
288 F.R.D. 26 (S.D.N.Y. 2012) .............................................................................. 8

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ........................................................ 10, 19, 20

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ................................................................. 17

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................... 20

iii

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) ............................................................ 17, 18

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ................................................................................ 15

*In re Trex Co., Inc. Sec. Litig.*,
  454 F. Supp. 2d 560 (W.D. Va. 2006) .............................................................. 16

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .............................................................................. 18

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ............................................................... 19

*Laber v. Harvey*,
  438 F.3d 404 (4th Cir. 2006) ........................................................................... 1, 4

*Landress v. Tier One Solar LLC*,
  243 F. Supp. 3d 633 (M.D.N.C. 2017) ............................................................... 5

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
  797 F.3d 160 (2d Cir. 2015) ................................................................................ 7

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................................. 17

*MC1 Healthcare LLC v. Mountainside Solutions, Inc.*,
  2019 WL 3663844 (W.D.N.C. Aug. 6, 2019) ..................................................... 4

*Perkins v. United States*,
  55 F.3d 910 (4th Cir. 1995) ............................................................................. 3, 9

*Rainey v. Anderson*,
  2018 WL 3636596 (E.D. Va. Apr. 11, 2018) ..................................................... 6

*SEC v. Pirate Inv'r, LLC*,
  580 F.3d 233 (4th Cir. 2009) ............................................................................. 14

*Silvestry v. Gen. Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) ............................................................................... 5

*South Ferry LP #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................. 18

*Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.*,
  299 F. Supp. 2d 565 (E.D. Va. 2004) .................................................................. 4

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................ 10, 11, 12, 20

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
  525 F.3d 370 (4th Cir. 2008) ................................................................................... 3, 9

*Williford v. Armstrong World Indus., Inc.*,
  715 F.2d 124 (4th Cir. 1983) ....................................................................................... 5

*Yates v. Municipal Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) ..................................................................................... 19

Statutes

15 U.S.C. § 78u-4 ........................................................................................................ 8

Rules

Fed. R. Civ. P. 15(a)(2) .......................................................................................... passim

Lead Plaintiffs Plymouth County Retirement System ("Plymouth County") and Oklahoma Police Pension and Retirement System ("Oklahoma Police") (collectively, "Lead Plaintiffs" or "Plaintiffs"), respectfully submit this Reply in Further Support of their Motion for Leave to Amend the Amended Class Action Complaint.[1]

## I.    INTRODUCTION

If the Court has been placed in a difficult position, it is not because Lead Plaintiffs have sought leave to amend their complaint in accordance with Rule 15(a)(2), but rather because Defendants have refused to consent to what should be a routine request, needlessly forced the parties and the Court to perform the extra, unnecessary work that they simultaneously claim is prejudicial to them, and advanced multiple positions that are wholly at odds with binding Supreme Court and Fourth Circuit authority.

Lead Plaintiffs' Motion for Leave should be granted. It is timely, having been filed at the pleading stage promptly after Lead Plaintiffs learned of new evidence. Nor have Defendants suffered any prejudice because they have to address new allegations at this early stage, as the Fourth Circuit has explained. *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006).

Moreover, the Court should reject Defendants' radical position that asks the Court to ignore the plain language of Rule 15 and hold now, before any discovery has occurred or the Court has even addressed the sufficiency of the pleadings, that Plaintiffs can never amend their complaint again. That is not the way litigation works, and it is therefore unsurprising that Defendants cite no

---

[1] Lead Plaintiffs filed their Motion for Leave to Amend on May 7, 2020 (the "Motion"). ECF No. 60. Lead Plaintiffs attached as Exhibit A to the Motion their Proposed Second Amended Complaint (the "Proposed SAC" or "SAC"). ECF No. 60-1. All "¶__" references herein are to the SAC unless otherwise stated; all defined terms have the meanings assigned in the SAC; all references to the "AC" are to the Amended Complaint (ECF No. 38), all references to the "Opposition" or "Opp." are to Defendants' Opposition (ECF No. 63), and all emphasis in quoted material is added and internal quotations and citations omitted unless otherwise noted.

authority to support their contention. The Proposed SAC is only the second time that Lead Plaintiffs have amended their complaint. Under the PSLRA it is customary for a Lead Plaintiff to file an amended complaint once appointed by the court; this is because once appointed, Lead Plaintiffs have the ability and responsibility to control the litigation on behalf of the Class. Lead Plaintiffs filed their Amended Complaint here on January 10, 2020 (ECF No. 38), and while Lead Plaintiffs do not presently have any intention of amending again, the Supreme Court has made clear that under the liberal standards of Rule 15, refusing to grant leave "without any justifying reason" is an abuse of discretion. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Finally, Plaintiffs' Proposed SAC is not futile. Indeed, as Plaintiffs demonstrated in their Opposition to the Defendants' first motion to dismiss ("Pl. Opp.," ECF No. 54), the AC states well-pled allegations that far surpass the pleading requirements for establishing violations of Section 10(b) of the Exchange Act and that would have survived the Defendants' motion to dismiss—all without the first-person account of CW 5. For example, the AC sufficiently pled scienter based on Defendants' admitted absolute and unfettered control over Passport; indeed, Defendants expressly acknowledged that Evolent: (i) was *"a co-owner"* of Passport; (ii) had *"joint governance" with Passport that allowed it to "drive the decisions we think are important for performance"*; (iii) was *"at the table participating in [Passport's operational] decisions"*; and (iv) *controlled the "levers" at Passport*. Defendants cannot now credibly distance themselves from their status as an avowed "co-owner" of Passport, and courts have uniformly held that such statements establish scienter. Pl. Opp. at 31-34. Plaintiffs additionally established that the CWs, who provided consistent and corroborating accounts, added to an inference of scienter; that Defendants were aware of Passport's ballooning cost increases and the disastrous Valence implementation because it concerned Evolent's core business; and that Defendants had motive and opportunity to commit

2

fraud. Pl. Opp. at 34-38.

CW 5's account buttresses those allegations and corroborates the accounts of the other CWs cited in the AC. Indeed, *after* Defendants' motion to dismiss was fully briefed, Lead Plaintiffs uncovered additional new evidence that supported their allegations—Passport's former Senior Director of Information Technology, who worked directly on Valence and who reported to Passport's COO.  CW 5 had direct personal knowledge of Evolent's fraudulent acts, and reached out to Plaintiffs on her own because she wanted to corroborate and add to the existing allegations, and reject Evolent's defenses.

Despite spending the majority of their Opposition arguing that the SAC is futile, Defendants nevertheless turn around and insist that if the amendment is granted, they should be allowed to move to dismiss. It is apparent that they seek two bites at the apple, and this tactic should not be countenanced by the Court. The Fourth Circuit is clear that the standard for determining futility is the same as the standards under Rule 12(b)(6), *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008); *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995). Defendants have made the strategic decision to not address the SAC on a motion to dismiss, but rather to oppose Plaintiffs' Motion on futility grounds. Accordingly, assuming that the Court grants Plaintiffs' Motion to Amend, any additional motion to dismiss that Defendants may file is moot. *Alliance Solutions, Inc. v. Quest Software, Inc.*, 2012 WL 692883, at **8-9, 11 (D. Md. Mar. 1, 2012) (holding proposed amendment states a claim for relief and "accordingly is not futile") (citing *Wilson*, 525 F.3d at 376).

Accordingly, Plaintiffs' Motion should be granted.

## II.   ARGUMENT

### A.   Lead Plaintiffs' Motion is Not Prejudicial or Procedurally Improper

Defendants' contention that they will be prejudiced because Plaintiffs' Motion is somehow

procedurally improper is frivolous on its face. Opp. at 5-6. Indeed, Defendants concede that Plaintiffs could not have moved under Rule 15(a)(1) (Opp. at 4), but fail to identify any prejudice that they purportedly suffered or any procedurally improper steps that Plaintiffs purportedly took in moving to amend precisely as Rule 15(a)(2) contemplates.[2]

*First*, this Action is in its earliest stages; a single Rule 12(b)(6) motion has been briefed but no hearing on that motion has been held, no ruling on that motion has been issued, no discovery has taken place pursuant to the PSRLA's discovery stay, no schedule of pre-trial deadlines has been proposed or entered, and no trial date has been set. Defendants assert that because briefing on their motion to dismiss is complete, Plaintiffs' Motion is "prejudicial on its face." Opp. at 6. But the Fourth Circuit has expressly explained that ***"[a]n amendment is not prejudicial . . . if it merely adds . . . to the facts already pled and is offered before any discovery has occurred."*** *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (emphasis added) (citing *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980)). Notably, Defendants fail to address this binding authority anywhere in their Opposition. Accordingly, courts have repeatedly held that Rule 15(a)(2) amendments are proper if filed at the pleading stage after a motion to dismiss. *See, e.g., MC1 Healthcare LLC v. Mountainside Solutions, Inc.*, 2019 WL 3663844, at **3-4 (W.D.N.C. Aug. 6, 2019) (granting leave to amend filed in response to defendant filing motion to dismiss); *Beads v. Md. State Police*, 2013 WL 6490268, at *4 n.12 (D. Md. Dec. 9, 2013) ("Contrary to the allegations of the Defendants, seeking to amend the complaint after opposing a motion to dismiss is not an indication of bad faith."); *Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.*, 299 F. Supp. 2d 565, 571 (E.D. Va. 2004) (granting motion for leave to amend

---

[2] Defendants' baseless insinuation that Plaintiffs are attempting to exploit the COVID-19 pandemic is unfathomable, beyond the pale, and merits no response.

made after defendants' motion to dismiss had been fully briefed).

Indeed, the authorities that Defendants do cite in support of their belief that Plaintiffs' Motion is prejudicial and procedurally improper are wholly irrelevant and do not contain **any** discussion regarding Rule 15 or motions to amend. Opp. at 5-6. *Silvestry v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) discusses a court's power to impose sanctions for spoliation of evidence; the word "amend" does not even appear in that opinion. *Landress v. Tier One Solar LLC*, 243 F. Supp. 3d 633, 646 (M.D.N.C. 2017), meanwhile, holds that a civil case should be stayed pending the outcome of a bankruptcy proceeding (and cites to *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) for that proposition).

*Second*, contrary to Defendants' baseless accusations of "procedural maneuver[ing]" (Opp. at 6), Plaintiffs moved with all reasonable speed to amend as soon as they learned of the bases for the Proposed SAC. As Plaintiffs explained in their Motion and in the SAC, CW 5 first contacted Plaintiffs on her own initiative **after** Defendants filed their Reply on March 5, 2020 and briefing on their motion to dismiss was complete. Mot. at 10; ¶88. In fact, ***CW 5 did not leave Passport until March 2017 (¶88)—making it impossible for Plaintiffs to have contacted her before then***. Plaintiffs promptly notified Defendants that they intended to seek amendment on April 16, 2020, and proposed a briefing schedule for the filing of the Proposed SAC and the Defendants' anticipated motion to dismiss.[3] After Defendants refused to consent to the amendment, Plaintiffs

---

[3] Defendants' claim that Plaintiffs did not provide them with any "satisfactory explanation" for their reason to amend (Opp. at 5) is baseless and omits key facts. In addition to Plaintiffs' representations that Defendants quote in their Opposition, Defendants fail to inform the Court that Plaintiffs' counsel also represented to Defendants' counsel that "[t]he additional facts . . . were only recently uncovered, which is why did we not seek to amend earlier" and that Plaintiffs "do not intend to name additional defendants, add additional counts, expand the length of the Class Period or change the definition of the Class in any way." Defendants' lack of satisfaction appears to stem from the fact that Plaintiffs reasonably did not provide them with a pre-filing work-product draft of the Proposed SAC weeks before the proposed filing date—which Defendants requested—while

informed the Court on April 22 that they intended to file their Rule 15(a)(2) motion. ECF No. 58. The purpose of this filing was to ensure that the Court was timely advised of Plaintiffs' intentions so that the Court did not needlessly expend its time reviewing a complaint that Plaintiffs intended to seek to amend. The fact that Plaintiffs moved with such promptness further undermines any belief that Plaintiffs' Motion is improper. *Beads*, 2013 WL 6490268, at *4 ("[T]here has been no significant delay in seeking leave to amend, and there is no evidence of Beads's bad faith.").[4]

Accordingly, Plaintiffs' motion is not procedurally improper and not prejudicial.

### B.   Prohibiting Any Further Amendments at This Early Stage is Improper

Rule 15(a)(2) provides that "[t]he court should freely give leave" to amend "when justice so requires," and the Fourth Circuit has unequivocally stated that "[i]t is this Circuit's policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)." *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010) (reversing denial of motion seeking leave to amend). Lead Plaintiffs do not, at this time, intend to seek another Rule 15(a)(2) amendment.[5] Defendants' insistence that the Court should absolutely foreclose all future possibilities to amend at

---

Plaintiffs were still in the process of their investigation relating to CW 5. *Rainey v. Anderson*, 2018 WL 3636596, at *3 (E.D. Va. Apr. 11, 2018), which is Defendants' own authority, noted that "a proper conference [in that case] would have all but eliminated the dispute." That is not the case here, particularly when Defendants know all of the facts relating to the SAC and are still opposing it.

[4] In sharp contrast, Defendants' proposal to hold Plaintiffs' Motion in abeyance until after the Court issues an opinion on the motion to dismiss (Opp. at 8-9) not only invites the Court and parties to perform unnecessary extra work, but also creates the very delay and inefficiencies that Defendants claim to want to avoid. Indeed, it makes no sense—and Defendants cite no authority—for the proposition that the Court ought to issue an opinion without the full consideration of all well-pled facts.

[5] As demonstrated herein, the Proposed SAC far surpasses all pleading requirements of the PSLRA and Rule 9(b). And while Lead Plaintiffs do not intend to seek further amendment at this time, this does not mean that Plaintiffs forfeit their rights under Rule 15(a)(2) to seek amendment in the future should additional new information come to light and if "justice so requires."

6

this early stage is improper, however, and it is unsurprising that they cite no authority in support of this extreme position. *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (reversible error for district court to deny leave to amend under Rule 15(a)(2) "in the critical absence of a definitive ruling" because it was "premature and inconsistent with the course of litigation prescribed by the Federal Rules.").

The Proposed SAC is only the second time that Lead Plaintiffs have amended their complaint. While Plymouth County Retirement System filed the initial complaint in this Action on August 8, 2019, it did not file that complaint in the capacity as a PSLRA-appointed Lead Plaintiff. It was not until November 12, 2019, that Plymouth County Retirement System and Oklahoma Police Pension and Retirement System were appointed Lead Plaintiffs pursuant to the PSLRA (ECF No. 29), who then filed their complaint in that capacity on January 10, 2019 (ECF No. 38).

Indeed, under the PSRLA it is customary for a Lead Plaintiff to file an amended complaint once appointed by the Court. The distinction between an initial complaint and a complaint filed by the court-appointed Lead Plaintiffs is critical because, as courts have uniformly explained, it is the Lead Plaintiff, in its capacity as such, that has the power and responsibilities to control securities fraud litigation and speak for the class. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 203 (3d Cir. 2005) ("Once a lead plaintiff has been appointed, that plaintiff should be deemed to speak for the entire class—as, indeed, the lead plaintiff has a fiduciary duty to represent all class members fairly."); *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004) ("[T]he main purpose of having a lead plaintiff [is] to empower one or several investors with a major stake in the litigation

7

to exercise control over the litigation. . . ."); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 288 F.R.D. 26, 36 (S.D.N.Y. 2012) (explaining that court-appointed lead plaintiff has responsibility to determine which claims will be asserted in the amended complaint). Indeed, without being appointed as a lead plaintiff, a class member is unable to speak or assert clams on behalf of a class. 15 U.S.C. § 78u-4(a)(3)(B)(i) (the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members. . . ."); *see also, e.g., In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 2011 WL 3211472, at *14 n.11 (S.D.N.Y. July 29, 2011) (securities purchases of plaintiff who was not PSLRA-appointed lead plaintiff or named class representative did not establish standing to pursue class-wide claims).

Accordingly, Lead Plaintiffs Plymouth County and Oklahoma Police first acted in their capacity as Lead Plaintiffs to file the AC on January 10, 2020, and the Proposed SAC represents nothing more than their second amended complaint.

### C.    Lead Plaintiffs' Motion is Not Futile Because the SAC Amply Establishes that Defendants Acted with Scienter in Defrauding Investors

The Proposed SAC, like the AC before it, states well-pled allegations that Defendants violated Section 10(b) of the Exchange Act. Throughout the Class Period, Defendants regularly represented to investors that Evolent's entire business model was predicated on its supposed ability to "lower clinical and administrative costs" for its clients. ¶¶137, 161, 185. With respect to Passport in particular, Evolent's most important partner that accounted for up to 20% of its revenue, Evolent boasted of its purported success in cutting costs and increasing the efficiency of its operations. ¶¶140, 168, 175. As Evolent transitioned Passport to Valence, Evolent's medical claims processing platform, Defendants repeatedly falsely assured investors that the "integration" was proceeding "smooth[ly]" and "going incredibly well"—and ultimately reported that Valence

8

was "successfully launched" in November 2017. ¶152.

The reality was the exact opposite. In truth, Evolent's services resulted in rapidly ballooning costs for Passport. ¶¶53, 84-88. In addition, the implementation of the highly touted Valence platform was an unmitigated "disaster." ¶67. Because Valence was designed as a dental claims platform, it was not powerful enough or designed to handle Medicaid medical claims, and Evolent's executives were repeatedly warned that the platform was not ready to go live. ¶67. Indeed, immediately after Valence went live, Kentucky began assessing hundreds of millions of dollars' of fines and penalties on Passport, which directly resulted from Valence's flawed implementation and the system's inability to process data and to accurately and timely report claims data to Kentucky. ¶¶73-79. Valence's botched encounter data reporting led directly to Kentucky cutting the Medicaid reimbursement rates that it paid to Passport, and Passport's resulting financial problems left it teetering on the brink of bankruptcy. ¶¶84-88. Defendants repeatedly denied that Evolent had any intention of acquiring Passport (¶¶118, 183), until Evolent was forced to do so at the last minute to protect the 20% of its revenues that Passport generated (¶188).

As Lead Plaintiffs demonstrated in their Opposition (ECF No. 54), the AC establishes that Defendants acted with scienter—even without the benefit of CW 5's account. Pl. Opp. at 30-38.[6] A

---

[6] The Fourth Circuit is clear that the standard for determining futility on a motion to amend is the same as a motion to dismiss under Rule 12(b)(6). *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) ("Because Relators' proposed amended complaint does not properly state a claim under Rule 12(b)(6) and lacks sufficient particularity under Rule 9(b), we find the district court correctly determined that further amendment would be futile."); *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995). Thus, assuming the Court finds that amendment would not be futile and grants Plaintiffs' Motion, any potential motion to dismiss would therefore be moot. *Alliance Solutions, Inc. v. Quest Software, Inc.*, 2012 WL 692883, at **8-9, 11 (D. Md. Mar. 1, 2012) (holding proposed amendment states a claim for relief and "accordingly is not futile") (citing *Wilson*, 525 F.3d at 376).

scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Rather, in evaluating scienter, the court "must evaluate the totality of the circumstances alleged in the complaint, and afford 'the inferential weight warranted by context and common sense.'" *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 783 (E.D. Va. 2015). The scienter inquiry "constantly assum[es] the plaintiff's allegations to be true" and asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis original).

CW 5's first-hand account of Defendants' fraud in the SAC simply further corroborates the fact that Defendants acted with scienter. Indeed, CW 5 came forward on her own initiative specifically because she had read the AC and explained that she wanted to—and could—corroborate the other CW's statements, and refute any suggestion that Evolent saved Passport money or was unaware of the significant issues facing Passport during the Class Period. ¶90.

> **1.    CW 5 Had a Front Row Seat to Witness "Evolent Run Passport to the Ground," "Cripple[] [Passport's] Business and then Charge[] us for Services that Weren't Rendered."**

It is hard to imagine a witness who could have a better understanding of the destruction that Evolent wreaked on Passport than CW 5. CW 5 was a former senior Passport executive who served as Passport's Senior Director of Information Technology from February 2020 to March 2020, and prior to that was the Director of Information Technology (March 2017 to February 2020), and the Manager of Infrastructure and IT Operations (October 2014 to February 2017). ¶89. CW 5 reported to Passport's Chief Operating Officer, worked directly on Valence, and was responsible for designing, maintaining, and managing Passport's IT infrastructure. *Id.*

CW 5 explained that "it was my job for two years to figure out what was broken right after

[Valence] was presented to Passport." ¶89. CW 5 further added that any claim by Evolent that they were not aware of the issues facing Passport is "100% inaccurate." ¶91. In her role, CW 5 unquestionably had a front row seat to "watch[] Evolent run Passport to the ground." ¶¶89. Indeed, When asked if Evolent saved Passport money, CW 5 replied, "absolutely not," adding "they took 350 of our employees, crippled our business and then charged us for services that weren't rendered. Everything that was done was either more expensive or cost us more money." ¶¶91, 138.

CW 5 stated that the fundamental problem with Valence was that "the . . . data was terrible, their reporting was terrible and nonexistent." ¶93. She explained that Valence was designed as a dental claims processing system, not a Medicaid medical claims processing system, and that as a result Valence was not configured to handle multiple providers, which led to significant numbers of rejected clams because Valence could "not match a claim with the provider/member that generated that claim," adding that it was "a systemic issue" that "still exists today. . . ." *Id*.

CW 5 explained that ***"everyone"*** was aware of Valence's fundamental flaws and botched implementation—and that in particular, Defendant Williams ***"absolutely"*** knew of these issues. ¶¶94, 96. Specifically, CW 5 explained that during "every relationship meeting" in which Defendant Williams participated, issues regarding Valence's design and inability to properly report claims "always" came up. ¶96. CW 5 further explained that she was "very explicit" regarding "Valence issues" during in-person meetings that she had with Defendant Williams and others. ¶97. In addition to meetings with Defendant Williams, CW 5 describes multiple meetings which were attended by Evolent's most senior executives, including a yearly "realignment call" where Evolent's executives flew to Passport's headquarters to "basically say they were sorry and were going to fix [Valence]," but it never was fixed. ¶98. CW 5 also specifically recalled that "we had call[s] all the time up and down the executive team at Evolent" regarding the Valence

11

implementation problems, which included several progress meetings with Tom Peterson, Evolent's Chief Operating Officer and one of its co-founders, during which they discussed the progress of the implementation. ¶99. CW 5 further explained that she too place in weekly progress calls during the time period that Valence was being implemented, and specifically recalled that Evolent's C-Suite executives were on these progress calls "all of the time." *Id*.

CW 5 stated that Passport's financial problems were "100%" due to Valence's inability to accurately report encounter data. ¶104. Specifically, CW 5 explained that encounter data—that Kentucky required Passport to submit and used to set Passport's reimbursement rates—could not be generated when claims could not be matched up to healthcare providers and as a result, Passport paid millions of dollars to healthcare providers that was not reimbursed, because it appeared to Kentucky that Passport paid out significantly less than it actually did. ¶¶104-05.[7]

As a result of the inaccurate, incomplete, and late encounter data processed through Valence, Kentucky imposed hundreds of millions of dollars' worth of fines and penalties on Passport. ¶¶73-79. CW 5 explained that these fines—which were so high it became "comical"— "absolutely were" sent to Evolent executives because "there were talks on who was going to foot the bill. Evolent agreed to foot the bill for a certain time period." ¶¶100-01. CW 5 further explained that the penalties were discussed at bi-weekly meetings of the Joint Operating Committee, and were thereafter sent to the "War Room" to address. ¶102.

---

[7] Defendants' selective distortion of CW 5's detailed account of Valence's inability to accurately or timely process claims data should be ignored. Opp. at 13-14. Indeed, in the very next paragraph after the one cited by Defendants, CW 5 stated that as a result of Valence's problems submitting encounter data, it appeared to Kentucky that Passport paid out significantly less than it actually did, explaining that "[Kentucky] looked at the claims we were paying and said that Passport was making too much money and therefore cut our rates." ¶105. This is because those rates were directly calculated from Passport's encounter data submissions (*id*.)—a fact that Passport admitted when it claimed that Kentucky based its rate cut "exclusively on encounter data." *See* Passport Complaint at 22-23, 27 (Def. Ex. 11 (ECF No. 50-11)).

Defendants' contention that CW 5 was not in a position to know these matters is nonsense.[8] CW 5 gave a detailed account of the very same problems at Passport that the other CWs corroborated—particularly with respect to Valence and Evolent's inability to lower Passport's costs. *See, e.g.,* ¶¶44, 52 (CW 1, Evolent did not save Passport money); ¶¶63-64 (CWs 2 and 3, as a dental claims system, Valence "not advanced enough" to handle Passport's Medicaid claims); ¶65 (CW 2, "everyone" telling Evolent executives about botched Valence transition); ¶70 (CW 1, Valence caused Passport to overpay providers millions of dollars that it could not recoup); ¶81 (CW 3, Medicaid rate cuts a "direct result" of Valence inability to submit accurate and timely encounter data). *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at \*5 n.13 (D. Md. June 14, 2006) ("[T]he witnesses' interlocking and corroborating accounts add support to the reliability of the statements"). Accordingly, CW 5's credibility cannot reasonably be questioned.

### 2. CW 5 Unquestionably Places Defendant Williams at the Center of Evolent's Fraud

CW 5's credible, first-hand account places Defendant Williams at the very center of Evolent's fraud. Defendants' attempts to recast CW 5's detailed, first-person account should be rejected.

*First*, as explained above, CW 5 unequivocally explained that Defendant Williams ***"absolutely"*** knew that there were multiple issues with Valence—including that it was not

---

[8] Defendants' disbelief that CW 5 had any knowledge of the fact that Evolent transitioning Passport to a new PBM dramatically increased Passport's PBM costs is belied by the fact that CW 5 actually worked on the transition to the new PBM—which as she explained, "has cost us more than what [the former PBM] charged us." ¶¶108-09. In addition, one would expect CW 5 to be familiar with the costs and expenses related to the 350 rebadged employees, particularly when, as CW 5 explained, Evolent kept those rebadged employees on Passport's IT systems and equipment, and then charged Passport for supporting those employees. ¶107. Similarly, one would expect CW 5 to be knowledgeable about Passport's membership profile and its lack of change over time (¶110), especially given that her job required significant amounts of work on Valence—the very system that was supposed to be processing those members' claims data.

designed for Medicaid claims and that there were issues with reporting data. ¶96. As explained above, Defendant Williams participated in "relationship calls," which often took place on a weekly basis, and that that issues regarding Valence's design and reporting problems *"came up" during "every relationship meeting that we had," that "[s]omeone always barked about them." Id*.[9] In addition to these relationship calls, CW 5 also described meetings between herself, Defendant Williams, Evolent's Chief Technology Officer Chad Pomeroy, and Passport's COO. ¶97. CW 5 explained that during these meetings, they got into very technical details about why Valence was not working, recalling that "*Valence issues came up all of the time with the CEO and CTO. We were very explicit with them." Id*. This is "classic" proof of scienter. *SEC v. Pirate Inv'r, LLC*, 580 F.3d 233, 243 (4th Cir. 2009) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

*Second*, Defendants' attempt to downplay the damning nature of these meetings by speculating that it would be "implausible" that Williams would be involved (Opp. at 10-11) is nonsense. As Defendants themselves concede, the Valence transition and implementation was "a significant undertaking." Opp. at 11. Throughout the Class Period Defendants admitted that they meticulously monitored all aspects of Passport. Defendant Williams himself boasted that Passport looked to Evolent "as a co-owner"—and strikingly went on to describe the Evolent-Passport relationship in even more intimate terms, telling investors that *Evolent was "at the table*

---

[9] Defendants' insistence that these relationship meetings should be viewed through the lens of expanding "additional services" that Evolent provided (Opp. at 11-12), makes no sense, is irrelevant, and should be disregarded—particularly given CW 5's first-hand account of these meetings, along with CW 2's corroborating account that she informed Evolent management "on a number of occasions" that Valence was not ready or adequate, and emphasized that "[p]retty much everyone from Passport was telling them" the Valence transition would not go smoothly. ¶65.

*participating in [Passport's operational] decisions,"* that *"we're able to drive the decisions we think are important for performance,"* that *Evolent was able to "control many more levers than if we're just in a pure service relationship,"* and that *"we really have joint governance,"* ¶¶42-43.[10] Simply put, Defendant Williams cannot claim to be an "owner" of a business that is "participating in [Passport's operational] decisions" and "driv[ing] the decisions we think are important for performance,"—especially with respect to "a significant undertaking" such as the Valence implementation—and then turn around and pretend to not be knowledgeable about the botched implementation and Valence's fundamental flaws, particularly in light of credible first-hand accounts placing Williams in multiple meetings where those very issues were repeatedly discussed.

*Third*, Defendants' contention that these meetings should be ignored because the specific dates and times of when the meetings took place are not mentioned (Opp. at 10-11) belies common sense and should be disregarded. *Collier v. ModusLink Global Solutions, Inc.*, 9 F. Supp. 3d 61, 73 (D. Mass. 2014) (rejecting argument that confidential witness accounts lack particularity and holding that "[t]he Court cannot construe the PSLRA's pleading requirement to mean that confidential witnesses . . . must recall all possible details from their former positions."); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed

---

[10] Given this intimate level of control that Evolent exercised over Passport, Defendants' conjecture that Passport's Board was somehow negligent (Opp. at 11-12) should be ignored. Additionally, as demonstrated in Section 3 below, these statements by themselves are more than sufficient to establish scienter on the part of all Individual Defendants, not just Defendant Williams.

15

evidentiary matter in securities litigation.").[11] As Defendants concede, the Valence implementation was a six-month-long process (Opp. at 11), meaning that these discussions could only have happened in this six-month period. Moreover, as the other CWs make clear, the reason why Valence was not ready was because it was designed to handle basic dental claims, not Passport's complex medical claims—a fact that remained unchanged throughout that implementation period. In other words, the reason behind CW 5's "very explicit" explanations—and the repeated warnings to Evolent management on "a number of occasions" that CW 2 noted (¶65)—remained unchanged throughout the implementation period.[12]

With full knowledge of the botched Valence implementation and the platform's fundamental flaws, on November 2, 2017, Williams falsely told investors that the Valence was implemented because Evolent "wanted to provide a higher level of service," that Evolent had "successfully launched Passport . . . onto our [Valence] platform," and that "teams continue to monitor [Valence's] operations closely and report a smooth transition." ¶152. Defendants' insistence that this was Williams's "one challenged statement related to Valence" (Opp. at 11) is plainly wrong. On February 27, 2018, Defendant Williams again falsely represented the status of Evolent's "integration" of Valence at Passport and that it was "successfully scaling" the platform.

---

[11] *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560 (W.D. Va. 2006) is inapplicable. In that opinion, the court noted that the CW did not provide "any basis" that an executive knew that his company's products would not be as widely distributed as he had represented to investors. *Id*. at 583. Here, the bases for CW 2's statement that Williams "absolutely" knew of the multiple problems with Valence is the fact that CW 2 met with Williams on multiple occasions and "very explicit[ly]" explained those problems to him.

[12] Defendants' attempt to downplay CW 5 as mere "IT staff" (Opp. at 10) is counterfactual, particularly in light of their concession that CW 5's role and responsibilities for nearly six years at Passport—including her tenure as Senior Director of Information Technology, Director of Information Technology, and Manager of Infrastructure and IT Operations (¶89)—"are sufficiently described." Opp. at 13.

16

¶158. Both of these statements were clearly false.[13] And given CW 5's first-hand account that Williams "absolutely" knew of Valence's problems because they were explained to him "very explicit[ly]" in multiple meetings on the issue, combined with Williams's own admission that Evolent was "at the table participating in [Passport's operational] decisions" and "driv[ing] the decisions we think are important for performance," there can be no question that Williams knew his statements were false when making them.[14]

---

[13] Nowhere do Plaintiffs allege that Defendant Williams should have predicted the future. Rather, as the SAC makes clear, Defendant Williams knew, in "very explicit" detail, that the Valence platform was fundamentally flawed and that its implementation was botched. The penalty letters confirm that these problems were not remedied prior to the "go-live" date. In any event, Defendant Williams would have had these penalty letters prior to his February 2018 false statements.

[14] Defendants assert that they "warned" investors about "challenges" of integrating Valence. Opp. at 11. This argument fails. Defendants' Opposition does not even identify the specific warnings on which they rely, instead making generic references to "transition process" and "warning." Opp. at 11. *See In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1359 (N.D. Ga. 2018) ("The Court will not use its scarce resources to scour 50 pages of filings in the hopes of finding which cautionary language Defendants intended."). Moreover, to be sufficiently meaningful, cautionary language must "warn about or fully disclose the potential specific risks allegedly omitted in the misrepresentations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009) (risk statements merely warned of a "limited, general, and vague risk to customer satisfaction" when defendants knew that specific and known problems "posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized."). Here, Defendants never disclosed that they knew that Valence was designed as a dental claims system, not a Medicaid claims system (¶54); that Valence was "not advanced enough" to handle Passport's medical claims data (¶64); that Valence "wasn't ready" to go live because the transition was a "disaster" from the outset (¶¶65, 67); and that once implemented, Valence caused Passport to make tens of millions of dollars in overpayments to healthcare providers—which Passport was unable to recoup (¶70). For these reasons, the purported cautionary language that Defendants cite on page 15 of their Opposition is also inadequate. *See*, *e.g., Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) (statements about expected demand and sales growth for products were misleading where defendants omitted "present facts" about "placement and sales problems at major retailers."); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 871 (D. Minn. 2007) (no "meaningful cautionary language" where "defendants [knew] that the potential risks they [had] identified in connection with integration had "in fact already occurred")

3.    **The SAC Amply Establishes Scienter on the Part of the Other Individual Defendants**

In addition to establishing Defendant Williams's scienter, the SAC also establishes the other Individual Defendants' scienter.

*First*, CW 5 describes multiple meetings which were attended by Evolent's most senior executives. For example, CW 5 explained that Evolent's executives flew to Passport's headquarters for a yearly "realignment call" to "basically say they were sorry and were going to fix [Valence]," but it never was fixed. ¶98. CW 5 also specifically recalled that "we had call[s] all the time up and down the executive team at Evolent" regarding the Valence implementation problems. ¶99. These calls included several progress meetings with Evolent's co-founder and COO Tom Peterson, during which they discussed the progress of the implementation, as well as meetings that took place "all the time" between CW 5 Evolent Chief Technology Officer Chad Pomeroy. *Id*. CW 5 further explained that there were weekly progress calls during the time period that Valence was being implemented, and recalled participating in many of these meetings with the executive teams from Evolent and Passport—specifically noting that Evolent's C-Suite executives were on these progress calls "all of the time." *Id*.

It is defies belief to suggest, as Defendants do, that Defendants Blackley, McGrane, Wigginton, and Spencer were unaware of why large numbers of Evolent executives were flying to Passport headquarters (¶98) or why Evolent agreed to "foot the bill" for the penalty letters for a period for the penalty letters incurred due to the flawed Valence system and its botched implementation (¶100). *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 272-73 (3d Cir. 2009) ("In assessing the allegations holistically as required by Tellabs, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.") (quoting *South Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir.

18

2008)).

*Second*, as demonstrated above, Defendants admitted that they meticulously monitored all aspects of Passport, including that **Evolent was "at the table participating in [Passport's operational] decisions,"** that **"we're able to drive the decisions we think are important for performance,"** and that **"we really have joint governance,"** ¶¶42-43. As numerous courts have held in similar circumstances, these admissions standing alone are sufficient to conclude that Defendants acted with scienter. *Genworth*, 103 F. Supp. 3d at 785 ("Because of the Individual Defendants' self-proclaimed 'personal involvement in Genworth's complete review of all [LTC] components,' the Court may reasonably infer that Defendants possessed knowledge of the true state of affairs of the LTC business, and thus had knowledge that their representations were misleading'"); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 607 (E.D. Va. 2015) (defendants' repeated statements that they were "personally involved in Lumber Liquidators' Chinese operations" contributes to inference of scienter).

*Third*, Defendants' false and misleading statements concerned the strategy upon which Evolent's entire business was predicated—Evolent's ability to cut clinical and administrative costs for its long-term partners. ¶¶37, 39. Passport was by far Evolent's most important customer, accounting for up to 20% of Evolent's revenue between 2016 and 2018. ¶41. Indeed, Passport was so critical to Evolent's financial performance that it was mentioned dozens of times in Evolent's Forms 10-K—and to suggest that the Individual Defendants were unaware of the ballooning cost increases or the disastrous Valence implementation strains credulity. *Genworth*, 103 F. Supp. 3d at 784 (core operations theory "certainly relevant to Court's holistic analysis" of scienter (citing *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014)); *Kiken*, 155 F. Supp. 3d at 606 (fraudulent conduct involving "core operations" of the business indicative of scienter).

*Fourth*, while the Supreme Court has explained there is no need to plead motive to commit securities fraud (*Tellabs*, 551 U.S. at 325), especially when the Complaint raises a strong inference that Defendants knew the undisclosed facts, as here. Nevertheless, Defendants undoubtedly had a motive to mislead investors concerning the true state of affairs at Passport. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000) ("[A] more particularized motive to commit fraud, one tied to specific circumstances . . . may provide the necessary added inferential weight to tilt the balance in favor of scienter."). At the beginning of the Class Period, Defendants were motivated to conceal the truth that Evolent's business model was actually raising costs, not lowering them, at Evolent's largest client. Later, when the writing appeared "on the wall" that Passport would need to be acquired, Defendants were motivated to downplay the severity of Passport's financial condition in hopes that Passport would be selected in the Kentucky Medicaid RFP Response, again to protect the 20% of its revenue stream that Passport represented. ¶103. *Genworth*, 103 F. Supp. 3d at 786 (motive to artificially preserve company's investment grade credit rating in advance of offering contributes to an inference of scienter).

In response, Defendants offer no real non-culpable inference for their conduct, nor do they even assert that they were unaware of Passport's skyrocketing costs or the faulty Valence implementation and resulting incorrect encounter data. Accordingly, Plaintiffs have pled a strong inference of scienter on the part of each of the Individual Defendants.

## III.    CONCLUSION

For all of these reasons, Lead Plaintiffs' Motion to Amend should be granted.

20

Dated: May 27, 2020

Respectfully submitted,

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
Megan Kinsella Kistler
mkistler@cohenmilstein.com
**COHEN MILSTEIN SELLERS**
**& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*

Maya Saxena (*pro hac vice* pending)
msaxena@saxenawhite.com
Joseph E. White, III (*pro hac vice* forthcoming)
jwhite@saxenawhite.com
Brandon T. Grzandziel (*pro hac vice*)
brandon@saxenawhite.com
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel: (561) 394-3399
Fax: (561) 394-3382

Steven B. Singer (*pro hac vice* forthcoming)
ssinger@saxenawhite.com
Sara DiLeo (*pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (*pro hac vice*)
jsaltzman@saxenawhite.com
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
Fax: (888) 631-3611

*Lead Counsel for Lead Plaintiffs*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2020, I caused the foregoing to be electronically filed with

the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

<u>/s/ Steven J. Toll</u>
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*