**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § | Case No. 1:19-cv-01031-RDA-TCB |
| | § | |
| v. | § | |
| | § | CLASS ACTION |
| EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON | § § § § § | |
| Defendants. | § | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX 78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Introduction.................................................................................................................................1

Background Facts.........................................................................................................................4

    A.  Relevant Parties ...........................................................................................................4

    B.  Evolent and Passport's Expanding, Productive Partnership. ..............................................6

    C.  Encounter Data and Passport's Medical Claims Processing System................................10

    D.  Evolent Purchases Passport and Turns Around Its Finances ..........................................11

Legal Standard ..........................................................................................................................13

Argument ..................................................................................................................................14

I.   Plaintiffs Have Failed to Adequately Allege Any False or Misleading Statements. ...............14

    A.  Optimistic statements and descriptions of the Company's aspirations are corporate puffery and not actionable. ........................................................................................15

    B.  Forward-looking statements are protected by the PSLRA. ...............................................17

    C.  Plaintiffs do not plead specific facts showing that the challenged statements were false when made...................................................................................................19

    D.  Many of the facts asserted by the CWs cannot be credited because they fall outside the scope of their personal knowledge. ...............................................................24

II.  Plaintiffs Fail to Plead Particularized Facts Supporting a Strong Inference of Scienter. ........27

III. Plaintiffs Fail to Adequately Plead Loss Causation..................................................................35

IV. Defendants Can Only Be Held Responsible for Their Own Statements. ...............................38

V.  Plaintiffs Fail to Adequately Plead Control-Person Liability.................................................39

Conclusion ................................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Arnlund v. Deloitte Touche, L.L.P.*,
   199 F. Supp. 2d 461 (E.D. Va. 2002) ...............................................................................34

*Ash v. PowerSecure Int'l, Inc.*,
   2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)...................................................................30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................................31, 39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................39

*In re Cable & Wireless, PLC Sec. Litig.*,
   321 F. Supp. 2d 749 (E.D. Va. 2004) ...............................................................................15

*Carlucci v. Han*,
   886 F. Supp. 2d 497 (E.D. Va. 2012) ...........................................................................14, 15

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...............................................................................16

*In re Constellation Energy, Inc. Sec. Litig.*,
   738 F. Supp. 2d 614 (D.Md. 2010) ....................................................................................40

*In re Coventry Healthcare, Inc. Sec. Litig.*,
   2011 WL 1230998 (D. Md. Mar. 30, 2011)........................................................................30

*Cozzarelli v. Inspire Pharm. Inc.*,
   549 F.3d 618 (4th Cir. 2008) .............................................................................................23

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................................................14, 35

*Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v.
   CommScope, Inc.*,
   2013 WL 4014978 (W.D.N.C. Aug. 6, 2013)......................................................................18

*In re Federal–Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001)........................................................................17, 21

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) .................................................................................29

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................................30

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) ..................................................................................22

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ..............................................................................16, 20

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ....................................................................28

*Jacobs v. Coopers & Lybrand, LLP*,
  1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ...........................................................40

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)...............................................................................1, 4, 38, 39

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) .......................................................................14, 36, 37

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ....................................................................39

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
  2006 WL 1367428 (M.D.N.C. May 18, 2006) .......................................................18

*Local 295/Local 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v.
  Fifth Third Bancorp.*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010) ...............................................................4, 29

*Local No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 Fed. App'x 63 (2d Cir. 2011) ...................29

*Maguire Fin. L.P. v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) .................................................................................27

*Marsh Grp. v. Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) .......................................................................17, 18

*Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ...........................................................................22, 28

*In re Mutual Funds Inv. Litig.*,
  566 F.3d 111 (4th Cir. 2009) .................................................................................36

*In re Neustar Sec. Litig.*,
  83 F. Supp. 3d 671 (E.D. Va. 2015) .................................................................16, 17, 21

*Nolte v. Capital One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) .................................................................................14

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)....................................................................................27

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.,*
   838 F. Supp. 2d 1148 (D. Colo. 2012)....................................................................40

*Ottmann v. Hanger Orthopedic Grp., Inc.,*
   353 F.3d 338 (4th Cir. 2003) ..................................................................................27

*In re PEC Solutions, Inc. Sec. Litig.,*
   418 F.3d 379 (4th Cir. 2005) ..................................................................................27

*Phillips v. LCI Int'l, Inc.,*
   190 F.3d 609 (4th Cir. 1999) ..................................................................................14

*Plymouth Cty. Ret. Ass'n v. Primo Water Corp.,*
   966 F. Supp. 2d 525 (M.D.N.C. 2013) ...................................................................18

*Raab v. Gen. Physics Corp.,*
   4 F.3d 286 (4th Cir. 1993) ......................................................................................17

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.,*
   935 F.3d 424 (5th Cir. 2019) .............................................................................27, 28

*Ret. Sys. v. Sterling Fin. Corp.,*
   963 F. Supp. 2d 1092 (E.D. Wash. 2013).................................................................28

*Santa Fe Indus., Inc. v. Green,*
   430 U.S. 462 (1977).................................................................................................14

*Teachers' Ret. Sys. of La. v. Hunter,*
   477 F.3d 162 (4th Cir. 2007) ............................................................................ *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007).................................................................................................27

*In re Trex Co., Inc. Sec. Litig.,*
   454 F. Supp. 2d 560 (W.D. Va. 2006) ............................................................. *passim*

*Weill v. Dominion Res., Inc.,*
   875 F. Supp. 331 (E.D. Va. 1994) ..........................................................................14

*In re XM Satellite Radio Holdings Sec. Litig.,*
   479 F. Supp. 2d 165 (D.D.C. 2007)........................................................................16

*Yates v. Mun. Mortg. & Eq., LLC,*
   744 F.3d 874 (4th Cir. 2014) ......................................................................28, 29, 33

**Statutes**

15 U.S.C. § 78j(n) (Section 10(b)) ........................................................................... *passim*

15 U.S.C. § 78u–4 ...................................................................................................... 14

15 U.S.C. § 78u-5 ................................................................................................. 17, 18

Private Securities Litigation Reform Act ................................................................. *passim*

**Other Authorities**

17 C.F.R. § 240.10b-5 (Rule 10b-5) .......................................................... 13, 35, 38, 39

Fed. R. Civ. P. 8 ......................................................................................................... 40

Fed. R. Civ. P. 9(b) .................................................................................................. 1, 36

## INTRODUCTION

This Court should dismiss Plaintiffs' Second Amended Complaint ("SAC") because they have not satisfied the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") or the requirements of Rule 9(b). Congress enacted these high standards because securities class action litigation is particularly susceptible to abuse. With the benefit of hindsight, it is too easy for class-action plaintiffs to allege that companies and their executives must have known about, and failed to disclose, adverse information any time business challenges result in a decline in share price. Under the PSLRA, before plaintiffs are allowed to undertake costly discovery, they must state an actionable claim for fraud by identifying with particularity each statement alleged to be false, explaining why each statement was materially false when made, and alleging facts sufficient to create a strong inference of scienter. A rambling, prolix complaint, filled with improper invective and conclusory accusations, is almost always a sign that plaintiffs are engaging in the type of abuse that Congress intended to prohibit.

Plaintiffs allege that Evolent Health, Inc. ("Evolent") made misstatements concerning its ability to deliver cost savings to its healthcare plan customers. Although Evolent had more than thirty-five customers across the U.S. during the Class Period, Plaintiffs' claims are based entirely on Evolent's alleged failures with respect to only one customer—Passport Health Plan ("Passport"). Plaintiffs assert that Evolent overcharged Passport, mismanaged its claims administration services, and then covered its tracks by acquiring a majority stake in Passport. Even with their extensive investigation and now their third complaint, Plaintiffs fail to properly state a claim for securities fraud for multiple, independent reasons.

*First*, Plaintiffs fail to identify any actionable misstatement or omission. Most of the challenged statements are aspirational comments about anticipated cost savings. They are classic corporate puffery—nonspecific comments about "driving greater efficiency," "helping" customers

1

achieve cost savings, meeting "high standards," and the like that are immaterial as a matter of law. In addition, many of the challenged statements are forward-looking comments about what Evolent planned or hoped to achieve for its customers. Because these statements were accompanied by detailed cautionary language about the many risks involved with Evolent's business, they are not actionable under the PSLRA's safe harbor.

*Second*, Plaintiffs fail to plead particularized facts raising a strong inference of scienter. The SAC does not allege that Evolent's executives had a financial motive to engage in fraud. Rather, they allege an illogical and self-defeating motive—that Evolent intentionally mismanaged Passport's business so that it could inject a "massive and cash-draining emergency bailout" of $70 million to acquire a majority stake in Passport. In the absence of a logical motive, the law requires that Plaintiffs plead especially compelling facts to support a strong inference of actual intent or severe recklessness. Plaintiffs have not met that burden.

Plaintiffs identify five confidential witnesses ("CWs"), all current or former Passport employees, who did not like the changes Evolent made to Passport's systems and processes. The CWs claim in vague terms that Evolent's executives knew that Evolent could not deliver cost savings to Passport. These assertions are neither compelling nor adequately supported. For example, the CWs contend that Defendants knew that Evolent would not deliver cost savings because Evolent charged Passport more under its contract than Passport's compensation costs for the approximately 350 employees that were "rebadged" to Evolent. But Passport obtained more under the contract than merely outsourcing its employees—it purchased a suite of healthcare technology systems, including claims management and pharmacy benefits management. The difference between what Passport previously paid the rebadged employees and the amount it paid Evolent thus says nothing about whether Defendants acted with scienter.

2

Crucially, the CWs do not identify any specific conversation with a specific defendant showing that this defendant knew that a specific statement was false or misleading when made. For example, several CW allege that Evolent's medical claims processing system, Valence, was implemented improperly and was not capable of processing medical claims despite Valence's 20-year history of doing just that.  CW5 alleges that she and defendant Frank Williams, the CEO, participated in "multiple meetings and progress calls" with others at Passport and Evolent at which the software implementation challenges that Evolent had warned investors about were discussed. But that does not demonstrate that Williams knew Evolent's statements about the Valence system were false when made.  More importantly, CW5 does not state when these interactions occurred and does not connect them with any particular statement made by Williams.  Courts in this Circuit require plaintiffs to provide detail about the timing and specific information discussed at meetings to plead scienter, so CW5's allegations are plainly not sufficient to raise a cogent and compelling inference of scienter that Williams made any statement knowing it was false.  Indeed, Plaintiffs' allegation that Defendants knew that Valence's claim processing system did not work cannot be reconciled with the fact that Evolent had paid nearly $220 million to acquire the Valence system, which raises a cogent and compelling inference that Defendants believed in the Valence technology.

Plaintiffs emphasize that months before Evolent acquired a majority stake in Passport, Evolent had said that it did intend to acquire Passport or any other healthcare plan.  That also does not raise a strong inference of scienter.  Circumstances change and business strategies adapt. Evolent changed its plans after Passport's Board solicited acquisition bids from multiple parties, which would have jeopardized Evolent's business with Passport.  Plaintiffs' theory that Evolent

3

acquired Passport to hide cost overruns is not only conclusory, it is also illogical and not supported by meaningful factual allegations.

*Third*, Plaintiffs fail to plead loss causation. Their core allegation is that Evolent misrepresented the cost savings it delivered to its healthcare plan clients because Evolent overcharged Passport for its services. As Plaintiffs allege, however, this information was made public in a January 25, 2019 *Insider Louisville* article. This Court can, and should, take judicial notice of the indisputable fact that Evolent's stock price barely moved in the days following this article. According to Plaintiffs, "the market for Evolent's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Evolent's common stock." SAC ¶ 222. Because Evolent's stock price did not decline following the January 25, 2019 *Insider Louisville* article, Plaintiffs cannot plead loss causation for the alleged "cost savings" misstatements as a matter of law.

*Finally*, under the Supreme Court's ruling in *Janus*, only the speaker of a challenged statement can be held liable for the statement under the federal securities laws. The Court should therefore dismiss the claims against the individual defendants that are based on statements they did not personally make.

## BACKGROUND FACTS

### A. Relevant Parties

*Evolent.* Evolent is a Virginia-based company that provides integrated, technology-enabled services to health systems and physician organizations to help them manage and administer patient health across Medicare, Medicaid and commercial markets." Ex. 2, 2019 10-K at 44. Evolent is a bridge between health care providers and insurers, and has particular expertise in value-based care models. Ex. 3, J.P. Morgan Conference at 9; Ex. 2, 2019 10-K at 1. Unlike

4

traditional fee-for-service models, which reward providers for each test or procedure they perform, value-based care models compensating providers with global payments for either an entire population or an episode of care. Evolent has about 3,400 employees and works with more than 39 health care organizations across the country. Ex. 2, 2019 10-K at 13, 45. By the end of 2018, 3.7 million people received care on a platform managed by Evolent. Ex. 4, Q4/Full Year 2019 Earnings Call at 3.

Evolent seeks to improve health outcomes *and* to decrease health care costs by providing technologies that identify patients who need specialized support and by delivering that support through a suite of clinical and administrative services. Ex. 5, 2018 Investor Day at 42–43. Evolent's technology determines which patients are likely to be admitted to a hospital and what type of interventions could prevent hospitalization, which is one of the most expensive parts of health care. *Id.* at 23–24. For example, if a patient suffers a serious wound, it might be more effective to hire a nurse to provide home care, which is more expensive in the short-run but could prevent a later, much more expensive rehospitalization, than merely give the patient instructions on how to bandage the wound properly . Ex. 6, 2019 Investor Day at 28.

Evolent provides software systems that aggregate and analyze medical and demographic data to help healthcare providers determine *who* to help, *how* to help, and *when* to help. Ex. 6, 2019 Investor Day at 24. Evolent's systems have created significant cost savings and improved outcomes for patients. *Id.* at 16. Outside consultants have shown that Evolent's targeted interventions have lowered total medical expense for Medicaid patients by 21%, reduced hospital admissions by 33%, and reduced emergency room visits by 36% among patients who received interventions over the course of a couple of years. *Id.*

5

***Individual Defendants.***  Plaintiffs have sued three current Evolent executives and two former employees (the "Individual Defendants").  Frank Williams is the Chief Executive Officer, director, and co-founder of Evolent.  Ex. 7, 2019 Proxy Statement at 11.  Seth Blackley is the President, director, and co-founder of Evolent.  *Id.* at 7.  Nicholas McGrane previously served as Evolent's Chief Financial Officer and now serves as Evolent's Executive Vice President, Corporate Performance.  Ex. 8, May 7, 2019 8-K at 2.  Steven Wigginton served as Valence's CEO after its acquisition by Evolent but left Evolent in early 2018 to join Sutter Health | Aetna.  *See* Ex. 9, 2018 Proxy Statement at 21.  Christie Spencer, who worked at Passport before joining Evolent as National Medicaid Chief Operating Officer, left Evolent in 2018 to join Lighthouse Health Plan.  She was never an executive officer at Evolent.  *See, e.g.,* Ex. 10, 2017 10-K at 13 (Spencer not listed); Ex. 11, 2018 10-K at 14 (Spencer not listed).

***Passport Health Plan.***  Founded by the University of Louisville in 1997, Passport is a non-profit that cares for some of Kentucky's poorest citizens.  Ex. 12, May 29, 2019 Form 8-K at Exhibit 99.1.  It is a well-run Medicaid health plan, as reflected in publicly available standard metrics of Medicaid plan performance, and has approximately 300,000 members, mostly from Louisville.  Ex. 13, 2017 Investor Day at 31.  It operates on a per member per month model.  SAC ¶ 36.  Under this model, Kentucky pays Passport the same rate regardless of whether members use any or no services that month; Kentucky does not reimburse Passport for each covered person's doctor's visits.

**B.**     **Evolent and Passport's Expanding, Productive Partnership.**

Evolent and Passport formed a strategic partnership in February 2016.  Ex. 14, Feb. 1, 2016 Form 8-K at 1.  Both parties viewed it as a long-term alliance that would allow them to grow into new markets and improve care.  Ex. 5, 2018 Investors Day at 23.  The partnership included a commitment to building a Medicaid Center of Excellence ("MOE") in Louisville, which would

offer services to Medicaid organizations across the United States. Ex. 5, 2018 Investor Day at 22–23. As part of the 10-year services agreement, Evolent provided Passport with (1) care management services (providing appropriate clinical interventions), (2) utilization management services (helping patients receive the most effective type of services), and (3) analytics and reporting services (such as delivering reports required by regulators). Ex. 14, Feb. 1, 2016 Form 8-K at 1; Ex. 5, 2018 Investor Day at 22–23.

To provide these services cost effectively, Passport and Evolent decided that some Passport employees would be "rebadged," meaning they would become Evolent employees, on Evolent's payroll, and with Evolent's benefits. Ex. 5, 2018 Investors Day at 23. The scope of the rebadged employees' jobs would eventually expand once Evolent opened the MCOE, which would provide services to numerous Medicaid plans in addition to Passport. *Id.*

Over time, Passport contracted with Evolent for additional services. Ex. 5, 2018 Investor Day at 22–23. It first added a new risk adjustment service, which allowed Passport to recover higher reimbursement rates from Kentucky if the "risk" of its patients increased (e.g., more diabetics joined as members). Ex. 5, 2018 Investor Day at 10; Ex. 15, CMS Medicaid Toolkit at 1. In September 2016, Passport selected Evolent to run its pharmacy benefit management ("PBM") program. Ex. 5, 2018 Investor Day at 24. In 2017, the PBM accounted for a significant part of the $90+ million in savings that Evolent helped Passport achieve. *Id.*; *see also infra* section I.C.

Passport next upgraded its third-party administrator ("TPA") services, which includes billing, managing medical claims, and processing and adjudicating claims. In 2016, Evolent had acquired its own TPA platform when it bought Valence Health Inc. and later Aldera, the software underlying Valence's services. Ex. 16, July 12, 2016 8-K at Exhibit 99.1 ("Valence Acquisition 8-K"); Ex. 13, 2017 Investor Day at 27. At the time of acquisition, Valence specialized in

7

Medicaid plans and had 10 large contracts that supported 600,000 people.  Ex. 16, Valence Acquisition 8-K at Exhibit 99.1.  Valence had nearly two decades of experience providing TPA services for medical claims, including processing claims for many Medicaid plans in multiple states. *Id.*

Passport replaced its TPA provider, Amerihealth, with Valence after extensive diligence and with the recognition that Valence provided modernized technology that could be integrated with the new population management and clinical services programs that Passport was using. Ex. 13, 2017 Investor Day at 29.  Passport's switch from Amerihealth to Valence occurred in October 2017.  SAC ¶ 66.  Because this was a massive undertaking, Evolent and Passport worked on the transition for more than six months.  Ex. 13, 2017 Investor Day at 28–29.  In its 10-K, Evolent warned investors that integrating Valence's systems "may be unpredictable, or subject to delays or changed circumstances, and … may not perform in accordance with our expectations." Ex. 10, 2017 10-K at 17.

Evolent has helped Passport remain a well-run Medicaid health plan with high member satisfaction.  Based on surveys of members conducted by Kentucky in 2018—after Evolent worked with Passport for almost 2 years—Passport was rated as "excellent" on the overall rating of its adult and child plans.  Ex. 17, 2019 Kentucky Guide to Choosing a Medicaid Managed Care Organization.

One standard evaluation metric used by the U.S. Centers for Medicare and Medicaid Services ("CMS"), the federal agency that oversees Medicaid, is a plan's Medical Loss Ratio ("MLR"), the portion of an organization's revenues spent on medical care (i.e., how much of the premiums are used to pay doctors, hospitals, and pharmacies).[1]  The remaining revenues are spent

---

[1] The standard MLR calculation is the same for all Medicaid organizations nationwide: MLR = (Total Hospital and Medical Expenses + Increase in Reserves for A&H Contracts) / Revenue.  Ex. 18, "Medicaid Managed Care Financial

8

on administering the plan and adding to required reserves.  In 2016, Passport's MLR was at 95.1%—which left little money for administrative costs or reserves.[2]  In 2017, the first full year that Evolent worked with Passport, the MLR improved to 89.9%, which allowed Passport sufficient funds for administrative expenses.[3]  In fact, as discussed below, that 5.2% MLR improvement contributed to the $90 + million in bottom-line cost savings to Passport in 2017.

Passport's administrative expenses, another standard metric for MCOs, are in-line with other Kentucky Medicaid organizations.[4]  Passport's administrative expenses, another standard metric for MCOs, are in-line with other Kentucky Medicaid organizations.    Ex. 18, Milliman Report at 3, 25 (listing ALR averages by state).  Public data demonstrates that Evolent significantly reduced Passport's trend of rising administrative expenses:

**Passport's Administrative Expenses by Year[5]**

| Year | Admin. Costs | % Increase Over Prior Year |
|------|--------------|----------------------------|
| 2013 | $51 M | |
| 2014 | 79 M | 54.9% |
| 2015 | 107 M | 35.4% |
| 2016 | 169 M | 57.9% |
| ***2017 | 182 M | 7.7% |
| 2018 | 193 M | 6.0% |

\*\*\* First full year with Evolent's partnership

---

Results for 2018," at 20 ("Milliman Report") (annually compiled report that compares MLRs across states, regions, and MCO characteristics).  The figures used in the calculation are taken from the identical page, line, and column number from the publicly available, standardized financial forms filed by **all** Medicaid organizations.  "Total Hospital and Medical Expenses," which includes pharmacy costs, are found on page 7, line 17, column 8.  Passport has no A&H Contracts so that number will not be used in the calculation, but it can be found on page 7, line 21, column 8.  "Revenue" is found on page 7, line 7, column 8.  With that equation and data from Passport's Annual Statements in 2016 and 2017, Ex. 19 and Ex. 20, the MLR can be calculated easily.

[2] Using the equation above and Passport's 2016 Annual Statement (Ex. 19), Passport's 2016 MLR = $1,644,681,907/ $1,730,097,322 = 95.1%

[3] Using the equation above and Passport's 2017 Annual Statement (Ex. 20), 2017 MLR = $1,705,056,248 / $1,897,000,830 = 89.9%

[4] Administrative expenses are frequently reported as a plan's Administrative Loss Ratio ("ALR"), the corollary to the MLR, calculated as "General Administrative Expenses" (plus some adjustments) / Revenues.  Ex. 18, Milliman Report at 21.  ALR is also calculated using data from the standardized, publicly filed annual statements of a Medicaid plan.

[5] Data from Ex. 20, Passport's 2017 Annual Statement at 29 (Five -Year Historical Data).  Numbers are rounded.

9

This improvement in 2017 occurred despite the addition of more new members than Passport had added in 2016 (19,863 in 2017 as compared to 17,469 in 2016). Ex. 20, Passport's 2017 Annual Statement at 29.

**C.      Encounter Data and Passport's Medical Claims Processing System**

CMS requires that all Medicaid plans submit "encounter data" to states,[6] which are "records of services delivered to Medicaid beneficiaries enrolled in managed care plans that receive a capitated, per-member-per-month payment." Ex. 15, CMS Medicaid Toolkit at 1. This data looks *similar* to the type of medical bill that many people are familiar with: it lists the doctor's services, the patient's diagnosis, and the treatment plan, and includes identification numbers for the doctors, nurses, and clinic. *See id.* Encounter data, however, is *not* a medical bill or invoice; the data is not used to determine or request a payment. *Id.* Instead, encounter data allows a Medicaid agency to track services received by the program's members. The data can be used for research purposes or as a way to audit a plan. *Id.* It is also used, in conjunction with other data sources, to set future rates and to calculate "risk adjustments." *Id.*

Many states, including Kentucky, impose sanctions for late, inaccurate, or incomplete encounter data. *Id.* at 12–14. Such penalties are common; Passport received penalty letters with its old TPA provider, Amerihealth, as well as with its new TPA provider, Valence. *See* Ex. 21, Penalty Letter for July 2017 (Amerihealth as TPA); Ex. 22, Penalty Letter for October 2017 (Valence as TPA). With the switch to Valence, it is unsurprising that there were delays in properly submitting some of the encounter data. Evolent had warned investors about this type of risk. Ex. 11, 2018 10-K at 16. But any company switching to a new software platform faces challenges; it

---

[6] Medicaid is a federal program administered by the states. States have discretion over particular software programs and systems used to collect encounter data, but many requirements are set by federal law and CMS.

was not unique to Evolent or Passport. Because Passport and Evolent knew that this would be an issue and Evolent wanted to be a responsible vendor, the contract for TPA services required Evolent to indemnify Passport for any encounter data penalties. *See* SAC 90.

Still, the encounter penalties were relatively small and were "capped" at about $10 million over an 18-month period between October 2017 and April 2019. SAC ¶ 78. The "staggering" number hyped by Plaintiffs is nowhere near what was actually paid to Kentucky. SAC ¶ 77. In fact, the total penalties in 2018 were about $6.5 million, which is immaterial compared with Passport's total revenues of $1.95 billion. SAC ¶¶ 77, 78; Ex. 23, Passport's 2018 Annual Statement at 4. The encounter data penalties were about 0.3% of revenues in 2018—and were paid by Evolent. *Id.*; *see* SAC 90.[7]

## D.    Evolent Purchases Passport and Turns Around Its Finances

Passport's finances were strong until November 1, 2018, when Kentucky instituted a Medicaid rate adjustment for **all** Medicaid managed care organizations, which retroactively applied beginning July 1, 2018. SAC ¶ 80. The adjustment decreased capitation rates paid for Medicaid members in the Louisville region, which affected all five Medicaid plans operating in Louisville, while raising rates paid across the rest of the state. Ex. 24, *Insider Louisville* at 4. Passport was affected most because it has the largest share of members in the Louisville area and relatively few members in the regions with increased rates. Ex. 25, 4Q/Full Year 2018 Earnings Call at 7. The rate cuts had a major adverse impact on Passport's finances, as its revenues under the new rates would not even cover its costs to pay doctors and pharmacies. Ex. 11, 2018 10-K at 16; Ex. 26, MOAC Letter at 2; SAC ¶ 80.

---

[7] The letters clearly note that the penalties are capped at .33% of Passport's monthly capitation rate; it lists that calculation before it lists the what the penalties are. Ex. 22, Penalty Letter for October 2017 at 1 ("TIMELINESS SECTION. The total amount of penalties under this section shall be capped at 0.33% of the Contractor's monthly capitation rate. For the month of October 2017, 0.33% of the Contractor's monthly capitation rate is $531,659.97.")

No one in authority, nor any media report, attributed the statewide rate adjustment to Passport's encounter data submissions, as the SAC attempts to do. Kentucky said that the decrease was based on its actuarial's projections. *Id.* ¶ 50. Many of Kentucky's elected officials and newspapers attributed the rate change to politics.[8] While much has been said about the rate changes,[9] no one except CWs 3 and 5, a low-level employee and an IT specialist, has ever alleged that faulty encounter data led to the statewide rate adjustment.

Due to the financial uncertainty surrounding the rate cuts, Passport began a competitive bidding process for a partner that could inject capital and share the risks of a value-based health care company dependent on Medicaid funding. Ex. 27, May 29, 2019 Special Call at 4–5; Ex. 6, 2019 Investor Day at 13. After Evolent purchased True Health, a New Mexico provider-sponsored health plan, in January 2018, Evolent told the market that it did not intend to purchase another health plan.[10] Ex 11, 2018 10-K at 1; *see* statements cited at SAC ¶¶ 182, 183, 188. But when Evolent learned in May 2019 that Passport was about to be purchased by a competitor—which meant that Evolent would likely lose its most significant customer—it decided to further invest in Passport. Ex. 6, 2019 Investor Day at 13.

---

[8] *See, e.g.,* Yetter, Deborah, "Louisville leaders call on Bevin to save Passport Health and its HQ," *Louisville Courier Journal* (Mar. 4, 2019) available at https://www.courier-journal.com/story/news/2019/03/04/louisville-leaders-discuss-passport-health-plans-future/3053130002/

[9] This was a major news story in Kentucky, particularly because of the closely contested gubernatorial race. *See* Raman, Sandhya, "Health care issues pivotal in Kentucky governor's race," *Roll Call*, July 1, 2019, available at https://www.rollcall.com/news/congress/health-issues-pivotal-in-kentucky-governors-race; Brammer, Jack, "Beshear cancels and rebids $8B in Medicaid managed care contracts issued by Bevin," *Lexington Herald Leader*, Dec. 23, 2019, available at https://www.kentucky.com/latest-news/article238663378.html.

[10] As Evolent explained and as cited in the SAC ¶ 33, full ownership of a plan was not in Evolent's "strategic lens" in early 2019. But True Health shows that Evolent's strategy had always included "creative, aligned," "co-ownership models" of various types of health plans when it made good financial sense. Ex. 25, 4Q/Full Year 2018 Earnings Call at 24.

Ultimately, Passport sold 70% of its equity interests to Evolent.[11]  *Id.* at 13.  Passport's Board and owners were enthusiastic about the continued partnership.  At the time, the President of the University of Louisville, one of Passport's owners, said the University "helped create Passport Health Plan in 1997, paving the way for what has become a national model for managed care. … Now, we are proud to partner with Evolent Health to begin a new chapter that will continue to spark innovation in the delivery of care." Ex. 12, May 29, 2019 Form 8-K at Ex. 99.1.

Since the acquisition, Evolent has guided Passport to a stable financial footing.  Ex. 4, Q4/Full Year 2019 Earnings Call at 6.  Passport experienced a 13.5-point improvement in operating margins from the first quarter to the end of the year.  *Id*.  Passport was losing money in January 2019, with about a 13% operating loss; by the end of 2019, it was profitable.  Ex. 26, MOAC Letter at 2. This turnaround can be attributed to an increase in rates paid by Kentucky, and to work done by Evolent and Passport to lower administrative costs and improve care management. *Id.*

## LEGAL STANDARD

To state a claim under Section 10(b) and Rule 10b–5 of the Securities Exchange Act, a plaintiff must show "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999).  A Section 10(b) claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled "with particularity" and the PSLRA's stricter requirements.  *Carlucci v. Han*, 886 F. Supp. 2d 497, 509

---

[11] There are no facts sufficiently pled to establish that Evolent had any undue influence or control over Passport before it acquired the company in mid-2019.  In 2016, Passport had twelve executive officers and seventeen members on its board of directors—none of whom were affiliated with or appointed by Evolent. Ex. 19, Passport's 2016 Annual Statement at 1 and 7.  There is no support for Plaintiffs' theory that Evolent caused Passport's officers and directors to shirk their fiduciary obligations, mismanage Passport, and drive it to the brink of insolvency.

(E.D. Va. 2012). Plaintiffs must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) (citing 15 U.S.C. § 78u–4(b)(1)). In addition, the complaint must allege facts giving rise to a strong inference that the defendant acted with scienter. *Id.* The complaint also must sufficiently allege a "causal connection" between "the plaintiff's economic loss and the defendant's fraudulent conduct." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011).

## ARGUMENT

### I.   Plaintiffs Have Failed to Adequately Allege Any False or Misleading Statements.

Under the PSLRA, a "complaint must be dismissed [if] it fails to plead falsity with requisite particularity." *Capital One Fin. Corp.*, 390 F.3d at 316. Plaintiffs' SAC should be dismissed because they have not adequately alleged any false or misleading statements that could provide a basis for imposing liability under the securities laws. Instead, they make general assertions that Evolent mismanaged its relationship with just one of its more than 35 customers. Courts have repeatedly recognized that "mere mismanagement" by executives does not state a valid claim for securities fraud because "poor management is a risk that every investor takes." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *Weill v. Dominion Res., Inc.*, 875 F. Supp. 331, 336 (E.D. Va. 1994). "Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives." *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004). But that is exactly what Plaintiffs do here—they attempt to convert potential mismanagement and breach-of-contract claims that belong to Passport into securities fraud claims by Evolent's

14

investors.  The statements they identify are not actionable because they are either (1) corporate puffery; (2) protected forward-looking statements; (3) unsupported by factual allegations; or (4) contradicted by Plaintiffs' own allegations, documents cited in the SAC, or in judicially recognizable documents such as SEC filings.

**A.       Optimistic statements and descriptions of the Company's aspirations are corporate puffery and not actionable.**

Optimistic and vague statements about a company's purpose, goals, and expectations are "non-actionable [because] they do not demonstrate falsity" and because the "kind of rosy affirmation commonly heard from corporate managers and familiar to the marketplace" are not material.  *Carlucci*, 886 F. Supp. 2d at 522; *In re Cable & Wireless,* 321 F. Supp. 2d at 766.  Such statements cannot be the basis of a securities fraud claim because they cannot be proved false and because "no reasonable investor could find them important to the total mix of information available."  *Id*. at 766–67.  Most of the alleged statements that Plaintiffs challenge are corporate puffery.  They do not support a section 10(b) claim as a matter of law.

Plaintiffs contend, for example, that the introduction to Evolent's 10-Qs is false and misleading because it states that the Company's "services enable health systems to manage patient health in a more cost-effective manner."  SAC ¶¶ 141, 149, 155, 165, 172, 176.[12]  Similarly, Plaintiffs allege it was false for Evolent's CEO to comment that (1) Evolent's "cost-effective infrastructure … allows our partners to leverage the benefits of integration in driving performance;" (2) Evolent has been able to "standardize and reduce costs in many areas;" and (3) Evolent's approach is "conservative in how we're building infrastructure to make sure we're

---

[12] See Ex. 1, Chart, listing reasons why each of the allegedly false or misleading statements cannot form the basis of a claim under Section 10(b).

managing cost well."[13]  SAC ¶¶ 164; 171.  But these are precisely the type of statements that courts have consistently recognized as immaterial corporate puffery.  *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179–80 (D.D.C. 2007) (holding that the statements in 10-Qs that the company's business plan was "cost effective," etc. were puffery).[14]

Statements about Evolent's "partnership model" and its relationship with customers are also the type of vague and optimistic statements that cannot form the basis of a Section 10(b) claim. For example, Plaintiffs object to Evolent's statements that its "partnership model enables cultural alignment…" and allows Evolent to "help[] these systems lower clinical and administrative costs… to offer a low cost, effective care setting …."  SAC ¶¶ 137, 161, and 185.  They also contend that it was false and misleading for Evolent to describe the "cultural alignment" with its customer as a way to "help[] systems lower … costs" and "drive some impressive consistent results for our partners."  SAC ¶¶ 140, 171.  None of these vague statements are actionable under the PSLRA.  *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.,* 412 F. Supp. 3d 206, 223 (E.D.N.Y. 2019) (finding that statements about "great partnerships" were inactionable puffery).

Plaintiffs also challenge many statements allegedly made by Williams about Evolent's customer, Passport, that are also non-actionable puffery.  *See In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 681 (E.D. Va. 2015).  He said that Passport is a "good example" of "a great partnership." SAC ¶ 167.  He also stated that Evolent "allowed [Passport] to get a lot of savings" and "was really important in terms of helping economics."  SAC ¶ 167.  No reasonable investor would be misled by these vague statements.  *In re Federal–Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D.

---

[13] In the Complaint, Plaintiffs assert that this statement was made by Nicholas McGrane.  That is incorrect.  It was made by CEO Frank Williams.  Ex. 28, 2Q 2018 Investor Call at 15.

[14] *See also In re XM Satellite Radio*, 479 F. Supp. 2d at 179–80 ("efficient" is puffery); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213–14 (4th Cir. 1994) (statement that company is "on target" to meet goals is puffery); *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 578 (W.D. Va. 2006) (describing finances as "on track" is puffery).

16

Mich. 2001) (noting that statements like "the Company is on target to achieve projected 'synergies' and cost savings" are the sort of "vague statements" that qualify as non-actionable puffery) (cited by *In re Neustar Sec.*, 83 F. Supp. 3d at 681).

Some of the statements that Plaintiffs highlight come from the risk factor section of Evolent's 10-Ks. For example, the SAC challenges the comment that "[t]he solution we offer our target market contemplates one strategic option—to… reduce utilization and total cost." SAC ¶ 136, 160. But that, too, is puffery. It is not specific enough to constitute a fraud on the market. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289–90 (4th Cir. 1993). In any event, the full statement actually warns investors that not all customers may choose to focus on lowering costs, so Evolent may lose business. Ex. 29, 2016 10-K at 19.[15]

**B.      Forward-looking statements are protected by the PSLRA.**

Statements about "future economic performance" and a company's "plans and objectives" are statutorily excluded from liability if (1) the statement is identified as a forward-looking statement and is accompanied by meaningful cautionary language, or (2) the plaintiff cannot show that the statement was made with actual knowledge of its falsity. 15 U.S.C. § 78u-5(c)(1)); *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146–47 (4th Cir. 2002). Oral forward-looking statements may incorporate by reference cautionary language available in a readily available document, such as a company's 10-K. 15 U.S.C. § 78u-5(c)(2); *In re Lab. Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *6 (M.D.N.C. May 18, 2006).

---

[15] Statements alleged to be false and misleading that are discussed at greater length below also qualify as corporate puffery. *E.g.,* SAC ¶ 145 ("strong cultural alignment" and "a lot of complementarity" with Valence and Evolent); SAC ¶ 152 (full quotation, not cited in SAC, explains "we wanted to provide a higher level of service"; "we'll be able to provide a differentiated and more efficient service for our members"; "we recognize the opportunity to expand the depth to our strategic alliance") (see Ex. 1 for paragraph, and Ex. 30, 3Q 2017 Earnings Call at 6, for full context); SAC ¶ 158 ("the Valence platform has enhanced our differentiation significantly in the marketplace").

Many of the allegedly false statements identified in the SAC are not actionable because they are forward-looking projections that were properly accompanied by risk warnings. For example, Plaintiffs allege that it was misleading for Williams to state on the May 7, 2019 earnings call that Evolent "believe[d] that Passport [wa]s making solid progress towards improving its financial performance" and "[o]verall, . . . remain[ed] hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market." SAC ¶ 188. These are classic examples of forward-looking statements, which the Fourth Circuit has held extends to statements that "relate to 'future economic performance'" and "statements of present belief regarding future events." *Marsh Grp.*, 46 F. App'x at 146–47. Moreover, that earnings call began with a warning that the "call contains forward-looking statements" and directing listeners to find full warnings in Evolent's SEC filings, on Evolent's investor relations page, and in the press release issued that day. The statement is therefore protected under the PSLRA's safe harbor.[16]

Statements about Evolent's business strategy regarding purchasing health plans are also forward-looking and protected by the PSLRA safe harbor. *See* SAC ¶ 182 ("while we're not focused on outright majority ownership in health plans, we are interested in exploring creative, aligned co-ownership arrangements… through [Medicare Advantage]");[17] ¶ 160 ("again, it's pretty hard to speculate on that."). Evolent's executives discussed future plans alongside

---

[16] See, e.g., *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 552 (M.D.N.C. 2013) (oral statements protected by PSLRA safe harbor); *Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope, Inc.*, 2013 WL 4014978, at *12–13 (W.D.N.C. Aug. 6, 2013) (same).

[17] The second half of the sentence was not included in the SAC. *See* Ex. 1 and at Ex. 25, 4Q/Full Year 2018 Earnings Call at 6.

appropriate warnings given in the SEC filings.  *E.g.,* Ex. 11, 2018 10-K at ii (warning about acquired businesses' financial performance).

Defendants attach a chart of some of the specific cautionary language that Evolent provided in its quarterly and annual SEC filings during the class period.  *See* Ex. 31.  These risk factors were meaningful and prescient of some of the business setbacks that Evolent actually faced during the class period (i.e., rate cuts and integration issues).

**C.      Plaintiffs do not plead specific facts showing that the challenged statements were false when made.**

To support a claim for securities fraud, the facts pled to support the falsity of a statement must show that the statement was false when made, not merely that it is likely to be false.  *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 579 (W.D. Va. 2006).  The SAC fails to meet this requirement.  Instead, it posits that Passport's *later* financial problems mean that Evolent's *earlier*, positive statements were necessarily false.  These generalized, fraud-by-hindsight assertions do not satisfy the PSLRA's and Rule 9(b)'s heightened pleading standards.

Plaintiffs fail to plead contemporaneous facts showing that the challenged statements were false when made.  For example, Evolent's statements to the *Louisville Insider*'s journalist about the number of employees in Louisville and per-member-per-month rates for Evolent's services are alleged, without support, to be false.  SAC ¶¶ 178–180.  Most of the allegations are conclusory statements, e.g., Evolent's "services were **not** provided 'at cost'" and Evolent's "services did **not** process claims 'at lower per member cost.'"  SAC ¶ 180 (emphasis in original).  Plaintiffs merely rely on increased overall administrative costs and encounter data penalties to show falsity, but these conclusory statements and unrelated facts do not establish that Evolent's statements about its number of employees or its per-member-per-month fees were false when made.

The SAC also fails to sufficiently allege that statements about Valence were false when made. The change from Passport's prior TPA vendor, Amerihealth, to the Evolent Valence platform, occurred in October 2017. SAC ¶ 80. Plaintiffs allege that statements made in May were false because of the challenges with the software conversion that occurred starting in October. SAC ¶¶ 143, 145 (describing statements made by Williams and Wigginton on an investor call and at Investor Day). Positive statements made five months before the transition occurred are not rendered false merely because the transition encountered problems later. That is impermissible fraud-by-hindsight. *Hillson Partners*, 42 F.3d at 209.

Plaintiffs cite statements by CWs that—even if true—could not support the falsity of the May statement. Two low-level employees, CW2 and CW4, predicted that the October 2017 transition would not go smoothly and that "the system wasn't ready." SAC ¶¶ 144, 147. Even if these CWs had told any Individual Defendant of their opinions—which is not alleged—a CWs' prediction of real problems later could very well turn out to be wrong after months of work. Similarly, the SAC relies on speculation that Valence was built for dental claims as evidence that the October 2017 transition would go poorly. SAC ¶¶ 144, 147. As shown in multiple SEC filings, however, this speculation is incorrect; Valence was not built for dental claims. *See* Ex. 16, Valence Acquisition 8-K at Exhibit 99.1; Ex. 32, Oct. 3, 2016 8-K at 2. In any event, software can be used for different purposes and with five months to go, Wigginton's and Williams's May 2017 statements about the transition process are not rendered false due to speculation about Valence's original purpose.

The SAC also alleges that Williams's statement about the Valence transition on a November 2, 2017 earnings call were false because the CWs say that Valence was a "disaster." SAC ¶ 152. Williams never said the transition was perfect; he said only that Evolent "successfully

20

launched" Valence, that Evolent was "continu[ing] to monitor it," and that it was a "smooth transition." *Id.* Plaintiffs claim that these statements are false because (1) Williams's allegedly participated in teleconferences that CW5 also attended, which is addressed below, and (2) Kentucky penalized Passport for late encounter data. But the first of these penalties was not even assessed until 2 weeks after the call, so it couldn't possibly show contemporaneous falsity. Ex. 22, Penalty Letter for October 2017 at 1.

Plaintiffs suggest that Spencer made an allegedly false statement on May 11, 2017 when she noted that Passport had done "a lot of due diligence" to make sure that "everything was working the way we want it to" before deciding to purchase the Valence system. SAC ¶ 146. The SAC's only alleged evidence of falsity is some employees' later opinions about the program. SAC ¶ 147. That is inadequate. The CW's do not say they were on the diligence team investigating Valence, nor do they purport to know how Passport had tested Valence or what competing factors the executives had weighed.

Plaintiffs also challenge Defendants' statements concerning Evolent's ability to deliver cost savings. But Evolent's general, aspirational statements regarding its customers in general are not rendered false by allegations that Evolent "overcharged" one customer. *In re Neustar Sec.,* 83 F. Supp. 3d at 681(citing *In re Federal–Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (dismissing as puffery the statement that "the Company is on target to achieve projected 'synergies' and cost savings"). It is undisputed that Evolent had over 35 customers during the Class Period. Ex. 11, 2018 10-K at 1. Without facts that Evolent overbilled clients or failed to deliver promised cost savings to other clients, Plaintiffs' allegations are insufficient to plead that the challenged statements, which do not specifically concern Passport, were false when

21

made.  The SAC does not articulate why the alleged problems with Passport demonstrate a systematic failure by Evolent to deliver cost-saving healthcare systems and services.

By contrast, the specific challenged statements by Defendants about cost-savings at Passport are actually directly corroborated by Plaintiffs' own allegations.  Plaintiffs allege that Williams and Blackley falsely claimed in May and September 2018 that Evolent had saved Passport between $75 million and $100 million.  SAC ¶¶ 168, 175.  Plaintiffs' own allegations show that Passport's net underwriting profits improved from a loss of $80.4 million in 2016 to a gain of $4.3 million for 2017.  SAC ¶ 87.  This $76.1 million swing supports the veracity of the challenged statements made in 2018 that Evolent helped Passport to improve its bottom-line finances between $75–100 million.  SAC ¶¶ 170, 175.

Moreover, Passport's financial statements, upon which Plaintiffs' rely, show that Evolent helped Passport improve its MLR from 95.1% in 2016 to 89.9% in 2017. [18]  Ex. 19, 2016 Annual Statement at 7; Ex. 20, 2017 Annual Statement at 7; *see supra* section I.B.  The savings based on the lowered MLR are significant: as Blackley and Williams pointed out, 5% of Passport's revenues in 2017 would be about $95 million.[19]  Said differently, had Passport operated in 2017 with its 2016 MLR, then Passport would have spent an additional 5.2% of its 2017 revenue on medical expense, which amounts to about  $98,644,043.

---

[18] Passport's annual statements may be considered by the Court.  These publicly filed records are routinely consider at the motion-to-dismiss stage in securities cases to test the adequacy of plaintiffs' allegations.  *Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009).  In addition, they are filed with a governmental administrative agency, *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004) (taking notice of public records on a governmental agency's website), and the Plaintiffs' SAC relies upon the financial statements heavily.  *See, e.g.,* ¶¶ SAC 5 (expenses), 10 ("bailout" necessary), 50–53 (expenses; bar chart included); 83–87 (expenses; bar charts included).

[19] Passport's 2017 Revenue as reported in its Annual Statement is $1,897,000,830; 5% of that is about $95 million.  The MLR improvement was 5.2%, which yields a savings of $98.6 million.  Ex. 20, 2017 Annual Statement at 7.

Plaintiffs repeatedly ignore and distort Evolent's own disclosures:  For example, Plaintiffs allege that:

- *"In the Fall of 2017 ... Evolent had absolutely no experience in processing complex individual medical claims."*  SAC ¶ 7.

  That is false.  As Evolent disclosed in multiple SEC filings, when it purchased Valence in October 2016, Valence was already processing medical claims for approximately 600,000 existing patients on its platform.  Ex. 16, Valence Acquisition 8-K at Exhibit 99.1.  In the year before Valence was implemented at Passport, additional lives were added to the Evolent-Valence platform, so more "individual medical claims" were processed.  Ex. 10, 2017 10-K at 52.

- *Valence Health's claims administration platform acquired by Evolent "was built to process bundled dental claims" not Medicaid claims.*  SAC ¶7.

  That is false.  As Evolent disclosed in its 2017 10-K, "[i]n its **20-year** history, Valence Health developed particular expertise in the Medicaid and pediatric markets." Ex. 10, 2017 10-K at 83 (emphasis added).

- *Rebadging employees was a "scheme" concocted by Evolent.*  SAC ¶ 47.

  That is false.  The rebadging was part of a 10-year long Master Services Agreement and strategic relationship between Passport and Evolent.  Ex. 33, Passport's Audited Financials at 7.  This long-term contract between two sophisticated organizations was not a "scheme" perpetrated by Evolent.

These distortions are why the Court must look at the full context of the challenged statements to determine whether plaintiffs have satisfied the PSLRA's heightened pleading standards. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (dismissing claims after refusing to "rely solely on [Plaintiffs'] discrete allegations" and instead "considering the necessary context" by reviewing reports cited in complaint).  Plaintiffs cannot plead that Evolent said one thing when Evolent's SEC filings and other judicially recognizable documents demonstrate that it actually said something materially different.

23

**D.      Many of the facts asserted by the CWs cannot be credited because they fall outside the scope of their personal knowledge.**

In the Fourth Circuit, allegations based on statements from a confidential witness are appropriately credited only when (1) the complaint describes the CW's role sufficiently to infer that a person in that position would possess the information alleged; (2) the CW has personal knowledge and is not relying on hearsay; and (3) the statements provide evidence of the CW's general understanding or knowledge of the information. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007); *In re Trex*, 454 F. Supp. at 573; *Hunter*, 477 F.3d at 179. Here, many of the CWs statements should not be credited because the facts do not reasonably arise from the CW's position or because the CW has shown a lack of understanding of the issue. *In re Trex*, 454 F. Supp. at 573; *Hunter*, 477 F.3d at 179.

Some alleged facts cannot be credited because the topic about which the CW opines is unrelated to her position at Passport and no allegation suggests that she would have access to information on the topic. For example, CW5 was the Director of IT at Passport for three years.[20] This IT experience has no bearing on Passport's PBM, which CW5 claims "dramatically increased costs." SAC ¶ 109. She is not alleged to have had any oversight or involvement with the PBM. In fact, her lack of basic knowledge is clear: she says *Navitus* performed better as Passport's PBM than did Evolent's CVS contract—but Passport's former PBM was Magellan, not Navitus. SAC ¶ 109; Ex. 33, Passport's Audited Financials at 26.[21] Similarly, her role as IT Manager or Director does not mean that she was in a position to have an informed opinion on whether the rebadging

---

[20] CW5 was a Manager in the IT department for 2.5 years before her role as Director, and she was a Senior Director for one month before leaving Passport in March 2020.

[21] Passport's audited financials, filed with the SEC by Evolent, state: "Magellan provided pharmacy benefit management services to UHC [Passport] through a three-year contract that was terminated by UHC effective August 31, 2017."

made sense from a business perspective. SAC ¶ 107. CW5's statements on the PBM and the rebadging are not a credible basis for Plaintiffs' claims.

Courts also disregard evidence when a CW shows a general lack of understanding of the subject matter. *Hunter*, 477 F.3d at 179. In *Hunter*, the Fourth Circuit held that a CW's "evident lack of familiarity with the R & D contract," the main contract about which allegedly false statements were made, meant that the CW's other assertions about the contract were suspect. *Id*. There are several allegations in the SAC that indicate the CWs do not understand a particular issue.

For example, CW1, CW3, and CW5 assert that Valence was a dental claims processing system inappropriate for handling medical claims.[22] SAC ¶¶ 7, 54, 63, 64, 144 and 147. But documents filed with the SEC, which Plaintiffs assert they reviewed before filing this litigation and do not challenge as false, show that Valence was already servicing more than 10 Medicaid plans when Evolent acquired it. Ex. 16, Valence Acquisition 8-K at Exhibit 99.1; SAC ¶ 2(a), (d). Dental claims are never referenced.

CW3's and CW5's evident lack of understanding of how Medicaid funding works means their comments on the Medicaid rate adjustment and its causes should not be credited.[23] CW5 asserts that because of computer issues, a medical claim "simply sat in the system," so Passport "was not reimbursed by Kentucky." SAC ¶ 104. But that is not how any Medicaid managed care organization is paid. Passport is paid by Kentucky via a "per member per month" model. *See* SAC ¶ 36. Consider the following simplified example: with 100 patients and a rate of $1 per

---

[22] There is nothing inherently different between dental claims and medical claims. A dentist might administer local anesthesia and fill a cavity. A dermatologist might administer local anesthesia and remove a mole. In both instances, a medical billing software could log the actions, match them to the provider and patient, and produce a billing record.

[23] Defendants recognize that CW3 can probably provide evidence on the aggregation of encounter data and CW5 on its transmission—those tasks fall within their positions. But their misunderstanding of the regulatory process means that their statements that the statewide rate adjustment "[was] a direct result of Passport's own failure to submit encounter data correctly" cannot be used as evidence to support anything in the SAC and should be disregarded by the Court. SAC ¶¶ 81, 90; *Hunter*, 477 F.3d at 179.

member per month, Passport would be paid $100 by Kentucky each month. Whether (1) each patient goes to the doctor and the Valence system correctly submits information on those 100 visits; (2) the Valence system correctly submits only 50 of those 100 visits as encounters; or (3) no patients go to the doctor at all, *Kentucky still pays Passport the same $100.* A claim sitting temporarily in the Valence system does not impact the reimbursement from Kentucky. The federal government's Medicaid website has a "toolkit" explaining encounter data, which states that they "are not tied to per-service payment from the state to the managed care organization (MCO), because the state is not paying for individual services…." Ex. 15, CMS Medicaid Toolkit at 1. The federal agency that administers Medicaid thus describes encounter data exactly the *opposite* of how CW5 understands it, and there is no way CW5's account can be squared with how Passport gets paid.

Similarly, CW3 and CW5 assert that the 2018 *statewide* rate adjustment that affected all Medicaid plans across Kentucky was caused by *Passport's* encounter data problems. SAC ¶ 81; SAC ¶ 105. CWs 3 and 5 thus argue that Passport's alleged problems with encounter data lowered rates for Aetna, Anthem, Humana, Passport, and WellCare in the Louisville region. Ex. 17, Kentucky Guide to Choosing a Medicaid Managed Care Organization (listing MCOs). But Kentucky actually said otherwise, as did the many Kentucky elected officials who spoke about the rate decrease.[24] The speculation from a person working in Passport's risk adjustment department and from a person in IT cannot be credited.

Comments about the origin of Valence as a dental claims software program (CWs 1, 3, and 5); the way that Passport is paid by Kentucky (CW5); and the underlying cause of the statewide rate adjustment (CWs 3 and 5) demonstrate the CWs' "evident lack of understanding" on these

---

[24] *See, e.g.,* Yetter, Deborah, "Louisville leaders call on Bevin to save Passport Health and its HQ," *supra* n.8.

26

particular issues, so conclusions based on those statements, such as Valence's inherent inability to work as a medical claims system, SAC ¶ 153, and the regulatory impact of Passport's internal challenges with submitting encounter data, SAC ¶ 104, must be disregarded. *Hunter*, 477 F.3d at 179 ("Given this source's evident lack of familiarity with the [contract], the facts he stated cannot support the complaint's assertion that [defendant] performed no [work under the contract]").

## II.   Plaintiffs Fail to Plead Particularized Facts Supporting a Strong Inference of Scienter.

The Court should dismiss the SAC for the independent reason that it lacks particularized facts supporting a "strong inference" of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). "To survive a motion to dismiss, the facts alleged must give rise to a strong inference that [Defendants] intentionally or recklessly deceived, manipulated, or defrauded investors." *Maguire Fin. L.P. v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017). "[M]ere negligence" or corporate mismanagement is not enough. *In re PEC Solutions*, *Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005).

***Plaintiffs Have Not Alleged Any Plausible Motive.*** Plaintiffs have not alleged facts establishing a motive to commit fraud because they have not alleged "concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003); *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000) ("[P]laintiffs had to allege that defendants benefitted in some concrete and personal way from the purported fraud."). Plaintiffs allege that Evolent intentionally overcharged Passport so that Evolent would need to inject $70 million into "a massive and cash-draining emergency bailout" of Passport's business. SAC ¶11. That alleged motive is illogical and self-defeating, and does not raise an inference of scienter. *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 636 (5th Cir. 2019) (rejecting plaintiff's "self-defeating"

27

argument that "Pier 1 executives kept ordering more inventory when they supposedly knew deep down that they would not be able to sell it."). It also means that Plaintiffs must come forward with especially precise and compelling factual allegations showing actual knowledge or severe recklessness. *Id.* at 431 (5th Cir. 2019) ("A failure to show motive means that the strength of the circumstantial evidence of scienter must be correspondingly greater.") (internal citations and quotations omitted). They have not met that heavy burden.

***The Individual Defendants' Executive Positions Do Not Establish A Strong Inference of Scienter.*** Plaintiffs urge the Court to assume that the Individual Defendants "must have known" about any problems or alleged wrongdoing merely because of their positions at Evolent. *Yates v. Mun. Mortg. & Eq., LLC,* 744 F.3d 874, 888–89 (4th Cir. 2014). That is improper. The SAC impermissibly attributes scienter to Defendants as a group, rather than pleading facts demonstrating scienter as to each Defendant. *Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 182, 190 (4th Cir. 2009). Moreover, as the Fourth Circuit has recognized, "owners" of a company cannot be found to have specific knowledge based merely on their ownership. *Matrix Capital,* 576 F.3d at 184; *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) ("holding an executive position alone does not necessarily lead one to infer that Individual Defendants knew that the alleged omissions were false or misleading").

Any inference is especially improper here because, at the time the challenged statements were made, Evolent did not own Passport. Passport was only one of Evolent's 35+ customers.[25]

---

[25] There are no allegations establishing that the Individual Defendants knew that Evolent's statements concerning its ability to deliver cost savings to clients generally were false or misleading. *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) (rejecting allegations from confidential witness where complaint "[did] not allege that the practices identified . . . were anything other than a local, isolated practice, or how [s/he] would have personal knowledge of whether the alleged practices were widespread or a matter of corporate policy"). CW3 and CW4 allege that Valence "was creating similar problems in 2018 at Evolent's three

28

Williams's understanding of Passport's operations and involvement in some strategic decisions does not mean that he knew that any of the challenged statements was false when made. *Genworth* noted that the "self-proclaimed personal involvement" of defendants is what supports an individual defendant's scienter. 103 F. Supp. 3d at 785. But Williams said that "we really have joint governance," SAC ¶ 42; he never said that he had personally participated in a full review of the Valence integration at Passport. *Compare* SAC ¶ 42 ("Passport 'look[s] at us as a co-owner'") *with In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) (CEO described his "his personal involvement in [company's] complete review of all components of the Company's long-term care business."). Again, generalized accusations that an executive—even a CEO— "must have known" about problems at a partner's company does not meet the high bar to plead a strong inference of scienter. *Yates,* 744 F.3d at 888.

**The CWs' Information Does Not Provide a Strong Inference of Scienter**. Plaintiffs rely heavily on the CWs, but the information attributed to them is insufficient to establish a strong inference of scienter. Plaintiffs must allege that a CW was in a position to have personal knowledge of the subject, and they must allege with specificity that a CW communicated information to the individual defendants or otherwise show how the witnesses knew what the defendants knew or recklessly disregarded.[26]

The CWs do not sufficiently allege that any Defendant knew that a specific statement was false or misleading when made. CWs 1–4 do not allege any direct interaction with any Individual Defendant. *E.g., Local No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724

---

Florida Medicaid plans," but they do not explain how they knew about issues at a separate customer in a different state and, as relevant here, never allege that they told any Individual Defendant about these alleged problems. SAC ¶ 202.

[26] *See Hunter*, 477 F.3d at 174, 181–82; *Local 295/Local 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 721 (S.D. Ohio 2010) (rejecting confidential witness testimony that could not "impute knowledge" of alleged fraudulent practices to any of the individual defendants).

F. Supp. 2d 447, 460–61 (S.D.N.Y. 2010), *aff'd*, 430 Fed. App'x 63 (2d Cir. 2011) (holding that employees' statements not sufficient to establish scienter when "employees had no contact with the Individual Defendants."). The SAC's allegation that "pretty much everyone from Passport was telling" Evolent about problems with Valence is nowhere near particular enough to support an inference of scienter. SAC ¶ 65. CWs 1–4 allege no contact with the Individual Defendants, and the statements attributed to them therefore cannot possibly demonstrate "what th[e] defendants actually knew." *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *13 (E.D.N.C. Sept. 15, 2015); *In re Coventry Healthcare, Inc. Sec. Litig.,* 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) (anonymous witnesses lacking "direct contact with" defendants logically cannot know "what the Defendants knew or recklessly disregarded").

"Common knowledge" at a company cannot support a finding of scienter. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590–91 (S.D.N.Y. 2011) (dismissing securities claim for lack of scienter when CWs' statements were only about the corporate environment with no connection to individual defendants). But that is all that Plaintiffs offer. No CW makes any allegation that she ever interacted with Blackley, McGrane, Wigginton, or Spencer.[27] The extent of the 'interaction' with anyone at Evolent and CWs 1–4 is the following:

- CW1 reported to Passport's CFO—not Evolent's CFO. SAC ¶ 44. CW1 knew that "the Passport executive team met every Monday" and that Spencer was in the room. *Id.* But CW1 does not say that she attended any of those meetings. She does not know what was discussed at those meetings generally or specifically. She did not speak to Spencer.[28] Even crediting CW1's statements concerning the general situation at

---

[27] CW5 says that she was on calls with "Evolent's most senior executives" in addition to Williams, but does not mention Blackley, McGrane, Wigginton, or Spencer. SAC ¶ 96. Presumably, the SAC would have included the names of those Individual Defendants if she had participated in calls with them. Without the specific allegation that she did interact with them, there can be no assumption about their actual knowledge.

[28] The only allegedly false statement made by Spencer was about Passport's transition to Valence and was based on her involvement in the decision to use the Valence system. SAC ¶ 146. The weekly meetings referenced appear to be general executive meetings, not Valence-transition meetings, and thus do not even relate to the subject of Spencer's one challenged statement.

30

Passport, the facts pled in the SAC do not show that her opinion of the situation ever made its way to an Individual Defendant.

- CW2 stated she told Evolent management that the Valence platform was not ready or adequate. SAC ¶ 65. CW2 does not say who "Evolent management" is—presumably, Plaintiffs would have said that CW2 had talked directly with an Individual Defendant if she had. CW2 does not say at what level of management the people she told were. She does not say when she told management or how. Without more specifics, it is impossible to infer that her statements about the adequacy of a software program ever made it to an Individual Defendant.

- CW3 said there was a "daily war room" to address the "mounting crisis" regarding Valence, and that Spencer attended "each war room meeting," and then created presentations "to share with Evolent's most senior executives." SAC ¶ 71. CW 3 does not say that she attended any meeting. CW3 does not say she helped prepare the purported presentation or even that she ever viewed one. She does not say how she knows a report was passed along to any Individual Defendant. This type of hearsay is exactly the type of evidence from confidential witnesses that courts rule as insufficient because it is not based on personal knowledge. *In re Trex*, 454 F. Supp. 2d at 573.

- CW4 does not say anything about meetings or communications with any management, much less with any Individual Defendant. *E.g.,* SAC ¶¶ 65, 67, and 86.

CW5 is the only CW that alleges some interaction with one Individual Defendant, CEO Frank Williams, but even these allegations do not support a strong inference of scienter. According to CW5, she was on "relationship calls" with Williams and others at Passport and Evolent, and asserts that Williams participated in meetings with CW5 and others where "very technical details" about Valence were discussed.[29] SAC ¶¶ 96, 97. The SAC notes six times that during these calls, "[s]omeone always barked about" Valence. SAC ¶¶ 90, 96, 144, 147, 153, 200. But even with all this "barking," CW5's statements, taken as true, show only that Williams was aware that people at Passport were frustrated with Valence.

---

[29] A complaint must be 'plausible,' and a number of allegations from CW5 do not meet this standard. It seems unlikely that the Chief Executive Officer of a large public company would be engaged in technical discussions on a weekly basis with his *customer's* IT staff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (determining whether a claim is "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Nonetheless, CW5's allegation still fails to raise a strong inference of scienter.

31

Because we do not know when these calls took place, we cannot know whether Williams' statements about Valence on November 2, 2020—the one statement that would be relevant to the calls CW5 talks about—was made with actual falsity. Without that specificity, there can be no inference of scienter. *Hunter*, 477 F.3d at 181 (requiring plaintiffs to plead a "particular date"); *In re Trex,*, 454 F. Supp. 2d at 583 (finding that statements made by a CW were insufficient because "the complaint does not indicate how or when" facts "came to be known" by defendants).

The required temporal specificity is particularly important here, where the Valence transition was a significant undertaking—the process itself started six months in advance of the "go live" date of October 1, 2017—and Evolent had warned investors about the challenges of integrating such technology. Ex. 13, 2017 Investor Day Transcript at 28–29 (transition process); Ex. 11, 2018 10-K at 16 (warning). A "barking call" in July, with three months to go before the transition, is not a red flag; it's just evidence that the task at hand is challenging, as Evolent warned its investors. Such a call with Williams would be relevant only if it occurred close enough to Williams's one challenged statement related to Valence, on November 2, that the "barking" could be said to be outside the normal challenges of a complex software integration. SAC ¶ 96. There are no allegations to make that essential connection. Taken as true, CW5's information suggests only that by some unspecified date, Williams was aware that some people at Passport were unhappy with Valence and that there were some "relationship calls" because the Evolent/Passport relationship "needed to be fixed." SAC ¶ 97. Such facts do not show fraudulent intent.

All the CWs worked in Louisville,[30] not in Evolent's Virginia headquarters. There is no factual basis to infer that the concerns of these employees made their way to any Individual

---

[30] CW2 and CW3 were Passport employees who were rebadged as Evolent employees; those employees remained in Louisville. SAC ¶ 49. CW1 and CW5 were Passport employees. SAC ¶¶ 44, 49; SAC ¶ 89. Based on the SAC, it is unclear where CW4 worked, but Defendants believe that a Quality Analyst working with Passport data worked in the

32

Defendant. The only "evidence" that any information from the CWs was conveyed to some level of "Evolent management" is based on hearsay about what happened at meetings to which CWs were not privy (CW1), presentations that CWs never saw (CW3), and conversations that are not adequately described (CW2 and CW5). Even assuming that everything the CWs say is true, there is no factual basis to infer that any Individual Defendant had actual knowledge of a false statement.

The SAC makes much of Evolent executives' presence at Passport and involvement on calls. But every diligent executive attends meetings regularly. *See Yates,* 744 F.3d at 889 ("We view the frequency of accounting meetings as a sign of diligence rather than evidence of a nefarious purpose."). CW5 alleges that non-defendant Evolent Chief Technology Officer Chad Pomeroy assisted regularly with the transition, and that non-defendant Tom Peterson, Evolent COO, was involved with the Valence implementation and later helped in the wake of the rate decrease in January 2019. SAC ¶¶ 99, 108. This assistance shows that Evolent worked hard to assist its customer, cared about its success, and addressed the problems CW5 alleges were serious. Examined in context, the CWs' allegations about Evolent's involvement with Passport do not support Plaintiffs' vision of Evolent as a parasitic drain on Passport and its finances.

Finally, the information supplied by the CWs that Evolent charged Passport more under its contract than Passport previously paid as compensation to the approximately 350 employees that were "rebadged" to Evolent is completely irrelevant to the issue of scienter. SAC ¶¶ 48, 138, 180. Plaintiffs contend that this information demonstrates that Defendants knew that Evolent could not deliver the promised cost savings to Passport. *E.g.,* SAC ¶ 35. It does not. Evolent did not merely provide outsourcing services to Passport. It provided Passport with a suite of healthcare technology systems, including (1) care management, (2) utilizations management, (3) analytics

---

Louisville office. SAC ¶ 65. CW4 never alleges any interaction with any Individual Defendant, though, so the location of her job is not relevant here.

and reporting, (4) risk adjustment, (5) pharmacy benefit management, and (6) claims administration. *See supra* Background Facts (B). Evolent was entitled to be compensated for these services. Thus, the fact that Passport paid Evolent more than it previously paid the "rebadged" employees does not raise any inference of scienter.

   ***Evolent's Acquisition of Passport Does Not Raise A Strong Inference of Scienter.*** Plaintiffs allege that Evolent's May 29, 2019 announcement that it would acquire a majority stake in Passport suggests that Williams knew that his earlier statement in February 2019 that acquiring Passport was "not in [Evolent's] strategic lens at this point" was false and misleading. SAC ¶ 183. That ignores the changed circumstances that caused Evolent to alter its strategy and acquire a majority interest in Passport. As Williams explained to investors on the May 29, 2019 conference call announcing the deal, the "owners of Passport… recently ran a competitive process to select a joint venture partner." Ex. 27, May 29, 2019 Special Call at 5. Because Passport solicited bids, Evolent changed its strategy—if it did not submit a winning bid, then its business relationship with Passport would be in jeopardy. At best, Plaintiffs argue that the four-month temporal proximity between Williams's two statements raises an inference of scienter. "However, pleading temporal proximity alone has not been viewed as adequately establishing scienter." *Arnlund v. Deloitte Touche, L.L.P.*, 199 F. Supp. 2d 461, 482 (E.D. Va. 2002).

   Plaintiffs also allege that Evolent knew that it would need to bail out Passport in January 2019 because non-defendant Tom Peterson stated during the May 30 conference call that the "writing [was] on the wall." SAC 184; SAC heading VII.D. But this "quote" is truncated and thus misleading. The full quote shows that Plaintiffs are wrong to imply that Passport's bankruptcy was a foregone conclusion at this point:

> Starting in January, **once the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be a retroactive rate relief,** there

was additional level of urgency that was placed on this, and I'll talk a little bit about this later on as to what we actually did about it.[31]

The "writing on the wall" was that Kentucky was not going to retroactively adjust rates back through July 2018, which Passport had hoped would happen and had been working to achieve. *See* Ex. 25, 4Q/Full Year 2018 Earnings Call at 7 (describing Passport's administrative and legal challenges to rate adjustment).

The statement does not indicate that Evolent knew in January that it would need to "bail out" Passport.  In fact, Peterson's statements echo what Evolent had told its shareholders in its 2018 10-K filed on February 28, 2019:  "Recent rate changes in Kentucky have negatively impacted Passport, our largest partner in terms of revenue for 2018, and could significantly harm our business, financial condition and results of operation."  Ex. 11, 2018 10-K at 16.  Indeed, Evolent told investors in February that "if the rates are not changed, [Passport] could be deemed insolvent by the end of March."  *Id*.

## III.     Plaintiffs Fail to Adequately Plead Loss Causation.

Plaintiffs asserting claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 bear the burden of alleging that the truth of the alleged misstatement or omission was revealed to the market and caused their losses.  That requires more than simply alleging that the plaintiff purchased defendant's stock at an artificially inflated purchase price and thereby sustained damages. *See Dura Pharm.,* 544 U.S. at 347.  Plaintiffs must allege loss causation with "sufficient specificity," a standard that the Fourth Circuit has recognized as essentially equivalent to the

---

[31] The truncated misquote is used in a particularly misleadingly way in SAC ¶ 10: "As Evolent management would later admit, in January 2019 Evolent realized that the "writing was on the wall" that Passport's financial situation was so desperate it would likely need a bailout."  Though Plaintiffs quote the statement in full in ¶ 125 and ¶ 204, the "writing was on the wall" is used six other times as shorthand for Peterson's "admission" that Passport was likely to become insolvent and would require Evolent to acquire it.  But Peterson's statement, as shown here, says no such thing and is much more limited.

35

particularity pleading requirement of Rule 9(b).   *See In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 119–120 (4th Cir. 2009).  This standard requires courts to examine whether "the necessary causal link exists" between the alleged misrepresentations or omissions and Plaintiffs' alleged damages.  *Hunter*, 477 F.3d at 186.

In this Circuit, "corrective disclosures will have to show both that corrective information was revealed and that this revelation prompted the resulting decline in price."  *Katyle*, 637 F.3d at 472 (internal quotations and citations omitted).  The corrective disclosures must "present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price."  *Id*. at 473 (internal citations and quotations omitted).  The core of Plaintiffs' case is that Evolent misled investors by not disclosing that it was "over-charging" Passport.   SAC ¶¶ 4, 48, 51, 138, 142.   Plaintiffs allege that the truth about how much Evolent was charging—and the impact this had on Passport—was not publicly revealed until February 15, 2019, when Passport filed a lawsuit against Kentucky.  SAC ¶¶ 115–116, 212.   Plaintiffs' entire argument is that this was the first time that investors knew the truth about the negative impact Evolent was having on Passport.  SAC ¶¶ 208–214.

The SAC fails as a matter of law to adequately plead the element of loss causation because the market was put on notice as early as January 25, 2019, about the supposedly excessive fees that Evolent charged Passport and that these charges might exacerbate Passport's financial distress.  Plaintiffs cite an article from January 25, 2019 from the *Insider Louisville* publication entitled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to Evolent Health."  SAC ¶¶ 112, 178–180.  This article provides very detailed information about how much Evolent charged Passport for its services.   For example, the article states that Passport's non-employee management fees had risen by $86 million following its partnership with Evolent.  SAC

36

¶ 113.  The article also places this fact into perspective, stating that Passport had paid more than $220 million in management fees to Evolent. SAC ¶¶ 113, 178.  It states that Passport was projecting a $144 million loss for the year.  Ex. 24, *Insider Louisville* article at 8.  It reported that Evolent and Passport's alliance was "under intense financial pressures" and that Passport's CEO had just "addressed the nonprofit's potential insolvency."  *Id*.  Moreover, the article links these problems to the recent reduction in the Medicare reimbursement rate instituted by the Commonwealth of Kentucky.  *Id*.

Plaintiffs argue that the true magnitude of the impact on Passport was not revealed to investors until the next month, when Passport filed suit against the Commonwealth. SAC ¶¶ 115–116, 212.  Similarly, Plaintiffs allege that Evolent's announced acquisition of Passport in May revealed to the public how dire Passport's financial position had become.  *Id*. ¶ 213.  But what matters is when the public became aware of the information that was allegedly withheld by Defendants.   *See Katyle,* 637 F.3d at 478 (upholding dismissal because alleged corrective disclosures did not relate directly to the actual information allegedly concealed by defendants). The January 25, 2019 article disclosed all relevant facts necessary to place investors on notice concerning the same risks that were allegedly revealed by both the lawsuit and the acquisition. Yet this article is not alleged to constitute a corrective disclosure because the stock price of Evolent barely moved after the release of the January 25, 2019 article.  *See* Ex. 34, Chart of Evolent Stock Price During Class period.  The market understood the risks involved with the relationship between Evolent and Passport; the author even notes that Passport's CEO testified to the Kentucky Senate that Passport was worried about its own solvency.  *See* Ex. 24, *Insider Louisville* article at 3.

37

The article—and the lack of a stock price drop—do not fit conveniently with Plaintiffs' narrative.   The market was not blindsided in February to learn that Passport had major financial problems.  Nor did any new information enter the market then about the fees and costs charged by Evolent.  Rather, the stock price decline beginning in February was the natural consequence of a previously understood risk materializing.  Because Plaintiffs' only alleged corrective disclosures occur after the relevant facts were disclosed to investors in the January 25 *Insider Louisville* article, it is impossible as a matter of law for Plaintiffs to allege a valid corrective disclosure, and the SAC should be dismissed for failure to plead loss causation.

**IV.    Defendants Can Only Be Held Responsible for Their Own Statements.**

Under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), only the person or entity that "makes" the challenged statements can be held liable under Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by— the party to whom it is attributed." *Janus*, 564 U.S. at 142–43.  The SAC does not attribute any of the challenged statements to Spencer or Wigginton except for statements at a May 11, 2017 conference (1) by Wigginton that Evolent's "integration" of Valence "has proceeded at or above our expectations" SAC ¶ 145, and (2) by Spencer that "Passport had done 'a lot of due diligence' on Valence." SAC ¶ 146.  These are the *only* statements attributed to Wigginton or Spencer.  The fact that all other challenged statements are specifically attributed to parties other than Spencer or Wigginton is "strong evidence" that they did not make those statements.  *Janus*, 564 U.S. at 142– 43; *see also id.* at 147–48 & n.11 (noting the significance of lack of attribution).

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142.  Although Plaintiffs allege that the "Individual Defendants, because of their

positions with the Company, controlled … the contents of its reports, press releases and presentations to [the] public," SAC ¶ 28, such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to carry the SAC past a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Absent particularized allegations explaining how Spencer or Wigginton had the requisite control over the challenged statements (except for the two statements alleged in SAC ¶¶ 145–46), Spencer and Wigginton cannot be liable under Rule 10b-5. *See Janus*, 564 U.S. at 142–43, 148 (holding that defendant did not make false statements in prospectuses of its client mutual fund, despite having been "significantly involved in preparing" prospectuses and having "provide[d] the false or misleading information"). There are no allegations that Spencer or Wigginton provided any false information to Evolent or to the other Individual Defendants.

## V.   Plaintiffs Fail to Adequately Plead Control-Person Liability.

To successfully plead a prima facie case of "control person liability" under § 20(a), Plaintiffs must allege (1) the existence of a primary securities violation committed by the "controlled" person or actor (*i.e.*, underlying predicate securities violation); and (2) the defendant's "control" over the primary violator. *See Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 602 (E.D. Va. 2015) (citation omitted). For all the reasons above, Plaintiffs have failed to plead a primary violation against Evolent and the Individual Defendants.

In addition, Plaintiffs' § 20(a) claims against Spencer fail because the SAC does not allege facts sufficient to establish that she controlled Evolent. To adequately plead "control," Plaintiffs must allege that Spencer had the power to control both the general affairs of Evolent and the specific corporate policy that resulted in the predicate securities violation. *See Kiken*, 155 F. Supp. 3d at 602 (citation omitted). Plaintiffs have not pleaded any specific facts to establish that Spencer exercised such control. The SAC is replete with conclusory allegations that Spencer was

39

a "controlling person" by "reason of [her] status as senior executive officers and/or directors" and "had the power and influence to cause the Company to engage in unlawful conduct" and "to control the contents of [Evolent's] reports, press releases and presentations… to the investing public." *See* SAC ¶¶ 27–28, 238–239.  Under Rule 8(a), however, the Court should not accept conclusory statements and legal conclusions as true.[32]

Plaintiffs' only factual control-person allegation related to Spencer is that she "was Evolent's National Chief Medicaid Operating Officer from 2016 to February 2018." SAC ¶ 22. Plaintiffs do not allege how the position of National Chief Medicaid Officer imparted control over the company or included responsibility for the corporate policies at issue in this case. Significantly, Spencer did not sign Evolent's SEC filings, nor was she listed in Evolent's SEC filings as an officer of the Company.  *See In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1182 (D. Colo. 2012) ("Defendants' authority to sign or not sign the registration statements at issue is an important indicia of 'control' over the representations and disclosures that went out to potential investors."); *Jacobs v. Coopers & Lybrand, LLP*, 1999 WL 101772, at * 18 (S.D.N.Y. Mar. 1, 1999) ("the allegation that [a Director] signed a fraudulent 10-K form" is an important factor when analyzing control). Accordingly, the Court should dismiss Plaintiffs' § 20(a) claim against Spencer because the SAC "does not plead any facts from which it can be reasonably inferred [she] was a control person." *In re Constellation Energy, Inc. Sec. Litig.,* 738 F. Supp. 2d 614, 639 (D.Md. 2010).

## CONCLUSION

For the reasons set forth above, the Amended Complaint should be dismissed with prejudice in its entirety for failure to state a claim for securities fraud.

DATED: June 22, 2020

RESPECTFULLY SUBMITTED,

*/s/ Ashley C. Parrish*
Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX  78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on June 22, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System on all parties in this case.

*/s/ Ashley C. Parrish*
Ashley C. Parrish

41