# Exhibit 29

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

_____

# FORM 10-K
_____

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2016**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the transition period from ___ to ___**

**Commission File Number: 001-37415**
_____

# Evolent Health, Inc.
**(Exact name of registrant as specified in its charter)**
_____

| | |
|---|---|
| **Delaware** | **32-0454912** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **800 N. Glebe Road, Suite 500, Arlington, Virginia** | **22203** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(571) 389-6000**

**Registrant's telephone number, including area code**

_____

**Securities registered pursuant to section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Class A Common Stock, par value $0.01 per share | New York Stock Exchange |

**Securities registered pursuant to section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 12 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. Large accelerated filer ☐ Accelerated filer ☒ Non-accelerated filer ☐ Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant (based on the closing price of the shares on the New York Stock Exchange on such date) as of the last business day of the registrant's most recently completed second fiscal quarter was $284.0 million.

As of February 24, 2017, there were 52,612,764 shares of the registrant's Class A common stock outstanding and 15,346,981 shares of the registrant's Class B common stock outstanding.

### Documents Incorporated by Reference

Selected portions of the Proxy Statement for the Annual Meeting of Shareholders, scheduled for June 8, 2017, have been incorporated by reference into Part III of this Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2016.

--------------------------------------------------------

**Explanatory Note**

In this Annual Report on 10-K, unless the context otherwise requires, "Evolent," the "Company," "we," "our" and "us" refer to (1) prior to the completion of the Offering Reorganization described in "Part I - Item 1. Business - Initial Public Offering, Organizational Transactions and Subsequent Secondary Offering - Organizational Transactions"), Evolent Health Holdings, Inc., our predecessor, (including its operating subsidiary, Evolent Health LLC), and (2) after giving effect to such reorganization, Evolent Health, Inc. and its consolidated subsidiaries. Evolent Health LLC, a subsidiary of Evolent Health, Inc. through which we conduct our operations, has owned all of our operating assets and substantially all of our business since inception. Evolent Health, Inc. is a holding company and its principal asset is all of the Class A common units of Evolent Health LLC. As described below under "Part II - Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Results of Operations," the financial statements of Evolent Health, Inc. for the years ended December 31, 2015 and 2014, do not reflect a complete view of the operational results for those periods as follows:

- Evolent Health, Inc.'s results for 2015 reflect (i) the investment of Evolent Health, Inc.'s predecessor in its equity method investee, Evolent Health LLC, for the period from January 1, 2015, through June 3, 2015, and (ii) the consolidated results of Evolent Health LLC from the time of the Offering Reorganization, or June 4, 2015, through December 31, 2015; and
- Evolent Health, Inc.'s results for 2014 reflect only the investment of Evolent Health, Inc.'s predecessor in its equity method investee, Evolent Health LLC.

For more information about the Offering Reorganization, refer to "Part I - Item 1. Business - Initial Public Offering, Organizational Transactions and Subsequent Secondary Offering."

As used in this Annual Report on Form 10-K:

- "2021 Notes" means the $125.0 million aggregate principal amount 2.00% Convertible Senior Notes due 2021, issued by Evolent Health, Inc. in December 2016;
- "ACA" means the Patient Protection and Affordable Care Act;
- "accountable care organizations," or "ACOs," means organizations of groups of doctors, hospitals and other health care providers which have come together voluntarily to provide coordinated care to their Medicare patients;
- "Aldera" means Aldera Holdings, Inc.;
- "ASU" means Accounting Standards Update;
- "capitated arrangements" means health care payment arrangements whereby providers are paid a fixed amount of money per patient during a given period of time rather than on a per-service or per-procedure basis;
- "CMS" means the Centers for Medicare and Medicaid Services;
- "DGCL" means General Corporation Law of the State of Delaware;
- "EMR" means electronic medical records;
- "Evolent Health Holdings" means Evolent Health Holdings, Inc., the predecessor to Evolent Health, Inc.;
- "Exchange Act" means the Securities Exchange Act of 1934, as amended;
- "FASB" means the Financial Accounting Standards Board;
- "FFS" means fee-for-service;
- "founders" means the Advisory Board Company ("The Advisory Board"), and the University of Pittsburgh Medical Center ("UPMC");
- "FTC" means the United States Federal Trade Commission;
- "GAAP" means United States of America generally accepted accounting principles;
- "GPAC" means Georgia Physicians for Accountable Care, LLC;
- "health insurance exchanges" means organizations that provide a marketplace for individuals to purchase standardized and government regulated health insurance policies;
- "HIPAA" means The Health Insurance Portability and Accountability Act;
- "HITECH Act" means The Health Information Technology for Economic and Clinical Health Act;
- "Indenture" means the indenture between Evolent Health, Inc. and U.S. Bank National Association, as trustee, related to the 2.00% convertible senior notes due 2021, dated as of December 5, 2016;
- "IPO" means our initial public offering as described in "Part II - Item 8. Financial Statements and Supplementary Data - Note 1;"
- "NOL" means net operating loss;
- "Note" means notes to consolidated financial statements presented in "Part II - Item 8. Financial Statements and Supplementary Data;"
- "Offering Reorganization" means the reorganization undertaken in 2015 prior to our IPO. See "Part II - Item 8. Financial Statements and Supplementary Data - Note 4" for further details of the Offering Reorganization;
- "partners" means our customers, unless we indicate otherwise or the context otherwise implies;
- "Passport" means University Health Care, Inc. d./b/a/ Passport Health Plan

i

- "pharmacy benefit management," or "PBM," means the administration of prescription drug programs, including developing and maintaining a list of medications that are approved to be prescribed, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers and processing prescription drug claim payments;
- "PMPM" means per member per month;
- "population health" means an approach to health care that seeks to improve the health of an entire human population;
- "Private Placement" means Evolent Health, Inc's offering of the $125.0 million aggregate principal amount 2.00% Convertible Senior Notes due 2021, to qualified institutional buyers within the meaning of Rule 144A under the Securities Act of 1933, as amended;
- "RSUs" means restricted stock units;
- "SEC" means the Securities and Exchange Commission;
- "Securities Act" means the Securities Act of 1933, as amended;
- "Series B Reorganization" means our reorganization undertaken in 2013 in connection with a round of equity financing. See "Part II - Item 8. Financial Statements and Supplementary Data - Note 4" for further details of the Series B Reorganization;
- "third party administration," or "TPA," means the processing of insurance claims or the administration of certain aspects of employee benefit plans for a separate entity;
- "TPG" means TPG Global, LLC and its affiliates including one or both of TPG Growth II BDH, LP and TPG Eagle Holdings, L.P.;
- "TRA" means the Income Tax Receivables Agreement. See "Part II - Item 8. Financial Statements and Supplementary Data - Note 11" for further details of the Tax Receivables Agreement;
- "UR" means utilization review;
- "Valence Health" means Valence Health, Inc., excluding Cicerone Health Solutions, Inc.;
- "value-based care" means a health care management strategy that is focused on high-quality and cost-effective care with the goals of promoting a healthy lifestyle, enhancing the patient experience and reducing preventable hospital admissions and emergency visits; and
- "Vestica" means Vestica Healthcare, LLC.

## FORWARD-LOOKING STATEMENTS - CAUTIONARY LANGUAGE

Certain statements made in this report and in other written or oral statements made by us or on our behalf are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). A forward-looking statement is a statement that is not a historical fact and, without limitation, includes any statement that may predict, forecast, indicate or imply future results, performance or achievements, and may contain words like: "believe," "anticipate," "expect," "estimate," "aim," "predict," "potential," "continue," "plan," "project," "will," "should," "shall," "may," "might" and other words or phrases with similar meaning in connection with a discussion of future operating or financial performance. In particular, these include statements relating to future actions, trends in our businesses, prospective services, future performance or financial results and the outcome of contingencies, such as legal proceedings. We claim the protection afforded by the safe harbor for forward-looking statements provided by the PSLRA.

These statements are only predictions based on our current expectations and projections about future events. Forward-looking statements involve risks and uncertainties that may cause actual results, level of activity, performance or achievements to differ materially from the results contained in the forward-looking statements. Risks and uncertainties that may cause actual results to vary materially, some of which are described within the forward-looking statements, include, among others:

- the structural change in the market for health care in the United States;
- uncertainty in the health care regulatory framework;
- the uncertain impact the 2016 presidential and congressional elections may have on health care laws and regulations;
- our ability to effectively manage our growth;
- the significant portion of revenue we derive from our largest partners;
- our ability to offer new and innovative products and services;
- risks related to completed and future acquisitions, investments and alliances, including the recently completed acquisitions of Valence Health and Aldera, which may be difficult to integrate, divert management resources, result in unanticipated costs or dilute our stockholders;
- certain risks and uncertainties associated with the acquisition of Valence Health, including revenues of Valence Health before and after the merger may be less than expected, the timing and extent of new lives expected to come onto the platform may not occur as expected and the expected results of Evolent may not be impacted as anticipated;
- the growth and success of our partners, which is difficult to predict and is subject to factors outside of our control, including premium pricing reductions and the ability to control and, if necessary, reduce health care costs;
- our ability to attract new partners;
- our ability to recover the significant upfront costs in our partner relationships;
- our ability to estimate the size of our target market;
- our ability to maintain and enhance our reputation and brand recognition;
- consolidation in the health care industry;

- competition which could limit our ability to maintain or expand market share within our industry;
- our ability to partner with providers due to exclusivity provisions in our contracts;
- restrictions and penalties as a result of privacy and data protection laws;
- adequate protection of our intellectual property, including trademarks;
- any alleged infringement, misappropriation or violation of third-party proprietary rights;
- our use of "open source" software;
- our ability to protect the confidentiality of our trade secrets, know-how and other proprietary information;
- our reliance on third parties and licensed technologies;
- our ability to use, disclose, de-identify or license data and to integrate third-party technologies;
- data loss or corruption due to failures or errors in our systems and service disruptions at our data centers;
- online security risks and breaches or failures of our security measures;
- our reliance on Internet infrastructure, bandwidth providers, data center providers, other third parties and our own systems for providing services to our users;
- our reliance on third-party vendors to host and maintain our technology platform;
- our dependency on our key personnel, and our ability to attract, hire, integrate and retain key personnel;
- the risk of potential future goodwill impairment on our results of operations;
- our indebtedness and our ability to obtain additional financing;
- our ability to achieve profitability in the future;
- the requirements of being a public company;
- our adjusted results may not be representative of our future performance;
- the risk of potential future litigation;
- our holding company structure and dependence on distributions from Evolent Health LLC;
- our obligations to make payments to certain of our pre-IPO investors for certain tax benefits we may claim in the future;
- our ability to utilize benefits under the tax receivables agreement described herein;
- our ability to realize all or a portion of the tax benefits that we currently expect to result from past and future exchanges of Class B common units of Evolent Health LLC for our Class A common stock, and to utilize certain tax attributes of Evolent Health Holdings and an affiliate of TPG;
- distributions that Evolent Health LLC will be required to make to us and to the other members of Evolent Health LLC;
- our obligations to make payments under the tax receivables agreement that may be accelerated or may exceed the tax benefits we realize;
- different interests among our pre-IPO investors, or between us and our pre-IPO investors;
- the terms of agreements between us and certain of our pre-IPO investors;
- the potential volatility of our Class A common stock price;
- the potential decline of our Class A common stock price if a substantial number of shares become available for sale or if a large number of Class B common units are exchanged for shares of Class A common stock;
- provisions in our amended and restated certificate of incorporation and amended and restated by-laws and provisions of Delaware law that discourage or prevent strategic transactions, including a takeover of us;
- the ability of certain of our investors to compete with us without restrictions;
- provisions in our certificate of incorporation which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees;
- our intention not to pay cash dividends on our Class A common stock;
- our ability to remediate the material weakness in our internal control over financial reporting;
- our status as an "emerging growth company"; and
- our lack of public company operating experience.

The risks included here are not exhaustive. Although we believe the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, level of activity, performance or achievements. More information on potential factors that could affect our business and financial performance is included in "Forward Looking Statements - Cautionary Language," "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" or similarly captioned sections of this Annual Report and the other period and current filings we make from time to time with the SEC. Moreover, we operate in a rapidly changing and competitive environment. New risk factors emerge from time to time, and it is not possible for management to predict all such risk factors.

Further, it is not possible to assess the effect of all risk factors on our businesses or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Given these risks and uncertainties, investors should not place undue reliance on forward-looking statements as a prediction of actual results. In addition, we disclaim any obligation to update any forward-looking statements to reflect events or circumstances that occur after the date of this report.

iii

**Market Data and Industry Forecasts and Projections**

We use market data and industry forecasts and projections throughout this Annual Report on Form 10-K, and in particular in "Part I - Item 1. Business." We have obtained the market data from certain publicly available sources of information, including publicly available independent industry publications and other third-party sources. Unless otherwise indicated, statements in this Annual Report on Form 10-K concerning our industry and the markets in which we operate, including our general expectations and competitive position, business opportunity and market size, growth and share, are based on information from independent industry organizations and other third-party sources (including industry publications, surveys and forecasts), data from our internal research and management estimates. Forecasts are based on industry surveys and the preparer's expertise in the industry and there is no assurance that any of the forecasted amounts will be achieved. We believe the data that third parties have compiled is reliable, but we have not independently verified the accuracy of this information (other than information provided by our affiliates). Any forecasts are based on data (including third-party data), models and experience of various professionals and are based on various assumptions, all of which are subject to change without notice. While we are not aware of any misstatements regarding the industry data presented herein, forecasts, assumptions, expectations, beliefs, estimates and projections involve risks and uncertainties and are subject to change based on various factors, including those described under the heading "Forward-Looking Statements - Cautionary Language" and in "Part I - Item IA. Risk Factors."

iv

for the sharing of data across multiple payers and care delivery integration regardless of payer, which we believe is not possible with payer led solutions.

*Partnership-Driven Business Model*

Our business model is predicated on long-term strategic partnerships with leading providers that are attempting to evolve two of their most critical business functions: how they deliver care and how they are compensated for it. The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, long-term contractual relationships and a cycle of clinical and cost improvement with shared financial benefit. We devote significant resources, primarily in the form of business development, to establish relationships with our partners. For 2016, our business development expenses represented 6.4% of our total revenues. Thereafter, beginning with the Blueprint phase of our engagement with a partner, our costs to serve our partners primarily consist of personnel-related costs for the deployment of our solution. We expect our business development expenses as a percentage of revenue to decline over time. As of December 31, 2016, our average contractual relationship with our long-term partners was approximately five years, with an average of 2.3 years of performance remaining per contract. As of December 31, 2016, we had entered into long-term contractual relationships with over 25 partners and a significant portion of our revenue is concentrated with several partners. Our three largest partners in 2016, Passport Health Plan, Indiana University Health Plan and MedStar Health, Inc., comprised 19.6%, 14.5% and 12.7%, respectively, of our revenue for 2016, or 46.8% in the aggregate. See "Part II - Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Business Overview" for additional discussion about our largest partners.

*Channel Development*

Our heritage, having been founded by UPMC, one of the largest providers in the country, and The Advisory Board with over 4,400 hospital and provider members as of December 2016, along with the relationships fostered by our senior management team, have allowed us to develop a significant channel into leading health systems. Our solution empowers a fundamental shift in a provider's business model and requires alignment of their senior management and board of directors for success. A significant portion of providers that make an investment in a Blueprint continue to partner with us for our proprietary process and integrated services, which we refer to as our Value-Based Operations.

Our business model creates additional channel development through our Blueprint services. Our Blueprint not only enables providers with a roadmap to value-based care and the financial implications of the transition, it also creates a connection between us and the provider's senior leadership. As a result, we derive revenues from providers who have completed the Blueprint phase and proceed to partner with us to enable their transition to value-based contracting.

*Proven Leadership Team*

We have made a significant investment in building an industry-leading management team. Our senior leadership team has extensive experience in the health care industry and a track record of delivering measurable clinical, financial and operational improvement for health care providers and payers. Our chief executive officer, Frank Williams, was formerly the chief executive officer of The Advisory Board, where he oversaw the growth of the company and its IPO.

**Growth Opportunities**

*Multiple Avenues for Growth with Our Existing, Embedded Partner Base*

We have established a multi-year partnership model with multiple drivers of embedded growth through the following avenues:

- growth in lives in existing covered populations;
- partners expanding into new lines of value-based care to capture growth in new profit pools; and
- partners utilizing our additional capabilities, such as new Identifi® applications, PBM and TPA services.

In addition to growth within our existing partner base, opportunities exist with providers utilizing our Blueprint, who sign short-term contracts under which we analyze the opportunities available to them in the value-based care market. From time to time, we also evaluate and consider pursuing opportunities to expand into businesses related to the services we currently provide.

*Early Stages of a Rapidly Growing Transformational Addressable Market*

We believe that our existing partners represent a small fraction of health systems that could benefit from our solutions. The transformation of the care delivery and payment model in the United States has been rapid, but it is still in the early stages. While approximately 10% of health care payments were paid through value-based care programs as of June 2014, it is estimated that this number will grow to over 50% by 2020.

8

*Capitalize on Growth in Select Government-Driven Programs*

Significant growth is projected in the number of people managed by government-driven programs in the United States over the next 8 years. Specifically, the CMS projects the number of Medicare beneficiaries to grow to approximately 63 million by 2020 from approximately 56 million at the end of 2016. We expect health systems to be direct beneficiaries of growth in Medicare Advantage and Medicaid Managed Care because those specific markets are well suited for value-based care. We believe that the growth in government programs will create an opportunity for health systems to capture a greater portion of the over two trillion dollars in annual health insurance expenditures. The nature of our variable fee economic model enables us to benefit from this growth in government-managed lives. A significant portion of our revenues are attributable to government-driven programs, primarily comprised of Medicaid and, to a less significant extent, Medicare. This dynamic represents a change from prior periods and results in part from our acquisition of Valence Health as well as our strategic alliance with Passport.

*Ability to Capture Additional Value Through Delivering Clinical Results*

We are capturing only a portion of the administrative dollars in the market through our current solution, which represent over 10% of total premium dollars. We believe there is a significant opportunity to capture a portion of the medical dollar over time - namely the remainder of the premium dollar which goes to medical expenses. As our health system partners continue to own a larger percentage of overall premiums, we have begun to pursue business models that allow us to participate in the medical savings through shared savings agreements that align incentives to reduce costs and improve quality outcomes.

*Expand Platform Offerings to Meet Evolving Market Needs*

There are multiple business offerings that health systems may require to operate in a value-based care environment that we do not currently provide, including but not limited to:

• PBM expansion to include additional specialty pharmacy management capabilities;
• Health savings account administration;
• On-site or specialty clinic platforms; and
• Consumer engagement and digital outreach.

*Selectively Pursue Strategic Acquisitions*

We believe that the nature of our competitive landscape provides meaningful acquisition opportunities. Our industry is in the early stages of its life cycle and there are multiple firms attempting to capitalize on the transformation of the care delivery model and the various forms of new profit pools. We believe that providers will require an end-to-end solution and we believe we are well positioned to meet this demand by expanding the breadth of our offerings through not only organic growth, but also the acquisition of niche providers and non-core portions of larger enterprises. From time to time we may also pursue acquisition opportunities of businesses related to services we currently provide. As an example of executing on our strategy, in February 2016 we entered into a strategic alliance with a leading nonprofit community-based and provider-sponsored health plan administering Kentucky Medicaid and federal Medicare Advantage benefits. This alliance created the Medicaid Center of Excellence, which offers centralized services for provider-led Medicaid health plans. In addition, in the fourth quarter of 2016 we completed the acquisitions of Valence Health and Aldera, expanding our capabilities and expertise in the Medicaid and pediatric markets, as well as the provision of certain third party administration services.

**Sales and Marketing**

We market and sell our services to providers throughout the United States. Our dedicated sales team targets provider opportunities for our platform solutions. Our sales team works closely with our leadership team and subject matter experts to foster long-term relationships with our provider partner's leadership and board of directors given the long-term nature of our partnerships. Our dedicated business development team works closely with our partners to identify additional service opportunities that can be offered from our platform on a continuous basis.

**Partner Relationships**

Our business model is predicated on long-term strategic partnerships with leading providers that are attempting to evolve two of their most critical business functions: how they deliver care and how they are compensated for it. The partnership model enables cultural alignment, integration into the provider care delivery and payment work flow, long-term contractual relationships and a cycle of clinical and cost improvement with shared financial benefit.

We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care. By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective care setting to payers, employers and consumers, which enables them to capture greater market

9

share. As providers have succeeded in lowering costs and growing market share, this enables them to increase their value-based offerings. By virtue of our business model, we benefit from our partners' growth.

As of December 31, 2016, we had long-term contractual relationships with over 25 partners. As of December 31, 2016, our average contractual relationship with our long-term partners was approximately five years, with an average of 2.3 years of performance remaining per contract. The contracts governing the relationships with our partners include key terms that define the period of performance, revenue rates, advanced billing terms, service level agreements, termination clauses, exclusivity clauses and right of first refusal clauses.

Typically, the terms of these contracts provide for a monthly payment that is calculated based on a specified rate multiplied by the number of members that our partners are managing under a value-based care arrangement. The specified rate varies depending on which market-facing solutions the partner has adopted and the number of services and technology applications they are utilizing. Typically, the terms of these contracts allow for advance billing of our partners. In some of our contracts, a defined portion of the revenue is at risk and can be refunded to the partner if certain service levels are not attained. We monitor our compliance with the service levels to determine whether a refund will be provided and record an estimate of these refunds.

Although the revenue from our long-term contracts is not guaranteed because certain of our contracts are terminable for convenience by our partners after a notice period has passed, certain partners would be required to pay us a termination fee in certain circumstances. Termination fees and the related notice period in certain of our contracts are determined based on the scope of the market-facing solutions that the partner has adopted and the duration of the contract. Most of our contracts include cure periods for certain breaches, during which time we may attempt to resolve any issues that would trigger a partner's ability to terminate the contract. However, certain of our contracts are also terminable immediately on the occurrence of certain events. For example, some of our contracts may be terminated by the partner if we fail to achieve target performance metrics over a specified period. Certain of our contracts may be terminated by the partner immediately following repeated failures by us to provide specified levels of service over periods ranging from six months to more than a year. Certain of our contracts may be terminated immediately by the partner if we lose applicable licenses, go bankrupt, lose our liability insurance, become insolvent, file for bankruptcy or receive an exclusion, suspension or debarment from state or federal government authorities. The loss, termination or renegotiation of any contract could negatively impact our results.

The contracts often contain exclusivity or other restrictive provisions, which may limit our ability to partner with or provide services to other providers or purchase services from other vendors within certain time periods and in certain geographic areas. The exclusivity and other restrictive provisions are negotiated on an individual basis and vary depending on many factors, including the term and scope of the contract. The time limit on these exclusivity and other restrictive provisions typically corresponds to the term of the contract. These exclusivity or other restrictive provisions often apply to specific competitors of our health system partners or specific geographic areas within a particular state or an entire state, subject to certain exceptions, including, for example, exceptions for employer plan entities that have operations in the restricted geographic areas but that are headquartered elsewhere. Accordingly, these exclusivity clauses may prevent us from entering into long-term relationships with certain potential partners.

The contracts with our partners impose other obligations on us. For example, we typically agree that all services provided under the partner contract and all employees providing such services will comply with our partner's policies and procedures. In addition, in most instances, we have agreed to indemnify our partners against certain third-party claims, which may include claims that our services infringe the intellectual property rights of such third parties.

### Competition

The market for our products and services is fragmented, competitive and characterized by rapidly evolving technology standards, customer needs and the frequent introduction of new products and services. Our competitors range from smaller niche companies to large, well-financed and technologically-sophisticated entities.

We compete on the basis of several factors, including breadth, depth and quality of product and service offerings, ability to deliver clinical, financial and operational performance improvement through the use of products and services, quality and reliability of services, ease of use and convenience, brand recognition and the ability to integrate services with existing technology. We also compete on the basis of price.

### Health Care Laws and Regulations

Our business is subject to extensive, complex and rapidly changing federal and state laws and regulations. Various federal and state agencies have discretion to issue regulations and interpret and enforce health care laws. While we believe we comply in all material respects with applicable health care laws and regulations, these regulations can vary significantly from jurisdiction to jurisdiction, and interpretation of existing laws and regulations may change periodically. Federal and state legislatures also may enact various legislative proposals that could materially impact certain aspects of our business. The following are summaries of key federal and state laws and regulations that impact our operations:

10

*Health Care Reform*

In March 2010, the ACA and the Health Care and Education Reconciliation Act of 2010, which we refer to, collectively, as health care reform, was signed into law. Health care reform contains provisions that have changed and will continue to change the health insurance industry in substantial ways. For example, health care reform includes a mandate requiring individuals to be insured or face tax penalties; a mandate that employers with over 50 employees offer their employees group health insurance coverage or face tax penalties; prohibitions against insurance companies that offer Individual Major Medical plans using pre-existing health conditions as a reason to deny an application for health insurance; medical loss ratio requirements that require each health insurance carrier to spend a certain percentage of their premium revenue on reimbursement for clinical services and activities that improve health care quality; establishment of health insurance exchanges to facilitate access to, and the purchase of, health insurance; and subsidies and cost-sharing credits to make health insurance more affordable for those below certain income levels.

Health care reform amended various provisions in many federal laws, including the Code, the Employee Retirement Income Security Act of 1974 and the Public Health Services Act. Health care reform is being implemented by the Department of Health and Human Services, the Department of Labor and the Department of Treasury. Most of the ACA regulations became effective on January 1, 2014.

Following the 2016 presidential and congressional elections, it is likely that legislation repealing or defunding the ACA (in whole or in part), amending the ACA, amending and replacing the ACA or otherwise altering the regulatory landscape with respect to the ACA and other healthcare laws will be introduced and passed by Congress and signed into law by President Trump, consistent with statements made by President Trump and by members of Congress in recent years. Because of the continued uncertainty about the implementation of the ACA, including the timing of and potential for further legal challenges or repeal or amendment of that legislation, we cannot quantify or predict with any certainty the likely impact of the ACA or its repeal or replacement on our business, financial condition, operating results and prospects. In addition, Congress, state legislatures and third-party payors may continue to review and assess alternative health care delivery and payment systems and may in the future propose and adopt legislation or policy changes or implementations effecting additional fundamental changes in the health care delivery system, including with respect to Medicare and Medicaid programs. We cannot assure you as to the ultimate content, timing, or effect of any changes, nor is it possible at this time to estimate the impact of any such potential legislation or changes. Health care reform has resulted in profound changes to the individual health insurance market and our business, and we expect these changes to continue.

*Stark Law*

We are subject to federal and state "self-referral" laws. The Stark Law is a federal statute that prohibits physicians from referring patients for items covered by Medicare or Medicaid to entities with which the physician has a financial relationship, unless that relationship falls within a specified exception. The Stark Law is a strict liability statute and is violated even if the parties did not have an improper intent to induce physician referrals. The Stark Law is relevant to our business because we frequently organize arrangements of various kinds under which (a) physicians and hospitals jointly invest in and own ACOs, clinically integrated networks and other entities that engage in value-based contracting with third-party payers or (b) physicians are paid by hospitals or hospital affiliates for care management, medical or other services related to value-based contracts. We evaluate when these investment and compensation arrangements create financial relationships under the Stark Law and design structures that satisfy exceptions under the Stark Law or Medicare Shared Savings Program waiver.

*Anti-kickback Laws*

In the United States, there are federal and state anti-kickback laws that generally prohibit the payment or receipt of kickbacks, bribes or other remuneration in exchange for the referral of patients or other health-related business. The United States federal health care programs' Anti-Kickback Statute makes it unlawful for individuals or entities knowingly and willfully to solicit, offer, receive or pay any kickback, bribe or other remuneration, directly or indirectly, in exchange for or to induce the referral of an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program or the purchase, lease or order, or arranging for or recommending purchasing, leasing or ordering, any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program. Penalties for violations include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from federal health care programs. The Anti-Kickback Statute raises similar compliance issues as the Stark Law. While there are safe harbors under the Anti-Kickback Statute, they differ from the Stark Law exceptions in that compliance with a safe harbor is not mandatory. If an arrangement falls outside the safe harbors, it must be evaluated on its specific facts to assess whether regulatory authorities might take the position that one purpose of the arrangement is to induce referrals of federal health care program business. Our business arrangements implicate the Anti-Kickback Statute for the same reasons they raise Stark Law issues. We evaluate whether investment and compensation arrangements being developed by us on behalf of hospital partners fall within one of the safe harbors or Medicare Shared Savings Program waiver. If not, we consider the factors that regulatory authorities are likely to consider in attempting to identify the intent behind such arrangements. We also design business models that reduce the risk that any such arrangements might be viewed as abusive and trigger Anti-Kickback Statute claims.

*Antitrust Laws*

The antitrust laws are designed to prevent competitors from jointly fixing prices. However, competitors often work collaboratively in order to reduce the cost of health care and improve quality. To balance these competing goals, antitrust enforcement agencies have established a regulatory framework under which claims of per se price fixing can be avoided if a network of competitors (such as an ACO or clinically integrated network) is financially or clinically integrated. In this context, we evaluate the tests for financial and clinical integration that would be applied to the provider networks that we are helping to create and support, including the nature and extent of any financial risk that must be assumed to be deemed financially integrated and the types of programs that must be implemented to achieve clinical integration. However, even if a network is integrated, it is still subject to a "rule of reason" test to determine whether its activities are, on balance, pro-competitive. The key factors in the rule of reason analysis are market share and exclusivity. We focus on network size, composition and contracting policies to strengthen our partners' position that their networks meet the rule of reason test.

*Federal Civil False Claims Act and State False Claims Laws*

The federal civil False Claims Act imposes liability on any person or entity who, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal health care program. The "qui tam" or "whistleblower" provisions of the False Claims Act allow a private individual to bring actions on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and to share in any monetary recovery. Our activities relating to the manner in which we sell and market our services, including our provider-led risk adjustment solution, may be subject to scrutiny under these laws.

*HIPAA, Privacy and Data Security Regulations*

By processing data on behalf of our partners, we are subject to specific compliance obligations under privacy and data security-related laws, including HIPAA, the HITECH Act and related state laws. We are also subject to federal and state security breach notification laws, as well as state laws regulating the processing of protected personal information, including laws governing the collection, use and disclosure of social security numbers and related identifiers.

The regulations that implement HIPAA and the HITECH Act establish uniform standards governing the conduct of certain electronic health care transactions and protecting the security and privacy of individually identifiable health information maintained or transmitted by health care providers, health plans and health care clearinghouses, all of which are referred to as "covered entities," and their "business associates" (which includes anyone who performs a service on behalf of a covered entity involving the use or disclosure of protected health information and is not a member of the covered entity's workforce). Our partners' health plans generally will be covered entities, and, as their business associate, they may ask us to contractually comply with certain aspects of these standards by entering into requisite business associate agreements.

*HIPAA Health Care Fraud Standards*

The HIPAA health care fraud statute created a class of federal crimes, including health care fraud and false statements relating to health care matters, known as the "federal health care offenses." The HIPAA health care fraud statute prohibits, among other things, executing a scheme to defraud any health care benefit program, while the HIPAA false statements statute prohibits, among other things, concealing a material fact or making a materially false statement in connection with the payment for health care benefits, items or services. Entities that are found to have aided or abetted in a violation of the HIPAA federal health care offenses are deemed by statute to have committed the offense and are punishable as a principal.

*Medicare and Medicaid*

Medicare is a federal program that provides hospital and medical insurance benefits to persons age 65 and over, as well as certain other individuals. Medicaid programs are jointly funded by federal and state governments and are administered by states under an approved plan that provides hospital and other health care benefits to qualifying individuals. As we increase our exposure to Medicare and Medicaid businesses through new and existing partners, including through our strategic alliance with Passport as well as our acquisition of Valence Health, we increase our exposure to changes in government policy with respect to and regulation of the Medicaid and Medicare programs in which we and our partners participate. We are subject to regulation by both CMS and state agencies in respect of certain services we provide relating to Medicaid and Medicare programs.

Because some of our partners are participants in governmental programs, our services have in the past and may again in the future be subject to periodic surveys and audits by governmental entities or contractors for compliance with Medicare and other standards and requirements. As a result of surveys or audits, CMS may seek premium and other refunds, prohibit us from continuing to market or enroll members in plans, exclude us from participating in one or more programs or institute other sanctions against us if we fail to comply with CMS regulations or Medicare contractual requirements.

12

The regulations and requirements applicable to us and other participants in Medicaid and Medicare programs are complex and subject to change. Following the 2016 presidential and congressional elections, Congress and state legislatures may propose and adopt legislation or policy changes or implementations effecting additional fundamental changes with respect to Medicare and Medicaid programs. Such changes in the law, or new interpretations of existing laws, may have a significant impact on our methods and costs of doing business. Additionally, expansion of enforcement activity could adversely affect our business and financial condition. Going forward, we expect CMS and Congress to continue to closely scrutinize each component of the Medicare program as well as modify the terms and requirements of the program. It is not possible to predict the outcome of this Congressional or regulatory activity, either of which could adversely affect us. Similarly, we cannot predict whether pending or future federal or state legislation or court proceedings will change various aspects of the Medicaid and Medicare programs, nor can we predict the impact those changes will have on our business operations or financial results, but the effects could be materially adverse.

*Consumer Protection Laws*

Federal and state consumer protection laws are being applied increasingly by the FTC, Federal Communications Commission and states' attorneys general to regulate the collection, use, storage and disclosure of personal or patient information, through websites or otherwise, and to regulate the presentation of website content and to regulate direct marketing, including telemarketing and telephonic communication. Courts may also adopt the standards for fair information practices promulgated by the FTC, which concern consumer notice, choice, security and access.

*State Privacy Laws*

In addition to federal regulations issued under HIPAA, some states have enacted privacy and security statutes or regulations, which we refer to as state privacy laws, that govern the use and disclosure of a person's medical information or records and, in some cases, are more stringent than those issued under HIPAA. These state privacy laws include regulation of health insurance providers and agents, regulation of organizations that perform certain administrative functions, such as UR, or TPA, issuance of notices of privacy practices and reporting and providing access to law enforcement authorities. In those cases, it may be necessary to modify our operations and procedures to comply with these more stringent state privacy laws. If we fail to comply with applicable state privacy laws, we could be subject to additional sanctions.

*Other State Laws*

State insurance laws require licenses for certain health plan administrative activities, including TPA licenses for the processing, handling and adjudication of health insurance claims and UR agent licenses for providing medical management services. Given the nature and scope of services that we provide to certain partners, we are required to maintain TPA and UR agent licenses and ensure that such licenses are in good standing on an annual basis. In addition, laws in many states govern prompt payment obligations for health care services. These laws generally define claims payment processes and set specific time frames for submission, payment, and appeal steps. Failure to meet these requirements and time frames may result in rejection, delay of claims and possible interest and regulatory penalties. The Company has also established a captive insurance company under the laws of the State of Vermont and is subject to the captive insurance laws of that state.

**Employees**

As of December 31, 2016, we had approximately 2,400 employees. None of our employees are represented by a labor union, and we are not a party to any collective bargaining agreements. We consider our employee relations to be good.

**Intellectual Property**

Our continued growth and success depends, in part, on our ability to protect our intellectual property and proprietary technology, including the Identifi® software platform. We primarily protect our intellectual property through a combination of copyrights, trademarks and trade secrets, intellectual property licenses and other contractual rights (including confidentiality, non-disclosure and assignment-of-invention agreements with our with employees, independent contractors, consultants and companies with which we conduct business).

However, these intellectual property rights and procedures may not prevent others from creating a competitive online platform or otherwise competing with us. We may be unable to obtain, maintain and enforce the intellectual property rights on which our business depends, and assertions by third parties that we violate their intellectual property rights could have a material adverse effect on our business, financial condition and results of operations. For additional information related to our intellectual property position see "Part I - Item 1A. Risk Factors - Risks relating to our business and industry."

13

**Research and Development**

Our research and development expenditures primarily consist of our strategic investment in enhancing the functionality and usability of our software, Identifi® and developing programs and processes to maximize care delivery efficiency and effectiveness. We also capitalize software development costs related to Identifi®. Our research and development expenditures and capitalized software development costs also include the suite of products developed by Valence and Aldera, respectively.

We expensed $11.1 million, $5.8 million and zero in research and development costs for the years ended December 31, 2016, 2015 and 2014, respectively. We capitalized $15.0 million, $6.4 million and zero of software development costs for the years ended December 31, 2016, 2015 and 2014, respectively.

**Available Information**

We file annual, quarterly and current reports, proxy statements and other documents with the SEC under the Exchange Act. The public may read and copy any materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Also, the SEC maintains a website that contains reports, proxy and information statements and other information regarding issuers, including Evolent, that file electronically with the SEC. The public can obtain any documents that we file with the SEC at www.sec.gov.

We also make available, free of charge, on or through our website, ir.evolenthealth.com, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Except as specifically indicated otherwise, the information available on our website and the SEC's website is not and shall not be deemed a part of this Annual Report on Form 10-K.

**Executive Officers of the Registrant**

Our executive officers as of March 2, 2017, were as follows:

| Name | Age [1] | Position |
|---|---|---|
| Frank Williams | 50 | Chief Executive Officer and Director |
| Seth Blackley | 38 | President |
| Nicholas McGrane | 48 | Chief Financial Officer |
| Tom Peterson | 46 | Chief Operating Officer |
| Jonathan Weinberg | 49 | General Counsel |
| Steve Wigginton | 50 | Chief Executive Officer - Valence Health |
| Lydia Stone | 41 | Principal Accounting Officer and Corporate Controller |

[1] Age shown is as of March 2, 2017.

*Frank Williams* is the Chief Executive Officer, co-founder and member of the Board of Directors of Evolent. Prior to Evolent, he served as the Chief Executive Officer of The Advisory Board from June 2001 to September 2008, and as its Chairman from September 2008 to August 2011. Previously, Mr. Williams also served as President of MedAmerica OnCall, President of Vivra Orthopedics and as a management consultant for Bain & Co. He currently serves on the boards of Peer Health Exchange and Head-Royce School. Mr. Williams holds a bachelor of arts with high honors in political economies of industrial societies from the University of California, Berkeley, and a master of business administration from Harvard Business School.

*Seth Blackley* has served as our President since August 2011. Prior to co-founding the company, Mr. Blackley was the Executive Director of Corporate Development and Strategic Planning at The Advisory Board from May 2004 to August 2011. Mr. Blackley began his career as an analyst in the Washington, D.C. office of McKinsey & Company. Mr. Blackley holds a bachelor of arts degree in business from The University of North Carolina at Chapel Hill, and a master of business administration from Harvard Business School.

*Nicholas McGrane* has served as our Chief Financial Officer since October 2014. Prior to joining Evolent, Mr. McGrane was Managing Director with Riverside Management Group from July 2013 to October 2014. Prior to joining Riverside Management Group, Mr. McGrane was an independent consultant for clients including Evolent Health LLC. He served as Interim Chief Executive Officer and Interim President of Sbarro Inc. from July 2010 to February 2012. Sbarro Inc. was a portfolio company of MidOcean

14

Partners, where Mr. McGrane held various roles, including Managing Director, from 1997 to 2012. Mr. McGrane holds a bachelor of science degree in management from Trinity College Dublin and a master of business administration from Harvard Business School.

*Tom Peterson* has served as our Chief Operating Officer since August 2011. From June 2009 to August 2011, Mr. Peterson was Chief Executive Officer of Inflect Advisors. From November 1999 to 2009, Mr. Peterson held executive roles with The Advisory Board. Prior to The Advisory Board, Mr. Peterson was Vice President of HealthSouth Corporation from January 1996 to November 1999. Mr. Peterson holds a bachelor of arts in government from Harvard University and a masters degree in mental health counseling from George Washington University.

*Jonathan Weinberg* has served as our General Counsel since January 2014. Prior to joining Evolent, Mr. Weinberg was a Senior Vice President and Deputy General Counsel for Coventry Health Care, Inc. from 2002 to 2013, and was in charge of the day-to-day management of the legal department as well as the company's risk management department. Prior to joining Coventry, Mr. Weinberg was an associate and then partner at Epstein Becker and Green, P.C. in the firm's health care practice, specializing in managed care issues from 1992 to 2002. Mr. Weinberg received his bachelor of arts in history and political science from the University of Wisconsin-Madison and his juris doctorate from the Catholic University of America.

*Steve Wigginton* assumed the position of Chief Executive Officer of Valence Health upon consummation of our acquisition of Valence Health in October 2016. Prior to joining the leadership team at Valence Health, Mr. Wigginton had held the position of Chief Development Officer since joining Evolent in 2012. Prior to joining Evolent, Mr. Wigginton served as the founding Chief Executive Officer of Medley Health, a venture-backed technology and services provider for physician practices, from 2010 to 2012. From 2005 to 2010, Mr. Wigginton was the President of Health Integrated, a provider of health management. Prior to Health Integrated, Mr. Wigginton was Executive Vice President of Neoforma from 2000 to 2004. Mr. Wigginton joined Neoforma's executive team after its acquisition of Pharos Technologies-a company he co-founded. Mr. Wigginton holds a bachelor of science in finance from Indiana University and a master in business administration from the Kelley School of Business, Indiana University.

*Lydia Stone* has served as our Controller since May 2013 and Principal Accounting Officer since September 2015. Prior to joining Evolent, Ms. Stone was a Senior Manager at BAE Systems, Inc. from November 2010 to May 2013, and was a manager at Ernst & Young LLP in its Assurance practice from August 2004 to November 2010. Ms. Stone received her master's degree in accounting from the College of William & Mary. Ms. Stone is a Certified Public Accountant in the Commonwealth of Virginia.

**Item 1A. Risk Factors**

**Risk factors**

Our business, operations and financial position are subject to various risks. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Annual Report on Form 10-K, including the audited annual financial statements and notes thereto included elsewhere in this Form 10-K, when evaluating your investment in our securities. The risks and uncertainties described below are those that we currently believe may materially affect the Company. Additional risks and uncertainties of which we are unaware or that we currently deem immaterial also may become important factors that affect the Company. If any of the following risks are realized, our business, financial condition, operating results and prospects could be materially and adversely affected. In that event, the price of our securities could decline, and you could lose part or all of your investment. Some statements in this Form 10-K, including statements in the following risk factors, constitute forward-looking statements. Please refer to "Forward Looking Statements - Cautionary Language."

**Risks relating to our business and industry**

*The market for health care in the United States is in the early stages of structural change and is rapidly evolving, which makes it difficult to forecast demand for our products and services.*

The market for health care in the United States is in the early stages of structural change and is rapidly evolving. Our future financial performance will depend in part on growth in this market and on our ability to adapt to emerging demands of this market. It is difficult to predict with any precision the future growth rate and size of our target market.

The rapidly evolving nature of the market in which we operate, as well as other factors that are beyond our control, reduce our ability to accurately evaluate our long-term outlook and forecast annual performance. We believe demand for our products and services has been driven in large part by price pressure in traditional FFS health care, a regulatory environment that is incentivizing value-based care models, a rapid expansion of retail insurance, broader use of the Internet and advances in technology. Widespread acceptance of the value-based care model is critical to our future growth and success. A reduction in demand for our products and services caused by lack of acceptance, technological challenges, competing offerings or other factors would result in a lower revenue growth rate or decreased revenue, either of which could negatively impact our business and results of operations. In addition, our business, financial condition and results of operations may be adversely affected if health care reform is not implemented in accordance with our expectations or if it is amended in a way that impacts our business and results in our failure to execute our growth strategies.

15

*The health care regulatory and political framework is uncertain and evolving.*

Health care laws and regulations are rapidly evolving and may change significantly in the future, which could adversely affect our financial condition and results of operations. For example, in March 2010, the ACA was adopted, which is a health care reform measure that provides health care insurance for approximately 20 million more Americans. The ACA includes a variety of health care reform provisions and requirements that were expected to become effective at varying times through 2018 and to substantially change the way health care is financed by both governmental and private insurers, which may significantly impact our industry and our business. Following the 2016 presidential and congressional elections, it is likely that legislation repealing or defunding the ACA (in whole or in part), amending the ACA, amending and replacing the ACA or otherwise altering the regulatory landscape with respect to the ACA and other health care laws will be introduced and passed by Congress and signed into law by President Trump, consistent with statements made by President Trump and by members of Congress in recent years. Because of the continued uncertainty about the implementation of the ACA, including the timing of and potential for further legal challenges or repeal or amendment of that legislation, we cannot quantify or predict with any certainty the likely impact of the ACA or its repeal or replacement on our business, financial condition, operating results and prospects.

In addition, Congress, state legislatures and third-party payors may continue to review and assess alternative health care delivery and payment systems and may in the future propose and adopt legislation or policy changes or implementations effecting additional fundamental changes in the health care delivery system, including with respect to Medicare and Medicaid programs. Such changes in the law, or new interpretations of existing laws, may have a significant impact on our methods and costs of doing business. Additionally, expansion of enforcement activity could adversely affect our business and financial condition. Going forward, we expect CMS and Congress to continue to closely scrutinize each component of the Medicare program as well as modify the terms and requirements of the program. It is not possible to predict the outcome of this Congressional or regulatory activity, either of which could adversely affect us. Similarly, we cannot predict whether pending or future federal or state legislation or court proceedings will change various aspects of the the health care delivery system, including Medicaid and Medicare programs, nor can we predict the impact those changes will have on our business operations or financial results, but the effects could be materially adverse.

In addition to these health care laws and regulations, we are subject to various other laws and regulations, including, among others, the Stark Law relating to self-referrals, the whistleblower provisions of the False Claims Act, anti-kickback laws, antitrust laws, the privacy and data protection laws. We have identified instances of noncompliance in the past and cannot guarantee that we will not identify other instances in the future, or the outcome of any regulatory investigation into any non-compliance. See "Part I-Item 1. Business-Health Care Laws and Regulations" for additional information. If we were to become subject to litigation, liabilities or penalties under these or other laws or as part of a governmental review or audit, our business could be adversely affected.

*If we fail to effectively manage our growth, our business and results of operations could be harmed.*

We have expanded our operations significantly since our inception, organically as well as through acquisitions. For example, we grew from six full-time employees at inception to approximately 2,400 employees as of December 31, 2016, and our revenue increased from $25.7 million for 2013 to $254.2 million for 2016 (after the completion of the Valence Health and Aldera acquisitions). If we do not effectively manage our growth as we continue to expand, the quality of our products and services could suffer. Our growth to date has increased the significant demands on our management, our operational and financial systems and infrastructure and other resources. In order to successfully expand our business, we must effectively recruit, integrate and motivate new employees, while maintaining the beneficial aspects of our corporate culture. We may not be able to hire new employees quickly enough to meet our needs. If we fail to effectively manage our hiring needs and successfully integrate our new employees, our efficiency and ability to meet our forecasts and our employee morale, productivity and retention could suffer, and our business and results of operations could be harmed. We must also continue to improve our existing systems for operational and financial management, including our reporting systems, procedures and controls. These improvements could require significant capital expenditures and place increasing demands on our management. We may not be successful in managing or expanding our operations or in maintaining adequate financial and operating systems and controls. If we do not successfully manage these processes, our business and results of operations could be harmed.

*We derive a significant portion of our revenues from our largest partners. The loss, termination or renegotiation of any contract could negatively impact our results.*

Historically, we have relied on a limited number of partners for a substantial portion of our total revenue and accounts receivable. Our three largest partners in 2016, Passport Health Plan, Indiana University Health Plan and MedStar Health, Inc., comprised 19.6%, 14.5% and 12.7%, respectively, of our revenue for 2016, or 46.8% in the aggregate. Our largest partner in terms of accounts receivable in 2016, Cook County Health and Hospitals System, comprised 14.3% of such total amount as of December 31, 2016. The sudden loss of any of our partners, including our strategic alliance partner, University Health Care, Inc., d/b/a Passport Health Plan, as discussed in "Part II - Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Business Overview," or the renegotiation of any of our partner contracts, could adversely affect our operating results. For example, amendments to our contracts with Piedmont WellStar Health Plan and WakeMed Health and Hospitals in 2015 significantly reduced

16

our 2016 expected revenues under those contracts, with minimal revenues expected under the Piedmont Wellstar relationship in subsequent years and reduced revenues expected under the WakeMed contract.

During the fourth quarter of 2015, we agreed to amend the terms of our contract with WakeMed Health and Hospitals and changed our fee structure from a PMPM-based fee to a combination of a fixed-fee and a performance-based fee. The performance-based portion of our fee was tied to Wake Med's participation in the Next Generation ACO Program. In 2016 Wake Med determined not to participate in the calendar year 2016 program; therefore the portion of our fee and the corresponding expenses related to the performance-based arrangement were eliminated from our agreement.

Because we rely on a limited number of partners for a significant portion of our revenues, we depend on the creditworthiness of these partners. Our partners are subject to a number of risks including reductions in payment rates from governmental payers and lack of predictability of financial results when entering new lines of business, such as plans established under the ACA and Aged, Blind and Disabled Medicaid. If the financial condition of our partners declines, our credit risk could increase. Should one or more of our significant partners declare bankruptcy, be declared insolvent or otherwise be restricted by state or federal laws or regulation from continuing in some or all of their operations, this could adversely affect our ongoing revenues, the collectability of our accounts receivable and affect our bad debt reserves and net income.

Although we have long-term contracts with our partners, these contracts may be terminated before their term expires for various reasons, such as changes in the regulatory landscape and poor performance by us, subject to certain conditions. For example, after a specified period, certain of these contracts are terminable for convenience by our partners after a notice period has passed and the partner has paid a termination fee. Certain of our contracts are terminable immediately upon the occurrence of certain events. For example, some of our contracts may be terminated by the partner if we fail to achieve target performance metrics over a specified period. Certain of our contracts may be terminated by the partner immediately following repeated failures by us to provide specified levels of service over periods ranging from six months to more than a year. Certain of our contracts may be terminated immediately by the partner if we lose applicable licenses, go bankrupt, lose our liability insurance or receive an exclusion, suspension or debarment from state or federal government authorities. In addition, one of our contracts may be terminated immediately if we become insolvent or file for bankruptcy. If any of our contracts with our partners is terminated, we may not be able to recover all fees due under the terminated contract, which may adversely affect our operating results. We expect that future long-term contracts will contain similar provisions.

*If we are unable to offer new and innovative products and services or our products and services fail to keep pace with advances in industry standards, technology and our partners' needs, our partners may terminate or fail to renew their relationship with us and our revenue and results of operations may suffer.*

Our success depends on providing high-quality products and services that health care providers use to improve clinical, financial and operational performance. If we cannot adapt to rapidly evolving industry standards, technology and increasingly sophisticated and varied partner needs, our existing technology could become undesirable, obsolete or harm our reputation. We must continue to invest significant resources in our personnel and technology in a timely and cost-effective manner in order to enhance our existing products and services and introduce new high-quality products and services that existing partners and potential new partners will want. Our operating results would also suffer if our innovations are not responsive to the needs of our existing partners or potential new partners, are not appropriately timed with market opportunity, are not effectively brought to market or significantly increase our operating costs. If our new or modified product and service innovations are not responsive to partner preferences, emerging industry standards or regulatory changes, are not appropriately timed with market opportunity or are not effectively brought to market, we may lose existing partners or be unable to obtain new partners and our results of operations may suffer. In addition, should any of our partners terminate their relationship with us after implementation has begun, we would not only lose our time, effort and resources invested in that implementation, but we would also have lost the opportunity to leverage those resources to build a relationship with other partners over that same period of time.

We also engage third-party vendors to develop, maintain and enhance our technology solutions, and our ability to develop and implement new technologies is therefore dependent on our ability to engage suitable vendors. We may also need to license software or technology from third parties in order to maintain, expand or modify our technology platform. However, there is no guarantee we will be able to enter into such agreements on acceptable terms or at all. The functionality of our platform depends, in part, on our ability to integrate it with third-party applications and data management systems that our partners use and from which they obtain data. These third parties may terminate their relationships with us, change the features of their applications and platforms, restrict our access to their applications and platforms or alter the terms governing use of their applications, data management systems and application programming interfaces and access to those applications and platforms in an adverse manner.

*We have made and may make acquisitions, investments and alliances, including the recently completed acquisitions of Valence Health and Aldera, which may be difficult to integrate, divert management resources, result in unanticipated costs or dilute our stockholders.*

Part of our business strategy is to acquire or invest in companies, products or technologies that complement our current products and services, enhance our market coverage or technical capabilities or offer growth opportunities. As an example, in February 2016 we

17

entered into a strategic alliance with a leading nonprofit community-based and provider-sponsored health plan administering Kentucky Medicaid and federal Medicare Advantage benefits. More recently, on October 3, 2016, we completed the acquisition of Valence Health and on November 1, 2016 we completed the acquisition of Aldera.

The recently completed acquisitions of Valence Health and Aldera, as well as future acquisitions, investments and alliances could pose numerous risks to our business which could negatively impact our financial condition and results of operations, including:

- difficulty integrating the purchased operations, products or technologies;
- substantial unanticipated integration costs, delays and challenges that may arise in integration;
- assimilation of the acquired businesses, which may divert significant management attention and financial resources from our other operations and could disrupt our ongoing business;
- the loss of key customers who are in turn subject to risks and financial dislocation in their businesses;
- the loss of key employees, particularly those of the acquired operations;
- difficulty retaining or developing the acquired business' customers;
- adverse effects on our existing business relationships with customers, suppliers, other partners, standing with regulators;
- challenges related to the integration of businesses that operate in new geographic areas and new markets;
- failure to realize the potential cost savings or other financial benefits or the strategic benefits of the acquisitions, including failure to consummate any proposed or contemplated transaction; and
- liabilities, including acquired litigation, and expenses from the acquired businesses for contractual disputes with customers and other third parties, infringement of intellectual property rights, data privacy violations or other claims and failure to obtain indemnification for such liabilities or claims, and distraction of our personnel in connection with any related proceedings.

We may be unable to integrate the operations, products, technologies or personnel gained through the Valence Health or Aldera acquisitions or integrate or complete any other such transaction without a material adverse effect on our business, financial condition and results of operations. Transaction agreements may impose limitations on our ability, or the ability of the business to be acquired, to conduct business. Events outside our control, including operating changes or regulatory changes, could also adversely affect our ability to realize anticipated revenues, synergies, benefits and cost savings. In addition, revenues of acquired businesses or companies including Valence Health, prior to and after consummation of a transaction, may be less than expected. Counterparties in transactions may have contracts with customers and other business partners which may require consents from these parties in connection with a transaction. If these consents cannot be obtained, the Company may suffer a loss of potential future revenue and may lose rights that are material to its business and the business of any combined company. Any such disruptions could limit our ability to achieve the anticipated benefits of the transaction. Any integration may be unpredictable, or subject to delays or changed circumstances, and we and any targets may not perform in accordance with our expectations.

In connection with these acquisitions, investments or alliances, we could incur significant costs, such as the $6.5 million expense associated with lease abandonment incurred as a result of our acquisition of Valence Health, debt, amortization expenses related to intangible assets or large and immediate write-offs or other impairments or charges, assume liabilities or issue stock that would dilute our current stockholders' ownership. For example, as part of the closing consideration for the Valence Health acquisition we issued 7.0 million shares of the Company's Class A common stock. In addition, the market price for our Class A common stock could be affected, following the consummation of the Valence Health acquisition or any other transaction, by factors that have not historically affected the market price for our Class A common stock.

*Our revenues and the growth of our business rely, in part, on the growth and success of our partners and certain revenues from our engagements, which are difficult to predict and are subject to factors outside of our control, including governmental funding reductions and other policy changes.*

We enter into agreements with our partners under which a significant portion of our fees are variable, including fees which are dependent upon the number of members that are covered by our partner's health care plan each month, expansion of our partners and the services that we provide, as well as performance-based metrics. The number of members covered by a partner's health care plan is often impacted by factors outside of our control, such as the actions of our partner or third parties. In addition, ongoing payment of fees by our partners could be negatively impacted by the general financial condition of our partners. Accordingly, revenue under these agreements is unpredictable. If the number of members covered by one or more of our partner's plans were to be reduced by a material amount, such decrease would lead to a decrease in our revenue, which could harm our business, financial condition and results of operations. In addition, growth forecasts of our partners are subject to significant uncertainty and are based on assumptions and estimates that may prove to be inaccurate. Even if the markets in which our partners compete meet the size estimates and growth forecasted, their health plan membership could fail to grow at similar rates, if at all. In addition, a portion of the revenue under certain of our long-term contracts is tied to the customer's continued participation in specified payer programs over which we have no control. If the customer ceases to participate or is disqualified from participation in any such program, this would lead to a decrease in our expected revenue under the relevant contract.

In addition, the transition to value-based care may be challenging for our partners. For example, fully capitated provider risk arrangements have had a history of financial challenges for providers. Our partners may also have difficulty in value-based care if

18

premium pricing is under pressure. Our partners may choose not to continue to capitalize affiliated health plans or subsidize losses to their reimbursement rates. Furthermore, revenue under our partner contracts may differ from our projections because of the termination of the contract for cause or at specified life cycle events, or because of fee reductions that are occasionally given after the contract is initially signed.

Our partners derive a substantial portion of their revenue from third-party private and federal and state governmental payers, including Medicaid programs. Revenue under certain of our agreements could be negatively impacted as a result of governmental funding reductions impacting government-sponsored programs, changes in reimbursement rates, and premium pricing reductions, as well as the inability of our partners to control and, if necessary, reduce health care costs, all of which are out of our control. Because certain of our partners' revenues are highly reliant on third-party payor reimbursement funding rates and mechanisms, overall reductions of rates from such payors could adversely impact the liquidity of our partners, resulting in their inability to make payments to us on agreed payment terms. See "Risk factors-The health care regulatory and political framework is uncertain and evolving" for additional information.

*If we do not continue to attract new partners, we may not achieve our revenue projections, and our results of operations would be harmed.*

In order to grow our business, we must continually attract new partners. Our ability to do so depends in large part on the success of our sales and marketing efforts. Potential partners may seek out other options. Therefore, we must demonstrate that our products and services provide a viable solution for potential partners. If we fail to provide high-quality solutions and convince individual partners of our value proposition, we may not be able to retain existing partners or attract new partners. In addition, there may be a limited-time opportunity to achieve and maintain a significant share of the market for our products and services due in part to the rapidly evolving nature of the health care and technology industries and the substantial resources available to our existing and potential competitors. If the market for our products and services declines or grows more slowly than we expect, or if the number of individual partners that use our solutions declines or fails to increase as we expect, our revenue, results of operations, financial condition, business and prospects could be harmed.

*We typically incur significant upfront costs in our partner relationships, and if we are unable to develop or grow these partner relationships over time, we are unlikely to recover these costs and our operating results may suffer.*

We devote significant resources to establish relationships with our partners and for 2016, our business development expenses represented approximately 6.4% of our total revenues. Some of our partners undertake a significant and prolonged evaluation process, including to determine whether our products and services meet their unique health system needs, which has in the past resulted in extended periods of time to establish a long-term partner relationship. Our efforts involve educating our partners about the use, technical capabilities and benefits of our products and services. Accordingly, our operating results will depend in substantial part on our ability to deliver a successful partner experience and persuade our partners to grow their relationship with us over time. There is no guarantee that we will be able to successfully convert a customer of our transformation services into a partner of our platform and operations services. If we are unable to sell additional products and services to existing partners, enter into and maintain favorable relationships with new partners or sufficiently grow our partners' lives on platform, it could have a material adverse effect on our business, financial condition and results of operations. As we expect to grow rapidly, our customer acquisition costs could outpace our build-up of recurring revenue, and we may be unable to reduce our total operating costs through economies of scale such that we are unable to achieve profitability. In addition, we estimate the costs and timing for completing the transformation phase, including the Blueprint phase, of the partner relationship. These estimates reflect our best judgment. Any increased or unexpected costs or unanticipated delays, including delays caused by factors outside our control, could cause our operating results to suffer.

*If the estimates and assumptions we use to determine the size of our target market are inaccurate, our future growth rate may be impacted and our business would be harmed.*

Market opportunity estimates and growth forecasts are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The estimates and forecasts in this Form 10-K relating to the size and expected growth of the market for our services may prove to be inaccurate. Even if the market in which we compete meets our size estimates and forecasted growth, our business could fail to grow at similar rates, if at all.

The principal assumptions relating to our market opportunity include health insurance expenditures, the total percentage of payments providers receive under value-based contracting, the size of the provider-sponsored health plan market and the fees we believe we can charge. Our market opportunity is also based on the assumption that the strategic approach that our solution enables for our potential partners will be more attractive to our partners than competing solutions. The solution we offer our target market contemplates one strategic option-to pursue clinical and technological integration to reduce utilization and total cost-among several such options our potential partners may pursue to achieve their objectives. Our potential partners may elect to pursue a different strategic option. In addition, our assumptions could be impacted by changes to health care laws and regulations as a result of the 2016 presidential and congressional elections. If these assumptions prove inaccurate, our business, financial condition and results of operations could be

19

adversely affected. For more information regarding our estimates of market opportunity and the forecasts of market growth included in this Form 10-K, see "Part I - Item 1. Business."

*If we are not able to maintain and enhance our reputation and brand recognition, our business and results of operations will be harmed.*

We believe that maintaining and enhancing our reputation and brand recognition is critical to our relationships with existing partners and to our ability to attract new partners. The promotion of our brands may require us to make substantial investments and we anticipate that, as our market becomes increasingly competitive, these marketing initiatives may become increasingly difficult and expensive. Our marketing activities may not be successful or yield increased revenue, and to the extent that these activities yield increased revenue, the increased revenue may not offset the expenses we incur and our results of operations could be harmed. In addition, any factor that diminishes our reputation or that of our management, including failing to meet the expectations of our partners, could make it substantially more difficult for us to attract new partners. Similarly, because our existing partners often act as references for us with prospective new partners, any existing partner that questions the quality of our work or that of our employees could impair our ability to secure additional new partners. Therefore, financial adversity of our partners' affiliated health plans may adversely affect our reputation. If we do not successfully maintain and enhance our reputation and brand recognition, our business may not grow and we could lose our relationships with partners, which would harm our business, results of operations and financial condition.

*Consolidation in the health care industry could have a material adverse effect on our business, financial condition and results of operations.*

Many health care industry participants and payers are consolidating to create larger and more integrated health care delivery systems with greater market power. We expect regulatory and economic conditions to result in additional consolidation in the health care industry in the future. As consolidation accelerates, the economies of scale of our partners' organizations may grow. If a partner experiences sizable growth following consolidation, it may determine that it no longer needs to rely on us and may reduce its demand for our products and services. In addition, as health care providers consolidate to create larger and more integrated health care delivery systems with greater market power, these providers may try to use their market power to negotiate fee reductions for our products and services. Finally, consolidation may also result in the acquisition or future development by our partners of products and services that compete with our products and services. Any of these potential results of consolidation could have a material adverse effect on our business, financial condition and results of operations.

*We may face intense competition, which could limit our ability to maintain or expand market share within our industry, and if we do not maintain or expand our market share our business and operating results will be harmed.*

The market for our products and services is fragmented, competitive and characterized by rapidly evolving technology standards, customer needs and the frequent introduction of new products and services. Our competitors range from smaller niche companies to large, well-financed and technologically-sophisticated entities.

We compete on the basis of several factors, including breadth, depth and quality of product and service offerings, ability to deliver clinical, financial and operational performance improvement through the use of products and services, quality and reliability of services, ease of use and convenience, brand recognition and the ability to integrate services with existing technology. Some of our competitors are more established, benefit from greater brand recognition, have larger client bases and have substantially greater financial, technical and marketing resources. Other competitors have proprietary technology that differentiates their product and service offerings from ours. Our competitors are constantly developing products and services that may become more efficient or appealing to our existing partners and potential partners. Additionally, some health care information technology providers have begun to incorporate enhanced analytical tools and functionality into their core product and service offerings used by health care providers. As a result of these competitive advantages, our competitors and potential competitors may be able to respond more quickly to market forces, undertake more extensive marketing campaigns for their brands, products and services and make more attractive offers to our existing partners and potential partners.

We also compete on the basis of price. We may be subject to pricing pressures as a result of, among other things, competition within the industry, consolidation of health care industry participants, practices of managed care organizations, government action and financial stress experienced by our partners. If our pricing experiences significant downward pressure, our business will be less profitable and our results of operations will be adversely affected.

We cannot be certain that we will be able to retain our current partners or expand our partner base in this competitive environment. If we do not retain current partners or expand our partner base, or if we have to renegotiate existing contracts, our business, financial condition and results of operations will be harmed. Moreover, we expect that competition will continue to increase as a result of consolidation in both the health care information technology and health care industries. If one or more of our competitors or potential competitors were to merge or partner with another of our competitors, the change in the competitive landscape could also adversely affect our ability to compete effectively and could harm our business, financial condition and results of operations.

20

*Our risk-adjustment offerings could be subject to audits by CMS and whistleblower claims under the False Claims Act.*

We support provider-sponsored health plans with Medicare Advantage, Medicaid and Exchange products, as well as health systems and physician groups participating in payer-delegated risk arrangements or in the CMS Next Generation ACO Model. We anticipate that CMS will continue review and audit the results of our risk adjustment offerings, with a focus on identifying possible false claims.

In addition, aspects of our review process and coding procedures could be subject to claims under the False Claims Act or Anti-Kickback Statute. Negative results of any such audit or claim could have a material adverse effect on our business, financial condition, results of operations or prospects.

*Exclusivity and right of first refusal clauses in some of our partner and founder contracts may prohibit us from partnering with certain other providers in the future, and as a result may limit our growth.*

Some of our partner and founder contracts include exclusivity and right of first refusal clauses. Any founder contracts with exclusivity, right of first refusal or other restrictive provisions may limit our ability to conduct business with certain potential partners, including competitors of our founders. For example, under the UPMC IP Agreement, if we were to conduct business with certain precluded providers, it would result in the loss of the license thereunder. Partner contracts with exclusivity or other restrictive provisions may limit our ability to partner with or provide services to other providers or purchase services from other vendors within certain time periods. These exclusivity or other restrictive provisions often apply to specific competitors of our health system partners or specific geographic areas within a particular state or an entire state. Accordingly, these exclusivity clauses may prevent us from entering into long-term relationships with potential partners and could cause our business, financial condition and results of operations to be harmed.

In addition, we entered into a services, reseller and non-competition agreement with The Advisory Board, which we refer to as The Advisory Board Reseller Agreement, that, among other things, prohibits us from promoting, marketing, offering or selling certain unbundled technology services, consulting services unless reasonably expected to lead to a long-term services contract or be part of a Blueprint engagement, or certain other services that are substantially similar to or competitive with certain Advisory Board services. Accordingly, that agreement prohibits us from selling such software or technology services on a standalone basis, but permits us to sell such services if they are part of an integrated offering to our partners and such services account for no more than 50% of the aggregate revenue attributable to our partner during the term of the contract. The Advisory Board Reseller Agreement also prohibits us from promoting, marketing, offering or selling consulting services that are not intended to be a part of our Blueprint services or any services that are substantially similar to or competitive with certain Advisory Board services. These restrictions are in effect until the earlier of June 27, 2020, and the date on which The Advisory Board no longer holds shares of our common stock. We have also entered into a reseller, services and non-competition agreement with an affiliate of UPMC, which we refer to as the UPMC Reseller Agreement, pursuant to which we are prohibited from providing products or services to certain third parties and in certain territories. These restrictions could cause our business, financial condition and results of operations to be harmed if we found it advantageous to provide products or services to such third parties or in such territories during the restricted period.

*We are subject to privacy and data protection laws governing the transmission, security and privacy of health information, which may impose restrictions on the manner in which we access personal data and subject us to penalties if we are unable to fully comply with such laws.*

As described below, we are required to comply with numerous federal and state laws and regulations governing the collection, use, disclosure, storage and transmission of individually identifiable health information that we may obtain or have access to in connection with the provision of our services. These laws and regulations, including their interpretation by governmental agencies, are subject to frequent change and could have a negative impact on our business.

- HIPAA expanded protection of the privacy and security of personal health information and required the adoption of standards for the exchange of electronic health information. Among the standards that the Department of Health and Human Services has adopted pursuant to HIPAA are standards for electronic transactions and code sets, unique identifiers for providers, employers, health plans and individuals, security, electronic signatures, privacy and enforcement. Failure to comply with HIPAA could result in fines and penalties that could have a material adverse effect on us.
- The Health Information Technology for Economic and Clinical Health Act, or the HITECH Act, enacted as part of the American Recovery and Reinvestment Act of 2009, also known as the "Stimulus Bill," effective February 22, 2010, set forth health information security breach notification requirements and increased penalties for violation of HIPAA. The HITECH Act requires individual notification for all breaches, media notification of breaches for over 500 individuals and at least annual reporting of all breaches to the Department of Health and Human Services. The HITECH Act also replaced the prior penalty system of one tier of penalties of $100 per violation and an annual maximum of $25,000 with a four-tier system of sanctions for breaches. Penalties now range from the original $100 per violation and an annual maximum of $25,000 for the first tier to a minimum of $50,000 per violation and an annual maximum of $1.5 million for the fourth tier. Failure to comply with the HITECH Act could result in fines and penalties that could have a material adverse effect on us.

21

- Numerous other federal and state laws may apply that restrict the use and protect the privacy and security of individually identifiable information, as well as employee personal information. These include state medical privacy laws, state social security number protection laws and federal and state consumer protection laws. These various laws in many cases are not preempted by HIPAA and may be subject to varying interpretations by the courts and government agencies, creating complex compliance issues for us and our partners and potentially exposing us to additional expense, adverse publicity and liability, any of which could adversely affect our business.
- Federal and state consumer protection laws are increasingly being applied by the FTC and states' attorneys general to regulate the collection, use, storage and disclosure of personal or individually identifiable information, through websites or otherwise, and to regulate the presentation of website content.

There is ongoing concern from privacy advocates, regulators and others regarding data protection and privacy issues, and the number of jurisdictions with data protection and privacy laws have been increasing. Also, there are ongoing public policy discussions regarding whether the standards for de-identified, anonymous or pseudonomized health information are sufficient, and the risk of re-identification sufficiently small, to adequately protect patient privacy. These discussions may lead to further restrictions on the use of such information. There can be no assurance that these initiatives or future initiatives will not adversely affect our ability to access and use data or to develop or market current or future services.

The security measures that we and our third-party vendors and subcontractors have in place to ensure compliance with privacy and data protection laws may not protect our facilities and systems from security breaches, acts of vandalism or theft, computer viruses, misplaced or lost data, programming and human errors or other similar events. Under the HITECH Act, as a business associate we may also be liable for privacy and security breaches and failures of our subcontractors. Even though we provide for appropriate protections through our agreements with our subcontractors, we still have limited control over their actions and practices. A breach of privacy or security of individually identifiable health information by a subcontractor may result in an enforcement action, including criminal and civil liability, against us. Due to the recent enactment of the HITECH Act, we are not able to predict the extent of the impact such incidents may have on our business. Our failure to comply may result in criminal and civil liability because the potential for enforcement action against business associates is now greater. Enforcement actions against us could be costly and could interrupt regular operations, which may adversely affect our business. While we have not received any notices of violation of the applicable privacy and data protection laws and believe we are in compliance with such laws, there can be no assurance that we will not receive such notices in the future.

*If we are unable to obtain, maintain and enforce intellectual property protection for our technology and products or if the scope of our intellectual property protection is not sufficiently broad, others may be able to develop and commercialize technology and products substantially similar to ours, and our ability to successfully commercialize our technology and products may be adversely affected.*

Our business depends on proprietary technology and content, including software, databases, confidential information and know-how, the protection of which is crucial to the success of our business. We rely on a combination of trademark, trade-secret and copyright laws and confidentiality procedures and contractual provisions to protect our intellectual property rights in our proprietary technology and content. We are pursuing the registration of our trademarks and service marks in the United States. We may, over time, increase our investment in protecting our intellectual property through additional trademark, patent and other intellectual property filings that could be expensive and time-consuming. Effective trademark, trade-secret and copyright protection is expensive to develop and maintain, both in terms of initial and ongoing registration requirements and the costs of defending our rights. These measures, however, may not be sufficient to offer us meaningful protection. If we are unable to protect our intellectual property and other proprietary rights, our competitive position and our business could be harmed, as third parties may be able to commercialize and use technologies and software products that are substantially the same as ours without incurring the development and licensing costs that we have incurred. Any of our owned or licensed intellectual property rights could be challenged, invalidated, circumvented, infringed or misappropriated, our trade secrets and other confidential information could be disclosed in an unauthorized manner to third parties, or our intellectual property rights may not be sufficient to permit us to take advantage of current market trends or otherwise to provide us with competitive advantages, which could result in costly redesign efforts, discontinuance of certain offerings or other competitive harm.

Monitoring unauthorized use of our intellectual property is difficult and costly. From time to time, we seek to analyze our competitors' products and services, and may in the future seek to enforce our rights against potential infringement. However, the steps we have taken to protect our proprietary rights may not be adequate to prevent infringement or misappropriation of our intellectual property. We may not be able to detect unauthorized use of, or take appropriate steps to enforce, our intellectual property rights. Any inability to meaningfully protect our intellectual property rights could result in harm to our ability to compete and reduce demand for our technology and products. Moreover, our failure to develop and properly manage new intellectual property could adversely affect our market positions and business opportunities. Also, some of our products and services rely on technologies and software developed by or licensed from third parties, and we may not be able to maintain our relationships with such third parties or enter into similar relationships in the future on reasonable terms or at all.

22

We may also be required to protect our proprietary technology and content in an increasing number of jurisdictions, a process that is expensive and may not be successful, or which we may not pursue in every location. In addition, effective intellectual property protection may not be available to us in every country, and the laws of some foreign countries may not be as protective of intellectual property rights as those in the United States. Additional uncertainty may result from changes to intellectual property legislation enacted in the United States and elsewhere, and from interpretations of intellectual property laws by applicable courts and agencies. Accordingly, despite our efforts, we may be unable to obtain and maintain the intellectual property rights necessary to provide us with a competitive advantage. Our failure to obtain, maintain and enforce our intellectual property rights could therefore have a material adverse effect on our business, financial condition and results of operations.

*If our trademarks and trade names are not adequately protected, we may not be able to build name recognition in our markets of interest and our business may be adversely affected.*

The registered or unregistered trademarks or trade names that we own or license may be challenged, infringed, circumvented, declared generic, lapsed or determined to be infringing on or dilutive of other marks. We may not be able to protect our rights in these trademarks and trade names, which we need in order to build name recognition with potential partners. In addition, third parties may in the future file for registration of trademarks similar or identical to our trademarks. If they succeed in registering or developing common law rights in such trademarks, and if we are not successful in challenging such third-party rights, we may not be able to use these trademarks to commercialize our technologies or products in certain relevant countries. If we are unable to establish name recognition based on our trademarks and trade names, we may not be able to compete effectively and our business may be adversely affected.

*Third parties may initiate legal proceedings alleging that we are infringing or otherwise violating their intellectual property rights, the outcome of which would be uncertain and could have a material adverse effect on our business, financial condition and results of operations.*

Our commercial success depends on our ability to develop and commercialize our services and use our proprietary technology without infringing the intellectual property or proprietary rights of third parties. Intellectual property disputes can be costly to defend and may cause our business, operating results and financial condition to suffer. As the market for health care in the United States expands and more patents are issued, the risk increases that there may be patents issued to third parties that relate to our products and technology of which we are not aware or that we must challenge to continue our operations as currently contemplated. Whether merited or not, we may face allegations that we, our partners, our licensees or parties indemnified by us have infringed or otherwise violated the patents, trademarks, copyrights or other intellectual property rights of third parties. Such claims may be made by competitors seeking to obtain a competitive advantage or by other parties. Additionally, in recent years, individuals and groups have begun purchasing intellectual property assets for the purpose of making claims of infringement and attempting to extract settlements from companies like ours. We may also face allegations that our employees have misappropriated the intellectual property or proprietary rights of their former employers or other third parties. It may be necessary for us to initiate litigation to defend ourselves in order to determine the scope, enforceability and validity of third-party intellectual property or proprietary rights, or to establish our respective rights. Regardless of whether claims that we are infringing patents or other intellectual property rights have merit, such claims can be time-consuming, divert management's attention and financial resources and can be costly to evaluate and defend. Results of any such litigation are difficult to predict and may require us to stop commercializing or using our products or technology, obtain licenses, modify our services and technology while we develop non-infringing substitutes or incur substantial damages, settlement costs or face a temporary or permanent injunction prohibiting us from marketing or providing the affected products and services. If we require a third-party license, it may not be available on reasonable terms or at all, and we may have to pay substantial royalties, upfront fees or grant cross-licenses to intellectual property rights for our products and services. We may also have to redesign our products or services so they do not infringe third-party intellectual property rights, which may not be possible or may require substantial monetary expenditures and time, during which our technology and products may not be available for commercialization or use. Even if we have an agreement to indemnify us against such costs, the indemnifying party may be unable to uphold its contractual obligations. If we cannot or do not obtain a third-party license to the infringed technology at all, license the technology on reasonable terms or obtain similar technology from another source, our revenue and earnings could be adversely impacted.

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business with respect to intellectual property. We are not currently subject to any claims from third parties asserting infringement of their intellectual property rights. Some third parties may be able to sustain the costs of complex litigation more effectively than we can because they have substantially greater resources. Even if resolved in our favor, litigation or other legal proceedings relating to intellectual property claims may cause us to incur significant expenses, and could distract our technical and management personnel from their normal responsibilities. In addition, there could be public announcements of the results of hearings, motions or other interim proceedings or developments, and if securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our Class A common stock. Moreover, any uncertainties resulting from the initiation and continuation of any legal proceedings could have a material adverse effect on our ability to raise the funds necessary to continue our operations. Assertions by third parties that we violate their intellectual property rights could therefore have a material adverse effect on our business, financial condition and results of operations.

*Our use of "open source" software could adversely affect our ability to offer our services and subject us to possible litigation.*

We may use open source software in connection with our products and services. Companies that incorporate open source software into their products have, from time to time, faced claims challenging the use of open source software and/or compliance with open source license terms. As a result, we could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms. Some open source software licenses require users who distribute software containing open source software to publicly disclose all or part of the source code to such software and/or make available any derivative works of the open source code, which could include valuable proprietary code of the user, on unfavorable terms or at no cost. While we monitor the use of open source software and try to ensure that none is used in a manner that would require us to disclose our proprietary source code or that would otherwise breach the terms of an open source agreement, such use could inadvertently occur, in part because open source license terms are often ambiguous. Any requirement to disclose our proprietary source code or pay damages for breach of contract could have a material adverse effect on our business, financial condition and results of operations and could help our competitors develop products and services that are similar to or better than ours.

*If we are unable to protect the confidentiality of our trade secrets, know-how and other proprietary information, the value of our technology and products could be adversely affected.*

We may not be able to protect our trade secrets, know-how and other proprietary information adequately. Although we use reasonable efforts to protect this proprietary information and technology, our employees, consultants and other parties may unintentionally or willfully disclose our information or technology to competitors. Enforcing a claim that a third party illegally obtained and is using any of our proprietary information or technology is expensive and time-consuming, and the outcome is unpredictable. In addition, courts outside the United States are sometimes less willing to protect trade secrets, know-how and other proprietary information. We rely, in part, on non-disclosure, confidentiality and invention assignment agreements with our employees, consultants and other parties to protect our trade secrets, know-how and other intellectual property and proprietary information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our trade secrets, know-how and other proprietary information.

*We depend on certain technologies that are licensed to us. We do not control the intellectual property rights covering these technologies and any loss of our rights to these technologies or the rights licensed to us could prevent us from developing and/or commercializing our products.*

We are a party to a number of license agreements under which we are granted rights to intellectual property that is important to our business, and we expect that we may need to enter into additional license agreements in the future. We rely on these licenses to use various proprietary technologies that may be material to our business, including without limitation those technologies licensed under an intellectual property and development services license agreement between us and UPMC, or the UPMC IP Agreement, a technology license agreement between us and UPMC, or the UPMC Technology Agreement, and an intellectual property license and data access agreement with The Advisory Board, or The Advisory Board IP Agreement. Under the UPMC IP Agreement, certain of UPMC's proprietary analytics models and know-how are licensed to us on a nonexclusive basis from UPMC; pursuant to the UPMC Technology Agreement, UPMC's proprietary technology platform, associated know-how and the Identifi® trademark are licensed to us on an irrevocable, non-exclusive basis from UPMC; in each case, subject to certain ongoing territorial, time and use restrictions. Under The Advisory Board IP Agreement, we hold a license to use a business plan and operating model designed by The Advisory Board, a right to access certain analysis, data and proprietary information of The Advisory Board, we obtain a membership in The Advisory Board's health care industry program, and the right to access key Advisory Board personnel and assistance in our promotion and sales efforts. Our rights to use these technologies and know-how and employ the software claimed in the licensed technologies are subject to the continuation of and our compliance with the terms of those licenses. Our existing license agreements impose, and we expect that future license agreements will impose on us, various exclusivity obligations. If we fail to comply with our obligations under these agreements, the applicable licensor may have the right to terminate our license, in which case we may not be able to develop or commercialize the products or technologies covered by the license.

Disputes may arise between us and our licensors regarding intellectual property rights subject to a license agreement, including:

*   the scope of rights granted under the license agreement and other interpretation-related issues;
*   whether and the extent to which our technology and processes infringe on intellectual property of the licensor that is not subject to the license agreement;
*   our obligations with respect to the use of the licensed technology in relation to our services and technologies, and which activities satisfy those obligations;
*   whether our activities are in compliance with the restrictions placed upon our rights to use the licensed technology by our licensors; and
*   the ownership of inventions and know-how resulting from the joint creation or use of intellectual property by our licensors and us and our partners.

24

If disputes over intellectual property rights that we have licensed prevent or impair our ability to maintain our current licensing arrangements on acceptable terms, we may be unable to obtain equivalent replacement licensing arrangements or to successfully develop and commercialize the affected products and technologies.

The risks described elsewhere pertaining to our intellectual property rights also apply to the intellectual property rights that we license, and any failure by us or our licensors to obtain, maintain and enforce these rights could have a material adverse effect on our business. In some cases, we do not have control over the prosecution, maintenance or enforcement of the intellectual property rights that we license, and may not have sufficient ability to consult and input into the prosecution and maintenance process with respect to such intellectual property, and our licensors may fail to take the steps we feel are necessary or desirable in order to obtain, maintain and enforce the licensed intellectual property rights and, as a result, our ability to retain our competitive advantage with respect to our products and technologies may be materially affected.

*Any restrictions on our use of, or ability to license, data, or our failure to license data and integrate third-party technologies, could have a material adverse effect on our business, financial condition and results of operations.*

We depend upon licenses from third parties for some of the technology and data used in our applications, and for some of the technology platforms upon which these applications are built and operate, including under the UPMC IP Agreement, the UPMC Technology Agreement and The Advisory Board IP Agreement. We expect that we may need to obtain additional licenses from third parties in the future in connection with the development of our products and services. In addition, we obtain a portion of the data that we use from government entities, public records and from our partners for specific partner engagements. We believe that we have all rights necessary to use the data that is incorporated into our products and services. However, we cannot assure you that our licenses for information will allow us to use that information for all potential or contemplated applications and products. In addition, certain of our products depend on maintaining our data and analytics platform, which is populated with data disclosed to us by our partners with their consent. If these partners revoke their consent for us to maintain, use, de-identify and share this data, consistent with applicable law, our data assets could be degraded.

In the future, data providers could withdraw their data from us or restrict our usage for any reason, including if there is a competitive reason to do so, if legislation is passed restricting the use of the data or if judicial interpretations are issued restricting use of the data that we currently use in our products and services. In addition, data providers could fail to adhere to our quality control standards in the future, causing us to incur additional expense to appropriately utilize the data. If a substantial number of data providers were to withdraw or restrict their data, or if they fail to adhere to our quality control standards, and if we are unable to identify and contract with suitable alternative data suppliers and integrate these data sources into our service offerings, our ability to provide products and services to our partners would be materially adversely impacted, which could have a material adverse effect on our business, financial condition and results of operations.

We also integrate into our proprietary applications and use third-party software to maintain and enhance, among other things, content generation and delivery, and to support our technology infrastructure. Some of this software is proprietary and some is open source software. Our use of third-party technologies exposes us to increased risks, including, but not limited to, risks associated with the integration of new technology into our solutions, the diversion of our resources from development of our own proprietary technology and our inability to generate revenue from licensed technology sufficient to offset associated acquisition and maintenance costs. These technologies may not be available to us in the future on commercially reasonable terms or at all and could be difficult to replace once integrated into our own proprietary applications. Most of these licenses can be renewed only by mutual consent and may be terminated if we breach the terms of the license and fail to cure the breach within a specified period of time. Our inability to obtain, maintain or comply with any of these licenses could delay development until equivalent technology can be identified, licensed and integrated, which would harm our business, financial condition and results of operations.

Most of our third-party licenses are non-exclusive and our competitors may obtain the right to use any of the technology covered by these licenses to compete directly with us. Our use of third-party technologies exposes us to increased risks, including, but not limited to, risks associated with the integration of new technology into our solutions, the diversion of our resources from development of our own proprietary technology and our inability to generate revenue from licensed technology sufficient to offset associated acquisition and maintenance costs. In addition, if our data suppliers choose to discontinue support of the licensed technology in the future, we might not be able to modify or adapt our own solutions.

*Data loss or corruption due to failures or errors in our systems or service disruptions at our data centers may adversely affect our reputation and relationships with existing partners, which could have a negative impact on our business, financial condition and results of operations.*

Because of the large amount of data that we collect and manage, it is possible that hardware failures or errors in our systems could result in data loss or corruption or cause the information that we collect to be incomplete or contain inaccuracies that our partners regard as significant. Complex software such as ours may contain errors or failures that are not detected until after the software is introduced or updates and new versions are released. We continually introduce new software and updates and enhancements to our existing software. Despite testing by us, we may discover defects or errors in our software. In addition, we may encounter defects or

25

errors in connection with the integration of software and technology we acquire, such as in our acquisitions of Valence Health, Aldera or other future transactions. Any defects or errors could expose us to risk of liability to partners and the government and could cause delays in the introduction of new products and services, result in increased costs and diversion of development resources, require design modifications, decrease market acceptance or partner satisfaction with our products and services or cause harm to our reputation.

Furthermore, our partners might use our software together with products from other companies. As a result, when problems occur, it might be difficult to identify the source of the problem. Even when our software does not cause these problems, the existence of these errors might cause us to incur significant costs, divert the attention of our technical personnel from our product development efforts, impact our reputation and lead to significant partner relations problems.

*Our business is subject to online security risks, and if we are unable to safeguard the security and privacy of confidential data, our reputation and business will be harmed.*

Our services involve the collection, storage and analysis of confidential information. In certain cases such information is provided to third parties, for example, to the service providers who provide hosting services for our technology platform, and we may be unable to control the use of such information or the security protections employed by such third parties. We may be required to expend significant capital and other resources to protect against security breaches or to alleviate problems caused by security breaches. Despite our implementation of security measures, techniques used to obtain unauthorized access to information or to sabotage information technology systems change frequently. As a result, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any compromise or perceived compromise of our security (or the security of our third-party service providers who have access to confidential information) could damage our reputation and our relationship with our partners, could reduce demand for our products and services and could subject us to significant liability as well as regulatory action. In addition, in the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current processes. Changing our processes could be time consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance.

*We rely on Internet infrastructure, bandwidth providers, data center providers, other third parties and our own systems for providing services to our partners, and any failure or interruption in the services provided by these third parties or our own systems could expose us to litigation and negatively impact our relationships with partners, adversely affecting our brand and our business.*

Our ability to deliver our products and services, particularly our cloud-based solutions, is dependent on the development and maintenance of the infrastructure of the Internet and other telecommunications services by third parties. This includes maintenance of a reliable network connection with the necessary speed, data capacity and security for providing reliable Internet access and services and reliable telephone and facsimile services. Our services are designed to operate without interruption in accordance with our service level commitments.

However, we have experienced limited interruptions in these systems in the past, including server failures that temporarily slow down the performance of our services, and we may experience more significant interruptions in the future. We rely on internal systems as well as third-party suppliers, including bandwidth and telecommunications equipment providers, to provide our services. We do not maintain redundant systems or facilities for some of these services. Interruptions in these systems, whether due to system failures, computer viruses, physical or electronic break-ins or other catastrophic events, could affect the security or availability of our services and prevent or inhibit the ability of our partners to access our services. In the event of a catastrophic event with respect to one or more of these systems or facilities, we may experience an extended period of system unavailability, which could result in substantial costs to remedy those problems or negatively impact our relationship with our partners, our business, results of operations and financial condition. To operate without interruption, both we and our service providers must guard against:

- damage from fire, power loss and other natural disasters;
- telecommunications failures;
- software and hardware errors, failures and crashes;
- security breaches, computer viruses and similar disruptive problems; and
- other potential interruptions.

Any disruption in the network access, telecommunications or co-location services provided by third-party providers or any failure of or by third-party providers' systems or our own systems to handle current or higher volume of use could significantly harm our business. We exercise limited control over our third-party suppliers, which increases our vulnerability to problems with services they provide. Any errors, failures, interruptions or delays experienced in connection with these third-party technologies and information services or our own systems could negatively impact our relationships with partners and adversely affect our business and could expose us to third-party liabilities. Although we maintain insurance for our business, the coverage under our policies may not be adequate to compensate us for all losses that may occur. In addition, we cannot provide assurance that we will continue to be able to obtain adequate insurance coverage at an acceptable cost.

26

The reliability and performance of our Internet connection may be harmed by increased usage or by denial-of-service attacks. The Internet has experienced a variety of outages and other delays as a result of damages to portions of its infrastructure, and it could face outages and delays in the future. These outages and delays could reduce the level of Internet usage as well as the availability of the Internet to us for delivery of our Internet-based services.

*We rely on third-party vendors to host and maintain our technology platform.*

We rely on third-party vendors to host and maintain our technology platform, including Identifi®. Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third-party vendors and entering into new relationships to meet the changing needs of our business. Any deterioration in our relationships with such vendors or our failure to enter into agreements with vendors in the future could harm our business, results of operations and financial condition. Despite precautions taken at our vendors' facilities, the occurrence of a natural disaster, a decision to close the facilities without adequate notice or other unanticipated problems could result in lengthy interruptions in our service. These service interruption events could cause our platform to be unavailable to our partners and impair our ability to deliver services and to manage our relationships with new and existing partners, which in turn could materially affect our results of operations.

If our vendors are unable or unwilling to provide the services necessary to support our business, or if our agreements with such vendors are terminated, our operations could be significantly disrupted. Two of our vendor agreements may be unilaterally terminated by the licensor for convenience, and if such agreements are terminated, we may not be able to enter into similar relationships in the future on reasonable terms or at all. We may also incur substantial costs, delays and disruptions to our business in transitioning such services to ourselves or other third-party vendors. In addition, third-party vendors may not be able to provide the services required in order to meet the changing needs of our business.

*We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business.*

Our success depends largely upon the continued services of our key executive officers. From time to time, there may be changes in our senior management team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.

In addition, competition for qualified management in our industry is intense. Many of the companies with which we compete for management personnel have greater financial and other resources than we do. We have not entered into employment agreements with our executive officers. All of our employees are "at-will" employees, and their employment can be terminated by us or them at any time, for any reason and without notice and without the payment of any severance. The departure of key personnel could adversely affect the conduct of our business. In such event, we would be required to hire other personnel to manage and operate our business, and there can be no assurance that we would be able to employ a suitable replacement for the departing individual, or that a replacement could be hired on terms that are favorable to us. In addition, volatility or lack of performance in our stock price may affect our ability to attract replacements should key personnel depart. If we are not able to retain any of our key management personnel, our business could be harmed.

*We have recorded a significant amount of goodwill, and we may never realize the full value of our intangible assets, causing us to record impairments that may negatively affect our results of operations.*

Our total assets include substantial goodwill. At December 31, 2016, we had $626.6 million of goodwill on our Consolidated Balance Sheets related to our one operating segment and reporting unit. Goodwill represents the excess of the purchase price, plus the fair value of any non-controlling interests in the acquiree, over the fair value of identifiable net assets acquired. Goodwill is not amortized, but is reviewed at least annually for indications of impairment, with consideration given to financial performance and other relevant factors. In the first quarter of 2016, we recorded an impairment charge of $160.6 million on our Consolidated Statements of Operations.

While our annual goodwill impairment test is conducted at October 31, we have processes to monitor for interim triggering events. Under GAAP, we review our goodwill for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Factors that may be considered a change in circumstances indicating that the carrying value of our goodwill may not be recoverable include macroeconomic conditions, industry and market considerations, our overall financial performance including an analysis of our current and projected cash flows, revenue and earnings, a sustained decrease in our share price and other relevant entity-specific events including changes in strategy, customers or litigation.

Subsequent to our 2015 annual impairment testing in the fourth quarter of 2015, our common stock price declined significantly, reaching our historic low in the first quarter of 2016. During the three months ended March 31, 2016, our common stock traded between $8.48 and $12.32, or an average common stock price of $10.33 compared to an average common stock price of $19.51 and $14.73 during the three-month periods ended September 30, 2015, and December 31, 2015, respectively. A sustained decline in our

common stock price and the resulting impact on our market capitalization is one of several qualitative factors we consider each quarter when evaluating whether events or changes in circumstances indicate it is more likely than not that a potential goodwill impairment exists. We concluded that the further decline in common stock price observed during the first quarter of 2016 did represent a sustained decline and that triggering events occurred during this period requiring an interim goodwill impairment test as of March 31, 2016, ultimately resulting in an impairment charge of $160.6 million. A detailed discussion of our impairment testing is included in "Part II - Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Policies and Estimates."

We may be required to recognize additional impairments in the future as a result of market conditions or other factors related to our performance, including changes in our forecasted results, investment strategy or interest rates. Any further impairment charges that we may record in the future could be material to our results of operations.

*We may need to obtain additional financing which may not be available or, if it is available, may result in a reduction in the ownership of our stockholders.*

We may need to raise additional funds in order to:

- finance unanticipated working capital requirements;
- develop or enhance our technological infrastructure and our existing products and services;
- fund strategic relationships, including joint ventures and co-investments;
- fund additional implementation engagements;
- respond to competitive pressures; and
- acquire complementary businesses, technologies, products or services.

Additional financing may not be available on terms favorable to us, or at all. If adequate funds are unavailable or are unavailable on acceptable terms, our ability to fund our expansion strategy, take advantage of unanticipated opportunities, develop or enhance technology or services or otherwise respond to competitive pressures could be significantly limited. If we raise additional funds by issuing equity or convertible debt securities, the ownership of our then-existing stockholders may be reduced, and holders of these securities may have rights, preferences or privileges senior to those of our then-existing stockholders. In addition, any indebtedness we incur and restrictive covenants contained in the agreements related thereto could:

- make it difficult for us to satisfy our obligations, including interest payments on any debt obligations;
- limit our ability to obtain additional financing to operate our business;
- require us to dedicate a substantial portion of our cash flow to payments on our debt, reducing our ability to use our cash flow to fund capital expenditures and working capital and other general operational requirements;
- limit our flexibility to plan for and react to changes in our business and the health care industry;
- place us at a competitive disadvantage relative to our competitors;
- limit our ability to pursue acquisitions; and
- increase our vulnerability to general adverse economic and industry conditions, including changes in interest rates or a downturn in our business or the economy.

The occurrence of any one of these events could cause a significant decrease in our liquidity and impair our ability to pay amounts due on any indebtedness, and could have a material adverse effect on our business, financial condition and results of operations.

*We have experienced net losses in the past and we may not achieve profitability in the future.*

We have incurred significant net losses in the past and we anticipate that our operating expenses will increase substantially in the foreseeable future as we continue to invest to grow our business and build relationships with partners, develop our platform, develop new solutions and comply with being a public company. These efforts may prove to be more expensive than we currently anticipate, and we may not succeed in increasing our revenue sufficiently to offset these higher expenses. In addition, to the extent we are successful in increasing our partner base, we could incur increased losses because significant costs associated with entering into partner agreements are generally incurred up front, while revenue under certain of our partner agreements is recognized each period in the month in which the services are delivered. As a result, we may need to raise additional capital through equity and debt financings in order to fund our operations. We may also fail to improve the gross margins of our business. If we are unable to effectively manage these risks and difficulties as we encounter them, our business, financial condition and results of operations may suffer.

*The requirements of being a public company may strain our resources and distract our management, which could make it difficult to manage our business, particularly after we are no longer an "emerging growth company."*

As a public company, we are required to comply with various regulatory and reporting requirements, including those required by the SEC. Complying with these reporting and other regulatory requirements is time-consuming and will continue to result in increased costs to us and could have a negative effect on our business, financial condition and results of operations. As a public company, we

28

are subject to the reporting requirements of the Exchange Act and the Sarbanes-Oxley Act. These requirements may place a strain on our systems and resources. The Exchange Act requires that we file annual, quarterly and current reports with respect to our business and financial condition. The Sarbanes-Oxley Act requires that we maintain effective disclosure controls and procedures and internal controls over financial reporting. To maintain and improve the effectiveness of our disclosure controls and procedures, we may need to commit significant resources, hire additional staff and provide additional management oversight. We have been and will be continuing to implement additional procedures and processes for the purpose of addressing the standards and requirements applicable to public companies. Sustaining our growth as a public company also requires us to commit additional management, operational and financial resources to identify new professionals to join our company and to maintain appropriate operational and financial systems to adequately support expansion. These activities may divert management's attention from other business concerns, which could have a material adverse effect on our business, financial condition and results of operations.

As an "emerging growth company" as defined in the JOBS Act, we are taking, and may continue to take, advantage of certain temporary exemptions from various reporting requirements, including, but not limited to, a delay in the timeframe required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act and reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements.

When these exemptions cease to apply, we expect to incur additional expenses and devote increased management effort toward ensuring compliance with them. We cannot predict or estimate the amount of additional costs we may continue to incur as a result of becoming a public company or the timing of such costs.

*Our adjusted results may not be representative of our future performance.*

In preparing the adjusted results included in our MD&A in this Form 10-K, we have made adjustments to our historical financial information to reflect the Offering Reorganization as if it had occurred on the first day of the relevant period and we have adjusted the results to exclude the impact of purchase accounting adjustments, stock-based compensation expenses and transaction expenses related to the Offering Reorganization, IPO and other transactions as well as certain other adjustments. These adjusted measures do not represent and should not be considered as alternatives to GAAP measurements, and our calculations thereof may not be comparable to similarly entitled measures reported by other companies. See "Part II - Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Non-GAAP Financial Measures" for additional information.

*We are and may become subject to litigation, proceedings, government inquiries, reviews, audits or investigations which could have a material adverse effect on our business, financial condition and results of operations.*

We are and may become subject to litigation, proceedings, government inquiries, reviews, audits or investigations in the future, including potential claims against us by our partners, with or without merit. Some of these matters and claims may result in significant defense costs and potentially significant judgments against us, some of which we are not, or cannot be, insured against. We generally intend to defend ourselves vigorously; however, we cannot be certain of the ultimate outcomes of any claims or other matters that may arise in the future. Resolution of these types of matters against us may result in our having to pay significant fines, judgments or settlements, which, if uninsured, or if the fines, judgments and settlements exceed insured levels, could adversely impact our earnings and cash flows, thereby having a material adverse effect on our business, financial condition, results of operations, cash flow and per share trading price of our Class A common stock. Certain litigation, proceedings, government inquiries, reviews, audits or investigations or the resolution of such matters may affect the availability or cost of some of our insurance coverage, which could adversely impact our results of operations and cash flows, expose us to increased risks that would be uninsured and adversely impact our ability to attract directors and officers.

**Risks relating to our structure**

*We are a holding company and our principal asset is our interest in Evolent Health LLC and, accordingly, we are dependent upon distributions from Evolent Health LLC to pay taxes and other expenses, including interest on the 2021 Notes.*

We are a holding company and our principal asset is our ownership of Class A common units of Evolent Health LLC. We have no independent means of generating revenue. Evolent Health LLC is treated as a partnership for U.S. federal income tax purposes and, as such, is not itself subject to U.S. federal income tax. Instead, its net taxable income is generally allocated to its members, including us, pro rata according to the number of common units each member owns. Accordingly, we incur income taxes on our allocable share of any net taxable income of Evolent Health LLC and also incur expenses related to our operations. We intend to continue to cause Evolent Health LLC to distribute cash to its members, including us, in an amount sufficient to cover all of our tax liabilities and dividends, if any, declared by us, as well as any payments due under the TRA, as described in "Part II - Item 8. Financial Statements and Supplementary Data - Note 12 - Tax Receivables Agreement." In addition, we intend to cause Evolent Health LLC to distribute cash to us in an amount sufficient to cover all of our liabilities under our notes. To the extent that we need funds to pay our tax, interest or other liabilities or to fund our operations, and Evolent Health LLC is restricted from making distributions to us under applicable agreements, laws or regulations or does not have sufficient cash to make these distributions, we may have to borrow funds to meet these obligations and operate our business, and our liquidity and financial condition could be materially adversely affected. To

29

the extent that we are unable to make payments under the TRA for any reason, such payments will be deferred and will accrue interest until paid.

*We are required to pay certain of our pre-IPO investors for certain tax benefits we may claim in the future, and these amounts are expected to be material.*

In connection with the September 2016 secondary offering and the underwriters' option to purchase additional shares of Class A common stock, 2.2 million of the Class B common units held upon completion of the Offering Reorganization were exchanged (together with an equal number of shares of our Class B common stock) for shares of our Class A common stock. The remaining 15.3 million Class B units may be exchanged (together with an equal number of shares of our Class B common stock) for shares of our Class A common stock in the future. The exchanges in connection with the September 2016 secondary offering resulted in increases in the tax basis of the assets of Evolent Health LLC by $43.6 million, that otherwise would not have been available. In addition, we expect that certain NOLs are available to us as a result of the transactions as described in "Tax Receivables Agreement" in "Part II - Item 8. Financial Statements and Supplementary Data - Note 12." These increases in tax basis and NOLs may reduce the amount of tax that we would otherwise be required to pay in the future, although the Internal Revenue Service ("IRS"), may challenge all or a part of the tax basis increases and NOLs, and a court could sustain such a challenge.

We have entered into the TRA, related to the tax basis step-up of the assets of Evolent Health LLC and certain NOLs of the former members of Evolent Health LLC, with the holders of Class B common units, the former stockholders of Evolent Health Holdings and certain of our other investors. Pursuant to the TRA, we will pay such holders of Class B common units, former stockholders of Evolent Health Holdings and other investors 85% of the amount of the cash savings, if any, in U.S. federal, state and local and non-U.S. income tax that we realize as a result of increases in tax basis resulting from our exchanges of Class B common units (calculated assuming that any post-IPO transfer of Class B common units (other than the exchanges) had not occurred) as well as certain other benefits attributable to payments under the TRA itself. For example, as a result of the tax basis step-up of the assets of Evolent Health LLC in connection with the September 2016 secondary offering, we may be required to pay up to approximately $18.5 million under the TRA.

The TRA also requires us to pay 85% of the amount of the cash savings, if any, in U.S. federal, state and local and non-U.S. income tax that we realize as a result of the utilization of the NOLs of Evolent Health Holdings and an affiliate of TPG attributable to periods prior to our IPO and the deduction of any imputed interest attributable to our payment obligations under the TRA.

The payments that we make under the TRA could be substantial. Assuming no material changes in relevant tax law and based on our current operating plan and other assumptions, including our estimate of the tax basis of our assets as of the date of the offering reorganization, if all of the Class B common units (including the units exchanged in the September 2016 secondary offering) had been acquired by us in taxable transactions at the time of the initial closing of the September 2016 secondary offering for a price of $22.50 per Class B common unit, we estimated at the pricing of the September 2016 secondary offering that the total amount we would be required to pay under the TRA could be approximately $182.7 million. This estimated amount includes approximately $26.8 million of potential future payments under the TRA related to the future utilization of the pre-IPO NOLs described above. The actual amounts may be materially greater than these hypothetical amounts as potential future payments will vary depending on a number of factors, including the timing of further exchanges, the price of our Class A common stock at the time of the exchanges, the amount, character and timing of our income and the tax rates then applicable. Payments under the TRA are not conditioned on our existing investors' continued ownership of any of our equity.

*We will not be reimbursed for any payments made under the TRA in the event that any tax benefits are disallowed.*

If the IRS successfully challenges the tax basis increases or the existence or amount of the NOLs at any point in the future after payments are made under the TRA, we will not be reimbursed for any payments made under the TRA (although future payments under the TRA, if any, would be netted against any unreimbursed payments to reflect the result of any such successful challenge by the IRS). As a result, in certain circumstances, we could be required to make payments under the TRA in excess of our cash tax savings.

*We may not be able to realize all or a portion of the tax benefits that are expected to result from the exchanges of Class B common units for our Class A common stock, the utilization of certain tax attributes previously held by Evolent Health Holdings and an affiliate of TPG and from payments made under the TRA.*

Our ability to realize the tax benefits that we expect to be available as a result of the increases in tax basis created by any exchanges of Class B common units (together with an equal number of shares of our Class B common stock) for our Class A common stock and by the payments made pursuant to the TRA, and our ability to utilize the pre-IPO NOLs of Evolent Health Holdings and an affiliate of TPG and the interest deductions imputed under the TRA all depend on a number of assumptions, including that we earn sufficient taxable income each year during the period over which such deductions are available and that there are no adverse changes in applicable law or regulations. If our actual taxable income were insufficient or there were adverse changes in applicable law or regulations, we may be unable to realize all or a portion of these expected benefits and our cash flows and stockholders' equity could

30

be negatively affected. Please refer to the discussion of in "Part II - Item 8. Financial Statements and Supplementary Data - Note 12 - Tax Receivables Agreement" for additional information.

*In certain circumstances, Evolent Health LLC will be required to make distributions to us and the other members of Evolent Health LLC and the distributions that Evolent Health LLC will be required to make may be substantial.*

Evolent Health LLC is treated as a partnership for U.S. federal income tax purposes and, as such, is not subject to U.S. federal income tax. Instead, taxable income is allocated to its members, including us. We intend to cause Evolent Health LLC to make pro rata cash distributions, or tax distributions, to its members in an amount sufficient to allow each member to pay taxes on such member's allocable share of the net taxable income of Evolent Health LLC. Funds used by Evolent Health LLC to satisfy its tax distribution obligations will not be available for reinvestment in our business. Moreover, these tax distributions may be substantial, and will likely exceed (as a percentage of Evolent Health LLC's income) the overall effective tax rate applicable to a similarly situated corporate taxpayer. As a result of the potential differences in the amount of net taxable income allocable to us and the Class B common unit holders, it is possible that we will receive distributions significantly in excess of our tax liabilities and obligations to make payments under the TRA. To the extent we do not distribute such cash balances as dividends on our Class A common stock and instead, for example, hold such cash balances or lend them to Evolent Health LLC, the Class B common unit holders would benefit from any value attributable to such accumulated cash balances as a result of their ownership of Class A common stock following an exchange of their Class B common units in Evolent Health LLC (including any exchange upon an acquisition of us). See "Part II - Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities - Dividends" for a discussion of our dividend policy.

*In certain cases, payments by us under the TRA may be accelerated or significantly exceed the tax benefits we realize in respect of the tax attributes subject to the TRA.*

The TRA provides that upon certain changes of control, or if, at any time, we elect an early termination of the TRA or are in material breach of our obligations under the TRA, we would be required to make an immediate payment equal to the present value of the anticipated future tax benefits to the holders of Class B common units, the former stockholders of Evolent Health Holdings and the former stockholders of an affiliate of TPG. Such payment would be based on certain valuation assumptions and deemed events set forth in the TRA, including the assumption that we have sufficient taxable income to fully utilize such tax benefits. The benefits would be payable even though, in certain circumstances, no Class B common units are actually exchanged and no NOLs are actually used at the time of the accelerated payment under the TRA, thereby resulting in no corresponding tax basis step-up at the time of such accelerated payment under the TRA. Accordingly, payments under the TRA may be made years in advance of the actual realization, if any, of the anticipated future tax benefits and may be significantly greater than the benefits we realize in respect of the tax attributes subject to the TRA. In these situations, our obligations under the TRA could have a substantial negative impact on our liquidity. We may not be able to finance our obligations under the TRA and any indebtedness we incur may limit our subsidiaries' ability to make distributions to us to pay these obligations. In addition, our obligations under the TRA could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combinations or other changes of control that could be in the best interests of holders of our Class A common stock.

*Different interests among our investors or between our investors and us, including with respect to related party transactions, could prevent us from achieving our business goals.*

Until October 3, 2017, one year following the date that we ceased to qualify as a "controlled company" under the NYSE rules, we expect that a majority of our board of directors will include directors who are affiliated with entities that may have commercial relationships with us. Certain of our pre-IPO investors could have business interests that conflict with those of the other investors, which may make it difficult for us to pursue strategic initiatives that require consensus among our owners.

Our relationship with our pre-IPO investors, who owned 33.6% of our Class A common stock, 100% of our Class B common stock and a 22.6% economic interest in Evolent Health LLC, as of December 31, 2016, could create conflicts of interest among our investors, or between our investors and us, in a number of areas relating to our past and ongoing relationships. For example, certain of our products and services compete (or may compete in the future) with various products and services of our investors. In addition, our pre-IPO investors may have different tax positions from us which could influence their decisions regarding whether and when to dispose of assets, whether and when to incur new or refinance existing indebtedness, especially in light of the existence of the TRA, and whether and when Evolent Health, Inc. should terminate the TRA and accelerate its obligations thereunder. In addition, the structuring of future transactions may take into consideration these pre-IPO investors' tax or other considerations even where no similar benefit would accrue to us. Except as set forth in the TRA and the stockholders' agreement that we entered into with our pre-IPO investors at the time of our IPO, which we refer to as the stockholders' agreement, there are not any formal dispute resolution procedures in place to resolve conflicts between us and our pre-IPO investors or among our pre-IPO investors. We may not be able to resolve any potential conflicts between us and a pre-IPO investor and, even if we do, the resolution may be less favorable to us than if we were negotiating with an unaffiliated party.

31

*The agreements between us and certain of our pre-IPO investors were made in the context of an affiliated relationship and may contain different terms than comparable agreements with unaffiliated third parties.*

The contractual agreements that we have with certain of our pre-IPO investors were negotiated in the context of an affiliated relationship in which representatives of such pre-IPO investors and their affiliates comprised a significant portion of our board of directors. As a result, the financial provisions, and the other terms of these agreements, such as covenants, contractual obligations on our part and on the part of such pre-IPO investors and termination and default provisions may be less favorable to us than terms that we might have obtained in negotiations with unaffiliated third parties in similar circumstances, which could have a material adverse effect on our business, financial condition and results of operations.

**Risks relating to ownership of our securities**

*We expect that our stock price will be volatile and may fluctuate or decline significantly.*

The trading price of our Class A common stock is likely to be volatile and subject to wide price fluctuations in response to various factors, including:

- economic and political conditions or events;
- market conditions in the broader stock market in general, or in our industry in particular;
- actual or anticipated fluctuations in our quarterly financial reports and results of operations;
- our ability to satisfy our ongoing capital needs and unanticipated cash requirements;
- indebtedness incurred in the future;
- introduction of new products and services by us or our competitors;
- issuance of new or changed securities analysts' reports or recommendations;
- sales of large blocks of our stock;
- additions or departures of key personnel;
- regulatory developments; and
- litigation and governmental investigations.

These and other factors may cause the market price and demand for our Class A common stock to fluctuate substantially, which may limit or prevent investors from readily selling their shares of Class A common stock, including any shares of Class A common stock they receive upon conversion of our 2021 Notes, and may otherwise negatively affect the liquidity of our Class A common stock. In addition, in the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders brought a lawsuit against us, we could incur substantial costs defending the lawsuit. Such a lawsuit could also divert the time and attention of our management from our business.

The trading market for our Class A common stock will also be influenced by the research and reports that industry or securities analysts publish about us or our business. As a new public company, if one or more of the analysts who cover us downgrades our stock, or if our results of operations do not meet their expectations, our stock price could decline which could, in turn, adversely affect the value of the notes.

*The market price of our Class A common stock could decline as a result of sales by our existing stockholders or if a substantial number of shares become available for sale and are sold in a short period of time in the future.*

If our existing stockholders sell substantial amounts of our Class A common stock in the public market, the market price of our Class A common stock could decrease significantly. The perception in the public market that our existing stockholders might sell shares of Class A common stock could also depress our market price. As of December 31, 2016, there were 52.6 million shares of Class A common stock outstanding. In addition, 4.0 million options that are held by our employees are currently exercisable or will be exercisable in 2017. In addition, certain of our executive officers, directors and employees hold additional shares of Class A common stock that may be available for resale under Rule 144 (in the case of restricted stock, after the shares have vested).

In connection with acquisitions and other transactions, from time to time we issue shares in transactions exempt from registration under the Securities Act. For example, in connection with the acquisition of Valence Health, we issued 7.0 million shares of our Class A common stock in transactions exempt from registration under the Securities Act.

The market price of shares of our Class A common stock may drop significantly as a result of the issuance of additional shares, the resale of such shares or when the restrictions on resale by our existing stockholders lapse. A decline in the price of shares of our Class A common stock might impede our ability to raise capital through the issuance of additional shares of our Class A common stock or other equity securities.

*The market price of our Class A common stock could decline due to the large number of shares of Class A common stock eligible for sale upon the exchange of Class B common units or conversion of the notes.*

The market price of our Class A common stock could decline as a result of sales of a large number of shares of our Class A common stock eligible upon the exchange of Class B common units (together with an equal number of shares of our Class B common stock) or conversion of the notes or the perception that such sales could occur. These sales, or the possibility that these sales may occur, may also make it more difficult for us to raise additional capital by selling equity or equity-linked securities in the future, at a time and price that we deem appropriate.

As of December 31, 2016, 52.6 million Class A common stock and 15.3 million Class B common units were outstanding. Each Class B common unit, together with one share of our Class B common stock, is exchangeable for one share of Class A common stock. Pursuant to our registration rights agreement, we granted registration rights to the holders of the Class B common units with respect to their shares of Class A common stock delivered in exchange for their Class B common units, as well as certain other holders of our Class A common stock. Resales of these securities were registered pursuant to our Registration Statement on Form S-3, File No. 333-212709, initially filed on July 28, 2016 and declared effective on August 12, 2016. In addition, a substantial number of shares of our Class A common stock is reserved for issuance upon the conversion of the notes. We cannot assure you if or when any future offerings or resales of these shares may occur.

*Some provisions of Delaware law, our amended and restated certificate of incorporation and amended and restated bylaws and certain of our contracts may deter third parties from acquiring us.*

Among other things, our amended and restated certificate of incorporation and our amended and restated bylaws:

- divides our board of directors into three staggered classes of directors that are each elected to three-year terms;
- prohibits stockholder action by written consent;
- authorizes the issuance of "blank check" preferred stock that could be issued by our board of directors to increase the number of outstanding shares of capital stock, making a takeover more difficult and expensive;
- prohibits cumulative voting in the election of directors, which would otherwise allow less than a majority of stockholders to elect director candidates;
- provides that special meetings of the stockholders may be called only by or at the direction of the board of directors, the chairman of our board or the chief executive officer;
- requires advance notice to be given by stockholders for any stockholder proposals or director nominees;
- requires the affirmative vote of holders of at least 75% of the voting power of our outstanding shares of stock to amend certain provisions of our amended and restated certificate of incorporation and any provision of our amended and restated bylaws; and
- requires the affirmative vote of holders of at least 75% of the voting power of our outstanding shares of stock to remove directors and only for cause.

In addition, Section 203 of the DGCL may affect the ability of an "interested stockholder" to engage in certain business combinations, for a period of three years following the time that the stockholder becomes an "interested stockholder." We have elected in our amended and restated certificate of incorporation not to be subject to Section 203 of the DGCL. Nevertheless, our amended and restated certificate of incorporation contains provisions that have the same effect as Section 203 of the DGCL, except that they will provide that each of TPG, UPMC and The Advisory Board and their transferees will not be deemed to be "interested stockholders," and accordingly are not subject to such restrictions.

These and other provisions could have the effect of discouraging, delaying or preventing a transaction involving a change in control of our company or could make it more difficult for stockholders to elect directors of their choosing or to cause us to take other corporate actions that they desire. Provisions in certain of our contracts may also deter third parties from acquiring us. For example, under the UPMC IP Agreement, Evolent Health LLC's license to certain intellectual property of UPMC would cease if we are acquired by certain specified acquirers. In addition, our contracts with certain partners would terminate if we are acquired by certain competitors or if UPMC ceases to be a subcontractor of our data and technology services.

*Our amended and restated certificate of incorporation and stockholders' agreement contain provisions renouncing our interest and expectation to participate in certain corporate opportunities identified by or presented to certain of our pre-IPO investors.*

Each of TPG, The Advisory Board and UPMC and their respective affiliates may engage in activities similar to ours or lines of business or have an interest in the same areas of corporate opportunities as we do. Our amended and restated certificate of incorporation and stockholders' agreement provide that such stockholders and their respective affiliates do not have any duty to refrain from (1) engaging, directly or indirectly, in the same or similar business activities or lines of business as us, including those business activities or lines of business deemed to be competing with us, or (2) doing business with any of our clients, customers or vendors. In the event that TPG, The Advisory Board or UPMC or any of their respective affiliates acquires knowledge of a potential business opportunity which may be a corporate opportunity for us, they have no duty to communicate or offer such corporate opportunity to us. Our amended and restated certificate of incorporation and stockholders' agreement also provide that, to the fullest extent permitted by

33

law, none of such stockholders or their respective affiliates will be liable to us, for breach of any fiduciary duty or otherwise, by reason of the fact that any such stockholder or any of its affiliates directs such corporate opportunity to another person, or otherwise does not communicate information regarding such corporate opportunity to us, and we have waived and renounced any claim that such business opportunity constituted a corporate opportunity that should have been presented to us. These potential conflicts of interest could have a material adverse effect on our business, financial condition, results of operations or prospects if attractive business opportunities are allocated by TPG, The Advisory Board or UPMC to themselves or their respective affiliates instead of to us.

*Our amended and restated certificate of incorporation designates courts in the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.*

Our amended and restated certificate of incorporation provides that, subject to limited exceptions, the Court of Chancery of the State of Delaware is the sole and exclusive forum for (a) any derivative action or proceeding brought on our behalf, (b) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (c) any action asserting a claim against us arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws, (d) any action to interpret, apply, enforce or determine the validity of our amended and restated certificate of incorporation or amended and restated bylaws or (e) any other action asserting a claim against us that is governed by the internal affairs doctrine. We refer to each of these proceedings as a covered proceeding. In addition, our amended and restated certificate of incorporation provides that if any action the subject matter of which is a covered proceeding is filed in a court other than the specified Delaware courts without the approval of our board of directors, which we refer to as a foreign action, the claiming party will be deemed to have consented to (1) the personal jurisdiction of the specified Delaware courts in connection with any action brought in any such courts to enforce the exclusive forum provision described above and (2) having service of process made upon such claiming party in any such enforcement action by service upon such claiming party's counsel in the foreign action as agent for such claiming party. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock will be deemed to have notice of and to have consented to these provisions. These provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits against us and our directors, officers and employees. Alternatively, if a court were to find these provisions of our amended and restated certificate of incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business and financial condition.

*We do not anticipate paying any cash dividends in the foreseeable future.*

We currently intend to retain our future earnings, if any, for the foreseeable future to fund the development and growth of our business. We do not intend to pay any dividends to holders of our Class A common stock. As a result, capital appreciation in the price of our Class A common stock, if any, will be your only source of gain on an investment in our Class A common stock. See "Part II - Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities - "Dividends" for a discussion of our dividend policy.

*In preparation of our IPO in 2015, we identified a material weakness in our internal control over financial reporting, and if we are unable to remedy our material weakness, or if we fail to establish and maintain effective internal controls, we may be unable to produce timely and accurate financial statements, and we may conclude that our internal control over financial reporting is not effective, which could adversely impact our investors' confidence and our stock price.*

Prior to the completion of our IPO, we were a private company and had limited accounting personnel to fully execute our accounting processes and address our internal control over financial reporting. Upon becoming a publicly-traded company, we became required to comply with the SEC's rules implementing Sections 302 and 404 of the Sarbanes-Oxley Act, which require management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of controls over financial reporting. We were not required to make our first annual assessment of our internal control over financial reporting pursuant to Section 404 until the filing of this 2016 10-K. Pursuant to the JOBS Act, our independent registered public accounting firm is not required to attest to the effectiveness of our internal control over financial reporting in general until the earlier of (1) the year in which our public float exceeds $700 million as of June 30 of the respective year or (2) December 31, 2020.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. During the course of preparing for our IPO, we determined that we had a material weakness in the design and operating effectiveness of our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness that we identified was that we did not maintain a sufficient complement of resources with an appropriate level of accounting knowledge, experience and training to address accounting for complex, non-routine transactions.

We are currently in the process of remediating the material weakness and have taken numerous steps that we believe will address the underlying causes of the material weakness. Steps we have taken include hiring additional, and reallocating existing, accounting and finance personnel with technical accounting and financial reporting experience, enhancing our training programs within our accounting and finance department, enhancing our internal review procedures during the financial statement close process and refining our existing internal control documentation. This initiative has placed significant demands on our financial and operational resources, as well as our IT systems. Our current efforts to design and implement an effective control environment may not be sufficient to remediate or prevent future material weaknesses or significant deficiencies from occurring. During the course of the design and implementation, we may identify additional control deficiencies, which could give rise to other material weaknesses, in addition to the material weakness described above. The material weakness described above or any newly identified material weakness could result in a misstatement of our financial statements or disclosures that would result in a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected. A control system, no matter how well designed and operated, can provide only reasonable assurance that the control system's objectives will be met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and all instances of fraud will be detected. If we fail to effectively remediate deficiencies in our control environment, if we identify future material weaknesses in our internal controls over financial reporting or if we are unable to comply with the demands that will be placed upon us as a public company, including the requirements of Section 404 of the Sarbanes-Oxley Act, in a timely manner, we may be unable to accurately report our financial results, or report them within the timeframes required by the SEC. In addition, if we are unable to assert that our internal control over financial reporting are effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, if and when required, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock could be negatively affected. We also could become subject to investigations by the NYSE, the SEC or other regulatory authorities.

*We are an "emerging growth company" and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our securities stock less attractive to investors.*

We are an "emerging growth company," as defined in the JOBS Act, and we are taking and intend to continue to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, which may increase the risk that weaknesses or deficiencies in our internal control over financial reporting go undetected. During the course of preparing for our IPO, we concluded that we had a material weakness in the design and operating effectiveness of our internal control over financial reporting. We also are taking and intend to continue to take advantage of reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, which may make it more difficult for investors and securities analysts to evaluate our company, and exemptions from the requirement of holding advisory "say on pay" votes on executive compensation and advisory votes on golden parachute compensation. We cannot predict if investors will find our securities less attractive if we rely on these exemptions. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and prices may be more volatile. We may take advantage of these reporting exemptions until we are no longer an emerging growth company, which in certain circumstances could be until December 31, 2020.

*Our business and stock price may suffer as a result of our lack of public company operating experience.*

Prior to our listing in 2015, we were a privately-held company since we began operations in 2011. Our lack of public company operating experience may make it difficult to forecast and evaluate our future prospects. If we are unable to execute our business strategy, either as a result of our inability to effectively manage our business in a public company environment or for any other reason, our prospects, financial condition, results of operations and stock price may be harmed.

**Item 1B. Unresolved Staff Comments**

Not applicable.

**Item 2. Properties**

Our corporate headquarters and executive officers are located in Arlington, Virginia, where we occupy approximately 91,000 square feet of office space. We occupy approximately 90,000 square feet of office space in Chicago, Illinois, as a result of our acquisition of Valence Health. We also occupy office space in Lisle, Illinois, as a result of our acquisition of Aldera. In addition, we occupy office space in San Francisco, California and also incur monthly rental expense to have a limited number of personnel on-site at certain client locations. We lease all of our facilities and we do not own any real property. As provided in "Part II - Item 8. Financial Statements and Supplementary Data - Note 9 - Commitments," the rental expense on operating leases was $5.9 million for 2016.

35

**Item 16. Form 10-K Summary**

Not Applicable.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Evolent Health, Inc.**

| | |
|---|---|
| By: | /s/ Nicholas McGrane |
| Name: | **Nicholas McGrane** |
| Title: | **Chief Financial Officer** |

Dated: March 2, 2017

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Frank Williams <br> **Frank Williams** | Chief Executive Officer and Director <br> (Principal Executive Officer) | March 2, 2017 |
| /s/ Nicholas McGrane <br> **Nicholas McGrane** | Chief Financial Officer <br> (Principal Financial Officer) | March 2, 2017 |
| /s/ Lydia Stone <br> **Lydia Stone** | Corporate Controller <br> (Principal Accounting Officer) | March 2, 2017 |
| /s/ David Farner <br> **David Farner** | Director | March 2, 2017 |
| /s/ Bruce Felt <br> **Bruce Felt** | Director | March 2, 2017 |
| /s/ Matthew Hobart <br> **Matthew Hobart** | Director | March 2, 2017 |
| /s/ Diane Holder <br> **Diane Holder** | Director | March 2, 2017 |
| /s/ Michael Kirshbaum <br> **Michael Kirshbaum** | Director | March 2, 2017 |
| /s/ Michael D'Amato <br> **Michael D'Amato** | Director | March 2, 2017 |
| /s/ Norman Payson <br> **Norman Payson, MD** | Director | March 2, 2017 |
| /s/ Kenneth Samet <br> **Kenneth Samet** | Director | March 2, 2017 |
| /s/ Cheryl Scott <br> **Cheryl Scott** | Director | March 2, 2017 |