# Exhibit 32

**Section 1: 8-K (8-K)**

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

_____

## FORM 8-K

_____

CURRENT REPORT
Pursuant to Section 13 OR 15(d) of
The Securities Exchange Act of 1934

**October 3, 2016**
Date of Report (Date of earliest event reported)

# Evolent Health, Inc.
**(Exact name of registrant as specified in its charter)**

_____

| **Delaware** | **001-37415** | **32-0454912** |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**800 N. Glebe Road, Suite 500, Arlington, Virginia 22203**
**(Address of principal executive offices)(zip code)**

**(571) 389-6000**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name, former address and former fiscal year, if changed since last report.)**

_____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 - Entry into a Material Definitive Agreement.**

On October 3, 2016, Evolent Health, Inc., a Delaware corporation (the "Company"), and Electra Merger Sub, LLC, a Delaware limited liability company and wholly-owned subsidiary of the Company ("Merger Sub"), entered into an amendment (the "Amendment") to the Agreement and Plan of Merger dated as of July 12, 2016 by and among the Company, Merger Sub, Valence Health, Inc., a Delaware corporation ("Valence"), and North Bridge Growth Management Company LLC and Philip Kamp, in their capacity as representative of the securityholders of Valence (the "Merger Agreement", and, as amended by the Amendment, the "Amended Merger Agreement"), pursuant to which, subject to the satisfaction or waiver of certain conditions, Valence would be merged with and into Merger Sub (the "Merger"), with Merger Sub surviving the Merger as a wholly-owned subsidiary of the Company.

The Amendment amended the definition of "Merger Consideration" to be cash in amount equal to $50.3 million (the "Cash Consideration") and 7.42 million shares of the Company's Class A common stock (the "Share Consideration"), subject to certain closing adjustments. After giving effect to the Amendment and certain closing adjustments, the aggregate amount of merger consideration to be paid by the Company at closing (the "Closing Merger Consideration") is $219.4 million based on the closing price of the Company's Class A common stock on the New York Stock Exchange on October 3, 2016, consisting of $50.3 million in Cash Consideration and 7.05 million in Share Consideration. The Amendment increased the Cash Consideration by $15.3 million and the Share Consideration by 1.58 million shares, for an aggregate increase in Closing Merger Consideration of $41.1 million (based on the agreed-upon stock price as of the execution of the Merger Agreement of $16.27). Such changes reflect the achievement prior to the closing of the Merger of a portion of the previously agreed-to earn-out after giving effect to an agreed upon adjustment to the earn-out threshold and an adjustment to the mix of cash and stock to be issued by the Company as Closing Merger Consideration to provide sufficient cash to fund certain operations of Valence not being acquired by the Company relating to its business of serving state insurance cooperatives.

In addition, the Amendment amended the Merger Agreement to reflect the following: (i) a decrease in the amount of additional contingent share consideration payable based on the satisfaction of certain conditions and achievement of new business activity over the balance of calendar year 2016 to $12.38 million (payable in shares of the Company's Class A common stock not to exceed 951,576 shares of the Company's Class A common stock), taking into account the achievement of the earn-out as described above; (ii) the accelerated vesting of all options and warrants to purchase shares of the capital stock of Valence and the cancellation of such options and warrants effective upon the closing of the Merger; (iii) the agreement of the parties with respect to certain known liabilities; and (iv) the agreement of the parties with respect to certain post-closing adjustments based on leased real property. In addition, as a result of the Amendment, certain Valence contracts serving state insurance cooperatives that have announced the shut-down of operations will not be transferred to a separate entity owned by the former Valence stockholders prior to the closing of the Merger as originally contemplated by the terms of the Merger Agreement. The Surviving Entity (defined below) will remain a party to such contracts purely for the provision of run-out services, and, subject to the terms of the Amended Merger Agreement, the Company will be entitled to indemnification for losses and expenses incurred in connection therewith as provided in the Amended Merger Agreement.

Other than as expressly modified pursuant to the Amendment, the Merger Agreement remains in full force and effect as originally executed on July 12, 2016. The foregoing description of the Amendment, the Amended Merger Agreement and the transactions contemplated thereby does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Amendment, which is filed herewith as Exhibit 2.2 and is incorporated herein by reference, and the Merger Agreement, which was previously filed as Exhibit 2.1 to the Current Report on Form 8-K filed with the Securities and Exchange Commission by the Company on July 29, 2016, and, as amended by the Amendment, is incorporated herein by reference.

**Item 2.01 - Completion of Acquisition or Disposition of Assets.**

On October 3, 2016, pursuant to the Amended Merger Agreement, the Company acquired all of the outstanding shares of capital stock of Valence ("Valence Stock") through the Merger, with Merger Sub surviving the merger as a wholly owned subsidiary of the Company and changing its name to Valence Health, LLC (the "Surviving Entity").

Under the terms of the Amended Merger Agreement, each share of Valence Stock issued and outstanding immediately before the effective time of the Merger was cancelled and converted into the right to receive a portion of the Share Consideration, Additional Share Consideration and/or Cash Consideration, all in accordance with the certificate of incorporation of Valence in effect immediately prior to the closing of the Merger. Pursuant to the terms of the Amended Merger Agreement, holders of Valence Stock who are not "accredited investors" as defined under Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), will receive cash and are not entitled to receive any portion of the Share Consideration or Additional Share Consideration.

As a result, the Company issued approximately 7.05 million shares of the Company's Class A common stock and paid $50.3 million in cash with cash on hand to the former Valence stockholders in connection with the Merger. The shares issued to Valence stockholders represent approximately 10.5% of the Company's issued and outstanding Class A common stock and Class B common stock after the Merger.

Prior to the closing of the Merger, Valence caused all outstanding and unexercised Options, including Options that had been granted under Valence's equity-based compensation plans, to vest in full. At the effective time of the Merger, all outstanding Options that remained unexercised were canceled for no consideration.

The foregoing description of the Amended Merger Agreement and the Merger and the other transactions contemplated thereby does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Amendment, which is filed herewith as Exhibit 2.2 and is incorporated herein by reference, and the Merger Agreement, which was previously filed as Exhibit 2.1 to the Current Report on Form 8-K filed with the Securities and Exchange Commission by the Company on July 14, 2016, and is incorporated herein by reference.

**Item 3.02 - Unregistered Sales of Equity Securities.**

The information set forth in Items 1.01 and 2.01 above with respect to the issuance of shares of the Company's Class A common stock as part of the Closing Merger Consideration and the Additional Share Consideration is incorporated into this Item 3.02 by reference.

Pursuant to the Amended Merger Agreement, the shares of the Company's Class A common stock comprising the Share Consideration included in the Closing Merger Consideration and the Additional Share Consideration will be issued only to those Valence stockholders who are "accredited investors" as defined in Regulation D promulgated under the Securities Act. The issuance and sale of the shares of the Company's Class A common stock is exempt from registration under Section 4(a)(2) of the Securities Act because the transaction does not involve a public offering. The shares of the Company's Class A common stock to be issued in the Merger will be restricted securities for purposes of Rule 144 and subject to certain requirements before sale, including holding period requirements. The Company has not engaged in general solicitation or advertising with regard to the issuance and sale of the Company's Class A common stock to be issued in the Merger.

**Item 7.01 - Regulation FD Disclosure.**

On October 3, 2016, the Company issued a press release announcing the execution of the Amendment and the closing of the Merger. A copy of the press release is furnished as Exhibit 99.1 to this Current Report and is incorporated herein by reference.

The information, including the exhibit attached hereto, furnished under this Item 7.01 shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, and shall not be incorporated by reference into any registration statement or other document pursuant to the Securities Act or the Exchange Act except as otherwise expressly stated in such filing.

**Item 8.01 - Other Events.**

Upon closing of the Merger, UPMC, certain affiliates of TPG Global, LLC and The Advisory Board Company no longer control a majority of the voting power of the Company's outstanding common stock. Following the closing of the Merger, the Company is no longer a "controlled company" under the New York Stock Exchange rules.

**Forward-Looking Statements**

In addition to the discussion regarding forward-looking statements in the press release attached as Exhibit 99.1 and incorporated herein by reference, this Current Report on Form 8-K contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), including, but not limited to, statements regarding the Merger and the consideration to be paid in connection with the Merger. The Company claims the protection afforded by the safe harbor for forward-looking statements provided by the PSLRA. Actual events or results may differ materially from those contained in these forward-looking statements. Among the factors that could cause future events or results to vary from those contained in the forward-looking statements include, without limitation:

- The acquisition of Valence, as well as future acquisitions, investments and alliances could pose numerous risks to the Company's operations, including:
  - difficulty integrating the purchased operations, products or technologies;
  - substantial unanticipated integration costs, delays and challenges that may arise in integration;
  - assimilation of the acquired businesses, which may divert significant management attention and financial resources from the Company's other operations and could disrupt the Company's ongoing business;
  - the loss of key employees, particularly those of the acquired operations;
  - difficulty retaining or developing the acquired business' customers;
  - adverse effects on the Company's existing business relationships with customers, suppliers, other partners, standing with regulators;

- ◦ challenges related to the integration of businesses that operate in new geographic areas and new markets;
- ◦ failure to realize the potential cost savings or other financial benefits or the strategic benefits of the acquisitions;
- ◦ liabilities from the acquired businesses for infringement of intellectual property rights, data privacy violations or other claims and failure to obtain indemnification for such liabilities or claims.
- ◦ The Company may be unable to complete acquisitions or integrate the operations, products or personnel gained through the Valence acquisition or any other such transaction without a material adverse effect on the Company's business, financial condition and results of operations.
- ◦ Transaction agreements may impose limitations on the Company's ability, or as is the case in the Valence acquisition, the ability of the business to be acquired, to conduct business.
- ◦ Events outside the Company's control, including operating changes or regulatory changes, could also adversely affect the Company's ability to realize anticipated revenues, synergies, benefits and cost savings.
- ◦ Revenues of Valence after consummation of the acquisition may be less than expected.
- ◦ Any integration may be unpredictable, or subject to delays or changed circumstances, and the Company and any targets may not perform in accordance with the Company's expectations.
- ◦ In addition, the market price for the Company's Class A common stock could be affected, following the consummation of the Valence acquisition or any other transaction, by factors that have not historically affected the market price for the Company's Class A common stock.
- the structural change in the market for health care in the United States;
- the Company's ability to effectively manage its growth;
- the significant portion of revenue the Company derives from its largest partners;
- the Company's ability to offer new and innovative products and services;
- the growth and success of the Company's partners, which is difficult to predict and is subject to factors outside of the Company's control, including premium pricing reductions and the ability to control and, if necessary, reduce health care costs;
- the Company's ability to attract new partners;
- the Company's ability to recover the significant upfront costs in its partner relationships;
- the Company's ability to estimate the size of its target market;
- the Company's ability to maintain and enhance its reputation and brand recognition;
- consolidation in the health care industry;
- competition which could limit the Company's ability to maintain or expand market share within its industry;
- the Company's ability to partner with providers due to exclusivity provisions in its contracts;
- uncertainty in the health care regulatory framework;
- restrictions and penalties as a result of privacy and data protection laws;
- adequate protection of the Company's intellectual property;
- any alleged infringement, misappropriation or violation of third-party proprietary rights;
- the Company's use of "open source" software;
- the Company's ability to protect the confidentiality of its trade secrets, know-how and other proprietary information;
- the Company's reliance on third parties;
- the Company's ability to use, disclose, de-identify or license data and to integrate third-party technologies;
- data loss or corruption due to failures or errors in the Company's systems and service disruptions at its data centers;
- breaches or failures of the Company's security measures;
- the Company's reliance on Internet infrastructure, bandwidth providers, data center providers, other third parties and the Company's own systems for providing services to its users;
- the Company's dependency on key personnel, and its ability to attract, hire, integrate and retain key personnel;
- risks related to future acquisition opportunities;
- the risk of potential future goodwill impairment on the Company's results of operations;
- the Company's future indebtedness and its ability to obtain additional financing;
- the Company's ability to achieve profitability in the future;
- the requirements of being a public company;
- the Company's adjusted results may not be representative of its future performance;
- the risk of potential future litigation;
- the Company's ability to remediate the material weakness in its internal control over financial reporting;
- the Company's holding company structure and dependence on distributions from Evolent Health LLC;
- the Company's obligations to make payments to certain of its pre-IPO investors for certain tax benefits it may claim in the future;
- the Company's ability to utilize benefits under the tax receivables agreement;
- the Company's ability to realize all or a portion of the tax benefits that it currently expects to result from future exchanges of Class B common units of Evolent Health LLC for its Class A common stock, and to utilize certain tax attributes of Evolent Health Holdings and an affiliate of TPG;

- distributions that Evolent Health LLC will be required to make to the Company and to the other members of Evolent Health LLC;
- the Company's obligations to make payments under the tax receivables agreement that may be accelerated or may exceed the tax benefits it realizes;
- different interests among the Company's pre-IPO investors, or between the Company and its pre-IPO investors;
- the terms of agreements between the Company and certain of its pre-IPO investors;
- the Company's exemption from certain corporate governance requirements due to its previous status as a "controlled company" within the meaning of the New York Stock Exchange rules;
- the potential volatility of the Company's Class A common stock price;
- the potential decline of the Company's Class A common stock price if a substantial number of shares become available for sale or if a large number of Class B common units is exchanged for shares of Class A common stock;
- provisions in the Company's amended and restated certificate of incorporation and amended and restated by-laws and provisions of Delaware law that discourage or prevent strategic transactions, including a takeover of the Company;
- the ability of certain of the Company's investors to compete with the Company without restrictions;
- provisions in the Company's certificate of incorporation which could limit the Company's stockholders' ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees;
- the Company's intention not to pay cash dividends on its Class A common stock; and
- the Company's status as an "emerging growth company."

In addition, please refer to the periodic reports that the Company files with the Securities and Exchange Commission ("SEC"), including on Forms 10-K, 10-Q and 8-K and the risk factors noted therein. The SEC filings by the Company identify and address other important factors that could cause events or results to vary from the forward-looking statements set forth in this Current Report on Form 8-K. In addition, the Company disclaims any obligation to update any forward-looking statements to reflect events or circumstances that occur after the date of this Form 8-K.

**Item 9.01 - Financial Statements and Exhibits**

(a) Financial Statements of Business Acquired.

As permitted by Item 9.01(a)(4) of Form 8-K, the financial statements required by this item will be filed by amendment to this Current Report on Form 8-K within 71 calendar days after the date on which this Current Report must be filed.

(b) Pro Forma Financial Information.

As permitted by Item 9.01(a)(4) of Form 8-K, the pro forma financial statements required by this item will be filed by amendment to this Current Report on Form 8-K within 71 calendar days after the date on which this Current Report must be filed.

(d) Exhibits

The following documents are filed as exhibits to this report:

| Exhibit Number | Description of Exhibit |
|---|---|
| 2.1* | Agreement and Plan of Merger, dated July 12, 2016, by and among Evolent Health, Inc., Electra Merger Sub, LLC, Valence Health, Inc. and North Bridge Growth Management Company LLC and Philip Kamp, in their capacity as the Securityholders' Representative. Previously filed as Exhibit 2.1 to the Company's Current Report on Form 8-K filed on July 14, 2016 and incorporated herein by reference. |
| 2.2* | First Amendment to Agreement and Plan of Merger, dated October 3, 2016, by and among Evolent Health, Inc., Electra Merger Sub, LLC, Valence Health, Inc. and North Bridge Growth Management Company LLC and Philip Kamp, in their capacity as the Securityholders' Representative. |
| 99.1 | Press Release of Evolent Health, Inc., dated October 3, 2016. |

* The Company agrees to furnish supplementally to the SEC a copy of any omitted schedule or exhibit upon the request of the SEC in accordance with Item 601(b)(2) of Regulation S-K.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

                                                                    **EVOLENT HEALTH, INC.**

                                                        By:        /s/ Jonathan Weinberg
                                                        Name:    **Jonathan Weinberg**
                                                        Title:      General Counsel and Secretary
                                                                    *(Duly Authorized Officer)*

Date: October 3, 2016

**EXHIBIT INDEX**

| Exhibit Number | Description of Exhibit |
|---|---|
| 2.1* | Agreement and Plan of Merger, dated July 12, 2016, by and among Evolent Health, Inc., Electra Merger Sub, LLC, Valence Health, Inc. and North Bridge Growth Management Company LLC and Philip Kamp, in their capacity as the Securityholders' Representative. Previously filed as Exhibit 2.1 to the Company's Current Report on Form 8-K filed on July 14, 2016 and incorporated herein by reference. |
| 2.2* | First Amendment to Agreement and Plan of Merger, dated October 3, 2016, by and among Evolent Health, Inc., Electra Merger Sub, LLC, Valence Health, Inc. and North Bridge Growth Management Company LLC and Philip Kamp, in their capacity as the Securityholders' Representative. |
| 99.1 | Press Release of Evolent Health, Inc., dated October 3, 2016. |

\* The Company agrees to furnish supplementally to the SEC a copy of any omitted schedule or exhibit upon the request of the SEC in accordance with Item 601(b)(2) of Regulation S-K.

(Back To Top)

# Section 2: EX-2.2 (EXHIBIT 2.2)

**FIRST AMENDMENT TO**
**AGREEMENT AND PLAN OF MERGER**

This First Amendment to the Agreement and Plan of Merger ("Amendment"), dated as of October 3, 2016, is entered into by and among Evolent Health, Inc., a Delaware corporation ("Evolent"), Electra Merger Sub, LLC, a Delaware limited liability company and wholly-owned subsidiary of Evolent ("Merger Sub" and together with Evolent, collectively, the "Evolent Entities"), Valence Health, Inc., a Delaware corporation ("Valence Parent"), and North Bridge Growth Management Company LLC ("North Bridge") and Philip Kamp, jointly as the Securityholders' Representative. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Merger Agreement (as defined below).

**RECITALS**

WHEREAS, the Parties entered into that certain Agreement and Plan of Merger, dated as of July 12, 2016 (the "Merger Agreement"); and

WHEREAS, the Parties desire to amend the Merger Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

**AGREEMENT**

1. **Definitions**. Unless otherwise defined in this Amendment, all capitalized terms have the meanings set forth in the Merger Agreement.

2. **Amendment to Merger Agreement**. The Merger Agreement is hereby amended as follows:

(a) Section 2.6(a) and Section 2.6(c) of the Merger Agreement are hereby amended and restated in their entirety as follows:

    (a)    <u>Treatment of Company Options</u>. Prior to Closing, the Company shall cause each then-outstanding and unexercised option to acquire Shares (a "<u>Company Option</u>") to vest in full and shall permit any holder thereof to exercise such Company Option. As of the Effective Time, each then-outstanding and unexercised Company Option shall be canceled by virtue of the Merger without any consideration therefor and shall no longer represent any right to acquire Shares or otherwise to receive any portion of the Total Merger Consideration.

    (b)    <u>Treatment of Company Warrants</u>. Prior to Closing, the Company shall cause each then-outstanding and unexercised warrant to acquire Shares (a "<u>Company Warrant</u>") to vest in full (to the extent not previously vested) and shall permit any holder thereof to exercise such Company Warrant. As of the Effective Time, each then-outstanding and unexercised Company Warrant shall be canceled by virtue of the Merger and shall no longer represent any right to acquire Shares or otherwise to receive any portion of the Total Merger Consideration.

    (c)    <u>Section 2.7(d) of the Merger Agreement is hereby amended and restated as follows</u>:

1

(d)    <u>Withholding</u>. Each of Evolent and its Affiliates (without duplication) shall be entitled to deduct and withhold from amounts otherwise payable to any Person under the terms of this Agreement such amounts as it may reasonably believe are required to be deducted and withheld with respect to the making of such payment under any provision of federal, state, local, or foreign Tax law. Other than with respect to payments of Total Merger Consideration being made to Equityholders with respect to the exercised Company Options, Evolent and its Affiliates shall provide any party on behalf of which such deduction or withholding is proposed to be made with written notice of its intention to make such deduction or withholding (such notice to be provided at least a commercially reasonable period of time before such deduction or withholding is required), which notice shall include the authority, basis and method of calculation for the proposed deduction or withholding, and Evolent and its Affiliates will cooperate with any reasonable request from such party to obtain reduction of or relief from such deduction or withholding. To the extent that amounts are so withheld by Evolent or any of its Affiliates and paid over to the appropriate Tax Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the relevant Person in respect of which such deduction and withholding was made.

(d)    <u>Section 2.12(a) and Section 2.12(f) of the Merger Agreement are hereby amended and restated in their entirety as follows</u>:

(a)    <u>Certain Definitions</u>. For purposes of this Section 2.12 the following capitalized terms shall have the meanings set forth below:

(i)    "<u>2017 Contracted Revenue</u>" means the contracted revenue attributable to the Qualified Eligible Bookings for Fiscal Year 2017, and to be calculated, with respect to each Qualified Eligible Booking, as (A) the product of: (x) the contracted per member per month (PMPM) price provided in the definitive agreement with the client, (y) the client's projected membership as set forth in the definitive agreement, and (z) the contracted number of months for which service is to be delivered in Fiscal Year 2017, *plus* (B) recognized implementation fees (determined consistent with historical practices of Valence Parent) contracted for with respect to Fiscal Year 2017, if any, from such Qualified Eligible Booking.

(ii)    "<u>Baseline Revenue</u>" means 2017 Contracted Revenue of $0.00.

(iii)    "<u>Earnout Amount</u>" means an amount, if any, calculated as follows: (A) if the 2017 Contracted Revenue Amount is greater than the Baseline Revenue, then an amount equal to the difference between 2017 Contracted Revenue Amount and the Baseline Revenue, up to a maximum of $6,190,000 and (B) if the 2017 Contracted Revenue Amount is greater than $6,190,000, then an additional amount equal to the product of .5 and the difference between the 2017 Contracted Revenue Amount and $6,190,000, up to a maximum of an additional $6,190,000.

(iv)    "<u>Earnout Valuation Methodology</u>" means the volume weighted average closing price of the Evolent Common Stock on the New York Stock Exchange for the seven (7) trading days ending December 31, 2016, which shall not be less than $13.01 nor more than $19.52.

2

(v)    "Fiscal Year 2017" means the period beginning on January 1, 2017 and ending on December 31, 2017.

(vi)    "Eligible Bookings" means those new clients of Valence Parent with respect to the Business set forth in the file entitled "Eligible Bookings Pipeline File" (the "Pipeline File"), delivered via email on September 28, 2016 to Nicky McGrane of Evolent.

(vii)    "Qualified Eligible Bookings" means any Eligible Bookings for which a definitive agreement is executed with Valence Parent no later than December 31, 2016, *provided*, that such definitive agreement must contain the Required Terms and be otherwise reasonably satisfactory to Evolent.

(viii)    "Required Terms" means, (A) a term of at least three (3) years, (B) a minimum gross margin (determined consistent with historical practices of Valence Parent) of thirty percent (30%) and (C) not subject to termination without cause (which shall be defined in a manner substantially consistent with past practice of Valence Parent) by the client; or, in each case, as any such term is modified by mutual agreement of Evolent and the Securityholders' Representative.

(ix)    "Valence Parent" means Valence Parent or any other entity which undertakes the Business after the Closing.

(f)    Maximum Earnout Amount. Notwithstanding anything to the contrary contained in this Agreement, in no event will the maximum Earnout Amount issuable and payable by Evolent hereunder exceed $12,380,000.

(e)    Section 9.2(a) of the Merger Agreement is hereby amended and restated in its entirety as follows:

(a) (i) any breach of any representation or warranty made by Valence Parent in this Agreement or any Valence Closing Document, including any breach of any such representation or warranty alleged by a third party or (ii) arising out of or related to any matter set forth on Section 9.2(a) of the Disclosure Schedule.

(f)    Section 9.2 of the Merger Agreement is hereby amended by adding the following:

(h) any liability or obligation to the extent arising out of or related to any matter set forth on Section 9.2(h) of the Disclosure Schedule.

(i) the Contracts set forth on Section 9.2(i) of the Disclosure Schedule, excepting only (i) Damages arising from Evolent's or its Affiliates' (including the Surviving Entity's) gross negligence or intentional misconduct and (ii) obligations of Evolent or its Affiliates (including the Surviving Entity) from and after the Effective Time under such Contracts in connection with the performance of such Contracts following the Effective Time in the Ordinary Course of Business.

(g)    Section 9.8 of the Merger Agreement is hereby amended by adding the following:

3

(f)    Notwithstanding anything herein to the contrary, for the avoidance of doubt, the provisions of this Section 9.8 shall apply to any claims relating to or arising out of Section 9.2(a)(ii), 9.2(h) and or 9.2(i).

(h)        Section 9.11(b)(iii) of the Merger Agreement is hereby amended and restated in its entirety as follows:

(iii)    other than with respect to Damages of the Evolent Indemnified Persons pursuant to Section 9.2(a)(ii), such Damages shall not include losses to the extent taken into account (including with respect to any reserves) as a reduction in Merger Consideration in the determination of the Final Adjustment Amount pursuant to Section 2.11.

(i)        The table of defined terms in Annex A is hereby amended to remove references to the following terms:

Option Closing Payment

(j)        The following defined terms set forth on Annex A of the Merger Agreement are hereby amended and restated in their entirety:

"*Current Liabilities*" means the following accounts: (i) Accounts Payable account 20100, excluding any amounts related to the Excluded Business; (ii) Unvouchered AP account 20200, excluding any amounts related to the Excluded Business; (iii) Accrued Payroll account 21100, excluding any amounts related to the Excluded Business; (iv) Accrued Bonus account 21101, excluding any amounts related to the Excluded Business; (v) Accrued PTO account 21102, excluding any amounts related to the Excluded Business; (vi) Accrued 401k Match account 21103, excluding any amounts related to the Excluded Business; (vii) 401k Payable account 21105, excluding any amounts related to the Excluded Business; (viii) FICA Payable account 21110, excluding any amounts related to the Excluded Business; (ix) Deferred Revenue account 21900, including current liabilities and excluding any amounts related to the Excluded Business; (x) Accrued Straightline Rent account 21800, including current liabilities; (xi) Other Accrued Expenses account 22200, excluding any amounts related to the Excluded Business but including an FLSA reserve in the amount of $1,550,000; and (xii) Deferred Lease Incentives account 21700, including current liabilities.

"*Equityholder*" means any Securityholder.

"*Merger Consideration*" means (a) cash in an amount equal to $50,309,141.00 (the "Cash Consideration"), *plus* (b) 7,422,618 shares of Evolent Common Stock (the "Share Consideration").

"*Per Share Class A Common Closing Cash Consideration*" means the amount of cash, if any, to which a holder of outstanding shares of Class A Common Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Class A Common Closing Share Consideration*" means the amount of stock consideration, if any, to which a holder of outstanding shares of Class A Common Stock would

4

be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Class A Common Earnout Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Class A Common Stock would be entitled to receive as of the payment of the Earnout Consideration pursuant to the terms of the Charter.

"*Per Share Class A Common Escrow Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Class A Common Stock would be entitled to receive as of the release of any Escrowed Funds pursuant to the terms of the Charter.

"*Per Share Class B Common Closing Cash Consideration*" means the amount of cash, if any, to which a holder of outstanding shares of Class B Common Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Class B Common Closing Share Consideration*" means the amount of stock consideration, if any, to which a holder of outstanding shares of Class B Common Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Class B Common Earnout Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Class B Common Stock would be entitled to receive as of the payment of the Earnout Consideration pursuant to the terms of the Charter.

"*Per Share Class B Common Escrow Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Class B Common Stock would be entitled to receive as of the release of any Escrowed Funds pursuant to the terms of the Charter.

"*Per Share Class C Common Closing Cash Consideration*" means the amount of cash, if any, to which a holder of outstanding shares of Class C Common Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Class C Common Closing Share Consideration*" means the amount of stock consideration, if any, to which a holder of outstanding shares of Class C Common Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Class C Common Earnout Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Class C Common Stock would be entitled to receive as of the payment of the Earnout Consideration pursuant to the terms of the Charter.

"*Per Share Class C Common Escrow Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Class C Common Stock would be entitled to receive as of the release of any Escrowed Funds pursuant to the terms of the Charter.

"*Per Share Series A Preferred Closing Cash Consideration*" means the amount of cash, if any, to which a holder of outstanding shares of Series A Preferred Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Series A Preferred Closing Share Consideration*" means the amount of stock consideration, if any, to which a holder of outstanding shares of Series A Preferred Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Series A Preferred Earnout Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Series A Preferred Stock would be entitled to receive as of the payment of the Earnout Consideration pursuant to the terms of the Charter.

"*Per Share Series A Preferred Escrow Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Series A Preferred Stock would be entitled to receive as of the release of any Escrowed Funds pursuant to the terms of the Charter.

"*Per Share Series B Preferred Closing Cash Consideration*" means the amount of cash, if any, to which a holder of outstanding shares of Series B Preferred Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Series B Preferred Closing Share Consideration*" means the amount of stock consideration, if any, to which a holder of outstanding shares of Series B Preferred Stock would be entitled to receive as of the Closing of the Merger out of the Closing Consideration pursuant to the terms of the Charter.

"*Per Share Series B Preferred Earnout Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Series B Preferred Stock would be entitled to receive as of the payment of the Earnout Consideration pursuant to the terms of the Charter.

"*Per Share Series B Preferred Escrow Consideration*" means the amount of cash consideration or stock consideration, if any, to which a holder of outstanding shares of Series B Preferred Stock would be entitled to receive as of the release of any Escrowed Funds pursuant to the terms of the Charter.

"*Target Net Working Capital*" means negative $3,825,000.

"*Valence Transaction Expenses*" means, in each case solely to the extent not paid immediately prior to the Effective Time, and whether or not invoiced, (i) the fees and expenses payable by

6

Valence Parent to J.P. Morgan Securities LLC and any other broker, investment bank or similar advisor or consultant in connection with this Agreement and the transactions and other agreements contemplated by this Agreement, (ii) the fees and expenses payable by Valence Parent to Latham & Watkins LLP and Weil, Gotshal & Manges LLP and any other attorneys engaged by Valence Parent in connection with this Agreement and the transactions and other agreements contemplated by this Agreement, (iii) the fees and expenses payable by Valence Parent to outside accountants or other advisors, and (iv) all sale bonuses, severance, change in control payments or similar compensatory payments triggered by the transactions contemplated hereby and payable by Valence Parent or any Subsidiary of Valence Parent, plus, to the extent not included in Current Liabilities, the employer's share of payroll Taxes imposed on Valence Parent or any Subsidiary of Valence Parent with respect to any such amounts, in each case incurred on or before the Closing Date in connection with this Agreement and the transactions and other agreements contemplated by this Agreement. For the avoidance of doubt, in no event shall Valence Transaction Expenses be deemed to include any fees or expenses incurred by the Securityholders' Representative after the Closing Date.

(k)        The Merger Agreement is hereby amended to replace references to "U.S. Bank National Association" with "American Stock Transfer & Trust Company, LLC".

(l)        Section 9.4(c) of the Merger Agreement is hereby amended to replace references to "Section 9.2(h)" with "Section 9.2(i)".

(m)        The Disclosure Schedules are hereby amended to add Sections 9.2(a)(ii), 9.2(h) and 9.2(i) of the Disclosure Schedule attached hereto and to amend and restate Section 2.13 of the Disclosure Schedule.

(n)        Annex E of the Merger Agreement is hereby amended and restated in its entirety.

3. **Waterfall**. Valence Parent represents and warrants that attached hereto as Exhibit A is a true, complete and correct copy of the Waterfall.

4. **Agreement and Acknowledgment**. For avoidance of doubt and consistent with the terms of the Charter Amendment, the Charter, the Merger Agreement and this Amendment (collectively, the "Operative Documents"), each of the parties hereto agrees and acknowledges that in the event that any shares of Evolent Common Stock (whether as a result of the release of the Escrow Consideration or the payment of the Earnout Amount) would otherwise be issued to any Equityholder pursuant to the terms of the Merger Agreement, as amended, but for the fact that such Equityholder is an Unaccredited Stockholder, then such shares shall not be issued to such Equityholder and instead such Equityholder shall be entitled to a cash payment in lieu of such shares consistent with the terms of the Operative Documents. The parties agree to take such actions as may be necessary to convert such shares into such cash payment.

5. **Merger Agreement Confirmed**. Unless specifically altered by this Amendment, the Merger Agreement remains unchanged and shall continue in full force and effect. The Evolent Entities hereby (a) waive the obligation set forth in Section 1.6(a)(ii) with respect to each contract set forth on Schedule 9.2(i) of the Disclosure Schedule and (b) consent to the assignment of the Third Party Administrator Services Master Agreement, dated as of March 1, 2013 by and between Valence Health, Inc. and Maine Community Health Options from Valence Parent to CHS as of prior to the Closing.

6.  **<u>Counterparts</u>**. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Amendment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Amendment.

*[Remainder of Page Intentionally Blank; Signatures on Following Page]*

8

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Evolent Entities:**

**Evolent Health, Inc.**

By: _____
Name: _____
Title: _____

**Electra Merger Sub, LLC**

By: _____
Name: _____
Title: _____

**Valence Parent:**

**Valence Health, Inc.**

By: _____
Name: _____
Title: _____

**Securityholders' Representative:**

**North Bridge Growth Management Company LLC**

By: _____
Name: _____
Title: _____

_____

**Philip Kamp**

9

(Back To Top)

# Section 3: EX-99.1 (EXHIBIT 99.1)



**Evolent Health Completes Acquisition of Valence Health**

*The addition of Valence Health enhances Evolent's market-leading value-based care platform*

WASHINGTON, DC. October 3, 2016 -- Evolent Health, Inc. (NYSE: EVH), a company providing an integrated value-based care platform to the nation's leading health systems and physician groups, announced today the completion of its acquisition of Valence Health. First announced on July 13, 2016, this strategic acquisition brings together two innovative companies that serve health care providers in the transition to value-based care.

The closing merger consideration net of certain closing adjustments is $219.4 million based on the closing price of Evolent's Class A common stock on the New York Stock Exchange on October 3, 2016, and consists of 7.05 million shares of Evolent Class A common stock and $50.3 million in cash. The shares issued to Valence stockholders represent approximately 10.5% of Evolent's issued and outstanding Class A common stock and Class B common stock after the merger. The terms of the transaction were amended relative to the agreement announced at signing and the closing merger consideration incorporates payments under the original earn-out related to a new contract with MDWise and also an adjusted mix of cash and stock to provide sufficient cash to fund the business that the sellers are retaining to serve state insurance cooperatives. As previously announced by Valence Health on September 26, 2016, Valence Health signed a contract to provide services to MDWise. Jointly sponsored by Eskenazi Health and Indiana University Health, the Indianapolis-based company serves more than 400,000 members and is among the nation's largest provider-sponsored Medicaid plans.

The transaction also includes additional earn-out potential of up to $12.4 million, payable in Evolent Class A common stock, tied to new business activity contracted on or before December 31, 2016. Shares to be issued in relation to the earn-out are limited to 951,576 shares. The shares issued at closing and pursuant to the earn-out will be issued in transactions exempt from registration under the Securities Act of 1933, as amended.

Evolent expects the acquired business, on a standalone basis, to generate revenues of approximately $80-85 million for the year ending December 31, 2016; however, Evolent will consolidate the results of the acquired business only for the period subsequent to the closing of the transaction.

**Conference Call and Webcast Details**
Evolent will hold a conference call to discuss details of the transaction tomorrow, October 4 at 8:00a.m., Eastern Time. The conference call will be available via live webcast on the company's Investor Relations website at http://ir.evolenthealth.com. To participate by telephone, dial
1-888-317-6016 and ask to join the Evolent call. Participants are advised to dial in at least 15 minutes prior to the call to register. The call will be archived on the company's website for 90 days. Evolent invites all interested parties to attend the conference call.

**###**

**About Evolent Health**

Evolent Health partners with leading health systems to drive value-based care transformation. By providing clinical, analytical and financial capabilities, Evolent Health helps physicians and health systems achieve superior quality and cost results. Evolent Health's approach breaks down barriers, aligns incentives and powers a new model of care delivery resulting in meaningful alignment between providers, payers, physicians and patients. Learn more at: www.evolenthealth.com.

**Forward-Looking Statements - Cautionary Language**

Certain statements made in this release and in other written or oral statements made by us or on our behalf are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). A forward-looking statement is a statement that is not a historical fact and, without limitation, includes any statement that may predict, forecast, indicate or imply future results, performance or achievements, and may contain words like: "believe," "anticipate," "expect," "estimate," "aim," "predict," "potential," "continue," "plan," "project," "will," "should," "shall," "may," "might" and other words or phrases with similar meaning in connection with a discussion of future operating or financial performance. In particular, these include statements relating to future actions, trends in our businesses, prospective services, future performance or financial results and the outcome of contingencies, such as legal proceedings. We claim the protection afforded by the safe harbor for forward-looking statements provided by the PSLRA.

These statements are only predictions based on our current expectations and projections about future events. Forward-looking statements involve risks and uncertainties that may cause actual results, level of activity, performance or achievements to differ materially from the results contained in the forward-looking statements. Risks and uncertainties that may cause actual results to vary materially, some of which are described within the forward-looking statements, include, among others:

- The acquisition of Valence Health, as well as future acquisitions, investments and alliances could pose numerous risks to our operations, including:
  - difficulty integrating the purchased operations, products or technologies;
  - substantial unanticipated integration costs, delays and challenges that may arise in integration;
  - assimilation of the acquired businesses, which may divert significant management attention and financial resources from our other operations and could disrupt our ongoing business;
  - the loss of key employees, particularly those of the acquired operations;
  - difficulty retaining or developing the acquired business' customers;
  - adverse effects on our existing business relationships with customers, suppliers, other partners, standing with regulators;
  - challenges related to the integration of businesses that operate in new geographic areas and new markets;

- ◦ failure to realize the potential cost savings or other financial benefits or the strategic benefits of the acquisitions;
- ◦ liabilities from the acquired businesses for infringement of intellectual property rights, data privacy violations or other claims and failure to obtain indemnification for such liabilities or claims.
- ◦ We may be unable to complete acquisitions or integrate the operations, products or personnel gained through the Valence Health acquisition or any other such transaction without a material adverse effect on our business, financial condition and results of operations.
- ◦ Transaction agreements may impose limitations on our ability, or as is the case in the Valence Health acquisition, the ability of the business to be acquired, to conduct business.
- ◦ Events outside our control, including operating changes or regulatory changes, could also adversely affect our ability to realize anticipated revenues, synergies, benefits and cost savings.
- ◦ Revenues of Valence Health after consummation of the acquisition may be less than expected.
- ◦ Any integration may be unpredictable, or subject to delays or changed circumstances, and we and any targets may not perform in accordance with our expectations.
- ◦ In addition, the market price for our Class A common stock could be affected, following the consummation of the Valence Health acquisition or any other transaction, by factors that have not historically affected the market price for our Class A common stock.
- the structural change in the market for health care in the United States;
- our ability to effectively manage our growth;
- the significant portion of revenue we derive from our largest partners;
- our ability to offer new and innovative products and services;
- the growth and success of our partners, which is difficult to predict and is subject to factors outside of our control, including premium pricing reductions and the ability to control and, if necessary, reduce health care costs;
- our ability to attract new partners;
- our ability to recover the significant upfront costs in our partner relationships;
- our ability to estimate the size of our target market;
- our ability to maintain and enhance our reputation and brand recognition;
- consolidation in the health care industry;
- competition which could limit our ability to maintain or expand market share within our industry;
- our ability to partner with providers due to exclusivity provisions in our contracts;
- uncertainty in the health care regulatory framework;
- restrictions and penalties as a result of privacy and data protection laws;
- adequate protection of our intellectual property;
- any alleged infringement, misappropriation or violation of third-party proprietary rights;
- our use of "open source" software;
- our ability to protect the confidentiality of our trade secrets, know-how and other proprietary information;
- our reliance on third parties;
- our ability to use, disclose, de-identify or license data and to integrate third-party technologies;

- data loss or corruption due to failures or errors in our systems and service disruptions at our data centers;
- breaches or failures of our security measures;
- our reliance on Internet infrastructure, bandwidth providers, data center providers, other third parties and our own systems for providing services to our users;
- our dependency on our key personnel, and our ability to attract, hire, integrate and retain key personnel;
- risks related to future acquisition opportunities;
- the risk of potential future goodwill impairment on our results of operations;
- our future indebtedness and our ability to obtain additional financing;
- our ability to achieve profitability in the future;
- the requirements of being a public company;
- our adjusted results may not be representative of our future performance;
- the risk of potential future litigation;
- our ability to remediate the material weakness in our internal control over financial reporting;
- our holding company structure and dependence on distributions from Evolent Health LLC;
- our obligations to make payments to certain of our pre-IPO investors for certain tax benefits we may claim in the future;
- our ability to utilize benefits under the tax receivables agreement;
- our ability to realize all or a portion of the tax benefits that we currently expect to result from future exchanges of Class B common units of Evolent Health LLC for our Class A common stock, and to utilize certain tax attributes of Evolent Health Holdings and an affiliate of TPG;
- distributions that Evolent Health LLC will be required to make to us and to the other members of Evolent Health LLC;
- our obligations to make payments under the tax receivables agreement that may be accelerated or may exceed the tax benefits we realize;
- different interests among our pre-IPO investors, or between us and our pre-IPO investors;
- the terms of agreements between us and certain of our pre-IPO investors;
- our exemption from certain corporate governance requirements due to our previous status as a "controlled company" within the meaning of the New York Stock Exchange rules;
- the potential volatility of our Class A common stock price;
- the potential decline of our Class A common stock price if a substantial number of shares become available for sale or if a large number of Class B common units is exchanged for shares of Class A common stock;
- provisions in our amended and restated certificate of incorporation and amended and restated by-laws and provisions of Delaware law that discourage or prevent strategic transactions, including a takeover of us;
- the ability of certain of our investors to compete with us without restrictions;
- provisions in our certificate of incorporation which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees;
- our intention not to pay cash dividends on our Class A common stock; and
- our status as an "emerging growth company."

The risks included here are not exhaustive. Although we believe the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, level of activity, performance or achievements. Our Annual Report on Form 10-K for the year ended December 31, 2015, as amended, filed with the SEC on February 29, 2016, our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016 and June 30, 2016 and other documents filed with the SEC include additional factors that could affect our businesses and financial performance. Moreover, we operate in a rapidly changing and competitive environment. New risk factors emerge from time to time, and it is not possible for management to predict all such risk factors.

Further, it is not possible to assess the effect of all risk factors on our businesses or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Given these risks and uncertainties, investors should not place undue reliance on forward-looking statements as a prediction of actual results. In addition, we disclaim any obligation to update any forward-looking statements to reflect events or circumstances that occur after the date of this report.

**Source**: Evolent Health, Inc.

**Contacts**:

Bob East                                              Robin Glass

(443) 213-0500                                   (571) 389-6005

Investor Relations                             Media Relations

InvestorRelations@evolenthealth.com        RGlass@evolenthealth.com

(Back To Top)