UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON,<br><br>        Defendants. | Case No. 1:19-cv-01031-RDA-TCB |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................iv

I.    Introduction ...............................................................................................................1

II.   Factual Background ....................................................................................................6

    A.    Evolent's Entire Business Model was Predicated on its Purported Ability to Reduce its Clients' Costs, the Most Important of Which was Passport ................... 6

    B.    Rather than "Lower Clinical and Administrative Costs," Evolent Dramatically Increases Passport's Costs Throughout the Class Period ................... 7

    C.    Evolent's Grossly Deficient Claims Administration Leads to Nearly Half a Billion Dollars in Undisclosed Penalties and a Devastating Medicaid Reimbursement Rate Cut for Passport .................................................................... 8

    D.    Acquiring Passport is "Not in our Strategic Lens": The Truth Emerges While Defendants Continue to Misrepresent the Difficulties with Passport........... 11

    E.    "The Writing Was on the Wall": After Months of Internal Planning, Evolent Publicly Reverses Course and Announces it Will Buy a 70% Stake in Passport ..................................................................................................................... 12

    F.    "I . . . Watched Evolent Run Passport to the Ground" and "Cripple Our Business": Passport's Senior Director of Information Technology Contacts Lead Counsel to Confirm Plaintiffs' Allegations and Refute Defendants' Arguments ................................................................................................................. 13

    G.    Evolent's Practices Render Passport Insolvent, and Kentucky Confirms That the Plan Could Not Provide Medicaid Services in a "Cost-Effective Manner".................................................................................................................... 16

III.  Argument ................................................................................................................18

    A.    Plaintiffs Have Pled That Defendants Made False and Misleading Statements .............................................................................................................. 18

        1.    Defendants Made False Statements About the Ability of Evolent's Services to "Lower Clinical and Administrative Costs"............................ 19

        2.    Defendants Made False and Misleading Statements About Valence .......... 24

        3.    Defendants Made False and Misleading Statements About Their Bailout and Acquisition of Passport.......................................................... 26

        4.    Defendants' False Statements Were Material............................................ 29

B.    The SAC Pleads a Strong Inference of Scienter......................................................... 31

C.    The SAC Sufficiently Pleads Loss Causation ......................................................... 38

IV.    Conclusion ...........................................................................................................................40

## TABLE OF AUTHORITIES

Cases

*Ash v. PowerSecure Int'l, Inc.*,
    2015 WL 5444741 (E.D.N.C. Sep. 15, 2015)....................................................................35

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ...........................................................................................40

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) ......................................................................29, 30

*Black v. Martek Biosciences Corp.*,
    2006 WL 8435572 n.13 (D. Md. June 14, 2006)....................................................25, 27, 33

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ........................................................................35

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) .............................................................................30

*Davison v. Loudoun Cty. Bd. of Supervisors*,
    2016 WL 4801617 (E.D. Va. Sept. 14, 2016)...................................................................23

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .........................................................................................................38

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016)..................................................................................29

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............................................................................20

*Fund v. Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) .............................................................................34

*Funderburk v. S.C. Elec. & Gas Co.*,
    395 F. Supp. 3d 695 (D.S.C. 2019) ..................................................................................18

*Hering v. Rite Aid Corp.*,
    331 F. Supp. 3d 412 (M.D. Pa. 2018) ..............................................................................27

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
    42 F.3d 204 (4th Cir. 1994) .............................................................................................30

*In re Acadia Pharm. Inc. Securities Litig.*,
    2020 WL 2838686 (S.D. Cal. June 1, 2020).....................................................................31

*In re Akorn Secs. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ...............................................................................25

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002) .......................................................................30

*In re Am. Apparel, Inc. S'holder Litig.*,
  2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ............................................................28

*In re Cable & Wireless, PLC*,
  321 F. Supp. 2d 749 (E.D. Va. 2004) .......................................................................20

*In re Computer Sci. Corp. Sec. Litig.*,
  890 F. Supp. 2d 650 (E.D. Va. 2012) .......................................................................33

*In re Countrywide Fin. Corp. Deriv. Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008).....................................................................34

*In re Coventry Healthcare, Inc. Sec. Litig.*,
  2011 WL 1230998 (D. Md. Mar. 30, 2011)..............................................................35

*In re Fed.-Mogul Corp. Sec. Litig.*,
  166 F. Supp. 2d 559 (E.D. Mich. 2001).....................................................................30

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ..................................................................32, 37

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) ............................................................22, 23, 28

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D.W.V. 2012)...............................................................30, 40

*In re SCANA Corp. Sec. Litig.*,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ..............................................................25

*In re Trex Co., Inc. Sec. Litig.*,
  454 F. Supp. 2d 560 (W.D. Va. 2006) .......................................................................22

*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) ..........................................................................30

*Janus Cap. Corp. v. First Deriv. Traders*,
  564 U.S. 135 (2011) .................................................................................................28

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2016 WL 3981236 (D.S.C. July 25, 2016) ....................................................25, 33, 39

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ....................................................................................23

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ................................................................ passim

*Local 295/Local 851 IBT Emp. Grp. Pen. Tr.*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010)......................................................................35

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................................................27, 31

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
  674 F.3d 369 (4th Cir. 2012) ...................................................................................................24

*McIntyre v. Pedder*,
  2015 WL 5039431 (W.D.N.C. Aug. 26, 2015) ........................................................................23

*Miss. Pub. Empl. Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008) ......................................................................................................27

*Monroe Cty. Empl. Ret. Sys. v. S. Co.*,
  2018 WL 1558577 (N.D. Ga. Mar. 29, 2018) ..........................................................................30

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. June 27, 2017) ...............................................................................31

*Nieman v. Duke Energy Corp.*,
  2013 WL 4004274 (W.D.N.C. July 26, 2013) ..........................................................................18

*Ollila v. Babcock & Wilson Enterprises, Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .......................................................................20, 36

*Peace Officers' Ann. & Ben. Fund of Ga. v. DaVita Inc.*,
  372 F. Supp. 3d 1139 (D. Colo. 2019) .....................................................................................28

*Pequignot v. Solo Cup Co.*,
  2009 WL 10730697 (E.D. Va. June 15, 2009) .........................................................................31

*Plumbers & Pipefitters Nat'l Pen. Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ....................................................................29, 30

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ...................................................................................................38

*SEC v. Agora, Inc.*,
  2007 WL 9725170 n.5 (D. Md. Aug. 3, 2007) .........................................................................31

*SEC v. Pirate Inv'r, LLC*,
  580 F.3d 233 (4th Cir. 2009) ...................................................................................................33

*Simon v. Abiomed, Inc.*,
  37 F. Supp. 3d 499 (D. Mass. 2014) ........................................................................................34

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) .................................................................................. 29, 38, 39, 40

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014) .......................................................................................29

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ..............................................................................................34, 37

*Tellabs, Inc. v. Major Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................................31, 38

*Willis v. Big Lots, Inc.*,
  2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ..............................................................29

Rules

Fed. R. Evid. 201..............................................................................................................18, 23

## I.    INTRODUCTION[1]

Throughout the Class Period, Evolent created an illusion of explosive growth predicated on a business model that was supposed to "lower clinical and administrative costs" for its health system clients, enable them to "drive greater efficiency," and allow them to "manage patient health in a more cost-effective manner." In particular, Evolent touted its partnership with a Kentucky-based Medicaid plan known as Passport Health Plan ("Passport" or the "Plan") as the paragon of this cost-cutting strategy. Evolent boasted that its relationship with Passport was "creat[ing] value" for the Plan and that it had yielded significant "improvement" to Passport's "bottom line." Given that Evolent appeared to be executing its winning cost-cutting formula with Passport—which was by far Evolent's largest and most important client, accounting for 20% of the Company's revenue—the Company's stock price soared, more than doubling in less than a year from $11 in November 2017 to a high of $28.75 in September 2018.

The truth, however, was that Evolent's highly touted cost-cutting platform was far from the success story that Defendants triumphantly portrayed. In reality, Evolent cannibalized Passport, drove it into insolvency, and ultimately caused it to lose its Medicaid contract with the Commonwealth of Kentucky—meaning Passport is now effectively out of business. As multiple former senior employees of both Passport and Evolent confirmed, Evolent grossly overcharged Passport hundreds of millions of dollars during the Class Period for the exact same routine administrative services that Passport had been performing in-house for years for a fraction of the cost. Indeed, these former executives uniformly recounted that Passport was "paying [Evolent] to do that stuff that we used to do, and *we were paying [Evolent] more*"; that "[Evolent] said they

---

[1] The Class Period is March 3, 2017 through May 28, 2019, inclusive. All "¶__" citations are to the Second Amended Complaint (Dkt. 69) (the "SAC"); all capitalized terms have the same meaning as in the SAC; and all emphasis is added unless noted otherwise.

could cut costs by providing services; *they did the opposite*"; and that "[e]verything that was done [by Evolent] was either *more expensive or cost us more money*." As a result, between 2015 and 2016, Passport's administrative expenses increased almost 60% in one year, from $107.5 million to $169.1 million, and by 2018 those expenses had spiked to $194 million per year.

Evolent also extended its grasp into other crucial areas of Passport's operations with the same deleterious impact. Specifically, in October 2017, Evolent implemented at Passport a fundamentally flawed claims administration system known as Valence, which caused Passport to become unable to comply with the basic requirements of its contract with Kentucky. Claims administration was crucial for Passport because the Plan was required to report the claims data (also known as encounter data) to Kentucky, which then used the data to set the reimbursement rates for Passport. Significantly, from the minute that Valence went live, Kentucky began to assess massive penalties for Passport's failure to timely and properly submit encounter data. These staggering amounts—nearly half a billion dollars in penalties during the Class Period—*were undisclosed to investors*, but were documented in detailed monthly letters entitled "Consequences for Failure to Submit Encounters in Accordance with the Contract" that Kentucky sent to Passport's most senior executives, including its CEO and CFO, and which Defendants admit that they received and reviewed.

Evolent's faulty Valence platform not only massively increased Passport's administrative costs, but it also led directly to Kentucky dramatically reducing Passport's reimbursement rates precisely because Passport was unable to timely submit accurate encounter data. This crushing combination had a catastrophic financial impact on Passport and brought it to the brink of insolvency. Evolent management would later admit that by January 2019, Evolent realized that the "writing was on the wall" that Passport's financial situation was so desperate that it would likely need a bailout. Yet Defendants disclosed none of this to investors, instead repeatedly assuring the

market that Evolent had no intention of bailing out or purchasing the ailing health plan. These false assurances continued as late as May 2019, when Defendant Williams again emphasized that Passport was "making solid progress towards improving its financial performance." ¶¶119, 188.

The market was stunned when, a mere three weeks later, on May 29, 2019, Evolent completely reversed course. On that day, Evolent made the shocking announcement that Passport's financial condition was so dire that the Company had no choice but to acquire a 70% stake in the Plan in a last-ditch effort to save its largest and most important customer. In response to the news of Evolent's emergency bailout of its largest customer, Evolent's stock price collapsed, losing nearly 30% of its value in a day, with analysts excoriating Evolent management for their lack of candor.

Since the end of the Class Period, still more facts have emerged establishing how Evolent utterly destroyed Passport's business. *First*, in November 2019, Kentucky took the extraordinary step of announcing that it would not renew Passport's Medicaid contract. Documents released by Kentucky in connection with its decision revealed that Passport was unable to establish how it could provide Medicaid services in a "cost-effective manner," and was, in fact, the most poorly run health plan in the Commonwealth. This decision meant that, only three years after Evolent took the reins at Passport, the Plan was effectively out of business after 23 years serving the Louisville community. Then, after Evolent was allowed to participate in a rebidding process—during which Passport explicitly admitted that it suffered ***"[a]n inability to implement key encounter data-reporting requirements" as a result of Evolent's faulty claims processing*** (Ex. A at 17)—Kentucky ***again*** rejected Passport's application to serve as a Medicaid provider. Ex. B. In announcing that second rejection on May 29, 2020, Kentucky disclosed that Passport ranked ***dead last*** among the seven contract applications (Ex. C), and that, yet again, the Plan was unable to establish that it could provide "cost-effective" services -- the same services that Evolent

3

*represented to investors was the entire reason for the Passport partnership* (Ex. D at 4). In sum, after just three short years, Evolent had utterly destroyed Passport's business, and with no business to conduct, Passport will be liquidated in 2021.

*Second*, after the Complaint was filed, CW 5, Passport's former Senior Director of Information Technology and a senior Passport executive for nearly six years who reported directly to Passport's COO, contacted Lead Counsel on her own accord, specifically because she wanted to verify the allegations in the Complaint. As the SAC makes clear, CW 5 stated that she had read Plaintiffs' first Amended Complaint, *she could corroborate the other CWs' accounts about how Evolent drove Passport into insolvency, and she could refute any suggestion by Defendants that Evolent saved Passport money or that they were unaware of the significant issues facing Passport*. Indeed, CW 5 confirmed that Passport's financial problems were *"100%"* due to Valence's inability to accurately report encounter data, and provided a direct link to Defendant William's actual knowledge of the fraud, stating that she personally confronted Williams and explained the serious issues impacting Valence in *"very explicit"* detail. As a result, CW 5 bluntly stated that she *"watched Evolent run Passport to the ground"* while these issues remained hidden and Passport's condition was affirmatively misrepresented to investors.

Notwithstanding these powerful facts, in their brief Defendants ask the Court to believe that the exact opposite of what happened is true. According to Defendants, Evolent's handling of Passport was a resounding success—Passport was "well-run"; Evolent's services dramatically "improved" Passport's costs; and Evolent "upgraded" Passport with "modernized technology." Defendants' alternate set of facts defies credulity. If Passport was so well managed, and Evolent's services truly lowered the Plan's costs, one wonders why: (i) Kentucky imposed nearly half a billion dollars in penalties on Passport for failing to perform one of its most basic contractual obligations with the Commonwealth; (ii) Passport was effectively insolvent after just three years

4

under Evolent's stewardship—despite thriving on its own for decades before that; (iii) Passport was the *only* Medicaid provider in Kentucky to become insolvent during the Class Period; (iv) Kentucky announced in November 2019 that it would not renew Passport's Medicaid contract, concluding not only that Passport was unable to establish that it could provide Medicaid services in a "cost-effective manner," but also that it was the most poorly run plan in Kentucky; (v) Passport admitted to Kentucky that Evolent's claims processing resulted in "[a]n inability to implement key encounter data-reporting requirements"; and (vi) in May 2020, Kentucky *again* rejected Evolent's bid to renew Passport's Medicaid contract, finding for the *second time* in six months that Passport was unable to provide services in a "cost-effective manner." Defendants have no answer for these cold, hard facts, because there is none. Passport did not become insolvent and twice lose its contract with Kentucky because it was "well-run." These events happened because the exact opposite was true—as CW 5 stated, Evolent simply "r[a]n Passport to the ground."

In the face of these particularized allegations, Defendants assert that Plaintiffs have failed to establish falsity, scienter, and loss causation. Defendants' motion fails in all respects.

*First,* the SAC establishes that Defendants' statements about Evolent's cost-cutting administrative services and its relationship with Passport were materially false and misleading. Rather than lowering costs, Evolent in fact deliberately increased Passport's expenses, while its deficient claims processing platform left Passport completely unable to fulfill the basic requirements of its contract with Kentucky, directly led to the imposition of nearly half a billion dollars in penalties, and significantly decreased Passport's Medicaid reimbursement rates. Moreover, Kentucky has now twice rejected Passport's contract bid precisely because Evolent could not perform the basic services that Defendants repeatedly assured investors that the Company was providing—objectively confirming Plaintiffs' allegations.

*Second*, scienter is more than adequately pled. The detailed and consistent CW accounts

5

from former high-level executives reinforce that Defendants were well-aware that their public statements were materially false and misleading. Moreover, by Defendants' own admissions, Evolent's control over Passport was absolute and unfettered: Defendants have expressly acknowledged that Evolent: (i) was "a co-owner" of Passport; (ii) had "joint governance" with Passport that allowed it to "drive the decisions we think are important for performance"; (iii) was "at the table participating in [Passport's operational] decisions"; and (iv) controlled the "levers" at Passport. These facts are dispositive. Defendants cannot now credibly distance themselves from their status as an avowed "co-owner" of Passport, and their brief is largely silent as to these powerful admissions—because courts have uniformly held that such statements establish scienter.

*Finally*, the SAC pleads loss causation, clearly alleging that Defendants' fraud was revealed through disclosures on February 15, 2019 and May 29, 2019, which caused the Company's share price to plummet 10% and 29%, respectively. While Defendants implausibly argue that their misconduct was actually revealed in a January 25, 2019 *Insider Louisville* article, Defendants neglect to mention that within this very article they flatly denied that Evolent's fees were harming Passport, or that Evolent was overcharging the Plan in any way—a denial that completely undermines their loss causation challenge. ¶113. Plaintiffs adequately plead loss causation.

For all of these reasons, Defendants' motion should be denied in its entirety.

## II.      FACTUAL BACKGROUND

### A.      Evolent's Entire Business Model was Predicated on its Purported Ability to Reduce its Clients' Costs, the Most Important of Which was Passport

Evolent provides healthcare delivery and payment services to Medicaid and Medicare health plans. ¶35. Throughout the Class Period, the Company's business model was predicated on its purported ability to reduce its clients' healthcare and administrative costs. ¶¶37-39. Evolent repeatedly touted that its suite of high-tech services would help plans "lower clinical and

6

administrative costs," and would create "a cycle of clinical and cost improvement" through long-term "partnerships" with health plans. *Id*. During the Class Period Evolent's most important client by far was Passport, a Kentucky-based Medicaid plan that primarily served the Louisville area. ¶¶40-41. Passport's relationship with Evolent officially began on February 1, 2016, and fees Passport paid to Evolent accounted for approximately 20% of Evolent's revenue between 2016 and 2019—far more than any other Evolent client. ¶41.

Because Passport was so critical to Evolent's bottom line, Defendants made clear that Evolent was intimately involved in Passport's operations. Defendants described Evolent as a *"co-owner"* of Passport and boasted that *"we really have joint governance [over Passport] and we're able to drive the decisions we think are important for performance."* ¶42. Defendant Williams told investors that this arrangement allowed Evolent to *"drive very specific actions in terms of how [Passport is] ultimately operating their risk business"*; to *"be at the table participating in [Passport's operational] decisions"*; and to ultimately *"control many more levers than if we're just in a pure service relationship."* ¶43. The extent of Evolent's involvement and control was so great that Defendants installed a "shadow management team" at Passport prior to Evolent's acquisition of Passport in 2019, pursuant to which Evolent boasted *"our own CEO, our own COO,"* stood "shoulder to shoulder with Passport leadership." ¶45.

**B.     Rather than "Lower Clinical and Administrative Costs," Evolent Dramatically Increases Passport's Costs Throughout the Class Period**

While Evolent reassured investors throughout the Class Period that its services would "lower clinical and administrative costs" for Passport, in reality the exact opposite was true. As CW 1, a former senior member of Passport's Internal Audit team succinctly put it, *"[Evolent] said they could cut costs by providing services; they did the opposite."* ¶52. Evolent began by "rebadging" about 350 Passport employees, which meant that Evolent hired them away from

7

Passport, only to have them continue performing the exact same functions for exorbitant fees that dwarfed what Passport had previously spent in-house. ¶¶47-48. Significantly, as CW 1 confirmed, "the admin expense [resulting from Passport's fees] was more than we were paying for those [employees'] salaries. That's all Evolent." ¶48. In other words, Passport was merely "paying [Evolent] to do that stuff that we used to do, and we were paying [Evolent] more." ¶49. Thus, while Passport's salary costs fell $22 million from 2015 to 2017 as a result of rebadging, the total fees that Passport paid to Evolent skyrocketed, from $55.5 million in 2016, to $88.2 million in 2017, and finally to $114.5 million in 2018—massive expense increases, with no change in Passport's membership profile. ¶¶50, 110.

As a direct result of Evolent's massive fees, Passport's financial condition dramatically worsened. In 2015, the year prior to the beginning of the partnership, Passport had a net underwriting gain (i.e. operating profit) of $33.3 million. ¶87. In 2016, its first year under Passport's management, Passport reported a net operating loss of $80.4 million, and by 2018, this loss had ballooned to $130.7 million, threatening Passport's solvency. *Id*. In spite of these glaring facts, Defendants misleadingly claimed that Passport was 'well-run" (Mem. at 6, 8) and that Evolent provided "about $75 million of improvement to Passport's bottom line" as of May 2018 and increased that claim to "over $100 million savings" by September 2018. ¶¶168, 175.

       **C.**       **Evolent's Grossly Deficient Claims Administration Leads to Nearly Half a Billion Dollars in Undisclosed Penalties and a Devastating Medicaid Reimbursement Rate Cut for Passport**

In May 2017, Evolent announced that it would replace Passport's longstanding third-party claims administrator with Valence, Evolent's newly acquired claims administration platform. ¶57. As Passport's claims administrator, Evolent was required to collect critical data known as "encounter data" on each medical claim, which was essentially a description of how sick each patient was, and the care needed as a result. ¶59. Properly recording and accurately reporting

encounter data was critical; as Evolent's own COO Tom Peterson explained, "*[o]ne of the most important things in Medicaid is encounter reporting*," because "*accurately reflecting the claims volume*" directly relates to the Medicaid reimbursement rates that are paid to the Plan. ¶60.

Defendants repeatedly assured investors that the Valence implementation was successful. On November 2, 2017—a month after Valence's launch—Defendant Williams boasted that "we've successfully launched Passport […] onto our [Valence] services platform." ¶66. And in February 2018—several months after the platform had been fully launched at Passport—Williams assured investors that "the integration [of Valence] is going incredibly well." ¶158.

Significantly, documents obtained by Lead Plaintiffs show that, in direct contravention to Defendants' representations, the deficient Valence platform left Passport wholly unable to submit encounter data—as required by its contract with Kentucky—a fact which was confirmed when Kentucky imposed nearly half a billion dollars in penalties on Passport for utterly failing to timely and properly submit encounter data *after* Valence's launch. ¶75. Indeed, prior to implementing Valence, Passport had incurred *de minimis* penalties averaging just $33,000 per month for untimely and incorrectly submitted encounter data. ¶77. By contrast, as soon as Evolent took Valence live in October 2017, Passport's monthly penalties skyrocketed: first to $619,625—an increase of approximately 1,800%—and then exponentially into the tens of millions of dollars per month. ¶77. For example, in February 2018—just as Defendant Williams was assuring investors that the integration of Valence was going "incredibly well" (¶158)—Passport submitted encounter data records to Kentucky that were a remarkable 44 million days late in the aggregate, resulting in $48 million in penalties. ¶¶76-77. By November and December 2018, the penalties imposed on Passport exceeded $100 million per month, demonstrating that the problems with Valence were never resolved and in fact became *worse* over time. All told, *by April 2019, or roughly 18 months after Evolent had required Passport to implement Valence, Evolent's defective claims*

***administration system had caused Passport to incur an astounding $489 million in penalties***.[2] ¶77. The senior officers of both Passport and Evolent were well-aware of these issues, as they were meticulously detailed in monthly letters sent directly to Passport's most senior officers—including its CEO and CFO—and titled ***"Consequences for Failure to Submit Encounters in Accordance with the Contract."*** ¶¶75-76.

Evolent's disastrous claims administration directly led to Kentucky's decision to cut its Medicaid payments to Passport. Specifically, on May 30, 2018, Passport learned that Kentucky planned to reduce Medicaid rates by roughly 3.2% for the six-month period ending December 31, 2018 (the "2018 rate cuts"). ¶80. Far from the "arbitrary" decision Defendants assert (Mem. at 14), these cuts were instead "a direct result of Passport's own failure to submit encounter data correctly," as CW 3 confirmed, which was a "downstream effect" of Valence's failures. ¶81. Evolent not only knew this, but according to CW 1, the Company's COO, Tom Peterson, was "on the ground for weeks on end trying to work to get things fixed." ¶82. These cuts devastated Passport, which projected a net loss of $75 million for the first half of 2019 alone. ¶83.

In addition, Valence's defects led to pervasive late and inaccurate medical claim payments. Passport was contractually obligated to pay interest penalties on late claims, which according to CW 1 dramatically increased after Valence was implemented. ¶68. Moreover, the improperly processed claims resulted in more than $20 million in overpayments to healthcare providers by the end of 2018—which were nearly impossible to recoup because Valence was so defective that Passport could not figure out who to credit for overpayments against future claims payments. ¶¶69-70, 104. Each improperly processed claim itself had to be reprocessed, further raising Passport's

---

[2] Passport was saved from paying the full amount of these penalties only because Kentucky capped penalty payments at a set percentage of its revenue; even still, Passport was forced to pay roughly $10 million in penalties when it was already cash-strapped due to Evolent's malfeasance. ¶78.

costs. ¶69. Finally, Valence's defects made Passport's finances impossible to manage, as CW 1 explained that its actuaries could no longer accurately predict its claims payments. ¶71.

> **D.    Acquiring Passport is "Not in our Strategic Lens": The Truth Emerges While Defendants Continue to Misrepresent the Difficulties with Passport**

Beginning in January 2019, reports emerged that Passport was in financial distress, ostensibly due solely to the Medicaid rate cuts. ¶111. On January 25, 2019, *Insider Louisville* published an article claiming that "declining reimbursement rates to Passport tell just part of the story," and explaining that Passport's financial troubles also appeared to stem from excessive "non-employee management fees" paid to Evolent—a total of $220 million in fees that "account[ed] for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead." ¶112. Significantly, ***in response to these allegations Evolent flatly denied that its fees were excessive or improper, and falsely claimed that Evolent was providing services "at cost" and even "at a lower per member cost than prior periods."*** ¶113.

On February 15, 2019, Passport filed a lawsuit against Kentucky (the "Passport Complaint"), challenging the Medicaid rate cuts. ¶115. The Passport Complaint revealed, for the first time, that a Passport bankruptcy was not only a possibility, but an imminent threat—if the rate cuts were not reversed immediately, Passport would be legally insolvent within two weeks. ¶115. On February 19, 2019, the first trading day following the lawsuit, Evolent's stock price fell 10.8%, to close at $14.99. Following the revelations, analysts were concerned that Evolent might be forced to bail out Passport because it constituted approximately 20% of the Company's revenue, and Evolent could not afford to let its most important partner go bankrupt. Thus, during a February 26, 2019 earnings call, analysts repeatedly pressed Defendants about whether there is "any balance sheet risk if [Passport] were to go insolvent" and whether "your joint investment efforts [with] Passport have given you any exposure in a tail event." ¶¶116-17. Defendant Williams

11

unequivocally denied the possibility, stating that Evolent had not even "thought about" acquiring Passport, that this was "not in our strategic lens" and "not something that is currently being evaluated. ¶117.

Over the next two months, Defendants assured investors that Passport's finances had improved by purported "cost-cutting" measures and a Medicaid rate increase in April 2019. ¶118. Analysts were encouraged that "elevated payments to Passport decrease[d the] risk EVH loses its largest customer." ¶118. As late as May 7, 2019, just three weeks before revealing that Passport was effectively insolvent and unable to survive as a standalone entity, Defendants reassured investors that "Passport is making solid progress towards improving its financial performance." ¶119.

E.    **"The Writing Was on the Wall": After Months of Internal Planning, Evolent Publicly Reverses Course and Announces it Will Buy a 70% Stake in Passport**

On May 29, 2019, Evolent stunned the market by announcing that it would have to pay $70 million (plus a promise of additional "interim balance sheet support") for a 70% stake in Passport. ¶120. The announcement was an admission that (i) Passport's finances were even worse than previously known, contrary to Defendants' assurances just three weeks prior, and (ii) the 2018 rate cuts were not the sole cause of Passport's financial troubles (as these cuts had already been reversed in April 2019), but rather were caused by Evolent's grossly excessive costs. ¶120. Indeed, during a special investor call the same day, Defendant Williams was forced to admit that Evolent had no choice but to buy a stake in Passport to avoid losing its largest client, stating that we "wish [we] weren't in this situation" and "given the financial situation, we needed to respond immediately." ¶121.

On this news, Evolent's stock price fell nearly 30%, or $4.14 per share, to close at $10.01, and analysts excoriated Evolent's executives for their lack of candor, noting that the Company's

disclosure directly contradicted management's prior statements about Passport. For example, SunTrust stated that "[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call: When asked whether EVH would acquire some, if not the whole, Passport business during the 4Q18 earnings call, management cited they had 'not contemplated acquiring a full Medicaid plan,' that it's 'not in our strategic lens at this point.'" SunTrust further emphasized that the bailout "signals that Passport wasn't in a position to remain operationally sustainable . . . . EVH's investment and balance sheet commitment is likely instrumental in supporting the business." ¶123.

Strikingly, during the May 30, 2019 call, Defendants admitted that they knew of the risk they would have to bail out Passport by January 2019, and even installed a "shadow management team" to pursue the acquisition. As the Company's COO and co-founder Thomas Peterson stated, "the sponsors [of Passport] really felt as though they needed to take on a partner. And so . . . starting in January, *once the writing kind of became on the wall* . . . there was [an] additional level of urgency that was placed on this." Indeed, Peterson admitted that the situation had become so dire that "in January what we did was we effectively created a shadow management team [at Passport]. So we had our own—we brought in our own CMO, our own CEO, our own COO . . . and we were shoulder to shoulder with Passport leadership." ¶125.

> **F.    "I . . . Watched Evolent Run Passport to the Ground" and "Cripple Our Business": Passport's Senior Director of Information Technology Contacts Lead Counsel to Confirm Plaintiffs' Allegations and Refute Defendants' Arguments**

After briefing on Defendants' prior motion to dismiss was complete, CW 5, a former Passport senior executive for nearly six years, contacted Lead Counsel on her own initiative to state that she had read Plaintiffs' first Amended Complaint, *she could corroborate the other CWs' accounts*—including CW 1, with whom she had a close working relationship—and *she could*

***refute any suggestion by Defendants that Evolent saved Passport money or that they were unaware of the significant issues facing Passport***. ¶89.

It is hard to imagine a witness who could have a better understanding of the destruction that Evolent wrought on Passport than CW 5. She was most recently Passport's Senior Director of Information Technology from February 2020 to March 2020, and prior to that the Director of Information Technology (March 2017 to February 2020), and the Manager of Infrastructure and IT Operations (October 2014 to February 2017). *Id*. CW 5 reported directly to Passport's COO, and was directly responsible for designing, maintaining, and managing Passport's IT infrastructure. CW 5 also worked directly on Valence and saw its multiple defects first-hand, explaining that "***it was my job for two years to figure out what was broken right after [Valence] was presented to Passport . . . I was in the middle of everything and watched Evolent run Passport to the ground***."

Significantly, CW 5 confirmed that Passport's financial problems were "100%" due to Valence's inability to accurately report encounter data. ¶104. According to CW 5, Valence's fundamental problem was that "the . . . data was terrible," and the "reporting was terrible and nonexistent." ¶93. CW 5 explained that as a dental claims platform, Valence was not able to handle multiple providers, leading to significant numbers of rejected claims because Valence could "not match a claim with the provider/member that generated that claim," and thus encounter data could not be generated. *Id*. As a result, Passport paid millions of dollars to healthcare providers that was not submitted as encounter data, thus making it appear to Kentucky that Passport paid out significantly less than it actually did—which reduced Passport's Medicaid reimbursement rates because those rates were directly calculated from encounter data submissions. ¶¶104-05. CW 5 succinctly stated that "[Kentucky] looked at the claims we were paying and said that Passport was making too much money and therefore cut our rates." ¶105. CW 5 added that Valence's inability to handle multiple providers was "a systemic issue" that "still exists today. . . ." ¶93.

14

In addition, CW 5 confirmed that Valence's inability to process encounter data directly resulted in Kentucky imposing hundreds of millions of dollars' worth of penalties on Passport—which were so high it became "comical." ¶¶73-79, 100-01. CW 5 explained that the deficiency letters documenting these penalties "absolutely were" sent to Evolent executives and "Evolent agreed to foot the bill for a certain time period"—demonstrating not only that Evolent knew about the letters, but that Evolent knew it was responsible for these penalties. ¶¶100-02.[3]

Finally, CW 5 confirmed that Evolent in fact drastically raised Passport's costs. Indeed, when directly asked if Evolent ended up saving Passport money, CW 5 laughed and replied "absolutely not," adding that Evolent *took 350 of our employees, crippled our business and then charged us for services that weren't rendered. Everything that was done was either more expensive or cost us more money."* ¶91. She stated that Evolent kept rebadged employees on Passport's IT system and then charged Passport for those employees, describing the roughly $10 million per year that Passport spent on IT costs as a "cash cow for Evolent." ¶107. CW 5 also recalled various projects that Evolent pushed onto Passport, explaining that "I don't think that a single one actually succeeded," adding that "Evolent came in and absorbed as much as they could out of Passport and they never delivered on really much." ¶108. One of the largest projects that CW 5 worked on involved transitioning Passport to a new pharmacy benefit manager ("PBM"), which CW 5 explained "to this day . . . cost us more than what [the prior PBM] charged us." ¶109.[4]

---

[3] Tellingly, while Defendants try to claim that CW 5 was supposedly not in a position to know the facts which she described in such detail, they *admit* that she was correct when she said Evolent agreed to pay the penalties.

[4] CW 5 actually worked on the transition to the new PBM, belying any disbelief on Defendants' part. ¶¶108-09. Defendants' contention that CW 5 is mistaken as to the identity of Passport's former PBM is based on a selectively edited and incomplete Form 8-K/A Defendants submitted to the Court as Exhibit 33 (ECF No. 76-33). The full and complete Form 8-K/A, attached as Ex. E, states on page 128 that "Navitus provided pharmacy benefit management services to UHC's [Passport's] MA-SNP members . . . UHC did not renew this contract and has contracted with CVS to provide this service . . . ." Accordingly, the full filing in fact confirms CW 5's account.

Moreover, CW 5 made clear that Evolent's most senior officers knew all of these facts, and in fact emphatically stated that any claim by Defendants that they were not aware of the issues facing Passport was "*100% inaccurate*." ¶91. Indeed, CW 5 stated that Defendant Williams "*absolutely*" knew that Valence was not designed for Medicaid claims and that there were issues with reporting data. ¶96. Specifically, CW 5 explained that Williams participated in "relationship meetings," which often took place on a weekly basis during the Valence integration, and that during "every relationship meeting," "[s]omeone always barked about" issues relating to Valence's design and inability to report claims. ¶96. CW 5 further explained that she was "*very explicit*" regarding "Valence issues" during other in-person meetings that she had with Williams and other Evolent executives. ¶97.

In addition to meetings with Defendant Williams, CW 5 also described myriad meetings which establish that Evolent's other senior executives knew of Valence's inability to process encounter data. These meetings included a yearly "realignment call" during the Class Period where Evolent's executives flew to Passport's Louisville headquarters to "*basically say they were sorry and were going to fix [Valence]*"—despite the fact that it was never fixed. ¶98. CW 5 also recalled that "we had call[s] all the time up and down the executive team at Evolent" regarding Valence implementation problems, including progress meetings with COO Peterson and Chad Pomeroy, Evolent's Chief Technology Officer. ¶99. CW 5 also recalled that she took place in weekly red light/green light progress calls during the Valence implementation, explaining that Evolent's C-Suite executives participated in these calls "all of the time." *Id*.

G.    **Evolent's Practices Render Passport Insolvent, and Kentucky Confirms That the Plan Could Not Provide Medicaid Services in a "Cost-Effective Manner"**

Events that occurred shortly after the end of the Class Period confirm that Passport was wholly unable to provide Medicaid services in a "cost-effective manner." In early 2019, Kentucky

16

put out bids seeking Medicaid service providers for a renewed five-year term. On November 26, 2019, Kentucky announced that Passport failed to win the bid, and that its Medicaid contract would accordingly not be renewed. ¶127. In announcing the rejection, Kentucky also revealed that Passport—which was once ranked as the 13th best Medicaid plan in the United States—scored the lowest of all respondents and was the most poorly run plan in the Commonwealth. ¶130. In rejecting Passport's bid, Kentucky specifically found that Passport was unable to establish how it could provide Medicaid services "in a cost-effective manner" (¶130)—*which was purportedly the entire justification for the Evolent partnership*. Tellingly, Evolent responded not by accepting responsibility, but by attributing the decision to partisan politics. Indeed, during a November 27, 2019 conference call, Defendant Williams complained that Passport did not get a fair review under the outgoing Republican administration, and insisted that "[w]e have a new [Democratic] administration coming in and that's really what we want. . . . All I'll say is we just want a fair and unbiased hearing of our appeal."

Six months later, Evolent received precisely the "fair and unbiased hearing" it had asked for—and it confirmed everything that Kentucky had previously determined. On May 29, 2020, *Kentucky rejected Passport's bid for a second time* (Ex. B (Evolent Press Release)), fatally undermining any notion that Evolent was "well-run" (Mem. at 6, 8) or was unfairly targeted due to political animus. In announcing the rejection, Kentucky revealed that the Evolent-controlled Passport had, once again, failed to establish that it could provide services "*in a cost-effective manner*," specifically finding that Passport "*provided no . . . meaningful information*" in response to questions regarding Passport's ability to provide "care" and "overall improvement in health outcomes in a cost-effective manner"—and that the answer Passport did provide contained "*gaps in logic*." Ex. D at 4 (Technical Proposal Evaluation). Accordingly, by a wide margin, Kentucky scored Passport dead last out of seven applicants. Ex. C (Determination and Finding).

17

Notably, Passport's bid ***admitted*** that it "experienced encounter data challenges in 2017" as a result of Valence, including "[a]n inability to implement key encounter data-reporting requirements" and "areas of misalignment between claims data and required encounter data," while acknowledging that Valence would not be fully functional until at least April 2020—over two-and-a-half years after the October 1, 2017 go-live date. Ex. A at 17, 18-20 (RFP Response).[5] Kentucky's rejection of Passport's bid sealed the Plan's fate, and with zero business, the Plan will be liquidated in 2021. Evolent's stock price has never recovered from the Passport debacle, and today trades in the range of $7 per share—a decline of 75% from its Class Period high.

## III.    ARGUMENT

### A.    Plaintiffs Have Pled That Defendants Made False and Misleading Statements

To allege falsity, Plaintiffs need only "plead sufficient facts to support a reasonable belief in the allegation that a defendant's statement was misleading." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015) (Wright Allen, J.). As a general rule, "the trier of fact decides whether a public statement is misleading," and thus "it is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage." *Id*. Rather, a plaintiff is only required to "allege[] facts and circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible." *Nieman v. Duke Energy Corp.*, 2013 WL 4004274, at *8 (W.D.N.C. July 26, 2013).

---

[5] Plaintiffs respectfully request that the Court take judicial notice of Exhibits A, B, C, and D attached to the Toll Declaration. The documents, which were made public after May 27, 2020, when briefing on Plaintiffs' Motion for Leave to Amend was complete (ECF No. 64), are "not subject to reasonable dispute" because they are "from sources whose accuracy cannot be questioned." Fed. R. Evid. 201(b). Exhibits A and B are documents produced by Passport and Evolent, respectively. Exhibits C and D are documents produced and published by Kentucky. *See Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 714 n.17 (D.S.C. 2019) (taking judicial notice of article from Environmental Protection Agency). Moreover, as amply demonstrated herein, these documents are indisputably relevant to Lead Plaintiffs' allegations.

1.  **Defendants Made False Statements About the Ability of Evolent's Services to "Lower Clinical and Administrative Costs"**

Throughout the Class Period, Evolent repeatedly emphasized that its business model was entirely predicated on its supposed ability to reduce its clients' healthcare and administrative costs. For example, Evolent told investors that ***"[t]he solution we offer . . . contemplates one strategic option—to pursue clinical and technological integration to reduce utilization and total cost[.]"*** ¶¶136, 160.[6] Evolent also repeatedly assured investors that its services enabled its partners to "lower clinical and administrative costs," and operate "in a more cost-effective manner." ¶¶141, 149, 155, 165, 172, 176. With respect to Passport, Evolent's most important client that accounted for 20% of its revenue, Evolent boasted of its supposed successes in cutting costs.[7] Defendant Blackley claimed for example that Evolent's services had created "about $75 million of improvement to Passport's bottom line," while Defendant Williams claimed that Evolent's services had "helped to generate over $100 million in savings," which was "highly valuable to [Passport]." ¶¶168, 175. And, as more fully discussed in Section C, below, when questions arose over the amount of fees that Evolent was charging Passport, Defendants flatly denied that Evolent's fees were excessive, falsely stating that it was providing services to Passport 'at cost" and "at a lower per member cost than prior periods." ¶179. These statements were false and misleading at the time they were made.

*First*, the facts that (i) Passport, which had previously operated successfully for decades, became insolvent and unable to survive as a standalone business just three short years after its

---

[6] Defendants claim that "the full statement warns investors that not all customers may choose to focus on lowering costs, so Evolent may lose business." Mem. at 17. This is irrelevant; Plaintiffs do not allege, and Defendants do not argue, that Evolent "lost [Passport's] business" on this basis.

[7] Defendants try to minimize Passport's importance by referring to it as "just one of its more than 35 customers." Mem at 14. This is a red herring. Defendants do not dispute that Passport was by far Evolent's most important customer, accounting for approximately 20% of its revenue. ¶41. Indeed, Passport was so material to Evolent that the Company mentioned Passport 39 times in its 2016 Form 10-K, 41 times in its 2017 Form 10-K, and 65 times in its 2018 Form 10-K.

"partnership" with Evolent began; and (ii) Kentucky *twice* rejected Passport's bid for a renewed Medicaid contract ***precisely because Kentucky determined that the Plan could not offer Medicaid services "in a cost-effective manner***," make clear that Defendants' statements about lowering costs were materially false and misleading.[8] Moreover, that Passport was rejected for a Medicaid contract by Kentucky twice in six months, by both Republican and Democratic administrations, dooms any suggestion that Passport was "well-run" under Evolent's stewardship. ¶¶84, 126-133; Ex. B; Mem. at 6, 8. And while Defendants claim that, while they may have mismanaged Passport, such "bad" business decisions do not constitute fraud (Mem. at 14), courts have made clear that defendants are liable for securities fraud where, as here, they ***are acutely aware*** of their own management failures yet continue to make misleading public statements to the contrary. Ex. A at 4, 17-20; *see, e.g., Ollila v. Babcock & Wilson Enterprises, Inc.*, 2018 WL 792069, at *6 (W.D.N.C. Feb. 8, 2018) (fraud pled where "defendant made certain statements despite knowing that existing mismanagement made those statements false or misleading."); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192–93 (S.D.N.Y. 2010).

*Second*, as Defendants admit, Passport's expenses increased dramatically after its partnership with Evolent began. Indeed, in 2016, the first year that Evolent provided services to Passport, Passport's administrative expenses rose nearly 60%, from $107.5 million to $169.1 million. ¶85.[9] Passport's general administrative expenses continued to increase in the following years, to $182.7 million in 2017 (a 70% increase over 2015) and $194 million in 2018 (an 80% increase over 2015). ¶85. Moreover—and significantly—these skyrocketing expenses could not be

---

[8] *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004) is inapposite, as it concerned defendants' "failure to disclose contingent liabilities when there was no reason to believe the contingency would manifest itself at the time," a fact pattern irrelevant to this case.

[9] Defendants refer to 2017 as "Passport's first full year with Evolent." Mem. at 9. However, Evolent began providing services to Passport no later than February 2016, meaning that Evolent was servicing Passport for roughly 11 months of 2016—nearly the entire year.

20

tied to corresponding revenue increases or to changing membership profiles; in fact, Defendants concede that Passport's membership grew just 13.7% from 2016 to 2017. Mem. at 9-10; ¶¶86, 110. Nor could these ballooning expenses be tied to corresponding revenue increases. ¶86.

Rather, these ballooning expenses were the direct result of Evolent's exorbitant fees and failure to deliver promised savings. CW 1, a former senior member of Passport's internal audit team, explained *"[Evolent] said they could cut costs by providing services; they did the opposite."* ¶52. She specifically pointed to the rebadging scheme, stating that Passport was merely "paying [Evolent] to do that stuff that we used to do, and we were paying [Evolent] more." ¶49. CW 5 fully corroborated CW 1, stating that Evolent *"took 350 of our employees, crippled our business and then charged us for services that weren't rendered. Everything that was done was either more expensive or cost us more money."* Likewise, CW 5 confirmed that Passport's $10 million per year IT payments were Evolent's "cash cow," and that Evolent's "technology systems" were *"snake oil"* that dramatically drove up Passport's costs without commensurate benefit. ¶¶106-07.[10]

*Third*, Valence's flaws and botched implementation caused Passport to submit medical records that were in the aggregate millions of days late, in violation of Passport's contract with Kentucky; incur interest charges on late claims payments; and pay out tens of millions in claims overpayments. ¶¶68-71, 75, 77, 104. Moreover, the penalties increased dramatically over time, demonstrating that the problems with Valence never improved, but instead became worse. For example, in February 2018 alone, Kentucky assessed Passport a staggering $48 million in penalties

---

[10] Defendants misleadingly claim that the "bottom-line savings" that they touted for Passport referred to Passport's swing from a $80.4 million net underwriting loss in 2016—the first year Evolent serviced Passport—to a *de minimis* net underwriting gain of just $4.3 million in 2017. (Mem. at 22). But Passport was far more profitable before Evolent took over, achieving a $33.3 million net underwriting gain in 2015. Moreover, the "improvement" did not last, as Passport suffered a massive and solvency-threatening net underwriting loss of $130.7 million in 2018. ¶87. Defendants cannot claim to have created "bottom line savings" for Passport when their actions actually caused Passport to become insolvent.

for untimely and improperly submitted encounter data; by October 2018, Passport was assessed penalties of $56 million per month; and, for both November and December 2018, Passport's penalties topped $100 million per month. ¶77.[11]

*Fourth*, Evolent's claims administration failures ultimately caused the 2018 Medicaid rate cut that Evolent publicly blamed for Passport's financial woes. ¶¶80-83. Defendants' attempt to refute this allegation is especially unavailing; Passport itself has admitted that Kentucky relied on the encounter data to set Medicaid reimbursement rates. Passport Complaint at 22-23, 27 (ECF No. 50-11). Defendants' alternative explanation—that "[m]any of Kentucky's elected officials and newspapers attributed the rate change to politics"—is undercut by the fact that both Republican and Democratic gubernatorial administrations have now rejected Passport's Medicaid bids.[12]

*Lastly*, Defendants offer no real response to Plaintiffs' well-pled allegations, and instead are forced to resort to improperly submitting an assortment of 46 documents totaling over 900 pages in an attempt to improperly shoehorn summary judgment arguments into their motion to dismiss. This

---

[11] Defendants assert that these massive penalties were not material because Kentucky capped the payments. This argument misses the mark. The fact that Passport was incurring more than $100 million in undisclosed penalties per month precisely because of Evolent's defective claims processing services establishes that Evolent rendered Passport wholly unable to comply with its basic contract requirements with Kentucky—facts which obviously were extraordinarily material to Evolent investors, given that Passport accounted for 20% of the Company's revenue. Indeed, the letters were sent directly by Kentucky—Passport's only contracting state—to Passport's most senior officers, including its CEO and CFO, and discussed with Evolent's most senior officers, facts which further establish their significance. For Defendants to claim that letters sent by Kentucky that were entitled "Consequences for Failure to Submit Encounters in Accordance with the Contract," were somehow not significant or important is meritless. Moreover, even the capped penalties were material to Passport, as the $10 million in penalties were double Passport's net underwriting gain of $4.3 million in 2017, and were about 8% of Passport's net underwriting loss in 2018. Lastly, Defendants simply ignore the other negative economic effects Valence had at Passport, such as causing tens of millions of dollars in unrecoverable claims overpayments.

[12] *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 578 (W.D. Va. 2006) is easily distinguishable. There, the court dismissed a statement that a company was "on track for a strong year"—a statement that is clearly non-specific because "strong year" does not have an objective or verifiable meaning. *Cf. In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1354 (N.D. Ga. 2018) (statements that the company supply chain's recovery from a disruption was "on track" false where plaintiffs pled particularized facts showing recovery was not meeting internal goals and was not resolving the company's supply chain problems.).

22

is a prime example of what the Ninth Circuit recently warned was a "concerning pattern in securities cases like this one," where Defendants "exploit[] [judicial notice] procedures to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Ninth Circuit explained that this improper practice leads to "harmful results" because it "risks premature dismissals of plausible claims that may turn out to be valid after discovery," and that the "risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id*.

The Court should not judicially notice these documents; alternatively, it should convert Defendants' motion into a motion for summary judgment and permit discovery. Over one-quarter of Defendants' exhibits are not even referenced in the SAC,[13] and thus fall far outside of the "narrow" circumstances in which a court may take notice of such materials because the documents are not "integral to" or "explicitly relied on." *McIntyre v. Pedder*, 2015 WL 5039431, at \*\*6-7 (W.D.N.C. Aug. 26, 2015). Moreover, many of Defendants' documents are transparently self-serving and unreliable, and thus highly inappropriate for judicial notice. For example, Ex. 26 (ECF No. 76-26), which Defendants submit as proof that Evolent lowered Passport's costs, is a letter written by Scott Bowers, a former Evolent executive who Evolent installed as Passport's CEO in June 2019. Mem. at 11, 13.[14] These documents are far from the types of "sources whose accuracy cannot reasonably be questioned" that are contemplated by Fed R. Evid. 201. *Davison v. Loudoun Cty. Bd. of Supervisors*, 2016 WL 4801617, at \*3–4 (E.D. Va. Sept. 14, 2016).

Even if the Court were to take judicial notice of Defendants' highly unreliable documents

---

[13] Exhibits 1, 3, 7, 8, 9, 15, 16, 17, 18, 26, 31, and 32 are not referenced in the SAC.

[14] Similarly, Defendants frequently cite **their own statements** in investor conference calls and press releases for the truth asserted therein. *See, e.g.* Mem at 20 (Exs. 16 & 32, Valence as a dental claims system); 26 (Ex. 15, Medicaid reimbursement rates).

23

and extraneous "facts," they are unavailing. For example, relying largely on documents not cited in the SAC, Defendants proffer their own calculations of Passport's "Medical Loss Ratio" ("MLR") and "Administrative Loss Ratio" ("ALR") as evidence that Evolent reduced Passport's costs. Mem. at 8-9, 22. Yet, Defendants point to only a single year's worth of data, cherry-picking Passport's MLR reduction from 95.1% in 2016 to 89.8% in 2017. What Defendants fail to note, however, is that Passport's MLR and ALR significantly *worsened* again in 2018, spiking back to its 2016 level of 95.1% and undermining any claim of sustained improvement.[15]

## 2.    Defendants Made False and Misleading Statements About Valence

During 2017 and 2018, Defendants made materially false and misleading statements about Evolent's "integration" of its Valence claims administration platform at Passport. For example, on November 2, 2017, Defendant Williams stated that Evolent had "successfully launched Passport … onto our [Valence] Platform," and that "teams continue to monitor [Valence]'s operations closely and report a smooth transition." ¶152. On Evolent's February 27, 2018 earnings call Williams again claimed that the Valence integration was "going incredibly well" and was helping Passport to "see[] strong success providing services." ¶158.[16] Similar statements are regularly found to be actionable where, as here, they are contradicted by specific, non-public facts showing that the

---

[15] Tellingly, Defendants have abandoned their argument from their first motion to dismiss that Passport's 2016 MLR was "too high at 95.1%," presumably because Evolent directly caused the increase back to this "too high" amount in 2018, as their own formulae reveal. Mem. at 8-9 & n.1-4. Defendants have similarly abandoned certain of their claims about Passport's ALR (the portion of revenue spent on administrative expenses), as their own calculations revealed that Passport's ALR skyrocketed when Evolent took over—from 6.6% to 9.5%—and remained at heightened levels throughout the Class Period. Defendants' citation of national and Kentucky "averages" for ALR is wholly irrelevant to Plaintiffs' claim that Evolent failed to lower Passport's clinical and administrative costs, while Defendants assertions concerning Passport's "high member satisfaction" and "excellent" rating are too poorly sourced, generic, or irrelevant even to respond to, nor do they contradict Plaintiffs' allegations. Mem. at 8.

[16] Notably, Defendants do not even address their February 2018 false and misleading statements about Valence. For this reason, Defendants have waived any argument that their February 2018 statements regarding Valence were not materially false and misleading. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012).

integration was not, in fact, "going incredibly well." *See, e.g., KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *8 (D.S.C. July 25, 2016) (upholding as false the statement "[t]he integration is going extremely well."); *In re Akorn Secs. Litig.*, 240 F. Supp. 3d 802, 816-18 (N.D. Ill. 2017) (statements that company was "on track" with plans to fully integrate the acquired business, and that "acquisitions are fully integrated," were materially false and misleading where company had "problems integrating" new accounting system and "fail[ed] to . . . accurately process and account for rebates and chargebacks.").

*First*, contrary to what Defendants contend, there are a plethora of facts which establish the critically important Valence system could not perform its most basic functions. Indeed, the monthly letters that Kentucky sent to Passport's most senior officers explicitly set forth the tens of millions of times each month that Passport violated its Medicaid contract with Kentucky, failing to timely and properly submit encounter data to the Commonwealth—which was exactly what Valence was supposed to do. The detailed letters easily establish that Valence was so defective that Kentucky staggeringly imposed almost half a billion dollars in penalties during the first 18 months that Valence was in operation.[17] ¶77. These glaring realities constituted "omitted material facts showing that [Defendants] lacked the basis for making those statements." *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019).

*Second*, five former Evolent and Passport employees, each with direct knowledge of the relevant facts*,* independently corroborated that Valence was "not advanced enough" to handle Medicaid medical claims; that it was "not ready" when launched at Passport; and that its launch was a "disaster." *See, e.g., Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 n.13 (D.

---

[17] Defendants' contention that Passport's prior claims administrator also incurred some encounter data penalties is unavailing. Evolent's penalties were many orders of magnitude higher than the previous administrator's *de minimis* penalties. ¶154.

Md. June 14, 2006) ("the [confidential] witnesses' interlocking and corroborating accounts add support to the reliability of the statements."); *see also* Section III.B., below.

*Third*, *after* Evolent acquired its controlling 70% stake in Passport, Passport *admitted* that as a result of Valence, Passport "experienced encounter data challenges in 2017," including *"[a]n inability to implement key encounter data-reporting requirements"* and "*areas of misalignment between claims data and required encounter data,*" and further conceded that Valence would not be fully functional until at least April 2020—or over two-and-a-half years after the October 1, 2017 go-live date. RFP Response at 17, 20-21. These facts establish the falsity of these statements.

### 3. Defendants Made False and Misleading Statements About Their Bailout and Acquisition of Passport

During Evolent's February 26, 2019 earnings call, Defendant Williams repeatedly and unequivocally denied that Evolent was considering acquiring a stake in Passport, telling analysts that such a transaction was "not in our strategic lens at this point," and that Evolent did not have "any broader exposure" to Passport. ¶183. On Evolent's May 7, 2019 earnings call, Defendants reassured investors that Passport's finances were improving. Specifically, Williams stated that "Passport is making solid progress towards improving its financial performance," and that Evolent "remain[s] hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen [Passport's] balance sheet . . . ." ¶188.

These statements were false at the time they were made. Defendants themselves later admitted that by January 2019, "the writing [was] on the wall" for Passport, and that Passport's sponsors "really felt as though they needed to take on a partner." ¶125.[18] Due to this "additional

---

[18] Defendants assert that Plaintiffs have "truncated" their quote in a "misleading" fashion in order to create the appearance of an admission. This is wrong. ¶125. Ironically, it is Defendants who have improperly "truncated" the quote, leaving out the critical language that ". . . the sponsors [of Passport] really felt as though they needed to take on a partner." Mem. at 34-35. Defendants' "admission," in other words, was that they had known in January that Passport would need to "take

level of urgency," Evolent transformed its senior executives—including Defendant Williams—into a "shadow management" team at Passport, who stood "shoulder to shoulder with Passport leadership." *Id*. Indeed, these statements were made just weeks before Evolent announced its buyout of Passport—meaning it is virtually impossible that Evolent was not planning to bail out Passport at the time it made the statements. As such, the "the extremely short time period here is strong evidence" that the statements were materially false and misleading when made. *Miss. Pub. Empl. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008). The market also understood these statements to be false; analysts specifically noted that "[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call," and that "management cited they had 'not contemplated acquiring a full Medicaid plan.'" ¶123.

Further, these statements are not forward-looking (Mem. at 21-22). The plain language used demonstrates that Defendants' statements concerned the then-current state of affairs—*i.e.,* whether a buyout was "***currently being evaluated***" or was in Evolent's "strategic lens ***at this point***." Defendants "omitted present facts" needed to make the statements not misleading. *See*, *e.g., Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412, 424 (M.D. Pa. 2018) ("Statements that Walgreens had committed to potentially divesting 1000 stores are not forward-looking because they relate to Walgreens's present commitment, not its eventual, possible actions.").[19]

---

on a partner," not just that they had known of its financial troubles.

[19] Moreover, the "generic disclaimer[s]" cited by Defendants (Mem. at 23-24 & Ex. 31) do not constitute the kind of "meaningful cautionary language" required to invoke the safe harbor; rather, sufficiently meaningful cautionary language must "warn about or fully disclose the potential specific risks allegedly omitted in the misrepresentations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 246-47 (5th Cir. 2009) (risk statements merely warned of a "limited, general, and vague risk to customer satisfaction," when defendants knew that specific and known problems "posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized."). Defendants do not point to any "cautionary language" that warns of the specific risk that Evolent was on the verge of bailing out Passport—indeed, the brief does not even identify what specific cautionary language Defendants believe insulates specific false statements, instead making generic references to their "chart" attached as Exhibit 1 and to "appropriate warnings given

In light of these incontrovertible facts, Defendants have cobbled together an implausible self-serving counternarrative in which, by late February 2019, they still had no idea that Passport might require a bailout or seek an acquirer or "partner." Instead, Defendants contend that they suddenly changed their minds about "further invest[ment] in Passport" only after they "learned that Passport was about to be purchased by one of Evolent's competitors" (Mem. at 12)—a claim that contradicts the plain allegations of the SAC and which, of course, was not what they said when they announced the acquisition.[20] Defendants' alternative explanation requires a series of ever-more dubious assumptions that, by the end of February 2019, Defendants were not even contemplating acquiring or bailing out Passport (even though they admitted the "writing was on the wall" and even though they knew Passport "needed a partner" no later than January 2019); yet, between May 8, 2019 (when they said that Passport's financial situation was improving) and May 29, 2019, Defendants (i) changed their mind entirely and (ii) went through the entire process of bidding, negotiating, and signing an agreement to acquire Passport. In light of Defendants' far-fetched alternative explanation, it is "implausible to conclude that [Defendants'] statements were not false when made." *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *16 (C.D. Cal. Jan. 16, 2013); *Peace Officers' Ann. & Ben. Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154-55 (D. Colo. 2019) (resolving inferences in plaintiffs' favor where "[d]efendants [] present[ed] only a weak plausible alternative. . . .").[21]

---

in the SEC filings" in Ex. 31. Mem. at 18-19. *See HD Supply*, 341 F. Supp. 3d at 1359 ("The Court will not use its scarce resources to scour 50 pages of filings in the hopes of finding which cautionary language Defendants intended.").

[20] Even the May 30, 2019 Investor Day Transcript cited by Defendants (Mem. at 5, 12 and Ex. 6) does not claim that Evolent made its decision to purchase a 70% stake in Passport only after learning "in May 2019 that Passport was about to be purchased by a competitor," nor would it be judicially noticeable for the truth of that statement.

[21] Defendants argue that, under *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011), statements not made by Wigginton and Spencer cannot be attributed to them. However, Plaintiffs do not seek to hold Wigginton or Spencer liable for statements they did not make.

### 4.     Defendants' False Statements Were Material

A statement is material "[i]f a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision." *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 666 (D.S.C. 2016). At this stage, a securities fraud complaint "may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018). It is also well-established that "[w]hether a representation is mere puffery depends . . . on the context in which it is made," and that statements that might be "insufficiently specific to support liability in some contexts," are actionable in others. *Plumbers & Pipefitters Nat'l Pen. Fund v. Davis*, 2020 WL 1877821, at *10 (S.D.N.Y. Apr. 14, 2020). Naturally, Defendants claim that nearly every false statement they made to investors is puffery.

*First*, Defendants' statements were material to investors because they concerned the singular purpose of Evolent's business—to lower clinical and administrative costs for health plans—***and*** because they concerned by far its largest and most important client, Passport. *See, e.g., Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *7 (S.D. Ohio Jan. 21, 2016) ("issues which could call into question the viability of [defendants'] business model" clearly material to investors); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 595–96 (W.D. Tex. 2014) ("any reasonable, prudent investor would take into consideration information about . . . the single investment product that [defendant company] sold."). As such, Evolent's success in lowering costs "would be among the most important information looked to by investors." *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (claims about underwriting quality material to investors in a mortgage banking company). Moreover, "the significance [of Evolent's purported lowering of its clients' costs] is illustrated by the frequency

29

with which Defendants emphasized [it]" in public statements. *Id*; *see also In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617–18 (S.D.W.V. 2012) ("[S]tatements professing that safety was [the defendants'] 'first priority every day'" were material where "[d]efendants closely aligned their statements of commitment to safety to their productivity and success as a company, thereby lending credence to the materiality of their statements."); *Davis*, 2020 WL 1877821, at *10 ("Defendants touted its brand as a source of PSG's success. Reasonable investors might have relied on those statements when choosing whether to invest in PSG and thus the statement that its brand reputation was improving, when Plaintiffs have alleged it was deteriorating, was false.").[22]

Indeed, Defendants themselves emphasized the materiality of their statements. For example, Defendant Blackley stated that Evolent's purported "$75 million improvement in [Passport's] bottom line ***is a big deal***, and [] helps make…the mission sustainable, and gives an opportunity to expand what we're doing in the state. And that's—***from an investor's standpoint, in taking away the net result—is critical***."[23]

_____

[22] Defendants' puffery argument rests on segregating "selective phrases within larger statements that, when read in their entirety and in context, are not mere corporate puffery." *Monroe Cty. Empl. Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *21 (N.D. Ga. Mar. 29, 2018). *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179-80 (D.D.C. 2007), is inapposite because the statements there lacked any context that would enable them to be "quantified []or specified in any way," not because language such as "cost-effective" and "efficient" is *per se* puffery. *Id.* By contrast, Evolent stated that its services "enable health systems to manage patient health in a ***more*** cost-effective manner," which is an objectively verifiable comparison to the same health systems' cost-effectiveness prior to using Evolent's services (rather than a "loose" or "vague" claim)—and which Kentucky conclusively found was not the case. *See, e.g. In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 332-33 (D. Mass. 2002) ("comparatory language" less likely to be puffery). For similar reasons, *In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (statements not tethered to verifiable truth) and *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223 (E.D.N.Y. 2019) (statements regarding unverifiable "sneaker culture") are inapposite. *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213-14 (4th Cir. 1994) did not even mention puffery in connection with the challenged statement.

[23] The Court should disregard Defendants' Exhibits 1 and 31 (ECF No. 76-1, 76-31), which purport to identify various statements quoted in the SAC—many of which are not addressed at all in Defendants' brief—and then offers conclusory "reasons for dismissal" such as "Corporate Puffery," "No Scienter" and "Facts Not Pled," "cautionary language," and "selected warnings" not identified in their brief. Defendants have transparently submitted these exhibits "for the sole

*Second*, Defendants' statements were clearly "capable of objective verification," *SEC v. Agora, Inc.*, 2007 WL 9725170, at *5 n.5 (D. Md. Aug. 3, 2007)—either Evolent "lower[ed] clinical and administrative costs" for Passport, or it did not; either Evolent created "bottom-line savings" for Passport, or it did not. *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *11 (D. Or. June 27, 2017), *report and rec. adopted,* 2017 WL 3610523 (D. Or. Aug. 22, 2017) ("statements [that] are either true or false and can be objectively evaluated and verified" were "clearly material to investors, and not puffery."). As demonstrated above, claims that Evolent "lowered clinical and administrative costs," or created "bottom-line savings," are actionable, *inter alia*, because Evolent in fact did the exact opposite, and dramatically increased Passport's costs.[24]

### B.      The SAC Pleads a Strong Inference of Scienter

A complaint pleads scienter by alleging "facts that constitute circumstantial evidence of either reckless or conscious behavior." *Kiken*, 155 F. Supp. 3d at 601. A plaintiff needs to raise only a "strong inference" of scienter that is "at least as compelling" as any plausible opposing inference. *Tellabs, Inc. v. Major Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007). In other words, "a tie favors the plaintiff." *Lormand*, 565 F.3d at 254. Moreover, a scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Rather, the court "must evaluate the totality of the circumstances alleged

---

purpose of presenting additional arguments against falsity which they could not fit in their [brief]." *In re Acadia Pharm. Inc. Securities Litig.*, 2020 WL 2838686, at *2–3 (S.D. Cal. June 1, 2020). As such, Exhibit 1 "is simply an extension of Defendants' argument and thus, Defendants' have exceeded the [40]-page limit for their briefs." *Id.*; *see also Pequignot v. Solo Cup Co.*, 2009 WL 10730697, at *1–2 (E.D. Va. June 15, 2009) (finding defendants violated Local Rule 7(3)(F) by improperly exceeding page limit and striking documents). Moreover, Defendants' "arguments" in Exhibits 1 and 31 are so vague and conclusory that they are impossible for Plaintiffs to respond to, and should be deemed waived.

[24] Similarly, statements that the integration of Valence at Passport had gone "incredibly well" were materially false, and not mere puffery, in the face of undisclosed facts showing that, in fact, Valence was a "disaster," was unable to perform its basic functions, was causing Passport to incur nearly half a billion dollars in penalties for failing to comply with its contract with Kentucky, and caused problems so severe that Evolent was forced to create a "War Room" to address them.

in the complaint, and afford 'the inferential weight warranted by context and common sense.'" *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 783 (E.D. Va. 2015). The SAC alleges ample facts raising a strong inference that Defendants knew or recklessly disregarded information that contradicted their public statements.

*First*, the Individual Defendants have admitted that they meticulously monitored all aspects of Passport's performance. Indeed, Evolent's control over Passport was so absolute that Defendant Williams publicly boasted that Passport looked to Evolent **"as a co-owner."** ¶42. Strikingly, Williams further described the Evolent-Passport relationship in even more intimate terms, telling investors that "**we really have joint governance**"; "**we're able to drive the decisions we think are important for performance**"; Evolent was able to "**control many more levers** than if we're just in a pure service relationship"; and Evolent was "**at the table participating in [Passport's operational] decisions**." ¶¶42-43. Evolent also admitted that "once the writing kind of became on the wall" and "there was [an] additional level of urgency" to bail out Passport, Evolent installed a "shadow management team [at Passport]" that included Defendant Williams, who stood "shoulder to shoulder with Passport leadership." ¶125.

These statements are dispositive as to Defendants' scienter, and the fact that Defendant Williams now attempts to walk back his "joint governance" statement is telling. Mem. at 29. Simply put, one cannot claim to be an "owner" of a business who "drives the decisions that we think are important" and is "at the table participating in [operational] decisions"—or to have a "shadow management team" that stood "shoulder to shoulder with Passport leadership"—and then turn around and pretend to not be knowledgeable about Passport's operations. *Genworth*, 103 F. Supp. 3d at 785 ("Because of the Individual Defendants' self-proclaimed 'personal involvement in Genworth's complete review of all [LTC] components,' the Court may reasonably infer that Defendants possessed knowledge of the true state of affairs of the LTC business, and thus had

32

knowledge that their representations were misleading'"); *In re Computer Sci. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012) (subject contract "was one of [the defendant's] largest, one that [Defendant CEO/Chairman] said he 'watch[ed] most closely' and had his 'utmost attention.' This is an important fact supporting the scienter allegations."); *Kiken*, 155 F. Supp. 3d at 607 (repeated statements that defendants were "personally involved in [company's] operations" contributes to inference of scienter). *KBC Asset Mgmt.*, 2016 WL 3981236, at *9 ("repeated statements about core operations of 3D Systems, such as the acquisition strategy" adds to inference of scienter).

*Second*, the monthly deficiency letters imposing nearly half a billion dollars of penalties on Passport are compelling evidence of scienter. These letters, which were titled "Consequences for Failure to Submit Encounters in Accordance with the Contract," documented Valence's inability to execute its most basic function—submitting accurate and timely encounter data to Kentucky. Indeed, by the end of the Class Period, these deficiency letters catalogued claims that were hundreds of millions of days late in the aggregate. CW 5 explained that the deficiency letters, which documented fines so high it became "comical," "absolutely were" sent to Evolent's executives because "Evolent agreed to foot the bill" for some of them. ¶¶100-01. Significantly, although the fact that Passport was incurring massive penalties because it was violating its contract with Kentucky was obviously highly material information for Evolent investors, and despite the fact that Defendants ***admit*** they received these deficiency letters (Mem. at 13, 24), ***they were never disclosed to investors***. *SEC v. Pirate Inv'r, LLC*, 580 F.3d 233, 243 (4th Cir. 2009) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

*Third*, multiple former high-level employees—including Passport's Senior Director of

Information Technology and a senior member of Passport's Internal Audit team (¶¶44, 89)—have provided independent, consistent, and corroborating accounts establishing that Defendants knew that Evolent caused Passport's rapidly ballooning costs and forced the faulty implementation of the flawed Valence platform onto Passport. *E.g., Martek*, 2006 WL 8435572, at *5 n.13 "[T]he witnesses' interlocking and corroborating accounts add support to the reliability of the statements").[25] For example, CW 5 stated that it was ***"100% inaccurate"*** for Evolent to claim that it was not aware of the issues facing Passport. In particular, CW 5 stated that Defendant Williams ***"absolutely"*** knew that Valence was designed for dental claims and that there were pervasive issues with its ability to report data, explaining that Williams participated in "relationship calls," which often took place on a weekly basis, and that issues regarding Valence's design and reporting problems ***"came up"*** during ***"every relationship meeting that we had."*** ¶96.

CW 5 further explained that she was ***"very explicit"*** regarding "Valence issues" during in-person meetings that she had with Williams, Evolent's Chief Technology Officer, and Passport's Chief Operating Officer. ¶97. Defendants' speculation that it would be "unlikely" that Williams spoke with CW 5 (Mem. at 31) is nonsense. As Defendants concede, the Valence transition and

---

[25] The CWs are identified by title, job responsibilities and tenure. ¶44 (CW 1, Passport Internal Audit senior member); ¶49 (CW 2, rebadged Contract Specialist); ¶49 (CW 3, Evolent's rebadged Associate Director of Risk Adjustment); ¶65 (CW 4, Evolent Medicare/Medicaid Quality Analyst); ¶89 (CW 5, Passport Senior Director of Information Technology). Nothing more is required. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) (witnesses must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations."). The fact that the CWs worked at Passport's headquarters in Louisville ***adds*** to their credibility, rather than detracts from it (Mem. at 32-33), because they were on the front lines to witness the events of which they speak. *See, e.g., Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014) (although CWs were not "in senior management positions" and "had relatively little ongoing contact with senior management," they were "in a position to know about the off-label marketing practices and training."); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (CWs at "different levels" and from various offices who "tell what is essentially the same story" support a strong inference of scienter). *Local No. 38 IBEW Pen. Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447 (S.D.N.Y. 2010) is inapposite because "many" of the CWs were "rank-and-file" employees or outside contractors who had "no access" to adverse data. *Id*. at 460.

implementation was "a significant undertaking" (Mem. at 32); Williams boasted of Evolent's intimate level of control over Passport (¶¶42-43, 125); and ***Defendants concede that CW 5 is adequately described, reported directly to Passport's C-Suite officers, and that she can credibly speak to encounter data issues*** (Mem. at 24 n.20 & 25 n.23).[26] Moreover, Defendants' insistence that the CW's accounts were mere "opinion[s]" (Mem. at 20, 30-31) is meritless, given that they were high-level senior employees in positions to directly know the facts—and their accounts are corroborated by the fact that Kentucky imposed nearly half a billion dollars of penalties on Passport for submitting inaccurate and untimely encounter data that was, in the aggregate, hundreds of millions of days late. ¶¶73-79.[27] Finally, Defendants' reliance on *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741 (E.D.N.C. Sep. 15, 2015) and *In re Coventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998 (D. Md. Mar. 30, 2011) is inapposite due to CW 5's multiple first-hand interactions with Defendant Williams.

---

[26] Defendants' reliance on *Yates* is misplaced. Mem. at 33. The excerpt that Defendants cite actually holds that the defendants knew that the company was not in compliance with certain GAAP provisions but could not specifically state that they were not in compliance during the class period. 744 F.3d at 887. That is not the case here, where Defendants were regularly informed of Valence's multiple flaws during the Class Period. The CW accounts in *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) related to "isolated practice[s]" at a bank's branch office, not to senior executives being in the room discussing "a massive undertaking" at Evolent's most important partner. Similarly, in *Local 295/Local 851 IBT Emp. Grp. Pen. Tr.*, 731 F. Supp. 2d 689, 722-25 (S.D. Ohio 2010) the court found that the CW's accounts were not connected to the individual defendants, and in many instances their accounts pre-dated the class period, unlike here—a fact that Defendants conceded in their previous Memorandum. ECF No. 49 at 28.

[27] Notably, Defendants do not actually contend that CW 1, CW 3, and CW 5 are incorrect about this fact. Mem. at 25. Given the monthly penalty letters and the fact that Defendants themselves have now admitted that they "experienced encounter data challenges in 2017" and the "inability to implement key encounter data-reporting requirements," Defendants cannot credibly contend that Valence was not grossly deficient and led to the termination of Passport's contract with Kentucky. While Defendants mention other plans that Valence was purportedly servicing at the time, this is irrelevant to the indisputable fact that every one of the CWs uniformly explained that the platform was unable to handle ***Passport's claims***. Additionally, Defendants' overly simplistic comparison of dental and medical claims ignores common situations such as surgery, where a patient might have one procedure but bills from multiple providers such as the facility, the surgeon, the anesthesiologist, and the imaging tech—which is one of the precise scenarios that CW 1 and CW 5 described Valence as being incapable of processing. ¶¶62-63; 93.

In addition to direct meetings with Defendant Williams, CW 5 also described (i) a yearly "realignment call" where Evolent's executives flew to Passport to "basically say they were sorry and were going to fix [Valence]"; (ii) "call[s] all the time up and down the executive team at Evolent" regarding the Valence implementation problems (which included Tom Peterson, Evolent's Chief Operating Officer and one of its co-founders); (iii) meetings "all the time" with Chad Pomeroy, Evolent's Chief Technology Officer; and (iv) weekly progress calls during the Valence implementation that Evolent's C-Suite attended "all of the time." ¶¶98-99. *See Ollila*, 2018 WL 792069, at *2 ("unfavorable monthly reports . . . regularly provided to senior management officers" supported scienter). CW 2 confirmed CW 5's account, informing Evolent management "on a number of occasions" that Valence was not ready or adequate, and emphasizing that "it wasn't just me" informing Evolent's executives of the problems. She stated that "pretty much everyone from Passport was telling them" the Valence transition would not go smoothly. ¶65.

Unable to dispute that these meetings actually occurred, Defendants assert that the CWs' accounts should simply be ignored because they did not pinpoint the exact dates and times of their meetings. Mem. at 32. CW 5 clearly explained, however, that (i) relationship calls often happened on a weekly basis (¶96); (ii) realignment calls took place on an annual basis during the Class Period (¶98); and (iii) calls with Evolent's executives regarding Valence implementation problems took place "all the time"—and could only have occurred during the course of the implementation itself (¶99). Moreover, Valence was flawed because it was not designed to handle Passport's medical claims, a fact that remained unchanged throughout this period. Likewise, the "War Room" meetings could only have been set up after Valence went live, while the rate cut meetings could

36

only have happened after the rate cuts. ¶¶71, 82.[28] It is similarly strains belief to suggest, as Defendants do, that they were unaware of Valence's encounter data issues and botched implementation, or of meetings attended by senior executives (including one of Evolent's co-founders) discussing these matters—particularly in the wake of the Valence "disaster" and the 2018 Medicaid rate cuts—and the fact that Valence directly caused these solvency-threatening problems, as CWs 1 and 5 explained in detail. ¶¶70-71; 104. Mem. at 29-31.[29]

*Fourth*, Defendants' false and misleading statements concerned the strategy upon which Evolent's entire business was predicated—Evolent's ability to cut clinical and administrative costs for its partners. ¶¶37-39. Passport was by far Evolent's most important customer, accounting for up to 20% of Evolent's revenue (¶41), and was critical to Evolent's financial performance. Evolent mentioned Passport a combined 145 times in its Class Period Forms 10-K, and to suggest that the Individual Defendants were unaware of the massive cost increases, the disastrous Valence implementation, or Valence's inability to properly submit encounter data defies credulity. *Genworth*, 103 F. Supp. 3d at 784 (core operations "certainly relevant to Court's holistic analysis" of scienter); *Kiken*, 155 F. Supp. 3d at 606 (fraudulent conduct involving "core operations" of the

---

[28] *Teacher' Ret. Sys. of La. v. Hunter*, 477 F.3d at 181 is inapposite because it concerned a negative sentiment concerning an acquisition beginning to take hold *after* the acquisition had closed.

[29] Defendants' distortion of CW 3's and CW 5's accounts should be rejected (Mem. at 25) because claims left sitting in Valence absolutely impact the money that Passport receives from Kentucky in the form of Medicaid reimbursement rates. CW 5 explicitly explained that when claims sat in the system, "there were no encounters created for any of those payments." ¶104. Because no encounter data was created for a claim, no encounter data could be submitted to Kentucky for that claim—despite Passport still being obligated to pay the healthcare providers. *Id*. Indeed, **Passport admitted to Kentucky that as a result of the Valence transition, it encountered "areas of misalignment between claims data and required encounter data."** RFP Response at 17 (Ex. A at 17). Thus, CW 5 explained that "[Kentucky] looked at the claims we were paying and said that Passport was making too much money and therefore cut our rates." ¶105. Defendants' example (Mem. at 25-26) rests on the false premise that Passport was actually receiving the $100 each month, when in fact it would receive some fraction of that amount because Valence was not correctly reporting the encounter data. Finally, nowhere do CW 3 or CW 5 speculate about rate changes that other MCOs might have experienced (Mem. at 25), and it is telling that Defendants fail to identify any statements in support of this mischaracterization.

business indicative of scienter); *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (It is "reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies.").[30]

### C.       The SAC Sufficiently Pleads Loss Causation

To plead loss causation, a complaint need provide only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Pleading loss causation "may be accomplished by alleging facts establishing that the defendant's misrepresentation or omission was one substantial cause of the investment's decline in value." *Singer*, 883 F.3d at 445. The "disclosure or series of partial disclosures need not precisely identify the misrepresentation or omission about which the plaintiff complains"—the disclosures need only "relate back to the misrepresentation and not to some other negative information about the company." *Id.* at 446. So long as a "plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings," because loss causation is "usually determined by the trier of fact." *Kiken*, 155 F. Supp. 3d at 609.

On February 15, 2019, Passport sued Kentucky, asserting that it had recorded a loss of $65.5 million for year-end 2018, projected an additional $75 million loss for the first half of 2019, and stating that if the rate cuts were not reversed, Passport would be legally insolvent by March 1—just two weeks' time. ¶115. On this news, which raised significant concerns about the impact of a potential Passport bankruptcy on Evolent's revenue, Evolent's share price fell over 10%, to close at $14.99. ¶115-16. Then, on May 29, 2019, Evolent stunned investors by announcing that it would

---

[30] Defendants baselessly assert that they had no motive to gouge Passport. Mem. at 26-27. As the Supreme Court has explained, however, there is no need to plead a motive to commit securities fraud. *Tellabs*, 551 U.S. at 325. Moreover, this argument ignores CW 5's unambiguous account that Passport was Evolent's "cash cow" (¶107)—particularly given that it contributed about 20% of Evolent's revenues ¶41. Indeed, Evolent was highly motivated to extract every single dollar of revenue that it could from Passport, a company which it boasted it owned and controlled, which is precisely why it "rebadged" 70% of Passport's employees and markedly increased its expenses.

acquire a 70% stake in the Plan, despite Defendants' repeated prior assurances to the contrary. Evolent's announcement was an admission that Passport's financial condition was far worse than had been previously represented, and in response, Evolent's share price plummeted nearly 30%, to close at $10.01. ¶121. These facts show that Evolent's share price dramatically declined when new, material information about Passport's financial condition, and the devastating impact that Evolent's practices had on Passport's financial condition, was revealed to the market. Nothing more is required to plead loss causation at this stage. *Singer*, 883 F.3d at 445.

In response to these undisputed facts, Defendants make a single challenge to Plaintiffs' well-pled loss causation allegations: that the January 25, 2019 *Insider Louisville* article titled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to Evolent Health" purportedly revealed the full truth of Defendants' fraud to the market. Mem. at 36-37. Defendants are wrong. While the article asserted that the fees Evolent was extracting from Passport were significant, the article also contained important information that Defendants notably fail to address: specifically, that ***Defendants flatly—and falsely—denied that Evolent's fees were harming Passport, or that Evolent was overcharging the Plan in any way***. ¶179. Indeed, the article quoted Evolent's false denials and its assurances that it was providing services to Passport "at cost" and even "at a lower per member cost than prior periods":

> Evolent told *Insider* via email that the ***'majority of the fees Passport pays to Evolent are directly tied to local staff — at cost — as well as (insurance claims processing) and pharmacy benefit services at a lower per member cost than prior periods.' The company said it has 'hundreds of employees supporting Passport' and that 'the number of employees has increased in line with the increases in scope of our partnership with Passport'*** and that 'the number of our employees in Louisville exceeds our original projection.'

Given Defendants' emphatic denials, it is unsurprising that Evolent's share price did not move in response to the publication of the article. *KBC Asset Mgmt.*, 2016 WL 3981236, at *11 (truth not revealed to market when defendants continued to deny existence of financial problems).

Indeed, the market credited Defendants' denials, including in a January 31, 2019 Piper Jaffray research note titled "Passport is a Happy Client, Despite Local Media Reports." ¶114.

In sum, it is undisputed that, when Passport revealed in its February 15, 2019 lawsuit against Kentucky that it would be legally insolvent in two weeks if the 2018 Medicaid rate cuts were not reversed, Evolent's share price fell 10.8% in response, and then plummeted another 30% on May 29, 2019, when Evolent announced that it would be acquiring a 70% stake in Passport. ¶¶115, 122. Defendants' conjecture that a mere regurgitation of publicly known information could somehow spark such dramatic sell-offs strains credulity and has been flatly rejected by this Circuit and others. *Singer*, 883 F.3d at 447 (allegation that share price declined 40% upon revelation of previously concealed fraudulent information "is wholly adequate to demonstrate that the exposure of the Company's fraud was at least one substantial cause of the investment's decline in value."); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (Easterbrook, J.) ("[I]t is hard to understand the sharp drop in the price of [a company's] stock" if "the full truth had reached the market.").[31]

## IV.   CONCLUSION

For all of these reasons, Defendants' motion should be denied in its entirety.

---

[31] The SAC also states control person claims against the Individual Defendants. "On a motion to dismiss, a Section 20(a) claim will . . . stand or fall based on the court's decision regarding the Section 10(b) claim." *Kiken*, 155 F. Supp. 3d at 609. Accordingly, "[b]ecause the Court has found that Plaintiffs have adequately pled that a primary violation exists under § 10(b), Plaintiffs' claim under § 20(a) stands as well." *Id*. Indeed, "as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss. . . ." *Massey*, 883 F. Supp. 2d at 627. Defendants only challenge Defendant Spencer's capacity as a control person. But there can be no doubt that Spencer controlled Evolent. She was part of the Passport Executive Team that met every Monday and was also entrusted to make public statements on behalf of Evolent, including at the May 11, 2017 Investor and Analyst Day, during which she falsely described the due diligence that she and the rest of the Individual Defendants performed on Valence. ¶¶44, 145-46.

Dated: July 6, 2020

Respectfully submitted,

/s/ Steven J. Toll
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
Megan Kinsella Kistler
mkistler@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*

Maya Saxena (*pro hac vice*)
msaxena@saxenawhite.com
Joseph E. White, III (*pro hac vice* forthcoming)
jwhite@saxenawhite.com
Lester R. Hooker (*pro hac vice* forthcoming)
lhooker@saxenawhite.com
Brandon T. Grzandziel (*pro hac vice*)
brandon@saxenawhite.com
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel: (561) 394-3399
Fax: (561) 394-3382

Steven B. Singer (*pro hac vice* forthcoming)
ssinger@saxenawhite.com
Sara DiLeo (*pro hac vice*)
sdileo@saxenawhite.com
Joshua H. Saltzman (*pro hac vice*)
jsaltzman@saxenawhite.com
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
Fax: (888) 631-3611

*Lead Counsel for Lead Plaintiffs*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2020, I caused the foregoing to be electronically filed with

the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

<u>/s/ Steven J. Toll</u>
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*