**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | Case No. 1:19-cv-01031-RDA-TCB |
| v. | § § | |
| | § | CLASS ACTION |
| EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, SETH BLACKLEY, CHRISTIE SPENCER, and STEVEN WIGGINTON | § § § § § | |
| Defendants. | § | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX 78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Introduction....................................................................................................................................1

Argument ......................................................................................................................................3

I.   Plaintiffs Fail to Adequately Plead That Any Statement Was False When Made.....................3

     A.   The challenged statements are not materially false or misleading when quoted in
          full and considered in context. ......................................................................................3

     B.   Plaintiffs allege no facts showing that Defendants' general statements about the
          Company's business were false. .....................................................................................5

     C.   Specific statements about Passport are not actionable....................................................8

          1.   Alleged mismanagement is not sufficient to state a Section 10(b) claim. .....................8

          2.   Statements about the Valence integration are not actionable because there are
               no allegations that they were false when made...........................................................10

          3.   Statements about cost savings at Passport are not actionable because they are
               demonstrably true.......................................................................................................13

          4.   Statements about Evolent's potential acquisition of Passport are not actionable
               because they rely on implausible assumptions. ..........................................................13

II.  Plaintiffs Fail to Allege a Strong Inference of Scienter.........................................................15

     A.   Plaintiffs' Opposition fails to address the absence of motive or the facts negating
          scienter. .......................................................................................................................15

     B.   Scienter cannot be inferred based on an executive's position alone................................16

     C.   Only one CW had any interaction with any Individual Defendant, and even that
          interaction does not support a strong inference of scienter..............................................17

III. Plaintiffs' Failure to Plead a Valid Corrective Disclosure Is Fatal to Their Entire
     Claim.................................................................................................................................19

Conclusion .................................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*In re Cable & Wireless PLC Sec. Litig.*,
   321 F. Supp. 2d 749 (E.D. Va. 2004) ........................................................................................8

*In re Computer Scis. Corp. Sec. Litig.*,
   890 F. Supp. 2d 650 (E.D. Va. 2012) .......................................................................................17

*Cozzarelli v. Inspire Pharm. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ................................................................................................4, 5

*In re DXC Tech. Co. Sec. Litig.*,
   2020 WL 3456129 (E.D. Va. June 2, 2020) .............................................................................18

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016)...........................................................................................6

*In re Federal-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001)....................................................................................7

*Friends of Lake View Sch. Dist. Incorporation No. 25 of Phillips Cty. v. Beebe*,
   578 F.3d 753 (8th Cir. 2009) .....................................................................................................4

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) .................................................................................16, 17

*Goldfarb v. Mayor & City Council of Baltimore*,
   791 F.3d 500 (4th Cir. 2015) .....................................................................................................4

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) .....................................................................................................4

*Hilson Partners Ltd. P'ship v. Adage, Inc.*,
   42 F.3d 204 (4th Cir. 1994) .....................................................................................................11

*Hunter. Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ...................................................................................................12

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
   432 F. Supp. 2d 571 (E.D. Va. 2006) ......................................................................................16

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. 2015) ......................................................................................17

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)......................................................................................................4

*In re Massey Energy Co. Sec. Litig.*,
    883 F. Supp. 2d 597 (S.D.W.V. 2012)..................................................................................6

*Matrix Capital Mgmt. Fund L.P. v. Bearingpoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ...............................................................................4, 13, 16

*In re Maximus, Inc. Sec. Litig.*,
    2018 WL 4076359 (E.D. Va., Aug. 27, 2018).........................................................................19

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. April 14, 2020) ..........................................................................6

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..................................................................................................8

*Smith v. Circuit City Stores, Inc.*,
    286 F. Supp. 2d 707 (E.D. Va. 2003) ...............................................................................11

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
    381 F. Supp. 3d 536 (D. Md. 2019)..................................................................................9

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014)................................................................................6

*In re Trex Co., Inc. Sec. Litig.*,
    454 F. Supp. 2d 560 (W.D.Va. 2006) ...............................................................................10

*Willis v. Big Lots, Inc.*,
    2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ..........................................................................6

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ............................................................................... *passim*

**Statutes**

Private Securities Litigation Reform Act..........................................................................1, 15, 16

**Other Authorities**

Fed. R. Civ. P. 9(b) ..................................................................................................4, 16

Fed. R. Civ. P. 12(b)(6)..................................................................................................4

## INTRODUCTION

When a plaintiff pleads allegations sufficient to state a claim for securities fraud, it is not difficult to identify the facts supporting the allegations. The SAC fails to accomplish that task. Plaintiffs' Opposition, which simply regurgitates their theory that Evolent crippled Passport's business, does not overcome the arguments raised in Defendants' motion to dismiss the SAC. Plaintiffs' spun-up tale is contradicted by Passport's public financial statements, which show that Passport reduced its trend of rising administrative costs after retaining Evolent. But the Court need not wade into these issues on a motion to dismiss. *See* MTD 11–12. This case is not a breach-of-contract action. Nor is it an occasion for former employees to second-guess the business judgment of Passport's or Evolent's management. It is a securities fraud class action on behalf of Evolent's shareholders subject to the heightened pleadings requirements of the Private Securities Litigation Reform Act. To survive a motion to dismiss, Plaintiffs must allege particularized facts sufficient to show falsity, scienter, and loss causation. They have not satisfied these requirements.

Stripped of its invective, Plaintiffs' case boils down to a theory that Evolent misled its shareholders by telling them that it hoped to deliver cost savings to Passport that supposedly never materialized. But the statements Plaintiffs rely on are non-actionable; most are either corporate puffery or forward-looking aspirational statements. Plaintiffs' Opposition focuses on alleged problems that Passport encountered with the Valence claims processing system, but Plaintiffs have not alleged facts showing that any statements were false when made. Other statements that Plaintiffs cite are taken out of context and are not fairly quoted, a flaw exposed by merely looking at the public documents from which the statements were lifted. Most notably, Plaintiffs' marquee and oft-repeated allegation—that Evolent "caused Passport to incur an astounding $489 million in penalties"—is demonstrably false. Opp. 10. As even Plaintiffs admit in a footnote, the total

1

penalties imposed on Passport were capped at about $10 million, an immaterial amount because Passport generated more than $1.9 billion in revenue a year.  Opp. 10 n.2; Ex. 21 at 4.

Plaintiffs have not identified any plausible motive, such as suspiciously timed stock sales, that could explain why Evolent would have engaged in fraud.  Nor do they plead any facts that raise a strong inference of scienter.  Their Opposition offers no reason why Evolent would intentionally harm Passport knowing that it would be forced to provide a $70 million "bailout."  It never explains why Evolent would spend nearly $220 million to acquire Valence when it supposedly knew the platform would not work.  Plaintiffs instead emphasize the types of generalized allegations—that Defendants closely monitored Passport's performance, engaged in "joint governance," or attended non-specific meetings where business problems were discussed— that courts have consistently rejected as insufficient.  Even the allegations by their new witness, CW5, are inadequate.  She claims that she attended some meetings where she discussed concerns about the Valence system, but she does not even allege when the meetings occurred, an essential detail without which no inference of scienter is permissible.

Plaintiffs do not dispute that the core allegations of fraud were publicly disclosed in an article by the *Insider Louisville* on January 25, 2019, and that Evolent's stock price did not decline in response.  Plaintiffs argue that this article does not qualify as a corrective disclosure because Evolent denied what the article said.  But that is irrelevant.  There is no requirement that defendants admit the veracity of a disclosure for it to be curative.  Plaintiffs have failed to allege facts sufficient to show that any decline in Evolent's stock price was caused by a materially false statement by any Defendant.

Plaintiffs and their witnesses do not like how Passport was managed and they blame Evolent for Passport's problems, instead of the regulatory landscape, market conditions, and other

factors. But this type of business dispute is not a gateway for litigating a securities class action. Plaintiffs have not met the heightened pleading requirements for securities fraud. Accordingly, the Court should dismiss with prejudice.

**ARGUMENT**

**I.      Plaintiffs Fail to Adequately Plead That Any Statement Was False When Made.**

The Opposition's colorful narrative does not connect the SAC's allegations directly to the statements alleged to be false or misleading. Thus, Plaintiffs fail to plead falsity.

**A.      The challenged statements are not materially false or misleading when quoted in full and considered in context.**

The allegedly false and misleading statements identified in the SAC at paragraphs 143, 145, 152, 167, 171, 182, 183 do not support a claim for securities fraud because they have been selectively edited and improperly taken out of context. When each statement is considered in full and in proper context, it is clear that the statement is not materially false or misleading.[1]     That is why Defendants include as exhibits the documents from which the alleged misstatements were lifted, and provide Exhibit 1, a summary chart of the alleged false statements (taken from SAC ¶¶ 136–188) with each statement quoted in full.[2]  This chart includes the exhibit and page number for the Court's convenience.

Plaintiffs argue that the Court should not look at the documents from which the alleged statements were taken. Opp. 22–23. Relying on out-of-circuit precedent, they urge the Court to ignore whether the SAC fairly quotes the alleged statements, or else to convert the motion to

---

[1] *E.g., compare* SAC ¶¶ 137, 161, and 185 *with* Exs. 29 at 9, 10 at 7, and 11 at 8 (Ex. 1 at 1) (10-Q never even mentions Passport); *compare* SAC ¶ 182 *with* Ex. 25 at 6 (Ex. 1 at 6) (quote is about *Medicare*, not Medicaid); *compare* SAC ¶ 171 *with* Ex. 28 at 18–19 (Ex. 1 at 5) (answering question about machine learning).

[2] Exhibits refer to the documents attached to the motion to dismiss ("MTD") in the Declaration of Ashley C. Parrish (ECF No. 76).

3

dismiss to a motion for summary judgment.  Neither request has merit.  Courts in this Circuit have held that plaintiffs' "discrete allegations" should be considered in "necessary context" on a motion to dismiss, including by a review of the reports from which the statements are taken.  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (dismissing securities claims based on statements that were not false when viewed in proper context); *Matrix Capital Mgmt. Fund L.P. v. Bearingpoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) (same); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.").  A plaintiff cannot evade Rule 9(b) and overcome the PSLRA's heightened pleading requirements by deceptively editing and selectively quoting statements and then claiming that the statements are false and misleading.

It is also well settled that a "court does not convert a motion to dismiss to a motion for summary judgment when it takes judicial notice of public records."  *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 506–07 (4th Cir. 2015) (citing *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004)).[3]  Plaintiffs effectively admit the point.  While they rail against Defendants' use of publicly available documents,[4] they also ask the Court to consider as exhibits documents related to the RFP that were filed with or by the Commonwealth of Kentucky.  Opp.

---

[3] The following types of documents have properly been considered at the motion to dismiss stage: (1) information on a state administrative agency's website, *Goldfarb*, 791 F.3d at 506, such as Ex. 17 (Kentucky guide to choosing a MCO); (2) analyst reports and calls, *Cozzarelli*, 549 F.3d at 625, such as Ex. 6, Investor Day 2019 and Ex. 25, 4th Quarter 2018 Earnings Call; and (3) records of administrative agencies, *Friends of Lake View Sch. Dist. Incorporation No. 25 of Phillips Cty. v. Beebe*, 578 F.3d 753, 762 (8th Cir. 2009), such as Exs. 19, 20, and 23, Passport's annual financial statements for 2016, 2017, and 2018.

[4] The vast majority of Defendants' exhibits are actually documents cited directly in the SAC: Exs. 2, 4, 5, 6, 10, 11, 12, 13, 14, 24, 25, 27, 28, 29, 30, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, and 46.  In addition, six other exhibits are relied upon by the SAC but not quoted: Exs. 19, 20, 23, and 33 (Passport's annual financial statements), Exs. 21 and 22 (penalty letters for encounter data submission), and Ex. 34 (stock price).

23 and 23 n.13; Pls. Exs. A (excerpt of RFP response), C (KY Determination), and D (Passport's scoring report). Plaintiffs cannot have it both ways. This Court can and should take judicial notice of publicly available documents that have been filed with or by state agencies, including Exs. 19, 20, and 23 (Passport Annual Filings), Ex. 17 (Kentucky's Guide to Choosing a Medicaid Plan), and Plaintiffs' Exs. A, C, and D. These documents show that Plaintiffs have not identified any false or misleading statements that could be the proper basis for pleading securities fraud. Defendants ask the Court to take judicial notice of public records that were available to Plaintiffs and putative class members at the time they made their investments, and only to provide the context that this Court must consider under *Cozzarelli*.

**B.      Plaintiffs allege no facts showing that Defendants' general statements about the Company's business were false.**

The statements listed in paragraphs 136, 137, 141, 149, 155, 160, 161, 164, 165, 171, 172, 176, and 185 of the SAC cannot support a claim for securities fraud because they are general statements about Evolent's business as a whole that are either corporate puffery or protected forward-looking statements and, in any event, there are no facts alleged sufficient to show that the statements were false or misleading when made.[5] Significantly, the SAC pleads ***no*** facts about any customer other than Passport. Evolent had more than 35 other customers, which accounted for about 80% of its business during the Class Period, but the SAC alleges nothing about these other customers. Without these allegations, it is neither permissible nor plausible to extrapolate the alleged experiences of a single customer (Passport) to assume that Evolent's general statements about its business as a whole were intentionally false.

---

[5] When read in context, the statements in paragraphs 145 and 158 are general statements, not ones about Passport, despite the SAC's misquoting. Wigginton's statement in SAC ¶ 145 is about Valence and Aldera's integration to Evolent, and Williams's statement in SAC ¶ 158 is about Valence's integration into Evolent's services generally, not at Passport. *Compare* SAC ¶ 145 *with* Ex. 13 at 27–28 (Ex. 1 at 2) *and* SAC ¶ 158 *with* Ex. 39 at 5, 6 (Ex. 1 at 4).

Plaintiffs suggest that Defendants "claim that nearly every false statement they made to investors is puffery," Opp. 29, but that is inaccurate.[6]    In fact, Defendants contend that approximately 40% of the challenged statements are puffery or forward-looking statements.  *See* MTD 15–17.  Plaintiffs also assert that generalized statements about Evolent's business can be actionable, but the cases they cite all involve situations where the statements about a company's *entire business*, not just a single client, were shown to be materially false.  *See Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 659–60 (D.S.C. 2016) (alleged fraud related to trapping consumers into inappropriate loans, where consumer loans comprised the primary business line of the defendant company).[7]    Plaintiffs' own parenthetical confirms the point: "[A]ny reasonable, prudent investor would take into consideration information about . . . *the single investment product that [defendant company] sold*."  Opp. 29 (describing *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 595–96 (W.D. Tex. 2014) (emphasis added)).  Moreover, in several of these cases, the statements about the company's general business practices were material because they allegedly helped defendants cover up an alleged fraud.  *See Big Lots*, 2016 WL 8199124, at *7, *36 (statements found to be material where defendants "downplayed" problems that were apparent from reported financials).[8]

---

[6] In addition, Defendants do not contend that Mr. Blackley's statement about the $75 million improvement to Passport's bottom line is puffery, Opp. 30, although this statement is not actionable for other reasons. *See* Ex. 1 at 5. Plaintiffs' confusion illustrates why Defendants attached the summary chart in Exhibit 1.

[7] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *1–2 (S.D.N.Y. April 14, 2020) (alleged fraud related to improperly inflating sales, where defendant company was "a developer and manufacturer of sports equipment and apparel"); *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *1–2 (S.D. Ohio Jan. 21, 2016) (alleged fraud related to "critical merchandising operations" of defendant company, a "broadline closeout retailer").

[8] *See also Davis*, 2020 WL 1877821, at *9–10 (statements about strength of brand found to be material where defendants used brand to explain short-term positive results that were allegedly actually resulting from a "Ponzi scheme"); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 603–07 (S.D.W.V. 2012) (finding statements material when they concerned safety where the defendant mine company had previously suffered a fatal explosion resulting in criminal and civil liability, and allegedly lied about their compliance with safety requirements imposed as part of the defendant company's efforts to settle cases brought by regulators).

6

Courts thus recognize that when a company sells only one product or serves only one client, general statements concerning the company's business practices could be materially misleading. But this case is much different. Plaintiffs do not allege that Evolent's general statements about its business practices were used by Defendants to explain unusual results or to downplay reported financial results, so there are no facts showing materiality. And Plaintiffs cite no case where a generalized statement about the company as a whole was found to be material where the company was not a single-client company and the only allegations of fraud related to a single client.

Perhaps recognizing this flaw, Plaintiffs take some of Evolent's general statements and twist them to suggest that they apply to Passport. For example, Plaintiffs complain that Defendants stated that "Evolent 'lower[ed] clinical and administrative costs' for Passport." Opp. 31. But Evolent never made this statement. The actual statement, found in Evolent's Form 10-K, does not even mention Passport. *Compare* SAC ¶¶ 137, 161, and 185 *with* Exs. 29 at 9, 10 at 7, and 11 at 8. When the Court reviews the full statement in proper context, it is obvious that Evolent was talking about its healthcare plan customers generally, not Passport specifically.[9]

When the made-up allegations are set aside, there are only four statements expressing generalized positive sentiments about Evolent's relationship with Passport, which appear in paragraphs 140, 152, 158, and 167, none of which can support a claim for securities fraud. These are the type of "vague statements" that qualify as non-actionable puffery. *See, e.g.*, *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001); *see* MTD 16–17. Plaintiffs' only response is that Defendants' statement that Evolent's services "enable health systems to manage patient health in a more cost-effective manner" is "objectively verifiable" because it is

---

[9] Plaintiffs also manufacture a statement that Evolent "created 'bottom-line savings'" for Passport. Opp. 31. That quoted phrase does not appear in the SAC as an allegedly false statement.

possible to compare a health system's costs both before and after using Evolent's services. Opp. 30 n.22 (emphasis omitted). That is wrong. A statement that services "*enable*" health systems to be more cost-effective is not a statement that these services will *necessarily result* in a particular health system saving money.[10]

### C.    Specific statements about Passport are not actionable.

#### 1.    Alleged mismanagement is not sufficient to state a Section 10(b) claim.

The SAC reads as if it were a breach of contract action brought by *Passport*, not a securities fraud action brought by Evolent's shareholders. And it does little more than list the alleged misdeeds or incompetence of Evolent.[11] But the alleged mismanagement is not enough to state a claim for securities fraud. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by Section 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *In re Cable & Wireless PLC Sec. Litig.*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004) (same). The issue is not whether Evolent allegedly mishandled its services under a carefully negotiated contract between two sophisticated organizations, but whether Plaintiffs have adequately alleged that Evolent or any Individual Defendant committed securities fraud. Under both the statute and applicable case law, the answer is no.[12]

---

[10] As most people who purchase exercise equipment come to learn, the equipment enables you to get into shape, but whether you ultimately achieve positive results depends on a number of factors that have nothing to do with the equipment. The same holds true for Evolent's services and technologies—they are designed to help healthcare systems reduce costs, but Evolent never guaranteed that a system would achieve costs savings because such results are dependent on a number of factors that are beyond Evolent's control.

[11] The SAC does, however, plead facts that Evolent took seriously its commitment to Passport: Evolent's Chief Technology Officer assisted continuously with the Valence transition, SAC ¶ 99; Tom Peterson, Evolent's COO, was also involved in the Valence transition and virtually moved to Louisville in the wake of the disastrous rate cuts in January 2018, SAC ¶ 108; and senior Evolent leaders participated in conference calls with Passport regularly, SAC ¶ 99. The Opposition finds this assistance problematic, e.g., Opp. 26–27, but the Fourth Circuit views attendance at "meetings as a sign of diligence rather than evidence of a nefarious purpose." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014).

[12] Though not relevant legally, there was no mismanagement. Passport's financial struggles were caused by Kentucky's steep rate cut in November 2018. Ex. 11 at 16. Passport's finances are now back on track, due to Evolent's work to lower administrative costs and adjust medical spending, and because Kentucky adjusted the rates higher.

Plaintiffs' Opposition discusses at length Kentucky's recent decision not to renew Passport's contract, which occurred a full year after the Class Period. But the SAC itself does not mention the May decision and it is improper for Plaintiffs to bolster the SAC with new allegations raised for the first time in briefing. *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 573 (D. Md. 2019) (quotations and citations omitted) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). In any event, neither the later decision nor the first decision not to renew the contract—which occurred in November 2019 and is mentioned in the SAC at ¶ 127—provide evidence that Defendants made a false or misleading statement with scienter that caused Plaintiffs' economic loss.[13]

Some of the allegations of mismanagement are based on deceptively edited quotes from Plaintiffs' own exhibits. For example, Kentucky stated that Passport's response to an RFP question about *staffing* under the contract "merely addresses the question, but provides no additional meaningful information. There may be some gaps in logic." Pls. Ex. D at 5. This is a generic answer that appears 4 times in Plaintiffs' Ex. D in response to other RFP questions, and appears multiple times in the RFP scoresheets for all other applicants.[14] Plaintiffs twist this

---

Ex. 4 at 6; *see also* MTD 12–13. Since January 2019, when the financial situation was most precarious, Passport's operating margin improved nearly 14 points and is now positive. *Id*. Further, Passport has had a sizeable increase in membership in 2020, growing more than 5% from 293,125 to 308,285 members. *See* data available on Kentucky's Medicaid website at https://chfs.ky.gov/agencies/dms/dafm/Pages/statistics.aspx.

[13] A motion to dismiss a securities claim is not the proper venue to litigate why, in the 2020 Kentucky RFP for Medicaid managed care organizations, both Passport and Anthem, two of the five incumbent Medicaid organizations in Kentucky, were not awarded renewals of their contracts. But for the record, the reason that Passport lost has more to do with the size of its capital reserves (the new companies that won the RFP, Molina Health Care and United Health Care, operate in many states and are much larger than Passport) and little to do with the kind of challenges faced by all participants in a highly regulated market that, in the best of times, has but a 1 or 2% profit margin. *See* article cited in SAC ¶ 128 (November 27, 2019 article from the *Courier-Journal* about the RFP).

[14] Scoresheets of all seven RFP bids include the phrase, and there is are 18 separate uses of it. *See* scoresheets for Molina Healthcare of Kentucky, Inc (4 times); Passport Health Plan (4 times); UnitedHealthcare of Kentucky, Ltd. (4 times); Anthem Kentucky Managed Care Plan, Inc. (3 times); Aetna Better Health of Kentucky Inc. (1 time); Humana Health Plan, Inc. (1 time); WellCare Health Insurance Co. of Kentucky, Inc. (1 time). All scoresheets available at https://finance.ky.gov/services/eprocurement/Pages/ProcurementAnnouncements.aspx (last visited July 11, 2020).

straightforward scoring response to say that Passport "'provided no . . . meaningful information' in response to questions regarding Passport's ability to provide 'care' and 'overall improvement in health outcomes in a cost-effective manner'—and that the answer Passport did provide contained 'gaps in logic.'" Opp. 17 (emphasis omitted).  The statement in Plaintiffs' exhibit is clearly not about cost effectiveness, and removing "additional" from the phrase "no additional meaningful information" is patently misleading.[15]  *Compare* Opp. 17 *with* Pls. Ex. D at 5.

**2. Statements about the Valence integration are not actionable because there are no allegations that they were false when made.**

The statements listed in paragraphs 143, 145, 146, and 152 about the Valence integration process are not actionable because a statement must be false or misleading when made, not merely in hindsight.[16] *In re Trex Co., Inc. Sec. Litig.,* 454 F. Supp. 2d 560, 579 (W.D.Va. 2006).  Positive statements about the early stages of the Valence integration made in May were not false when made because problems existed later in November, or even because CWs found out that problems surfaced between May and November.  Plaintiffs are required to show that Evolent's statements were false when made.  They have failed to do so.

Plaintiffs emphasize that the Valence integration resulted in encounter data delays and penalties, but they never show why those issues are material.  First, under the contract with

---

[15] The Opposition also includes many odd mischaracterizations and hyperbole about the RFP process.  For example, it says that "Kentucky took the extraordinary step of announcing it would not renew Passport's Medicaid contact." Opp. 3.  When it did so, it also declined to renew another one of the five Medicaid organizations in Kentucky, Anthem. Thus, 2 out 5 MCOs did not receive a renewal, which at least takes it out of the realm of an "extraordinary" event. The Opposition also states that "Evolent was allowed to participate in a rebidding process," as if there were a way for Kentucky to violate its own contracting statute and prevent Passport from reapplying.  Opp. 3.

[16] Spencer's comment, SAC ¶ 146, is about Passport's decision to adopt the Valence program.  No CW is alleged to be involved in that diligence process or the decision to purchase or switch Passport's medical claims processing vendor, so the SAC fails to allege anything to show the statement was false when made.  The Opposition's assertion that the statement is false is unfounded and is not supported by allegations in the SAC.  Opp. 40 n.31. Defendants also note that regular attendance at a meeting with Passport executives does not make Spencer a "control person" of Evolent.

Kentucky, penalties for failing to properly submit encounter data on time are capped at .33% of capitation rates. Ex. 21 at 1. In November 2017, that means that Passport's penalties for late submission of encounter data were capped at $531,659.97. Ex. 22 at 1. Just like no one thinks a car's MSRP is the actual price of a car, no one at Passport or Evolent thought that Kentucky would try to collect $500 million in "penalties" when it agreed under the contract that it could only collect a tiny fraction of that amount. And Plaintiffs concede that the total amount of penalties Kentucky imposed on Passport was capped at about $10 million over a 17-month period. Opp. 10 n.2 and SAC ¶ 78. Passport recorded more than $1.9 billion in revenue in 2018 alone. Ex. 23 at 4. Thus, in 2018, the actual penalties were less than 0.4% of Passport's annual revenue, which is immaterial as a matter of law. *See Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, at 720 (E.D. Va. 2003) (holding that alleged omission of increased cost representing 3.25% of net earnings was immaterial and collecting cases demonstrating that "Circuit Courts routinely find immaterial misstatements or omissions of this magnitude."); *see also Hilson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, at 219 (4th Cir. 1994) (holding that alleged misstatement amounting to .5% of total revenue was immaterial as a matter of law.)

Second, any issues submitting the encounter data did not impact the per-member-per-month, or capitation, fees that Passport received. Passport was not paid based on encounters; it was paid based on the size of its membership. SAC ¶ 36. This is the explanation from the Center for Medicare and Medicaid Services, even if the Opposition contradicts it. *See* MTD 10; Ex. 15, CMS Medicaid Encounter Toolkit; Opp. 14–15. The Court should credit the explanation from the agency that designs, implements, and regulates the use of encounter data, and not CW5's contradictory supposition.[17] *Hunter*, 477 F.3d at 179; *see also* MTD 24–27.

---

[17] CW5's statements related to the pharmacy benefit management (PBM) program should similarly not be credited by the Court. CW5 wrongly identifies the PBM that served Passport's Medicaid members before Evolent became the

11

Third, the SAC and the very exhibits attached to Plaintiffs' Opposition show that Evolent was engaged in trying to remedy the issues (SAC ¶ 99), was honest about the challenges with the encounter data (Pls. Ex. D at 8),[18] and developed and implemented a detailed plan to improve (Pls. Ex. A at 3–14). In fact, Plaintiffs' Exhibit A shows that Passport's timeliness and accuracy measures for submitting encounter data *did* improve: they were well over the required Kentucky rates of 95%. Pls. Ex. A at 16.[19]

More to the point, the encounter data penalties are not legally relevant. This is supposed be a case of alleged securities fraud, not a case about whether the services provided to Passport under the Evolent contract were satisfactory. The relevant question for the Court is whether Evolent or an Individual Defendant made a material misstatement, with scienter, about the Valence integration at Passport or its impact on encounter data. The answer, as explained here and in the Motion to Dismiss, is no because the SAC does not—and cannot—specify a statement about this subject that was false or misleading when made.

---

PBM. *See* MTD 24. She says it was Navitus, but multiple SEC filings show that it was Magellan. Ex. 33 at 26. This error is relevant because CW5 says that Evolent "dramatically increased Passport's PBM costs," SAC ¶ 109, but the Opposition makes clear that CW5 is comparing the costs of a PBM for a small *Medicare* program, a MA-SNP program, that serves fewer than 3,000 members with a *Medicaid* program that serves 300,000 members. Opp. 15 n.15; Pls. Ex. E at 111 (Passport's MA-SNP's previous PBM was Navitus) and 110 (Passport's Medicaid program's previous PBM was Magellan). The cost differential to provide prescription drug coverage for more than 100 times as many people is, in fact, dramatic. CW5's confusion between a small Medicare program and the much larger Medicaid program that is Passport's central program further shows that she does not have the required familiarity with Passport's PBMs to provide creditable evidence under the requirements of *Hunter*. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 179 (4th Cir. 2007).

[18] Kentucky gave Passport's RFP answer on encounter data a 5 out of 5 possible points, and commented that the company was "Very honest about the challenges they have encountered over the last 3 years and they provide Exhibit C.7-1 which was the end to end process. Talked about working with providers." Pls. Ex. D at 8.

[19] Plaintiffs include Ex. A to cite one half-sentence, in which Passport explains it had faced "an inability to implement key encounter data-reporting requirements…" Opp. 3 (citing Pls. Ex. A at 17). Plaintiffs' selective edit is misleading. Kentucky ranked Passport 5 out of 5 on this answer, and found it "very honest" that Evolent recognized the problems it had in the past, and then worked to remedy them. *See* n.18. More generally, Plaintiffs' Ex. A illustrates a company and vendor working hard to make things right for Kentucky Medicaid members, not a company bent on hiding its operating problems and perpetrating a fraud.

### 3. Statements about cost savings at Passport are not actionable because they are demonstrably true.

The only allegedly false statements that address specific cost savings to Passport are (1) Defendant Blackley's May 11, 2018 statement that Evolent's suite of services had caused "about $75 million of improvement to Passport's bottom line," SAC ¶ 168, and (2) Defendant Williams's September 5, 2018 comment that he "believ[ed]" that "we've helped to generate over $100 million in savings" in Passport's plan.  SAC ¶ 175.  The two statements cannot support a claim for securities fraud because they are both demonstrably true.  The SAC itself shows this when it alleges that Passport's net underwriting profits improved from a loss of $80.4 million in 2016 to a gain of $4.3 million in 2017, a swing of about a $76.1 million.  SAC ¶ 87.  In addition, using Passport's publicly available Annual Statements, it is straightforward to calculate the impact of Passport's improved Medical Loss Ratio ("MLR"), which shows an improvement of about $98 million in 2017.[20]  *See* MTD 22.

### 4. Statements about Evolent's potential acquisition of Passport are not actionable because they rely on implausible assumptions.

None of the statements about Evolent's business strategy, its plans about purchasing Passport, or Passport's progress is false or misleading even when Plaintiffs' allegations are taken as true.  *See* SAC ¶¶ 182, 183, and 188.  Plaintiffs do not plead any facts showing that Williams's statement in February 2019, that Evolent did not currently have plans to acquire Passport, was false when made.  They rely instead on an assumption: Evolent bought Passport three months after Williams said it was not in Evolent's "strategic lens," so Williams must have been lying.  Plaintiffs

---

[20] Plaintiffs take issue with Defendants' use of Passport's financial statements because they are not cited in the SAC. But the SAC is based entirely on Passport's financial performance, so its financial statements are certainly integral to the complaint.  Further, these publicly filed records are precisely the type of documents that federal courts routinely consider at the motion-to-dismiss stage in securities cases to test the adequacy of plaintiffs' allegations.  *Matrix Capital*, 576 F.3d at 183.

rely on non-defendant Tom Peterson's comment that in January 2019, "the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be retroactive rate relief…." SAC ¶ 204; Opp. 28. But Peterson's comments merely echo what Evolent disclosed in its 2018 10-K filed in February: that Kentucky's rate cuts would have a material adverse impact on Passport and could result in its bankruptcy. Ex. 11 at 16. When asked about a potential acquisition of Passport, Williams did not promise shareholders that Evolent would not purchase another health plan. He said purchasing Passport was "not something that is currently being evaluated." SAC ¶ 183. There are no facts pled suggesting that it actually was being evaluated in February 2019, just baseless supposition that the *later* purchase *must* mean that they were evaluating it earlier. This is classic, impermissible fraud by hindsight.

The documents that Plaintiffs themselves cite show that Williams's statements were not false when made. *See* Ex. 6 at 16–17; 13–16 (not alleged to be false or misleading). Evolent changed its strategy in May 2019 after it learned that a competitor was poised to purchase Passport. Ex. 6 at 14–15 ("If we stepped away, imagine a national Medicaid MCO would've come in, they would've bought the asset and surely would've figured out a way for us to be much less engaged than we were engaged… [this was] outside of our strategy… but, boy, it seems like something we should look at."). Though the Company had not planned on acquiring another health plan, Evolent decided doing so made the most sense to keep Passport's business. *Id.*

Williams's positive statements on May 7, 2019 about Passport's prospects are clearly forward-looking and are accompanied by meaningful cautionary language.[21] SAC ¶ 188. Williams prefaced the projection about Passport's improving finances by saying "we believe" that

---

[21] Exhibit 31 contains excerpts of the risk factors and warnings included in the SEC filings in which Plaintiffs allege that false or misleading statements were made, and relevant warnings from the 2019 10-K, which was cited in the SAC. Inexplicably, Plaintiffs complain that these excerpts are somehow improper.

14

Passport is "making solid progress." SAC ¶ 188. He said that Evolent was "hopeful" that increased rates and administrative improvements would "provide a path" to "strengthen" the balance sheet. *Id.*

## II.    Plaintiffs Fail to Allege a Strong Inference of Scienter

### A.    Plaintiffs' Opposition fails to address the absence of motive or the facts negating scienter.

Claims under Section 10(b) and the PSLRA require more than just a mere inference of scienter—Plaintiffs must allege a strong inference, which means that it must be "at least as compelling as any opposing inference." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.*

Plaintiffs' Opposition does not address Defendants' argument that the SAC does not identify a plausible motive behind the alleged fraud, such as suspiciously timed insider sales of Evolent stock. Nor does the Opposition try to salvage the SAC's illogical and self-defeating motive—that Evolent knowingly mismanaged Passport so that it could spend $70 million to bail it out. According to Plaintiffs, Evolent allegedly knew that the Valence claims processing system was defective and would not work for healthcare plans like Passport, but Plaintiffs do not explain why Evolent would spend nearly $220 million to acquire the Valence platform if it knew that it would not work. While Plaintiffs ignore the facts that provide a compelling and innocent inference regarding the Valence integration, this Court must consider them when determining whether the SAC raises a strong inference of fraudulent intent.

15

**B.    Scienter cannot be inferred based on an executive's position alone.**

Plaintiffs misstate the law on the impact of a defendant's executive position on scienter. The Opposition claims that because Williams said that Evolent was a "partner" with Passport, he must have had actual knowledge that any semi-positive statement he made about Passport was false. Opp. 32. But that is not the law; being an owner or an executive does not raise an automatic strong inference of scienter. *Yates*, 744 F.3d at 888–89; *Matrix Capital,* 576 F.3d at 184. Courts cannot infer from a defendant's executive position that he "must have known" about any problems or alleged wrongdoing at the executive's company, much less at one of the company's many clients. *Yates*, 744 F.3d at 888–89; *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) (holding that Rule 9(b) and PSLRA standards for scienter were not met because "holding an executive position alone does not necessarily lead one to infer that Individual Defendants knew that the alleged omissions were false or misleading."). The Fourth Circuit has recognized that "owners" of a company cannot be found to have specific knowledge based merely on their ownership. *Matrix Capital,* 576 F.3d at 184 (declining to find a strong inference of scienter when "Plaintiffs ask us to infer from the breadth and gravity of OneGlobe problems that high level corporate agents (including [the CEO] and [the CFO]) must have been aware of the problems…."). And here, at the time the challenged statements were made, Evolent did not even own Passport.

The cases Plaintiffs cite are readily distinguished because they all involve admissions by individual executives that they were directly involved in the circumstances at issue in the case. *See* Opp. 32. For example, the defendant in *Genworth* said that his statement "was based on his *personal involvement* in Genworth's complete review of all components of the Company's long-term care business." *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) (emphasis in original). A "complete review" in which the executive was "personally

16

involved" is very different than the facts alleged here.  Williams said that "we really have joint governance," SAC ¶ 42; he never said that he had personally participated in a full review of the Valence integration at Passport.  Generalized accusations that a CEO "must have known" about problems at a partner's company (not even at his own company) does not meet the high bar to plead a strong inference of scienter.  *Yates,* 744 F.3d at 888.

Similarly, *Computer Sciences Corp.* and *Kiken* describe statements made by executives that show clear, personal involvement, in contrast to Williams's statements that Evolent was a partner with Passport.  *In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012) (executive paid "the 'utmost attention' to the contract at issue in the case); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 607 (E.D. Va. 2015) (defendants said repeatedly that they were "personally involved").  The *Genworth* court noted that the "self-proclaimed personal involvement" of defendants is what supports an individual defendant's scienter.  103 F. Supp. 3d at 785.  The circumstances in the cited cases are much different than the ones in this case, and thus Plaintiffs' cases do not support an inference of scienter in this case.

**C.      Only one CW had any interaction with any Individual Defendant, and even that interaction does not support a strong inference of scienter.**

CW5 is the only witness that allegedly had any contact with an Individual Defendant; she says she attended meetings with Williams.  SAC ¶ 96.  No CW is alleged to have had any contact with the remaining four Individual Defendants—McGrane, Blackley, Wigginton, and Spencer.  As a result, there is no evidence of scienter as to these four Individual Defendants.

With respect to Williams, the interaction between him, as Evolent's CEO, and CW5, Passport's Director of IT, does not support a strong inference of scienter.  Williams's general knowledge of challenges during the months-long implementation process for a major software platform change at an organization with $1.9 billion in revenue does not show that he knew that

17

statements he made in May 2017, at the start of the process, or on November 2, 2017, a month after the actual transition, were false when made.

The Opposition itself admits this reality. Opp. 36. Plaintiffs claim that meetings at which people "barked" about Valence "sometimes took place on a weekly basis." SAC ¶ 96. What does that mean? Were these calls weekly, or were they not? Weekly meetings in October would be more probative—albeit still insufficient—of Williams's general knowledge. But if the meetings occurred on a weekly basis in May, June, or July, that is no evidence at all. Similarly, while there may have been "realignment calls" on an "annual basis," Opp. 36, SAC ¶ 98, the SAC never states that a yearly meeting took place during the six-month transition process. SAC ¶ 98. "Calls with Evolent's executives" may have occurred "all the time," but it is not clear that Williams was ever on those "all the time" calls—and the SAC suggests that those more-frequent calls were with Chad Pomeroy, not Frank Williams. SAC ¶ 99. Congress set a much higher bar for pleading claims of fraud, and higher still for claims of securities fraud. *Yates*, 744 F.3d at 885; *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *11 n.11 (E.D. Va. June 2, 2020) (evidence that CW attended meetings with executives about some issues in case was not sufficient to show any specific statement was false when made).

Even if Williams had knowledge that some people at Passport did not like the Valence platform, Valence was a 20-year old company that performed medical billing services covering more than 600,000 health plan members, including many in Medicaid programs—thus it was reasonable for Williams to listen to his "teams … monitor[ing] operations closely" at Passport and conclude that the complicated transition was proceeding as expected. Ex. 16; SAC ¶ 152; full quote at Ex. 38 at 6 (Ex. 1 at 3). When weighing the "malicious and innocent inferences," the

18

innocent one—that Williams believed that Valence could work well once fully implemented—is more compelling. *Yates,* 744 F.3d at 885.

### III.   Plaintiffs' Failure to Plead a Valid Corrective Disclosure Is Fatal to Their Entire Claim.

All of Plaintiffs' claims can be dismissed on the independent basis of their failure to adequately plead loss causation. Plaintiffs allege that the "truth" of Defendants' alleged fraud was revealed to the market when Passport filed a lawsuit revealing its financial situation and the harm inflicted by Evolent. Opp. 38. But the financial impact on Passport had already been disclosed to investors in an article published in the *Insider Louisvill*e. *See* MTD 37. This article clearly disclosed that "Passport Health Plan's fiscal troubles, *which may push the nonprofit into insolvency as soon as this summer*, began even before the state changed the distribution of its Medicaid dollars last summer. In the last three years, Passport paid the publicly traded Evolent Health some $220 million in non-employee management fees…" Ex. 24 at 2 (emphasis added). Because corrective disclosures must contain new information, not just a confirmation of prior news, all of Plaintiffs' alleged corrective disclosures that followed the *Insider Louisville* article legally fail to establish loss causation. *See In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *15 (E.D. Va., Aug. 27, 2018) (holding that plaintiffs failed to plead loss causation because their alleged corrective disclosures only revealed risks that were already known to the market) (internal quotations and citations omitted.)

Plaintiffs' only rebuttal is that the *Insider Louisville* article could not have put investors on notice because Defendants denied what the article said. Opp. 39. First, there is no requirement that defendants admit the veracity of a disclosure for it to qualify as a curative disclosure. Second, this argument is self-defeating because it also applies to the later disclosures that Plaintiffs allege were valid corrective disclosures. Defendants never admitted that Evolent mismanaged

19

Passport—this lawsuit is proof that such an admission has never been made. In other words, the Passport lawsuit revealed the exact same information as the *Insider Louisville* article: Passport was facing insolvency because of reduced reimbursement rates while paying large fees to Evolent. *See* SAC ¶ 116. Because Plaintiffs' alleged corrective disclosures are simply confirmation of information that the market already knew, Plaintiffs have failed to plead loss causation.

## CONCLUSION

The securities laws are designed to protect against fraud—demonstrably false or misleading statements of material fact made with an intent to deceive or defraud. They are not meant as insurance for aggrieved investors who suffered losses due to alleged business mismanagement, such as overcharging customers or failing to integrate a complex medical claims software system. Plaintiffs' case is a paradigm example of trying to shoehorn a mismanagement case into a securities fraud case. Congress strengthened the requirements to plead securities fraud to weed out cases like this one at the pleading stage. Because Plaintiffs have failed to satisfy the PSLRA's heightened pleading requirements for falsity, scienter, and loss causation, the SAC should be dismissed with prejudice.

DATED: July 17, 2020

RESPECTFULLY SUBMITTED,

*/s/ Ashley Parrish*
Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Tyler W. Highful, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX  78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
thighful@kslaw.com
jcarvalho@kslaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on July 17, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System on all parties in this case.

*/s/ Ashley Parrish*
Ashley C. Parrish

21