# EXHIBIT 1

2020 WL 6270482

2020 WL 6270482
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia.

CAMBRIDGE RETIREMENT SYSTEM, Plaintiff,
v.
JELD-WEN HOLDING, INC., et al., Defendants.

Civil Action No. 3:20-cv-112
|
Filed 10/26/2020

**OPINION**

John A. Gibney, Jr. United States District Judge

**\*1** In this putative class action, the plaintiffs[1]—investors in JELD-WEN Holding, Inc. ("JELD-WEN")—allege that JELD-WEN failed to disclose intentionally anticompetitive conduct that violated federal antitrust law. They argue that this failure violated Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5. Defendants Mark A. Beck, L. Brooks Mallard, Kirk S. Hachigian, and Gary S. Michel (the "Individual Defendants"), JELD-WEN, and Onex[2] have filed separate motions to dismiss the plaintiffs' complaint for failure to state a claim.[3] The defendants argue that they had no duty to disclose JELD-WEN's anticompetitive conduct to the market. Additionally, Onex contends that even if the defendants had such a duty, the plaintiffs cannot hold Onex liable for the failure to adhere to that duty because Onex could not control the disclosure of JELD-WEN's anticompetitive conduct to the market. For the reasons stated herein, the Court will deny both motions.

**I. FACTS ALLEGED IN THE COMPLAINT**

JELD-WEN makes doors and windows, including interior molded doors ("IMD"). To make IMDs, a manufacturer joins "two doorskins between a wood frame filled with a hollow or solid wood core." (ECF No. 73 ¶ 3.) Doorskins account "for up to 70% of the cost to manufacture a molded door." (*Id.*) JELD-WEN also makes doorskins.

The plaintiffs allege that JELD-WEN schemed to eliminate competition in the doorskin and IMD market by engaging in an unlawful antitrust conspiracy. The scheme began when JELD-WEN acquired Craftmaster Manufacturing, Inc. ("CMI"),[4] one of its two competitors in manufacturing doorskins, by deceiving the Department of Justice about the transaction's anticompetitive nature to receive DOJ's approval of the Merger. After acquiring CMI, JELD-WEN engaged in unfair competition by, among other things, conspiring with its competitor, Masonite Corporation, to raise the price of doorskins and IMDs. This made JELD-WEN highly profitable. It also raised the ire of its competitor in the IMD market, Steves & Sons ("Steves"). Steves asked DOJ to review the Merger again. DOJ reviewed the Merger, but it closed its investigation without taking any action against JELD-WEN. Shortly thereafter, Steves sued JELD-WEN in this Court for violating federal antitrust law.

**\*2** In its public statements, JELD-WEN claimed that it operated successfully in a "highly competitive business environment." (*Id.* ¶ 102.) But JELD-WEN did not disclose its anticompetitive scheme. Instead, it credited "pricing optimization," "pricing discipline," "strategic pricing," and "favorable pricing." (*Id.* ¶ 101.) Although it acknowledged Steves's allegations and the relief it sought, JELD-WEN continued to attribute its success to its pricing strategy. JELD-WEN also stated its belief that "Steves' claims lack merit." (ECF No. 79-9, at 16.)[5]

On February 15, 2018, a jury in the Eastern District of Virginia returned a $176 million verdict against JELD-WEN in *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civil Case No. 3:16cv545. The general verdict form included minimal evidentiary findings. That same day, despite the verdict, JELD-WEN circulated a press release saying that it "continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract." (ECF No. 73 ¶ 115 (emphasis omitted).) It also said that the negative outcome would not "material[ly] impact" the company and that it believed "Steves is not permitted to pursue its claim for divestiture of certain assets acquired in the CMI acquisition." (ECF No. 79-25, at 2.) JELD-WEN later reiterated these beliefs and attributed its financial success to legitimate business practices.

Then, on October 5, 2018, United States District Judge for

2020 WL 6270482

the Eastern District of Virginia Robert E. Payne issued a lengthy opinion making detailed factual findings about JELD-WEN's anticompetitive behavior and ordering divestiture of JELD-WEN's doorskins manufacturing facility in Towanda, Pennsylvania (the "Divestiture Decision"). Nevertheless, JELD-WEN "firmly maintain[ed] that it ha[d] not violated any antitrust laws," calling Judge Payne's ruling "incorrect." (ECF No. 73 ¶ 133.) Market reaction to the Divestiture Decision caused an approximately 5% drop in JELD-WEN's stock price on October 9, 2018.

JELD-WEN's stock dropped even further after it announced on October 15, 2018, that it expected to incur $76.5 million in liability due to the *Steves* verdict (the "Liability Announcement"). JELD-WEN claimed that it could make the Liability Announcement because the Divestiture Decision "now provided sufficient detail for the company to estimate future liabilities." (*Id.* ¶ 136 (alteration in original omitted).) That same day, JELD-WEN also revealed that its CFO, L. Brooks Mallard, would resign. The next day, JELD-WEN's stock dropped by 19%.

The plaintiffs filed their initial complaint on February 19, 2020. They filed the operative amended complaint on June 22, 2020. On July 29, 2020, the defendants filed their motions to dismiss. (ECF Nos. 75 (Onex), 77 (JELD-WEN and the Individual Defendants).) The Court held a hearing on the motions on September 25, 2020 (the "Hearing").

## II. DISCUSSION[6]

### A. Section 10(b) and Rule 10b-5 Claim

**\*3** To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the representation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). The defendants argue that the Court should dismiss the plaintiffs' complaint because they failed to (1) "identify

any actionable omission"; (2) "plead falsity with the requisite particularity, and the alleged misstatements are either puffery or honestly held opinions, neither of which is actionable,"; (3) "plead facts supporting a strong inference that Defendants acted with scienter—*i.e.*, with severe recklessness or an intent to defraud"; (4) "plead loss causation"; and (5) timely file their complaint within "two years after a reasonably diligent plaintiff would have discovered Plaintiffs' allegations." (ECF No. 78, at 16.)[7]

### 1. Material Misrepresentation or Omission

The plaintiffs argue that JELD-WEN's statements about operating in a "highly competitive" environment, crediting its pricing strategy and product quality for its success, and denying anticompetitive conduct satisfy the material misrepresentation or omission prong. Simply put, they contend that these statements and omissions misled investors because they concealed JELD-WEN's anticompetitive conduct. JELD-WEN counters that it "fully satisfied its disclosure obligations by repeatedly disclosing the existence and relevant details of the *Steves* litigation." (*Id.*)

To satisfactorily allege the material misrepresentation element, a plaintiff must allege that "the defendant acted deceptively, i.e., that the defendant engaged in deceptive acts such as 'misstatements' and 'omissions by those with a duty to disclose.' " *Singer*, 883 F.3d at 439 (quoting *U.S. S.E.C. v. Pirate Inv. LLC*, 580 F.3d 239-40 (4th Cir. 2009)).

In *Singer*, the Fourth Circuit held that a plaintiff satisfied the material misrepresentation or omission prong by alleging that a healthcare provider, TranS 1, failed to disclose a fraudulent reimbursement scheme that TranS 1 relied on "to generate a substantial portion of [its] continuing revenues." *Id.* at 439-40. TranS 1 publicly touted its legal policies regarding reimbursements for medical procedures and other legal workarounds that it concocted to circumvent a decision by the American Medical Association that made it less likely that doctors would receive reimbursements for using TranS 1's product. *Id.* at 432-33. TranS 1 did not, however, disclose that it also relied on a fraudulent reimbursement scheme to generate a large portion of its revenues. *Id.* at 433.

The court acknowledged that Section 10(b) and Rule

2020 WL 6270482

10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 440. But it held that "disclosure of material information *is required* 'when necessary to make statements made, in the light of the circumstances in which they were made, not misleading.' " *Id.* (emphasis added) (quoting 🚩 *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, what companies share with the market determines what they must disclose under Section 10(b) and Rule 10b-5. *Id.*[8]

**\*4** In TranS 1's case, by choosing to inform the market about its plan to legally obtain reimbursements for doctors who used its product, it "was obliged to further disclose its fraudulent reimbursement scheme." *Id.* If it did not, then its statements about the legal reimbursement plans "were utterly misleading," in part because they "misled the market about the actual source of TranS 1's continuing revenues." *Id.* Thus, the court held that, "the Complaint is sufficient to establish that, by choosing to speak about its reimbursement practices, the Company possessed a duty to disclose its alleged illegal conduct." *Id.* at 442.

Like the plaintiff in *Singer*, the plaintiffs here have adequately pled that JELD-WEN made a material misrepresentation or omission by alleging that JELD-WEN failed to disclose its anticompetitive behavior to the market. JELD-WEN publicly touted its legal pricing strategies to explain its success in the highly competitive door and window market. It did not, however, disclose its anticompetitive behavior. Because JELD-WEN spoke about its pricing strategy, it acquired "a duty to tell the whole truth," including the truth about its anticompetitive behavior. By not doing so, it made its prior statements about its pricing strategy "utterly misleading" and "misled the market about the actual source of [its] continuing revenues." These allegations satisfy the material misrepresentation and omission prong.[9]

JELD-WEN protests that it need not "confess to the wrongdoing alleged in *Steves* while that litigation was ongoing." (ECF No. 78, at 16.) But *Singer* requires just that. The Fourth Circuit held that TranS 1 had "a duty to disclose its alleged illegal conduct" because it discussed its legal reimbursement strategy. The court gave no indication that ongoing litigation about the illegal behavior would relieve TranS 1 of that duty. It also did not provide that TranS 1 could satisfy that duty by merely disclosing the "existence and relevant details" of a lawsuit filed by a third party alleging illegal conduct by TranS 1. (*Id.*) Moreover, disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest

disclosures.

JELD-WEN argues that *Singer's* duty-to-disclose rule only applies "when a defendant chooses to speak *in detail* on the same subject as the alleged omissions." (ECF No. 91, at 11 (emphasis added).) *Singer* does not, however, base the duty to disclose on the level of detail a company uses when speaking on a subject. Instead, it requires a company to "tell[ ] the whole, material truth" about a topic if it chooses to speak about it. 🚩 *Singer*, 883 F.3d at 442. Thus, because JELD-WEN chose to speak about its pricing strategy, it had a duty to "tell[ ] the whole, material truth" about it, regardless of the level of detail it used to discuss the topic.

### 2. Falsity

The defendants also argue that the plaintiffs did not "plead falsity with the requisite particularity." (ECF No. 78, at 16.) To determine whether the plaintiffs pled falsity with particularity, a court "must ascertain whether the complaint states *sufficient facts* to permit a *reasonable* person to find that the plaintiff satisfied this element of his claim—that the defendant made a false or misleading statement." 🚩 *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 173 (4th Cir. 2007) (emphasis in original). The plaintiffs have met that burden.

**\*5** The amended complaint alleges that JELD-WEN made false or misleading statements by (1) crediting its market success to its pricing strategy and quality products, not its anticompetitive conduct; (2) characterizing the door and window market as competitive while simultaneously engaging in an anticompetitive conspiracy; and (3) describing the *Steves* litigation as meritless when it resulted in a $176 million verdict for Steves and the divestiture of JELD-WEN's Towanda plant. The amended complaint details when and how the defendants made these allegedly false statements. It also sets forth facts that would permit a reasonable person to find that the defendants made false or misleading statements, namely that the Divestiture Decision revealed that JELD-WEN knowingly engaged in a long-running anticompetitive conspiracy to artificially inflate prices in the doorskin and IMD industry.

The defendants argue that they did not make false statements because they accurately described their products' quality and their pricing strategy and because

2020 WL 6270482

the competitiveness statements do not specifically refer to the doorskin market. Additionally, they claim that no reasonable investor would "have misunderstood the competitive nature of the doorskins market." (ECF No. 78, at 21.)

These arguments fail, however, because they do not address *Singer's* requirement that once a party speaks on a topic, they have an obligation to tell the whole truth. So, when the defendants spoke about their pricing strategy, they had an obligation to disclose the anticompetitive behavior that artificially inflated prices. It makes no difference that the defendants implemented legal pricing strategies alongside their illegal behavior. Under *Singer*, they had an obligation to reveal both their legal and illegal behavior as it related to pricing. Divulging only the legal aspects of its pricing strategy renders those statements "utterly misleading."

The defendants' arguments about their competitiveness statements also fail. While describing the market as competitive, the defendants allegedly knew that they also operated a long-running anticompetitive conspiracy. Failing to disclose that scheme rendered the defendants' statements about the competitiveness of the door and window market false or misleading. The defendants also ignore "the reality that no reasonable investor would have understood the [defendants'] representations of a 'competitive market' to mean they were actually engaging in illegal conduct specifically designed to 'kill off' the competition." (ECF No. 86, at 27-28 (internal citations omitted).) Moreover, the Court gives no weight to the defendants' semantic argument about the competitiveness statements not referring specifically to the *doorskins* market because a reasonable investor would have assumed that (1) any statements about market competitiveness referred to all the markets in which JELD-WEN competed, including the doorskin market, and (2) references to the door and window market include the doorskins market.[10]

The defendants also claim that the allegedly false pricing and quality statements "were puffery and are not actionable." (ECF No. 78, at 22.) Although "opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999). A factual statement is "one that is demonstrable as being true or false." *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 586 (D. Md. 2017) (quoting *Shah v. GenVec, Inc.*, No. DKC 12-0341, 2013 WL 5348133, at *11 (D. Md. Sept. 20, 2013)).

A statement or omission is "material" if there is a "substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact."

**\*6** *Id.* (quoting *Shah*, 2013 WL 5348133, at *12). "Ultimately, [t]he inquiry is whether, read as a whole, the [statements or omissions] would have misled a reasonable investor about the nature of the securities." *Shah*, 2013 WL 5348133, at * 12 (D. Md. Sept. 20, 2013) (internal quotation marks omitted and alterations in original) (quoting *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 624-25 (D. Md. 2010)).

Here, for the reasons outlined above, the defendants' statements attributing JELD-WEN's success to its pricing strategy and quality products, when read alongside their failure to disclose their anticompetitive conduct, "would have misled a reasonable investor about the nature of" JELD-WEN's securities. The parties can prove the truth or falsity of the omissions at issue here, and a reasonable investor would certainly consider information about JELD-WEN's anticompetitive conduct important when deciding to buy or sell the company's stock. Thus, the omissions are factual, material, and, therefore, actionable, even if the statements are opinion or puffery. The defendants' argument that their statements about the merits of the *Steves* litigation "were opinion, not actionable, and not false" fail for the same reason. (ECF No. 78, at 23.)[11]

### 3. Scienter

The plaintiffs have sufficiently pled scienter because they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Those facts "must show that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *Makor Issues & Rts.*, 551 U.S. at 319). "To evaluate the strength of scienter inferences, courts engage in a comparative analysis." *Id.* "After comparing the 'malicious and innocent inferences cognizable from the facts pled,' a complaint will not be dismissed so long as 'the malicious inference is at least as compelling as any opposing innocent inference.' " *Id.*

2020 WL 6270482

(quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014)).[12]

**\*7** The plaintiffs argue that the following alleged facts support a compelling inference of scienter: (1) JELD-WEN and the Individual Defendants "pursued an intentional scheme" to engage in anticompetitive behavior; (2) the Individual Defendants repeatedly made false or misleading statements about critical topics they knew about, like pricing, the market's competitiveness, and the *Steves* litigation;[13] (3) Mallard, JELD-WEN's CFO, resigned shortly after the Divestiture Decision and on the same day of the Liability Announcement; and (4) "the temporal proximity between [JELD-WEN's and the Individual Defendants'] misleading statements and the revelation of the truth." (ECF No. 86, at 30, 34.)

The defendants counter that the plaintiffs have failed to allege scienter for five reasons: (1) the plaintiffs "allege no motive for any Defendant to engage in the alleged fraud"; (2) the Individual Defendants believed that JELD-WEN's merger with CMI and its pricing conduct "were lawful because the DOJ had twice signed off on the Merger"; (3) the plaintiffs cannot plead scienter "based on 'group pleading' or by attempting to impute alleged corporate knowledge to individuals"; (4) the plaintiffs cannot plead scienter "based on stacking the inference of knowledge of pricing policy upon an inference of knowledge of anticompetitive conduct in order to further infer fraudulent intent"; and (5) "Mallard's resignation does not support an inference of scienter." (ECF No. 78, at 26-27.)

A comparison of the inferences drawn by the plaintiffs and the defendants supports finding that the plaintiffs alleged facts suggesting that "the malicious inference is at least as compelling as any opposing innocent inference." *Zak*, 780 F.3d at 606. First, the defendants acknowledge that "a plaintiff is not required to articulate a motive to show scienter." (ECF No. 78, at 27.) Even so, the desire for "personal financial gain" and to avoid legal liability for an illegal anticompetitive policy provides a motive to engage in fraud. *See Makor Issues & Rights*, 551 U.S. at 325 ("While it is true that motive can be a relevant consideration, and *personal financial gain may weigh heavily in favor of a scienter inference*, we agree with the Seventh Circuit that the absence of a motive allegation is not fatal." (emphasis added)).

Second, the plaintiffs' allegation that the defendants perpetrated an intentional, long-running anticompetitive conspiracy creates a malicious inference at least as strong as the innocent inference the defendants ask the Court to draw from their claim that they thought their behavior

complied with the law. In fact, given Judge Payne's factual findings in the Divestiture Decision, the malicious inference appears much stronger than the innocent inference.[14]

**\*8** Third, contrary to the defendants' claim, the plaintiffs did not plead scienter based on "group pleading" and "generalized allegations as to what 'Defendants' purportedly knew or were aware of." (ECF No. 78, at 28-29.)[15] The Fourth Circuit has held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 190 (4th Cir. 2009) (quoting *Makor Issues & Rts.*, 513 F.3d at 710). That said, a plaintiff must do more than claim that an individual defendant "must have known" about the fraudulent or misleading nature of the alleged misstatements to adequately plead scienter.[16]

The plaintiffs have satisfied this standard. They specifically identified false or misleading statements made by the defendants, and they allege that the defendants made those statements to bolster JELD-WEN's stock price and mislead investors. The plaintiffs allege that the Individual Defendants knew about these statements' false or misleading nature because of their positions at JELD-WEN *and* because they implemented and oversaw the anticompetitive scheme. (*See* ECF No. 73 ¶¶ 286-90 (describing the Individual Defendants' involvement in setting prices).) The plaintiffs do not merely allege that the Individual Defendants must have known about the anticompetitive scheme solely because of their positions within the company. Thus, these allegations support a malicious inference at least as strong as any innocent inference the Court can draw.

Fourth, the plaintiffs do not stack inferences to allege scienter. Rather, they make a straightforward allegation to support their claim that the defendants acted with the requisite mental state: the defendants created, knew of, and implemented an anticompetitive scheme to increase their profits in the IMD and doorskins market, and, instead of disclosing that scheme to investors as required by *Singer*, the defendants credited their success to their pricing strategy and quality products to mislead investors.[17]

These allegations supporting scienter differ significantly from the ones the Fourth Circuit deemed inadequate in *Maguire Financial, LP v. PowerSecure International, Inc.*, 876 F.3d 541 (4th Cir. 2017). There, the plaintiff "allege[d] facts that permit an inference that [the defendant] knew his statement was false, and then ask[ed

2020 WL 6270482

the court] to *infer from that inference* that [the defendant] acted with scienter." *Id.* at 548 (emphasis in original). The Fourth Circuit declined to stack those inferences "because stacking inference upon inference in this manner violates [15 U.S.C. § 78u-4(b)(2)'s] mandate that the strong inference of scienter be supported by facts, not other inferences." *Id.*

**\*9** Unlike the plaintiff's allegations in *Maguire*, the plaintiffs here did not only allege facts that allow the Court to infer that the defendants knew they made incomplete and misleading statements about the basis for their success in a competitive market. The plaintiffs also allege that the defendants knew that they engaged in an unlawful anticompetitive scheme and omitted this information in public disclosures to mislead investors. (ECF No. 73 ¶¶ 15-20, 101-26.) These factual allegations support the inference that that the defendants acted with the intent to deceive.

Fifth, Mallard's resignation *by itself* could not support an inference of scienter. *See Iron Workers Loc. 16*, 432 F. Supp. 2d at 593 ("The Court finds that retirements and resignations are insufficient to show that Defendants acted with the requisite scienter."). The Court can, however, consider this alleged fact in its "holistic analysis." *Cf. Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (describing the defendants' argument that "the resignation of the Company's auditor fails to create a showing of scienter" as "lacking" because "under a holistic analysis, any factor *by itself is* inadequate to reveal or refute the presence of scienter" (emphasis added)). Indeed, the Supreme Court has cautioned courts against scrutinizing each allegation supporting scienter in isolation. *Makor Issues & Rts.*, 551 U.S. at 326 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Instead, a court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as the opposing inference?" *Id.* Here, the answer is yes.

### 4. Loss Causation

The plaintiffs adequately plead loss causation because they allege "a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011). A plaintiff can do this by "alleging facts establishing that the defendant's 'misrepresentation or omission was one substantial cause of the investment's decline in value.' " *Singer*, 883 F.3d at 445 (quoting *Katyle*, 637 F.3d at 472). To satisfy this standard, "a plaintiff must plead (1) the 'exposure' of the defendant's misrepresentation or omission, i.e., the revelation of 'new facts suggesting [the defendant] perpetrated a fraud on the market,' and (2) that such exposure 'resulted in the decline of [the defendant's] share price.' " *Id.* (quoting *Katyle*, 637 F.3d at 473).

A plaintiff can allege "exposure for purposes of the loss causation element ... pursuant to the corrective disclosure theory and the materialization of a concealed risk theory." *Id.* Under the corrective disclosure theory, a plaintiff alleges "that the defendant company itself made a disclosure that 'publicly revealed for the first time' that the company perpetrated a fraud on the market by way of a material misrepresentation or omission." *Id.* (quoting *Katyle*, 637 F.3d at 473). Under the concealed risk theory, the plaintiff alleges "that news from another source revealed the company's fraud." *Id.* Under either theory, the "ultimate loss causation inquiry ... is the same: whether a 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.' " *Id.* at 446 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016)). The plaintiffs use both theories here and adequately plead loss causation.

**\*10** Under the concealed risk theory, the plaintiffs allege that the disclosure of the defendants' anticompetitive conspiracy in the factual findings of the Divestiture Decision "began apprising the market, for the first time, that anticompetitive behavior was the true reason for the Company's success." (ECF No. 86, at 36-37.) In other words, the Divestiture Decision revealed the true basis of JELD-WEN's profitability and that the Court would require JELD-WEN to divest itself of its Towanda plant. Within four days, JELD-WEN's stock dropped nearly 5%. Thus, the plaintiffs adequately allege loss causation using the concealed risk theory of exposure.

The plaintiffs also satisfactorily allege loss causation under the corrective disclosure theory by alleging that JELD-WEN's October 15, 2018 Liability Announcement and the announcement of Mallard's resignation caused a 19% drop in JELD-WEN's stock the next day. (*Id.* at 37.) Before then, the company had publicly denied liability in the *Steves* litigation and criticized the lawsuit's merits. Only after the October 15, 2018 announcements did the market finally realize that JELD-WEN had failed to

2020 WL 6270482

disclose the threat its anticompetitive practices posed to its financial outlook.

Nevertheless, the defendants argue that the plaintiffs fail to sufficiently plead loss causation for two reasons: (1) "neither corrective disclosure said anything about a price-fixing conspiracy related to interior molded doors"; and (2) "neither corrective disclosure revealed any new facts related to the Merger or its impact on the competitiveness of the doorskins market," in part because "the market knew the risk of divestiture and the financial risk of the *Steves* litigation long before ... the Divestiture Decision" and Liability Announcement. (ECF No. 78, at 31.) Both arguments fail.

Contrary to the defendants' argument, the Divestiture Decision *does* say something about the price-fixing conspiracy related to IMDs because it provides a detailed factual recitation confirming that JELD-WEN engaged in an anticompetitive conspiracy to inflate the price of the primary component of IMDs—doorskins—thereby reducing competition in the IMD market. (*See, e.g.*, ECF No. 87-1, at 75 ("Indeed, part of JELD-WEN's pricing plan was to kill off some of the independent door makers that were its doorskin customers.").) Before Judge Payne issued the Divestiture Decision, the market knew only that a jury found for Steves and that JELD-WEN thought the verdict would not stand. Only after Judge Payne issued the Divestiture Decision did the market finally start to realize that JELD-WEN's protestations of innocence would not shield them from liability.

The defendants' attempt to analogize this case to *In re Cree, Inc. Securities Litigation* misses the mark. No. 1:03CV00549, 2005 WL 1847004 (M.D.N.C. Aug. 2, 2005), *aff'd sub nom. Teachers' Retirement System of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007). In *Cree*, the plaintiffs filed a lawsuit alleging that the defendant, Cree, engaged in fraudulent transactions with six companies. *Id.* at *2. The filing of the lawsuit "precipitated the Plaintiffs['] complained-of loss." *Id.* at *12. But that "lawsuit did not disclose anything about transactions with five of the six companies Plaintiffs ... claim[ed] were the subjects of numerous misstatements and omissions." *Id.* More importantly, Cree had fully disclosed the transactions "in various SEC filings at the time they were executed." *Id.* Thus, the lawsuit "disclose[d] nothing new, but merely attribute[d] an improper purpose to the previously disclosed facts." *Id.*

The court held that if investors knew or should have known that the facts alleged in a lawsuit match facts "*which were previously disclosed by the Company*," and the lawsuit merely casts "the motives for entering into the transactions ... in a negative light, [then] it cannot be said that a new disclosure occurs [upon filing of the lawsuit] such that a resulting loss in share price is caused by the transaction." *Id.* (emphasis added). Rather, the "loss is caused by the subsequent characterization of the transaction." *Id.* In *Cree*, the lawsuit did not constitute a disclosure for loss causation purposes because its characterization of the disputed transactions made "a general averment of fraud with no specific factual allegations." *Id.*; *see id.* at *13 ("A disclosure must reveal new facts; a bald assertion of fraud is not sufficient.").

**\*11** Unlike the complaint in *Cree*, the Divestiture Decision revealed new, previously undisclosed *facts* about JELD-WEN's anticompetitive conduct and the consequences JELD-WEN would face as a result.[18] The defendants argue that the Divestiture Decision merely confirmed what the market already knew from Steves's complaint. The market, however, knew only about the complaint's unproven, untested allegations. A reasonable investor could not assume the validity of the allegations in the complaint, especially when JELD-WEN deemed them meritless. Stated differently, a reasonable investor would wait for a full adjudication of the case to make an investment decision. Letting the litigation play out before drawing conclusions seems eminently reasonable and undercuts the defendants' claim that mere allegations provide an investor with a factual basis upon which to invest. Indeed, such an assertion suggests that investors assume, based on the plaintiffs' allegations alone, that the defendants will lose this lawsuit—an assumption the defendants surely do not endorse outside of this litigation.

The Liability Announcement also disclosed new facts to the market—namely, that JELD-WEN expected to incur a $76.5 million loss from the *Steves* litigation. Before then, JELD-WEN maintained that it did not expect Steves to succeed in its lawsuit. Like the Divestiture Decision, this new fact altered the risk calculus for investors buying and selling JELD-WEN stock.

Moreover, JELD-WEN's characterization of the *Steves* litigation and the allegations therein stands in stark contrast to Cree's truthful disclosure in SEC filings of the facts that underpinned the complaint in *Cree*. In that case, the company did not dispute the factual allegations in the complaint, only their characterization. Not so here. JELD-WEN consistently disputed, and indeed still disputes, the facts alleged in Steves's complaint. Thus, the confirmation of those allegations by an unbiased source—Judge Payne—constitutes a disclosure of new *facts* that an investor could reasonably rely on to make investment decisions.

2020 WL 6270482

### 5. Statute of Limitations

The defendants argue that the statute of limitations bars the plaintiffs' claims "as they relate to the Pricing, Competitiveness, and Quality Statements—because a reasonably diligent plaintiff would have discovered the alleged facts underlying Plaintiffs' claims no later than February 15, 2018, the date of the *Steves* jury verdict and the Company's press release disclosing it." (ECF No. 78, at 35.)[19] But "a reasonably diligent plaintiff" would not have discovered *the facts* constituting the securities fraud violation until Judge Payne issued the Divestiture Decision on October 5, 2018.

Section 1658(b) of Title 28 of the United States Code requires a plaintiff to bring a securities fraud case "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." " '[D]iscovery' refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered." *Merck & Co., Inc.* v *Reynolds*, 559 U.S. 633, 644 (2010) (emphasis in original) (quoting § 1658(b)). "[F]acts showing scienter are among those that 'constitut[e] the violation.' " *Id.* at 649. Thus, "the limitations period does not begin to run until the plaintiff ... discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* at 653 (quoting § 1658(b)).

**\*12** Specifically, comparing Steves's complaint with the jury verdict would not have allowed a reasonably diligent plaintiff to discover the facts supporting an inference of scienter. For example, in its complaint, Steves alleged that JELD-WEN assured DOJ in the months preceding the Merger that "competition at the doorskins and door level would not be impaired" "because of its long-term doorskin supply agreements with Steves and other smaller door manufacturers." (ECF No. 1 ¶ 60, Civil Case No. 3:16cv545.) But the complaint did not inform the market that JELD-WEN entered into those supply agreements specifically to "assuage the concerns of the DOJ and the Independents about the anticompetitive effects of the proposed merger." (ECF No. 87-1, at 19-20.) Judge Payne's Divestiture Decision did.

Similarly, the market could not have learned that "part of

JELD-WEN's pricing plan was to kill off some of the independent door makers that were its doorskin customers" until Judge Payne issued the Divestiture Decision. (*Id.* at 75.) The plaintiffs relied heavily on these facts when making and defending their allegations that the defendants acted with the requisite scienter. (*See, e.g.*, ECF No. 73 ¶¶ 112, 148, 268-76; ECF No. 86, at 30.)

Thus, the statute of limitations does not bar the plaintiffs' claims because "a reasonably diligent plaintiff" would not have discovered the facts constituting the securities fraud violation until October 5, 2018.

### B. Section 20(a)[20]

To state a claim under Section 20(a), a plaintiff "must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 129-30 (4th Cir. 2009), *rev'd on other grounds sub nom. Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Onex argues that the plaintiffs have established neither element.

Onex cites JELD-WEN's and the Individual Defendants' brief as the basis for its claim that the plaintiffs did not adequately allege a predicate violation of Section 10(b). Thus, for the reasons stated above, the plaintiffs have established the first element. Accordingly, the rest of this section addresses only whether the plaintiffs have adequately alleged that Onex controlled JELD-WEN— the second element of a Section 20(a) claim.

A plaintiff adequately alleges the control requirement for a Section 20(a) claim by pleading facts "showing that the controlling defendant [ (1) ] 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and (2) ] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.' " *Id.* at 130 (quoting *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 661 (E.D. Va. 2000)).

Section 20(a)'s remedial nature "requires a liberal construction, in favor of finding liability." *Latham v. Matthews*, 662 F. Supp. 2d 441, 469 (D.S.C. 2009). Thus, "[i]t requires 'only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable.' " *Id.* (quoting *Sennott v. Rodman &*

*Renshaw*, 414 U.S. 926, 929 (1973)). When deciding "whether a defendant possessed the requisite control, 'the courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof.' " *In re Mut. Funds*, 566 F.3d at 130 (quoting *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890-91 (3d Cir. 1975)).

**\*13** Courts have described determining whether someone qualifies as a controlling person under Section 20(a) as "a 'complex factual question.' " *Id.* (quoting *S.E.C. v. Coffey*, 493 F.2d 1304, 1318 (6th Cir. 1974)). Thus, courts ordinarily should not resolve the issue on a motion to dismiss, unless a plaintiff pleads no facts "from which it can reasonably be inferred the defendant was a control person." *Id.* (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir. 1998)). Moreover, "for purposes of Section 20(a), there are no heightened pleading requirements, particularly as to scienter or culpability; and a plaintiff need only satisfy Rule 8's short and plain statement requirement." *In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 717 (E.D. Va. 2020); *see* Fed. R. Civ. P. 8(a)(2) ("A pleading ... must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief.").

Onex does not contest that it had the power to control JELD-WEN's affairs when it allegedly violated federal securities law. (ECF No. 90, at 3.)[21] Onex argues only that the complaint did not plead facts showing that Onex "had the power to 'control or influence [JELD-WEN's] specific corporate polic[ies]' concerning the challenged statements in SEC filings, earning calls, press releases, and conferences." (ECF No. 76, at 9 (alterations in original).)

The plaintiffs claim to have alleged that Onex could control the challenged statements by pleading that (1) Onex owned most of JELD-WEN's shares; (2) two Onex "employees—Anthony Munk and Matthew Ross—served as Jeld-Wen directors"; (3) Onex had indirect power over the pricing decisions at issue; and (4) Munk and Ross "*signed [JELD-WEN's] Forms 10-K* issued during the Class Period containing the false and misleading statements about Jeld-Wen's financial success." (ECF No. 86, at 42-43 (emphasis in original).)

In *Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824 (E.D. Va. 2014), the court found that the plaintiffs adequately alleged control person liability when they alleged that individual defendants had "direct and supervisory involvement in the day to day operations of the Company" and "the power to influence and control,

and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading." *Id.* at 831, 833-34. The complaint also "discusse[d] the roles that each named defendant had at" the controlled company. *Id.* at 831. "*Most tellingly*, each and every defendant seeking dismissal signed at least two financial statements that were purportedly fraudulent." *Id.* at 833-34 (emphasis in original). The court ultimately concluded that those "signatures, in connection with the signatories' membership on the Board and various sub-committees of the Board, particularly those on the audit committee, [were] sufficient to state control—otherwise, the signatures on such financial statements would be meaningless." *Id.* at 834.

The plaintiffs here allege that "the Onex Defendants, as the controlling shareholder of Jeld-Wen, were able to and did control the content of Jeld-Wen's SEC filings, press releases, and other public statements issued by or on behalf of Jeld-Wen during the Class Period." (ECF No. 73 ¶ 295.) They further allege that Onex "would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected." (*Id.*) Although not mentioned in the complaint, two Onex employees, Munk and Ross, signed JELD-WEN's Forms 10-K as members of JELD-WEN's board of directors.

**\*14** Like the complaint in *Masterson*, the complaint here alleges that Onex could and did control the content of the contested filings. Moreover, the plaintiffs provided the Court with contested Forms 10-K signed by two Onex employees. *Hunter*, 477 F.3d at 184 ("[C]orporate liability derives from the actions of its agents."). In *Masterson*, these factors, particularly the signing of purportedly misleading financial statements, supported the court's finding that the plaintiffs adequately alleged a Section 20(a) violation.[22]

Admittedly, unlike the plaintiffs in *Masterson*, the plaintiffs here do not discuss the role that Onex or its agents had with JELD-WEN, other than mentioning that Onex owned a vast majority of JELD-WEN's outstanding stock and Munk and Ross served on JELD-WEN's board. But "[a]n individual's position alone does not establish control person liability." *In re Constellation Energy*, 738 F. Supp. 2d at 639. Accordingly, bare-bones allegations about Onex's position as majority shareholder and Munk's and Ross's positions on JELD-WEN's board would not, by themselves, establish control person liability. Nevertheless, the plaintiffs here allege control

2020 WL 6270482

based on more than Onex's position as majority shareholder and Munk's and Ross's board membership, most importantly by highlighting Munk's and Ross's roles in signing two allegedly misleading Forms 10-K. Thus, given Section 20(a)'s remedial nature and because the plaintiffs have pled (or, in the case of the Munk and Ross allegations, *produced*) some facts "from which it can be reasonably inferred the defendant was a control person," this claim will survive the motion to dismiss. *In re Mut. Funds*, 566 F.3d at 130 (quoting *Maher*, 144 F.3d at 1306).

### III. CONCLUSION

For the foregoing reasons, the Court will deny the defendants' motions to dismiss.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Richmond, VA

**All Citations**

Slip Copy, 2020 WL 6270482

**Footnotes**

1    The Court has appointed the Public Employees' Retirement System of Mississippi and the Plumbers and Pipefitters National Pension Fund as lead plaintiffs. (ECF No. 57.)

2    Onex refers to Onex Corporation, Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex American Holdings II LLC, BP EI II LLC, BP EI LLC, OAH Wind LLC, and Onex Advisor Subco III LLC. (ECF No. 76, at 4 n. 1.) Throughout this Opinion, the Court uses the pagination assigned by the CM/ECF docketing system.

3    The Court refers to JELD-WEN, the Individual Defendants, and Onex collectively as the defendants.

4    The Court refers to this transaction as the "Merger."

5    The Court relies on documents outside the complaint because "when ruling on Rule 12(b)(6) motions to dismiss," courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine ..., in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (noting that a court may consider a document not attached to the complaint when deciding whether to dismiss an action if the document "was integral to and explicitly relied on in the complaint" and if "the plaintiff[ ] do[es] not challenge its authenticity").

6    The defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claims. *Republican Party of N. C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The principle that a court must accept all allegations as true, however, does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Securities fraud allegations "are subject to strict pleading standards." *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018). Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Additionally, the Private Securities Litigation Reform Act of 1995 requires a

2020 WL 6270482

plaintiff to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

Onex argues that the plaintiffs did not allege a Section 10(b) or Rule 10b-5 claim based on JELD-WEN's and the Individual Defendants' arguments. Accordingly, the Court mentions the defendants collectively throughout Section II.A even though all citations and argument reference JELD-WEN's and the Individual Defendants' briefs.

*See also* 🚩*Siracusano*, 563 U.S. at 44 ("[C]ompanies can control what they have to disclose under [Section 10(b) and SEC Rule 10b-5] by controlling what they say to the market."); 🚩*Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

*See also Holwill v. AbbVie Inc.*, No. 1:18-cv-06790, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) (holding that the plaintiff adequately pled that the defendant had a duty to disclose an allegedly unlawful kickback scheme because it attributed its product's success to its sales and marketing practices and programs).

Indeed, doorskins comprise the most important part of IMDs, representing up to 70% of the overall cost of IMDs.

The defendants argue that their statements about the *Steves* litigation "disclosed what was known to Defendants at the time they were made. The only thing Plaintiffs allege was not disclosed in the [statements about the *Steves* litigation] was what Judge Payne would decide in the future. Nothing in the securities laws requires companies to predict and disclose future events." (ECF No. 91, at 16 (citations omitted).) This argument refuses to acknowledge the plaintiffs' actual allegations. Contrary to the defendants' characterization, the plaintiffs do not allege only that the defendants failed to disclose what Judge Payne would decide in the future. Rather, the plaintiffs allege that the defendants did not disclose their anticompetitive scheme to the public even though they knew about it before Steves sued JELD-WEN.

*See also* 🚩*Makor Issues & Rts.*, 551 U.S. at 323-24 ("The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.' " (quoting 🚩*Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004))).

The Northern District of Illinois's recent ruling in *Holwill v. AbbVie* supports the plaintiffs' argument that this allegation supports an inference of scienter. There, the court found that the plaintiff adequately pled scienter in part because the defendants'

> numerous statements regarding AbbVie's sales and marketing practices and programs, and the importance that Defendants placed on those practices and programs to AbbVie's and Humira's growth and success constitute strong circumstantial evidence that Defendants had detailed information regarding AbbVie's sales and marketing practices and programs, especially given Defendants' reluctance to delve into the details.

2020 WL 5235005, at *5.

The defendants note that Hachigian, Mallard, and Beck joined JELD-WEN after the Merger. That does not matter. The plaintiffs allege that the Individual Defendants knowingly participated and concealed the anticompetitive conspiracy during their tenure at JELD-WEN. The defendants cite no authority to support finding that a person escapes liability for securities fraud if he engages in illegal activity but does not initially conceive of the illegal scheme.

15    Courts have defined "the group pleading doctrine" as "a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (quoting *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007)).

16    *See In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (dismissing as "inadequate to withstand the special pleading requirements in securities fraud cases," an allegation that, "because of their positions," defendants "must have known" that a company's statements "were false and misleading"); *see also Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) ("[T]he holding of an executive position alone does not lead to an inference that Individual Defendants knew the alleged omissions were false or misleading.").

17    The defendants argue that even if the Court assumes that the plaintiffs can prove that they made false statements, they have not alleged that the defendants intended to deceive investors. The defendant conceded, however, that some of the alleged misstatements occurred on earnings calls. Earnings calls primarily aim to inform investors. This further supports the Court's finding that the plaintiffs have adequately alleged scienter.

18    The jury verdict contained minimal factual findings. Thus, only after Judge Payne issued the Divestiture Decision did the market understand the facts underpinning JELD-WEN's antitrust violation. Moreover, the market first learned that the Court would force JELD-WEN to divest itself of the Towanda plant from the Divestiture Decision.

19    The defendants do not argue that the statute of limitations bars the plaintiffs' claims as they relate to the defendants' statements about the merits of the *Steves* litigation.

20    The plaintiffs also allege Section 20(a) control person allegations against the Individual Defendants. The Individual Defendants contest those allegations only by arguing that the plaintiffs did not establish a primary violation under Section 10(b) and Rule 10b5. Thus, this section focuses exclusively on the plaintiffs' control person allegations against Onex.

21    Onex owned 84% of JELD-WEN's outstanding stock on an as-converted basis as of September 24, 2016. (ECF No. 73 ¶ 37.)

22    Other courts have similarly relied on the endorsement of allegedly false or misleading statements to support a finding that a plaintiff has adequately alleged control person liability. *See In re Willis Towers*, 439 F. Supp. 3d at 718 (finding that the plaintiff adequately pled control person liability in part because the amended complaint alleged that the defendant, as a director of the controlled company, signed certain SEC filings of the controlled company "that contained the false and misleading statements at issue"); *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1182 (D. Colo. 2012) (explaining that the defendants' "authority to sign or not sign the registration statements at issue is sufficient indicia of 'control' over the representations and disclosures that went out to potential investors to support 'control person' liability at the pleading stage of this litigation"); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) ("[P]ersuasive authority indicates that an officer or director who has signed financial statements containing materially false or misleading statements qualifies as a control person.").

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**CAMBRIDGE RETIREMENT SYSTEM, Plaintiff, v. JELD-WEN..., Slip Copy (2020)**

2020 WL 6270482