IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:19-cv-1031 (RDA/TCB) |
| EVOLENT HEALTH, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants Evolent Health, Inc.'s ("Evolent"),
Frank Williams's ("Defendant Williams"), Nicholas McGrane's ("Defendant McGrane"), Seth
Blackley's ("Defendant Blackley"), Christie Spencer's ("Defendant Spencer"), and Steven
Wigginton's ("Defendant Wigginton") (collectively, "Defendants") Motion to Dismiss Plaintiffs'
Second Amended Complaint ("Motion to Dismiss") (Dkt. 74). Considering Plaintiffs'[1] Second
Amended Complaint (Dkt. 69); the Motion to Dismiss (Dkt. 74); Defendants' Memorandum in
Support of their Motion to Dismiss (Dkt. 75); Plaintiffs' Opposition to Defendants' Motion to
Dismiss (Dkt. 80); Defendants' Reply in Support of their Motion to Dismiss (Dkt. 85); Plaintiffs'
First Notice of Supplemental Authority (Dkt. 99); Defendants' Response to Plaintiffs' First Notice
of Supplemental Authority (Dkt. 100); Plaintiffs' Second Notice of Supplemental Authority (Dkt.
101-1); and Defendants' Response to Plaintiffs' Second Notice of Supplemental Authority (Dkt.

---

[1] Lead Plaintiffs Plymouth County Retirement System and Oklahoma Police Pension and
Retirement System "bring this securities class action . . . on behalf of themselves and all other
persons and entities who purchased or otherwise acquired any of the publicly-traded common stock
of Evolent . . . from March 3, 2017[,] through May 28, 2019[.]" Dkt. 69, ¶ 1.

105), and for the following reasons, it is hereby ORDERED that the Motion to Dismiss is GRANTED in part and DENIED in part.

## I.  BACKGROUND

On August 8, 2019, Plaintiff Plymouth County Retirement System ("Plaintiff Plymouth County") filed its original Complaint in this Court, and thereby commenced this securities class action "on behalf of all persons or entities that purchased or otherwise acquired Evolent common stock from March 3, 2017[,] through May 28, 2019," (the "Class Period").    Dkt. 1, ¶ 1.  This Court appointed Plaintiffs Plymouth County and Plaintiff Oklahoma Police Pension and Retirement System ("Plaintiff Oklahoma Police") (collectively, "Lead Plaintiffs") as lead plaintiffs on Plaintiff Plymouth County's motion.  *See* Dkt. Nos. 18; 29.

On January 10, 2020, Plaintiffs filed their first Amended Class Action Complaint, Dkt. 38, which Defendants moved to dismiss, Dkt. 48.  Although Plaintiffs opposed Defendants' motion to dismiss, *see* Dkt. 54, and that motion was fully briefed, *see also* Dkt. 57, Plaintiffs moved for leave of Court to file a second Amended Class Action Complaint, *see* Dkt. 60.  The Court granted Plaintiffs leave over Defendants' objection.  *See* Dkt. Nos. 63; 68.  Accordingly, the Lead Plaintiffs filed their second Amended Class Action Complaint ("Second Amended Complaint") on behalf of their class.  Dkt. 69.

In their Second Amended Complaint, Plaintiffs set forth the following two securities fraud claims pursuant to the Security Exchange Act: (1) that all Defendants have violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; and (2) that Defendants Williams, McGrane, Blackley, Spencer, and Wigginton (collectively, the "Individual Defendants") violated 15 U.S.C. 78t(a).  Dkt. 69, ¶¶ 227-242.  In support of these claims, Plaintiffs allege certain facts.  For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Second Amended

Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### A.   The Parties

Plaintiff Plymouth County "is a public pension system organized for the benefit of current and retired municipal and county employees of Plymouth County, Massachusetts." Dkt. 69, ¶ 15. Plaintiff Oklahoma Police "is an administrator of a multi-employer, cost-sharing defined benefit pension plan that provides participants with retirement, death[,] and disability benefits." *Id*. at ¶ 16.  These Lead Plaintiffs, like the members of their class, allegedly purchased common stock from Evolent during the defined Class Period. *Id*. at ¶¶ 1, 15, 16.

Evolent is a corporation that provides "healthcare delivery and payment services to provider-sponsored health systems across the Medicaid, Medicare, and commercial markets." *Id*. at ¶¶ 18, 35.  According to Plaintiffs, Evolent generally touts "that its 'end-to-end' suite of technology-based clinical, financial, administrative, and analytical services is designed to capitalize on the transition of the healthcare industry from a fee-for-service payment model to a value-based care approach, precisely by reducing its client's clinical and administrative costs through integration onto Evolent's technological services platform."[2] *Id*. at ¶ 35.  In June of 2015, Evolent "held its initial public offering[,]" and "its common stock trades on the NYSE under the symbol 'EVH.'" *Id*.

---

[2] Plaintiffs describe that in January of 2014, with the implementation of the Affordable Care Act ("ACA"), federal and state governments transitioned from a "fee-for-service" payment model to a "value-based care approach." Dkt. 69, ¶ 36. Plaintiffs explain that under the "fee-for-service" method, "the government reimburses Medicaid and Medicare health plans for virtually all of the medical expenses their members incur." *Id*.  Conversely, based on the "value-based care" system, "the government provides health plans with fixed 'per member per month' ("PMPM") payments based on the health of the populations served, and the health plans must then operate within this capitated budget." *Id*.

Plaintiffs describe the Individual Defendants as people who, during the Class Period, held "senior executive" and/or "director" positions within Evolent. *Id*. at ¶ 26. More specifically, Defendant Williams was the Chief Executive Officer ("CEO") of Evolent during the Class Period. *Id*. at ¶ 19. Defendant Williams is also Evolent's co-founder and sits on Evolent's Board of Directors. *Id*. During the Class Period, Defendant McGrane was Evolent's Chief Financial Officer ("CFO"). *Id*. at ¶ 20. Defendant Blackley served as the President of Evolent's "operating subsidiary, Evolent Health LLC" for the duration of the Class Period. *Id*. at ¶ 21. He also co-founded Evolent and is a member of its Board of Directors. *Id*. From 2016 to February of 2018, Defendant Spencer was Evolent's "National Chief Medicaid Operating Officer[,]" and from May of 2011 through January of 2016, she was the Vice President and Chief Operating Officer ("COO") of an entity entitled "University Health Care, Inc. d/b/a/ Passport Health Plan" ("Passport"). *Id*. at ¶ 22. The last of the Individual Defendants, Defendant Wigginton, "was, at all relevant times, CEO of Valence Health, Inc., a company Evolent acquired in October [of] 2016." *Id*. at ¶ 23.

Although not a party to this action, Passport is a "non-profit, provider-sponsored managed care organization ("MCO") that administers Medicaid benefits to eligible residents of the Commonwealth of Kentucky." *Id*. at ¶ 30. Passport was founded in 1997, was Kentucky's first MCO, and has administered Medicaid in Kentucky for over 20 years. *Id*. Passport was one of Evolent's clients, and as a client, "was responsible for 20% of Evolent's revenue." *Id*. at ¶ 4. On December 30, 2019, Evolent purchased Passport. *Id*. Evolent's interactions with Passport form the basis of this lawsuit.

### B. The Alleged Fraud

Generally, Plaintiffs take issue with Defendants' alleged misrepresentations that Evolent was effective in "'lower[ing] clinical and administrative costs' for its clients and 'enabl[ing] health

systems to manage patient health in a more cost-effective manner.'" *Id*. at ¶ 3.  Plaintiffs contend that while Defendants flaunted their ability to lower costs for clients, those statements "were materially false, and [ ] [Evolent's] growth was wholly illusory." *Id*. at ¶ 4.  From Plaintiffs' perspective, this illusion is exemplified by the notion that "Evolent grossly overcharged its single most important client[,]" Passport, to the tune of "hundreds of millions of dollars during the Class Period for basic healthcare management services." *Id*.

Indeed, in arguing that Defendants carried out a fraudulent scheme in violation of 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, and 15 U.S.C. 78t(a), Plaintiffs focus their claims on Defendants' dealings with Passport.  *See generally*, Dkt. 69.  Plaintiffs contend that "Evolent's focus on 'clinical and cost improvement' that enabled 'high-quality cost-effective care' attracted . . . Passport to retain Evolent." *Id*. at ¶ 40.  Accordingly, Evolent and Passport entered into a "long-term master services agreement (the 'Passport MSA')," which was "a 10-year arrangement under which Evolent was to provide services to Passport, thereby purportedly enabling Passport to cut costs and maintain profitability using the value-based care approach." *Id*.

Plaintiffs maintain that Evolent's engagement with Passport is indicative of Evolent's overarching fraudulent scheme because Passport was "Evolent's most significant client" given that in 2016, 2017, 2018, and 2019, Passport accounted for 19.6%, 20.6%, 17.5%, and 18.7% of Evolent's revenue, respectively. *Id*. at ¶ 41.  Further, Plaintiffs assert that Evolent held out that it had significant control over Passport and that it "effectively ran Passport's daily operations, including managing Passport's clinical, financial and back-office services[;] [ ] contracting with Passport's network of healthcare providers[;] [ ] conducting risk adjustment and pharmaceutical benefit management services[;] [ ] and processing Passport's medial claims." *Id*. at ¶¶ 42-45.  Thus, Plaintiffs urge that Defendants' statements concerning Evolent's business model were

demonstrably misstatements based upon the way that Defendants handled and negatively impacted Passport, its most critical client.  *See generally*, Dkt. 69.

Moreover, Plaintiffs contend that Defendants made these misstatements with the requisite scienter in that Defendants "acted knowingly, or severely recklessly, when they concealed from the market the material negative information" concerning its effectiveness in cutting costs for Passport.  *Id*. at ¶ 190.

Plaintiffs also aver that these misstatements caused an "unrealistically positive assessment of" Evolent in the market, which in turn, lead to Evolent's "stock price [ ] be[ing] overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times."  *Id*. at ¶ 209.  Plaintiffs allege that these misrepresentations caused them to purchase Evolent's stock at artificially inflated prices, and "[w]hen Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Evolent common stock fell precipitously as the prior artificial inflation dissipated."  *Id*. at ¶ 210.  Because of this, Plaintiffs explain that Defendants' misrepresentations have caused them to suffer "economic loss," and "damages [ ] under the federal securities laws."  *Id*. at ¶¶ 210-11.

Plaintiffs further maintain that the Individual Defendants are liable because "as senior executive officers and/or directors of Evolent," they were "privy to confidential, proprietary[,] [ ] material[, and] adverse non-public information concerning Evolent, its operations, finances, financial condition, and present and future business prospects . . . ."  *Id*. at ¶ 26.

1.  Plaintiffs Contend that Evolent Did Not Decrease Passport's Costs

Plaintiffs maintain that Defendants, as a collective, made a number of misstatements pertaining to Evolent's success in cutting its clients['], including Passport's, costs.  As described above (*supra*, p. 4-5), Plaintiffs maintain that "Defendants repeatedly emphasized to investors that

Evolent's entire business was predicated on the claim that its high-tech services dramatically 'lower[ed] clinical and administrative costs' for health plans such as Passport operating under the value-based model." *Id*. at ¶ 37.

To this end, Plaintiffs set forth that at an investor conference on January 11, 2017, Defendant Williams said the following concerning Evolent's cost-saving model. *Id*. He indicated that Evolent was founded "'because health plans [were] moving to a value-based care approach," and there was a "'need to get [ ] costs under control[.]" *Id*. Similarly, Plaintiffs maintain that through its public filings with the United States Securities and Exchange Commission ("SEC"), "Evolent regularly told investors that its business model consisted of 'one strategic option[,]' which was to 'reduce . . . total cost[s]' for its customers, including Passport." *Id*. (emphasis omitted).

By contrast, Plaintiffs argue that Evolent "dr[o]ve[ ] Passport to the brink of bankruptcy." *Id*. at ¶ 16 (each word capitalized in original). Plaintiffs contend that Evolent did so in two ways: (1) by "rebadg[ing]" Passport employees, which in turn, drastically increased Passport's costs for services that it previously performed in-house; and (2) by implementing Valence, Evolent's claims processing platform. *See* Dkt. 69, ¶ 84. Plaintiffs also surmise that the financial strain that Evolent inflicted upon Passport is further evidenced by Passport's faltering finances that followed Evolent's involvement with Passport. *Id*. at ¶¶ 84-88. Plaintiffs also present statements from five individuals who discuss the impact that Evolent's "rebadging" of Passport employees and implementation of Valence at Passport, had on Passport's increased costs. *Id*. at ¶¶ 44, 48, 49, 61, 62, 64-65, 67, 89-100.

*a.   Rebadging*

As for the "rebadging," Plaintiffs note that beginning in 2016, Evolent began to provide Passport with "back-office-type services," in addition to providing "healthcare management services." *Id*. at ¶ 47.   Yet, Evolent, on its own, was not equipped to provide this "back-office-type" work.   *Id*.   As such, Defendants allegedly "engaged in a scheme to convert over two-thirds of Passport's workforce (approximately 350 of Passport's 500 employees) and hire[d] them as Evolent employees—and in Evolent's vernacular, 'rebadging' Passport employees to make them its own."   *Id*.   The employees that were "rebadged" performed "various administrative functions that Passport had once performed itself," but after these employees were "rebadged" as Evolent employees, Evolent began charging Passport for the "rebadged" employees services.   *Id*. at ¶ 48. The rates that Evolent charged Passport for the "rebadged" employees was "far more" than what "it had previously cost Passport to perform the same services in-house."   *Id*.   Plaintiffs provide two specific examples of individuals who were "rebadged" in this manner.   *Id*. at ¶ 49.   Plaintiffs describe the impact that this "rebadg[ing]" had on Passport:

> [f]rom 2015 through 2017, Passport's salary costs fell $22 million, from $39 million to $17 million, primarily as a result of Passport employees being "rebadged" as Evolent employees and moving off Passport's payroll.   However, these salary savings were dwarfed by the increased fees that Passport paid to Evolent.   From 2016 through 2018, the total fees that Evolent reaped from Passport more than doubled: from $55.5 million in 2016, to $88.2 million in 2017, and finally to $114.5 million in 2018[.]

*Id*. at ¶ 50 (emphasis omitted).   Plaintiffs further explain that:

> Evolent's "rebadging" strategy was a far cry from a cost-savings tool and was in reality nothing more than a scheme to fraudulently capitalize on its control over Passport.   Indeed, between 2015 and 2016, Passport's administrative expenses increased almost 60% in one year, rising from $107.5 million to $169.1 million (a growth rate that was more than 1,000% greater than its revenue growth). Moreover[,] Passport had a net underwriting gain of $33.3 million in 2015— essentially, a true measure of operational cost efficiency derived by subtracting claims payments and general administrative expenses from Passport's total

Medicaid revenue—but suffered a net underwriting loss of $80.4 million in 2016 after Evolent was brought onboard.

*Id*. at ¶ 53.

### b. *Valence: Evolent's Claims Processing System*

Plaintiffs also contend that by implementing Valence, Evolent's claims processing system, at Passport, Evolent caused Passport great financial strain, thereby demonstrating that Evolent's statements concerning cost savings were indeed material misstatements.  *Id*. at ¶ 54.  Evolent integrated Valence at Passport effective October 1, 2017.  *Id*. at ¶ 57.  Plaintiffs describe that prior to that, Evolent "had no experience with claims processing[.]"  *Id*.  As such, Evolent "perform[ed] this crucial function using" Valence, Evolent's "[then] recently-acquired claims administration platform that was built to process group dental claims, which were substantially different and less complex than processing Passport's individual medical claims."  *Id*. (emphasis omitted).  Plaintiffs allege that the implementation of Valence caused Passport to incur increased "underpayments, overpayments, and delayed payments," which, in turn, resulted in "tens of millions of dollars in interest payments on late paid claims, preprocessing costs and unrecoverable provider overpayments[.]"  *Id*. at ¶ 55.  Plaintiffs maintain that "debilitating additional cost[s] burden[ed] [ ] Passport's already-struggling finances."  *Id*.

Additionally, Plaintiffs contend that Evolent's Valence platform was "wholly incapable of processing and submitting essential Medicaid claims data (known as "encounter data") to Kentucky[.]"  *Id*. at ¶ 56.  Based on the Second Amended Complaint, encounter data is the information that the Commonwealth of Kentucky "used to set Passport's Medicaid reimbursement rates."  *Id*.  Encounter data is "essentially a description of what [ ] [is] wrong with [ ] [a] patient, how sick [ ] [a] patient [ ] [is], and what care [ ] [is] needed."  *Id*. at ¶ 59.  And, according to this protocol, if the encounter data reflected that a "population was sicker and needed more care,

[reimbursement] rates would increase, and if the population was healthier and needed less care, rates would decrease." *Id*. at ¶ 74. Evolent was responsible for "regularly submit[ting] this data to Kentucky on behalf of Passport." *Id*. at ¶ 59. Because of deficiencies with the Valence system, which caused Passport to submit "inaccurate and untimely encounter data" to Kentucky, Kentucky assessed Passport "hundreds of millions of dollars in penalties[,]" and "cut Passport's Medicaid reimbursement rates." *Id*. at ¶¶ 59, 73. Plaintiffs claim that this then reduced Passport's revenue and led to Passport's financial decline. *Id*. Plaintiffs maintain that the rate cuts were so significant that by the end of 2018, Passport reported a loss of $65.5 million, and that by the first half of 2019, Passport reported an additional $75 million loss. *Id*. at ¶ 83.

Plaintiffs allege that when Kentucky assessed penalties to Passport, Kentucky issued monthly penalty letters to "Passport's most senior officers—including Passport's CEO, CFO[,] and Director of Claims and Reimbursement[.]" *Id*. at ¶ 75. Plaintiffs claim that these letters were issued "each month during the Class Period[.]" *Id*. The letters detailed how Passport failed to comply with its Medicaid contract with Kentucky. *Id*. at ¶ 76. In support of its claim, Plaintiffs suggest the following examples:

> if Passport failed to submit encounters within 30 days of the adjudication date (the date the claim was either accepted or denied), Passport was subject to a fine of $1 per encounter per day. According to the penalty letter for February [of] 2018, which was sent to Passport on March 16, 2018, the encounter data Passport submitted in February alone were a remarkable 44,115,599 days late in the aggregate, resulting in a penalty of $44,115,599. Similarly, if Passport failed to resubmit error encounter files within 60 days from receiving notice of such error, Passport was subject to a "late fee" of $1 per encounter per day for each day over 60 days. Again, the penalties that Passport was subjected to were staggering: in February, "[b]ased upon the February data report, Passport Health Plan had 2,178,712 records over sixty (60) days [late] for a penalty of $2,178,712."

*Id*. at ¶ 76 (emphasis omitted).  Plaintiffs also compare the penalties that Passport was assessed

during the nine-month period prior to Valence's implementation, to those assessed in the months

following the Valence transition in October of 2017:

> during the nine-month period prior to Evolent taking over claims processing for Passport, Passport averaged penalties of just $33,000 per month.  By contrast, in October [of] 2017—the first month Evolent handled claims processing—Passport's assessed penalties immediately skyrocketed to $619,625—an increase of roughly 1,800%.  Moreover, even this stunning immediate increase paled in comparison to the astronomical penalties imposed on Passport in subsequent months as a result of Evolent's utterly deficient claims processing.  In fact, rather than Evolent remedying the pervasive problems, the systemic failures only worsened. . . .  [I]n February [of] 2018 alone, Evolent caused Passport to be assessed with a staggering $48 million in penalties for untimely and improperly submitted encounter data.  In October [of] 2018, Passport submitted encounter data that was more than 50 million days late in the aggregate, and its corresponding penalty totaled $56 million.  And, for each of November and December [of] 2018, Passport's encounter data penalties topped $100 million per month.  In all, from October [of] 2017 through April [of] 2019, Evolent caused Passport to incur a staggering $489 million in penalties for deficient encounter data submissions in violation of its contract with Kentucky— an amount so large that it would have bankrupted the Plan.

*Id*. at ¶ 77 (emphasis omitted).  Plaintiffs contend that the only way that Passport was able to

withstand these staggering penalties was that the penalties were "capped at 0.33% of their monthly

capitation revenue."  *Id*. at ¶ 78.  Accordingly, Passport was required to pay "over $10 million to

Kentucky between October [of] 2017 and April [of] 2019[,]" which Plaintiffs describe as "an

amount equivalent to one-third of Passport's entire net operating gain for 2015 (the year before

Evolent took over at Passport)."  *Id*. (emphasis omitted).

Despite this, Plaintiffs contend that on May 9, 2017, during an investor earnings call,

Defendant Williams represented to investors that "the integration of Valence's claims processing

technology into Evolent's other services 'ha[d] gone incredibly well'" and that, with respect to the

implementation of Valence at Passport, "'[Evolent's] commitment was to get that absolutely right

in terms of serving clients at a high standard from the outset.'"  *Id*. at ¶ 61.  Defendant Williams

further urged that "'by bringing [the Valence platform] in-house,' Evolent would 'improve
margins dramatically.'"  *Id*. at ¶ 66.  Defendant Williams also indicated that "Evolent's services
had 'drive[n] greater efficiency' for Passport'" and that:

> "[i]n terms of growth to our existing partners, [ ] [he was] also excited about [ ]
> [Evolent's] work across the [ ] [prior] year at Passport Health Plan in Kentucky.
> Passport is a nationally recognized organization in Medicaid and [ ] [Evolent had]
> been able to leverage its experience and strong provider network in combination
> with the Evolent platform to drive greater efficiency and to improve quality of care
> across [ ] [Passport's] large and diverse population."

*Id*. at ¶ 140.

Yet, Plaintiffs contend that "well before October [of] 2017, Defendants knew that the
Valence platform was utterly unequipped to handle processing claims for Passport."  *Id*. at ¶ 62.
Plaintiffs plead that multiple Passport employees informed Evolent management "on a number of
occasions" that Valence "was not ready or adequate" to be deployed at Passport.  *Id*. at ¶ 65.  Still,
on October 1, 2017, Evolent launched Valence at Passport.  *Id*. at ¶ 66.

On November 2, 2017, during an earnings call, Defendant Williams indicated that Evolent
"'successfully launched Passport [. . .] onto [ ] [its] [Valence] services platform, which should
contribute meaningfully to [ ] [Evolent's] revenue in 2018.'"  *Id*. at ¶ 67.  Plaintiffs further allege
that during that call, Defendant Williams also told investors that Evolent's "'teams continue[d] to
monitor operations closely and report[ed] a smooth transition.'"  *Id*.  Further, Defendant Williams
said that "transitioning to Valence would 'provide a differentiated and more effective service' . . .
and 'create value for Passport unmatched by a traditional vendor[-]client relationship[.]'"  *Id*. at ¶
152.  Also, Plaintiffs describe that Defendant Williams reminded investors that Evolent:

> made th[e] decision [to process claims for Passport using Valence] together for
> several reasons.  First, we wanted to provide a higher level of service for Passport
> members and providers.  By integrating our clinical and administrative platforms,
> we'll be able to provide a differentiated and more efficient service for our members.
> Second, we recognize the opportunity to expand the depth of our strategic alliance,

leveraging best practices from both entities to create value for Passport unmatched by a traditional vendor client relationship.

\* \* \*

To ensure a seamless transition for providers and plan members, teams continue to monitor operations closely and report a smooth transition.  In the months since go live, over 1.6 million enrolment transactions have been completed as we onboard more than 300,000 Passport Health Plan members across the quarter.

*Id*. at ¶ 152 (quoting Defendant Williams).  Despite Defendant Williams's comments, Plaintiffs maintain that the transition was not smooth because the incorporation of Valence increased Passports costs.  Dkt. 69, ¶¶ 67-72.

### c.  *Increased Expenses Lead to Passport's Financial Loss*

Plaintiffs further allege that Defendants' fraud is supported by the notion that "Evolent financially crippled Passport," by "transforming it from one of Kentucky's most successful Medicaid providers into a hollowed-out shell teetering on the brink of insolvency."  *Id*. at ¶ 88.

With regard to this assertion, Plaintiffs plead that in 2011, before Evolent became involved with Passport, "Passport was nationally ranked as the 13th best Medicaid health plan in the United States." *Id*. at ¶ 84.  Also, in 2015, prior to Evolent's relationship with Passport, Passport "incurred total general administrative expenses of $107.5 million . . . ." *Id*. at ¶ 85.  Yet, after Evolent and Passport's relationship commenced in 2016, Passport faced increasing general administrative expenses—$169.1 million, $182.7 million, and $194 million in the years 2016, 2017, and 2018, respectively.  *Id*.  Plaintiffs declare that these increased expenses did not correlate with Passport's growth because, for example, "in the first year of Evolent's partnership with Passport, Passport's $62 million jump in total administrative expenses represented a staggering 57% increase over the prior year—while Passport's revenues increased by only about 5% for the same period." *Id*. at ¶ 86.

In addition, Plaintiffs assert Passport's annual "net underwriting gain/loss" decreased after Evolent partnered with Passport. *Id.* at ¶ 87. "[W]hile Passport had a net underwriting gain of $33.3 million in 2015, after retaining Evolent, Passport had a net underwriting loss of $80.4 million in 2016, a *de minimis* net underwriting gain of $4.3 million for 2017, and a $130.7 million net underwriting loss for 2018[.]" *Id.* (emphasis omitted).

### d. The CWs

Furthermore, Plaintiffs allege that the stories from five individuals regarding Evolent's involvement with Passport further shed light on the Evolent's allegedly fraudulent scheme. *See generally*, Dkt. 69. Plaintiffs describe these individuals as CW 1, CW 2, CW 3, CW 4, and CW 5. *Id.*

### i. CW 1

Plaintiffs describe CW 1 as a person "who was a senior member of Passport's Internal Audit team from December [of] 2011 to March [of] 2019[,]" and as such, was "responsible for monitoring Passport's compliance with Kentucky-mandated internal controls designed to ensure Passport's financial statements were accurate and complete, and who reported directly to Passport's CFO[.]" *Id.* at ¶ 44. According to Plaintiffs, CW 1 describes that Evolent was directly involved in Passport's business and that included "participating in weekly meetings with Passport's management team." *Id.* CW 1 avers that "'[t]he [Passport] executive team met every Monday and [Defendant Spencer]'"—who had previously worked for Passport before moving to Evolent—"'was always in the room.'" *Id.* CW 1 also discussed the rebadging process (*supra*, p. 8-9) and confirmed that Passport paid Evolent "'more than [ ] [it] had been paying for the salaries of the people that did the [same] work Evolent . . . [did]'" after the employees had been rebadged.'" *Id.* at ¶¶ 48-49.

CW 1 also provided information concerning the integration of Valence at Passport (*supra*, p. 9-13). *Id*. at ¶ 61. CW 1 indicated that despite that "'claims processing is the biggest thing that insurance companies do[,]'" from CW 1's perspective, "the Valence platform lacked the capabilities needed to manage Medicaid medical claims because 'Valence was built to be a dental claims processing system' and 'dental and medical are two different things.'" *Id*. at ¶¶ 62-63.

### ii. CWs 2 and 3

Plaintiffs assert that CW 2 is an individual who "began working at Passport in 2016 as a Contract Specialist, where she was responsible for drafting contracts between Passport and the Plan's healthcare providers." *Id*. at ¶ 49. Plaintiffs allege that CW 2 was one of the former Passport employees that Evolent "rebadged'" and in that vein, she was employed by Evolent as a "Contract Specialist." *Id*. In that capacity, CW 2's "day-to-day [ ] responsibilities remained 'exactly the same.'" *Id*.

Similarly, "CW 3, who worked in risk adjustment at Passport and was rebadged as Evolent's Associate Director of Risk Adjustment from August [of] 2018 through July [of] 2019, also confirmed the same" concept regarding Evolent "rebadging" Passport employees as Evolent employees to do the same work they had previously done for Passport. *Id*.

CWs 2 and 3 also echoed CW 1's assertions (*supra*, p. 9-13) concerning the integration of Valence at Passport. *Id*. at ¶¶ 64-65.

### iii. CW 4

CW 4, "a former Evolent Medicare/Medicaid Quality Analyst from 2016 to July [of] 2019[,] specifically tasked with analyzing Passport's medical claims data, said it was clear at the outset that 'the [Valence] system was [ ] [not] ready'" when it went live at Passport in 2017. *Id*. at ¶ 65. CW 4 described the transition to Valence at Passport as a "disaster" because it

"dramatically increased Passport's costs rather than 'lowering' its costs as Defendants told investor Evolent's services would do." *Id.* at ¶ 67.

### iv.   CW 5

Finally, Plaintiffs provide statements that CW 5, "a former senior Passport executive for nearly six years," made about the integration of Valence at Passport, which, in essence, are largely the same as the sentiments expressed by CWs 1, 2, and 3. *Id.* at ¶¶ 89-110.

According to the facts set forth in the Second Amended Complaint, from February of 2020 to March of 2020, CW 5 was Passport's "Senior Director of Information Technology[;]" from March of 2017 to February of 2020, she was Passport's "Director of Information Technology[;]" and from October of 2014 to February of 2017, she was Passport's "Manager of Infrastructure and IT Operations." *Id.* at ¶ 89.

CW 5 asserts that Evolent and Defendant Williams were aware of Valence's deficiencies. *Id.* at ¶ 90. To that end, CW 5 indicates that:

> Evolent pitched Valence as a medical claims processing system, and it was not until a Passport employee accidentally found a tooth chart in the system—which would have been unnecessary in a medical claims system—that Evolent admitted that Valence was designed for dental claims instead of medical claims. CW 5 recall[s that] at that point, that "Evolent admitted that it was a dental system and that it was underpowered. [Evolent was not] [ ] very forthcoming but once [ ] [Passport employees] stumbled upon things, [ ] [Evolent] admitted it."

*Id.* at ¶ 94. CW 5 also describes that the issues with Valence's integration at Passport were so pervasive that at times, individuals from Evolent and Passport engaged in "relationship calls" wherein they discussed the integration of Valence and its impact on the Evolent-Passport relationship. *Id.* at ¶ 96.

In support of these allegations, CW 5 describes that at a time "during the Class Period[,] all of Evolent's executives flew to Passport's headquarters in Kentucky to 'basically say that they

were sorry and were going to fix [Valence],' but it was never fixed." *Id*. at ¶ 98.  In Plaintiffs' words, "CW 5 confirm[s] that Kentucky assessed massive penalties on Passport through a series of monthly deficiency letters due to the incomplete, incorrect, or untimely encounter data that Passport submitted to the Commonwealth." *Id*. at ¶ 100.  CW 5 maintains that these letters "'absolutely were' sent to Evolent executives." *Id*. In turn, the penalties were discussed at bi-weekly meetings between Evolent and Passport. *Id*. at ¶ 102.  Finally, Plaintiffs also believe that CW 5 "confirm[s] that" Passport's costs "drastically rose after Evolent rebadged roughly 350 of its employees due to the increased fees that Passport paid Evolent for those employees." *Id*. at ¶ 107.

2.   Information Pertaining to Passport's Finances Becomes Publicized

Plaintiffs allege that on January 25, 2019, an article entitled "Passport's Finances Being Dragged Down by $20M in 'Management Fees' to Evolent Health" was published in *Insider Louisville*, a local Kentucky news outlet. *Id*. at ¶ 112.  That article, Plaintiffs maintain, "reported on Passport's financial woes and discussed that—setting aside the 2018 rate cuts—Evolent's exorbitant fees were dramatically worsening Passport's financial situation." *Id*.  The article attributed Passport's financial struggles to "'overspending'" and "'non-employee management fees[.]'" *Id*.  Plaintiffs set forth that the article specifically indicated that in the three years prior to the article's publication, "'Passport paid the publicly traded Evolent Health some $220 million in non-employee management fees, accounting for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead.'" *Id*.  The writer of the article further described that in 2016 and 2017, Passport's "'expenses rose at a faster pace than [its] revenue.'" *Id*.  at ¶ 113.

Despite these representations, the *Insider Louisville* article reported that:

17

> "Evolent told *Insider* via email that the 'majority of the fees Passport pays to Evolent are directly tied to local staff — at cost — as well as (insurance claims processing) and pharmacy benefit services at a lower per member cost than prior periods.' The company said it has 'hundreds of employees supporting Passport' and that 'the number of employees has increased in line with the increases in scope of [ ] [Evolent's] partnership with Passport' and that 'the number of our employees in Louisville exceeds our original projection."

*Id.* ¶ 113 (quoting the *Insider Louisville* article). In addition, Plaintiffs represent that "Evolent dispatched Passport's CEO, Mark Carter ("Carter"), a non-party, to reassure investors that the [*Insider Louisville*] article was incorrect, and that Passport had actually benefitted from its arrangement with Evolent." Dkt. 69, ¶ 114. Plaintiffs suggest that Carter was so dispatched given that Piper Jaffray's ("Jaffray") January 31, 2019 research note entitled "Passport is a Happy Client, Despite Local Media Reports," set forth that Jaffray had "'caught up with Mark Carter, CEO of Passport Health,'" who told Jaffray that "'[w]hile Passport is wrangling with regulators over capitation rates, the issue is not tied to [Evolent] relationship.'" *Id.* (quoting Jaffray's article).

On February 15, 2019, Passport commenced a lawsuit against Kentucky's Finance and Administration Cabinet and its Cabinet for Health and Family Services ("CHFS"). Dkt. 69, ¶ 115. According to Plaintiffs, Passport's complaint ("Passport Complaint") "challeng[ed] the Medicaid rate cuts that Passport learned of in May [of] 2018[;]" alleged that "if the rate cuts were not reversed, Passport would be legally insolvent by March 1, 2019[;]" claimed that Passport had "recorded a loss of $65.5 million for year-end 2018 and projected an additional $75 million in losses for the first half of 2019 alone[;]" and predicted that because of these losses, Passport "would fall below the statutory minimum capital needed to remain solvent by law as soon as March 1, 2019 . . . and risked losing its Medicaid contract with Kentucky[.]" *Id.*

As such, investors grew "significant[ly] concern[ed.]" *Id.* at ¶ 116. In this regard, Plaintiffs maintain that on February 26, 2019, Evolent's investors and management, and analysts engaged

in an "investor conference call[,]" during which "analysts peppered Evolent's management with questions about Passport's dire financial condition and its potential effects of Evolent." *Id*. at ¶ 116. According to Plaintiffs, during that call, Defendant Williams represented that at that time, Evolent "[was] 'not focus[ed] on outright majority ownership in health plans'" and told analysts, "there[ ] [was] no big change in strategy based on what [ ] [Evolent saw] happening with Passport specifically.'" *Id*.

Also on the February 26, 2019 phone call, one analyst inquired of Defendant Williams as to whether "'[o]n the Passport side, [ ] [was] there any balance sheet risk if [ ] [Passport] were to go insolvent? Or put another way, ha[d] [Evolent's] joint investment efforts of Passport given [ ] [Evolent] any exposure in a tail event?'" *Id*. at ¶ 117. In response to that question, Defendant Williams indicated that Evolent did not "'have any broader exposure.'" *Id*. (emphasis omitted).

Also, Plaintiffs allege that analysts also asked whether Evolent was "even considering acquiring Passport." *Id*. Plaintiffs describe that "Defendant Williams emphatically rejected that possibility, stating that Evolent had not even 'thought about' acquiring Passport," and that "such an acquisition was 'not in [ ] [Evolent's] strategic lens[.]'" at that point. *Id*. Plaintiffs assert that Defendant Williams further clarified that "a Passport bailout was 'not something that [Evolent was] then] [ ] evaluat[ing].'" *Id*.

Plaintiffs describe that "[b]y Spring [of] 2019, Passport's financial picture appeared to have improved[,]" and significantly, "on April 10, 2019, Kentucky announced that it was reversing its prior Medicaid cuts [ ] [,] thus increasing the reimbursement rate affecting Passport." *Id*. at ¶ 118. Also, "as late as May 7, 2019, during its earnings call for the first quarter of 2019," "Evolent management" reported to investors that "'Passport [] [was] making solid progress towards improving its financial performance.'" *Id*. at ¶ 119.

19

Nevertheless, Plaintiffs describe, despite prior assurances, on May 29, 2019, Evolent "issued a press release" indicating that "it had agreed to acquire a majority stake in Passport, paying $70 million in exchange for its 70% interest, and further agreed to . . . pay in additional capital [ ] if such support became necessary for Passport to meet its statutory capital requirements." *Id*. at ¶ 120.  Before the market opened that day, Defendant Williams allegedly described to investors that the acquisition was an "'opportunity'" for Evolent.  *Id*. at ¶ 121.  However, Plaintiffs explain that when analysts asked Defendant Williams why Evolent "'still [ ] need[ed] to make this investment to become basically a 70% owner,'" Defendant Williams responded that "'. . . given the financial situation, [ ] [Evolent] need[ed] to respond immediately.'"  *Id*.

Plaintiffs aver that on May 29, 2019, as a result of the "emergency bailout[,]" Evolent's stock price decreased 29.3%.  *Id*. at ¶ 122.

On May 30, 2019, Evolent "management" had another call with Evolent investors.  *Id*. at ¶ 124.  Plaintiffs claim that during the call, Thomas Peterson, Evolent's COO and co-founder, and non-party to this suit, provided that:

> "despite having this really strong profound belief in the mission of Passport and the potential for Passport, the sponsors [of Passport] really felt as though they needed to take on a partner.  And so . . . starting in January, once the writing kind of became on the wall around the real impact of the rates and the fact that there was not likely to be retroactive rate relief, there was [an] additional level of urgency that was placed on this . . . ." [i]n January what we did was we effectively created [sic.] a shadow management team [at Passport].  So we had our own – we brought in our own CMO, our own CEO, our own COO, a Chief Actuary, Head of Network Contracting, and we were shoulder to shoulder with Passport leadership."

*Id*. at ¶ 125 (emphasis omitted).

Also in May of 2019, Kentucky began requesting entities to submit proposals to award Medicaid contracts.  *Id*. at ¶ 126.  Passport was one of the entities that submitted a proposal.  *Id*. On November 26, 2019, Kentucky awarded contracts to certain entities, but Passport was not one

of those that were selected.  *Id.*  at ¶ 127.  The following day, Evolent's stock price fell 27%.  *Id.* at ¶ 129.  Plaintiffs further allege that "Passport lost its Medicaid contract with Kentucky because it was unable to establish that it could provide Medicaid services 'in a cost-effective manner.'"  *Id.* at ¶ 130.  And Plaintiffs explain that the contract was also lost because "Passport failed to provide any 'formal policy' regarding encounter data processing."  *Id.*

On December 23, 2019, newly elected Kentucky Governor Andy Beshear announced that Kentucky would accept rebidding for contracts to provide Medicaid services in Kentucky.  *Id.* at ¶ 132.  Plaintiffs have represented that as of the filing of their Second Amended Complaint, Kentucky's Medicaid contract awards remained undecided.  *Id.*

### 3.  False and Misleading Statements

Despite Passport's aforementioned financial woes, Plaintiffs aver that Defendants also made the following twenty sets of false and misleading statements.  *Id.* at ¶¶ 134-189.

Plaintiffs allege that the first of these twenty set of false and misleading statements were made in March 3, 2019, in Evolent's 2016 "Form 10-K[.]"  *Id.* at ¶ 136.  Plaintiffs assert that, therein, Defendants made a number of assertions geared toward explaining that Evolent's "sole purpose" was to decrease clinical and administrative costs for its clients.  *See id.* at ¶¶ 136-38.

Second, Plaintiffs claim that Defendant Williams made false and misleading statements during a May 9, 2017 investor call.  *Id.* at ¶ 140.  Those statements are detailed above (*supra*, p. 11-12).

Third, Plaintiffs contend that Evolent made false and misleading statements in its May 10, 2019 Form 10-Q.  *Id.* at ¶ 141.  In that document, Evolent set forth that the services that it provided to its clients, were created in an effort to "enable health systems to manage patient health in a more cost-effective manner."  *Id.*

Fourth, Plaintiffs assert that Defendants made false and misleading statements at its May 11, 2017 Investor and Analyst Day Conference. *Id.* at ¶ 145. Plaintiffs allege that during the course of the conference, Defendants, as a whole, "extensively discussed the Passport partnership" as well as Evolent's "plan to migrate Passport to . . . Valence[.]" *Id.* Plaintiffs detail that at the conference, Defendant Wigginton stated that the "'integration process with the Valence health team ha[d] proceeded at or above [ ] [Evolent's] expectations,' and that Evolent was 'really creating a seamless, highly integrated infrastructure' by combining Valence's services with the Company's other service offerings." *Id.* at ¶ 145. Also, in this fourth category of alleged misstatements, Plaintiffs maintain that Defendant Spencer "represented that Passport had done 'a lot of due diligence' on Valence and had 'made sure that everything was working the way that [ ] [Evolent] want[ed] it to' before deciding to transition to Valence." *Id.* at ¶ 146.

Fifth, Plaintiffs claim that Defendants made false, material, and misleading statements in Evolent's August 7, 2017 Form 10-Q, which described Evolent's "suite of tech-based services and claimed [that] they enabled health plan partners like Passport to operate 'in a more cost-effective manner.'" *Id.* at ¶ 149. Additionally, the document also contained the following statement:

> [Evolent]'s services include providing our customers, who we refer to as partners, with a population management platform, integrated data and analytics capabilities, pharmacy benefit management ("PBM") services and comprehensive health plan administration services. Together these services enable health systems to manage patient health in a more cost-effective manner.

*Id.* at ¶ 149.

Sixth, Plaintiffs declare that Defendant Williams made false, material, and misleading statements on a November 2, 2017 investor conference call. *Id.* at ¶ 151. Those statements are described above (*supra*, p. 12-13).

Seventh, Plaintiffs assert that Evolent made false, material, and misleading statements on its November 9, 2017 Form Q-10.  *Id*. at ¶ 151.  Set forth therein were representations that Evolent "provid[ed] [ ] [its] customers . . . with a population management platform, integrated data and analytics capabilities, pharmacy benefit management ('PBM') services[,] and comprehensive health plan administration services.  Together these services enable[d] health systems to manage patient health in a more cost-effective manner."  *Id*. at ¶ 155.

Eighth, Plaintiffs allege that Defendant Williams made misrepresentations on Evolent's February 27, 2018 investor call.  *Id*. at ¶ 157.  They contend that during that call, Defendant Williams "claimed that the integration of Evolent's Valence claims processing platform into Evolent's services for Passport was going 'incredibly well'" and was enabling the Company's partners, including Passport, to 'get to a higher level of performance.'"  *Id*. at ¶ 158.  Further, Defendant Williams indicated that 2017 was:

> "important in terms of integrating Valence into [ ] [Evolent's] broader health plan services offering and successfully scaling the [ ] [Evolent] with several large clients [including Passport] coming in across the year.  While [ ] [Evolent] still ha[d] work to do in fulfilling [ ] [its] long-term vision, the integration [was] [ ] going incredibly well and the Valence platform ha[d] [ ] enhanced [ ] [Evolent's] differentiation significantly in the marketplace."

*Id*. at ¶ 158 (quoting Defendant Williams).  He also described that Evolent was "'seeing strong success'" in terms of incorporating Valence into Evolent's "'health plan services platform.'"  *Id*.  Defendant Williams further indicated that Evolent was then "'providing services to existing and larger scale provider-owned health plans.  The integration of the back-office claims and network management system . . . is highly differentiated in the market, and these organizations get to a higher level of performance in a more demanding market.'"  *Id*.

Ninth, Plaintiffs urge that Evolent's 2017 Form 10-K also contained false and misleading statements.  Dkt. 69, ¶ 160.  Like the Form 10-K from the previous year (*supra*, p. 21), Plaintiffs

assert that in the 2017 Form 10-K, Defendants made a number of assertions geared toward explaining that Evolent's "sole purpose" was to decrease clinical and administrative costs for its clients. *See id.* at ¶ 160-61.

Tenth, Plaintiffs allege that Defendant Williams also made false, material, and misleading statements during a May 9, 2018 investor call concerning Evolent's "financial results" for the first quarter of 2018. *Id.* at ¶ 163. Plaintiffs claim that during the call, Defendant Williams indicated that Evolent had "'a cost-effective infrastructure that integrate[d] clinical and administrative functions under one roof, and allow[ed] [its] [ ] provider partners to leverage the benefits of integration in driving performance.'" *Id.* at ¶ 164. Further, Defendant Williams described that Evolent "'had been driving efficiency and operational scale within [ ] [its] Medicaid business.'" *Id.*

Eleventh, Plaintiffs maintain that in Evolent's May 10, 2018 Form 10-Q, Evolent made false, material, and misleading claims that the company functioned "'in a more cost-effective manner.'" *Id.* at ¶ 165. That Form also indicated that Evolent's services "enable[d] health systems to manage patient health in a more cost-effective manner.'" *Id.*

Twelfth, Plaintiffs assert that Defendants made false and misleading statements at its May 11, 2018 Investor and Analyst Day. *Id.* at ¶ 167. At that event, Defendant Williams indicated that "'Passport was a good example [of] a great partnership' . . . [because] Evolent 'allowed [ ] [Passport] to get a lot of savings' and [Passport] ' was really important in terms of helping economics.'" *Id.* at ¶ 167. Plaintiffs claim that Defendant Blackley also made false and misleading statements at the Investor and Analyst Day. *Id.* at ¶ 168. They assert that Defendant Blackley indicated that Evolent's services caused "'about $75 million of improvement to Passport's bottom line,'" and effectively, that he thought the $75 million improvement was a "'big deal.'" *Id.*

Plaintiffs claim that the thirteenth set of false, material, and misleading statements were made by Defendant Williams during Evolent's August 7, 2018 investor conference call. *Id.* at ¶ 170. Defendant Williams indicated that Evolent had a "'differentiated platform,'" that was "'highly integrated[,]'" which, in turn, allowed Evolent "'to standardize and reduce costs in many areas.'" *Id.* at ¶ 171. Along a similar vein, Defendant McGrane remarked that that Evolent was "'conservative in how [ ] [Evolent was] building infrastructure to make sure [ ] [it] was managing cost[s] well.'" Dkt. 69, ¶ 171.

The fourteenth set of statements that Plaintiffs plead were false and misleading are those set forth in Evolent's August 9, 2018 Form 10-Q, which are the same as the statements that were provided in Evolent's November 9, 2017 Form Q-10 (*supra*, p. 23). Dkt. 69, ¶ 172.

The fifteenth group of statements that Plaintiffs allege were false, material, and misleading are those that Defendant Williams made at the 2018 Wells Fargo Healthcare Conference. *Id.* at ¶¶ 174-75. There, he indicated that "'[i]n [Passport's] own plan, [ ] [Evolent] believe[d] [it] [ ] helped to generate over $100 million in savings, which was highly valuable to that organization.'" *Id.* at ¶ 175.

The sixteenth group of comments that Plaintiffs assert were false, material, and misleading are those set forth in Evolent's November 8, 2018 Form 10-Q, which are the same as the statements that were provided in Evolent's November 9, 2017 Form Q-10 (*supra*, p. 23). Dkt. 69, ¶¶174, 176.

The seventeenth category of remarks that Plaintiffs proclaim were false, material, and misleading were the comments attributed to Evolent in the January 25, 2019 *Insider Louisville* article. *Id.* at ¶ 178. That commentary is set forth above (*supra*, p. 17-18).

25

The eighteenth subset of allegedly false, material, and misleading remarks were made by Defendant Williams during a February 26, 2019 investor conference call, at which time, Defendant Williams indicated that Evolent did not have plans to buy out Passport (*supra*, p. 18-19). *Id*. at ¶ 182.

Plaintiffs maintain that Evolent made a nineteenth set of false, material, and misleading assertions in its February 28, 2019 Form 10-K. *Id*. at ¶ 185. Therein, Evolent represented that its:

> partnership model enable[d] cultural alignment, integration into the provider care delivery and payment work flow, contractual relationships and a cycle of clinical and cost improvement with shared financial benefit . . . . By helping these systems lower clinical and administrative costs, [ ] [Evolent] believe[d] [] [it was] positioning [ ] [its clients] to offer a low cost, effective care setting to payers, employers and consumers, which [would] enable[ ] them to capture greater market share. As providers have succeeded in lowering costs and growing market share, this [would] enable[ ] them to increase their value-based offerings.

*Id*.

The twentieth and final set of remarks that Plaintiffs argue were misleading, material, and false were those made, again, by Defendant Williams in an investor conference call on May 7, 2019. *Id*. at ¶ 187. Plaintiffs assert that during the call, Defendant Williams represented that "'Passport [ ] [was] making solid progress towards improving its financial performance[;]'" and that Evolent was then:

> "pursuing several major initiatives in close collaboration with the Passport leadership team[.]
> * * * *
> Based on these initiatives and given the strength of its clinical model, [ ] [Evolent] believe[d] that Passport [ ] [was] making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members. Overall, [Evolent] [ ] remain[ed] hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet [ ] [would] provide a path for Passport to be successful long term in the Kentucky Medicaid market."

*Id*. at ¶ 188.

Plaintiffs urge that all of these statements were inapposite to what Evolent actually did, as set forth above (*supra*, p. 4-26).

### C.  Defendants' Motion to Dismiss

On June 22, 2020, Defendants filed the instant Motion to Dismiss, arguing that Plaintiffs' Second Amended Complaint should be dismissed for failure to state a claim.  Dkt. 74.  Plaintiffs have opposed Defendants' Motion to Dismiss, Dkt. 80, and Defendants have filed a reply in furtherance of their motion, Dkt. 85.

The Motion to Dismiss is now fully briefed and is ripe for disposition.

## II.  STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible under this standard when a plaintiff pleads factual content sufficient for a court to make a reasonable inference that a defendant is liable.  *Id.*  Allegations that are conclusory are "not entitled to be assumed true."  *Id.* at 681 (citing *Twombly*, 550 U.S. at 554-555).  A court should "construe facts in the light most favorable to the plaintiff and draw all reasonable inferences in [her] favor . . . [but] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (internal citations and quotation marks omitted).

Though generally, "extrinsic evidence should not be considered at the 12(b)(6) stage," the United States Court of Appeals for the Fourth Circuit has opined that "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss

the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiff[] do[es] not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  "A document is integral to the complaint where it is significantly related to a cause of action, and it is authentic when it is not in dispute by the opposing party." *McGlothian v. Fralin*, No. 3:18-cv-507, 2019 WL 1087156, at *7 (E.D. Va. Jan. 23, 2019) (citations omitted).

Further, the Fourth Circuit has opined that "[u]nder Federal Rule of Evidence 201, courts at any stage of a proceeding may judicially notice a fact that is not subject to reasonable dispute, provided that the fact is generally known within the court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Zak v. Chelsea Theraputics Intern., Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (internal quotations omitted).  Still, even "when a court considers relevant facts from the public record at the pleading stage, the court must construe such facts in the light most favorable to the plaintiffs." *Id.* (citation omitted).  To this end, the Fourth Circuit has emphasized that "the determination whether a fact is considered under th[e public notice] [ ] exception depends on the manner in which a court uses this information." *Id.* at 607-08 (finding that in class action securities fraud case, that "the district court . . . incorrectly construed the information contained in [ ] SEC documents" where "[i]nstead of considering the information in the light most favorable to the plaintiffs, the court found that" the documents contained in the SEC documents refuted those that were asserted by those plaintiffs in their complaint, and in turn, the district court improperly granted defendants' motion to dismiss) (citing *Clatterback v. Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013)).

B.   Federal Rule of Civil Procedure 9(b)

Pursuant to Fed. R. Civ. P. 9(b), certain elements of a fraud claim are subject to a "heightened pleading standard[.]"  *Carlucci v. Han*, 886 F. Supp. 2d 497, 509 (E.D. Va. Aug. 7, 2012) (citing Fed. R. Civ. P. 9(b)).  To be sure, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

C.   Private Securities Litigation Reform Act of 1995 ("PSLRA")

And not only are securities fraud actions subject to Rule 9(b) pleading requirements, such pleadings must also be reviewed under the strictures of the PSLRA.  *See Carlucci*, 886 F. Supp. 2d at 509-10 (citing *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobs*, 432 F. Supp. 2d 571, 578 (E.D. Va. 2006).  In order to state a plausible claim for relief under the PSLRA, plaintiffs must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all facts on which that belief is formed.'"  *Carlucci*, 886 F. Supp. 2d at 510 (citing 15 U.S.C. § 78u-4(b)(1)).  Plaintiffs must also "'state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind,' i.e., scienter."  *Carlucci*, 886 F. Supp. 2d at 510 (citing 15 U.S.C. § 78u-4(b)(2)).  Plaintiffs bear the burden of pleading facts that demonstrate "'an inference of scienter *as least as likely as* any plausible opposing inference.'"  *Id*. (emphasis in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007)).

This Court applies these principles in reviewing Defendants' Motion to Dismiss.

III.   ANALYSIS

A.  Whether the Court Will Consider Defendants' Exhibits

To suggest that this matter has not been fully briefed and that the parties have not fully provided their positions on the matter would be akin to suggesting that the 2020 Pandemic has not been challenging.  But alas, we work toward some measure of resolution.

As a threshold matter, this Court must first address whether, under the applicable legal standards, it is appropriate to consider the 46 exhibits that Defendants have submitted in support of their Motion to Dismiss and the five exhibits that Plaintiffs have filed in accompaniment with their opposition. This exhibit-by-exhibit evaluation is critical to this Court's evaluation of the instant Motion to Dismiss.

1.  Defendants' 46 Exhibits

As for Defendants' exhibits, on the one hand, Plaintiffs argue that "[o]ver one-quarter of Defendants' exhibits are not referenced in the" Second Amended Complaint.  Dkt. 80, 23.  Without challenging those documents' authenticity, they contend that the Court should not consider these exhibits because they are not "'integral to'" nor "'explicitly relied'" on by the Plaintiffs in their Second Amended Complaint.  *Id.* (quoting *McIntyre v. Pedder*, No. 3:12-cv-213, 2015 WL 5039431, at *6-7 (W.D.N.C.  Aug. 26, 2015)).  More specifically, the Plaintiffs maintain that Defendants' Exhibits One, Three, Seven, Eight, Nine, 15, 16, 17, 18, 26, 31, and 32 are not referenced in the Second Amended Complaint.  Dkt. 80, 23 n. 13.

On the other hand, Defendants argue that "the vast majority of" their exhibits are "cited directly" by Plaintiffs in the Second Amended Complaint.  Dkt. 85, 4 n.4.  Defendants specify that their exhibits that are cited in Plaintiffs' Second Amended Complaint are Exhibits 2, 4, 5, 6, 10, 11, 12, 13, 14, 21, 22, 24, 25, 27, 28, 29, 30, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, and 46.

*Id.* Defendants also argue that the Court should consider its Exhibits 6, 17, 19, 20, 23, and 25 because those exhibits are "publicly available documents" that the Court may take judicial notice of. *Id.*

This Court will consider Exhibit 1, as it is merely a chart that sets forth the statements that Plaintiffs allege in their Second Amended Complaint to be false or misleading,[3] and Defendants' corresponding reasons as to why each alleged statement does not amount to fraud. *See* Dkt. 76-1. Each statement contained in Exhibit 1 is integral to and explicitly referenced by Plaintiffs in their Second Amended Complaint. *Compare*, Dkt. 1, *with*, Dkt. 76-1. Also, Plaintiffs do not attack the authenticity of the assertions contained in Exhibit One, and therefore, the Court will Consider that exhibit.

Exhibits 2 and 29 appear to be Evolent's Form 10-K, for the fiscal years ending on December 31, 2019, and December 31, 2016, respectively. *See* Dkt. Nos. 76-2, 2; 76-29, 2. These documents are integral to and explicitly referenced by Plaintiffs in their Second Amended Complaint. *See* Dkt. 69, ¶ 133 ("The reason for this massive impairment charge became clear when [ ] [Evolent] filed its 2019 Form 10-K on March 3, 2020."). Also, the Court observes that these documents were publicly filed with the United States Securities and Exchange Commission ("SEC"), and therefore, to the extent that the Court views the assertions set forth in this document

---

[3] At certain points in Exhibit One, Plaintiffs reference quotations from the Second Amended Complaint, argue that those quotations do not provide sufficient context for the manner in which the statement was actually made, and then Plaintiffs provide what they believe is the full quotation. *See e.g.*, Dkt. 76-1, 3 ("Full quotes above; portion undermined omitted from [ ] [the Second Amended Complaint."). Because at the 12(b)(6) phase of litigation, the Court is tasked with examining the facts pleaded in the Second Amended Complaint, and not the full panoply of evidence that might be available in this case, and because the Court must construe the facts contained in the Second Amended Complaint in the light most favorable to the Plaintiffs, the Court will not consider what Defendants describe as the "[f]ull quote[.]" *Id.* Nevertheless, the Court will consider the remaining portions of the Second Amended Complaint.

in the light most favorable to Plaintiffs, they may be considered by the Court in deciding the Motion to Dismiss.  *See Zak*, 780 F.3d at 607-08; *Yates v. Muni. Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. Mar. 7, 2014) (finding it proper to "take judicial notice of the content of relevant SEC filings and other publicly available documents included in the record" in determining whether the district court properly dismissed a securities fraud action for failure to state a claim under Rule 12(b)(6)); *see also Smith v. Cir. City Stores, Inc.*, 286 F. Supp. 2d 707, 721 (E.D. Va. Feb. 10, 2003) (considering a Form 10-K in deciding a motion to dismiss a securities fraud action); *In re FAC Realty Securities Litigation*, 900 F. Supp. 416, 420 (E.D.N.C. Nov. 5, 1997) (finding that a "Form 10-K, publicly filed with the SEC" may be considered in deciding a 12(b)(6) motion to dismiss in a securities fraud action).  As such, the Court will consider Exhibits Two and 29 in deciding the Motion to Dismiss.

Exhibit 3 is a document entitled "J.P. Morgan Healthcare Conference: Evolent Health" that is dated January 15, 2020.  Dkt. 62-3.  Exhibit 3 is neither integral to nor explicitly relied on by Plaintiffs in their Second Amended Complaint.  *See generally*, Dkt. 69.  Exhibit 3 also is not a public record subject to judicial notice.  *See generally*, Dkt. 62-3.  Accordingly, the Court will not consider the document in deciding the Motion to Dismiss.

Exhibit 4 appears to be the "Corrected Transcript" from Evolent's February 25, 2020 call concerning its earnings from the fourth quarter of 2019.  *See* Dkt. Nos. 76, ¶ 4; 76-4, 1.  Although Plaintiffs do not expressly challenge Exhibit Four's authenticity, this document in its entirety does not appear to be integral to or explicitly referenced in Plaintiffs' Second Amended Complaint, and it is not a publicly filed document.  Therefore, the Court will not consider Exhibit Four in deciding the Motion to Dismiss.

Exhibits 5 and 6 are transcripts from Evolent's May 11, 2018, and May 30, 2019 Investor Day events.  *See* Dkt. 76-5.  In the Second Amended Complaint, Plaintiffs set forth allegations concerning the May 11, 2018 Investor Day and they provide statements that Defendant Williams and Defendant Blackley made at that conference.  *See* Dkt. 69, ¶¶ 167-168.  These statements are two of the dozens that Plaintiffs claim were fraudulent.  *See id*. at ¶ 169.  But while certain statements made at the May 11, 2018 Investor Day may be integral to and explicitly referenced by Plaintiffs in the Second Amended Complaint, *all the statements from the entire* Investor Day, as set forth in Exhibit Five, are not necessarily integral to nor explicitly referenced by Plaintiffs in the Second Amended Complaint.  At this stage in the litigation, where this Court is charged with assessing the sufficiency the allegations Plaintiffs set forth in their Second Amended Complaint, the Court finds it improper for the Court to consider the entire transcript from the May 11, 2018 Investor Day.  Accordingly, the Court will not consider Exhibit 5 in deciding the Motion to Dismiss.

Unlike Evolent's May 11, 2018 Investor Day, it does not appear that Plaintiffs explicitly reference the May 30, 2019 Investor Day in the Second Amended Complaint.  *See generally*, Dkt. 69.  In the Second Amended Complaint, Plaintiffs reference statements that Defendant Williams made on a "*call*" to investors on May 30, 2019, *see id*. at ¶ 124, but based on the face of the Second Amended Complaint, it is not clear that this was necessarily the "Investor Day" event that Exhibit 6 is a transcription of.  And indeed, at this stage in the litigation, the Court is required to construe the facts in the Second Amended Complaint in the light most favorable to Plaintiffs.  Moreover, even if Plaintiffs explicitly referenced Evolent's May 30, 2019 Investor Day in the Second Amended Complaint, the same reasons why Exhibit 5 cannot be considered at this time, are similarly applicable to Exhibit 6.  At bottom, while Plaintiffs may conceivably refer to some

statements in their Second Amended Complaint that are a part of the greater body of remarks set forth in Exhibit 6, this does not open the door for the Court to consider all the statements provided in Exhibit 6.

Exhibits 7 and 9 appear to be Evolent's DEF14A Proxy Statements that were publicly filed with the SEC on April 30, 2019, and April 27, 2018, respectively. *See* Dkt. Nos. 76-7; 76-9. Those documents are not explicitly referenced and do not appear to be relied on by Plaintiffs in their Second Amended Complaint, but they appear to be public records, which under certain circumstances, the Court may consider. Therefore, the Court will consider Exhibits 7 and 9 in the light most favorable to Plaintiffs. *See Zak*, 780 F.3d at 607-08; *Yates*, 744 F.3d at 88; *Smith*, 286 F. Supp. 2d at 721; *In re FAC Realty Securities Litig.*, 900 F. Supp. at 420.

Exhibits 8, 12, 14, and 16 are Evolent's Form 8-Ks that were publicly filed with the SEC on May 7, 2019, May 29, 2019, February 1, 2016, and July 12, 2016, respectively. *See* Dkt. Nos. 76-8; 76-12; 76-14; 76-16. Exhibits 10 and 11 are Evolent's Form 10-Ks, which were publicly filed with the SEC on March 1, 2018, and February 28, 2019, respectively. *See* Dkt. Nos. 76-10; 76-11. All of these documents are public records, and the Court will consider them in the appropriate manner in adjudicating the Motion to Dismiss. *See Zak*, 780 F.3d at 607-08; *Yates*, 744 F.3d at 88; *Smith*, 286 F. Supp. 2d at 721; *In re FAC Realty Securities Litig.*, 900 F. Supp. at 420.

Exhibit 13 appears to be a transcript of Evolent's May 11, 2017 Investor Day conference. *See* Dkt. 76-13. The Court will not consider that exhibit for the same reasons explained as to Exhibits Five and Six (*supra*, p. 33-34).

Exhibit 15 seems to be a November 2013 "Encounter Data Toolkit" submitted to the United States Department of Health and Human Services by The Centers for Medicare & Medicaid

Services.  *See* Dkt. 76-15, 2-3.  Exhibit 17 is a "2019 Guide to Choosing Medicaid Managed Care Organization[.]"  *See* Dkt. 76-17.  Exhibit 18 is Milliman Research's report entitled "Medicaid [M]anaged [C]are [F]inancial [R]esults for 2018[.]"  *See* Dkt. 76-18.  These documents are neither integral to nor explicitly referenced by Plaintiffs in their Second Amended Complaint and will not be considered in deciding the Motion to Dismiss.  Exhibits 19, 20, and 23, Passport's 2016, 2017, and 2018 Annual Statements, are similarly not explicitly referenced in Plaintiffs' Section Amended Complaint, and will also not be considered.

Exhibits 21 and 22 appear to be letters addressed to an individual named Mark Carter, Passport's then-CEO, from Cindy Arflack, Kentucky's then-Director for the Department of Medicaid Services' Division for Quality Control.  *See* Dkt. Nos. 76-21; 76-22.  The subject lines of the letters describe the documents concern the "Consequences for Failure to Submit Encounters in Accordance with Contract."  *Id*. at 1.  The Court finds that Exhibits 21 and 22 may be considered as they are integral to and expressly relied on by Plaintiffs in their Second Amended Complaint, and Plaintiffs do not challenge the authenticity of these exhibits.  *See* Dkt. 69, ¶ 207 (pleading the Passport's "penalties were set forth in detailed letter tFhat [sic.] Lead Plaintiffs obtained through their independent investigation and that Kentucky sent on a monthly basis directly to Mark Carter, the CEO of Passport . . . .").

Indeed, the Court will consider Exhibit 24, the January 25, 2019 *Insider Louisville* article entitled "[P]assport's [F]inances [B]eing [D]ragged [D]own by $220M in 'Management Fees' to Evolent[.]"  *See* Dkt. 76-24.  That article is certainly integral to and explicitly relied on by Plaintiffs in their Second Amended Complaint, and Plaintiffs do not challenge the authenticity of the exhibit. *See*, *e.g.*, Dkt. 69, ¶¶ 178-180.

Nevertheless, the Court will not consider Exhibit 25—a transcript of Evolent's February 26, 2019 earnings call (*supra*, p. 33-34, discussion on Exhibits Five, Six, and 13). *See* Dkt. 76-25. Exhibit 27, another transcript, this time from a May 29, 2019 "Special Call," and the transcripts set forth in Exhibits 28, 30, 35, 39, 40, 43, and 45 will not be considered for the same reasons. *See* Dkt. Nos. 76-27; 76-28; 76-30; 76-35; 76-39; 76-40; 76-43; 76-45.

The Court will not consider Exhibit 26—a letter from Scott A. Bowers, Passport's then-CEO, to the Honorable Stephen Meredith, the then-Co-Chairman of Kentucky Senate's Medicaid Oversight and Advisory Committee—because the document simply is not integral to and expressly relied on by Plaintiffs in their Second Amended Complaint. *See* Dkt. 76-26.

Plaintiffs describe Exhibit 31 as "[a] selected list of cautionary language, warnings and Risk Factors listed in Evolent's SEC filings, including its 10-Ks and 10-Qs." *See* Dkt. Nos. 76, ¶ 31; 76-31, 2-6. It appears to the Court that this exhibit is Defendants' analysis of certain language in various other exhibits that they filed. The Court will only consider Exhibit 31 to the extent that it makes reference to other exhibits that this Court finds proper to review at the 12(b)(6) stage.

In deciding the Motion to Dismiss, the Court will take judicial notice of and consider Exhibit 32, which is Evolent's 8-K publicly filed on October 3, 2016, with the SEC. *See* Dkt. 76-32. The Court will only consider this exhibit in the light most favorable to Plaintiffs. *See Zak*, 780 F.3d at 607-08.

Exhibits 33, 36, 37, 38, 41, 42, and 44, an Evolent Form 8-K/A and various Evolent Form 10-Qs, will also be considered as they are publicly filed and integral to and explicitly relied on by Plaintiffs in their Second Amended Complaint. *Compare*, Dkt. 76-33, *with* Dkt. 69, ¶ 50; *compare*, Dkt. 76-36, *with* Dkt. 69, ¶ 139; *compare*, Dkt. 76-37, *with* Dkt. 69, ¶ 148; *compare*, Dkt. 76-38,

*with* Dkt. 69, ¶ 151; *compare*, Dkt. 76-41, *with* Dkt. 69, ¶ 163; *compare*, Dkt. 76-42, *with* Dkt. 69, ¶ 170; *compare*, Dkt. 76-46, *with* Dkt. 69, ¶ 174.

Next, the Court will not consider the "[c]hart listing historical stock price information for Evolent taken from Yahoo! Finance website on January 31, 2020," set forth in Exhibit 34 because it is not explicitly referenced by Plaintiffs in their Second Amended Complaint. *See generally*, Dkt. 69; *see also* Dkt. Nos. 76, ¶ 34; 76-34.

*Finally*, Exhibit 46 is Evolent's Form 10-Q that was publicly filed with the SEC on November 5, 2019, and therefore, the Court will view the assertions set forth in this document in the light most favorable to Plaintiffs. *See Zak*, 780 F.3d at 607-08; *Yates*, 744 F.3d at 881; *Smith*, 286 F. Supp. 2d at 721; *In re FAC Realty Sec. Litig.*, 900 F. Supp. at 420.

The Court's rulings on Defendants' 46 exhibits are summarized in the following chart:

| Exhibit Number | Will the Court consider the exhibit in deciding the Motion to Dismiss? |
|---|---|
| 1 | YES |
| 2 | YES (conditionally) |
| 3 | NO |
| 4 | NO |
| 5 | NO |
| 6 | NO |
| 7 | YES (conditionally) |
| 8 | YES (conditionally) |
| 9 | YES (conditionally) |
| 10 | YES (conditionally) |
| 11 | YES (conditionally) |
| 12 | YES (conditionally) |
| 13 | NO |
| 14 | YES (conditionally) |
| 15 | NO |
| 16 | YES(conditionally) |
| 17 | NO |
| 18 | NO |
| 19 | NO |
| 20 | NO |
| 21 | YES |
| 22 | YES |

| 23 | NO |
| 24 | YES |
| 25 | NO |
| 26 | NO |
| 27 | NO |
| 28 | NO |
| 29 | YES (conditionally) |
| 30 | NO |
| 31 | YES (conditionally) |
| 32 | YES (conditionally) |
| 33 | YES (conditionally) |
| 34 | NO |
| 35 | NO |
| 36 | YES (conditionally) |
| 37 | YES (conditionally) |
| 38 | YES (conditionally) |
| 39 | NO |
| 40 | NO |
| 41 | YES (conditionally) |
| 42 | YES (conditionally) |
| 43 | NO |
| 44 | YES (conditionally) |
| 45 | NO |
| 46 | YES (conditionally) |

2.  Plaintiffs' Exhibits

Plaintiffs have filed four exhibits in support of their Opposition to the Motion to Dismiss. *See* Dkt. Nos. 81-1; 81-2; 81-3; 81-4; 81-5.  Plaintiffs have labeled those as Exhibits A, B, C, D, and E.  *Id*.

The Court will consider Exhibit A as it is integral to and expressly referenced by Plaintiffs in their Second Amended Complaint.  *Compare*, Dkt. 81-1, *with*, Dkt. 69, ¶ 131.

The Court will not consider Exhibit B, Evolent's Press Release entitled "Evolent Health Partner Passport Health Plan is Not Selected for Kentucky Managed Medicaid Contract," as it is not *expressly* referenced nor integral to Plaintiff's Second Amended Complaint.  *See* Dkt. 81-2; *see generally* Dkt. 69.

As for Exhibit C—Kentucky's Finance & Administration Cabinet's "Determination and Finding (D&F) Managed Care Organization(s) (MCO)," which sets forth the awards for a certain RFP—the Court finds that that exhibit is integral to and expressly referenced by Plaintiffs in their Second Amended Complaint and will be considered.  *Compare*, Dkt. Nos. 81, 2; 81-3, *with*, Dkt. 69, ¶ 130.  For the same reasons, the Court will consider the "Technical Proposal Evaluation" set forth in Exhibit D.  *See* Dkt. Nos. 81-4; 69, ¶ 130.

And as for Exhibit E, an exhibit also filed by Defendants, *see* Dkt. 76-33, the Court will consider that document for the reasons forth above (*supra*, p. 36-37).

The Court's rulings on Plaintiffs' exhibits are summarized in the following chart:

| Exhibit Number | Will the Court consider the exhibit in deciding the Motion to Dismiss? |
|---|---|
| A | YES |
| B | NO |
| C | YES |
| D | YES |
| E | YES |

B.   Whether Plaintiffs Have Stated a Plausible Claim for Relief

In their Second Amended Complaint, Plaintiffs set forth two claims.  Dkt. 69, ¶¶ 227-242. First, Plaintiffs allege that all Defendants violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240,10b-5 ("Claim One").  *Id.*  at ¶¶ 227-235.  15 U.S.C. § 78j(b) provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).  And more generally, 17 C.F.R. § 240.10b-5 sets forth that:

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Plaintiffs maintain that Defendants have violated these provisions because:

> [d]uring the Class Period, Defendants disseminated or approved [ ] [certain] false statements . . ., which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made . . . .

*Id*. at ¶ 229.

Second and relatedly, Plaintiffs claim that the Individual Defendants violated 15 U.S.C. § 78t(a) ("Claim Two").  *Id*. at ¶¶ 236-242.  15 U.S.C. § 78t(a) sets forth in pertinent part that:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  In support of their claim that Defendants violated this provision, Plaintiffs contend that "[d]uring their tenures as officers and/or directors of Evolent, each of the Individual Defendants was a controlling person of [ ] [Evolent.]" *Id*. at ¶¶ 238.  And in those capacities, the Individual Defendants "were able to and did control, directly and indirectly, the content of the public statements made by Evolent during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omission of material facts . . . ." *Id*.

In response to these claims, Defendants argue that both claims should be dismissed because Plaintiffs have not stated sufficient facts in support of them.  *See generally*, Dkt. Nos. 74; 75. Therefore, Defendants urge that Plaintiffs: (1) "fail[ ] to adequately allege any false or misleading statements[;]" (2) "fail to plead particularized facts supporting a strong inference of scienter[;]" (3) "fail to adequately plead loss causation[;]" and (4) "fail to adequately plead control-person liability." *See generally*, Dkt. 75.

Naturally, Plaintiffs maintain that they have pleaded sufficient facts in support of their claims.  *See generally*, Dkt. 80.

The Court will address each argument in turn.

### 1.   Claim One

#### a.   *Whether Plaintiffs Have Pleaded Sufficient Facts to Demonstrate that Defendants Made False and Misleading Statements*

The first reason that Defendants maintain that Plaintiffs' Second Amended Complaint should be dismissed is because Plaintiffs have failed to sufficiently plead facts that demonstrate that Defendants made material and misleading statements.  Dkt. 75, 15-27.  To this end, Defendants urge that the statements at issue cannot form the basis for a violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 as they: (1) constitute corporate puffery and are not actionable (*see* Dkt. 75, 15-17); (2) are forward-looking statements that are therefore not actionable pursuant to the PSLRA (*see id*. at 17-19); (3) are unsupported by sufficient facts that show that the statements were false at the time that they were made (*see id*. at 19-23); and (4) cannot be supported by the comments made by the CWs in the Second Amended Complaint given that the statements at issue fall outside of the scope of those CWs' personal knowledge (*see id*. at 24-27).

i.   Whether the Statements at Issue Constitute Corporate Puffery

In response to the statements set forth in the Second Amended Complaint that Plaintiffs deem as material and misleading, Defendants, relying primarily on out-of-circuit authority, contend that ten of those statements are corporate puffery and cannot form the basis of a violation under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  *See* Dkt. 76-1, 1-7.

In response, Plaintiffs take a holistic approach to oppose Defendants' corporate puffery arguments, and do not address each individual statement at issue.  Dkt. 80, 29-31.  To this end, Plaintiffs make two arguments as to all the statements that Defendants maintain constitute corporate puffery.  *Id.*

First, Plaintiffs generally allege that Defendants' statements do not constitute corporate puffery because "they concern[ ] the singular purpose of Evolent's business—to lower clinical and administrative costs for health plans—and because they concerned by far its largest and most important client, Passport."  *Id.* at 29 (citing *Willis v. Big Lots, Inc.*, No. 2:12-cv-006004, WL 8199124, at *7 (S.D. Ohio Jan. 21, 2016); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 595-96 (W.D. Tex. 2014); *Atlas v. Accredited Home Lenders Holding, Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617-18 (S.D.W. Va. 2012); *Plumbers & Pipefitters Nat'l Pen. Fund v. Davis*, No. 1:16-cv-03591, 2020 WL 1877821, at *10 (S.D.N.Y. Apr. 14, 2020)).  And Plaintiffs further argue that the significance of these statements concerning Evolent's purpose is magnified given the frequency with which Defendants made these assertions, and Defendant Blackley's representations about the importance of Evolent's purpose. Dkt. 80, 29-30.

Second, Plaintiffs reason that Defendants' corporate puffery argument fails because the statements at issue "were clearly 'capable of objective verification'" . . . –either Evolent 'lower[ed]

42

clinical and administrative costs' for Passport or it did not; either Evolent created 'bottom-line savings' for Passport, or it did not." *Id.* at 31 (citing *SEC v. Agora, Inc.*, No. MJG-03-1042, 2007 WL 9725170, at *5 n.5 (D. Md. Aug. 3, 2007); *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521, 2017 WL 3084274, at *11 (D. Or. June 27, 2017), *report and rec. adopted*, No. 3:16-cv-00521, 2017 WL 3610523 (D. Or. Aug. 22, 2017)).

As this Court has previously explained, "[r]epresentations about business dealings may be actionable when properly supported by facts demonstrating their falsity." *Carlucci*, 886 F. Supp. 2d at 522 (citing *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) (holding that representations that company was in negotiations with certain major companies were material and that "business dealings and prospects are not simply sales pitches but rather can be proven true or false-and, if properly supported, could be found material by a reasonable jury"); *Cook v. Mfg. Homes, Inc.*, 998 F.2d 1256, 1259 (4th Cir. 1993) (finding representations concerning business projects and contracts with an insurer actionable)).

However, "[i]ndefinite statements of corporate optimism, also known as 'puffery,' are generally non-actionable as they 'do not demonstrate falsity.'" *Carlucci*, 886 F. Supp. 2d at 522 (citations omitted). This Court has held that such statements are legally insufficient "when they are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* (citations and internal quotations omitted).

Indeed, the Fourth Circuit has explained that:

[a]nalysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.

*Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993).  Of course, this rule is necessary because "[p]redictions of future growth . . . will almost always prove to be wrong in hindsight." *Id.* at 290.

The 2016 and 2017 Evolent 10-Ks set forth that "[t]he solution [ ] [Evolent] offer[ed] [ ] [its] target market contemplates one strategic option—pursue clinical and technological integration to reduce utilization and total cost . . . ."  Dkt. Nos. 69, ¶¶ 136, 160; 76-29, 18; 76-10, 22.  This statement, contained in both of Evolent's 2016 and 2017 10Ks, is the first alleged material misstatement that Defendants argue is corporate puffery.  *See* Dkt. Nos. 76-1, 2; 75, 17.  Defendants argue this statement is "not specific enough to constitute a fraud on the market[,]" and the statement, when read in full, "warns investors that customers may choose to focus on lowering costs, so Evolent may lose business."  Dkt. 75, 17 (citing *Raab*, 4 F.3d at 289-90).

Indeed, the statement that "[t]he solution [ ] [Evolent] offer[ed] [ ] [its] target market contemplates one strategic option—pursue clinical and technological integration to reduce utilization and total cost . . . ." is one of corporate optimism, and therefore, is not actionable.  *See Carlucci*, 886 F. Supp. 2d at 522 (citations omitted).  This statement is clearly a "projection[ ] of future performance" and is "not worded as [a] guarantee[ ][.]"  *Raab*, 4 F.3d at 298-99.  These statements are more akin to a sales pitch than business dealings and prospects that may been deemed objectionably false.  *See Dunn*, 369 F.3d at 431.

The second alleged material misstatement that Defendants argue is corporate puffery is set forth in Evolent's 2016, 2017, and 2018 Form 10-Ks.  *See* Dkt. 69, ¶¶ 137, 161, 185.  Plaintiffs claim that the following statement is contained in each of those documents:

> [t]he partnership model enables cultural alignment, integration into the provide care delivery payment work flow, long-tern contractual relationships and a cycle of clinical and cost improvement with shared financial benefit.

> We have sought to partner with leading providers in sizable markets, which we believe creates a growth cycle that benefits from the secular transition to value-based care.  By helping these systems lower clinical and administrative costs, we believe we are positioning them to offer a low cost, effective care setting to payers, employers and consumers, which enables them to capture greater market share.  As providers have succeeded in lowering costs and growing market share, this enables them to increase their value-based offerings.  By virtue of our business model, we benefit from our partners' growth.

*Id*. at ¶¶ 137, 161 (emphasis omitted); *see also* Dkt. Nos. 69, 85; 76-10, 10; 76-11, 12; 76-29, 8.[4]

The Court finds that this statement is also one of "corporate optimism" that clearly constitutes the then-opinions of the speaker.  *See Carlucci*, 886 F. Supp. 2d at 522 (citations omitted); *Raab*, 4 F.3d 298-99.  Thus, to the extent that Plaintiffs rely on this statement in asserting its claims against Defendants, the Court finds that Plaintiffs' pleadings are deficient.[5]

Third, Defendants contend that Defendant Williams's statement during Evolent's May 9, 2017 earnings call is also corporate puffery that is not actionable.  *See* Dkt. 76-1, 2 (quoting Dkt. 69, ¶ 140).  Allegedly, Defendant Williams stated that:

> [i]n terms of growth to our existing partners, I am also excited about our work across the last year at Passport Health Plan in Kentucky.  Passport is a nationally recognized organization in Medicaid and we've been able to leverage its experience and strong provider network in combination with the Evolent platform to drive

---

[4] With the exception of the last sentence, this statement is contained in Evolent's 2016, 2017, and 2018 Form 10-Ks.  In the 2018 Form 10-K, the final sentence is slightly modified and provides that Evolent "benefit[s] from [ ] [its] partners' growth, and in certain cases, [ ] [Evolent] [] participate[s] alongside [ ] [its] partners through various risk-sharing arrangements, including loans, provisions of letters of credit, equity investments, insurance and capitation arrangements and other extensions of capital."  Dkt. 76-11, 12; *see also* 69, ¶ 185.  This modification does not take away from the fact that this statement on the whole is not actionable under the relevant authorities.

[5] This statement is also not actionable because it is forward-looking (*infra*, p. 51-53).  The thrust of this assertion a vague "projection of future economic performance."  *Marsh Group v. Prime Retail, Inc*., 46 Fed. App'x. 140, 146-47 (4th Cir. Aug. 30, 2002).  Indeed, this statement speaks of projections of "create[ing] [ ] growth[,]" "positioning [ ] [Evolent's clients] to offer" services at "a low cost[,]" and "enabl[ing] them to capture greater market share[.]"  Dkt. 69, 137, 161 (emphasis omitted).

> greater efficiency and to improve quality of care across the [Plan's] large and
> diverse population.

Dkt. 69, ¶ 140.  This too is corporate puffery because the statement on the whole is vague and is

clearly the perspective of the speaker.  Here, Defendant Williams shares with the listener his

reasons as to why he was "excited about [ ] [Evolent's] work across the last year at Passport[,]"

and in his view, he felt that Evolent's platform "dr[o]ve greater efficiency" and "improved quality

of care."  *Id*.  These are not the kinds of facts and data which the Fourth Circuit has described that

analysts rely upon, *see Raab*, 4 F.3d at 289-90, and therefore, the Court finds that Plaintiffs have

not pleaded sufficient facts to demonstrate that this statement is actionable under the relevant

authorities.

The fourth statement that Defendants argue is corporate puffery is contained across various

Evolent 10-Qs from 2017 and 2018.  *See* Dkt. Nos. 76-1, 3; 69, ¶¶ 141, 149, 155, 165, 172, 16.

Therein, Evolent has set forth that its:

> [s]ervices include providing to [ ] [its] customers, . . . with a population
> management platform, integrated data and analytics capabilities, pharmacy benefit
> management ("PBM") services and comprehensive health plan administration
> services.  Together these services enable health systems to manage patient health
> in a more cost-effective manner.

Dkt. 69, ¶¶ 141, 149, 155, 165, 172, 176 (emphasis omitted).

It is of no matter that the first of these two sentences is not corporate puffery, *see Carlucci*,

886 F. Supp. 2d at 522, because that phrase apparently is not the portion of the statement above

with which Plaintiffs take issue.

The second sentence, which apparently is the one with which Plaintiffs take issue, *see* Dkt.

69, ¶¶ 142, 150, 156, 166, 173, 177, is indeed corporate puffery.  This statement is generically

optimistic in nature and is "not worded as a guarantee."  *Carlucci*, 886 F. Supp. 2d at 522; *Raab*,

4 F.3d at 298-99.  The use of the word "enable" suggests that there is a potential that Evolent's

services would allow "health systems to manage patient health in a more cost-effective manner[,]" but does not state those expectations with certainty. Accordingly, the Court finds that Plaintiffs have not stated sufficient facts to demonstrate that this statement is a material misstatement.

The fifth set of statements that Defendants argue are corporate puffery were purportedly made by Defendant Williams during a November 2, 2017 earnings call. *See* Dkt. Nos. 76-1, 4; 69, ¶ 152. According to the facts set forth within the Second Amended Complaint, during that call, Defendant Williams stated that Evolent "successfully launched Passport . . . onto [ ] [its] [Valence] platform[;]" and that Evolent "teams continue[d] to monitor [Valence's] operations closely and report[ed] a smooth transition." Dkt. 69, ¶ 152. Plaintiffs also allege that Defendant Williams said that transitioning to Valence would "provide a differentiated and more efficient service" for Passport and "create value for Passport unmatched by a traditional vendor client relationship[.]" *Id.* Also, in this set of statements, Plaintiffs set forth that Defendant Williams indicated that:

> [a]s a reminder, [ ] [Evolent] made this decision [to process claims for Passport using Valence] together for several reasons. First, [ ] [Evolent] wanted to provide a higher level of service for Passport members and providers. By integrating [ ] [Evolent's] clinical and administrative platforms, [ ] [Evolent would] be able to provide a differentiated and more efficient service for [ ] [its] members. Second, [ ] [Evolent] recognize[d] the opportunity to expand the depth of [ ] [its] strategic alliance, leveraging best practices from both entities to create value for Passport unmatched by a traditional vendor client relationship.
>
> * * *
>
> To ensure a seamless transition for providers and plan members, teams continue to monitor operations closely and report[ed] a smooth transition. In the months since go live, over 1.6 million enrolment transactions have been completed as [ ] [Evolent] onboard[ed] more than 300,000 Passport Health Plan members across the quarter.

*Id*. (emphasis omitted).[6]

The Court finds that the majority of this fifth set of statements constitutes corporate puffery that is not actionable under the applicable authority.  Whether Valence's launch at Passport was "smooth" or "successful" are subjective descriptions that are vague, so lacking in specificity, [that they]  clearly constitute[e] the opinion[ ] of" Defendant Williams such that a reasonable investor would not rely upon those assertions.  *See Carlucci*, 886 F. Supp. 2d at 522.  And to the extent that Plaintiffs maintain that Defendant Williams is liable for his projections that Valence would "provide a differentiated and more efficient service" for Passport and "create value for Passport unmatched by a traditional vendor client relationship[,]" the Court finds that those statements are also not actionable.  This is so because based upon the facts pleaded in the Second Amended Complaint, those assertions appear to have been "projections of future performance not worded as guarantees," which "will almost always prove to be wrong in hindsight."  *Raab*, 4 F.3d at 289-90.  Defendant Williams's assertion that "over 1.6 million enrolment transactions ha[d]" at that point, "been completed as [ ][Evolent] onboard[ed] more than 300,000 Passport Health Plan members across the quarter" is not corporate puffery, but Plaintiffs do not expressly maintain that that those statistics were false.[7]  *See* Dkt. 69, ¶ 153-54.

---

[6] Defendants dispute the accuracy of this statement.  *See* Dkt. 76-1, 4.  However, at this stage in the litigation, the Court will accept all facts set forth in the Second Amended Complaint as true.

Also, Defendants expand this quotation beyond what is quoted by Plaintiffs in the Second Amended Complaint.  *See* Dkt. 76-1, 4.  At the 12(b)(6) procedural posture, the Court's objective is to test the sufficiency of the facts alleged in a plaintiff's pleadings, and as such, there is a general rule against considering evidence extrinsic to a plaintiff's complaint.  Accordingly, this Court will not consider the additional comments that Defendants allege Defendant Williams made during the November 2, 2017 investor conference call.

[7] The Court also finds that this statement when read together, is forward-looking within the meaning set forth by the PSLRA.  The Court observes that Defendant Williams's use of mixed

Sixth, Defendants argue that certain statements that Defendant Williams made during Evolent's February 27, 2018 earnings call are also corporate puffery. *See* Dkt. 76-1, 5. During that call, Defendant Williams described that Evolent's services for Passport were going "incredibly well," and that Evolent's services had been allowing its clients to "get to a higher level of performance." Dkt. 69, ¶ 158. Also, Plaintiffs allege that during that call, Defendant Williams said that the:

> past year was also important in terms of integrating Valence into [ ] [Evolent's] broader health plan services offering and successfully scaling the organization with several large clients [including Passport] coming in across the year. While [ ] [Evolent] still ha[d] work to do in fulfilling [ ] [its] long-term vision, the integration [ ] [was] going incredibly well and the Valence platform ha[d] enhanced [ ] [Evolent's] differentiation significantly in the marketplace.

> * * *

> Lastly, with the integration of Valence and Aldera into [ ] [Evolent's] health plan services platform, [ ] [Evolent was] seeing strong success providing services to existing and larger scale provider-owned health plans. The integration of the back-office claims and network management system . . . [ ][was] highly differentiated in the market, and these organizations get to a higher level of performance in a more demanding market.

Dkt. 69, ¶ 158 (emphasis omitted). These statements are clearly Defendant Williams's perspective, and are so vague "that no reasonable investor could find them important to the total mix of information available." *Carlucci*, 886 F. Supp. 2d at 522.

The seventh set of statements that Defendants maintain are corporate puffery were also alleged to have been made by Defendant Williams during a May 9, 2018 earnings call. *See* Dkt.

---

tenses to some degree, muddles the clarity of whether the statement is indeed forward-looking from a grammatical perspective. Nevertheless, reading the statement holistically, the Court finds the assertion is legally forward-looking. Indeed, Defendant Williams spoke of what Evolent *would* "be able to provide" and the "*opportunity* to expand the depth of [ ] [Evolent's] strategic alliance[.]" Dkt. 69, ¶ 152 (emphasis added). As such, the Court find this statement to be a vague and immaterial "forward-looking projection[ ] of future dividends." *Marsh Group*, 46 Fed. App'x at 146-47.

69, ¶ 164.  Plaintiffs claim that during that call, Defendant Williams said that Evolent provided "a cost-effective infrastructure that integrate[d] clinical and administrative functions under one roof, and allow[ed] [ ] [its] provider partners to leverage the benefits of integration in driving performance."  *Id*. (emphasis omitted).  Also, Plaintiffs allege that Defendant Williams told investors that Evolent had "been driving efficiency and operational scale within [ ] [its] Medicaid business." *Id*. (emphasis omitted).  These statements simply do not read as guarantees but instead read as aspirational objectives related to what Evolent was designed to do.  Based on the facts pleaded in the Second Amended Complaint, this statement is so vague "that no reasonable investor could find them important to the total mix of information available."  *Carlucci*, 886 F. Supp. 2d at 522.  Thus, the Court finds that this set of alleged misstatements is also not actionable.

The eighth set of statements that Defendants argue is corporate puffery were also made by Defendant Williams.  *See* Dkt. 76-1.  Plaintiffs provide that on May 11, 2018, during Evolent's Investor and Analyst Day, Defendant Williams described that Passport was a "good example" of the manner by which Evolent helped its partners to "get a lot of savings" and that Evolent was "really important in terms of helping economics."  Dkt. 69, ¶ 167.  The Court finds that this set of statements, as set forth in the Second Amended Complaint, is also corporate puffery because the statements are so ambiguous and are so clearly Defendant Williams's opinion that "no reasonable investor" could find these statements "important to the total mix of information available." *Carlucci*, 886 F. Supp. 2d at 522.

The ninth set of statements that Defendants urge are corporate puffery were made by Defendant Williams during an August 7, 2018 investor call.  *See* Dkt. 76-1, 6.  Plaintiffs allege that on that call, Defendant Williams described Evolent's platform as "differentiated," and "highly

50

integrated," and therefore,  Evolent was able "to standardize and reduce costs in many areas" and "drive some impressive[,] consistent results for [ ] [its] partners."  Dkt. 69, ¶ 171.

The tenth and final set of statements that Defendants argue constitute corporate puffery were made during the same call allegedly by Defendant McGrane.[8]  *Id*.  Plaintiffs claim that Defendant McGrane said that Evolent was "conservative in how [ ] [it was] building infrastructure to make sure [ ] [it was] managing cost[s] well."  *Id*.

Again, Defendant Williams's and Defendant McGrane's statements are clearly their opinions, and the Court finds that their statements were so vague "that no reasonable investor" could find these statements "important to the total mix of information available."  *Carlucci*, 886 F. Supp. 2d at 522.  Accordingly, the Court finds that these statements are not actionable under the statutes at issue.

### ii.   Whether Certain Statements are "Forward-Looking"

Defendants also maintain that "[m]any of the allegedly false statements identified in the [ ] [Second Amended Complaint] are not actionable because they are forward-looking projections that were properly accompanied by risk warnings."  Dkt. 75, 18.  Defendants identify five alleged misstatements that they maintain are impermissibly forward-looking.   *See* Dkt. 76-1, 2-8. Defendants have also identified two of these statements as corporate puffery, (*supra*, p. 45, n.5; p. 48 n.7) and the Court has addressed its findings concerning whether these statements are also forward-looking.   Therefore, in this section, the Court will only address the three remaining statements.

---

[8] Defendants argue that this set of statements were actually made by Defendant Williams as opposed to Defendant McGrane, as Plaintiffs allege.  *See* Dkt. 76-1, 6.  At the 12(b)(6) stage of litigation, the Court accepts all facts contained within the Second Amended Complaint as true, and still, in this instance, irrespective of which of the Defendants was the speaker, the Court finds that the substance of the statement constitutes corporate puffery.

In response to the Defendants' arguments in this respect, Plaintiffs respond that the statements contained in the Second Amended Complaint are not forward-looking because they "concerned the then-current state of affairs—*i.e.*, whether a buyout was 'currently being evaluated' or was in Evolent's 'strategic lens at this point.'"  Dkt. 80, 27 (emphasis omitted).

The PSLRA sets forth in relevant part that

> in any private action . . . that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not be held liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—(A) the forward-looking statement is—(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement—(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or (ii) if made by a business entity; was—(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).   Further, the PSLRA defines a "forward-looking statement" as being at least one of the following: (1) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;" (4) "any statement of the assumptions underlying or relating to any statement described" in the first three points; (5) "any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or" (6) "a statement containing a projection or

estimate of such other items as may be specified by rule or regulation of the Commission."  15 U.S.C. § 78u-5 (h)(i)(1).

Considering these provisions, the Fourth Circuit has recognized that "[a]ll projections can be characterized as presently held beliefs[,]" but that "statements are forward-looking" when "they relate to 'future economic performance.'"  *See Marsh Group v. Prime Retail, Inc.*, 46 Fed. App'x 140, 146-47 (4th Cir. 2002) (quoting 15 U.S.C. § 78u-5(i)(1)(C)).  And where statements meet that criteria, those "allegedly false statements . . . are immaterial as a matter of law."  *Marsh Group*, 46 Fed. App'x at 146-47.

First, Defendants argue that certain statements that Defendant Williams made on a February 26, 2019 investor conference call are "forward-looking statements."  Dkt. 76-1.  During the call, Defendant Williams indicated that Evolent was "not focused on outright majority ownership of health plans[,]" that there was "no big change in strategy based on what [ ] [Evolent] saw happening with Passport specifically,"  and that Evolent would have to acquire Passport.  Dkt. 69, ¶ 182.  While these statements may be characterized as then-"presently held beliefs," they also "relate to 'future economic performance.'"  *Marsh*, 46 Fed. App'x at 146-47 ((quoting 15 U.S.C. § 78u-5(i)(1)(C)).

However, it is as simple as coming to the conclusion that a statement be merely forward-looking in order for a defendant to be shielded from liability.  *See* 15 U.S.C. § 78u-5(c)(1).  For present purposes, the statement must also be either immaterial or "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *See id.*

Based on the facts pleaded in the Second Amended Complaint, considered in a light most favorable to the Plaintiff, it is not clear that Defendant Williams's statement was immaterial.  And

Defendants point to the context in which Defendant Williams made his statements to denote that the assertions at issue were accompanied by such "meaningful cautionary statements." *See* Dkt. Nos. 75, 18 ("Moreover, that earnings call began with a warning that the 'call contain[ed] forward-looking statements' and direct[ed] listeners to find full warnings in Evolent's SEC filings, on Evolent's investor page, and the press release issued that day."); 67-1, 7 (providing statements in addition to those included in the Second Amended Complaint). Yet, at this stage of the proceedings, the Court cannot consider these additional statements as those are facts that have not been pleaded in the Second Amended Complaint and are not otherwise reviewable. Accordingly, the Court finds that this statement is not forward-looking, and based on the arguments presented, is actionable.

Second, Defendants argue that Defendant Williams's responses to certain questions posed during the February 26, 2019 investor conference call are also forward-looking. Dkt. 76-1, 8. In the Second Amended Complaint, Plaintiffs allege that the following transpired on that call:

> Still concerned that Evolent would wind up having to bail out Passport, a Citigroup analyst asked Williams outright: "[o]n the Passport side, is there any balance sheet risk if [ ] [Passport] were to go insolvent? Or put another way, have your joint investment efforts of Passport given you any exposure in a tail event…?" [Defendant] Williams [ ] responded unequivocally: "No. No, we don't have any broader exposure." The Citigroup analyst sought specific assurances that Evolent was not planning to bail out Passport: "[i]f there was a tail event for Passport, and given the importance of scale on your business, what would prevent you from potentially acquiring some of their assets, if not the whole business?" Significantly, [Defendant] Williams again flatly dismissed the possibility that Evolent had any intention of acquiring or bailing out Passport, insisting instead that such a transaction was "not in [ ] [Evolent's] strategic lens at this point" and specifically that, "related to Passport that's not something that is currently being evaluated": "Again, it's pretty hard to speculate on that. I don't think we've thought about acquiring a full Medicaid plan. It's just not in our strategic lens at this point. Again, in certain situations, we've talked about co-ownership models where we might have a minority stake in something, but related to Passport that's not something that is currently being evaluated."

Dkt. 69, ¶ 183.

This second set of statements, like the first (*supra*, p. 53-54), concern "'future economic performance.'"  *Marsh*, 46 Fed. App'x at 146-47 ((quoting 15 U.S.C. § 78u-5(i)(1)(C)).  Still, as with the first set of statements, it is not clear that this set of statements is immaterial.  And this second set of statements presents a more interesting question of whether Defendant Williams's assertions were "accompanied by meaningful cautionary statements" as Defendant Williams's comments were couched in conditional phrases such as "it's pretty hard to speculate on that."  However, 15 U.S.C. § 78u-5(i)(1)(C)(1)(A)(i) more specifically requires that to be protected, the statement at issue must "identify[ ] *important factors* that could cause actual results to differ materially from those in the forward-looking statement[.]"  (emphasis added).  Here, despite using more vague cautionary language, Defendant Williams does not identify such important factors.  Accordingly, the Court finds that this statement is actionable.

The third and final set of statements that Defendants maintain requires dismissal solely because the statement is forward-looking is set forth in paragraph 188 of Plaintiffs' Second Amended Complaint.  Dkt. 76-1, 8.  Therein, Plaintiffs indicate that on a May 7, 2019 investor conference call, Defendant Williams: "attempted to assuage Passport-related bailout concerns by assuring investors that 'Passport [ ] [was] making solid progress towards improving its financial performance[.]'"  Dkt. 69, ¶ 188.  Allegedly, Defendant Williams further indicated that Evolent was then:

> "pursuing several major initiatives in close collaboration with the Passport leadership team[.]
>
> * * *
>
> Based on these initiatives and given the strength of its clinical model, [ ] [Evolent] believe[d] that Passport [ ] [was] making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members.  Overall, [ ] [Evolent] remain[ed] hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to

> strengthen the balance sheet [ ] [would] provide a path for Passport to be successful
> long term in the Kentucky Medicaid market."

*Id*.  Based on the facts in the Second Amended Complaint, this statement seems to have been about Evolent's and Defendant Williams's projections for Passport's future financial performance, and thus could be considered forward-looking.  However, it is not clear that the statement is immaterial.  And in the Second Amended Complaint, Plaintiffs do not indicate that Defendant Williams's statements were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1).  Accordingly, this statement survives Defendants' 12(b)(6) attack.

### iii.  Whether Plaintiffs Have Pleaded Certain Statements as False

Defendants also contend that "Plaintiffs [ ] [have] not plead specific facts showing that [ ] [certain] challenged statements were false when made."  Dkt. Nos. 75, 19-23; 76-1, 3, 4, 7.  Instead, Defendants argue that it is Plaintiffs' position that "Passport's later financial problems mean that Evolent's earlier, positive statements were necessarily false."  Dkt. 75, 19.  Defendants urge that this is impermissible because "[t]hese generalized, fraud-by-hindsight assertions do not satisfy the PSLRA's and Rule 9(b)'s heightened pleading standards."  *Id*.

Plaintiffs generally counter that they sufficiently pleaded that Defendants made statements about Evolent's ability to lower clinical and administrative costs, statements concerning Valence, and statements about their bailout and acquisition of Passport, all of which were contemporaneously false.  Dkt. 80, 19-38.

It is well established that, "[m]ere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b).'"  *Hillson Partners, Ltd. P'Ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) (quoting *Borow v. nVIEW Corp.*, 829 F. Supp. 828, 833 (E.D. Va. 1993), *aff'd mem.*, 27 F.3d 562 (1994)) (additional citations omitted).

Defendants argue that Plaintiffs have not pleaded sufficient facts to show that Defendant Wigginton's statements during Evolent's May 11, 2017 Investor and Analyst Day Conference were false when stated.  Dkt. 76-1, 3.  In the Second Amended Complaint, Plaintiffs plead that at that conference, Defendant Wigginton indicated that "the 'integration process with the Valence health team ha[d] proceeded at or above [ ] [Evolent's] expectations' and that Evolent was 'really creating a seamless, highly integrated infrastructure' by combining Valence's services with [Evolent's] other service offerings."  Dkt. 69, ¶ 145.  Also, Plaintiffs aver that at the same conference, Defendant Spencer indicated that "Passport had done 'a lot of due diligence' on Valence and had 'made sure that everything was working the way [ ] [Evolent and Passport] want[ed] it to' before deciding to transition to Valence."  *Id*. at ¶ 146.  Plaintiffs' position is that these statements were "materially false and misleading" because, based on CWs 2, 3, 4 and 5's assertions, "Defendant's knew well before the scheduled October 1, 2017 go-live date that" these remarks were not true.  *Id*. at ¶ 147.  Thus, Plaintiffs make the point that Defendants had the wherewithal on May 11, 2017, to know that their statements at that time would prove false on October 1, 2017.  *See id*.

The Court finds that even if CWs 2, 3, 4, and 5 had the foresight to know that Valence's integration at Passport would not prove successful on October 1, 2017, that does not necessarily render Defendants Wigginton's and Spencer's May 11, 2017 opinions false.  And to the extent that Plaintiffs rely on what happened on or after the October 1, 2017 "go-live" date as an indication that Defendant Wigginton's and Spencer's statements were false, the Court finds that from the factual predicate Plaintiffs allege, such reliance is impermissible fraud by hindsight.  *See Hillson Partners*, 42 F.3d at 209.

Defendants also maintain that Plaintiffs have not pleaded facts to demonstrate that the statements attributed to Evolent in the *Insider Louisville* article were false when made.  *See* Dkt. 76-1, 7.  In the Second Amended Complaint, Plaintiffs plead that:

> Specifically, the *Insider Louisville* article reported [that]: Evolent told *Insider* via email that the "majority of the fees Passport pa[id] to Evolent [ ] [were] directly tied to local staff—at cost—as well as (insurance claims processing) and pharmacy benefit services at a lower per member cost than prior periods."  [ ] [Evolent] said it ha[d] "hundreds of employees supporting Passport" and that "the number of employees ha[d] increased in line with the increases in scope of [ ] [its] partnership with Passport" and that "the number of our employees in Louisville exceed[ed] [ ] [its] original projection."   However, [ ] [Evolent] did not provide details."

Dkt. 69, ¶ 179 (emphasis omitted).  As set forth in paragraph 180 of the Second Amended Complaint, at this stage of the litigation, the Court finds that Plaintiffs have pleaded sufficient facts to demonstrate that the statements attributed to Evolent in the *Insider Louisville* article were false when made.  *See id*. at ¶¶ 179-80.

Finally, Defendants maintain that Plaintiffs have not sufficiently pleaded that Defendant Williams's statements at the September 5, 2018 Wells Fargo Health Care Conference were false when made.  *See* Dkt. 76-1, 7.  In the Second Amended Complaint, Plaintiffs set forth that during that conference, "Defendant Williams expressly stated: '[i]n [Passport's] own plan, [ ] [Evolent] believe [ ] [that it had] helped to generate over $100 million in savings, which was highly valuable to that organization.'"  Dkt. 69, ¶ 175.  At this stage in the proceedings, the Court finds that based upon the allegations contained in paragraph 177 of the Second Amended Complaint, Plaintiffs have pleaded sufficient facts to show that Defendant Williams's statements at the September 5, 2018 Wells Fargo Health Care Conference were false when made.  *See* Dkt. 69, ¶ 177.

iv.   The Surviving Alleged Misstatements

In sum, for the reasons set forth above (*supra*, p. 41-58), the Court finds that Plaintiffs have failed to plead sufficient facts to demonstrate that Defendants made false and misleading statements except as to the following four statements.

First, Plaintiffs have pleaded sufficient facts as to Defendant Williams's alleged misstatements at the 2018 Wells Fargo Healthcare Conference.  *See* Dkt. 69, ¶ 175.  Second, Plaintiffs' allegations as to the statements attributed to Evolent in the *Insider Louisville* article are sufficient.  *Id*. at ¶¶ 178-79.  Third, Plaintiffs' pleadings as to Defendant Williams's statements on the February 26, 2019 investor conference call are sufficient.  *Id*. at ¶ 183.  Fourth and finally, the allegations concerning Defendant Williams's remarks on the May 7, 2019 investor conference call are adequately pleaded.  *Id*. at ¶ 187-88.

The Second Amended Complaint is DISMISSED as to all other alleged misstatements for failure to state a claim.

b.   Whether Plaintiffs Have Pleaded Sufficient Facts in Support of Scienter

Defendants argue that Plaintiffs have also failed to plead sufficient facts to support a finding of scienter as to the alleged misstatements contained within the Second Amended Complaint.  *See* Dkt. Nos. 75, 27-35; 76-1, 1-7.  First, Defendants maintain that "Plaintiffs have not alleged facts establishing a motive to commit fraud because they have not alleged 'concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged.'"  *Id*. at 27-28 (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003)) (also citing *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000); *Mun. Emps.' Sys of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 436 (5th Cir. 2019)).  Second, Defendants argue that the Individual Defendants' executive positions do not establish a strong inference of scienter.

Dkt. 75, 28-29.  Third, Defendants point out that while "Plaintiffs rely heavily on the CWs" in the Second Amended Complaint, "the information attributed to them is insufficient to establish a strong inference of scienter."  Dkt. 75, 29-34.  Fourth, Defendants argue that Evolent's acquisition of Passport does not raise a strong inference of scienter.  *Id*. at 34-35.

In response, Plaintiffs urge that they have pleaded sufficient facts to establish the requisite inference of scienter.  *See* Dkt. 80, 31-38.  To this end, they argue that the facts contained in the Second Amended Complaint "'constitute circumstantial evidence of either reckless or conscious behavior'" for four discrete reasons.  *Id*. (quoting *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015)).   First, Plaintiffs contend that because they have pleaded facts that demonstrate that the Individual Defendants "meticulously monitored all aspects of Passport's performance[,]" they have established the requisite scienter.  Dkt. 80, 32-33 (citing *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015); *In re Computer Sci. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012); *Kiken*, 155 F. Supp. 3d at 607; *KBC Asset Mgmt. NV v. 3d Sys. Corp.*, No. 0:15-cv-02393, 2016 WL 3981236, at * 9 (D.S.C. July 25, 2016)).  Second, Plaintiffs argue that "the monthly deficiency letters imposing nearly half a billion dollars of penalties on Passport are compelling evidence of scienter."  Dkt. 80, 33 (citing *SEC v. Pirate Inv'r, LLC*, 580 F.3 233, 243 (4th Cir. 2009)).   Third, Plaintiffs reason that they have established scienter because they have pleaded that "multiple former high-level [Passport] employees . . . have provided independent, consistent, and corroborating accounts establishing that Defendants knew that Evolent caused Passport's rapidly ballooning costs and forced the faulty implementation of the flawed Valence platform onto Passport."  Dkt. 80, 33-37 (citing *Black v Martek Biosciences Corp.*, No. MJG-05-1224, 2006 WL 8435572, at * 5 n.13 (D. Md. June 14, 2006).  Fourth and finally, Plaintiffs argue that they have pleaded sufficient facts in support of

scienter because they have asserted that "Defendants' false and misleading statements concerned the strategy upon which Evolent's entire business was predicated –Evolent's ability to cut clinical and administrative costs for its partners."  Dkt. 80, 37-38 (citing *Genworth*, 103 F. Supp. 3d at 784; *Kiken*, 155 F. Supp. 3d at 606; *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014)).

The Fourth Circuit has held that "[t]o establish scienter, . . . a plaintiff must prove that the 'defendant[s] acted with a mental state embracing intent to deceive, manipulate, or defraud.'" *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546-47 (4th Cir. 2017) (quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 974, 884 (4th Cir. 2014) (third level quotation omitted)). But, at the 12(b)(6) phase of litigation, it is sufficient that plaintiffs allege "'either intentional or severely reckless conduct[.]'" *Id.*  In this context, the Fourth Circuit has defined recklessness as "'an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff.'" *Maguire Fin., LP*, 876 F.3d at 547 (quoting *Ottmann*, 353 F.3d at 343 (third level quotation omitted)).  And in turn, the appellate court has opined that "sever[e] reckless[ness]" is "in essence, 'a slightly lesser species of intentional misconduct.'"  *Maguire Fin., LP*, 876 F.3d at 547 (quoting *Ottmann*, 353 F.3d at 343 (third level quotation omitted)).  District courts are to determine "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Maguire Fin., LP*, 876 F.3d at 547 (emphasis in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).  Indeed, to survive a motion to dismiss, "'the inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations.'" *Maguire Fin., LP*, 876 F.3d at 547 (emphasis in original) (quoting *Tellabs, Inc.*, 551 U.S. 308, 324 (2007)).

Turning to Defendants' first argument—that Plaintiffs have failed to plead sufficient facts in support of scienter because the motive to defraud investors is lacking—the Court finds *Ottmann v. Hanger Orthopedic Grp., Inc.*, instructive.  353 F.3d 338, 352 (4th Cir. 2003).  In *Ottmann*, the Fourth Circuit considered "a series of allegations that . . . relate[d] to possible financial motives to misrepresent [ ] [a company's] financial situation, such as maintaining positive relationships with creditors, avoiding additional interest payments, and promoting future acquisition."  353 F.3d at 352.  In considering such motives, the Court rejected those allegations as establishing scienter and observed that "courts have repeatedly rejected these types of generalized motives—which are shared by all companies—as insufficient to plead scienter under the PSLRA."  *Ottmann*, 353 F.3d at 352.  Further, the court reiterated its previous holding that "'[i]n order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged.  Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement.'"  *Id.*  (quoting *Phillips v. LCI Intern., Inc.*, 190 F. 3d 609, 620 (4th Cir. 1999)); *see also Pier 1 Imports, Inc.*, 935 F. 3d at 436 (finding no strong inference of scienter where investors made the "self-defeating" argument that required them to allege "both that [ ] [a company] said that all of its inventory [ ] [was] subject to markdown risk if not sold quickly (to characterize [ ] [that company] as a trend-driven business) and, in the same breath, that [ ] [the same company] did not say that (to make an allegation of fraud). . . .  And the investors ha[d] not explained why [ ] [the company's] executives kept ordering more inventory when they supposedly knew deep down that they would not be able to sell it").

Here, Plaintiffs argue that based on the facts pleaded in the Second Amended Complaint, Evolent's motive to engage in fraud is inconsequential where Plaintiffs have pleaded that as a result of the allegedly fraudulent misstatements, Evolent was required to "inject $70 million into

'a massive and cash-draining emergency bailout' of Passport's business."  Dkt. 75, 27 (quoting

Dkt. 69, ¶ 11).   Plaintiffs address this point in a footnote of their Opposition brief, arguing that:

> [a]s the Supreme Court has explained, however, there is no need to plead a motive
> to commit securities fraud.  *Tellabs*, 551 U.S. at 325.  Moreover, this argument
> ignores CW 5's unambiguous account that Passport was Evolent's "cash cow"
> (¶107)—particularly given that it contributed about 20% of Evolent's revenues ¶41.
> Indeed, Evolent was highly motivated to extract every single dollar of revenue that
> it could from Passport, a company which it boasted it owned and controlled, which
> is precisely why it "rebadged" 70% of Passport's employees and markedly
> increased its expenses.

Dkt. 80, 38 n.30.

Plaintiffs' position does not fully appreciate the Supreme Court's holding as to motive in

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007), and Plaintiffs seem to

misapprehend Defendants' point as to the competing motives as alleged in this case.  In *Tellabs*,

the Supreme Court specifically provided that "[w]hile it is true that motive *can* be a relevant

consideration, and personal financial gain *may weigh heavily in favor* of a scienter inference, we

agree with the Seventh Circuit that the absence of a motive allegation is not fatal." 551 U.S. at 325

(emphasis added).  In other words, while a lack of motive can compromise a plaintiff's ability to

establish scienter, depending on the circumstances of the case, that blow need not be fatal.  *Id.*

And here, the Court is persuaded by Defendants' argument that the facts in the Second Amended

Complaint suggest Defendants lacked a motive to intentionally subject Passport to increased costs.

If it is true, as Plaintiffs assert, that Evolent was effectively co-owner of Passport, *see, e.g.*, Dkt.

69, ¶¶ 42-43, 125, and if it is true that Passport's success informed Evolent's success in the manner

that Plaintiffs allege, then Defendants would not have a motive to run Passport into the ground, as

Plaintiffs contend that Defendants did.  While this Court does not view this particular lack of

motive as fatal to Plaintiffs' scienter claim, the Court does take this factor into consideration in

determining whether the Second Amended Complaint on the whole establishes the requisite scienter at the 12(b)(6) stage.

Accordingly, this Court turns to Defendants' second argument concerning scienter—that the Individual Defendants' executive positions do not establish a strong inference of scienter.  Dkt. 75, 28-29.  The Fourth Circuit has held that "[t]he presence of 'red flags,' coupled with the 'breadth and gravity' of a company's problems, may provide 'substantial weight' to an inference that high level corporate agents 'must have been aware of [certain] [ ] problems.'"  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 888 (4th Cir. 2014) (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183-85 (4th Cir. 2009)).  "The more significant the error the stronger the inference it supports."  *Yates*, 744 F.3d at 888-89 (finding no strong inference of scienter and rejecting plaintiffs' argument that "[b]ecause the[ ] defendants were directly responsible for [ ] [a] [c]ompany's financial statements. . . they must have known, or recklessly failed to realize, that the Company was not in compliance with" a certain requirement, where an error was not "especially obvious" and "the practical effect of proper consolidation on [ ] [a] [c]ompany's financial statements was relatively small") (citing *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 3d 474, 488-89 (S.D.N.Y. 2004) ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter.")).

In some instances, a defendant's "self-proclaimed personal involvement" may give rise to a strong inference of scienter.  *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015).  Yet, "holding an executive position alone does not necessarily lead one to infer that" such executives "knew that the alleged omissions were false or misleading."  *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,  432 F. Supp. 2d 571, 592 (E.D. Va. 2006) (finding

64

no strong inference of scienter where plaintiff alleged that the defendants, "by virtue of their corporate position[s], 'had access to internal corporate documents [and] conversations and connections with other corporate officers and employees'"). And "[w]hen plaintiffs also name individual defendants, they must, of course, allege facts that support a strong inference that *each* [individual] defendant acted with at least recklessness in making the false statement." *Matrix Capital Mgmt. Fund, LP*, 576 F.3d at 190 (emphasis in original) (internal quotations and citations omitted).

Here, Plaintiffs argue that they have supported a scienter claim as to the Individual Defendants beyond their mere roles as Evolent executives. *See* Dkt. 80, 32-38. In support of their argument that scienter has been established as to all of the Individual Defendants, Plaintiffs point to Defendant Williams's statements concerning Evolent's governing role in the Evolent-Passport relationship. *Id*. at 32. Plaintiffs claim that "[t]hese statements are dispositive as to Defendants' scienter," because "one cannot claim to be an 'owner' of a business who 'drives the decisions that . . . are important' . . . and then turn around and pretend not to be knowledgeable about" that business's operations. *Id*.

The Court finds that although "it cannot be concluded that [the Individual] Defendants acted intentionally or recklessly on this fact alone," Plaintiffs allegations concerning the Individual Defendants' executive positions and Evolent's governing role at Passport, "is certainly relevant to the Court's holistic [scienter] analysis." *Genworth*, 103 F. Supp. 3d at 784.

And the importance of these allegations is augmented by Plaintiffs' contention that Defendants received "the monthly deficiency letters imposing nearly half a billion dollars of penalties" on Passport. Dkt. 80, 33. Plaintiffs describe that the penalty letters "documented Valence's inability to execute its most basic function—submitting accurate and timely encounter

data to Kentucky." *Id*.  It appears that at least two of these letters were addressed to an individual named Mark Carter, Passport's then-CEO, from Cindy Arflack, Kentucky's then-Director for the Department of Medicaid Services' Division for Quality Control.  *See* Dkt. Nos. 76-21; 76-22.  To this end, in the Second Amended Complaint, Plaintiffs assert that CW 5, indicated that these letters "absolutely were" sent to Evolent's executives and that "Evolent agreed to foot the bill" for at least some of the penalties.  Dkt. 69, ¶ 100.  At this 12(b)(6) phase, the Court accepts these representations as true, and construes these facts set forth in the Second Amended Complaint in the light most favorable to Plaintiffs.  Thus, it does not appear that Plaintiffs' rely *solely* on the Individual Defendants' corporate positions to prove scienter.  Indeed, Plaintiffs have pleaded additional facts in support of scienter.

Still, Defendants argue that the Court should disregard the CWs' accounts of circumstances attendant with this case because "CWs 1-4 do not allege any direct interaction with any Individual Defendant," and "CW5 is the only CW that alleges some interaction with one Individual Defendant"—Defendant Williams.  Dkt. 75, 29, 31.  At this juncture, the Court finds that the Plaintiffs have pleaded facts with particularity that demonstrate that the CWs would have had knowledge of the matters on which they spoke.  For example, in the Second Amended Complaint, Plaintiffs contend that CW 5 was "a former senior Passport executive for nearly six years," and from February of 2020 to March of 2020, CW 5 was Passport's "Senior Director of Information Technology[;]" from March of 2017 to February of 2020, she was Passport's "Director of Information Technology[;]" and from October of 2014 to February of 2017, she was Passport's "Manager of Infrastructure and IT Operations."  Dkt. 69, ¶ 89.  Again, construing the facts in the Second Amended Complaint in the light most favorable to Plaintiffs, the Court finds these facts sufficient to infer that CW 5 would have knowledge as to whether letters "absolutely were" sent

to Evolent's executives and that "Evolent agreed to foot the bill" for at least some of the penalties assessed due to issues with Valence.

And while Defendants urge that "'[c]ommon knowledge' at a company cannot support a finding of scienter," Dkt. 75, 30 (quoting *Glasser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590-91 (S.D.N.Y. 2011), Plaintiffs' assert more than just "common knowledge[.]"   In this case, because Plaintiffs plead that the substantial penalty letters "absolutely were" sent to Evolent, Plaintiffs have presented facts to show "[t]he presence of 'red flags[.]'" *Yates*, 744 F.3d at 888.  And these alleged red flags, seem to have been "coupled with[,]" *see Yates*, 744 F.3d at 888, significant problems for Evolent as ultimately, Evolent was required to "pay[ ] $70 million in exchange for [ ] 70% interest" in Passport.  Dkt. 69, ¶ 120.

Thus, on the one hand, based upon the facts pleaded in the Second Amended Complaint, there appears to be no motive for fraud (*supra*, p. 62-64).  On the other hand, at this stage of the litigation, Plaintiffs have made enough of a showing that there was a "presence of red flags, coupled with" significant problems for Evolent, which "provide substantial weight to an inference that" the Individual Defendants "must have been aware" that Valence was not successfully integrated at Passport and that Evolent had not been successful in cutting costs for its most important client.  *Yates*, 744 F.3d at 888.  Considering these facts, the Court finds that Plaintiffs have narrowly met their burden as to the scienter.

Yet, Defendants argue that Evolent's acquisition of Passport does not raise a strong inference of scienter because Plaintiffs' argument to the contrary "ignores the changed circumstances that caused Evolent to alter its strategy and acquire a majority interest in Passport." Dkt. 75, 34.  Defendants explain that the acquisition occurred because "the 'owners of Passport . . . [had then] recently ran a competitive process to select a joint venture partner[,]'" and because of

this solicitation, "Evolent changed its strategy." *Id*. (quoting Dkt. 76-27, 5). Defendants cite to a transcript of a May 9, 2019 conference call to support their argument that this is the narrative that the Court should accept. It is inappropriate to consider this document at this time. Moreover, Defendants' theory relies on facts not pleaded in the Second Amended Complaint. At a time where this Court is tasked with determining the sufficiency if the facts alleged in the Second Amended Complaint, the Court is constrained to reject Defendants' alternate theory on this ground without considering the plausibility of that narrative.

Finally, Defendants note the "four-month temporal proximity between" when Defendant Williams said Evolent was not considering acquiring Passport and when Evolent actually acquired Passport. Dkt. 75, 34. Considering this, Defendants point out that "pleading temporal proximity alone has not been viewed as adequately establishing scienter[,]" Dkt. 75, 34 (quoting *Arnlund v. Deloitte Touche, L.L.P.*, 199 F. Supp. 2d 461, 482 (E.D. Va. 2002), but that is not the only fact that Plaintiffs advance to plead scienter (*supra*, p. 65-66). And therefore, Defendants' reliance on this argument is misplaced.

On the whole, the Court finds that Plaintiffs have alleged sufficient facts in support of scienter.

c. Whether Plaintiffs Have Pleaded Sufficient Facts to Show Causation

The heart of Defendants' argument as to causation is that Plaintiffs have failed to sufficiently prove causation "because the market was put on notice as early as January 25, 2019, about the supposedly excessive fees that Evolent charged Passport and that these charges might exacerbate Passport's financial distress." Dkt. 75, 36. Defendants contend that the market was put on notice as to these circumstances with the January 25, 2019 *Insider Louisville* article entitled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to 'Evolent

Health[.]"  *Id*. at 35-38; Dkt. 69, ¶ 112.  Despite the January 25, 2019 publication of this article, which revealed that Passport paid Evolent around $220 million in non-employee management fees, *see* Dkt. 69, ¶ 112, it is Defendants' position that Plaintiffs did not allege that "this article . . . constitute[d] a corrective disclosure because the stock price of Evolent barely moved after the release" of the article, Dkt. 75, 37.  Defendants stress that in ascertaining whether the Plaintiffs have sufficiently pleaded causation, "what matters is when the public became aware of the information that was allegedly withheld by Defendants."  Dkt. 75, 37 (citing *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 478 (4th Cir. 2011).

In response, Plaintiffs urge that they have sufficiently pleaded causation by pointing to the timing of (1) Passport's lawsuit against Kentucky and the Evolent stock price drop four days later; and (2) Evolent's May 29, 2019 announcement that it would acquire 70% stake in Passport and the Evolent stock price drop on the same day.  Dkt. 80, 38-40.  Plaintiffs explain that the January 25, 2019 *Insider Louisville* article could not be the impetus for the stock price decline because (1) "Evolent's share price did no move in response to the article[;]" and (2) in that article, Evolent "emphatic[ally]" denied that it overcharged Passport. *Id*. at 39.

It bears repeating that district courts are "obliged to review a complaint's 'allegations of loss causation for sufficient specificity, a standard largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity.'" *Singer v. Reali*, 883 F.3d 425, 444-45 (4th Cir. 2018) (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)).  "The loss causation element requires the pleading of a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct, which may be accomplished by alleging facts establishing that the defendant's misrepresentation or omission was one substantial cause of the investment's decline in value." *Singer*, 883 F.3d at 445 (quotations

and citation omitted).  The Fourth Circuit has further determined that under those circumstances, "the plaintiff must plead (1) the exposure of the defendant's misrepresentation or omission, i.e., the revelation of new facts suggesting [the defendant] perpetrated a fraud on the market, and (2) that such exposure resulted in the decline of [the defendant's] share price."  *Id.* (quotations and citations omitted).

In *Singer v. Reali*, the Fourth Circuit described that "exposure for purposes of the loss causation element" may be alleged in two ways—(1) under a "corrective disclosure theory" and/or (2) pursuant to a "materialization of a concealed risk theory."  883 F.3d 425, 445 (4th Cir. 2018). "[U]nder corrective disclosure theory, a complaint may allege that the defendant company itself made a disclosure that 'publicly revealed for the first time' that the company perpetrated a fraud on the market by way of a material misrepresentation or omission."  *Id.*  (citation omitted). However, the materialization of a concealed risk theory requires a plaintiff to plead that "news from another source revealed the company's fraud."  *Id.* (citation omitted).  Nevertheless, under either theory, the Fourth Circuit has discerned that the "important[ ]" inquiry is "the same: whether 'a misstatement or omission concealed something from the market that, when disclosed negatively affected the value of the security.'"  *Id.* (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016) (emphasis omitted)).  Stated another way, "the plaintiff must show that the loss caused by the alleged fraud results from the relevant truth leaking out."  *Singer*, 883 F.3d at 446 (internal quotations and citations omitted).

And in the context of a corrective disclosure:

> the truth may have gradually emerged through a series of partial disclosures, with the entire series of partial disclosures [prompting] the stock price deflation. Moreover, the disclosure or series of partial disclosures need not precisely identify the misrepresentation or omission about which the plaintiff complains, but must reveal to the market in some sense the fraudulent nature of such misrepresentation

> or omission, and must at least relate back to the misrepresentation [or omission] and not to some other negative information about the company.

*Id.* (internal quotations and citations omitted).

Here, it seems that Plaintiffs' allegations as to causation are a blend of the corrective disclosure and the materialization of a concealed risk theories. This becomes readily apparent because not only do Plaintiffs explain that Passport revealed the truth by way of filing its lawsuit against Kentucky, but Plaintiffs also explicate that the truth came about when Evolent itself revealed that it would be acquiring a 70% interest in Passport. *See* Dkt. 80, 38-39 (citing Dkt. 69, ¶¶ 115-16, 121). Still, under either theory, this Court is tasked with determining whether Plaintiffs have pleaded sufficient facts to show that the decline in Evolent's stock prices resulted from the "truth leaking out." *Singer*, 883 F.3d at 446.

In this case, Plaintiffs allege that the truth that Defendants fraudulently withheld from the market is that Evolent did not lower administrative and clinical costs for its clients—namely Passport—but instead, Evolent raised costs for its clients, as demonstrated by the circumstances with Passport. *See generally*, Dkt. 69. Plaintiffs maintain that this truth came to light on February 15, 2019, when Passport filed suit against Kentucky's Finance and Administration Cabinet and its Cabinet for Health and Family Services. *Id.* at ¶ 115. Plaintiffs claim that that lawsuit revealed the truth because therein, Passport alleged that if the "rate cuts" Kentucky imposed upon it were not reversed, that "Passport would be legally insolvent by March 1, 2019[,]" and that Passport had "recorded a loss of $65.5 million for year-end 2018 and projected an additional $75 million in losses for the first half of 2019 alone. . . ." *Id.* Plaintiffs maintain that it is apparent that the publicly-accessible allegations caused Plaintiffs' losses because a mere four days later, which was "the first trading day following Passport's lawsuit, Evolent's stock price fell 10.8% to close at

$14.99 (from a closing price of $16.80 on the previous trading day) [a]n unusually high volume." *Id*.

Also, the same day that Defendant Williams revealed that Evolent was required to "urgent[ly]" acquire a 70% interest in Passport because of "the financial situation," "Evolent's stock price fell a staggering 29.3%— or $4.14 per share— . . . to close at $10.01 (from the previous tradition day's closing price of $14.15)." *Id*. at ¶213.

These two instances with peculiar temporal proximity, at the 12(b)(6) stage of litigation, demonstrate to the Court that Plaintiffs have pleaded sufficient facts in support of causation.

It is of no moment that the *Insider Louisville* article was published prior to the commencement of the Passport lawsuit or the revelation as to Evolent's acquisition of Passport because Plaintiffs have alleged "facts establishing that [ ] [D]efendant's misrepresentation or omission was *one* substantial cause of the investment's decline in value." *Singer*, 883 F.3d at 445 (quotations and citation omitted) (emphasis added). Indeed, "[a] plaintiff need not show conclusively that the defendant's fraud was the sole cause of the plaintiff's loss . . . . Loss causation is most critical at the proof stage, and is usually determined by the trier of fact." *Kiken*, 155 F. Supp. 3d at 609 (citations and internal quotations omitted). "With respect to loss causation '[s]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the [plaintiffs'] case can be rejected on evidentiary grounds.'" *Id*. (quoting *Carlucci*, 907 F. Supp. 2d at 724).

Moreover, even if the *Insider Louisville* article was the first iteration of the emergence of truth, the Fourth Circuit has recognized that "the truth may have gradually emerged through a series of partial disclosures[.]" *Singer*, 883 F.3d at 446.

72

Accordingly, for all these reasons, the Court finds that at this stage, Plaintiffs have met their burden as to causation.

### 2. Claim Two

In the case at bar, Defendants contend that Claim Two should be dismissed as to all the Individual Defendants because Plaintiffs fail to plead a primary securities violation by the Individual Defendants and, specifically as Claim Two relates to Defendant Spencer, Plaintiffs have failed to plead to sufficient facts to establish that she controlled Evolent.  Dkt. 75, 39-40.   Thus, with respect to Claim Two, the two questions before the Court are—(1) whether Plaintiffs have pleaded that the Individual Defendants committed a securities violation; and (2) whether Plaintiffs have pleaded facts that show that Defendant Spencer had control over Evolent.  The Court answers both inquiries in the affirmative, as detailed below (*infra*¸ p. 73-76).

### a. Whether Plaintiffs have Pleaded that the Individual Defendants Each Committed a Securities Violation

To plead a claim under 15 U.S.C. § 78t(a), "a plaintiff must allege (1) a predicate violation of [15 U.S.C. § 78j(b)] [ ], and (2) control by the defendant over the primary violator."  *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 627 (S.D.W. Va. 2012) (citations omitted).  "'On a motion to dismiss, a [15 U.S.C. § 78t(a)] [ ] claim will . . . stand or fall based on the court's decision regarding the [15 U.S.C. § 78j(b)] [ ] claim.'"  *Kiken*, 155 F. Supp. 3d at 609 (quoting *Genworth*, 103 F. Supp. 3d at 791).  Thus, when a court finds that "[p]laintiffs have adequately ple[a]d[ed] that a primary violation exists under [15 U.S.C. § 78j(b)] [ ], [the p]laintiffs' claim under [15 U.S.C. § 78(a)] [ ] stands as well."  *Kiken*, 155 F. Supp. 3d at 609 (citing *Genworth*, 103 F. Supp. 3d at 790-91).  "[U]ltimately, as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss, and dismissal should be

granted only when a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Massey*, 883 F. Supp. 2d at 627.

Also important in this context, in *Janus Capital Group, Inc. v. First Derivative Traders*, the Supreme Court of the United States held that in the context of Rule 10b-5 claims, it would "not expand liability beyond the person or entity that ultimately has authority over a false statement." 564 U.S. 135, 144 (2011). To this end, the Court explained that "[o]ne 'makes' a statement by stating it." *Id*. at 142. Therefore,

> [f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame— for what is ultimately said.

*Id*. at 142-43.

In light of *Janus*, Defendants contend that "Defendants Spencer and Wigginton cannot be liable under Rule 10b-5" because in the Second Amended Complaint, Plaintiffs do not make "particularized allegations" that those Defendants made or "had the requisite control over the challenged statements[.]" Dkt. 75, 39.

Here, the Court has found that Plaintiffs have pleaded sufficient facts in support of a primary violation pursuant to 15 U.S.C. § 78j(b) as it pertains to certain statements set forth above (*supra*, p. 41-59). In the Second Amended Complaint, Plaintiffs attribute each of the surviving statements to either Defendant Williams or Evolent. *See supra*, p. 59; *see also* Dkt. 69, ¶¶ 175, 178-79, 183, 187-88. From the facts pleaded in the Second Amended Complaint, at this point, it

appears that only Defendant Williams was liable for his own misstatements consistent with *Janus*. Therefore, the only remaining statement that could be attributed to the other Individual Defendants by virtue of their alleged control over Evolent are those statements set forth in the *Insider Louisville* article.   Recognizing the general Rule 12(b)(6) standard of review and that "assessing control person liability is not ordinarily subject to resolution on a motion to dismiss," *Massey*, 883 F. Supp. 2d at 627, the Court finds that, at this stage in the litigation, Plaintiffs have pleaded sufficient facts to establish that the other Individual Defendants had sufficient control over Evolent such that they *may* be held liable for those assertions.   Accordingly, the Court finds that Plaintiffs' 15 U.S.C. § 78t(a) claim, as it relates to the surviving statements (*supra*, p. 59), must stand against the Individual Defendants.

The statements attributed to Defendant Williams in the Second Amended Complaint will stand against him.  The *Insider Louisville* statements will stand as to all Defendants.

b.   Whether Plaintiffs Have Pleaded Sufficient Facts to Establish that Defendant Spencer Had Control Over Evolent

In response to Defendants' argument that Plaintiffs have not sufficiently pleaded that Defendant Spencer had control over Evolent, Plaintiffs explain in a footnote that:

> there can be no doubt that Spencer controlled Evolent. She was part of the Passport Executive Team that met every Monday and was also entrusted to make public statements on behalf of Evolent, including at the May 11, 2017 Investor and Analyst Day, during which she falsely described the due diligence that she and the rest of the Individual Defendants performed on Valence.

Dkt. 80, 40 n.31 (citing Dkt. 69, ¶¶ 44, 145-46).   In support of their opposition on this point, Plaintiffs cite to paragraphs 44, 145, and 146 of their Second Amended Complaint.  *Id*.

In paragraph 44 of the Second Amended Complaint, Plaintiffs plead that "Evolent's executives were intimately involved in virtually all of Passport's operations and finances throughout the Class Period."  Dkt. 69, ¶ 44.  As for Defendant Spencer, Plaintiffs aver that she

was present at the weekly meetings between Passport and Evolent.  *Id*.  Plaintiffs describe that Defendant Spencer was "always in the room" for those meetings.  *Id*.

In paragraphs 145 through 146 of the Second Amended Complaint, Plaintiffs assert that at the time of Evolent's May 11, 2017 Investor and Analyst Day, Defendant Spencer served as Evolent's National Medicaid COO.  *Id.* at ¶ 145-46.  And at that conference, Plaintiffs claim that Defendant Spencer made a purported material misrepresentation that "Passport had done 'a lot of due diligence' on Valence and had 'made sure that everything was working the way that [ ] [Evolent] wanted it to' before deciding to transition to Valence."  *Id*.

It bears repeating that "ultimately, as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss, and dismissal should be granted only when a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person."  *Massey*, 883 F. Supp. 2d at 627.  Considering this relatively low bar, at this stage in the litigation, the Court finds that Plaintiffs have pleaded sufficient facts to establish control as to Defendant Spencer.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. 74) is GRANTED in part and DENIED in part.

It is SO ORDERED.

Alexandria, Virginia
March 24, 2021

/s/

Rossie D. Alston, Jr.
United States District Judge