**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY,<br><br>    Defendants. | Case No. 1:19-cv-01031-MSN-TCB<br><br>REDACTED |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION
TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..........................6

        A.    Evolent Becomes A "Co-Owner' Of Passport And Uses It As A Cash Cow,
              Becoming Financially Dependent On The "Nice Margin" It Made On
              Passport ...........................................................................................................6

        B.    Evolent Repeatedly Told Investors It Was Saving Passport Tens Of Millions
              Of Dollars, When Exactly The Opposite Was True ........................................8

        C.    The "Writing Is On The Wall": Evolent Would Be Forced To Bail Out
              Passport .........................................................................................................11

              1.    Evolent's Excessive Fees And Deficient Services Directly Caused
                    Passport's Financial Decline ..............................................................11

              2.    Internal Documents Confirm That ░░░░░░░░░░░░░░
                    ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ ..........................13

        D.    The Truth Regarding Defendants' Fraud Emerges .........................................14

        E.    Procedural History .........................................................................................15

III.    ARGUMENT ........................................................................................................17

        A.    Defendants' Statements Regarding "$100 Million In Identified Annualized
              Savings" For Passport Are Actionable ..........................................................17

              1.    Defendants Have Conceded That Their January And May 2018
                    "$100 Million In Identified Annualized Savings" Statements Were
                    False And Misleading When Made, And Were Made With The
                    Requisite Scienter ...............................................................................17

              2.    Defendants' Statements Regarding "$100 Million In Identified
                    Annualized Savings" Were Material .....................................................18

              3.    Plaintiffs Have Sufficiently Alleged Loss Causation ..........................22

        B.    Defendant Blackley's May 11, 2018 Statement That Evolent Had Provided
              "$75 Million Of Improvement To Passport's Bottom Line" Is Actionable ....24

              1.    Defendant Blackley's Statement Was Materially False and
                    Misleading ...........................................................................................24

2.      Plaintiffs Have Adequately Alleged Blackley's Scienter.............................27

C.      Defendants' February 26 And May 7, 2019 Statements Are Actionable..................29

IV.     CONCLUSION......................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................................29

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) .......................................................................19, 20

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .............................................................................................28

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) ..............................................................................................28

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 655 (D.S.C. 2016) ...................................................................................17

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................................................20

*Gaer v. Am. Pub. Educ., Inc.*,
895 F. Supp. 2d 763 (N.D.W. Va. 2011) ...........................................................................24

*Gavish v. Revlon, Inc.*,
2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ...................................................................21

*Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*,
141 S.Ct. 1951 (2021) ........................................................................................................23

*Greenhouse v. MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004) .............................................................................................21

*Hall v. Rent-A-Ctr., Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ...................................................................17

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ....................................................................23

*Ho v. Flotek Indus., Inc.*,
248 F. Supp. 3d 847 (S.D. Tex. 2017) ...............................................................................28

*Hutchins v. NBTY, Inc.*,
2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ...................................................................19

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..........................................................................27, 28

iii

*In re Cooper Sec. Litig.*,
   691 F. Supp. 2d 1105 (C.D. Cal. 2010) ........................................................................26

*In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*,
   298 F. Supp. 2d 544 (E.D. Tex. 2004) .........................................................................26

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015).................................................................28, 32, 33

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) .................................................................23

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) ......................................................................................34

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .................................................................19

*In re Humphrey Hosp. Tr. Inc. Sec. Litig.*,
   219 F. Supp. 2d 675 (D. Md. 2002)..............................................................................34

*In re Lab Corp. of Am. Holdings Sec. Litig.*,
   2006 WL 1367428 (M.D.N.C. May 18, 2006)...............................................................34

*In re Maximus, Inc. Sec. Litig.*,
   2018 WL 4076359 (E.D. Va. Aug. 27, 2018) ................................................................24

*In re Merrill Lynch & Co., Inc.*,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003)...........................................................................27

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ...........................................................................19

*In re Musicmaker.com Sec. Litig.*,
   2001 WL 34062431 (C.D. Cal. June 4, 2001)................................................................26

*In re Neustar Sec. Litig.*,
   83 F. Supp. 3d 671 (E.D. Va. 2015)..............................................................................24

*In re Nokia OYJ (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006)...........................................................................21

*In re Salix Pharmaceuticals, Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)................................................................34

*In re Stone & Webster, Inc. Securities Litigation*,
   2007 WL 9822735 (D. Mass. Sept. 7, 2007)..................................................................23

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................24

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ..............................................................................24

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) .....................................................22, 27, 29

*Lee v. Active Power, Inc.*,
  29 F. Supp. 3d 876 (W.D. Tex. 2014) .................................................................23

*Marsden v. Select Med. Corp.*,
  2007 WL 518556 (E.D. Pa. Feb. 12, 2007) ........................................................24

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................................................26

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ...............................................................................25

*NECA-IBEW Pension Trust Fund v. Precision Castparts Corp.*,
  2017 WL 4453561 (D. Or. Oct. 3, 2017) ............................................................32

*Ollila v. Babcock & Wilson Enter., Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ...............................................27, 32, 33

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund. Mgmt., LLC,*,
  595 F.3d 86 (2d Cir.2010) ..................................................................................26

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006) .................................................................24

*Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*,
  2021 WL 1439680 (E.D. Va. Mar. 24, 2021) ......................................................2, 3

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020) .............................................................................5, 18

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ..................................................................... *passim*

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014) .................................................................19

*Teachers' Ret. Sys. of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ..............................................................................24

v

*TIAA-CREF Large-Cap Growth Fund v. Allergan PLC*,
   2021 WL 4473156 (D.N.J. Sept. 30, 2021).........................................................................28, 30, 31

*Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.,*
   886 F. Supp. 2d 328 (S.D.N.Y. 2012)...........................................................................................24

*Willis v. Big Lots, Inc.*,
   2016 WL 8199124 (S.D. Ohio Jan. 21, 2016)...............................................................................19

**STATUTES**

15 U.S.C.A. § 78u-5(c)(2).........................................................................................................34

Lead Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint (ECF Nos. 161, 162).[1]

## I. INTRODUCTION

Evolent Health Inc. ("Evolent" or the "Company") provides technology-enabled services that are purportedly designed to lower clinical and administrative costs for health plans. Throughout the Class Period, Defendants assured investors that Evolent was achieving exactly that goal for its largest and most important client: a Kentucky Medicaid plan known as Passport Health Plan ("Passport" or the "Plan"), which accounted for 20% of Evolent's revenue and *all* of its profit during the Class Period. Indeed, Evolent repeatedly touted Passport as a success story that demonstrated Evolent's purportedly effective and cost-efficient platform, even going so far as to boast that the Company had generated as much as $100 million in cost savings for Passport that went directly to the Plan's "bottom line." Fueled by these assurances, Evolent's stock price soared by more than 100% in just nine months, reaching a Class Period high of $28.75 on September 25, 2018.

However, as would ultimately be revealed, Defendants' statements were false. In reality, and as Evolent's own internal emails and documents produced to Plaintiffs in discovery unequivocally confirm, Evolent *never* delivered its promised savings to Passport. To the contrary, Evolent capitalized on its unique relationship with Passport—pursuant to which Evolent had become, in Defendant Williams' own words, a "co-owner" of Passport that enjoyed "joint governance" over the Plan—by dramatically *increasing* Passport's costs through ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ fees. As multiple former Passport and Evolent employees stated, Evolent "said they could cut costs by providing services; they did the opposite."

---

[1] All "¶__" references are to the Third Amended Class Action Complaint ("TAC") (ECF No. 150); all defined terms have the meanings assigned in the TAC; and all emphasis in quoted material is added unless otherwise noted.

In addition, Evolent's medical claims processing services were so grossly deficient that ███████ ██████████████████████ that rendered Passport wholly unable to perform even its most basic and rudimentary functions, causing it to issue tens of millions of dollars in erroneous overpayments to providers, fail to pay others on time (or at all), and incur hundreds of millions of dollars in penalties from Kentucky for failing to submit required claims data.

Evolent's deficient services, combined with its exorbitant fees, crippled Passport and ultimately pushed it to the brink of insolvency. When the truth emerged, Evolent's stock price plummeted, first declining by over 10% on February 19, 2019—after a lawsuit revealed that Passport was mere weeks away from insolvency—and then falling an additional 30% on May 29, 2019, after Evolent announced it would be forced to bail out the ailing health plan by acquiring a 70% ownership stake. Evolent's failures at Passport were so egregious that, notwithstanding Evolent's bailout of Passport, Kentucky *twice* rejected the renewal of Passport's Medicaid contract, and the Plan was ultimately saved from complete ruin only because another health plan purchased its membership.

The Court has already upheld, in large part, Plaintiffs' Second Amended Complaint (the "SAC")—which was filed prior to discovery and alleged virtually all of the same facts as the TAC. Specifically, in its order denying in part Defendants' motion to dismiss the SAC (*Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680 (E.D. Va. Mar. 24, 2021)) ("MTD Order"), the Court sustained four categories of alleged false and misleading statements: (i) Defendants' September 2018 statements that Evolent's services had "helped to generate over $100 million" in annual cost savings for Passport; (ii) Defendants' January 2019 statements denying that Evolent's fees were harming Passport; (iii) Defendants' February 2019 statements denying that Evolent had any intention to bail out Passport; and (iv) Defendants' May 2019 statements claiming Passport's financial situation was

improving.  *Id.* at *30-36.  Moreover, the Court found that Plaintiffs had established loss causation for the two corrective disclosures alleged in this Action.  *Id.* at *36-38.

Based on facts learned in discovery, Plaintiffs filed the TAC on November 17, 2021, which alleges a newly uncovered false statement, and re-alleges a similar statement that was not discussed in the Court's MTD Order.  Specifically, on January 10, 2018, the first day of the Class Period alleged in the TAC, Defendants emphasized in an investor presentation that they were saving an unnamed "[f]ull risk partner" "$100M+" in costs—and as documents produced in discovery have now revealed, ██████████████████████████████.  ¶¶143-44, 162.  Defendants repeated this statement in their May 11, 2018 investor presentation, and Defendant Williams made reference to it in the accompanying investor call.  ¶166.  The TAC also re-alleges Defendant Blackley's May 11, 2018 statement that Evolent had generated $75 million in "improvement to Passport's bottom line." ¶165.  Notably, the Court did not explicitly discuss this statement in the MTD Order, which was the subject of Plaintiffs' motion for reconsideration that was pending at the time that the TAC was filed. *See* ECF No. 112.

Significantly, these statements are virtually identical to a statement that the Court has already determined was materially false and misleading: namely, Defendants' September 2018 statement that Evolent's services had "helped to generate over $100 million" in annual cost savings for Passport. MTD Order at *32, *35-36.  Moreover, as set forth in the TAC, Defendants' statements about the purportedly massive savings Evolent generated for Passport are directly contradicted by, *inter alia*, a plethora of internal documents.  Indeed, ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

3

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

In the wake of these damning facts, Defendants have now moved only to partially dismiss the TAC with respect to: (1) the newly alleged January 10, 2018 and May 11, 2018 statements; (2) the re-alleged May 11, 2018 statement; and (3) the February 26, 2019 and May 7, 2019 statements, which the Court already *expressly upheld* in the MTD Order. Defendants' arguments are meritless.

*First*, Defendants do not challenge, and thus concede, that the January 10 and May 11, 2018 statements concerning the "$100M+" in savings that Evolent had generated for an unnamed "full risk partner" were false and misleading when made, and were made with scienter. Instead, Defendants argue that Plaintiffs cannot establish loss causation for these statements because, while they admittedly related solely to Passport, Defendants referred to Passport not by name but as a "full risk partner." This is meritless. The Court has already held that both of the corrective disclosures alleged in the TAC establish loss causation, holding that "the truth that Defendants fraudulently withheld from the market is that Evolent did not lower administrative and clinical costs for its clients—namely Passport—but instead, Evolent raised costs for its clients, as demonstrated by the circumstances with Passport." MTD Order at *38; *see also Singer v. Reali*, 883 F.3d 425, 446 (4th Cir. 2018) (loss causation does not require a "fact-for-fact disclosure of the relevant truth to the market"). The newly alleged statements, like the previously upheld ones, concern this exact same issue. Accordingly, the Court's decision on loss causation applies equally to Defendants' representations regardless of whether the statement in question expressly named Passport.

4

*Second*, Defendants argue that Plaintiffs have failed to allege the materiality of their statement that they generated "$100 million in identified annualized savings" for Passport because (1) the TAC purportedly does not directly tie these savings to Evolent's financial results, and (2) the statement is supposedly a mere "sentence fragment" that was "buried" in a slide presentation. Defendants are wrong.  Materiality is a "mixed question of law and fact, rarely resolved at the motion to dismiss stage."  *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213, n.12 (2d Cir. 2020). Moreover, here there are a plethora of facts that easily establish materiality, including the fact that this Court has held that substantially similar statements were <u>materially</u> false.  MTD Order at *32, *35-36.  Indeed, Defendants' own actions belie their argument that these statements were not material, as Evolent itself repeatedly highlighted this purported "$100 million in identified annualized savings" in investor presentations throughout the Class Period—and did so precisely because Evolent wished to tout Passport as an example of the success of Evolent's business model.

*Third*, Defendants argue that Defendant Blackley's May 11, 2018 statement claiming Evolent delivered $75 million in "improvement to Passport's bottom line" was not false or misleading because Blackley was supposedly "merely reciting" a financial metric—Passport's "medical loss ratio" or "MLR."  MTD at 18.  As an initial matter, the notion that any benefit to Passport's MLR resulted in a $75 million improvement on Passport's "bottom line" is completely belied by the factual record here.   Indeed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Moreover, Blackley in no way limited his statement to a 5% reduction in MLR. To the contrary, Blackley specifically stressed the resulting improvement in Passport's "bottom line"

5

on multiple occasions.   There is no ambiguity in what "bottom line" means: Blackley himself repeatedly asserted that the "results of the partnership…over the last few years" had generated "$75 million of improvement to Passport's <u>bottom line</u>," and Blackley made this crystal clear when he told investors that "from an investor's standpoint…taking away the <u>net result</u> is critical."   ¶165.

*Fourth*, contravening the MTD Order, Defendants again challenge Defendants' February 26 and May 7, 2019 statements as forward-looking, despite the fact that the Court already explicitly considered these arguments *at length* and rejected them.   MTD Order at *28-30.   Moreover, discovery has only strengthened these allegations, as internal emails and documents confirm that, █

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Further, Defendants are not entitled to safe harbor protection because Defendant Williams had actual knowledge of the falsity of his statements.   Tellingly, in their attempt to argue that Williams had no knowledge of the critical facts ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

For all of these reasons, Defendants' partial motion to dismiss should be denied in its entirety.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Evolent Becomes A "Co-Owner' Of Passport And Uses It As A Cash Cow, Becoming Financially Dependent On The "Nice Margin" It Made On Passport

In February 2016, Evolent signed a ten-year services contract (the "Master Services Agreement" or "MSA") with Passport, a large and well-respected non-profit Kentucky-based Medicaid plan that had been successfully operating for more than 20 years.   From inception of the MSA, Passport was, by far, Evolent's most significant client, generating 20% of Evolent's annual

revenue and <u>all of</u> the Company's profit.  In 2018, Evolent earned $109 million in fees from Passport,

███████████████████████████████████████████████████████████████████████

███████  Significantly, for 2018, Evolent's publicly-reported Adjusted EBITDA[2] was only $23

million, ████████████████████████████████████████████████████████████

███████  *Id.*  In other words, by charging Passport grossly excessive fees, Evolent turned what

would have been massive losses into substantial profits, making Passport Evolent's cash cow.

Evolent was able to take full advantage of Passport because of the Company's unique

relationship with the Plan.  Specifically, Evolent structured the MSA so that Evolent had control

over all major aspects of Passport's business and daily operations, including clinical, financial and

back-office services, contracts, risk adjustment, and medical claims processing.  Evolent's

arrangement with Passport allowed Evolent to hire away 350 of Passport's employees who had

formerly performed these services in house, enabling Evolent to charge Passport more money to

perform the same services than they had previously cost Passport.  ¶¶51-57.

Evolent's control over Passport was so absolute that Evolent executives publicly described

the Company as a "co-owner" of Passport, and proclaimed that this "co-ownership" strategy was

specifically designed to allow Evolent to exert control over Passport.  For example, during an

August 7, 2017 earnings call, Defendant Williams boasted that Passport "<u>look[s] at us as a co-</u>

<u>owner</u>" and "<u>we really have joint governance and we're able to drive the decisions we think are</u>

<u>important for performance</u>."  Williams further explained that this arrangement allowed Evolent to

"<u>drive very specific actions in terms of how [Passport is] ultimately operating their risk business</u>";

---

[2] In its SEC filings, Evolent specifically highlighted Adjusted EBITDA as its preferred measure of profitability.  ¶45, n.1.

"be at the table participating in [Passport's operational] decisions"; and "control many more levers than if we're just in a pure service relationship."  ¶¶46-50, 189-195.

### B.    Evolent Repeatedly Told Investors It Was Saving Passport Tens Of Millions Of Dollars, When Exactly The Opposite Was True

Throughout the Class Period, Defendants touted the enormous "bottom line" savings its services had supposedly created for Passport.  For example, in a January 2018 investor presentation, Evolent boasted it had "achieve[d] MLR / ALR reduction impact representing $100M+ in identified annualized savings"[3] for a "full risk partner," ██████████████████████

██████      In May 2018, Defendants touted $75 million in "improvement to Passport's bottom line" as a result of Evolent's services.  And in September 2018, Evolent claimed it had generated "over $100 million in savings" for Passport which was "highly valuable" to the plan.

Former high-ranking Passport executives and employees confirmed that the exact opposite was true: Passport was "paying [Evolent] to do the stuff that we used to do, and *paying [Evolent] more*"; "[Evolent] said they could cut costs by providing services; *they did the opposite*"; and "[e]verything that was done [by Evolent] was either *more expensive or cost us more money*," such that Evolent's exorbitant fees dwarfed any possible medical cost savings.  ¶¶7, 53, 56, 95.

Documents produced in discovery confirm that, contrary to their public representations, Defendants knew throughout the Class Period that Evolent was not providing any savings to Passport whatsoever.  For example, ███████████████████████████████████

████████████████████████████████████████████████████████

---

[3] "MLR" refers to "Medical Loss Ratio," i.e. the percentage of a health plan's revenue spent paying for its members' medical expenses. "ALR" refers to "Administrative Loss Ratio," i.e. the percentage of revenue spent on administrative costs (which, for Passport, were mostly made up of Evolent's fees). ¶139.  Thus, by claiming "MLR/ALR Reduction Impact," Evolent was claiming to have provided net savings to Passport through reduction of both medical and administrative costs.  The opposite was in fact true. ¶163.

8

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Defendants' claims of saving Passport money were so egregiously false that, ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

Meanwhile, Evolent was not only failing to save Passport money, it was also dramatically worsening Passport's operations and creating a ██████████ for the "Plan." Specifically, Evolent's recently acquired claims administration platform, which was called Valence, was so faulty that it effectively destroyed Passport's ability to manage its claims payments. This in turn led to a quagmire of claims overpayments, underpayments, late payments, and accounting problems, and ██████████ ████████████████████████████████████████████████. ¶¶59-60, 71-76

9

145-48. Moreover, Passport began incurring massive penalties from Kentucky due to inaccurate and untimely reported "encounter data"—essential data that Passport was required to submit about each medical claim so that Kentucky could set Medicaid rates. Evolent's defective claims processing caused Passport's penalties to skyrocket to previously unheard-of levels. For example, according to a "penalty letter" from Kentucky for February 2018, the encounter data Passport submitted in that month alone was a remarkable 44,115,599 days late in the aggregate, resulting in a penalty of $44,115,599.[4]  ¶¶77-83.

In stark and striking words, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[4] Passport's obligations on these penalties were contractually capped at 0.33% of Passport's monthly revenue.

**C.**  **The "Writing Is On The Wall": Evolent Would Be Forced To Bail Out Passport**

**1.**  **Evolent's Excessive Fees And Deficient Services Directly Caused Passport's Financial Decline**

11



**2.    Internal Documents Confirm That** ████████████████
████████████████████████████████████

In February 2019, after Passport filed a lawsuit against Kentucky challenging the rate cuts, analysts began questioning whether Evolent had plans to bail out Passport to safeguard the 20% of its revenues produced by the Plan.  Defendants, however, repeatedly denied that Passport's financial condition was so dire that it would require such a dramatic step.  For example, on February 26, 2019, Defendant Williams reassured investors that acquiring Passport was "not in our strategic lens at this point," and underscored that even a minority stake in Passport was not under consideration, stating: "we've talked about co-ownership models where we might have a minority stake in something, but related to Passport that's not something that is currently being evaluated." ¶158.  Then, on May 7, 2019, Williams touted Passport's purportedly improving finances, stating that "Passport is making solid progress towards improving its financial performance."  ¶123.

However, directly contradicting these assurances, ████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
    ████████████████████████████████
████████████████████████████████████
████████L█████████████████████████

---

[5] Refuting Defendants' argument that ████████████████████████
████████████████████
████████████



### D.    The Truth Regarding Defendants' Fraud Emerges

The truth of Evolent's fraud began to emerge on February 15, 2019, when Passport filed a lawsuit against Kentucky alleging that, if Kentucky's rate cuts were not reversed, Passport would be insolvent within two weeks. On February 19, 2019, the first trading day after this news, Evolent's stock price fell 10.8%, from $16.80 to close at $14.99 on unusually high volume.

On May 29, 2019, the market learned the full truth. Directly contradicting Defendants' prior assurances, Evolent revealed that Passport's financial condition was so dire that Evolent was forced to acquire a 70% stake in Passport for $70 million, along with additional "balance sheet support" totaling $40 million. In a special investor call, Defendant Williams admitted that Evolent's defective services and excessive fees had crippled the Plan, explaining that "given the financial situation, we need[ed] to respond immediately." ¶125. On this news, Evolent's stock price plummeted a staggering 29.3%—or $4.14 per share—from $14.15 to close on May 29, 2019 at $10.01. ¶126.

Analysts excoriated Defendants for their lack of candor, with SunTrust noting that the acquisition "signals that Passport wasn't in a position to remain operationally sustainable as a standalone entity," and criticizing Defendants' prior denials that Evolent would have to bail out Passport, noting that "[m]anagement has previously talked down going after Passport as recently

14

as 4Q18 earnings call," and that management had said in February that such a bailout was "not in our strategic lens at this point." Similarly, Citigroup worried that the deal raised "concerns that EVH had to pay to maintain its customer base." ¶127.

### E.    Procedural History

On January 10, 2020, Lead Plaintiffs filed their Amended Class Action Complaint. ECF No. 38. On May 7, 2020, Lead Plaintiffs moved for leave to file a Second Amended Complaint ("SAC"), which added allegations from a former senior Passport executive who had contacted Plaintiffs' counsel after the first amended complaint was filed, provided new information that corroborated the other confidential witnesses cited in the complaint, and leant further support to Plaintiffs' claims. ECF Nos. 60-62. On June 5, 2020, the Court granted Lead Plaintiffs' motion. ECF No. 68. Following briefing on Defendants' motion to dismiss, on March 24, 2021, the Court issued the MTD Order sustaining four misstatements: Defendants' September 5, 2018 statements concerning Passport's purported $100 million in savings thanks to Evolent, their statements on the February 26, 2019 investor call concerning Evolent's purported lack of intention to bail out Passport, their statements on the May 7, 2019 conference call concerning Passport's purportedly improving finances, and their statements in the Insider Louisville article. MTD Order at *30-36.

Plaintiffs and Defendants each moved for partial reconsideration of the MTD Order on April 1, 2021, which remained pending when the TAC was filed. Plaintiffs' motion (ECF No. 112) requested that the Court sustain a statement that it did not discuss in the MTD Order: Defendant Blackley's statement on May 11, 2018 in which he asserted that Evolent had provided

15

"about $75 million improvement to Passport's bottom line," because such statement was virtually identical to Defendant Williams' September 5, 2018 statement that the Court sustained.[6] *See id.*

On September 10, 2021, the Court entered a Rule 16(b) scheduling order (ECF No. 125), which adopted, in relevant part, the proposed schedule listed in Appendix A to the parties' Joint Rule 26(f) Proposed Discovery Plan (ECF No. 122). The schedule adopted by the Court provided that the "Deadline to Amend Pleadings or Add Parties" was November 17, 2021.

The parties began document discovery on October 7, 2021. By October 29, 2021, Defendants had produced over 16,000 documents to Plaintiffs, which Plaintiffs diligently reviewed. Within these productions, Plaintiffs identified numerous compelling documents which not only supported allegations that the Court had sustained in the MTD Order, but also supported falsity and scienter with respect to the January 10 and May 11, 2018 statements.

On November 17, 2021, Plaintiffs moved for leave to amend the SAC, which Defendants did not oppose and which the Court granted on December 2, 2021. ECF Nos. 147, 149, 156-157. The TAC was filed on December 2, 2021. ECF 158. Defendants filed their motion to dismiss the TAC on December 15, 2021. ECF Nos. 161, 162. Plaintiffs now timely file their opposition.

---

[6] Defendants sought reconsideration of the Court's decision sustaining Defendant Williams' alleged February 26, 2019 and May 7, 2019 misstatements, arguing that those statements were "forward looking" and protected by the PSLRA safe harbor. ECF No. 110. However, as Plaintiffs set forth in their opposition (ECF No. 115), this Court already expressly considered and rejected these arguments, finding that Defendants' statements were not "forward looking" and were not accompanied by meaningful cautionary language. Defendants' arguments were therefore improper on reconsideration.

16

III.   **ARGUMENT**

A.   **Defendants' Statements Regarding "$100 Million In Identified Annualized Savings" For Passport Are Actionable**

1.   **Defendants Have Conceded That Their January And May 2018 "$100 Million In Identified Annualized Savings" Statements Were False And Misleading When Made, And Were Made With The Requisite Scienter**

At the motion to dismiss stage, when a defendant fails to contest an element of a claim, the defendant concedes that element is adequately pled. *See, e.g., Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 677 (D.S.C. 2016) (upholding § 20(a) control person liability claim where "Defendants fail[ed] to contest whether Individual Defendants were controlling persons"); *Hall v. Rent-A-Ctr., Inc.,* 2017 WL 6398742, at *5 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (sustaining PSLRA complaint without analyzing loss causation where Defendants did not address that element).

Defendants do not contest, and thus concede, falsity and scienter for their "$100 million in identified annualized savings" statements made on January 10, 2018, and repeated on May 11, 2018. For this reason alone, the Court should find falsity and scienter adequately pled for these statements. But regardless, the TAC more than adequately alleges falsity and scienter.

First, the Court has already sustained a virtually identical statement: namely, Defendants' September 2018 statement that "[i]n [Passport's] own plan, we believe we've helped to generate over $100 million in savings, which was highly valuable to that organization." *See* MTD Order at *32 (finding statement false and misleading); *id.* at *35-36 (finding scienter).

Second, the TAC's new allegations, which are based on Defendants' own internal documents, only further support falsity. Specifically, the TAC alleges that ███████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

17



Such highly detailed, specific allegations clearly establish falsity.

For similar reasons, the TAC's new allegations further support Defendants' scienter for these statements. These internal documents show ███████████████████████████ ███████████████████████████████████ Defendants openly acknowledged their intensive involvement in Passport's affairs, describing themselves as "co-owners" of the Plan, and many key documents cited in the TAC ███████████████. ¶¶138-59.

## 2. Defendants' Statements Regarding "$100 Million In Identified Annualized Savings" Were Material

A securities fraud complaint "may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on … their importance." *Singer*, 883 F.3d at 440; *see also Setzer*, 968 F.3d at 213, n.12 (materiality is a "mixed question of law and fact, rarely resolved at the motion to dismiss stage.").

Here, Defendants' statements that a "[f]ull risk partner [had] achieve[d] [a] MLR/ALR reduction impact representing $100M+ identified annual savings" through Evolent's services were unquestionably highly material to investors. First, the Court has already upheld substantively similar statements by Defendants as actionable. MTD Order at *32 (upholding statement regarding a purported $100 million in savings provided to Passport through Evolent's services).

18

Second, Passport was Evolent's single most important client, and "given that the [Passport relationship was] among the most important … it strains credulity to argue that a reasonable investor [] would have been unaffected" by significant negative information about that relationship. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 657 (E.D. Va. 2000); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *14 (S.D.N.Y. Dec. 2, 2013) (finding it material that defendant "continued to tout its contractual relationship with [a client accounting for 18.2% of its revenue] in an investor presentation" while the relationship was at risk due to an undisclosed contract dispute); *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *5–6 (E.D.N.Y. Mar. 30, 2012) (potential future loss of exclusivity with Wal-Mart potentially material to investors where "Wal–Mart accounted for a substantial percentage of [the defendant]'s sales").

Third, Defendants' statements concerned the singular purpose of Evolent's business—to lower clinical and administrative costs for health plans. *See, e.g., Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *7 (S.D. Ohio Jan. 21, 2016) ("issues which could call into question the viability of [defendants'] business model" clearly material to investors); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 595–96 (W.D. Tex. 2014) ("any reasonable, prudent investor would take into consideration information about . . . the single investment product that [defendant company] sold."). As such, Evolent's success in lowering costs "would be among the most important information looked to by investors." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (underwriting quality material to investors in a mortgage banking company).

Fourth, Defendants' own actions establish materiality for these statements. Defendants not only repeated these claims verbatim in two different investor presentations on two different dates, but Evolent's CEO specifically pointed to the statement during the May 11, 2018 investor conference call, and Evolent executives further made highly similar claims in later investor conference calls.

19

¶¶162-63, 166, 169. *See Atlas*, 556 F. Supp. 2d at 1155 ("significance" of false statements was "illustrated by the frequency with which Defendants emphasized [it]" in public statements); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 184 (S.D.N.Y. 2010) (information material where "repeatedly emphasized" by defendants).

Fifth, discovery has confirmed that Defendants themselves recognized that Evolent's ability to save its clients—and especially Passport—money was highly material to investors. As discussed in the TAC, ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ Defendant Blackley also expressly recognized the materiality of savings for Passport in his public statements, stating, for example, that Evolent's purported "improvement in [Passport's] bottom line is a big deal, and… from an investor's standpoint, in taking away the net result—is critical." ¶165.

Notwithstanding these facts, Defendants argue that the statements were immaterial as a matter of law. First, Defendants argue that their false claim of having saved a client $100 million was immaterial because Plaintiffs have not specifically connected those savings quantitatively to Evolent's financial results. MTD at 15-16. But this is a red herring. The statements were clearly material to Evolent, as evidenced by the fact that Evolent's most senior officers repeatedly boasted about these purported savings in investor presentations. Evolent's entire business model was predicated on its ability to save its clients money, and any undisclosed adverse information on this point (especially with regard to the Company's most important client) was highly material to investors. Moreover, $100 million in savings clearly *was* a material number for Evolent—which

earned only $435 million in total revenue in 2017 (¶45)—because Defendants themselves repeatedly touted that number in investor calls and presentations throughout the Class Period. [7]

Second, Defendants argue the statement was immaterial because it was a "sentence fragment buried in the bottom corner of a single slide." MTD at 16. Defendants offer no legal support for this argument, but in any case, Defendants mischaracterize the facts. The "$100m in identified annualized savings" statement was printed in large type, occupied one quarter of a slide, emphasized "$100m" in colored, bold typeface, was repeated in multiple investor presentations, and was highlighted by Defendant Williams in Defendants' May 11, 2018 investor call. ¶ 162. Moreover, Defendants were so clearly aware of the materiality of these "savings" statements in Evolent's investor presentations ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Surely, Defendants would not devote this level of attention to a mere immaterial "sentence fragment buried in the bottom corner of a single slide."

Finally, the fact that Defendants' statement did not expressly name Passport, but only referred to the Plan as a "full risk partner," is irrelevant to materiality. It strains credulity to believe that a company's statements about its most important customers can only be material if they actually name those specific customers. Indeed, investors would clearly want to know if Evolent was successful with its major customers—named or unnamed, and indisputably with respect to the Company's

---

[7] *In re Nokia OYJ (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006), cited by Defendants (MTD at 15), is thus distinguishable, as it concerned improper accounting for mere millions of dollars' worth of defective products for a company with sales of over $37 billion. *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) is similarly inapposite because it concerned alleged accounting overstatements where the plaintiffs failed to allege even a dollar amount by which sales were supposedly overstated. And *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 659 (4th Cir. 2004) is inapposite because it concerned statements about a CEO's college education—facts in no way comparable to the central misrepresentations at issue here. Moreover, none of Defendants' cases stand for the absurd proposition that a false statement can *only* be material to investors if it can be directly tied to a specific amount of revenue or profit.

21

single most important client.  Accordingly, Defendants' statements regarding a purported "$100m in identified annualized savings" for Passport were unquestionably material to investors.

### 3.    Plaintiffs Have Sufficiently Alleged Loss Causation

In the Fourth Circuit, pleading loss causation requires only that Plaintiffs "alleg[e] facts establishing that the defendant's misrepresentation or omission was one substantial cause of the investment's decline in value."  *Singer*, 883 F.3d at 445.  The "disclosure or series of partial disclosures <u>need not precisely identify the misrepresentation or omission about which the plaintiff complains</u>"—but need only "relate back to the misrepresentation and not to some other negative information about the company."  *Id.* at 446 (emphasis added).  So long as a "plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings," and "determined by the trier of fact."  *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 609 (E.D. Va. 2015); *see also* MTD Order at *38 (same).

Significantly, the Court has already held that the two corrective disclosures alleged in the TAC establish loss causation.  MTD Order at *36-39.  The TAC does not plead any new disclosures that were not already sustained by the Court, and Defendants never sought reconsideration on the issue.  As this Court unequivocally held, loss causation was adequately alleged because the SAC, like the TAC, pleads "<u>that the truth that Defendants fraudulently withheld from the market is that Evolent did not lower administrative and clinical costs for its clients—namely Passport—but instead, Evolent raised costs for its clients, as demonstrated by the circumstances with Passport</u>."  MTD Order at *38.  The January 2018 and May 2018 statements proceed on the identical theory—*i.e.*, that Evolent told investors it was saving its clients substantial amounts of money, when in fact it was not, and that the truth came to light through the exact same two disclosures.

Defendants have not pointed to any reason why these allegations—which the Court previously upheld—should be treated differently here.  Instead, as with materiality, Defendants again

argue that loss causation is not established for those statements because Defendants did not refer to "Passport" by name but instead as a "full risk partner." This is incorrect.[8] As with the substantially similar statements that this Court has already sustained, Defendants' "full risk partner" statements created the materially false impression in the market that Evolent saved its most important client hundreds of millions of dollars, when the exact opposite was true. It is well-established that "neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation." *Singer*, 883 F.3d at 446.[9] Indeed, "courts around the country have found that plaintiffs may satisfy the loss causation pleading requirement without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline." *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *17 (N.D. Ill. Aug. 11, 2021) (emphasis added) (collecting cases and finding that there was no requirement at pleading stage that plaintiffs "explain exactly which alleged misstatements the corrective disclosures corrected"); *see also Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 890 (W.D. Tex. 2014) (upholding class period beginning with statement about an unnamed "distribution partner," as defendant "committed the same fraud with these statements he committed [in later statements] with the only

---

[8] Defendants' citation to *In re Stone & Webster, Inc. Securities Litigation,* 2007 WL 9822735, at *1 (D. Mass. Sept. 7, 2007) is inapposite. In that case, the court did not reject loss causation because the project in the alleged corrective disclosure was "unnamed," but because a mere "cost overrun" did not reveal anything about alleged accounting fraud. Indeed, the court stated it was "not imperative that the press release expressly mention" the project by name for there to have been a corrective disclosure. *Id.*

[9] Defendants' citation to the Supreme Court's class certification decision in *Goldman Sachs* is wholly inapposite, as there is no "generic misrepresentation" here. MTD at 11 (citing *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.* 141 S.Ct. 1951, 1961 (2021). Moreover, on remand, the district court in that case found loss causation was adequately alleged. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at *14 (S.D.N.Y. Dec. 8, 2021) (noting that "the Supreme Court [did not] hold [] that the *Basic* presumption can no longer withstand any differing levels of abstraction between misstatement and disclosure.")

23

difference being he omitted the name [of the partner].").  As such, loss causation is established for

Defendants' false statements regardless of whether or not they specifically mentioned Passport.[10]

> **B.    Defendant Blackley's May 11, 2018 Statement That Evolent Had Provided "$75 Million Of Improvement To Passport's Bottom Line" Is Actionable**
>
> > **1.    Defendant Blackley's Statement Was Materially False and Misleading**

As set forth in the TAC, on May 11, 2018, Defendant Blackley told investors that Evolent

had provided "$75 million of improvement to Passport's bottom line."   ¶165.  There is no question

that this statement was false.  As an initial matter, the Court has already held that a substantially

similar misstatement—namely, Defendants' September 2018 statement that Evolent's services had

"helped to generate over $100 million" in annual cost savings for Passport—was materially false

and misleading.  MTD Order at *32, *35-36.  Moreover, the TAC alleges additional facts that further

demonstrate the falsity of this statement.  For example, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[10] Defendants' cases on this point are inapposite.  In *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282-83 (S.D.N.Y. 2008), the court found loss causation from the announcement of an SEC investigation that was pleaded as a corrective disclosure, and rejected the defendants' argument that the announcement "did not reveal any part of the falsity of (defendants') prior representations." *Id.*  In *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007), a lawsuit alleged as a disclosure was "devoid even of general allegations" relating to the alleged fraud, other than previously disclosed facts that thus "could not have caused [the] stock price to decline."  *Id.* Similarly, in *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011), the court found that the mere announcement of delays in evaluating a leveraged buyout would not have revealed to the market that the buyout was expected to fail.   The disclosures in numerous other cases cited by Defendants similarly revealed nothing whatsoever about the underlying alleged fraud, unlike the disclosures here, which have already been upheld by this Court as revealing the truth of Defendants' fraud. *See, e.g. In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *17 (E.D. Va. Aug. 27, 2018) (finding plaintiffs failed to allege any false statements or corrective disclosures whatsoever); *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 679-80 (E.D. Va. 2015); *Gaer v. Am. Pub. Educ., Inc.*, 895 F. Supp. 2d 763, 792-93 (N.D.W. Va. 2011) (same); *Marsden v. Select Med. Corp.*, 2007 WL 518556, at *5 (E.D. Pa. Feb. 12, 2007) ("none of th[e] information [about the alleged fraud] was ever disclosed to the market") (emphasis added); *Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.,* 886 F. Supp. 2d 328, 337-38 (S.D.N.Y. 2012) (finding "no logical connection between [the alleged corrective disclosures] and Plaintiff's vague allegations of manipulations and improper accounting," while recognizing that "loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements") (emphasis added); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 610 (W.D. Pa. 2006) (MTD at 14) ("not one of the alleged misrepresentations… caused precipitous drops in the stock price).

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

Nevertheless, Defendants argue that this statement was not false because Blackley was supposedly "merely reciting a common, widely used managed care organization financial metric (MLR) based on Passport's annual financial statements." MTD at 18. But this is not correct.

First, Blackley spoke at length about the supposed "$75 million of improvement to Passport's bottom line"—he even repeated it twice, and specifically noted that it was a "big deal." The plain meaning of "improvement to Passport's bottom line" was that Evolent had improved Passport's *overall financial picture* by $75 million *net of any fees, penalties, interest payments, or other negative financial impacts caused by Evolent*. Indeed, rather than somehow limiting his statement to a single financial metric, Blackley did the exact opposite, specifically highlighting that "from an investor's standpoint…taking away the net result is critical," and stressing that the $75 million in improvement in Passport's bottom line "gives you a full picture of the impact of all the work [done by Evolent]." Thus, Blackley clearly conveyed to investors exactly what he said—that Evolent had provided "$75 million in improvement to Passport's bottom line."

Second, even assuming, *arguendo*, that Blackley's statement only concerned MLR—which it obviously did not—that still would not result in its dismissal. Indeed, it is axiomatic under the federal securities laws that once Blackley chose to speak about the purported savings Evolent was providing to Passport's "bottom line," he was obligated to disclose all material information about that subject needed to make it not materially misleading. *Singer*, 883 F.3d at 440 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing

25

independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.") (internal quotation omitted); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund. Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir.2010)) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead [investors]."). Such information obviously included the highly material fact that, in reality, Evolent's ██████████ fees and deficient services were dramatically <u>increasing</u> Passport's costs to the point that the Plan was on the brink of bankruptcy.

<u>Third</u>, to the extent there is any "dispute concerning what, exactly, [Blackley] meant," that creates an "issue of fact" not appropriate for resolution here. *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1116 (C.D. Cal. 2010); *In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 559 (E.D. Tex. 2004) (declining to "resolve a fact issue regarding how the market interpreted [defendants'] accounting statements" at pleading stage); *see also In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *19, n.13 (C.D. Cal. June 4, 2001) ("The question is whether a defendant deliberately made a statement which would mislead a reasonable investor, not whether there is any conceivable interpretation of the defendant's words according to which they were not false.").

<u>Fourth</u>, and tellingly, Defendants' sole support for their argument is a chart which they claim comes from data reported in Passport's 2016 and 2017 financial statements. MTD at 18. Defendants contend that this chart supports Blackley's statement about a $75 million improvement in Passport's "bottom line." However, the chart does no such thing, and on its face does not even show a $75 million improvement in MLR, or in any other metric, let alone Passport's "bottom line."

26

Finally, in light of the foregoing, Defendants' argument that Plaintiffs do not allege that Passport's financial statements are false is irrelevant.[11] Even assuming, arguendo, that it would be appropriate to judicially notice and accept as accurate Passport's financial statements, the accuracy of those financial statements has little bearing on whether Evolent was responsible for $75 million in "bottom line" savings for Passport.[12] Defendants point to nothing in those financial statements that would enable investors to determine whether *Evolent* had created *"bottom line" savings* at Passport, which is exactly why ███████████████████████████████████████████

████████████████████████████████████████████████ [13]  ¶139.

### 2. Plaintiffs Have Adequately Alleged Blackley's Scienter

In evaluating a corporate officer's scienter, the Court "must evaluate the totality of the circumstances alleged in the complaint, and afford 'the inferential weight warranted by context and common sense." *Kiken*, 155 F. Supp. 3d at 606 (internal quotation omitted).

---

[11] Defendants' caselaw on this point is also entirely inapposite for these and other reasons. For example, unlike in *In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 467 (S.D.N.Y. 2005) (MTD at 18), Plaintiffs' allegations here do not hinge on Passport's financial statements being false. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 360 (S.D.N.Y. 2003) (MTD at 18) is even less on point, as it concerned alleged false statements by *analysts* in 44 different research reports, and the court found that the plaintiffs failed even to identify "which statements in specifically which of the forty-four 24/7 research reports published during the class period–carried 'not true' opinions, or how these 'misrepresentations' (plural) 'concerned' the various 'companies,' or any of the specific facts upon which the belief that the opinions (whichever ones are meant) were false." *Id.*

[12] Defendants' argument that the documents cited in the TAC "refer to different time frames" than Blackley's statement also fails. MTD at 21. It is implausible that Blackley's claim that Evolent had created $75 million in "bottom line" improvement "over the last few years" was true specifically and only in May 2018, yet false at all other times throughout the Class Period. Similarly, while Defendants assert that their "corporate mismanagement and "operational problems" were insufficient to make Blackley's statements false (MTD at 23), this, too, misses the point. Blackley's statement was false not merely because Defendants had "operational problems," but because Defendants falsely claimed to be saving Passport massive amounts of money while those operational problems were in fact causing Passport's financial decline. *See Ollila v. Babcock & Wilson Enter., Inc.*, 2018 WL 792069, at *6 (W.D.N.C. Feb. 8, 2018) ("various courts recognize that pleading lies and omissions raises a claim above internal mismanagement and into the realm of securities fraud.").

[13] As such, Defendants' renewed attack on the credibility of CW 5 (MTD at 20-21) (which the Court has already rejected, *see* MTD Order at *35) is also irrelevant because Defendants argue only that CW5 lacked "knowledge to opine on whether Passport's financial statements accurately reflected Passport's revenue, medical expenses, and MLR improvements."

27

As an initial matter, Defendants' entire argument regarding Blackley's scienter depends entirely on their patently incorrect characterization that Blackley "merely recited a financial metric from Passport's publicly reported financial data," and therefore that "Plaintiffs cannot allege scienter unless they show he knew (or recklessly disregarded) that Passport's publicly reported financial data was false." MTD at 23. As with Defendants' falsity argument, this misses the point. Blackley's statement was false not because of his claim about changes in Passport's MLR, but because he claimed Evolent provided Passport with $75 million in "bottom line" savings. As such, Blackley's knowledge of Passport's financial statements is irrelevant to his scienter here. MTD at 24.[14]

Moreover, the TAC is replete with facts supporting Defendant Blackley's scienter. Blackley was a co-founder of Evolent and President of its main operating subsidiary that contracted with Passport. ¶¶28, 152. *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) (executives' positions "augment[t] the other allegations of intimate involvement pleaded."). Passport was by far Evolent's most important client, generating not only 20% of its revenue ███████ ███████████████████████████████████████████████████. *See id.* at 784 ("core operations" allegations "certainly relevant to the Court's holistic analysis" of scienter); *TIAA-CREF Large-Cap Growth Fund v. Allergan PLC*, 2021 WL 4473156, at *11 (D.N.J. Sept. 30, 2021) (granting "core operations" scienter inference where fraud involved "key products… representing almost one-quarter of [defendant company's] profit-drivers."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988, n.5 (9th Cir. 2008) ("The size of the contract and the prominence of the client raise a strong inference [of scienter]."). Indeed, Evolent regularly boasted of its close involvement in Passport's business, calling itself a "co-owner" of Passport with "joint governance" allowing

---

[14] Defendants' caselaw on this point is also inapposite for the same reasons, namely, that Plaintiffs' allegations do not rely on a contention that Passport's financial statements were false. *See* MTD at 24-25 (citing *Alstom*, 406 F. Supp. 2d at 467; *id.* at 471; *Ho v. Flotek Indus., Inc.,* 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017); and *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)).

Evolent to "drive the decisions we think are important for performance." ¶¶189-90. *See Kiken*, 155 F. Supp. 3d at 607 (public statements about high level of involvement with Chinese operations, including that "[w]e have personnel on the ground" supported inference of scienter).

Documents cited in the TAC demonstrate that Blackley, along with other top Evolent executives, ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████[15] In sum, it is not plausible that Blackley would have been unaware of the same facts Evolent's other top executives knew by May 2018—*i.e.*, ████████████████████████████████████████████████.[16]

### C.   Defendants' February 26 And May 7, 2019 Statements Are Actionable

During Evolent's February 26, 2019 earnings call, as Passport teetered on the brink of bankruptcy, an analyst asked if there was "any balance sheet risk if [Passport] were to go insolvent?" Defendant Williams unequivocally responded "No, we don't have any broader exposure" (¶179)—

---

[15] Blackley's scienter is further supported by the fact that he "spoke in detail" about Evolent's purported savings for Passport and thus "held himself out to investors as knowledgeable about" the subject. *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228–29 (E.D. Pa. 2021) (finding executive's "professed knowledge" of subject of misleading statements created "a strong inference ...that [his] misleading statements were therefore made with scienter.").

[16] Defendants' loss causation argument regarding Blackley's statement is also based on the same misreading of Plaintiffs' complaint to be alleging that *Evolent's claims about Passport's MLR* were false, and thus fails for the same reason as their scienter argument. Additionally, Defendants' loss causation argument fails for the reasons set forth further at §III(A)(3), namely that a "fact-for-fact disclosure of the relevant truth to the market is [not] a necessary prerequisite to establishing loss causation." *Singer*, 883 F.3d at 446.

*i.e.* he denied that there was a risk that Evolent would have to bail out Passport, assuring analysts that such a transaction was "not in our strategic lens at this point," and that even acquiring "a minority stake… related to Passport [was] not something that is currently being evaluated." *Id.*

Then, during Evolent's May 7, 2019 earnings call—just three weeks before Evolent was forced to bail out Passport—Defendants assured investors that Passport's finances were improving. Specifically, Williams stated that "Passport is making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members," and that "[o]verall, we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market." ¶184.

In the MTD Order, the Court made clear that it had fully considered Defendants' arguments regarding these statements and, in upholding those statements, rejected all of those arguments. *See* MTD Order at *28-30; *id.* at *32-36. Defendants should not now be granted a second chance to dismiss these same statements on the same theories.

Regardless, however, these statements were clearly false and misleading when made, as further demonstrated by documents produced in discovery. For example, ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Unable to refute these allegations, Defendants again seek refuge in the PSLRA's "safe harbor" for forward-looking statements, which the Court already rejected. As set forth below, the safe harbor does not apply here and does not shield Defendants from liability for their fraud.

### 1.    The Safe Harbor Does Not Apply Because The Statements Were Not Forward-Looking[17]

Self-evidently, the PSLRA's "safe harbor" for forward-looking statements applies only to statements that are truly forward-looking. However, Defendants' statements at issue here were not forward-looking, and thus not entitled to the PSLRA "safe harbor," because they concerned what was "in [Defendants'] strategic lens at this point," and what was "currently being evaluated" with

---

[17] Defendants incorrectly assert that the Court "found" these statements to be forward-looking. In reality, the Court either outright found that the statements were *not* forward-looking or else declined to reach a conclusion. *See id. at \*29* (with respect to certain of the February 26, 2019 statements, "the Court finds that this statement is not forward-looking, and based on the arguments presented, is actionable"); *id.*at \*30 (considering other statements made Feb. 26, 2019, finding that "as with the first set of statements, it is not clear that this set of statements is immaterial," and finding that *even if considered as forward-looking*, the statements were not accompanied by meaningful cautionary language); *id.* at \*30 (finding that May 7, 2019 statement "*could* be considered forward looking," but that it was nonetheless not accompanied by meaningful cautionary language) (emphasis added).

31

respect to Passport, and, similarly, the claim that Passport was "making solid progress" with respect to its financial stability. As such, these statements "contain assertions about present facts," rather than merely what might happen in the future, and therefore "refers to the present state of the Company's affairs." *Genworth*, 103 F. Supp. 3d at 788; *see also NECA-IBEW Pension Trust Fund v. Precision Castparts Corp.*, 2017 WL 4453561, at *11 (D. Or. Oct. 3, 2017) (because statements could "properly [be] construed as [Defendants'] present assessment of the company's intention[s]" they were not forward-looking statements); *Ollila*, 2018 WL 792069, at *5 ("If a statement is a mix of both forward-looking and present or past facts," safe harbor doesn't apply "to the parts of the statement that are not forward-looking.").

### 2. Defendant Williams Had Actual Knowledge Of Falsity, And His Statement Was Not Accompanied By Meaningful Cautionary Language

Defendants cannot invoke the PSLRA "safe harbor" where they "knew their statements were false or misleading when made." *Ollila*, 2018 WL 792069, at *5; *Genworth,* 103 F. Supp. 3d at 790 (same). As discussed above, Defendant Williams knew his statements were false when he made them. *Inter alia,* ██████████████████████████████████████████████████████████████████████████████████[18]

Defendants' argument on this point is simply wrong with respect to the evidentiary record. Specifically, ██████████████████████████████

---

[18] ████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████ For this reason alone, Defendants' argument fails.

In light of Defendant Williams' actual knowledge of the falsity of his statements, virtually no possible cautionary language could be sufficiently "meaningful" to shield them. *Genworth*, 103 F. Supp. 3d at 790 ("[i]f the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading.") (internal quotation omitted). Moreover, none of the "cautionary" language cited by Defendants (MTD at 29-30) warns of the specific problems that Defendant Williams already knew were present when making these statements, namely (1) that Evolent, rather than a Medicaid rate change, was the cause of Passport's financial decline, (2) that insolvency remained likely for Passport *regardless of whether the rate change was reversed*, and (3) that ████████

██████████████████████████████████████████████████. *See, e.g., Ollila* 2018 WL 792069, at *5 (no safe harbor where "the risks defendants warned of had already been realized."); *see also Genworth,* 103 F. Supp. 3d at 790 (declining to determine whether cautionary language was sufficient at pleading stage where "there is a question of fact concerning whether Defendants knew the 'potential' risks identified had already occurred.") (internal quotation omitted).

Finally, the cautionary language cited by Defendants fails to shield Defendant Williams' statements because it was not incorporated into the investor calls in which Defendant Williams made the statements. Instead, statements in these calls warned only that Defendants' statements were subject to "risks and uncertainties"—but never identified any specific statements or particular risks, much less the specific risks identified in the TAC concerning Passport that Defendants knew full well existed at the time. The language moreover stated only that "some" of the risks can be found

33

in "reports" filed with the SEC—but never identified which risks could be found in which reports, or pointed to any particular section of any particular report filed on any particular date. Under the PLSRA, this is insufficient as a matter of law. *See* 15 U.S.C.A. § 78u-5(c)(2) (safe harbor applies to oral forward-looking statements only where an accompanying oral statement expressly "identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement.") (emphasis added); *See also In re Salix Pharmaceuticals, Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings," as this "fails to alert investors to the specific risks they are facing."); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102-04 (D.C. Cir. 2015) (cautionary language "warning generally of risk and referring listeners to the Company's recent Annual Report" insufficient).[19]

In sum, even if the Court were to find Defendants' February 26 and May 7, 2019 statements to be forward looking, these statements were false and misleading when made and do not otherwise qualify for the PSLRA's safe harbor.

**IV.   CONCLUSION**

For all of these reasons, Defendants' motion should be denied in its entirety.

Dated: January 28, 2022                     Respectfully submitted,

                                            */s/ Steven J. Toll*
                                            Steven J. Toll
                                            Va. Bar No. 15300
                                            stoll@cohenmilstein.com
                                            Daniel S. Sommers
                                            dsommers@cohenmilstein.com
                                            Joshua C. Handelsman

---

[19] *In re Humphrey Hosp. Tr. Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (see MTD at 29) is distinguishable because, *inter alia*, it concerned written forward-looking statements. And *In re Lab Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428 (M.D.N.C. May 18, 2006) is distinguishable because, unlike the oral statements here, the statements there identified and referenced specific SEC filings containing cautionary language. *Id.* at *7

jhandelsman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*

Maya Saxena
msaxena@saxenawhite.com
Joseph E. White, III
jwhite@saxenawhite.com
Lester R. Hooker
lhooker@saxenawhite.com
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel: (561) 394-3399
Fax: (561) 394-3382

Steven B. Singer
ssinger@saxenawhite.com
Sara DiLeo
sdileo@saxenawhite.com
Joshua H. Saltzman
jsaltzman@saxenawhite.com
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
Fax: (888) 631-3611

*Lead Counsel for Lead Plaintiffs*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2022, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*