1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**PLYMOUTH COUNTY RETIREMENT
SYSTEM, et al.**

                 **Plaintiffs,**

       **v.**

**EVOLENT HEALTH, INC., et
al.,**


                 **Defendants.**

: 
: 
:  Civil Action
:  No. 1:19-cv-1031
: 
: 
:  March 18, 2022
:  10:00 a.m.
: 
: 
: 
: 
: 

.............................

**TRANSCRIPT OF MOTION PROCEEDINGS
BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiffs:         SAXENA WHITE, P.A.
                          JOSEPH E. WHITE, III, ESQ.
                          LESTER R. HOOKER, ESQ.
                          7777 Glades Road, Suite 300
                          Boca Raton, FL 33434

                          COHEN MILSTEIN SELLERS & TOLL, PLLC
                          STEVEN JEFFREY TOLL, ESQ.
                          DANIEL S. SOMMERS, ESQ.
                          1100 New York Avenue NW, Suite 500
                          West Tower
                          Washington, DC 20005

For the Defendants:        HIRSCHLER FLEISCHER, P.C.
                          ROBERT R. VIETH, ESQ.
                          8270 Greensboro Drive, Suite 700
                          Tysons Corner, VA 22102

                          KING & SPALDING, LLP
                          PAUL BESSETTE, ESQ.
                          JILL CARVALHO, ESQ.
                          500 W. 2nd Street, Suite 1800
                          Austin, TX 78701

Court Reporter:                     Diane Salters, CSR, RPR, RCR
                                    Official Court Reporter
                                    United States District Court
                                    401 Courthouse Square
                                    Alexandria, VA 22314
                                    Email: Dianesalters.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

(Proceedings commenced at 9:58 a.m.)

THE DEPUTY: *Plymouth County Retirement System v. Evolent Health, Inc., et al.*, Case No. 19-cv-1031. Will the parties please note their appearances for the record.

MR. TOLL: Good morning, Your Honor. Steven Toll for the plaintiffs, along with my partner, Dan Sommers, here, and lead counsel of the Saxena White law firm, Lester Hooker, who will argue today --

MR. HOOKER: Good morning, Your Honor.

MR. TOLL: -- and Mr. Joseph White.

MR. WHITE: Good morning, Your Honor.

MR. VIETH: Good morning, Your Honor. Robert Vieth of Hirschler for the defendants; and with me at counsel table is Mr. Paul Bessette --

MR. BESSETTE: Good morning, Your Honor.

MR. VIETH: -- and Ms. Jill Carvalho of the King & Spalding firm. And with the Court's permission, Mr. Bessette will be handling today's arguments.

THE COURT: Very good. Good morning to you-all.

This matter comes before the Court on defendant's partial motion to dismiss the third amended complaint. This case has a long history that predates my involvement in it, but I have the case now, and I've worked hard to review the docket, the motions that will resolve this morning, and I've looked very carefully at Judge Alston's previous extremely comprehensive

and thorough order on the motion to dismiss regarding the second amended complaint.

Let me just start by saying this is not going to be a wholesale revisiting of those issues that have been decided. They are the law of the case, with the exception of the specific issues that have been raised in this new motion, which is both a motion to dismiss under 12(b)(6), but also a motion for reconsideration since two of the three sets of statements at issue were previously briefed and considered by the Court. And so I'm mindful of the different standards on those issues.

There's been a lot written here. I don't need to hear everything that's been argued already, but I will hear, briefly, oral argument. We will then resolve matters and talk about scheduling, because we're also in an unusual position where matters have been stayed, which I'm sure, as all of you know, especially those of you who are familiar with this court, that is not the typical practice. The length of this case does not reflect the typical way these matters are resolved. Some of this is a reflection, of course, of the pandemic and things beyond even the control of the Eastern District of Virginia, but I have every intention of getting this back on track on a schedule that may or not be appealing to you-all, but will, nonetheless, help us move it forward.

So, for the defendant, I'll hear first, since it's your motion, anything you wish to add that is not already contained

in your papers.

MR. BESSETTE:  Thank you, Your Honor.

May it please the Court, Paul Bessette of King & Spalding for the Evolent defendants.

We appreciate the opportunity to address the Court today. We know Your Honor is new to the case; and as you've recognized, the case is two and a half to three years old.

This is a securities class action governed by the Private Securities Litigation Reform Act.  The alleged fraud in this case, however, has never made sense, and on a high level. Plaintiffs allege that Evolent allegedly overcharged Passport, one of its significant clients, and then lied to its own investors about a cost savings that it helped Passport achieve, that, in fact, almost drove the company to bankruptcy.  I mean, to what end would that be the case?  Apparently, to buy out Passport, pay 70 million of its investors' money for a 70-percent stake.  It just doesn't make any sense.  It's opposite of what Evolent's business is and other businesses are, which is they do better when their clients do better. That is Evolent's business model.  This case has never made sense.

So as we pointed out in the motion to dismiss the second amended complaint, and as Your Honor recognized, Judge Alston, he cut 20 of the alleged misstatements down to four; found that plaintiffs narrowly met their scienter burden; and he narrowed

the Class Period, which really affected the value of the case. The parties both filed motions for reconsideration of limited aspects, as Your Honor has noted; plaintiffs, because they wanted a better explanation for why its statement was dismissed, that was improper; defendants, because there was a clear error of law with respect to applying the PSLRA provisions to forward-looking statements. And as you've noted, those motions are still pending and are baked into the current motion.

Plaintiffs filed a third amended complaint, but it really does nothing to change the theory or the makeup of the case. They've added two new statements and realleged a statement that was already dismissed and, significantly, they're trying to move the Class Period and expand it backwards nine months, which, again, affects the valuation of this case. So we filed a partial motion to dismiss, not objecting to or challenging all of these statements, but we are challenging the two new added risk partner statements and the realleging of Mr. Blackley's already dismissed statement, and have pointed out in the papers that unlike other litigation cases, the PSLRA has a very heightened pleading burden, which plaintiffs have not come close to meeting, which is to allege particularized facts to show that a particular statement was false or misleading when it was made and that the speaker had a strong inference to lie, to have an intent to deceive or defraud when

he made this statement.

Plaintiffs have also failed to plead the necessary element of loss causation, what the Fourth Circuit says is a standard of sufficient specificity, which is akin to Rule 9(b). So we've pointed out that with respect to the risk partner statements, plaintiffs have failed to plead loss causation. That is a very in-the-weeds type argument, but it's very important because the securities laws are not an insurance for investors. They have to show that an alleged misstatement actually caused their economic loss. There had to be a corrective disclosure that at least related back to or corrected the alleged misstatement so they can show that at least that statement was a significant cause of their economic harm. Absent doing that, with what the Fourth Circuit says is sufficient specificity, they haven't pled loss causation. They're essentially looking for insurance.

So we pointed that out and we pointed out, I believe, Your Honor, that the risk partner statements in and of themselves, which were on one slide of two different slide presentations, are just not material to Evolent investors. Mr. Blackley --

THE COURT: Help me understand that argument. I mean, I get that it's a big PowerPoint of their multiple slides, but is it your position that if there's false information on one of those slides, it's okay if you just put in enough other slides that are correct, that it becomes

immaterial because no one would pay attention to that particular slide?

MR. BESSETTE:  That's a good question, Your Honor. No, that's not our position.  Our position, first and foremost, is they haven't demonstrated it was false; but more importantly, they haven't shown loss causation.  That was the focus of our brief.  So I just mention --

THE COURT:  Right.  And that argument is there's no mention of Passport; it's a mention of a risk partner; and it talks about this enormous cost savings.  And your argument is that there's no loss causation here because how would anyone have known that the reference was to Passport, and later on when it turns out that Passport wasn't doing so well and the stock drops, it doesn't all match up.  Is that the argument, essentially?

MR. BESSETTE:  Yes, Your Honor, that's the thrust. That's the -- call it two points.  That was the first point. The market didn't know it was Passport.  The plaintiffs admit they didn't know until they got documents.  Nobody knew.  And the market can't react to information it doesn't know.  That's a basic tenet of the fraud on the market presumption, which is what this case is about.  So if the market doesn't know something, it can't react.  The market didn't know it was Passport.  But more importantly, or just as importantly, the second prong of that is if you look at the corrective

disclosures, right, they're specific to Passport.  The first one is when Passport filed a lawsuit against Kentucky, challenging the Medicaid rate cuts; and it said in that suit that it suffered 2018 losses because of those rate cuts; it was looking at 2019 losses, and it was on the brink of insolvency. It doesn't say anything about MLR or ALR savings a year before then for an unnamed client.  It's completely unrelated.  And so, yes, it doesn't mention Passport, but it's not even subject matter related, which is another big problem.  So the identity of Passport and the subject matter don't match up.  There's just no loss causation.  There's no indication, especially when their burden is near a 9(b) standard, to show that that statement was in any way related to the stock drop in February, the first corrective disclosure; and the second one in May was even further removed.  That's when Evolent announced it was going to pay $70 million for a 70-percent stake.  There's nothing about ALR/MLR savings for an unnamed client a year and a half before then.  They're just completely unrelated.

So, yes, the identity of the partner and the subject matter of the corrective disclosure does not relate back to the alleged misstatement, so there's no meeting their pleading burden to show that those statements caused the economic loss.

If Your Honor -- I won't belabor on this point -- but a good road map for how you should look at this is the *Take-Two Interactive* case that we've cited in our brief.  In that case,

it shows how a court distinguishes between corrective disclosures that are sufficiently related to an alleged misstatement and those that are not.  So, for example, in that case -- the fraud allegations in that case related to a company's stock option granting practices, and there were two corrective disclosures, like there are here.  The first one was the company announced that a Manhattan district attorney had subpoenaed some compensation and H.R. records.  The second one was the company announcing that the SEC was investigating its stock option practices.  The Court looked at that and said, you know, that first announcement about the subpoena, there's no loss causation there; that announcement is just a distant relationship to the alleged misstatement.

The second one, however, was closely related, and so that met their pleading burden.  But the same thing here:  We've got two unrelated corrective disclosures specific to Passport that do not relate back to an unnamed client having specific MLR/ALR savings in 2016 and 2017.  That's the essence of our loss causation argument.

Mr. Blackley's statement, first off, as Your Honor had said in your introduction, is the subject of the reconsideration motion.  We pointed out that that was improper by plaintiffs to ask to reconsider that because it was clearly dismissed, and they don't meet the standard for reconsideration.  But just as importantly, if the Court is

going to consider it, there is no -- plaintiffs have not pled its specificity with respect to the statement being false or that the speaker, Mr. Blackley, made it with scienter.  The statement, just so Your Honor knows, has two very specific statements in it:  Essentially, that Passport achieved a five-percent improvement in what's called MLR -- that's medical loss ratio.  There are federal regulations that define, for companies like Passport in the Medicaid/Medicare field, what is a medical expense and what is not, what's an administrative expense and what is not; and then you just compare those expenses to the total revenue, and so you have an MLR ratio.  That is all in Passport's financial statements.  Mr. Blackley made statements that relate and tied directly to those financial statements, which this Court can consider because plaintiffs, in paragraph 74 of the third amended complaint, specifically named Passport's financial statements.  And in other paragraphs in the complaint are ripe with financial metrics and numbers that all tie directly to Passport's financial statements.

Passport's financial statements show a five-percent improvement in MLR from 2016 -- we have a draft in the papers that Your Honor can see -- but it was 95 percent in 2016, and then in 2017, improved to 89.9 percent.  So the medical expense of total revenue dropped.  That means a bottom-line improvement, bottom line meaning net income to a company, which

was also in the financial statements.  And Mr. Blackley said that five-percent improvement in MLR accounted for or showed a $75 million improvement to Passport's net income, which is the bottom line.

Now, importantly, plaintiffs concede that they do not contend that these financial statements are false.  I mean, that's the ball game.  That's an admission that they can't show Mr. Blackley's statements are false, because they can't show the financial statements are false.  No falsity.  And certainly can't show scienter, that he intended to deceive investors by making a statement that ties directly to the financial statements that plaintiffs don't allege are false.

Finally, Your Honor, we'll talk about Mr. Williams' forward-looking statements.  That's the clear error.  I mean, the forward-looking statements, the PSLRA defines what those are:  Projections of revenues, earnings, statements of plans and objectives of management, statements of future economic performance.  We cited the *Marsh* case in the Fourth Circuit, which makes clear that statements that relate to future economic performance are forward-looking statements under the statute.  And Judge Alston was clear and the case law is clear that a statement of presently held belief regarding a future event is also a forward-looking statement.

The statements at issue here, Mr. Williams' statements, were made at two earnings call when he was answering questions

from analysts about future events; like, for example, a possibility of Evolent's future acquisition of Passport, and whether Passport's problems presented future balance sheet risks.  He was responding to analysts' questions about those future events.  Same with the May statements where he said, you know, we believe Passport is making solid progress towards improving its financial performance; we remain hopeful it will continue to do so.  Those are forward-looking statements. Judge Alston said they were forward-looking statements under *Marsh*, but what he did do is say I can't look at the accompanying cautionary language because it wasn't cited.

THE COURT:  And that's why you think you need the Rule 59 standard, for clear error; is that correct?

MR. BESSETTE:  Yes, Your Honor.

THE COURT:  And, likewise, why you think the plaintiffs don't meet that same stringent standard with regard to his dismissal of the Blackley statements?

MR. BESSETTE:  That's correct.  That's correct.

So by any measure, these are forward-looking statements. And so you have to look -- if Judge Alston had looked at the meaningful cautionary language, which we pointed out, it's replete.  First off, at the beginning of each earnings call, the statement was read that oral forward-looking statements -- what is required; that actual results may differ from presently held beliefs, and that additional information on why could be

readily available in SEC filings.  And we showed, in those SEC filings, both the 2017 10-K and the 2018 10-K.  Exhibits 7 and 8, they list over 50 different risk factors facing Evolent, which consumed 24 pages each of those 10-Ks.  I mean, I don't know how anybody goes through it, but they were all there.  And the warnings are specific and directly connected to the subject matters of the earnings calls, and they would also relate to the very factors that plaintiffs claim led to their investment losses, in particular, possible future investment and/or acquisition of Passport, the risks of Passport's insolvency and expectations of Passport's financial condition.  That qualifies as meaningful cautionary language under the first prong of the safe harbor.  Those are protected statements and should have been dismissed.

We also pointed out, under *Raab* and its progeny, forward-looking statements like this which are general which do not contain guaranties or specific facts are immaterial as a matter of law.  And, interestingly, as we've pointed out, Judge Alston cited the *Raab* case for this topic, but then didn't apply it when he was looking at these forward-looking statements.  So our argument is both that it's meaningful cautionary language to forward-looking statements, automatically protected under the safe harbor, and also immaterial as a matter of law under *Raab* and its progeny, so also protected.

With that, we don't reach, and don't need to reach, Mr. Williams' actual knowledge; and I'm happy to go into that, or we can do it later, if appropriate, but we don't ever get there because of the first prong of both meaningful cautionary language and immateriality. But as we pointed out in the briefs, they haven't come close to pleading actual knowledge by Mr. Williams to take him outside of the safe harbor. So I won't get into that unless we need to, Your Honor.

We appreciate the Court's reviewing all the papers. This is an old case, and it matters because this case is going to go on beyond today because there are still two statements we are not challenging. The focus really is what is left in the case. So we know which statements we're defending, what the Class Period is, what the evaluation of the case is, so we can kind of take a look at where we want to go from here.

With that, thank you, Your Honor.

THE COURT: Thank you.

MR. HOOKER: Good morning again, Your Honor. Lester Hooker. May it please the Court.

THE COURT: Good morning, Mr. Hooker.

MR. HOOKER: I think a good place to start would be the start of the Class Period that's alleged in the third amended complaint with the full-risk partner statement that happens in January 2018.

One thing that my colleague on the defense side didn't say

was that he disputed that this reference was to Passport; so there's no question that the reference was, in fact, to Passport. And I'll discuss in a moment his arguments on loss causation; and they also mention in the papers materiality, but I think it will be useful to briefly discuss the new allegations in the third amended complaint that really show what defendants and the senior officers of both Evolent and Passport were saying behind the scenes and juxtapose that against what they were saying publicly to investors.

So, a couple months before this statement was made in January of 2018, in September 2017 -- we begin our discussion of this in the complaint at paragraph 139 -- Defendant McGrane, who's Evolent's CFO, he sends an email to the national president for Medicaid of Evolent, and he says he's receiving questions from investors about Evolent's fees and whether they're having a negative impact on Passport given that Passport's profitability had deteriorated in conjunction with Evolent coming aboard. And, importantly -- and this ties into Mr. Blackley's reference to MLR later -- Mr. Bower, Scott Bower, who's the national Medicaid president, he tried to suggest referencing improvements to MLR. In response, Defendant McGrane rejects that assertion. He references that Passport's costs have increased from 107 million to 169 million in a year when they paid Evolent close to $50 million.

And then, importantly -- and this really sets up the

trajectory of our allegations throughout the Class Period -- he rhetorically asks -- and this is a verbatim quote -- The question I have is, we make a nice margin at Passport, and so the question is, are they seeing a benefit in that of our fees? That's at paragraph 140.  He answers his own question in the negative.  He says, The answer is no in 2016.  Now, defendants say, well, that was before the Class Period starts that's alleged in the complaint.  So the question is did that change.

We include another email chain on January 11, 2018.  This is one day after that full-risk partner statement that references the $100 million in identified annualized savings. So the next day, there's an email chain from Evolent's managing director of client analytics, Lakshmi Subramanian, and she tells the company's senior vice president and chief actuary that after looking at data concerning Passport's expenses -- this is a quote -- I doubt if we've been able to demonstrate any clinical savings despite the insanely high ALR.  An insanely high ALR is a reference to Passport's administrative costs.  And she says if revenue continues to dip, Passport was in grave trouble.  This is the day after the start of the Class Period.  And the response from the senior vice president is, I don't think this is news to anyone.  This is in paragraph 142 of the complaint.

So in the span of just a couple months, you have the managing director of client analytics doubting that

Evolent could demonstrate any clinical savings for Passport. You have the senior vice president saying that that wasn't news to anyone, and you have Defendant McGrane, the CFO, saying that Passport was not seeing a benefit net of the fees. And what did defendants say publicly? Again, in May 2018, Evolent's own analysts, in an investor day conference, they repeat that same claim from the first day of the Class Period, and the CEO, Defendant Williams, actually, in his oral remarks, highlights that claim.

A couple of months later on September 5, 2018, at a Wells Fargo healthcare conference -- and this is the statement that the Court, Judge Alston, has already upheld and defendants do not challenge -- they again assert to investors the same $100 million. They say Evolent's services helped to generate over $100 million in savings, which was highly valuable to that organization. Again, defendants do not challenge that. So the new allegations in the complaint only reinforce the Court's holding remains true.

We also mention -- and, briefly, I'll just discuss a couple more of these documents -- in October 2018, you have Evolent's general counsel's office flagging that very claim. That same slide --

THE COURT: Well, let me stop you there just to focus on what we're talking about here.

MR. HOOKER: Sure.

THE COURT:  Their claim is that there's no loss causation and they're not material --

MR. HOOKER:  Yes.

THE COURT:  -- so I understand the context in which you've explained how this arises.  So tell me why these two slides, the one in January and the one in May, were significant enough that investors would have relied on them and then it would have relayed it to the later disclosures, corrective disclosures, when it turned out Passport was not in good shape.

MR. HOOKER:  Sure.  And I think Judge Alston's prior holding is instructive here on the loss causation point; and I'll read from his order.  He stated that plaintiff's loss causation theory -- he described it as follows:  The truth that defendants fraudulently withheld from the market is that Evolent did not lower administrative and clinical costs for its clients, namely, Passport, but instead, Evolent raised costs for its clients as demonstrated by the circumstances with Passport.  And he says that at page 71 of his order.  And, again, in holding that, the Court held that loss causation was adequately alleged for defendant's September 2018 statement regarding $100 million in savings.

THE COURT:  But it specified it was $100 million in savings for Passport in September; is that correct?

MR. HOOKER:  Correct.

THE COURT:  And so, here, their argument, as I think

I've just heard it articulated and in the papers, is that in January and May, there wasn't a reference to Passport specifically, it was a risk partner, $100 million in savings; and I think your argument is one can fairly infer that it was Passport because Passport was such a significant client for Evolent.  Is that a fair summary of your argument?

MR. HOOKER:  Yes.  It wasn't just a significant client; it was its single most important client.  And for investors -- and this kind of overlaps because defendants do mention arguments on materiality with regard to this statement -- investors would want to know a massive amount like $100 million.  It's claimed that they're saving $100 million in savings, whether that's true or false.  The documents that we've added to the complaint show that it's false.  And simply by refraining from including the name of the client in a slide would, we think, prejudice the class and unfairly mean that defendant's liability under the federal securities laws is in their hands.  They can just simply avoid liability on a loss causation basis on facts similar like this where there's a client or distribution partner involved by simply refusing to name the specific client or distribution partner; and that's not what the securities laws say.  And they advocate in their briefing that you need a fact-for-fact mirror image connection between the false statement and the disclosure at issue; and we argue that that's not true, that's not consistent with the case

law that we point out in the briefing, and that's not required at the pleading stage, which we still are here.

And, really, defendants don't dispute that all of these statements, including the one that was upheld by the Court, refer to Passport.

And one thing that defense counsel mentioned:  The theory remains the same.  The theory has not changed from the earlier version of the complaint.  It's still that Evolent represented that they saved their clients money, that they saved Passport money.  In the end, the truth was still disclosed with the same two disclosures that were in the prior complaint.  So there's still a connection.  There's still the same nexus that Judge Alston wrote about in his opinion.

I can turn to Mr. Blackley's statement next, Your Honor. Again, this is a very similar statement.  It's in May 2018.  He references $75 million of improvement to Passport's --

THE COURT:  Let me stop you there because I do think that the standard is important here.

MR. HOOKER:  Okay.

THE COURT:  You agree that this is really being reviewed as reconsideration because this decision was made, it was briefed --

MR. HOOKER:  Yes.

THE COURT:  -- and nothing about the third amended complaint changes that set of facts you thought that Judge

Alston got wrong, either that he overlooked it or that he somehow made a distinction that is not consistent with the other decisions he made, but I have to look at this through the lens of Rule 59, because as I said at the outset, both as a practical matter and as the law requires, I'm not going to wholesale revisit all of the work that's already been done in this case.  So tell me why it needs the stringent standard of Rule 59.

MR. HOOKER:  Well, Your Honor, the Court was meticulous in its order.  It was a 76-page opinion.  The first half of the opinion sets forth the 20 misstatements that are at issue; and beginning on page 41, ending on page 59, Judge Alston spent 18 pages going category by category, statement by statement, and either finding statements inactionable or sustaining.  And he actually specifically discusses in his legal analysis section each of those categories, each of those statements, except for Mr. Blackley's statement.  And what we were pointing out in our briefing was we thought it just slipped through the cracks because of its similarity to the 2018 statements, almost identical, that he upheld, referencing savings amount that Evolent provided to Passport.

So defendants argue in their briefing that Blackley's statement was not false and that scienter was not alleged as well because he was referring to that metric MLR.  And then they mention in their reply brief -- they slightly

alter that -- that it wasn't MLR; it was the net income from 2016 to 2017 that MLR was referring to.  But as we set forth in the papers, the argument fails.  He repeats the statement twice during that conference.  It's a plain language statement.  It conveys that Evolent's services improved the overall financial picture by $75 million.  And at paragraph 165 of the complaint, his entire quote is provided.  You know, he says the $75 million improvement in the bottom line is a big deal; it helps make, I think, the mission sustainable, and gives an opportunity for us to expand what we're doing in the state, and that's from an investor's standpoint in taking away the net result.  It's critical.  So he not only references the bottom line; he says -- he's commenting on the net result.  This is a big deal.  From an investor's standpoint, it's critical.  He's conveying the exact same message that the Court upheld and found actionable in the September 2018 statement.

Defendants' argument that Blackley was only referring to MLR doesn't make sense in that context, and it doesn't help them, because if he's referencing one improvement and one metric -- even if he is, which we argue that he's not -- he was obligated to tell the entire truth, to show the entire picture that's also supported by the additional new documents that we set forth in the complaint.

So given the context of the entire exchange, and especially when you consider all the internal emails and

documents that we set forth in the third amended complaint where you have the CFO of Passport saying -- sorry, the CFO of Evolent saying that Passport was not seeing a benefit net of the fees; the managing director of client analytics calling the fees insanely high; Passport's own CFO -- which it's set forth in the complaint -- saying just months later that Evolent's analysis, own analysis, showed no benefit was conferred to Passport up to two and a half years and millions in fees; and, critically, not only did Evolent's general counsel's office say that they could not find any backup for the $100 million claim that we were talking about at the beginning, but in 2019 when the reporter for the *Insider Louisville* sends an inquiry to the company saying he wanted to inquire about Evolent's claims, about the savings that they provided to Passport, and Mr. Blackley again suggests internally in emails with the senior-most officers of Evolent, he suggests referencing $70 million in savings for medical pharmacy.  The senior director of corporate communications explicitly says that she had not seen any analysis on actual savings, and it's not clear to me how we get to that math.  And she says that she discussed that with the CEO, Defendant Williams, and he concurred.

So defendant's argument that this was only in reference to one single metric, it just doesn't make sense when you look at these documents, these allegations that we have in the complaint.  And they not only establish falsity, but they also

establish a strong inference of Mr. Blackley's scienter.

Your Honor, I could turn to the last -- the third set of documents of challenged misstatements, defendants' statements February 26th and May 7, 2019.  Again, these include the February 2019 statement where defendants are at an investor conference call.  An analyst, including a Citigroup analyst, asked whether Evolent had any balance sheet risk and whether they would need to acquire some of Passport's assets.  So this is prominently on the minds of analysts because it's indicative of Evolent's financial situation.  In response, Defendant Williams assured the analysts that, no, we don't have any broader exposure.  He goes on to say that bailing out Evolent was not in our strategic lens at this point, and not even acquiring a minority stake was something that's being currently evaluated.  And in May 2019, defendants assured investors that during another conference call, that Passport's finances were improving.  And this is three weeks before they have to bail out Passport because the plan's on the brink of bankruptcy.

So, again, defendants argue that the statements are forward looking, that they are accompanied by meaningful cautionary language.  Judge Alston specifically spent five pages talking about analyzing, reviewing, and rejecting these same exact arguments.  But the new documents --

THE COURT:  What's your response to the defendant's argument that he made an error in concluding that he couldn't

look at those outside documents for meaningful cautionary language?

MR. HOOKER:  Well, we submit that it wasn't an error. But even if you do, it still doesn't help defendants, because the third amended complaint includes documents to show that, No. 1, these were statements of present facts, current then, present facts; and the new documents in the complaint show that defendants knew they were false at that time.  They're saying that they're not considering even a minority stake in Passport, it's not in our strategic lens; exactly what analysts want to hear.  But if you look at, starting in paragraph 155 of the complaint, just weeks earlier -- so the statement was made in February.  Weeks earlier, January 15, 2019, Evolent's COO, Tom Peterson, he sent a document to Passport's CEO, and it describes several initiatives that they're contemplating; and included in that was Evolent, quote, minority ownership position in Passport; that these were part of a, quote, broader alignment model that may be needed to guaranty the future viability of Passport.

So just weeks after these documents are sent, analysts are laser focused on this issue.  They're asking defendants about balance sheet risks, whether Evolent will need to purchase any assets; and to assuage those direct concerns, Defendant Williams says that's not in our strategic lens; even a minority stake is not something being valued.  That's rendered

completely false by these statements that are in our complaint. These documents are in our complaint.  They prove the exact opposite is true.  Evolent, in fact, was evaluating the exact scenario that defendants publicly denied just weeks later. That email was on January 15th.  The complaint also has, over the next two weeks, additional documents that further reinforce that, and we discuss those in paragraph 158.

So these include an option where Evolent is an investor-partner in an executive summary where Passport's solvency model scenarios are being evaluated.  And, interestingly, the far more likely scenario that's listed in there is one where a capital call would be immediately required of Passport, and Evolent would have to provide financial support to Passport, e.g. capital.  So the exact issues that analysts are asking defendants and they're denying.  So these are then-present statements, and the falsity of these statements is reinforced by these new documents that are in our complaint now.

So we discuss in our opposition that in light of these and other internal documents, there really can be no credible argument that the statements were false, that they were a false representation of present facts.  Analysts specifically relied on the statements.  When the final disclosure that the Court has already upheld is issued in May, analysts specifically excoriate management and they reference these statements.  They

reference that as recently as the fourth quarter 2018 earnings call, the management had previously topped down going after Passport.

So we respectfully submit that they remain actionable, as the Court held in the prior order, because that order is even more reinforced by these new documents in the complaint.

THE COURT:  Thank you.

I'll briefly hear from you, Mr. Bessette, since it's your motion, but I think we've exhausted these issues.

MR. BESSETTE:  I'll be brief, Your Honor.

THE COURT:  Thank you.

MR. BESSETTE:  I do think there are some particular points I need to make and clarify for Your Honor.

First, with respect to loss causation, there's a critical difference; and I know counsel read what Judge Alston said about why the corrective disclosures were sufficiently related to the alleged misstatements.  We don't agree with his ruling on that, but there was -- there's some -- we understand why it was made, because both the corrective disclosures and the alleged misstatements mention Passport.  So the idea that maybe the misstatements talked about savings and going -- you know, increasing savings, but the corrective disclosures show that Passport -- or Evolent didn't provide savings.  At least Judge Alston put that connection together, because they both reference Passport.  That is not the case here.  These

statements are unnamed and ambiguous who they're referring to. The market clearly didn't know; the plaintiffs didn't know; and the reason they didn't know is because the 10-Ks for Evolent disclosed there are 35-plus clients; and, yes, Passport is a significant one, but there are three or four other significant clients.  In fact, in the same year of 2017, in the 10-K, Evolent discloses that three different plans accounted for 60 percent of Evolent's A.R., accounts receivable.  There were significant clients with significant revenues, and that statement in the slide deck, which doesn't reference Passport, is not corrected by or related back to by corrective disclosures about Passport, looking at 2018 and 2019.  They're just unrelated.  The same rationale that Judge Alston used doesn't apply here.

THE COURT:  Well, the plaintiff is correct that you're not disputing that those slide decks referring to the $100 million in savings, in fact, did refer to Passport; not that the word "Passport" was in the slide, but you're not making an argument that that $100 million was a reference to a different client, are you?

MR. BESSETTE:  Correct, I'm not making that argument, because as plaintiffs --

THE COURT:  And so it was a choice that was made by Evolent to not specify the client, for whatever reasons; for -- I don't know, I don't know what reasons there would be.

Presumably, there wouldn't have been negative repercussions to identifying their, you know, one of their best, most lucrative clients recognizing this savings as a result of work that Evolent did, right?

MR. BESSETTE:  Right.

THE COURT:  So it can't be that if this was knowingly false, that they knew that it wasn't realizing this savings and it was misleading the market, potentially, that you could avoid liability by simply saying risk partner generically as opposed to identifying the specific client in order to then later argue, well, no one could have relied on this.  Because the point of including it in the slide was to demonstrate that Evolent is a competent company that is helping healthcare companies realize savings by doing the things that they're doing, right?

MR. BESSETTE:  I would say no, Your Honor, that's not correct.  Here's the distinction, right:  Plaintiffs argue that the statement was false and they have other documents to suggest it was false.  And we can get into the weeds because it's not false.  They're pointing to different savings -- clinical, pharmacy -- that really aren't related to MLR/ALR, which is very specific in this statement.  But we don't want to get into a factual dispute, and we don't need to, because showing falsity is one element of a 10b-5 case.  So they have to plead, with specificity in this circuit, loss causation,

that that statement was a significant cause of their economic loss; and if the stock, when it did drop in 2019 based on those two corrective disclosures specific to Passport, if they don't have sufficient pleading to tie those back to an unnamed risk partner statement, then the falsity of that statement was never revealed to the market; it did not cause their loss; it didn't cause the stock drop.  And if they can't plead sufficient particularized facts under a 9(b) standard in this circuit, then they don't have a 10b-5 claim for that statement, whether it was false or not.  So that is a distinction.  And it is important that that statement didn't refer to Passport.  I mean, if you could say, well, even if -- it was false, so we get a 10b-5 case.  I mean, it just doesn't work that way for loss causation.  I mean, that's like saying that the corrective disclosures about Passport, do they also suffice to show the falsity of any statement Evolent made about any of its other 35 customers.  Well, of course not.  They have to be sufficiently related otherwise, and the Fourth Circuit and the EDVA cases we cite make that clear.  The *Two-Take [sic] Interactive* case I described, you parse through the corrective disclosures and the alleged misstatements, and there -- we've never said there needs to be a face-to-face confession between the corrective disclosure and the alleged misstatement, but they have to relate back; they have to reveal the relevant truth.  If the corrective disclosures don't reveal the relevant truth about

the alleged misstatement, it didn't cause the stock drop in whole or in part; and that's the situation plaintiffs are in, whether you take a cynical view that Evolent could have named Passport or not.  If you look at the slide deck, Passport's name and its other customers' names are all over the place, so there was no -- it was no sinister intent, but the point is they are here on a securities fraud claim, a 10b-5 claim. Falsity is one element; scienter is another element.  They fail on loss causation, and that's just a fact.

Another way that I think plaintiffs are confusing things on Mr. Blackley's statement is they're tying it to savings, that Mr. Williams mentioned savings.  You know, they're trying to make the case that Mr. Blackley is referring to that Evolent was providing savings to Passport.  That's not what he said. His statement was very specific:  A five-percent improvement in MLR -- fact check true from their own financial statements; a $75 million improvement to the bottom line for Passport -- fact check true from their own financial statements.  And if they can't allege and they don't allege that those financial statements are false, they can't meet the element of showing falsity of his statement.  He didn't talk about savings. That's an undefined kind of term.  And they talk about, well, there's clinical savings, there's other savings, there's medical pharmacy savings.  I mean, it's a squishy term. He didn't talk about squishy terms.  He talked about a

five-percent MLR, a metric that's easily shown in the financial statements, and a $75 million bottom line, also shown in the financial statements; and they don't allege that's false.

The risk partner -- oh, that actually applies to the risk partner statement, too, the savings. I mean, it's an undefined term, and I don't think we need to go into there because the risk partner statements fail on loss causation.

So, lastly, forward-looking statements. Plaintiffs are focusing on the additional documents they attached to the third amended -- or pled in the third amended complaint to show Mr. Williams' actual knowledge; and I didn't go into all that because it's very clear they are forward-looking statements, and they can have present-tense statements that are included in forward-looking statements. The *Marsh* case makes that very clear, and Judge Alston found that as well, and that is in the order.

So now that the Court has looked at the meaningful cautionary language, which Judge Alston didn't think he could, it's clear that there's meaningful cautionary language. We never get to Mr. Williams' knowledge, but since they've raised it, I want to assure the Court that these documents that they're talking about don't come close to showing actual knowledge.

The January 15, 2019 email that was referred to by counsel as well as a February 2019 email -- both sent by Mr. Peterson,

the COO of Evolent -- they talk about executive summary of different scenarios, different possibilities, right?  Neither of those two documents was ever received by Mr. Williams.  It's not alleged that he ever saw them.  And they themselves -- if you look at the documents, and we've attached them -- they are cursory references to a possible or potential form of future financial assistance if many prior or other different scenarios don't work out.  It's what good management does.  It's certainly not a smoking gun.  Doesn't show actual knowledge of falsity.  Doesn't show that the company was then evaluating a purchase of a $2 billion Medicaid plan.  No.  It was listed on a strategic option, which Mr. Williams never saw or sanctioned.

The third document -- and here's where we get a little kerfuffle, if you will, in the briefing -- this document is referenced in the third amended complaint at paragraph 157, dated January 23rd, and it's entitled Macro Strategic Priorities.  It was never sent to Williams either.  He never saw that.  What plaintiffs attached is a similar document, dated the next day.  They attached it to their opposition; in effect, amending their third amended complaint, which they cannot do under the law.  This Court should not consider that document; but if it does, it is similar and it's a different version of the January 23rd one that was alleged in the complaint, which, again, is a listing of strategic options, which Mr. Peterson said directly, I send this at the risk of

ticking off Mr. Williams.  So Mr. Williams didn't sanction it. He may have seen that one, but he didn't see the one alleged in the third amended complaint.  But, most importantly, if you look at that document -- and you can look at Exhibit 9 -- Mr. Peterson said this is a starting point; this is a listing of 100 different options in different scenarios for, by the way, different customers.  Passport's just one.  And in that document, it says, Protect and grow our top relationships, a) Passport; and then, like, seven or eight things down, Pursue parallel options related to more dire scenario on rates. Because we know those Medicaid rates were killing Passport. Passport sued Kentucky because of those.

It says -- and the whole smoking gun is Evolent as investor-partner.  That's it.  And they draw from that, supposedly, Mr. Williams' actual knowledge that the company was then evaluating a $2 billion acquisition because one of the strategic options was Evolent as investor-partner.  That doesn't say they were evaluating the plan.  They're trying to squish -- again, like Mr. Blackley is saying savings when he didn't, they're trying to say that shows actual knowledge that Mr. Williams was lying when he said they weren't currently evaluating.  This document doesn't show they're currently evaluating.

Now, remember, the standard under the safe harbor, the forward-looking statements, is plaintiffs have to show that

Mr. Williams had actual knowledge.  That's higher than scienter.  They've barely met scienter in the pleading.  This document, which is the only one Mr. Williams got, which the Court shouldn't consider anyway because it was amended -- it's, in effect, amending the third amended complaint by their opposition -- is not a smoking gun.  It doesn't show actual knowledge at all.

THE COURT:  I feel like we've wandered far away from the standard of Rule 59.

MR. BESSETTE:  With that, I submit, Your Honor.

THE COURT:  Thank you.

Well, this matter comes before the Court on defendant's partial motion to dismiss the third amended complaint; and as I noted at the outset, this case has a long history and there's been a lot written about it already by Judge Alston, and it has been very thoroughly briefed, and I've reviewed those briefs and listened carefully to the arguments of counsel, and I appreciate the care that everyone has taken.

I'm going to grant the motion in part and deny the motion in part.  I believe I understand the arguments on loss causation and materiality.  I do find that the risk partner statements are actionable and can go forward.  While it is true that Passport is not mentioned specifically, I do find, for purposes of the PSLRA, 9(b), and the pleading standards, that the plaintiffs have met their burden and that the January 2018

and May 2018 statements are sufficiently pled at this stage to go forward for purposes of this case.  I don't find the mere fact that Passport is not named, given all the other circumstances, to be dispositive; and I do find that there's a sufficient connection between the corrective statements and that information.

I will not revisit and overturn Judge Alston's decisions with regard to the other two sets of statements; in other words, I am going to dismiss and grant the motion to dismiss with regard to Blackley's statements.  I do not find that there's a basis under Rule 59, which I believe is the correct standard, to revisit Judge Alston's decision.  I understand the plaintiffs' arguments that these statements fall under the same categories with those recognized in other circumstances by Judge Alston.  I do not find that, by the stringent standard of manifest injustice or a clear error of law, that he erred, however, in dismissing those statements.

With regard to the third set of statements, I am not going to overturn his decision.  I'm going to let those matters go forward as actionable as he concluded; however, I will make the record clear that I've considered the arguments regarding the meaningful cautionary language and the information that he did not consider; and having looked at that language, I find that it is not specific enough, that it is too vague and overly broad, and not tailored to provide the safe harbor for those

statements which are forward looking.  Those statements are a, as he concluded, mixed combination of present statements and forward-looking statements, but I find, having considered all of the information, that the safe harbor provisions do not apply and that there's not a basis to come to a different conclusion, so I will permit those statements to go forward as actionable at this time.

So the motion is granted in part and denied in part, and I am not going to add to the docket by writing a lengthy opinion as Judge Alston did for the sake of this matter being able to move forward on the merits now.

Let me turn to the issue of scheduling.  A motion to stay was granted on December 2nd.  That motion to stay is now lifted, and the matter needs to get back on course.  There had been a consent order setting out dates, but those dates, obviously, have been overtaken by events, and so we need to address where we are.

So let me first ask you, perhaps, the most important question, then we'll come back to it later, which is that one date that predated December 2nd was November 23rd, which is the date that the parties had identified for having some sort of a settlement conference; did that ever come to pass, or was that set by the wayside as this motion to dismiss was being briefed?

MR. BESSETTE:  Your Honor, the parties did mediate in a private mediation, but it was unsuccessful.

THE COURT:  Okay.  Well, I'm glad that you kept to the submission that you had provided to the Court.  And, obviously, circumstances have changed, and it is always beneficial to think about settlement in any case, but especially a case like this, and especially given all that is before you.

Where are we with regard to discovery?  I would note that it is not typical that we have a separation of fact and expert discovery.  That is the way this case has played out.  I'm not sure I would have phrased it that way.  But tell me where you are with regard to discovery on both what we would call fact discovery and expert discovery.

MR. HOOKER:  Your Honor, document discovery is substantially complete.  That took place during the stay of the case; so now that the stay has been lifted, we can complete document discovery.  We had noticed depositions.  I believe the order on the stay contemplates the defense counsel and plaintiffs' counsel meeting and conferring to set forth a new schedule, both for the completion of discovery and to renew our motion for class certification; and now that the Class Period has been defined and the statements that are still at issue in the case have been defined, we can do that in short order.

THE COURT:  You did not do that in anticipation of the hearing today?

MR. HOOKER:  Because the Class Period had not been

set by the order that Your Honor just gave, we did not do that yet, but the prior motion and our expert on market efficiencies report can simply be updated to accommodate the ruling.

THE COURT:  So the stay was issued on December 2nd, and your schedule that you had agreed to and had been endorsed by the Court, I think, contemplated another 40- -- if I'm counting right or if we've counted right -- 43 days of discovery.  Do you believe that you need 43 days of further discovery, or are you ready to move right now to class certification and disclosure of expert reports?

MR. HOOKER:  I think we can do both on the same trajectory.  We could file a motion for class certification.  I think we may need a little bit more than the 43 days to complete everything, simply to get the motion filed, the opposition by defendants, the depositions of our expert. Defendants had noticed depositions for our clients and our clients' investment managers and consultants, and we, obviously, noticed depositions for fact witnesses.  So it is a lot to get done, but I'm sure we can do it expeditiously.

MR. BESSETTE:  If I may, Your Honor.  We -- just -- I agree with counsel.  We had calculated at the time the third amended complaint came on, there was about two and a half months left of discovery, fact discovery.  I think that's still -- we would need that amount of time.  Class certification will be ongoing, as counsel said, right away.

And we had contemplated a schedule a certain number of days out from the ruling. We got the ruling today. And I think that's before the Court already, that class cert schedule and the fact discovery. The clock would start ticking today. So we're not asking for a lot of time, just what was in the original order in terms of what was left for fact discovery.

THE COURT: Well, with regard to class certification, I think the parties had requested 21 days from the ruling on the motion to dismiss. So three weeks from now, the motion would be filed, and then -- I'm not sure why you need more than 30 days to respond to the motion on class certification. Is there some reason why it's going to require more than 30 days?

MR. BESSETTE: I think we had 45 days, Your Honor, just to make sure we had the expert, you know, deposition or depositions, along with I think there's still some outstanding class certification discovery. All of that stopped.

THE COURT: Well, again, I can't go back in time, but I'm reticent to, you know, have this thing drag out. As you pointed out, this has been two and a half years. You know, 30 days ought to be enough time to file an opposition to class certification.

MR. BESSETTE: I think part of the issue, as counsel mentioned, is we can only depose their expert once, and we didn't know what the class cert timing was going to be until now, so I would ask for the 45 days on opposition. If Your

Honor wanted to cut it to 40, I mean, that's going to be, obviously, fine, but --

THE COURT:  Well, there are a lot of dates here, and I'm not sure I want to go through a negotiation on each one of them right now.  On the other hand, I'm not sure I want to send you-all out to submit a schedule that I'm going to look at and think is not really what this case needs now.  So I want to be realistic.  I realize that you've got class certification; you've got completing fact discovery; you've got your expert reports all taking place at the same time --

MR. BESSETTE:  Right.

THE COURT:  -- but this case is going to move forward now.  We're back.  We're here.  We don't have masks on.  It's great.  We need to move this case along.

MR. BESSETTE:  Understood.

THE COURT:  We now understand the parameters of the case.  We're not going to be readdressing the pleadings here. You know, we need to get to the next part of this.  So what I'm going to do is wipe the slate clean, and I'm going to direct you to submit a comprehensive omnibus joint motion setting out a schedule.  My preference -- class certification is due in 21 days, period, unless you convince me to have it due in 14 days.  So we can start with that.  There's no negotiating. I'll let you-all discuss.  My preference would be 30 days for an opposition, 14 days for a reply brief, oral argument on

class certification within a week of that.  If that bumps up against a problem with expert disclosures that make it difficult for you to file your opposition, I will take that into account, but you-all have known what experts you needed for a long time.  Your experts should be lined up and ready to, you know, issue these reports.  The dates that you had previously set before the stay was in reflected to me, having some experience with these matters, that you should have been 95 to 98 percent done with discovery.  So your experts should have the material they need in short order.  So, you know, a schedule that says your experts are going to be disclosed 60 days from now, and 45 days after that -- this is the Eastern District of Virginia.  You know, sometimes I would get the question as to, in a normal case, how can we disclose our experts three weeks after discovery has begun?  And, you know, some lawyers can do it.  So when you talk to each other and you come up with your expert disclosure dates, be mindful of my expectations and how that will fit in with the class certification.  Once we've done class certification and the experts are disclosed, we're going to have our final pretrial conference.  That's the point at which we will set *Daubert* motions and summary judgment.  I don't need your predictions on when we should hear those.

     So the question is, when are we going to have this final pretrial conference?  Don't come back to me and say it's going

to be in August or September.  We should be able to get this done by June, at the latest, at the very latest.  So that's the guidance I'm giving you as you talk to each other.  And I realize it is going to be burdensome on both sides, but, hopefully, it will also focus the mind, because I think that sooner rather than later, you should think about sitting down to talk about settlement again.

Now, some of you have -- and I know in these cases, there are very, very competent retired judges and other people who specialize in these matters and charge enormous amounts of money for it.  The court provides this service, and does so very ably.  It may be -- and I will not speak for her -- that Judge Brinkema would be willing to hold a settlement conference in this matter.  As I think some of you know, she does that on occasion, but she has plenty of other work to do.  I would strongly recommend that when you leave, you talk amongst yourselves, especially those lawyers who have done settlement conferences in this courthouse before with Judge Brinkema, as to the great benefit you would get from taking advantage of that opportunity if she's willing to schedule it, and I would suggest that you do that sooner rather than later.  If you don't think that's productive, the Court is certainly not requiring you to do that, and far be it from me to require Judge Brinkema to do anything.  It is only through her graciousness that she's willing to consider it.

So I would like a joint schedule submitted to me by next Wednesday at noon, at the latest; and if I have an issue with it, then we can have a conference call or, otherwise, address matters.  But class certification will be -- initial brief will be due in 21 days.

Is there anything else that I need to address or that I failed to address this morning?

MR. BESSETTE:  Not for the defendants.

MR. HOOKER:  No, Your Honor.

THE COURT:  Thank you very much again for your care in briefing this matter.

*Diane Salters, CSR, RPR, RCR*
Official Court Reporter

CERTIFICATE OF REPORTER

I hereby certify that the foregoing transcript is a true and accurate record of the stenographic proceedings in the above matter.


            /s/ Diane Salters                    3/24/22
_____        _____
Diane Salters, CSR, RCR, RPR          Date
Official Court Reporter