UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY,<br><br>          Defendants. | Case No. 1:19-cv-01031-MSN-TCB |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES,
AND APPOINTMENT OF CLASS COUNSEL AND LIAISON COUNSEL**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................... 4

        A.      Evolent's Rebadging Practice Leads to Illusory Cost Savings .............................. 4

        B.      Evolent's Faulty Valence Platform Directly Leads to Hundreds of Millions
                of Dollars of Penalties Assessed on Passport and the 2018 Medicaid Rate
                Cuts ........................................................................................................................ 5

        C.      Evolent Drives Passport to the Brink of Insolvency ............................................. 6

        D.      Evolent is Forced to Bail Out Passport ................................................................. 7

III.    PROCEDURAL HISTORY.......................................................................................... 9

IV.     LEGAL ARGUMENT................................................................................................ 10

        A.      Courts Favor Class Treatment in Securities Actions ........................................... 10

        B.      The Requirements of Rule 23(a) Are Satisfied.................................................... 11

                1.      Numerosity Is Established .......................................................................... 11

                2.      Commonality Is Established ....................................................................... 12

                3.      Typicality Is Established............................................................................. 13

                4.      Adequacy Is Established ............................................................................. 14

                5.      The Proposed Class Is Ascertainable......................................................... 16

        C.      The Requirements of Rule 23(b)(3) Are Satisfied............................................... 17

                1.      Common Issues of Law and Fact Predominate.......................................... 17

                2.      Lead Plaintiffs and the Class Are Entitled to a Presumption of
                        Reliance under *Basic*................................................................................. 18

                3.      The *Krogman* Factors and other Additional Factors Support A
                        Finding of Market Efficiency..................................................................... 24

                4.      Lead Plaintiffs Are Entitled to an *Affiliated Ute* Presumption of
                        Reliance...................................................................................................... 26

                5.      There Are No Damages Issues that Predominate ...................................... 27

6. A Class Action Is a Superior Method of Adjudicating Plaintiffs' Claims ............................................................................................... 29

V. CONCLUSION ................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) .................................................................................................... 18, 26

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................................... 11, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ........................................................................................ 11, 18, 19, 27

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .................................................................................................... 17, 18, 19

*Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*,
  2016 WL 4098741 (D. Minn. July 28, 2016) ............................................................. 20

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................................ 25

*Bloom v. Anderson*,
  2020 WL 6710429 (S.D. Ohio Nov. 16, 2020)........................................................... 15

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ............................................................................... 20, 22, 23

*Cheney v. Cyberguard Corp.,*
  213 F.R.D. 484 (S.D. Fla. 2003)................................................................................. 25

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
  270 F.R.D. 247 (D.S.C. 2010) .................................................................................... 21, 22

*Di Donato v. Insys Therapeutics, Inc.*,
  333 F.R.D. 427 (D. Ariz. 2019) .................................................................................. 28

*Dougherty, et al. v. Esperion Therapeutics, Inc., et al.*,
  2020 WL 3481322 (E.D. Mich. June 19, 2020)......................................................... 28

*Droste v. Vert Capital Corp.,*
  2015 WL 1526432 (E.D. Va. Apr. 2, 2015) ............................................................... 16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011).................................................................................................. 18, 19

*Funkhouser v. City of Portsmouth*,
  2014 WL 12597159 (E.D. Va. Oct. 16, 2014)............................................................ 12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) .................................................................................. 18, 19

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ......................................................... 14, 18, 21, 27

*In re BearingPoint, Inc. Sec. Litig.*,
232 F.R.D. 534 (E.D. Va. 2006) .................................................................... *passim*

*In re Computer Sci. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) .................................................................... *passim*

*In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ..................................................................... 26

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ............................................................................ 16

*In re Jeld-Wen Holding, Inc. Sec. Litig.*,
2021 WL 1186326 (E.D. Va. Mar. 29, 2021) ............................................. 13, 15, 29

*In re NII Holdings, Inc. Sec. Litig.*,
311 F.R.D. 401 (E.D. Va. 2015) .................................................................... *passim*

*In re Red Hat, Inc. Sec. Litig.*,
261 F.R.D. 83 (E.D.N.C. 2009) ............................................................................. 11

*In re Smith Barney Transfer Agent Litig.*,
290 F.R.D. 42 (S.D.N.Y. 2013) ............................................................................. 26

*In re the Mills Corp. Sec. Litig.*,
257 F.R.D. 101 (E.D. Va. 2009) ................................................................. 11, 12, 17

*In re Willis Towers Watson PLC Proxy Litig.*,
2020 WL 5361582 (E.D. Va. Sept. 4, 2020) ......................................................... 27

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2017 WL 4297450 (D.S.C. Sept. 28, 2017) .......................................................... 20

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) .......................................................................... 11, 17

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ............................................................... 20, 24, 25

*Lapin v. Goldman Sachs & Co.*,
254 F.R.D. 168 (S.D.N.Y. 2008) ........................................................................... 21

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) .................................................................................. 25

*Milbeck v. TrueCar, Inc.*,
    2019 WL 2353010 (C.D. Cal. May 24, 2019) ...................................................... 14, 20

*Monroe Cty. Employees' Ret. Sys. v. Southern Co.,*
    332 F.R.D. 370 (N.D. Ga. 2019).............................................................................. 22

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal. 2015) .............................................................................. 25

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................................ 28

*Plymouth County Retirement System v. GTT Communications, Inc.*,
    2021 WL 1659848 (E.D. Va. Apr. 23, 2021) ............................................................ 15

*Plymouth County Retirement System v. Patterson Companies, Inc.*,
    2020 WL 5757695 (D. Minn. Sept. 28, 2020) .......................................................... 14

*Police Ret. Sys. of St. Louis v. Granite Construction Inc.*,
    2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ............................................................. 20

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
    2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...................................................... 3, 4, 20

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)...................................................................................... 27

*Soutter v. Equifax Info. Servs., LLC*,
    307 F.R.D. 183 (E.D. Va. 2015) .......................................................................... 11, 16

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)................................................................................................... 26

*Takiguchi v. MRI Int'l, Inc.*,
    2016 WL 1091090 (D. Nev. Mar. 21, 2016) ........................................................... 18

*Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................................21, 23, 24, 26

*Villella v. Chem. & Mining Co. of Chile*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................ 22

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).......................................................................................... 24

v

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) ....................................................................................... 20

*Wilson v. LSB Indus., Inc.*,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ......................................................................... 22

## RULES

Fed. R. Civ. P.
   23(a) ............................................................................................................................. *passim*
   23(b)(3) ......................................................................................................................... *passim*
   23(g) .................................................................................................................................. 1, 15, 30

## REGULATIONS

17 C.F.R. § 239.13 .................................................................................................................... 23

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 104-369 (1995) ........................................................................................ 3, 14

Pursuant to Rules 23(a), 23(b)(3), and 23(g) of the Federal Rules of Civil Procedure, Lead Plaintiffs respectfully move to certify this action as a class action, appoint Lead Plaintiffs as Class Representatives, and appoint Saxena White P.A. ("Saxena White") as Class Counsel and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel for the Class.[1]

## I.    PRELIMINARY STATEMENT

This is a securities fraud class action against Evolent Health, Inc. ("Evolent"), a healthcare technology company, and its senior executives. The Complaint asserts that Defendants made a series of materially false and misleading statements regarding the purported cost savings and operational efficiencies that Evolent achieved with respect to Passport Health Plan ("Passport"), a Kentucky-based Medicaid plan that constituted 20% of Evolent's revenue and was its largest and most important client. Rather than improve Passport's operations and save costs, however, Evolent reaped hundreds of millions of dollars in revenue from Passport while driving Passport to the brink of bankruptcy. Evolent charged Passport excessive and debilitating fees, and forced the plan to implement a medical claims reporting system that left Passport unable to accurately track costs and claims data, resulting in hundreds of millions of dollars of penalties that Kentucky assessed to Passport. When news of Passport's rapidly approaching bankruptcy became public, Defendants repeatedly denied that Evolent would bail out Passport. However, on May 28, 2019, Defendants

---

[1] Lead Plaintiffs are Plymouth County Retirement System ("Plymouth County") and Oklahoma Police Pension and Retirement System ("Oklahoma Police," and together with Plymouth County, "Lead Plaintiffs" or "Plaintiffs"). This action (the "Action") asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants Evolent Health, Inc. ("Evolent" or the "Company"), Frank Williams, Nicholas McGrane, and Seth Blackley (collectively, "Individual Defendants," and together with Evolent, "Defendants"). Unless otherwise noted herein: (i) capitalized terms and abbreviations have the same meanings as in the Third Amended Class Action Complaint (the "Complaint," ECF No. 150); (ii) references to "¶__" refer to paragraphs of the Complaint; (iii) all emphasis is added; (iv) internal citations and quotation marks are omitted; and (v) cites to "Ex.__" are to exhibits to the Declaration of Steven J. Toll ("Toll Decl.") filed herewith.

1

were suddenly forced to announce that in order to save Passport, Evolent would acquire a 70% stake in the plan for $70 million, causing Evolent's share price to plummet nearly 30%.

On June 22, 2020, Defendants moved to dismiss Plaintiffs' Second Amended Complaint, and on March 24, 2021, the Court entered an Order denying in part and granting in part Defendants' motion.[2] On November 17, 2021, Plaintiffs moved for leave to amend the Second Amended Complaint, attaching a copy of their proposed Complaint, which the Court granted on December 2, 2021.[3]  ECF No. 156.  Thereafter, Defendants filed a partial motion to dismiss the Complaint.  ECF No. 161.   On March 18, 2022, the Court entered an Order (the "Order," ECF No. 190) denying in part and granting in part Defendants' partial motion to dismiss the Complaint. In that Order, the Court also instructed Plaintiffs to amend or renew their Prior Motion for Class Certification.  *Id.*

Lead Plaintiffs now seek to certify a class pursuant to Rules 23(a) and 23(b)(3) on behalf of itself and those persons or entities who purchased or otherwise acquired the publicly traded common stock of Evolent from January 10, 2018 through May 28, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class").[4] As set forth below, this is a straightforward securities class action that is ideally suited for class treatment under Rule 23.  Indeed, courts in

---

[2] In that Order (ECF No. 106), the Court sustained four allegedly false statements representing a putative class period of September 5, 2018 through May 28, 2019.  Plaintiffs subsequently filed a motion seeking to certify this Action as a class action for that time period (the "Prior Motion for Class Certification," ECF No. 134).

[3] The class period alleged in the Complaint is from January 10, 2018 until May 28, 2019, inclusive.

[4] Excluded from the Class are Defendants, the officers and directors of Evolent at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, any entity in which Defendants or their immediate families have or had a controlling interest, as well as The Advisory Board Company, the University of Pittsburgh Medical Center, and TPG Global, LLC. ¶216.

2

this District have explicitly held that securities fraud cases such as this one "are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006) (certifying class).

*First*, the proposed Class here easily satisfies each of the requirements of Rule 23(a). Not only are the numerosity, commonality and typicality prerequisites easily satisfied, but Lead Plaintiffs also are clearly adequate, as Plymouth County and Oklahoma Police are precisely the type of sophisticated institutional investors that Congress sought to lead securities class actions when enacting the PSLRA, (*see* H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733), and Plaintiffs have selected Saxena White as Class Counsel and Cohen Milstein as Liaison Counsel—both highly experienced securities litigation firms.

*Second*, the requirements of Rule 23(b)(3) are also satisfied as courts routinely find that predominance is met in securities class actions alleging that defendants defrauded investors by engaging in a common course of conduct, as the Complaint alleges here, and the pursuit of claims as a class action is superior to other methods for prosecuting this Action.

*Finally*, Lead Plaintiffs' motion is supported by the Expert Report of Chad Coffman, CFA ("Coffman Rpt.") (Ex. A), a highly respected expert whose opinions have been relied upon to certify classes in numerous federal securities class actions around the country. *See, e.g., Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020) (noting "dozens of cases in which Coffman's expert opinions have supported the certification of a class" in federal securities class actions). The Coffman Report unequivocally demonstrates that the market for Evolent common stock was efficient during the Class Period,

3

thereby entitling Plaintiffs to a presumption of reliance on the fraud-on-the-market theory. In addition, the Coffman Report establishes that damages can be calculated on a class-wide basis in this Action, using the standard out-of-pocket methodology, which "is widely considered an accepted method for the evaluation of [ ] damages to a class of stockholders in a defendant corporation[.]" *Id.* (collecting cases certifying classes and relying upon Coffman's proposed "out-of-pocket" methodology to calculate class-wide damages).

Accordingly, there can be no credible dispute that this is the paradigmatic Action for class treatment. Lead Plaintiffs' motion should be granted in its entirety.

## II.    STATEMENT OF FACTS

Evolent provides healthcare delivery and payment services to Medicaid and Medicare health systems. ¶41. Throughout the Class Period, the Company's business model was predicated on its purported ability to reduce its clients' healthcare and administrative costs. ¶43. Evolent repeatedly touted that its suite of high-tech services would help plans "lower clinical and administrative costs," and would create a cycle of clinical and cost improvement through long-term "partnerships" with health plans. *Id.* During the Class Period, Evolent's most important client by far was Passport, a Kentucky-based Medicaid plan that primarily served the Louisville area. ¶¶44-45. Passport's relationship with Evolent began on February 1, 2016, and the fees that Passport paid to Evolent accounted for approximately 20% of Evolent's annual revenue between 2016 and 2019—far more than any other Evolent client. *Id*.

### A.    Evolent's Rebadging Practice Leads to Illusory Cost Savings

Despite Evolent's promises that its services would "lower clinical and administrative costs" for Passport, the exact opposite was true. ¶¶54-57. Evolent began by "rebadging" about 350 Passport employees—more than 70% of Passport's workforce—which meant that Evolent hired them away from Passport, only to have them continue performing the exact same functions for

4

exorbitant fees that significantly exceeded what Passport had previously paid them in salary. ¶¶51-53. Indeed, while Passport's salary costs fell $22 million from 2015 to 2017 as a result of rebadging, the total fees that Passport paid to Evolent skyrocketed, from $55.5 million in 2016, to $88.2 million in 2017, and finally to $114.5 million in 2018—massive expense increases, with no change in Passport's membership profile. ¶¶54, 114.

As a direct result of Evolent's massive fees, Passport's financial condition dramatically worsened. In 2015, the year prior to the beginning of the partnership, Passport had a net underwriting gain (i.e. operating profit) of $33.3 million. ¶91. In 2016, its first year under Evolent's management, Passport reported a net operating loss of $80.4 million, and by 2018, Passport's net operating loss had ballooned to $130.7 million, threatening Passport's solvency. *Id.* In spite of these glaring facts, on January 10, 2018, the first day of the Class Period, Evolent misleadingly claimed that a "[f]ull risk partner"—i.e., Passport—had "achieve[d] MLR/ALR reduction impact representing $100M+ in identified annualized savings." ¶162. Defendants again made substantially similar false statements purporting to have generated $100 million in savings to Passport's bottom line on May 11, 2018, and September 5, 2018. ¶¶166, 169.

**B.** **Evolent's Faulty Valence Platform Directly Leads to Hundreds of Millions of Dollars of Penalties Assessed on Passport and the 2018 Medicaid Rate Cuts**

In May 2017, Evolent announced that it would replace Passport's longstanding third-party claims administrator with Valence, Evolent's newly acquired claims administration platform, effective October 1, 2017. ¶61. As Passport's claims administrator, Evolent was required to collect critical data known as "encounter data" on each medical claim, which was essentially a description of how sick each patient was and the care needed as a result, and report this data to Kentucky. ¶63. However, documents obtained by Lead Plaintiffs show that the defective Valence platform left Passport wholly unable to submit encounter data, as required by its contract with Kentucky.

Indeed, by November and December 2018, the penalties imposed on Passport exceeded $100 million per month; by April 2019, Evolent's Valence platform had caused Passport to incur an astounding $489 million in penalties. ¶¶79, 81. Significantly, these penalties were documented in detailed monthly letters sent directly to Passport's most senior officers, and were titled "Consequences for Failure to Submit Encounters in Accordance with the Contract." ¶80.

Evolent's disastrous claims administration directly led to Kentucky's decision to cut its Medicaid payments to Passport. Specifically, on May 30, 2018, Passport learned that Kentucky planned to reduce its Medicaid rates for the region Passport served by roughly 3.2% for the six-month period ending December 31, 2018 (the "2018 rate cuts"). ¶84. Unbeknownst to investors, the cuts were a direct result of Evolent's own failure to properly submit encounter data on Passport's behalf. ¶85. These cuts devastated Passport, which projected a net loss of $75 million for the first half of 2019 alone. ¶87. Moreover, the improperly processed claims resulted in more than $20 million in overpayments to healthcare providers by the end of 2018—which were nearly impossible to recoup because Valence was so defective that Passport could not figure out whom to credit for overpayments against future claims payments. ¶74.

### C.    Evolent Drives Passport to the Brink of Insolvency

Beginning in January 2019, reports emerged that Passport was in financial distress, ostensibly due solely to the Medicaid rate cuts. ¶115. On January 25, 2019, *Insider Louisville* published an article claiming that "declining reimbursement rates to Passport tell just part of the story," and explaining that Passport's financial troubles also appeared to stem from excessive "nonemployee management fees" paid to Evolent—a total of $220 million in fees that "account[ed] for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead." ¶116. Significantly, in response to these allegations Evolent flatly denied that its fees were excessive or improper, and falsely claimed that

6

Evolent was providing services "at cost" and even "at a lower per member cost than prior periods." ¶117.

On February 15, 2019, Passport filed a lawsuit against Kentucky (the "Passport Complaint"), challenging the Medicaid rate cuts. ¶119. The Passport Complaint revealed, for the first time, that a Passport bankruptcy was not only a possibility, but an imminent threat—if the rate cuts were not reversed immediately, Passport would be legally insolvent within two weeks. *Id.* On February 19, 2019, the first trading day following the lawsuit, Evolent's stock price fell 10.8%, to close at $14.99. *Id.* Following the revelations, analysts were concerned that Evolent might be forced to bail out Passport because it constituted approximately 20% of the Company's revenue, and Evolent could not afford to let its most important partner go bankrupt. ¶120.

**D.     Evolent is Forced to Bail Out Passport**

In light of these concerns, during a February 26, 2019 earnings call, analysts repeatedly pressed Defendants about whether there was "any balance sheet risk if [Passport] were to go insolvent" and whether "your joint investment efforts [with] Passport have given you any exposure in a tail event." ¶¶120-21. Defendant Williams unequivocally denied the possibility, stating that Evolent had not even "thought about" acquiring Passport, that this was "not in our strategic lens" and "not something that is currently being evaluated." ¶121. As late as May 7, 2019, just three weeks before revealing that Passport was effectively insolvent and unable to survive as a standalone entity, Defendants reassured investors that "Passport is making solid progress towards improving its financial performance." ¶123.

On May 29, 2019, Evolent stunned the market by announcing that it would have to pay $70 million (plus a promise of additional "interim balance sheet support") for a 70% stake in Passport. ¶124. The announcement was an admission that (i) Passport's finances were even worse than previously known, contrary to Defendants' assurances just three weeks prior, and (ii) Passport's

7

financial troubles were not solely caused by the 2018 rate cuts (as these cuts had already been reversed in April 2019), but rather were caused by Evolent's grossly excessive fees and deficient claims administration processes. *Id.* Indeed, during a special investor call the same day, Defendant Williams was forced to admit that Evolent had no choice but to buy a stake in Passport to avoid losing its largest client, stating that "given the financial situation, we needed to respond immediately." ¶125.

On this news, Evolent's stock price fell nearly 30%, or $4.14 per share, to close at $10.01, and analysts excoriated Evolent's executives for their lack of candor, noting that the Company's disclosure directly contradicted management's prior statements about Passport. ¶¶126-27. For example, SunTrust stated that "[m]anagement has previously talked down going after Passport as recently as 4Q18 earnings call: When asked whether EVH would acquire some, if not the whole, Passport business during the 4Q18 earnings call, management cited they had 'not contemplated acquiring a full Medicaid plan,' that it's 'not in our strategic lens at this point.'" ¶127. SunTrust further emphasized that the bailout "signals that Passport wasn't in a position to remain operationally sustainable . . . [and] that EVH's investment and balance sheet commitment is likely instrumental in supporting the business." *Id.*

In addition to the strong discovery record underlying the Complaint, post-Class period events also further corroborate Plaintiffs' allegations. On November 26, 2019, Kentucky announced its decision regarding the new Medicaid contracts it would award based on responses to its request for Medicaid proposals (the "RFP"). ¶131. Five MCOs were awarded Medicaid contracts under the RFP, and Passport was not one of them, meaning that Passport had lost its long-standing Medicaid contract, the basis of virtually its entire business. *Id*. Documents obtained from Kentucky show that, among the seven applicants for the RFP, the now Evolent-owned

8

Passport received by far the lowest numerical score on its application, for reasons including Passport's "substantial net loss of $125 million in 2018"—a net loss directly caused by Evolent—and its failure to show how "whole-person integrated care, population health, and overall [healthcare] improvement outcomes" would be "accomplished in a cost-effective manner." ¶134.

On February 25, 2020, Evolent disclosed that it was taking a $199.8 million goodwill impairment charge, which on March 3, 2020, the Company explained was triggered by its "significant[]" share price decline "[d]uring the second half of 2019"—the precise time period immediately following Evolent's announcement that it was bailing out Passport and encompassing the long period of uncertainty whether Passport would be awarded a Medicaid services contract by Kentucky. ¶136. On May 29, 2020, after a second RFP rebidding process ordered by Kentucky's newly elected governor (¶137), Kentucky rejected Passport's bid for a Medicaid contract for a second time, for similar reasons as the first. ECF No. 80, at 17. As a result, Evolent was forced to take a second goodwill write-down of $215 million. ECF No. 92, at 3.[5]

III.   **PROCEDURAL HISTORY**

On November 12, 2019, the Court appointed Plymouth County and Oklahoma Police as Lead Plaintiffs and appointed Saxena White as Lead Counsel and Cohen Milstein as Liaison Counsel. ECF No. 29. On January 10, 2020, Lead Plaintiffs filed their Amended Class Action Complaint. ECF No. 38. On June 8, 2020, the Court granted Lead Plaintiffs' motion for leave to file the Second Amended Complaint ("SAC"). ECF No. 68.

Following briefing on Defendants' motion to dismiss the SAC, on March 24, 2021, the Court issued an Order denying in part and granting in part Defendants' motion, sustaining

---

[5] On July 17, 2020, Evolent announced it would sell Passport to Molina Healthcare, Inc., and that Molina would take over provision of Medicaid services to Passport's members. ECF No. 86, at 1.

9

Plaintiffs' allegations that Defendants made materially false statements on September 5, 2018, January 25, 2019, February 26, 2019, and May 7, 2019. *See* ECF No. 106 at 59. In that Order, the Court also found the SAC's allegations were sufficient to show a strong inference of scienter (*id.* at 67-68), and that Plaintiffs' allegations "that the truth that Defendants fraudulently withheld from the market is that Evolent did not lower administrative and clinical costs for its clients—namely Passport—but instead, Evolent raised costs for its clients, as demonstrated by the circumstances with Passport" were sufficient to establish loss causation for the four sustained false statements. *Id.* at 71-73. The parties then engaged in extensive document discovery.

Plaintiffs' Third Amended Class Action Complaint became operative when the Court granted Plaintiffs' motion for leave to amend the SAC on December 2, 2021. ECF No. 156. During the March 18, 2022 hearing on Defendants' partial motion to dismiss the Complaint, the Court expressly endorsed the previous Order resolving Defendants' motion to dismiss the SAC, finding not only that it was an "extremely comprehensive and thorough [O]rder," but also that the Order's holdings had now become "the law of the case." Hr'g Tr. at 1:25-2:1; 2:5. During that hearing, the Court also sustained the Complaint's two new alleged false statements made in January and May 2018, concluding that "the risk partner statements are actionable and can go forward" and that "there's a sufficient connection between the corrective statements and that information" to support the element of loss causation. *Id.* at 36:21-22; 37:4-6. Accordingly, after the hearing, the Court issued an Order granting in part and denying in part Defendants' partial motion to dismiss. *See* ECF No. 190.

## IV.   LEGAL ARGUMENT

### A.   Courts Favor Class Treatment in Securities Actions

Courts in this District and around the country have consistently held that "[s]ecurities fraud cases are particularly appropriate candidates" for class certification because "the elements of the

cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *BearingPoint, Inc.*, 232 F.R.D. at 542; *see also In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 86 (E.D.N.C. 2009) ("Securities litigation is particularly well suited to class action treatment."). Indeed, the Supreme Court has recognized that the class action device is particularly appropriate in securities fraud cases. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

In seeking certification of a class, a plaintiff must demonstrate that it meets Rule 23's prerequisites merely by a preponderance of the evidence. *See, e.g., In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012); *In re the Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009). Courts should otherwise avoid evaluating the merits at the class certification stage, as "the likelihood of the plaintiffs' success on the merits [] is not relevant to the issue of whether certification is proper." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 195 (E.D. Va. 2015); *see also Mills*, 257 F.R.D. at 108; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

## B.      The Requirements of Rule 23(a) Are Satisfied

Rule 23(a) requires parties seeking class certification to demonstrate that the proposed class meets the following prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019). Here, the proposed Class readily satisfies each Rule 23(a) prerequisite.

### 1.      Numerosity Is Established

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The numerosity requirement is "seldom disputed in

11

securities fraud cases" where, as here, the defendant corporation's common stock is publicly traded on the New York Stock Exchange ("NYSE"). *BearingPoint*, 232 F.R.D. at 538; *see also Computer Sci.*, 288 F.R.D. at 117 (there was "no doubt" that a class of shareholders of a NYSE-traded company was "so numerous that joinder of all members would be impracticable"). Here, Evolent's common stock actively traded on the NYSE, and between 74.7 million and 82 million shares were outstanding during the Class Period. Coffman Rpt. ¶66 & Ex. 12. *Mills*, 257 F.R.D. at 105 (numerosity established where company "had millions of shares outstanding during the Class Period"). Thus, numerosity is easily established here.

### 2.  Commonality Is Established

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "does not mean that members of the class must have identical factual and legal claims in all respects." *Mills*, 257 F.R.D. at 105. Rather, commonality only "requires that there be at least one question of law or fact common to members of the class" and furthermore, "a class action will not be defeated solely because of some factual variances in individual grievances." *Funkhouser v. City of Portsmouth*, 2014 WL 12597159, at *3 (E.D. Va. Oct. 16, 2014). "The commonality requirement is permissively applied in the context of securities fraud litigation" because "[m]embers of a proposed class in a securities case are especially likely to share common claims and defenses." *BearingPoint*, 232 F.R.D. at 539, n. 7.

Here, numerous questions of law and fact are common among Plaintiffs and the putative Class, including: (1) whether Defendants violated the federal securities laws; (2) whether Defendants misrepresented or omitted material facts; (3) whether Defendants acted with scienter; (4) whether the Individual Defendants controlled Evolent and its violations of the federal securities laws; (5) whether Defendants' misrepresentations and omissions caused Class members to suffer

a compensable loss; and (6) whether Class members have sustained damages, and the proper measure of damages. ¶¶220, 236, 239, 243. These are the exact types of issues that regularly satisfy the commonality requirement in federal securities cases. *See, e.g., In re Jeld-Wen Holding, Inc. Sec. Litig.*, 2021 WL 1186326, at *3 (E.D. Va. Mar. 29, 2021); *In re NII Holdings, Inc. Sec. Litig*., 311 F.R.D. 401, 406 (E.D. Va. 2015). Accordingly, commonality is established.

### 3.    Typicality Is Established

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "commonality and typicality requirements of Rule 23(a) tend to merge" into one another as "[b]oth serve as guideposts for determining whether. . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *BearingPoint*, 232 F.R.D. at 538.

As with commonality, here the typicality requirement is easily established as "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Computer Sci.,* 288 F.R.D. at 117. Specifically, Lead Plaintiffs' claims are typical of the claims of the Class because they all arise from Defendants' false and misleading statements and omissions concerning Evolent's purported cost savings for Passport, and Defendants' purported lack of intentions to bail out Passport. Moreover, like other members of the Class, Lead Plaintiffs allege that they purchased or acquired Evolent common stock at artificially inflated prices due to Defendants' materially false and misleading statements and were damaged when the truth emerged. Further, there are no unique defenses that threaten to become the focus of the litigation. Plaintiffs' claims are typical of those of the Class because "as goes the claim of the named plaintiff, so go the claims of the class." *NII Holdings*, 311 F.R.D. at

407; *see also BearingPoint*, 232 F.R.D. at 539 (typicality satisfied where the plaintiff's claims "represent the essential claims of the proposed plaintiff class").

### 4.    Adequacy Is Established

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The primary purpose of the adequacy requirement "is to detect and avoid potential conflicts between lead plaintiffs and other class members." *Computer Sci.*, 288 F.R.D. at 118. Here, there is no evidence of any conflict—let alone a disqualifying one—between Lead Plaintiffs and the Class. *See, e.g., In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104 (S.D.N.Y. 2016) ("Lead plaintiffs are institutional shareholders whose interests are aligned with those of the Class."). Indeed, as public pension funds with experience serving in leadership capacities in securities class actions, substantial assets under management and significant financial interests in the Action, Plymouth County and Oklahoma Police are precisely the type of institutional investors that Congress sought to ensure is given a leadership role in securities class actions when enacting the PSLRA. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733; *NII Holdings*, 311 F.R.D. at 407 (adequacy established when plaintiffs were "sizeable pension funds that have a strong incentive to seek the largest possible recovery on behalf of their beneficiaries"). *See also Plymouth County Retirement System v. Patterson Companies, Inc.*, 2020 WL 5757695, at *7 (D. Minn. Sept. 28, 2020) (finding Plymouth County adequate and the type of "large, institutional lead plaintiff[s] envisioned by Congress when the PLSRA was enacted"); *Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) (finding Oklahoma Police adequate).

Further, Lead Plaintiffs have set forth a robust record demonstrating their adequacy by, among other things, actively seeking appointment as Lead Plaintiffs, conducting an extensive

14

investigation of their claims, filing three highly detailed amended complaints, twice surviving Defendants' motions to dismiss, and actively pursuing fact discovery and responding to Defendants' discovery requests. *See Jeld-Wen Holding*, 2021 WL 1186326, at *4 (adequacy established where plaintiffs "vigorously and competently represented the interests of the proposed class members throughout this litigation"). Lead Plaintiffs have and will continue to vigorously and competently prosecute their claims on behalf of the Class.

In assessing the adequacy of counsel, the Court should consider: (i) the work counsel has done in identifying or investigating potential claims in the Action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the Action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the Class. *See* Fed. R. Civ. P. 23(g)(1)(A). Lead Plaintiffs are therefore also adequate because they have selected counsel with considerable experience in securities class actions and complex litigation to represent the Class.

Indeed, as demonstrated by its extensive experience in prosecuting and resolving complex securities class actions in courts throughout the United States, Saxena White is well-qualified to prosecute this Action on behalf of Plaintiffs and the Class. *See* Ex. B (Firm Resume); *see also, Plymouth County Retirement System v. GTT Communications, Inc.*, 2021 WL 1659848, at *5 (E.D. Va. Apr. 23, 2021) (finding Saxena White had "conducted the litigation [] with skill, perseverance and diligent advocacy" in PSLRA action resulting in $25 million recovery); *Bloom v. Anderson*, 2020 WL 6710429, at *8-9 (S.D. Ohio Nov. 16, 2020) (commending Saxena White for its "considerable track record [] of successfully prosecuting" securities actions). As Court-appointed Lead Counsel, Saxena White also has demonstrated its willingness to commit substantial time and resources to representing the Class, including by preparing the detailed Complaint, pursuing

15

extensive discovery from Defendants, retaining experts in market efficiency, and assembling a qualified team of attorneys and staff to prosecute the claims in this Action on behalf of Plaintiffs and the Class. Moreover, as an experienced securities class action litigation firm with substantial experience litigating in this District (*see* Ex. C (Firm Resume)), Cohen Milstein is well-qualified to serve as Liaison Counsel.

Given Plaintiffs' significant interest in the outcome of this case, their supervision of the litigation, their experience in overseeing similar actions, the lack of any conflict between Lead Plaintiffs and other members of the proposed Class, and the demonstrated adequacy of proposed Class Counsel and Liaison Counsel, the requirements of Rules 23(a)(4) and (g) are satisfied.

### 5.    The Proposed Class Is Ascertainable

The "implicit" ascertainability requirement of Rule 23 necessitates only that a class be defined using objective criteria that establish a membership with definite boundaries and Plaintiffs need only "demonstrate that class members will be identifiable without extensive and individualized fact-finding or mini-trials." *Soutter*, 307 F.R.D. at 196. Indeed, the "standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015). Here, the requirement is easily met, because "the proposed class"—all persons or entities who purchased or otherwise acquired the publicly traded common stock of Evolent from January 10, 2018 through May 28, 2019, inclusive, and were damaged thereby—"is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Droste v. Vert Capital Corp.,* 2015 WL 1526432, at *4 (E.D. Va. Apr. 2, 2015). Accordingly, the proposed Class satisfies the ascertainability requirement.

### C.    The Requirements of Rule 23(b)(3) Are Satisfied

This Action also satisfies the requirements of Rule 23(b)(3), which authorizes certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Krakauer*, 925 F.3d at 655. Courts in this District have explained that "[s]ecurities fraud actions typically meet the Rule 23(b)(3) requirement because the claims relate to acts or omissions of the same defendants and damages of individual class members might be too small to provide incentive for the individuals to sue." *Mills*, 257 F.R.D. at 109. This case is no different.

### 1.    Common Issues of Law and Fact Predominate

Predominance under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "The inquiry with respect to the predominance standard focuses on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." *BearingPoint*, 232 F.R.D. at 542. As the Supreme Court has held, "[p]redominance is a test readily met in certain cases alleging . . . securities [claims]." *Amchem*, 521 U.S. at 625; *see also, generally, Basic Inc. v. Levinson,* 485 U.S. 224 (1988). Indeed, as the above analysis of Plaintiffs' allegations under Rule 23(a)(2)'s commonality standard demonstrates, there are an overwhelming number of questions of law and fact common to Plaintiffs and the proposed Class. This showing demonstrates that the predominance standard of Rule 23(b)(3) is satisfied as these numerous common questions predominate over any perceived or potential individual issues. *See Amchem*, 521 U.S. at 625.

To recover under Section 10(b) of the Exchange Act, all Class members must establish: "(1) a material misrepresentation or omission . . . ; (2) scienter; (3) a connection . . . [with] the

17

purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61. It is axiomatic that "most of these elements are clearly susceptible to classwide proof." *Takiguchi v. MRI Int'l, Inc.*, 2016 WL 1091090, at *7 (D. Nev. Mar. 21, 2016); *accord Amgen*, 568 U.S. at 475 (same). For instance, "[t]he same evidence will be used to prove the existence of [Defendants' fraud], the falsity of the representations, [and] each defendant's role and knowledge in the scheme." *Takiguchi*, 2016 WL 1091090, at *4. Moreover, a plaintiff is not required to prove materiality or loss causation at the class certification stage. *See Amgen*, 568 U.S. at 469-70 (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184-87 (2011) ("*Halliburton I*"). Thus, "[w]hether common questions of law or fact predominate [] often turns on the element of reliance." *Halliburton I*, 131 S. Ct. at 2181.

Here, common questions of law and fact predominate because Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). ¶¶222-24. Therefore, individual reliance issues will not predominate over issues common to the Class. *See Barrick Gold*, 314 F.R.D. at 101 ("plaintiffs can meet their burden of proving predominance by establishing their entitlement to the *Basic* presumption").

### 2. Lead Plaintiffs and the Class Are Entitled to a Presumption of Reliance under *Basic*

Under the fraud-on-the-market presumption, reliance on material statements and omissions is presumed so long as the stock traded in an efficient market. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407-08 (2014) ("*Halliburton II*"); *Basic*, 485 U.S. at 247. This is because an efficient market rapidly reacts to new information about a listed company or its prospects, causing the price of its securities to rise or fall as investors trade upon the news. By purchasing a security at the price set by an efficient market, an investor is therefore constructively

18

relying upon all of the public information about the company.[6] *Basic*, 485 U.S. at 241-42; *accord Halliburton I*, 131 S. Ct. at 2185.

Investors clearly relied on the integrity of the market price for Evolent common stock when making their transactions. Indeed, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47. Under the fraud-on-the-market theory, a plaintiff can satisfy the reliance element of a Rule 10b–5 claim by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the [security] traded in an efficient market, and (4) that the plaintiff traded the [security] between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2408.[7]

Here, the evidence indisputably demonstrates that there was an efficient market for Evolent common stock during the Class Period. To determine whether a stock traded in an efficient market, courts in this District and elsewhere routinely apply a non-exhaustive list of factors that were first adopted in *Cammer v. Bloom*, specifically: (1) the weekly trading volume; (2) the amount of analyst coverage; (3) the existence of market makers and arbitrageurs; (4) the eligibility of the company to file a Form S-3 registration statement; and (5) the stock prices' historic reaction to

---

[6] When a company publishes false information about its business (or fails to disclose negative information), the price of its securities traded in an efficient market will be higher than if a truthful disclosure had been made. Thus, an investor that purchases at the inflated price is constructively relying upon the false information, whether that investor personally read or knew anything about the falsehoods. *See Basic*, 485 U.S. at 241-42 ("Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.").

[7] These factors are satisfied here. Each misrepresentation alleged in the Complaint was a public statement addressed to the market, and Plaintiffs and Class members purchased Evolent common stock after Defendants' misrepresentations were made and before full disclosure of the relevant truth concealed by Defendants. ¶¶22, 23; ECF No. 150 (stating Lead Plaintiffs' transactions in Evolent common stock). As discussed above, materiality need not be established at the class certification stage, since it is a question common to the Class. *See Amgen*, 568 U.S. at 469-70.

19

unexpected corporate events. *See, e.g., NII Holdings,* 311 F.R.D. at 409 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

While courts in this Circuit have found the *Cammer* factors instructive, under Fourth Circuit law there is no specific factor that is dispositive. *See NII Holdings,* 311 F.R.D. at 409 ("[I]n the Fourth Circuit, no one factor is more important than another when [. . .] determining whether a market is efficient."). Courts in this District have also considered the factors discussed in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), to be relevant to the determination of efficiency, including: (1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders. *Id.* at 477-78; *see, e.g., NII Holdings*, 311 F.R.D. at 410 (applying *Krogman* factors). Here, each of these factors supports efficiency.

In support of market efficiency, Plaintiffs submit the accompanying Coffman Report. Mr. Coffman is a highly respected and experienced expert whose opinions have been relied on in "dozens of cases" certifying classes under the federal securities laws in this District and around the country. *Police Ret. Sys. of St. Louis v. Granite Construction Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021); *see also Pub. Employees' Ret. Sys. of Mississippi.,* 2020 WL 919249, at *9; *NII Holdings*, 311 F.R.D. at 413; *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450, at *7 (D.S.C. Sept. 28, 2017); *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 132-36 (M.D. Tenn. 2020) (crediting Coffman's findings on efficiency and rejecting all of defendants' expert's criticisms), *petition to appeal denied sub nom., In re Tivity Health Inc., et al.,* 2020 WL 4218743 (6th Cir. July 23, 2020); *Milbeck*, 2019 WL 2353010, at *4 (certifying class and finding "[v]arious courts have considered the same Coffman report as that offered in this case and have found it sufficient"); *Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at

20

*8-11 (D. Minn. July 28, 2016) (discussing Coffman's report at length and rejecting defendants' arguments against efficiency); *Barrick Gold*, 314 F.R.D. at 104-05.

Here, the fact that Evolent's stock trades on a major national stock exchange and otherwise satisfies the first and second *Cammer* factors, even without more, is sufficient to support a finding of market efficiency. *See Carpenters Pen. Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("In most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification."); *see also Computer Sci.*, 288 F.R.D. at 120 ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the New York Stock Exchange is not an efficient market.").

As set forth below and in the Coffman Report, *all* of the *Cammer* and *Krogman* factors favor a finding of market efficiency, entitling Plaintiffs to a presumption of reliance under *Basic*.

### a.    *Cammer* Factor 1: Weekly Trading Volume

During the Class Period, Evolent common stock had an average weekly volume of 6.36% of the Company's outstanding stock—roughly 4.96 million shares—compared to 2.05% for the average weekly trading volume on both the NYSE and NASDAQ exchanges. Coffman Rpt. ¶28. Evolent's Class Period trading volume thus far exceeds the 1 or 2% *Cammer* threshold, supporting a finding of efficiency. Coffman Rpt. ¶28. *See also e.g. NII Holdings,* 311 F.R.D. at 410 ("average weekly turnover percentages surpass the benchmark set down by *Cammer* of 2% for a 'strong presumption' that the market was efficient"); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (weekly trading volume of 2.61% supported market

21

efficiency); *Villella v. Chem. & Mining Co. of Chile*, 333 F.R.D. 39, 52 (S.D.N.Y. 2019) (4.4% weekly trading volume supported efficiency).[8]

### b.    *Cammer* Factor 2: Analyst Coverage

During the Class Period, at least 161 analyst reports were issued by at least 11 separate firms, including major firms such as J.P. Morgan, Cantor Fitzgerald, and Piper Jaffray (Coffman Rpt. ¶33 & Ex. 4), which is another indicator of an efficient market as it shows that new information was rapidly being disseminated and acted upon by investors. *See Cammer*, 711 F. Supp. at 1286. This demonstrates that there was "an active market for information regarding the company and its securities, and that [such] information was widely distributed." *NII Holdings*, 311 F.R.D. at 410. The second *Cammer* factor is thus easily satisfied, strongly supporting a finding of efficiency. *See, e.g., Sonoco*, 270 F.R.D. at 256 (coverage by six analysts sufficient); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (five analysts supported market efficiency).[9]

### c.    *Cammer* Factor 3: Market Makers

A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis. Where, as here, a stock trades on a major national exchange such as the NYSE with reporting on trades and trade volume and generally high liquidity, the number of market makers is not especially significant to a finding of efficiency. Coffman Rpt. ¶¶37-40; *see Monroe Cty. Employees' Ret. Sys. v. Southern Co.,* 332 F.R.D. 370, 383–84 (N.D. Ga. 2019) (finding that

---

[8] Mr. Coffman also determined that Evolent's "annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms," supports efficiency. Coffman Rpt. ¶29. Specifically, Evolent common stock's turnover velocity ratio during the Class Period was 318% vs. the NYSE and NASDAQ average of 107%. *Id.*

[9] Mr. Coffman also notes that there was substantial public press coverage of Evolent—for example, a search of the database Factiva for articles relating to Evolent resulted in 480 unique articles during the Class Period and 655 for the broader "Analysis Period" he used. Coffman Rpt. ¶35.

trading on the NYSE satisfies *Cammer* factor 3 because "[t]he NYSE – one of the most renowned and liquid stock exchanges in the world – employs a Designated Market Maker (DMM) for each listed stock … [and] DMMs are responsible for maintaining a fair and orderly market for registered securities"). Nonetheless, according to Bloomberg, there were 99 market makers for Evolent common stock during the Class Period, thus supporting market efficiency. Coffman Rpt. ¶41; *see Carpenters Pen. Tr. Fund of St. Louis*, 310 F.R.D. at 92 ("anywhere between six and twenty market makers is sufficient to support a finding of market efficiency").

### d.      *Cammer* **Factor 4: S-3 Eligibility**

A company is eligible to file a Form S-3 registration statement if it possesses a market capitalization of at least $75 million and has filed SEC reports for twelve consecutive months. 17 C.F.R. § 239.13. Courts treat eligibility to file a Form S-3 as evidence of market efficiency because of the SEC's statement that eligibility is "predicated on the Commission's belief that the market operates efficiently for these companies [that file Form S–3s], *i.e*., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the marketplace." *Cammer*, 711 F. Supp. at 1284-1285 (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41, 902 (1981)). "In other words, when an issuer of securities meets Form S-3's requirements, the market for its securities is likely one that quickly assimilates material public information into the price because the market is well developed and trading is robust." *NII Holdings*, 311 F.R.D. at 411.

Throughout the Class Period, Evolent met all of the requirements to file a Form S-3. Coffman Rpt. ¶44. Indeed, Evolent filed both a Form S-3ASR and a Form S-3 before the Class Period, on August 7, 2017 and July 28, 2016, respectively. Accordingly, this factor supports a

23

finding of market efficiency. *NII Holdings*, 311 F.R.D. at 411 ("This *Cammer* factor accordingly weighs in favor of a finding that the market for NII common stock was efficient.").

### e. *Cammer* Factor 5: Price Reaction to New Information

The fifth *Cammer* factor—whether a company's stock price reacts to new information—is typically demonstrated through an event study—i.e., a "regression analys[i]s that seek[s] to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). There is no requirement that a plaintiff satisfy the fifth *Cammer* factor to demonstrate market efficiency. *Id.* at 97. Indeed, event studies are typically more critical where—unlike here—"the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market." *Id.* at 97-98; *NII Holdings,* 311 F.R.D. at 413 ("even if the fifth *Cammer* factor were considered weak, the evidence offered in support of the other *Cammer* factors as well as the non-*Cammer* factors is more than sufficient to demonstrate by a preponderance of the evidence that the stocks and bonds at issue traded in an efficient market").

Nonetheless, Mr. Coffman's event study clearly demonstrates statistically significant price reactions to Evolent-specific news. Coffman Rpt. ¶¶45-64. Accordingly, this factor supports a finding of market efficiency.

### 3. The *Krogman* Factors and other Additional Factors Support A Finding of Market Efficiency

Additional factors also support a finding of market efficiency.

*First*, Evolent's market capitalization averaged $1.5 billion during the Class Period—a market capitalization ranging from the 49th to 67th percentile of the combined NYSE and NASDAQ markets. Coffman Rpt. ¶67 & Exs. 9-10; *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 79 (citing *Krogman*, 202 F.R.D. at 478) ("investors tend to be more interested in

24

companies with higher market capitalizations, thus leading to more efficiency"); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 154 (S.D.N.Y. 2012) (market capitalization ranged from $288 to $717 million).

*Second*, Evolent's stock had a time-weighted average bid-ask spread between 0.029% and 0.178% for the Class Period—well below the average and median bid-ask spreads of a random sample of 100 other common stocks trading on the NYSE and NASDAQ, which further supports the fact that the market for Evolent common stock was efficient. Coffman Rpt. ¶¶69-70. *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (citing *Krogman*, 202 F.R.D. at 478) (efficiency supported by fact that "the average and median bid/ask spreads on Och-Ziff stock during the Class Period were comparable to those of a random sample of stocks listed on the [NYSE]"); *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 501 (S.D. Fla. 2003) (2.44% average daily relative bid-ask spread supported market efficiency).

*Third*, during the Class Period, over 98% of all Evolent shares were held by non-insiders. Coffman Rpt. ¶71. Institutional ownership of Evolent stock was also robust, as institutions held virtually the entirety of the public float. *Id*. at ¶72 & Ex. 12. This factor supports a finding of efficiency.

*Fourth*, Mr. Coffman found no evidence of serial correlation, or "autocorrelation"—essentially, the ability of past price movements to predict future price movements—in Evolent's stock prices. Coffman Rpt. ¶76 & Ex. 13. A lack of autocorrelation supports market efficiency, as "[t]he more likely past price movement is to predict future price movement, the less efficient a market is likely to be because an efficient market incorporates information quickly into the first day's price, whereas an inefficient market would not fully digest the information until later." *Petrie*

*v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015); *see also Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 93 (lack of serial correlation supported market efficiency).

*Fifth*, Mr. Coffman found evidence of considerable option trading in Evolent common stock, another factor that supports market efficiency, because, as Mr. Coffman explains: "[e]mpirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks." Coffman Rpt. ¶77.

In sum, for all of the reasons discussed above, the evidence set forth in the Coffman Report shows that the market for Evolent common stock was efficient throughout the Class Period. Accordingly, the *Basic* presumption of reliance applies; common issues will predominate; and the Action properly can and should proceed as a class action.

### 4. Lead Plaintiffs Are Entitled to an *Affiliated Ute* Presumption of Reliance

Lead Plaintiffs are also entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). The *Affiliated Ute* presumption applies to claims involving a failure to disclose. *See id.* at 153; *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). In such circumstances, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* The presumption reflects the reality that where information is omitted, "reliance as a practical matter is impossible to prove." *In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013); *see also In re Smith Barney*

26

*Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).[10]

Here, the Complaint alleges Defendants made material omissions and that Defendants engaged in a fraudulent scheme. ¶223. Because the Complaint alleges actionable omissions, Plaintiffs are also entitled to rely on the *Affiliated Ute* presumption to establish reliance.

### 5.      There Are No Damages Issues that Predominate

The predominance inquiry "focuses on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." *BearingPoint*, 232 F.R.D. at 542. Any "differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." *Id.*; *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015) (holding Rule 23(b)(3) "does not mandate . . . a finding that damages are capable of measurement on a classwide basis"); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *10 (E.D. Va. Sept. 4, 2020) (a damages model "pertains to an objective question common to the class and resolvable by common evidence" and therefore "no risk whatsoever" of "individual questions predominating"). As explained above, common issues of liability predominate, making class certification appropriate.

Mr. Coffman has explained how the "out-of-pocket method" could be used to calculate damages equal to the artificial inflation in Evolent's share price at the time of each putative Class member's purchase minus the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, artificial inflation at the time of purchase subject to the PSLRA's "90-day lookback" provision). Coffman Rpt. ¶¶78-83. *See Barrick Gold*, 314 F.R.D. at 106

---

[10] Furthermore, because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 467 ("[B]ecause [t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor, materiality can be proved through evidence common to the class.").

(accepting Mr. Coffman's proposed damages methodology and noting that "securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations," and that this "oft-used remedy does not create individualized damages issues that defeat predominance" because it "calls for the application of a damages model across the entire class").

Mr. Coffman has further explained how he could use an event study methodology to quantify the artificial inflation on each day of the Class Period (*see* Coffman Rpt. ¶¶78-83), which numerous courts have recognized as "the standard method for calculating damages in virtually every Section 10(b) class action." *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 446 (D. Ariz. 2019) (crediting Coffman's proposed damages methodology, noting: "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act."); *see also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018) (plaintiffs' expert's proposed damages model was sufficient where it involved "determining the change in a security's price caused by a corrective disclosure by isolating price movements specific to [the defendant company] through an event study; analyzing, for each day of the Class Period, the amount of inflation in the stock price due to the alleged fraud and then mechanically calculat[ing] damages on an individual basis by analyzing a class member's actual trading activity"); *Dougherty, et al. v. Esperion Therapeutics, Inc., et al.,* 2020 WL 3481322, at *8 (E.D. Mich. June 19, 2020) (accepting Mr. Coffman's proposed event study damages methodology and citing other cases where Mr. Coffman's methodology had been credited).

Accordingly, Plaintiffs have sufficiently demonstrated that damages are calculable on a class-wide basis, and that individualized damages issues will not predominate.

**6.      A Class Action Is a Superior Method of Adjudicating Plaintiffs' Claims**

In addition to predominance, Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors relevant to this inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." "Phrased more generally, the superiority requirement compares class action litigation to possible alternatives[.]" *Jeld-Wen Holding*, 2021 WL 1186326, at *9.

Here, each factor weighs strongly in favor of class certification. *First*, "[a]ny interest individual members of the class may have in controlling the litigation is far outweighed by the benefit of distributing the financial burden of the litigation among the class." *BearingPoint*, 232 F.R.D. at 544. *Second*, Plaintiffs are not aware of any other litigation "commenced by members of the class against these defendants alleging these claims." *Id. Third*, this forum "is particularly appropriate as it is closest to defendant [Evolent's] corporate headquarters and therefore many of the witnesses." *Id. Finally*, "management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members." *Id.* at 544-45. Thus, "because class actions are a particularly appropriate and desirable means to resolve claims based on alleged violations of the securities laws, the plaintiff's proposed class is the superior method for adjudicating this dispute." *Id*. at 545.

Accordingly, Plaintiffs have demonstrated that a class action is a superior means of resolving the claims in this Action.

## V.    **CONCLUSION**

This Action satisfies all of the requirements of Rule 23(a) and (b)(3), and counsel satisfy the requirements of Rule 23(g). Accordingly, Plaintiffs respectfully request that the Court: (1) certify this Action pursuant to Rule 23(a) and (b)(3) as a class action on behalf of the Class, as defined herein; (2) appoint Lead Plaintiffs as Class Representatives; and (3) appoint Saxena White as Class Counsel and Cohen Milstein as Liaison Counsel for the Class.

Dated: April 8, 2022

Respectfully submitted,

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs and the
Proposed Class*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel: (561) 206-6708
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
Sara DiLeo
Joshua H. Saltzman
10 Bank Street, 8th Floor

30

White Plains, New York 10606
Tel: (914) 437-8551
ssinger@saxenawhite.com
sdileo@saxenawhite.com
jsaltzman@saxenawhite.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2022, I caused the foregoing to be electronically filed with

the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

> */s/ Steven J. Toll*
> Steven J. Toll
> Va. Bar No. 15300
> stoll@cohenmilstein.com
> **COHEN MILSTEIN SELLERS & TOLL PLLC**
> 1100 New York Avenue, Suite 500
> Washington, D.C. 20005
> Tel: (202) 408-4600
> Fax: (202) 408-4699
>
> *Liaison Counsel for Lead Plaintiffs and the*
> *Proposed Class*

32