**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | § § § § § | |
| | § | Case No. 1:19-cv-01031-MSN-TCB |
| Plaintiffs, | § § | |
| | § | CLASS ACTION |
| v. | § § | |
| EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY, | § § § § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND <u>APPOINTMENT OF CLASS COUNSEL AND LIAISON COUNSEL</u>**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .........................................................2

LEGAL STANDARD ...........................................................................................................5

ARGUMENT........................................................................................................................5

I.   PLAINTIFFS ARE INADEQUATE AND ATYPICAL CLASS
     REPRESENTATIVES..................................................................................................5

     A.  Plaintiffs Are Inadequate Because They Have Severely Exceeded the
         PSLRA's Case Filing Limits. ..............................................................................5

     B.  Plaintiffs Are Subject to Unique Reliance Defenses Because Their Investment
         Managers Reject the Notion That the Corrective Disclosures Revealed Any
         Fraud and Continued Purchasing Evolent Stock. ...............................................6

II.  PLAINTIFFS HAVE NOT ESTABLISHED THAT CLASSWIDE DAMAGES
     CAN BE CALCULATED IN A MANNER CONSISTENT WITH THEIR
     THEORIES OF LIABILITY.........................................................................................9

III. ALTERNATIVELY, THE CLASS PERIOD MUST BE NARROWED TO
     START ON FEBRUARY 26, 2019. ............................................................................14

     A.  The *Basic* Presumption of Reliance Does Not Apply to Misstatements Prior
         to February 26, 2019. ..........................................................................................14

         1.  The Cost Savings Statements Had No Front-End Price Impact. ...........15

         2.  The "Back-End" Price Declines Do Not Show Price Impact for the Cost
             Savings Statements.................................................................................18

             a.  The February 15, 2019 Passport Lawsuit Does Not Show Price Impact
                 Because Of the Mismatch with the Cost Savings Statements. ..........20

             b.  The February 15, 2019 Passport Lawsuit Cannot Show Price Impact
                 Because It Contained No New Information Related to the Cost
                 Savings Statements..........................................................................23

             c.  The May 29, 2019 Alleged Corrective Disclosure Does Not Show Price
                 Impact For Any Cost Savings Statement............................................26

         3.  The Court Is Required to Consider Defendants' Evidence Rebutting
             Price Impact. ......................................................................................29

**B. The *Affiliated Ute* Presumption of Reliance Does Not Apply**............................................**30**

**CONCLUSION** ...................................................................................................................**30**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ..................................................................................14, 29, 30

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ...........................................................................15, 29

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018)...............................................................................18, 25

*Aronson v. McKesson HBOC, Inc.*,
79 F. Supp. 2d 1146 (N.D. Cal. 1999) .....................................................................6

*Artery v. Astra Space Inc.*,
1:22-cv-00737 (E.D.N.Y.) .......................................................................................6

*Avila v. LifeLock*,
2:15-cv-01398 (D. Az.)............................................................................................6

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................... *passim*

*In re BearingPoint, Inc. Sec. Litig.*,
232 F.R.D. 534 (E.D. Va. 2006) ............................................................................25

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014) .........................................................9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)......................................................................................... *passim*

*Cox v. Collins*,
7 F.3d 394 (4th Cir. 1993) .....................................................................................30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ..........................................................................18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)............................................................................................7, 20

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) .........................................................18

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ...................................................................................14, 19, 20

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) .........................................................................8

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) .......................................................................18

*Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*,
  141 S. Ct. 1951 (2021).................................................................................... *passim*

*Grae v. Corr. Corp. of Am.*,
  330 F.R.D. 481 (M.D. Tenn. 2019) .....................................................................................29

*Gross v. GFI Grp.*,
  310 F. Supp. 3d 384 (S.D.N.Y. 2018).................................................................................13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)........................................................................................ *passim*

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) .............................................................................................11

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016), and (2) .......................................................................15, 19, 25

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)...........................................................21, 22, 27

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ...............................................................................................26

*Knurr v. Orbital ATK, Inc.*,
  220 F. Supp. 3d 653 (E.D. Va. 2016) .................................................................................5, 6

*In re Kosmos Energy Ltd.*,
  299 F.R.D. 133 (N.D. Tex. 2014) .........................................................................................6

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ..........................................................................................18, 19

*Luczak v. Nat'l Beverage Corp.*,
  548 F. Supp. 3d 1256 (S.D. Fla. 2021) .........................................................................20, 27

*Miller v. Asensio & Co., Inc.*,
  364 F.3d 223 (4th Cir. 2004) .........................................................................................10, 12, 13

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................................................18

*In re New Motor Vehicles Can. Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ............................................................................................29

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) .....................................................................................20

*Plymouth Cty. Ret. Assoc. v. AppHarvest, Inc.*,
  1:21-cv-09676 (S.D.N.Y.) .............................................................................................6

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) .......................................................................................9

*In re S.E. Hotel Props. Ltd. P'ship, Inv'r Litig.*,
  151 F.R.D. 597 (W.D.N.C. 1993)................................................................................30

*In re Safeguard Scientifics*,
  216 F.R.D. 577 (E.D. Pa. 2003)....................................................................................8

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) ...................................................................................6

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) ........................................................................................5

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2018 WL 2958361 (S.D.N.Y. June 13, 2018) ..............................................................7

*In re Vivendi Univ., S.A. Sec. Litig.*,
  123 F. Supp. 3d 424 (S.D.N.Y. 2015)...........................................................................8

*Wal–Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)......................................................................................................5

**Statutes**

15 U.S.C. § 78u-4 ..................................................................................................1, 5, 6

Federal Rule of Civil Procedure 23 .................................................................... *passim*

## **INTRODUCTION**

The Court should deny class certification because Plaintiffs[1] fail to meet the adequacy, typicality, and predominance requirements of Rules 23(a) and (b)(3).

*First*, Plaintiffs are not adequate class representatives under the PSLRA because they are professional plaintiffs who loan their names to enterprising plaintiffs' counsel to "monitor" their portfolios for stock drops to support serial filings of securities class actions. The PSLRA contains restrictions on such professional plaintiffs, limiting service as a lead plaintiff to "no more than 5 securities class actions brought . . . during any 3-year period." 15 U.S.C. § 78u-4(a)(3)(B)(vi). Plaintiffs have served as lead plaintiffs *18* times in the last three years, rendering them presumptively inadequate.

*Second*, Plaintiffs cannot satisfy Rule 23(a)'s typicality requirement because they are subject to a unique reliance defense. Plaintiffs outsource their investment decisions to professional investment managers, whose knowledge and actions are imputed to them. Discovery revealed that Plaintiffs' investment managers did not consider the market price of Evolent stock to be tainted by fraud (before or after the "fraud" was allegedly revealed), and they testified that the stock price declines following the corrective disclosures were attributable to non-fraud factors. Consistent with that conclusion, both managers made significant purchases of Evolent stock *after* the corrective disclosures, which dooms Plaintiffs' assertion that they have "typical" claims.

*Third*, Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement because they have not shown that their proposed method for calculating classwide damages meets the threshold legal requirements recognized in *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). To comply

---

[1] "Plaintiffs" refers to Lead Plaintiffs Oklahoma Police Pension and Retirement System ("OPPRS") and Plymouth County Retirement System ("PCRS").

- 1 -

with Rule 23(b)(3), Plaintiffs must establish that their method for calculating classwide damages will measure "only those damages attributable to [Plaintiffs'] theory" of liability. *Id.* Plaintiffs have not done so, and instead advance a model that measures damages based on the price inflation allegedly caused by *all 22 statements* challenged in Plaintiffs' Second and Third Amended Complaints instead of *only the 6 statements* that survived the Court's Motion to Dismiss Orders.

Class certification must be denied on any of the above grounds. In the alternative, even if Plaintiffs could overcome the adequacy, typicality, and *Comcast* hurdles, the class period must be significantly narrowed under *Halliburton Co. v. Erica P. John Fund, Inc.* (*"Halliburton II"*), 573 U.S. 258, 275 (2014), because of the lack of "price impact" for any alleged misrepresentation before February 26, 2019. The record evidence—including an event study, analysis by an expert economist, and direct evidence from market participants (including Plaintiffs' investment managers)—demonstrates that *none* of the cost savings misrepresentations caused Evolent's stock price to increase when made. That showing rebuts the *Basic* presumption of class-wide reliance that Plaintiffs depend on to establish predominance for all misrepresentations made before February 26, 2019. Accordingly, if any class can be certified, it must be limited to the period of February 26, 2019 to May 28, 2019.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs have amended their complaint three times. The previous version—the Second Amended Complaint (Dkt. 69, "SAC")—challenged 20 different "false or misleading" statements on a variety of topics, including Evolent's ability to decrease clinical and administrative costs for its clients generally; Evolent's integration of its Valence claims processing platform into other services; whether Evolent helped its largest client, Passport Health Plan ("Passport"), achieve certain, specific levels of cost savings; and whether Evolent had plans to acquire Passport. SAC ¶¶134–207. Plaintiffs alleged in the SAC that "all" of the false and misleading statements made

- 2 -

on over 20 different dates between March 2017 and May 2019 inflated the price of Evolent's common stock, and that all of this "prior artificial inflation dissipated" when Evolent's share price fell in response to two alleged corrective disclosures. *Id.* ¶¶135, 210, 235.

On March 24, 2021, this Court significantly narrowed the case in its Order granting in part and denying in part Defendants' Motion to Dismiss the SAC (Dkt. 106, the "First MTD Order"). The Court held that Plaintiffs failed to state a claim as to 16 of the 20 challenged statements in the SAC, limiting Plaintiffs' claims to 4 surviving statements. *Id.* at 59. Three of these statements related to cost savings realized by Passport under the Evolent relationship, and one related to whether Evolent was considering an acquisition of Passport. *Id.*

On November 17, 2021, Plaintiffs filed their Third Amended Complaint (Dkt. 150, the "TAC") to add two identical cost savings statements buried in investor slide decks on January 10 and May 11, 2018, which read: "Full risk partner achieves MLR/ALR reduction impact representing $100M+ in identified annualized savings." TAC ¶¶162, 166. The TAC also re-alleged a May 11, 2018 statement the Court had previously dismissed. *Id.* ¶¶164–66. Like the SAC, the TAC alleged that "all" of the misstatements, including the newly added statements and certain dismissed statements, inflated Evolent's share price, and that all of the "prior artificial inflation dissipated" when the price declined following the corrective disclosures. *Id.* ¶¶161, 211, 235.

After another round of motion to dismiss briefing, the Court issued an Order on March 24, 2022 (Dkt. 190, the "Second MTD Order") sustaining the two new unnamed "risk partner" statements; dismissing the May 11, 2018 statement Plaintiffs had realleged; and leaving undisturbed the 4 alleged misstatements sustained in the First MTD Order. *Id.* at 1. As a result of the Court's orders, of the 22 statements Plaintiffs alleged to be misleading in the SAC and TAC,

only 6 alleged misstatements remain in the case. The first 4 of these statements relate solely to whether Evolent helped Passport achieve cost savings (the "Cost Savings Statements"):

- January 10, 2018: "Full risk partner achieves MLR/ALR reduction . . . representing $100M+ in identified annualized savings" in 2016 and 2017. TAC ¶162

- May 11, 2018: Plaintiffs allege Evolent made "a substantively identical claim to the one described" above and that Defendant Williams also orally stated "a full-risk partner achieving 100 million in identified savings through a bunch of different levers that we have across the platform." *Id.* ¶166.

- Sep. 5, 2018: "In [Passport's] own plan, we believe we've helped to generate over $100 million in savings, which was highly valuable to that organization." *Id.* ¶169.

- Jan. 25, 2019: "Evolent told Insider [Louisville] via email that the 'majority of the fees Passport pays to Evolent are directly tied to local staff—at cost—as well as (insurance claims processing) and pharmacy benefit services at a lower per member cost than prior periods. . . .'" *Id.* ¶173.

The last 2 statements are a February 26, 2019 statement related to whether Evolent was then evaluating an acquisition of Passport, and a May 7, 2019 statement that "Passport is making solid progress towards improving its financial performance." *Id*. ¶¶123, 158. Plaintiffs contend the falsity of these statements was revealed by the same two corrective disclosures—the lawsuit Passport filed against Kentucky on February 15, 2019 challenging Kentucky's Medicaid rate cuts (the "Passport Lawsuit") and Evolent's May 29, 2019 announcement that it was acquiring a 70% stake in Passport. TAC ¶¶213–14.

Plaintiffs seek to certify a class of purchasers of Evolent stock between January 10, 2018 and May 28, 2019 who were allegedly damaged. For the reasons discussed herein, class certification should be denied. Alternatively, the class period must be shortened to begin on February 26, 2019.

## LEGAL STANDARD

A class action is "an exception to the general rule that a party in federal court may vindicate only his own interests." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006). "[T]o justify a departure from that rule" and obtain class certification, Plaintiffs bear the burden of satisfying all of the requirements of Rule 23(a) and at least one requirement of Rule 23(b). *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). As the Supreme Court has made clear, Plaintiffs are required to "affirmatively demonstrate [their] compliance" with Rule 23 "through evidentiary proof." *Comcast*, 569 U.S. at 33. That is, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275. The Court "must conduct a 'rigorous analysis'" of whether Plaintiffs have met that burden, *Thorn*, 445 F.3d at 318, which "frequently" will "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart*, 564 U.S. at 351.

## ARGUMENT

### I.    PLAINTIFFS ARE INADEQUATE AND ATYPICAL CLASS REPRESENTATIVES.

#### A.    Plaintiffs Are Inadequate Because They Have Severely Exceeded the PSLRA's Case Filing Limits.

Congress placed restrictions on professional plaintiffs in the PSLRA to "combat abuse of the class action machinery in securities fraud cases by ensuring that these class actions are [not] controlled . . . by law firms or professional plaintiffs with only nominal interests at stake." *Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 657 (E.D. Va. 2016). The PSLRA presumptively bars individuals and entities who have served as a lead plaintiff in more than five cases in three years from serving in a representative capacity. 15 U.S.C. § 78u-4(a)(3)(B)(vi). While some courts in other circuits have found this restriction does not apply to institutional investors, *this Court* does not. The Eastern District of Virginia has held that an "exemption" for institutional investors has

no basis in the statute's text. *See Knurr*, F. Supp. 3d at 659–62 ("Because Congress did not include any such language, an exemption for institutional investors cannot be judicially grafted onto the statute."); *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1156–57 (N.D. Cal. 1999).

Plaintiffs are not adequate class representatives because they are serial securities class action litigants who together have served as lead plaintiffs *in at least 18 such actions* in the last three years.[2] ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████ [3] *See In re Kosmos Energy Ltd.*, 299 F.R.D. 133, 149 (N.D. Tex. 2014) (criticizing such agreements for "creat[ing] a clear incentive for the [law firm] to discover 'fraud' in the investments it monitors and to recommend . . . that [the client], at no cost to itself, bring a class action lawsuit.") (citation omitted). There is no reason for the Court to disregard the text of the PSLRA to allow such habitual litigants to serve as class representatives.

### B. Plaintiffs Are Subject to Unique Reliance Defenses Because Their Investment Managers Reject the Notion That the Corrective Disclosures Revealed Any Fraud and Continued Purchasing Evolent Stock.

Rule 23(a)(3)'s typicality requirement is not satisfied when the plaintiff is "subject to unique defenses which threaten to become the focus of the litigation." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007). Here, Plaintiffs are subject to unique reliance defenses

---

[2] *See* Dkt. 20-2 at 2, 4; Dkt. 150 at 103, 106; *see also Avila v. LifeLock*, 2:15-cv-01398 (D. Az.). Plaintiffs' parade of class action appearances is even more extensive than that—they have also sought appointment as lead plaintiff in at least three more cases just since filing the TAC: *Marquez v. Bright Health Grp., Inc.*, 1:22-cv-00101 (E.D.N.Y.); *Artery v. Astra Space Inc.*, 1:22-cv-00737 (E.D.N.Y.); *Plymouth Cty. Ret. Assoc. v. AppHarvest, Inc.*, 1:21-cv-09676 (S.D.N.Y.).

[3] *See* Ex. 1, PCRS Dep. 22:19–23:25, 82:22–83:14; Ex. 2, OPPRS Dep. 19:1–14; 73:5–24.  Cites to "Ex. _" reference exhibits to the Declaration of Peter Starr filed contemporaneously herewith.

because the two investment managers[4] who purchased Evolent shares on their behalf did not believe the corrective disclosures revealed any "fraud" and continued to purchase Evolent shares even *after* the corrective disclosures.

Plaintiffs seek to establish reliance by invoking the "fraud-on-the-market theory," which presumes that "an investor relies on public misstatements" when the market for a stock is efficient. *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 811 (2011) (citation omitted). But as the Supreme Court has explained, the presumption can "be rebutted by appropriate evidence." *Id.* In particular, Defendants can rebut the presumption by showing that Plaintiffs purchased Evolent stock "without relying on the integrity of the market," *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988), or "that [Plaintiffs] would have bought . . . the stock even had [they] been aware that the stock's price was tainted by fraud." *Halliburton II*, 573 U.S. at 269.

Discovery has revealed that Plaintiffs' investment managers—and by extension, Plaintiffs themselves—are subject to unique defenses because they did not believe that Evolent's stock price was ever tainted by fraud. Both managers were aware of the alleged misstatements and corrective disclosures on which Plaintiffs' fraud theory is based. Nonetheless, drawing on their own extensive research and specialized knowledge, they concluded that the decline in Evolent's stock price was directly attributable to other, *non-fraud* factors, such as Passport's financial challenges from the Kentucky Medicaid rates cuts and a perceived change in Evolent's business strategy to become an insurance plan rather than a technology-based service provider.[5] Both investment managers also

---

[4] Courts routinely impute "an investment adviser's knowledge to institutional plaintiffs for purposes of determining whether that plaintiff relied on an alleged misstatement or omission." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018) (collecting cases).

[5] *See* Ex. 3, Silvercrest Dep. 75:5–16, 97:8–99:17, 108:24–109:10, 112:10–22, 114:1–9, 120:19–121:4; Ex. 4, Newton Dep. 122:13–123:17; 127:3–129:24.

testified that they did not believe the alleged corrective disclosures related to any wrongdoing on Evolent's part or revealed any prior statements to be misleading. Ex. 3, Silvercrest Dep. 89:20–90:2, 115:7–12; Ex. 4, Newton Dep. 85:3–23, 129:25–130:19.

An investor who believes there were no alleged misrepresentations cannot be said to have relied on those misrepresentations. *See In re Vivendi Univ., S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 428, 436 (S.D.N.Y. 2015) (finding *Basic* presumption rebutted because the plaintiff "admitted that . . . *none* of the nine corrective disclosures . . . 'corrected' any misunderstanding" and testified he "was not misled"). The investment managers' "own specialized knowledge and advanced research" thus rendered them "completely indifferent" to the alleged fraud. *See id.* at 428, 438.

The investment managers testified that they would not invest in a company if they believed the management had committed fraud. *See* Ex. 3, Silvercrest Dep. 35:18–36:1; Ex. 4, Newton Dep. 37:18–38:7. And yet, both managers made additional, significant purchases of Evolent stock *after* an alleged corrective disclosure that, under Plaintiffs' theory, "revealed" the "fraud" to the market. *See* Dkt. 20-2 at 6 (listing purchases). Courts have held that post-corrective disclosure purchases alone defeat typicality and rebut the presumption that Plaintiffs relied on the integrity of the market in making their purchases. *See George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) ("[P]ost-disclosure purchases can both defeat typicality and adequacy as well as rebut the presumption that plaintiff relied on the alleged misrepresentations or the integrity of the market in making his or her purchases."); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (plaintiff subject to unique defenses because he "increased his holdings … even after public disclosure of the alleged fraud"). The reasoning of those cases applies with particular force here. The post-disclosure purchases *and* direct evidence—in the form of the investment managers' testimony—demonstrate that Plaintiffs did not believe Defendants committed any fraud

- 8 -

or that the corrective disclosures "revealed" any fraud. These facts render Plaintiffs atypical and incapable of representing the class.

## II.    PLAINTIFFS HAVE NOT ESTABLISHED THAT CLASSWIDE DAMAGES CAN BE CALCULATED IN A MANNER CONSISTENT WITH THEIR THEORIES OF LIABILITY.

To satisfy Rule 23(b), Plaintiffs bear the burden of establishing that their proposed model for calculating classwide damages is "consistent with" their surviving theories of liability and will "measure only those damages attributable to that theory." *Comcast,* 569 U.S. at 35. Plaintiffs' expert proposes a generic damages model that measures alleged damages based on the price inflation caused *by all 22* of the statements Plaintiffs have challenged rather than just the 6 surviving statements. Because Plaintiffs' model is untethered to the surviving statements in the case, Plaintiffs have failed to establish that damages can be measured on a classwide basis. *Id.*; *see also In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *1 (S.D. Tex. May 20, 2014) (observing that a court must determine at the Rule 23 stage "whether Plaintiffs' proposed damages methodologies [] quantify the injury caused by Defendants' alleged wrongful conduct"), *aff'd sub nom. Ludlow*, 800 F.3d 674 (5th Cir. 2015); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253–54 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

Plaintiffs allege that all 22 of the statements they challenged in the SAC and TAC had the effect of inflating Evolent's stock price (SAC ¶135; TAC ¶161), and that the information disclosed on the two corrective disclosure dates dissipated the "artificial inflation" in Evolent's stock price allegedly caused by all of the challenged statements: "When Defendants' prior misrepresentations . . . were disclosed . . . , the price of Evolent common stock fell precipitously as the prior artificial inflation dissipated." SAC ¶210; TAC ¶211. Consistent with these allegations, Plaintiffs seek to recover "out-of-pocket" damages based on losses allegedly suffered when the artificial inflation

in Evolent's stock price caused by all of the alleged misstatements was removed from the stock price—that is, when the "truth" was revealed and Evolent's stock price fell. Dkt. 196 at 27–28. As the Fourth Circuit has held, such "out-of-pocket" damages reflect "the difference between the 'fair value of what' Plaintiffs 'received' and the 'fair value of what they would have received had there been no fraudulent conduct.'" *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 227–28 (4th Cir. 2004).

Plaintiffs' expert, Chad Coffman, submitted a report contending that damages can be measured by a common methodology on a classwide basis. ("Coffman Rpt.," Dkt. 197-1 ¶81). Coffman proposes to estimate the alleged artificial inflation in Evolent's stock price by conducting an "event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged . . . misrepresentations (*i.e.*, a 'corrective disclosure')." *Id.* Coffman testified that damages could be calculated on a classwide basis by using the price declines on the two corrective disclosure dates as a "proxy for how much the stock price was inflated," and then backcasting that amount of inflation to earlier dates in the Class Period when shares were purchased. Ex. 5, Coffman Dep. 98:5-6; Coffman Rpt. ¶81. Although Coffman acknowledged that the SAC and TAC allege that the inflation from *all* 22 of the alleged misstatements was dissipated by the price declines following the corrective disclosures, he admitted that he did not explain in his report how his "common damages methodology" is capable of measuring *only* the inflation attributable to the surviving misstatements rather than the combined inflation of *all* misstatements, including the 16 dismissed statements. Ex. 5, Coffman Dep. 82:8–9; 82:15 ("That's not something I undertook").

Plaintiffs' proposed damages approach fails to satisfy *Comcast* because it ignores that the case has been narrowed to just 6 surviving statements—the model does not distinguish between (i) claimed inflation/damages allegedly attributable only to the 6 alleged misstatements that remain

- 10 -

at issue following the Court's Motion to Dismiss Orders and (ii) inflation/damages allegedly attributable to the 16 inflationary misstatements that have been dismissed.[6]

In *Comcast*, the Supreme Court reversed an order certifying a class of cable TV subscribers asserting violations of federal antitrust law. 569 U.S. at 29, 38. The Supreme Court held that the class could not be certified because plaintiffs failed to establish that their damages model would measure only damages attributable to plaintiffs' lone surviving liability theory. *Id.* at 33–38. The *Comcast* plaintiffs initially asserted four distinct theories of antitrust impact, but the district court rejected three of those theories, finding that only one was capable of classwide proof. *Id.* at 31. At class certification, plaintiffs' expert proffered a "regression model" that measured the collective impact of all four theories and "did not isolate damages resulting from any one theory of antitrust impact." *Id*. at 32. Like Coffman here, plaintiffs' expert in *Comcast* proposed measuring classwide damages by comparing prices Comcast actually charged subscribers to "a 'but for' baseline" in which *none* of the price inflation associated with the four initial theories of antitrust impact was present. *Id*. at 36–37. Because the damages model measured the *collective* impact of *all four* theories of price distortion, and not *only* the impact attributable to the lone surviving theory, the Supreme Court held that Rule 23(b)(3) was not satisfied. *Id.* at 37–38. As the Court observed:

> [A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

*Id.* at 35. Consistent with *Comcast*, courts have held that measuring out-of-pocket damages requires a plaintiff to identify and isolate the portions of declines in the subject stock price that are attributable to the dissipation of fraud-induced inflation. *See Hubbard v. BankAtlantic Bancorp,*

---

[6] Defendants deny that any "damages" attributable to any of the categories of alleged misstatements can be proven.

*Inc.*, 688 F.3d 713, 726 (11th Cir. 2012); *see also Miller*, 364 F.3d at 232. Portions of price declines attributable to "forces unrelated to the wrong" are not recoverable damages. *Miller*, 364 F.3d at 232 (citation omitted). A proposed damages model that is not shown to be capable of identifying *only* the part of the price decline attributable to dissipation of the fraud-induced inflation fails *Comcast's* requirement to establish that the model will "measure only those damages attributable to [Plaintiffs'] theory." *Comcast,* 569 U.S. at 35.

Plaintiffs' proposed approach to calculating damages suffers from the same deficiencies rejected by *Comcast* and its progeny. As in *Comcast*, Plaintiffs' "but for" world measures the price inflation allegedly caused by *all* 22 of the statements Plaintiffs challenged in the SAC and TAC, rather than the narrow subset of 6 statements that survived the motions to dismiss. *See* Ex. 5, Coffman Dep. 70:4–7 (affirming that Plaintiffs are "alleging a series of misstatements and omissions in this complaint and that those—*collectively* those misstatements and omissions inflated the common stock.") (emphasis added). *Comcast* requires Plaintiffs to establish that their proposed model measures *only* the alleged inflation-based damages attributable to the 6 surviving alleged misstatements, rather than the "collective" inflationary impact of *all* 22 statements. *Comcast*, 569 U.S. at 36. Coffman did not even attempt to show whether his approach was capable of measuring only the impact of the 6 statements that remained in the case—the only impact that could be relevant. Ex. 5, Coffman Dep. 82:10–20.

Further evidence that Coffman's model is not tailored to Plaintiffs' remaining theories of liability comes from its generic, cookie-cutter nature. Coffman has submitted two reports in support of class certification, the first in connection with Plaintiffs' initial certification motion based on the SAC (Dkt. 136-1), and the second for Plaintiffs' current motion based on the TAC (Dkt. 197-1). *Notwithstanding the substantial differences between the challenged misstatements*

*and putative class periods under the SAC and TAC, Coffman's damages model did not change.* In fact, Coffman admitted paying no attention to this Court's rulings, testifying that it did not matter to his analysis whether the Court's MTD orders "dismissed 90 percent of the claimed false statements or 10 percent of the claimed false statements." Ex. 5, Coffman Dep. 73:8–74:15.

Coffman also admitted that the section of his reports proposing a damages/common methodology is *identical* to reports he submits in other cases, as noted in the following exchange:

> Q. I think you mentioned that this section of your report not only is not different from the first report that you gave in this case, that it's not different from other reports you have given in other cases. Is that correct?
>
> A. Yes, that's absolutely true.

*Id.* 94:8–13; *see also* Ex. 6, Coffman Rpt. from *In re Conduent Sec. Litig.* ¶¶79–84 (advancing the exact same damages model as in Coffman Rpt. ¶¶78–83). Coffman's cut-and-paste approach, which disregards the Court's rulings, further shows that his one-size-fits-all-cases model is not tailored to the remaining theories of liability, and fails *Comcast's* basic requirement.[7]

Because Plaintiffs' model fails to distinguish between injury allegedly attributable to theories/statements that are no longer at issue in the case and injury allegedly attributable to the surviving theories/statements, Plaintiffs have not shown that their proposed approach will

---

[7] Plaintiffs also fail to satisfy *Comcast* because their model measures damages based on inflation shown by corrective disclosures that do not in fact "correct" or reveal the relevant truth from prior misrepresentations, and thus do not fit the liability theory. *See infra* Section III. Further, Coffman does not specify how the model is capable of isolating the portion of the stock price declines that are due to confounding non-fraud factors, such as Passport's conflict with Kentucky. *See* Ex. 7, Expert Report of Lucy Allen ("Allen Rpt.") ¶¶93-95; *see also Miller*, 364 F.3d at 232. Coffman says that he "*may* utilize valuation techniques and *may* depend on information learned through discovery" to disentangle the impact of such information. Coffman Rpt. ¶81 (emphasis added). Coffman's "just trust me approach" is plainly insufficient under *Comcast. See Gross v. GFI Grp.*, 310 F. Supp. 3d 384, 398 (S.D.N.Y. 2018) ("Coffman does not attempt to attribute any portion of the increase in GFI's share price to a corrective disclosure as opposed to other simultaneously released information.").

"measure only those damages attributable to [the surviving theories]," and have not shown that the claimed damages "are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. Class certification should be denied.

### III.    ALTERNATIVELY, THE CLASS PERIOD MUST BE NARROWED TO START ON FEBRUARY 26, 2019.

Even if Plaintiffs were able to overcome the adequacy, typicality, and *Comcast* hurdles, the requested Class Period must be shortened to begin on February 26, 2019 because individual reliance issues will predominate for earlier start dates.

Fraud claims are not susceptible to class action treatment because individual questions of class members' reliance on the alleged misrepresentations will predominate. *See Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). Seeking to avoid these individualized questions, Plaintiffs invoke two separate presumptions of reliance that can apply in certain circumstances to securities fraud claims: (1) the fraud-on-the-market presumption of reliance recognized in *Basic*, and (2) the rarely invoked presumption for omission-based claims recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

### A.    The *Basic* Presumption of Reliance Does Not Apply to Misstatements Prior to February 26, 2019.

The *Basic* presumption of reliance rests on the theory that "the price of stock traded in efficient market reflects all public, material information—including material misstatements" and, therefore, "anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements" when doing so. *Halliburton II*, 573 U.S.at 263. For purposes of this motion, Defendants do not contest that the market for Evolent stock was efficient. But *even if* the market for a stock is generally efficient, a defendant can rebut the *Basic* presumption with evidence that the alleged misrepresentations "did not actually affect the market price," *i.e.*, that they had no "price impact." *Id.* at 284. If a misrepresentation had no price impact, then an investor cannot have

- 14 -

"indirectly relied on that misrepresentation through his reliance on the integrity of the market price"—and "*Basic's* fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 278 (quotations omitted); *Basic*, 485 U.S. at 248 ("*Any showing* that severs the link between the alleged misrepresentation and the [stock's] price . . . [is] sufficient to rebut the presumption of reliance.").

There are two ways to assess whether a statement had price impact when made: (1) by examining whether misstatements increased the stock price at the time they were made (the "front-end"), *see IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016), and (2) assessing whether a subsequent price drop following a corrective disclosure (the "back-end") suggests there was prior inflation associated with the statement. *See Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021); *see also* Allen Rpt. ¶20 (explaining front-end and back-end price impact analyses).[8] In this case, Defendants can rebut the *Basic* presumption as to the Cost Savings Statements period because none of those Statements had price impact based on either a front-end or back-end analysis.[9]

### 1. The Cost Savings Statements Had No Front-End Price Impact.

Securities litigants commonly assess price impact by conducting event studies. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020) ("[E]vent studies have come to be treated as the sine qua non for proving or disproving price impact and loss causation."). An event

---

[8] For purposes of this motion, Defendants do not challenge the price impact of the February 26, 2019 or May 7, 2019 alleged misstatements. Like all elements of a Rule 10b-5 claim, price impact must be assessed statement-by-statement and corrective disclosure-by-corrective disclosure. *See Halliburton II*, 573 U.S. at 279 (noting that defendants must be given "an opportunity to rebut the presumption by showing . . . that *the particular misrepresentation at issue* did not affect the stock's market price.").

[9] Defendants bear the "burden of persuasion to prove lack of price impact by a preponderance of the evidence," but this "allocation of the burden" will be determinative only rarely—when "the court finds the evidence in equipoise." *Goldman*, 141 S. Ct. at 1963.

study seeks to isolate the impact of particular information on a company's stock price, including by examining whether a particular movement in the stock price is statistically significant. *See* Allen Rpt. ¶¶25-27 (explaining event studies and statistical significance).

Defendants' expert, Lucy Allen, conducted an event study that demonstrates there was no statistically significant front-end price impact associated with *any* of the Cost Savings Statements made on January 10, 2018, May 11, 2018, September 5, 2019, and January 25, 2019. *See* Allen Rpt. ¶¶28-29, 31-53. Plaintiffs' expert Coffman also conducted an event study which confirms that there were no statistically significant price reactions associated with three of these four alleged misstatement dates. *See* Ex. 8, Coffman Event Study (COFFMAN_000111590) at rows 196, 276, 373, 395; Allen Rpt. ¶¶27-29, 32 n.40 (explaining Coffman's event study). The results of both event studies are set forth in the chart below:

| Price Reactions Following Alleged Misrepresentations and Alleged Corrective Disclosures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Coffman Event Study | | | Allen Event Study | | |
| Event Date | Reaction Date | Event | % Price Reaction | t-stat | Statistically Significant?[1] | % Price Reaction | t-stat | Statistically Significant?[1] |
| *Alleged Misrepresentations* | | | | | | | | |
| 1/10/18 | 1/10/18 | J P Morgan Conference | 5 8% | 2 5 | Yes | 6 2% | 1 9 | No |
| 5/11/18 | 5/11/18 | Evolent Analyst Day | 1 1% | 0 5 | No | 1 0% | 0 5 | No |
| 9/5/18 | 9/5/18 | Wells Fargo Conference | -3 3% | -1 7 | No | -3 4% | -1 6 | No |
| 1/25/19 | 1/25/19 | *Insider Louisville* Article | -1 9% | -0 8 | No | -2 1% | -0 8 | No |
| 2/26/19 | 2/27/19 | FY18 Earnings Call | -3 1% | -1 3 | No | -3 0% | -1 1 | No |
| 5/7/19 | 5/8/19 | 1Q19 Earnings Call | 4 0% | 1 5 | No | 4 1% | 1 4 | No |
| *Alleged Corrective Disclosures* | | | | | | | | |
| 2/15/19 | 2/19/19 | Passport sues Kentucky | -10 6% | -4 5 | Yes | -10 7% | -4 2 | Yes |
| 5/29/19 | 5/29/19 | Evolent announces Passport acquisition | -27 6% | -10 5 | Yes [2] | -27 5% | -9 8 | Yes [2] |

Allen Rpt. ¶29. With respect to the only alleged misstatement date on which Coffman found a statistically significant increase in Evolent's stock price—January 10, 2018—the evidence

conclusively establishes that the stock price reaction on that date was entirely unrelated to the alleged misstatement.[10]

The January 10, 2018 statement was a bullet point buried in the bottom corner of a single page of a lengthy investor slide deck which reads: "Full risk partner achieves MLR/ALR reduction impact representing $100M+ in identified annualized savings" in 2016 and 2017. TAC ¶162. The statement was not mentioned or discussed in Evolent's accompanying oral remarks at the conference. *See* Allen Rpt. ¶31; Ex. 9, 1/10/18 Conference Transcript. That statement did not identify the anonymous "risk partner." And not a single analyst mentioned the statement in any subsequent coverage. *See* Allen Rpt. ¶¶31-33. To the contrary, analyst reports issued after the date the statement was issued focused on—and attributed the increase in Evolent's stock price to—two pieces of new information discussed that day: (1) that Evolent expected to meet or exceed its guidance for 4Q17, and (2) better-than-expected guidance for fiscal year 2018. *See id.* ¶¶33-34.

Plaintiffs have not presented any evidence from which to conclude that the "risk partner" savings comment in the slide deck was responsible for the price movement in Evolent's stock on January 10, 2018. Coffman did not analyze or express any opinion about whether the price reaction on January 10 was associated with the alleged misstatement made on that date. *See* Coffman Rpt. ¶¶6–7. Accordingly, Defendants' event study and the analysts' commentary shows "that the allegedly false information the market was absorbing was not causing the stock price to artificially inflate"; therefore Defendants "have severed the link between the misrepresentation and the price"

---

[10] The only reason Coffman could get to statistical significance on January 10, 2018 is because he manipulated the comparison data set to *exclude* several dates on which there had been significant price movements (which resulted in boosting the significance level for January 10). Coffman Rpt. at Ex. 3 (notes); Allen Rpt. ¶27. Allen's event study did not make such arbitrary exclusions, and demonstrates that the January 10, 2018 movement is not statistically significant. Allen Rpt. ¶¶27, 32-33 & n.37. Regardless, and critically, the analyst commentary establishes that the cost savings comment secluded deep in the January 10 slide deck was not a factor in the price movement.

of Evolent stock on the front-end as to the 4 Cost Savings Statements. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011).[11]

### 2.     The "Back-End" Price Declines Do Not Show Price Impact for the Cost Savings Statements.

Nor can price impact of the Cost Savings Statements be shown from the "back-end" price declines following the corrective disclosures because of the mismatch between those disclosures and the Cost Savings Statements.[12]

The Supreme Court's recent *Goldman* decision emphasized that "a court cannot conclude Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact."

---

[11] The non-statistically significant price increases on January 10 and May 11, 2018 are insufficient to show price impact. The Second Circuit has explained that if an "isolated stock price movement" is not statistically significant, the price reaction on that date "cannot be attributed to company-specific information announced on the event date." *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.,* 879 F.3d 474, 481 n.5 (2d Cir. 2018). And numerous courts have recognized that a statistically insignificant price reaction does not suffice to demonstrate price impact. *See, e.g., In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7–*8 (N.D. Cal. Dec. 5, 2017) (finding a lack of price impact where stock price changes following alleged misstatements were "not statistically significant"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortgage Corp.*, 2018 WL 3861840, at *13, *18 (N.D. Ohio Aug. 14, 2018). Defendants' evidence that there was no statistically significant price impact on any of the Cost Savings Statement dates is enough to "sever[] the link" between the alleged misstatements and Evolent's stock price. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 257, 270 (N.D. Tex. 2015) (presumption rebutted where price reaction was not statistically significant at "the 95% confidence level"). Finally, any movement on May 11, 2018 cannot be attributable to the repetition of the January 10 Cost Savings Statement, as efficient markets only react to "new" news. *See Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 n.1, 684–85 (4th Cir. 1999).

[12] The "back-end" price declines on the alleged corrective disclosure dates should not even be considered here. Courts have recognized that back-end price movement is only relevant where plaintiffs advance a "price maintenance" theory—under which alleged misrepresentations merely maintain a stock's already inflated price. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at *5 (S.D.N.Y. Dec. 8, 2021) (holding that under an "inflation-maintenance" theory, price impact can be "measured via stock price decreases" on corrective disclosure dates). But in this case, Plaintiffs do not travel under a price maintenance theory. They allege that Defendants' affirmative misrepresentations "artificially inflated" Evolent's share price. TAC ¶161. Accordingly, back-end price declines are irrelevant. *See Finisar*, 2017 WL 6026244, at *7–*8 (finding *Basic* presumption rebutted due to lack of front-end price impact and refusing to consider later price declines because plaintiff was "not proceeding on a price maintenance theory").

- 18 -

141 S. Ct. at 1961 (emphasis in original). Critically, that includes whether the information disclosed in an alleged corrective disclosure actually "corrected" any of the alleged misrepresentations. *Goldman* held that price impact may be lacking "when there is a ***mismatch between the contents of the misrepresentation and the corrective disclosure*.**" *Id.* at 1951 (emphasis added); *see also Best Buy*, 818 F.3d at 782–83 (finding that back-end price decline upon the release of a corrective disclosure was not evidence of price impact where the inflation it removed related to "non-fraudulent" information); *Ohio Pub. Emps.*, 2018 WL 3861840, at *18 (defendants' expert "report demonstrates that the alleged misstatements in the case at bar did not impact [defendant's] stock price" because "there was no evidence to suggest that the Company's disclosures were disclosures linked to the alleged misrepresentations").

Similarly, if the information in an alleged corrective disclosure is not *new*—*i.e.*, if that information was already publicly known—then it also could not have caused any price impact. *See Longman.*, 197 F.3d at 682 n.1, 684–85 (noting that in an efficient market, a stock's price will not change based on the repetition of public information); *Ark. Teachers*, 879 F.3d at 485–86 (district courts must decide whether allegedly corrective information was new in determining price impact). Analyzing whether the information at issue is both corrective *and* new is thus appropriate and required at this juncture.

Consistent with the Fourth Circuit's command that district courts must "make findings on whether" Rule 23 is satisfied, *Gariety*, 368 F.3d at 370, and *Goldman*'s instruction that courts "should be open to *all* probative evidence" on price impact, 141 S. Ct. at 1960, Defendants present the expert analysis of a financial economist, empirical evidence from equity analysts, and record evidence from Plaintiffs' own investment managers to demonstrate that the back-end price drops do not show the required front-end price impact. In contrast, Plaintiffs offer only an "assertion by

class counsel" that the challenged statements inflated the stock price—and that is simply "not enough." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).[13]

Plaintiffs propose measuring the alleged inflation in Evolent's stock price caused by the misstatements by reference to the back-end price drop on the corrective disclosure dates. *See* TAC ¶211 (alleging that the "inflation" in the stock price "dissipated" due to the corrective disclosures). Plaintiffs' insurmountable problem in showing price impact through the back-end drops is that neither "corrective disclosure" actually "corrects" or "reveals the relevant truth" of the allegedly misleading Cost Savings Statements.

### a. The February 15, 2019 Passport Lawsuit Does Not Show Price Impact Because Of the Mismatch with the Cost Savings Statements.

The 4 alleged misstatements made before the filing of the Passport Lawsuit—the Cost Savings Statements—relate to just one topic: whether Evolent helped Passport (or an unnamed "risk partner") achieve specific levels of savings. *See* TAC ¶¶162, 166, 169, 173. Plaintiffs' theory is that these alleged misstatements introduced inflation in Evolent's stock price that was removed by—and can be measured by reference to—the stock price declines that occurred when "corrective" information was disclosed via the Passport Lawsuit. *See id.* ¶¶210–13. For that theory to work, the information in the corrective disclosures must relate back to the alleged misrepresentations and reveal their lack of truth. *See Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1263 n.3 (S.D. Fla. 2021) (denying certification and holding that "the analyst reports in

---

[13] The Court's ruling at the motion to dismiss stage that loss causation was sufficiently *alleged* is not determinative at class certification, where the Court must make evidentiary findings on whether Plaintiffs have "affirmatively demonstrate[d] compliance" with Rule 23. *See Gariety*, 368 F.2d at 365, 370; *Comcast*, 569 U.S. at 33. Additionally, price impact—*i.e.*, "whether the alleged misrepresentations affected the market price," *Halliburton I*, 563 U.S. at 814 (2011)—is "distinct" from loss causation. And a "court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Goldman*, 141 S. Ct. at 1961.

question do not even constitute corrective disclosures" because they did not "relate back" to the alleged misrepresentations); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at \*16 (N.D. Cal. Dec. 22, 2016) (holding *Basic* presumption rebutted as to part of class period because financial disclosures were "not corrective of misrepresentations related to safety"). But in this case, Passport's Lawsuit challenging the Medicaid rate cuts had no connection with the alleged Cost Savings Statements. The suit plainly focuses on the financial impact of the *decrease in revenue* on Passport; the suit says *nothing* about the cost side of the ledger. In fact, the suit mentions Evolent in only two paragraphs, stating that Evolent had helped Passport "streamline operations, reduce administrative costs, [and] increase membership." *See* Ex. 10, Passport Compl. ¶¶ 109–10. Accordingly, the "inference" that "back-end price drop equals front-end inflation . . . break[s] down" because "there is *a mismatch between the contents of the misrepresentation and the corrective disclosure*." *Goldman*, 141 S. Ct. at 1961 (emphasis added)

Contemporaneous evidence shows that market participants and analysts did not view the Passport Lawsuit as relating to the Cost Savings Statements or revealing any fraud on the part of the Defendants. To the contrary, *both* of Plaintiffs' investment managers testified that the suit did not "reveal any of Evolent's prior statements to be false." Ex. 3, Silvercrest Dep. 89:24–90:2, 115:7–12; Ex. 4, Newton Dep. 85:3–23, 129:25–130:19.[14] They further testified that they interpreted the Passport Lawsuit as revealing only that the reduction in Medicaid reimbursement rates imposed by the Kentucky government was causing Passport financial harm. *See* Ex. 3, Silvercrest Dep. 89:3–12 ("I think that the lawsuit was an attempt to improve rates."); Ex. 4,

---

[14] *See also* Ex. 3, Silvercrest Dep. 89:20–23 ("Q: In your view, did Passport's lawsuit against Kentucky reveal any wrongdoing on Evolent's part?" "A: Not in my view, no."); Ex. 4, Newton Dep. 85:7–11 ("I saw nothing in any of [Passport's dealings] with the State of Kentucky that led me to believe that Evolent *bore any responsibility for the financial challenges at Passport*.") (emphasis added).

Newton Dep. 82:11–12 ("[I]n the end the thing that was rattling the stock was all about Passport and Kentucky."). Further, both investment managers backed up their words with actions by purchasing additional shares of Evolent stock *after* the Passport Lawsuit was filed—even though they testified they would "never put a single dollar" into a company if they believed that company's management had committed fraud. *See* Dkt 20-2 (listing post-disclosure purchases of Evolent stock); Ex. 4, Newton Dep. 37:18–38:7; Ex. 3, Silvercrest Dep. 35:18–36:1.

As explained in the Allen Report, equity analysts following Evolent confirmed that the market viewed Evolent's stock price decline as relating to Passport's rate dispute with Kentucky— and explicitly rejected any suggestion that Evolent was the cause of Passport's financial challenges. Allen Rpt. ¶¶60-65. For instance, SunTrust observed on February 19, 2019 that "[c]oncerns over solvency of [Evolent's] largest client appear to be weighing on shares." Ex. 11, 2/19/19 SunTrust Rpt. And William Blair concluded that "Evolent has been a key partner for the plan (helping it markedly through past financial pressures) *versus any cause of the issue*." Ex. 12, 2/26/19 William Blair Rpt. (emphasis added).[15]

Contemporaneous evidence from market participants thus demonstrates the Passport Lawsuit did not reveal the "truth" behind Defendants' Cost Savings Statements. Accordingly, Defendants have demonstrated that the price drop following the Passport Lawsuit does not show that the alleged misstatements had any price impact. *See Goldman*, 141 S. Ct. at 1961 (no price impact where there is a "mismatch between" the "misrepresentation and the corrective disclosure"); *Intuitive*, 2016 WL 7425926, at *16.

---

[15] ██████████████████████████████████████████ *See* Ex. 13, Stanley Dep. 217:13-218:13; Ex. 14 Felix Dep. 174:10–21.

> b.      **The February 15, 2019 Passport Lawsuit Cannot Show Price Impact Because It Contained No New Information Related to the Cost Savings Statements.**

Even assuming *arguendo* that the information disclosed via the Passport Lawsuit on February 15, 2019 was corrective of the Cost Savings Statements, it could not show price impact for the independent reason that it contained no new information bearing on those statements. Weeks before the Passport Lawsuit was filed, Passport publicly disclosed information about Passport's financial condition that was substantively similar to what it subsequently alleged in the lawsuit. Specifically, on January 23, 2019, Passport's CEO, Mark Carter, testified at a public legislative hearing about the impact of the Medicaid rate cuts on Passport's finances.[16] Mr. Carter stated that (i) Passport could potentially become insolvent by the middle of 2019, (ii) Passport had already lost $60 million in 2018 due to the rate cuts, and (iii) Passport projected losses of up to $144 million in 2019. *See* Ex. 15, 1/23/19 Hr'g Minutes at 10, 12; Ex. 16, 1/23/19 *WDRB* news article (reporting that "Passport Health Plan could be 'insolvent' by 'mid-year'"). This news was reported on by the press. *See* Ex. 16, 1/23/19 *WDRB* news article; *see also* Ex. 17, 1/23/19 *Courier Journal* news article (reporting that "Passport could face bankruptcy this year because of cuts"); Ex. 18, 1/24/19 *Becker's Healthcare* news article (similar).

Equity analysts also commented on the testimony at the public hearing. For instance, R.W. Baird issued an analyst report on January 24, 2019 cautioning that "[a]t a recent hearing on Wednesday (1/23), Passport Health's CEO suggested the organization could be insolvent by mid-2019 due to losses associated with the rate changes." Ex. 19, 1/24/19 R.W. Baird Rpt. And Piper Jaffray concluded on January 31, 2019 that "Passport is wrangling with regulators over capitation

---

[16] *See generally* Ex. 15, Minutes of the Jan. 23, 2019 Meeting of Kentucky Legislature's Interim Joint Committee on Health and Welfare and Family Services ("1/23/19 Hr'g Minutes"), *available at* https://apps.legislature.ky.gov/minutes/h_w/190123OK.PDF.

rates," but "*the issue is not tied to the [Evolent] relationship*." Ex. 20, 1/31/19 Piper Jaffray Rpt. (emphasis added). Finally, Plaintiffs' own investment managers were aware of Passport's rate-cut-induced financial challenges *prior* to the Passport Lawsuit as well. *See* Ex. 21, 1/24/19 email (Silvercrest-EVH REV 0069109) (alerting Silvercrest that Passport "could be insolvent by mid-2019"); Ex. 4, Newton Dep. 77:13–18 ("I can guarantee that we were aware of" the "dispute between Passport and Kentucky in January 2019.").

Importantly, the information Passport disclosed on January 23, 2019—that Passport could become insolvent by mid-2019, had lost $60 million in 2018, and expected to lose $144 million in 2019—is nearly identical to the financial information Passport alleged in its February 15, 2019 lawsuit. Plaintiffs allege that the corrective information disclosed through the Passport Lawsuit was: (i) that "Passport's statutory net worth had dropped $68.9 million during 2018 and that it had suffered losses of $65.5 million for the year"; (ii) Passport expected "a staggering additional $75 million in losses for the first six months of 2019 alone"; and (iii) as a result, Passport "would fall below the statutory minimum capital needed to remain solvent by law as soon as March 1, 2019." TAC ¶213. The information about Passport's financial losses caused by the rate cuts is the same as what Passport disclosed on January 23, 2019; and the fact that these rate cuts could cause Passport to become insolvent was also previously disclosed. The *only* difference between the allegedly corrective information disclosed in the Passport Lawsuit and the earlier, January 23, 2019 comments relates to the *timing* of Passport's potential insolvency (*i.e.*, the lawsuit said it could happen in weeks rather than months)—but that, of course, does not contradict or correct any of the earlier Cost Savings Statements.[17]

---

[17] While the financial impact to Passport over the rate cuts was not new, market commentary reflects that Passport's filing a lawsuit against its largest payor was an alarming new development that added further uncertainty. *See, e.g.*, Ex. 22, 2/19/19 email (Silvercrest-EVH REV 0070239)

That this information was not new presents yet another problem for Plaintiffs. Under their theory, the market for Evolent stock was efficient at all relevant times—which means "that the market price accurately reflects all publicly available information." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006). As a result, one would expect to see a statistically significant price decline on January 23 or 24, 2019—when information that was substantively the same as the information in the Passport Lawsuit was released. But there is *no statistically significant price reaction* on either January 23 (when the public testimony was given); January 24 (when news and analyst reports about the testimony were published); or January 31, 2019 (when analyst Piper Jaffray issued a report on the hearing). *See* Allen Rpt. ¶¶ 52, 59 & n.66, n.77; Ex. 8, Coffman Event Study (COFFMAN_000111590) at rows 371–72, 377. It therefore follows that the information regarding Passport's financial losses which was repeated in the Passport Lawsuit did not have any price impact. *See Best Buy*, 818 F.3d at 782 (holding it is "common sense" that "statements add[ing] nothing to what was already public" had no price impact); *Ark. Teachers*, 879 F.3d at 486 (reversing and remanding where district court declined to consider, in assessing price impact, evidence that the "truth" had been publicly revealed prior to the corrective disclosures).[18]

_____

at 240 (forwarding R.W. Baird Analyst Report with "update" on the Passport-Kentucky rate dispute, referring to prior coverage of the January 23 hearing, and noting that the dispute had "*taken a very bitter turn*") (emphasis added); Ex. 23, 2/25/19 Oppenheimer Rpt. (stating that the "ongoing battle between . . . Passport Health and KY State Medicaid *reached new heights* with Passport Health's lawsuit against KY Medicaid over reimbursement cuts and their impact on its solvency.") (emphasis added). In addition, analysts noted that the suit stated that the rate cuts could result in Passport's insolvency much sooner (March 1, 2019) than was discussed at the January hearing (mid-2019). This commentary further establishes that factors other than cost savings drove the price reaction. *See* Allen Rpt. ¶¶ 59-60.

[18] Plaintiffs allege that the information released via the January 25, 2019 *Insider Louisville* article was both a date on which "the truth beg[a]n to emerge" regarding a lack of cost savings *and* a new actionable misstatement related to cost savings. *See* TAC ¶¶115–18, 172–76. That is nonsensical, but the salient point for present purposes is that the claims made in the *Insider Louisville* article—

A misstatement cannot "actually affect the market price of the stock" if the stock price already reflects the true state of affairs. *Halliburton II*, 573 U.S. at 284. In this case, the market was already aware of Passport's losses and that Passport was facing the specter of bankruptcy as a result of Kentucky's Medicaid rate cuts—and Evolent's stock price did not decline when that information was first released. There is zero new information in the Passport Lawsuit (or the preceding public hearing) bearing on cost savings. Accordingly, Defendants have demonstrated that the price decline following the Passport Lawsuit does not show price impact for any of the Cost Savings Statements.

### c.    The May 29, 2019 Alleged Corrective Disclosure Does Not Show Price Impact For Any Cost Savings Statement.

Evolent's May 29, 2019 announcement that it was acquiring a 70% equity stake in Passport (*see* TAC ¶¶124–26, 214) likewise has no logical relationship with any of the Cost Savings Statements. Plaintiffs do not and cannot explain how Evolent's announcement that it was acquiring 70% of Passport "revealed" the falsity of statements made about the level of cost savings Passport had achieved in *prior years*. Instead, Plaintiffs merely assert that the announcement of the Passport acquisition "was an admission that . . . the catastrophic financial harm imposed on Passport by Evolent's excessive fees" were "the cause of Passport's downfall." *Id.* ¶124. The problem with that theory, of course, is that Evolent's announcement made no such admission, and also provided zero information about cost savings. It thus does not qualify as corrective at all. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (to be corrective, a "disclosure must 'at

---

*i.e.*, that Evolent was not saving Passport money but was in fact "pushing up [its] expenses" through "exorbitant fees" (*id.* ¶116)—are arguably related to and corrective of the Cost Savings Statements whereas the Passport Lawsuit clearly is not. However, as Allen explains, the *Insider Louisville* article did not cause a statistically significant reaction in Evolent's stock price. *See* Allen Rpt. ¶¶52-55.

*least relate back to the misrepresentation and not to some other negative information about the company*'") (citation omitted) (emphasis in original).

Because of the glaring informational mismatch between Evolent's acquisition announcement and the Cost Savings Statements, the ensuing price drop does not show that those alleged misstatements had price impact. *See Luczak*, 548 F. Supp. 3d at 1263, n.3 (holding disclosure was not corrective where it did not "relate back" to the misstatement); *Intuitive*, 2016 WL 7425926 at *16 (similar). As with Plaintiffs' other corrective disclosure, when there is a "mismatch between the contents of the misrepresentation and the corrective disclosure," "there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Goldman*, 141 S. Ct. at 1961. This "mismatch" is particularly pronounced with respect to the unnamed "risk partner" statements; because those statements did not mention Passport, they cannot be corrected by Passport-specific corrective disclosures such as the Passport Lawsuit and the May 29 announcement of the Passport acquisition.

As with the Passport Lawsuit corrective disclosure, contemporaneous evidence from Plaintiffs' own investment managers and other equity analysts confirms that market participants did not believe the disclosure was "corrective" of allegedly fraudulent statements. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  Critically, both investment managers testified that "Evolent's announcement it was acquiring Passport" did not "reveal any of Evolent's prior statements to be false." *See* Ex. 3,

- 27 -

Silvercrest Dep. 89:20–90:2, 115:7–12; Ex. 4, Newton Dep. 85:3–23, 129:25–130:19.[19] Instead, they believe that Evolent's stock price declined following news of the Passport acquisition because (i) it marked a change in business strategy and (ii) it meant Evolent was "drift[ing] away from . . . their core competency" and "add[ing] unnecessary complexity."[20] The documents produced by Plaintiffs' investment managers corroborate this story, and refute any suggestion that the stock price decline following the May 29 announcement removed inflation attributable to the Cost Savings Statements. *See* Ex. 26, 6/10/19 email (Silvercrest-EVH REV 0080096) ("We prefer to see [Evolent] sell services/software to providers and not take on the role of plan administrator."); Ex. 27, 5/29/19 email (BNYM CONFIDENTIAL000512) ("I'd rather see [Evolent] make investments that allow them to grow lives under coverage.").

Defendants' expert's analysis of the reports issued by equity analysts on May 29, 2019 confirms that the stock price decline associated with that announcement was not due to any revelation regarding cost savings. *See* Allen Rpt. ¶¶66-69. Instead, analysts attributed the price drop "to concerns about Evolent's business model and strategic direction." *Id.* ¶¶68-69, 71; *see also, e.g.*, Ex. 28, 5/29/19 SunTrust Rpt. ("We think [Evolent] is capable of running Passport more successfully," but "this transaction does raise questions about what is Evolent's business model?"); Ex. 29, 5/29/19 Citi Rpt. ("We believe the deal struck a raw nerve" due to "increased health plan exposure, which has weighed on shares.").

---

[19] Silvercrest (OPPRSs's investment manager) similarly testified that it was not "concerned" that "Evolent itself was the cause of Passport's worsening financial condition" in May 2019. *See* Ex. 3, Silvercrest Dep. 114:18–23. In fact, after the acquisition was completed, Silvercrest opined that "upon taking ownership, [Evolent] corrected [Passport's] thesis issues immediately improving cash flows." Ex. 25, 8/16/19 email (Silvercrest-EVH REV 0003109).

[20] Ex. 4, Newton Dep. 122:13–123:17; Ex. 3, Silvercrest Dep. 114:5–9.

Accordingly, the views espoused by market participants debunk Plaintiffs' interpretation of the May 29 disclosure as a "corrective" disclosure that revealed the "truth" of the Costs Savings Statements to the market. Because there was no price impact attributable to the 4 Cost Savings Statements, should a class be certified, the Court should limit the class period to February 26, 2019 to May 28, 2019.

> ### 3.    The Court Is Required to Consider Defendants' Evidence Rebutting Price Impact.

Plaintiffs will no doubt claim that Defendants' price impact challenge relates to loss causation, which is not appropriately considered at the Rule 23 phase. However, *Goldman* makes clear that "[i]n assessing price impact at class certification, courts 'should be open to *all probative evidence on that question*—qualitative as well as quantitative—aided by a good dose of common sense.'" *Goldman*, 141 S. Ct. at 1960 (emphasis added) (quotation marks omitted). "That is so *regardless whether the evidence is also relevant to a merits question* like materiality" or loss causation. *Id.* (emphasis added). As the Seventh Circuit has explained "[e]vidence supporting or refuting the *Basic* presumption of reliance is often relevant to three other closely related issues in a securities fraud case—materiality, loss causation, and transaction causation." *Allstate*, 966 F.3d at 600. "Yet to decide class certification using the *Basic* presumption, a court *must* consider the same evidence if the defense offers it to show the absence of transaction causation, also known as price impact." *Id.* (emphasis in original) That is, a "district court must decide at the class stage the price impact issue," even if that requires "split[ting] some very fine hairs." *Id.* at 600–01.

It matters not that some of the evidence used to rebut price impact will also be relevant to loss causation. Indeed, if "plaintiff is to succeed, the price impact must be what caused the loss—the two become one and the same." *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 498 (M.D. Tenn.

2019). But a court need not "put blinders on as to an issue simply because it implicates the merits." *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008).

### B. The *Affiliated Ute* Presumption of Reliance Does Not Apply.

Finally, Plaintiffs half-heartedly argue (in a two-paragraph section of their brief) that they are also entitled to a presumption of reliance under *Affiliated Ute*. The *Affiliated Ute* presumption applies only in a narrow category of cases asserting claims based on pure omissions, where reliance on the defendant standing mute would be all but impossible. *See Cox v. Collins*, 7 F.3d 394, 395–96 (4th Cir. 1993) ("The *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b-5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure."). In contrast, where, as here, Plaintiffs allege that Defendants issued affirmative misstatements that were false or misleading, the presumption does not apply. *See In re S.E. Hotel Props. Ltd. P'ship, Inv'r Litig.*, 151 F.R.D. 597, 604 (W.D.N.C. 1993) (finding presumption did not apply where the case was "not based *solely* on alleged omissions of facts").

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification in its entirety. Alternatively, the Class Period must be limited to February 26, 2019 to May 28, 2019.

Dated: May 20, 2022

Respectfully submitted,

*/s/ Robert R. Vieth*
Robert R. Vieth, Esq. (VSB No. 24304)
Abigail J. Johansen (VSB No. 93585)
**HIRSCHLER FLEISCHER, PC**
8270 Greensboro Drive, Suite 700
Tysons Corner, VA 22102
Tel: (703) 584-8366
Fax: (703) 584-8901
rvieth@hirschlerlaw.com
ajohansen@hirschlerlaw.com
*Local counsel for Defendants*

- 30 -

Ashley C. Parrish
Virginia Bar No. 43089
**KING & SPALDING LLP**
700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Tel: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com

Paul R. Bessette, *pro hac vice*
Michael J. Biles, *pro hac vice*
Jill R. Carvalho, *pro hac vice*
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, TX 78701
Tel: (512) 457-2050
Fax: (512) 457-2100
pbessette@kslaw.com
mbiles@kslaw.com
jcarvalho@kslaw.com

Michael R. Smith, *pro hac vice*
Peter M. Starr, *pro hac vice*
**KING & SPALDING LLP**
1180 Peachtree St. NE
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5140
mrsmith@kslaw.com
pstarr@kslaw.com

*Attorneys for Defendants*

- 31 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2022, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System on all parties in this case.

 /s/ Robert R. Vieth
Robert R. Vieth (VSB No. 24304)
**HIRSCHLER FLEISCHER, PC**
8270 Greensboro Drive, Suite 700
Tysons Corner, VA 22102
Tel: (703) 584-8366
Fax: (703) 584-8901
rvieth@hirschlerlaw.com
*Local counsel for Defendants*
