# Exhibit 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

PLYMOUTH COUNTY                )
RETIREMENT SYSTEM and          )
OKLAHOMA POLICE PENSION         )  CASE NO.
AND RETIREMENT SYSTEM,          )  1:19-cv-01031-MSN-TCB
Individually and On             )
Behalf of All Others            )
Similarly Situated              )
                                )
VS.                             )
                                )
EVOLENT HEALTH, INC.,           )
FRANK WILLIAMS,                 )
NICHOLAS MCGRANE, and           )
SETH BLACKLEY                   )

ORAL AND VIDEOTAPED DEPOSITION OF STEVEN LILLY

MAY 6, 2022

ORAL AND VIDEOTAPED DEPOSITION OF STEVEN LILLY, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Friday, May 6, 2022, from 9:10 a.m. to 2:12 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, via Zoom, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Page 1

A P P E A R A N C E S

FOR THE PLAINTIFF:
     DONALD GRUNEWALD
     JOSHUA H. SALTZMAN
     SAXENA WHITE, PA
     10 Bank Street, 8th Floor
     White Plains, New York  10606
     Tel:  (203) 803-5949
     dgrunewald@saxenawhite.com
     Jsaltzman@saxenawhite.com

FOR THE DEFENDANT:
     PETER STARR
     LAUREN NEWMAN
     KING & SPALDING, LLP
     500 W. 2nd Street, Suite 1800
     Austin, Texas  78701
     Tel:  (404) 572-2767
     pstarr@kslaw.com
     Lnewman@kslaw.com

FOR THE WITNESS:
     DOMINICK EVANGELISTA
     BRESSLER AMERY & ROSS
     17 State Street, 34th Floor
     Florham Park, New York  10004
     Tel:  (973) 660-4435
     devangelista@bressler.com

Also Present:
     JOSH STIVERS (Videographer)
     REBECCA DOMINGUEZ (Veritext)

Page 2

VIDEOGRAPHER:  Good morning.  We're going on the record at 9:08 a.m., May 6, 2022.  This is Media Unit One of the video-recorded deposition of Steve Lilly taken by Defendant in the matter of Plymouth County Retirement System, et al., versus Evolent Health Incorporated, et al., filed in the United States District Court, Eastern District of Virginia, Alexandria Division, Case Number 1:19-cv-01031-MSN-TCB.

Deposition is being held remotely via Zoom. My name is Josh Stivers from the firm Legal Video of Texas.  I'm the videographer.  Court reporter is Janalyn Elkins from the firm Veritext.

Counsel and all present in the room and everyone attending remotely will now state their appearance affiliations for the record, beginning with the noticing attorney.

MR. STARR:  Peter Starr, King & Spalding, LLC on behalf of Evolent Health, Incorporated and the individual Defendants, and with me is Lauren Newman, also of King & Spalding, on behalf of the Defendants.

MR. GRUNEWALD:  This is Don Grunewald.  I'm with Saxena White, P.A., and I represent lead Plaintiffs, and with me is Joshua Saltzman, also from Saxena White, also representing the Plaintiffs.

MR. EVANGELISTA:  Dominick Evangelista from

Page 5

Bresseler, Amery & Ross representing Mr. Lilly, and with me in the room is Silvercrest General Counsel, David Campbell.

MR. LILLY:  Steve Lilly with Silvercrest Asset Management in Milwaukee.

STEVEN LILLY,

having been duly sworn, testified as follows:

EXAMINATION

Q.  (BY MR. STARR)  Good morning, Mr. Lilly.  Could you please state your full name for the record?

A.  Yes.  Steven, with a V, Richard Lilly.

Q.  And have you ever been deposed before, Mr. Lilly?

A.  No, I've not.

Q.  All right.  So in that case, I'd like to just go over a few ground rules before we jump into it.  And the first one is just to help the court reporter take down what's said today, I'd ask that you provide verbal answers rather than a head shake or a -- or a nod.  Is that all right?

A.  That's okay.

Q.  Second, if you don't understand one of my questions, please ask me for clarification.

A.  Okay.

Q.  Third is that your counsel may object to my

Page 6

Q. Do you see the bottom of that page where it says, "Investment Thesis Changes"?

A. I do.

Q. What does it mean at a general level for an investment thesis to change?

A. So for an investment thesis to change, it would mean that the reason we bought the security is no longer valid, but we're continuing to own it for a different reason.

Q. So the first bullet under that heading is "Loss of confidence in management." Do you see that?

A. We see that. I see that, yes.

Q. And if that happens, if Silvercrest loses confidence in a company's management, it will divest its holding in that company; is that correct?

A. That is a typical course of action. It's not a hard-and-fast rule.

Q. If you believe that a company's management team had committed fraud, would that cause you to lose confidence in the management team?

A. Yes, that would.

Q. Is it fair to say that when you're managing Oklahoma Police's money you would not invest in a company if you believe its management had committed fraud?

Page 35

A.   That is fair to say, yes.

Q.   Please turn to Page 17, Mr. Lilly.

A.   There's a little delay when I try to turn so I'm still not there yet, but there we go.

Q.   Understood.  Are you there now?

A.   I am -- I'm there.

Q.   Okay.  So what does this page show, Mr. Lilly?

A.   This shows our top 10 holdings in the small cap growth strategy as of September 30, 2019.

Q.   And I see there's text there that says, "Representative Account"?

A.   Correct.

Q.   So this is supposed to be a representative account invested in the Silvercrest small cap growth strategy?

A.   That is correct.

Q.   Would you please navigate to Page 19.

A.   Yeah, I'm there.

Q.   This page also reflects the holdings of a representative account invested in the strategy, right?

A.   Yes, correct.

Q.   These holdings are also dated as of September 30, 2019, correct?

A.   Correct.

Q.   And looking to the actual companies listed

Page 36

Jefferson County (Louisville) which is where Passport

has a large ownership base.

                    Do you see that?

        A.   I see that.

        Q.   Based on your understanding of Medicaid health

plans generally, would a 4 percent rate cut be an

adverse development?

        A.   Yes.

        Q.   Significantly adverse development for Passport?

        A.   I would believe so, yes.

                    MR. GRUNEWALD:   Object to form.

        Q.   (BY MR. STARR)   Why was this news pertinent to

Evolent?

        A.   As stated, Passport is a large customer of

Evolent, so a negative development for Passport could be

a negative development for Evolent.

        Q.   And, in fact, if you look at the top line of

Mr. West's email to -- to Adam Dahms, he's saying that

he wanted to make sure Adam saw this because as the

quote here says, "Looks like you own a bit of EVH."

Right?

        A.   That is correct.

        Q.   Directing your attention to the second bullet

in that email --

        A.   Uh-huh.

Page 75

A.  Oh, yeah.  Right.  Yeah.  Yeah.  So I agree then.

Q.  Yes.  Okay.  Would you agree that Passport's goal in filing the lawsuit against Kentucky was to force the Kentucky government to reinstate Medicaid rates to the prior and higher levels?

MR. GRUNEWALD:  Object to form.

MR. EVANGELISTA:  Object to form.

THE WITNESS:  I was pausing expecting that. I think that the lawsuit was an attempt to improve rates.  To what extent, I don't know what they were looking for.

Q.  (BY MR. STARR)  Evolent was not a party to Passport's lawsuit against Kentucky, correct?

A.  I don't know.

Q.  Do you know if Evolent was mentioned in Passport's lawsuit against Kentucky?

A.  I have not read that lawsuit so I can't -- I wouldn't say one way or the other.

Q.  In your view, did Passport's lawsuit against Kentucky reveal any wrongdoing on Evolent's part?

MR. GRUNEWALD:  Object to form.

THE WITNESS:  Not in my view, no.

Q.  (BY MR. STARR)  It didn't reveal any of Evolent's prior statements to be false, did it?

Page 89

MR. GRUNEWALD: Object to form.

THE WITNESS: I don't believe so, no.

MR. STARR: Lauren, can we do Tab 17, please.

(Exhibit No. 566 was marked.)

Q. (BY MR. STARR) Mr. Lilly, I'm adding a document that's been marked Exhibit 565 -- 566. Excuse me. I'm not counting correctly today. And the document has been marked Exhibit 566. And once it loads, my question will be: What is this document?

A. This looks like a message that has the @Lync appended to it, so it looks like it's probably an instant message from myself to Adam on February 19, 2019.

Q. And it was sent at 10:42 a.m., correct?

A. That is correct.

Q. And I only note that because we'll see what appears to be the response to this message in the very next exhibit, so I just wanted you to take note of the time stamp.

A. Okay.

Q. In the first sentence of this document you write, (Reading:) End of the day it's 12 percent of their business so it would be problematic if Passport went belly up but not catastrophic.

Page 90

government chose to cut Medicaid rates payable to Passport's region while not cutting the rates in other regions?

A.  I do not.

MR. STARR:  Lauren, can you do Tab 20, please.

(Exhibit No. 569 was marked.)

Q.  (BY MR. STARR)  Mr. Lilly, I'm introducing a document on Exhibit Share that's been marked Exhibit 569.  Lauren is keeping me honest here.

MR. STARR:  Thank you, Lauren.

Q.  (BY MR. STARR)  Please let me know when it's up.

A.  Okay.  I have that open.

Q.  What is this document, Mr. Lilly?

A.  It looks like Sandy Draper was an -- a healthcare IT analyst at SunTrust Robinson Humphrey at the time sending a message to Tom Eck with a research report attached discussing Evolent Health and Passport.

Q.  And that research note, it provides an update about Passport's lawsuit against Kentucky, right?

A.  Well, I don't see the note.  But what I can see on the screen here just shows -- oh, here we go.  Sorry. Yeah.  Like I said, it provides an update.  It just was talking about Evolent stock being down as the Passport

Page 97

rate dispute is ongoing.

Q.  Could you just read the title of this research note into the record?  Both of -- the both --

A.  Yeah.  "Concerns over solvency of largest client appear to be weighing on shares.  Shares are down 7 percent today."

Q.  Do you agree that concerns over Passport's solvency were weighing on Evolent's share price after the lawsuit was filed?

MR. GRUNEWALD:  Object to form.

THE WITNESS:  I forget.  The lawsuit we determined was filed prior to February 19th?  I'm trying to recall the --

Q.  (BY MR. STARR)  February 15 -- February 15 was the filing of the lawsuit.

A.  Okay.  So, yes, I'd agree that the shares were down in part due to the filing of the lawsuit.

Q.  Did the Passport lawsuit change Silvercrest's investment thesis for Evolent?

A.  I think I stated earlier we would -- had to do the analysis on what losing a 12-percent customer would mean to the business.  It would not have necessarily changed the thesis, but it would have changed the calculus.

Q.  Mr. Lilly, in the second paragraph at the

Page 98

bottom of this page that's above the text "Passport's significance to EVH," if you would look in the second to last line in that paragraph, I guess it's the second to last line on this first page of the exhibit, there's a sentence beginning with the word "Furthermore."  Do you see that?

A.  I see that, yes.

Q.  It says, (Reading:)  Furthermore, given the importance of Passport Health to EVH, we believe EVH will likely work to ensure the continuity of the relationship under a variety of circumstances.

It continues, (Reading:)  This could mean the potential for certain financing arrangements, extension or write-downs of receivables, or revision of existing contracting terms.

Did I read all that correctly, Mr. Lilly?

A.  You read that correctly, yes.

Q.  Back in February 2019, did Silvercrest think that Evolent might try to secure financing for Passport to help prevent its insolvency?

A.  I don't know that we did or didn't.

MR. STARR:  Lauren, can you please introduce Tab 21.

(Exhibit No. 570 was marked.)

Q.  (BY MR. STARR)  Mr. Lilly, I'm adding a

Page 99

It sounds more of a -- that she's just re -- repeating what somebody else said.

Q.   Looking at the last sentence of that email, Ms. Andreen writes, (Reading:)  So at this point, we think the Passport issues are in the stock, although it's a 20 percent customer they would have to back fill.

What do you understand the statement about "Passport issues being in the stock" to mean?

A.   I understand that to be that the current stock price reflects the added risk of Passport and the challenges in Passport.

Q.   Do you agree with that assessment?

A.   As of January 31, 2019, I can't say if I agreed or disagreed, although we continued to own the stock, so it would seem we agreed with that.

MR. STARR:  Lauren, could you please add Tab 24.

(Exhibit No. 573 was marked.)

Q.   (BY MR. STARR)  Mr. Lilly, I introduced on Exhibit Share a document that's been marked Exhibit 573. Let me know when you can see it.

A.   I can see it.  I have it open.

Q.   What is this document, Mr. Lilly?

A.   This is an email from Tom Eck to Adam Dahms on February 25, 2019, relating to Evolent in Kentucky.

Page 107

Q.  And if you scroll down to the last email in
this chain, it's on the second page.

A.  Yeah.

Q.  You can see that Tom Eck is corresponding with
Emily Evans at Hedgeye, right?

A.  Correct.

Q.  What is Hedgeye?

A.  Hedgeye is a research firm and Emily Evans in
particular is an analyst that has a background in -- in
Washington, DC and sort of understands the inner
workings of Medicaid and Medicare and all these sort of
things.  So she consults or she provides information and
advice to investors.

Q.  In that bottom email from Tom Eck, Mr. Eck is
asking Emily for insights into the Kentucky Medicaid
saga with Passport Health, right?

A.  I'll need to read it here.  Yeah.  To me, it
sounded more like he's asking for general information on
is this a typical thing that happens in Medicaid plans
or is this out of the normal course of business.

And it seems like he's more providing the
facts on Evolent and Passport than -- than asking for
her -- her for information on that.

Q.  Do you see the second sentence in that e-mail
there where he says -- Mr. Eck says, (Reading:)  We own

Page 108

a little EVH, which has been crushed on the tension between Passport and the state?

A.  Yeah.  I see that, yes.

Q.  Does that statement mean that Evolent's stock price has been crushed due to the tension between Passport and the state?

A.  That's what I interpret it to mean, yes.

Q.  And that refers to the dispute over Medicaid rate cuts that we've been discussing, right?

A.  Correct.  That's my interpretation.

MR. STARR:  Lauren, could you please introduce Tab 25.

(Exhibit No. 574 was marked.)

Q.  (BY MR. STARR)  Mr. Lilly, I'm adding on Exhibit Share a document that's been marked Exhibit 574. Please let us know when you can see it.

A.  I can see it.  I have it pulled up.

Q.  Could you identify the document for us, please?

A.  It's an email from Adam Dahms to myself on February 27, 2019.  The subject line is "AXGN" but the email text mentions Evolent.

Q.  In the first sentence there, Mr. Dahms says, (Reading:)  I think they did a pretty good job on the call.

Is that a reference to the earnings call

Page 109

Q.  And Silvercrest ultimately did decide to purchase additional shares of Evolent stock on March 22, 2019, right?

A.  I believe that's what the trading history reflects, yes.

Q.  Do you know why Silvercrest made those additional -- that additional purchase on March 22nd?

A.  I can't speak to exactly what was in our head at that specific moment in time.

Q.  Do you recall in late May 2019 that Evolent -- Evolent announced that it would be acquiring a 70 percent stake in Passport?

A.  I do recall that, yes.

Q.  What do you recall about that announcement?

A.  I recall being surprised and I recall being, I guess, not happy with that decision, and I recall the stock going down because of it.

Q.  Why were you unhappy with that decision?

A.  Well, because it effectively made Evolent, which we viewed and valued as a healthcare technology company, it made them an insurance plan to a certain degree and that's not what we initially invested in.

MR. STARR:  Lauren, can you please add Tab 27.

(Exhibit No. 576 was marked.)

Page 112

Q.  Do you think that was one factor in the stock price decline that occurred around the date of the announcement that Evolent would be acquiring Passport?

A.  I do.

Q.  Do you think the stock price declined around that time because as you noted, investors were worried that Evolent was changing its business strategy by acquiring a health plan?

A.  I do.

Q.  Do you think the stock price declined because the market thought Evolent overpaid for Passport?

MR. GRUNEWALD:  Object to form.

THE WITNESS:  I don't think --

Q.  (BY MR. STARR)  You can answer.

A.  Okay.  In my opinion, the amount they paid wasn't the primary concern that -- that we had as investors.

Q.  Were you concerned that Evolent itself was the cause of Passport's worsening financial condition prior to the acquisition?

A.  No.  It wasn't a concern of ours.  Of course, we had to contemplate that concept, but it wasn't a concern of ours.

Q.  Did you think that Evolent's announcement -- withdraw the question.

Page 114

Do you think the stock price decline on the date Evolent announced the acquisition was an overreaction?

A. I -- I can't say specifically. I -- I don't know. I don't recall exactly where it went that day and what the math was that we would have done.

Q. Did you think that Evolent's announcement that it was acquiring Passport revealed any of Evolent's prior statements to be false?

MR. GRUNEWALD: Object to form.

Q. (BY MR. STARR) You can answer.

A. No, I didn't.

MR. STARR: Lauren, could we please add Tab 28.

(Exhibit No. 577 was marked.)

Q. (BY MR. STARR) Mr. Lilly, we've added to Exhibit Share a document that's been marked Exhibit 577. Can you see it?

A. I can see it, yes.

Q. What is this document, Mr. Lilly?

A. All right. It's an email exchange between myself, Tom Eck, and Adam Dahms regarding Evolent on May 29, 2019.

Q. So that's the same day Evolent announced its acquisition of a 70-percent stake in Passport, right?

Page 115

customer in Ohio that Evolent made an investment in that you mentioned earlier?

A.   I don't recall it offhand, but I would recognize it.

MR. STARR:  Lauren, could you please add Tab 29.

(Exhibit No. 578 was marked.)

Q.   (BY MR. STARR)  Mr. Lilly, we're putting up a document that's been marked Exhibit 578.  Once it loads, let us know.

A.   Yep, I've got it open now.

Q.   All right.  Could you identify this document for the record, please?

A.   Yeah.  It's an email exchange between Adam Dahms and Sandy Draper, who's the SunTrust analyst and healthcare IT guide I mentioned earlier.  This is from November 3rd, 2017 and there are a few other people CC'd on it.

Q.   So we've gone a couple years back in the timeline here, right?

A.   Correct.

Q.   If you go to the bottom of this email thread and take a look at the research note that's in that email.

A.   Yeah.

Page 118

Q.  So there's -- there are four paragraphs in the first part of this research note that are numbered 1 through 4.  Are you with me?

A.  I'm with you, yes.

Q.  And then right beneath that first paragraph, 4, there's bolded text that says, (Reading:)  However, there some lingering questions about EVH's growth outlook, et cetera.

Do you see that?

A.  No.  I'm sorry.  What -- it's in the -- what number is it in?

Q.  Sorry.  So there's an initial section that's got paragraphs 1, 2, 3, 4, and then there's bolded text right there that says in a new line that's flush with the left margin, it says "however, the lingering questions."

A.  Yeah.

Q.  So I'd like to direct your attention to the first numbered paragraph beneath that heading that says, (Reading:)  EVH bought another client's health plan.

A.  Right.

Q.  You with me now?

A.  Yeah, I'm with you now.

Q.  So that paragraph says, (Reading:)  As done recently with New Mexico Health, EVH bought Premier

Page 119

Health's MA and Commercial plans.

Do you see that?

A.  I see that, yes.

Q.  So that's the New Mexico Health plan acquisition that you were talking about?

A.  Premier is the Ohio acquisition.  New Mexico is the one that they had done before that.

Q.  Got it.

And do you see the second to last paragraph in that -- excuse me.  The second to last sentence in that paragraph that says, (Reading:)  EVH's willingness (or need) to buy health plans is still a worry for investors?

A.  Yes.

Q.  So would you agree that's an example of investors disliking the fact that Evolent had purchased another health plan?

A.  I would agree.

Q.  If you go up to the top of the email chain, Mr. Lilly, there's a -- the first sentence in that top email from Mr. Draper says, (Reading:)  People hate that they bought another health plan.

Do you see that?

A.  I see that.

Q.  Does the paragraph -- does that first paragraph

Page 120

reflect the same sentiment you were expressing about investor reaction to Evolent's apparent change in business strategy when it purchases a health plan?

A.   Yes.

Q.   You can -- you can put that exhibit aside now, Mr. Lilly.

A.   Okay.

MR. STARR:   Will you get Tab 31, please, Lauren.

(Exhibit No. 579 was marked.)

Q.   (BY MR. STARR)  Mr. Lilly, we're adding a document on Exhibit Share that's been marked Exhibit 579.

A.   Okay.  I see that.

Q.   Could you identify this document for us?

A.   This is an email from Lee Glenna, the salesperson at Canaccord Genuity, and it looks like it's a morning email he would send to all his clients on his distribution list with a download of that day's research from Canaccord.

Q.   So it's like a research blast essentially?

A.   Correct.

Q.   You received this one, right?

A.   Yeah.  I'm in the -- the "to" column there.  So I presume I received it.

Page 121

REPORTER'S CERTIFICATION

DEPOSITION OF STEVEN LILLY

TAKEN MAY 6, 2022

I, Janalyn Elkins, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, STEVEN LILLY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to PETER STARR;

That a copy of this certificate was served on all parties and/or the witness shown herein on

_____.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and

Page 151

further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of May 2022.

JANALYN ELKINS

Texas CSR 3631

Expiration Date 1/31/2023

Veritext Legal Solutions

300 Throckmorton Street, Suite 1600

Fort Worth, Texas  76102

Firm Registration No. 571

PH:  (817) 336-3042

Page 152