# Exhibit 4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

PLYMOUTH COUNTY RETIREMENT      *
SYSTEM and OKLAHOMA POLICE      *
PENSION AND RETIREMENT          *
SYSTEM, Individually and On     *
Behalf of All Others            *
Similarly Situated,             *
                                *    Case No.
     Plaintiffs,                *    1:19-cv-01031-MSN-TCB
                                *
VS.                             *
                                *
EVOLENT HEALTH, INC., FRANK     *
WILLIAMS, NICHOLAS MCGRANE,     *
and SETH BLACKLEY,              *
                                *
     Defendants.                *


          *******************************************
             ORAL AND VIDEOTAPED DEPOSITION OF
        NEWTON  INVESTMENT MANAGEMENT NORTH AMERICA, LLC
                      BY AND THROUGH
                       JOHN PORTER
                      MAY 11, 2022
                    (Reported Remotely)
          *******************************************


                                                    Page 1

APPEARANCES (Via Videoconference)


FOR THE PLAINTIFFS:

        Mr. Donald Grunewald
        Mr. Scott Guarcello
        SAXENA WHITE PA
        10 Bank Street, 8th Floor
        White Plains, New York  10606
        914-437-8551
        dgrunewald@saxenawhite.com
        sguarcello@saxenawhite.com

FOR THE DEFENDANTS:

        Mr. Peter Starr
        Ms. Lauren Newman Smith
        KING & SPALDING LLP
        1180 Peachtree Street, NE, Suite 1600
        Atlanta, Georgia  30309
        404-572-4600
        pstarr@kslaw.com
        lnsmith@kslaw.com

FOR THE WITNESS:

        Mr. Christopher Soller
        BANK OF NY MELLON
        500 Grant Street, Suite 151-1915
        Pittsburgh, Pennsylvania  15258
        412-234-7847
        christopher.soller@bnymellon.com

ALSO PRESENT:

        Mr. Josh Stivers, Videographer

Page 3

THE VIDEOGRAPHER:  Here begins the deposition of John Porter.  Today's date is May 11, 2022.  Time is 11:01.

Counsel, please identify yourselves and state whom you represent.

MR. STARR:  Peter Starr, King & Spalding, LLP, on behalf of Evolent Health, Incorporated, and the individual defendants.  And with me is Lauren Smith also on behalf of the defendants.

MR. GRUNEWALD:  This is Donald Grunewald. I'm with Saxena White, and I represent lead plaintiffs. And I'm here with Scott Guarcello, who is also with Saxena White and also represents lead plaintiffs.

MR. SOLLER:  Christopher Soller, counsel for the witness from Newton Investments Asset Management.

(Witness sworn)

JOHN PORTER, having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. STARR:

Q.  Good morning, Mr. Porter.  Could you please state your full name and business address for the record?

A.  Sure.  John R. Porter III, One Boston Place,

Page 6

record of success or evidence that they, you know, are -- are differentiated in their ability to navigate a competitive landscape.

Q. Do you ever look at whether the management's compensation incentives are aligned with shareholder incentives?

A. Oh, absolutely. That is -- you know, we always look at, you know, how are they going to get paid, because if you want to know how someone is going to behave, just ask them how they get paid. Many people on this call get paid by the hour, so we're probably going to have a long conversation today.

Q. No comment on that.

A. I don't get paid by the hour.

Q. Is it fair to say that you try to invest in companies run by management you believe you can trust?

A. Of course.

Q. Is it also fair to say that when managing clients' money you would not invest in a company -- you would not invest in a company if you believed its management had committed fraud?

MR. GRUNEWALD: Object to form.

Q. (By Mr. Starr) You can answer.

A. Yes, of course. I -- I would, you know. That often is revealed too late to -- to make up for it,

Page 37

but, yeah, absolutely I would avoid that at all cost.

Q.   Yeah.  To be clear, I'm talking about ex ante, right?  Your position -- your belief at the time you're making the investment.

A.   Yes.  Yeah, I would never put a single dollar of client capital in a management team that I didn't feel like I could trust.  But there's always -- you know, companies give guidance.  Companies make statements.  They fall short.  And one of the things that -- that we have to do as investors is assess did -- did what they say not come true because they misrepresented what could happen or because they -- you know, stuff happens.

The environment changes and, you know, what -- you know, the client that you were sure was going to sign that contract six months from now, all of a sudden there's a CEO change and, you know, the new CEO doesn't necessarily want to go down that path.  So, you know, that's one of the things we spend a lot of time is assessing is when companies aren't delivering on the things that they told us that we should expect, what was the underlying cause.

Q.   And in connection with that analysis you will consider whether prior statements were untrue?

MR. GRUNEWALD:  Object to form.

Page 38

Q.    Then if you turn to page 3, there's a short paragraph there in about the middle of the page that says "Passport earlier this month appealed to Meier to revisit rate cuts that the Medicaid department put into effect July 1, saying it expects to lose 60 million in 2018 and 144 million in 2019 unless payments are raised."  Do you see that?

A.    I do.

Q.    Does this article refresh your recollection about those Medicaid rate cuts submitted by the Kentucky government?

A.    Yes.

Q.    Was Newton aware in January 2019 of the dispute between Passport and Kentucky over these Medicaid rates?

A.    I mean, if it was being written about by a local Kentucky newspaper, I can guarantee that we were aware of it, yes.

Q.    Is Passport's dispute with the government of Kentucky something that Newton monitored?

A.    Yes.

Q.    Do you recall what ultimately ended up happening with the rate cuts and Passport's dispute with the state?

A.    Well, depends on what you mean by what

Page 77

Q.    Yeah.   That statement about Passport going away, does that mean the market was pricing in the possibility Passport --

MR. GRUNEWALD:   Object to form.

Q.    (By Mr. Starr)   -- would go out of business altogether?

A.    Absolutely.   Yes.   I mean, you had Passport themselves publicly in hearings that were matters of public records declaring that their solvency could be in question within the next six months.   So, yeah, the market -- the market was rapidly reflecting that in the equity value for Evolent.

Q.    Yeah.   And that hearing in the article we saw in the prior exhibit, right, that was back in January 2019, correct?

A.    Yep.

Q.    And this lawsuit was filed February 15, 2019, right?

A.    I guess.   I don't see the lawsuit here, but obviously it was -- it was, you know, in mid-February sometime.

Q.    Sure.   Do you recall the other story referenced here about Florida Medicaid partners?   Do you recall any of the details about that issue?

A.    Yeah.   And this -- this comes back to -- back

Page 81

in Ed's earnings model where he talked about sort of the lumpy addition of new lives.  You could -- you could reach an agreement with a company to partner with them, but the take-up of new lives could -- could be inconsistent or lumpy as we refer to it sometimes.  So that's -- that's what he's talking about here.  There was a couple new contracts in Florida that were just ramping a little bit more slowly than what we in the market broadly were -- were anticipating.

It didn't turn out to be a material issue.  I mean, in the -- in the end the thing that was rattling the stock was all about Passport and Kentucky.  But at this moment we were trying to assess, you know, a couple of different things that were -- were being discussed in the -- in the market.

Q.   So after this email was sent on February 19 Newton continued to buy Evolent stock for Plymouth's account, right?

A.   Well, "continue" is a little bit of a strong word.  We bought some more six weeks after this, so we -- we neither bought nor sold in mid-February.  We sort of took a wait and see at that moment, and it wasn't until April when we bought more -- the stock had fallen further, but we were actually starting to see some of the dust settle in ways that we thought was

Page 82

making that weren't tied to their relationship with --

with Evolent.

Q.    In your view did Passport's lawsuit against Kentucky reveal any wrongdoing on Evolent's part?

MR. GRUNEWALD:  Object to form.

Q.    (By Mr. Starr)  You may answer.

A.    I saw -- I saw nothing -- I saw nothing in any of the back-and-forth with the State of Kentucky that -- that led me to believe that Evolent bore any responsibility for the financial challenges at Passport.

Q.    Evolent wasn't a party to the lawsuit between Kentucky and Passport, right?

A.    Not as far as I know.

Q.    Do you know if Evolent was even mentioned in the Passport lawsuit against Kentucky?

A.    I wouldn't know.

Q.    In your view did Passport's lawsuit against Kentucky reveal any of Evolent's prior statements to be false?

MR. GRUNEWALD:  Object to form.

Q.    (By Mr. Starr)  You may answer.

A.    No.

Q.    Did you think that the decline in Evolent's stock price that coincided with this lawsuit was

Page 85

to acquire in 2017?

A.   It does, yes.   Thank you.

Q.   Premier Health was also an Evolent client; is that right?

A.   It implies so.   I mean, I can't -- I mean, it says "bought another client's health plan," so the implication is that Premier Health was a client.

Q.   If you skip down a couple lines there, third line from the bottom of that numbered paragraph 1 says "Evolent's willingness, or need, to buy health plans is still a worry for investors."

A.   Yes.

Q.   Do you agree that Evolent's willingness or need to buy health plans would be a concern for investors?

A.   Yes.

MR. GRUNEWALD:   Object to form.

Q.   (By Mr. Starr)   Why?

MR. GRUNEWALD:   Because you're making a speculation as to what the market --

MR. STARR:   I'm sorry.   I'm sorry.   Don, I was asking -- my question was to Mr. Porter why he believes that's a concern for investors.

MR. GRUNEWALD:   No worries.

THE WITNESS:   Well, it was -- think about

Page 122

what Evolent was at that time.  It was a small developing company with, you know, unproven products that they were still -- you know, at one point my analyst Ed is -- referred to their sales cycle as being a bit evangelical because you're trying to sort of convert people to your way of thinking, and for them to take on, you know, an entire health plan and all the associated complexity of that was, you know, a distraction for what was a resource-constrained company.

So, you know, anytime any business of any scale sort of drifts away from sort of their core competency, you worry a little bit, but particularly when it's a small cap company.  There's enough stuff that could go wrong.  You don't want them adding unnecessary complexity to the -- to the equation if they can avoid it.

Q.   (By Mr. Starr)  So if I'm hearing you correctly, it's -- it marks a change in strategy or a different business model that's not what you viewed as Evolent's core competency?  Is that right?

A.   I wouldn't quite say it was a change in strategy because I think what they were trying to do was -- you know, they wanted -- they wanted access to a portion of the business -- and I know this was the case

Page 123

with New Mexico.  I don't -- I don't have any
recollection of Premier Health.  They wanted access to
a portion of the business, but they just -- they just
bought the whole thing so they could get the piece they
wanted and then they would figure out how to manage the
other part of it, whether it was, you know, managing
internally or finding a potential partner in the future
to off-load the pieces that they didn't want.

So I don't think it was a change in
strategy.  It was just -- it was -- you know, again, I
come back to sort of this notion of -- of unnecessary
or too much complexity.  You know, small developing
company with limited bandwidth, you don't want them
drifting away from what the focus of generating
long-term value is supposed to be.

MR. STARR:  Lauren, let's do Tab 17.

Q.    (By Mr. Starr)  In just a moment, Mr. Porter,
a document that's been marked Exhibit 625 should appear
in the Exhibit Share queue.  Can you see it?

A.    Yeah.  Just got it.

Q.    Okay.  This is another analyst report, right?
This one from J.P. Morgan?

A.    Yep.

Q.    It is dated December 8, 2017, so that's about
a month after the last analyst report we looked at,

Page 124

that allow them to grow lives under coverage."  Right?

A.    Yes.

Q.    Did Newton have any suspicions or expectations that Evolent might attempt to acquire Passport prior to this May 29 announcement?

A.    Well, I mean, the fact that he says, "I'm not stunned by the news" means that it was a possibility that if you had asked Ed the day before in a handicap he would have assigned some reasonable probability to it.  So he -- he certainly recognized that it was a possible outcome.

Q.    And he said he's not thrilled by it, and the reason he gives for that is that he would rather see Evolent make investments that allow them to grow lives under coverage.  What do you understand that statement to mean?  Does that relate to what you were testifying about earlier?

A.    Yeah.  Basically what it means is, you know, any business has finite resources, and how they deploy those resources, you know, opens up future opportunities.  And in this case Evolent was essentially having to expend resources, those resources being, you know, precious capital and management bandwidth, to essentially preserve an existing revenue stream.

Page 127

So they're spending resources that wasn't -- at least at that point in time didn't appear that it was going to add to the -- to the enterprise value, you know, in the future. It was going to preserve enterprise value but not add to it. So as growth investors we're always looking for those resources to be deployed in a way that we're going to grow the enterprise value as -- as significantly as -- and as rapidly as possible. And this was a bit of a step backwards, if you will.

Q. Do you think that's the reason that Evolent's stock price declined after this announcement was made, because of that reaction or perception that you just described?

A. Yes. And I think that there was, you know, some unknowns, uncertainty about the ultimate, you know, financial risks that they were taking on by buying Passport. I don't remember the health of some of the other plans that they had purchased in the past, but, you know, by the end of the -- by the end of May it was extremely well documented the financial challenges that Passport was faced with, and, you know, the investors were concerned that they just added some potential significant liabilities to their -- to the Evolent business by taking on this -- this acquisition.

Page 128

Q.   And when you refer to the financial challenges Passport was facing at the time, is that -- does that relate to the ongoing dispute over rates with the Kentucky government?

A.   Yes.

Q.   Would it also relate to the upcoming Medicaid RFP process and whether Passport would win that -- that contract?

A.   Yes.

Q.   Do you think the Evolent stock price declined after this announcement because investors thought that Evolent had overpaid for Passport?

MR. GRUNEWALD:  Object to form.

THE WITNESS:  No, because I don't think anybody saw the $70 million as being -- it was a lot of money for -- for Evolent then, but it didn't -- I don't think people viewed the purchase price, per se, as being a challenge.  I think the stock price reaction probably would have been the same if they had paid, you know, $50 million or $5 million because it was the unknown uncertainty about future liabilities they may be taking on, the management distraction.  And I think those were the issues that weighed on the stock, not -- not the purchase price itself.

Q.   (By Mr. Starr)  Back in May 2019 at the time

Page 129

did you think that Evolent's announcement that it was acquiring Passport revealed any of Evolent's prior statements to be false?

MR. GRUNEWALD: Object to form.

Q. (By Mr. Starr) You can answer.

A. No, I don't. I mean, Ed says here, "I'm not -- I'm not stunned by the news," and there have been, you know, other situations I think of where companies zigged when we thought for sure they would zag and they had assured us they weren't going to zig, and we would have described it as -- you know, even in a brief email like this I suspect that Ed would have said, "This is a stark change in the strategic direction than what they had -- had shared with me previously."

Q. There would be some indication that this was contrary to what the company had previously told me? Is that -- is that what you're saying?

A. Yes.

Q. Do you think the stock price decline following this May 2019 announcement was an overreaction?

MR. GRUNEWALD: Object to form.

THE WITNESS: I'll come back to my own behavior. I mean, we neither -- we neither bought or sold after this news, so that would tell me that I

Page 130

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

PLYMOUTH COUNTY RETIREMENT    *
SYSTEM and OKLAHOMA POLICE    *
PENSION AND RETIREMENT        *
SYSTEM, Individually and On   *
Behalf of All Others          *
Similarly Situated,           *
                              *    Case No.
      Plaintiffs,             *    1:19-cv-01031-MSN-TCB
                              *
VS.                           *
                              *
EVOLENT HEALTH, INC., FRANK   *
WILLIAMS, NICHOLAS MCGRANE,   *
and SETH BLACKLEY,            *
                              *
      Defendants.             *

*****************************************
REPORTER'S CERTIFICATION
NEWTON INVESTMENT MANAGEMENT NORTH AMERICA, LLC
BY AND THROUGH
JOHN PORTER
MAY 11, 2022
*****************************************

I, Marsha Yarberry, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOHN PORTER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

Page 152

_____ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature pages contain any changes and the reasons therefor;

\_\_xx\_\_ was not requested by the deponent or a party before the completion of the deposition.

I further certify that the amount of time used by each party at the deposition is as follows:

Mr. Peter Starr - 3 hours, 11 minutes

Mr. Donald Grunewald - 22 minutes.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken.  Further, I am not a relative or employee of any attorney of record, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 13th day of May, 2022.

*Marsha Yarberry*

MARSHA YARBERRY, TEXAS CSR 5100

Expiration Date:  07/31/22

Veritext Legal Solutions

Firm Registration No. 571

300 Throckmorton, Suite 1600

Fort Worth, Texas  76102

800-336-4000

Page 153