# Exhibit 7

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

PLYMOUTH COUNTY RETIREMENT SYSTEM, and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY,

Defendants.

Case No. 1:19-cv-01031-MSN-TCB

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**May 20, 2022**

**TABLE OF CONTENTS**

I.    Scope of assignment ..................................................................................................1

II.    Summary of findings..................................................................................................1

III.    Qualifications and remuneration................................................................................5

    A.  Qualifications..................................................................................................5

    B.  Remuneration..................................................................................................6

IV.    Materials considered .................................................................................................6

V.    Background.................................................................................................................9

    A.  Company background .....................................................................................9

    B.  Summary of allegations .................................................................................9

VI.    Methodology............................................................................................................14

VII.    The Alleged Cost Savings Misrepresentations did not have price impact.........................18

    A.  An analysis of the market reaction following the Alleged Cost Savings Misrepresentations shows that these statements did not have price impact ................18

        1.  Analysis of the January 10, 2018 alleged misrepresentation..................................19

        2.  Analysis of the May 11, 2018 alleged misrepresentation ......................................22

        3.  Analysis of the September 5, 2018 alleged misrepresentation ..............................25

        4.  Analysis of the January 25, 2019 alleged misrepresentation................................27

    B.  An analysis of the alleged corrective disclosures provides no evidence that the Alleged Cost Savings Misrepresentations had price impact........................................31

        1.  The alleged corrective disclosures did not reveal Passport's supposed failure to achieve cost savings from the Evolent relationship or provide the market with any new understanding of the disclosures in the *Insider Louisville* article ...31

        2.  The decline in Evolent's stock price following the alleged corrective disclosures was not caused by the Alleged Cost Savings Misrepresentations, but instead was due to other factors ........................................................................33

        (i)  The price drop following the February 15, 2019 alleged corrective disclosure was due to the market's concern about Passport's conflict with Kentucky and its potential near-term insolvency driven by Kentucky's Medicaid rate cuts, not by any revelation regarding whether Passport achieved cost savings through its relationship with Evolent ...........................33

        (ii)  The price drop following the May 29, 2019 alleged corrective disclosure was due to the market's concern about a change in Evolent's business model from a tech services company to a health plan administrator, not by

     any revelation regarding whether Passport achieved cost savings through its relationship with Evolent ..............................................................................37

  C. The market reaction following the alleged corrective disclosures is not consistent with price impact of the Alleged Cost Savings Misrepresentations ...........................42

   1. Contrary to Plaintiffs' claims that the alleged misrepresentations created an "unrealistically positive" assessment of Evolent's "future growth prospects," analysts did not lower their expectations of Evolent's future revenue growth after the end of the Putative Class Period ..........................................................42

   2. The fact that Evolent continued to gain new customers after the end of the Putative Class Period is inconsistent with Plaintiffs' claims that the Company failed to achieve cost savings for its clients...........................................................44

   3. Evolent reportedly made a profit on the Passport acquisition, as it later sold Passport for more than it paid at the end of the Putative Class Period .................45

VIII. The Coffman Proposed Damages Methodology is not well-defined and has no explanation for how it could measure alleged damages in a manner consistent with Plaintiffs' theory of liability.....................................................................................47

  A. It is not clear how the Coffman Proposed Damages Methodology could quantify alleged inflation, given that there is no evidence that the alleged corrective disclosures provided the market with any new information "correcting" the Alleged Cost Savings Misrepresentations ..................................................................50

  B. The Coffman Proposed Damages Methodology has no explanation for how it could account for and separate out the inflation attributable to the 16 dismissed statements from the inflation attributable to the six remaining alleged misrepresentations..................................................................................................50

  C. The Coffman Proposed Damages Methodology is not well-specified and has no concrete explanation for how it would disaggregate any price reactions to the alleged corrective disclosures from confounding information ...................................53

  D. The Coffman Proposed Damages Methodology is not well-specified and has no concrete explanation for how it would estimate stock price inflation for each day during the Putative Class Period...............................................................................54

ii

## I.    SCOPE OF ASSIGNMENT

1.    I have been asked by counsel for Defendants to address two issues regarding Plaintiffs' securities class action against Evolent Health, Inc. ("Evolent" or "the Company"), concerning its allegedly inflated stock price between January 10, 2018 and May 28, 2019 (the "Putative Class Period"). First, I was asked to analyze price impact of the alleged misrepresentations regarding specific cost savings (*i.e.*, the January 10, 2018, May 11, 2018, and September 5, 2018 alleged misrepresentations), as well as the January 25, 2019 alleged misrepresentations in the *Insider Louisville* article which also relate to whether Evolent was helping lower Passport's costs (together, the "Alleged Cost Savings Misrepresentations").

2.    Second, I have been asked to review Mr. Coffman's proposed damages methodology ("Coffman Proposed Damages Methodology"), as detailed in the Expert Reports of Chad Coffman, submitted on October 19, 2021 and April 8, 2022 (respectively, "Coffman First Report" and "Coffman Second Report") and Mr. Coffman's deposition testimony on May 9, 2022 ("Coffman Deposition"), and assess whether it is capable of measuring alleged damages in a manner consistent with Plaintiffs' theory of liability.

## II.    SUMMARY OF FINDINGS

*Price Impact:*

3.    I find that the Alleged Cost Savings Misrepresentations did not have price impact. Generally, Plaintiffs contend that Evolent made misrepresentations during the Putative Class Period regarding its ability to help clients, including its most important client Passport Health Plan ("Passport"), achieve cost savings and that these misrepresentations inflated the Company's stock price.

4.    Overall, I find that there is no support for a link between the Alleged Cost Savings Misrepresentations and Evolent's stock price movement, and substantial evidence against a link, and thus find no price impact from the Alleged Cost Savings Misrepresentations. I find no evidence that the market's view of whether Passport achieved cost savings through its relationship with Evolent changed as a result of any of the Alleged Cost Savings Misrepresentations or any of the alleged corrective disclosures – which is direct evidence against price impact.

1

5.      While Plaintiffs claim that each of the alleged misrepresentations inflated Evolent's stock price, based on a detailed analysis of price impact for each of the Alleged Cost Savings Misrepresentations, I find that these alleged misrepresentations did not have price impact. For each of the Alleged Cost Savings Misrepresentations, I examined whether there was a link between Evolent's stock price and the alleged misrepresentation, including by analyzing whether there was any indication of a market reaction (price reaction and analyst commentary and/or change in analysts' price target) that could be attributed to the Alleged Cost Savings Misrepresentations both after these alleged misrepresentations were made and after the alleged corrective disclosures. I find no evidence of a link between Evolent's stock price and any of the Alleged Cost Savings Misrepresentations. In particular:

a) January 10, 2018 alleged misrepresentation: Plaintiffs claim the first alleged misrepresentation was on January 10, 2018, when an Evolent investor presentation included text on a slide stating that the Company had helped an unnamed full-risk partner achieve $100 million in savings. I find no evidence of price impact from this alleged misrepresentation. The alleged misrepresentation was only a single sentence in one slide of a 26-page investor presentation providing an overview of Evolent's business and financial performance. No representative of the Company mentioned the alleged misrepresentation during the oral presentation. Seven analysts issued eight reports following the investor presentation and none mentioned the alleged misrepresentation or increased their price targets as a result of the alleged misrepresentation. Instead, analysts focused on Evolent's 4Q17 and FY18 guidance. In addition, according to my event study model, there was no statistically significant increase in Evolent's stock price after the alleged misrepresentation. This provides clear evidence of no price impact – thus severing any link between the alleged misrepresentation and the stock price.

b) May 11, 2018 alleged misrepresentation: Plaintiffs claim the second alleged misrepresentation was on May 11, 2018, when the same statement regarding helping an unnamed full-risk partner achieve $100 million in savings was mentioned by Evolent in an investor presentation. Unlike the first alleged misrepresentation, Evolent not only included the statement on a slide in the investor presentation, but also mentioned the statement orally in the Company's commentary to investors. In

2

addition, two analysts included a copy of the slide with the alleged misrepresentation in their reports issued after May 11, 2018. I find no evidence of price impact from this alleged misrepresentation. There was no statistically significant increase in Evolent's stock price according to both Mr. Coffman's event study model and my own event study model. Moreover, no analysts changed their price targets for Evolent's stock as a result of the alleged misrepresentation. This provides clear evidence of no price impact – thus severing any link between the alleged misrepresentation and the stock price.

c) September 5, 2018 alleged misrepresentation: Plaintiffs claim the third alleged misrepresentation was on September 5, 2018, when Evolent identified Passport, for the first time according to Plaintiffs, as a client for whom the Company had achieved over $100 million in savings. I find no evidence of price impact from this alleged misrepresentation. There was no statistically significant increase in Evolent's stock price according to both Mr. Coffman's event study model and my own event study model. Moreover, the one analyst that did issue a report after the September 5 conference did not even mention the alleged misrepresentation. This provides clear evidence of no price impact – thus severing any link between the alleged misrepresentation and the stock price.

d) January 25, 2019 alleged misrepresentation: Plaintiffs claim that Evolent made further alleged misrepresentations in the *Insider Louisville* article. However, contrary to the previous alleged misrepresentation that Evolent was helping Passport achieve cost savings, the information in the article at least suggested that Evolent was not helping Passport achieve cost savings – for example, by stating that the fees passport paid to Evolent Health were "increasingly dwarfing its administrative overhead." [1] Thus, unlike the alleged corrective disclosures, the *Insider Louisville* article actually suggested that Evolent was not benefitting Passport. I find not only that there is no evidence of price impact from this alleged misrepresentation, but also that the market reaction to the *Insider Louisville* article shows that there is no price impact from any of the Alleged Cost Savings Misrepresentations. In particular, when the *Insider*

---

[1] "Passport's finances being dragged down by $220M in 'management fees' to Evolent Health," *Insider Louisville*, January 25, 2019.

3

*Louisville* article suggested that Evolent was not helping Passport achieve cost savings, there was no market reaction, including no statistically significant reaction in Evolent's stock price according to both Mr. Coffman's event study model and my own event study model – thus again providing clear evidence of no price impact and severing any link between the Alleged Cost Savings Misrepresentations and Evolent's stock price.

6.    Plaintiffs claim that the alleged inflation in Evolent's stock price was partially removed on two alleged corrective disclosure dates. However, the two corrective disclosures alleged by Plaintiffs did not reveal any new information about Evolent's supposed failure to help Passport achieve cost savings and therefore provide no evidence of price impact of the Alleged Cost Savings Misrepresentations. Market evidence shows that the price drops following the alleged corrective disclosures were *not* caused by the correction of any of the Alleged Cost Savings Misrepresentations or any revelation of Passport failing to achieve cost savings, but instead were due to other factors. In particular:

a) February 15, 2019 alleged corrective disclosure: The price drop following the February 15, 2019 alleged corrective disclosure, the filing of Passport's lawsuit against Kentucky over reductions in Medicaid reimbursement rates, provides no evidence that the Alleged Cost Savings Misrepresentations had price impact. Market evidence shows that the price drop following this alleged corrective disclosure was due to the market's concern about Passport's conflict with Kentucky and its potential near-term insolvency driven by Kentucky's Medicaid rate cuts, not by any revelation regarding whether Passport achieved cost savings through its relationship with Evolent. While analysts discussed the risk of Evolent losing Passport as a customer if Passport became insolvent, not one analyst mentioned a risk of Evolent losing *any other* customers as a result of the February 15, 2019 alleged corrective disclosure.

b) May 29, 2019 alleged corrective disclosure: The price drop following the May 29, 2019 alleged corrective disclosure, Evolent's announcement that it would acquire a majority stake in Passport, provides no evidence that the Alleged Cost Savings Misrepresentations had price impact. Market evidence shows that the price drop following this alleged corrective disclosure was due to the market's concern about a change in Evolent's business model from a tech services company to a health plan

4

administrator, not by any revelation regarding whether Passport achieved cost savings through its relationship with Evolent.

7.     Moreover, the market reaction following the alleged corrective disclosures is not consistent with price impact of the Alleged Cost Savings Misrepresentations. For example, contrary to Plaintiffs' claims that the alleged misrepresentations created an "unrealistically positive" assessment of Evolent's "future growth prospects," analysts did not lower their expectations of Evolent's future revenue growth after the end of the Putative Class Period. In fact, Evolent continued to gain new customers after the end of the Putative Class Period, which is inconsistent with Plaintiffs' claims that the alleged corrective disclosures somehow revealed to the market that the Company failed to achieve cost savings for its clients.

*Coffman Proposed Damages Methodology:*

8.     The Coffman Proposed Damages Methodology does not constitute a feasible or concrete methodology for calculation of class-wide damages. Given that there is no evidence that the alleged corrective disclosures provided the market with any new information "correcting" the Alleged Cost Savings Misrepresentations, it is not clear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology could quantify alleged inflation, other than zero inflation. Moreover, given that the Court has dismissed many of the alleged misrepresentations from the case, and given the nature and timing of them, it is unclear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology will account for and separate out the inflation attributable to the dismissed statements from the inflation attributable to the remaining alleged misrepresentations. The Coffman Proposed Damages Methodology is not well-specified and has no concrete explanation for how it could disaggregate any price reactions to the alleged corrective disclosures from confounding information or how it could estimate stock price inflation for each day during the Putative Class Period.

## III.    QUALIFICATIONS AND REMUNERATION

### A.    Qualifications

9.     I am a Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice

5

related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

10.    I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

### B.    Remuneration

11.    NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,050 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## IV.    MATERIALS CONSIDERED

12.    In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

a)  Second Amended Class Action Complaint, filed June 8, 2020 ("Second Amended Complaint");

b)  Third Amended Class Action Complaint, filed November 17, 2021 ("Third Amended Complaint");

6

c) Expert Report of Chad Coffman, dated October 19, 2021 ("Coffman First Report"), including exhibits, appendices and materials turned over;

d) Expert Report of Chad Coffman, dated April 8, 2022 ("Coffman Second Report"), including exhibits, appendices and materials turned over;

e) Memorandum Opinion and Order, filed March 24, 2021 ("First MTD Order");

f) Defendants' Memorandum in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint, filed June 22, 2020;

g) Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint, filed July 6, 2020;

h) Defendants' Reply in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint, filed July 17, 2020;

i) Lead Plaintiffs' Memorandum in Support of Motion for Class Certification, filed October 19, 2021;

j) Lead Plaintiffs' Memorandum in Support of Their Motion for Leave to Amend the Second Amended Class Action Complaint, filed November 17, 2021;

k) Defendants' Partial Motion to Dismiss the Third Amended Class Action Complaint, filed December 21, 2021;

l) Defendants' Memorandum in Support of Their Partial Motion to Dismiss the Third Amended Class Action Complaint, filed December 21, 2021;

m) Order dated March 18, 2022 ("Second MTD Order");

n) Plaintiffs' Memorandum in Support of Motion for Class Certification, filed April 8, 2022;

o) Deposition of Chad Coffman, May 9, 2022 ("Coffman Deposition");

p) Analyst reports on Evolent from Refinitiv Eikon and documents produced in discovery;

q) Evolent's filings with the Securities and Exchange Commission ("SEC filings") between 2016 and 2020;

7

r) Evolent's press releases, conference call transcripts and investor presentations between 2016 and 2020 from Factiva and FactSet Research Systems, Inc.;

s) News stories on Evolent, Passport Health Plan and the healthcare market in Kentucky between 2016 and 2020 from Factiva and Bloomberg, L.P.;

t) Price, total return, trading volume, implied volatility, and short interest data for Evolent from FactSet Research Systems, Inc. and Bloomberg, L.P.;

u) Price and total return data for market and industry indices from FactSet Research Systems, Inc. and Bloomberg, L.P.;

v) Institutional and insider holdings data for Evolent from FactSet Research Systems, Inc.;

w) Analysts' revenue estimates for Evolent from I/B/E/S (obtained via FactSet Research Systems, Inc.);

x) Transcripts of depositions of Lead Plaintiffs' Investment Managers (Silvercrest Asset Management, May 6, 2022 and Newton Investment Management North America, May 11, 2022);

y) Internal documents on Lead Plaintiffs' trading;

z) Financial statements of Passport Health Plan between 2013 and 2019 filed with the Kentucky Department of Insurance and the Internal Revenue Service;

aa) Verified Complaint for Injunctive and Declaratory Relief in *Passport v. Commonwealth of Kentucky*;

bb) Academic literature and textbooks on finance, securities, valuation and statistics; and

cc) Court decisions

8

## V.    BACKGROUND

### A.    Company background

13.    Evolent is a healthcare technology company that provides services aimed at helping health systems and physician organizations manage the transition away from "fee-for-service" to "value-based" reimbursement in the U.S. healthcare industry. Evolent provides advisory services, as well as a technology platform and operations support to help its clients manage risk and control medical costs.[2]

### B.    Summary of allegations

14.    Generally, Plaintiffs contend that Evolent made misrepresentations during the Putative Class Period regarding its ability to help clients, including its most important client, Passport Health Plan ("Passport"), achieve cost savings and that these misrepresentations inflated the Company's stock price.

15.    In particular, Plaintiffs claim that Evolent's business model is "predicated on its purported ability to dramatically reduce its clients' healthcare and administrative costs."[3] Plaintiffs allege that, throughout the Putative Class Period, Evolent "repeatedly" touted the Company's partnership with Passport as a success story, "even going so far as to emphasize to investors that the Company's healthcare management services had provided Passport with <u>over $100 million</u> in annualized savings."[4] Plaintiffs allege that "[f]ueled by these assurances," Evolent's stock price "skyrocketed by more than 100% in just nine months" from the beginning of the Putative Class Period.[5] However, Plaintiffs allege that Evolent's statements about helping Passport achieve cost savings were "utterly false" and that "rather than lowering the costs of its single most important client, Evolent did the exact opposite: Evolent dramatically <u>increased</u> Passport's costs…"[6]

---

[2]    Evolent FY16 Form 10-K, filed March 3, 2017, pp. 1, 5. See, also, for example, JP Morgan analyst report, "Initiating with Overweight and $23 PT; Well Positioned to Grow with Value-Based Reimbursement Shift," dated June 30, 2015.

[3]    Third Amended Complaint, ¶5.

[4]    Third Amended Complaint, ¶5 (emphasis as in Third Amended Complaint).

[5]    Third Amended Complaint, ¶5.

[6]    Third Amended Complaint, ¶6 (emphasis as in Third Amended Complaint).

9

16.      Plaintiffs allege that Evolent's stock price was artificially inflated during the Putative Class Period as a result of 22 alleged misrepresentations made by Defendants.[7] It is my understanding that, following the Court's two Motion to Dismiss Orders dated March 24, 2021 and March 18, 2022 (respectively, "First MTD Order" and "Second MTD Order") there are six alleged misrepresentation dates remaining in the case – January 10, 2018, May 11, 2018, September 5, 2018, January 25, 2019, February 26, 2019, and May 7, 2019 – summarized in the table below.[8]

| Date | Event | Alleged Misrepresentation from Third Amended Complaint |
|---|---|---|
| 1/10/18 | J.P. Morgan Conference | "Full risk partner achieves MLR / ALR [Medical Loss Ratio / Administrative Loss Ratio] reduction impact representing $100M+ in identified annualized savings"[9] |
| 5/11/18 | Evolent Analyst Day | "Full risk partner achieves MLR / ALR reduction impact representing $100M+ in identified annualized savings"[10] |
| 9/5/18 | Wells Fargo Conference | "In [Passport's] own plan, we believe we've helped to generate over $100 million in savings, which was highly valuable to that organization."[11] |

---

[7]  Second Amended Complaint ¶135, Third Amended Complaint ¶161, First MTD Order, p. 21 (addressing "twenty sets of false and misleading statements" alleged in Second Amended Complaint), Second MTD Order, p.1 (sustaining two "Newly Added 'Risk Partner' Statements").

[8]  First MTD Order, p. 59, and Second MTD Order. See, also, Defendants' Memorandum in Support of Their Partial Motion to Dismiss the Third Amended Class Action Complaint, filed December 21, 2021.

[9]  Third Amended Complaint, ¶162. Medical Loss Ratio is the "portion of an organization's revenues spent on medical care (*i.e.*, how much of the premiums are used to pay doctors, hospitals, and pharmacies." Administrative Loss Ratio is a measure of administrative expenses as a percent of revenues. See Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint, June 22, 2020, pp. 8-9.

[10]  Third Amended Complaint, ¶166. I understand that the other alleged misstatements on May 11, 2018 in the Third Amended Complaint have been dismissed from the case. See Defendants' Memorandum in Support of Their Partial Motion to Dismiss the Third Amended Class Action Complaint, filed December 21, 2021, and Second MTD Order.

[11]  Third Amended Complaint, ¶169 (emphasis as in Third Amended Complaint).

| Date | Event | Alleged Misrepresentation from Third Amended Complaint |
|---|---|---|
| 1/25/19 | *Insider Louisville* article | "Evolent told Insider via email that the 'majority of the fees Passport pays to Evolent are directly tied to local staff—<u>at cost</u>—as well as (insurance claims processing) and pharmacy benefit services at a <u>lower per member cost than prior periods</u>.' The company said it has 'hundreds of employees supporting Passport' and that 'the number of employees has increased in line with the increases in scope of our partnership with Passport' and that 'the number of our employees in Louisville exceeds our original projection.' <u>However, the company did not provide details</u>.'"[12] |
| 2/26/19 | FY18 earnings call | "While we're <u>not focused on outright majority ownership in health plans</u>, we are interested in exploring creative, aligned co-ownership arrangements where we can partner with providers to help them monetize clinical value through MA [Medicare Advantage]."[13]<br><br>"We're going to learn from every relationship, but <u>there is no big change in strategy based on what we see happening with Passport specifically</u>."[14]<br><br>"<u>No. No, we don't have any broader exposure [if Passport were to go insolvent]</u>."[15]<br><br>"Again, it's pretty hard to speculate on that. <u>I don't think we've thought about acquiring a full Medicaid plan. It's just not in our strategic lens at this point</u>. Again, in certain situations, we've talked about co-ownership models where we might have a minority stake in something, <u>but related to Passport that's not something that is currently being evaluated</u>."[16] |

---

[12]  Third Amended Complaint, ¶173 (emphasis as in Third Amended Complaint).

[13]  Evolent 4Q18 earnings conference call, February 26, 2019. See Third Amended Complaint, ¶178 (emphasis as in Third Amended Complaint).

[14]  Evolent 4Q18 earnings conference call, February 26, 2019. See Third Amended Complaint, ¶178 (emphasis as in Third Amended Complaint).

[15]  Third Amended Complaint, ¶179 (emphasis as in Third Amended Complaint).

[16]  Third Amended Complaint, ¶179 (emphasis as in Third Amended Complaint).

| Date | Event | Alleged Misrepresentation from Third Amended Complaint |
|---|---|---|
| 5/7/19 | 1Q19 earnings call | "Currently, we're pursuing several major initiatives in close collaboration with the Passport leadership team[.]"<br><br>"Based on these initiatives and given the strength of its clinical model, we believe that Passport is making solid progress towards improving its financial performance, while continuing to provide market-leading care to its members. Overall, we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market."[17] |

17.     Plaintiffs claim that the alleged "truth" regarding the alleged misrepresentations was disclosed to the market on two "corrective disclosure" dates. These two alleged corrective disclosures are described below:

a) February 15, 2019: On this date, Passport filed a lawsuit against Kentucky's Cabinet for Health and Family Services challenging the cuts to Medicaid reimbursement rates enacted by Kentucky in 2018. In the lawsuit, Passport stated that, if the rate cuts were not reversed, Passport would be "legally insolvent by March 1, 2019."[18] Plaintiffs claim that Passport "further alleged that it had recorded a loss of $65.5 million for year-end 2018 and projected an additional $75 million in losses for the first half of 2019 alone—ostensibly solely as a result of the Medicaid rate cuts."[19]

b) May 29, 2019: On this date, Evolent announced that it would acquire a majority stake in Passport by paying $70 million in exchange for a 70% interest and agreeing to provide "interim balance sheet support" if required for Passport to meet its statutory capital requirements.[20] Plaintiffs claim that the announcement "was an admission that it was not the 2018 rate cuts—which had already been rescinded—that were the cause

---

[17]   Third Amended Complaint, ¶184 (emphasis as in Third Amended Complaint).

[18]   Third Amended Complaint, ¶119.

[19]   Third Amended Complaint, ¶119.

[20]   Third Amended Complaint, ¶124.

of Passport's downfall, but rather the catastrophic financial harm imposed on Passport by Evolent's excessive fees and deficient claims administration processes."[21]

18.    In addition, Plaintiffs point to another date when the "truth" began "to emerge" – January 25, 2019.[22] On this date, *Insider Louisville* published an article titled "Passport's Finances Being Dragged Down by $220M in 'Management Fees' to Evolent Health," which, according to Plaintiffs, "reported on Passport's financial woes" and revealed that Evolent's "exorbitant fees were dramatically worsening Passport's financial situation."[23] Although Plaintiffs claim that the "truth" about the alleged misrepresentations was "begin[ning] to emerge" on this date,[24] Plaintiffs do not claim the *Insider Louisville* article as an alleged corrective disclosure.[25]

19.    The chart below shows Evolent's daily stock price and trading volume from January 2018 to October 2019, along with the alleged misrepresentations and the alleged corrective disclosures.

---

[21]  Third Amended Complaint, ¶124.

[22]  Third Amended Complaint, ¶¶115-116.

[23]  Third Amended Complaint, ¶116.

[24]  See, for example, Third Amended Complaint, ¶¶115-116.

[25]  Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint, July 6, 2020, p. 6. See, also, Third Amended Complaint, ¶¶213-214.

13



**Evolent Health Daily Stock Price and Trading Volume**

## VI. METHODOLOGY

20.    An analysis of price impact is an analysis of whether the alleged misrepresentations affected the market price when made.[26] In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misrepresentation (*i.e.*, analyzing the "front-end" market reaction), including analyzing the stock price movement and examining market and analyst commentary following an alleged misrepresentation, or (2) indirectly by analyzing the market

---

[26]    See, for example, *Halliburton I*, 131 S. Ct. 2179, 2186 (2011) ("'[P]rice impact' – that is, whether the alleged misrepresentations affected the market price in the first place.").

reaction when the truth concealed by an alleged misrepresentation is later revealed by a corrective disclosure (*i.e.*, analyzing the "back-end" market reaction).[27]

21.    To analyze price impact of the Alleged Cost Savings Misrepresentations, I examined publicly available information related to Evolent and Plaintiffs' allegations. I reviewed Plaintiffs' claims in the Second and Third Amended Complaints and other pleadings, as well as the two reports of Plaintiffs' expert, Mr. Coffman, and examined the alleged misrepresentations and the alleged corrective disclosures (including what information was allegedly false, when the alleged truth was purportedly revealed to the market, and what information was alleged to be corrective).

22.    I analyzed publicly available information on Evolent, including analyst reports, SEC filings, and news stories from Bloomberg and Factiva.[28] I focused on what the market knew about the alleged misrepresentations, and on how the market reacted in terms of analyst and other market commentary and price reactions.

23.    Analyst reports are periodic reports issued by professional financial analysts who perform research and analysis on specific industries and companies. Analysts evaluate companies by studying information about the company and the stock, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries using financial techniques such as discounted cash flow models and valuation multiples. Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share), and give recommendations to buy, hold or sell the stock. Analysts covering a company typically issue reports after new information about the company is released and are a valuable source of information on market knowledge and sentiment at the

---

[27]    See, for example, *Halliburton II*, 134 S. Ct. 2398 (2014).

[28]    Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

15

time. The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock.[29]

24.      Plaintiffs and Mr. Coffman claim that the market for Evolent's stock was efficient during the Putative Class Period,[30] and thus, that Evolent's stock price reflected "all publicly available information" and impounded "new publicly available information rapidly and in an unbiased fashion."[31] For the purpose of this analysis of price impact, I have been asked to assume that Plaintiffs' claim of market efficiency is true.

25.      To analyze how Evolent's stock price reacted to new information, I used the event study methodology. An event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[32] Academics often use an event study to determine how stock prices respond to new information.[33]

26.      An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or

---

[29]  Courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements. See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla., March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex., Sept. 25, 2006) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated."). The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary. See, *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

[30]  Coffman Second Report, ¶6.

[31]  Coffman Second Report, ¶18.

[32]  See, for example, Janet C. Alexander, "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994, Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, 38: 1982, and Frederick C. Dunbar and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[33]  See, for example, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Robert G. Bowman, "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, 10(4): 1983.

16

industry indices, often over a control period.[34] Using the regression results and the returns of the indices, the predicted stock price movement and excess stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the event being tested. Then, the statistical significance of the excess stock price movement can be tested.[35]

27.    I tested Evolent's stock price reactions using both the event study methodology put forward by Mr. Coffman, as well as my own event study methodology. Both models use the S&P 500 index to control for market movements, the S&P Health Care Services Select Industry Index to control for industry movements, and a rolling control period of 120 trading days (approximately six months) prior to each event tested. My event study model does not exclude dates, while Mr. Coffman excludes a number of dates from his regression models, in particular, all earnings announcements, the alleged corrective disclosures and one "outlier" event (November 6, 2017).[36] Mr. Coffman's decision to exclude a number of more volatile dates has the effect of making the results of his event study more likely to be statistically significant.[37] My conclusion of no price impact from the Alleged Cost Savings Misrepresentations does not depend on which event study model is used.

---

[34]  Regression analysis is used to estimate the relationship between two or more variables. See, for example, Robert V. Hogg and Elliot A. Tanis, *Probability and Statistical Inference* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

[35]  The results of the event study are based on the 5% significance level, the standard typically used. See, for example, David A. Freedman and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980.

[36]  Coffman Second Report, fn. 63.

[37]  By excluding more volatile dates from his market model, Mr. Coffman lowers his estimate of the typical volatility in Evolent's stock price. This means that he lowers the reported statistic called the standard error, which is a measure of how much of the variability in Evolent's stock price is not explained by the market and industry indices. The t-statistic, which measures the statistical significance of a price reaction, is calculated as the price reaction divided by the standard error of the regression. Thus, the smaller the reported standard error, the bigger the magnitude of the t-statistic, and the more likely it is that Mr. Coffman will find a price reaction to be statistically significant. See, for example, Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, (Federal Judicial Center: Washington, D.C., 3rd ed., 2011), pp. 281-282.

## VII. THE ALLEGED COST SAVINGS MISREPRESENTATIONS DID NOT HAVE PRICE IMPACT

### A. An analysis of the market reaction following the Alleged Cost Savings Misrepresentations shows that these statements did not have price impact

28. As part of the analysis of price impact, I analyzed whether the Alleged Cost Savings Misrepresentations caused a statistically significant increase in Evolent's stock price when made. According to both Mr. Coffman's event study model, as well as my own event study model (described above), I calculated the abnormal stock price movement (*i.e.*, the company-specific movement in Evolent's stock price after controlling for market and industry movements) following each alleged misrepresentation, and tested the abnormal movement to determine if it was statistically significant. In addition, I performed event studies on the alleged corrective disclosure dates.

29. The results of the event studies following the alleged misrepresentations and the alleged corrective disclosures are below:

| | | | Coffman Event Study | | | Allen Event Study | | |
|---|---|---|---|---|---|---|---|---|
| Event Date | Reaction Date | Event | % Price Reaction | t-stat | Statistically Significant?[1] | % Price Reaction | t-stat | Statistically Significant?[1] |
| *Alleged Misrepresentations* | | | | | | | | |
| 1/10/18 | 1/10/18 | J.P. Morgan Conference | 5.8% | 2.5 | Yes | 6.2% | 1.9 | No |
| 5/11/18 | 5/11/18 | Evolent Analyst Day | 1.1% | 0.5 | No | 1.0% | 0.5 | No |
| 9/5/18 | 9/5/18 | Wells Fargo Conference | -3.3% | -1.7 | No | -3.4% | -1.6 | No |
| 1/25/19 | 1/25/19 | *Insider Louisville* Article | -1.9% | -0.8 | No | -2.1% | -0.8 | No |
| 2/26/19 | 2/27/19 | FY18 Earnings Call | -3.1% | -1.3 | No | -3.0% | -1.1 | No |
| 5/7/19 | 5/8/19 | 1Q19 Earnings Call | 4.0% | 1.5 | No | 4.1% | 1.4 | No |
| *Alleged Corrective Disclosures* | | | | | | | | |
| 2/15/19 | 2/19/19 | Passport sues Kentucky | -10.6% | -4.5 | Yes | -10.7% | -4.2 | Yes |
| 5/29/19 | 5/29/19 | Evolent announces Passport acquisition | -27.6% | -10.5 | Yes[2] | -27.5% | -9.8 | Yes[2] |

**Price Reactions Following Alleged Misrepresentations and Alleged Corrective Disclosures**

Notes and Sources:
Data from Bloomberg, L.P. and "COFFMAN_00011590.xlsx."

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the sample period. "Yes" indicates that the price reaction is statistically significant at the 5% level.

[2] Note that there was a statistically significant increase in Evolent's stock price on May 30, 2019, the next trading day.

18

30.    I was asked to analyze price impact of the Alleged Cost Savings Misrepresentations (*i.e.*, the January 10, 2018, May 11, 2018, September 5, 2018, and January 25, 2019 alleged misrepresentations). I find that an analysis of the market reaction following each of these alleged misrepresentations shows that these statements did not have price impact, as described in the sections that follow.

### 1.    Analysis of the January 10, 2018 alleged misrepresentation

31.    The alleged misrepresentation on January 10, 2018 was a statement appearing on a slide in Evolent's investor presentation at a J.P. Morgan Healthcare Conference regarding an unnamed "full risk partner" having achieved "$100M+ in identified annualized savings." The statement was a single sentence in one slide of a 26-page investor presentation providing an overview of Evolent's business and financial performance. No representative of Evolent mentioned the statement during the oral presentation, and Evolent did not identify the "full risk partner" as Passport.[38]

32.    Plaintiffs claim that the alleged misrepresentations created "an unrealistically positive assessment of Evolent's business"[39] and thus inflated Evolent's stock price. An analysis of the market reaction following the January 10, 2018 alleged misrepresentation shows that this statement did not have price impact. In particular:

a)    No analysts mentioned the alleged misrepresentation.

b)    No analysts increased their price targets for Evolent's stock following the presentation.

c)    There was no statistically significant increase in Evolent's stock price following the presentation, according to my event study model.[40]

---

[38]    "Evolent Health Inc at JP Morgan Healthcare Conference," January 10, 2018 and accompanying presentation.

[39]    Third Amended Complaint, ¶161.

[40]    In addition, my team and I reviewed news on Evolent released on January 10, 2018 and found that there was no other news announced on that date that could have offset any positive reaction in Evolent's stock price.

According to Mr. Coffman's event study model, there was a statistically significant increase in Evolent's stock price; however, to the extent there was a statistically significant price reaction, a review of the market evidence shows that it cannot be tied to the alleged misrepresentation. In particular, the Company did not mention the statement itself during the call, no analyst mentioned the statement, and analysts were instead focused on Evolent's 4Q17 and FY18 guidance.

19

33.     A review of analyst reports published right after the January 10, 2018 investor presentation shows that the alleged misrepresentation did not have price impact. As shown in the table below, seven analysts issued eight reports discussing and analyzing Evolent's investor presentation. Not one of these seven analysts mentioned the text on the slide related to an unnamed risk partner having achieved $100M+ in cost savings,[41] nor did any of the analysts raise their price targets for Evolent's stock following the presentation. Thus, there is no evidence that the market perceived that it had received any "new value relevant"[42] information from Evolent's statement.

34.     The only positive information mentioned by analysts was regarding two updates to Evolent's guidance: (i) that Evolent expected to meet/exceed its guidance for 4Q17, and (ii) a "strong pipeline" and a "good" outlook for FY18.

---

[41]   In addition, I find that no news articles mentioned the alleged misrepresentation.

[42]   Coffman Second Report, ¶53.

20

**Analyst Commentary following Jan. 10, 2018 Alleged Misrepresentation**

| | Analyst | Date | Commentary About Slide With Alleged Misrep.? | Does Analyst Change Price Target? | Commentary About Conference |
|---|---|---|---|---|---|
| 1. | Cantor | 1/10/18 | None | Yes, Decreases | "EVH announced that it expects to **meet or exceed** its previously-issued 4Q17 adjusted revenue and adjusted EBITDA guidance. […] Adjusted services revenue growth for 2018 is expected to be in the mid-to-high teens, which is below our estimate, but still **impressive**, in our view." [emphasis added] |
| 2. | JP Morgan | 1/10/18 | None | No | "EVH expects to **meet or exceed 2017 guidance** […] The company **added 7 new partners** in 2017, at the high end of its 5-7 target range. Looking ahead to 2018, mgmt spoke to a **strong pipeline** with adjusted services revenue growth forecast at mid to high teens, True Health New Mexico adjusted premium revenue of $95-100M, and adjusted inter company revenues of $20M." [emphasis added] |
| 3. | Leerink | 1/10/18 | None | No | "This rate [2018 Adj. Services Revenue] is slightly below our model but we believe is **better than feared** and in-line to slightly above consensus. […] **2018 Outlook looks good**. […] **4Q17 expected to meet or exceed**. We also see this commentary as a relief for the stock as many investors have been concerned about client attrition in recent months." [emphasis added] |
| 4. | SunTrust | 1/10/18 | None | No | "This [2018 Services Revenue growth] brackets our previously published estimates […] We expect a **positive reception by the market from this guidance**. […] Aligned to beat every quarter in 2017." [emphasis added] |
| 5. | Wells Fargo | 1/10/18 | None | No | "The guidance [2018] is a little light, but we would also note that valuation at 1.8x the new core revenue guidance (assuming 16% growth as a mid-point) suggests the buyside was expecting more like 10-15% growth […] The presentation also says Q4 revenue should meet or exceed guidance, and that the company has a 'strong pipeline.'" |
| 6. | William Blair | 1/10/18 | None | No | "As part of the filing, the company indicated that it anticipates meeting, or exceeding, prior fourth quarter 2017 sales and adjusted EBITDA guidance. More important, for 2018, the company indicated it has a **strong pipeline** […] This [2018 services revenue] is relatively in line with our current target of $521 million in services revenue, and should **provide some relief to investors concerned about the 2018 growth outlook**." [emphasis added] |
| 7. | Cowen | 1/12/18 | None | No | "EVH recently provided some clarity on its co-investment strategy and provided an initial 2018 outlook, which we believe should give investors comfort moving into the year. […] Management provided its initial thoughts on the 2018 outlook and some commentary around 2019, which we believe is **better than the Street was originally expecting**." [emphasis added] |

**Sources:**
Analyst reports on Evolent

35.     Thus, an analysis of the market reaction following the January 10, 2018 alleged misrepresentation shows that this statement did not have price impact. While Plaintiffs claim that each of the alleged misrepresentations inflated Evolent's stock price, I find no evidence of anyone discussing the January 10, 2018 alleged misrepresentation (including the Company

21

itself), no analysts increased their price targets following the alleged misrepresentation, and there was no statistically significant increase in Evolent's stock price, according to my event study. This is clear evidence of no price impact – thus severing any link between the alleged misrepresentation and the stock price.

### 2.    Analysis of the May 11, 2018 alleged misrepresentation

36.    Evolent included an identical statement regarding an unnamed "full risk partner" having achieved "$100M+ in identified annual savings" in the Company's May 11, 2018 analyst day presentation slide deck. Unlike the first alleged misrepresentation, Evolent not only included the statement on a slide in the investor presentation, but also mentioned the statement orally in the Company's commentary to investors.[43]

37.    Plaintiffs claim that each of the alleged misrepresentations created "an unrealistically positive assessment of Evolent's business"[44] and thus inflated Evolent's stock price. An analysis of the market reaction following the May 11, 2018 alleged misrepresentation shows that this statement did not have price impact. In particular:

a)    While two analysts included the slide with the statement in their reports, they did not change their price targets for Evolent's stock.

b)    There was no statistically significant increase in Evolent's stock price following the May 11, 2018 alleged misrepresentation, according to either Mr. Coffman's event study model or my own.

38.    A review of analyst reports published right after the May 11, 2018 analyst day presentation shows that that alleged misrepresentation did not have price impact. Following the May 11, 2018 analyst day presentation, eight analysts issued reports discussing and analyzing Evolent's investor presentation. Two of these analysts included a copy of the relevant slide from the presentation in their reports, but they did not change their price targets for Evolent's stock. For example, a William Blair analyst report included a copy of the slide, stating that the

---

[43]    "Evolent Health Inc Corporate Analyst Meeting," May 11, 2018 ("[A]nd then a full-risk partner achieving $100 million in identified savings through a bunch of different levers that we have across the full platform.")

[44]    Third Amended Complaint, ¶161.

"company has now demonstrated an ability to drive results for its partner organizations."[45]
William Blair did not change any of its forward-looking estimates of Evolent's financial results
or its price target for Evolent's stock.[46] Detail on each of the analyst reports released after the
analyst day presentation is shown in the table below:

| | **Analyst** | **Mentions Slide With Alleged Misrep.?** | **Does Analyst Change Price Target?** | **Indication Changed Value Due to Alleged Misrep.?** |
|---|---|---|---|---|
| **Analysts' Reactions following May 11, 2018 Alleged Misrepresentation** | | | | |
| 1. | Cantor | No | No | No |
| 2. | Cowen | No | No | No |
| 3. | Jefferies | No | No | No |
| 4. | JP Morgan | No | No | No |
| 5. | Leerink | Yes | No | No |
| 6. | Oppenheimer | No | No | No |
| 7. | Wells Fargo | No | Yes, Increases | No |
| 8. | William Blair | Yes | No | No |

**Sources:**
Analyst reports on Evolent from May 11 to May 14, 2018.

39.     While analysts at Wells Fargo changed their price target following the May 11,
2018 analyst day,[47] the fact that the Wells Fargo analysts did not mention the alleged
misrepresentation in the report is evidence that the price target change had nothing to do with the
alleged misrepresentation. There is no indication that any of the other analysts changed their
price targets following the alleged misrepresentation.

40.     I find that, according to either Mr. Coffman's event study or my own, there was
no statistically significant increase in Evolent's stock price following the May 11, 2018 alleged
misrepresentation. In other words, Evolent's stock price reaction following this alleged

---

[45]  William Blair analyst report, dated May 11, 2018

[46]  William Blair analyst report, dated May 11, 2018 ("However, we are not making any adjustments to our model based on the analyst day event, especially as we already updated our financial targets following the release of Evolent's first-quarter results on Wednesday, May 9.")

[47]  Note that Wells Fargo analysts had not updated their price target following the Company's previous earnings announcement on May 9, 2018.

23

misrepresentation, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price and, thus, cannot be distinguished from zero.[48]

41.      The lack of a statistically significant increase in Evolent's stock price when the May 11, 2018 statement was made is direct evidence that the alleged misrepresentation did not impact Evolent's stock price. The lack of an observable statistically significant price reaction is considered by academics,[49] as well as the courts,[50] as providing evidence of no price impact. Moreover, Plaintiffs, in support of class certification, have put forward the Coffman Proposed Damages Methodology which claims that an event study can be used to quantify artificial inflation.[51] The use of an event study for a common damages methodology, as well as to assess market efficiency, implies that Plaintiffs are claiming that the event study has a good chance at detecting a meaningful association. Mr. Coffman's own event study shows that there was no statistically significant increase in Evolent's stock price when the May 11, 2018 statement was made. Thus, the failure to find a meaningful association between Evolent's stock price and the alleged misrepresentation is persuasive evidence that there is no link between them. For example, according to the *Reference Manual on Scientific Evidence*, "when studies have a good chance of detecting a meaningful association, **failure to obtain significance can be persuasive evidence that there is nothing much to be found**."[52]

---

[48]  In addition, my team and I reviewed news on Evolent released on May 11, 2018 and found that there was no other news announced on that date that could have offset any positive reaction in Evolent's stock price.

[49]  See, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, **with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact.**" See, Abdeldayem and Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance,* 8(8):2016, pp. 23-32, emphasis added.

[50]  See, for example, Erica P. John Fund, Inc. v. Halliburton Company, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015 ("To show that a corrective disclosure had a negative impact on a company's share price, **courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard** […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is necessary. […] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that **there was no price impact on December 21, 2000**, and finds that Defendants have rebutted the Basic presumption as to the allegedly corrective disclosure made on that date.")

[51]  Coffman Second Report, ¶81.

[52]  Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), p. 254.

24

42.    Thus, an analysis of the market reaction following the May 11, 2018 alleged misrepresentation shows that this statement did not have price impact. While the Company actually mentioned the statement during its commentary (rather than just including the statement on a slide in the investor presentation), no analysts changed their price targets for Evolent's stock as a result of the statement, and there was no statistically significant increase in Evolent's stock price. This is clear evidence of no price impact – thus severing any link between the alleged misrepresentation and the stock price.

### 3.    Analysis of the September 5, 2018 alleged misrepresentation

43.    Evolent stated at a Wells Fargo conference on September 5, 2018 that it had "helped to generate over $100 million in savings" for Passport. This is the first misrepresentation alleged by Plaintiffs that identified Passport as a client for whom Evolent had achieved over $100 million in savings.

44.    Plaintiffs claim that each of the alleged misrepresentations created "an unrealistically positive assessment of Evolent's business"[53] and thus inflated Evolent's stock price. An analysis of the market reaction following the September 5, 2018 alleged misrepresentation shows that this statement did not have price impact. In particular:

a)  No analysts mentioned the September 5, 2018 alleged misrepresentation.

b)  There was no statistically significant increase in Evolent's stock price following the alleged misrepresentation, according to either Mr. Coffman's event study model or my own.

45.    A review of analyst reports published right after the September 5, 2018 analyst day presentation shows that that alleged misrepresentation did not have price impact. Following the September 5, 2018 conference, only one analyst issued a report discussing and analyzing Evolent's remarks at the Wells Fargo conference. This analyst did not mention the alleged misrepresentation – meaning there is no evidence that the market learned any "new value relevant"[54] information from Evolent's statement regarding savings at Passport. Detail on

---

[53]   Third Amended Complaint, ¶161.

[54]   Coffman Second Report, ¶53.

25

analysts that did or did not issue reports following the September 5, 2018 alleged misrepresentation is shown in the table below:[55]

| | Analyst | Issues Report?[1] | Mentions Alleged Misrep.? |
|---|---|---|---|
| | **Analysts' Reactions following Sep. 5, 2018 Alleged Misrepresentation** | | |
| 1. | Canaccord Genuity | No | No |
| 2. | Cantor | No | No |
| 3. | Cowen | No | No |
| 4. | Jefferies | No | No |
| 5. | JP Morgan | No | No |
| 6. | Leerink | No | No |
| 7. | Oppenheimer | No | No |
| 8. | Piper Jaffray | No | No |
| 9. | SunTrust | No | No |
| 10. | Wells Fargo | Yes | No |
| 11. | William Blair | No | No |

**Notes and Sources:**

Analyst reports on Evolent.

[1] Based on reports issued from Sep. 5, 2018 to Sep. 11, 2018, by analysts covering Evolent during the Putative Class Period (each of whom published at least one report in Sep. 2018) from Refinitiv Eikon.

46.    I find that, according to either Mr. Coffman's event study model or my own, there was no statistically significant increase in Evolent's stock price following the September 5, 2018 alleged misrepresentation.[56] The lack of a statistically significant increase in Evolent's stock price when the September 5, 2018 statement was made is direct evidence that the alleged misrepresentation did not impact Evolent's stock price. The lack of an observable statistically

---

[55]  Note that it appears that four other analysts (Baird, Citi, Goldman and KeyBanc) that did not contribute to Refinitiv Eikon did not issue reports either.

[56]  In addition, my team and I reviewed news on Evolent released on September 5, 2018 and found that there was no other news announced on that date that could have offset any positive reaction in Evolent's stock price.

26

significant price reaction is considered by academics,[57] as well as the courts,[58] as providing evidence of no price impact.

47.    Thus, an analysis of the market reaction following the September 5, 2018 alleged misrepresentation shows that this statement did not have price impact. This was the first misrepresentation alleged by Plaintiffs that identified Passport as a client for whom it had achieved over $100 million in savings, and no analysts mentioned the alleged misrepresentation, and there was no statistically significant increase in Evolent's stock price. This is clear evidence of no price impact – thus severing any link between the alleged misrepresentation and the stock price.

### 4.    Analysis of the January 25, 2019 alleged misrepresentation

48.    Plaintiffs identify January 25, 2019, the publication date of the *Insider Louisville* article, as both an alleged misrepresentation date as well as a date when the "truth" about the alleged misrepresentations was "begin[ning] to emerge."[59] According to Plaintiffs, the article "reported on Passport's financial woes" and revealed that Evolent's "exorbitant fees were dramatically worsening Passport's financial situation."[60] However, according to Plaintiffs, Defendants "flatly denied that their fees were excessive or improper" and instead claimed that they were providing services "at cost" and even "at a lower per member cost than prior periods," statements that Plaintiffs are alleging were misrepresentations.[61]

---

[57]    As noted above, see, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, **with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact.**" See, Abdeldayem and Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance,* 8(8):2016, pp. 23-32, emphasis added.

[58]    As noted above, see, for example, Erica P. John Fund, Inc. v. Halliburton Company, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015 ("To show that a corrective disclosure had a negative impact on a company's share price, **courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard** […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is necessary. […] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that **there was no price impact on December 21, 2000**, and finds that Defendants have rebutted the Basic presumption as to the allegedly corrective disclosure made on that date.")

[59]    See, for example, Third Amended Complaint, ¶¶115-116.

[60]    Third Amended Complaint, ¶116.

[61]    Third Amended Complaint, ¶117.

49.    Plaintiffs allege that Evolent's stock price was inflated during the Putative Class Period because the Company made misrepresentations regarding helping Passport achieve cost savings, while failing to disclose that Evolent did not lower costs, and instead actually raised costs, for Passport.[62] As explained in further detail below, the two corrective disclosures alleged by Plaintiffs did not reveal any new information about Evolent's supposed failure to help Passport achieve cost savings. The information in the *Insider Louisville* article at least suggested that Evolent was not helping Passport achieve cost savings, while the alleged corrective disclosures did not. When the *Insider Louisville* article revealed this information to the market, there was no market reaction, further demonstrating that the Alleged Cost Savings Misrepresentations did not have price impact.

50.    The *Insider Louisville* article stated that in each year between 2014 and 2017, Passport's "expenses rose at a faster pace than revenue" and cited the $220 million in "non-employee management fees" that Passport had paid to Evolent as "increasingly dwarfing its administrative overhead":

> In the last three years, Passport paid the publicly traded Evolent Health some $220 million in non-employee management fees, accounting for the vast majority of dollars it did not spend on its clients' medical care and increasingly dwarfing its administrative overhead.[63]

The *Insider Louisville* article is the only disclosure identified by Plaintiffs during the Putative Class Period that could have any link to their allegations that Evolent was not helping Passport achieve cost savings.

51.    Despite the fact that the *Insider Louisville* article at least suggested that Evolent was not helping Passport achieve cost savings, an analysis of the market reaction following its publication further demonstrates that the Alleged Cost Savings Misrepresentations did not have price impact. In particular:

---

[62]    Third Amended Complaint, ¶6 ("In reality, rather than lowering the costs of its single most important client, Evolent did the exact opposite: Evolent dramatically increased Passport's costs by hundreds of millions of dollars by charging exorbitant fees for performing the same exact administrative functions that Passport had previously been performing in-house for a fraction of the cost."). See also, for example, Third Amended Complaint, ¶¶162, 166 and 169.

[63]    "Passport's finances being dragged down by $220M in 'management fees' to Evolent Health," *Insider Louisville*, January 25, 2019.

28

a) Only one analyst, Piper Jaffray, issued a report in the days following publication of the *Insider Louisville* article, and this report disputed the claims in the *Insider Louisville* article.

b) There was no statistically significant reaction in Evolent's stock price following publication of the article, according to either Mr. Coffman's event study or my own.

52.    A review of analyst reports issued right after publication of the *Insider Louisville* article shows that that Alleged Cost Savings Misrepresentations did not have price impact. In the days following publication of the article, no analysts issued new reports on Evolent. It was only almost a week later, on January 31, 2019, that Piper Jaffray issued a report titled "Passport is a Happy Client, Despite Local Media Report." The report noted that while "Passport [was] wrangling with regulators over capitation rates, the issue [was] not tied to the EVH relationship."[64] In addition, the analysts stated that they had met with Passport's CEO, Mark Carter, who had said that Passport's relationship with Evolent was going well and that "[t]he challenges facing Passport are due to a dispute the plan has with the Kentucky Department of Medicaid Services."[65]

53.    I find that, according to either Mr. Coffman's event study or my own, there was no statistically significant price reaction following publication of the January 25, 2019 *Insider Louisville* article.[66] The lack of a statistically significant price reaction when the *Insider Louisville* article was published is direct evidence that the Alleged Cost Savings Misrepresentations did not impact Evolent's stock price. The lack of an observable statistically significant price reaction is considered by academics,[67] as well as the courts,[68] as providing evidence of no price impact.

---

[64]   Piper Jaffray analyst report, dated January 31, 2019.

[65]   Piper Jaffray analyst report, dated January 31, 2019.

[66]   There was also no statistically significant reaction following publication of the January 31, 2019 Piper Jaffray report, according to either Mr. Coffman's event study model or my own.

[67]   As noted above, see, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, **with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact.**" See, Abdeldayem and Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance,* 8(8):2016, pp. 23-32, emphasis added.

29

54.     It appears Plaintiffs contend Evolent's stock price did not react following the publication of the *Insider Louisville* article because of the alleged misrepresentations in that same article.[69] If Plaintiffs' claims were true, then the later corrective disclosures should have revealed the "truth" about Evolent's denial, and caused the market to reassess the disclosures about Passport's costs in the *Insider Louisville* article. However, contrary to Plaintiffs' claim, there is no indication from analysts after the alleged corrective disclosures that they had newly learned or understood that Evolent was not helping Passport achieve cost savings.[70] In other words, the later alleged corrective disclosures *did not* provide analysts with any new understanding of the *Insider Louisville* article, Evolent's statement refuting the article, or Evolent's alleged failure to help Passport achieve cost savings, which contradicts Plaintiffs' implication that Evolent's stock price would have declined on January 25 if not for the Company's denial.

55.     Thus, an analysis of the market reaction following publication of the January 25, 2019 *Insider Louisville* article shows that the Alleged Cost Savings Misrepresentations did not have price impact. Unlike Plaintiffs' alleged corrective disclosures, this article at least suggested that Evolent was not helping Passport achieve cost savings. Nonetheless, when the *Insider Louisville* article revealed this information to the market, there was no market reaction. Thus, not only was there no market reaction when the Alleged Cost Savings Misrepresentations were made, but also there was no market reaction when the *Insider Louisville* article at least suggested that Evolent was not helping Passport achieve cost savings. This is clear evidence of no price

---

[68]    As noted above, see, for example, Erica P. John Fund, Inc. v. Halliburton Company, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015 ("To show that a corrective disclosure had a negative impact on a company's share price, **courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard** […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is necessary. […] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that **there was no price impact on December 21, 2000**, and finds that Defendants have rebutted the Basic presumption as to the allegedly corrective disclosure made on that date.")

[69]    Third Amended Complaint, ¶117.

[70]    See, for example, Leerink analyst report, dated February 20, 2019, emphasis added ("Since Evolent is so ingrained in Passport's operations, and **since EVH has delivered savings**, we estimate that it is unlikely that Passport will simply sever ties with Evolent Health.") and William Blair analyst report, dated May 31, 2019, emphasis added ("[W]e believe the framing makes more sense when viewing the transaction from a financial perspective-with **Evolent's clear line of sight to cost control improvements**[.]")

30

impact – thus severing any link between the Alleged Cost Savings Misrepresentations and the stock price.

**B.    An analysis of the alleged corrective disclosures provides no evidence that the Alleged Cost Savings Misrepresentations had price impact**

**1.    The alleged corrective disclosures did not reveal Passport's supposed failure to achieve cost savings from the Evolent relationship or provide the market with any new understanding of the disclosures in the *Insider Louisville* article**

56.    Plaintiffs allege that the "truth" that was concealed by the Alleged Cost Savings Misrepresentations, and revealed by the alleged corrective disclosures, was that Evolent did not lower costs, and instead actually raised costs, for Passport.[71] If Plaintiffs' claims were true, then the two alleged corrective disclosures should have provided the market with new information that Passport did not achieve over $100 million in cost savings from the Evolent relationship and/or a new understanding of the disclosures in the *Insider Louisville* article. However, contrary to Plaintiffs' claim, there is no indication from analysts after the February 15 or the May 29, 2019 alleged corrective disclosures that they had newly learned or understood that Passport was not achieving cost savings from the Evolent relationship.

57.    Rather, as explained in more detail below in the next section, analyst commentary following the February 15, 2019 alleged corrective disclosure focused on concerns about Passport's potential insolvency driven by Kentucky's Medicaid rate cuts. Analyst commentary following the May 29, 2019 alleged corrective disclosure focused on concerns about a change in Evolent's business model from a tech services company to a health plan administrator.

58.    Plaintiffs do not explain in the Third Amended Complaint how the two alleged corrective disclosures revealed the alleged "truth" regarding the Alleged Cost Savings Misrepresentations. In particular, Plaintiffs have not identified any disclosures regarding:

---

[71]    Third Amended Complaint, ¶6 ("In reality, rather than lowering the costs of its single most important client, Evolent did the exact opposite: Evolent dramatically increased Passport's costs by hundreds of millions of dollars by charging exorbitant fees for performing the same exact administrative functions that Passport had previously been performing in-house for a fraction of the cost."). See also, for example, Third Amended Complaint, ¶¶162, 166 and 169.

a) whether or not Passport realized $100 million or more in cost savings through its relationship with Evolent;[72]

b) whether the majority of the fees Passport paid to Evolent were directly tied to local staff at cost;[73] and,

c) whether Passport's payments to Evolent for insurance claims processing and pharmacy benefit services were at a "lower per member cost than prior periods."[74]

Based on my own review of the alleged corrective disclosures and analyst commentary regarding these disclosures, I also cannot find any evidence of any such disclosure of the information Plaintiffs allege was misrepresented, or the disclosure of any information with any logical link to the information Plaintiffs allege was misrepresented.[75] It is unclear how the Passport-related disclosures correct the two alleged misstatements (on January 10, 2018 and May 11, 2018) that *did not even mention* Passport itself.[76]

---

[72] Third Amended Complaint, ¶163.

[73] Third Amended Complaint, ¶173.

[74] Third Amended Complaint, ¶173.

[75] Note that it is my understanding that Lead Plaintiffs' investment advisors' testified that none of the alleged corrective disclosures were in fact corrective. See, for example, Deposition of Steven Lilly on behalf of Silvercrest Asset Management, dated May 6, 2022, 89:20-90:2 ("Q. In your view, did Passport's lawsuit against Kentucky reveal any wrongdoing on Evolent's part? […] The Witness: Not in my view, no. Q. It didn't reveal any of Evolent's prior statements to be false, did it? […] The Witness: I don't believe so, no.") and 114:18-23 ("Q. Were you concerned that Evolent itself was the cause of Passport's worsening financial condition prior to the acquisition? A. No. It wasn't a concern of ours. Of course, we had to contemplate that concept, but it wasn't a concern of ours.") See also, Deposition of John Porter on behalf of Newton Investment Management North America, dated May 11, 2022, 85:18-23 and 129:25-130:15.

[76] Note that it is my understanding that Plaintiffs themselves have admitted that they were not aware that these two alleged misstatements related to Passport until *recent* document productions in discovery. In other words, Plaintiffs were not aware that these alleged misstatements related to Passport when the statements were made or at the time of the alleged corrective disclosures. See, Lead Plaintiffs' Memorandum of Law in Support of Their Motion for Leave to Amend the Second Amended Class Action Complaint, filed November 17, 2021, p.4, stating that the fact the unnamed "partner" from the January 10 and May 11, 2018 statements was Passport "was only recently revealed by Defendants' internal documents produced in discovery."

>        **2.       The decline in Evolent's stock price following the alleged corrective
>                  disclosures was not caused by the Alleged Cost Savings
>                  Misrepresentations, but instead was due to other factors**
>
>                  **(i)      The price drop following the February 15, 2019 alleged corrective
>                            disclosure was due to the market's concern about Passport's
>                            conflict with Kentucky and its potential near-term insolvency
>                            driven by Kentucky's Medicaid rate cuts, not by any revelation
>                            regarding whether Passport achieved cost savings through its
>                            relationship with Evolent**

59.      Plaintiffs claim that the alleged inflation in Evolent's stock price was partially removed on February 15, 2019, the first of the two alleged corrective disclosure dates. On February 15, 2019, Passport filed a lawsuit against Kentucky's Cabinet for Health and Family Services challenging the cuts to Medicaid rates enacted by Kentucky in 2018. Earlier news reports had mentioned insolvency risk for Passport by "mid-2019" due to the rate cuts and that Passport expected to lose $60 million in 2018 and $144 million in 2019 unless payments were raised.[77] In the lawsuit, Passport alleged that as a result of the rate changes, it had recorded a loss of $65.5 million for 2018 and if the rate cuts were not reversed, Passport would lose $75 million in the first half of 2019 and be "legally insolvent by March 1, 2019," (a shortened timeline for Passport's potential insolvency as compared to prior reports).[78] The table below shows the rate changes in Region A (covering the majority of Passport's enrollment) and in Region B, according to the complaint in the Passport lawsuit.[79]

---

[77]  "Passport Health Plan could be 'insolvent' by 'mid-year', CEO tells lawmakers," *WDRB*, January 23, 2019. For example, a January 16, 2019 article in *The Courier-Journal* stated that Passport "expects to lose $144 million in 2019 under the [rate] cuts, which will 'jeopardize its fiscal solvency and continued existence.'" ("Fighting for its life; Passport Health appeals state rate cuts after talks falter," *The Courier-Journal*, January 16, 2019) A January 24, 2019 article in *The Courier-Journal* quoted Passport's CEO Mark Carter as having told a legislative committee in an open public hearing the previous day that Passport was "not on the verge of bankruptcy" but that state cuts to its Medicaid business "make that a real threat down the road" – "possibly as soon as mid-2019." ("Passport CEO: 'Real threat' ahead; Kentucky cuts would hit 2nd largest of state's 5 Medicaid managed care firms," *The Courier-Journal*, January 24, 2019) In addition, a Baird report issued on January 24, 2019 discussed the public hearing, stating that Passport's CEO had said that Passport "could be insolvent by mid-2019 due to losses associated with the rate changes." (Baird analyst report, dated January 24, 2019). Note that there were no statistically significant reactions following the publication of these news articles and the Baird analyst report.

[78]  Third Amended Complaint, ¶119 and Complaint in *Passport v. Commonwealth of Kentucky*, ¶¶71,74 and 75 ("Accordingly, on or before March 1, 2019, due to these losses Passport expects to report a financial status showing expected risk based capital will be significantly less than the statutory threshold for DOI action.")

[79]  Complaint in *Passport v. Commonwealth of Kentucky*, ¶¶14, 56.

33

**Medicaid Rate Changes
and Passport Beneficiary Population**

|  | Region A | Region B |
|---|---|---|
| Rate Changes | -4.1% | 2.2% |
| % of Passport Beneficiaries | 65% | 35% |

**Source:** Data from Complaint in Passport v. Commonwealth of Kentucky.

60.    While the results of Mr. Coffman's event study, as well as my own, show that there was a statistically significant decline in Evolent's stock price following the filing of the Passport lawsuit, this price drop is not evidence that the earlier Alleged Cost Savings Misrepresentations had any price impact. This is because market evidence shows that the drop was *not* caused by the correction of any of the Alleged Cost Savings Misrepresentations or any revelation of Passport failing to achieve cost savings, but instead was due to the market's concern about Passport's conflict with Kentucky and its potential near-term insolvency driven by Kentucky's Medicaid rate cuts.

61.    In its complaint, Passport attributed its financial difficulties to the rate cuts imposed by the Kentucky government, and stated that its relationship with Evolent had led to cost savings.[80] Plaintiffs have not provided any rationale for why Passport would sue Kentucky, rather than Evolent, if Evolent was the true cause of Passport's financial difficulties. Moreover, there is no indication by any analyst covering Evolent that they believed the lawsuit or Passport's potential insolvency was caused by Evolent, or that the lawsuit revealed Passport's failure to achieve cost savings through its relationship with Evolent. Instead, contrary to Plaintiffs' claims, analysts explicitly stated that they believed Evolent was *not* the cause of Passport's financial difficulties and that Evolent had actually helped Passport better manage its finances. For example:

---

[80]   Complaint in *Passport v. Commonwealth of Kentucky*, pp. 33-34 ("Passport's payments to Evolent, which are based on a percentage of Passport's revenues, are effectively its reimbursement to Evolent for staffing employee positions that Passport used to pay directly. This relationship - which is not at all unusual in the industry - is similar to but has advantages over Passport's original structure that was established with CHFS's blessing. Passport's cost structure and outsourced relationship with Evolent falls well within industry benchmarks in all of the major cost categories. Further, the relationship has allowed Passport to streamline operations, reduce administrative costs, increase membership and improve care coordination.")

34

> **It's not as if Passport incurred ~$90M of incremental costs in 2017 because of Evolent**, rather Evolent is now very much ingrained into Passport's operations, and many of those costs would have been incurred even if Evolent wasn't in the market. […] We also believe that **all of these issues are being caused mainly due to a botched implementation of the new Kentucky HEALTH program** and new leadership at Kentucky Medicaid. [Leerink, 2/25/19, emphasis added]

> Passport Health, the company's largest client (again 10% to 12% of the 2018 sales guidance), is facing financial distress following Medicaid rate cuts by the state of Kentucky, and management provided only limited novel commentary (not overly surprising given that Passport is now involved in a lawsuit against the state). That stated, we continue to look for a positive resolution to the matter, and **we believe that Evolent has been a key partner for the plan (helping it markedly through past financial pressures) versus any cause of the issue**. [William Blair, 2/26/19, emphasis added]

62.    Further, analyst commentary after the lawsuit was announced indicates that analysts still believed Evolent had delivered cost savings to Passport. In order words, despite the revelation of the "truth" as alleged by Plaintiffs, there is no indication that any analyst had any new understanding of Evolent's prior statements regarding cost savings (and in fact analysts indicated that they still believed those prior statements to be true).[81] In fact, analysts at Leerink explicitly stated that despite prior news articles, they still believed Evolent had delivered cost savings to Passport.

> Some of the news articles we have come across suggest that some in Kentucky believe that some of Passport's woes may be due to their "outsourcing" and payment to EVH. However, **we believe these comments are likely groundless**. In EVH's 2018 Analyst Day, the company featured Passport and the Medicare Center for Excellence. EVH claimed that in 2017 alone, the company delivered savings exceeding $75M to Passport. […] Since Evolent is so ingrained in Passport's operations, and **since EVH has delivered savings**, we estimate that it is unlikely that Passport will simply sever ties with Evolent Health. We still believe that the long-term partnership will continue, though the contract terms between Passport and EVH may change. [Leerink, 2/20/19, emphasis added]

63.    Analysts at SunTrust explicitly mentioned the January 25 *Insider Louisville* article, but made no reference to having learned any new information regarding whether Passport had achieved cost savings from the Evolent relationship.

---

[81]    Both Lead Plaintiffs continued to buy shares of Evolent *after* the February 2019 alleged corrective disclosure. See, Third Amended Complaint, pp. 105-106. ██████████████████████

Shares are down 7% today. What happened? **On Friday Passport Health (Private) filed a lawsuit with the state of Kentucky**, claiming its planned cuts to Medicaid payments would force Passport into insolvency (Link; courier-journal.com) as soon as March of this year. The lawsuit seeks to bar the state from imposing the cuts that data back to July 2018. **We note that January 25 article (Link; insiderlouisville.com) already noted that Passport was battling Kentucky's government** over the Medicaid fee change that could "threaten its solvency and continued existence." […] Given the **significant contributions to revenue**, we think the loss or decrease from financial commitments from Passport could reverse the recently achieved positive adj. EBITDA and delay recognition of positive FCF. Furthermore, given the **importance of Passport Health to EVH**, we believe EVH will likely work to ensure the continuity of the relationship under a variety of circumstances; this could mean the potential for certain financing arrangements, extension or writedowns of receivables, or revision of existing contracting terms. [...] With shares down 23% YTD (+11% S&P), we think the stock continues to reflect worries about 2019 guidance, with the additional pressure coming from potential risks associated with a key client. [SunTrust, 2/19/19, emphasis added]

64.     Rather than attribute the drop in Evolent's stock price following the February 15, 2019 alleged corrective disclosure to any revelation regarding whether Passport had achieved cost savings from the Evolent relationship, analysts attributed the price drop to concern about Passport's conflict with Kentucky, Evolent's exposure to Passport (a key client), and potential lost revenues if Passport became insolvent. For example:

> **PASSPORT SUES KENTUCKY. Shares of EVH are off 9% vs. the Russell basically flat today (2/19).** Passport Health is a large managed Medicaid plan in Kentucky that is an estimated 13% customer for EVH, which processes claims for Passport and helps manage its population of ~315,000 beneficiaries. **On Friday (2/16), Passport filed a lawsuit against the Kentucky for cutting its Medicaid rates.** […] **We suspect if the plan were to go into liquidation, Evolent would still be retained for most if not all of 2019. Passport would be a big loss, though, and has been a marque client (5% reduction in cost of care).** [Wells Fargo, 2/19/19, emphasis added]

> Recent headlines regarding **Passport's (EVH partner) conflict w/ Kentucky have weighed on EVH shrs** (down 15%-20%). […] Reports indicate Passport's Medicaid region would receive a 4.1% rate cut, compared to an average 2.2% increase elsewhere in Kentucky. We estimate Passport represents roughly 12% of our 2020 revenue estimates, and the potential rate cut on our current assumptions results in a roughly 5%-6% headwind to our 2020 adj. EBITDA estimate of $92M. **Passport's comments around potential insolvency raises the possibility of total loss of Passport for EVH**. Assuming a 10%-15% contribution margin for Passport, we see the loss of Passport having around a $12-$18M impact to adj. EBITDA, or roughly 13%-20% to our 2020 estimate. Given that shares have fallen roughly 15%-20% since news around this issue surfaced in mid-January,

36

**we think the market has largely discounted the potential entire loss of Passport**. [Cowen, 2/20/19, emphasis added]

The stock was down 13% just in the last week as news has emerged related to Passport Health Plan (the company's largest relationship) and its **battle over reimbursement rates for managed Medicaid with the state of Kentucky**. We do believe that there was an overreaction to the Passport news. [...] Of note, Evolent did not highlight the Passport situation in its presentation, thus there could be even more risk to 2019 numbers if there is an unfavorable resolution to this issue. [Canaccord Genuity, 2/20/19, emphasis added]

EVH **traded down nearly 11% yesterday, vs. a 0.15% gain in the S&P 500, on reports of a lawsuit filed by the company's partner Passport Health vs the state of Kentucky asserting that rate cuts could push it into insolvency by March.** [JP Morgan, 2/20/19, emphasis added]

While analysts discussed the risk of Evolent losing Passport as a customer if Passport became insolvent, not one analyst mentioned a risk of Evolent losing *any other* customers as a result of the February 15, 2019 alleged corrective disclosure. If Plaintiffs' claims were true, and the alleged corrective disclosures revealed to the market that Evolent was failing to achieve cost savings for its largest client, Passport, then one would expect analysts to be concerned about Evolent losing other clients. However, there is no such evidence.

65.     Thus, I find that the February 15, 2019 alleged corrective disclosure provides no evidence of price impact of the Alleged Cost Savings Misrepresentations. Market evidence shows that the price drop following the February 15, 2019 alleged corrective disclosure was not caused by the correction of any of the Alleged Cost Savings Misrepresentations or any revelation of Passport failing to achieve cost savings, but instead was due to the market's concern about Passport's conflict with Kentucky and its potential near-term insolvency driven by Kentucky's Medicaid rate cuts.

>           **(ii)    The price drop following the May 29, 2019 alleged corrective disclosure was due to the market's concern about a change in Evolent's business model from a tech services company to a health plan administrator, not by any revelation regarding whether Passport achieved cost savings through its relationship with Evolent**

66.     Plaintiffs claim that the alleged inflation in Evolent's stock price was partially removed on May 29, 2019, the second of the two alleged corrective disclosure dates. On May 29,

37

2019, Evolent announced that it would acquire a majority stake in Passport by paying $70 million in exchange for its 70% interest and agreeing to provide "interim balance sheet support" if required for Passport to meet its statutory capital requirements.[82]

67.    While the results of Mr. Coffman's event study, as well as my own, show that there was a statistically significant decline in Evolent's stock price following the announcement of the Passport acquisition, this price drop is not evidence that the Alleged Cost Savings Misrepresentations had any price impact. This is because market evidence shows that the drop was *not* caused by the correction of an earlier alleged misstatement or any revelation of whether Passport had achieved cost savings through its relationship with Evolent, but instead was due to the market's concern about a change in Evolent's business model from a tech services company to a health plan administrator.

68.    There is no indication by any analyst covering Evolent that the acquisition revealed that Passport's financial issues were caused by Passport's failure to achieve cost savings through its relationship with Evolent. Instead, analysts attributed the price drop to concerns about Evolent's business model and strategic direction (*i.e.*, whether it was a tech services company or a health plan administrator). For example:

> Although **we think EVH is capable of running Passport more successfully** (evidenced by EVH's management of True Health to date), this transaction does raise **questions about what is Evolent's business model?** Is it still a tech-enabled service for health plans and providers or is it a hybrid of tech-enabled services and a health plan business? [...] Shares of EVH are down ~20% (S&P down less than 1%), which is a loss of ~$230 million in market cap since yesterday's close. We are not surprised, as **the market previously reacted adversely when EVH had acquired health plans in late 2017**. [SunTrust, 5/29/19, emphasis added]

> Investors will likely **re-rate EVH's multiple lower to be more in line with health plans** than its HCIT peers as the company's recent investments increasingly lever its earnings exposure toward health plan performance. EVH maintains that it does not want to be a health plan but management's use of capital suggests otherwise. [...] We are **confused by the strategic rationale** for EVH's investment in Passport which seems to be at odds with management's comments that the company does not want to be a health plan. [Cowen, 5/29/19, emphasis added]

---

[82]    Third Amended Complaint, ¶124. See also, "Evolent Health Expands Partnership with Passport Health Plan to Support Medicaid Beneficiaries in the Commonwealth of Kentucky," *PR Newswire*, May 29, 2019.

We are moderately skeptical of management's decision to invest in another health plan, particularly in light of Passport's recent financial issues. Recall that **investors were displeased when the organization acquired its True Health New Mexico health plan assets**, and we would not be surprised if shares of Evolent slide in Wednesday's trading. [William Blair, 5/29/19, emphasis added]

Shares of EVH are down 24% today with the Russell down 1%. **EVH has made three investments in health plans and none of them have been received well**. […] We see the strategic sense in what EVH is doing. Each investment has been at a low valuation. These vehicles give them a chance to show off. However, investors do not own this to get health plan exposure. [Wells Fargo, 5/29/19, emphasis added]

We believe the deal struck a raw nerve given (1) **increased health plan exposure**, which has weighed on shares following EVH's True Health New Mexico deal and (2) concerns that EVH had to pay to maintain its customer base. While we expect shares to recover a touch in the coming days given the magnitude of the pullback, we believe EVH could command a lower multiple in the near term as investors see more puts than takes— namely, EVH would continue its **shift away from being a VBC consultant in healthcare IT to being a health plan, warranting a lower trading multiple** in line with managed care names (payer average at 0.7x revs vs. HCIT average at 3.3x; EVH is trading closer to payers at 1.1x). [Citi, 5/29/19, emphasis added]

On the surface, the latest transaction represents **a continuation of EVH's apparent pivot in strategy** to acquire ownership in health plans and align itself with customers, rather than simply providing technology services to health plans and risk-bearing healthcare providers. We believe it will take some time for investors to get comfortable with this pivot, but we think the shares are attractive at current levels. [...] The financial implications of the Passport transaction make sense to us. However, **the transition from a tech-enabled services provider to a company investing (aligning) with its health plan customers will likely create near-term uncertainty for investors**. [Cantor, 5/29/19, emphasis added]

69.    These comments by analysts concerned about Evolent's strategic direction are entirely unconnected to Plaintiffs' claims that Passport or an unnamed risk partner had not achieved the represented amount of cost savings, and thus, demonstrate that the price drop at the end of the Putative Class Period was not due to the Alleged Cost Savings Misrepresentations.

70.    Further evidence of no price impact is the fact that there was a statistically significant *increase* in Evolent's stock price on May 30, 2019, following the Company's further explanation of the transaction at its investor day. Analysts attributed the price increase to increased clarity about the rationale for the Passport acquisition, and Evolent's reiteration that health plan ownership was *not* its core strategy. For example:

39

In our view, the decision to acquire a stake in Passport was initially perplexing, and the stock's performance following the deal announcement suggests we were not alone (shares declined roughly 30% in Wednesday's trading upon the announcement). Still, we are **modestly more positive on the deal following Thursday's investor day**. More specific, we appreciate management's thesis that the transaction represents an attractive opportunity for Evolent to acquire a quality asset (with significant scale [over 300,000 members], long-term operating history, and a strong brand in the local Kentucky market) and **myriad opportunities to drive profitability through operational improvements**—all at a reasonable price. [William Blair, 5/31/19, emphasis added]

We came away from EVH's investor day with **greater confidence** 2020 estimates will move higher and we are maintaining our positive Fresh Pick designation. Management provided additional insight/details on the Passport transaction, which **we found reassuring**. Management provided a thorough defense of the Passport transaction and **we sense this was the least bad option**. If EVH had not made the $70M investment, Passport could have been sold to a larger MCO, putting $100M of revenue at risk. With Passport, EVH has a stronger foundation for growth in 2020, with the potential to monetize/leverage this asset in the future. EVH is also protected on the downside if Passport doesn't renew its contract with KY. EVH emphasized that health plan ownership is not core to its strategy. [Baird, 5/30/19, emphasis added]

Yesterday, EVH announced that it will take a majority stake in its largest customer, Passport Health. EVH was able to speak to this decision. **The company's logic makes sense to us**. […] In our view, management's remarks were encouraging, but we expect investor skepticism to remain for the time being. The expanded MSA arrangement with Passport should increase the core revenue base (about $100 million) by 50-75% in the near term (at target margins). [Cantor, 5/30/19, emphasis added]

In our view **the ~30% sell-off in shares of EVH yesterday was overdone**. While the investment community is clearly opposed to EVH acquiring significant interests in health-plan customers, **we think the deal actually makes sense**. […] Since this was a competitive process, had a different organization partnered with Passport, then it's very possible that EVH and Passport would have had to part ways. By making this investment, Passport remains a long-term customer of EVH. We maintain our OP and $25 PT on EVH and **we believe the sell-off was overdone**. [Leerink, 5/30/19, emphasis added]

Mgmt. spent a fair bit of time on the rationale behind the Passport Health deal. EVH risked either losing Passport as a client under different ownership, very likely under a larger MCO, or going in for the deal, and taking the opportunity to potentially increase the equity value significantly, if the current RFP finalizes. Mgmt. took the latter route, **which makes sense**, and while EVH reiterated its intention not to change its strategy on owning health plans, investor worry about the precedent it sets for similar future situations is palpable. [Oppenheimer, 5/31/19, emphasis added]

40

We are **incrementally more positive on the Passport transaction** following the Analyst Day. The company provided **additional clarity giving us greater comfort** that the deal is a unique opportunity and does not represent a shift in strategy. We believe there is limited downside to the investment and we do not believe EVH intends to maintain its 70% stake over the long-term […] A better understanding of EVH's rationale for the Passport transaction gives us **greater comfort that the long-term strategy remains intact**. EVH maintains that it does not want to be a health plan and that Passport was an opportunistic investment [Cowen, 6/2/19, emphasis added]

After spending a day on the road with the CEO and CFO, we believe that while the "story" has some challenges, **the underlying business is operating better than the stock is reflecting**. Clearly, investor pessimism is at an all time high, based on concerns that the company is "becoming a health plan" or "keeps changing strategy." In our view, this sentiment will change over the next 12-18 months as the Passport challenges get cleared up and organic services growth returns in 2020. […] We came away from the meetings with a better understanding of the process and higher degree of confidence that Passport is likely to retain its Medicaid business. We also believe that in the unlikely event that Passport does not win the bid, there is less financial exposure than we originally thought (~$10 mil). [SunTrust, 6/13/19, emphasis added]

71.     Furthermore, analysts' comments actually contradict Plaintiffs' claims. In particular, analysts indicated that they remained confident in Evolent's ability to control Passport's costs. If, as Plaintiffs claim, the announcement of the Passport acquisition "corrected" the Alleged Cost Savings Misrepresentations – and revealed that Evolent had failed to help Passport achieve cost savings – then it would not make sense for analysts to make such statements after the end of the Putative Class Period.

The decision to acquire *Passport* was catalyzed by *Passport* looking to sell itself to a larger national health plan that, in turn, would have likely in-sourced the work EVH was doing. As such, EVH was forced either to acquire *Passport* or possibly lose this client entirely. By our models, *Passport* should represent $100M of profitable services revenue for EVH in 2019. **Also, with greater day-to-day operating control and a Medicaid rate increase in April**, **management sees** *Passport* **generating a 1%-2% operating margin in the near term**. [KeyBanc, 5/30/19, emphasis added]

Yet we understand investors' negative sentiment of late and concede that management may have lost some credibility with investors with the acquisition of another health plan, but we believe the framing makes more sense when viewing the transaction from a financial perspective–with **Evolent's clear line of sight to cost control improvements** that can provide asset appreciation potential over time. Notably, the company stated numerous times throughout the event that it does not want to become a health plan. [William Blair, 5/31/19, emphasis added]

41

**EVH plans to use various cost-savings initiatives** to drive Passport's operating margins to 1-2%. Importantly, the new Passport governance structure enables EVH to reduce its stake to a minority interest. [Cantor, 5/30/19, emphasis added]

We believe challenges to Passport, and by extension EVH, **do not reflect the quality of the underlying technology platforms or domain expertise**, both of which we think are competitive points of differentiation for EVH. [SunTrust, 5/31/19, emphasis added]

72.     As shown by the analyst quotes above, Evolent had previously acquired health plans in 2017, and investors reacted negatively to the announcements of those acquisitions.[83] The market reaction to these earlier announcements is consistent with the reaction to the May 29, 2019 announcement and shows that concern over Evolent's strategic direction, rather than any new information about Evolent's alleged failure to help Passport achieve cost savings, caused the stock price drop at the end of the Putative Class Period.

73.     Thus, I find that the May 29, 2019 alleged corrective disclosure provides no evidence of price impact of the Alleged Cost Savings Misrepresentations. Market evidence shows that the price drop following the May 29, 2019 alleged corrective disclosure was not caused by the correction of any of the Alleged Cost Savings Misrepresentations or any revelation of Passport failing to achieve cost savings, but instead was due to the market's concern about a change in Evolent's business model from a tech services company to a health plan administrator.

## C.     The market reaction following the alleged corrective disclosures is not consistent with price impact of the Alleged Cost Savings Misrepresentations

### 1.     Contrary to Plaintiffs' claims that the alleged misrepresentations created an "unrealistically positive" assessment of Evolent's "future growth prospects," analysts did not lower their expectations of Evolent's future revenue growth after the end of the Putative Class Period

74.     Plaintiffs claim that the alleged misrepresentations "created in the market an unrealistically positive assessment of Evolent's business, operational status, profitability, and

---

[83]    See, for example, SunTrust analyst report, dated May 29, 2019 emphasis added ("We are not surprised, as **the market previously reacted adversely when EVH had acquired health plans in late 2017**.")

future growth prospects, all of which artificially inflated the price of Evolent's common stock."[84]
If Plaintiffs' claims were true (*i.e.*, if the alleged misrepresentations created an unrealistically
positive assessment of Evolent's "future growth prospects"), then one would expect analysts to
reassess Evolent's expected future revenue growth once the full "truth" about the alleged
misrepresentations was revealed at the end of the Putative Class Period. However, contrary to
Plaintiffs' claims, analysts *did not* lower their expectations of Evolent's future revenue growth
following the alleged corrective disclosures.

75.      In particular, the chart below shows analysts' consensus expectations of Evolent's
FY19 and FY20 revenue around the time of the alleged corrective disclosures. As the chart
shows, analysts did not lower their expectations of Evolent's revenue for either year following
the end of the Putative Class Period.



**Analysts' Mean Consensus Estimates of Evolent's Future Revenue**

**Sources:** Data from I/B/E/S obtained via FactSet Research Systems, Inc. Events from the Third Amended Complaint.

---

[84]   Third Amended Complaint, ¶161.

**2.    The fact that Evolent continued to gain new customers after the end of the Putative Class Period is inconsistent with Plaintiffs' claims that the Company failed to achieve cost savings for its clients**

76.    Although the Third Amended Complaint focuses on Passport, Plaintiffs claim that Evolent touted its relationship with Passport as a "success story" that was "demonstrative of the value that Evolent provided to its clients."[85] If Plaintiffs' claims were true, and the alleged corrective disclosures revealed to the market that Evolent was failing to achieve cost savings for its largest client, Passport, then one would expect Evolent's customer base to decrease over time, once the alleged corrective disclosures revealed these failures and/or the Company's clients suffered financial issues (like Passport) as a result of the Company's conduct.

77.    However, contrary to Plaintiffs' claims, Evolent did not lose customers, and in fact actually *gained* new customers after the end of the Putative Class Period. In particular, as shown in the table below, Evolent increased its number of customers from around at least 25 at the start of the Putative Class Period, to at least 35 at the end of the Putative Class Period, and to at least 39 by the end of FY19.

---

[85]    Third Amended Complaint, ¶138.

44



### 3. Evolent reportedly made a profit on the Passport acquisition, as it later sold Passport for more than it paid at the end of the Putative Class Period

78.    According to Evolent's own statements and analyst commentary, Evolent later sold Passport for more than it paid at the end of the Putative Class Period. Just over a year after purchasing Passport, Evolent sold Passport to Molina Healthcare, Inc. ("Molina") at a profit.[86]

---

[86]  Plaintiffs erroneously claim that Molina paid Evolent "just $20 million in up-front cash, plus up to $40 million in contingent payments for Passport – significantly less than Evolent had paid for the plan only a year earlier." Third Amended Complaint, ¶137. This claim is inconsistent with company and analyst commentary on the transaction. See, for example, "Evolent Health Inc Agreement Between Molina Healthcare and Passport Health Plan for Molina to Acquire Certain Assets of Passport Call," July 17, 2020 ("[W]e would estimate Evolent's transaction proceeds to be in the range of $130 million to $170 million. And again that's versus our original investment of $110 million which was the upfront purchase price and the $40 million surplus note. […] The bottom end of the range that we talked about of $130 million really is related to the statutory capital release back to Evolent, net of the $20 million guarantee payments to the other provider owners, and that will be coordinated with the Kentucky DOI. We would expect a portion of that to come back in the fall or later this year, and then the bulk of it to come back during the first half of next year. The remaining $40 million, which takes us up to $170 million, is related to the membership potential that Frank was talking about earlier, and that will be calculated in the first part of next year.") Note that the original investment of $110 million includes the $40 million surplus note.

79.     There was a statistically significant *increase* in Evolent's stock price following the announcement of the Passport sale, and analysts covering Evolent reacted positively to the announcement. For example:

> EVH announced an agreement to sell Passport Health Plan to Molina in a transaction that is expected to provide a total return that exceeds the company's previous investment, thus providing a **favorable return** and pathway to putting the **Kentucky Medicaid saga** in the rear-view mirror. [Canaccord Genuity, 7/17/20, emphasis added]

> EVH expects to generate net proceeds of $130-170 million from the transaction, which suggests a **solid return** on the initial $110 million investment in Passport. Also, Evolent will now provide specialty care management (via New Century Health) to Molina's members in Kentucky, with the potential to expand to other states over time. **We view the transaction positively** from EVH's perspective. In addition to finding a good solution to Passport, it will increase its revenue opportunity in the process. [Cantor, 7/17/20, emphasis added]

80.     Furthermore, there is no mention in any report on Evolent following the announcement of the Passport sale that the Company was responsible for Passport's prior financial difficulties. In fact, analysts explicitly stated that Evolent's management of Passport had *improved* the health plan's operations. For example:

> Thus, EVH appears optimistic in its opportunity to meet the performance targets required for the performance fee. The company noted Passport's strong results YTD with 315K members, up 8% in 2020. Additionally, **EVH has dramatically improved Passport's operations, with the plan producing a 1.9% operating margin over the last 12 months and a 14-point margin improvement since 1Q'19**. [Canaccord Genuity, 7/17/20, emphasis added]

> As we've previously discussed, we do not view the Passport investment as a failure even though the company did not win the reprocurement (in fact, today's announcement indicates EVH will come out net-positive). **EVH was able to drive a 14-point operating margin improvement within a relatively short time which points to the compelling value prop of its services**. [Cowen, 7/17/20, emphasis added]

81.     Plaintiffs claim that the alleged corrective disclosures revealed to the market that the Evolent failed to achieve cost savings for its largest client, Passport – thereby revealing weakness in the Company's business model, which is "predicated on its purported ability to dramatically reduce its clients' healthcare and administrative costs."[87] It is not clear how

---

[87]   Third Amended Complaint, ¶5.

46

Plaintiffs can reconcile that claim with the substantial *increase* in the Company's stock price since the end of the Putative Class.



## VIII. THE COFFMAN PROPOSED DAMAGES METHODOLOGY IS NOT WELL-DEFINED AND HAS NO EXPLANATION FOR HOW IT COULD MEASURE ALLEGED DAMAGES IN A MANNER CONSISTENT WITH PLAINTIFFS' THEORY OF LIABILITY

82.    I understand from counsel for Defendants that, per the Supreme Court's *Comcast* ruling, although Plaintiffs are not yet required to calculate damages, Plaintiffs are required to demonstrate at the class certification phase that a methodology exists for calculating damages (i)

47

using a common methodology applied to the class as a whole that (ii) measures only those damages attributable to Plaintiffs' liability theory.[88]

83.     The Coffman Second Report claims that "damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole."[89] According to Mr. Coffman, alleged damages can be calculated by quantifying "artificial inflation" and by using the "out-of-pocket" method.[90] From an economic perspective, the difference between the price paid and the alleged "true" value of the stock—the alleged "inflation"—is the difference between the price at which the security was purchased and the hypothetical price that would have existed "but for" the alleged misrepresentations.[91] To quantify alleged inflation, Mr. Coffman states that the most widely-used technique "starts from an event study," and that the event study would "need to consider" to what extent confounding information contributed to the observed price movement.[92] The Coffman Second Report further states that the calculation of alleged damages would require an analysis of "how inflation per share may have evolved over the class period."[93]

84.     Although the Coffman Second Report discusses, at a high-level, steps in estimating alleged damages, Mr. Coffman has not explained in his report or in his deposition testimony how damages consistent with Plaintiffs' theory of liability in this case could be estimated. In particular, as explained in more detail below:

a)  It is not clear how the Coffman Proposed Damages Methodology could quantify alleged inflation, given that there is no evidence that the alleged corrective disclosures provided the market with any new information "correcting" the Alleged Cost Savings Misrepresentations.

---

[88]  *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) ("*Comcast*").

[89]  Coffman Second Report, ¶83.

[90]  Coffman Second Report, ¶78.

[91]  See, for example, Gold, Kevin L., et al., "Federal Securities Acts and Areas of Expert Analysis," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: Hoboken, NJ, 6th ed., 2017), Ch. 27 ("The out-of-pocket measure rule defines damages as "the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or, in other words, the difference between the amount parted with and the value of the thing received." Typically, courts measure this as the plaintiff's purchase price less the true value at the time of the transaction. The true value is the price of the security in the absence of fraud or misrepresentation [.]")

[92]  Coffman Second Report, ¶81.

[93]  Coffman Second Report, ¶82.

48

b) Given that the Court has dismissed many of the alleged misrepresentations from the case, and given the nature and timing of them, it is unclear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology will account for and separate out the inflation attributable to the dismissed statements from the inflation attributable to the remaining alleged misrepresentations.

c) The Coffman Proposed Damages Methodology is not well-specified and has no concrete explanation for how it would disaggregate any price reactions to the alleged corrective disclosures from confounding information, given that analysts attributed the price declines following the alleged corrective disclosures to factors other than the Alleged Cost Savings Misrepresentations.

d) The Coffman Proposed Damages Methodology is not well-specified and has no concrete explanation for how it would estimate stock price inflation for each day during the Putative Class Period.

Thus, the Coffman Proposed Damages Methodology does not constitute a feasible or concrete methodology for calculation of class-wide damages.[94]

---

[94] Courts have found that plaintiffs must show the feasibility of their proposed damages methodologies. For example:

*Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013). (A "model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory[…]courts must conduct a 'rigorous analysis' to determine whether that is so.")

*Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789, at *47 (N.D. Cal. Dec. 15, 2014). ("[T]he Court is obligated to do more than rubberstamp a proposed damages class merely because the plaintiff's expert [proposes] to … use[] a peer reviewed methodology….")

*Bruton v. Gerber Prods. Co.*, 2018 U.S. Dist. LEXIS 30814, at *34 (N.D. Cal. Feb. 13, 2018).  ("[R]eal explanation is necessary"; "vague and abstract proposals do not suffice"; "a clearly defined list of variables"; "a meaningful explanation as to how the variables will be addressed"; "the data related to … [the] proposed … variables exists.")

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 492 (N.D. Cal. 2008). ("'[C]ourts[…]are increasingly skeptical of … experts who offer only generalized and theoretical opinions that a particular methodology may serve [their] purpose without also submitting a functioning model that is tailored to market facts in the case at hand.'")

*In Re BP plc Securities Litigation*, Civil Action No. 4: 10-md-2185 (S.D. Tex. Dec. 6, 2013). ("*Comcast* signals a significant shift in the scrutiny required for class certification[…]Following *Comcast*, circuit and district courts have rigorously examined proposed damages methodologies in putative class action cases[…and]some of these examinations have resulted in denials of class certification.")

49

**A.    It is not clear how the Coffman Proposed Damages Methodology could quantify alleged inflation, given that there is no evidence that the alleged corrective disclosures provided the market with any new information "correcting" the Alleged Cost Savings Misrepresentations**

85.    Because there was no disclosure of new information revealing the "relevant truth" with regards to Passport's cost savings through its relationship with Evolent, as discussed above in Section VII.B., it is unclear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology could identify and isolate any relevant information regarding stock price inflation earlier in time using the price declines on the alleged corrective disclosure dates.

86.    The Coffman Second Report states that an event study measuring price reactions to corrective disclosures is "the most widely-used technique to quantify alleged inflation."[95] The Coffman Second Report defines a corrective disclosure as a disclosure that "revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations."[96] In his deposition, Mr. Coffman testified that had not yet assessed in this case whether any of the alleged corrective disclosures were actually corrective using this definition.[97]

87.    Thus, it is not clear how the Coffman Proposed Damages Methodology could quantify alleged inflation, other than zero, given that there is no evidence that the alleged corrective disclosures provided the market with any new information "correcting" the Alleged Cost Savings Misrepresentations.

**B.    The Coffman Proposed Damages Methodology has no explanation for how it could account for and separate out the inflation attributable to the 16 dismissed statements from the inflation attributable to the six remaining alleged misrepresentations**

88.    Given that the Court has dismissed many of the alleged misrepresentations from the case, and given the nature and timing of them, it is unclear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology could account for and separate out

---

[95]    Coffman Second Report, ¶81.

[96]    Coffman Second Report, ¶81.

[97]    Coffman Deposition, pp. 103-105.

50

the inflation attributable to the dismissed statements from the inflation attributable to the remaining alleged misrepresentations. Plaintiffs allege that Evolent's stock price was artificially inflated during the Putative Class Period as a result of 22 alleged misrepresentations made by Defendants.[98] The Second and Third Amended Complaints allege that the artificial inflation in Evolent's stock price allegedly caused by all 22 of the alleged misrepresentations was dissipated on two alleged corrective disclosure dates.[99] I understand that the Court's two MTD Orders found that 16 of 22 statements which Plaintiffs allege to be false and misleading, and to have inflated Evolent's share price, are *not* actionable and have been dismissed from the case.[100]

89.     It is unclear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology could account for and separate out the inflation attributable to the dismissed 16 statements from the inflation attributable to the six remaining alleged misrepresentations. During his deposition, Mr. Coffman testified that he has not yet analyzed what value, if any, the dismissed statements might have had separate from the other statements, and that he was not sure whether such a separation "would even be necessary."[101]

90.     Plaintiffs' alleged misrepresentation on May 11, 2018 regarding "$75 million of improvement to Passport's bottom line" has been dismissed from the case.[102] However, the alleged misrepresentation on that same date regarding an unnamed Evolent full risk partner achieving "$100M+ in identified annualized savings" remains in the case. It is unclear, and Mr.

---

[98]  Second Amended Complaint ¶135, Third Amended Complaint ¶161, First MTD Order, p. 21 (addressing "twenty sets of false and misleading statements" alleged in Second Amended Complaint), Second MTD Order, p.1 (sustaining two "Newly Added 'Risk Partner' Statements").

[99] Second Amended Complaint ¶210, Third Amended Complaint ¶211. See also Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint, p. 6 ("[T]he SAC pleads loss causation, clearly alleging that Defendants' fraud was revealed through disclosures on February 15, 2019 and May 29, 2019[.]")

[100]  First MTD Order, p.59 (dismissing 16 of 20 alleged misstatements, and listing the four "Surviving Alleged Misstatements"); Second MTD Order, p.1 (sustaining two "Newly Added 'Risk Partner' Statements").

[101]  Excerpt from Coffman Deposition, p. 87:

"(By Mr. Smith) But you have not looked at whether you can separate out the inflation attributable to the dismissed statements from that attributable to just the statements which survived; is that right?

A. Well, I haven't done a specific analysis of what value, if any, the dismissed statements might have had separate from the other misstatements, and the point is it's not clear in the way you're asking the question that such a separation or disaggregation would even be necessary. Maybe it is. Maybe it isn't. I'm just not sure. I have not specifically analyzed loss causation, and so whether this statement -- like whether this particular statement being dismissed changes the relevant truth that has to be considered and therefore changes the amount of artificial inflation relative to what would have been otherwise, I just don't know. It's not what I've studied."

[102]  Note that this is the first alleged misrepresentation that specifically claims cost savings for Passport.

Coffman has not explained, how the Coffman Proposed Damages Methodology could separate out any inflation attributable to these two statements on that date. Note that there was no statistically significant price reaction following the May 11, 2018 alleged misrepresentation, as discussed above in Section VII.A.2.

91.    In addition, Plaintiffs' alleged misrepresentation on May 11, 2017 regarding Evolent's "integration process with the Valence health team" has been dismissed from the case on grounds of "impermissible fraud by hindsight."[103] It is unclear, and Mr. Coffman has not explained, how the Coffman Proposed Damages Methodology could separate out any inflation attributable to this alleged misrepresentation from inflation attributable to the surviving alleged misrepresentations.

92.    The chart below shows the dismissed and surviving alleged misrepresentations along with selected alleged misstatements.



---

103  First MTD Order, p. 57.

C.    **The Coffman Proposed Damages Methodology is not well-specified and
has no concrete explanation for how it would disaggregate any price
reactions to the alleged corrective disclosures from confounding
information**

93.    For each alleged corrective disclosure, Mr. Coffman has failed to provide a
methodology to isolate any portion of Evolent's stock price decline due to the revelation of the
"relevant truth" regarding the six remaining alleged misrepresentations from stock price declines
due to other reasons. The Coffman Second Report simply states, "If there is such confounding
information, disaggregating the price impact of corrective disclosures from confounding
information may utilize valuation techniques and may depend on information learned through
discovery."[104]

94.    The Coffman Second Report makes vague and abstract allusions to examples of
"techniques" that may potentially be used, including "fundamental valuation analysis," "use of
academic studies," and "other available valuations."[105] In his deposition, Mr. Coffman testified
that he had not yet determined whether there was any confounding information on the alleged
corrective disclosure dates, nor had he determined "whether or not any of these techniques or
some other would be necessary."[106]

95.    As outlined in Section VII.B. above, the alleged corrective disclosures did not
correct the Alleged Cost Savings Misrepresentations, and commentary by analysts shows that the
declines in Evolent's stock price following the alleged corrective disclosures were due to *other*

---

[104]  Coffman Second Report, ¶81.

[105]  Coffman Second Report, ¶81.

[106]  Excerpt from Coffman Deposition, p. 113:

"Q. And just to confirm, have you considered whether there's any confounding information in the corrective
disclosures alleged in the third amended complaint?

A. That's not something I've done an analysis of, no.

Q. You -- you state in paragraph 81 that disaggregating the price impact of corrective disclosures from
confounding information may utilize valuation techniques and may depend on information learned through
discovery, and you list certain examples of such techniques. Have you determined which of these techniques to
apply in this case?

A. Like I said, I haven't even evaluated whether there is confounding information, so whether or not any of these
techniques or some other would be necessary is not something I've evaluated."

53

factors such as Passport's conflict with Kentucky regarding Medicaid rate cuts, near-term potential insolvency, and the market's concern about a change in Evolent's business model from a tech services company to a health plan administrator.[107] The Coffman Proposed Damages Methodology therefore has no concrete explanation for how it would disaggregate any price reactions to the alleged corrective disclosures from confounding information.

### D.    The Coffman Proposed Damages Methodology is not well-specified and has no concrete explanation for how it would estimate stock price inflation for each day during the Putative Class Period

96.    The event study analysis Mr. Coffman generally describes, even if combined with other analyses to remove the effects of confounding information, would only analyze the stock price reactions on the two alleged corrective disclosure dates.  The Coffman Proposed Damages Methodology has no concrete explanation for how it would estimate stock price inflation in this case for each day during the Putative Class Period.

97.    The Coffman Second Report discusses examples of "methods" that may potentially be used to estimate stock price inflation during the Putative Class Period, including the "constant dollar inflation" and "constant percentage inflation" methods.[108] However, Mr. Coffman does not specify the method he would use in this case in the Coffman Second Report or in his deposition testimony.[109] The Coffman Proposed Damages Methodology therefore has no concrete explanation for how it would estimate stock price inflation for each day during the Putative Class Period.

_____

Lucy P. Allen

_____

[107]  See Section VII.B.

[108]  Coffman Second Report, ¶82.

[109]  Coffman Deposition, pp. 95-99.

54



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# LUCY P. ALLEN
# MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present    **National Economic Research Associates, Inc.**
Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993    **Council of Economic Advisers, Executive Office of the President**
Staff Economist.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force.

1986-1988    **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984    Senior Associate.  Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

Summer 1985       **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983        **Arthur Andersen & Company**
<u>Consultant</u>.    Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992       <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

Lucy P. Allen

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

Lucy P. Allen

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Lucy P. Allen

Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation*, 2019.

Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc.*, 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Lucy P. Allen

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

Testimony and Deposition Testimony before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

# Appendix B – Materials Considered

**Case Documents and Filings in this Matter**

1. Second Amended Class Action Complaint, filed June 8, 2020
2. Third Amended Class Action Complaint, filed November 17, 2021
3. Expert Report of Chad Coffman, dated October 19, 2021, including exhibits, appendices and materials turned over
4. Expert Report of Chad Coffman, dated April 8, 2022, including exhibits, appendices and materials turned over
5. Memorandum Opinion and Order, filed March 24, 2021
6. Defendants' Memorandum in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint, filed June 22, 2020
7. Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint, filed July 6, 2020
8. Defendants' Reply in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint, filed July 17, 2020
9. Lead Plaintiffs' Memorandum in Support of Motion for Class Certification, filed October 19, 2021
10. Lead Plaintiffs' Memorandum in Support of Their Motion for Leave to Amend the Second Amended Class Action Complaint, filed November 17, 2021
11. Defendant's Partial Motion to Dismiss the Third Amended Class Action Complaint, filed December 21, 2021
12. Defendants' Memorandum in Support of Their Partial Motion to Dismiss the Third Amended Class Action Complaint, filed December 21, 2021
13. Order dated March 18, 2022
14. Plaintiffs' Memorandum in Support of Motion for Class Certification, filed April 8, 2022
15. Deposition of Chad Coffman, May 9, 2022

**Analyst Reports on Evolent**

16. 2015.06.30 - JP Morgan
17. 2015.06.30 - Goldman
18. 2015.06.30 - SunTrust
19. 2015.11.06 - Goldman
20. 2016.02.02 - Goldman
21. 2016.02.04 - JP Morgan
22. 2016.02.26 - Goldman
23. 2016.02.26 - JP Morgan
24. 2016.05.13 - Goldman
25. 2016.05.25 - Canaccord Genuity

1

## Appendix B – Materials Considered

26. 2016.05.26 - SunTrust
27. 2016.05.26 - JP Morgan
28. 2016.07.13 - Canaccord Genuity
29. 2016.07.13 - Goldman
30. 2016.07.13 - SunTrust
31. 2016.10.04 - JP Morgan
32. 2016.11.10 - JP Morgan
33. 2017.01.05 - Cantor
34. 2017.01.11 - JP Morgan
35. 2017.01.13 - Jefferies
36. 2017.01.13 - Wells Fargo
37. 2017.01.20 - Cantor
38. 2017.01.30 - William Blair
39. 2017.02.23 - Wells Fargo
40. 2017.02.23 - William Blair
41. 2017.02.28 - Canaccord Genuity
42. 2017.02.28 - Jefferies
43. 2017.02.28 - Leerink (1)
44. 2017.02.28 - Leerink (2)
45. 2017.02.28 - SunTrust
46. 2017.02.28 - William Blair
47. 2017.03.01 - Goldman
48. 2017.03.01 - JP Morgan
49. 2017.03.01 - Cantor
50. 2017.03.01 - Cowen
51. 2017.03.01 - Wells Fargo
52. 2017.03.03 - JP Morgan
53. 2017.03.09 - SunTrust
54. 2017.03.13 - Oppenheimer
55. 2017.03.14 - Oppenheimer
56. 2017.03.20 - SunTrust
57. 2017.03.26 - Wells Fargo
58. 2017.03.29 - JP Morgan
59. 2017.03.30 - Wells Fargo
60. 2017.04.12 - Canaccord Genuity
61. 2017.04.13 - Canaccord Genuity
62. 2017.05.01 - Cowen
63. 2017.05.09 - SunTrust

2

# Appendix B – Materials Considered

64.   2017.05.09 - Canaccord Genuity
65.   2017.05.09 - Cantor
66.   2017.05.09 - Jefferies
67.   2017.05.09 - Oppenheimer
68.   2017.05.09 - Wells Fargo
69.   2017.05.09 - William Blair
70.   2017.05.10 - Goldman
71.   2017.05.10 - Cowen
72.   2017.05.10 - JP Morgan
73.   2017.05.10 - Leerink
74.   2017.05.10 - SunTrust
75.   2017.05.11 - Goldman
76.   2017.05.11 - Cantor
77.   2017.05.11 - Cowen
78.   2017.05.11 - Jefferies
79.   2017.05.11 - William Blair
80.   2017.05.12 - JP Morgan
81.   2017.05.12 - SunTrust
82.   2017.05.12 - Leerink
83.   2017.05.12 - Oppenheimer
84.   2017.05.12 - Wells Fargo
85.   2017.05.17 - Canaccord Genuity
86.   2017.06.18 - Leerink
87.   2017.06.21 - Oppenheimer
88.   2017.06.27 - Cowen (1)
89.   2017.06.27 - Cowen (2)
90.   2017.08.07 - Canaccord Genuity
91.   2017.08.07 - Cantor
92.   2017.08.07 - Jefferies
93.   2017.08.08 - JP Morgan
94.   2017.08.08 - Goldman
95.   2017.08.08 - Cowen
96.   2017.08.08 - Leerink
97.   2017.08.08 - Oppenheimer
98.   2017.08.08 - SunTrust
99.   2017.08.08 - Wells Fargo
100.   2017.08.09 - Cantor
101.   2017.08.09 - SunTrust

3

# Appendix B – Materials Considered

102.   2017.08.14 - William Blair
103.   2017.08.16 - Wells Fargo
104.   2017.08.17 - JP Morgan
105.   2017.08.17 - SunTrust (1)
106.   2017.08.17 - SunTrust (2)
107.   2017.08.18 - Leerink
108.   2017.08.23 - William Blair
109.   2017.08.29 - Leerink
110.   2017.08.30 - William Blair
111.   2017.09.06 - Jefferies (1)
112.   2017.09.06 - Jefferies (2)
113.   2017.09.06 - Jefferies (3)
114.   2017.09.06 - Wells Fargo
115.   2017.09.15 - Jefferies
116.   2017.09.20 - SunTrust
117.   2017.09.25 - Cantor
118.   2017.09.27 - Cantor
119.   2017.09.27 - Canaccord Genuity
120.   2017.09.27 - SunTrust
121.   2017.09.27 - Cowen
122.   2017.09.27 - Leerink (1)
123.   2017.09.27 - Leerink (2)
124.   2017.09.27 - Wells Fargo
125.   2017.09.27 - William Blair
126.   2017.09.28 - Canaccord Genuity
127.   2017.09.28 - SunTrust
128.   2017.10.06 - Cowen (1)
129.   2017.10.06 - Cowen (2)
130.   2017.10.16 - William Blair
131.   2017.11.02 - Canaccord Genuity
132.   2017.11.02 - Cantor
133.   2017.11.02 - Cowen
134.   2017.11.02 - Jefferies
135.   2017.11.02 - Leerink
136.   2017.11.02 - SunTrust
137.   2017.11.02 - William Blair
138.   2017.11.03 - JP Morgan
139.   2017.11.03 - Oppenheimer

4

# Appendix B – Materials Considered

140.  2017.11.03 - Wells Fargo
141.  2017.11.05 - SunTrust
142.  2017.11.05 - William Blair
143.  2017.11.06 - Cowen
144.  2017.11.06 - Leerink
145.  2017.11.06 - Wells Fargo
146.  2017.11.07 - SunTrust
147.  2017.11.08 - William Blair
148.  2017.11.10 - Canaccord Genuity
149.  2017.11.10 - Cantor (1)
150.  2017.11.10 - Cantor (2)
151.  2017.11.15 - Leerink
152.  2017.12.03 - Cantor
153.  2017.12.08 - Goldman
154.  2017.12.08 - JP Morgan
155.  2017.12.08 - SunTrust
156.  2017.12.08 - Cantor
157.  2017.12.08 - Cowen
158.  2017.12.08 - Leerink (1)
159.  2017.12.08 - Leerink (2)
160.  2017.12.08 - Leerink (3)
161.  2017.12.08 - Wells Fargo
162.  2017.12.11 - Canaccord Genuity
163.  2017.12.11 - Leerink
164.  2017.12.12 - Canaccord Genuity
165.  2017.12.12 - SunTrust
166.  2017.12.20 - Leerink
167.  2017.12.22 - Leerink
168.  2018.01.02 - Cantor
169.  2018.01.03 - Cantor
170.  2018.01.03 - William Blair
171.  2018.01.10 - SunTrust
172.  2018.01.10 - Cantor (1)
173.  2018.01.10 - JP Morgan
174.  2018.01.10 - Leerink
175.  2018.01.10 - Wells Fargo
176.  2018.01.10 - William Blair
177.  2018.01.10 - Cantor (2)

5

# Appendix B – Materials Considered

178.  2018.01.12 - Cowen
179.  2018.01.18 - William Blair
180.  2018.01.25 - Cantor
181.  2018.01.30 - SunTrust
182.  2018.02.13 - Jefferies
183.  2018.02.27 - Canaccord Genuity
184.  2018.02.27 - Cantor
185.  2018.02.27 - Cowen
186.  2018.02.27 - Jefferies
187.  2018.02.27 - Wells Fargo
188.  2018.02.27 - William Blair
189.  2018.02.28 - JP Morgan
190.  2018.02.28 - Leerink
191.  2018.02.28 - Oppenheimer
192.  2018.02.28 - SunTrust
193.  2018.03.05 - William Blair
194.  2018.03.12 - SunTrust
195.  2018.03.14 - Oppenheimer (1)
196.  2018.03.14 - Oppenheimer (2)
197.  2018.03.28 - Canaccord Genuity
198.  2018.04.02 - Wells Fargo
199.  2018.04.24 - William Blair
200.  2018.05.09 - Cantor
201.  2018.05.09 - Canaccord Genuity
202.  2018.05.09 - Cowen
203.  2018.05.09 - William Blair
204.  2018.05.10 - Goldman
205.  2018.05.10 - JP Morgan
206.  2018.05.10 - SunTrust
207.  2018.05.10 - Jefferies
208.  2018.05.10 - Leerink
209.  2018.05.10 - Oppenheimer
210.  2018.05.10 - Wells Fargo
211.  2018.05.11 - Cowen
212.  2018.05.11 - William Blair
213.  2018.05.13 - Cantor
214.  2018.05.14 - JP Morgan
215.  2018.05.14 - Jefferies

6

# Appendix B – Materials Considered

216.  2018.05.14 - Leerink
217.  2018.05.14 - Oppenheimer
218.  2018.05.14 - Wells Fargo
219.  2018.05.20 - Canaccord Genuity
220.  2018.05.25 - Leerink
221.  2018.06.01 - Canaccord Genuity
222.  2018.06.01 - Leerink
223.  2018.06.04 - Piper Jaffray
224.  2018.06.05 - Jefferies
225.  2018.06.06 - Cantor
226.  2018.06.06 - Canaccord Genuity
227.  2018.06.06 - Leerink
228.  2018.06.06 - William Blair
229.  2018.06.07 - SunTrust
230.  2018.06.07 - JP Morgan
231.  2018.06.07 - Piper Jaffray
232.  2018.06.18 - Oppenheimer
233.  2018.06.18 - Piper Jaffray
234.  2018.07.02 - Piper Jaffray
235.  2018.07.09 - Canaccord Genuity
236.  2018.07.16 - Oppenheimer
237.  2018.07.26 - Leerink
238.  2018.07.29 - Canaccord Genuity
239.  2018.08.07 - SunTrust
240.  2018.08.07 - Cantor
241.  2018.08.07 - Canaccord Genuity
242.  2018.08.07 - Cowen
243.  2018.08.07 - Jefferies
244.  2018.08.07 - Oppenheimer
245.  2018.08.07 - Wells Fargo
246.  2018.08.07 - William Blair
247.  2018.08.08 - Goldman
248.  2018.08.08 - JP Morgan
249.  2018.08.08 - Leerink
250.  2018.08.08 - Piper Jaffray
251.  2018.08.09 - William Blair
252.  2018.08.10 - Leerink
253.  2018.08.13 - Leerink

7

# Appendix B – Materials Considered

254.   2018.08.13 - Oppenheimer
255.   2018.08.13 - Piper Jaffray
256.   2018.09.05 - Wells Fargo
257.   2018.09.12 - JP Morgan
258.   2018.09.12 - SunTrust
259.   2018.09.12 - Canaccord Genuity
260.   2018.09.12 - Cantor
261.   2018.09.12 - Cowen
262.   2018.09.12 - Jefferies
263.   2018.09.12 - Leerink
264.   2018.09.12 - Oppenheimer
265.   2018.09.12 - Piper Jaffray
266.   2018.09.12 - William Blair
267.   2018.09.13 - Goldman
268.   2018.09.14 - Leerink
269.   2018.09.27 - SunTrust
270.   2018.10.05 - Leerink
271.   2018.10.17 - Leerink
272.   2018.10.22 - Cantor
273.   2018.11.02 - Leerink
274.   2018.11.06 - Cantor
275.   2018.11.06 - Cowen
276.   2018.11.06 - Jefferies
277.   2018.11.06 - Canaccord Genuity
278.   2018.11.06 - JP Morgan
279.   2018.11.06 - KeyBanc
280.   2018.11.06 - Leerink
281.   2018.11.06 - Wells Fargo
282.   2018.11.06 - William Blair
283.   2018.11.07 - Goldman
284.   2018.11.07 - Citi
285.   2018.11.07 - SunTrust
286.   2018.11.07 - Oppenheimer
287.   2018.11.07 - Piper Jaffray
288.   2018.11.28 - Piper Jaffray
289.   2018.11.29 - SunTrust (1)
290.   2018.11.29 - SunTrust (2)
291.   2018.12.06 - Jefferies

# Appendix B – Materials Considered

292.  2018.12.19 - JP Morgan
293.  2018.12.21 - Oppenheimer
294.  2018.12.27 - Oppenheimer (1)
295.  2018.12.27 - Oppenheimer (2)
296.  2018.12.31 - Cantor
297.  2019.01.09 - JP Morgan
298.  2019.01.11 - JP Morgan
299.  2019.01.13 - Canaccord Genuity
300.  2019.01.16 - Leerink
301.  2019.01.18 - William Blair
302.  2019.01.22 - Leerink
303.  2019.01.24 - Baird
304.  2019.01.31 - Piper Jaffray
305.  2019.02.19 - Piper Jaffray
306.  2019.02.19 - SunTrust
307.  2019.02.19 - Wells Fargo
308.  2019.02.19 - William Blair
309.  2019.02.20 - Canaccord Genuity
310.  2019.02.20 - Cowen
311.  2019.02.20 - JP Morgan
312.  2019.02.20 - Leerink
313.  2019.02.25 - Leerink
314.  2019.02.25 - Oppenheimer
315.  2019.02.26 - Baird
316.  2019.02.26 - Canaccord Genuity
317.  2019.02.26 - Cantor
318.  2019.02.26 - Citi
319.  2019.02.26 - JP Morgan
320.  2019.02.26 - KeyBanc
321.  2019.02.26 - Leerink
322.  2019.02.26 - Wells Fargo
323.  2019.02.26 - William Blair
324.  2019.02.27 - Cowen
325.  2019.02.27 - Goldman
326.  2019.02.27 - Oppenheimer
327.  2019.02.27 - Piper Jaffray
328.  2019.02.27 - SunTrust
329.  2019.02.27 - Jefferies

9

# Appendix B – Materials Considered

330.  2019.02.28 - SunTrust
331.  2019.03.04 - Cantor
332.  2019.03.04 - William Blair
333.  2019.03.08 - Leerink
334.  2019.03.11 - SunTrust
335.  2019.03.12 - William Blair
336.  2019.03.14 - Cantor
337.  2019.03.20 - Oppenheimer
338.  2019.03.21 - Cantor
339.  2019.03.21 - Cowen
340.  2019.03.21 - Leerink
341.  2019.03.21 - William Blair
342.  2019.03.22 - Oppenheimer
343.  2019.03.28 - Canaccord Genuity
344.  2019.03.28 - Cantor
345.  2019.03.28 - Cowen
346.  2019.03.28 - KeyBanc
347.  2019.03.28 - Leerink
348.  2019.03.28 - Piper Jaffray
349.  2019.03.28 - Oppenheimer (1)
350.  2019.03.28 - JP Morgan
351.  2019.03.28 - SunTrust
352.  2019.03.28 - Wells Fargo
353.  2019.03.28 - Oppenheimer (2)
354.  2019.03.29 - Leerink
355.  2019.04.10 - Cantor
356.  2019.04.10 - SunTrust
357.  2019.04.10 - Canaccord Genuity
358.  2019.04.10 - Cowen
359.  2019.04.10 - Leerink
360.  2019.04.10 - William Blair
361.  2019.04.11 - Cantor
362.  2019.04.11 - Oppenheimer
363.  2019.04.16 - Wells Fargo
364.  2019.04.22 - Leerink
365.  2019.05.07 - Baird
366.  2019.05.07 - Canaccord Genuity
367.  2019.05.07 - Cantor

10

# Appendix B – Materials Considered

368.  2019.05.07 - Citi
369.  2019.05.07 - Cowen
370.  2019.05.07 - JP Morgan
371.  2019.05.07 - KeyBanc
372.  2019.05.07 - Leerink
373.  2019.05.07 - Wells Fargo
374.  2019.05.07 - William Blair
375.  2019.05.07 - Jefferies
376.  2019.05.08 - Goldman
377.  2019.05.08 - Oppenheimer
378.  2019.05.08 - Piper Jaffray
379.  2019.05.08 - SunTrust
380.  2019.05.10 - William Blair
381.  2019.05.29 - JP Morgan
382.  2019.05.29 - Baird
383.  2019.05.29 - Cantor
384.  2019.05.29 - Citi
385.  2019.05.29 - Cowen
386.  2019.05.29 - KeyBanc
387.  2019.05.29 - Leerink
388.  2019.05.29 - SunTrust
389.  2019.05.29 - Wells Fargo
390.  2019.05.29 - William Blair
391.  2019.05.29 - Canaccord Genuity
392.  2019.05.29 - Oppenheimer (2)
393.  2019.05.29 - Oppenheimer (1)
394.  2019.05.30 - JP Morgan
395.  2019.05.30 - Baird
396.  2019.05.30 - Cantor
397.  2019.05.30 - KeyBanc
398.  2019.05.30 - Leerink (2)
399.  2019.05.30 - Leerink (1)
400.  2019.05.31 - Citi
401.  2019.05.31 - Goldman
402.  2019.05.31 - Oppenheimer
403.  2019.05.31 - Piper Jaffray
404.  2019.05.31 - SunTrust
405.  2019.05.31 - William Blair

11

## Appendix B – Materials Considered

406.  2019.06.02 - Cowen
407.  2019.06.07 - Leerink
408.  2019.06.11 - Cantor
409.  2019.06.13 - Canaccord Genuity
410.  2019.06.13 - SunTrust
411.  2019.07.17 - Leerink
412.  2019.08.02 - Cowen
413.  2019.08.06 - Citi
414.  2019.08.06 - Cowen
415.  2019.08.06 - JP Morgan
416.  2019.08.06 - KeyBanc
417.  2019.08.06 - Wells Fargo
418.  2019.08.06 - William Blair
419.  2019.08.06 - Baird
420.  2019.08.06 - Canaccord Genuity
421.  2019.08.06 - Cantor
422.  2019.08.07 - Goldman
423.  2019.08.07 - Piper Jaffray
424.  2019.08.07 - SunTrust
425.  2019.08.07 - Oppenheimer
426.  2019.08.15 - Canaccord Genuity
427.  2019.09.04 - Wells Fargo
428.  2019.09.10 - Piper Jaffray
429.  2019.10.04 - Cantor
430.  2019.10.04 - Jefferies
431.  2019.10.07 - Piper Jaffray
432.  2019.11.05 - Canaccord Genuity
433.  2019.11.05 - Cantor
434.  2019.11.05 - Cowen
435.  2019.11.05 - Wells Fargo
436.  2019.11.05 - William Blair
437.  2019.11.06 - JP Morgan
438.  2019.11.06 - Oppenheimer
439.  2019.11.06 - Piper Jaffray
440.  2019.11.06 - SunTrust
441.  2019.11.15 - Wells Fargo
442.  2019.11.27 - Canaccord Genuity
443.  2019.11.27 - Cantor

12

## Appendix B – Materials Considered

444. 2019.11.27 - Cowen
445. 2019.11.27 - JP Morgan
446. 2019.11.27 - Oppenheimer
447. 2019.11.27 - Piper Jaffray
448. 2019.11.27 - SunTrust
449. 2019.11.27 - Wells Fargo
450. 2019.11.27 - William Blair
451. 2019.12.04 - SunTrust
452. 2019.12.05 - Piper Jaffray
453. 2019.12.06 - SunTrust
454. 2019.12.08 - Piper Jaffray
455. 2019.12.10 - Canaccord Genuity
456. 2019.12.10 - Cantor
457. 2019.12.10 - SunTrust
458. 2019.12.10 - William Blair
459. 2019.12.11 - Cantor
460. 2019.12.17 - SunTrust (1)
461. 2019.12.17 - SunTrust (2)
462. 2019.12.17 - Wells Fargo
463. 2019.12.18 - Piper Jaffray
464. 2019.12.23 - Canaccord Genuity
465. 2019.12.23 - Cantor
466. 2019.12.23 - Piper Jaffray
467. 2019.12.23 - SunTrust
468. 2019.12.24 - Cantor
469. 2019.12.24 - Wells Fargo
470. 2019.12.31 - Piper Jaffray
471. 2019.12.31 - Cantor
472. 2020.07.17 - Baird
473. 2020.07.17 - Canaccord Genuity
474. 2020.07.17 - Cantor
475. 2020.07.17 - Cowen
476. 2020.07.17 - JP Morgan
477. 2020.07.17 - KeyBanc
478. 2020.07.17 - Wells Fargo
479. 2020.07.17 - William Blair
480. 2020.07.20 - SunTrust
481. 2020.07.20 - William Blair

13

# Appendix B – Materials Considered

482.  2020.08.04 - Canaccord Genuity
483.  2020.08.05 - Piper Jaffray
484.  2020.11.06 - Canaccord Genuity

**Evolent's SEC filings between 2016 and 2020**

**Evolent's press releases, conference call transcripts and investor presentations between 2016 and 2020**

**News stories on Evolent, Passport Health Plan and the healthcare market in Kentucky between 2016 and 2020**

**Data from FactSet Research Systems, Inc., I/B/E/S (via FactSet Research Systems, Inc.) and Bloomberg, L.P.**

485.  Price, total return, trading volume, implied volatility, and short interest data for Evolent
486.  Price and total return data for market and industry indices
487.  Institutional and insider holdings data for Evolent
488.  Analysts' revenue estimates for Evolent

**Transcripts of depositions of Lead Plaintiffs' Investment Managers**

489.  Deposition of Steven Lilly on behalf of Silvercrest Asset Management, dated May 6, 2022
490.  Deposition of John Porter on behalf of Newton Investment Management North America, dated May 11, 2022

**Internal documents on Lead Plaintiffs' trading**

491.  "BNY Mellon Transaction Detail," (OPPRS_00000108-09)
492.  "State Street Reports" for Plymouth County Retirement (SSBT_0000052-53)

**Financial statements of Passport Health Plan between 2013 and 2019 filed with the Kentucky Department of Insurance and the Internal Revenue Service**

**Verified Complaint for Injunctive and Declaratory Relief in *Passport v. Commonwealth of Kentucky***

**Academic literature and textbooks on finance, securities, valuation and statistics**

**Court decisions**

14