# Exhibit 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

---

PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,

                    Plaintiffs,

v.

EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY,

                    Defendants.

Case No. 1:19-cv-01031-MSN-TCB

---

## EXPERT REPORT OF CHAD COFFMAN, CFA

**May 27, 2022**

## Table of Contents

**Page**

I.    **INTRODUCTION** ......................................................................................... **3**

II.   **SUMMARY OF OPINIONS** ....................................................................... **4**

III.  **OVERVIEW OF EVOLENT AND PLAINTIFFS' ALLEGATIONS** ......................... **11**

    A.   EVOLENT .......................................................................... **11**

    B.   PLAINTIFFS' ALLEGATIONS .................................................... **13**

IV.  **IMPORTANCE OF ALLEGED MISSTATEMENTS AND OMISSIONS** ................ **21**

    A.   EVOLENT'S AND DEFENDANTS' PUBLIC STATEMENTS ............................. **22**

    B.   INTERNAL DOCUMENTS ........................................................... **27**

    C.   ANALYST COMMENTARY ......................................................... **30**

    D.   ECONOMIC AND VALUATION PRINCIPLES ..................................... **36**

    E.   EVENT STUDY .................................................................... **37**

V.   **LOSS CAUSATION** ..................................................................... **39**

    A.   INVESTOR LOSSES WERE FORESEEABLE ......................................... **39**

    B.   THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES .............. **41**

VI.  **ANALYSIS OF THE CORRECTIVE DISCLOSURE EVENTS** ............................. **42**

    A.   FEBRUARY 19, 2019 ............................................................. **42**

    B.   MAY 29, 2019 – MAY 30, 2019 ................................................. **50**

VII. **THE KENTUCKY MEDICAID RATE CUTS WERE NOT SUFFICIENT TO FULLY CAUSE PASSPORT'S FINANCIAL DISTRESS** .................................. **56**

VIII. **CALCULATING ARTIFICIAL INFLATION PER SHARE AND DAMAGES FOR EVOLENT COMMON STOCK** ....................................... **59**

    A.   INFLATION PER SHARE ........................................................... **59**

    B.   DAMAGES ....................................................................... **62**

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.

2.    I have previously filed expert reports in this matter (collectively, my "Prior Reports"), and incorporate them here by reference.[1]  On October 19, 2021, I submitted an expert report in this matter (my "Original Efficiency Report") in which I concluded that the market for Evolent Health, Inc. ("Evolent" or the "Company") Class A common stock ("Evolent Common Stock")[2] was efficient[3] during certain relevant periods,[4] and that damages in this action can be calculated on a class-wide basis using a common methodology.[5]  On April 8, 2022, I submitted another expert report in this matter (my "Efficiency Report") in which I concluded that the market for Evolent Common Stock was efficient from January 10, 2018 through May 28, 2019, (the "Class Period")[6] and that damages in this action can be calculated on a class-wide basis using a common methodology.[7]  I continue to hold the opinions expressed in my Prior Reports.

---

[1] Unless otherwise defined herein, capitalized terms in this report have the same meaning as in my Efficiency Report.  "Complaint" refers to the Third Amended Class Action Complaint, ECF No. 158, Case No. 1:19-cv-01031-MSN-TCB, dated November 17, 2021.  Unless otherwise noted, all emphasis in this report is added.

[2] Evolent Health, Inc. Class B common stock was not listed on any stock exchange and was not publicly traded.  *See* Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 40.

[3] Throughout this report the term "efficiency" refers to "semi-strong market efficiency" as defined in my Original Efficiency Report (*see* Coffman Original Efficiency Report ¶¶ 17 – 18).

[4] My Original Efficiency Report was filed while items were pending reconsideration from the Court.  In my Original Efficiency Report, I concluded that the market for Evolent Common Stock was efficient throughout September 5, 2018 – May 28, 2019 (the "Original Class Period"), the Expanded Class Period (May 11, 2018 – May 28, 2019), and the Analysis Period (August 4, 2017 - May 28, 2019).  *See* Original Efficiency Report footnote 3.  I continue to hold the opinions expressed in my Original Efficiency Report.

[5] Coffman Original Efficiency Report ¶¶ 6 – 7.

[6] Complaint ¶ 1.

[7] Coffman Efficiency Report ¶¶ 6 – 7.

3.     I have been asked by counsel for Lead Plaintiffs in this matter to offer additional opinions on: (1) whether the alleged false and misleading statements and/or omissions concerned information that was important to investors; (2) whether investor losses were proximately caused by Defendants' alleged false and misleading statements and/or omissions (i.e., loss causation); (3) the quantification of the amount of loss attributable to the revelation of the allegedly misrepresented and/or omitted facts; (4) the quantification of any artificial inflation per share for Evolent Common Stock for each day of the Class Period attributable to the alleged false and misleading statements and/or omissions; and (5) the proper method to quantify Rule 10b-5 damages for each Class Period purchase of Evolent Common Stock.

4.     The materials I considered in forming my opinions are identified in **Appendix A** to this report.  Global Economics Group is being compensated at $900 per hour for my work on this matter and at standard hourly rates for work performed by members of my staff acting under my supervision and direction.  Neither my compensation nor the compensation of my firm is in any way contingent upon the outcome of this case or upon the opinions I express.

5.     My qualifications were detailed in my Efficiency Report and an updated version of my curriculum vitae is attached as **Appendix B**.

6.     I reserve the right to amend this report to reflect new information that becomes available to me in light of further proceedings in this matter, including additional discovery and/or future rulings from the Court.

## II.   SUMMARY OF OPINIONS

7.      My opinions regarding materiality, loss causation, and damages in this action arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, are premised upon

4

Defendants being found to have knowingly or recklessly issued false or misleading statements and/or omissions during the Class Period regarding Evolent's ability (or lack thereof) to provide value to its most important customer, Passport. Specifically, Plaintiffs allege that Defendants' false and misleading statements and omissions concealed that, on balance, Evolent was raising costs instead of lowering costs for Passport, thus rendering the revenue and income received from Passport unsustainable.

8.     The alleged misstatements and omissions regarding Evolent's ability to add value to Passport, and thus the sustainability of Evolent's business with Passport, were important to investors. I base my opinion of the importance of this information from: (1) Evolent's own public statements indicating the importance of Passport's business to achieve Evolent's financial goals; (2) internal documents showing that Passport's business was a priority to Evolent and Defendants; (3) analyst commentary demonstrating that the market relied upon Defendants' statements concerning Evolent's ability to lower Passport's costs to the financial benefit of both firms; (4) the application of basic economic and valuation principles whereby the unsustainability of Passport's business would negatively affect Evolent's financial performance; and (5) my event study analysis, which demonstrates statistically significant negative declines in the price of Evolent Common Stock as the market learned Evolent's business from Passport was at great risk and then ultimately unsustainable without bailing out Passport, which is explained in greater detail in **Section IV** of this report.

9.     Any event that either revealed that Evolent was incapable of providing the declared value to Passport or revealed the unsustainability of Evolent's revenue and profit from Passport reflects a partial disclosure of the relevant truth concealed by the alleged misrepresentations and/or omissions. I have identified two events that represent the disclosure of portions of the

relevant truth concealed by the alleged misrepresentations and/or omissions which were also associated with statistically significant stock price declines (the "Corrective Disclosure Events").

10.    The corrective disclosure events I identified dissipated artificial inflation from the market price of Evolent Common stock on February 19, 2019 and May 29, 2019 (the "Corrective Disclosure Events"):

- **February 19, 2019:**[8] Passport filed a lawsuit against the Commonwealth of Kentucky, (the "Passport Complaint")[9] revealing that Passport would be insolvent within weeks, thus putting the revenue and profit Evolent receives from Passport at great risk.[10]

- **May 29, 2019:** Evolent announced before the market opened that, as a result of Passport's financial distress, it would acquire a 70% ownership stake in Passport for $70 million and further agreed to provide "interim balance sheet support[,]" thus demonstrating that Evolent's business strategy of providing services independent of Passport was unsustainable.[11]

---

[8] It is my understanding that Passport intended to file the Passport Complaint at 12:00 PM EST on February 15, 2019, but did not issue a press release, *see* EVH00240289. It is also my understanding from Plaintiffs that the Kentucky court in which the Passport Complaint was filed did not have an easily publicly accessible internet-based docket system that would have publicly disseminated the complaint at the time of filing. Since newspapers only began to disseminate this information after market close, the market was unaware of the filing as of the close of trading on Friday, February 15, 2019. The NYSE was closed on Monday, February 18, 2019 in observance of "Washington's Birthday" (*see* "NYSE Group Announces 2019, 2020 and 2021 Holiday and Early Closings Calendar," *Business Wire,* December 4, 2018). Therefore, this information only began to impact the market price of Evolent Common Stock on the following trading day, Tuesday, February 19, 2019. Thus, for purposes of this report, I refer to this as the February 19, 2019 Corrective Disclosure Event.

[9] VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF filed February 15, 2019 in UNIVERSITY HEALTH CARE, INC. d/b/a PASSPORT HEALTH PLAN v. COMMONWEALTH OF KENTUCKY, FINANCE AND ADMINISTRATION CABINET and WILLIAM LANDRUM, III, Not Individually But In His Official Capacity As Secretary, Finance And Administration Cabinet and COMMONWEALTH OF KENTUCKY, CABINET FOR HEALTH AND FAMILY SERVICES and ADAM MEIER, Not Individually But In His Official Capacity As Secretary, Cabinet For Health And Family Services, Case No. 19-CI-00160.

[10] As I will discuss in more detail below in **Section VI.A**, the first mention of this corrective information that I identified was a news article published at 4:00 PM on February 15, 2019 (*see* "Passport sues state over rate cuts it says could put it out of business," *Courier Journal,* February 15, 2019, 4:00 PM). Unless otherwise noted, all times in this report refer to Eastern Time.

[11] "Evolent Health Expands Partnership with Passport Health Plan to Support Medicaid Beneficiaries in the Commonwealth of Kentucky," *PR Newswire,* May 29, 2019, 6:30 AM; "Special Call," *S&P Capital IQ*, May 29, 2019, 8:00 AM; "Passport Health Plan Partnership," *Evolent Health*, May 29, 2019.

11.     While Passport's and Evolent's public statements suggest that Passport's financial distress was caused by a reduction in Kentucky Medicaid capitation payment rates, this ignores that (1) Passport had over $250 million in total capital and at least $139 million of excess regulatory capital as of the end of 2015, just before Evolent began providing services to Passport; (2) that the total impact of the Kentucky Medicaid rate cuts was approximately $47 million; (3) that Evolent charged Passport approximately $300 million from 2016 through the first half of 2019 while Passport's administrative costs as a percentage of revenue increased substantially; and (4) that the reversal of the Medicaid rate cuts did not prevent Passport from having to be bailed out by Evolent.[12]  As a result, the Kentucky rate cuts were not capable of independently causing Passport's financial distress and blaming the Medicaid rate cuts independent of Evolent's excessive costs and mismanagement for Passport's financial distress is not consistent with economic logic.

12.     There is a clear economic link between the alleged misrepresentations and omissions and the foreseeable investor losses that occurred on the Corrective Disclosure Events. If, as Plaintiffs allege, Defendants knew, or recklessly disregarded, (1) that Evolent was not actually providing Passport the value it publicly represented, but rather was causing Passport to incur costs in excess of any benefits, thus rendering the revenue and profit earned from Passport unsustainable, then it was foreseeable at the time of the alleged misstatements and/or omissions that when the relevant truth became known, the market value of Evolent Common Stock would decline.  Investors who purchased Evolent Common Stock at prices that were affected by Defendants' misleading statements and/or omissions, including that Evolent had "achieve[d]

---

[12] Complaint ¶¶ 122, 124.

MLR/ ALR reduction impact representing $100M+ in identified annualized savings"[13] for Passport, that "Passport [was] making solid progress towards improving its financial performance,"[14] and that there was no risk that, if Passport's financial distress continued, Evolent would have to acquire Passport, or even "some of their assets" or a "minority stake"[15] suffered losses as the relevant truth was revealed. Therefore, the misrepresentations and/or omissions represent the but-for cause of such investors' economic losses, as described in greater detail in **Section V** of this report.

13.    The revelation of the relevant truth caused the price of Evolent Common Stock to decline on the Corrective Disclosure Events. This opinion is based upon (1) my event study analysis, which demonstrates there was a statistically significant abnormal stock price decline on the day of the Corrective Disclosure Events beyond the 95% confidence level (as well as beyond the 99% confidence level), (2) my analysis of the content of the information disclosed, (3) my review of the analyst and investor reaction and commentary regarding the information disclosed, (4) and my review of news articles published in the wake of the Corrective Disclosure Events. As part of my analysis, I also specifically analyzed whether there was information released contemporaneously with the corrective information that is unrelated to the alleged fraud (i.e., "confounding" information).

---

[13] Evolent specifically stated in a slide for the J.P. Morgan Healthcare Conference presentation that a "Full-risk partner achieves MLR/ ALR reduction impact representing $100M+ in identified annualized savings" which I understand refers to Passport, and which was upheld as a false and misleading statement in this case. *See* "Company Conference Presentation," *S&P Capital IQ,* January 10, 2018, 1:30 PM, slide 11; Transcript of Motion Proceedings Before the Honorable Michael S. Nachmanoff, United States District Court Judge, on March 18, 2022; Evolent's Sr. Director, Corporate Communications, Kim Conquest helped draft the slide presentation for Evolent CFO Nicky McGrane, and admitted that the unnamed partner was Passport, *see* Conquest Deposition Tr. 105:14 to 105:18.

[14] "FQ1 2019 Earnings Call Transcripts," *S&P Capital IQ,* May 7, 2019, 5:00 PM, p. 6.

[15] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ,* February 26, 2019, 5:00 PM, p. 24.

14.    Based upon my loss causation analysis, the total fraud-related abnormal price decline (net of market and industry effects) associated with the Corrective Disclosure Events is $5.01 per share, which is explained in further detail in **Section VIII** of this report.

**Artificial Inflation per Share Dissipated on
Corrective Disclosure Events**

| Corrective Disclosure Event Date | Artificial Inflation Per Share Dissipated |
|---|---|
| February 19, 2019 | $1.78 |
| May 29, 2019 | $3.23 |
| Total | $5.01 |

15.    The $5.01 per share of market price declines in Evolent Stock caused by the revelation of the relevant truth identified through the event study represents the most reliable evidence and proxy for how Evolent's market price would have declined upon an earlier correction of the relevant truth.  In particular, I understand that Plaintiffs expect to prove that Defendants knew that by the time Defendants made the alleged false statements on January 10, 2018 regarding Evolent's purported cost savings at Passport, Evolent had not in fact provided its touted savings to Passport, but had dramatically increased Passport's overall costs by significantly raising its administrative costs without sufficiently decreasing medical costs, thus rendering the revenues and profits earned from Passport unsustainable.  I am not aware of any compelling economic evidence to suggest the financial impact of losing Passport's business as an independent entity (i.e. what was disclosed as of the Corrective Disclosure Events) would have been any less if disclosure of the relevant truth had been made earlier in the Class Period.  As a result, as described below in **Section VIII**, application of constant dollar inflation is appropriate and reasonable, and the amount of artificial inflation can be summarized as follows:

9

**Artificial Inflation per Share Over Time**

| Date Range | Artificial Inflation Per Share |
|---|---|
| January 10, 2018 - February 15, 2019 | $5.01 |
| February 19, 2019 - May 28, 2019 | $3.23 |

16.    Damages per share (prior to any statutory limitations) for any class member under Rule 10b-5 are calculated as the difference between inflation in the security price at purchase and inflation in the security price at sale.  For example, assume that investor X purchased a share of Evolent Common Stock on November 1, 2018 when the price inflation due to the fraud was $5.01 and sold it on February 25, 2019 after the first partial corrective disclosure left $3.23 of artificial inflation in the shares, then Investor X's damages would be equal to $1.78 ($5.01 inflation per share at purchase minus $3.23 inflation per share at sale).  Any class member who did not hold shares through at least one Corrective Disclosure Event has zero damages for that particular purchase.  In **Section VIII**, I provide a method for quantifying per share damages for each Class Period purchase or acquisition of Evolent Common Stock that incorporates the impact of the Private Securities Litigation Reform Act of 1995's ("PSLRA") limitations on per share damages.  Furthermore, the damages methodology I provide is flexible enough to incorporate any alternative findings regarding the degree and timing of artificial inflation.

17.    The remainder of this report is organized as follows: **Section III** provides an overview of Evolent and the claims in this case.  **Section IV** contains my analysis of the importance to investors of the allegedly misrepresented and/or omitted facts.  **Section V** discusses loss causation principles.  **Section VI** shows the connections between the alleged misstatements and/or omissions with the associated statistically significant abnormal price

10

decline on the Corrective Disclosure Events and demonstrates loss causation for the Class.

**Section VII** includes my analysis of the Kentucky rate cuts.  Finally, **Section VIII** presents the

resulting artificial inflation per share and damages methodology.

## III.  OVERVIEW OF EVOLENT AND PLAINTIFFS' ALLEGATIONS

### A.  EVOLENT

18.    Evolent is incorporated in the state of Delaware with its headquarters in Virginia.[16]

Evolent described its business during the Class Period as follows:

> We are a market leader in the new era of health care delivery and payment,
> in which leading health systems and physician organizations, which we refer
> to as providers, are taking on increasing clinical and financial responsibility
> for the populations they serve. We provide integrated, technology-enabled
> services to our national network of leading health systems, physician
> organizations and national and regional payers across Medicare, Medicaid
> and commercial markets… We believe we are pioneers in enabling health
> systems to succeed in value-based payment models… [W]e provide an end-
> to-end, built-for-purpose, technology-enabled platform for providers to
> transition their organization and business model to succeed in value-based
> payment models. To succeed under value-based care reimbursement, payers
> are under increasing pressure to manage high cost complex patient
> populations. We offer technology-enabled services to address these
> populations.[17]

19.    For the fiscal year ended December 2018, Evolent reported revenue of $627

million, a net loss of $54 million, and listed total assets of $1,722 million.[18]  As of December 31,

2018, Evolent employed approximately 3,800 employees,[19] and its Common Stock traded on the

NYSE under the ticker "EVH" throughout the Class Period.[20]

---

[16] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 13, 39.

[17] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 1.

[18] Evolent Health, Inc. SEC Form10-K for the fiscal year ended December 31, 2018, p. 41.

[19] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 12.

[20] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, pp. 13, 40.

20.    Prior to the start of the Class Period, in 2016, Evolent entered into a strategic alliance with Passport whereby Evolent would not only provide services to Passport, but also would use Passport as a showcase client to help generate business from other Medicaid plans. Specifically, Evolent described the relationship as follows in the press release announcing the partnership:

> Passport Health Plan and Evolent Health are pleased to announce the formation of a strategic alliance that will create The Medicaid Center of Excellence.
>
> The Medicaid Center of Excellence is the first of its kind in the country. It combines Passport's expertise in Medicaid managed care with Evolent's industry-leading technology and operations to offer centralized services for provider-led Medicaid health plans nationwide. The Center of Excellence will deliver strategy, clinical and operational capabilities, health plan administrative support, and IdentifiSM -- Evolent's population health performance management platform.
>
> The strategic alliance between Passport and Evolent will create new jobs, generate additional tax revenue, and further establish Louisville as a center for health care innovation. It is anticipated that the number of employees at The Medicaid Center of Excellence will increase substantially over the next five years as it grows to support Passport and other health plans across the country.
>
> Evolent Health -- headquartered in Arlington, Va. -- currently partners with leading health systems to advance value-based care. The alliance with Passport Health Plan -- a nonprofit, provider-sponsored managed care organization (MCO) that has been administering Medicaid benefits in Kentucky since 1997 -- **will offer a clear blueprint that can be scaled on a national level to providers and governmental entities seeking new ways to improve patient health outcomes and lower costs**.[21]

21.    Passport was Evolent's largest customer by revenue at the start of and throughout the Class Period.  Indeed, Evolent described Passport as generating a "significant portion" of the Company's revenue in its annual SEC filings:

---

[21] "Passport Health Plan and Evolent Health form Strategic Alliance to create Medicaid Center of Excellence in Louisville," *PR Newswire,* February 2, 2016, 9:00 AM.

12

*2016 10-K*: As of December 31, 2016, we had long-term contractual relationships with over 25 partners, and a significant portion of our revenue is concentrated with several partners. Our three largest partners, Passport, Indiana University Health and MedStar Health, Inc. comprised 19.6%, 14.5% and 12.7%, respectively, of our revenue for 2016, or 46.8% in the aggregate.[22]

*2017 10-K*: As of December 31, 2017, we had contractual relationships with over 25 operating partners and a significant portion of our revenue is concentrated with a single partner, Passport, which comprised 20.6% of our revenue for 2017.[23]

*2018 10-K*: As of December 31, 2018, we had contractual relationships with over 35 operating partners. A significant portion of our revenue is concentrated with a single partner, Passport, which comprised 17.5% of our consolidated revenue for 2018.[24]

*2019 10-K:* A significant portion of our services revenue is concentrated with a single partner, Passport (in which we now own a 70% equity interest), which comprised 18.7% of our consolidated revenue for 2019…[25]

## B. PLAINTIFFS' ALLEGATIONS

22. Plaintiffs allege that Evolent and the Individual Defendants[26] made false or misleading statements and omissions during the Class Period, ultimately causing damages to purchasers of Evolent Common Stock who unknowingly bought Common Stock at artificially inflated prices and suffered economic loss when the stock price ultimately reflected the concealed information.[27]

23. More specifically, the Complaint alleges that throughout the Class Period, Defendants assured investors that Evolent was providing lower clinical and administrative costs

---

[22] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2016, p. 43.

[23] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 7.

[24] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 1.

[25] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 2.

[26] The Individual Defendants are, co-founder, board member, and former CEO (and current Executive Chair) Frank Williams ("Defendant Williams"), former CFO Nicholas McGrane ("Defendant McGrane"), and co-founder, board member, and then-President (and current CEO) Seth Blackley ("Defendant Blackley"). *See* Complaint ¶¶ 25 – 30.

[27] Complaint ¶¶ 210 – 211.

for its largest and most important client, Passport, which accounted for approximately 20% of Evolent's revenue and accounted for a substantial percentage of Evolent's operating profit during the Class Period.[28]  The Complaint alleges that Evolent's repeated touting of its purported savings for Passport, and of its partnership with Passport as a success story that demonstrated Evolent's ability to significantly cut costs for its clients, contributed to the more than doubling of its stock price in nine months.[29]  The Complaint further alleges that, in reality, as Evolent's own internal emails and other documents produced to Plaintiffs in discovery confirmed, Evolent never delivered its promised savings to Passport.[30]  Rather, the Complaint alleges, Evolent capitalized on its unique relationship with Passport pursuant to which Evolent had become, in Defendant Williams' own words, a "co-owner" of Passport that enjoyed "joint governance" over the Plan—by dramatically increasing Passport's costs through what the Company's own executives internally described as Evolent's "insanely high" fees.[31]

24.    The Complaint alleges that additionally, Evolent's medical claims processing services were so grossly deficient that they created an administrative "nightmare" that rendered Passport wholly unable to perform even its most basic and rudimentary functions, causing it to issue tens of millions of dollars in erroneous overpayments to providers, and also leading to the failure to pay providers on time (or at all).[32]  The Complaint alleges that Evolent's deficient

---

[28] Complaint ¶¶ 5, 45.

[29] Complaint ¶ 5.

[30] Complaint ¶ 142; "Evolent signed up with Passport 2/16.  I doubt if we've been able to demonstrate any clinical savings despite the insanely high ALR." […] "I don't think this is news to anyone," *see* EVH00124389 at -389; and "By Evolent's own analysis, no value has been provided for Medicaid after 2 and a half years and millions of dollars paid to Evolent." *See* EVH00129772 at -772; "I still show meaningfully lower returns in 2016 v 2015. The question I have is (a) we make a nice margin at [P]assport and so the question is are they seeing a benefit net of our fees. The answer is no in 2016…" *See* EVH00019418 at -418.

[31] Complaint ¶¶ 8, 17.

[32] Complaint ¶¶ 6, 19, 59.

14

services, combined with its exorbitant fees and its failure to deliver its touted savings, crippled

Passport and ultimately pushed it to the brink of insolvency.[33]  By January 2019, Passport's

financial health had worsened to the degree that the Complaint alleges Defendants knew it would

likely need substantial capital infusions and potentially a bailout in order to continue operating

and to win renewal of Passport's Kentucky Medicaid contract.[34]

25.    Rather than disclose the unsustainability of the revenue and profit Evolent was

earning from Passport, and thus impact the market value of Evolent's Common Stock,

Defendants allegedly concealed this information from investors throughout the Class Period

through a series of false and misleading statements and omissions.[35]  **Appendix C** contains a full

list of the actionable alleged misrepresentations and/or omissions that I was asked to assume

occurred, which are also described in greater detail below.

26.    For example, on January 10, 2018, the first day of the Class Period, Evolent

participated in the 36th Annual J.P. Morgan Healthcare Conference.[36]  Defendant Williams and

Defendant McGrane presented slides at the conference, which Evolent also included in a Form 8-

K filed earlier in the morning on January 10, 2018.[37]  Within the presentation was a slide entitled

"Delivering Results Across All Partner Strategies" as reproduced below:[38]

---

[33] Complaint ¶¶ 11-12.

[34] Complaint ¶¶ 12, 159.

[35] Complaint Section VI.

[36] *See* "Evolent Health to Participate in Upcoming Investor Conference," *PR Newswire,* December 20, 2017, 10:00 AM; "Company Conference Presentation," *S&P Capital IQ,* January 10, 2018, 1:30 PM.

[37] Evolent SEC Form 8-K filed January 10, 2018, 8:06 AM.

[38] Evolent SEC Form 8-K filed January 10, 2018, 8:06 AM.



27.    Critically, the slide stated that a "Full risk partner achieve[d] MLR/ALR reduction impact representing $100M+ in identified annualized savings."[39,40]  Plaintiffs allege that "[d]iscovery has made clear that the 'full risk partner' referred to in this slide was Passport," and that it falsely portrayed Evolent as adding over $100 million in value for Passport rather than revealing the relevant truth that Evolent was costing Passport more than it was saving, thus rendering the revenue and profit earned from Passport unsustainable.[41]

---

[39] Evolent SEC Form 8-K filed January 10, 2018, 8:06 AM.  The footnote to the statement read "Approximate annualized savings for all initiatives implemented in 2016 and 2017."

[40] *See* Complaint footnote 6: ("Medical Loss Ratio ("MLR") refers to the proportion of a health plan's revenue that is spent paying for the medical expenses of its members. By definition, it does not include administrative costs, such as the fees paid to Evolent. Administrative costs as a percentage of revenue are referred to as Administrative Loss Ratio ("ALR")").

[41] Complaint ¶ 162; Email correspondence at Evolent likewise confirms this number was in reference to Passport: *see* EVH00020780; EVH00209262 at -264 ("The $100M in the slides is passport plan MLR/ALR savings and I don't think that will make as much sense here."); and EVH00020779 ("We currently have the attached in IR deck which shows Passport with $100 M+ savings. We weren't able to track down back up for the $100M.")

28.    On May 11, 2018, Evolent held an Investor and Analyst Day.[42]  During the conference, Defendants made two statements that Plaintiffs allege were false and misleading. Specifically, Defendant Williams represented that: "…*a full-risk partner achieving $100 million in identified savings* through a bunch of different levers that we have across the full platform."[43]

29.    Evolent also included a slide in its presentation on May 11, 2018 that was similar to the slide mentioned above from January 10, 2018.  This slide made virtually the same claim regarding over $100 million in annualized savings for the "Full risk partner" (i.e., Passport), which Plaintiffs allege was false and misleading:[44]

## Delivering Results Across All Partner Strategies

**CLINICAL RESULTS**

Newly launched ACO achieves clinical impact through Complex Care program[1]

▼ **48%**  Medical Spend (PMPM)

▼ **66%**  Inpatient Admissions

MA partner achieves clinical impact through hospital Transition Care program[2]

▼ **50%**  30-day readmission rates

▼ **31%**  Average length of stay of 30-day readmission

**FINANCIAL RESULTS**

Full risk partner achieves
MLR / ALR reduction impact representing
**$100M+**  identified annual savings[3]

1) Study period varies by partner analysis. Baseline period for clinical and utilization profile: 12 months prior to Complex Care case creation. Cases were excluded based on program length and closure status. Persons who declined participation were also excluded. Cases and controls were matched on demographics, socioeconomic status, health risk (i.e., CCI), inpatient case mix, 12 month prior healthcare use and spend using a propensity score model. Total annual cost savings are based on a cost savings per engaged case, using a difference-in-difference evaluation methodology, applied to the total number of engaged patients who met the case definition in a 9 month period (to account for lag in savings realization). 2) Transition Care cases created 1-Jan-15 to 30-Apr-17. Acute IP discharges based on claims incurred through May 2017, paid through August 2017. Exclusions applied for discharges for death, those with a principle diagnosis of pregnancy, or those with a condition originating in the perinatal period. Persons that declined participation or were inappropriate for program were also excluded. Cases and controls were matched on demographics, health risk (i.e., CCI), inpatient case mix and 12 month prior healthcare use and spend using a propensity score model. 3) Approximate annualized savings for all initiatives implemented in 2016 and 2017.



_____

[42] "Evolent Health to Host Investor and Analyst Day on May 11, 2018," *PR Newswire,* May 3, 2018, 10:00 AM; "Analyst/Investor Day," *S&P Capital IQ,* May 11, 2018, 8:30 AM.

[43] Complaint ¶ 166; "Analyst/Investor Day," *S&P Capital IQ,* May 11, 2018, 8:30 AM, p. 9.

[44] Complaint ¶ 166; "Evolent Health 2018 Investor & Analyst Day," *Evolent Health,* May 11, 2018, slide 17.  The slide also contained the same footnote as the January 10, 2018 slide: "Approximate annualized savings for all initiatives implemented in 2016 and 2017."

17

30.    On September 5, 2018, Evolent participated in the Wells Fargo Healthcare

Conference.[45]  During the conference, Defendant Williams made the following allegedly false

and misleading statement: "…an absolutely wonderful partner in Passport. In their own plan, *we*

*believe we've helped to generate over $100 million in savings,* which was highly valuable to

that organization."[46]

31.    On January 25, 2019, Insider Louisville published an article titled "Passport's

finances being dragged down by $220M in 'management fees' to Evolent Health."[47]  The article

reported that:

> Evolent told Insider via email that the 'majority of the fees Passport pays to
> Evolent are directly tied to local staff—at cost—as well as (insurance claims
> processing) and pharmacy benefit services at a lower per member cost than
> prior periods.' … The company said it has 'hundreds of employees
> supporting Passport' and that 'the number of employees has increased in
> line with the increases in scope of our partnership with Passport' and that
> 'the number of our employees in Louisville exceeds our original projection.'
> However, the company did not provide details.[48]

32.    Plaintiffs allege that the statements made to Insider Louisville were false and

misleading because Evolent was not proving staff "at cost" and failed to reveal that Evolent was

costing Passport far more than the benefits that were being provided, thus rendering the revenue

and profits earned from Passport unsustainable.[49]

33.    Then, on February 15, 2019, the first Corrective Disclosure Event, Passport filed a

complaint against Kentucky's Finance Administration Cabinet and its Cabinet for Health and

---

[45] "Evolent Health to Participate in Upcoming Investor Conferences," *PR Newswire,* August 22, 2018, 10:00 AM;
"Wells Fargo Health Care Conference," *Bloomberg,* September 5, 2018, 10:15 AM.

[46] Complaint ¶ 169; "Wells Fargo Health Care Conference," *Bloomberg,* September 5, 2018, 10:15 AM, p. 5.

[47] "Passport's finances being dragged down by $220M in 'management fees' to Evolent Health," *Insider Louisville,*
January 25, 2019, 1:30 PM.

[48] *Id*.

[49] Complaint ¶¶ 174-176.

Family Services in which Passport warned, *inter alia*, that it "expects to report a financial status showing expected risk-based capital will be significantly less than the statutory threshold for DOI action" by March 1, 2019.[50] *The Courier Journal* reported on the lawsuit, stating "Passport Health Plan, in a lawsuit filed Friday, claims that state rate cuts have affected it so dramatically that the Louisville-based, non-profit Medicaid managed care company could be insolvent by March and subject to state takeover."[51] Despite these revelations from its most significant client and notwithstanding the Company's own dependence on Passport to generate revenues, Evolent assured investors that it would not bail out Passport.[52] Defendants further attested to investors that Passport's finances were improving through the end of the Class Period in May 2019.[53]

34.    On February 26, 2019, Evolent announced its fourth quarter and full year 2018 earnings and hosted its earnings call.[54] Analysts questioned Defendants regarding the potential impact on Evolent of Passport's financial difficulties and possible insolvency. Defendant Williams represented that Evolent was "not focused on outright majority ownership [of] health plans," and further assured that, "…there is no big change in strategy based on what we see happening with Passport specifically."[55] An analyst asked if "[o]n the Passport side, is there any balance sheet risk if they were to go insolvent? Or put another way, have your joint investment efforts of Passport given you any exposure in a tail event...?"[56] Defendant Williams stated "No.

---

[50] Complaint ¶ 119, Passport Complaint ¶ 75.

[51] "Passport sues state over rate cuts it says could put it out of business," *Courier Journal*, February 15, 2019, 4:00 PM.

[52] Complaint ¶ 12.

[53] *Id.*

[54] "Evolent Health Announces Fourth Quarter and Full Year 2018 Results," *PR Newswire*, February 26, 2019, 4:01 PM; "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM.

[55] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 24.

[56] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 23.

19

No, we don't have any broader exposure."[57]  The same analyst then asked, "if there was a tail event for Passport, and given the importance of scale on your business, what would prevent you from potentially acquiring some of their assets, if not the whole business?"  Defendant Williams answered:

> Again, it's pretty hard to speculate on that. I don't think we've thought about acquiring a full Medicaid plan. ***It's just not in our strategic lens at this point.*** Again, in certain situations, we've talked about co-ownership models where we might have a minority stake in something, ***but related to Passport that's not something that is currently being evaluated.***[58]

35.    On May 7, 2019 Evolent announced its first quarter 2019 earnings[59] and hosted its earnings call, during which Defendant Williams stated:

> Currently, we're pursuing several major initiatives in close collaboration with the Passport leadership team. [...] Based on these initiatives and given the strength of its clinical model, we believe that Passport is making solid progress towards improving its financial performance...we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market.[60]

36.    Plaintiffs allege that these above-mentioned statements were false and misleading statements because Defendants were aware as of the start of the Class Period that: (1) "Evolent's services did not, and could not, help its largest client, Passport, cut costs, but in fact did the exact opposite", thus rendering the revenue and profit earned from Passport unsustainable; and (2) "once Passport's financial situation became dire, that Evolent would have no choice but to bail out Passport so as not to lose its largest and most significant client."[61]

---

[57] *Id*.

[58] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 24.

[59] "Evolent Health Announces First Quarter 2019 Results," *PR Newswire*, May 7, 2019, 4:03 PM.

[60] "FQ1 2019 Earnings Call Transcripts," *S&P Capital IQ*, May 7, 2019, 5:00 PM, p. 6.

[61] Complaint ¶ 188.

37.    It was not until May 29, 2019, the final Corrective Disclosure Event, that investors learned the full truth.  On this day, Evolent announced it would acquire a 70% ownership stake in Passport.[62]  Specifically, the announcement states "Evolent will contribute $70 million for a 70 percent ownership interest in Passport Health Plan and will also provide interim balance sheet support if necessary to meet near term regulatory capital requirements."[63, 64]  The Complaint alleges that ultimately through the two Corrective Disclosure Events, the market finally learned of the unsustainability of the revenue and profit Evolent was earning from Passport and the negative implications this had for Evolent's business model.[65]  Subsequently, the price of Evolent Common Stock fell, harming investors who bought at inflated prices.[66]

## IV.    IMPORTANCE OF ALLEGED MISSTATEMENTS AND OMISSIONS

38.    The alleged misstatements and/or omissions in this case were important in nature to investors.  While I am not a lawyer and I do not offer a legal opinion, in this analysis I consider the definition of "material" as articulated by the United States Supreme Court:

> An omitted fact is "material" for purposes of Section 10(b) if there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[67]

39.    Therefore, the relevant question is whether the allegedly misrepresented and concealed information regarding the fact that rather than reducing costs for Passport and

---

[62] "Evolent Health Expands Partnership with Passport Health Plan to Support Medicaid Beneficiaries in the Commonwealth of Kentucky," *PR Newswire*, May 29, 2019, 6:30 AM.

[63] *Id*.

[64] Evolent's willingness to keep Passport solvent is evident in discovery.  For example, Passport support is listed first for "Critical Path Items" and includes "Support for solvency" and lists Passport as a "Core backbone of company profitability."  *See* EVH00086007.

[65] Complaint ¶¶ 127, 212-215.

[66] Complaint ¶¶ 13, 210-211.

[67] Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011).

delivering on its touted savings, Evolent was unable to provide value to Passport, thus rendering

Evolent's revenue and profit generated from business with Passport unsustainable.  As

shorthand, hereinafter I will use the term "material" for this concept.

40.    I conclude that the alleged misrepresentations and omissions were material and

would have been viewed by a reasonable investor as significantly altering the "total mix" of

information.  I base this opinion on: (1) Evolent's own public statements indicating the

importance of Passport to achieve Evolent's financial goals; (2) internal documents showing that

Passport was a priority to Evolent and Defendants; (3) analyst commentary demonstrating that

the market relied upon Defendants' statements concerning Evolent's ability to lower Passport's

costs to the financial benefit of both firms; (4) the application of basic economic and valuation

principles whereby Passport's worsening financial condition and financial insolvency would

negatively affect Evolent's financial performance; and (5) my event study analysis, which

demonstrates statistically significant negative declines in the price of Evolent Common Stock

upon correction of the alleged misstatements and/or omissions.

## A.    EVOLENT'S AND DEFENDANTS' PUBLIC STATEMENTS

41.    Statements made by Defendants during conference calls with securities analysts and

investors and in filings with the SEC prior to, and throughout the Class Period, demonstrate the

importance to investors of accurate information regarding Evolent's partnership with Passport.

Since Passport was Evolent's largest partner – comprising a "significant portion" of the

Company's revenues prior to and during the Class Period (as discussed above in **Section III.A**) –

the Company's current and future financial performance depended on Evolent's ability to deliver

on its touted savings to Passport and maintain it as a key client.  Passport was of such

significance to Evolent that Defendants routinely touted their partnership with Passport and its

22

positive impact on Evolent's financial performance during many conference calls before and

during the Class Period, such as:

> *Defendant Williams:* In terms of anticipated growth across our existing partner base, **we've successfully launched Passport**, and as of today, an additional 150,000-plus lives for Cook County onto our health plan services platform, **which should contribute meaningfully to our revenue in 2018**.[68]

> *Defendant Williams:* When prospective partners see the level of investment, the distinctive clinical and administrative capabilities and leading organizations, such as Passport, committed to best practice in vital areas such as social determinants of health, it becomes an easy decision to become an integral part of the network. Our development team is constantly getting feedback from network partners, prospects and policymakers to prioritize the next areas for investment to ensure that we stay on the cutting edge of what's possible in delivering world-class care to Medicaid beneficiaries. **Exciting progress and heartening to see such a high return on the investment we initiated roughly 2 years ago with Passport.**[69]

> *Defendant McGrane:* Adjusted Platform and Operations revenue accounted for $114.7 million, or 91.9% of our total adjusted services revenue for the first quarter, representing an increase of $18.2 million or 18.8% compared to the same quarter last year. **The increase was driven primarily by new partners that went live in the first quarter as well as growth in some of our existing partners, particularly Passport** and Cook County.[70]

> *Defendant McGrane:* Adjusted platform and operations revenue accounted for $117.2 million or 93.4% of our total adjusted services revenue in the second quarter compared to $102 million in the same quarter last year. **This increase was driven primarily by new partners that went live in the first and second quarter as well as growth from some of our existing markets, particularly with Passport** and Cook County.[71]

> *Defendant McGrane:* On a year-over-year basis, the increase in adjusted services revenue was primarily driven by new partners that went live in the first and second quarter as well as growth from existing markets, **particularly with Passport** and Cook County.[72]

---

[68] "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ*, November 2, 2017, 5:00 PM, p. 6.

[69] "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 9, 2018, 5:00 PM, p. 6.

[70] "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 9, 2018, 5:00 PM, p. 7.

[71] "FQ2 2018 Earnings Call Transcripts," *S&P Capital IQ*, August 7, 2018, 5:00 PM, p. 7.

[72] "FQ3 2018 Earnings Call Transcripts," *S&P Capital IQ*, November 6, 2018, 5:00 PM, p. 8.

*Defendant Williams:* **The fourth and final pressure point is related to Passport**, a Medicaid health plan with over 300,000 lives that we support in the Commonwealth of Kentucky. **Passport has been a valued partner since 2016**, and we provide a range of support services, including third-party administrative claims processing, pharmacy benefit management and clinical program and care management support through the Identifi platform.[73]

*Defendant McGrane:* **And given the recent press coverage, we're going to provide a note on Passport**. Revenues from Passport Health included in our guidance represents approximately 10% to 12% of our total adjusted revenues for the full year… And again, with respect to Passport, revenues from Passport Health included in our first quarter guidance represents approximately 12% to 13% of our total revenues for the first quarter.[74]

*Defendant Williams:* Lastly, **Passport is an important partnership for us, and we want to proactively support strong performance operationally, clinically and financially** with the ultimate objective to most effectively serve Kentucky's Medicaid beneficiaries.[75]

*Defendant Williams:* Lastly, **one of our other important focus areas is helping to stabilize Passport Health Plan.** As many of you are aware, Passport, a provider-owned Medicaid plan based in Louisville, has experienced significant financial pressure based on the decrease in retroactive bridge Medicaid reimbursement rates announced by the Commonwealth of Kentucky last September. We feel that the recent rate increase from the Commonwealth of Kentucky effective as at April 1, better reflects trend and represents the step in the right direction. At the same time, **we continue to partner with Passport to drive performance improvement in all aspects of operations** in an effort to insulate the health plan as much as possible from potential rate volatility in the future. These improvements are needed in addition to the recent rate increase and will take some time to implement given provider notice period and approvals required. Currently, we're pursuing several major initiatives in close collaboration with the Passport leadership team.[76]

42.    Evolent's SEC filings similarly establish the importance of Passport to Evolent.

The Company's SEC Form 10-K for the year ended 2018, for example, demonstrates that

---

[73] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 7.

[74] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 9-10.

[75] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 10.

[76] "FQ1 2019 Earnings Call Transcripts," *S&P Capital IQ*, May 7, 2019, 5:00 PM, p. 6.

Passport's insolvency could cause Evolent significant financial damage, reputational harm, as well as potentially hinder its operational capacity and ability to pursue other opportunities as seen from the following excerpts:

> Risks and uncertainties that may cause actual results to vary materially… include… the significant portion of revenue we derive from our largest partners, ***and the potential loss, termination or renegotiation of customer contracts [and] uncertainty relating to expected future revenues from and our relationship with our largest customer, Passport, including as a result of ongoing litigation pertaining to rate adjustments and Passport's ability to remain solvent,*** which among other things could result in significantly reduced fees or a significant customer loss in 2019…[77]

> Additionally, ***if a partner, including Passport, were to lose applicable licenses, go bankrupt, lose liability insurance, become insolvent, file for bankruptcy or receive an exclusion, suspension or debarment from state or federal government authorities,*** our contract with such partner could in effect be terminated. The loss, termination or renegotiation of any contract ***could negatively impact our results.***[78]

> The sudden loss of any of our partners, ***including Passport,*** our strategic alliance partner, or the renegotiation of any of our partner contracts, ***could adversely affect our operating results.***[79]

> Recent rate changes in Kentucky have negatively impacted Passport, our largest partner in terms of revenue for 2018, and ***could significantly harm our business, financial condition and results of operations.***[80]

> However, this lawsuit, the rate reductions and surrounding publicity could result in reduced enrollment for Passport, provider disruption and reputational impact for both Passport and the Company. In addition, these matters could result in significant reductions of the fees we receive from Passport***. If Passport were to become insolvent or cease to operate, we would no longer receive fees from Passport. As a result, the ongoing situation and the ultimate resolution thereof could negatively impact our business, financial condition and results of operations***, as well as the

---

[77] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. ii.

[78] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 8.

[79] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 15.

[80] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 16.

prospects for the joint investment we have made with Passport in the Center of Medicaid Excellence in Louisville, Kentucky.[81]

In addition, any factor that diminishes our reputation or that of our management, including failing to meet the expectations of our partners, *or any adverse publicity or litigation involving or surrounding one of our joint venture partners, investors or strategic alliance partners, including for example Passport, could make it substantially more difficult for us to attract new partners.* Similarly, because our existing partners often act as references for us with prospective new partners, any existing partner that questions the quality of our work or that of our employees could impair our ability to secure additional new partners. Therefore, financial adversity of our partners' affiliated health plans may adversely affect our reputation.[82]

43.    As the foregoing demonstrates, Defendants repeatedly stated that Evolent's partnership with Passport and Passport's financial performance were highly material to the Company. Evolent relied on Passport for a significant portion of its revenue, and as shown by Defendants above, Passport was critical to Evolent's financial performance and future expected financial performance. Defendants warned in SEC filings that the loss of Passport as a partner or its insolvency would have a material adverse impact on Evolent. For these reasons, truthful information regarding the sustainability of Passport's business was important to the market. The Company's public statements above also demonstrate that Defendants routinely updated the market on the state of the partnership and Passport's operations. Therefore, the alleged misstatements and omissions that concealed the relevant truth that Evolent was not providing benefits to Passport, therefore rendering the revenue and profit generated from Passport unsustainable and calling Evolent's business model into doubt, was important to the total mix of information for a reasonable investor.

---

[81] *Id.*

[82] Evolent Health, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 21.

## B.    INTERNAL DOCUMENTS

44.    Internal documents reaffirm that Passport was a priority to Evolent and Defendants. Correspondence between Defendants and other Evolent staff members demonstrates the importance of Passport to the Company's financial performance and future expected financial performance.  The urgency with which Passport's solvency was discussed demonstrates the critical nature of the issue to the Company, and the preparation of Evolent's staff should they be questioned on Passport highlights the perceived market interest in the success of the partnership between the two companies.

45.    Defendant Williams stated in an email that "Passport should be [Evolent's] number one (drop everything) priority."[83]  A spreadsheet detailing Evolent's priorities for 2019 listed "Passport Support" as the first item.[84]  One of the focus areas under this item was "[s]upport for solvency," which would be impactful on 2019 and 2020 as it was the "[c]ore backbone of company profitability."[85]  Similarly, under the "Protect and grow our top relationships" section of a list of "Macro Strategic and Business Priorities," the first partner listed was Passport.[86]

46.    Several other internal communications show that efforts were made to ensure Evolent staff was briefed on Passport and knew how to address the partnership when questioned. Kim Conquest, Evolent's Senior Director of Corporate Communication, assembled a list of frequently asked questions and talking points and sent them to "Market-Facing Leaders" at Evolent in the instance that their "contacts are tracking news coverage surrounding Passport's rate dispute with the Commonwealth of Kentucky and Evolent's relationship with Passport," and

---

[83] EVH00208937 at -937.

[84] EVH00086007.

[85] *Id.*

[86] EVH00108215 at -215 and -218.

are asking "what [Evolent's] position is on the situation and the press coverage."[87]  Conquest also put together a list of investor relations ("IR") talking points addressing public speculation regarding Passport's Medicaid contract, stating that "Evolent's 2018 financial results reflect the rate pressure Passport has been facing."[88]  Similarly, Defendant Williams wrote in an email to other senior Evolent employees that at an upcoming investor conference, it was "important for [Evolent] to articulate a clear path and plan on Passport," to such an extent that they thought it would be worthwhile to "spend time on scripting" in preparation.[89]

47.    Moreover, both internal documents and Defendants' public statements demonstrate that Passport was not only Evolent's most significant client by revenue, but was also the centerpiece of a strategy to market Evolent's services to other Medicaid plans.  For example, Evolent explicitly created a Strategic Growth Committee that would "confer periodically on strategies to expand Evolent's nationwide business using Passport's managed care business as the model and the [Medicaid Center of Excellence] as the catalyst."[90, 91]  During his deposition, Passport's former CFO during most of the Class Period, David Stanley, confirmed that this was one of Evolent's goals in the Evolent-Passport relationship, explaining that "Evolent wanted Passport to succeed because they wanted Passport to be their flagship Medicaid program that they could take on roadshows as they tried to expand their Medicaid base across the country,"

---

[87] EVH00086025 at -025.

[88] EVH00209254 at -254.

[89] EVH00103820 at -820.

[90] EVH00549771 at -772.

[91] I understand that the Medicaid Center of Excellence was a project created as part of the Evolent-Passport partnership that was to be used both to service Passport and to market Evolent's services to other Medicaid plans. *See* "Passport Health Plan and Evolent Health form Strategic Alliance to create Medicaid Center of Excellence in Louisville," *PR Newswire*, February 2, 2016, 9:00 AM.

explaining further that Evolent wanted to say, "you know, look at Passport. Here's what we can do for Medicaid programs… so Passport was critically important… to the folks at Evolent."[92]

48.    Defendants also highlighted the importance of Passport to their business development in public investor calls both before and during the Class Period.  For example, on January 11, 2017, Defendant Williams stated at the JP Morgan Healthcare Conference, "The Medicaid Center of Excellence in Louisville, with Passport, that has gotten us into some really interesting statewide conversations across the country."[93]

49.    Similarly, on the May 11, 2018 Investor and Analyst Day Call, Evolent's then-COO Tom Peterson stated:

> [T]he partnership with Passport was really an opportunity for us to establish a proof point. When you're going out and trying to win business in other states, the bulk of the RFPs are all based on your track record and your experience, and the ability to have a partner that we can reference in terms of that track record.[94]

50.    Passport's importance to Evolent also manifested itself in Evolent's actions once Passport faced financial distress.  Shortly after Passport filed its lawsuit against Kentucky, Defendant Blackley, along with Evolent COO Tom Peterson and Passport CEO Mark Carter, went so far as to set up a so-called "war room" in Kentucky in order to "ensure [they] are rapidly getting the assumptions correct on a path to solvency."[95]  Defendant Blackley stated that the group "need[ed] to be physically in the same room … and push through this work together," and travel to Kentucky the very next day.[96]  The next week, correspondence at Evolent described

---

[92] Stanley Deposition Tr. 184:9-13; 184:19-185:4.

[93] "Company Conference Presentation," *S&P Capital IQ,* January 11, 2017, 2:30 PM, p. 6.

[94] "Analyst/Investor Day," *S&P Capital IQ,* May 11, 2018, 8:30 AM, p. 22.

[95] EVH00103307 at -307.

[96] *Id.*

some of the priorities from the war room: COO Peterson wanted to ensure that senior Evolent employees had a weekly presence at Passport, and "to make sure [they] are maintaining the priority of daily war room calls."[97]  The urgency with which the "war room" was set up, including the attendance of Evolent's President and COO, as well as the promise to maintain its atmosphere clearly demonstrates that Passport was critical to Evolent and Defendants.

## C.   ANALYST COMMENTARY

51.    During the Class Period, securities analysts routinely discussed Passport and its financial significance to Evolent when reporting on the Company.  This provides further evidence of the importance of the allegedly false and misleading statements made by Evolent and Defendants to investors (and what they concealed from the market).  Throughout the Class Period, analyst reports and questions at conference and earnings calls demonstrated that analysts understood full-well the interconnected relationship between Passport and Evolent in the market, and that Passport was a topic of critical importance to the market in discussing Evolent's performance.

52.    Analysts discussed Passport at length in their reports, making clear connections between Passport's financial health and solvency and the price of Evolent Common Stock after the partnership between the companies was announced in 2016 and throughout the Class Period. The reports highlighting this relationship began as early as the day following the announcement of their partnership:

> *J.P. Morgan*: Earlier this week ***Evolent announced a strategic alliance with a Medicaid health plan in Kentucky that will add meaningful incremental revenue, aid future growth in Medicaid, and should also help alleviate some concerns about the pace of long-term client wins ahead of 2016 revenue guidance.*** Passport Health's 280k members will be added to EVH's platform over the coming months, and we estimate a revenue contribution of

---

[97] EVH00110133 at -133.

$12M in 2016 (representing 5-6% of top-line growth), ramping towards a full annualized run rate of $20M (~9%).[98]

*J.P. Morgan*: Upside vs. our model was driven by incremental lives, which reached more than 1.2M, above the 1.1M level the company had already reached at the time of the last earnings call at the end of February and compared to 718k at the end of 2015 (**with growth in the quarter driven by the new Passport partnership**).[99]

*William Blair*: To this end, management highlighted how it is working with Passport Health—its largest client as measured by sales—to drive adoption of the Valence platform. **Of note, Passport Health was already Evolent's largest partner (again, by sales), having signed a 10-year agreement in February 2016 that brought nearly 300,000 lives and $1.7 billion in premiums to the Evolent platform.**[100]

*Piper Jaffray:* **One of EVH's largest customers, Passport,** resides in Kentucky, **and comprised 20% of EVH's revenue in 2017, and we estimate it'll comprise at least 14% of revenue in 2018.**[101]

*Piper Jaffray*: EVH's largest client is under pressure due to changes to the capitation payments for Louisville residents, and **the solvency of the plan is an incremental risk/overhang on the shares.**[102]

53.    On several occasions, analysts highlighted the purported savings produced by Evolent for Passport, signifying that this was a critical metric in their evaluation of the partnership and Evolent's stock performance.  For the same reason, these passages on savings indicate that the market was totally unaware of the ineffectiveness of the services that Evolent was providing to Passport and the financial impact this was having on the Kentucky plan. Indeed, a  May 11, 2018 William Blair report reproduced, in full, Evolent's slide representing that a "Full risk partner achieves MLR / ALR reduction impact representing $100M identified

---

[98] "Passport Health Partnership Adds Revenues and Strengthens Medicaid Capabilities," *J.P. Morgan*, February 3, 2016.

[99] "1Q16 Results Beat Expectations with Higher Revenue & Member Lives," *J.P. Morgan*, May 12, 2016.

[100] "Highlights From 2017 Analyst Day; Remains a Top Long-Term Pick," *William Blair*, May 11, 2017.

[101] "Waived Kentucky Waiver Mitigates Enrollment Risk," *Piper Jaffray*, July 2, 2018, 6:56 PM.

[102] "Passport is a Happy Client, Despite Local Media Reports," *Piper Jaffray*, January 31, 2019, 2:54 AM.

annual savings" – one of Plaintiffs' alleged false statements – and noted that "management

highlighted its investment experience with Passport Health and the Medicaid Center of

Excellence, which has allowed the company to develop valuable expertise and apply it across its

entire client base to generate greater savings (and thus stronger interest in partnering with

Evolent amount [*sic*] other managed Medicaid providers)."[103]  Other analysts similarly focused

on Evolent's purported ability to generate "significant savings" for Passport (and, thus, for

"clients like Passport").  For example:

> *Baird*: Finally, established clients like Passport highlighted significant savings… Passport Health (EVH's largest client) has been able to reduce health plan MLR by 5% (or $75M) ...[104]

> *Cowen:* In 2017, the partnership [with Passport] dove [*sic*] $75M in savings and a 5% improvement in MLR.[105]

> *Cantor Fitzgerald*: EVH and Passport formed a strategic alliance in 2016 to create a Medicaid Center of Excellence. […] The partnership has been successful so far. Passport was able to generate over $75 million in medical expense savings in 2017 driven primarily by pharmacy improvements as well as utilization and claims management.[106]

> *Jefferies*: The combination of EVH and Passport's strengths has already helped Passport take 500 bps out of its medical spend.[107]

54.    During Evolent conference calls and presentations analysts regularly asked about

Passport and implied that Defendants' answers would be important in their analysis of Evolent's

performance:

---

[103] "Highlights from 2018 Analyst Day; Remains a Top Long-Term Pick," *William Blair*, May 11, 2018.  Indeed, at p. 3, the analyst report even reproduced the slide representing "Full risk partner achieves MLR / ALR reduction impact representing $100M identified annual savings", one of the alleged false statements.

[104] "IR Day Highlights, Definitely Back on Track," *Baird*, May 11, 2018, *see* EVH00224237 at -287.

[105] "EVH Investor Day Provides Insight from Partners," *Cowen*, May 11, 2018, *see* EVH00224237 at -294.

[106] "Key Takeaways from Analyst Meeting Support our Investment Thesis; Overweight," *Cantor Fitzgerald*, May 13, 2018.

[107] "Key Insights from EVH's 2018 Investor Day," *Jefferies*, May 14, 2018, 12:00 AM.

*Piper Jaffray*: So on Passport, can you give us any of your views on maybe likely scenarios that are going to happen? I know you can predict the future and it's going to court, but **just exactly how that is factored into guidance and how we should think about that as we form our estimates?** And also what is the -- I know that you said, 10% to 12% of revenues -- but **how were they on a profitability standpoint for you guys?**[108]

*Baird*: And then as a quick follow-up. I thought you all made a comment that the guidance assumes a little bit more conservatism with respect to Passport. **And so I was just trying to understand what was assumed in the 2019 guidance with respect to the Passport revenue?**[109]

*Baird*: For Passport Health, I appreciate the comments you provided. **Should we think about Passport as being on stable financial footing or are there some hurdles that they still need to overcome before they're on a sort of stable trajectory?**[110]

*Citi*: So Frank, going back to your prepared remarks on Passport, can you give us more detail on some of these new initiatives like specialty care management and the clinical initiatives? And as a follow-up to that, **how should we think about Passport revenue growth for the year, just given the puts and takes of the new offerings and the rate concession?**[111]

55.    After the first Corrective Disclosure Event, analysts attributed much of their concern surrounding Evolent to uncertainty around Passport, with one analyst going as far as calling the risk of losing Passport "existential" to Evolent[112], especially as the Company's largest source of revenue:

*Piper Jaffray*: At 1x EV/2019E Revenue, EVH is now a "plug your nose and buy it" stock. With many moving parts in the 2019 guide, **there are plenty of reasons to be skeptical, including the still outstanding issue of the financial viability of Passport.** Nobody said the transition to value-based care would be easy, and EVH's results prove this point. But we're sticking with it while it's at its lows, because value-based care will come...eventually. **We are lowering our target multiple to 1.5x (from 3x) to**

---

[108] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ,* February 26, 2019, 5:00 PM, p. 15.

[109] "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ*, February 26, 2019, 5:00 PM, p. 17.

[110] "FQ1 2019 Earnings Call Transcripts," *S&P Capital IQ*, May 7, 2019, 5:00 PM, p. 15.

[111] "FQ1 2019 Earnings Call Transcripts," *S&P Capital IQ*, May 7, 2019, 5:00 PM, p. 20.

[112]  "EVH's Passport Relationship Catches a Break," *SunTrust Robinson Humphrey*, April 10, 2019.

*account for the slower growth and uncertainty regarding Passport, which brings our PT down to $19 (from $33).*[113]

*William Blair:* **Passport Health, the company's largest client (again 10% to 12% of the 2018 sales guidance),** is facing financial distress following Medicaid rate cuts by the state of Kentucky, and management provided only limited novel commentary (not overly surprising given that Passport is now involved in a lawsuit against the state). That stated, we continue to look for a positive resolution to the matter, and we believe that Evolent has been a key partner for the plan (helping it markedly through past financial pressures) versus any cause of the issue. **Still, we acknowledge that the Passport-related noise will remain a key overhang on the stock until the matter is resolved (a hearing is scheduled for March 5, 2019).**[114]

*Forensic Research Group*: Finally, the guidance provides no real clarity on the Passport outcome, and instead merely takes an arbitrary haircut to its FY'19 contribution. **In a best case scenario, Passport stays in business at reduced rates and profitability, which will only hurt Evolent further. In the worst case, Evolent losses [sic] +10% of its revenue and even more its already paltry EBITDA.**[115]

*SunTrust Robinson Humphrey*: We reiterate our Buy rating but lower our PT to $19 (from $25). Specifically, EVH is getting hit with several early year, one-time head winds that led us to cut our growth outlook through 2020. **Additionally, EVH may lose its largest client (Passport) if the organization does not get reimbursement relief from the state of Kentucky, which led us to cut our PT multiple to 1.9x EV/Sales (from 2.3x).** Despite those pressures, EVH has its strongest pipeline in years. In our view, the company looks poised to have a strong 2H19, which would set up for double-digit organic growth in 2020.[116]

*William Blair*: In our view, news of this rate update—paired with recent cost-reduction efforts—is a positive development as Passport solvency has been an overhang on Evolent shares. **More specific, Passport Health is the company's largest client (10% to 12% of 2019 sales guidance), and concerns regarding Passport Health's long-term solvency have been top of**

---

[113] "Value-Based Care – You're Always a Day Away," *Piper Jaffray*, February 27, 2019, 3:25 AM.

[114] "Solid End to 2018; As Anticipated, Initial 2019 Guidance Below Expectations," *William Blair*, February 26, 2019.

[115] "Evolent Health: Company Commentary," *Forensic Research Group*, February 27, 2019, 9:02 AM.

[116] "Keeping the Towel on the Shoulder; PT to $19," *SunTrust Robinson Humphrey*, February 28, 2019.

*mind with investors since the managed Medicaid entity faced recent rate cuts.*[117]

*SunTrust Robinson Humphrey:* ***Existential risk related to Passport Health Plan*** (private) staved off for now, in our view.[118]

*William Blair:* ***Regarding key highlights, recall in April, Passport (Evolent's largest customer at about 10% to 12% of 2019 guidance)*** received finalized Medicaid payment rates that removed near-term solvency risk and are expected to boost Passport's sales (and profits) by about $80 million annually (our thoughts can be found in our flash note).[119]

56.     Analysts routinely listed Evolent's reliance on Passport for a significant portion of its revenue as a risk.  The following are examples of risks which are repeated in Evolent analyst reports prior to and throughout the Class Period:

*J.P. Morgan*: ***Of note: EVH's largest partner Passport Health Plan comprised 20.6% of revenue in 2017***…[120]

*Cantor Fitzgerald*: Reliance on large customers. ***In 2017, one customer [Passport] accounted for about 20.6% of total revenue.*** In 2016, Evolent's three largest customers - Passport Health Plan, Indiana University Health Plan and MedStar Health, Inc. - accounted for 19.6%, 14.5%, and 12.7% of revenue, respectively, or collectively, 46.8% of total revenue. We expect this concentration to decline as the customer base grows. The acquisition of Valence Health in October 2016 also increased its revenue diversification. A loss of, or non-renewal by, one of its top customers could have a significant impact on results.[121]

*Oppenheimer*: Beyond political and regulatory uncertainty, notably around value-based payments (VBPs), ***risks include client concentration (No. 1 client Passport is ~21% of total)***…[122]

---

[117] "Flash Note: Kentucky Rate Update Could Put Passport Back in the Black – But Some Uncertainty Remains," *William Blair*, March 21, 2019.

[118] "EVH's Passport Relationship Catches a Break," *SunTrust Robinson Humphrey*, April 10, 2019.

[119] "Another Partnership, Solid Quarter Brings Incremental Confidence in Back Half 2019 Growth Acceleration," *William Blair*, May 7, 2019.

[120] "Getting HIPAA to Healthcare IT," *J.P. Morgan*, April 24, 2018, 3:00 AM.

[121] "Looks in the Mirror with Pop Health Acquisition; Raise PT; Reiterate Overweight," *Cantor Fitzgerald*, September 12, 2018.

[122] "New Century Boosts Exposure to Fast-Growing MA Market, Brings Higher PMPM with Upside," *Oppenheimer*, September 12, 2018, 10:55 AM.

57.    As shown by the quotes above, analysts reporting on Evolent had a clear interest in Passport and its financial condition given its relationship with the company.  It is also evident that Passport's solvency concerns had substantial implications with regard to Evolent's financial health, a fact that analysts considered when making stock recommendations and determining target prices.  It therefore follows that accurate and truthful information regarding the fact that Evolent's business with Passport was unsustainable because Evolent was not providing any net benefit to Passport, but rather costing Passport more net of any benefits would have been important to the mix of information for a reasonable investor, given the importance of Passport to Evolent both as a source of revenue and as an exemplar Medicaid client.

## D.  ECONOMIC AND VALUATION PRINCIPLES

58.    A fundamental principle of financial economics holds that the value of a security is equal to the present value of expected future cash flows to holders of that security.[123]  In other words, a security's value is the sum of the estimated future cash flows discounted at a rate that reflects their riskiness.[124]  All else held equal, a decrease in a company's future revenue or future earnings reflects a decrease in the cash flows to the common stockholders, and thus causes a decrease in the value of the security.

59.    Passport had a singular importance to Evolent's financial performance.  As outlined above in **Section IV.A**, Passport's fees contributed to a substantial portion of Evolent's overall annual revenue throughout the Class Period and Passport was Evolent's largest customer by revenue.  Further, as evident by the examples above in **Section IV.A** and **Section IV.B**,

---

[123] *See, for example*, Richard A. Brealey & Stewart C. Myers, "Principles of Corporate Finance," *McGraw-Hill,* Tenth Edition, 2011, pp. 90-93 and Aswath Damodaran, "Investment Valuation, Tools and Techniques for Determining the Value of Any Asset," *John Wiley & Sons,* 1996, pp. 9-10.

[124] Aswath Damodaran, "Investment Valuation, Tools and Techniques for Determining the Value of Any Asset," *John Wiley & Sons,* 1996, pp. 9-10.

Defendants represented that Passport would continue to not only be a successful customer for

Evolent, but also a steady revenue stream. Thus, investors were factoring in expected future cash

flows from Passport into the present value of Evolent Common Stock. In the event that Passport

could no longer pay its fees to Evolent, this would have adverse impacts on Evolent's financial

performance by eliminating this vital revenue stream and threatening Evolent's ability to execute

on its business model. Specifically, as outlined in examples above in **Section IV.A**, loss of

Passport as a customer could have multiple effects. First, the loss of sales from Evolent's most

important customer and largest client by revenue would have a direct negative financial impact

on Evolent's financial condition, and second, the loss of Passport could cast doubt on the

efficacy of Evolent's services at reducing costs for other Medicaid plans, thus inhibiting

Evolent's ability to attract new clients or maintain existing customers. Thus, because a loss of

revenue due to Evolent's failure to provide the savings it promised Passport directly impacts the

cash flows available to common stockholders, which in turn impacts a company's stock price,

the loss of revenue from Passport would have direct implications on the price of Evolent

Common Stock, and based on fundamental valuation principles, investors would view the

concealed information and the alleged misstatements and omissions to be important to the total

mix of information.

### E.  EVENT STUDY

60.  A technique often relied upon both inside and outside of the context of litigation to

establish a causal connection between new company-specific news events and movements in the

market price of a security is called the "event study." An event study is a well-accepted

statistical method utilized to isolate the impact of information on market prices.[125]  Event studies

have been used for over 40 years and have appeared in hundreds if not thousands of academic

articles as a means of generating scientific evidence to evaluate how new information affects

securities prices.[126]

61.    An event study is a technique used to measure the effect of new information on the

market prices of a company's publicly traded securities.  New information may include, for

example, company press releases, earnings reports, SEC filings, and news reports or analyst

reports.  An event study is conducted by specifying a model of expected price movements

conditioned on outside market factors and then testing whether the deviation from expected price

movements is sufficiently large so that simple random movement can be rejected as the cause.

62.    Here, as in my Efficiency Report, I performed an event study.[127]  The event study is

used to determine whether Evolent's Common Stock reacted to the release of fraud-related

information in a statistically significant manner after controlling for market and industry

factors.[128]  **Exhibit 1** summarizes the results of my event study on the Corrective Disclosure

Events and demonstrates that there was a statistically significant negative price movement

beyond the 95% confidence level (as well as beyond the 99% confidence level) on the two

Corrective Disclosure Events.  This provides direct scientific evidence of the importance of the

---

[125] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature,* Vol. XXXV, March 1997, pp. 13-39.

[126] John J. Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting,* Vol. 11, 1998, pp. 111-137.

[127] The underlying regression model used for the event study remains unchanged from my Efficiency Report.  For further details about the event study, see my Efficiency Report, Section VII.F.

[128] In other words, my regression methodology specifically isolates and removes any market-wide or industry-wide phenomenon that may have been affecting the price of Evolent Common Stock.

alleged misstatements and omissions (the linkage between the misrepresentations and omissions and the Corrective Disclosure Events is discussed in greater detail in **Section VI**).

63.     For all the reasons discussed above, the alleged misrepresentations and/or omissions would have been viewed by a reasonable investor as having significantly altered the total mix of information available.  Thus, I conclude that the alleged misstatements and/or omissions in this case were important to investors.

## V.     LOSS CAUSATION

64.     For purposes of my report, I consider loss causation to be a combination of the "but for" test and the "foreseeability" test.  In other words, would Plaintiffs have suffered an economic loss "but for" the Defendants' alleged violations, and was the economic loss a foreseeable consequence of Defendants' alleged violations?  The roles for economists in this type of inquiry include evaluating the economic impact of the alleged violations and determining whether there is economic evidence to link price declines (if any) to the revelation of the prior alleged misstatements or omissions.

65.     First, I address why, in my view, there is a foreseeable causal link between Defendants' alleged misrepresentations and omissions and the Corrective Disclosure Events. Second, I explain how the event study methodology I employ demonstrates that the Corrective Disclosure Events caused economic loss to Class Members.

### A.   INVESTOR LOSSES WERE FORESEEABLE

66.     As explained above, Plaintiffs' allegations are that Defendants misstated and omitted material facts related to the fact that rather than reducing costs for Passport, Evolent was unable to provide value to Passport, and in fact caused Passport to incur costs in excess of any benefits, thus rendering Evolent's revenue generated from business with Passport unsustainable.

The alleged misrepresentations and/or omissions regarding Evolent's ability to add value to Passport, and thus the sustainability of Evolent's business with Passport, were allegedly false and misleading for a number of reasons including, but not limited to, (1) that Evolent was not reducing Passport's costs, but rather raising them; (2) that Evolent knew of and failed to disclose evidence of Passport's worsening financial condition due largely to Evolent charging excessive fees and increasing Passport's costs while failing to provide touted savings; and (3) that Evolent would have to acquire Passport in order to protect its revenue and profit from the Passport business.

67.    As discussed above in **Section IV.D.**, a generally accepted economic principle is that the value of a security is directly related to expectations of future cash flows to holders of that security.  Evolent's practice of charging its largest client Passport high fees for deficient services threatened Evolent's financial performance through a foreseeable loss of revenue from Passport (and potential loss of revenue from future clients due to a tarnished reputation).  Because of the economic link between revenue and the Company's anticipated future cash flows, and the link between anticipated future cash flows and the market value of Evolent Common Stock, there is a clear economic link between information regarding (1) the sustainability of Evolent's revenue and profit generated from the Passport business; and (2) the fact that rather than reducing costs for Passport, Evolent caused Passport to incur costs in excess of any benefits, thus providing no value to Passport, and the market value of Evolent Common Stock.  As a result, it is entirely foreseeable that failure to disclose Evolent's inability to produce value for Passport, and the worsening financial condition and acquisition of Passport as a result would harm investors when the corrective information came to light.  Therefore, it is my opinion that there is a direct and foreseeable causal link between the allegations of misrepresenting and/or

omitting adverse information related to Evolent's ability to provide value to Passport by reducing

Passport's clinical and administrative costs, the resulting unsustainability of Evolent's revenue

and profit from Passport, and the subsequent economic loss that occurred on the Corrective

Disclosure Events.

### B. THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES

68.     Economists assessing loss causation typically conduct an event study to evaluate

whether there is economic evidence to link corrective information regarding prior misstatements

or omissions to price declines in the subject security.  Based on the alleged misrepresentations

and omissions and my understanding of loss causation principles, any news that revealed new

information regarding the fact that Evolent was incapable of providing value to Passport (i.e.,

rather than reducing costs for Passport, Evolent provided Passport no benefit net of their fees,

and mismanaged Passport's claims), or that Evolent's revenue and profit from Passport was

unsustainable would be deemed corrective.  Two events, described below, meet this criterion.

69.     In determining which event(s) constituted the release of corrective information, I

gathered and reviewed Evolent and Passport news events during the Class Period.  Among other

items, my news search included a multitude of articles obtained from Factiva,[129] numerous

analyst reports issued by equity research firms covering Evolent, SEC filings issued by Evolent,

and Company press releases, conference call transcripts, and presentations.  My evaluation of

what information represents corrective information did not depend on the market response, but

rather whether it revealed new information that was allegedly misrepresented or concealed in this

---

[129] Factiva is a business information and research tool owned by Dow Jones & Company.  Factiva aggregates
content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and
other information management capabilities.

matter.  I then relied upon the event study to determine whether the market reaction to the corrective information was statistically significant.

70.    **Exhibit 1** includes event study results for the Corrective Disclosure Events and demonstrates that each day is accompanied by a statistically significant negative price reaction at the 95% confidence level (as well as beyond the 99% confidence level).

71.    I now describe below the basis for inclusion of the Corrective Disclosure Events, specifically how new Company-specific information released to the market was corrective of Defendants' misrepresentations and/or omissions and the impact the release of the information had on the price of Evolent Common Stock.

## VI.    ANALYSIS OF THE CORRECTIVE DISCLOSURE EVENTS

### A.    FEBRUARY 19, 2019[130]

72.    The first Corrective Disclosure Event took place on Friday, February 15, 2019 when Passport filed a lawsuit against the Commonwealth of Kentucky that indicated Passport would violate the capital threshold necessary to continue operations within weeks unless it received an increase in its Medicaid capitation payment rates.[131]  More specifically, the lawsuit claimed that Passport's estimated risk-based capital threshold would "be significantly less than

---

[130] This information was released after market hours on Friday, February 15, 2019.  As noted above, Passport intended to file the complaint at noon EST on February 15, 2019, but did not issue a press release, *see* EVH00240289.  However, I have not seen any evidence that the market was aware of the complaint in substance until after the close of trading that day.  Furthermore, the NYSE was closed on Monday, February 18, 2019, in observance of "Washington's Birthday" (*see* "NYSE Group Announces 2019, 2020 and 2021 Holiday and Early Closings Calendar," *Business Wire*, December 4, 2018).  Therefore, this information would impact the market price of Evolent Common Stock on the following trading day, Tuesday, February 19, 2019.  Thus, for purposes of this report, I refer to this as the February 19, 2019 Corrective Disclosure Event.

[131] Passport Complaint ¶¶ 71-81.

the statutory threshold [of $130 million] for DOI ["Department of Insurance"] action[,]" on or

before March 1, 2019.[132]

73.    I identified the first mention of this news as being reported by *The Courier Journal*,

a Kentucky newspaper, at 4:00 PM on February 15, 2019.[133]  The article stated that "the

Louisville-based, non-profit Medicaid managed care company [Passport] could be insolvent by

March and subject to state takeover."[134]  This news alerted the market that the revenue and profit

Evolent had been receiving from Passport was at great risk because of Passport's financial

distress.  Evolent's stock price declined as the market rapidly priced in the putative potential

unsustainability of the cash flows from Passport – i.e., what Plaintiffs allege was the relevant

truth from the beginning of the Class Period.  While the lawsuit alleges that Passport's financial

distress was precipitated solely by reduced Medicaid capitation payment rates from Kentucky, as

will be analyzed below, the notion that Passport's financial distress was solely caused by reduced

Medicaid rates instead of also being the result of the Evolent's failure to provide touted savings

to Passport despite significantly increased administrative costs is not credible.[135]

74.    Analyst reports on February 19, 2019 reacted to the news of the lawsuit and

Passport's assertion that it would be insolvent by March.  Analysts likewise contacted Evolent

---

[132] Passport Complaint ¶¶ 71, 73-75, 77.

[133] "Passport sues state over rate cuts it says could put others out of business," *Courier Journal*, February 15, 2019, 4:00 PM.  The Courier Journal published a Tweet linking its article on the Passport Complaint at 4:02 PM.  This tweet was followed by at least 5 other tweets shortly after commenting on the news of the Passport lawsuit, *see* **Appendix A**.  I understand that the signature page of the Passport Complaint is dated February 14, 2019, however, the last page of the Passport Complaint indicates courtesy copies were transmitted on February 15, 2019, and the document heading reads that the complaint was filed on February 15, 2019.  *See* Passport Complaint pp. 44 and 45. This is consistent with discovery showing that the complaint was planned to be filed during the day on February 15, 2019, and that Passport did not expect news coverage until the afternoon.  *See* EVH00240289.  I am not aware of any public information being released about the Passport Complaint before 4:00 PM on February 15, 2019.

[134] "Passport sues state over rate cuts it says could put others out of business," *Courier Journal*, February 15, 2019, 4:00 PM.

[135] *See* **Section VII**.

43

for additional information regarding the lawsuit and the effect Passport's financial problems could have on Evolent.[136]

> *SunTrust Robinson Humphrey*: On Friday Passport Health (Private) filed a lawsuit with the state of Kentucky, claiming its planned cuts to Medicaid payments would force Passport into insolvency (Link; courier-journal.com) as soon as March of this year. The lawsuit seeks to bar the state from imposing the cuts that data back to July 2018. We note that January 25 article (Link; insiderlouisville.com) already noted that Passport was battling Kentucky's government over the Medicaid fee change that could "threaten its solvency and continued existence". … We estimate Passport Health accounted for ~19% of revenue in the first 9 months of 2018, with no other client accounting for greater than 10% of revenue during that time. ***Given the significant contributions to revenue, we think the loss or decrease from financial commitments from Passport could reverse the recently achieved positive adj. EBITDA and delay recognition of positive FCF. Furthermore, given the importance of Passport Health to EVH, we believe EVH will likely work to ensure the continuity of the relationship under a variety of circumstances***; this could mean the potential for certain financing arrangements, extension or write-downs of receivables, or revision of existing contracting terms.[137]

> *Piper Jaffray*: EVH's largest client Passport Health has sued Kentucky State agencies over the capitation rate cut for Region 3, where 2/3 of Passport members are based. ***If we assume EVH loses Passport as a client, we then believe EVH's 2019 guidance is at risk.*** We believe EVH remains a derivative play on payment reform, for better or for worse. At the moment it's for the worse. … Passport, which represents ~20% of EVH revenues, has filed lawsuits against the state's Cabinet for Health and Family Services and the Finance and Administration Cabinet, plus two individuals, claiming the recent rate cuts in region 3 are punitive to Passport and were done to either harm Passport, help their competition, or done with gross and deliberate indifference.[138]

75.    On the following day, February 20, 2019, analysts continued to attribute Evolent's stock price decline to the Passport lawsuit. For instance:

---

[136] *See* EVH00020583 (February 19, 2019 email from Wells Fargo analyst to Evolent CFO Nicky McGrane asking: "given the lawsuit headlines and the decline in the stock, any color would be great. Is this just a matter of the rates they pay providers being too high? The revenue exposure is pretty clear, but what about EBITDA?").

[137] "Concerns over solvency of largest client appear to be weighing on shares," *SunTrust Robinson Humphrey*, February 19, 2019.

[138] "Passport Outlook More Questionable," *Piper Jaffray*, February 19, 2019, 2:41 PM.

44

> *Canaccord Genuity*: The stock was down 13% just in the last week as news
> has emerged related to Passport Health Plan (the company's largest
> relationship) and its battle over reimbursement rates for managed Medicaid
> with the state of Kentucky.[139]

> *J.P. Morgan*: EVH traded down nearly 11% yesterday, vs. a 0.15% gain in
> the S&P 500, on reports of a lawsuit filed by the company's partner Passport
> Health vs the state of Kentucky asserting that rate cuts could push it into
> insolvency by March.[140]

76.    Media outlets echoed the news originally reported in the Courier Journal.

Louisville Business First, a local Louisville source, reported:

> The Louisville-based nonprofit insurer sued the state's Cabinet for Health
> and Family Services and the Finance and Administration Cabinet, claiming
> that the agencies violated the state's contract with Passport and that the state
> acted in bad faith by cutting payment rates for Passport while increasing
> rates for Passport's competitors.[141]

77.    The Associated Press reported: "Nonprofit sues Kentucky over Medicaid

reimbursement rates".[142]  Theflyonthewall.com published three reports on February 19, 2019 and

another report on February 20, 2019: "…Passport sues Kentucky state agencies over rate

cuts…", "…Piper says Evolent Health guidance may be at risk…", "…Evolent slips after largest

client claims state cuts could push it to insolvency", and "…William Blair cautious on Evolent

into Q2 results…".[143]

---

[139] "4Q preview and Passport update," *Canaccord Genuity*, February 20, 2019, 11:11 PM.

[140] "Digging In and Assessing Potential Headwinds; Passport Scenarios and Core Growth Math," *J.P. Morgan*, February 20, 2019.

[141] "Passport lawsuit claims state Medicaid cuts could push it to insolvency," *Louisville Business First,* February 18, 2019, 9:41 AM.

[142] "Nonprofit sues Kentucky over Medicaid reimbursement rates," *Associated Press Newswires*, February 16, 2019, 1:54 PM.

[143] "14:55 EDT Passport sues Kentucky state agencies over rate cuts, Courier Journal…," *theflyonthewall*, February 19, 2019, 2:55 PM; "15:10 EDT Piper says Evolent Health guidance may be at risk, but shares likely…," *theflyonthewall*, February 19, 2019, 3:10 PM; "15:32 EDT Evolent slips after largest client claims state cuts could push it to…" *theflyonthewall*, February 19, 2019, 3:32 PM; "09:14 EDT William Blair cautious on Evolent into Q2 results, sees risk to…,"*theflyonthewall*, February 20, 2019, 9:14 AM.

78.     While Passport representatives had previously made public statements that Passport was experiencing some degree of financial distress, and had even mentioned the possibility of insolvency, the Passport Complaint—a verified complaint signed by Passport's CEO—made clear that Passport's insolvency risk was real and imminent, and not mere posturing during a routine rate dispute with Kentucky.  Both internal Evolent documents and analyst reports discussed above support this understanding.

79.     Evolent executives readily acknowledged that the Passport Complaint was received publicly as "new news" versus prior media coverage of the rate dispute.[144]  For example, in a February 19, 2019 email, an analyst from Canaccord Genuity wrote to Defendant McGrane with a link to a news article about the Passport Complaint.  The analyst wrote:

> *Canaccord Genuity*: Getting calls on this with the stock down.  I am curious if there is anything new here from the last time we talked/emailed on this back on 1/17?  I guess today's article (link below) has people nervous that numbers are going to have to get cut since Passport ~19% of revenue (10-Q).  [The analyst then quoted the article:] 'Without an immediate rate adjustment, Passport Health Plan will face insolvency in 2019.'  Passport estimates that if rates aren't changed, it could be deemed insolvent by the end of March and that it would lose $144 million by June 30, the end of its fiscal year…  [In response, Defendant McGrane wrote:] yes we have gotten a lot of in-bounds on the topic and the lawsuit on Friday is seen as new news.[145]

80.     Similarly, analysts recognized that the filing of the lawsuit made the threat of Passport's insolvency more real.  A February 19, 2019 Baird report noted that the lawsuit "suggest[s] the dispute has again taken a very bitter turn."  Baird took note of Passport's prior public statements about its potential insolvency risk from the rate cuts, but found that the lawsuit meant that the threat was far more serious: "[w]e had previously been optimistic a resolution

---

[144] EVH00089363 at -363.

[145] *Id.*

46

between Passport Health and KY Medicaid could be negotiated, but it appears discussions have broken down."[146]  Baird further noted that "[i]n response, KY Medicaid officials reiterated that Passport has been 'unable to identify any legitimate issues with the soundness of our rates.'"[147]

81.    If Plaintiffs' allegations are accurate, then the negative information disseminated on February 15, 2019 revealed a portion of the relevant truth concealed by the alleged misrepresentations and omissions.  Specifically, Plaintiffs' allegations imply that the revenue and profit Evolent generated from Passport was unsustainable because rather than providing net financial benefits to Passport, Evolent was causing Passport financial harm.  The lawsuit was how the market ultimately learned that the revenue and profit from Passport was at great risk and may not continue.

82.    Based on my event study, Evolent's Common Stock declined by 10.59%, or $1.78 per share, after controlling for market and industry effects.  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -4.48 (see **Exhibit 1**).[148]

83.    I carefully evaluated whether there was any other news outside of the Passport lawsuit (which revealed the unsustainability of Evolent's revenue and profit from Passport) that could explain the observed Evolent Common Stock price reaction on February 19, 2019 and found none.  As discussed in more detail in **Section VII** of this report, while the lawsuit claimed that Passport's financial distress was precipitated by Medicaid capitation payment rate cuts, the rate cuts could not have independently caused Passport's financial distress and therefore it is not

---

[146] EVH00640413 at -414.

[147] *Id.*

[148] Results are based on the Daily Event Study described above in **Section IV.E.**

credible to suggest that Passport's financial distress is independent of Plaintiffs allegations regarding the financial harm Plaintiffs allege Evolent caused Passport. Indeed, as discussed below, Passport ultimately had to be financially rescued by Evolent *even though the rate cuts at issue were reversed prior to the end of the Class Period. Thus, the rate cuts do not represent a sole confounding cause of Passport's financial distress*. Indeed, Evolent analyses confirm that Passport "would be in this situation without the rate cut, though slightly less acute/urgent and they would have run out of capital later in the year versus H1."[149]

84.   I also evaluated whether additional information that was revealed on February 19, 2019 regarding enrollment data in Florida Medicaid Plans could have negatively impacted Evolent's stock price and concluded that it did not. In particular, there had already been earlier disclosures of lower-than-expected enrollment data and discussion of how this would impact Evolent which is consistent with the impact described on February 19, 2019.

85.   For example, on January 13, 2019, Canaccord Genuity understood from Evolent that Florida Medicaid enrollment was "below expectations," in January 2019, indicating that Florida enrollment data was not entirely new information and would not be expected to significantly impact Evolent's stock price:

> *Canaccord Genuity:* JPM commentary highlighted items that company will be encountering in 2019. Management discussed with investors, and us in a follow-up call, several items that should be considered when looking at growth in 2019. Some of these items were a reiteration of previous comments over the last several quarters; however, some items were new. (1) EVH reiterated that recently acquired New Century's new growth opportunities are likely a late 2H'19 and 2020 contributor to growth. (2) Management also reminded investors that recent changes to the ACO program may push some opportunities to future quarters. (3) *On Medicaid, the company remained optimistic on its new Florida managed Medicaid*

---

[149] EVH0097791 at -791.

*contracts; however, noted that enrollment in the initial start-up has been below expectations*…[150]

86.    Consequently, in the same report, the Canaccord analyst reduced their growth estimates by half in part due to the lowered expectations for enrollment in Florida managed Medicaid contracts:

> *Canaccord Genuity:* We have lowered our estimates proactively to attempt to factor in the potential impact of the items discussed above. **Previously, we were forecasting sequential growth of 12% in covered lives in 1Q'19, we have lowered that growth forecast to 6%.** This resulted in a new 2019 rev. growth forecast of 33.2% (was 38.4%). We also lowered our 2019 adj-EBITDA forecast by 30 bps to 6.6% (was 6.9%).[151]

87.    In the wake of the Florida enrollment data released on February 19, 2019, J.P. Morgan noted that they were now considering a range of revenue growth from 0% to 12% - with a midpoint of 6% - exactly what the Canaccord analyst had forecast based on the earlier reporting of lower-than-expected Medicaid enrollment:

> *J.P. Morgan*: With 1H headwinds called out in January, this could be lower depending on market share capture in Florida. […] *We see 2019 revenue ranging from $790M to $846M depending on EVH's market share capture in Florida.* Core 2019 revenue should see contribution from 5 partnerships announced in 2018, with the largest the collaboration with three provider-sponsored Medicaid plans in the State of Florida. *At the time of the Florida announcement, management expected a revenue contribution of $35-45M assuming the company could capture 12-15% share of lives at a ~$22 PMPM. With mgmt. speaking to enrollment in this region initially falling short of expectations we lay out the potential scenarios for total 2019 revenue, ranging from 0% to 12%.*"[152]

88.    In other words, the additional Florida data released on February 19, 2019 did not cause the analyst to lower expectations below what Canaccord had already forecasted based

---

[150] "Lowering '19 estimates yet optimistic long term," *Canaccord Genuity*, January 13, 2019, 11:01 PM.

[151] *Id.*

[152] "Evolent Health (EVH US): Digging In and Assessing Potential Headwinds; Passport Scenarios and Core Growth Math," *J.P. Morgan*, February 20, 2019.

49

upon previously reported lower than expected Florida Medicaid enrollment. Furthermore, only two analysts mentioned the Florida Medicaid data as relevant information released, while all other analyst reports issued in the days after the filing of the lawsuit focused primarily on the lawsuit as the relevant information the market was reacting to on February 19, 2019.

89.    In light of this analysis, I conclude that the release of Florida Medicaid enrollment data did not contribute to Evolent's negative stock price reaction on February 19, 2019. Taken together, the evidence shows that the Florida Medicaid enrollment data did not introduce analyst forecasts that were any lower than discussed prior to on February 19, 2019.

90.    As a result of the foregoing, and if Plaintiffs' claims are accurate, I find no economic evidence of information unrelated to Plaintiffs' claims that needs to be disaggregated from the price reaction on February 19, 2019. Thus, I reasonably conclude $1.78 of artificial inflation per share was dissipated on February 19, 2019 (see **Exhibit 1**).[153]

### B.    MAY 29, 2019 – MAY 30, 2019

91.    The second Corrective Disclosure Event occurred before market open on May 29, 2019 when Evolent published a press release and corresponding 8-K announcing that Evolent would "acquire an ownership interest in Passport Health Plan" and "expand the scope and term of its long-term Management Services Agreement" with Passport.[154] Also on May 29, 2019 at 8:00 AM, before market open, Evolent hosted a Special Call with an accompanying presentation.[155] The press release stated:

---

[153] Results are based on the Daily Event Study described above in **Section IV.E.**

[154] "Evolent Health Expands Partnership with Passport Health Plan to Support Medicaid Beneficiaries in the Commonwealth of Kentucky," *PR Newswire*, May 29, 2019, 6:30 AM; Evolent SEC Form 8-K filed May 29, 2019, 6:33 AM.

[155] "Special Call," *S&P Capital IQ*, May 29, 2019, 8:00 AM ET; "Passport Health Plan Partnership," *Evolent Health*, May 29, 2019.

> Per the terms of the agreement, Evolent will contribute $70 million for a 70 percent ownership interest in Passport Health Plan and will also provide interim balance sheet support if necessary to meet near-term regulatory capital requirements.[156]

92.    The market reacted negatively to learning that Evolent would no longer earn revenue and profit from Passport as a separate entity, but instead would have to be responsible for bailing out Passport financially and running a health plan that had been losing money.

93.    Analysts understood the implications of the transaction, namely that Evolent's acquisition of the company confirmed the unsustainability of the Passport business.  For example, an analyst at SunTrust Robinson Humphrey specifically highlighted the fact that the disclosure revealed that Evolent's Passport revenue was unsustainable without a bailout of Passport, as well as the incongruence between Defendant Williams' alleged false statements from February 26, 2019 and the announcement of the stake and capital support:

> *SunTrust Robinson Humphrey*: Our sense is that this transaction signals that Passport wasn't in a position to remain operationally sustainable as a standalone entity, which suggests to us that EVH's investment and balance sheet commitment is likely instrumental in supporting the business. Although we think EVH is capable of running Passport more successfully (evidenced by EVH's management of True Health to date), this transaction does raise questions about what is Evolent's business model?... Shares of EVH are down ~20% (S&P down less than 1%), which is a loss of ~$230 million in market cap since yesterday's close. […] Management has previously talked down going after Passport as recently as 4Q18 earnings call: ***When asked whether EVH would acquire some, if not the whole, Passport business during the 4Q18 earnings call, management cited they had "not contemplated acquiring a full Medicaid plan", that it's "not in our strategic lens at this point".*** Management did state that they have "talked about co-ownership models where they might have a minority stake", ***but "related to Passport it's not something that is being evaluated".***[157]

---

[156] "Evolent Health Expands Partnership with Passport Health Plan to Support Medicaid Beneficiaries in the Commonwealth of Kentucky," *PR Newswire,* May 29, 2019, 6:30 AM.

[157] "Impressions on EVH Stamping Passport With a 70% Stake," *SunTrust Robinson Humphrey*, May 29, 2019.

94.    An analyst at Cowen opined that the Company's stated rationale for the transaction

"doesn't make sense," and similarly took the news as a sign that Evolent had to bail out its most

important client in order to retain revenue:

> *Cowen*: Strategic Rationale Doesn't Make Sense to Us… The company views the Passport deal as an opportunistic investment after it won Passport's competitive search for a long-term partner. This could be true, but we are somewhat skeptical given Passport's recent financial struggles**. *It is not unreasonable, in our opinion, that Passport could have explored a potential sale to a larger managed care organization as part of its competitive search process. If this is true, then we would view EVH's investment as more driven by the need to retain a key client as opposed to a unique opportunity.* In fact, the investment was likely attractively priced given the near-term uncertainty presented by the Kentucky RFP awards. *If Passport was really interested in a long-term strategic partner and not in dire financial straits, and EVH did not feel compelled to act quickly, we believe it would make more sense to wait until after the RFP process is completed.*"[158]

95.    Piper Jaffray also tied the drop in price to the announcement and clearly focused on

how Evolent had to pay to keep its largest customer:

> *Piper Jaffray:* **EVH shares took a tumble after the announcement of a $70M investment in their largest customer, Passport Health, to save them from insolvency and keep EVH's competitors at bay.** After gaining greater clarity at Thursday's analyst meeting, we can say we get it. We don't like it, but we get it.[159]

96.    News reports explicitly linked the decline in Evolent's share price to its

announcement that it would acquire an ownership stake in Passport.  For example, Dow Jones

Newswires stated:

> Shares of Evolent Health Inc. (EVH) fell more than 20% Wednesday after the company said it would pay $70 million for a 70% stake in Passport

---

[158] "EVH Morphing Into a Health Plan?" *Cowen*, May 29, 2019, 2:32 PM – *see* EVH00327843 at -843.

[159] "When you are in a Hole, Stop Digging," *Piper Jaffray,* May 31, 2019, 3:28 AM.

Health Plan, which serves more than 300,000 Medicaid beneficiaries in Kentucky.[160]

97.    Analysts reported on the news that Evolent would acquire an ownership stake in Passport and linked the Company's stock price decline to this announcement.  For example, Canaccord Genuity observed that "investors are clearly punishing the company" for its announcement.[161]  Other analysts likewise analyzed the move:

> *Oppenheimer: **EVH announced it will invest $70M for a 70% stake in its top client (10-12% of CY19E revs), Passport Health**, the KY Medicaid plan which faced solvency issues earlier this year, but recently won better rates from the state. The ownership stake, predicated on the new state Medicaid RFP (through 2025), will give majority ownership to EVH. Despite the strategic rationale and the potential for leverage here**, we believe investors' appetite for such deals continues to be low and growing investments and ownership in health plans changes EVH's story**. Medicare continues to be a big upcoming opportunity **but investors' concern on health plan strategy could cause investor churn and pressure the stock**.*[162]

> *Citi: **EVH share [sic] are down 29% following this morning's announcement** that the company has entered into an agreement to acquire a 70% ownership stake in Passport Health, a Kentucky-based Medicaid health plan with 315k lives. We note that Passport has historically been EVH's largest customer at 13% of 1Q19 revenues. **We believe the deal struck a raw nerve given** (1) increased health plan exposure, which has weighed on shares following EVH's True Health New Mexico deal and **(2) concerns that EVH had to pay to maintain its customer base**.*[163]

> *William Blair: **We are moderately skeptical** of management's decision to invest in another health plan, **particularly in light of Passport's recent financial issues.***[164]

---

[160] "Evolent Shares Fall After Deal to Buy 70% of Kentucky Medicaid Plan >EVH," *Dow Jones Newswires*, May 29, 2019, 11:27 AM.

[161] "EVH to take 70% ownership in Passport," *Canaccord Genuity*, May 29, 2019, 11:05 PM.

[162] "Announces Plan to Acquire 70% Stake in Passport Health," *Oppenheimer*, May 29, 2019, 2:47 PM.

[163] "Alert: Initial Takes on Passport Health Plan Partnership," *Citi*, May 29, 2019, 11:34 PM.

[164] "Expanding Partnership With Passport Health Plan Through Acquisition of 70% Stake," *William Blair*, May 29, 2019.

98.     Evolent's announcement on May 29, 2019, that it would acquire a 70% stake in Passport and provide additional capital support was the final revelation of the truth concealed by the alleged misrepresentations and omissions.  Specifically, the Corrective Disclosure Event revealed that Evolent earning revenue and profit from Passport as a separate entity was unsustainable – specifically what Plaintiffs allege was concealed by the alleged false and misleading statements.  Furthermore, as is discussed in **Section VII** below, the need to bail out Passport, even after the Kentucky Medicaid capitation payment rate cuts were significantly increased, demonstrates that the rate cuts were not the sole cause of Passport's financial distress and reflects the role Evolent played in causing financial harm to Passport.

99.     My event study demonstrates that on May 29, 2019, the news that Evolent would bail out Passport caused Evolent's common stock to decline by 27.62%, or $3.91 per share, after controlling for market and industry effects.  This price decline is statistically significant at beyond the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -10.49 (see **Exhibit 1**).[165]

100.   I evaluated whether there was any confounding information outside of the news regarding Evolent's decision to purchase a majority stake in, and provide balance sheet support, to its largest customer, Passport.  I did not identify any confounding news that contributed to the stock price decline.  I also evaluated whether there was evidence of a continued stock price reaction to the news on the following trading day of May 30, 2019.

101.   On the day following the press release, May 30, 2019, Evolent hosted an investor day.  While the topics of conversation included an in-depth company overview, industry updates, additional details on Evolent's partnerships, and updated financial projections, the new Passport

---

[165] Results are based on the Daily Event Study described above in **Section IV.E.**

news from the day prior was a large part of the discussion, and the focus of analysts after the

presentation.

> *Defendant Williams*: So we're going to start with just an overview of the value-based care market landscape, where we plan it, what our strategy is, how we think of the various business lines we're in. ***We're going to spend a lot of time on Passport. Obviously, we had a major announcement yesterday. There's a lot of questions about it***. Where does that fit into our strategy? Why are we doing this type of deal? And we really want to dive in there and talk about the logic of it.[166]

102.    Analysts and news reports continued to discuss the announcement from May 29,

2019, and the discussion of the Passport acquisition during the analyst day.  For example, the

Courier Journal published an article titled "How Passport Health Plan's sale to Evolent will

affect its customers and employees."[167]  And Cantor Fitzgerald, among others, issued reports:

> *Cantor Fitzgerald*: Management used the event as an opportunity to address a number of recent operating decisions, ***which have met some investor scrutiny.*** Yesterday, EVH announced that it will take a majority stake in its largest customer, Passport Health. EVH was able to speak to this decision.[168]

103.    Additionally, Defendant Williams attributed the stock reaction on May 29, 2019

and May 30, 2019 to the Passport sale[169] and subsequent analyst day giving Evolent the

opportunity to make the case to investors:

> *Defendant Williams:* As we expected, ***the market did not react well initially to Evolent purchasing a majority stake in a Healthplan particularly one that had been under strain across the last several months.*** The stock was down significantly the day of the announcement and on Thursday we had a

---

[166] "Analyst/Investor Day," *S&P Capital IQ*, May 30, 2019, 8:30 AM, p. 4.

[167] "How Passport Health Plan's sale to Evolent will affect its customers and employees," *Courier Journal*, May 30, 2019, 6:26 AM.

[168] "Despite Passport Acquisition, Risk/Reward Scenario is Attractive; Overweight," *Cantor Fitzgerald*, May 30, 2019.

[169] Defendant Williams stated in email correspondence responding to the May 29, 2019 SunTrust report: "Not surprised by the reaction... 70% and $70M are the killers particularly with limited commentary on future ownership stake.  Hard for investors to understand and current external Passport story not great (eg bailout)".  *See* EVH00103820.

previously scheduled investor day in New York with major shareholders and our analysts...we had extraordinarily positive feedback from a number of participants.[170]

104.  My event study shows that Evolent's stock price rebounded a statistically significant amount on May 30, 2019.  As I described, there was also further discussion of the May 29 disclosure by the company, analysts, and news reports on May 30.  Moreover, trading volume was much higher than average on May 30, 2019 (2.38 million shares, compared to an average daily trading volume of 0.99 million shares during the Class Period).  Based on this evidence of continued reaction to the corrective information, I have incorporated the price rebound on May 30, 2019 into my assessment of the degree of artificial inflation that was dissipated by the second Corrective Disclosure Event.  According to my event study, Evolent's stock price increased by 6.76% or $0.68 per share on May 30, 2019, after controlling for market and industry effects.  This price increase is statistically significant at the 95% confidence level with a t-statistic of 2.61.  The total abnormal dollar decline due to the corrective information from May 29, 2019 to May 30, 2019 combined is a price decline of $3.23 per share, and I therefore conclude that $3.23 per share of artificial inflation per share was dissipated on May 29, 2019 through May 30, 2019 (see **Exhibit 1**).[171]

## VII.  THE KENTUCKY MEDICAID RATE CUTS WERE NOT SUFFICIENT TO FULLY CAUSE PASSPORT'S FINANCIAL DISTRESS

105.  It is my understanding that Passport (in its lawsuit and elsewhere) claimed that rate cuts implemented in 2018 by the State of Kentucky were the primary (if not sole) source of Passport's financial distress.  While the rate cuts certainly had an adverse effect on Passport's

---

[170] EVH00081626 at -626.

[171] Results are based on the Daily Event Study described above in **Section IV.E.**

56

financial condition, further analysis reveals that the rate cuts alone were not sufficient to drive

Passport into distress.

106.  First, it should be noted that as of year-end 2015—shortly before Passport entered

into an agreement with Evolent to receive healthcare administrative services—Passport's capital

and surplus totaled $250 million.[172]  This capital level was 2.3x the reported statutory minimum

capital and surplus requirement of $110.7 million—representing $139 million of capital in

excess of regulatory requirements.[173]

107.  In September 2018, the Kentucky Department of Medical Services ("DMS")

announced a reduction in the "per member per month" ("PMPM") rates paid for Medicaid

healthcare services provided to member beneficiaries located in the Louisville metropolitan

area—a region in which the majority of Passport members were located.[174]  According to

Passport, the reduction in PMPM rates in this region resulted in "a statewide reduction of 3.2%

in rates overall" for Passport.[175]  That rate reduction was applied retroactively to July 2018 and

remained in effect until April 1, 2019—the effective date of a rate increase by DMS that

mitigated the prior reduction.[176]  Thus, over a period of nine months, Passport revenues were

negatively impacted by the lower rates paid by Kentucky.

108.  In order to determine the impact of the rate cuts on Passport's revenue, I took

Passport's reported net premium income for the nine-month period ending March 2019 and

---

[172] Annual Statement of the University Health Care, Inc. d/b/a Passport Health Plan (2015), *see* JOINTLP_00006635 at -638.

[173] Annual Statement of the University Health Care, Inc. d/b/a Passport Health Plan (2015), *see* JOINTLP_00006635 at -684.

[174] Passport Complaint ¶¶ 1, 56.

[175] Passport Complaint ¶ 56.

[176] *See* "EVH's Passport Relationship Catches a Break," *SunTrust Robinson Humphrey*, April 10, 2019; "Positive Medicaid rate changes in KY imply 4.7% boost for Passport," *Canaccord Genuity*, April 10, 2019, 6:10 PM.

divided it by (1 – 3.2%) in order to estimate what Passport's revenue would have been absent the rate cut.  Deducting Passport's actual revenue over the nine-month period from this amount results in total revenues lost due to the rate cut of $47.2 million, as shown in **Exhibit 2**.

109.  Clearly, the $47 million impact of the nine-month rate cut was a fraction of the $139 million capital cushion Passport had immediately prior to retaining Evolent as an administrative services provider.  Furthermore, the alleged misstatements in this matter imply that, had the statements been true, Evolent would have generated savings of at least $100 million for Passport and thereby would have provided even more financial cushion to absorb a rate cut. In contrast, Evolent charged Passport approximately $300 million in fees between 2016 and mid-2019, with Passport's total administrative costs as a percentage of revenue increasing substantially over this timeframe even after considering the functions Evolent took over.[177]

110.  Consequently, while the rate cuts negatively affected Passport's financial condition, the $47 million impact was only a fraction of the financial harm that would be necessary to deplete Passport's capital.  Furthermore, the reversal of the Medicaid rate cuts, effective April 2019, did not prevent Passport from requiring a bailout from Evolent.  As a result, the Kentucky rate cuts were not capable of independently causing Passport's financial distress.

---

[177] *See* EVH00332193.  Passport administrative fees as a percentage of net premium income increased from 6.5% in 2015 to over 9% in 2016 through 1H 2019.  Even removing the impact of the 1% special assessment fee added by Kentucky in 2016, this increase in administrative fees implies over $100 million of new spending.  *See* JOINTLP_00017649 at -702; JOINTLP_00005434 at -439.

2014:  Total Administrative Expenses ($79,092,182) ÷ Total Revenues ($1,290,295,480) = 6.1%

2015: $107,528,988 ÷ $1,653,065,718 = 6.5%

2016: $169,051,568 ÷ $1,747,750,539 = 9.7%

2017: $182,745,021 ÷ $1,925,009,372 = 9.5%

2018: $193,988,868 ÷ $1,945,920,405 = 10.0%

1H 2019: $86,942,607 ÷ $957,088,875 = 9.1%

## VIII. CALCULATING ARTIFICIAL INFLATION PER SHARE AND DAMAGES FOR EVOLENT COMMON STOCK

### A. INFLATION PER SHARE

111. The analysis in **Section VI** quantifies the artificial inflation dissipated from the price of Evolent Common Stock on the Corrective Disclosure Events. This is summarized below in **Table A**:

**Table A**
**Artificial Inflation per Share Dissipated on**
**Corrective Disclosure Events**

| Corrective Disclosure Event Date | Artificial Inflation Per Share Dissipated |
|---|---|
| February 19, 2019 | $1.78 |
| May 29, 2019 | $3.23 |
| Total | $5.01 |

112. However, these analyses do not establish how inflation evolved over the Class Period. One standard method commonly relied upon to evaluate the level of artificial inflation in a stock price is the "constant dollar" method. This method assumes that the amount of artificial stock inflation dissipated on each Corrective Disclosure Event was present in the stock price going back to the beginning of the Class Period. Put another way, this means that barring an intervening event that is related to the fraud (i.e., a Corrective Disclosure Event), the inflation per share on day $t$-$1$ is the same as the inflation on day $t$. I note that the constant dollar methodology is used by a wide variety of experts in matters such as this, and in my experience, is often advocated by defense experts.

113. Based on my understanding of Plaintiffs' allegations, coupled with my review of the documents and information identified in **Appendix A**, I conclude that constant dollar inflation is appropriate in this matter. My opinion is based on the fact that the nature of the misrepresented and/or omitted information did not change during the Class Period. Specifically,

I understand that Plaintiffs expect to prove that Evolent was not actually providing any value to Passport, but rather causing Passport to incur costs in excess of any benefits, thus rendering the revenue and profit earned from Passport unsustainable.

114.   Indeed, above in **Section IV,** I discussed the market's reliance on Evolent's statements concerning Evolent's ability to add value to Passport, and thus the sustainability of Evolent's business with Passport.  Plaintiffs allege that prior to the start of the Class period, Defendants knew or recklessly disregarded that they were not providing Passport with savings, but rather worsening Passport's financial condition directly by charging excessively high fees and increasing administrative costs while failing to provide touted savings.  Evolent acknowledged its inability to provide Passport any savings[178] and that Passport's costs were an outlier compared to its competitors, which would negatively affect Passport's bid for a new Medicaid contract from Kentucky.[179]

115.   The deficient services and excessive costs provided by Evolent are evident in an email sent during the Class Period from David Stanley, Passport's CFO, to other Passport executives in which he questioned the value of Evolent's services and cited to an Evolent analysis showing "no value has been provided" to Passport:[180]

> Since we are no longer meeting on Monday mornings, and since an Evolent employee attends our ELT meetings, I thought I would share some thoughts/concerns with this group via email about the overall performance of Evolent.  *I'm not sure that Evolent is providing the quality service that Passport needs,* especially in the following areas:  1. Claims processing: The conversion to Aldera has been a nightmare with significant processing issues including a huge volume of claims being processed incorrectly.  This

---

[178] *See* EVH00124389 ("I doubt if we've been able to demonstrate any clinical savings despite the insanely high ALR.").

[179] *See* EVH00339775 (Referencing a table of MRTs: "Passport is an outlier across the board, and as a result driving up the state's costs.  If we don't lower our costs quickly, the state is not going to want us to win the upcoming RFP.").

[180] EVH00129772.

has really given Passport a black-eye with providers and OMS, which will probably be reflected in our upcoming provider survey.  2. Encounters:  The backlog of unsubmitted encounters is totally unacceptable and will impact our cap rates negatively.  3. Risk Adjustment:  ***By Evolent's own analysis, no value has been provided for Medicaid after 2 and a half years and millions of dollars paid to Evolent.***  4. Quality/HEDIS:  Our decrease in star ratings and overall HEDIS scores speak for themselves.[181]

116.  Disclosing that Evolent was not providing Passport with savings, and was instead charging Passport excessively high fees and increasing its expenses – thus directly worsening Passport's financial condition – would have revealed to the market the threat to Evolent's financial health posed by the failure of Evolent's business model and potential loss of one of Evolent's most important customers and sources of revenue and profit.  Given that the Corrective Disclosure Events revealed the unsustainability of its business with Passport – the same information that Plaintiffs allege should have been disclosed from the beginning of the Class Period, I find no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period and thus I find no economic reason to deviate from the standard constant dollar methodology.  In my view, the most widely accepted and reliable proxy for evaluating how the market would have reacted to such a disclosure at the beginning of the Class Period is to rely upon the abnormal market price decline observed upon the later disclosure of such information.

117.  By applying the constant dollar methodology described above and taking the analyses of the Corrective Disclosure Events into account, **Table B** below summarizes how the total artificial inflation per share for Evolent Common Stock evolved during the Class Period:

---

[181] *Id.*

61

**Table B**
**Artificial Inflation per Share Over Time**

| Date Range | Artificial Inflation Per Share |
|---|---|
| January 10, 2018 - February 15, 2019 | $5.01 |
| February 19, 2019 - May 28, 2019 | $3.23 |

## B.  DAMAGES

118.  The standard and well-settled formula for assessing damages for each Class Member under Section 10(b) is the "out-of-pocket" method, which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale (or the artificial inflation at the time of purchase if the share was not ultimately sold).  If the security was sold at a time before the artificial inflation had dissipated – that is, prior to the first Corrective Disclosure Event, which in this case is February 19, 2019 – then there are no damages.  However, if the security was purchased after the first alleged misstatement and sold after the artificial inflation was partially or fully dissipated, then damages would be equal to the artificial inflation at the time of purchase minus the artificial inflation at the time of sale.  For example, assume that investor X purchased a share of Evolent Common Stock on November 1, 2018 and sold it on February 25, 2019.  Table B shows that there was $5.01 of artificial inflation in the stock price at the time of purchase and $3.23 artificial inflation in the stock price at the time of sale.  Thus, Investor X's damages would be equal to $1.78 ($5.01 - $3.23).

119.  In addition, the calculation of damages incorporates the application of a statutory cap on recovery in federal securities cases brought under Rule 10(b)-5 (the 90-day lookback

62

provision of the PSLRA).[182]  The limitation is that damages calculated on Evolent Common Stock purchased during the Class Period and sold during the 90-day lookback period cannot exceed the difference between the purchase price paid during the Class Period and the average closing price from date of the last corrective disclosure to the date of sale.  **Table C** below shows the 90-day lookback price for each day starting on the final Corrective Disclosure Event, which in this case is May 29, 2019.  For example, if Investor Y purchased a share of Evolent Common Stock for $20.00 during the Class Period and then sold that share on August 1, 2019 during the 90-day lookback period, when the average closing price from May 29, 2019 through August 1, 2019 was $7.96 as shown below in **Table C**, Investor Y's damages could not exceed $12.04 ($20.00 - $7.96) per share under the 90-day lookback provision.  Furthermore, Evolent Common Stock purchased during the Class Period and never sold or sold after the 90-day lookback period cannot have per share damages that exceed the difference between the purchase price paid and the average price of Evolent Common Stock during the 90-day lookback period, which is $7.70 as shown in the last row in **Table C** below.

---

[182] Pursuant to the PSLRA, 15 U.S.C. § 78u-4 (e)(1), "in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."

**Table C**
**Evolent Closing Price and Average Closing Price**
**May 29, 2019 - August 26, 2019**

| Date | Closing Price | Average Closing Price Between May 29, 2019 and Date Shown | Date | Closing Price | Average Closing Price Between May 29, 2019 and Date Shown |
|---|---|---|---|---|---|
| 5/29/2019 | $10.01 | $10.01 | 7/15/2019 | $7.44 | $8.41 |
| 5/30/2019 | $10.69 | $10.35 | 7/16/2019 | $7.46 | $8.39 |
| 5/31/2019 | $10.64 | $10.45 | 7/17/2019 | $7.19 | $8.35 |
| 6/3/2019 | $10.63 | $10.49 | 7/18/2019 | $7.01 | $8.31 |
| 6/4/2019 | $10.33 | $10.46 | 7/19/2019 | $6.65 | $8.27 |
| 6/5/2019 | $10.24 | $10.42 | 7/22/2019 | $6.45 | $8.22 |
| 6/6/2019 | $9.41 | $10.28 | 7/23/2019 | $6.59 | $8.18 |
| 6/7/2019 | $8.90 | $10.11 | 7/24/2019 | $6.85 | $8.15 |
| 6/10/2019 | $8.88 | $9.97 | 7/25/2019 | $6.48 | $8.11 |
| 6/11/2019 | $8.83 | $9.86 | 7/26/2019 | $6.74 | $8.07 |
| 6/12/2019 | $7.94 | $9.68 | 7/29/2019 | $6.82 | $8.04 |
| 6/13/2019 | $8.44 | $9.58 | 7/30/2019 | $6.91 | $8.02 |
| 6/14/2019 | $7.98 | $9.46 | 7/31/2019 | $6.82 | $7.99 |
| 6/17/2019 | $8.07 | $9.36 | 8/1/2019 | $6.38 | $7.96 |
| 6/18/2019 | $7.98 | $9.26 | 8/2/2019 | $6.39 | $7.92 |
| 6/19/2019 | $7.99 | $9.19 | 8/5/2019 | $6.12 | $7.89 |
| 6/20/2019 | $7.90 | $9.11 | 8/6/2019 | $5.82 | $7.84 |
| 6/21/2019 | $8.41 | $9.07 | 8/7/2019 | $6.69 | $7.82 |
| 6/24/2019 | $8.26 | $9.03 | 8/8/2019 | $7.14 | $7.81 |
| 6/25/2019 | $7.74 | $8.96 | 8/9/2019 | $7.17 | $7.79 |
| 6/26/2019 | $7.71 | $8.90 | 8/12/2019 | $7.42 | $7.79 |
| 6/27/2019 | $7.87 | $8.86 | 8/13/2019 | $7.12 | $7.78 |
| 6/28/2019 | $7.95 | $8.82 | 8/14/2019 | $7.10 | $7.76 |
| 7/1/2019 | $7.83 | $8.78 | 8/15/2019 | $6.98 | $7.75 |
| 7/2/2019 | $7.56 | $8.73 | 8/16/2019 | $7.30 | $7.74 |
| 7/3/2019 | $7.64 | $8.69 | 8/19/2019 | $7.41 | $7.74 |
| 7/5/2019 | $7.63 | $8.65 | 8/20/2019 | $7.57 | $7.73 |
| 7/8/2019 | $7.34 | $8.60 | 8/21/2019 | $7.31 | $7.73 |
| 7/9/2019 | $7.55 | $8.56 | 8/22/2019 | $7.41 | $7.72 |
| 7/10/2019 | $7.26 | $8.52 | 8/23/2019 | $7.02 | $7.71 |
| 7/11/2019 | $7.22 | $8.48 | 8/26/2019 | $7.02 | $7.70 |
| 7/12/2019 | $7.36 | $8.44 | | | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Chad Coffman

Executed on May 27, 2022.

65

**Exhibit 1**
**Event Study Analysis of Evolent Health Inc. Event Dates**

| # | Event Type | Date | Time | Market Date | Day | Closing Price | Raw Return | Volume (millions) | Abnormal Return[1] | Abnormal Dollar Change[1] | t-Statistic[1] | p-Value[1] | Significance Level[2] | Events |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Corrective Disclosure | 2/15/19 | 4:00 PM | 2/19/19 | Tue | $14.99 | -10.77% | 3.0 | -10.59% | ($1.78) | (4.48) | 0.00 | *** | "On February 15, 2019, Passport filed a lawsuit against Kentucky's Finance and Administration Cabinet and its Cabinet for Health and Family Services ("CHFS") (the "Passport Complaint"), challenging the Medicaid rate cuts that Passport learned of in May 2018. In that lawsuit, Passport alleged that, if the rate cuts were not reversed, Passport would be legally insolvent by March 1, 2019." (Complaint ¶ 119) |
| 2 | Corrective Disclosure | 5/29/19 | 6:30 AM | 5/29/19 | Wed | $10.01 | -29.26% | 8.8 | -27.62% | ($3.91) | (10.49) | 0.00 | *** | "Before the market opened on May 29, 2019, Evolent stunned investors by abruptly and suddenly reversing course. On that day, the Company issued a press release announcing that, notwithstanding its prior assurances, it had agreed to acquire a majority stake in Passport, paying $70 million in exchange for its 70% interest, and further agreed to provide additional "interim balance sheet support"—that is, to pay in additional capital—if such support became necessary for Passport to meet its statutory capital requirements." (Complaint ¶ 124) |
| | | 5/30/19 | NA | 5/30/19 | Thu | $10.69 | 6.79% | 2.4 | 6.76% | $0.68 | 2.61 | 0.01 | ** | Potential Continued Market Reaction |

Sources: S&P Capital IQ and Complaint.

Notes:

(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the S&P Health Care Services Select Industry Total Return Index, a modified equal-weighted price index that uses the returns of companies in the S&P Total Market Index that are classified in the GICS health care services sub-industry. Evolent Health, Inc.'s industry classification is Health Care Technology, a sub-industry of the Health Care Equipment and Services Industry. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates, and one outlier date have been removed from estimation (i.e., 11/6/2017: Market skepticism about Evolent's announcement of an expanded partnership with Premier Health, including the acquisition of its Medicare Advantage plan).

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater.

(3) Tuesday, February 19, 2019 is the first trading date following the filing of Passport's complaint against Kentucky on Friday, February 15, 2019. Markets were closed in observance of Presidents' Day on Monday, February 18, 2019.

# Exhibit 2
## Impact of the Kentucky Rate Cut on Passport Revenue

*Q3 and Q4 2018*

| | | |
|---|---:|---|
| Net Premium Income 2018[1] | $1,945,920,405 | [A] |
| Net Premium Income Q1 and Q2 2018[2] | $987,645,757 | [B] |
| **Net Premium Income Q3 and Q4 2018** | **$958,274,648** | [C] = [A] - [B] |

*Q1 2019*

| | | |
|---|---:|---|
| **Net Premium Income Q1 2019[3]** | **$468,303,768** | [D] |

| | | |
|---|---:|---|
| **Actual Net Premium Income for 9-Month Rate Cut Period** | **$1,426,578,416** | [E] = [C] + [D] |
| **Percent Reduction Due to Rate Cut[4]** | **3.2%** | [F] |
| **Net Premium Income But-For Rate Cut** | **$1,473,738,033** | [G] = [E] * (1/(1-[F])) |

| | | |
|---|---:|---|
| **Estimated Lost Net Premium Income Due to Rate Cut** | **$47,159,617** | [H] = [G] - [E] |

Sources:
1) Annual Statement of the University Health Care, Inc. d/b/a Passport Health Plan (December 31, 2018) [JOINTLP_00017649-798 at 655].
2) Quarterly Statement of the University Health Care, Inc. d/b/a Passport Health Plan (June 30, 2018) [JOINTLP_00005553-611 at 557].
3) Quarterly Statement of the University Health Care, Inc. d/b/a Passport Health Plan (March 31, 2019) [JOINTLP_ 00005489-552 at 493].
4) Passport Complaint ¶ 56.

# Appendix A
# Documents Considered

**Prior Expert Reports in this Matter**

- Expert Report of Chad Coffman, CFA, dated October 19, 2021, including all data and all documents included in Appendix A of that report.
- Expert Report of Chad Coffman, CFA, dated April 8, 2022, including all data and all documents included in Appendix A of that report.

**Court Documents**

- Second Amended Class Action Complaint filed June 8, 2020, in *Plymouth County Retirement System and Oklahoma Police Pension and Retirement System,* Individually and On Behalf of All Others Similarly Situated, v. *Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton,* Case No. 1:19-cv-01031-RDA-TCB.
- Memorandum Opinion and Order filed March 24, 2021, in *Plymouth County Retirement System, et al.* v. *Evolent Health, Inc., et al.,* Civil Action No. 1:19-cv-01031 (RDA/TCB).
- Defendants' Memorandum of Law in Support of Their Motion for Partial Reconsideration of the Court's Order on Two Forward-Looking Statements filed April 1, 2021, in *Plymouth County Retirement System,* Individually and On Behalf of All Others Similarly Situated, v. *Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton*, Case No. 1:19-cv-01031-RDA-TCB.
- Lead Plaintiffs' Memorandum of Law in Support of Motion for Partial Reconsideration filed April 1, 2021, in *Plymouth County Retirement System and Oklahoma Police Pension and Retirement System,* Individually and On Behalf of All Others Similarly Situated, v. *Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton*, Case No. 1:19-cv-01031-RDA-TCB.
- Third Amended Class Action Complaint filed under seal November 17, 2021, ECF No. 158, Case No. 1:19-cv-01031-MSN-TCB.
- Defendants' Memorandum in Support of Their Partial Motion to Dismiss the Third Amended Class Action Complaint filed December 21, 2021, in *Plymouth County Retirement System and Oklahoma Police Pension and Retirement System,* Individually and On Behalf of All Others Similarly Situated, v. *Evolent Health, Inc., Frank Williams, Nicholas McGrane, and Seth Blackley*, Case No. 1:19-cv-01031-MSN-TCB.
- Plaintiffs' Opposition to Defendants' Partial Motion to Dismiss the Third Amended Class Action Complaint filed under seal January 28, 2022, in *Plymouth County Retirement System and Oklahoma Police Pension and Retirement System,* Individually and On

Case 1:19-cv-01031-MSN-WEF    Document 222-2    Filed 06/09/22    Page 70 of 95
PageID# 6022

Behalf of All Others Similarly Situated, v. *Evolent Health, Inc., Frank Williams, Nicholas McGrane, and Seth Blackley*, Case No. 1:19-cv-01031-MSN-TCB.

- Defendants' Reply Memorandum in Support of Their Partial Motion to Dismiss the Third Amended Class Action Complaint filed under seal February 10, 2022, in *Plymouth County Retirement System and Oklahoma Police Pension and Retirement System,* Individually and On Behalf of All Others Similarly Situated, v. *Evolent Health, Inc., Frank Williams, Nicholas McGrane, and Seth Blackley*, Case No. 1:19-cv-01031-MSN-TCB.
- Transcript of Motion Proceedings Before the Honorable Michael S. Nachmanoff, United States District Court Judge, on March 18, 2022, in *Plymouth County Retirement System, et al., v. Evolent Health, Inc. et al., Civil Action No.: 1:19-cv-1031.*

## Court Decisions and Securities Law

- *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1318 (2011).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## Depositions

- Deposition of Chad Coffman, May 9, 2022.
- Deposition of David Stanley, May 5, 2022.
- Deposition of Kimberly Conquest, April 26, 2022.

## SEC Filings/Forms

- Evolent Health, Inc. SEC Form 10-K for the fiscal years ended December 31, 2016 through December 31, 2019.
- Evolent Health, Inc. SEC Form 8-K filed January 10, 2018, and May 29, 2019.

## Evolent Public Statements

- Evolent conference call transcripts and accompanying slides:
  - "FQ3 2017 Earnings Call Transcripts," *S&P Capital IQ*, November 2, 2017, 5:00 PM.
  - "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 9, 2018, 5:00 PM.
  - "FQ2 2018 Earnings Call Transcripts," *S&P Capital IQ*, August 7, 2018, 5:00 PM.
  - "FQ3 2018 Earnings Call Transcripts," *S&P Capital IQ*, November 6, 2018, 5:00 PM.
  - "FQ4 2018 Earnings Call Transcripts," *S&P Capital IQ,* February 26, 2019, 5:00 PM.
  - "FQ1 2019 Earnings Call Transcripts," *S&P Capital IQ*, May 7, 2019, 5:00 PM.

- o "Analyst/Investor Day," *S&P Capital IQ,* May 11, 2018, 8:30 AM.
  - o "Analyst/Investor Day." *S&P Capital IQ,* May 30, 2019, 8:30 AM.
  - o "Company Conference Presentation," *S&P Capital IQ,* January 11, 2017, 2:30 PM.
  - o "Company Conference Presentation," *S&P Capital IQ,* January 10, 2018, 1:30 PM.
  - o "Company Conference Presentation," *S&P Capital IQ*, January 9, 2019, 1:00 PM.
  - o "Evolent Health 2018 Investor & Analyst Day," *Evolent Health*, May 11, 2018.
  - o "Passport Health Plan Partnership," *Evolent Health*, May 29, 2019.
  - o "Special Call," *S&P Capital IQ*, May 29, 2019, 8:00 AM.
  - o "Wells Fargo Health Care Conference," *Bloomberg,* September 5, 2018, 10:15 AM.
- "Evolent Health Announces Fourth Quarter and Full Year 2018 Results," *PR Newswire*, February 26, 2019, 4:01 PM.
- "Evolent Health Announces First Quarter 2019 Results," *PR Newswire*, May 7, 2019, 4:03 PM.
- "Evolent Health Expands Partnership with Passport Health Plan to Support Medicaid Beneficiaries in the Commonwealth of Kentucky," *PR Newswire,* May 29, 2019, 6:30 AM.
- "Evolent Health to Host Investor and Analyst Day on May 11, 2018," *PR Newswire*, May 3, 2018, 10:00 AM.
- "Evolent Health to Participate in Upcoming Investor Conference," *PR Newswire,* December 20, 2017, 10:00 AM.
- "Evolent Health to Participate in Upcoming Investor Conferences," *PR Newswire,* August 22, 2018, 10:00 AM.

**Bates Stamped Documents**

| Bates Start | Bates End |
|---|---|
| EVH00019418 | EVH00019419 |
| EVH00020583 | EVH00020583 |
| EVH00020779 | EVH00020779 |
| EVH00020780 | EVH00020780 |
| EVH00081626 | EVH00081628 |
| EVH00086007 | EVH00086007 |
| EVH00086025 | EVH00086026 |
| EVH00089363 | EVH00089363 |
| EVH00097791 | EVH00097792 |
| EVH00103307 | EVH00103308 |
| EVH00103820 | EVH00103824 |

| Bates Start | Bates End |
|---|---|
| EVH00108215 | EVH00108220 |
| EVH00110133 | EVH00110134 |
| EVH00124389 | EVH00124389 |
| EVH00129772 | EVH00129772 |
| EVH00208937 | EVH00208939 |
| EVH00209254 | EVH00209255 |
| EVH00209262 | EVH00209265 |
| EVH00224237 | EVH00224307 |
| EVH00240289 | EVH00240289 |
| EVH00327843 | EVH00327848 |
| EVH00332193 | EVH00332193 |
| EVH00339775 | EVH00339775 |
| EVH00549771 | EVH00549774 |
| EVH00640413 | EVH00640413 |
| JOINTLP_00005553 | JOINTLP_00005611 |
| JOINTLP_00006635 | JOINTLP_00006778 |
| JOINTLP_00017649 | JOINTLP_00017798 |
| JOINTLP_00005489 | JOINTLP_00005552 |
| JOINTLP_00005434 | JOINTLP_00005488 |

**Security Data**

- All data referenced in Appendix A of my Efficiency Report, dated April 8, 2022.

**Evolent Analyst Reports**

- Evolent analyst reports supplied by Counsel including but not limited to:
  - "1Q16 Results Beat Expectations with Higher Revenue & Member Lives," *J.P. Morgan*, May 12, 2016.
  - "4Q preview and Passport update," *Canaccord Genuity*, February 20, 2019, 11:11 PM.
  - "Alert: Initial Takes on Passport Health Plan Partnership," *Citi*, May 29, 2019, 11:34 PM.
  - "Announces Plan to Acquire 70% Stake in Passport Health," *Oppenheimer*, May 29, 2019, 2:47 PM.
  - "Another Partnership, Solid Quarter Brings Incremental Confidence in Back Half 2019 Growth Acceleration," *William Blair*, May 7, 2019.

- "Concerns over solvency of largest client appear to be weighing on shares," *SunTrust Robinson Humphrey*, February 19, 2019.
- "Despite Passport Acquisition, Risk/Reward Scenario is Attractive; Overweight," *Cantor Fitzgerald*, May 30, 2019.
- "Digging In and Assessing Potential Headwinds; Passport Scenarios and Core Growth Math," *J.P. Morgan*, February 20, 2019.
- "EVH to take 70% ownership in Passport," *Canaccord Genuity*, May 29, 2019, 11:05 PM.
- "EVH's Passport Relationship Catches a Break," *SunTrust Robinson Humphrey*, April 10, 2019.
- "Evolent Health: Company Commentary," *Forensic Research Group*, February 27, 2019, 9:02 AM.
- "Expanding Partnership With Passport Health Plan Through Acquisition of 70% Stake," *William Blair*, May 29, 2019.
- "Flash Note: Kentucky Rate Update Could Put Passport Back in the Black – But Some Uncertainty Remains," *William Blair*, March 21, 2019.
- "Getting HIPAA to Healthcare IT," *J.P. Morgan*, April 24, 2018, 3:00 AM.
- "Highlights From 2017 Analyst Day; Remains a Top Long-Term Pick," *William Blair*, May 11, 2017.
- "Highlights from 2018 Analyst Day; Remains a Top Long-Term Pick," *William Blair*, May 11, 2018.
- "Impressions on EVH Stamping Passport With a 70% Stake," *SunTrust Robinson Humphrey*, May 29, 2019.
- "Keeping the Towel on the Shoulder; PT to $19," *SunTrust Robinson Humphrey*, February 28, 2019.
- "Key Insights from EVH's 2018 Investor Day," *Jefferies*, May 14, 2018, 12:00 AM.
- "Key Takeaways from Analyst Meeting Support our Investment Thesis; Overweight," *Cantor Fitzgerald*, May 13, 2018.
- "Looks in the Mirror with Pop Health Acquisition; Raise PT; Reiterate Overweight," *Cantor Fitzgerald*, September 12, 2018.
- "Lowering '19 estimates yet optimistic long term," *Canaccord Genuity*, January 13, 2019, 11:01 PM.
- "New Century Boosts Exposure to Fast-Growing MA Market, Brings Higher PMPM with Upside," *Oppenheimer*, September 12, 2018, 10:55 AM.
- "Passport Health Partnership Adds Revenues and Strengthens Medicaid Capabilities," *J.P. Morgan*, February 3, 2016.
- "Passport is a Happy Client, Despite Local Media Reports," *Piper Jaffray*, January 31, 2019, 2:54 AM.

- "Passport Outlook More Questionable," *Piper Jaffray*, February 19, 2019, 2:41 PM.
- "Positive Medicaid rate changes in KY imply 4.7% boost for Passport," *Canaccord Genuity*, April 10, 2019, 6:10 PM.
- "Solid End to 2018; As Anticipated, Initial 2019 Guidance Below Expectations," *William Blair*, February 26, 2019.
- "Value-Based Care - You're Always a Day Away," *Piper Jaffray*, February 27, 2019, 3:25 AM.
- "Waived Kentucky Waiver Mitigates Enrollment Risk," *Piper Jaffray*, July 2, 2018, 6:56 PM.
- "When you are in a Hole, Stop Digging," *Piper Jaffray*, May 31, 2019, 3:28 AM.

## Academic/Industry Literature

- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 15 (1997).
- Aswath Damodaran, "Investment Valuation: Tools and Techniques for Determining the Value of Any Asset", *John Wiley & Sons, Inc.*, 1996.
- John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT., 111 (1998).
- Richard A. Brealey & Stewart C. Myers, Principles of Corporate Finance, pp. 90-93 (McGraw-Hill 10th ed. 2011).

## News/Other

- @courierjournal, "Passport Health Plan is suing Kentucky over rate cuts it says could put the company out of business," *Twitter*, February 15, 2019, 4:02 PM ET, via https://twitter.com/courierjournal/status/1096515168379592707.

- @d_yetter, "Passport sues state over rate cuts it says could put it out of business courier-journal.com/story/news/pol… via @courierjournal," *Twitter*, February 15, 2019, 4:04 PM ET, via https://twitter.com/d_yetter/status/1096515578490208256?s=20&t=mKkSWbh6bpALj_Vtm__xbQ.

- @DerbyCityTVEP, "Passport Health Plan sues Bevin administration over Medicaid cuts," *Twitter*, February 15, 2019, 4:38 PM ET, via https://twitter.com/DerbyCityTVEP/status/1096524061356802050?s=20&t=mKkSWbh6bpALj_Vtm__xbQ.

- @LedfordVivian, "Passport sues state over rate cuts it says could put it out of business courier-journal.com/story/news/pol… via @courierjournal," *Twitter*, February 15, 2019, 4:08 PM ET, via

https://twitter.com/LedfordVivian/status/1096516643897991169?s=20&t=mKkSWbh6bpALj_Vtm__xbQ.

- @TomLoftus_CJ, "Passport sues state over rate cuts it says could put it out of business courier-journal.com/story/news/pol… via @courierjournal," *Twitter*, February 15, 2019, 4:26 PM ET, via https://twitter.com/TomLoftus_CJ/status/1096521203827773440?s=20&t=mKkSWbh6bpALj_Vtm__xbQ.

- "09:14 EDT William Blair cautious on Evolent into Q2 results, sees risk to …," *theflyonthewall*, February 20, 2019, 9:14 AM.

- "14:55 EDT Passport sues Kentucky state agencies over rate cuts, Courier Journal…," *theflyonthewall*, February 19, 2019, 2:55 PM.

- "15:10 EDT Piper says Evolent Health guidance may be at risk, but shares likely …," *theflyonthewall*, February 19, 2019, 3:10 PM.

- "15:32 EDT Evolent slips after largest client claims state cuts could push it to…" *theflyonthewall*, February 19, 2019, 3:32 PM.

- "Evolent Shares Fall After Deal to Buy 70% of Kentucky Medicaid Plan >EVH," *Dow Jones Newswires*, May 29, 2019, 11:27 AM.

- "How Passport Health Plan's sale to Evolent will affect its customers and employees," *Courier Journal*, May 30, 2019, 6:26 AM.

- "Nonprofit sues Kentucky over Medicaid reimbursement rates," *Associated Press Newswire*, February 16, 2019, 1:54 PM.

- "NYSE Group Announces 2019, 2020 and 2021 Holiday and Early Closings Calendar," *Business Wire,* December 4, 2018.

- "Passport Health Plan and Evolent Health form Strategic Alliance to create Medicaid Center of Excellence in Louisville," *PR Newswire,* February 2, 2016, 9:00 AM.

- "Passport lawsuit claims state Medicaid cuts could push it to insolvency," *Louisville Business First*, February 18, 2019, 9:41 AM.

- "Passport sues state over rate cuts it says could put it out of business," *Courier Journal,* February 15, 2019, 4:00 PM.

- "Passport's finances being dragged down by $220M in 'management fees' to Evolent Health," *Insider Louisville,* January 25, 2019, 1:30 PM.

- VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF filed February 15, 2019 in UNIVERSITY HEALTH CARE, INC. d/b/a PASSPORT HEALTH PLAN v. COMMONWEALTH OF KENTUCKY, FINANCE AND

ADMINISTRATION CABINET and WILLIAM LANDRUM, III, Not Individually But In His Official Capacity As Secretary, Finance And Administration Cabinet and COMMONWEALTH OF KENTUCKY, CABINET FOR HEALTH AND FAMILY SERVICES and ADAM MEIER, Not Individually But In His Official Capacity As Secretary, Cabinet For Health And Family Services, Case No. 19-CI-00160.

# APPENDIX B

## CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:          (815) 382-0092
Email:           ccoffman@globaleconomicsgroup.com


## EMPLOYMENT:

**Global Economics Group, LLC**
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats. MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
            Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o   In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o   In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o   In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o   In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o   Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed expert rebuttal report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2011.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD, United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015. Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017. Filed expert report November 11, 2020. Filed expert rebuttal report December 14, 2020. Deposition January 29, 2021.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Deposition January 31, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018**.**

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019. Deposition April 8, 2019.

- Testifying expert in <u>Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division</u>. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

- Testifying expert in <u>Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York.</u> Filed expert report May 06, 2019.

- Testifying expert in <u>Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan</u>. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in <u>West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina.</u> Filed expert report June 28, 2019. Deposition August 16, 2019.

- Testifying expert in <u>Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee.</u> Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in <u>In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey.</u> Filed expert report July 19, 2019. Deposition September 10, 2019.

- Testifying expert in <u>Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado.</u> Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey</u>. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division. Filed declaration September 28, 2020.

- Testifying Expert in Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey. Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California. Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York. Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois. Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., Blackrock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey.</u> Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in <u>In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York</u>. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in <u>Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022.

- Testifying Expert in <u>Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in <u>In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York</u>. Filed expert report on October 15, 2021.

**Chad Coffman**
**Page 15 of 18**

- Testifying Expert in <u>Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division</u>. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022.

- Testifying Expert in <u>In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division</u>. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division</u>. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York.</u> Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., Blackrock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals</u>

International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.– Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York. Filed expert report May 29, 2018. Deposition July 24, 2018.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.

# Appendix C

# Summary of Alleged False and Misleading Statements and Omissions Made By Defendants During the Class Period

| Date | False and Misleading Statements and Omissions | Source | Complaint Paragraph |
|---|---|---|---|
| 1/10/2018 | Delivering Results Across All Partner Strategies… Full risk partner achieves MLR / ALR reduction impact representing $100M+ in identified annualized savings… Approximate annualized savings for all initiatives implemented in 2016 and 2017. | 36th Annual J.P. Morgan Healthcare Conference, SEC Form 8-K ex. 99.1 | 162 |
| 5/11/2018 | Delivering Results Across All Partner Strategies… Full risk partner achieves MLR / ALR reduction impact representing $100M+ identified annual savings… Approximate annualized savings for all initiatives implemented in 2016 and 2017. | Investor and Analyst Day Conference | 166 |
| 5/11/2018 | "a full-risk partner achieving $100 million in identified savings through a bunch of different levers that we have across the full platform." | Investor and Analyst Day Conference | 166 |
| 9/5/2018 | "*__In [Passport's] own plan, we believe we've helped to generate over $100 million in savings__*, which was highly valuable to that organization." | Wells Fargo Healthcare Conference | 169 |
| 1/25/2019 | "majority of the fees Passport pays to Evolent are directly tied to local staff — *__at cost__* …. at a *__lower per member cost than prior periods__*." … "hundreds of employees supporting Passport" … "the number of employees has increased in line with the increases in scope of our partnership with Passport" … "the number of our employees in Louisville exceeds our original projection. *__However the company did not provide details.__*" | *Insider Louisville* Article | 173 |
| 2/26/2019 | "we're not focused on outright majority ownership in health plans" | FY18 Earnings Call | 178 |
| 2/26/2019 | "No. No, we don't have any broader exposure." | FY18 Earnings Call | 179 |
| 2/26/2019 | "…there's no big change in strategy based on what we see happening with Passport specifically." | FY18 Earnings Call | 178 |
| 2/26/2019 | "Again, it's pretty hard to speculate on that. *__I don't think we've thought about acquiring a full Medicaid plan. It's just not in our strategic lens at this point.__* Again, in certain situations, we've talked about co-ownership models *__where we might have a minority stake__* in something, *__but related to Passport that's not something that is currently being evaluated.__*" | FY18 Earnings Call | 179 |
| 5/7/2019 | "Currently, we're pursuing several major initiatives in close collaboration with the Passport leadership team. […] *__Based on these initiatives and given the strength of its clinical model, we believe that Passport is making solid progress towards improving its financial performance… we remain hopeful that the combination of the new reimbursement rates, administrative and clinical improvements and efforts to strengthen the balance sheet will provide a path for Passport to be successful long term in the Kentucky Medicaid market__*." | 1Q19 Earnings Call | 184 |

Source: Complaint.