UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY,

Defendants.

Case No. 1:19-cv-01031-MSN-TCB

**LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION,
APPOINTMENT OF CLASS REPRESENTATIVES,
AND APPOINTMENT OF CLASS COUNSEL AND LIAISON COUNSEL**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................... 1

II.   LEGAL ARGUMENT........................................................................................... 3

      A.    Lead Plaintiffs Are Adequate Class Representatives................................ 3

            1.    Lead Plaintiffs Are Paradigmatic Institutional Investors Who Have
                  No Conflicts With The Class ........................................................ 3

            2.    Defendants' Misapplication of the "Five-in-Three" Rule Does Not
                  Render Lead Plaintiffs Inadequate.............................................. 4

      B.    Lead Plaintiffs' Claims Are Typical Of The Class.................................. 6

            1.    Post-Disclosure Purchases Do Not Render Lead Plaintiffs Atypical ......... 6

            2.    Investment Advisors' Statements Do Not Render Plaintiffs
                  Atypical.................................................................................. 7

      C.    Mr. Coffman's Damages Model Is Universally Accepted..................................... 8

      D.    Defendants Have Failed To Rebut The Presumption Of Reliance, And The
            Full Class Period Should Be Certified................................................... 10

            1.    Defendants' Concessions "Doom" Their Arguments ............................. 11

            2.    Defendants' Front-End Price Impact Arguments Fail Because
                  Plaintiffs Have Alleged Inflation Maintenance ...................... 12

            3.    Defendants Cannot Show A Lack Of Back-End Price Impact ................. 14

            4.    The Record Evidence Fatally Undermines Defendants' Arguments........ 17

            5.    Allen's "Evidence" Is Insufficient And Improper As A Matter Of
                  Law ..................................................................................... 18

      E.    Post-Class Period Events Are Irrelevant To Class Certification .......................... 20

III.  CONCLUSION................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aronson v. McKesson HBOC, Inc.*,
79 F. Supp. 2d 1146 (N.D. Cal. 1999) ................................................................................. 5

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ............................................................................................. 16

*Burges v. Bancorpsouth Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017) ................................................................ 20

*City of Cape Coral Mun. Fire. Ret. Plan v. Emergent Bio., Inc.*,
322 F. Supp. 3d 676 (D. Md. 2018) ........................................................................ 9, 10, 20

*Cohen v. Luckin Coffee Inc.*,
2020 WL 3127808 (S.D.N.Y. June 12, 2020) ..................................................................... 5

*Cox v. Collins*,
7 F.3d 394 (4th Cir. 1993) ................................................................................................. 20

*George v. China Automotive Systems, Inc.*,
2013 WL 3357170 (S.D.N.Y. 2013) .................................................................................... 7

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021) .................................................................................... 2, 11, 12, 13

*Gross v. GFI Grp.*,
310 F. Supp. 3d 384 (S.D.N.Y 2018) ................................................................................ 10

*Hubbard v. BankAtlantic Bancorp Inc.*,
688 F.3d 713 (11th Cir. 2012) .......................................................................................... 10

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
818 F.3d 775 (8th Cir. 2016) ............................................................................................ 16

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ................................................................. 15

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ................................................................... 16

*In re Allstate Corp. Sec. Litig.*,
2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) ...................................................... 12, 16, 19

*In re Apple Inc. Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ..................................................................... 12

*In re BearingPoint, Inc. Sec. Litig.*,
   232 F.R.D. 534 (E.D. Va. 2006) ....................................................................... 6

*In re BP p.l.c. Sec. Litig.*,
   2014 WL 2112823 (S.D. Tex. May 20, 2014) ................................................... 10

*In re Celgene Corp. Sec. Litig.*,
   2020 WL 8870665 (D.N.J. Nov. 29, 2020) ...................................................... 16

*In re Computer Sciences Corp. Sec. Litig.*,
   288 F.R.D. 112 (E.D. Va. 2012) ..................................................................... 6

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) ................................................... 10

*In re Jeld-Wen Holding, Inc. Sec. Litig.*,
   2021 WL 1186326 (E.D. Va. Mar. 29, 2021) ............................................... 4, 6

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014) ................................................................... 6

*In re Mattel, Inc. Sec. Litig.*,
   2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ............................................. 15, 20

*In re NII Holdings, Inc. Sec. Litig.*,
   311 F.R.D. 401 (E.D. Va. 2015) ............................................................. *passim*

*In re Safeguard Scientifics*,
   216 F.R.D 577 (E.D. Pa. 2003) ..................................................................... 7

*In re Teva Sec. Litig.*,
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ............................................. 13, 18

*In re Vivendi Universal SA Sec. Litig.*,
   123 F.Supp.3d 424 (S.D.N.Y. 2015) ............................................................... 8

*In re Willis Towers Watson PLC Proxy Litig.*,
   2020 WL 5361582 (E.D. Va. Sept. 4, 2020) ............................................... 5, 7

*Karinski v. Stamps.com, Inc.*,
   2020 WL 6572660 (C.D. Cal. Nov. 9, 2020) ................................................. 12

*KBC Asset Management NV v. 3D Systems Corp.*,
   2017 WL 4297450 (D.S.C. Sept. 28, 2017) ............................................. 6, 9, 10

*Knurr v. Orbital ATK, Inc.*,
   220 F.Supp.3d 653 (E.D. Va. 2016) ............................................................... 5

iii

*Luczak v. Nat'l Beverage Corp.*,
548 F. Supp. 3d 1256 (S.D. Fla. 2021) ...................................................................... 15

*Middlesex County Retirement System v. Semtech Corp.*,
2010 WL 11507255 (C.D. Cal. Aug. 27, 2010) ........................................................... 4

*Milbeck v. TrueCar, Inc.*,
2019 WL 2353010 (C.D. Cal. May 24, 2019) .................................................... 6, 7, 9

*Miller v. Asensio & Co., Inc.*,
364 F.3d 223 (4th Cir. 2004) ................................................................................. 10

*Monroe Cnty Emp. Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ............................................................................. 11

*New Jersey Carpenters' Health Fund v. RBS Group, PLC*,
2016 WL 7409840 (S.D.N.Y. Nov 4, 2016) ............................................................ 4, 5

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................................ 16

*Pearlstein v. BlackBerry Ltd.*,
2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ......................................................... 15, 19

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680 (E.D. Va. Mar. 24, 2021) ........................................................... 15

*Plymouth County Retirement System v. Patterson Companies, Inc.*,
2020 WL 5757695 (D. Minn. Sept. 28, 2020) ........................................... 1, 6, 11, 17

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
2021 WL 229310 (N.D. Cal. Jan. 21, 2021) .............................................................. 9

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ............................................................. 10

*Strougo v. Tivity Health, Inc.*,
2022 WL 2037966 (M.D. Tenn. June 7, 2022) ................................................ 11, 12, 19

*Villella v Chemical & Mining Co. of Chile, Inc.*,
2018 WL 2958361 (S.D.N.Y. June 13, 2018) ............................................................. 7

*Villella v Chemical & Mining Co. of Chile, Inc.*,
333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................. 8

*Weiner v. Tivity Health, Inc.*,
334 F.R.D. 123 (M.D. Tenn. 2020) ........................................................................... 6

iv

**STATUTES**

15 U.S.C. § 78u-4(a)3(B) ................................................................................................................ 4

Pursuant to Rules 23(a), 23(b)(3), and 23(g) of the Federal Rules of Civil Procedure, Lead Plaintiffs respectfully submit this Reply Memorandum of Law in Further Support of their Motion to Certify this Action as a Class Action, appoint Lead Plaintiffs as Class Representatives, and appoint Saxena White P.A. ("Saxena White") as Class Counsel and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel for the Class ("Motion").[1]

## I.    PRELIMINARY STATEMENT

As Plaintiffs' opening brief established, this is a straightforward securities action ideally suited for class treatment—and Defendants' opposition only makes that fact more clear. Indeed, Defendants and their expert have now explicitly **conceded** that Evolent's stock traded in an efficient market during the Class Period, and that the two alleged corrective disclosures in the case indisputably resulted in statistically significant stock price declines. Moreover, Defendants have utterly failed to identify **any** confounding information that could have caused those stock price declines, meaning that for purposes of this Motion there is no dispute that Plaintiffs' allegations are correct—the corrective disclosures revealed new material information that caused statistically significant declines in Evolent's stock price. Such cold, hard facts fully demonstrate that Defendants have failed "to sever the link" between the alleged false statements and the corrective disclosures, and that Plaintiffs' motion should be granted. *Plymouth County Retirement System v. Patterson Companies, Inc.*, 2020 WL 5757695, at *12 (D. Minn. Sept. 28, 2020) ("Defendants' expert does not dispute that there were statistically significant price drops following all three disclosure dates. **This is sufficient to prevent Defendants from completely sever[ing] the link**

---

[1] Unless otherwise noted, capitalized terms have the same meanings as in the Motion or the TAC (ECF No. 150); "¶__" references are to paragraphs of the TAC; all emphasis is added; internal citations and quotations are omitted; cites to "Ex.__" are to exhibits to the Declaration of Steven J. Toll ("Toll Decl.") filed herewith; cites to "Opp." are to Defendants' opposition to the Motion (ECF No. 217-1); cites to "Allen ¶__" are to the Expert Report of Lucy P. Allen (ECF No. 217-4); and cites to "Coffman ¶__" are to the Expert Report of Chad Coffman, CFA (ECF No. 197-1).

*between the alleged misrepresentations and any impact on Patterson's stock price*.").

Defendants' remaining arguments are meritless. First, Lead Plaintiffs are clearly adequate, as they are paradigmatic institutional investors who have fully demonstrated their commitment to this case. While Defendants resort to invoking the "professional plaintiff" canard, the PSLRA provision to which they refer applies only to the selection of a lead plaintiff, *not* at the class certification stage—and even then, courts have repeatedly rejected Defendants' argument when discussing *institutional* investors such as Lead Plaintiffs. Moreover, it would be antithetical to the interests of justice to apply that "rule" at this late stage of the proceedings, to two sophisticated institutions that have been successfully prosecuting this case for *two and a half years*. Similarly, Plaintiffs' claims clearly are typical of the proposed Class, and Defendants' selective quoting of statements from Plaintiffs' investment advisors about Evolent has no relevance here whatsoever.

Second, Defendants assert that Plaintiffs' expert purportedly has not shown how damages can be calculated on a class-wide basis. Not so. Mr. Coffman's proposed out-of-pocket model is the exact same model that has been used for years to establish damages in securities class actions and "is widely accepted as the traditional measure of damages for Rule 10b-5 actions." *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413-14 (E.D. Va. 2015) (Brinkema, J.).

Third, Defendants' attempt to rebut the presumption of reliance—and to dramatically shorten the Class Period by over a year, to begin in February 2019—by arguing that Evolent's alleged false statements about its purported savings for its most important client, Passport, had *no impact whatsoever* on Evolent's stock price, is meritless. Indeed, Defendants' "front-end price impact" argument—that there was no statistically-significant price increase following the alleged misstatements—is irrelevant, as the TAC explicitly alleged an "inflation maintenance" theory, which is a widely accepted form of price impact that was recently reaffirmed by the Supreme Court. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).

2

Similarly, Defendants' "back-end price impact" argument—that there was a supposed "mismatch" between the alleged false statements and the corrective disclosures because those disclosures did not explicitly say that Evolent was responsible for Passport's financial difficulties—likewise fails. Courts have repeatedly held that price impact does not require a "mirror image" disclosure, and here, there is no question that both the alleged false statements and the corrective disclosures were highly specific, pertaining to Passport's financial condition under Evolent's management. In fact, the record is replete with evidence—including from investors, analysts, Passport's most senior executives, and even the Commonwealth of Kentucky—demonstrating that the market understood that Passport's financial condition was much worse than had been represented and that Evolent was responsible for Passport's difficulties. Underscoring this point, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

For all of these reasons and those set forth below, the Court should grant Plaintiffs' Motion and certify the proposed Class for the entirety of the proposed Class Period.

## II.    LEGAL ARGUMENT

### A.    Lead Plaintiffs Are Adequate Class Representatives

#### 1.    Lead Plaintiffs Are Paradigmatic Institutional Investors Who Have No Conflicts With The Class

Lead Plaintiffs clearly have demonstrated their adequacy. *See* Memo at 14-15. Indeed, Lead Plaintiffs are sophisticated institutional investors that together manage over $3.5 billion on behalf of public employees; have collectively recovered nearly $200 million since 2017 in actions where either fund served as a lead plaintiff; and indisputably have no conflicts with the interests of the Class. ¶¶22-23; *NII Holdings*, 311 F.R.D. at 407 (plaintiffs were "sizeable pension funds" with "strong incentive to seek the largest possible recovery" for class, and their interests aligned

3

with class in "establishing [D]efendants' liability and obtaining the maximum possible recovery").

Adequacy is further established because Lead Plaintiffs have "vigorously and competently represented the interests of the proposed class members throughout this litigation." *In re Jeld-Wen Holding, Inc. Sec. Litig.*, 2021 WL 1186326, at *4 (E.D. Va. Mar. 29, 2021). Each Lead Plaintiff has diligently supervised the prosecution of this Action on behalf of the Class. Representatives of each Lead Plaintiff: traveled across the country to prepare for and sit for depositions; collected and produced 18,449 pages of documents to Defendants; and reviewed regular correspondence from Lead Counsel and key filings, including each complaint, Defendants' discovery requests, and the Court's decisions on the motions to dismiss. *See e.g.*, Ex. 1 at 35:1-24 (reviewed all complaints); ██████████████████████████████ Ex. 3 at 22:1-24:15 (detailed knowledge of case facts, reviewed complaints and orders); *id.* 101:3-10 ("We were given examples of what was going to be filed [ ] for us to review" and "updated on a regular basis with the lead counsel"). Defendants do not, and cannot, contest Lead Plaintiffs' diligence and commitment in prosecuting this Action.

### 2. Defendants' Misapplication of the "Five-in-Three" Rule Does Not Render Lead Plaintiffs Inadequate

Unable to contest these facts, Defendants instead mischaracterize both Plaintiffs' record and a PSLRA provision sometimes referred to as the "Five-in-Three Rule"—which, Defendants claim, "presumptively bars individuals and entities who have served as a lead plaintiff in more than five cases in three years from serving in a representative capacity." Defendants are wrong. That "rule" applies to the ***lead plaintiff appointment process***, and ***not*** at class certification—which is precisely why that section of the PSLRA is titled: "Appointment of Lead Plaintiff." 15 U.S.C. § 78u-4(a)3(B). Thus, courts around the country have rejected Defendants' argument where, as here, defendants provided "no authority for [the rule's] application in the context of a motion for class certification." *New Jersey Carpenters' Health Fund v. RBS Group, PLC*, 2016 WL 7409840 (S.D.N.Y. Nov 4, 2016); *see also Middlesex County Retirement System v. Semtech Corp.*, 2010

4

WL 11507255 (C.D. Cal. Aug. 27, 2010) (same, as the court "has found no[]" authority otherwise). In fact, Defendants' own cited authorities were **lead plaintiff decisions**, not class certification opinions. *See* Opp. at 5-6 (citing *Knurr v. Orbital ATK, Inc.*, 220 F.Supp.3d 653 (E.D. Va. 2016); *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146 (N.D. Cal. 1999)).

Moreover, as Defendants **admit** (Opp. at 5), courts have repeatedly held that the "'5-in-3' rule by its terms applies to 'person[s]' rather than institutional investors, leading courts to routinely waive[] the restriction in the case of qualified institutional investors." *RBS Group*, 2016 WL 7409840, at *5. Indeed, Defendants' own authority acknowledges that the PSLRA "plainly gives courts discretion to waive" the rule. *Orbital ATK* at 662. Thus, even if the rule applied here (which it does not), and even if Plaintiffs had exceeded the provision (which they did not),[2] this case demonstrates precisely why the rule is discretionary: two sophisticated institutions with storied records have vigorously litigated this Action for over **two and a half years**, through three amended complaints, two decisions on motions to dismiss, and extensive fact and expert discovery. Against this background, it is absurd for Defendants to suggest that Lead Plaintiffs are inadequate.

Similarly, Defendants claim that Plaintiffs' portfolio monitoring agreements with counsel somehow renders them inadequate. But courts in this District and nationwide have "routinely rejected attacks on the propriety of portfolio monitoring agreements," and have found that such agreements do not render a plaintiff inadequate, particularly where the plaintiff is not obligated to commence litigation—including Lead Plaintiffs here. *In re Willis Towers Watson PLC Proxy*

---

[2] Defendants wrongly claim that Lead Plaintiffs "together have served as lead plaintiffs in at least 18 such actions in the last three years." At the time of their Lead Plaintiff certifications, Oklahoma Police had been appointed a lead plaintiff in four actions, and Plymouth five, during the prior three years. Defendants have cited no authority for aggregating lead plaintiffs together under this provision; for the relevancy of subsequent appointments; or for the idea that the number of *pending* cases is relevant. *See Cohen v. Luckin Coffee Inc.*, 2020 WL 3127808, at *7–8 (S.D.N.Y. June 12, 2020) (PSLRA addresses actions *brought* in last three years, not pending actions.).

5

*Litig.*, 2020 WL 5361582, at *15 (E.D. Va. Sept. 4, 2020); *see Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) (monitoring agreements did not render Oklahoma Police inadequate); *Patterson*, 2020 WL 5757695, at *8 (same for Plymouth).[3]

### B.   Lead Plaintiffs' Claims Are Typical Of The Class

#### 1.   Post-Disclosure Purchases Do Not Render Lead Plaintiffs Atypical

Plaintiffs demonstrated that they satisfy the typicality requirement (Mot. at 13-14) because Plaintiffs and the proposed Class all purchased Evolent common stock at inflated prices due to Defendants' alleged fraud, and all seek to recover for alleged violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. *Jeld-Wen*, 2021 WL 1186326, at *3. Nonetheless, Defendants argue that Plaintiffs' investment managers' post-corrective disclosure purchases subject them to unique defenses that defeat typicality. (Opp. at 6-9). Defendants are wrong.

Courts uniformly hold that post-disclosure purchases do not render a plaintiff atypical because post-disclosure purchases are "not unique to [plaintiffs] but will instead be applicable to many Class members," and even a post-class period purchase "is insufficient to destroy typicality." *KBC Asset Management NV v. 3D Systems Corp.*, 2017 WL 4297450 at *4 (D.S.C. Sept. 28, 2017); *see also In re Computer Sciences Corp. Sec. Litig.*, 288 F.R.D. 112, 123-24 (E.D. Va. 2012) (Ellis, J.) (post-disclosure purchases "will not destroy a lead plaintiff's typicality unless they threaten to become the focus of the litigation" and "in no way indicate[] that plaintiff would have purchased the stock at the pre-disclosure, inflated price absent the allegedly fraudulent statements"); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 539-40 (E.D. Va. 2006) (same); *Weiner v. Tivity*

---

[3] Neither Lead Plaintiff here was obligated to pursue the case, and each was free to choose lead counsel and carefully evaluated the case's merits before proceeding. *See e.g.*, Ex. 1 at 83:15-20 ("I still have full discretion to move or not move and then choose whomever"); Ex. 3 at 74:5-22 ("I am not" required to hire Saxena White). *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133 (N.D. Tex. 2014) is inapposite because the plaintiff had an exclusive monitoring agreement with one firm opposed to several firms among which it could choose. *Id.* at 149.

6

*Health, Inc.*, 334 F.R.D. 123, 130 (M.D. Tenn. 2020) (collecting cases); *TrueCar* 2019 WL 2353010, at *3 (post-class period purchases by Oklahoma Police not a unique defense).[4]

### 2.       Investment Advisors' Statements Do Not Render Plaintiffs Atypical

Defendants also argue that Plaintiffs are atypical because the investment managers that purchased these shares on their behalf testified that they concluded the decline in Evolent's stock price was attributable to non-fraud factors and that both alleged corrective disclosures did not reveal any of Defendants' prior statements to be misleading, and therefore they could not have relied on those misrepresentations. Opp. at 7-8. Defendants are wrong again.

As this is a fraud-on-the-market case, the views of Plaintiffs' "investment advisors" do not "sufficiently undercut the 'typicality' of Plaintiff[s'] claim[s] to disqualify Plaintiff[s] from acting as [] class representative[s]" because any such view "bears little" on the "common class-wide issues." *Willis Tower Watson*, 2020 WL 5361582, at *14. Moreover, Defendants ignore that Plaintiffs' investment advisors testified that they ***were not privy to any non-public information about Evolent***; that they would ***not*** buy the stock of companies that they believed had committed fraud; and that they relied on the market price in their purchases of securities. Ex. 4 at 139:8-18, 147:3-20; Ex. 5 at 138:5-23. As courts have held, and as Defendants' own authorities explicitly acknowledge, Plaintiffs are not atypical if defendants "do not cite any evidence" that "their investment advisors had information atypical of the class." *Jeld-Wen*, 2021 WL 1186326, at *4.[5]

---

[4] In both of Defendants' cases the plaintiffs seeking appointment were individuals—not institutions—who suffered from potential unique defenses not applicable here. *See George v. China Automotive Systems, Inc.*, 2013 WL 3357170, at *3 (S.D.N.Y. 2013) (plaintiffs "engaged in significant 'in-and-out' trading activity during" the class period); *In re Safeguard Scientifics*, 216 F.R.D 577, 582-83 (E.D. Pa. 2003) (the court had "serious concerns with [the] credibility" of one plaintiff, another had potential "unauthorized trades," and the last gave "conflicting testimony").

[5] Against this clear authority, Defendants rely on a decision concerning ***letters rogatory***, *Villella v Chemical & Mining Co. of Chile, Inc.*, 2018 WL 2958361 (S.D.N.Y. June 13, 2018)—***not a decision on class certification***. *Id.*, at 7 (describing "limited circumstances" where courts find

Further, these investment managers' testimony underscored the importance of Evolent's purported savings for Passport, including that: the "stock volatility related to Passport" in the wake of Passport's lawsuit against Kentucky "was the impetus for [a] deep dive" and to "further explore the value of [Evolent's] product offering" (Ex. 5 at 141:23-142:3); if Evolent had "an existing client that you believe you saved a significant amount of money for and that client says, 'I see no evidence of savings,' that—that's a problem. Absolutely" (*id.* at 148:12-16); and if Passport were to say that Evolent "didn't save us money," that would be a "headwind" to Evolent's ability to "try and sell on their product" (*id.* at 150:20-24). Similarly, after Evolent was forced to acquire Passport to prevent it from going bankrupt, a Silvercrest analyst specifically questioned whether Evolent provided any benefit to Passport, noting: "Passport hasn't been able to be profitable while already using a number of EVH products. What does EVH believe it can do that hasn't already been done to drive profitability for Passport? If that plan isn't clear it seems like they're just using our cash to prop up the largest client." Ex. 6.

### C.      Mr. Coffman's Damages Model Is Universally Accepted

At this stage, Plaintiffs' burden regarding damages is "merely [] that 'a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.'" *NII Holdings,* 311 F.R.D. at 413.    There can be no serious dispute that Plaintiffs have met this standard here. Each Class member suffered damages traceable to the alleged misstatements and omissions when the truth was revealed on February 15, 2019 and May 29, 2019. ¶¶213-14.  Mr. Coffman conducted an event study and regression analysis quantifying abnormal

---

non-reliance as involving possession of non-public information.  But at class certification, the *Villella* court found the lead plaintiff typical because it was not established that its manager "knew of the fraud." *Villella v Chemical & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 57-58 (S.D.N.Y. 2019).  Similarly, *In re Vivendi Universal SA Sec. Litig.*, 123 F.Supp.3d 424 (S.D.N.Y. 2015), was a post-trial proceeding concerning individual reliance of an opt-out plaintiff—***not*** a class certification opinion. *Id.* at 435-438 (detailing factors disproving reliance that do not exist here).

returns related to the fraud. Coffman ¶¶45-83. Mr. Coffman explained how, after common liability questions are adjudicated, the out-of-pocket method can be mechanically applied to measure damages tied to Defendants' liability. *See*, *id.*, ¶¶78-79.

Numerous courts within this District, the Fourth Circuit and nationwide have recognized that Mr. Coffman's out-of-pocket method is perfectly suited to the liability theory in Section 10(b) fraud-on-the-market cases such as here because it calculates damages based solely on the artificial stock price inflation due to Defendants' violations of the securities laws. *NII Holdings*, 311 F.R.D. at 413-14 (Coffman's "method offered by [l]ead [p]laintiffs is widely accepted as the traditional measure of damages for Rule 10b-5 actions"); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (Mr. Coffman's "out-of-pocket method will be suitable and fulfills the damages element of Rule 23(b)"); *3D Sys.*, 2017 WL 4297450, at *7 (same); *see also Emergent*, 322 F. Supp. 3d at 692 ("the Court could not find [a case] in which the court did not certify the proposed class based on the class's proposal of a sufficiently explained out-of-pocket damages model . . .").

In the face of this authority, Defendants argue that Mr. Coffman's method does not satisfy *Comcast* because: (i) his report is similar to his reports in other cases; and (ii) Mr. Coffman has not explained how he can measure the inflation attributable to sustained false statements as opposed to that from all alleged false statements combined, or how the model can isolate the portion of stock declines caused by non-fraudulent factors. Opp. at 9-13.  Both arguments fail.

First, Mr. Coffman's use of an overwhelmingly-accepted, formulized, and standard model across securities cases clearly demonstrates that his model is reasonable, objective, and suitable. *See e.g.*, *TrueCar*, 2019 WL 2353010, at *4 ("[v]arious courts have considered the same Coffman report as that offered in this case and have found it sufficient").

Second, plaintiffs are not required to disaggregate purportedly confounding information at

9

the class certification stage.   Indeed, this argument is particularly meritless here, given that Defendants and their expert have not identified any confounding information in connection with the alleged corrective disclosures.   Moreover, even if Defendants had done so, it would not defeat class certification, as it would not prevent damages from being calculated on a class-wide basis.[6] *See NII Holdings*, at \*414 (rejecting similar arguments because defendants had not demonstrated that Mr. Coffman's "damages theory does not closely hew to Lead Plaintiffs' theory of liability or that such a theory could not be applied class-wide"); *Emergent*, 322 F. Supp. 3d at 691 ("exact calculations are not necessary at this stage"); *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at \*9–10 (N.D. Ill. Feb. 26, 2020) (Mr. Coffman's method sound "even in the face of confounding information").[7]

> **D.      Defendants Have Failed To Rebut The Presumption Of Reliance, And The Full Class Period Should Be Certified**

Federal courts in this Circuit and around the country have made clear that, in order to rebut the *Basic* presumption of reliance at class certification, "[d]efendants must show by a preponderance of the evidence that the alleged misstatements caused ***no price impact whatsoever***." *Emergent*, 322 F. Supp. 3d at 686–87; *3D Sys. Corp.*, 2017 WL 4297450, at \*8 (same); *In re*

---

[6]   For similar reasons, Mr. Coffman need not have "analyzed what value, if any, the dismissed statements might have had separate from the other statements." Allen ¶89. *See 3D Sys.*, 2017 WL 4297450 at \*6-7 (rejecting argument that Coffman "fails to explain how he would calculate damages that result from [] only the alleged misrepresentations," because allowing for "any damages caused by things other than Defendants' alleged fraud [] is not required at the class certification stage").

[7] Defendants' citations are of no aide. The court in *Emergent*, 322 F. Supp. 3d at 692 distinguished *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at \*1 (S.D. Tex. May 20, 2014) *aff'd sub nom. Ludlow*, 800 F.3d 674 (5th Cir. 2015) in holding that there was no "rule that plaintiffs in a securities fraud case must put forth any particular damages calculation methodology." *Miller v. Asensio & Co., Inc.*, 364 F.3d 223 (4th Cir. 2004) and *Hubbard v. BankAtlantic Bancorp Inc.*, 688 F.3d 713, 726 (11th Cir. 2012) explain the standard for damages at trial, not class certification. *Gross v. GFI Grp.*, 310 F. Supp. 3d 384 (S.D.N.Y 2018) is a decision on summary judgment and therefore addresses the merits of loss causation, not whether damages can be calculated classwide.

*Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at \*12 (S.D.N.Y. Dec. 8, 2021) (citing *Goldman* 141 S. Ct. at 1963); *Monroe Cnty Emp. Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019); *Strougo v. Tivity Health, Inc.*, 2022 WL 2037966, at \*7 (M.D. Tenn. June 7, 2022) ("to sever the link," defendants "must show a ***complete lack of price impact*.**"); *Patterson*, 2020 WL 5757695, at \*12 (same). To meet this substantial burden, Defendants must prove a lack of both "front-end" price impact – that the misrepresentations at issue did not increase ***or maintain*** the stock price – ***and*** "back-end" price impact – that the stock price did not decline in response to the alleged corrective disclosures. *Monroe Cty.*, 332 F.R.D. at 393. Defendants have not come close to making such a showing.

### 1.    Defendants' Concessions "Doom" Their Arguments

Significantly, Defendants and their expert have *expressly conceded* both that the market was efficient for Evolent *and* that statistically significant price drops occurred on each of the alleged corrective disclosures. *See* Opp. at 14 ("Defendants do not contest that the market for Evolent stock was efficient"); Opp. at 16 (chart) (citing Allen ¶29) (showing statistically significant drops on each disclosure date under Allen's model); Allen ¶29 (affirming that both Allen's and Coffman's models show statistically significant stock price declines on each alleged corrective disclosure date). These concessions alone "doom[] Defendants' attempt to rebut the presumption." *Monroe Cty.*, 332 F.R.D. at 395; *see also Patterson*, 2020 WL 5757695, at \*12 ("Defendants' expert does not dispute that there were statistically significant price drops following all three disclosure dates. ***This is sufficient to prevent Defendants from completely sever[ing] the link between the alleged misrepresentations and any impact on Patterson's stock price*.**").

Despite these significant concessions, Defendants devote 16 pages of briefing and 30 pages of their expert's report to arguing that Evolent's alleged false statements about its purported savings for its most important client had *no impact whatsoever*, whether on the front-end or the

11

back-end, on Evolent's stock price.  Defendants' arguments wholly fail.

### 2. Defendants' Front-End Price Impact Arguments Fail Because Plaintiffs Have Alleged Inflation Maintenance

Defendants argue that the "cost-savings statements" had no front-end price impact because they did not cause statistically significant increases in Evolent's stock price.  This is irrelevant.  As Plaintiffs clearly alleged, Defendants' false and misleading statements "caus[ed] the Company's stock price to be overvalued and artificially inflated and/or *maintained at artificially inflated levels* at all relevant times."  ¶210. *See Karinski v. Stamps.com, Inc.*, 2020 WL 6572660 at *7 (C.D. Cal. Nov. 9, 2020), *appeal dismissed*, 2022 WL 1284305 (9th Cir. Apr. 28, 2022) ("[p]laintiff's price maintenance theory is made clear in the Complaint"); *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *5 (N.D. Ill. Dec. 21, 2020), at *4-5 ("Allen erroneously conflates the lack of an increase with the lack of inflation… [and thus] fails to rebut the Basic presumption in light of plaintiffs' inflation maintenance theory.").  Significantly, the inflation maintenance theory is widely accepted and was recently reaffirmed by the Supreme Court.  *Goldman*, 141 S. Ct. at 1961; *see also In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *7 (N.D. Cal. Feb. 4, 2022) ("[P]rice impact can be observed on the 'front-end' (i.e., misstatements causing *or maintaining inflation*) *or* on the 'back-end' (i.e., a decline in price caused by the corrective disclosures)").[8]

In a re-hash of their arguments at the pleading stage, Defendants argue that there was no

---

[8] While Plaintiffs are proceeding on an inflation maintenance theory, Defendants also have not met their burden to show that none of the price increase following the January 10, 2018 statement was the result of the alleged false statement that day, and Ms. Allen has not argued that the model Mr. Coffman used to show a statistically significant price increase that day was unsound, only that she believes a different model is more appropriate.  Defendants also do not argue that there was no price impact from the February 26, 2019 alleged false statements.  Plaintiffs thus do not address them here, as Defendants have the burden to show lack of price impact.  This, too, dooms their arguments and their attempt to shorten the class period. *See, e.g., Tivity*, 2022 WL 2037966, at *9 (rejecting defendants' lack of price impact arguments where they "ha[d] not attempted to dispute price impact with respect to [some of] the alleged statements," and rejecting attempt to shorten class period by throwing out other alleged statements on purported lack of price impact).

"front-end" price impact from their January 2018 statement claiming to have saved Passport $100 million in "MLR/ALR reduction" because, *inter alia*, the statements were not also repeated in oral remarks accompanying the presentation, Defendants did not identify the partner by name, and analysts purportedly did not focus on the statement.  However, these are *materiality* arguments, not price impact arguments, that are merits issues inappropriate for resolution at class certification. *See, e.g., In re Teva Sec. Litig.*, 2021 WL 872156, at *41 (D. Conn. Mar. 9, 2021) (declining to consider materiality arguments already rejected at the motion to dismiss stage, and noting that "while securities class action defendants have numerous avenues for challenging materiality, Rule 23 is not one of them."); *Goldman*, 141 S. Ct. at 1961, n. 2 (While there is "overlap" between the *evidence* that might be used to support both price impact and merits issues, the Court must "use the evidence to decide the price impact issue *while resisting the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits*.").

Significantly, the Court already rejected these arguments (Ex. 10 at 36:20-37:6), and the evidence further establishes Plaintiffs' allegations. Indeed, fundamentally undermining Defendants' argument, Evolent specifically highlighted its claim of $100 million in savings on its Twitter account the same day as the JPMorgan presentation—*one of only three statements from the presentation that Evolent tweeted* ("Evolent Health delivers results across all partner strategies = one of our #fullrisk partners achieved MLR/ALR reduction impact representing $100M+ in identified annualized savings. #JPM18"). Ex. 18.  Further, Defendants highlighted near-identical statements throughout the Class Period, including in May and September 2018 investor events, and a William Blair analyst, reproduced the May 2018 slide as a "key highlight" and deemed the alleged false statement as evidence that "the Company has now demonstrated an ability to drive results for its partner organizations."  Ex. 20.  As this Court has clearly held, the mere fact this statement did not explicitly refer to Passport by name did not render it immaterial.  *See, e.g.,* Ex.

13

10 at 29:15-30:15. ("the point of including [the statement] in the slide was to demonstrate that Evolent is a competent company that is helping healthcare companies realize savings.")

Finally, the record evidence fully demonstrates that Evolent's cost-savings statements were highly material to investors.  Indeed, the fact that Evolent itself chose to highlight the purportedly massive savings it generated for Passport to investors throughout the Class Period directly belies any claim now by Evolent that such statements were immaterial.  No one forced Evolent to make these statements—it did so voluntarily, and precisely because it wanted investors to believe it was saving its most important client hundreds of millions of dollars.  *See, e.g.,* ECF No. 178 at 18-21; Ex. 7 at 136:3-137:5 (JPMorgan presentation was "hugely important" and "your slides go up on a screen that's like the size of a movie theater screen. It's enormous."); Ex. 8 at 69:4-18 (affirming importance of JPMorgan conference); Ex. 2 at 102:13-15 (same); Ex. 9 at 184:18-185:12 (investors and clients would want to know if Evolent provided a net savings to Passport); Ex. 11 at (Evolent COO explaining that Passport was a "proof point" to help "win business" based on "track record."); Ex. 12 (Lead Plaintiff's investment manager stating that "***[t]he real issue is are they [Evolent] saving customers money***").  For these reasons alone, Defendants' price impact arguments fail.

### 3.     Defendants Cannot Show A Lack Of Back-End Price Impact

There is no question that Plaintiffs have demonstrated back-end price impact.  As mentioned above, Defendants and their expert specifically concede that the corrective disclosures resulted in statistically significant price declines, and Defendants point to no other information that could have caused those declines.  Nevertheless, relying on *Goldman*, Defendants argue that there is a supposed "mismatch" between the alleged false statements concerning Evolent's purported savings for Passport and the corrective disclosures, because the corrective disclosures did not expressly state that Evolent failed to save Passport money.  Significantly, the Court has already rejected this argument *twice*, and Defendants have proffered no reason to disturb that holding.  See

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *38 (E.D. Va. Mar. 24, 2021) ("MTD Order"); Ex. 10 at 37:4-6 ("I do find that there's a sufficient connection between the corrective statements" and the savings statements).

Furthermore, Defendants' argument misconstrues the law. Courts have rejected Defendants' ***own expert*** in finding that price impact ***does not*** require that a disclosure be a "mirror image tantamount to a confession of fraud." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *19 (S.D.N.Y. Jan. 26, 2021) (noting that "Allen applie[d] the improper 'mirror image' principle" in arguing certain disclosures weren't corrective of alleged false statements); *see also In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021) ("This Court does not read *Goldman* to contradict that a 'corrective disclosure need not be a mirror image disclosure—a direct admission that a previous statement is untrue.'").[9] In truth, there is no "mismatch" here: the alleged false statements were detailed and specific, focusing intently on Evolent's purported savings for its most important client, and the corrective disclosures specifically revealed that the opposite was true, that Passport's financial condition was disastrous, and that as a result Evolent was forced to bail out Passport. Contrary to Defendants' assertions, Evolent did not need to explicitly admit that the reason Passport failed was because Evolent mismanaged the health plan—such an admission is not required under the federal securities laws.

Additionally, Defendants' argument that there was no "new information" in the Passport Complaint fails to show a lack of price impact. Opp. at 23-26. First, the Court has already rejected

---

[9] *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1263 n.3 (S.D. Fla. 2021) (Opp. at 20) is inapposite, as there, "Plaintiff did not allege" the analyst report in question to be a corrective disclosure. *Id. In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, (N.D. Cal. Dec. 22, 2016) (Opp. at 21) is also inapposite, as there the disclosure in question was an earnings release that was *entirely* unrelated to the surviving misstatements, which concerned product safety, and further, did not cause a statistically significant price decline. *Id.* at *15-16. Likewise, "[t]he generic representations in *Goldman*—e.g., 'Integrity and honesty are at the heart of our business'—are nothing like highly specific [] statements" at issue here. *Mattel*, 2021 WL 4704578, at *5.

this argument. MTD Order at \*38 ("[i]t is of no moment that the *Insider Louisville* article was published prior to the commencement of the Passport lawsuit.").[10] Second, Defendant McGrane himself admitted in an email that the market saw the lawsuit as "new news," Ex. 13, and, as discussed below, record evidence shows that the market clearly linked this "new news" to suspicions that Evolent was harming Passport. Indeed, even Defendants' opposition acknowledges that the lawsuit's filing was seen as an "***alarming new development that added further uncertainty***," (Opp. at 24, n.17) and that it revealed Passport's ***insolvency was imminent***, rather than a hypothetical future outcome. *Id.* at 24. Finally, Defendants fail to explain why, if the lawsuit did not reveal new information, its filing caused an 11% decline in Evolent's stock price. *See, e.g., Allstate*, 2020 WL 7490280, at \*5 (Allen's claim that "the [disclosures] revealed no new information to the market" is "***difficult to square with the 10% price drop***," and Allen's lack of "empirical testing" to determine cause of stock price drop is "fatal to defendants' [opposition]."); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (Easterbrook, J.) ("hard to understand the sharp drop in the price of [the] stock" if "full truth had reached the market.").[11]

---

[10] That Evolent's stock price did not experience a statistically significant drop following the publication of the *Insider Louisville* article has no bearing on the price impact, particularly given that Defendants ***expressly denied these concerns within the same article***. *See, e.g., In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at \*12-\*13 (S.D.N.Y. Sept. 8, 2021) (price impact found even though reports preceding corrective disclosure that linked defendants' product to cancer had not caused statistically significant price drops, particularly because defendants had "specifically tried to downplay and discredit [the reports] by making misrepresentations to the public.").

[11] Defendants' cases do not help them. *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 780 (8th Cir. 2016) has been recognized as an outlier case based on a highly unusual fact pattern that does not apply here. *See, e.g., In re Celgene Corp. Sec. Litig.*, 2020 WL 8870665, at \*10 (D.N.J. Nov. 29, 2020) ("the Eighth Circuit's decision [in *Best Buy*] was based on the specific evidence presented in that matter – namely that the plaintiffs' own expert attributed the entire price change to the press release" rather than the earnings call the same day). And in *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*17 (N.D. Ohio Aug. 14, 2018), the plaintiffs failed to establish market efficiency.

16

### 4.    The Record Evidence Fatally Undermines Defendants' Arguments

Significantly, the evidentiary record only underscores the direct link between the alleged misstatements and the corrective disclosures. First, with respect to the February 19, 2019 stock price decline (which came mere weeks after the *Insider Louisville* article was published), the disclosure of the Passport Complaint filing raised serious questions as to Passport's financial condition and whether Evolent was the cause of that distress. *See, e.g., Patterson* 2020 WL 5757695, at *16 (negative earnings announcement weeks after FTC complaint filing revealed "impact that the antitrust conduct had had on propping up Patterson's prior earnings," even though the announcement itself "did not contain any information relating to the alleged antitrust misconduct."). In fact, █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ ; *see also* Ex. 12 (Plaintiffs' investment manager heard that "***EVH's fees may also be part of the problem***" though it was "tough to determine this from [Passport's] public filings."). Moreover, these concerns were *directly* tied to questions about Evolent's purported cost savings for Passport. For example, internal documents show that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ [12]

---

[12] Ms. Allen argues that "Plaintiffs have not provided any rationale for why Passport would sue Kentucky, rather than Evolent, if Evolent was the true cause of Passport's financial difficulties."

After Evolent's May 29, 2019 announcement of its bailout of Passport, analysts made clear that the real reason for the acquisition was Passport's disastrous financial condition. Moreover, the notion that the market did not believe Evolent was responsible for Passport's decline when Evolent boasted that the Company was a "co-owner" with "joint governance" of the plan defies credulity and contradicts the evidence. Indeed, shortly following the disclosure, ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████  These issues thus clearly

impacted Evolent's stock price.

### 5. Allen's "Evidence" Is Insufficient And Improper As A Matter Of Law

Ignoring this evidence, Defendants' expert instead provides her own qualitative commentary on analyst reports and conference call transcripts. This "evidence" is insufficient, as a matter of law, to rebut the presumption of reliance, and thus Defendants' arguments fail. *Teva*,

---

Allen ¶61. Like much of her report, Ms. Allen's comment is not only speculative and irrelevant, but wholly ignores the fact that Evolent itself touted that it was a "co-owner" of Passport with "joint governance and [the ability] to drive the decisions we think are important for performance." ¶46. Moreover, there is a plethora of evidence for Evolent's culpability, including that ██████ ████████████████████████████████████████ and that Passport executives internally ***blamed*** Evolent for Passport's woes. *See, e.g.,* Ex. 14 at 97:3-98:21 (Passport's COO testified Passport was "***losing money using Evolent***"); ████████████████████████████ ████████████████████████████████████████

2021 WL 872156, at *41 (expert's "qualitative review [of] Teva's SEC filings, press releases, and conference call transcripts …is not nearly enough to show by a preponderance of the evidence" a complete lack of price impact); *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *20-21 (S.D.N.Y. Jan. 26, 2021) (review of analyst commentary "not a scientifically accepted method of demonstrating price impact or its absence." ).  Indeed, undermining much of her analysis, ***Allen herself testified that it isn't "necessary for an analyst to react to a statement for there to be a price impact***."  Ex. 19 at 57:22-58:2.

As she has done in other cases, Ms. Allen also intentionally ignores analyst commentary that contradicts her theory, further discrediting her analysis.  *See, e.g., Allstate*, 2020 WL 7490280, at *6 ("Allen [] disregard[ed] analyst commentary that contradicts her conclusion.").  For example, Ms. Allen argues that the May 29, 2019 stock price decline was solely "due to the market's concern about a change in Evolent's business model from a tech services company to a health plan administrator."  Allen ¶¶66-69.  Yet, Evolent only bought Passport because Passport's financial condition left it no choice—which the market clearly understood.  Indeed, numerous analysts, including those cited by Ms. Allen, made this clear: Evolent purchased Passport because "Passport wasn't in a position to remain operationally sustainable as a standalone entity, [suggesting that] EVH's investment and balance sheet commitment is likely instrumental in supporting the business," (¶ 127); Evolent "had to pay to maintain its customer base," (*id.*); and the bail-out was "more driven by the need to retain a key client as opposed to a unique opportunity." Ex. 17.

Accordingly, the Court should reject Defendants' transparent attempt to shorten the Class Period.  *See Tivity*, 2022 WL 2037966, at *9 ("To the extent [Defendants believe they are] entitled to shorten and limit the class period without showing a complete lack of price impact, the Court disagrees . . . the question of what caused the stock price to decline is an ultimate merits questions for which plaintiffs bear the burden at trial, not at class certification.").

19

**E.    Post-Class Period Events Are Irrelevant To Class Certification**

In addition to her Class Period "evidence," Ms. Allen introduces scattershot post-Class Period information that she claims further shows a lack of price impact, such as a "substantial increase" in Evolent's stock price ***long after the Class Period*** as evidence supposedly negating Plaintiffs' theory of the case. But Evolent stock only rebounded to its February 15, 2019 pre-corrective disclosure closing price of $16.80 per share on January 7, 2021—***nearly 20 months after the end of the Class Period***—and only rebounded to its Class Period high of $28.75 on September 29, 2021—***nearly two-and-a-half years after the Class Period ended***. For good reason, courts routinely reject such arguments. *See Emergent* 322 F. Supp. 3d at 690 n.4 (a court need not "look so far beyond the identified corrective disclosure to assess price impact."); *Mattel,* 2021 WL 4704578, at *6 (post-Class Period rebound did not refute price impact). Ms. Allen's arguments concerning Evolent's purported post-Class Period success are far outside the Class Period and discovery parameters, are irrelevant, and should be ignored.[13]

**III.    CONCLUSION**[14]

For all of the foregoing reasons, Lead Plaintiffs respectfully request that the Court certify the proposed Class for the entire proposed Class Period, and that it appoint Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel.

---

[13] Tellingly, Ms. Allen ignores the post-Class Period events that undercut her theories—such as the fact that, shortly after the Class Period ended, Kentucky rejected Passport's RFP response and denied it a Medicaid contract, forcing Evolent to sell Passport.

[14] Plaintiffs also are entitled to an *Affiliated Ute* presumption of reliance, and Defendants are wrong on this as well. (Opp. at 30). "Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the Affiliated Ute presumption as to the element of reliance with regard to alleged omissions." *Burges v. Bancorpsouth Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017). Defendants' authority, *Cox v. Collins*, 7 F.3d 394 (4th Cir. 1993), is an inapposite post-judgment decision on improper jury instructions.

20

Dated: June 17, 2022                    Respectfully submitted,


                                        /s/ Steven J. Toll
                                        Steven J. Toll
                                        Va. Bar No. 15300
                                        stoll@cohenmilstein.com
                                        Daniel S. Sommers
                                        dsommers@cohenmilstein.com
                                        **COHEN MILSTEIN SELLERS
                                        & TOLL PLLC**
                                        1100 New York Avenue, Suite 500
                                        Washington, D.C. 20005
                                        Tel: (202) 408-4600
                                        Fax: (202) 408-4699

                                        *Liaison Counsel for Lead Plaintiffs and the
                                        Proposed Class*

                                        **SAXENA WHITE P.A.**
                                        Maya Saxena
                                        Joseph E. White III
                                        Lester R. Hooker
                                        7777 Glades Road, Suite 300
                                        Boca Raton, FL 33434
                                        Tel: (561) 206-6708
                                        msaxena@saxenawhite.com
                                        jwhite@saxenawhite.com
                                        lhooker@saxenawhite.com

                                        Steven B. Singer
                                        Sara DiLeo
                                        Joshua H. Saltzman
                                        10 Bank Street, 8th Floor
                                        White Plains, New York 10606
                                        Tel: (914) 437-8551
                                        ssinger@saxenawhite.com
                                        sdileo@saxenawhite.com
                                        jsaltzman@saxenawhite.com


                                        *Lead Counsel for Lead Plaintiffs and the Proposed
                                        Class*


21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2022, I caused the foregoing to be electronically filed with

the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs and the
Proposed Class*

22