UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**PLYMOUTH COUNTY RETIREMENT** :
**SYSTEM, et al.,** :
: Civil Action
: No. 1:19-cv-1031
**Plaintiffs,** :
**v.** :
: July 8, 2022
**EVOLENT HEALTH, INC., et** : 1:08 p.m.
**al.,** :
:
:
**Defendants.** :
:
............................ :

**TRANSCRIPT OF MOTION PROCEEDINGS**
**BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

  For the Plaintiffs:      SAXENA WHITE P.A.
                           LESTER R. HOOKER, ESQ.
                           JOSHUA H. SALTZMAN, ESQ.
                           7777 Glades Road, Suite 300
                           Boca Raton, FL 33434

                           COHEN MILSTEIN SELLERS & TOLL PLLC
                           STEVEN J. TOLL, ESQ.
                           DANIEL S. SOMMERS, ESQ.
                           1100 New York Avenue NW, Suite 500
                           West Tower
                           Washington, DC 20005

  For the Defendants:     HIRSCHLER FLEISCHER, P.C.
                          ROBERT R. VIETH, ESQ.
                          8270 Greensboro Drive, Suite 700
                          Tysons Corner, VA 22102

                           (Continued)

For the Defendants:        KING & SPALDING LLP
                           MICHAEL R. SMITH, ESQ.
                           PETER STARR, ESQ.
                           PAUL R. BESSETTE, ESQ.
                           1180 Peachtree Street NE
                           Suite 1600
                           Atlanta, GA 30309

Court Reporter:            Diane Salters, CSR, RPR, RCR
                           Official Court Reporter
                           United States District Court
                           401 Courthouse Square
                           Alexandria, VA 22314
                           Email: Dianesalters.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

THE COURTROOM DEPUTY:  *Plymouth County Retirement System, et al. vs. Evolent Health, Inc., et al.*, Case Number 19-cv-1031.  Will the parties please note their appearances for the record.

MR. SOMMERS:  Good morning, Your Honor.  For the plaintiffs, Steven Toll and Dan Sommers from Cohen Milstein, and Lester Hooker and Josh Saltzman from Saxena White, and Mr. Hooker will be arguing today.

THE COURT:  Good morning to you all.  Good morning, Mr. Hooker.

MR. VIETH:  Good morning, Your Honor.  Robert Vieth of Hirschler for the defendants, and with me are Michael Smith and Peter Starr and Paul Bessette of the King & Spalding firm.  And with the Court's permission, Mr. Starr will address the adequacy and typicality arguments, and Mr. Smith will address the *Comcast* and price impact points.  Thank you, Your Honor.

THE COURT:  Good morning to you all.

All right.  Long morning, but we're just getting started.

This matter comes before the Court on the lead plaintiffs' motion to certify.  This is a class action, and I've received a lot of materials and had the opportunity to review all of it.  I know the defendants wish to present even more information today through live testimony; and while I considered that opportunity, I concluded that we could proceed fully

considering all of the evidence in the record carefully, through exhibits and affidavits and declarations, and I have done so. But to the extent there is any further information that the defendants feels is important to put into the record or present, I will hear that today.  It is, however, the plaintiffs' motion, so I'll hear from the plaintiffs first.  I do not need to hear a lecture, however, I have read these pleadings.  I will not hesitate to interrupt and redirect if I feel like we're not using our time productively.

MR. HOOKER:  Good morning, Your Honor.  Lester Hooker from Saxena White on behalf of the lead plaintiffs and the class again, and may it please the Court.

I know the parties have submitted, you know, substantial materials in connection with our motion, but, really, at the heart of it, it's a straightforward securities class action.  It's similar to other cases that courts within this district and around the country have found suitable for class treatment.  We're seeking to certify a class for the same period that Your Honor sustained in your order on the motion to dismiss from a few months ago.

Our initial brief set forth that the requirements of Rule 23(a) and (b)(3) were easily satisfied here.  We also established that plaintiffs are entitled to the presumption of reliance because there is no question that the market for Evolent securities was efficient.  They traded on the New York Stock

Exchange.  Virtually every relevant *Cammer* and *Krogman* factor satisfied.  And I know we highlight this in our papers, but it's important to note two concessions that defendants and their expert made, and that's they conceded that the market was efficient for Evolent stock, and they also conceded that two corrective disclosures in this case resulted in statistically significant stock price declines, and they're the same disclosures that Judge Alston sustained in the first motion to dismiss order and that Your Honor sustained in the second. Defendants and their expert also failed to identify any information that could have caused those stock price declines other than the corrective disclosures.

So I'll address defendants' arguments that they make in their opposition, and they're really arguments that we see in virtually every opposition to a securities class action class certification motion:  Adequacy, typicality, the damages model of our expert, and the price impact issue.  As we mentioned in the briefing, they're really unsupported by the extensive factual record that we've set forth in this case, the vast weight of authority, the case law; and several of them are simply improper to consider at this stage.  They're merits issues.  They should be for summary judgment or trial.

With respect to adequacy, defendants argue that the class should not be certified because the lead plaintiffs here are somehow inadequate to service class representatives, and this

is the Oklahoma Police Pension and the Plymouth County Retirement System.  Now, they have a long track record of successfully serving as class representatives and lead plaintiffs in other cases.  Here, defendants' argument is despite the fact that they've successfully litigated this case for the better part of three years now, these institutions are supposedly not adequately representing the interest of the class, so the class should not be certified and the class should not recover anything.  We think that doesn't make sense, particularly with regard to the record that we've set forth regarding their representation.  Again, they've supervised counsel for three years through the filing of three amended complaints, two orders on the motion to dismiss, extensive discovery.  Their executive directors and administrative staff identified, collected, reviewed, and produced nearly 20,000 pages of documents in that discovery. Their executive directors flew across the country to prepare for and sit for their depositions, and they've demonstrated an extensive knowledge of the case during that deposition.  They knew the class; they knew the defendants; they knew that they're representing the interest of class members; they knew their role as class representatives and that they're supervising counsel.

I'll briefly address their arguments on adequacy, the five-in-three rule; they call it.  It's a PSLRA provision that they claim bars a plaintiff from serving in a representative capacity in more than five cases in three years.  In Footnote 2

of our reply brief, we take issue with the math, but setting that aside, the so-called rule actually doesn't apply here.  It applies to the lead plaintiff selection process.  We cite the PSLRA itself that says that and courts around the country that have held that.  In defendants' own authorities that they cite to in support of that position are lead plaintiff decisions; they're not class cert opinions.  And even then and in the other cases that we cite concede that this provision is entirely discretionary even at the lead plaintiffs' stage.  And particularly so, courts weigh this provision with respect to qualified institutional investors that we have here.

Defendants raise another issue on the adequacy point, and that's that the lead plaintiffs are somehow inadequate because they have portfolio monitoring agreements with counsel. And, again, courts have rejected this argument, including with respect to the two lead plaintiffs here, both Plymouth and Oklahoma Police.  We cite the *TrueCar* case out of the Central District of California with respect to Oklahoma Police, and the *Patterson* case from the District of Minnesota with respect to Plymouth, and that holding is particularly appropriate where the portfolio monitoring agreement does not obligate the plaintiff to commence litigation, much less with that counsel; and that's what we have here.

With regard to defendants' arguments on the typicality of the lead plaintiffs, they're similarly problematic.  There's

two issues here.  One is they argue that post-disclosure purchases somehow render the plaintiffs atypical.  And on page 6 of our reply, we cite several cases from this district and around the country rejecting that argument, including Judge Ellis' *Computer Sciences* case, and they all find they explicitly, repeatedly find that post-disclosure purchases are insufficient to destroy typicality.  Judge Ellis, in the *Computer Sciences* case, said, quote, the substantial majority of cases, end quote, come out that way.  Cases also comment that the purchases are not even unique to the lead plaintiffs, as other class members had similar trades.  We cite the *KBC Asset Management* case out of the District of South Carolina that said post-disclosure purchases are not unique and they are insufficient to destroy typicality.

The second point on typicality that they raise is that testimony from the investment advisors for the lead plaintiffs somehow renders the lead plaintiffs atypical and, you know, their thoughts on Evolent's stock price decline during the class period.  Again, this is a fraud-on-the-market case.  The views of individual investment advisors largely do not -- or bear little on common class-wide issues.  But, here, the central question that courts look to is:  Were the investment advisors privy to nonpublic information?  It's not the case here.  Both of the investment advisors testified that they were not privy to nonpublic information.  Judge Gibney, in the *JELD-WEN Holding* case that we cite in our brief, held that lead plaintiffs are not

atypical if defendants, quote, do not cite any evidence that their investment advisors had information atypical of the class, end quote.  So we submit that the lead plaintiffs have demonstrated their adequacy and typicality and should be appointed as class representatives.

I'll turn to defendants' arguments on the damages model that lead plaintiffs' expert, Mr. Coffman, has submitted.  And just off the top, Mr. Coffman is really a renowned expert.  His opinions and reports have been accepted and approved by courts around the country on dozens of occasions.  But, again, the central question here is, Can damages be calculated on a class-wide basis?  And the resounding answer is yes, as it is in a multitude of cases.  Mr. Coffman fully explained in his report how the out-of-pocket methodology can be mechanically applied here to measure damages tied to defendants' liability, and this method is the exact same method that is used in virtually every securities class action.  Judge Brinkema, in the *NII Holdings* case stated that this method, quote, is widely accepted as the traditional measure of damages for Rule 10b-5 actions, end quote.  So despite that authority, defendants lodge, again, similar arguments to what we've seen in other cases.  First, they argue that Mr. Coffman's report is similar to reports that he submitted in other cases.  Well, that's to be expected given that the methodology is universally accepted.  In the *TrueCar* case that I mentioned earlier, the Court rejected this same argument and held

that, quote, various courts have considered the same Coffman report as that offered in this case and have found it sufficient, end quote. And that's at *4 of the opinion.

The second point that defendants raise is that Mr. Coffman has not isolated the portion of the stock price decline that was caused by the sustained false statement versus supposedly non-fraudulent factors. Again, this is a disaggregation argument that we see in virtually every case. We cite the *KBC Asset Management* case from the District of South Carolina rejecting the same argument that Mr. Coffman fails to explain how he would calculate damages that result from, quote, only the alleged misrepresentation. And, there, the Court said that allowing for, quote, any damages caused by things other than defendants' alleged fraud is not required at the class certification stage, end quote. Again, Judge Brinkema, in the *NII Holdings* case, similarly rejected this same argument and held that defendants had not demonstrated that Mr. Coffman's, quote, damages theory does not closely hew to lead plaintiffs' theory of liability or that such a theory could not be applied class-wide. And that's the case here. We cite to a number of other cases on page 10 of our reply that follow the same approach that Judge Brinkema used in *NII*.

And I'll get to defendants' price impact argument now, which is really, I guess, what they spill the most ink on in their briefs. So defendants tried to defeat class certification

or, essentially, achieve the same result by dramatically limiting the class period to just a couple of months through a price impact argument, but the cases make clear that in order to do so, they face an incredibly difficult, exceedingly tall task.  They have to show by a preponderance of the evidence that the alleged misstatements caused no price impact whatsoever, no impact.  They have to completely sever the link between the alleged misstatements and any impact on Evolent's stock price.  And I mentioned this at the top of the presentation -- I'll just revisit it now -- the two concessions to market efficiency and statistical significance to the stock price declines are really fatal to this argument.  The *Patterson* case from the District of Minnesota is basically directly on point here.  And I'll quote Judge Davis' opinion:  Quote, defendants' expert does not dispute that there were statistically significant price drops following all three disclosure dates.  This is sufficient to prevent defendants from completely severing the link between the alleged misrepresentations and any impact on Patterson's stock price, end quote.  And that's at *12 of the opinion.

There was the *Tivity Health* case just a few weeks ago out of the Middle District of Tennessee, same arguments, same defense counsel, even; and, there, the Court said, quote, to sever the link, defendants must show a complete lack of price impact.  And the Court found that they had not done so and certified the class.  So the concessions alone and the price

impact inquiry at the class certification stage -- but I'll get to the two categories of arguments that they make under this umbrella.  The first is the front-end price impact, and they argue that there's no price impact because the cost-savings statement that start the class period did not result in a statistically significant increase in Evolent's stock price.  And I'll just note that there was a stock price increase after the start of the class period, but I'll set this aside for a second because defendants haven't met their burden to show that none of that increase can be attributable to that statement.  But it's really irrelevant here because even if there was a lack of a stock price increase, the third amended complaint clearly alleges a price-maintenance theory, and we cite paragraph 210 in our brief on that, and numerous courts have explicitly rejected this argument on that very basis.  They've also criticized defendants' expert on this basis.  We cite the *Allstate* case from the Northern District of Illinois that was decided just a year and a half ago; and, there, the Court held that, quote, Ms. Allen erroneously conflates the lack of an increase with the lack of inflation and, thus, fails to rebut the *Basic* presumption in light of plaintiffs' inflation-maintenance theory.  And that's at *5.  And there's no controversy over this theory.  The Supreme Court reaffirmed it in the *Goldman* case.  Numerous courts have also recently followed it, including the *Apple* case from California that we cite in our brief, the *Tivity* case that I just

mentioned from Middle District of Tennessee.

But turning back to defendants' argument regarding the cost-savings statement, they rehash their pleading stage argument that because the cost-savings statement does not specifically name Passport as the full-risk partner in the statement, somehow it could not have caused any impact on the stock price for Evolent. And, again, as an initial matter, this is a materiality argument that's inappropriate for resolution at the class certification stage. The Supreme Court, in *Goldman*, specifically stated that the Court must, quote, use the evidence to decide the price impact issue while resisting the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits, end quote. The *Teva* case that we cite from the District of Connecticut similarly held. There, the Court held that while securities class action defendants have numerous avenues for challenging materiality, Rule 23 is not one of them. And *Teva* is interesting because they declined to consider materiality arguments at the class certification stage especially when the Court had already rejected that same argument at the pleading stage.

THE COURT: But you agree it's appropriate to consider it at the summary judgment stage?

MR. HOOKER: Yes, Your Honor. Ultimately, we think that materiality is a merits question that goes to the jury, too, but, here, it's particularly appropriate that it's not

appropriate to consider class certification since the Court's already rejected it as well.  The Court specifically found that the mere fact that the statement did not name Passport does not render the statement immaterial.  And even if it was appropriate to consider at this stage, we've set forth an extensive record that actually shows and supports plaintiffs' allegations here.  Evolent itself clearly and specifically highlighted the same statement on its Twitter account, the corporate Twitter account, on the same day of the presentation, and it makes no sense to suggest that something is immaterial when the company goes out of its way to highlight that same statement -- one of only three statements that were highlighted that day -- on their corporate Twitter account.  And defendant highlighted virtually the identical statement on multiple times and multiple formats during the class period.  They did so voluntarily.  They didn't have an obligation to do so, and they did that to ensure investors that Evolent was doing what it said it was doing, that it was saving its most important client hundreds of millions of dollars.  And we cite several deposition transcripts and materials that confirm the importance of the statements at the JPMorgan presentation at the beginning of the class period; some of the individual defendants and senior executives at Evolent saying that, you know, it's a movie theater-sized screen that the presentation was displayed on and how important that presentation was.

Regarding the back-end price impact arguments that

defendants make -- and, really, we respectfully think that these are even more strained -- again, given the concessions that the corrective disclosures resulted in statistically significant price declines and the fact that they offered no other information other than the corrective disclosures that could have caused those price declines --

THE COURT:  Well, I think their argument really is that maybe they really aren't corrective disclosures.  And, again, that's been litigated already, but the argument is the price decline didn't come from a recognition that the hundred million dollars was a false statement; it came from worry about Passport's viability going forward and what that might mean as a big customer for Evolent.

MR. HOOKER:  Look, I think that might be the crux of their argument, but at base here, they're not pointing to any other news that came out that day that could have caused a price decline.  So they have no confounding information in the sense that, Well, there was this one announcement, but they also announced, you know, 20 other different things, and these other things took place on this day that could have caused the stock price decline.  They don't provide anything like that.  And, you know, their argument really boils down to in order to have, according to them, a back-end price impact, you, presumably, need to have Evolent confessing that it failed to save Passport money. And that's not the law.  Again, requiring a mirror image

disclosure, basically a confession by the corporate entity, it would place liability in the hands of the corporate defendants themselves, and that's just not the case.

We point out in our rely brief -- I know Your Honor has mentioned the Court has twice rejected this, finding that there was a sufficient connection between the misstatements and the corrective disclosures, and courts have similarly rejected the same argument on multiple times, including with respect to defendants' expert's opinions, because the opinion improperly applied that mirror image principle -- we cite the *Pearlstein v. BlackBerry* case from the Southern District of New York from last year. There, the Court held that, quote, Allen applied the improper mirror image principle, end quote, in making this argument. And I wanted to highlight another quote that kind of boils down -- that really summarizes what we have here, and that's at *19: Quote, this Court is not persuaded by arguments that this disclosure only mentioned one thing; discussion of that one thing in no way indicates or reveals a problem with this other thing; ergo, no revelation of fraud, end quote. And that's what we have here.

We also cite the *Mattel* case from California where the Court held, quote, this Court does not read *Goldman* to contradict that a corrective disclosure need not be a mirror image, a direct admission that a previous statement is untrue, end quote.

Now, setting aside the case law, there really is no

mismatch here, contrary to what defendants contend.  The misstatements weren't vague, generic, general statements about, you know, corporate actions; they were intently focused on Evolent's purported savings for Passport, its most important client.  And the corrective disclosures revealed that the opposite was true, that Passport's financial condition was disastrous and, as a result, Evolent was forced to bail out the health plan.

With regard to the first partial disclosure in February 2019, the filing of the Passport complaint, defendants argue, as they did previously at the pleading stage, that this was not new, there was no new news here, because there was an *Insider Louisville* article that was published weeks earlier examining Passport's finances.  The Court has already rejected this argument.  Judge Alston found that, quote, it is of no moment that the *Insider Louisville* article was published prior to the commencement of the Passport lawsuit, end quote.  And that's at *38 of the first motion to dismiss order.  And Judge Gibney, in the *JELD-WEN* case that we cited in our brief, also rejected the argument that a disclosure revealed nothing new to the market, and Judge Gibney held, quote, the defendants auditioned this argument at the motion to dismiss stage.  The argument fell flat then, and it fails now for the same reason:  The liability announcement disclosed new information to the market, end quote.

We also set forth evidence in the record that support

us.  Defendant McGrane admitted in an email that the market saw the lawsuit as new news.  Defendants don't really explain why if there was nothing new in this disclosure, the stock price fell 11 percent immediately thereafter.

We cite the *Allstate* case, again, where they criticize defendants' expert's opinion on that and said, It's difficult to square with the 10 percent drop.

And we cite Judge Easterbrook's case from *Asher v. Baxter* on this same point.

And, lastly, I'll just mention that we have set forth in the record a very robust record that directly links the misstatements to the disclosures.  With regard to the first disclosure, Defendant Williams testified that investors and analysts and even Evolent clients were asking him, quote, whether Evolent was having some negative impact on Passport's finances.  Plaintiffs' investment managers testified that, quote, Evolent's fees may be part of the problem, end quote.  And this is, you know, an interesting event that took place less than two weeks after that disclosure.  The *Insider Louisville* reporter who wrote the prior article asked for proof from the senior executives of Evolent for the savings that they purportedly gave to Passport.  There's a lengthy email exchange amongst the most senior executives of the company.  And, ultimately, they determined not to provide that information, because doing so would, quote, beg questions on whether those savings were actually realized, end

quote.

With regard to the May 2019 disclosure that ends the class period, again, analysts and investors made that link. There's a really remarkable email from a large institution that was sent to Defendant Williams himself, and that institutional investor said, quote, the obvious question is when you have been so integrally involved with Passport, why have they struggled so much operationally?  Investors could say, See, the products solutions don't work, they don't deliver more efficient care, there is tremendous lack of confidence in the model and management now.  That was Exhibit 16 of our reply brief.  And Williams also testified himself that a number of other investors and analysts asked that same question, whether the bailout of Passport meant that Evolent's services might not have been able to help Passport run in a more cost-effective manner.  It's at Exhibit 2.

So we submit that defendants' price impact arguments are really meritless in light of the case law, the stage of the proceedings, and the record that we've built.  What also falls flat is their attempt to shorten the class period by over a year, by basically limiting it to only a few months.  I mentioned the *Tivity* case because it's really closely aligned in terms of the analysis to what's going on here.  And just a few weeks ago, the Middle District of Tennessee held, quote, to the extent defendants believe they are entitled to shorten and limit the

class period without showing a complete lack of price impact, the Court disagrees.  The question of what caused the stock price to decline is an ultimate merits question for which plaintiffs bear the burden at trial, not at class certification.

The last point that I was going to discuss was defendants' expert, Ms. Allen, provides some analysts' commentary on post-class period events.  We discussed that in our brief.  I'm happy to address it now if Your Honor would like, or we could stand on what we wrote in the briefs.

THE COURT:  I think I've heard enough.

MR. HOOKER:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Starr, are you first?

MR. STARR:  Yes, Your Honor.

May it please the Court, Peter Starr, King & Spalding, on behalf of the defendants.

So it's widely recognized that typicality is defeated where a class representative is subject to unique defenses; and in this case, plaintiffs are atypical because of the testimony and actions of their investment managers.  Mr. Hooker said that this case is routine, that these arguments are heard in every securities case, but the testimony from plaintiffs' investment managers was anything by routine.

For context, I should explain that neither lead plaintiff actually makes any investment decisions for itself;

they, instead, hire professional investment managers to whom they give complete trading discretion.  And the evidence in this case shows that plaintiffs' investment managers didn't believe Evolent's stock price was tendered by fraud.  Consistent with that belief, they continued to invest in Evolent stock even after the alleged corrective disclosures.  And this evidence raises a unique reliance defense and rebuts the *Basic* presumption as to the plaintiffs themselves.

To take a step back, recall that the *Basic* presumption is an indirect form of reliance.  It's based on the integrity of the market price.  But why should the Court accept indirect evidence of reliance when, here, we have direct evidence of non-reliance?  The investment manager's testimony was unequivocal.  Both testified that they didn't believe either corrective disclosure revealed any of defendants' prior statements to be false.  To the contrary, they attributed the stock price declines to other factors, to non-fraud factors.  For example, when asked about the first corrective disclosure, which is Passport's lawsuit against the State of Kentucky, Plymouth County's investment manager testified, I saw nothing -- and this is a quote -- "I saw nothing in any of the back-and-forth with the state of Kentucky that led me to believe that Evolent bore any responsibility for the financial challenges at Passport." Any responsibility.  That manager also said, quote, the thing that was rattling the stock was all about Passport in Kentucky.

With respect to the second corrective disclosure, which was Evolent's announcement that it would be acquiring Passport, Oklahoma's investment manager testified that it was not concerned that, quote, Evolent itself was the cause of Passport's worsening financial condition.  Instead, the manager believed the stock price decline was due to the concern that Evolent was changing its business strategy by acquiring a health plan.  At the --

THE COURT:  Help me understand why it matters what the individual investment managers thought when it's a fraud-on-the-market theory.

MR. STARR:  So the *Basic* court held that any showing that severs the link between the alleged misrepresentation and the price that was paid is sufficient to rebut the presumption of reliance.  So there may be, if, you know, if the Court were to find that the *Basic* presumption is not rebutted here as to absent class members, they might be able to invoke this presumption, but the lead plaintiffs could not.  Here, we have testimony that they didn't think there was any fraud.  They didn't think there were any misrepresentations.  And so if the investment managers didn't think there were misrepresentations at the time they purchased the stock, then, obviously, they could not have relied on such statements.

The Middle District of North Carolina recognized that the presumption that they rebutted by showing that the plaintiff -- and this is a quote -- would have made the purchase

regardless of the undisclosed information.  And if you have testimony from the investment managers that there were no misrepresentations, they did not subjectively think there were any misrepresentations, that shows they would have bought the stock regardless of whatever undisclosed information plaintiffs allege was out there.

So plaintiffs -- to address -- to address Mr. Hooker's argument about the post-corrective disclosure purchases.  So I've covered the testimony.  There are also post-corrective disclosure purchases which show that plaintiffs, they voted with their feet; they acted consistent with their beliefs -- excuse me -- plaintiffs' investment managers acted consistent with their beliefs and continued to purchase Evolent stock.  And this is despite testifying, unequivocally, that they would never invest a single dollar into a company if they believed its management had committed fraud.

So the case law about post-corrective disclosures not being sufficient to defeat typicality, it kind of misses the point here.  Our typicality argument is not about solely these post-disclosure purchases; it's these purchases coupled with the direct testimony that we have from the investment managers that they didn't believe there was any fraud or any misleading statements.  Plaintiffs cited the *Computer Sciences Corporation* case, decided by this court in 2012; and, there, Judge Ellis reasoned -- again, this is at the same point -- Judge Ellis

reasoned that post-disclosure purchases alone do not defeat typicality because, quote, they do not indicate that plaintiff would have purchased the stock at the pre-disclosure inflated price absent the allegedly fraudulent statements. But that's precisely what we have evidence of here, and we know that plaintiffs' investment managers would have purchased the Evolent stock absent the allegedly fraudulent statements because they don't believe there were any fraudulent statements at all.

Plaintiffs have also argued that neither investment manager had access to any nonpublic information, and they say that ends the inquiry. But, again, this only proves our point. These are sophisticated professional investors. They have large investment stat analysts and staff who follow these companies closely, and these sophisticated investors had access to all the same public information as every other Evolent investor and, yet, neither of them believed that any fraud had taken place. If plaintiffs' theory were true, that is, if the alleged corrective disclosures had actually shocked the world and revealed the truth about Evolent's fraud, then neither investment manager would have continued to purchase Evolent stock. But it seems plaintiffs are the only ones who drew that conclusion.

So if the investment managers didn't think defendants made any misrepresentations, then, clearly, they could not have relied on those misrepresentations. And for these reasons, the Court should find both plaintiffs to be atypical.

Unless the Court has any questions, I'll move on to adequacy. And the adequacy argument, Your Honor, is fully briefed. We've cited the five-in-three rule from the Private Securities Litigation Reform Act; forbids a party from serving as a lead plaintiff in more than five cases in three years.

THE COURT: Have you cited any cases where the five-in-three rule has been applied at the class certification stage as opposed to the lead plaintiffs' selection stage?

MR. STARR: No, Your Honor. We'll concede our cases. The cases we cite come from the lead plaintiffs' selection phase. We'd note that the PSLRA incorporates the requirements of Rule 23. But, frankly, we'll rest on our papers as to the adequacy argument. And unless the Court has any questions, Mr. Smith will address price impact and *Comcast* now.

THE COURT: Thank you.

MR. STARR: Thank you.

MR. SMITH: Good morning --

THE COURT: Good morning.

MR. SMITH: -- Your Honor.

I'm going to start the -- Michael Smith from King & Spalding for the defendants. I'm going to start the argument on price impact, because it really sets the table for the *Comcast* argument as we get into it.

I think the Court is familiar that they have to have the *Basic* presumption of reliance to get a class certified here;

otherwise, individualized issues predominate no class.  There have been several Supreme Court decisions in the last decade that we've cited to you that really focus on this price impact issue and on the *Basic* presumption.  You've got the *Halliburton* decision in 2014 that said even if a plaintiff can show initial -- make an initial showing of qualification for the *Basic* presumption, showing market efficiency and some other factors, that --

THE COURT:  You then concede there's market efficiency here, right?

MR. SMITH:  We don't challenge market efficiency here.

THE COURT:  That's the same as conceding.

MR. SMITH:  Well, I won't quibble with you.  We're not challenging it here, we're not conceding it, and reserve rights at further stages of the proceedings.

But even where they make an unchallenged showing of market efficiency, *Halliburton* and other Supreme Court cases show that defendants still get the opportunity to show no price impact.  In fact, the *Halliburton* decision said that price impact -- that there's an impact -- that the misrepresentation had an impact on the price is an essential precondition of the *Basic* presumption.  And that was *Halliburton II* at 282.

So, Your Honor, I've got a chart that summarizes our evidence, and I think this will help move the argument along.  May I approach and --

THE COURT:  You'll have some assistance there.

MR. SMITH:  I'll give this to plaintiffs (indicating), and you can provide that to the Court and clerks (handing).  The court reporter may have one to attach as well.

Your Honor, this chart, which I'll refer to as Exhibit 1, is a graph which shows the price of Evolent's stock during the alleged class period, and it also puts down all of the sustained alleged misrepresentations, and it marks the two corrective disclosures on which the plaintiffs rely.  Just so you can follow along, the defendants are challenging the cost-savings statements, the price impact of the four cost-savings statements. Those are the ones that are in the yellow portion of the chart. We're not making any challenge --

THE COURT:  Can I ask, did you make this chart?

MR. SMITH:  I made it with our experts.

THE COURT:  It's an excellent chart.  I like a good chart.

MR. SMITH:  Okay.  Well, I'll pass that on to him.

We did try to distill down because we think it makes it easier to follow the argument.

So the defendants have rebutted the *Basic* presumption here through evidence.  And let's just -- let's remind the Court, we are not at the pleading stage.  We're not at giving inferences to the plaintiffs on pled facts.  We're at the evidentiary stage. Defendants have submitted evidence in the form of expert economic

opinion, in the form of analyst commentary in response to these events, which we maintain clearly shows that the cost-savings statements had no price impact.

All right.  We're going to focus first on front-end impact.  I'm not going to spend much time on that because they have conceded --

THE COURT:  Why don't you go to your third bullet point on the unpled price-maintenance theory since that's what they seem to be focused on.

MR. SMITH:  Okay.  I'll be happy to do that.  Because that's really -- they have to have this price-maintenance theory to get to the back-end impact.  We've shown no front-end impact. They're not even making an argument that there was any front-end impact.  These statements did not move the needle in a statistically significant manner, any of the alleged four statements.

So they claim, Your Honor, for the first time in three years of litigation of this case, that they have alleged an inflation maintenance or a price-maintenance theory.  This is the first time that they have made that claim.  We have three points to that.  They have not raised that.  They have not pled it. It's not a viable theory recognized in the Fourth Circuit.  And even if they had pled it, even if it were recognized, it doesn't do them any good because of the lack of connection of the disclosures.

So let me elaborate on those three points.  First, it's not a viable theory.  It's not been recognized by the Fourth Circuit.  You know, the plaintiffs, both in their papers and here today, made a very unfortunate misrepresentation of the Supreme Court's position on the price-maintenance, inflation-maintenance theory.  They said in their papers and they said again today that the Supreme Court has reaffirmed this theory.  That's just a blatant misrepresentation of the Supreme Court's -- of what the Supreme Court said.  In the very first footnote of the *Goldman* opinion, the Supreme Court said as follows:  Quote, although some courts of appeals have approved the inflation-maintenance theory, this Court has expressed no view on its validity or its contours.  We need not and do not do so in this case.  I don't know how they take that statement and say that the Supreme Court has reaffirmed the validity of this price-maintenance theory.

There's a circuit split on the theory.  You do have three circuits -- I think the Second, Seventh, and Eleventh have recognized the theory.  You've got two -- the Fifth and the Eighth -- have said no, it's not a valid theory.  The Fourth Circuit, as I mentioned, has not addressed this.  And we think there are strong reasons why this theory is not valid or viable.  We think it runs contrary to *Basic* and to *Halliburton*, which both said that whether a misstatement actually affected the market price for a stock is a fundamental premise of the *Basic* presumption.  If you credit this theory -- and as we'll see in a

minute -- they don't explain what inflation this was maintaining. They don't say when this inflation entered the stock, how it entered the stock, and they've got other pleadings that I think will -- I'll discuss in a minute -- that absolutely contradict their reliance on this theory.  But if you credit this theory -- we think it really hollows out *Basic* and *Halliburton* -- if they don't have to put in any evidence of when the inflation entered the stock, what caused it, whether it was due to a misrepresentation, how does a defendant come in and show that there's no price impact?  So we don't think it's one that's going to be recognized.

THE COURT:  I'm sorry to interrupt, but a lot of what you're saying sounds like a materiality argument, that let's assume these are false statements, but if you can't show a jump in the stock price after we, you know, put something out there on the jumbotron, as they say, telling everyone we just saved our biggest client a hundred million dollars, let's just assume, for the sake of argument, that's just a bald-faced lie, never happened, but the company decides they're going to put that out there, but the market doesn't react to that, right?  No analysts say, Hey, they saved their biggest client a hundred million dollars.  And now the stock goes up.  You're saying that you can't pursue a claim?  I'm trying to understand.  Now, maybe it's a materiality argument and there's an argument that you can make at summary judgment on that, but I'm trying to glean where you're

going here with the --

MR. SMITH:  Thank you.  We're not challenging materiality at all.  We are focused 100 percent on price impact.  That's what *Basic*, *Halliburton*, *Amgen*, and this most recent decision in *Goldman*, they're looking at the price impact.  And, here, we've already shown, and they've conceded -- they say it's irrelevant, that the market yawned, that there was no price impact for any of these cost-savings statements -- and we think that's incorrect statement of law.  They have to rely on this price-maintenance theory.  They have to look at these back-end disclosures, which they claim satisfied the price impact theory.  We think they -- again, we don't think it's a valid, viable theory in the Fourth Circuit; it's not been approved yet; you shouldn't be the first to step out and do so.  But even if you did, I'm going to show you they don't qualify for it.  Their allegations contradict it.  And then after that, I'm going to show it doesn't matter anyway because the back-end drops don't relate to the front-end disclosures.

Let me talk about their allegations and why they don't qualify for this late-raised, first time in three years of the case that we've heard, inflation maintenance.  So in the third amended complaint, paragraph 5 -- which I'm going to quickly read into the record:  Quote, indeed, defendants repeatedly touted Passport as a success story and a good example of a great partnership that demonstrated the improvement to Passport's

bottom line from Evolent's purportedly cost-efficient platform, even going so far as to emphasize to investors that the company's health care management services had provided Passport with over 100 million in annualized savings during the class period. Fueled by these assurances, Evolent's stock price skyrocketed by more than 100 percent in just nine months from $13.65 on the first day of the class period on January 10, 2018, to a high of $28.75 on September 25, 2018, end quote. So they're making -- they're not saying that the misrepresentation maintained any inflation; they're saying it caused it to skyrocket. That's paragraph 5.

Let's move to paragraph 161 of the third amended complaint: Quote, defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of Evolent's business, operational status, profitability, and future growth prospects, all of which artificially inflated the price of Evolent's common stock, closed quote.

Again, this is not maintenance. These allegations contradict a maintenance theory, which is that there was preexisting inflation that was maintained by the statement. In fact, they say that it caused the increase, and we've shown, and they have not rebutted, economic evidence saying there was no price increase.

So they put all of their eggs in this one basket. They

scoured the complaint, and they found one reference in paragraph 210 that says -- that hedges and says that the misrepresentations artificially inflated and/or maintained, at artificially inflated levels, the price. That's it. That one little fragment reference is the entire basis of this newly found inflation-maintenance theory. It is not sufficient.

And I'm going to also refer to this new damages report that their expert put in that also undermines inflation maintenance. By the way, neither the class cert report that their economic expert put in nor the damages report, which we filed in Docket 222-2 in the court, neither one of them mentions this inflation-maintenance theory. And, in fact, at paragraph 40 of the damages report at Docket 222-2, he states: I conclude that the alleged misrepresentations and omissions were material and would have been viewed by a reasonable investor as significantly altering the total mix of information. So he's saying that this is new news that's significantly altering the total mix of information. But what happens to the price? Nada, nothing, zero, flatline. So that's completely inconsistent with a price-maintenance theory. It's not confirming prior inflation that was in the case. He was saying it was new information. So we don't think they qualify for it.

But now let's move on -- let's assume that it's a viable theory, that they have adequately shown that they were eligible for it, and they properly raised it -- none of which we

think is true -- does it do them any good?  And the answer is no. And why is that?  And that is because of the complete mismatch between the corrective disclosures and the alleged misrepresentations -- at least the alleged cost-savings misrepresentations.  Now, they said, Oh, this has already been decided.  This is not -- this is price impact.  This is at the evidentiary stage.  What was decided before was whether loss causation was adequately pled, under an entirely different standard; no facts required, no evidence required; just pleading and all reasonable inferences in the plaintiffs' favor.  We're at a different stage of the ball game now.  And we have submitted evidence, again, in the form of expert economic opinion from Ms. Allen saying that these two corrective disclosures do not relate back to and do not mention cost savings and don't sufficiently relate to them.  We presented evidence in her report that the market commentary following both of these disclosures, no one said anything to suggest that they gleaned that there was any relationship between the alleged cost-savings misstatements and the information that came out in these corrective disclosures.  They are apples and oranges.

Now, this brings me to another unfortunate set of misstatements.  They have claimed that neither the defendants nor their expert has pointed to any confounding information, any other information which drove the stock price down on that day other than revelations of the so-called fraudulent nature of the

cost-savings statements.  Well, it's just not true.  We submit in Ms. Allen's report, if you look at her report on -- this is her class cert opposition report, which is Exhibit 7 to our opposition brief, at page 33 -- the entire Heading 2 addresses this.  She spends pages talking about the factors that did drive the stock price down, and they weren't related to cost-savings statements.  Heading 2 -- I'll just read into the record -- of page 33, the Allen report, Exhibit 7:  The decline in Evolent's stock price following the alleged corrective disclosures was not caused by the alleged cost-savings misrepresentations, but, instead, was due to other factors.  And then she spends pages talking about the other factors.  It's the near-term insolvency driven by the rate cuts is what drove the share price down that day, and she supports that with market commentary.  There's nothing to do with cost-savings statements, which, by the way, the cost-savings statements focus on savings from initiatives implemented back in 2016 and 2017.  Now we're two or three years later in 2019 when this suit is filed, and they're truly saying, Well, this is a revelation that those statements about cost savings in 2016 and 2017 were somehow not true.  The lawsuit doesn't mention cost savings.  The only mention of Evolent in there, in the Passport lawsuit, as we point out, was favorable.  So Passport itself is saying Evolent has helped us to streamline and save costs, and, yet, they claim that the Passport lawsuit and the stock price drop was related to these cost-savings

disclosures.  They're just not.

And on the second one -- and by the way, their investment managers also testified, Yeah, we follow the Evolent stock really closely, and we saw that news; we saw the stock drop; and no, we did not take from that that Evolent had any cause or -- cause of the financial problems and financial distress of Passport.  That's what they testified to.

So the same with the second alleged corrective disclosure that occurred on May the 29th.  That's all about the acquisition of Passport.  Nothing said about cost savings, certainly not cost savings back in 2016 and '17.

And then, finally, you're left with the real obvious point that the first two of the statements on the chart -- the January 10th statement and the May 11th statement -- don't even mention Passport.  They just say there's cost savings in an unnamed partner.  How could a disclosure related to Passport somehow correct or show that there was price impact for statements that don't even mention them?  They've put in no evidence on that.

So let me sum up on price impact.  Here's where we stand.  *Goldman* says that the district court's task at the class certification stage, quote, is simply to assess all the evidence of price impact, direct and indirect, and determine whether it is more likely than not that the alleged misrepresentations had price impact.  That's *Goldman* at 1963.

*Goldman* also instructs that the court should be aided in its determination by, quote, a good dose of common sense. Okay. That's at 1961. So let's look at the scales here and what evidence each party has put in. On the front end, defendants have economic evidence. They've got an event study that shows no front-end impact. Got evidence from market participants, the analysts that don't -- that they put in, and there's no change in their valuation of the company. They don't change their price targets. They don't even mention the statements, okay. So no front-end impact, that's unrebutted. They say it's irrelevant.

So let's look at the back-end impact. Again, we've got expert economic opinion that says there's no connection. We've got analysts' commentary. Nobody mentions anything about cost savings. Doesn't even -- as I mentioned, the back-end disclosure about Passport cannot possibly, under any common-sense view, correct or show that there's impact on a statement that never mentioned Passport in the first place.

So it -- and they have -- all they have -- and he mentioned this in his argument -- were two things. They put in an email, Exhibit 16, that came a month after the second disclosure, okay, from one investor. And, of course, they elided the critical parts of that email -- which I'll just read into the record -- in the first paragraph, point 2: There are very few successful models that have worked on larger scales. Point 3: Evolent has shown that it can help, although it is still evolving

and has one of the few scaleable solutions that can be broadly applied. So it's a positive email. It's not contemporaneous with the May 29th drop. It doesn't show any connection between the announcement, We're acquiring 70 percent of Passport, in these cost-savings statements.

The other attempt they make is in Exhibit 2. They cite some Williams' testimony that they say shows a connection in the market between the Passport suit, I guess, and cost-savings statements. But Mr. Williams did not affirm that investors were asking about whether Evolent was having negative impact on Passport. He says as follows -- Exhibit 2, page 190, lines 13 through 16 -- "You know, I don't know that they asked that specifically. They asked about the article," meaning the *Insider Louisville* article. Tell me about -- this is what was written: "Tell me what's your view of what's going on with Passport."

So as you look at the evidence -- and that's where we are today, and that's the district court's task is to say whether it's more likely than not that there was price impact by these cost-savings statements -- we believe that it's overwhelming that the defendants have put in all this economic testimony; they don't have one piece of expert opinion addressing price impact. They chose not to do that. They have nothing. All they have is these two little snippets that I've just read -- and I've hopefully shown how they don't apply -- against our expert's opinion, our references to analysts' commentary after these, and

the common-sense notion that these corrective disclosures do not mention the cost-savings statements in any way, shape or form, don't relate to them, don't address even the same subject matter.

So I'm going to quickly -- can I have the second chart? I have a chart -- now that I've set the table on the -- for the *Comcast* argument, I've got another similar chart that --

So *Comcast*, we believe that this case represents a classic example of how they have failed to satisfy *the Comcast* requirement that the damages model fit the remaining theories of liability in this case.  This chart goes back.  It doesn't begin just at the class period that's in the third amended complaint; it shows what the class period was originally alleged to be in the second amended complaint, and it shows all the dates when there were alleged misstatements in the case.  There were originally 22 -- or, in the second amended complaint, there were 20 misstatements.  Sixteen of them were dismissed; four were sustained; and then in the third amended complaint, they added in the January 10th and May 11th statements, which Your Honor sustained.  So in red are all the dates on which there were alleged misstatements that the Court threw out, okay.  In green are the statements that were sustained; and, again, we show the two corrective disclosures.  Now, what's critical to understand here is the allegations made in paragraphs 135 of the second amended complaint and 161 of the third amended complaint.  We've got that in a box above the price line there.  "Defendants'

material misstatements and omissions thus created in the market an unrealistically positive assessment of Evolent's business, operational status, profitability, and future growth prospects, all of which artificially inflated the price of Evolent's common stock."  So all these statements inflated the stock price.  But then look at paragraphs 210 and 211 below that of the second and third amended complaints respectively:  "When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Evolent common stock fell precipitously as the prior artificial inflation dissipated."  So all of these statements inflated the share price, and all of them -- all of that inflation came out when there were corrective disclosures.  The problem here is they have now put in their damages model -- this is the Coffman report, Exhibit 222-2 -- and he does nothing to address the 16 dismissed statements which were alleged to have contributed to this inflation.  In fact, he pegs all of that inflation and says that it's all due to the first statement in the class period.  That just doesn't fit the case as it sits today.  The case is not all 22 statements; it's six statements.  And this is just what happened in *Comcast.*  The Supreme Court reviewed what happened below.  There were four different theories of antitrust impact.  Three of them got thrown out, but the plaintiffs there put in a damages model that measured damages based on all four theories, and the court said that doesn't fit the case; and without a damages model that fits,

there's no way to assess whether there would be predominance, and you can't certify a class.  So we think there's a lack of fit because there's no -- they don't address the 16 dismissed statements.  There's not a fit because the entire model, we now see, is based on the drops that occurred at the back end; and those back-end drops -- those two corrective disclosures, as I've argued -- do not match the front-end statements.

And then, finally, Mr. Coffman acknowledges, but fails to remove some of the -- that there were confounding factors.  He said we didn't identify confounding factors.  He identifies confounding factors, but he doesn't do anything to address them.  If you -- I'm sorry.  At paragraph 83 of his damages report, 222-2, he acknowledges that there's confounders.  He conceded that the Kentucky rate cuts are one of the, quote, confounding causes of Passport's financial distress.  But then he does nothing to disaggregate the price reaction on February 15th due to what he himself identifies as a confounding factor.

So for those reasons, we think that the model doesn't fit the remaining theories, and under *Comcast*, a class cannot be certified.

Thank you, Your Honor, for your patience in hearing me out.  Unless you have any other questions, I'll sit down.

THE COURT:  Thank you.  Mr. Hooker.

MR. HOOKER:  Your Honor, I'll be very brief, but I think my colleague's presentation really underscores the dynamic

at play here.  He's raising a number of issues that are really merits issues:  What was the true cause of Passport's decline?  Was it the rate cuts, like Ms. Allen says?  Was it Evolent's services, like plaintiffs' saying and Mr. Coffman -- the information in Mr. Coffman's report?  There have been expert depositions in the last week post the close of the class certification briefing.  All of those issues are rightly confined to the summary judgment stage of the litigation.  At class certification, the question is can damages be measured class-wide?  And, again, it's a resounding yes.  The same exact methodology that Mr. Coffman is setting forth here has been accepted in courts around the country.

I'll briefly touch on some of the points that both Mr. Starr raised regarding the atypicality.  I don't think I really need to get into it that much.  The post-disclosure purchases:  Again, purchases made after the first partial corrective disclosure, the full truth was not out yet.  We cite cases throughout our brief in discussing this subject, that the views of individual investment advisors don't really control on this issue.  And the investment advisors did testify as to the importance of the information that was revealed at the end of the class period.

On price impact, again, they're not challenging market efficiency.  They mention this is the first time we raised the price-maintenance theory.  It's in the complaint.  There's cases

that say you don't -- it's not a magic word or game where you have to say this is a price-maintenance case, but we did allege it in paragraph 210 of our complaint. And it makes sense. And Mr. Coffman, both in his report -- in his merits report and in the rebuttal that just took place and that will be featured in summary judgment, attributes that the relevant truth was revealed at the end of the class period. And, importantly, on price impact, in order to prevail class certification, they have to completely sever that link. They have to show both front end and back end --

THE COURT: How do you respond to Mr. Smith's comment about the *Goldman Sachs* case and whether or not the Supreme Court has affirmed that price maintenance is a viable theory?

MR. HOOKER: In the Supreme Court *Goldman* case, they specifically remanded the case back because of the generic nature of the statements at issue; and on remand, the class was certified using that theory. Now, the Supreme Court didn't outright say across the land that price maintenance is accepted in every court, but in the Fourth Circuit, it hasn't --

THE COURT: So by permitting it to go forward in those circuits that have recognized it, it was affirming it; it wasn't resolving a circuit split?

MR. HOOKER: Correct, it was not resolving a circuit split.

And we cited a number of cases post *Goldman* that

specifically followed it.  There's a case just on June 7th from the Middle District of Tennessee, the *Tivity* case, where these same exact arguments were raised, that defendants attempted to shorten the class period on those --

THE COURT:  And do you agree with Mr. Smith that the circuit split does not involve the Fourth Circuit that has not directly spoken to the issue yet?

MR. HOOKER:  Yes, I agree.

And Mr. Smith raised a number of issues on the back-end price impact.  Cited Ms. Allen's report and how she attributes the final disclosure to factors that supposedly had nothing to do with the corrective disclosures.  Again, she's citing issues between Passport and Kentucky.  Kentucky itself, as we note in the complaint and in the briefing, found that Passport's decline coincides with its decision to subcontract with Evolent.  There's the Passport CFO himself that sent a scathing email blaming Evolent for Passport's financial duress.  There are all the communications with investors that Mr. Smith says show nothing. We say look at the issues that are raised in these emails and in this testimony.  So, again, this just shows that we're really dealing with, on the expert front, a battle of the experts; on the factual front, a battle of facts, a battle of transcripts; and it's really inappropriate to resolve at the class certification stage.  It's a summary judgment or merits issue.

Thank you, Your Honor.

THE COURT:  Thank you.

Well, I want to assure the parties that I've reviewed the pleadings very carefully.  I have reviewed and have considered all of the information submitted by the defendants as well as the plaintiffs.  I'm mindful of the common sense and rigorous approach that has commanded that the district court apply in determining class certification.

I'm going to take this matter under advisement, and I will issue an opinion very shortly.  The parties, I believe, indicated to me that they had a settlement set up for the near future; is that correct?

MR. HOOKER:  That's correct, Your Honor.  There's a mediation on --

MR. BESSETTE:  That's correct, Your Honor.

THE COURT:  Would it be helpful or unhelpful to the parties to have a decision on class certification before that begins?

MR. HOOKER:  Depends on the holding, Your Honor.

THE COURT:  Well, I am not going to -- we need to move this matter forward.  I'm heartened by the fact that you are meeting to pursue a mediation, and I support that entirely, but to the extent it is not successful or not successful promptly, we will move on to the next stage of the case, so I'm not going to, you know, wait to issue an opinion.

I had not settled on the schedule for summary judgment.

I know there had been just a slight difference of opinion.  I do think that setting a date that is governed by the time the opinion comes out is appropriate, though, but you should know that that opinion will come out very promptly, and then I'll give you -- I think you requested 35 days from the date of the opinion.  But I have no doubt that much of that work has already been done, and now you simply need to understand where things stand with regard to class certification.

I appreciate the effort everyone's put in.  This has been an interesting and challenging, intellectual exercise, and I will endeavor to issue a well-reasoned opinion as quickly as possible.

Is there anything else I need to address this morning with regard to this matter before I get into my next class action matter in half an hour with some of the same parties here?

MR. HOOKER:  Not on behalf of plaintiffs, Your Honor.

THE COURT:  Thank you.

MR. SMITH:  Not on behalf of defendants, Your Honor. Thank you for your time, Your Honor.

THE COURT:  Thank you.  Court will be in recess.

CERTIFICATE OF REPORTER

I hereby certify that the foregoing transcript is a true and accurate record of the stenographic proceedings in the above matter.


/s/ Diane Salters                    July 12, 2022
_____      _____
Diane Salters, CSR, RCR, RPR          Date
Official Court Reporter