UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>EVOLENT HEALTH, INC., FRANK WILLIAMS, NICHOLAS MCGRANE, and SETH BLACKLEY,<br><br>Defendants. | Case No. 1:19-cv-01031-MSN-WEF |

**DECLARATION OF LESTER R. HOOKER IN SUPPORT OF LEAD PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF
ALLOCATION AND REQUEST FOR ATTORNEYS' FEES AND EXPENSES**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     PROSECUTION OF THE ACTION ........................................................................ 8

        A.      The Commencement of the Action, Lead Plaintiff Appointment, and
                Filing of the Amended Complaint ............................................................... 8

        B.      The Pleading Stage ..................................................................................... 9

        C.      Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts ...................... 16

                1.      Discovery Obtained from Defendants ..................................................... 16

                2.      Discovery Obtained from Third Parties ................................................... 18

                3.      Discovery from Lead Plaintiffs ............................................................... 19

                4.      Lead Counsel's Document Review and Deposition Preparations ............ 19

                5.      Deposition Discovery ............................................................................ 21

                6.      Experts and Supplemental Responses to Interrogatories ......................... 22

        D.      Renewed Briefing of Class Certification ................................................... 22

        E.      The Status of the Litigation Going into the Second Mediation Session .............. 24

        F.      The Parties' Mediation Sessions ............................................................... 24

        G.      The Settlement Agreement and Preliminary Approval ................................ 25

III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ........................... 26

        A.      Reasons for the Settlement ........................................................................ 26

        B.      Lead Plaintiffs' Compliance with Court's Preliminary Approval Order in
                Administering Notice ............................................................................... 28

        C.      The Plan of Allocation ............................................................................. 29

IV.     THE FEE AND EXPENSE APPLICATION ............................................................ 30

V.      THE WHOLLY POSITIVE REACTION OF THE SETTLEMENT CLASS AND
        LEAD PLAINTIFFS' APPROVAL ........................................................................ 37

VI.     CONCLUSION ..................................................................................................... 39

## EXHIBIT LIST

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Declaration of Timothy Smyth, Executive Director of the Plymouth County Retirement Association and the Declaration of David Sullivan, former Executive Director of the Plymouth County Retirement Association |
| B | Declaration of Regina Sigler, Executive Director of the Oklahoma Police Pension and Retirement System |
| C | Declaration of Jed D. Melnick, Esq. |
| D | Declaration of Eric Nordskog on behalf of A.B. Data, Ltd. |
| E | Summary of Plaintiffs' Counsel's Lodestar and Expenses |
| F | Declaration of Lester R. Hooker on behalf of Saxena White P.A. |
| G | Declaration of Daniel S. Sommers on behalf of Cohen Milstein Sellers & Toll PLLC |

I, Lester R. Hooker, of Saxena White P.A. ("Saxena White" or "Lead Counsel"), respectfully submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of the Class Action Settlement, Plan of Allocation, and Request for Attorneys' Fees and Expenses (the "Motion").[1]  I have personal knowledge of the matters stated in this declaration based on my active supervision and participation in the prosecution and settlement of the Action.  If called upon as a witness, I would testify competently thereto.

## I.      **PRELIMINARY STATEMENT**

1.     Saxena White is Lead Counsel for Lead Plaintiffs Plymouth County Retirement Association ("Plymouth County") and Oklahoma Police Pension and Retirement System ("Oklahoma Police" and together with Plymouth County, "Lead Plaintiffs" or "Plaintiffs") and the Settlement Class.  I am a Director of my firm and have actively supervised and participated in the prosecution and resolution of the Action.

2.     The Court, having presided over this complex securities class action for over three years, is familiar with the claims and defenses asserted.  Accordingly, this declaration does not seek to detail each and every event that has occurred so far in the litigation.  Rather, it highlights certain pertinent events leading to the Settlement and the basis upon which Lead Plaintiffs and Lead Counsel recommend its approval.

3.     On August 9, 2022, the Court granted preliminary approval of the proposed $23.5 million cash settlement with Defendants.  ECF No. 247.  The Settlement will resolve all claims asserted in the Action against Defendants by all persons and entities who purchased or otherwise

---

[1] Unless otherwise indicated, all capitalized terms herein have the same meanings as in the Stipulation and Agreement of Settlement, dated August 2, 2022 (the "Settlement Agreement" or "Stipulation") (ECF No. 245).  All citations and internal quotations are omitted; and all emphasis is added.  All exhibit ("Ex. _") references are to the exhibits submitted with this declaration. "Memorandum" is the Memorandum of law in support of the Motion.

acquired publicly-traded Evolent common stock between January 10, 2018 and May 28, 2019, inclusive, and were damaged thereby.[2]  Since then, the Court-approved Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), has notified potential members of the Settlement Class of the Settlement by mail in accordance with the Preliminary Approval Order.  The Summary Notice was also published through *Investor's Business Daily* and over *PR Newswire*.  *See* Ex. D.  In addition, a settlement-specific website and toll-free telephone number were established to provide potential Settlement Class Members with additional information.

4.    On or about August 29, 2022, Defendants caused the $23,500,000 cash settlement to be deposited into an escrow account for the benefit of the Settlement Class.

5.    The Settlement Amount, when viewed in the context of the challenges and risks in this litigation, is superb.  If approved, a settlement of $23.5 million would secure for Settlement Class Members between 12% and 67% of their potential recoverable damages—up to ***nine times*** the typical securities class action recovery, which between 2012 and 2020 was just 7.3% of estimated damages for similarly-sized cases.  The $23.5 million Settlement Amount in absolute terms is also nearly ***three times*** the $7.9 million median recovery amount for a securities class action in 2021.  Thus, by any measure, the proposed Settlement provides an outstanding benefit for the Settlement Class that outpaces the normal range of recoveries in securities class actions.

6.    The recovery is also noteworthy when weighed against the substantial risks of either a reduced recovery or no recovery at all had the litigation continued, as Plaintiffs faced formidable defenses from Defendants regarding falsity, scienter, and loss causation.  Regarding falsity, Defendants had credible arguments that their statements about providing cost savings for

---

[2] Excluded from the Class are Defendants, the officers and directors of Evolent at all relevant times, and Defendants' Related Persons.  Also excluded from the Settlement Class are those persons or entities who file valid and timely requests for exclusion in accordance with the Preliminary Approval Order.

Passport were true when made and supported by calculations generated by Evolent's actuaries. With respect to scienter, Defendants would have argued that, even if their savings statements were proven false, the Individual Defendants lacked the requisite scienter for securities fraud because they had a reasonable basis upon which to make the statements. Moreover, Defendants would have argued that there was no loss causation from Evolent's savings statements because the alleged corrective disclosures did not discuss or mention anything pertaining to whether Evolent had saved Passport money. Finally, even if Plaintiffs could establish that Evolent had contributed to Passport's financial decline, Defendants would have presented evidence that Kentucky's Medicaid rate cuts and other non-Evolent-related factors were also contributing causes, and that damages should be reduced accordingly, or eliminated altogether.

7.    While Plaintiffs believed that they had strong responses to these points, there is no question that Defendants' arguments could have been accepted by this Court in deciding Plaintiffs' then-pending class certification motion or at summary judgment, or by a jury at trial. And if the Court or a jury ultimately concluded that Defendants' statements regarding Passport were not material or otherwise actionable, or that all (or a large portion) of the stock price decline that occurred at the end of the Class Period was not attributable to the alleged fraud, the potential recovery would be reduced dramatically—and potentially to zero. Even a favorable jury verdict would have been subjected to an inevitable appeals process, the conclusion of which would have been uncertain. If Plaintiffs had prevailed at trial, it is highly questionable as to whether Plaintiffs would have recovered more than (or even as much as) the substantial Settlement Amount.

8.    The Settlement is thus a highly beneficial result for the Settlement Class, and is the result of Lead Plaintiffs' and Lead Counsel's extensive litigation efforts, including:

(i)    investigating and preparing the initial complaint and Amended Complaint;

3

(ii)  conducting an extensive factual investigation, including identifying and contacting numerous former Evolent and Passport employees with direct knowledge of the facts, several of whom contributed critical information to Plaintiffs' complaints;

(iii)  filing a detailed 94-page Second Amended Complaint incorporating new allegations related to information provided by a confidential witness;

(iv)  filing a detailed 108-page Third Amended Complaint incorporating allegations regarding various documents produced in discovery by Defendants, adding three new allegedly false statements;

(v)  successfully opposing Defendants' motions to dismiss the Second Amended Complaint and Third Amended Complaint;

(vi)  drafting comprehensive papers in support of Plaintiffs' class certification motion;

(vii)  conducting extensive fact, expert, and class certification discovery, which included creating a protocol for obtaining electronically-stored documents, drafting discovery requests and third-party subpoenas, participating in numerous meet-and-confer calls, drafting meet-and-confer correspondence, and analyzing over 755,000 pages of documents from Defendants and third parties;

(viii)  preparing for and taking, defending, or otherwise attending 23 fact and expert witness depositions;

(ix)  reviewing five expert reports prepared on behalf of Lead Plaintiffs and six expert reports prepared on behalf of Defendants;

(x)  submitting detailed mediation statements setting forth Lead Plaintiffs' positions on the hotly disputed issues in the case; and

(xi)  attending two formal day-long mediation sessions before a well-respected mediator involving vigorous negotiations.

9.  In light of this robust evidentiary record, by the time of Settlement, Lead Plaintiffs and Lead Counsel had a thorough understanding of the strengths and weaknesses of the Parties' positions concerning liability and damages, their respective abilities to prove or defend the claims at trial, and Defendants' ability to pay a substantial judgment.

10.  As set forth in the Memorandum, Plaintiffs respectfully submit that the Settlement represents an outstanding recovery for the Class that is supported by each of the factors that the

Fourth Circuit advises courts to consider in the final approval process, as set forth in Federal Rule of Civil Procedure 23(e)(2) and *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991).

11.    In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan of Allocation, Lead Plaintiffs engaged Global Economics Group LLC ("GEG"), a well-recognized firm of economic and financial experts with extensive experience in preparing similar plans. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss Amount" as calculated pursuant to the Plan of Allocation—a methodology that is standard in securities fraud class action settlements and has been approved by courts nationwide.

12.    Lead Counsel also requests an award of attorneys' fees for its efforts, and for reimbursement of its Litigation Expenses.  Specifically, Lead Counsel is applying for an attorneys' fee award of one-third of the Settlement Fund and for reimbursement of Litigation Expenses in the amount of $918,539.45 to be paid from the Settlement Fund.  Lead Counsel's requested fee is well within the range of fees routinely approved by courts in this Circuit and around the country in comparable securities or complex class actions, and is amply supported by each of the relevant factors set forth in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 733 (3d Cir. 2001) and *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).  *See, e.g., In re Celebrex (Celecoxib) Antitrust Litig.*, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) (Wright Allen, J.) (awarding one-third of $94 million settlement as "[f]ee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one"); *In re Peanut Farmers Antitrust Litig.*, 2021 WL 9494033, at *6 (E.D. Va. Aug. 10, 2021) (Jackson, J.) (approving one-third fee of $102.75 million settlement fund because "[d]istrict courts in this Circuit have frequently found

5

a percentage award of one-third of a common fund to be within the range of reasonable percentage awards"); *Plymouth County Ret. Sys. v. GTT Communications, Inc.*, 2021 WL 1659848, at *5 (E.D. Va. Apr. 23, 2021) (Hilton, J.) (awarding one-third fee of $25 million recovery in a securities class action); *In re Perrigo Company plc Sec. Litig.*, 2022 WL 500913, at *1 (S.D.N.Y. Feb. 18, 2022) (one-third fee awarded in $31.9 million recovery).

13.    The reasonableness of Lead Counsel's requested one-third fee is also confirmed by a lodestar cross-check that yields a multiplier of 0.71, which is known as a "negative multiplier." This means that a one-third fee would represent significantly less than the total value of the attorney and staff hours invested by Plaintiffs' Counsel in the prosecution of the Action.  Courts have repeatedly recognized that the reasonableness of a fee request is reinforced where, as here, "the percentage fee would represent a negative multiplier of the lodestar." *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("When the lodestar cross-check shows that the percentage fee is lower than the fee the lawyers have accrued on a time-and-service basis, it is relatively easy to support a percentage-based fee."); *see also In re Health Ins. Innovations Sec. Litig.*, 2021 WL 1341881, at *12 (M.D. Fla. Mar. 23, 2021) ("Moreover, the negative lodestar multiplier [] further supports the reasonableness of the fee requested.").

14.    Furthermore, this multiplier is well below the range of multipliers routinely awarded in the Fourth Circuit.  *See, e.g., In re: Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) (Gibney, Jr., J.) ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar multipliers."); *Seaman v. Duke Univ.*, 2019 WL 4674758, at *6 (M.D.N.C. Sep. 25, 2019) ("lodestar multipliers 'on large and complicated class actions have ranged from at least 2.26 to 4.5'").

15.     In accordance with the PSLRA, Lead Plaintiffs Plymouth County Retirement Association and Oklahoma Police Pension and Retirement System seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the amounts of $7,335.27 and $8,550 respectively.  The amount of time and effort devoted to this Action by the representatives of Lead Plaintiffs—which together expended considerable time and effort in actively supervising the litigation over a multi-year period, including by reviewing pleadings, collecting and producing numerous documents, traveling to Florida to prepare for their depositions and be deposed, and participating in ongoing settlement discussions—is detailed in the accompanying Lead Plaintiff declarations.  *See* Exs. A & B.

16.     Significantly, although the deadline for objections and exclusions has not passed, to date, no members of the Class have objected to any aspect of the Settlement, the Plan of Allocation, or the attorneys' fee and expense request, and no investors have requested exclusion. This unanimous, positive reaction is significant given that a substantial percentage of the Class consists of sophisticated institutional investors with the resources and motivation to object, if warranted.[3]  Moreover, Lead Plaintiffs—sophisticated institutional investors who fully understand their fiduciary duty to act in the best interest of the Settlement Class—wholly endorse the Settlement and Lead Counsel's requested fee award.  *See* Exs. A & B.

17.     For all of the reasons discussed in this Declaration, its attached exhibits and in the accompanying Memorandum, Lead Plaintiffs and Lead Counsel respectfully submit that the

---

[3] Plaintiffs' expert, Mr. Coffman, in his April 8, 2022 market efficiency report, concluded that there was a "substantial level of institutional ownership of Evolent Common Stock during the Class Period" even though certain idiosyncrasies of reporting of the short interest and potential double counting by third party data providers generated a figure on institutional holdings that exceeded the public float.  ECF 197-1, at ¶72 and n. 90.  Nonetheless, Mr. Coffman represented that this fact "does not affect or undermine my primary point that sophisticated institutions held a large percentage of Evolent Common Stock." *Id.* at n. 90.

Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Plaintiffs respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable and should be approved.

## II.      PROSECUTION OF THE ACTION

### A.      The Commencement of the Action, Lead Plaintiff Appointment, and Filing of the Amended Complaint

18.     Plymouth County initiated this litigation by filing the original complaint in the Action.  ECF No. 1.  Plymouth County's investigation was based upon review and analysis of publicly available information concerning Evolent, including: (a) Evolent's public filings with the SEC; (b) press releases and other publications disseminated by Evolent and other related non-parties; (c) news articles, shareholder communications, conference call transcripts, and postings on Evolent's website concerning the Company's public statements; (d) analyst and short seller reports about the Company; and (e) other publicly available information concerning the Company.

19.     On November 12, 2019, the Court appointed Plymouth County and Oklahoma Police as Lead Plaintiffs and approved Lead Plaintiffs' selection of Saxena White as Lead Counsel and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel.  ECF No. 29.

20.     Thereafter, Lead Counsel continued their ongoing investigation of Plaintiffs' claims.  In addition to expanding upon their initial review and analysis of publicly available information regarding Evolent and its partnership with the Kentucky-based Medicaid health plan Passport Health Plan ("Passport"), Plaintiffs' multi-faceted investigation included: (i) identifying and interviewing dozens of former employees of Evolent and Passport, several of whom served as confidential witnesses who provided detailed information that was highly important in developing and supporting Plaintiffs' claims; (ii) reviewing additional research reports by securities and financial analysts concerning Evolent; (iii) continuing to monitor Evolent's SEC filings and

8

earnings call transcripts as they were filed or occurred; (iv) analyzing data reflecting the pricing of Evolent stock; (v) consulting with an expert on market efficiency, loss causation, and damages; and (vi) making several Open Records Requests on Kentucky regulatory agencies, which, among other things, led to Plaintiffs obtaining critical non-public documents, including a series of penalty letters Kentucky sent to Passport relating to Passport and Evolent's faulty submission of encounter data during the alleged Class Period.  Lead Counsel's investigation significantly bolstered the strength of Plaintiffs' claims.  For example, the Court would later cite Plaintiffs' allegations about these penalty letters as a key component in establishing scienter.  *Plymouth County Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *35 (E.D. Va. Mar. 24, 2021) (Alston, Jr., J.).

## B.    The Pleading Stage

21.    On January 10, 2020, Lead Plaintiffs filed their Amended Class Action Complaint (the "Amended Complaint," ECF No. 38).

22.    On February 6, 2020, Defendants moved to dismiss the Amended Complaint.  ECF Nos. 48-51.  Plaintiffs filed their opposition on February 27, 2020, and on March 5, 2020, Defendants filed their reply.  ECF Nos. 54, 57.

23.    On May 7, 2020, Plaintiffs moved for leave to file the Second Amended Complaint ("SAC") after Passport's former Senior Director of Information Technology ("CW 5"), contacted Lead Counsel after reading a copy of the Amended Complaint.  ECF Nos. 60, 61.  CW 5 provided information which Plaintiffs believed supported their allegations that Defendants knew that there were problems with the Valence system that Evolent used to process claims for Passport, that Evolent received copies of the penalty letters, and that Evolent's claims processing failures were one of the causes of Passport's financial distress.  ECF No. 69 at ¶90.  Although Defendants

opposed amendment, after full briefing of the motion, on June 5, 2020, the Court granted this motion and directed that the SAC be made effective. *See* ECF Nos. 68, 69.

24.     The SAC alleged that, for a class period spanning March 3, 2017 through May 28, 2019, Evolent claimed that its business model was predicated on its ability to lower clients' clinical and administrative costs, but that these statements were materially false and misleading, as shown by the events at Evolent's largest client, Passport. *See e.g.*, ECF No. 69 at ¶¶3-4. Specifically, the SAC alleged that rather than lowering its clients' costs, Evolent overcharged Passport and provided deficient services, including switching Passport's claims processing to an Evolent-owned platform, Valence, that could not properly process Passport's claims. *See, e.g., id.* at ¶¶5, 62. The SAC alleged that Valence's improper submission of encounter data from claims to Kentucky was so deficient that Kentucky imposed, in aggregate, nearly a half billion dollars in penalties on Passport. *See, e.g., id.* at ¶154. The SAC further alleged that the combination of Evolent's inflated fees and its claims administration failures brought Passport to the brink of insolvency. *See, e.g., id.* at ¶9.

25.     The SAC alleged that the truth about Defendants' false statements was partially revealed on February 15, 2019, when Passport sued various Kentucky agencies and officials, claiming that Passport would be legally insolvent by March 1, 2019 without reversal of the rate cuts. *Id.* at ¶115. Evolent's stock price fell in response to this news. *Id.* The SAC further alleged that on February 26, 2019, Defendants denied that (i) they had any "broader exposure" to a Passport insolvency beyond lost revenues and (ii) they were considering taking a financial interest in Passport or otherwise bailing the plan out. *Id.* at ¶¶116-17. The SAC alleged that on May 29, 2019, the fraud was fully revealed when Evolent announced that it would pay $70 million for a 70% interest in Passport and provide "interim balance sheet support" as necessary for Passport to

10

meet its statutory capital requirements. *Id.* at ¶121. On this news, Evolent's stock price fell 29.3%. *Id.* at ¶122.

26.  On June 22, 2020, Defendants moved to dismiss the SAC, arguing first that most of the alleged misstatements were puffery and/or that many of the statements were forward-looking statements about what Evolent hoped to achieve for its customers and were sufficiently accompanied by cautionary language warning of any risks. *See*, ECF No. 75 at 14-17. Second, Defendants contended that the SAC did not adequately allege scienter, because it failed to plead that Defendants had a motive to engage in fraud, that any confidential witnesses had a sufficient connection to Defendants, or that Evolent planned to acquire Passport prior to when Passport began soliciting bids from multiple parties. *See, e.g.*, *id.* at 27-35. Finally, Defendants argued that there was no loss causation, because the information about any potential overcharging of Passport was made public in the January 25, 2019 *Insider Louisville* article, and Evolent's share price did not decline immediately following the publication of this article. *See, e.g.*, *id.* at 36-38.

27.  On July 6, 2020, Plaintiffs filed their opposition. ECF Nos. 80-81. Plaintiffs argued that Defendants' statements about cost-cutting were false because Evolent raised Passport's expenses while it employed a deficient class processing platform that led to the imposition of nearly a half billion dollars in penalties and ultimately to significant cuts to the Medicaid rates paid by Kentucky. ECF No. 80 at 19-23. Plaintiffs further argued that the statements about the Valence's implementation were false because the Valence system allegedly could not perform its most basic functions, resulting in the penalties assessed by Kentucky, and because confidential witness accounts corroborated that Valence's launch was a "disaster." *Id.* at 24-25. Further, Plaintiffs contended that the statements related to bailing out Passport were false because Evolent

11

knew it would have to bail Passport out no later than as January 2019, and that these statements were not forward-looking because they concerned the then-current state of affairs. *Id.* at 27-28.

28.     The opposition also argued that the SAC adequately demonstrated a strong inference of scienter through the detailed accounts of former high-level Passport and Evolent employees and Defendants' own admissions that, among other things, Evolent was a "co-owner" of Passport and had "joint governance" with the plan. *Id.* at 32-37.  Finally, Plaintiffs argued that the SAC sufficiently alleged loss causation because, among other things, Defendants had flatly denied in the January 25, 2019 *Insider Louisville* article that they were overcharging or harming Passport, and because the facts showed that Evolent's share price dramatically declined when new material information about Passport's financial condition and the negative impact of Evolent's practices on Passport was revealed. *Id.* at 38-40.

29.     On July 17, 2020, Defendants filed their reply.  ECF No. 85.

30.     On March 24, 2021, the Court issued an order granting in part and denying in part Defendants' motion to dismiss the SAC. *Plymouth County Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680 (E.D. Va. Mar. 21, 2021) (Alston, Jr., J.).   The Court dismissed more than three quarters of the alleged false statements, finding many of them to be inactionable vague statements of corporate optimism. *Id.* at *27.  The Court also dismissed all false statements specifically about the integration and performance of the Valence claims processing platform at Passport, and substantially reduced the operative class period to just under 9 months (September 5, 2018 through May 28, 2019) from the more than 26-month period alleged in the SAC (March 3, 2017 through May 28, 2019). *Id.* at *27-28.  Nonetheless, the Court sustained as actionable four sets of false statements, including two about specific cost savings Evolent provided to Passport, the bailout-related statements from February 26, 2019, and a statement from May 7, 2019 about Passport's

12

financial progress. *Id.* at 33. Critically, the Court found that "Plaintiffs have narrowly met their burden as to the scienter." *Id.* at *36. The Court premised this finding in large part on "the penalty letters [that] 'documented Valence's inability to execute its most basic function—submitting accurate and timely encounter data to Kentucky,'" and noted that Plaintiffs alleged that CW 5 "indicated that these letters 'absolutely were' sent to Evolent's executives[.]" *Id*. at *35. Thus, had Plaintiffs not uncovered these penalty letters through an aggressive program of open records requests and/or had Defendants succeeded in preventing Plaintiffs from filing the SAC to add compelling allegations specifically cited by the Court as showing an inference of scienter, the litigation might not have survived the first motion to dismiss.

31.     Also, importantly, the Court determined that Plaintiffs had sufficiently alleged loss causation because "Plaintiffs allege that the truth that Defendants fraudulently withheld from the market is that Evolent did not lower administrative and clinical costs for its clients—namely Passport—but instead, Evolent raised costs for its clients, as demonstrated by the circumstances with Passport," as evidenced in the two corrective disclosures. *Id.* at *38.

32.     On April 1, 2021, Defendants and Lead Plaintiffs moved for reconsideration of portions of the Court's order on the motion to dismiss the SAC. ECF Nos. 109-110, 111-112.

33.     While discovery was underway, on October 19, 2021, Plaintiffs filed their original motion for class certification, together with the expert report of Mr. Coffman who opined on market efficiency. ECF Nos. 134-136.

34.     Plaintiffs filed a notice of their intent to amend the SAC on November 4, 2021, to incorporate new allegations about documents identified by Lead Counsel from Defendants' productions and to allege three new false statements related to savings Evolent claimed to have provided to Passport. ECF No. 139. Consequently, the Court stayed the deadlines related to class

13

certification.  ECF No. 142.  Plaintiffs then moved for leave to amend the SAC on November 17, 2021, attaching a copy of the proposed TAC.  ECF Nos. 147-150.  On December 2, 2021, Magistrate Judge Buchanan granted Plaintiffs' motion, thereby staying discovery.  ECF No. 156.

35.    In the TAC, Plaintiffs cited a number of documents produced in discovery as additional evidence supporting their claims and contentions.  *See*, *e.g.*, ECF No. 158, at ¶¶138-159.  Specifically, the TAC repleaded all false statements found to be actionable as well as one statement made by Defendant Blackley on May 11, 2018 that Plaintiffs contended the Court had not specifically addressed in its prior order.  *Id.* at ¶¶165, 169, 172-3, 177-9, and 183-4.  The TAC also alleged three new false statements in which Defendants claimed to have provided $100 million or more in savings to an unnamed "full-risk partner," which Plaintiffs contended, and Defendants did not contest, was in fact Passport.  *Id.* at ¶¶162 and 166.

36.    Defendants moved to partially dismiss the TAC on December 21, 2021, electing not to challenge the Court's prior finding that two alleged false statements were actionable.  ECF Nos. 161-168.  Defendants argued that newly alleged statements in Company presentations referring to the unnamed full-risk partner were not actionable, because there could be no loss causation when it had never been revealed that the partner was Passport; the alleged corrective disclosures did not reveal anything about the falsity of Defendants' statements regarding cost savings at Passport; and the statements could not be material when they each appeared on one slide in long Company presentations.  *See*, *e.g.*, ECF No. 163 at 10-16.

37.    As to Defendant Blackley's May 11, 2018 statement, Defendants asserted that this statement was not false because Blackley had merely recited facts from Passport's audited financial statements.  *Id.* at 18-25.  Defendants also argued that Plaintiffs had not properly alleged loss causation for this statement, because neither alleged corrective disclosure had revealed that a

14

"5% improvement in MLR" or a "$75 million" improvement to "Passport's bottom line" were false. *Id.* at 25-26. Finally, Defendants argued that Defendant Williams' alleged false statements made on February 26, 2019 and May 7, 2019, which previously had been found actionable by Judge Alston, should be dismissed as they were properly protected under the PSLRA safe harbor. *Id.* at 26-34.

38.    Plaintiffs opposed on January 28, 2022, arguing that the TAC established loss causation for the newly alleged statements on the savings Evolent provided to an unnamed full-risk partner, since these statements were virtually identical to the September 5, 2018 statement that the Court had already found actionable and because the fact that Passport was not identified by name did not negate loss causation. ECF No. 179 at 22-23. Plaintiffs also contended that these statements were material because Evolent highlighted the purported "$100 million in identified annualized savings" throughout the Class Period to tout Passport as an example of the success of Evolent's business model. *Id.* at 18-20.

39.    Plaintiffs argued that Defendant Blackley's May 11, 2018 statement on a "$75 million improvement" to Passport's "bottom line" was false based on documents produced by Defendants and because there was no ambiguity that "bottom line" meant the net result as evidenced by Blackley's own comments that "taking away the net result is critical." *Id.* at 25. Finally, Plaintiffs asserted that, as previously found by the Court, Defendants' February 26 and May 7, 2019 statements were actionable. *Id.* at 29-34.

40.    Defendants filed their reply on February 10, 2022. ECF Nos. 182-183.

41.    On March 18, 2022, this Court conducted a hearing on Defendants' partial motion to dismiss the TAC, at the conclusion of which it ruled on the Parties' partial motions for reconsideration and Defendants' partial motion to dismiss, thereby lifting the second discovery

stay.  ECF Nos. 189-190, 193.  The Court issued a decision from the bench, which found the newly added statements on January 10, 2018 and May 11, 2018 about savings Evolent had provided to an unnamed full-risk partner as actionable, declined to reconsider Judge Alston's earlier decision that Defendant Blackley's May 11, 2018 was inactionable, and declined to reconsider Judge's Alston's decision that Defendant Williams' February 26, 2019 and May 7, 2019 statements were actionable.  As a result, the operative class period began on January 10, 2018.

### C.   Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts

42.   Given the length of the Class Period, the scope of Lead Plaintiffs' claims, and the complex subject matter at issue in this Action, discovery was a considerable undertaking.  Among other things, Plaintiffs served document requests on Defendants, subpoenaed documents from non-party Molina Healthcare ("Molina," which acquired Passport's assets after the end of the Class Period), and the Kentucky Cabinet for Health and Family Services.  Plaintiffs ultimately obtained, produced, and reviewed a total of over 786,000 pages of documents.  The amount of work done by Lead Plaintiffs during this time period is extraordinarily compelling evidence of Lead Plaintiffs' vigorous prosecution of and commitment to this Action, as set forth below.

### 1.   Discovery Obtained from Defendants

43.   Plaintiffs served Defendants with their First Request for Production of Documents on September 7, 2021.  These 59 requests sought, among other things, documents concerning: (i) Evolent's control over Passport, (ii) Evolent's acquisition of Passport; (iii) the services Evolent provided to Passport and the fees charged; (iv) the re-badging of Passport employees as Evolent employees; (v) Evolent's statements to the media and analysts; (vii) Passport's reporting of encounter data and the encounter penalty letters it received; and (viii) the alleged false statements. Defendants served their responses and objections to Plaintiffs' requests on September 22, 2021.

44.     In response to Plaintiffs' requests, Defendants produced e-mails and attachments from the custodial files of individual custodians.  In September 2021, Plaintiffs subpoenaed Passport's new owner, Molina, for Passport's records and other relevant documents.  Molina served responses and objections to the subpoena on September 22, 2021.  Lead Counsel met and conferred with Defense Counsel and Molina's outside counsel, who each represented that Molina would turn Passport's documents over to Evolent for review and production.  Defendants ultimately agreed to produce responsive documents formerly in Passport's possession for a number of Passport custodians, including Passport's former most senior executives and other high-ranking former Passport employees.  Defendants made multiple document productions (including productions on behalf of Molina and Passport and on behalf of Defendants' experts), beginning on October 7, 2021, and concluding on June 24, 2022, which collectively comprised approximately 663,000 pages of information contained in approximately 61,000 documents.

45.     Beginning in October 2021, the Parties frequently exchanged written correspondence and held numerous meet-and-confer conferences to negotiate the appropriate scope of discovery.  Those interactions involved, among other things, lengthy disputes about which custodians to search for relevant documents, which search terms should be employed, the relevant time period for discovery, and the scope of productions from various custodians.

46.     Plaintiffs continued to actively press discovery issues with Defendants throughout the litigation, including challenging and preparing to move to compel for documents from a potentially critical custodian that had not been produced, which Defendants claimed could not be located.  As a result of Plaintiffs' efforts, Defendants tracked down copies of these documents through alternative means and ultimately produced a total of 590 documents from this custodian.

17

47.     Plaintiffs also raised multiple challenges to Defendants' claims of privilege over certain documents.  For example, in December 2021, Defendants claimed to have documents that proved that their statements about cost savings at Passport were based on valid assessments by their internal actuaries.  As a result of Plaintiffs' efforts, Defendants agreed to de-designate 671 purportedly privileged documents, spanning more than 7,300 pages, pertaining to this defense.

48.     In May 2022, Plaintiffs challenged the privilege designations of nearly 1,500 documents from Defendants' privilege log.  After a vigorous exchange of correspondence, Defendants agreed to produce approximately 585 pages of these documents.

49.      Finally, in July 2022, Plaintiffs contended that if Defendants were to make an advice of counsel defense, they would have to provide certain communications with counsel.  This dispute ultimately was not resolved due to the Parties arriving at the Settlement, but had the case continued to summary judgment, this could have been a critical point of contention going forward.

50.     In sum, Plaintiffs' diligent efforts during discovery and their willingness to move to compel on multiple occasions led Defendants to produce documents that were critical to prosecuting their claims.

51.     Plaintiffs also served interrogatories on all Defendants on May 25, 2022, consisting of fifteen questions asking, among other things, for all material facts supporting Defendants' asserted defenses, the truth of all the surviving alleged misstatements, and Defendants' contemporaneous belief that the statements were true when made.  Defendants served their initial responses and objections on June 9, 2022.

### 2.     Discovery Obtained from Third Parties

52.     In addition to Molina, as noted above, Lead Plaintiffs also subpoenaed the Kentucky Cabinet for Health and Family Services in May 2022 and received 73 documents

18

spanning 10,600 pages. Defendants also produced to Plaintiffs approximately 8,400 documents spanning 81,000 pages—an unusually voluminous amount—which they obtained by subpoenaing Plaintiffs' investment managers, asset managers, and custodian banks.

### 3.    Discovery from Lead Plaintiffs

53.    On September 8, 2021, Defendants served their first set of document requests on Lead Plaintiffs. Numbering 65 separate and distinct requests (not including subparts), Evolent sought wide-ranging information concerning this Action, Lead Plaintiffs' investments, their roles as Lead Plaintiffs and proposed Class Representatives, and multiple other topics.

54.    Also on September 8, 2021, Defendants served their first set of interrogatories on Plaintiffs, consisting of 13 questions asking for information supporting the false statements alleged in the complaint, the Confidential Witnesses, and Plaintiffs' investments.

55.    Lead Plaintiffs served their objections and responses to Defendants' discovery requests on September 23, 2021. Following service, the parties met and conferred regarding the substance and scope of Lead Plaintiffs' production. Eventually, the parties reached a general consensus concerning the breadth of relevance, identity and number of custodians, limited set of search terms, and estimated timing of Plaintiffs' productions.

56.    Plaintiffs and Lead Counsel expended significant effort on collecting, reviewing, and producing documents in response to Defendants' discovery requests. Ultimately, Plaintiffs collectively produced 850 documents totaling over 18,000 pages. Plaintiffs also ultimately produced on behalf of their experts over 900 documents totaling over 13,000 pages.

### 4.    Lead Counsel's Document Review and Deposition Preparations

57.    Collectively, the Defendants and third parties produced approximately 755,000 pages of documents to Lead Plaintiffs in discovery, with the first production on October 7, 2021

19

and the last production on June 24, 2022.  Lead Counsel devoted substantial time to reviewing and analyzing these documents.  Lead Counsel generated an effective and efficient discovery plan and took significant steps designed to quickly identify the custodians and documents most important to uncovering the facts at the heart of the Action.  Accordingly, the extensive and targeted discovery work conducted by Lead Counsel was crucial to achieving the highly favorable Settlement for the Class.

58.     Lead Counsel's discovery plan leveraged a sophisticated electronic document hosting system, and a dedicated team of attorneys with substantial experience in electronic document discovery, deposition, and trial preparation.  Attorneys on the litigation team for the Action prepared and continuously updated a highly detailed document review coding manual and protocol, which included detailed case information as well as instructions on coding documents.  Document reviewers were trained to code documents for their level of responsiveness or importance to the case (*e.g.*, "Hot," "Warm," "Relevant," "Irrelevant"), for case issues (*e.g.*, "Passport's Financial Performance/Reporting," "Encounter Data/Penalties," and "Scienter"), for review by experts, and for potential use with particular deponents.  Throughout document discovery, senior attorneys in the litigation team met regularly with staff attorneys to ensure their understanding of the case and discuss key facts uncovered by the review, and staff attorneys were instructed to prepare detailed memoranda on potential witnesses and subject matters of importance to assist senior attorneys in their preparations for depositions and trial.

59.     Many of the documents produced to Plaintiffs were substantively complex and laden with healthcare and financial jargon and terms of art.  Throughout the course of discovery, Lead Counsel consulted with Mr. Chad Coffman, CFA and his team at GEG—who specialize in assessing economic issues related to market efficiency, loss causation, and damages.  Lead

Counsel also consulted with Adam E. Block, PhD, an expert on Medicaid plan administration, for assistance in understanding these documents and the key issues in the case. Finally, Lead Counsel consulted with Illocution, LLC ("Illocution"), a discovery consultant that performs linguistic analyses of electronic productions, to aid in quickly identifying the most relevant documents through targeted searches based on parameters and topics devised by senior attorneys on the litigation team. Lead Counsel also developed and continuously updated reference resources to aid members of the document review team, including chronologies of significant events, lists of key players, and a glossary of technical terms and acronyms utilized in the health insurance industry.

### 5. Deposition Discovery

60. Depositions provided a critical component of Lead Plaintiffs' efforts to develop the evidentiary record, both in terms of fact-gathering and solidifying Plaintiffs' legal arguments. To prepare for fact witness depositions, attorneys on the review team were assigned to conduct an in-depth review of the custodial files of each potential deponent and identify key documents and issues for that deponent. During this process, attorneys met numerous times to discuss potential deposition candidates, review samples of relevant documents for these candidates, and debate the relative merits of each.

61. From April 21, 2022 through June 28, 2022, the Parties conducted a total of 23 depositions, consisting of thirteen fact depositions (including all Individual Defendants, five other current and former senior Evolent executives, Passport's former CEO, CFO, and COO, a Passport board member, and the CEO of Wakely), two Rule 30(b)(6) depositions of representatives of Lead Plaintiffs, two Rule 30(b)(6) depositions of representatives of Lead Plaintiffs' investment managers, and six expert depositions. These depositions were conducted remotely and/or in-person in states across the country, including New York, Florida, Illinois, Virginia, Washington,

D.C., Kentucky, Texas, and Colorado.  In sum, Lead Plaintiffs' fact witness depositions resulted in over 3,500 pages of testimony and about 375 exhibits.

### 6.   Experts and Supplemental Responses to Interrogatories

62.   The Parties served and/or filed eleven expert reports (inclusive of those filed in connection with Plaintiffs' class certification motion and Defendants' opposition thereto): three reports prepared by Chad Coffman, CFA and served and/or filed on behalf of Lead Plaintiffs on October 19, 2021, April 8, 2022, and May 27, 2022; two reports prepared by Adam E. Block, PhD and served on behalf of Lead Plaintiffs on May 27, 2022 and June 14, 2022; two reports prepared by Lucy P. Allen and served and/or filed on behalf of Defendants on May 20, 2022 and June 14, 2022; two reports prepared by Kevin O'Brien, CFE, CICA, CVA, MAFF and served on behalf of Defendants on May 27, 2022 and June 14, 2022; and two reports prepared by Robert G. Manz, CPA/CFF, CFA, CFE and served on behalf of Defendants on May 27, 2022 and June 14, 2022.

63.   Each expert was subsequently deposed.  Mr. Coffman was deposed on May 9 and June 22, 2022.  Dr. Block was deposed on June 28, 2022.  Ms. Allen was deposed on June 15, 2022.  Mr. O'Brien was deposed on June 22, 2022.  Mr. Manz was deposed on June 27, 2022.

64.   On June 29, 2022, the Parties exchanged comprehensive supplemental responses to interrogatories identifying documents and testimony that supported their contentions.

### D.   Renewed Briefing of Class Certification

65.   On April 8, 2022, Plaintiffs filed a renewed motion for class certification.  ECF Nos. 195-197.  On May 20, 2022, Defendants filed their opposition.  ECF Nos. 208, 213, 214.

66.   Among other arguments, Defendants argued that Plaintiffs could not show price impact for any alleged false statement made before February 26, 2019, because (i) there were no statistically significant increases in Evolent's share price after any of the sustained false

statements, and (ii) because neither of the two alleged corrective disclosures revealed anything about the falsity of statements relating to Evolent's alleged cost savings at Passport (noting in particular that analysts attributed both drops to non-fraud related reasons, such as questions about Evolent's business model). *See*, ECF No. 208 at 15-16, 20-28.

67.    On June 3, 2022, Defendants moved for leave to present live expert testimony at the scheduled class certification hearing and to file a supplemental brief opposing class certification. ECF Nos. 218-220. On June 8, 2022, Plaintiffs filed their opposition. ECF No. 221. On June 9, 2022, Defendants replied. ECF No. 222. To resolve this motion, the Court conducted a status conference on June 14, 2022, at which time the Court: (i) denied Defendants' motion; (ii) rescheduled the hearing on Plaintiffs' motion for class certification to July 8, 2022; (iii) directed the Parties to confer and file a proposed schedule for summary judgment briefing; and (iv) suspended the June 30, 2022 pretrial conference. ECF Nos. 223-225.

68.    On June 17, 2022, Plaintiffs filed their reply in support of their motion for class certification. ECF Nos. 231-233. Plaintiffs argued that Defendants' price impact arguments were "doomed" because Defendants had the burden to show that there was a complete lack of price impact whatsoever and it was undisputed that there were statistically significant stock price drops after both alleged disclosures   ECF No. 232 at 10-11. Plaintiffs also argued that Defendants had failed to show a lack of price impact because, among other things: (i) the law does not require a corrective disclosure to mirror a false statement, and so therefore Evolent did not need to explicitly admit that Passport failed because of Evolent's mismanagement; (ii) the Court had already found that new information had been disclosed after the alleged disclosures; and (iii) the factual record made clear that the February 15, 2019 disclosure of the Passport complaint filing raised serious questions as to Passport's financial condition and whether Evolent was the cause of that distress,

23

and the May 29, 2019 disclosure showed that the real reason for the acquisition of Passport was its disastrous financial condition. *Id.* at 14-18.

69.     The Court conducted a hearing on July 8, 2022 on the motion for class certification, but did not issue a ruling from the bench. ECF Nos. 239-40. At the time of the Parties agreed to the Settlement, the motion was still pending and *sub judice*.

**E.     The Status of the Litigation Going into the Second Mediation Session**

70.     By the July 8, 2022 mediation, all fact and expert discovery had concluded. The Parties were awaiting the Court's decision on Plaintiffs' motion for class certification. In the event that the Parties were unable to resolve the Action at this mediation, Plaintiffs were in preparations for Defendants' anticipated motion for summary judgment. Plaintiffs were also preparing to move to exclude testimony of one or more of Defendants' experts and were preparing for similar motions to exclude testimony of one or both of their experts. To that end, the Parties had submitted a joint proposed schedule to the Court setting forth slightly competing proposed schedules, both of which contemplated a final hearing on these motions in October 2022. ECF No. 242.

**F.     The Parties' Mediation Sessions**

71.     After Plaintiffs first moved for class certification and while Plaintiffs were still actively pursuing fact discovery, the Parties agreed to participate in a private mediation. Over two mediation sessions, the Parties and Defendants' Directors and Officers liability insurers engaged in vigorous negotiations regarding a potential resolution of the Action.[4]

72.     The Parties engaged Mr. Jed D. Melnick, Esq. of JAMS to facilitate the mediations. Mr. Melnick serves as a Mediator and Special Master in complex business litigation matters. Since

---

[4] The mediation sessions are discussed below for the purpose of describing key events in this Action, and do not constitute a waiver of any privilege, doctrine, law, or rule protecting information from disclosure.

24

becoming a full-time mediator in 2005, Mr. Melnick has resolved over one thousand disputes, with an aggregate value in the billions of dollars.[5]

73.    On December 1, 2021, the Parties held their first mediation session.  In advance of the session, the Parties submitted and exchanged detailed mediation statements detailing the relevant facts and analyses concerning falsity, scienter, loss causation and damages.  During the session, Plaintiffs shared their positions and conveyed to the mediator their understanding of the strengths and weaknesses of the claims and defenses in this Action, as well as potential sources of recovery.  However, at the conclusion of this session, it was clear that the Parties maintained highly divergent views on the strengths and weaknesses of their claims and defenses, as well as the settlement value of the Action.  The Parties did not reach a settlement at that time, however the Parties remained in dialogue with the mediator about a potential resolution of the Action.

74.    On July 11, 2022, the Parties participated in a second remote, full-day mediation session before Mr. Melnick, with the Parties again submitting written statements and exhibits in support of their respective positions and providing detailed presentations on a variety of litigation issues.  At the conclusion of this mediation, Mr. Melnick delivered to the Parties a mediator's recommendation to settle this Action for $23.5 million, which the Parties thereafter accepted.

**G.      The Settlement Agreement and Preliminary Approval**

75.    After agreeing on the principles of the proposed Settlement, the Parties engaged in extensive negotiations regarding: the material terms of the Stipulation; the Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from the Settlement Class reach a certain threshold—a standard agreement in securities class action

---

[5] *See* Mr. Melnick's bio, available at https://www.jamsadr.com/melnick/.

25

settlements generally called a "blow provision"; and various supporting documents, including proposed Class notices and proposed orders for the Court.

76.     On August 2, 2022, Plaintiffs filed their motion for preliminary approval of the proposed Settlement, along with the memorandum in support, the Stipulation, and its exhibits. ECF Nos. 243-246.  On August 9, 2022, the Court granted Plaintiffs' motion, authorized Notice for the proposed Settlement to be sent to potential members of the Settlement Class, and set a Settlement Hearing for November 18, 2022 (the "Preliminary Approval Order," ECF No. 247).

## III.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

77.     The $23,500,000 cash Settlement was the result of arm's length negotiations between experienced counsel, conducted under the auspices of Mr. Melnick, a well-respected independent mediator with extensive experience mediating securities class actions.   The Settlement eliminates the very real risk of protracted litigation against Defendants under circumstances where a favorable recovery—or any recovery at all—cannot be assured.  Lead Plaintiffs and Lead Counsel accordingly believe that the Settlement is fair, reasonable, and an excellent result for the Class, considering the risk of recovering a lesser amount, or nothing at all, after substantial delays, possibly lasting several years.

### A.     Reasons for the Settlement

78.     The Settlement provides the Class with an immediate and certain cash benefit of $23.5 million, representing a high percentage (as much as 67%) of the maximum likely recoverable damages for the Class at trial, which Plaintiffs' expert estimated ranged from $35 million to $195 million.  The $195 million figure was calculated under the best-case scenario, *i.e.*, if Plaintiffs' claims were able to survive class certification and summary judgment largely intact.  However, there were substantial risks that the Court could have issued unfavorable rulings at class

certification and/or summary judgment, which could greatly impact the amount of possible damages (if any) that Plaintiffs could recover.

79.     Indeed, while Lead Plaintiffs and Lead Counsel believe that the claims asserted in this action are meritorious, continued litigation against Defendants posed significant risks that made any recovery from them uncertain.  For example, Lead Plaintiffs were aware of the significant challenges Defendants raised on the key issues of falsity, scienter, loss causation, and damages.  Although Lead Plaintiffs successfully survived the motion to dismiss the SAC, the Court dismissed more than three-quarters of the alleged false statements (16 out of 20) and eliminated one of Plaintiffs' entire theories of the fraud relating to Defendants' statements about Evolent's Valence claims processing platform.  The Court's decision dramatically reduced the length of the putative class period to just under 9 months from the more than 26-month period alleged.  While Plaintiffs were later able to successfully allege two more false statements and extend the operative class period by nearly eight more months (i.e. nearly doubling it), the second motion to dismiss order did not fully resolve the key issues listed above, and the attendant risks concerning these issues did and would have continued to resurface at every subsequent stage of the litigation—at class certification, on summary judgment, at trial, and on appeal.  Had any of Defendants' arguments been accepted in whole or in part, any potential recovery would have been drastically reduced or eliminated altogether.

80.     Moreover, Plaintiffs were aware that Defendants' damages expert had calculated maximum possible damages well below the maximum aggregate damages that Plaintiffs' expert had calculated. Defendants' expert also presented scenarios that the Class had suffered no cognizable damages as a result of Plaintiffs' allegations—which would undoubtedly result in a "battle of the experts" at trial with no certainty as to which of the experts the jury would credit.

27

81.     Furthermore, the proceeds of Defendants' insurance policies were rapidly wasting. Continued litigation likely could have significantly reduced the remaining proceeds and thereby hampered the Settlement Class in obtaining a larger recovery than the Settlement Amount, even should the Settlement Class prevail in full at summary judgment or trial.  Thus, there were very significant risks attendant to the continued prosecution of the Action against Defendants.

82.     Given these risks and based on their participation throughout the prosecution and resolution of the claims in the Action, Lead Plaintiffs and Lead Counsel fully endorse the Settlement.  *See* Exs. A and B (Lead Plaintiffs' Declarations) attached hereto.  Lead Plaintiffs are the Court-appointed Settlement Class representatives and are sophisticated institutional investors who have actively overseen the prosecution of this Action for nearly three years and who understand their fiduciary duties to act in the best interests of the Settlement Class.

83.     Lead Counsel, Saxena White, is a law firm that specializes in complex securities class action litigation and is highly experienced in such litigation.  *See* Ex. 3 to Ex. F (Saxena White firm resume).  Based on their experience and knowledge of the facts and applicable law in this Action, Lead Counsel and Lead Plaintiffs have determined that the Settlement is in the best interest of the Settlement Class.

**B.     Lead Plaintiffs' Compliance with Court's Preliminary Approval Order in Administering Notice**

84.     As required by the Court's Preliminary Approval Order, by September 7, 2022, Plaintiffs, through the Court-approved Claims Administrator A.B. Data notified potential Class Members of the Settlement by mailing them a copy of the Notice.  *See* Ex. D.

85.     A.B. Data used several resources to reasonably identify Settlement Class Members. For example, under the Preliminary Approval Order, Evolent was required to provide A.B. Data records concerning the identity and last known address of potential Settlement Class members.

The Preliminary Approval Order also requires brokers or nominees to (i) request additional copies of the Notice to send to the beneficial owners of the shares, or (ii) to provide A.B. Data with the names and addresses of such persons.  A.B. Data also sent the Notice to entities identified on a proprietary list maintained by them of the most common banks, brokers, and other nominees.  In the aggregate, as of October 7, 2022, A.B. Data had disseminated 40,706 copies of the Notice to potential members of the Settlement Class and their nominees.  *See* Ex. D at ¶10.

86.    In addition, on September 19, 2022, the Summary Notice was published through *Investor's Business Daily* and over *PR Newswire*.  Information regarding the Settlement, including copies of the Notice and Claim Form, was posted on the website established by A.B. Data specifically for this Settlement.  The settlement website also provides potential Class Members with information concerning the Action and access to downloadable copies of the Notice, Claim Form, Stipulation of Settlement, Preliminary Approval Order, and redacted TAC.[6]  Class Members also have the option to submit a claim online at the website.  A.B. Data also reserved a toll-free phone number for the Settlement, (877) 354-3840.

87.    As explained in the Memorandum, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances and complies with the Court's Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, and due process.

### C.    The Plan of Allocation

88.    Plaintiffs have proposed a plan to allocate the proceeds of the Net Settlement Fund among members of the Settlement Class who submit valid proofs of claim.  The objective of the proposed Plan of Allocation (the "Plan") is to equitably distribute the Settlement proceeds, on a

---

[6] Available at www.EvolentSecuritiesLitigation.com.

*pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

89.     Plaintiffs engaged their damages and loss causation expert to prepare the Plan.  In developing the Plan, Plaintiffs' expert calculated the amount of estimated artificial inflation in the per share closing price of publicly traded Evolent common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements.  In doing so, Plaintiffs' expert considered price changes in Evolent common stock in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces.

90.     The Notice set forth and explained the proposed Plan to members of the Settlement Class.  In response to the mailing of over 40,000 Notices, there have been no objections to the proposed Plan, further underscoring its fairness.

## IV.     THE FEE AND EXPENSE APPLICATION

91.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Plaintiffs also submit their application to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees and reimbursement of litigation expenses.

92.     As set forth in the Memorandum, the fee and expense request amply meets all of the relevant *Cendant* and *Barber* factors that courts in the Fourth Circuit consider in evaluating such requests. Based on consideration of these factors and on the additional legal authorities set forth in the Memorandum, Lead Plaintiffs and Lead Counsel respectfully submit that the requested one-third fee is fair and reasonable and should be granted.

93.     As detailed above, the recovery obtained for the Class was the result of thorough and diligent prosecutorial and investigative efforts, motion practice, extensive discovery efforts, and hard-fought settlement negotiations.  As a result of this Settlement, thousands of Settlement

Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or a significantly lower recovery) in the absence of a settlement.

94.     With no promise of recovery, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Securities class actions require substantial up-front costs.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires.  Lead Counsel not only had to pay for their standard overhead expenses during the entirety of the litigation—including the time of numerous highly qualified and experienced attorneys—but had to advance all costs and expenses, including substantial expert and electronic discovery costs, all without a guarantee of any recovery.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis, which heavily supports the requested fee.

95.     Additionally, the risks undertaken, and difficulties presented in a complex securities class action such as this one, favor approval of the requested fee award.  As detailed above, and in the Memorandum, the Action involved challenging issues of law and fact that presented considerable risk to Plaintiffs' case.  Thus, when Lead Counsel undertook this engagement, there was no assurance that Lead Counsel would recover any payment for their services.  Notably, by the end of 2021, 48% of securities class actions filed in 2019 (like this one) had been dismissed—twice the number of cases that had settled to that point.[7]  *See also Genworth*, 210 F. Supp. 3d at 844 ("Even before trial, [] 54% of securities class actions cases are dismissed").

---

[7] Cornerstone Research, Securities Class Action Filings 2021 Year in Review, at 18, available at https://www.cornerstone.com/wp-content/uploads/2022/02/Securities-Class-Action-Filings-2021-Year-in-Review.pdf

96.      Indeed, as discussed above, and in the Memorandum, Defendants mounted significant challenges at multiple stages of the litigation.  Had Defendants been fully successful in any one of these efforts, Plaintiffs' case could have failed in its entirety, likely resulting in either no recovery or significantly smaller one. Thus, Lead Counsel's success in repeatedly withstanding Defendants' motions and arguments is testament to Lead Counsel's skill and also weighs heavily in favor of the requested fee.

97.      In addition, the quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by King & Spalding LLP, a 1,200-attorney firm, under the direction of the co-chair of its Corporate & Securities Litigation Practice, who personally took an extensive and active role in the Action, including taking or defending several depositions.[8]  Defendants were also represented by Hirschler Fleischer P.C., a 90-attorney Virginia firm with extensive experience in litigation practice in the District going back to 1946.[9]  Despite this opposition, Lead Counsel was able to attain this outstanding Settlement.

98.      Furthermore, "[f]ee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one." *Celebrex*, 2018 WL 2382091, at *5 (awarding one-third of $94 million recovery as an attorneys' fee award); *GTT Communications*, 2021 WL 1659848, at *5 (awarding one-third fees on $25 million recovery in a securities class action); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding fees of one-third in $163.5 million recovery); *Seaman*, 2019 WL 4674758, at *5 (awarding one-third of $54.5 million recovery); *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *9 (D. Ariz. Apr. 20,

---

[8] *See* https://www.kslaw.com/pages/about.

[9] *See* https://www.hirschlerlaw.com/firm.

32

2012) (awarding fees of one-third of $145 million recovery); *Thorpe v. Walter Investment Management Corp.*, 2016 WL 10518902, at *11 (S.D. Fla. Oct. 17, 2016) (awarding fees of one-third of $24 million recovery in a securities class action); *In re Star Sci., Inc. Sec. Litig.*, 2015 WL 13821326, at *1 (E.D. Va. June 26, 2015) (Gibney, Jr., J.) (awarding one-third of recovery in securities class action); *see also* Memorandum at 25 and cases cited therein.

99.    A lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request.  As set forth in Exhibits E, F, and G, Plaintiffs' Counsel expended a total of 20,401.25 hours in the investigation, prosecution, and resolution of this Action from inception up through September 30, 2022.  The resulting lodestar is $11,036,633.75.  In light of this, the requested fee of one-third of the Settlement Fund yields a negative multiplier of 0.71—well below the range of multipliers awarded in this Circuit and around the country in comparable contingent securities and other complex class actions.  *See, e.g., Genworth*, 210 F. Supp. 3d at 845 ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar multipliers"); *Seaman*, 2019 WL 4674758, at *6 ("lodestar multipliers 'on large and complicated class actions have ranged from at least 2.26 to 4.5'" and awarding a one-third fee equal to a 2.89 multiplier in a $54.5 million class action recovery); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *13 (S.D.N.Y. May 9, 2014) ("negative multiplier [is] a 'strong indication of the reasonableness of the [requested] fee'"); *Guevoura Fund Ltd.*, 2019 WL 6889901, at *18 ("a very significant negative multiplier [] militates very in favor of the reasonableness of the fee request").

100.    Furthermore, Lead Counsel's hourly rates are the same as, or comparable to, the rates submitted by comparable firms for lodestar cross-checks in other securities and other complex class action fee applications that have been granted in this District, Circuit, and others. *See, e.g., GTT Communications*, No. 1:19-cv-00982-CMH-MSN, 2021 WL 1659848, at *5-6 and

33

ECF No. 93-4, at 7-8 (E.D. Va. Mar. 19, 2021) (approving Saxena White's 2021 rates of $365 to $895 for attorneys); *Seaman*, 2019 WL 4674758, at *5 (approving hourly attorney rates of between $395 and $900 as "in line with hourly rates used for Class Counsel in other cases" and finding that "[g]iven the complexity and risk involved, it is reasonable to use a non-local hourly rate"); *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031-TSE-MSN, 2019 WL 3317976, at *2 (E.D. Va. June 7, 2019) and ECF No. 453 at 9-10 (E.D. Va. Apr. 26, 2019) (Ellis, III, J.) (finding rates of up to $1,250 for attorneys as "fair and reasonable and consistent with awards in similar cases within the Eastern District of Virginia and the Fourth Circuit"). Indeed, Plaintiffs' Counsel's blended hourly rate of $541 underscores the reasonableness of the fee request and is well in-line with blended hourly rates approved in this Circuit. *See Sponn v. Emergent Biosolutions Inc.*, 2019 WL 11731087, at *2 (D. Md. Jan. 25, 2019) (awarding 33% in a securities settlement where counsel had a blended rate of approximately $646).

101. Each attorney that prosecuted this Action performed substantive work that directly benefited the Class. The time spent by each attorney was reasonable and beneficial to effective and efficient litigation, and was important to Lead Counsel's and Lead Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

102. Additionally, aside from drafting the motion for final approval, Lead Counsel will continue to work towards effectuating the Settlement in the event that the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, respond to shareholder inquiries, file a motion for distribution, and oversee the distribution process. No additional compensation will be sought for this work.

103.     In sum, based on the excellent results achieved for the Settlement Class, the quality of the work performed, and the risks of prosecuting the Action against Defendants, Lead Counsel submit that their request for a one-third fee award is fair, reasonable, and consistent with other similar fee awards in this District and Circuit.

104.     Lead Plaintiffs also request reimbursement of $918,539.45 in litigation costs and expenses, to also be paid from the Settlement Fund, well below the $1,000,000 upper limit set forth in the Notice disseminated to the Class.  *See* Exs. E, F, and G.

105.     Effective and zealous litigation of a securities class action through fact and expert discovery and class certification, up to the brink of briefing for summary judgment and against highly qualified and well-funded Defendants' counsel, requires an extensive commitment in resources and costs.  *See*, *e.g.*, *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings Inc.*, 2022 WL 4136175, at *1 (S.D.N.Y. Feb 14, 2022) (reimbursing counsel $1,290,333.96 in expenses for an $18 million settlement at the conclusion of discovery and after a decision on a contested motion for class certification).

106.     As noted above, Plaintiffs took, defended, or otherwise attended 23 depositions. Many of these depositions occurred fully or least partially in-person, such that that at least one attorney for Plaintiffs had to travel to the vast majority of these depositions, which were conducted in jurisdictions across the country.  Lead Counsel also had to advance fees for service of subpoenas, hosting, transcription, and video recording (which due to the compressed deposition schedule often needed to be obtained for added cost on a rush basis), largely paid to Veritext Legal Solutions, the same vendor utilized by Defendants.  To house and effectively manage the hundreds of thousands of pages of documents, Lead Counsel had to engage a discovery platform called Relativity from

35

KLDiscovery, and due to the volume of documents and the highly compressed schedule, Lead Counsel engaged a third-party service, Illocution, to help review the data.

107.    As also noted above, Lead Counsel also engaged two renowned experts in their fields: Mr. Chad Coffman, CFA, an economist at Global Economics Group specializing in market efficiency, loss causation, and damages; and Dr. Adam E. Block, an economist with significant government and industry experience specializing in health insurance economics, and their respective associates.  Not only did Mr. Coffman and his team provide consultative advice on loss causation and damages (including preparation of damage analyses that were used at the mediations and in the Settlement negotiations) throughout the Action, but he prepared two market efficiency reports and one report on loss causation and damages and was deposed twice.  Dr. Block prepared one report opining on the allegedly false savings statements and the allegedly false statement from the *Insider Louisville* article and one supplemental report on the same (which reports Lead Counsel believed would be critical to demonstrating falsity and scienter for those statements at summary judgment), attended the deposition of Defendants' rebuttal expert, Mr. O'Brien, and was deposed once.  Both of Plaintiffs' experts also reviewed and provided extensive consultative advice regarding the various experts' reports prepared on behalf of Defendants, and Dr. Block also aided Lead Counsel in understanding and analyzing certain complex documents and issues in the case pertaining to Medicaid plan administration and economics.

108.    Thus, Lead Counsel assumed the heavy burden of paying for hundreds of thousands of dollars of expenses in advance with no guarantee of ever seeing a penny of this back, and did so willingly because such expenses were absolutely necessary to achieving the outstanding recovery for the Settlement Class.  Accordingly, Lead Plaintiffs respectfully submit that the request for the reimbursement of Litigation Expenses should be approved.

109.     In addition, in accordance with the PSLRA, Lead Plaintiffs further request the reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class, in the amount of $15,885.27 in the aggregate—an amount that is less than the total estimated value of the time that the Lead Plaintiffs spent in overseeing and participating in the Action.  Lead Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging individual institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.  As set forth in their declarations, each of the Lead Plaintiffs has, throughout the litigation of the Action, been fully committed to pursuing the interests of the Class.

## V.     THE WHOLLY POSITIVE REACTION OF THE SETTLEMENT CLASS AND LEAD PLAINTIFFS' APPROVAL

110.     As mentioned above, consistent with the Preliminary Approval Order, a total of 40,706 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed one-third of the Settlement Fund, and payment of expenses in amount not greater than $1,000,000, which could include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to the representation of the Settlement Class.  *See* Ex. D, at Ex. A, Notice at ¶5. Additionally, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  *See* Ex. D, ¶11.  The Notice has also been available on the settlement website maintained by the Claims Administrator.  *Id*. at ¶12.

111.     Significantly, to date, not a single Member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or motion for an award of attorneys' fees and reimbursement of Litigation Expenses.  *See Seaman,* 2019 WL 4674758, at *3 ("[t]he absence of any objections to the settlement indicates that 'counsel have achieved a superior result for the class

37

and weighs in favor of their requested award'"); *Genworth*, 210 F. Supp. 3d at 844 ("A lack of objections by class members as to fees requested by counsel weighs in favor of the reasonableness of the fees").  This is particularly noteworthy given that the vast majority of the Settlement Class is comprised of sophisticated institutional investors who have the resources, professional staff, and financial motivations to object to the requested fee, if such an objection was warranted.

112.    Moreover, Lead Plaintiffs are themselves each sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action.  As discussed in the declarations submitted by Lead Plaintiffs, Lead Plaintiffs have evaluated Lead Counsel's fee and expense application and believe that Lead Counsel's requested fee is fair and reasonable in light of the work counsel performed, the risks of the litigation, and the results achieved.[10]  *See* Ex. A, ¶¶13-16; Ex. B, ¶¶13-16.  The support and approval of court-appointed lead plaintiffs weighs heavily in favor of approval of a fee request.  *See, e.g.*, *In re Genworth Fin. Sec. Litig.*, 2016 WL 7187290, at *2 (E.D. Va. Sep. 26, 2016) (Gibney, Jr., J.) ("Lead Plaintiffs are sophisticated institutional investors that have been directly and extensively involved in the prosecution and resolution of the Action and have a substantial interest in ensuring that any fees paid to the Plaintiffs' Counsel are duly earned and not excessive"); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("[P]ublic policy considerations support the award in this case because the Lead Plaintiff ... —a large public pension fund— conscientiously supervised the work of lead counsel and has approved the fee request").

---

[10] Lead Plaintiffs' retainer agreements provided that Lead Counsel could seek up to a one-third fee.  After the agreement to settle the Action was reached, Lead Plaintiffs again evaluated and approved Plaintiffs' Counsel's proposed one-third fee request.  *See* Exs. A and B at ¶¶13-16.

## VI.    CONCLUSION

113.    For all the reasons discussed above and in the Memorandum, Lead Plaintiffs and Plaintiffs' Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  In addition, as set forth above and in the Memorandum, Lead Plaintiffs and Plaintiffs' Counsel further submit that the requested fee in the amount of one-third of the Settlement Fund should be approved as fair and reasonable, the request for reimbursement of Litigation Expenses in the total amount of $918,539.45 should be approved, and Lead Plaintiffs' Representative Reimbursements of $7,335.27 and $8,550 should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of October, 2022.

*/s/ Lester R. Hooker*
Lester R. Hooker

39